FILED

JAN - 3 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

A CERTIFIED TRUE COPY
ATTEST

By Mecca Thompson on Jan 02, 2008

FOR THE UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Jan 02, 2008

FILED
CLERK'S OFFICE

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

FILED

JAN 1 5 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

**IN RE: PEREGRINE SYSTEMS, INC.,
SECURITIES LITIGATION**

MDL No. 1889

C.V 07-393

08cv 0008 BEN (RBB)/MAS

**TRANSFER ORDER**

**Before the entire Panel***: Defendant Arthur Andersen LLP and the New Jersey plaintiff have jointly moved, pursuant to 28 U.S.C. § 1407, to centralize this litigation for coordinated or consolidated pretrial proceedings in the Southern District of California. No party has responded to the motion.

This litigation presently consists of 35 actions listed on Schedule A and pending in two districts as follows: 34 actions in the Southern District of California and one action in the District of New Jersey.

After considering the argument of counsel, we find that the actions in this litigation involve common questions of fact, and that centralization under Section 1407 in the Southern District of California will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. All actions share factual questions arising out of alleged misrepresentations or omissions relating to improper accounting practices at Peregrine Systems, Inc., between 2000-02. Centralization under Section 1407 will eliminate duplicative discovery; avoid inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary.

We further find that the Southern District of California is an appropriate transferee district for this litigation, because (1) 34 of the 35 actions are already pending there, (2) relevant documents and witnesses are likely in proximity to Peregrine Systems, Inc.'s former headquarters in San Diego, California, and (3) the Section 1407 motion proposing selection of this district is unopposed.

I hereby attest and certify on  1/3/10
That the foregoing document is a full true and correct
copy of the original on file in my office and in my legal
custody.
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By B. Robinson          Deputy

---

* Judge Scirica took no part in the disposition of this matter.

- 2 -

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the action listed on Schedule A and pending in the District of New Jersey is transferred to the Southern District of California and, with the consent of that court, assigned to the Honorable Roger Benitez for coordinated or consolidated pretrial proceedings with the actions pending there and listed on Schedule A.

PANEL ON MULTIDISTRICT LITIGATION

John G. Heyburn II
Chairman

| | |
|---|---|
| D. Lowell Jensen | J. Frederick Motz |
| Robert L. Miller, Jr. | Kathryn H. Vratil |
| David R. Hansen | Anthony J. Scirica |

IN RE: PEREGRINE SYSTEMS, INC.,
SECURITIES LITIGATION                                           MDL No. 1889

## SCHEDULE A

<u>Southern District of California</u>

Alan Marshall, et al. v. Peregrine Systems, Inc., et al., C.A. No. 3:02-870
Richard Bowe v. Peregrine Systems, Inc., et al., C.A. No. 3:02-871
Joel A. Gerber v. Peregrine Systems, Inc., et al., C.A. No. 3:02-882
Peter Ahrens v. Peregrine Systems, Inc., et al., C.A. No. 3:02-885
Blake Halberg v. Peregrine Systems Inc., et al., C.A. No. 3:02-886
Chris Martin v. Peregrine Systems, Inc, et al., C.A. No. 3:02-887
Ira Gaines v. Peregrine Systems, Inc., et al., C.A. No. 3:02-890
Jeff Michon, et al. v. Peregrine Systems, Inc., et al., C.A. No. 3:02-891
Peter J. Krinsky v. Peregrine Systems, Inc., et al., C.A. No. 3:02-902
Jonathan D. Layes v. Peregrine Systems, Inc., et al., C.A. No. 3:02-906
Alan Berkowitz v. Peregrine Systems, Inc., et al., C.A. No. 3:02-921
Mendel Spiegel, et al. v. Peregrine Systems, Inc., et al., C.A. No. 3:02-926
Gabriel West v. Peregrine Systems, Inc., et al., C.A. No. 3:02-951
Randy Lee v. Peregrine Systems, Inc., et al., C.A. No. 3:02-979
Henry Frankel v. Peregrine Systems, Inc., et al., C.A. No. 3:02-996
Richard Schleicher v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1002
Anthony Boarman v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1010
Eric P. Daniels v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1011
Donna Murray v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1022
Stephen Anish v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1047
Robert Renzi v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1060
Craig McCarthy v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1061
Stoneridge Investment Partners, LLC v. Peregrine Systems, Inc., et al.,
   C.A. No. 3:02-1073
Heywood Waga v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1095
Michael J. Farrell v. Peregrine Systems, et al., C.A. No. 3:02-1120
Mateo Camarillo, et al. v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1168
Congregation Bais Avrohom v. Peregine Systems, Inc., et al., C.A. No. 3:02-1174
Katy Cox Johnson v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1176
Alan Hylton v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1207
Janet Kusmierski, et al. v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1208
Michele Voth, et al. v. Peregrine Systems, Inc., et al., C.A. No. 3:02-1238
Blair Alexander v. Matthew C. Gless, et al., C.A. No. 3:02-1242
Felix Lecocq v. Peregrine Systems, Inc., et al., C.A. No. 3:02-2550
William V. Alesi v. Matthew C. Gless, et al., C.A. No. 3:03-57

<u>District of New Jersey</u>

David Hildes, etc. v. Arthur Andersen, LLP, et al., C.A. No. 2:07-393

1/3/08

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**CHAIRMAN:**
Judge John G. Heyburn II
United States District Court
Western District of Kentucky

**MEMBERS:**
Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

Judge Anthony J. Scirica
United States Court of Appeals
Third Circuit

**DIRECT REPLY TO:**

Jeffery N. Lüthi
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:        [202] 502-2888
http://www.jpml.uscourts.gov

January 2, 2008

W. Samuel Hamrick, Jr., Clerk
4290 Edward J. Schwartz Federal Building
880 Front Street
San Diego, CA 92101-8900

Re: MDL No. 1889 -- IN RE: Peregrine Systems, Inc., Securities Litigation

Dear Mr. Hamrick:

Attached as a separate document is a certified copy of a transfer order issued today by the Judicial Panel on Multidistrict Litigation in the above-captioned matter. The order is directed to you for filing. Rule 1.5 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 428 (2001), states "A transfer or remand pursuant to 28 U.S.C. § 1407 shall be effective when the transfer or remand order is filed in the office of the clerk of the district court of the transferee district."

Today we are also serving an information copy of the order on the transferor court(s). The Panel's governing statute, 28 U.S.C. §1407, requires that the transferee clerk "transmit a certified copy of the Panel's order to transfer to the clerk of the district court from which the action is being transferred [transferor court]."

Rule 1.6(a), pertaining to transfer of files, states "the clerk of the transferor district court shall forward to the clerk of the transferee district court the complete original file and a certified copy of the docket sheet for each transferred action." With the advent of electronic filing, many transferee courts have found that it is not necessary to request the original file. Some transferee courts will send their certified copy of the Panel order with notification of the newly assigned transferee court case number and inform the transferor courts that they will copy the docket sheet via PACER. Others may request a certified copy of the docket sheet and a copy of the complaint (especially if it was removed from state court). You should be specific as to the files you would like to receive from the transferor courts and if no files will be necessary, you should make that clear. Therefore, Rule 1.6(a) will be satisfied once a transferor court has complied with your request.

You may find Chapter 7 of Volume 4 of the Clerks Manual, United States District Courts helpful in managing the your MDL docket.

- 2 -

The Panel Clerk's Office maintains the only statistical accounting of multidistrict litigation traffic in the federal courts. These statistics are used by the Administrative Office of the United States Courts and the Judicial Conference. Therefore, your cooperation in keeping the Panel advised of the progress of this litigation would be appreciated. We are particularly interested in receiving the docket numbers assigned to each transferred action by your court; the caption and docket numbers of all actions originally filed in your district; and copies of orders regarding appointment of liaison counsel, settlements, dismissals, state court remands, and reassignments to other judges in your district.

Your attention is also directed to Panel Rule 7.6, regarding termination and remand of transferred actions. Upon notification from your court of a finding by the transferee judge suggesting to the Panel that Section 1407 remand of a transferred action is appropriate, this office will promptly file a conditional remand order.

Attached to this letter, for your information, is a copy of the Panel Attorney Service List. Listed below is the transferor clerk information:

William T. Walsh, Clerk
Martin Luther King, Jr. Federal Building & U.S. Courthouse
50 Walnut Street, 4th Floor
Newark, NJ 07102
**NJDdb_MDLClerk/njd/03/USCOURTS**

Very truly,

Jeffery N. Lüthi
Clerk of the Panel

By _____
Mecca S. Thompson
Docket Specialist

Attachments (Transfer Order is a Separate Document)

cc:    Transferee Judge: Judge Roger T. Benitez
       Chief Judge Transferee District: Judge Irma E. Gonzalez

JPML Form 33



**Beverly Robinson/CASD/09/USCOURTS**

01/03/2008 03:18 PM

To  NJDdb_MDLClerk/njd/03/USCOURTS@USCOURTS

cc  Jamie Ponzio/CASD/09/USCOURTS@USCOURTS, John Morrill/CASD/09/USCOURTS@USCOURTS, Joseph Diaz/CASD/09/USCOURTS@USCOURTS, Mary Anne

bcc

Subject  MDL 1889 In re: Peregrin Systems Inc., Securities Litigation

## IN RE: MDL 1889

### Peregrine Systems, Inc., Securities Litigation

Attached is a certified copy of the transfer order received from the Multidistrict Litigation Panel in Washington, D.C. It instructs that the case(s) listed be transferred to our district for disposition pursuant to Title 28 USC 1407, as soon as possible. The case has been assigned to the Honorable Roger Benitez. Please include the civil case number **08cv08BEN** on future documents.

Please forward a copy of the complaint (including notice of removal, if applicable), any amendments, the docket sheet and the MDL Transfer Order, preferably as PDF documents attached to an email addressed to Beverly Robinson/CASD/09/USCOURTS@USCOURTS. Please attach separate PDFs for each of the documents. If this is not possible, please forward the printed copies of the requested documents via mail.

Should you have any questions regarding this request, please contact Beverly Robinson at (619)557-5519.

Very truly yours,
Beverly Robinson, Case Admin. Specialist
Southern District of California



08CV08_MDL 1889_01 3 2008 12 14 14 AM.pdf

12BR, CLOSED, RULE16

# U.S. District Court
## District of New Jersey [LIVE] (Newark)
## CIVIL DOCKET FOR CASE #: 2:07-cv-00393-SRC-MAS

HILDES v. ARTHUR ANDERSEN, LLP et al
Assigned to: Judge Stanley R. Chesler
Referred to: Magistrate Judge Michael A. Shipp
Cause: 15:77 Securities Fraud

Date Filed: 01/24/2007
Date Terminated: 01/14/2008
Jury Demand: Plaintiff
Nature of Suit: 850
Securities/Commodities
Jurisdiction: Federal Question

**Plaintiff**

**DAVID HILDES**
*individually and as Trustee of the THE*
*DAVID AND KATHLEEN HILDES*
*1999 CHARITABLE REMAINDER*
*UNITRUST DATED JUNE 25, 1999*

represented by **ANDREW DAVIN STILLUFSEN**
KAYE SCHOLER LLP
425 PARK AVENUE
NEW YORK, NY 10022
212-836-8000
Email: astillufsen@kayescholer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LORI BLAKE LESKIN**
KAYE SCHOLER, LLP
425 PARK AVENUE
NEW YORK, NY 10022
(212) 836-8000
Email: maodnj@kayescholer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ARTHUR ANDERSEN, LLP**

represented by **DAVID L. HARRIS**
LOWENSTEIN SANDLER PC
65 LIVINGSTON AVENUE
ROSELAND, NJ 07068-1791
(973) 597-2500
Email: dharris@lowenstein.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SALLY ANNE MULLIGAN**

LOWENSTEIN SANDLER, PC
65 LIVINGSTON AVENUE
ROSELAND, NJ 07068
(973) 597-2422
Email: smulligan@lowenstein.com
*ATTORNEY TO BE NOTICED*

**STEVEN M. HECHT**
LOWENSTEIN SANDLER PC
65 LIVINGSTON AVENUE
ROSELAND, NJ 07068-1791
(973) 597-2500
Email: shecht@lowenstein.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**THOMAS G. WATROUS, SR.**

**Defendant**

**JOHN DOE**
*as the Executor of the ESTATE of*
*DAVID A. FARLEY*

**Defendant**

**DOUGLAS S. POWANDA**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/24/2007 | 1 | COMPLAINT against ARTHUR ANDERSEN, LLP, THOMAS G. WATROUS, SR ( Filing fee $ 350 receipt number 343423.) JURY DEMAND, filed by DAVID HILDES. (Attachments: # 1 Rule 7.1 Statement# 2 Civil Cover Sheet)(ld, ) (Entered: 01/25/2007) |
| 01/25/2007 | 2 | Summons Issued as to ARTHUR ANDERSEN, LLP, THOMAS G. WATROUS, SR.Days Due - 20.MLD TO COUNSEL 1/25/07 (ld, ) (Entered: 01/25/2007) |
| 04/10/2007 | 3 | NOTICE of Appearance by ANDREW DAVIN STILLUFSEN on behalf of DAVID HILDES (STILLUFSEN, ANDREW) (Entered: 04/10/2007) |
| 04/10/2007 | 4 | WAIVER OF SERVICE Returned Executed by DAVID HILDES. THOMAS G. WATROUS, SR waiver sent on 3/21/2007, answer due 5/21/2007. (STILLUFSEN, ANDREW) (Entered: 04/10/2007) |
| 05/30/2007 | 5 | WAIVER OF SERVICE Returned Executed by DAVID HILDES. ARTHUR ANDERSEN, LLP waiver sent on 5/10/2007, answer due 7/9/2007. (STILLUFSEN, ANDREW) (Entered: 05/30/2007) |

| 07/03/2007 | 6 | Application and Proposed Order for Clerk's Order to extend time to answer as to Defendant, Arthur Andersen, LLP. Attorney DAVID L. HARRIS and DAVID L. HARRIS for ARTHUR ANDERSEN, LLP added. (HARRIS, DAVID) (Entered: 07/03/2007) |
|---|---|---|
| 07/03/2007 | | CLERK'S TEXT ORDER - The 6 Application and Proposed Order for Clerk's Order to extend time to answer has been GRANTED as to deft. ARTHUR ANDERSEN, LLP through 7/24/07. (dc, ) (Entered: 07/05/2007) |
| 07/18/2007 | 7 | LETTER ORDER setting Initial Scheduling Conference by telephone for 11/20/2007 at 12:00 PM before Magistrate Judge Claire C. Cecchi. JOINT DISCOVERY MUST BE SUBMITTED PRIOR TO THE CONFERENCE. Signed by Judge Claire C. Cecchi on 7/18/07. (nc, ) (Entered: 07/18/2007) |
| 07/19/2007 | 8 | NOTICE of Appearance by STEVEN M. HECHT on behalf of ARTHUR ANDERSEN, LLP (HECHT, STEVEN) (Entered: 07/19/2007) |
| 07/19/2007 | 9 | STIPULATION *Extending Time for Defendant Arthur Andersen LLP To Respond To Complaint* by ARTHUR ANDERSEN, LLP. (HECHT, STEVEN) (Entered: 07/19/2007) |
| 07/19/2007 | | CLERK'S QUALITY CONTROL MESSAGE: The 9 Stipulation filed by S. Hecht on 7/19/07 is a proposed document that must be executed by a Judicial Officer before filing. Please forward to the appropriate Judicial Officer in accordance with his/her preferred practice. This submission will remain on the docket unless otherwise ordered by the court. This message is for informational purposes only. (dc, ) (Entered: 07/23/2007) |
| 07/23/2007 | 11 | MDL JOINT MOTION for Transfer of Action to the Southern District of California Under 28 U.S.C. 1407 for Coordinated or Consolidated Pretrial Proceedings. (Attachments: # 1 Schedule of Actions)(dc, ). (Entered: 07/24/2007) |
| 07/23/2007 | | Set/Reset Deadlines as to 11 MDL JOINT MOTION for Transfer of Action to the Southern District of California. Motion Hearing set for 9/10/2007 before Judge Stanley R. Chesler. (dc, ) (Entered: 07/24/2007) |
| 07/24/2007 | 10 | STIPULATION AND ORDER extending Deft. Arthur Andersen LLP's time to respond to Complaint through 9/7/07, etc. Signed by Judge Claire C. Cecchi on 7/23/07. (dc, ) (Entered: 07/24/2007) |
| 07/24/2007 | | Update Answer Due Deadline as to Deft. Arthur Andersen, LLP. (dc, ) (Entered: 07/24/2007) |
| 07/24/2007 | 12 | AMENDED COMPLAINT against ARTHUR ANDERSEN, LLP, THOMAS G. WATROUS, SR, JOHN DOE, filed by DAVID HILDES. (Attachments: # 1 Supplemental Summons)(STILLUFSEN, ANDREW) (Entered: 07/24/2007) |
| 07/30/2007 | 13 | Summons Issued as to DOUGLAS S. POWANDA.Days Due - 20, re 12 Amended Complaint. Mailed to Kaye Scholer LLP. (dc, ) Additional attachment(s) added on 1/14/2008 (dc, ). (Entered: 07/30/2007) |

| 08/07/2007 | 14 | NOTICE of Appearance by SALLY ANNE MULLIGAN on behalf of ARTHUR ANDERSEN, LLP (MULLIGAN, SALLY) (Entered: 08/07/2007) |
|---|---|---|
| 08/07/2007 | 15 | Letter from Lowenstein Sandler PC re: Pro Hac Vice Admission of Scott Vick, Esq.. (Attachments: # 1 Certification of S. Hecht# 2 Certification of S. Vick# 3 Proposed Form of Order)(MULLIGAN, SALLY) (Entered: 08/07/2007) |
| 08/08/2007 | 16 | Letter from Lowenstein Sandler PC re: Proposed Stipulation and Order Extending Time for Defendant Arthur Andersen LLP to Respond to Complaint. (Attachments: # 1 Proposed Stipulation and Order)(MULLIGAN, SALLY) (Entered: 08/08/2007) |
| 08/08/2007 | 17 | ORDER granting pro hac vice admission of Scott Vick, Esq. Signed by Judge Claire C. Cecchi on 8/8/07. (dc, ) (Entered: 08/08/2007) |
| 08/10/2007 | 18 | STIPULATION AND ORDER extending Deft. Arthur Andersen LLP's time to respond to the Complaint to 10/29/07. Signed by Judge Claire C. Cecchi on 8/9/07. (dc, ) (Entered: 08/10/2007) |
| 08/10/2007 |  | Update Answer Due Deadline as to deft. Arthur Andersen LLP. (dc, ) (Entered: 08/10/2007) |
| 08/10/2007 | 19 | Notice of Request by Pro Hac Vice Scott Vick to receive Notices of Electronic Filings. (MULLIGAN, SALLY) (Entered: 08/10/2007) |
| 08/10/2007 |  | Pro Hac Vice fee: $ 150, receipt number 346707 for Scott Vick, Esq. (dc, ) (Entered: 08/10/2007) |
| 08/13/2007 | 20 | MDL AMENDED BRIEF in support of Joint Moton for Transfer of Acation under 28usc 1407. (Attachments: # 1 Certificate of Service)(cs, ) (Entered: 08/14/2007) |
| 08/20/2007 | 21 | Judicial Panel on Multidistrict Litigation Notice of Appearance (cs, ) (Entered: 08/21/2007) |
| 10/16/2007 | 22 | Letter from Lowenstein Sandler PC re: Proposed Stipulation and Order extending Defendant Arthur Andersen LLP's time to respond to Complaint. (Attachments: # 1 Proposed Stipulation and Order)(MULLIGAN, SALLY) (Entered: 10/16/2007) |
| 10/16/2007 | 23 | Letter from Lowenstein Sandler PC requesting adjournment of Initial Scheduling Conference. (MULLIGAN, SALLY) (Entered: 10/16/2007) |
| 10/17/2007 | 24 | ORDER ON ORAL MOTION adjourning the initial scheduling conference until 2/19/2008 at 12:00 at noon. Signed by Judge Claire C. Cecchi on 10/16/07. (dc, ) (Entered: 10/17/2007) |
| 10/18/2007 | 25 | STIPULATION AND ORDER extending Deft. Arthur Andersen LLP's time to respond to the First Amended Complaint to 12/28/07. Signed by Judge Claire C. Cecchi on 10/17/07. (dc, ) (Entered: 10/18/2007) |

| 10/18/2007 | | Update Answer Due Deadline as to Deft. Arthur Andersen, LLP (dc, ) (Entered: 10/18/2007) |
|---|---|---|
| 10/29/2007 | 26 | MDL NOTICE of presentation of waiver of oral argument w/service list attached thereto. (cs, ) (Entered: 10/30/2007) |
| 10/30/2007 | | Judge Michael A. Shipp added. Judge Claire C. Cecchi no longer assigned to case. (pv, ) (Entered: 10/30/2007) |
| 11/02/2007 | 27 | NOTICE by DAVID HILDES *JPMDL NOTICE OF PRESENTATION OR WAIVER OF ORAL ARGUMENT* (STILLUFSEN, ANDREW) (Entered: 11/02/2007) |
| 11/09/2007 | | Set/Reset Hearings: The Initial Conference presently set for 2/19/08 at 12:00 PM has been rescheduled to 3/3/2008 03:30 PM in Newark - Courtroom 2C before Magistrate Judge Michael A. Shipp. This conference is in person. (nm, ) (Entered: 11/09/2007) |
| 12/27/2007 | 28 | Letter from Lowenstein Sandler PC re: Proposed Stipulation and Order to Extend Time for Defendant Arthur Andersen LLP to Respond to Complaint. (Attachments: # 1 Proposed Stipulation and Order)(MULLIGAN, SALLY) (Entered: 12/27/2007) |
| 01/02/2008 | 29 | STIPULATION AND ORDER extending Deft. Arthur Andersen's LLP's time to respond to complaint 1/25/08. Signed by Judge Michael A. Shipp on 12/28/07. (dc, ) (Entered: 01/02/2008) |
| 01/02/2008 | | Update Answer Due Deadline as to Deft. Arthur Andersen LLP. (dc, ) (Entered: 01/02/2008) |
| 01/14/2008 | 30 | Certified Copy of MDL Transfer Order transferring case to the Southern District of California.. Signed by Judge No Judge Assigned on 1/14/08. (Attachments: # 1 Schedule A# 2 Cover Letter# 3 Notice from Beverly Robinson)(dc, ) (Entered: 01/14/2008) |
| 01/14/2008 | | Remark - Transmittal Letter sent electronically to USDC/CASD/09. Received 1/14/08 at 8:41 AM PST. re 30 MDL Transfer Order. (dc, ) (Entered: 01/14/2008) |

# PACER Service Center

## Transaction Receipt

01/15/2008 13:31:43

| PACER Login: | ud0077 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:07-cv-00393-SRC-MAS Start date: 1/1/1970 End date: 1/15/2008 |

**Billable Pages:**   3        **Cost:**   0.24

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID HILDES, Individually and as Trustee of the THE DAVID AND KATHLEEN HILDES 1999 CHARITABLE REMAINDER UNITRUST DATED JUNE 25, 1999,<br><br>               Plaintiff<br>vs.<br><br>ARTHUR ANDERSEN, LLP; THOMAS G. WATROUS, SR; and JOHN DOE as the Executor of the ESTATE of DAVID A. FARLEY,<br><br>               Defendants. | CASE NO.:<br><br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><br>**DEMAND FOR JURY TRIAL** |

Lori B. Leskin (LL 7115)
**KAYE SCHOLER LLP**
425 Park Avenue
New York, NY 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689


Of Counsel:
Allan M. Pepper
**KAYE SCHOLER LLP**
425 Park Avenue
New York, NY 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Attorneys for Plaintiff*

31394110.WPD

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................. 1

JURISDICTION AND VENUE ................................................. 5

PARTIES ........................................................................... 5

NO STATUTORY SAFE HARBOR ............................................ 9

PEREGRINE SWITCHES TO AN IMPROPER METHOD OF REVENUE
RECOGNITION ................................................................. 10

THE FALSE AND MISLEADING STATEMENTS ............................ 13

THE MATERIAL FALSE AND MISLEADING STATEMENTS EMERGE .............. 19

DEFENDANTS' CONCEALMENT OF WRONGDOING ......................... 23

COUNT I ......................................................................... 24
    Against the Individual Defendants For Violations Of Section 11 Of The Securities
    Act ........................................................................... 24

COUNT II ........................................................................ 26
    Against Arthur Andersen, LLP For Violations of Section 11 of the Securities Act .... 26

PRAYER FOR RELIEF ........................................................... 28

JURY DEMAND ................................................................. 29

## INTRODUCTION

1.     Plaintiff, individually and as trustee for the David and Kathleen Hildes 1999 Charitable Remainder Unitrust Dated June 25, 1999, by and through his attorneys, alleges the following upon information and belief, except those allegations concerning himself, which are alleged upon personal knowledge. Plaintiff's information and belief is based, *inter alia*, on the review of the documents produced by the litigation trustee of Peregrine Systems, Inc. and performed by counsel for class plaintiffs' in *In re Peregrine Systems, Inc. Securities Litigation*, currently pending in the United States District Court for the Southern District of California, and an investigation conducted by plaintiff's attorneys, including, *inter alia*, a review of a Registration Statement on Form S-4/A filed by defendant Peregrine Systems, Inc., ("Peregrine" or the "Company") with the Securities and Exchange Commission ("SEC") on May 22, 2000 (the "Registration Statement") issued in connection with the merger, completed on or about June 16, 2000, between Peregrine and Harbinger Corporation ("Harbinger") (collectively, the "Merger"); the Joint Proxy Statement and Prospectus included within the Registration Statement (the "Merger Proxy/Prospectus"); documents incorporated by reference into the Registration Statement; and other public filings and news articles pertaining to or issued by the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth after a reasonable opportunity for discovery.

2. .    As is more fully alleged throughout the Complaint, this action arises from damages incurred by Plaintiff as a result of the issuance by defendants to Plaintiff in New Jersey of materially false and misleading statements in the Registration Statement and Merger Proxy/Prospectus, which artificially inflated the value of the Company's securities.

31394110.WPD                          3

3.      In particular, the Registration Statement and Merger Proxy Prospectus includes the financial statements for the Company's fiscal year 2000 ended March 31, 2000, as well as results for the fiscal year 1999 ended March 31, 1999, both of which were materially overstated. This information was material to Harbinger shareholders, including the Plaintiff, in considering how to vote on the Merger, including whether the Exchange Ratio accurately reflected the value of Peregrine common stock.

4.      Furthermore, the Registration Statement and Merger Proxy Prospectus includes false statements regarding Peregrine's declared method of revenue recognition from indirect software licensing agreements to third party resellers. The Registration Statement and Merger Proxy Prospectus stated that the Company used the proper "sell-through" method of revenue recognition for indirect licensing agreements, which meant that revenue could only be recognized when the software was sold through to the end-user. However, beginning no later than April 1999, Peregrine was in fact using the improper "sell in" method to recognize revenue from this type of transaction, which meant that revenue was recognized as soon as the software was sold-in to the third party reseller, even though there was no commitment by the third party to sell the product, or even an identified end-user for the product. It engaged in this practice in order to maintain the appearance of revenue growth.

5.      This improper method of revenue recognition was in violation of not only Peregrine's stated policies, but also the Generally Accepted Accounting Principles ("GAAP"), and was not disclosed in the Registration Statement and Merger Proxy Prospectus.

6.      As a result of defendants' false statements, misrepresentations, and omissions, the price of Peregrine securities was artificially inflated at the time of the Merger. Peregrine shares closed at $25.56 per share on June 16, 2000, the closing date of the Merger.

31394110.WPD                                    4

7.     It was not until the close of trading on April 30, 2002 -- nearly two years after the Merger -- that the Company announced that it would delay its planned earnings release and conference call to announce its financial results for its fourth quarter 2002 and the 2002 fiscal year ended March 31, 2002 because its new auditor, KPMG, required additional time to complete its audit. On that announcement, the price of Peregrine shares plummeted from $6.85 to close at a 52-week low of $3.45 on May 1, 2002, a loss of over 49% in one day on heavy trading. The price of Peregrine stock continued to plummet, closing at $2.57 on May 3, 2002.

8.     The Company also disclosed in a May 6, 2002 press release that its Board of Directors had authorized its audit committee to "conduct an internal investigation into potential accounting inaccuracies brought to the attention of the audit committee by KPMG, the Company's independent auditors." The Company further disclosed that certain transactions involving revenue recognition irregularities, totaling as much as $100 million, have been called into question and may have been recorded during periods in fiscal 2001 and 2002.

9.     In the same May 6, 2002 press release, the Company announced the resignation of the Company's two top officers, Chairman and Chief Executive Officer Stephen P. Gardner ("Gardner") and Chief Financial Officer Matthew C. Gless ("Gless"). Following the Company's disclosures, the price of Peregrine stock continued its free fall, plunging 65% to close at $0.89 on May 6, 2002 on extraordinary volume of 129,957,300 shares as compared to the Company's 192,308,000 outstanding shares and 30-day average trading volume of 3,902,000 shares.

10.     Finally, on May 23, 2002, Peregrine announced that it would restate results for fiscal year 2000, as well as for fiscal year 2001 and the first three quarters of fiscal year 2002. In addition, Peregrine announced that the SEC had begun an investigation into its accounting practices.

11.    On February 28, 2003, Peregrine filed with the SEC restated financial results for fiscal years 2000 and 2001 and the first three reporting quarters of fiscal year 2002. These restated results demonstrate that Peregrine's revenues actually declined by approximately 5%, from $138,063,000 to $131,632,000, from fiscal year 1999 to fiscal year 2000, rather than increased nearly 83%, from $138,063,000 to $253,300,000, as misrepresented in the Registration Statement and Merger Proxy Prospectus. These restated financial results were from Pricewaterhouse Coopers, Peregrine's independent auditors after KPMG, and have been accepted unchallenged by the *In re Peregrine* bankruptcy court, the SEC, the IRS, and Peregrine's shareholders and creditors.

12.    The false and misleading financial statements included in the Registration Statement caused Peregrine's common stock price to be artificially inflated at the time of the Merger. As a result, the Exchange Ratio utilized in the Merger was artificially deflated and Harbinger shareholders, like Plaintiff, who exchanged their Harbinger common stock for Peregrine common stock in connection with the Merger were harmed by having received insufficient value for their Harbinger common stock.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v. The claims asserted herein arise under Sections 11 of the Securities Act, 15 U.S.C. §§ 77k.

14.    Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §§ 1391(b) and 1391(c). The offer and sale of Peregrine stock occurred in this District, and the violations of law complained of herein occurred in this District, including the

dissemination of materially false and misleading statements and the omission of material information complained of herein.

15.    In connection with the conduct complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.    Prior to the Merger, the Plaintiff held shares of Harbinger common stock that were exchanged for shares of Peregrine common stock in connection with the Merger, and Plaintiff was damaged thereby.

17.    Defendant Thomas G. Watrous, Sr. ("Watrous") served as a member of the Board of Directors of Peregrine from January 1999 through at least May 2002. He became a member of the Audit Committee of Peregrine's Board of Directors on April 17, 2000. Watrous was a senior partner with the management consulting firm of Andersen Consulting (now known as Accenture), which was previously an affiliate of defendant Arthur Andersen LLP.    Defendant Watrous signed the Registration Statement.

18.    Defendant John Doe is the executor of the Estate of David A. Farley ("Farley"). Farley died in late 2000. John Doe is a fictitious name, becaue Plaintiff has not yet been able to determine Farley's executor's true identity despite a diligent search. Farley was at all relevant times the Company's Chief Financial Officer.   Because of Defendant Farley's positions with Peregrine, he had access to adverse, non-public information about the Company's method of reporting revenues. Defendant Farley signed the Registration Statement.

19.    The above individual defendants in paragraphs 17 and 18 (the "Individual Defendants") each signed, and/or consented to being named as a director and/or officer of

Peregrine in the Registration Statement and/or the Merger Proxy/Prospectus, pursuant to which Peregrine issued securities in connection with its Merger with Harbinger.

20.     The Individual Defendants participated in the drafting, preparation, and/or approval of various false and misleading statements contained in the Registration Statement and Merger Proxy/Prospectus filed by the Company with the SEC in connection with the Merger. Because of their Board memberships and/or executive and managerial positions, each of the Individual Defendants was responsible for ensuring the truth and accuracy of the various statements contained in the Registration Statement and Merger Proxy/Prospectus, including the truth of the reported financial results of Peregrine.

21.     Each of the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's true operational and financial condition and to promptly correct any previously disseminated false or misleading information. As a result of their failure to do so in connection with the preparation and filing of the Registration Statement and Merger Proxy/Prospectus, the price of Peregrine common stock was artificially inflated prior to, and at the time of, the Merger, causing the Exchange Ratio to be artificially deflated and causing injury to Plaintiff.

22.     The Individual Defendants, because of their management positions and memberships on the Peregrine Board, had the power and influence to direct the management and activities of Peregrine, and its employees, and to cause Peregrine to engage in the unlawful conduct complained of herein. Accordingly, the Individual Defendants were able to, and did, control the contents of the Registration Statement and Merger Proxy/Prospectus. Each Individual Defendant was provided with copies of the filings alleged herein to be false and misleading prior

to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance and/or to cause them to be corrected, but failed to do so.

23.    Defendant Arthur Andersen LLP ("Andersen") served as Peregrine's outside auditor at the time of the Merger, and had served as such since 1996. Andersen was the Company's auditor until April 2, 2002, when the Company announced that it had terminated Andersen, effective immediately, and appointed KPMG LLP as its outside auditor. Andersen issued an unqualified audit opinion, dated April 25, 2000, on Peregrine's financial results for its fiscal year ending March 31, 2000 contained in the Merger Proxy/ Prospectus. Andersen falsely represented in its unqualified opinion on Peregrine's fiscal year 2000 financial statements which were contained in the Merger Proxy/Prospectus that the financial statements were presented in accordance with Generally Accepted Accounting Principles ("GAAP") and that Andersen performed its audit of Peregrine in accordance with Generally Accepted Auditing Standards ("GAAS"). Andersen allowed the false statements in its unqualified audit opinion to be used in the Merger Proxy Prospectus. In fact, Peregrine's revenues and related receivables were materially overstated, which resulted in an overstatement of revenues and earnings for the fiscal year 2000. By virtue of its position as the purported independent auditor for Peregrine, Andersen had access to the Company's key personnel, accounting, books and records and transactional documents, such as software licensing agreements, and to the Company's key customers, at all relevant times. As a result of the auditing and other services performed by Andersen, Andersen personnel were frequently present at Peregrine's corporate headquarters and had continual access to and knowledge of the Company's confidential internal corporate, financial, operating and business information, and had the opportunity to observe and review the Company's business and accounting practices and to test the Company's internal and publicly reported financial

statements, as well as the Company's internal controls. On April 5, 2002, Arthur Andersen was

replaced by KPMG LLP as Peregrine's independent auditor. Arthur Andersen was paid

approximately $4 million in fees for its auditing, accounting, and consulting work for Peregrine

since being retained in July 1996.

24.    Andersen's audit opinion was false and materially misleading because it failed to

note, in either the textual portion of the opinion letter or in any accompanying footnotes to the

financial statements, that Peregrine's Board had approved a material change in accounting policy

in April 1999 (*see* ¶¶ 32-36) from the proper sell-through method to the improper sell-in method.

This change materially impacted the fourth quarter of fiscal year 1999 results that were

incorporated in the fiscal year-end results that Andersen had audited. The change to the sell-in

method was designed to provide Peregrine with an immediate revenue and earnings boost so that

it could meet its own published expectations for the fiscal quarter and fiscal year. It was known

to Andersen that the policy had been changed to apply to the fourth quarter of fiscal year 1999.

Andersen also knew that the revenue recognition policy was changed to provide for revenue

recognition immediately upon execution of a software licensing agreement with third party

resellers even though there was no commitment to pay and no identified end user committed to

pay, and to allow the Company to meet published earning and revenue forecasts. Andersen knew

that the Company's published descriptions of its revenue recognition policy were materially

inaccurate in light of the change Peregrine made to use the improper sell-in method of revenue

recognition rather than  the proper sell-through method of revenue recognition method.

25.    Each defendant is liable to Plaintiff as a direct participant in the wrongs

complained of herein.

## NO STATUTORY SAFE HARBOR

26.     The statutory safe harbor provided for forward-looking statements (under certain circumstances) does not apply to any of the false statements and material omissions alleged in this complaint. The statements alleged to be false and misleading all relate to then-existing facts and conditions. In addition, none of the statements alleged herein were identified as "forward-looking statements" when made. Nor did meaningful cautionary language identify important factors that could cause actual results to differ materially from those stated. To the extent that the statutory safe harbor does apply to any statements alleged herein deemed to be forward-looking, defendants nonetheless are liable for issuing false forward-looking statements because, at the time each of the statements was made, the statements were authorized and/or approved by an executive officer of Peregrine.

## PEREGRINE SWITCHES TO AN IMPROPER
## METHOD OF REVENUE RECOGNITION

27.     Peregrine was a publicly traded company and claimed to be a global provider of software and services for infrastructure resource management, employee relationship management and e-commerce technologies.

28.     Peregrine was incorporated in California in 1981 and reincorporated in Delaware in 1994. Its principal executive offices were located at 3611 Valley Centre Drive, San Diego, California 92130. Peregrine pursued an aggressive growth-by-acquisition strategy and completed the acquisition of several businesses and technologies. By April 2001, Peregrine had acquired 12 companies in transactions valued at over $2.2 billion, including the acquisition of Harbinger, an electronic data interchange provider, for $1.45 billion on June 16, 2000 ("the Merger"). On September 22, 2002, Peregrine filed for bankruptcy under Chapter 11 of the United States

Bankruptcy Code. Peregrine was acquired by the Hewlett-Packard Company on December 19, 2005.

        29.      Under the "Generally Accepted Accounting Principles" ("GAAP"), the decision as to whether revenue from licensing computer software should be recognized and, if so, in what amounts, must follow the procedures set forth in the "Statement of Position 97-2 - Software Revenue Recognition" (the "SOP").

        30.      Paragraph 8 of the SOP provides that, for software that does not require significant production, modification, or customization, revenue from licensing the software should be recognized only when all of the following criteria are met:

        a.      persuasive evidence of an arrangement exits;

        b.      delivery has occurred;

        c.      the vendor's fee is fixed or determinable; and

        d.      collectibility is probable.

This method of revenue recognition is known as "sell through."

        31.      As detailed below (*see* ¶¶ 40-46), Peregrine's revenue recognition policy, which appeared in the Merger Proxy/Prospectus Financials, is consistent with the SOP, as detailed below. In brief, Peregrine stated in the Merger Proxy/Prospectus that for the fiscal years 1998, 1999 and 2000:

> Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancellable license agreement has been signed, the product has been delivered, there are no material uncertainties regarding customer acceptance, collection of the resulting receivable is deemed probable, risk of concession is deemed remote, and we have no other significant obligations associated with the transaction.

Therefore, Peregrine's stated revenue recognition policy was on a "sell through" basis, because revenue could only be recognized when the product was sold-through to the ultimate end-user.

32.     However, beginning in early 1999, in order to meet Peregrine's revenue goals, top executives of Peregrine, including defendant Farley, made the decision to immediately recognize revenue from indirect licensing agreements with third party resellers. This was known as the "sell-in" method of revenue recognition, because revenue was recognized when the product was sold-in to the third party reseller. This was clearly improper, as it violated most of Peregrine's and GAAP's criteria for revenue recognition from indirect licensing agreements, as detailed below. (see ¶ 51).

33.     This decision to improperly recognize revenue from indirect licensing agreements to third party resellers was first made on a transaction with IBM Global Services. Defendant Farley, President and Chief Executive Officer Stephen Gardner and Executive Vice President of Worldwide Operations Douglas Powanda decided at a meeting in early 1999 that they would immediately book as revenue the transaction with IBM in order to meet Peregrine's revenue goals, even though there was no commitment to pay for the products involved nor any identified end-user.

34.     At the April 1999 Peregrine Board meeting, the board discussed the recent increase in indirect licensing agreements, also known as indirect channel sales, and their anticipated future growth. Defendant Farley presented to the Board the issue of whether to apply the "more aggressive" sell-in method of revenue recognition from indirect channels.

35.     Farley told the board that the sell-in method was not the "preferred" method of accounting. The preferred method was the sell-through method. However, he explained that it was only by using the sell-in method that the Company could meet its financial goals for the prior

quarter (the fourth quarter of fiscal year 1999), which had ended three weeks earlier, and its future revenue goals. He warned that, without adopting the sell-in approach, the Company would fail to meet the expectations of the stock market.   Board members Steven Gardner, John J. Moores (who was also Chairman of the Board), Richard Nelson, Charles Noell, Christopher Cole, Richard Hosley, Norris van den Berg and defendant Thomas Watrous specifically approved the change from the proper sell-through method to the improper sell-in method at the April 1999 Board meeting.

36.     As a result of this accounting change,  Peregrine began to record revenues as if it had fully completed the software sales process when it "sold" software to resellers, even though the resellers had no commitments from end users or had even identified end users interested in the product.

37.     Indeed, Peregrine recognized revenue on the improper sell-in method despite the existence of both oral and written agreements and side letters with resellers under which they had no obligation to pay Peregrine for software until it was sold-through to an end user.  As demonstrated above, the practice of recognizing revenue on agreements where there was no fixed obligation to pay (i.e., sell-in method) was authorized by the full Board, including Defendant Watrous, and senior management, including defendant Farley.

38.     However, as detailed below, this change was not disclosed in the Merger Proxy/Prospectus received by Plaintiff in connection with the Harbinger merger. Instead, the Merger Proxy/Prospectus falsely and misleadingly represented that Peregrine followed the proper sell-through revenue recognition method for revenue from indirect licensing agreements that was consistent with GAAP. In fact, this material change in Peregrine's method of revenue recognition was never publicly disclosed.

## THE FALSE AND MISLEADING STATEMENTS

39.     The Merger could not be completed without the approval of a majority of

shareholders of Peregrine common stock present and voting at a special meeting and a majority

of the outstanding shares of Harbinger common stock.  Accordingly, on or about May 22, 2000,

defendants issued the Registration Statement and Merger Proxy/Prospectus which, *inter alia*,

solicited Peregrine and Harbinger common shareholder votes, including Plaintiff's, to approve

the Merger.

40.     On May 22, 2000, Peregrine filed the Registration Statement with the SEC on

Form S-4/A that included the Merger Proxy/Prospectus, for special meetings on June 16, 2000.

The shareholders of Peregrine and Harbinger were each voting on the Merger.

41.     The Merger Proxy/Prospectus contained the following information, among other

data, concerning Peregrine's revenue.  Under "Sales And Marketing," Peregrine stated:

> We sell our software and services in North America and internationally
> primarily through a direct sales force.  A large number of our sales force is based
> at our San Diego headquarters, but we also have North American sales personnel
> located in, or in close proximity to, most major cities in the United States and
> Canada.  Our international sales force is located in the metropolitan areas of
> Amsterdam, Frankfurt, London, Milan, Copenhagen, Munich, Paris, Singapore
> and Sydney.  Our sales model combines telephone and Internet communications
> for product demonstrations with travel to customer locations to pursue a
> consultative sales process.  In addition to our direct sales strategy, we continue to
> pursue indirect distribution channels.  In the Pacific Rim and Latin America, we
> have established a network of channel partners.  In North America, we have
> established a network of regional and national systems integrators and channel
> partners.  When sold through direct channels, the sales cycle for our products
> typically ranges from six to nine months, depending on a number of factors,
> including the size of the transaction and the level of competition we encounter in
> our sales activities.
>
> In recent periods, we have devoted significant resources to building our
> marketing organization and infrastructure.  We have significantly expanded
> product marketing, marketing communications, alliance marketing, telemarketing
> and sales training.  The primary focus of our marketing department is to generate

31394110.WPD                                              15

qualified leads for the worldwide direct sales force and to create market awareness
programs for Peregrine and our products.  As part of our strategy, we have
invested significantly in the Internet, developing a new corporate web site during
fiscal 2000 and executing an array of web-based marketing programs.  In addition,
during fiscal 2000, we established an executive briefing center in order to focus
our sales efforts at senior levels within our prospective customer's organizations.

We have significantly increased the size of our sales force over the last
year and expect to continue hiring sales personnel, both domestically and
internationally, over the next twelve months.  Competition for qualified sales
personnel is intense in the software industry.  <u>We also expect to increase the
number of our regional, national, system integrator and channel partners, both
domestically and internationally</u>.  Any failure to expand our direct sales force or
other distribution channels could have a material adverse effect on our business,
results of operations, and financial condition....

(underscoring added).

42.     Peregrine's Merger Proxy/Prospectus, in its "Selected Consolidated Financial

Data" section, reported, among other things, that for the fiscal year ended March 31, 2000

Peregrine had Total Revenues of $253,300,000 (Licenses Revenues were $168,467,000 and

Services Revenues were $84,833,000) and a Net Loss of $25,070,000.

43.    · In Peregrine's "Management's Discussion And Analysis Of Financial Condition

And Results Of Operations" ("Merger Proxy/Prospectus MDA") which appears in the Merger

Proxy/Prospectus, Peregrine stated the following concerning revenue:

Our revenues are derived from product licensing and services.  Services
are comprised of maintenance, professional services, and training.  License fees
are generally due upon the granting of the license and typically include a one-year
maintenance and warranty period as part of the license agreement.  We also
provide ongoing maintenance services, which include technical support and
product enhancements, for an annual fee based upon the current price of the
product.

<u>Revenues from license agreements are recognized currently, provided that
all of the following conditions are met:  a noncancelable license agreement has
been signed, the product has been delivered, there are no material uncertainties
regarding customer acceptance, collection of the resulting receivable is deemed
probable, the risk of concession is deemed remote and no other significant vendor</u>

<u>obligations exist</u>. Revenues from post-contract support services are recognized ratably over the term of the support period, which is generally one year. Maintenance revenues which are bundled with license agreements are unbundled using vendor-specific objective evidence. Consulting revenues are primarily related to implementation services most often performed on a time and material basis under separate service agreements for the installation of our products. Revenues from consulting and training services are recognized as the respective services are performed.

----

REVENUES. Total revenues were $253.3 million, $138.1 million and $61.9 million for the fiscal years ended 2000, 1999 and 1998, representing period-to-period increases of 83% and 123% for the fiscal 2000 and 1999 periods....

LICENSES. License revenues were $168.4 million, $87.4 million and $38.8 million in fiscal 2000, 1999 and 1998, representing 67% of total revenues in fiscal 2000 and 63% in both fiscal 1999 and 1998. Total license revenues increased 93% and 125% period-to-period for fiscal 2000 and 1999. Domestic license revenues increased 73% in fiscal 2000 and 135% in fiscal 1999, while international license revenues increased 125% and 111% in fiscal 2000 and 1999. The increases in license revenues are attributable to increased demand for new and additional licenses of our infrastructure resource management applications, from new and existing customers, larger transaction sizes, expansion of our domestic and international sales forces, and acquisitions. We expect larger transaction sizes from a limited number of customers to account for a large percentage of license revenues for the foreseeable future. Management believes these trends will fluctuate period to period in absolute dollars and as a percentage of total revenues.

<u>During the past three years, we have increased the number of channels that we use to distribute our products</u>. The majority of our products are distributed through our direct sales organization. <u>The balance is derived through indirect sales channels and alliance partners, including value added resellers and systems integrators. Revenues derived through indirect channels now comprise a significant portion of our total license revenues.</u> We have substantially less ability to manage our sales through indirect channels and less visibility about our partner's success in selling the products that they have purchased from us. To the extent indirect sales continue to increase as a percentage of total revenues, we could experience unforeseen variability in our future revenues and operating results if our partners are unable to sell our products.

SERVICES. Services revenues consist of support, consulting and training services. Service revenues were $84.8 million, $50.7 million and $23.1 million for fiscal years 2000, 1999 and 1998, representing 33% of total revenues in fiscal

> 2000 and 37% in both fiscal 1999 and 1998. Total services revenues increased
> 67% and 120% period-to-period for fiscal 2000 and 1999. Domestic services
> increased 63% in fiscal 2000 and 111% in fiscal 1999, while international services
> revenues increased 78% and 140% in fiscal 2000 and 1999, respectively. The
> dollar increases are attributable to maintenance agreements and related billings
> from our expanded installed base of customers and an increase in consulting and
> training revenues related to the implementation of our software from initial
> license agreements and related expansion. While these revenues are increasing in
> absolute dollars, we expect these trends to fluctuate as a percentage of total
> revenues.

(underscoring added)

44.    Peregrine's financial statements for the fiscal year ended March 31, 2000 and

1999 ("Merger Proxy/Prospectus Financials") are included in the Merger Proxy/Prospectus.

Defendant Andersen, Peregrine's Independent Accountants, issued an unqualified opinion on

these financial statements. The financial statements included Peregrine's "Consolidated

Statements Of Operations" for the fiscal year ended March 31, 2000 which reported that

Peregrine had Total Revenues of $253,300,000 (Licenses Revenues were $168,467,000 and

Services Revenues were $84,833,000) and a Net Loss of $25,070,000 for that fiscal year. For the

fiscal year ended March 31, 1999 Peregrine reported Total Revenues of $138,063,000 (License

Revenues were $87,362,000 and Service Revenues were $50,701,000) and a Net Loss of

$23,370,000 for that fiscal year.

45.    The Merger Proxy/Prospectus Financials had "Notes To Consolidated Financial

Statements" which included the following under the caption: Company Operations And

Summary Of Significant Accounting Policies

REVENUE RECOGNITION

> We generate revenues from licensing the rights to use our software
> products primarily to end users. We also generate revenues from post-contract
> support (maintenance), consulting and training services performed for customers

who license our products.  We do not provide professional services unrelated to our products.

Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met:  a non-cancelable license agreement has been signed, the product has been delivered, there are no material uncertainties regarding customer acceptance, collection of the resulting receivable is deemed probable, risk of concession is deemed remote, and we have no other significant obligations associated with the transaction.  Revenues from post-contract support services are recognized ratably over the term of the maintenance period, generally one year.  Maintenance revenues which are bundled with license agreements, are unbundled using vendor specific objective evidence.  Professional services revenues are primarily related to implementation services most often performed on a time and material basis under separate service agreements for the installation of our products.  Revenues from professional services and customer training are recognized as the respective services are performed.

Cost of license revenues consists primarily of amounts paid to third-party vendors, product media, manuals, packaging materials, personnel, and related shipping costs.  Cost of maintenance and services revenues consists primarily of salaries, benefits, and allocated overhead costs incurred in providing telephone support, professional services, and training to customers.

Deferred revenues primarily relates to maintenance fees, which have been paid by our customers in advance of the performance of these services.

..................................................................

Quarterly Information ( Unaudited )
The following unaudited quarterly financial information includes, in our opinion, all normal and recurring adjustments (in thousands) necessary to fairly

state our consolidated results of operations and related information for the periods
presented.

| | FIRST QUARTER | SECOND QUARTER | THIRD QUARTER | FOURTH QUARTER |
|---|---|---|---|---|
| **FISCAL 2000** | | | | |
| Licenses revenues .............. | $ 32,092 | $ 37,102 | $ 46,524 | $ 52,749 |
| Services revenues ............... | 19,513 | 20705 | 21,020 | 23,595 |
| Total costs and expenses ........ | -53093 | (56,006) | -63233 | -89624 |
| Income (loss) from operations ..... | (1,488) | 1,801 | 4311 | (13,280) |
| Interest income (expense) and | | | | |
| other ........................ | 86 | 7 | 5 | (60) |
| Income tax expense ............. | 3439 | 4042 | 4183 | 4788 |
| Net income (loss) ............... | $ (4,841) | $ (2,234) | $    133 | $(18,128) |

........................................................................

46.    On June 16, 2000, Peregrine completed the acquisition of Harbinger Corporation.

Peregrine issued approximately 30,157,000 shares of Peregrine Common Stock (excluding

approximately 6.0 million shares of Peregrine common stock issuable upon exercise of options

and warrants assumed in connection with the acquisition) in exchange for all of the outstanding

shares of Harbinger for a total purchase price, including merger related costs, of approximately

$1,481.4 million.


### THE MATERIAL FALSE AND MISLEADING STATEMENTS EMERGE

47.    As noted above, the change to the improper sell-through method of revenue

recognition was not disclosed in the Merger Proxy/Prospectus received by Plaintiff in connection

with the Harbinger merger. Instead, the Merger Proxy/Prospectus falsely and misleadingly

represented that Peregrine followed the proper sell-through revenue recognition method for

revenue from indirect licensing agreements that was consistent with GAAP. In fact, this material

change in Peregrine's method of revenue recognition was never publicly disclosed.

48.     In February 2002, Peregrine announced it had replaced Arthur Andersen with a new independent outside auditor - KPMG LLP.

49.     On May 6, 2002, Peregrine announced that KPMG uncovered potential accounting inaccuracies that at that time questioned at least $100 million in revenue for fiscal years 2001 and 2002. According to the Company, the revenue that was being questioned was from "indirect channels," meaning that it came via third-party partners that were selling Peregrine's products to the end user. Furthermore, Peregrine said it "currently" recognized revenue from "indirect channels" on the above mentioned "sell through" basis, and thus revenue was recognized at the time the software was sold to the end user.

50.     However, Peregrine finally disclosed May 6, 2002 that, to recognize revenue from "indirect channels," it had "previously" used the "sell in" basis

51.     In "indirect channels" transactions, Peregrine knowingly recognized revenue from software licensing deals with resellers despite the fact that one or more conditions for proper recognition of revenue under GAAP and its own stated policy were never met, including the following: (i) the fee owed to Peregrine was not fixed and determinable, (ii) collectability of the fee was not probable, or (iii) the reseller's obligation to pay for the product was contingent upon subsequent sale of the product to an end user. In addition, Peregrine provided certain resellers with side payments, deep discounts and rebates to induce them into "purchasing" license agreements where no end user had committed to purchase the product.

52.     At the same time, the Company announced that it had replaced Steve Gardner, its Chairman and Chief Executive Officer, and Matthew Gless, its Chief Financial Officer.

53.     As a result of these announcements, Peregrine's stock fell on May 6, 2002 from $1.68 to $.89, down from a 52 week high of $33.55 in the NASDAQ.

54.    On May 23, 2002, Peregrine admitted that its fiscal year 2000 financial statements

had to be restated and that it would also restate results for fiscal year 2001 and the first three

quarters of 2002. In addition, Peregrine announced that the SEC had begun an investigation into

its accounting practices.

55.    On June 3, 2002 Peregrine filed with the SEC a Form 8-K in which it admitted

> [r]evenue recognition irregularities, principally arising in the
> Company's indirect channel sales and, to a lesser extent, arising in
> connection with commercial transactions involving
> contemporaneous product purchase activities and investments or
> acquisitions. KPMG has advised that correcting these irregularities
> would have the effect generally of delaying to later periods, or
> nullifying revenue recognized from product sales.

56.    On June 30, 2003, the SEC filed a complaint against Peregrine in the United

States District Court for the Southern District of California. In relevant part, the SEC complaint

alleged as follows:

> This case involves a massive financial fraud by defendant
> Peregrine Systems, Inc., a publicly traded San Diego-based
> software company. The purpose of the fraud was to inflate
> Peregrine's revenue and stock price. To achieve its unlawful
> purpose, Peregrine filed materially incorrect financial statements
> with the Commission for 11 consecutive quarters between April 1,
> 1999 and December 31, 2001 . . . In February 2003, Peregrine
> restated its financial results for its fiscal years 2000 and 2001, and
> for the first three quarter of fiscal 2002. Peregrine reduced
> previously reported revenue of $1.34 billion by $509 million . . ..

57.    On July 22, 2003, Peregrine consented to entry of a Final Judgment in the SEC

action against it. Among other things, the Final Judgment (i) permanently enjoined Peregrine

and related persons from violating the antifraud provisions of the federal securities laws; (ii)

required the Company to retain an Internal Auditor acceptable to the SEC who is required to

report directly to the Audit Committee of Peregrine's Board of Directors, and to assess and

31394110.WPD                                    22

enforce Peregrine's accounting control structure and to ensure that Peregrine's financial

condition and results are accurately reported in Peregrine's public financial statements; (iii)

required Peregrine to establish a Corporate Compliance Program and appoint a Corporate

Compliance Office acceptable to the SEC whose duties include assessing and reporting on

Peregrine's compliance with recognized standards of "best practices" with respect to corporate

governance and to ensure that Peregrine's Board of Directors (and its committees) have

appropriate powers, structure, composition and resources; and (iv) required Peregrine to

commence a training and education program for its officers and employees, to prevent violations

of the federal securities laws.

58.     On February 28, 2003, Peregrine filed with the SEC restated financial results for

its fiscal years 2000 and 2001, and the first three (3) reporting quarters of fiscal year 2002. By

these restatements the Company admitted that it had improperly recognized over $500 million in

revenue during the restated periods. These restatements are also an admission that each

document publishing the originally announced financial results for the restated periods contained

untrue statements of material fact. Thus, Peregrine has admitted that each of the press releases

and the annual quarterly reports filed on SEC forms 10-K and 10-Q and all other SEC filings

incorporating or including such financial information, for the periods ending June 30, 1999

through and including December 31, 2001, contained untrue statements of material fact. The

devastating impact of the accounting restatement is reflected by a comparison of the originally

reported results with actual results, as set forth below.

**Fiscal Year Ended March 31, 2000**

| Income Statement | As Reported | Restatement Adjustment | Restated Amount |
|---|---|---|---|
| Revenue | $253,300,000 | ($121,668,000) | $131,632,000 |

| Income Statement | As Reported | Restatement Adjustment | Restated Amount |
|---|---|---|---|
| Net Loss | ($25,070,000) | ($192,348,000) | ($217,418,000) |

| Cash Flow Statement | As Reported | Restatement Adjustment | Restated Amount |
|---|---|---|---|
| Cash Flow Provided By Operations | $57,611,000 | ($92,373,000) | ($34,762,000) |
| Advances From Factored Receivables | ----- | ($90,885,000) | ($90,885,000) |

59.    The above statements and omissions were material.  A reasonably prudent investor would have wanted to know the truth and the omitted facts in deciding whether to vote to approve the merger of Harbinger and Peregrine.  The truth and the omitted facts bore directly on Peregrine's financial condition, status and prospects and thus on the value of Peregrine's shares.

## DEFENDANTS' CONCEALMENT OF WRONGDOING

60.    Defendants actively concealed their wrongdoing such that no reasonable investor would have been put on inquiry or actual notice of such wrongdoing until, at the earliest, May 6, 2002, when Peregrine announced the resignations of President and CEO Stephen Gardner and Chief Financial Officer Matthew Gless, and the commencement of an investigation into potential accounting irregularities.

## COUNT I

### Against the Individual Defendants
### For Violations Of Section 11 Of The Securities Act

61.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing

paragraphs, as if fully set forth herein.  This Count is asserted against the Individual Defendants

for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k.

62.    On or about May 22, 2000, the individual defendants caused the issuance, and/or

signed Amendment 1 to its Form S-4/A Registration Statement that was filed with the SEC in

connection with Peregrine's acquisition of Harbinger.  This Registration Statement included a

Proxy/Prospectus, which provided for, inter alia, special meetings to be held on June 16, 2000 in

which shareholders of both Peregrine and Harbinger were solicited to vote to approve the merger

of the two companies.  Under the terms of the merger, each outstanding share of Harbinger stock

would be exchanged for 0.75 of a share of Peregrine common stock, and each option to purchase

Harbinger would be exchanged for an option to purchase Peregrine common stock at the same

exchange ratio.

63.    The Registration Statement and Merger Proxy/Prospectus, and those documents

and disclosures incorporated therein by reference, were materially false and misleading;

contained untrue statements of material facts, omitted to state material facts necessary to make

the statements made in the Registration Statement and Merger Proxy/Prospectus, under the

circumstances in which they were made, not misleading; and/or failed to adequately disclose

material facts.  As detailed herein, the misrepresentations contained in, or the material facts

omitted from, the Registration Statement and Merger Proxy Prospectus included, but were not

limited to, the overstatement of Peregrine's revenues its fiscal year ended March 31, 2000.  For

fiscal year 2000, Peregrine's financial statements have been restated by over $300 million. This information was material to Plaintiff in considering how to vote on the Merger, including whether the Exchange Ratio accurately reflected the value of Peregrine common stock.

64.     The Individual Defendants were responsible for the contents of the Registration Statement and Merger Proxy/Prospectus and caused their filings with the SEC.

65.     The Individual Defendants signed the Registration Statement, consented to being named therein as directors and/or officers of Peregrine, and caused it to be prepared, filed with the SEC and circulated to shareholders of Harbinger, including Plaintiff in New Jersey.

66.     Plaintiff acquired Peregrine common stock issued pursuant to the Registration Statement and Merger Proxy/Prospectus.

67.     At the time Plaintiff acquired Peregrine's common stock pursuant to the Registration Statement and Merger Proxy/Prospectus, Plaintiff did not know, nor by the exercise of reasonable care could have known, of the facts concerning the material misstatements and/or omissions alleged herein.

68.     Defendants' false statements, misrepresentations and omissions caused the market price of Peregrine securities to be artificially inflated at the time of the merger with Harbinger. On June 16, 2000, the date of the merger with Harbinger, the market price of Peregrine common stock closed at $25.56 per share.

69.     This action was brought within one year after the discovery of the untrue statements and/or omissions, and within three years after the Peregrine common stock was acquired in connection with the Merger pursuant to class action tolling of the statute of limitations

70.     By reason of the foregoing, the Individual Defendants violated Section 11 of the

Securities Act and are liable to Plaintiff, who has been damaged by reason of such violation, the

amount of which will be determined at trial.

## COUNT II

### Against Arthur Andersen, LLP For
### <u>Violations of Section 11 of the Securities Act</u>

71.     Plaintiff repeats and realleges each of the allegations set forth in the foregoing

paragraphs, as if fully set forth herein. This Count is asserted against Andersen for violations of

Section 11 of the Securities Act, 15 U.S.C. § 77k.

72.     The Registration Statement and Merger Proxy/Prospectus, and those documents

and disclosures incorporated by reference therein, were materially false and misleading;

contained untrue statements of material facts, omitted to state material facts necessary to make

the statements made in the Registration Statement and Merger Proxy/Prospectus, under the

circumstances in which they were made, not misleading; and/or failed to adequately disclose

material facts. As detailed herein, the misrepresentations contained in, or the material facts

omitted from, the Registration Statement and Merger Proxy Prospectus included, but were not

limited to the overstatement of Peregrine's revenues for the fiscal year ended March 31, 2000.

For fiscal year 2000, Peregrine's financial statements have been restated by over $300 million.

This information was material to Plaintiff in considering how to vote on the Merger, including

whether the Exchange Ratio accurately reflected the value of Peregrine common stock.

73.     Andersen prepared and/or certified a report or valuation used in connection with

the Registration Statement, as defined in Section 11 of the Securities Act, 15 U.S.C. § 77k(a)(4).

74.     Arthur Anderson had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the Peregrine financial statements contained in the Harbinger Registration Statement.  They had a duty to ensure such statements were true and there were no omissions of material facts that would make the statements misleading.  Arthur Andersen failed to do so.  Instead, Arthur Andersen consented to the inclusion of its materially false and misleading audit report on Peregrine's fiscal year 2000 financial statements.  Arthur Andersen audit report contained in the Peregrine registration statement with the knowledge and consent of Arthur Andersen.

75.     Andersen, as a preparer or certifier of a report or valuation used in the Registration Statement, is liable to Plaintiff due to his exchange of  Harbinger common stock for Peregrine common stock in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus.

76.     Plaintiff acquired Peregrine common stock issued pursuant to the Registration Statement and Merger/Prospectus.

77.     At the time Plaintiff acquired Peregrine's common stock pursuant to the Registration Statement and Merger Proxy/Prospectus, Plaintiff did not know, nor by the exercise of reasonable care could have known, of the material misstatements and/or omissions alleged herein.

78.     This action was brought within one year after the discovery of the untrue statements and/or omissions and within three years after the Peregrine common stock was acquired in connection with the Merger pursuant to class action tolling of the statute of limitations.

79.    By reason of the foregoing, Andersen violated Section 11 of the Securities Act and is liable to Plaintiff, who has been damaged by reason of such violation, the amount of which will be determined at trial.  Defendant Andersen is liable for its violations of Section 11 of the Securities Act under applicable principles of corporate law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, as follows:

A.    Declaring and determining that the Defendants violated the federal securities laws by reason of their conduct alleged herein;

B.    Awarding monetary damages against all of the Defendants, jointly and severally, in favor of Plaintiff for the damages suffered as a result of the wrongdoing complained of herein, together with prejudgment interest from the date of the wrongdoing to the date of the entry of judgment;

C.    Awarding Plaintiff his costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees and costs;

D.    Granting equitable and/or injunctive relief as permitted by law, equity and federal statutory provisions sued on herein, including attaching, impounding, imposing a constructive trust upon or otherwise restricting Defendants' assets so as to assure Plaintiff of an effective remedy, and;

E.    Awarding Plaintiff such other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

31394110.WPD

DATED: January 2 2, 2007

Lori B. Leskin (LL 7115)
**KAYE SCHOLER LLP**
425 Park Avenue
New York, NY 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689


Of Counsel:
Allan M. Pepper
**KAYE SCHOLER LLP**
425 PARK AVE
New York, NY 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

----------------------------------------------------------------- X
DAVID HILDES, Individually and as Executor of  :
THE DAVID AND KATHLEEN HILDES
CHARITABLE REMAINDER UNITRUST        :
DATED JUNE 25, 1999,
                                                           :    CASE NO.:

        **Plaintiff**

    vs.                                                :

ARTHUR ANDERSEN LLP; THOMAS G.        :
WATROUS, SR., AND; JOHN DOE as the Executor
of the ESTATE OF DAVID A. FARLEY        :

       **Defendants.**                        :

----------------------------------------------------------------- X

## PLAINTIFF DAVID HILDES' RULE 7.1 STATEMENT

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure to enable Judges and

Magistrates of this Court to evaluate possible disqualification or recusal, Plaintiff David Hildes

("Hildes"), by his undersigned counsel, certifies that Hildes is an individual and thus has neither

a  corporate parent nor stock.

Dated: January 2 2 , 2007                    Respectfully submitted,

                                   Lori B. Leskin (LL 7115)
                                   **KAYE SCHOLER LLP**
                                   425 Park Avenue
                                   New York, NY 10022
                                   Telephone: (212) 836-8000
                                   Facsimile: (212) 836-8689

                                   of counsel:
                                   Allan M. Pepper
                                   **KAYE SCHOLER LLP**
                                   425 Park Avenue
                                   New York, NY 10022

31400956.WPD

Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Attorneys for Plaintiff*

☙JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
David Hildes; The David and Kathleen Hildes 1999 Charitable Remainder Unitrust Dated June 25, 1999

**DEFENDANTS**
Arthur Andersen LLP; Thomas G. Watrous, Sr.; John Doe, the executor of the Estate of David Farley

**(b)** County of Residence of First Listed Plaintiff  **BERGEN**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Lori B. Leskin, Kaye Scholer LLP, 425 Park Ave., New York, NY 10022
(212) 836-8000

Attorneys (If Known)
alschuler grossman, 1620 26th st, santa monica, ca 90404-4060
goodwin macbride, 505 Sansome st suite 900 san francisco, ca 94111

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)
Appeal to District Judge from Magistrate Judgment

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 usc 77k
Brief description of cause:
Violations of Securities Act

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ AS DETERMINED AT TRIAL
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE Roger T. Benitez
DOCKET NUMBER SD-Cal 3:02cv870

DATE 1/22/2007
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.     Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.     Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**     Example:     U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.     Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.     Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID HILDES, Individually and as Trustee of the THE DAVID AND KATHLEEN HILDES 1999 CHARITABLE REMAINDER UNITRUST DATED JUNE 25, 1999,<br><br>               Plaintiff<br>  vs.<br><br>ARTHUR ANDERSEN, LLP; THOMAS G. WATROUS, SR; DOUGLAS S. POWANDA; and JOHN DOE as the Executor of the ESTATE of DAVID A. FARLEY<br><br>          Defendants. | CASE NO.: 2:07-cv-393 (SRC)<br><br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><br>**DEMAND FOR JURY TRIAL** |

Andrew Davin Stillufsen
**KAYE SCHOLER LLP**
425 Park Avenue
New York, NY 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689


Of Counsel:
Allan M. Pepper
**KAYE SCHOLER LLP**
425 Park Avenue
New York, NY 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Attorneys for Plaintiff*

31489113.WPD

**TABLE OF CONTENTS**

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PEREGRINE SECURITIES TRADED ON AN EFFICIENT MARKET . . . . . . . . . . . . . . . . . 10

NO STATUTORY SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

PEREGRINE SWITCHES TO AN IMPROPER METHOD OF
REVENUE RECOGNITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

PEREGRINE'S BOARD WAS AWARE OF THE PROBLEMS
WITH CHANNEL SALES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

THE DEFENDANTS' KNOWLEDGE OF AND/OR DELIBERATE
RECKLESSNESS AS TO THE FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

THE FALSE AND MISLEADING STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

THE MATERIAL FALSE AND MISLEADING STATEMENTS EMERGE . . . . . . . . . . . . . 53

DEFENDANTS' CONCEALMENT OF WRONGDOING . . . . . . . . . . . . . . . . . . . . . . . 57

COUNT I - Against Defendants Watrous and Farley For Violations Of Section 11 Of The
Securities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

COUNT II - Against Defendant Arthur Andersen, LLP For Violations of Section 11
of the Securities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

COUNT III - Against All Defendants for Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

COUNT IV - Against Defendants Watrous and Farley for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder . . . . . . . . . . . . . . . . . . . . . . . 64

COUNT V - Against Defendant Arthur Andersen for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

                                                                          Page

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

## INTRODUCTION

1.      Plaintiff, individually and as trustee for the David and Kathleen Hildes 1999

Charitable Remainder Unitrust Dated June 25, 1999, by and through his attorneys, alleges the

following upon information and belief, except those allegations concerning himself, which are

alleged upon personal knowledge.  Plaintiff's information and belief is based, *inter alia*, on the

review of the documents produced by the litigation trustee of Peregrine Systems, Inc. and

performed by counsel for class plaintiffs' in *In re Peregrine Systems, Inc. Securities Litigation*,

currently pending in the United States District Court for the Southern District of California, and

an investigation conducted by Plaintiff's attorneys, including, *inter alia*, a review of the filings in

*In re Peregrine*; a review of deposition transcripts related to *In re Peregrine*; a Registration

Statement on Form S-4/A filed by Peregrine Systems, Inc., ("Peregrine" or the "Company") with

the Securities and Exchange Commission ("SEC") on May 22, 2000 (the "Registration

Statement") issued in connection with the merger, completed on or about June 16, 2000, between

Peregrine and Harbinger Corporation ("Harbinger") (collectively, the "Merger"); the Joint Proxy

Statement and Prospectus included within the Registration Statement (the "Merger

Proxy/Prospectus"); documents incorporated by reference into the Registration Statement; and

other public filings and news articles pertaining to or issued by the Company.  Plaintiff believes

that substantial evidentiary support will exist for the allegations set forth after a reasonable

opportunity for discovery.

2.      As is more fully alleged throughout the Complaint, this action arises from

damages incurred by Plaintiff as a result of the issuance by defendants to Plaintiff in New Jersey

of materially false and misleading statements in the Registration Statement and Merger

Proxy/Prospectus, and in Defendants' other false and misleading material statements, which artificially inflated the value of the Company's securities.

3.      In particular, the Registration Statement and Merger Proxy Prospectus includes the financial statements for the Company's fiscal year 2000 ended March 31, 2000, as well as results for the fiscal year 1999 ended March 31, 1999, both of which were materially overstated. This information was material to Harbinger shareholders, including the Plaintiff, in considering how to vote on the Merger, including whether the Exchange Ratio accurately reflected the value of Peregrine common stock.

4.      Furthermore, the Registration Statement and Merger Proxy Prospectus includes false statements regarding Peregrine's declared method of revenue recognition from indirect software licensing agreements to third party resellers, also known and referenced herein as "channel sales." The Registration Statement and Merger Proxy Prospectus stated that the Company used the proper "sell-through" method of revenue recognition for indirect licensing agreements, which meant that revenue could only be recognized when the software was sold through to the end-user. However, beginning no later than April 1999, Peregrine was in fact using the improper "sell in" method to recognize revenue from this type of transaction, which meant that revenue was recognized as soon as the software was sold-in to the third party reseller, even though there was no commitment by the third party to sell the product, or even an identified end-user for the product. It engaged in this practice in order to maintain the appearance of revenue growth.

5.      This improper method of revenue recognition was in violation of not only Peregrine's disclosed policies, but also the Generally Accepted Accounting Principles ("GAAP"), and was not disclosed in the Registration Statement and Merger Proxy Prospectus.

31489113.WPD                                    2

6.    Furthermore, Peregrine reported four quarterly revenue increases, from July 21, 1999 to April 26, 2000. These statements appeared in press releases, SEC filings and analysts' reports. As set forth in further detail below, all of these statements were materially false and misleading because Peregrine's reported revenue was materially overstated, there was no disclosure of a material change in its accounting policy, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated[1].

7.    The Defendants' knowledge of and/or deliberate recklessness towards the fraud is evidenced not only by their participation in the fraud, but also by their possession of non-public, material information obtained through their positions either on the Peregrine board or as Company executives and through the Individual Defendants' unprecedented insider sales of Peregrine shares.

8.    As a result of defendants' false statements, misrepresentations, and omissions, the price of Peregrine securities was artificially inflated at the time of the Merger. Peregrine shares closed at $25.56 per share on June 16, 2000, the closing date of the Merger.

9.    It was not until the close of trading on April 30, 2002 -- nearly two years after the Merger -- that the Company announced that it would delay its planned earnings release and conference call to announce its financial results for its fourth quarter 2002 and the 2002 fiscal year ended March 31, 2002 because its new auditor, KPMG, required additional time to complete its audit. On that announcement, the price of Peregrine shares plummeted from $6.85 to close at

---

[1]    DSO is an acronym and stands for "days sales outstanding." DSO is a measure of a company's collection of accounts receivable. In general, it is preferable for a company to have a low DSO.

a 52-week low of $3.45 on May 1, 2002, a loss of over 49% in one day on heavy trading. The price of Peregrine stock continued to plummet, closing at $2.57 on May 3, 2002.

10.    The Company also disclosed in a May 6, 2002 press release that its Board of Directors had authorized its audit committee to "conduct an internal investigation into potential accounting inaccuracies brought to the attention of the audit committee by KPMG, the Company's independent auditors." The Company further disclosed that certain transactions involving revenue recognition irregularities, totaling as much as $100 million, have been called into question and may have been recorded during periods in fiscal 2001 and 2002.

11.    In the same May 6, 2002 press release, the Company announced the resignation of the Company's two top officers, Chairman and Chief Executive Officer Stephen P. Gardner ("Gardner") and Chief Financial Officer Matthew C. Gless ("Gless"). Following the Company's disclosures, the price of Peregrine stock continued its free fall, plunging 65% to close at $0.89 on May 6, 2002 on extraordinary volume of 129,957,300 shares as compared to the Company's 192,308,000 outstanding shares and 30-day average trading volume of 3,902,000 shares.

12.    Finally, on May 23, 2002, Peregrine announced that it would restate results for fiscal year 2000, as well as for fiscal year 2001 and the first three quarters of fiscal year 2002. In addition, Peregrine announced that the SEC had begun an investigation into its accounting practices.

13.    On February 28, 2003, Peregrine filed with the SEC restated financial results for fiscal years 2000 and 2001 and the first three reporting quarters of fiscal year 2002. These restated results demonstrate that Peregrine's revenues actually declined by approximately 5%, from $138,063,000 to $131,632,000, from fiscal year 1999 to fiscal year 2000, rather than increased nearly 83%, from $138,063,000 to $253,300,000, as misrepresented in the Registration

Statement and Merger Proxy Prospectus and other public statements. These restated financial results were from Pricewaterhouse Coopers, Peregrine's independent auditors after KPMG, and have been accepted unchallenged by the *In re Peregrine* bankruptcy court, the SEC, the IRS, and Peregrine's shareholders and creditors.

14.     The public false and misleading financial statements, including those in the Registration Statement, caused Peregrine's common stock price to be artificially inflated at the time of the Merger. As a result, the Exchange Ratio utilized in the Merger was artificially deflated and Harbinger shareholders, like Plaintiff, who exchanged their Harbinger common stock for Peregrine common stock in connection with the Merger were harmed by having received insufficient value for their Harbinger common stock.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v. This Court also has jurisdiction over the subject matter of this action under Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. §78aa. The claims asserted herein arise under Section 11 of the Securities Act, 15 U.S.C. §§ 77k, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b), and Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.106-5 and Rule 14a-9, 17 C.F.R. §240.

16.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b) and 1391(c). The offer and sale of Peregrine stock occurred in this District, and the violations of

law complained of herein occurred in this District, including the dissemination of materially false and misleading statements and the omission of material information complained of herein.

17.    In connection with the conduct complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

18.    Prior to the Merger, the Plaintiff held shares of Harbinger common stock that were exchanged for shares of Peregrine common stock in connection with the Merger, and Plaintiff was damaged thereby.

19.    Defendant Thomas G. Watrous, Sr. ("Watrous") served as a member of the Board of Directors of Peregrine from January 1999 through at least May 2002. He became a member of the Audit Committee of Peregrine's Board of Directors on April 17, 2000. Watrous was a senior partner with the management consulting firm of Andersen Consulting (now known as Accenture), which was previously an affiliate of defendant Arthur Andersen LLP. Defendant Watrous signed the Registration Statement.

20.    Defendant Douglas S. Powanda held various executive sales positions at Peregrine, such as Director of Sales, Director of International Sales, Vice President of International Sales, Vice President of North American Sales, Vice President and General Manager of International Sales, Executive Vice President for Operations, and Executive Vice President - Worldwide Sales during the time at issue. Because of Powanda's positions with Peregrine, he had access to adverse, non-public information about the Company's method of reporting revenues. He has pleaded guilty in connection with the massive fraud at Peregrine and is awaiting sentencing.

31489113.WPD                    6

21.    Defendant John Doe is the executor of the Estate of David A. Farley ("Farley").
Farley died in late 2000. John Doe is a fictitious name, because Plaintiff has not yet been able to
determine Farley's executor's true identity despite a diligent search.  Farley was the Company's
Chief Financial Officer.  Because of Farley's positions with Peregrine, he had access to adverse,
non-public information about the Company's method of reporting revenues.  Farley signed the
Registration Statement.

22.    The above individual defendants in paragraphs 19, 20 and 21 (the "Individual
Defendants") each signed, and/or consented to being named as a director and/or officer of
Peregrine in the Registration Statement and/or the Merger Proxy/Prospectus, pursuant to which
Peregrine issued securities in connection with its Merger with Harbinger.

23.    The Individual Defendants participated in the drafting, preparation, and/or
approval of various false and misleading statements contained in the Registration Statement and
Merger Proxy/Prospectus filed by the Company with the SEC in connection with the Merger and
other false and misleading statements as detailed herein.  Because of their Board memberships
and/or executive and managerial positions, each of the Individual Defendants was responsible for
ensuring the truth and accuracy of the various statements contained in the Registration Statement
and Merger Proxy/Prospectus and other statements, including the truth of the reported financial
results of Peregrine.

24.    Each of the Individual Defendants had a duty to promptly disseminate accurate
and truthful information with respect to the Company's true operational and financial condition
and to promptly correct any previously disseminated false or misleading information.  As a result
of their failure to do so in connection with the preparation and filing of the Registration
Statement and Merger Proxy/Prospectus and other false statements, the price of Peregrine

common stock was artificially inflated prior to, and at the time of, the Merger, causing the Exchange Ratio to be artificially deflated and causing injury to Plaintiff.

25.    The Individual Defendants, because of their management positions and memberships on the Peregrine Board, had the power and influence to direct the management and activities of Peregrine, and its employees, and to cause Peregrine to engage in the unlawful conduct complained of herein. Accordingly, the Individual Defendants were able to, and did, control the contents of the Registration Statement and Merger Proxy/Prospectus and other false statements. Each Individual Defendant was provided with copies of the statements and filings alleged herein to be false and misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance and/or to cause them to be corrected, but failed to do so.

26.    Defendant Arthur Andersen LLP ("Andersen") served as Peregrine's outside auditor at the time of the Merger, and had served as such since 1996. Andersen was the Company's auditor until April 2, 2002, when the Company announced that it had terminated Andersen, effective immediately, and appointed KPMG LLP as its outside auditor. Andersen issued an unqualified audit opinion, dated April 25, 2000, on Peregrine's financial results for its fiscal year ending March 31, 2000 contained in the Merger Proxy/ Prospectus. Andersen falsely represented in its unqualified opinion on Peregrine's fiscal years 1999 and 2000 financial statements which were contained in the Merger Proxy/Prospectus that the financial statements were presented in accordance with Generally Accepted Accounting Principles ("GAAP") and that Andersen performed its audit of Peregrine in accordance with Generally Accepted Auditing Standards ("GAAS"). Andersen allowed the false statements in its unqualified audit opinion to be used in the Merger Proxy Prospectus. In fact, Peregrine's revenues and related receivables

were materially overstated, which resulted in an overstatement of revenues and earnings for the fiscal years 1999 and 2000. By virtue of its position as the purported independent auditor for Peregrine, Andersen had access to the Company's key personnel, accounting, books and records and transactional documents, such as software licensing agreements, and to the Company's key customers, at all relevant times. As a result of the auditing and other services performed by Andersen, Andersen personnel were frequently present at Peregrine's corporate headquarters and had continual access to and knowledge of the Company's confidential internal corporate, financial, operating and business information, and had the opportunity to observe and review the Company's business and accounting practices and to test the Company's internal and publicly reported financial statements, as well as the Company's internal controls. On April 5, 2002, Andersen was replaced by KPMG LLP as Peregrine's independent auditor. Andersen was paid approximately $4 million in fees for its auditing, accounting, and consulting work for Peregrine since being retained in July 1996.

27.    Andersen's audit opinion was false and materially misleading because, *inter alia*, it failed to note, in either the textual portion of the opinion letter or in any accompanying notes to the financial statements, that Peregrine's Board had approved a material change in accounting policy in April 1999 (*see* ¶¶ 36-46) from the proper sell-through method to the improper sell-in method. This change materially impacted the results for the fourth quarter of fiscal year 1999 and the results for entire fiscal year 2000 that were incorporated in the fiscal year-end results that Andersen had audited. The change to the sell-in method was designed to provide Peregrine with an immediate revenue and earnings boost so that it could meet its own published expectations for the fiscal quarter and fiscal year. It was known to Andersen that the policy had been changed to apply beginning in the the fourth quarter of fiscal year 1999. Andersen also knew that the

revenue recognition policy in its financial statements was changed to provide for revenue recognition immediately upon execution of a software licensing agreement with third party resellers even though there was no commitment to pay and no identified end user committed to pay, and to allow the Company to meet published earning and revenue forecasts. Andersen knew that the Company's published descriptions of its revenue recognition policy in its financial statements were materially inaccurate in light of the change Peregrine made to use the improper sell-in method of revenue recognition rather than the proper sell-through method of revenue recognition method.

28.     Each defendant is liable to Plaintiff as a direct participant in the wrongs complained of herein.

## PEREGRINE SECURITIES TRADED ON AN EFFICIENT MARKET

29.     As to the claims asserted under the Exchange Act, Plaintiff relies, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine. The market for Peregrine securities was, at all relevant times, an efficient market for the following reasons, among others:

a.     Peregrine's common stock was listed on the NASDAQ, a highly efficient market that quickly reflects all publicly available information concerning a listed company;

b.     As a regulated issuer, Peregrine filed periodic public reports with the SEC, including Forms 10-K for fiscal years 2000 and 2001 and other financial statements that contained material misrepresentations and/or omitted material facts, as alleged herein, causing the price of Peregrine's stock to trade at artificially inflated prices;

c.     Peregrine's senior management regularly met with and provided Company-related information to stock market analysts, institutional investors, fund managers and other market professionals;

d.     Peregrine was followed by several securities analysts employed by major brokerage firms who wrote research reports, which were distributed to the sales force and customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

e.     The brokerage firms following Peregrine included First Union Capital Markets; CIBC World Markets Corp.; U.S. Bancorp Piper Jaffray, Inc.; Thomas Weisel Partners; and Bear Stearns & Co., Inc. Each of these companies relied upon Peregrine's financial statements, as well as statements made by senior management during conference calls and meetings with analysts, in compiling their reports and making their recommendations. First Union, CIBC, Piper Jaffray and Bear Stearns each rated Peregrine a "strong buy," "buy," or "attractive" in their research reports disseminated immediately following Peregrine's announcement of its quarterly financial results and conference calls. The analysts' assessments of Peregrine's stock was based, in material part, upon the honesty and accuracy of Peregrine's reported financial results.

f.     The trading volume of Peregrine's common stock shows that there was a liquid market for Peregrine stock;

g.     Peregrine disseminated information on a market-wide basis through various electronic media services, including issuing press releases through PR Newswire, Business Wire and through the Internet; and

h.    The market price of Peregrine's securities reacted efficiently to new

information entering the market.

### NO STATUTORY SAFE HARBOR

30.    The statutory safe harbor provided for forward-looking statements (under certain

circumstances) does not apply to any of the false statements and material omissions alleged in

this complaint. The statements alleged to be false and misleading all relate to then-existing facts

and conditions. In addition, none of the statements alleged herein were identified as

"forward-looking statements" when made. Nor did meaningful cautionary language identify

important factors that could cause actual results to differ materially from those stated. To the

extent that the statutory safe harbor does apply to any statements alleged herein deemed to be

forward-looking, defendants nonetheless are liable for issuing false forward-looking statements

because, at the time each of the statements was made, the statements were authorized and/or

approved by an executive officer of Peregrine.

### PEREGRINE SWITCHES TO AN IMPROPER
### METHOD OF REVENUE RECOGNITION

31.    Peregrine was a publicly traded company and claimed to be a global provider of

software and services for infrastructure resource management, employee relationship

management and e-commerce technologies.

32.    Peregrine was incorporated in California in 1981 and reincorporated in Delaware

in 1994. Its principal executive offices were located at 3611 Valley Centre Drive, San Diego,

California 92130. Peregrine pursued an aggressive growth-by-acquisition strategy and completed

the acquisition of several businesses and technologies. By April 2001, Peregrine had acquired

12 companies in transactions valued at over $2.2 billion, including the acquisition of Harbinger,

an electronic data interchange provider, for $1.45 billion on June 16, 2000 ("the Merger"). On

September 22, 2002, Peregrine filed for bankruptcy under Chapter 11 of the United States

Bankruptcy Code. Peregrine was acquired by the Hewlett-Packard Company on December 19,

2005.

      33.     Under the "Generally Accepted Accounting Principles" ("GAAP"), the decision

as to whether revenue from licensing computer software should be recognized and, if so, in what

amounts, must follow the procedures set forth in the "Statement of Position 97-2 - Software

Revenue Recognition" (the "SOP").

      34.     Paragraph 8 of the SOP provides that, for software that does not require

significant production, modification, or customization, revenue from licensing the software

should be recognized only when all of the following criteria are met:

        a.     persuasive evidence of an arrangement exists;

        b.     delivery has occurred;

        c.     the vendor's fee is fixed or determinable; and

        d.     collectibility is probable.

This method of revenue recognition is known as "sell through."

      35.     As detailed below (see ¶¶ 130-133), Peregrine's revenue recognition policy, which

appeared in the Merger Proxy/Prospectus Financials, is consistent with the SOP, as detailed

below. In brief, Peregrine stated in the Merger Proxy/Prospectus that for the fiscal years 1998,

1999 and 2000:

> Revenues from direct and indirect license agreements are
> recognized currently, provided that all of the following conditions
> are met: a noncancellable license agreement has been signed, the
> product has been delivered, there are no material uncertainties
> regarding customer acceptance, collection of the resulting

> receivable is deemed probable, risk of concession is deemed
> remote, and we have no other significant obligations associated
> with the transaction.

Therefore, Peregrine's stated revenue recognition policy was on a "sell through" basis, because revenue could only be recognized when the product was sold-through to the ultimate end-user.

36.    However, beginning in early 1999, in order to meet Peregrine's revenue goals, top executives of Peregrine, including Defendants Farley and Powanda, made the decision to immediately recognize revenue from indirect licensing agreements with third party resellers. This was known as the "sell-in" method of revenue recognition because revenue was recognized when the product was sold-in to the third-party reseller. This was clearly improper, as it violated most of Peregrine's and GAAP's criteria for revenue recognition from indirect licensing agreements, as detailed below. (*See* ¶ 130-133).

37.    These indirect licensing agreements with third party resellers, also known as "channel sales," took on new significance with Gardner's elevation to the positions of President and Chief Executive Officer. In preparation for the Board's quarterly meeting in October 1998, Gardner prepared a report to all Company directors concerning the state of the Company. Entitled "Review and Outlook," these reports were distributed each quarter to Board members prior to the Company's quarterly Board meetings. The reports were intended to serve as a basis for discussion at the quarterly board meetings. Board members Steven Gardner, John J. Moores (who was also Chairman of the Board), Richard Nelson, Charles Noell, Christopher Cole, Richard Hosley, Norris van den Berg and defendant Watrous received and reviewed Gardner's October 1998 "Review and Outlook" report at the time it was disseminated prior to the October 1998 Board meeting.

38.    In his quarterly report dated October 1998, Gardner advised the Board members that with respect to channel sales there had been "lots of smoke, little fire," and revenue from channel sales was "absent." Gardner advised Board members that "We are going to move Channels under Worldwide Sales and Marketing, focus on 3 relationships and make it happen. This change will be made in the next few weeks . . . "

### April 1999 Report To Board Of Directors

39.    By the fourth quarter of fiscal year 1999, ending March 31, 1999, the Company was in the midst of the new channel strategy. Channel sales rose to $6.7 million, representing 22% of all license revenues that quarter, more than double prior quarters.

40.    The Company intended to raise these numbers even higher. On April 21-24, 1999, the Company's sales force met at the La Costa Resort and Spa in La Costa, California for its annual Sales Kick-Off. At the meeting, channel sales were a featured topic. In a presentation at this event, defendant Powanda spoke concerning "Integrating our Channel Partners." In a 90-minute presentation that same day, Stephen Spitzer, Vice President, Alliances, spoke on the topic, "Using the Channel in FY 00 - Key to Closing Business."

41.    In conjunction with the Sales Kick-Off meeting, the Board of Directors met at La Costa on the afternoon of April 22, 1999. The meeting was conducted to review both quarterly results and results for the recently-completed fiscal year, including an "outlook and budget" for fiscal year 2000 and executive compensation issues. In addition, given the proximity of the Sales Kick-Off meeting, Gardner encouraged the directors to take advantage of the opportunity it afforded and "to attend as much of the kick-off as you like." Attendees at this Board meeting included Board members Gardner, Moores, Nelson, Noell, Cole, Hosley, van den Berg, and defendant Watrous.

31489113.WPD                          15

42.    Gardner's report in connection with this Board meeting was dated April 19, 1999 and was titled "Fiscal Year 1999 Review, including details of the 4th Quarter." Board members Moores, Nelson, Noell, Cole, Hosley, van den Berg, and defendant Watrous received and read this report at the time it was disseminated to the Board members in April 1999. The report contained a section headed "**Continued Strong US performance, particularly in Channels.**" It stated that,

> This was the first quarter that channels contributed meaningfully to revenue. Steve Spitzer's team came through in a big way. Given the favorable valuation of the company, it is time to proceed with a follow-on offering to raise additional cash for acquisition purposes. We would propose a follow-on offering which would net $70 to $100 million in cash for the company in the May 1999 time period. The total offering size would depend upon the appetite for our equity in the market and the desires of other selling shareholders.

Commenting on related issues, Gardner informed the Board members that in the area of "customer satisfaction" an external survey showed "a negative trend from the survey six months earlier." As to productivity of sales personnel, Gardner advised the Board members that "[o]ur median performer is not producing enough and we have too many people who were on-quota all year who produced very little." In projecting results for Fiscal Year 2000, Gardner informed the Board members as follows: **"We are targeting to exceed budget, as a global organization with $300 million revenue and at least $0.65 EPS ("earnings per share")for FY 2000; This is our 300/200 program."** (Emphasis added). In explaining the program to the Board members, Gardner relayed that "if we meet the goal of $300 million in revenue in FY2000 with an EPS of at least $0.65 per share, that every employee will be fully vested at the end of one-year in 300 options for Peregrine stock at an exercise price set in April of 1999 . . . Please approve the 300/200 program option grant and the attached budget submission." The program was approved

by the Board as proposed. Gardner also advised the Board of a major organizational change to achieve the 300/200 goal, which involved putting Defendant Powanda in charge of the "Operations Group," including sales, marketing, professional services and customer support. Defendant Powanda's new title was Executive Vice President for Operations. One of the reasons offered by Gardner for Defendant Powanda's promotion, and related increase in proposed compensation, was that he helped to achieve the Company goal of increasing channel revenue from less than 5% in the first half of the fiscal year to over 15% in the second half.

43.    Like the Sales Kick-Off meeting, channel activity was a topic addressed at the April 1999 Board meeting, a reflection of the recent increase in channel sales and, more importantly, their anticipated future growth. Farley presented to the Board the issue of whether to apply the sell-in method rather than the sell-through method of accounting to the Company's channel sales.

44.    Farley told the Board that while the sell-in method was not the "preferred" method of accounting it was only by using the sell-in method that the Company would meet its financial goals for the prior quarter (the fourth quarter of fiscal year 1999), which had ended three weeks earlier. He warned that, without adopting the new approach, the Company would also fail to meet its future revenue goals and stock market expectations. Indeed the Company would meet revenue expectations only by applying the improper sell-in method for the prior quarter, and by cutting into revenue for the coming first quarter of fiscal year 2000 ending June 30, 1999. It was in essence borrowing revenue from the future. This confirmed to Board members that there was an underlying and continuing weakness in Peregrine's overall sales efforts. Farley had insisted that the Board be made aware of this proposed change in accounting treatment of channel sales and signify its consent, which the Board did at this meeting. Board members Gardner, Moores,

Nelson, Noell, Cole, Hosley, van den Berg, and Defendant Watrous specifically approved of the use of this new more aggressive and improper accounting method at the April 1999 Board meeting. However, this material change in Peregrine's method of revenue recognition was never disclosed to the public, including Plaintiff. To the contrary, the Company's disclosures concerning its revenue recognition policy did not change, and it misrepresented that Peregrine was using the sell-through method of revenue recognition.

45.     At the April 22, 1999 meeting, Board members also were told that defendant Andersen, the Company's auditor, was not comfortable with any level of channel activity which accounted for more than 25% of revenue. In the just-completed fourth quarter of fiscal year 1999, 22% of license revenue derived from channel sales, and it was clear from Gardner's report to the Board that channel sales would represent an increasing percentage of license revenue.

46.     While this April 1999 Board decision was an official ratification of the improper and undisclosed sell-in method, Company executives, including defendants Powanda and Farley, were already using this method to improperly book channel sales as revenue. Gardner and defendants Farley and Powanda decided at a meeting in early 1999 that they would immediately book as revenue a channel transaction with IBM Global Services in order to meet Peregrine's revenue goals, even though there was no commitment to pay for the products involved nor any identified end-user.

47.     As a result of this decision to switch to the improper sell-in method, Peregrine began to record revenues as if it had fully completed the software sales process when it "sold" software to resellers, even though the resellers had no commitments from end users or had even identified end users interested in the product.

18

48.    Indeed, Peregrine recognized revenue on the improper sell-in method despite the existence of both oral and written agreements and side letters with resellers under which they had no obligation to pay Peregrine for software until it was sold-through to an end user. As demonstrated above, the practice of recognizing revenue on agreements where there was no fixed obligation to pay (i.e., sell-in method) was authorized by the full Board, including Defendant Watrous, and senior management, including Defendants Farley and Powanda.

49.    On April 26, 1999, the Company announced its financial results for the quarter ending March 31, 1999 and its year-end results for fiscal year 1999. According to the announcement, and applying the undisclosed and improper sell-in accounting treatment, the Company posted revenues of $46.1 million for the quarter, an increase of **129%** over the prior year's comparable period, and revenues of $138.1 million for fiscal year 1999, a **123% increase** over results for fiscal year 1998. These reported numbers met and exceeded Wall Street expectations. The investing public was never informed that these reported results were only achieved as a result of the Board's approval of a change to the improper sell-in method of revenue recognition.

50.    The Board again discussed the issue of revenue recognition and the sell-through versus the sell-in method of revenue recognition for channel sales at the January 2000 Board meeting. Specifically, at that meeting the Board was reminded that the selection of the sell-in instead of the sell-through method of accounting for revenues had an impact on the revenues reported to the investing public. Gardner specifically told the Board that Peregrine had booked as actual sales transactions with resellers or with the channel in which the product was unsold to the ultimate user. Moreover, the Board was told that the percentage of sales in the channel was so high that the auditors were uncomfortable with that percentage.

51.    At that meeting Gardner proposed to the Board that Peregrine again change its accounting method for recognition of sales in the channel.  He proposed that Peregrine adopt a policy in which some sales would be recognized on the sell-through method and other sales be recognized on the sell-in method and that Peregrine start to treat portions of contracts as unbooked until sold to the ultimate user.

52.    However, these changes in revenue recognition, from the proper sell-through method, to the improper sell-in method, and then to the improper combination of sell-through and sell-in, were not disclosed to the investing public, including Plaintiff.  The disclosures in the financial statements concerning revenue recognition were unchanged during the entire period prior to the merger with Harbinger, and the investing public, including Plaintiff, were misled into believing that Peregrine was using the proper sell-through method of revenue recognition throughout the period.

53.    Specifically, the changes in revenue recognition at Peregrine were not disclosed in either the Merger Proxy/Prospectus or other public statements made by Peregrine.  To the contrary, Peregrine's financial statements in the Merger Proxy/Prospectus and other public filings falsely and misleadingly represented that Peregrine followed the proper sell-through method of revenue recognition for revenue from indirect licensing agreements that was consistent with GAAP.  In fact, the material changes from proper sell-through, to improper sell-in, to partial sell-through and partial sell-in, were never disclosed publicly.

## PEREGRINE'S BOARD WAS AWARE
## OF THE PROBLEMS WITH CHANNEL SALES

54.    The Individual Defendants were aware of the deepening problems with Peregrine's channel activities, as reflected in Gardner's report for the Board's October 19, 1999

31489113.WPD                                    20

meeting, which Defendants Farley and Powanda reviewed and approved prior to the meetings.

Board members Moores, Nelson, Noell, Cole, Hosley, van den Berg, and Defendant Watrous

received and reviewed Gardner's October 15, 1999 "Fiscal Q2 2000 Review and Outlook" at the

time it was disseminated prior to the October 1999 Board meeting.  Gardner presented an

ominous report to the Board:

> This was the toughest quarter we have experienced since June of
> 1997.  A decent performance from the West, a strong quarter (but
> still small) from Asia/Pacific Latin America and a **very strong
> channel performance** allowed us to compensate for these major
> deficiencies.  **We have now reached a level of channel activity
> that is concerning as we look to the future.  We have a large
> amount of inventory in the channel that must be sold through,
> and this must be done as we simultaneously continue to grow
> our direct businesses.** (Emphasis added).

55.    All of the channel inventory described by Gardner had been recorded as revenue

pursuant to the policy previously approved by the Board and senior Company management.

56.    The ability to sell the burgeoning channel inventory was compounded by a crisis

in the direct sales area.  Although the Company needed "to grow its direct sales," those efforts

had to overcome the fact that it faced a "direct sales challenge."  As reported by Gardner, "Sales

rep productivity in the direct sales area was at a very low level (less than $1 million annualized)

in the September quarter."  This reflected a 29% drop in productivity.  Gardner advised the Board

that it was only because of a "strong channel performance" that the Company was able to

overcome these "major deficiencies."  In other words, loading up the channel with inventory that

could not ultimately be sold was allowing the Company to maintain the illusion of prosperity and

success.  Defendant Watrous was specifically informed of this fact in connection with the

October 1999 Board meeting.

31489113.WPD                                     21

57.    In the face of these serious and fundamental problems confronting the Company
in late 1999, Gardner proposed an exit strategy for himself and Defendant Powanda. Rather than
waiting for the Company's problems to grow worse, Gardner sought Board approval for the
creation of an e-business website, InfraPlace.com, as a separate company to be run by Gardner
and Powanda, together with Farley. In answering the question he posed in this report, "So, are all
the rats moving on?," he acknowledged that current management was not the right "operating
management team" to take the Company to $1 billion in revenue. Gardner stated that Peregrine
had "12 to 18 months to get the right team in place before we have a crisis point . . ." Attendees
at this meeting included board members Gardner, Moores, Nelson, Cole, Noell, Hosley, van den
Berg, and defendant Watrous.

58.    On October 20, 1999, the Company announced results for the second quarter of
fiscal year 2000 ending September 30, 1999 in a publicly disseminated press release. It reported
revenues of $57.8 million, a 95% increase over the prior year's second quarter. No disclosure
was made concerning the change to the improper sell-in method of revenue recognition, its
increasing level of channel activity and its vital importance to meeting published earnings
estimates, the exploding inventory levels, the weaknesses in direct sales, senior management's
request to leave the Company, or the coming crisis point in 12-18 months.

59.    The crisis from bloated channel inventory deepened in the third quarter of fiscal
year 2000 ending December 31, 1999. Channel sales remained high, at $18.6 million,
representing 40% of license revenues. Peregrine's auditors, Defendant Andersen, informed the
Company that it was only comfortable with channel sales representing 25% of licensing
revenues. Channel inventory rose sharply to $57.1 million, an amount equal to 84% of license

revenues for the quarter. With a quarterly burn rate of less than $3 million, the Company would

need almost 20 months to dispose of existing inventory.

## January 2000 Report To Board Of Directors

60.     On January 18, 2000, Gardner disseminated a report to board members Moores,

Nelson, Noell, Cole, Hosley, van den Berg and defendant Watrous, which they each received and

reviewed, and which was prepared in connection with the January 20, 2000 Board meeting.

Gardner told the Board members in his report that it was a "very tough quarter":

> Once again, however, this was a very tough quarter. The opening
> lines from Dickens['] Tale of Two Cities summarizes it best: "It
> was the best of times, it was the worst of times. It was a time of
> wisdom. It was a time of foolishness."
>
> * * *
>
> Why was it the worst of times?
>
> We have a $2 million professional services revenue shortfall
> compared to plan with little or no warning. Half of the reason for
> this was Y2K, the remainder was **the shift toward selling through
> alliances, which had not been adequately factored into the plan**
> . . . .
>
> •     **Our bread and butter business went to hell. The deals
>       between $75K and $500K just were missing in action.**
>       Some of this may also be Y2K effect, most of it was
>       undoubtedly due to the huge sales force re-engineering we
>       have undertaken. In other words, we did this to ourselves
>       . . . I suspect we have one more quarter, and perhaps two, of
>       hand-holding and close upper management involvement in
>       sales. **Sales force productivity is at a ridiculously low
>       level. The US is substantially under $1 million per
>       person and EMEA is right around $1 million/person,
>       while we need both to be closer to $1.5 million per
>       person.** Big deals and excellent individual performances
>       were required to cover the shortfall, when they should have
>       been the icing on the cake.

- **... The US was even worse.** We had a bad forecast to begin with, a gradual improvement in the middle part of the quarter, and then a $4 million melt-down in the last week of the quarter. Only the KPMG deal with Sodexho/Marriott and Gold mine saved the US performance.

*     *     *

Why was it a time of foolishness?

- ... I have come to the conclusion that we are at the awkward teenage stage of our existence. We are much bigger than we were but not big enough to be taken seriously ...

- **Our channel business is now a cause for concern.** We are victims of both our own success and a changing accounting and regulatory landscape. We have been much more successful generating sales to channels and getting partners to buy into our message and vision. **We have not been as successful, and in some cases unsuccessful, in getting the sell-through that would remove the inventory of software from the channels. Rather than a 3 to 6 month latency, the inventory is moving in closer to 9 months as partners ramp up. Due to several highly publicized incidents at other companies (Informix, Network Associates, HBOC), the rules are tightening and practices are being re-examined. The net of this is that we are now at a level of channel inventory that makes our auditors uncomfortable.** (Emphasis added).

61.      By his report, Gardner informed Board members, including Defendant Watrous, that channel sales were a serious ongoing problem. They represented 40% of Peregrine's total revenue, and revenue was being recognized by the improper sell-in method of revenue recognition that it had adopted at least as early as April of 1999, if not earlier. As alleged above, the Board also discussed the sell-in versus sell-through method of revenue recognition, and agreed to keep the improper sell-in method. Gardner also informed the Board of material adverse developments regarding direct sales, and that "big deals" were required to cover the shortfall, to

ensure that the Company did not disappoint market expectations. Gardner also informed the

board, including Defendant Watrous, at this meeting that it would take six to nine months to

work through all of the channel inventory it had. A necessary consequence of this need to work

through the channel inventory is that earnings would likely dramatically fall given the fact that

the channel was full of inventory, and very little, if any further "sales" could be made into it.

Thus, denied this source of revenue, Peregrine's earnings would likely fall. The board members

were fully aware of this consequence and the need to work through the channel inventory.

   62. Gardner stressed in his report that achieving $75 million in revenue for the fourth

quarter of fiscal year 2000 was "important," but would not be easy. To reach that figure while

simultaneously holding down or reducing channel inventory, would require three concurrent

developments: (i) an increase in direct sales productivity to an annualized $1.5 million level per

salesperson; (ii) a "couple of big deals," citing a prospective large sale to Electronic Data

Systems ("EDS"); and (iii) completion of some acquisitions before the end of the quarter.

Without the latter two elements (*i.e.*, a large deal and the acquisitions), revenues for the fourth

quarter would be only $64 million, well below Wall Street expectations.

**THE DEFENDANTS' KNOWLEDGE
OF AND/OR DELIBERATE RECKLESSNESS AS TO THE FRAUD**

   63. Each of the Individual Defendants, whether through their membership on the

Peregrine board or in their capacity as high-level Company executives, learned of material

adverse facts regarding the business and operations of the Company through written, oral, and in

some cases e-mailed reports provided to them by Gardner, as well as through their access to

current financial reports regarding the operations of the Company. Gardner's reports are alleged

in detail in paragraphs 39-42 and 60-62 hereof. As a result of receiving and reading these

reports, or gaining access to such information through their Board participation, each of these defendants had knowledge of the following facts and knew, or with deliberate recklessness disregarded, that none of these material adverse facts were disclosed in Peregrine's press releases or SEC filings, or otherwise:

        a.      Peregrine had implemented the highly aggressive and improper sell-in method of recognizing for revenue immediately upon the sale of software licenses, regardless of whether there was a firm commitment from the reseller, or an identified and committed end user, because absent such accounting treatment the Company would miss earnings targets provided by senior management to the investment community;

        b.      As a result of approving the improper sell-in accounting method, the Company consistently was borrowing from potential future revenue streams to make its current revenue and earnings targets, making it increasingly difficult if not impossible for the Company to report the consistent growth that it represented to the market and that would allow it to continue on its strategy of growth through acquisition by stock mergers;

        c.      Defendants, through their position as Company executives, directors, or outside auditors, knew after at least as early as the January 2000 board meeting that the only way Peregrine could meet earnings targets was by switching to the improper sell-in method of revenue recognition, and thus book as revenue channel sales that had no committed end user or a firm commitment to buy from the channel partner, or other violation of the Company's stated revenue recognition policy;

        d.      There was massive inventory in the channel that neither Peregrine nor its resellers could sell, which was hard evidence that GAAP accounting was not being followed in the recording of revenue throughout the time period at issue in this case, because Peregrine was

recording revenue simply upon entering into agreements with the resellers pursuant to the Board's approval;

        e.     In the aftermath of the Board and Sales Force meetings in April 1999, channel sales rapidly increased. For fiscal year 1999, channel sales accounted for only 13% of all license revenue, with the bulk of those sales coming in the fourth quarter. In contrast, during fiscal year 2000 (April 1, 1999 to March 31, 2000), the Company equaled or exceeded the 25% maximum set by Company auditor and Defendant Andersen in all quarters. As shown below, at the close of fiscal year 2000 in April 2000, channel sales represented over 38% of all license revenues, nearly triple the percentage of channel sales a year earlier and well past the auditor's maximum:

| Fiscal Quarter | Channel Sales | as % of Total License Revenues |
| --- | --- | --- |
| 4Q/99 | $6,700,000 | 22% |
| 1Q/00 | $12,677,896 | 40% |
| 2Q/00 | $19,287,692 | 52% |
| 3Q/00 | $18,600,273 | 40% |
| 4Q/00 | $12,409,381 | 24% |
| **Total FY 2000** | **$62,975,242** | 38% |

        f.     From $6.5 million at the end of fiscal year 1999, channel inventory levels peaked at over $57 million in December 1999, before falling to a level of $34.9 million in March 2000. Channel inventory levels rose so quickly that in some quarters they threatened to exceed license revenues reported in the same quarter:

| Fiscal Quarter | Channel Inventory | as % of Total Revenue |
| --- | --- | --- |
| 4Q/99 | $6,500,000 | 14% |

| | | |
|---|---|---|
| 1Q/00 | $21,080,000 | 42% |
| 2Q/00 | $40,137,168 | 69% |
| 3Q/00 | $57,150,842 | 84% |
| 4Q/00 | $38,793,304 | 50% |

g.    Channel partners were unable to sell the inventory even when assisted by the Company's sales force. Internally, the Company tracked "burn," sales out of the inventory of its channel partners. Its ability to "burn" inventory was dwarfed by the sheer size of the channel inventory that partners were accumulating;

h.    In the second quarter of fiscal year 2000 ending September 30, 1999, the Company burned $2.2 million of channel inventory. But at quarter's end overall channel inventory was $40.1 million. At that rate, the sales force would have needed 18 months to eliminate existing channel inventory, without any allowances for future channel inventory increases. Less than six months after the change to the improper sell-in method of accounting, quarterly channel sales had reached $19 million, representing 52% of all license revenues, and channel inventory was more than two-thirds of license revenue;

i.    In the ensuing third quarter of fiscal year 2000 ending December 31, 1999, the Company improved its "burn" of channel inventory to $2.9 million. However, there was a much larger jump in channel inventory during the quarter to $57.1 million. The Company's sales force would have needed nearly 20 months to eliminate this inventory;

j.    Peregrine had a direct sales crisis arising from weak and diminishing direct sales and poor sales force productivity, such that reliance on stuffing the channel and recording revenue in violation of GAAP before an end user could be found became necessary to meet revenue and earnings estimates;

31489113.WPD                                    28

k.     Peregrine's auditors, Defendant Andersen, were uncomfortable with the level of revenue based on sell-in to the channel, and discussed with the Audit Committee known violations of applicable revenue recognition principles;

l.     Excessive use of channel deals to create revenue was forcing the Company to consistently rely on "big deals" to cover shortfalls in revenue, which deals were difficult to complete and which often demanded extraordinary terms such that recognition of revenue on such transactions was improper;

m.     As of October 1999, the Chief Executive Officer of the Company, Gardner, wanted to implement an "exit strategy" for himself and the Company's leading salesman, Defendant Powanda, and warned of the Company coming to a "crisis point" in 12 to 18 months;

n.     Throughout the time period at issue in this case the Company was constantly in need of cash, resulting in undisclosed "sales" of receivables to purportedly raise cash, and the need to access the capital markets to fund operations, creating a situation where any earnings miss or disclosure of the fundamental problems underlying the Company's business would lead to disastrous consequences; and

o.     The directors and officers, including Defendants Watrous, Farley and Powanda knew, from, *inter alia*, the Board discussions in April 1999 and January 2000, that Peregrine had changed its revenue recognition policy from the sell-through to the improper sell-in method of revenue recognition. However, the disclosures of revenue recognition in the notes to Peregrine's financial statements did not change, and falsely represented that Peregrine continued to use the sell-through method of revenue recognition. As a result, the Peregrine officers and directors, including the Defendants herein, knew that those representations concerning the

Company's method of revenue recognition contained in the Company's financial statements were false when made.

### Insider Sales In Connection with the Harbinger Merger

64.     The Individual Defendants' knowledge of the fraud is also demonstrated by their unprecedented insider sales of Peregrine shares prior to the Merger with Harbinger. Notwithstanding the continuing negative financial developments within the Company, in or about February 2000, Peregrine's board and its executives, including the Individual Defendants, were aware that Peregrine intended to make its largest acquisition ever, a $1.5 billion purchase of Harbinger. These Defendants also knew that the acquisition, once announced, would depress the price of Peregrine stock. This was due not only to the market's natural tendency to depress the price of the shares of an acquiring company in a transaction of this size, but because Harbinger had a slower growth rate and lower operating margins than those purportedly achieved by Peregrine, a sure indication that market analysts would question the wisdom of the transaction for Peregrine. Board members were continuously updated in the January - February 2000 time frame as to the progress of the Harbinger acquisition. In four (4) days of insider selling between February 15 and 18, 2000, Board members Moores, Cole, Gless, Luddy, and Defendants Powanda and Watrous sold 4.3 million shares of Peregrine stock for over $194 million, with Moores' trading accounting for $177 million of this amount in just two days. So egregious was this insider selling that in an e-mail exchange between Peregrine's then general counsel Richard T. Nelson and Farley, this conduct was denigrated and referred to as "the hogs are at the trough."

65.     By February 2000, Gardner, Moores, Nelson, Noell, Cole, Luddy, and Defendants Farley and Powanda were aware of material nonpublic information concerning a planned acquisition of Harbinger Corporation, an Atlanta-based e-commerce transaction delivery firm.

When it later was announced, the Company's proposed acquisition of Harbinger was negatively received by the investing public, causing a 36% drop in the first day alone in the Company's stock price, and erasing over $2.5 billion in shareholder equity.

66.    In pursuing the Harbinger acquisition, Defendants privately had concluded that the acquisition would depress the price of Peregrine stock. They knew that Harbinger had a slower growth rate and lower operating margins (based on then-reported financial results) than did Peregrine and the strategic fit with Harbinger was unlikely to be readily apparent to the investing public.

67.    Consideration of the Harbinger acquisition began in late 1999. Serious discussions involving executives of both companies took place in January 2000 and February 2000, with updates to key Board members, including Defendant Watrous. The transaction was finalized and documented in March 2000 and publicly announced April 5, 2000. Costing more than $1.5 billion, Harbinger was the largest acquisition in the Company's history. Given its sheer size, and the strategic departure it represented, the acquisition was reviewed and analyzed by the Individual Defendants well before its public announcement.

68.    In early November 1999, Gardner and Farley traveled to Baltimore for a meeting with Noell's old firm, Deutsche Bank Alex. Brown, whose affiliate Deutsche Bank Securities Inc. acted as the Company's investment banker. On November 8, 1999, Gardner placed a call to Karl Will, managing director in Deutsche Bank Alex. Brown's San Francisco office, who was the senior investment banker representing the Company on the transaction. Thereafter, Deutsche Bank Alex. Brown forwarded to the Company background information concerning Harbinger, including stock price and ownership information, SEC filings, public news articles, and a recent Harbinger presentation for a technology conference hosted by Deutsche Bank Alex. Brown.

69.     In the ensuing weeks, Farley kept certain key Board members updated on the unfolding Harbinger transaction, including Noell and Moores.  He also coordinated the sale of insider shares.  According to phone records, during the two-week period of insider selling from February 15-29, 2000, he made at least five telephone calls either to the main number at JMI Services or directly to Noell's office at JMI Services.

70.     Farley was in regular contact with brokers responsible for selling the Company's stock on behalf of defendants, which according to defendant Noell included Deutsche Bank Alex. Brown and Goldman Sachs.  According to phone records, Farley placed at least 25 calls to Deutsche Bank Alex. Brown (Brett Clifford) and at least 23 calls to Goldman Sachs during the six-week period from mid January 2000 through the end of February 2000.

71.     Frequent meetings and calls ensued as the Harbinger deal progressed.  According to a Form S-4 filed with the SEC for the merger, Gardner met again with Deutsche Bank Alex. Brown in January 2000, when he authorized contact with Harbinger.  Thereafter, on February 8, 2000, he talked by phone with the Harbinger Chief Executive Officer and its General Counsel concerning "the benefits of a strategic relationship between the companies."

72.     Additional calls followed in the next several days as the deal gathered momentum. On February 14-16, 2000, calls were made to the Harbinger CEO.  On February 14-15, calls were made to the Deutsche Bank banker, including by Gardner.

73.     Between February 15 and 18, 2000, Moores, Cole, Gless, Luddy, and Defendant Powanda sold 4.3 million shares of Company stock for over $194 million, with Moores accounting for over $177 million in just two days of trading.  At the time, Peregrine stock traded at or near record highs, closing at an all-time high on February 16, 2000.  The insider selling

proceeds for the selling defendants in these four days exceeded Peregrine's total reported revenues over the prior three quarters.

74.    According to phone records, Farley placed nine calls to defendant Moores' broker at Deutsche Bank Alex. Brown on February 17, 2000, with the last call not concluded until 7:30 p.m. EST.  In addition, he called the Houston office of Goldman Sachs two times, where a broker retained by Moores was employed, and another three calls were placed from the Company to numbers associated with Deutsche Bank Alex. Brown.  On the following day, February 18, 2000, as the selling continued, Farley made two calls to Deutsche Bank Alex. Brown and another three to Goldman Sachs.  One of his last calls that day was to JMI Services, the investment firm of Moores and Noell.

75.    Given the ramifications of the Harbinger acquisition, Moores and Noell kept abreast of the discussions.  On February 22, 2000, Gardner and Farley traveled to Houston for what expense records refer to as a "JMI Meeting," where they were joined by Luddy, the Company's chief technology officer.

76.    Prior to departing for the JMI meeting early on February 22, Farley made two calls each to Deutsche Bank Alex. Brown and to Goldman Sachs, all shortly before or just after the commencement of stock market trading that day.  Upon arriving in Houston later that morning, he again made calls to Deutsche Bank Alex. Brown and Goldman Sachs.  In addition, he accessed the browser function on his cell phone some sixteen times before the close of the markets that day, on average once every fifteen minutes.

77.    The day after the JMI meeting, February 23, 2000, Farley again placed calls to Deutsche Bank Alex. Brown and Goldman Sachs at or near the time that the markets opened.  He

also continued monitoring his browser, initiating some 28 sessions in only two hours, or once every six minutes, before departing Houston.

78.    Upon their return to the Company's offices on February 24, 2000, Farley was again in contact with Deutsche Bank Alex. Brown and Goldman Sachs, and he placed a call to Noell as well. By the end of the day, Gardner and Farley booked airline tickets to San Francisco, where on February 29, they traveled with Nelson for a dinner meeting with Harbinger executives.

79.    Thus, the Company's management committed to a face-to-face meeting with Harbinger after the trip to Houston for the JMI Services meeting. Coupled with Farley's constant monitoring of his browser while in Houston, his repeated phone calls to Deutsche Bank Alex. Brown and Goldman Sachs, and the presence of the Company's chief technology officer in Houston, these facts demonstrate that the "JMI meeting" was an update on both the Harbinger acquisition and the ongoing insider stock sales.

80.    Upon agreement from Moores and Noell, the discussions with Harbinger moved forward, with Gardner and Nelson, and Farley meeting the Harbinger CEO, chief financial officer, and general counsel in San Francisco for a dinner on February 29, 2000. According to the Form S-4, after a discussion of their respective businesses, the San Francisco meeting focused on strategic alternatives for the companies, including "a possible business alliance, joint venture, or business combination."

81.    Prior to traveling to San Francisco, Farley called Noell at his JMI Services office. Noell had not been a supporter of the Harbinger acquisition. He believed that Harbinger's slower reported growth and lower operating margins were likely to cause Peregrine's stock price to fall upon announcement of the transaction. In an e-mail two years later, Moores recollected that

"Noell was the only dissenting voice on the board." As for Moores's own position, he noted: "I forget (conveniently, in all likelihood) what I thought at the time."

82.    Formal approval of the Harbinger acquisition was given on April 5, 2000 with all directors voting in favor, including Defendant Watrous. The vote occurred after Moores' stockholdings in Peregrine had been reduced by over $177 million, before the material risks accompanying the Harbinger acquisition became publicly known.

83.    When announced, the Harbinger acquisition caused the Company's stock to fall from $58 to $36.75 in a single day of trading on then-record volume of 23 million shares. The downward spiral in the stock price continued over the next several weeks, until it went under $18 per share in late May 2000.

84.    During the period February 15-19, 2000, Moores, Cole, Gless, Luddy, and Defendant Powanda, knowing material nonpublic adverse information concerning the Harbinger deal, sold more than 6 million shares of Company common stock, obtaining proceeds exceeding $193 million.

85.    This insider selling occurred when the selling defendants knew of, and traded on, two material facts that were not known to the investing public; specifically, that Peregrine's channel sales were out of control, there was minimal sell-through, and its auditors were "uncomfortable" with the level of inventory in the channel, and (ii) that the Company was about to make the biggest acquisition in its history that would in the short term depress the price of Peregrine shares.

86.    Further, these February 2000 insider sales by the aforementioned individually named selling Defendants occurred during a "lockup" period by which Peregrine had barred its directors from engaging in trading due to their possession of material, nonpublic inside

31489113.WPD

35

information. Peregrine's then general counsel Eric Deller told investigators in May 2002 that, "[f]rom the end of 1999 through February of 2001, all section 16 officers and directors were prohibited from trading." This was confirmed in Gardner's "Fiscal Q3 2000 Review and Outlook" report dated January 18, 2000, by which the Individual Defendants were informed that "given the uncertainty in the quarter due to the nature of the EDS deal, and our own concerns regarding the uncertainty in the direct sales forecast, **we are going to extend the lock-down period** for all Section 16 officers and directors until such time that the forecast is firm, the EDS deal is signed or committed." (Emphasis added). The forecast was never firmed up. The EDS deal was not announced until April 2000, well after the Individual Defendants had made these insider sales of shares in violation of the "lockup" period.

### Thomas G. Watrous

87.     In addition to the allegations regarding Watrous previously made above, the following allegations demonstrate Watrous' knowledge and/or deliberate recklessness as to the fraud at Peregrine.

88.     Watrous knew that the revenue recognition policy of Peregrine as stated in the Harbinger Proxy/Prospectus, and in the other false statements made by defendant, was false, and that Plaintiff, as a shareholder of Harbinger, would rely on this statement and others in deciding whether or not to vote in favor of the Merger, and be misled as to the financial condition of Peregrine.

89.     In insider sales, Watrous sold 15,000 shares of Peregrine on February 25, 2000, at a sales price of $54.08, for a gain of $811,200 while knowing material adverse nonpublic information about the Company.

90.     All of these shares were sold during the Company imposed lockout period.

**Douglas Powanda**

91.    Defendant Powanda has pleaded guilty to the massive fraud at Peregrine, Docket No. 3:04-cr-2605 (S.D.Cal.), and awaits sentencing.

92.    In addition to the allegations regarding Powanda set forth above, Powanda also participated in the creation and dissemination of Peregrine's false financial results for fiscal year 1999 and 2000. Powanda did so by authorizing sales personnel to enter into sales transactions which included written and oral side agreements, whereby resellers were not obligated to pay Peregrine until they sold the product through to the end user. Powanda knew through discussions with Gardner, Gless, Nelson and Spitzer that Peregrine improperly recognized revenue on such transactions.

93.    Powanda knew that Peregrine set unrealistically aggressive growth targets and pressured its sales personnel each quarter to make the numbers. Powanda attended periodic sales meetings in Peregrine's headquarters which were also attended by Gardner, Farley (until his death) and/or CFO Gless and Peregrine's top sales executives including Defendant Powanda's direct reports. The primary purpose of these meetings was to update and discuss the financial outlook for the current quarter and to review large license agreements anticipated to close during the quarter. Through these meetings and computerized reports received from Gless which tracked the Company's "burn," i.e., commitments from resellers not yet sold-through to the end user, Powanda closely monitored the progress of these anticipated deals, as well as Peregrine's progress towards meeting quarterly revenue targets.

94.    By January 1998, Powanda was Peregrine's Executive Vice President of Worldwide Sales reporting directly to Gardner. He served in that position until approximately April 2000. At that point, Gardner and Powanda negotiated a compensation plan providing

37

Powanda with substantial cash, approximately $750,000 in commissions, which was paid pursuant to this plan on March 15, 2001 and April 30, 2001.

95.     Powanda was involved in multiple transactions whereby revenue was improperly recognized, including agreements with Corporate Software & Technology, CI Solutions, British Telecom, Action, Systematics, and Barnhill. These transactions were negotiated near the end of a quarter, were large in dollar volume and were designed to permit Peregrine to equal or exceed its revenue and pro forma earnings forecasts to the investment community.

96.     Powanda was a confidant of Gardner and often was called upon by Gardner to generate sales revenue for the Company, particularly when it appeared that Peregrine might miss its earnings estimates. Powanda and Gardner, for example, often traveled to Europe at the end of quarters to meet customers and "close" deals. One of Powanda's primary sales techniques was to entertain customers lavishly at strip clubs and then use his entertaining to later call in chits for Peregrine business. Powanda kept a drawer in his office, known as the "magic drawer," which was filled with contracts that he could pull out at quarter's end to purportedly book revenue.

97.     Powanda was an architect of the KPMG relationship. Although the main interface with KPMG was Spitzer, Powanda was directly involved in the KPMG/Morgan Stanley transaction. Powanda negotiated with Morgan Stanley for an "enterprise license" agreement, a very large sale. Powanda claimed to have a letter agreement. He asked Spitzer to have KPMG finalize the deal, and KPMG would receive a large services contract. Powanda knew that KPMG had done similar "favors" for Peregrine in the past, whereby it would sign agreements knowing it had no real payment obligation.

98.     According to a former employee, Peregrine management fraudulently faxed purchase orders and other accounting/audit-related documents from one Peregrine office to

another during end of quarter audits. Management would change dates and add new date stamps so that they could include sales for the quarter after the quarter had closed. Powanda sanctioned this practice and laughed about it.

99.    An Area Vice President, E-business Programs reporting to Powanda, has stated: "Powanda told me in 1999 that the fax machine in his office on the second floor (at the end of the mahogany row next to the accounting department in the old building), was 3 days back-dated so that customer contracts that were closed after the quarter could be faxed through to his fax machine and back-dated. I sat in the office between Farley and Powanda. Those that had direct knowledge of this machine was a tightly held secret. Powanda's fax machine was the collection point for improperly booked Euro deals."

100.    In light of Powanda's education and extensive experience in the software business, he knew the criteria to determine whether revenue could be recognized on a particular transaction, and that the deals described herein did not satisfy the relevant criteria. Powanda knew, or was deliberately reckless in disregarding, that Peregrine's reported revenues in fiscal year 2000 and fiscal year 2001 were materially overstated.

101.    Powanda knew that the revenue recognition policy of Peregrine as stated in the Harbinger Proxy/Prospectus, and in the other false statements made by defendant, was false, and that Plaintiff, as a shareholder of Harbinger, would rely on this statement and others in deciding whether or not to vote in favor of the Merger, and be misled as to the financial condition of Peregrine.

102.    Powanda also engaged in insider sales of Peregrine shares while knowing material adverse nonpublic information about the Company.

103.    Powanda made the following sales of Peregrine common stock during 1999-2000,

while knowing of material adverse nonpublic information:

| Date | Number of Shares | Sales Price | Proceeds Received |
|------|------------------|-------------|-------------------|
| 08/16/99 | 10,000 | $33.00 | $ 330,000.00 |
| 08/16/99 | 6,250 | $33.00 | $ 206,250.00 |
| 02/17/00 | 30,000 | $45.98 | $ 1,379,400.00 |
| 02/17/00 | 20,000 | $46.19 | $ 923,800.00 |
| 02/17/00 | 10,000 | $45.94 | $ 459,400.00 |
| 02/17/00 | 20,000 | $46.13 | $ 922,600.00 |
| 02/17/00 | 20,000 | $46.22 | $ 924,400.00 |
| 02/17/00 | 10,000 | $46.44 | $ 464,400.00 |
| 02/23/00 | 2,500 | $44.94 | $ 112,350.00 |
| 02/23/00 | 5,000 | $45.19 | $ 225,950.00 |
| 02/24/00 | 22,500 | $45.00 | $ 1,012,500.00 |
| 02/24/00 | 10,000 | $45.13 | $ 451,300.00 |
| 02/24/00 | 10,000 | $46.00 | $ 460,000.00 |
| 02/24/00 | 2,500 | $45.56 | $ 113,900.00 |
| 02/24/00 | 10,000 | $46.38 | $ 463,800.00 |
| 02/24/00 | 7,500 | $45.50 | $ 341,250.00 |
| 02/25/00 | 5,000 | $47.75 | $ 238.750.00 |
| 02/25/00 | 10,000 | $48.13 | $ 481,300.00 |
| 02/25/00 | 5,000 | $47.00 | $ 235,00.00 |

**David Farley**

104.    In addition to the above, Farley's knowledge of and/or recklessness towards the

fraud at Peregrine is demonstrated by the fact that Farley knew that the revenue recognition policy

of Peregrine as stated in the Harbinger Proxy/Prospectus, and in the other false statements made

31489113.WPD                                    40

by defendants, was false, and that Plaintiff, as a shareholder of Harbinger, would rely on these false statements and others in deciding whether or not to vote in favor of the Merger, and be misled as to the financial condition of Peregrine.

**Arthur Andersen**

105.    In addition to the above, Andersen's knowledge of or deliberate recklessness with regard to the fraud at Peregrine is evidenced by its unqualified opinion in the Harbinger Merger Proxy/Prospectus, which materially misrepresented Peregrine's revenues by over $121 million, and understated Peregrine's losses by over $192 million, as detailed in ¶ 145 below.

106.    Furthermore, Andersen knew that Peregrine's channel sales were being improperly recognized as revenue, in violation of GAAP and the representations made of the revenue recognition policies set forth in the notes to Peregrine's financial statements, as it issued several unqualified audit reports, in both Peregrine's 10Q and the Harbinger 10K, that showed these channel sales as revenue even though they met none of Peregrine's or GAAP's requirements. Andersen also knew that Harbinger shareholders, including the Plaintiff, would rely upon its false statements in deciding whether or not to vote in favor of the Merger.

## THE FALSE AND MISLEADING STATEMENTS

**1st Quarter of 2000 (April 1, 1999 to June 30, 1999)**

107.    On July 21, 1999, Peregrine issued a press release stating it had achieved "record" quarterly revenues of $51.6 million for the first quarter of fiscal year 2000, ending June 30, 1999. Peregrine further stated that "[o]verall results were driven by a 131 percent increase in license revenue over the comparable quarter in the prior year." Gardner was quoted: "We are extremely pleased with the outstanding growth in both our software license sales and our professional

services activity in the first fiscal quarter. . . ." All Individual Defendants read and approved the press release.

108.    On July 21, 1999, Peregrine management, led by Gardner, held a conference call with investors and analysts. During the call, Peregrine management reported on Peregrine's previously released financial results for the quarter. Peregrine management also reported that it saw strength in its product lines, distribution channels and geographic regions, that international revenues had increased 195%, or 47% of total reported revenue, and that DSO finished the quarter at 76 days within Peregrine expectations.

109.    On July 22, 1999, the brokerage firm CIBC World Markets ("CIBC") reported Peregrine's previously released financial results[2] and that Peregrine management had indicated: "Peregrine saw strength across its product lines, distribution channels and geographies." The report also stated that "International revenues soared an incredible 195% to make up 47% of the mix as Peregrine focused its attention on the world market" and that DSO finished the quarter at 76 days. CIBC raised its earnings estimates and rated Peregrine's stock a "strong buy."

110.    On July 22, 1999, First Union Capital Markets ("First Union") also issued a report. In it, First Union repeated Peregrine's previously released financial results and raised its earnings estimates. First Union rated Peregrine a "buy." Peregrine's stock closed at $15.34 per share on July 22, 1999.

111.    On August 13, 1999, Peregrine filed its Form 10-Q with the SEC. Gless signed the 10-Q as Vice President of Finance and Chief Accounting Officer. The 10-Q included Peregrine's July 21, 1999 press release. The 10-Q also included Peregrine's revenue recognition policy:

---

[2]    Unless otherwise noted, all analyst reports repeated Peregrine's financial statements included in the respective press release.

> Revenues from direct and indirect license agreements are
> recognized currently, provided that all of the following conditions
> are met: a noncancelable license agreement has been signed; the
> product has been delivered; there are no material uncertainties
> regarding customer acceptance; collection of the resulting
> receivable is deemed probable; risk of concession is deemed
> remote; and no other significant vendor obligations exist.[3]

All Individual Defendants read and approved the 10-Q. Defendant Andersen allowed or

consented to the inclusion of its unqualified audit report in the 10-Q.

### 2nd Quarter of 2000 (July 1, 1999 to September 30, 1999)

112.    On October 20, 1999, Peregrine issued a press release announcing that it had

achieved "record" quarterly results for the second quarter of 2000, ending September 30, 1999.

Peregrine stated that the total revenues "increased 95 percent to record $57.8 million" from the

same quarter a year ago. Gardner was quoted:

> We are delighted with our continued rapid growth and with the on-
> going development of the customer demand for our end-to-end
> Infrastructure Management solutions. . . .This quarter marked a
> significant maturation of our alliances on a global basis, leading to
> both increased software license sales via alliances and a shift in
> some service revenue growth to some of our partners. . . .

All Individual Defendants read and approved the press release.

113.    On October 20, 1999, Peregrine management, led by Gardner, held a conference

call with investors and analysts. During the conference, Peregrine management reported on

Peregrine's previously released financial results for the quarter. Peregrine management also stated

that they continued to see strength for all of Peregrine's products in all geographical regions, that

Peregrine was working on a number of very large orders which would have a material positive

---

[3]     Unless otherwise noted, any further reference to Peregrine's revenue recognition policy is
a reference to this quoted language.

impact on future revenues and earnings and that the balance sheet had improved this quarter with $24.9 million in cash on hand.

114.    On October 21, 1999, CIBC reported that Peregrine management had indicated that Peregrine "executed flawlessly in the quarter with strength across all product lines and geographies." Management was also reported as representing that there were a number of "mega deals" that were likely to close and which would have a "material positive impact on the top-and-bottom line in the quarter in which they close" and that there was improvement in the balance sheet. CIBC continued its "strong buy" rating.

115.    On October 21, 1999, First Union reported the Peregrine management's statements concerning the "mega deals," and that they were described as between 20% and 25% of a quarter's revenue. First Union again assessed Peregrine a "strong buy." Peregrine's stock closed at $20.875 per share on October 22, 1999.

116.    On November 14, 1999, Peregrine filed its Form 10-Q with the SEC. Gless signed the 10-Q as Vice President of Finance and Chief Financial Officer. The Form incorporated the financial statements from the October 20, 1999 press release and Peregrine's revenue recognition policy. All Individual Defendants read and approved the 10-Q. Defendant Andersen allowed or consented to the inclusion of its unqualified audit report in the 10-Q.

**3rd Quarter of 2000 (October 1, 1999 to December 31, 1999)**

117.    On January 20, 2000, in a press release, Peregrine reported "record" quarterly results for the third quarter of fiscal year 2000, ending December 31, 1999. Peregrine stated it had achieved revenues of $67.5 million, a 67% increase from the same quarter a year ago. Gardner was quoted:

> [W]e had a number of large transactions and remarkably strong
> surge of both interest and initial sales from our new Get.It! and
> Get.Resources! employee self service and e-procurement products.
> In addition, we exceeded our expectations for the launch of our new
> midrange solution, InfraCenter for Workgroups.

All Individual Defendants read and approved the press release.

118.    On January 20, 2000, Peregrine management, led by Gardner, held a conference

call with investors and analysts.  At the conference, Peregrine management reported on

Peregrine's previously released financial results for the quarter.  Peregrine management also state

that customer acceptance of Peregrine's new Get.It! e-products far surpassed expectations and that

the balance sheet remained strong with cash increasing and DSO remaining steady at an

acceptable level of 79 days.

119.    On January 21, 2000, CIBC reported "[t]he enthusiastic reception on Peregrine's

New Get.It! e-procurement products far exceed management's expectations, and generated

$5 million in sales in just three weeks of release."  The report also indicated "that the deal pipeline

was more active than usual."  CIBC also noted:

> The balance sheet remained strong this quarter, increasing $300,000
> to $25.2 million with cash remaining at $0.38 per share.  Accounts
> receivable rose $8.5 million to $59.6 million, with DSO remaining
> steady at 79, also within what management regards as an acceptable
> range.  Deferred revenues grew $9.8 million to $31.3 million, and
> were made up solely of customer support.

CIBC continued to rate Peregrine as a "strong buy".  First Union also rated Peregrine a "strong

buy."  Peregrine stock rose to $44.53 per share at the close of trading on January 24, 2000.

120.    On February 11, 2000, Peregrine filed its Form 10-Q with the SEC.  Gless signed

the 10-Q as Vice President of Finance and Chief Accounting Officer.  The 10-Q included the

January 20, 2000 press release and Peregrine's revenue recognition policy.  All Individual

Defendants read and approved the 10-Q. Defendant Andersen allowed or consented to the inclusion of its unqualified audit report in the 10-Q.

**4th Quarter of 2000 (January 1, 2000 to March 31, 2000) and Fiscal Year 2000**

121.    On April 26, 2000, Peregrine issued a press release, stating it had "record" quarterly revenues of $76.3 million (a 66% increase compared with revenues in the comparable prior year period) and "record" annual revenue of $253.3 million (a 83% increase over prior year revenues). Gardner was quoted: "[t]he market remains strong" and "our products continue to lead in their respective areas." All Individual Defendants read and approved the press release.

122.    On April 26, 2000, Peregrine management, led by Gardner, held a conference call with investors and analysts. During the conference, Peregrine reported on Peregrine's previously released financial results for the quarter. Peregrine management also stated that Peregrine had closed a very large order with EDS, that Peregrine had excellent visibility into the next quarter and that it expected a $40-$50 million revenue contribution from Get.It! for the year.

123.    On April 27, 2000, CIBC reported that Peregrine management had represented that:

> Peregrine's 4Q00 results indicate that its core business remains strong. During the quarter the company closed a particularly large deal with EDS; the size of the deal was not disclosed, but management implied that the company has "great visibility into the next quarter." We regard this as an extremely positive sign that there is no slowdown in Peregrine's business, which was a concern last quarter.

124.    The report also stated that "management comments referring to a $40-50 million revenue contribution from Get.It! for the year [which] would imply a significant ramp-up must be in store," as well as management's indication "that it was seeing a strong rebound in mid-sized deal flow ($100,000 - $300,000). . . ." Expressing concern over possible logistical and integration

difficulties associated with the acquisition of Harbinger, CIBC rated Peregrine's stock as "Hold." Peregrine's stock closed at $24.06 per share on April 28, 2000.

     125.    On May 10, 2000, Peregrine filed its Form 10-K with the SEC. It incorporated the financial statements that were included in the April 26, 2000 press release. The 10-K also included Peregrine's revenue recognition policy. The 10-K further included Andersen's unqualified audit report on Peregrine's year end financial statements for the fiscal 2000. Gless, Gardner, Moores, Noell, van den Berg, Hosley and Defendant Watrous and signed the 10-K.

### The Harbinger Registration Statement and Merger Proxy/Prospectus

     126.    The Merger could not be completed without the approval of a majority of shareholders of Harbinger and Peregrine common stock present and voting at a special meeting and a majority of the outstanding shares of Harbinger common stock. Accordingly, on or about May 22, 2000, Defendants issued the Registration Statement and Merger Proxy/Prospectus which, *inter alia*, solicited Peregrine and Harbinger common shareholder votes, including Plaintiff's, to approve the Merger. Had Plaintiff been aware of Defendants' many material false and misleading statements and known Peregrine's true condition, he would not have ultimately given his proxy in favor of the merger. Indeed, if Plaintiff had learned of Defendants' many material false and misleading statements and known Peregrine's true condition, he would have rescinded the proxy.

     127.    On May 22, 2000, Peregrine filed the Registration Statement with the SEC on Form S-4/A that included the Merger Proxy/Prospectus, for special meetings on June 16, 2000. The shareholders of Peregrine and Harbinger were each voting on the Merger.

     128.    The Merger Proxy/Prospectus contained the following information, among other data, concerning Peregrine's revenue. Under "Sales And Marketing," Peregrine stated:

31489113.WPD

We sell our software and services in North America and internationally primarily through a direct sales force. A large number of our sales force is based at our San Diego headquarters, but we also have North American sales personnel located in, or in close proximity to, most major cities in the United States and Canada. Our international sales force is located in the metropolitan areas of Amsterdam, Frankfurt, London, Milan, Copenhagen, Munich, Paris, Singapore and Sydney. Our sales model combines telephone and Internet communications for product demonstrations with travel to customer locations to pursue a consultative sales process. In addition to our direct sales strategy, we continue to pursue indirect distribution channels. In the Pacific Rim and Latin America, we have established a network of channel partners. In North America, we have established a network of regional and national systems integrators and channel partners. When sold through direct channels, the sales cycle for our products typically ranges from six to nine months, depending on a number of factors, including the size of the transaction and the level of competition we encounter in our sales activities.

In recent periods, we have devoted significant resources to building our marketing organization and infrastructure. We have significantly expanded product marketing, marketing communications, alliance marketing, telemarketing and sales training. The primary focus of our marketing department is to generate qualified leads for the worldwide direct sales force and to create market awareness programs for Peregrine and our products. As part of our strategy, we have invested significantly in the Internet, developing a new corporate web site during fiscal 2000 and executing an array of web-based marketing programs. In addition, during fiscal 2000, we established an executive briefing center in order to focus our sales efforts at senior levels within our prospective customer's organizations.

We have significantly increased the size of our sales force over the last year and expect to continue hiring sales personnel, both domestically and internationally, over the next twelve months. Competition for qualified sales personnel is intense in the software industry. We also expect to increase the number of our regional, national, system integrator and channel partners, both domestically and internationally. Any failure to expand our direct sales force or other distribution channels could have a material adverse effect on our business, results of operations, and financial condition....

(underscoring added).

129.    Peregrine's Merger Proxy/Prospectus, in its "Selected Consolidated Financial Data" section, reported, among other things, that for the fiscal year ended March 31, 2000 Peregrine had Total Revenues of $253,300,000 (Licenses Revenues were $168,467,000 and Services Revenues were $84,833,000) and a Net Loss of $25,070,000.

130.    In Peregrine's "Management's Discussion And Analysis Of Financial Condition And Results Of Operations" ("Merger Proxy/Prospectus MDA") which appears in the Merger Proxy/Prospectus, Peregrine stated the following concerning revenue:

> Our revenues are derived from product licensing and services. Services are comprised of maintenance, professional services, and training. License fees are generally due upon the granting of the license and typically include a one-year maintenance and warranty period as part of the license agreement. We also provide ongoing maintenance services, which include technical support and product enhancements, for an annual fee based upon the current price of the product.
>
> Revenues from license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed, the product has been delivered, there are no material uncertainties regarding customer acceptance, collection of the resulting receivable is deemed probable, the risk of concession is deemed remote and no other significant vendor obligations exist. Revenues from post-contract support services are recognized ratably over the term of the support period, which is generally one year. Maintenance revenues which are bundled with license agreements are unbundled using vendor-specific objective evidence. Consulting revenues are primarily related to implementation services most often performed on a time and material basis under separate service agreements for the installation of our products. Revenues from consulting and training services are recognized as the respective services are performed.

> REVENUES. Total revenues were $253.3 million, $138.1 million and $61.9 million for the fiscal years ended 2000, 1999 and 1998, representing period-to-period increases of 83% and 123% for the fiscal 2000 and 1999 periods....

LICENSES. License revenues were $168.4 million, $87.4 million and $38.8 million in fiscal 2000, 1999 and 1998, representing 67% of total revenues in fiscal 2000 and 63% in both fiscal 1999 and 1998. Total license revenues increased 93% and 125% period-to-period for fiscal 2000 and 1999. Domestic license revenues increased 73% in fiscal 2000 and 135% in fiscal 1999, while international license revenues increased 125% and 111% in fiscal 2000 and 1999. The increases in license revenues are attributable to increased demand for new and additional licenses of our infrastructure resource management applications, from new and existing customers, larger transaction sizes, expansion of our domestic and international sales forces, and acquisitions. We expect larger transaction sizes from a limited number of customers to account for a large percentage of license revenues for the foreseeable future. Management believes these trends will fluctuate period to period in absolute dollars and as a percentage of total revenues.

During the past three years, we have increased the number of channels that we use to distribute our products. The majority of our products are distributed through our direct sales organization. The balance is derived through indirect sales channels and alliance partners, including value added resellers and systems integrators. Revenues derived through indirect channels now comprise a significant portion of our total license revenues. We have substantially less ability to manage our sales through indirect channels and less visibility about our partner's success in selling the products that they have purchased from us. To the extent indirect sales continue to increase as a percentage of total revenues, we could experience unforeseen variability in our future revenues and operating results if our partners are unable to sell our products.

SERVICES. Services revenues consist of support, consulting and training services. Service revenues were $84.8 million, $50.7 million and $23.1 million for fiscal years 2000, 1999 and 1998, representing 33% of total revenues in fiscal 2000 and 37% in both fiscal 1999 and 1998. Total services revenues increased 67% and 120% period-to-period for fiscal 2000 and 1999. Domestic services increased 63% in fiscal 2000 and 111% in fiscal 1999, while international services revenues increased 78% and 140% in fiscal 2000 and 1999, respectively. The dollar increases are attributable to maintenance agreements and related billings from our expanded installed base of customers and an increase in consulting and training revenues related to the implementation of our software from initial license agreements and related expansion.

> While these revenues are increasing in absolute dollars, we expect
> these trends to fluctuate as a percentage of total revenues.

(underscoring added)

131.    Peregrine's financial statements for the fiscal year ended March 31, 2000 and 1999

("Merger Proxy/Prospectus Financials") were included in the Merger Proxy/Prospectus.

Defendant Andersen, Peregrine's Independent Accountants, issued an unqualified opinion on

these financial statements.  The financial statements included Peregrine's "Consolidated

Statements Of Operations" for the fiscal year ended March 31, 2000 which reported that Peregrine

had Total Revenues of $253,300,000 (Licenses Revenues were $168,467,000 and Services

Revenues were $84,833,000) and a Net Loss of $25,070,000 for that fiscal year. For the fiscal year

ended March 31, 1999 Peregrine reported Total Revenues of $138,063,000 (License Revenues

were $87,362,000 and Service Revenues were $50,701,000) and a Net Loss of $23,370,000 for

that fiscal year.

132.    The Merger Proxy/Prospectus Financials had "Notes To Consolidated Financial

Statements" which included the following under the caption:  Company Operations And Summary

Of Significant Accounting Policies

REVENUE RECOGNITION

> We generate revenues from licensing the rights to use our
> software products primarily to end users.  We also generate
> revenues from post-contract support (maintenance), consulting and
> training services performed for customers who license our products.
> We do not provide professional services unrelated to our products.

> Revenues from direct and indirect license agreements are
> recognized currently, provided that all of the following conditions
> are met:  a non-cancelable license agreement has been signed, the
> product has been delivered, there are no material uncertainties
> regarding customer acceptance, collection of the resulting
> receivable is deemed probable, risk of concession is deemed remote,

and we have no other significant obligations associated with the
transaction. Revenues from post-contract support services are
recognized ratably over the term of the maintenance period,
generally one year. Maintenance revenues which are bundled with
license agreements, are unbundled using vendor specific objective
evidence. Professional services revenues are primarily related to
implementation services most often performed on a time and
material basis under separate service agreements for the installation
of our products. Revenues from professional services and customer
training are recognized as the respective services are performed.

Cost of license revenues consists primarily of amounts paid
to third-party vendors, product media, manuals, packaging
materials, personnel, and related shipping costs. Cost of
maintenance and services revenues consists primarily of salaries,
benefits, and allocated overhead costs incurred in providing
telephone support, professional services, and training to customers.

Deferred revenues primarily relates to maintenance fees,
which have been paid by our customers in advance of the
performance of these services.

............................................................

Quarterly Information ( Unaudited )
The following unaudited quarterly financial information
includes, in our opinion, all normal and recurring adjustments (in
thousands) necessary to fairly state our consolidated results of
operations and related information for the periods presented.

| | FIRST QUARTER | SECOND QUARTER | THIRD QUARTER | FOURTH QUARTER |
|---|---|---|---|---|
| FISCAL 2000 | | | | |
| Licenses revenues .............. | $ 32,092 | $ 37,102 | $ 46,524 | $ 52,749 |
| Services revenues .............. | 19,513 | 20705 | 21,020 | 23,595 |
| Total costs and expenses ......... | -53093 | (56,006) | -63233 | -89624 |
| Income (loss) from operations ..... | (1,488) | 1,801 | 4311 | (13,280) |
| Interest income (expense) and other ....................... | 86 | 7 | 5 | (60) |
| Income tax expense ............. | 3439 | 4042 | 4183 | 4788 |
| Net income (loss) .............. | $ (4,841) | $ (2,234) | $    133 | $(18,128) |

(underscoring added)

133.    On June 16, 2000, Peregrine completed the acquisition of Harbinger Corporation. Peregrine issued approximately 30,157,000 shares of Peregrine Common Stock (excluding approximately 6.0 million shares of Peregrine common stock issuable upon exercise of options and warrants assumed in connection with the acquisition) in exchange for all of the outstanding shares of Harbinger for a total purchase price, including merger related costs, of approximately $1,481.4 million.

### THE MATERIAL FALSE AND MISLEADING STATEMENTS EMERGE

134.    As noted above, the change to the improper sell-in method of revenue recognition was not disclosed in the Merger Proxy/Prospectus received by Plaintiff in connection with the Harbinger merger. Instead, the Merger Proxy/Prospectus falsely and misleadingly represented that Peregrine followed the proper sell-through revenue recognition method for revenue from indirect licensing agreements that was consistent with GAAP. In fact, this material change in Peregrine's method of revenue recognition was never publicly disclosed.

135.    In February 2002, Peregrine announced it had replaced Andersen with a new independent outside auditor - KPMG LLP.

136.    On May 6, 2002, Peregrine announced that KPMG uncovered potential accounting inaccuracies that at that time questioned at least $100 million in revenue for fiscal years 2001 and 2002. According to the Company, the revenue that was being questioned was from "indirect channels," meaning that it came via third-party partners that were selling Peregrine's products to the end user. Furthermore, Peregrine said it "currently" recognized revenue from "indirect channels" on the above mentioned "sell through" basis, and thus revenue was recognized at the time the software was sold to the end user.

137.    However, Peregrine finally disclosed May 6, 2002 that, to recognize revenue from "indirect channels," it had "previously" used the "sell in" basis.

138.    In "indirect channels" transactions, Peregrine knowingly recognized revenue from software licensing deals with resellers despite the fact that one or more conditions for proper recognition of revenue under GAAP and its own stated policy were never met, including the following: (i) the fee owed to Peregrine was not fixed and determinable, (ii) collectibility of the fee was not probable, or (iii) the reseller's obligation to pay for the product was contingent upon subsequent sale of the product to an end user. In addition, Peregrine provided certain resellers with side payments, deep discounts and rebates to induce them into "purchasing" license agreements where no end user had committed to purchase the product.

139.    At the same time, the Company announced that it had replaced Steve Gardner, its Chairman and Chief Executive Officer, and Matthew Gless, its Chief Financial Officer.

140.    As a result of these announcements, Peregrine's stock fell on May 6, 2002 from $1.68 to $.89, down from a 52 week high of $33.55 in the NASDAQ.

141.    On May 23, 2002, Peregrine admitted that its fiscal year 2000 financial statements had to be restated and that it would also restate results for fiscal year 2001 and the first three quarters of 2002. In addition, Peregrine announced that the SEC had begun an investigation into its accounting practices.

142.    On June 3, 2002 Peregrine filed with the SEC a Form 8-K in which it admitted

> [r]evenue recognition irregularities, principally arising in the Company's indirect channel sales and, to a lesser extent, arising in connection with commercial transactions involving contemporaneous product purchase activities and investments or acquisitions. KPMG has advised that correcting these irregularities would have the effect generally of delaying to later periods, or nullifying revenue recognized from product sales.

31489113.WPD

54

143.   On June 30, 2003, the SEC filed a complaint against Peregrine in the United

States District Court for the Southern District of California.  In relevant part, the SEC complaint

alleged as follows:

> This case involves a massive financial fraud by defendant
> Peregrine Systems, Inc., a publicly traded San Diego-based
> software company.  The purpose of the fraud was to inflate
> Peregrine's revenue and stock price.  To achieve its unlawful
> purpose, Peregrine filed materially incorrect financial statements
> with the Commission for 11 consecutive quarters between April 1,
> 1999 and December 31, 2001 . . . In February 2003, Peregrine
> restated its financial results for its fiscal years 2000 and 2001, and
> for the first three quarter of fiscal 2002.  Peregrine reduced
> previously reported revenue of $1.34 billion by $509 million . . ..

144.   On July 22, 2003, Peregrine consented to entry of a Final Judgment in the SEC

action against it.  Among other things, the Final Judgment (i) permanently enjoined Peregrine

and related persons from violating the antifraud provisions of the federal securities laws;

(ii) required the Company to retain an Internal Auditor acceptable to the SEC who is required to

report directly to the Audit Committee of Peregrine's Board of Directors, and to assess and

enforce Peregrine's accounting control structure and to ensure that Peregrine's financial

condition and results are accurately reported in Peregrine's public financial statements;

(iii) required Peregrine to establish a Corporate Compliance Program and appoint a Corporate

Compliance Office acceptable to the SEC whose duties include assessing and reporting on

Peregrine's compliance with recognized standards of "best practices" with respect to corporate

governance and to ensure that Peregrine's Board of Directors (and its committees) have

appropriate powers, structure, composition and resources; and (iv) required Peregrine to

commence a training and education program for its officers and employees, to prevent violations

of the federal securities laws.

145.    On February 28, 2003, Peregrine filed with the SEC restated financial results for

its fiscal years 2000 and 2001, and the first three (3) reporting quarters of fiscal year 2002.  By

these restatements the Company admitted that it had improperly recognized over $500 million in

revenue during the restated periods.  These restatements are also an admission that each

document publishing the originally announced financial results for the restated periods contained

untrue statements of material fact.  Thus, Peregrine has admitted that each of the press releases

and the annual quarterly reports filed on SEC forms 10-K and 10-Q and all other SEC filings

incorporating or including such financial information, for the periods ending June 30, 1999

through and including December 31, 2001, contained untrue statements of material fact.  The

devastating impact of the accounting restatement is reflected by a comparison of the originally

reported results with actual results, as set forth below.

**Fiscal Year Ended March 31, 2000**

| Income Statement | As Reported | Restatement Adjustment | Restated Amount |
| --- | --- | --- | --- |
| Revenue | $253,300,000 | ($121,668,000) | $131,632,000 |
| Net Loss | ($25,070,000) | ($192,348,000) | ($217,418,000) |

| Cash Flow Statement | As Reported | Restatement Adjustment | Restated Amount |
| --- | --- | --- | --- |
| Cash Flow Provided By Operations | $57,611,000 | ($92,373,000) | ($34,762,000) |
| Advances From Factored Receivables | ----- | ($90,885,000) | ($90,885,000) |

146.    The above statements and omissions were material.  A reasonably prudent

investor would have wanted to know the truth and the omitted facts in deciding whether to vote

to approve the merger of Harbinger and Peregrine.  The truth and the omitted facts bore directly

on Peregrine's financial condition, status and prospects and thus on the value of Peregrine's shares.

## DEFENDANTS' CONCEALMENT OF WRONGDOING

147. Defendants actively concealed their wrongdoing such that no reasonable investor would have been put on inquiry or actual notice of such wrongdoing until, at the earliest, May 6, 2002, when Peregrine announced the resignations of President and CEO Stephen Gardner and Chief Financial Officer Matthew Gless, and the commencement of an investigation into potential accounting irregularities.

### COUNT I

### Against the Individual Defendants Watrous and Farley
### For Violations Of Section 11 Of The Securities Act

148. Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs, as if fully set forth herein. This Count is asserted against the Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k.

149. On or about May 22, 2000, the individual defendants caused the issuance, and/or signed Amendment 1 to its Form S-4/A Registration Statement that was filed with the SEC in connection with Peregrine's acquisition of Harbinger. This Registration Statement included a Proxy/Prospectus, which provided for, inter alia, special meetings to be held on June 16, 2000 in which shareholders of both Peregrine and Harbinger were solicited to vote to approve the merger of the two companies. Under the terms of the merger, each outstanding share of Harbinger stock would be exchanged for 0.75 of a share of Peregrine common stock, and each option to purchase Harbinger would be exchanged for an option to purchase Peregrine common stock at the same exchange ratio.

150.    The Registration Statement and Merger Proxy/Prospectus, and those documents
and disclosures incorporated therein by reference, were materially false and misleading;
contained untrue statements of material facts, omitted to state material facts necessary to make
the statements made in the Registration Statement and Merger Proxy/Prospectus, under the
circumstances in which they were made, not misleading; and/or failed to adequately disclose
material facts.  As detailed herein, the misrepresentations contained in, or the material facts
omitted from, the Registration Statement and Merger Proxy Prospectus included, but were not
limited to, the overstatement of Peregrine's revenues its fiscal year ended March 31, 2000.  For
fiscal year 2000, Peregrine's financial statements have been restated by over $300 million.  This
information was material to Plaintiff in considering how to vote on the Merger, including
whether the Exchange Ratio accurately reflected the value of Peregrine common stock.

151.    The Individual Defendants were responsible for the contents of the Registration
Statement and Merger Proxy/Prospectus and caused their filings with the SEC.

152.    The Individual Defendants signed the Registration Statement, consented to being
named therein as directors and/or officers of Peregrine, and caused it to be prepared, filed with
the SEC and circulated to shareholders of Harbinger, including Plaintiff in New Jersey.

153.    Plaintiff acquired Peregrine common stock issued pursuant to the Registration
Statement and Merger Proxy/Prospectus.

154.    At the time Plaintiff acquired Peregrine's common stock pursuant to the
Registration Statement and Merger Proxy/Prospectus, Plaintiff did not  know, nor by the exercise
of reasonable care could have known, of the facts concerning the material misstatements and/or
omissions alleged herein.

31489113.WPD                              58

155.    Defendants' false statements, misrepresentations and omissions caused the market price of Peregrine securities to be artificially inflated at the time of the merger with Harbinger. On June 16, 2000, the date of the merger with Harbinger, the market price of Peregrine common stock closed at $25.56 per share.

156.    This action was brought within one year after the discovery of the untrue statements and/or omissions, and within three years after the Peregrine common stock was acquired in connection with the Merger pursuant to class action tolling of the statute of limitations.

157.    By reason of the foregoing, the Individual Defendants Watrous and Farley violated Section 11 of the Securities Act and are liable to Plaintiff, who has been damaged by reason of such violation, the amount of which will be determined at trial.

## COUNT II

### Against Arthur Andersen, LLP For
### Violations of Section 11 of the Securities Act

158.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs, as if fully set forth herein. This Count is asserted against Andersen for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k.

159.    The Registration Statement and Merger Proxy/Prospectus, and those documents and disclosures incorporated by reference therein, were materially false and misleading; contained untrue statements of material facts, omitted to state material facts necessary to make the statements made in the Registration Statement and Merger Proxy/Prospectus, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts. As detailed herein, the misrepresentations contained in, or the material facts

omitted from, the Registration Statement and Merger Proxy Prospectus included, but were not limited to the overstatement of Peregrine's revenues for the fiscal year ended March 31, 2000. For fiscal year 2000, Peregrine's financial statements have been restated by over $300 million. This information was material to Plaintiff in considering how to vote on the Merger, including whether the Exchange Ratio accurately reflected the value of Peregrine common stock.

160.    Andersen prepared and/or certified a report or valuation used in connection with the Registration Statement, as defined in Section 11 of the Securities Act, 15 U.S.C. § 77k(a)(4).

161.    Andersen had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the Peregrine financial statements contained in the Harbinger Registration Statement. It had a duty to ensure such statements were true and there were no omissions of material facts that would make the statements misleading. Andersen failed to do so. Instead, Andersen consented to the inclusion of its materially false and misleading audit report on Peregrine's fiscal year 2000 financial statements. Andersen audit report contained in the Peregrine registration statement with the knowledge and consent of Andersen.

162.    Andersen, as a preparer or certifier of a report or valuation used in the Registration Statement, is liable to Plaintiff due to his exchange of Harbinger common stock for Peregrine common stock in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus.

163.    Plaintiff acquired Peregrine common stock issued pursuant to the Registration Statement and Merger/Prospectus.

164.    At the time Plaintiff acquired Peregrine's common stock pursuant to the Registration Statement and Merger Proxy/Prospectus, Plaintiff did not know, nor by the exercise

of reasonable care could have known, of the material misstatements and/or omissions alleged

herein.

165.   This action was brought within one year after the discovery of the untrue

statements and/or omissions and within three years after the Peregrine common stock was

acquired in connection with the Merger pursuant to class action tolling of the statute of

limitations.

166.   By reason of the foregoing, Andersen violated Section 11 of the Securities Act

and is liable to Plaintiff, who has been damaged by reason of such violation, the amount of which

will be determined at trial.  Defendant Andersen is liable for its violations of Section 11 of the

Securities Act.

**COUNT III**

**Against All Defendants for Violations of Section 10(b)
of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

167.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing

paragraphs, as if fully set forth herein.

168.   This Count with regard to the claim under Section 10(b) of the Exchange Act and

SEC Rule 10b-5 promulgated thereunder is asserted by Plaintiff against all Defendants.

169.   These Defendants carried out a plan, scheme, and course of conduct which was

intended to and did;  deceive the investing public, including Plaintiff; artificially inflate and

maintain the market price of Peregrine securities; cause Plaintiff to acquire Peregrine securities at

artificially inflated prices.

170.   In furtherance of this unlawful scheme, these Defendants employed devices,

schemes and artifices to defraud Plaintiff.  They made untrue statements of material fact and/or

omitted to state material facts necessary to make the statements made not misleading.  In addition, these Defendants engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiff.  These Defendants did so to maintain artificially inflated market prices for Peregrine's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

171.    In addition to the duties of full disclosure imposed on Defendants as a result of their making or approving of affirmative statements and reports, or their participation in the making of affirmative statements and reports to the investing public, the defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. 210.01 *et seq.*) and S-K (17 C.F.R. 229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market price of the Company's securities would be based on truthful, complete and accurate information.

172.    The liability of the individually named Defendants arises from the following facts as more specifically alleged above:

a.    they were high-level executives at the Company and were members of the Company's senior management team or were members of the Company's Board of Directors;

b.    by virtue of their responsibilities and activities as senior officers and/or directors of the Company, they were privy to and participated in the drafting, reviewing and/or approving the misleading statements, press releases, reports and other public representations about Peregrine, and/or were engaged in authorizing or entering into the fraudulent transactions

alleged herein, and/or signed the Company's public filings with the SEC which contained the

materially misleading statements as alleged herein;

        c.    they knew of or had access to the material, adverse, nonpublic information

about Peregrine's financial results and business, which were materially at odds with reported

financial results;

        d.    and they were aware of the Company's dissemination of information to the

investing public and Plaintiff which they knew or were deliberately reckless in not knowing was

materially false and misleading.

     173.    Andersen was engaged by Peregrine to provide the auditing and accounting

services to Peregrine and to audit Peregrine's annual financial results and to review Peregrine's

quarterly financial results during fiscal years 1999 and 2000  As a result, Andersen owed a duty

of full and complete disclosure to shareholders and prospective shareholders of Peregrine.

Andersen breached that duty by failing to fully and adequately disclose Peregrine's true financial

condition through the issuance of unqualified audit reports on Peregrine's audited financial

statements for fiscal years 1999 and 2000.  Andersen's actions or inactions, as alleged herein,

violated GAAP as set forth above.

     174.    The Defendants named herein had actual knowledge of the misrepresentations and

omissions of material facts set forth herein, or acted with deliberate recklessness in that they

failed to ascertain and to disclose such facts, even though such facts were readily available to

them.  These Defendants' material misrepresentations and/or omissions were done knowingly or

with deliberate recklessness to conceal Peregrine's true financial condition from the investing

public and to support the artificially inflated price of its securities.

175. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, the market price of Peregrine securities was artificially inflated at the time of the Harbinger merger. In ignorance of the fact that the market price of Peregrine securities was artificially inflated, and relying directly or indirectly on the false and misleading statements by these Defendants, or upon the integrity of the market in which Peregrine securities trade, Plaintiff acquired Peregrine securities at artificially inflated prices through the Merger with Harbinger and was damaged thereby.

176. At the time of the alleged misrepresentations and omissions, Plaintiff was ignorant of their falsity, and believed them to be true. Had Plaintiff known of the Defendants' false statements as alleged herein he would not have given his proxy in favor of the merger with Peregrine, or would have rescinded the proxy.

177. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with the merger with Peregrine.

178. Andersen violated Section 10(b) and Rule 10b-5 by the issuance of materially false and misleading statements as alleged herein.

179. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff suffered damages in connection with the merger with Peregrine.

## COUNT IV

### Against Defendants Watrous and Farley for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

180. Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs, as if fully set forth herein.

181.    This Count is asserted against Defendants Watrous and Farley for violations of
Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9, 17 C.F.R. §240.14a-9. This
Count is based solely on these Defendants' negligent conduct.

182.    Each Defendant named in this Count solicited proxies by means of the Joint Proxy
Statement and Prospectus filed on or about May 22, 2000 as part of Amendment No. 1 to
Peregrine's Form S-4 Registration Statement (the "Harbinger Joint Proxy"). The Harbinger Joint
Proxy was distributed by defendants named herein to Harbinger shareholders, including Plaintiff.
They each permitted the use of their names in the Harbinger Joint Proxy.

183.    The Harbinger Joint Proxy was a "proxy solicitation" within the meaning of
Section 14 of the Exchange Act, and Rule 14a-9 promulgated thereunder.

184.    Each of the Defendants named in this Count signed Amendment No. 1 to the
Peregrine Registration Statement which contained the Harbinger Joint Proxy, thus allowing it to
be filed with the SEC. These Defendants were members of Peregrine's Board of Directors or a
high level Company executive at all relevant times.

185.    The Harbinger Joint Proxy contained or incorporated by reference Peregrine's
audited financial statements for the fiscal years ending March 31, 1999 and 2000. These
financial statements were materially false and misleading for the reasons set forth above.

186.    The Harbinger Joint Proxy was materially false and misleading, in that it
contained the foregoing false and misleading statements of material fact and failed to disclose
material facts necessary to make the statements made not false and misleading.

187.    The Defendants named in this Count sought to secure Harbinger shareholder
approval of the Peregrine/Harbinger merger, including Plaintiff's, by means of the materially

31489113.WPD                    65

false and misleading Harbinger Joint Proxy and permitted the use of their names to solicit

proxies from Plaintiff and other Harbinger shareholders.

188.    The facts herein referenced, and the following facts, give rise to a strong inference

that each of the defendants named in this Count acted with the requisite state of mind for liability

under Section 14(a) and Rule 14a-9, *i.e.*, negligence, at the time they issued or caused to be

issued the Harbinger Joint Proxy and permitted the use of their names in the Harbinger Joint

Proxy. As detailed more fully above, these defendants were negligent in not knowing that the

Harbinger Joint Proxy contained misstatements of material fact and that it omitted to state

material facts necessary in order to make the statements made therein not false or misleading.

189.    Watrous was a member of the Peregrine Board on April 14, 1999 when the

Company implemented a radical change. It was at a meeting on that date that the Board

approved of the use of the improper sell-in method of accounting although they were told that the

sell-in method was not the preferred method. Defendant Farley informed the Board member,

including Defendant Watrous, that only by using that method would Peregrine meet its quarterly

revenue goals. Thus, the Board should have been aware that a weakness existed in Peregrine's

sales efforts, which needed to be watched consistently. Moreover, the Board was informed that

the Company's auditors would be uncomfortable if the channel activity accounted for more than

25% of the Company's revenue. From that point forward, the members of the Board, including

Defendant Watrous, were on notice that they needed to scrutinize the Company's revenue

closely, along with the Company's revenue recognition policies, and to satisfy themselves that

the sell-in method was not being utilized improperly and that that revenue was being recognized

appropriately and that the disclosures in the financial statements concerning revenue recognition

were accurate.

190.    The members of the Board were given a further reason to assure themselves that the Company's revenue was proper by their receipt of the quarterly Review and Outlook reports send by Gardner. These reports, as detailed above, consistently painted a bleak picture of Peregrine's anticipated revenue while the Company incredibly was able to meet analyst expectations at the last moment of almost every quarter. Thus, while Gardner was reporting severe trouble with the Company's "bread and butter" business, and informing the Board that channel activity was a cause for concern and that the Company was borrowing from the future, the Board did not take actions necessary to correct the problems. Even when Gardner reported that channel inventory had reached a level that made the auditors uncomfortable, the Board, including Defendant Watrous, took no appropriate action.

191.    Indeed, as detailed above, as channel sales increased quickly and dramatically, inventory was also becoming overly bloated -- sure signs that the Company was having problems selling to end users -- yet the Company was purportedly making its revenue number. The Defendants named in this Count were sophisticated businessmen, many of whom had years of experience in the software industry, and their failure to miss these warning signs was negligent.

192.    As detailed above, the Defendants named in this Count controlled Peregrine. Certainly, for purposes of the distribution of the Harbinger Joint Proxy, the Board had control of whether such distribution should be made and the contents thereof.

193.    The Merger required and received the affirmative vote of the Harbinger shareholders at the Special Meeting of Harbinger shareholders held on June 16, 2000, including Plaintiff's. Accordingly, the materially false and misleading Harbinger Joint Proxy was an essential link in the accomplishment of Peregrine's acquisition of Harbinger.

31489113.WPD

67

194.    Based on the foregoing, the Defendants named in this Count have violated

Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated by the SEC thereunder.

195.    As a direct and proximate result of these defendants' wrongdoing, Plaintiff has

sustained injury and damages by reason of these defendants' misrepresentations contained in the

Harbinger Joint Proxy in connection with the Peregrine's acquisition of Harbinger.

## COUNT V

### Against Defendant Arthur Andersen for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

196.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing

paragraphs, as if fully set forth herein.

197.    This Count is asserted against Defendant Andersen for violations of Section 14(a)

of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9, 17 C.F.R. §240.14a-9.

198.    The Joint Proxy which was included in Peregrine's May 22, 2000 Amendment 1

to its S-4 Registration Statement filed with the SEC and distributed to Harbinger shareholders

(the "Harbinger Joint Proxy"), including Plaintiff. was a "proxy solicitation" within the meaning

of Section 14 of the Exchange Act, and Rule 14a-9 promulgated thereunder. This Count is based

solely on defendants' negligent conduct.

199.    Defendant Andersen consented to the use of Andersen's name in the Harbinger

Joint Proxy to solicit proxies from Plaintiff and other Harbinger shareholders

200.    Andersen also consented to the inclusion and/or the incorporation by reference, in

the Harbinger Joint Proxy, of Andersen's unqualified audit report on Peregrine's fiscal year 2000

financial statements, as set forth in Peregrine's Form 10-K for the year ending March 31, 2000,

and consented to all references to Andersen in the registration statement, which included a

reference to it under the caption "Experts," and under the caption "Peregrine Selected

Consolidated Financial Data," where it was noted that the consolidated financial data was based

upon financial statements audited by Defendant Andersen.

201.    Defendant Andersen's audit report on Peregrine's financial statements for the

years ending March 31, 1999 and 2000, which was included and/or incorporated by reference

into the Harbinger Joint Proxy, was materially false and misleading for the reasons set forth

above.

202.    The following facts and the foregoing facts above give rise to a strong inference

that Defendant Andersen acted with the requisite state of mind for liability under Section 14(a)

and Rule 14a-9, *i.e.*, negligence, in permitting Andersen's name to be used in conjunction with

the solicitation of proxies pursuant to a proxy statement that contained material

misrepresentations and omissions.  As detailed more fully above, Andersen should have known

at the time that consent to the use of Arthur Andersen's name in the Harbinger Joint Proxy was

given that Andersen's audit report on Peregrine's financial statements for the years ending March

31, 1999 and 2000, which were included and/or incorporated by reference to in the Harbinger

Joint Proxy, were materially false and misleading.

203.    Andersen was aware that when the Company adopted the sell-in method, it did so

in order to meet its quarterly revenue estimates.  Moreover, Andersen knew that the sell-in

method was an aggressive and improper revenue recognition procedure.

204.    Defendant Andersen had informed the Company when it adopted the sell-in

method that it would be uncomfortable if channel activity reached 25% of the Company's

revenue, yet even when that number was far exceeded, Andersen consented to its unqualified

audit report to be included in the Harbinger Joint Proxy.

205.    As detailed above, plenty of warning signs existed that should have alerted Andersen that severe problems existed with the Company's accounting. Auditor guidelines for items that should receive special consideration identified almost the exact type of situation as the one that existed at Peregrine, such as significant sales volume occurring near the end of the quarter, unusual volume of sales to resellers, barter transactions and side agreements. Messages about "bad revenue," inquiries from the SEC, and complaints about revenue recognition were either provided to Andersen, discovered by it or readily available to it had it sought to look. Instead, Defendant Andersen ignored the warning signs and allowed the Company to continually spiral downward into a deeper revenue hole.

206.    In addition, Andersen should have been aware that problems existed at the Company that required further investigation on their part because of the lack of Audit Committee minutes, the failure to hold regular meetings during fiscal year 2000, and the participation of members of management in the Audit Committee deliberations. The failure to respond to the above repeated warning signs demonstrates Andersen's negligence.

207.    Andersen was also involved in designing the Company's stock option compensation plan, which allowed for the exercise prices to be below the common stock market values when the options were granted. This plan was also a part of Peregrine's restatement, and a further sign that should have alerted Andersen that a problem existed at Peregrine.

208.    The Merger required and received the affirmative vote of the Harbinger shareholders, including Plaintiff's, at the Special Meeting of Harbinger shareholders held on June 16, 2000. Accordingly, the materially false and misleading Harbinger Joint Proxy was an essential link in the accomplishment of the Peregrine's acquisition of Harbinger.

31489113.WPD

70

209. Based on the foregoing, Andersen violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated by the SEC thereunder.

210. As a direct and proximate result of Defendant Andersen wrongful conduct, Plaintiffs has sustained injury and damages by reason of Defendants' misrepresentations contained in the Harbinger Joint Proxy in connection with the Peregrine's acquisition of Harbinger.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, as follows:

A.    Declaring and determining that the Defendants violated the federal securities laws by reason of their conduct alleged herein;

B.    Awarding monetary damages against all of the Defendants, jointly and severally, in favor of Plaintiff for the damages suffered as a result of the wrongdoing complained of herein, together with prejudgment interest from the date of the wrongdoing to the date of the entry of judgment;

C.    Awarding Plaintiff his costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees and costs;

D.    Granting equitable and/or injunctive relief as permitted by law, equity and federal statutory provisions sued on herein, including attaching, impounding, imposing a constructive trust upon or otherwise restricting Defendants' assets so as to assure Plaintiff of an effective remedy, and;

E.    Awarding Plaintiff such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: July 24, 2007

_____

Andrew Davin Stillufsen
**KAYE SCHOLER LLP**
425 Park Avenue
New York, NY 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

Of Counsel:
Allan M. Pepper
**KAYE SCHOLER LLP**
425 PARK AVE
New York, NY 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Attorneys for Plaintiff*

31489113.WPD                              72

✎AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of _____ NEW JERSEY

| | |
|---|---|
| David Hildes, The david and kathleen hildes 1999 charitable remainder unitrust dated june 25, 1999 | **SUPPLEMENTAL** |
| | **SUMMONS IN A CIVIL ACTION** |
| V. | |
| arthur andersen llp, thomas watrous, douglas powanda, john doe as executor for david farley | |
| | CASE NUMBER:   2:07-CV-393 |

TO: (Name and address of Defendant)

> Douglas S. Powanda c/o
> Robert H. Logan, Esq.
> Keesal Young & Logan
> 400 Oceangate
> P.O. Box 1730
> Long Beach, CA 90801-1730

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

> Allan M Pepper, Esq.
> Kaye Scholer LLP
> 425 Park Avenue
> New York, NY 10022
> (212) 836-8000

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.  Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

_____     _____
CLERK                                                              DATE

_____
(By) DEPUTY CLERK

✎AO 440  (Rev.  8/01)  Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[(1)] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant.  Place where served:

☐  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

   Name of person with whom the summons and complaint were left:

☐  Returned unexecuted:

☐  Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____    _____
                        Date                        *Signature of Server*


                                                  _____
                                                  *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

✎AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

|  |  |
|---|---|
| District of | NEW JERSEY |

David Hildes, The david and kathleen hildes 1999
charitable remainder unitrust dated june 25, 1999

V.

arthur andersen llp, thomas watrous, douglas
powanda, john doe as executor for david farley

## SUPPLEMENTAL

### SUMMONS IN A CIVIL ACTION

CASE NUMBER:   2:07-CV-393

TO: (Name and address of Defendant)

> Douglas S. Powanda c/o
> Robert H. Logan, Esq.
> Keesal Young & Logan
> 400 Oceangate
> P.O. Box 1730
> Long Beach, CA 90801-1730

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

> Allan M Pepper, Esq.
> Kaye Scholer LLP
> 425 Park Avenue
> New York, NY 10022
> (212) 836-8000

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

CLERK                                                    DATE

(By) DEPUTY CLERK

✎AO 440  (Rev.  8/01)  Summons in a Civil Action

| RETURN OF SERVICE | |
|---|---|
| Service of the Summons and complaint was made by me[1] | DATE |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant.  Place where served:

☐  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐  Returned unexecuted:

☐  Other (specify):

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL  $0.00 |

| DECLARATION OF SERVER |
|---|

      I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____      _____
              Date             *Signature of Server*

                                 _____
                                 *Address of Server*

_____
(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

### David Hildes

**DEFENDANTS**

### Arthur Andersen, LLP et.al.

**(b) COUNTY OF RESIDENCE OF FIRST LISTED  Newark
PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

**Andrew Davin Stillufsen
425 Park Avenue
New York, NY 10022
(212)836-8000**

**ATTORNEYS (IF KNOWN)**

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
     (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
(For Diversity Cases Only)       **FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

15:77 Securities Fraud

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☐ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☒ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

DEMAND $

Check YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**     JUDGE BENITZ

Docket Number

DATE

SIGNATURE OF ATTORNEY OF RECORD

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should completed the form as follows:

I.(a) Plaintiffs - Defendants. Enter names (last, first, middle intitial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giveing both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

(c) Attorneys. Enter firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place the "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, it officers or agencies, place an X in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III. Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

V. Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action , in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI. Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

VII. Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. Related Cases. This section of the JS-44 is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.
(rev. 07/89)