# EXHIBIT D

1  GOLD BENNETT CERA & SIDENER LLP
   PAUL F. BENNETT (State Bar No. 63318)
2  SOLOMON B. CERA (State Bar No. 99467)
   GWENDOLYN R. GIBLIN (State Bar No. 181973)
3  THOMAS C. BRIGHT (State Bar No. 169713)
   595 Market Street, Suite 2300
4  San Francisco, California 94105-2835
   Telephone: (415) 777-2230
5  Facsimile: (415) 777-5189

6  Attorneys for Section 10(b) Lead Plaintiff
   The Loran Group
7

8  STULL, STULL & BRODY
   JULES BRODY
   HOWARD T. LONGMAN
9  PATRICK SLYNE
   6 East 45th Street, 4th Floor
10 New York, New York 10017
   Telephone: (212) 687-7230
11 Facsimile: (212) 490-2022

12 ABRAHAM & ASSOCIATES
   JEFFREY ABRAHAM
13 LAWRENCE D. LEVIT
   One Penn Plaza, Suite 1910
14 New York, NY 10119-0165
   Telephone: (212) 714-2444
15 Facsimile: (212) 279-3655

16 Attorneys for Section 11 Lead Plaintiff
   Heywood Waga
17

FILED

APR 5 2004

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

18                  UNITED STATES DISTRICT COURT

19                 SOUTHERN DISTRICT OF CALIFORNIA

20

21 IN RE PEREGRINE SYSTEMS, INC.        Case No. 02-CV-0870 J(RBB)
   SECURITIES LITIGATION
22                                        **FIRST AMENDED CONSOLIDATED
                                          COMPLAINT FOR VIOLATIONS OF
23                                        THE FEDERAL SECURITIES LAWS**

24 This Document Relates to:             **JURY TRIAL DEMANDED**

25    ALL ACTIONS.

26

27

28

#105317

Exhibit D
0125

# TABLE OF CONTENTS

Page

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.   Lead Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.   Other Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    C.   Peregrine Systems, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    D.   Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CLASS ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

PEREGRINE SECURITIES TRADED ON AN EFFICIENT MARKET . . . . . . . . . . . . . . . . . 29

OVERVIEW OF THE FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    A.   The Defendants Intentionally Destroyed Records . . . . . . . . . . . . . . . . . . . 30

    B.   Peregrine's Internal Accounting Process . . . . . . . . . . . . . . . . . . . . . . . 32

    C   How The Fraud Was Committed . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

          1.   Improper Revenue Recognition . . . . . . . . . . . . . . . . . . . 41

          2.   Quarters Were Improperly Kept Open To Meet Revenue And Earnings Targets . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

          3.   Improper Balance Sheet Accounting . . . . . . . . . . . . . . . . . 47

          4.   Concealment Of Write Off Of Receivables . . . . . . . . . . . . . . 49

          5.   Understatement Of Stock Option Compensation . . . . . . . . . . . 49

          6.   Failure To Implement And Maintain Adequate Internal Accounting Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    D.   Participation Of The Board Of Directors In Peregrine's Accounting Fraud . . . . 52

          1.   October 1998 Report To Board Of Directors . . . . . . . . . . . . . . . . . . 53

          2.   April 1999 Report To Board Of Directors . . . . . . . . . . . . . . . . . . 54

          3.   October 1999 Report To Board Of Directors . . . . . . . . . . . . . . . . . . 57

          4.   January 2000 Report To Board Of Directors . . . . . . . . . . . . . . . . . . 58

          5.   February 2000 Activity Regarding the Harbinger Acquisition . . . . . . . . 60

## TABLE OF CONTENTS
### (Continued)

**Page**

6.    July 2000 Report To The Board Of Directors . . . . . . . . . . . . . . . . . . . . 64

7.    October 2000 Report To The Board Of Directors . . . . . . . . . . . . . . . . 66

8.    January 2001 Report To The Board Of Directors . . . . . . . . . . . . . . . . 67

9.    April 2001 Report to Board of Directors . . . . . . . . . . . . . . . . . . . . . . 68

10.   July 2001 Report To The Board Of Directors . . . . . . . . . . . . . . . . . . . 68

11.   October 2001 Report To The Board Of Directors . . . . . . . . . . . . . . . . 70

12.   December 2001 Report To The Board Of Directors . . . . . . . . . . . . . . 71

13.   January 2002 Report To The Board Of Directors . . . . . . . . . . . . . . . . 72

14.   February 2002 Report To The Board Of Directors . . . . . . . . . . . . . . . 73

15.   March 2002 Report To The Board Of Directors . . . . . . . . . . . . . . . . . 74

16.   April 2002 Report To The Board Of Directors . . . . . . . . . . . . . . . . . . 74

E.    Audit Committee Members Knew Of Or Were Deliberately Reckless With
      Regard To Peregrine's Accounting Fraud . . . . . . . . . . . . . . . . . . . . . . 75

1.    July 6, 1999 Audit Committee Meeting . . . . . . . . . . . . . . . . . . . . . . . 78

2.    April 25, 2000 Audit Committee Meeting . . . . . . . . . . . . . . . . . . . . . 79

3.    January 24, 2001 Audit Committee Meeting . . . . . . . . . . . . . . . . . . . 79

4.    April 25, 2001 Audit Committee Meeting . . . . . . . . . . . . . . . . . . . . . 79

5.    June 29, 2001 Audit Committee Meeting . . . . . . . . . . . . . . . . . . . . . . 80

6.    July 23, 2001 Audit Committee Meeting . . . . . . . . . . . . . . . . . . . . . . 81

7.    October 24, 2001 Audit Committee Meeting . . . . . . . . . . . . . . . . . . . 82

8.    February 12, 2002 Special Audit Committee Meeting . . . . . . . . . . . . 83

9.    April 2, 2002 Audit Committee Meeting . . . . . . . . . . . . . . . . . . . . . . 84

10.   April 29, 2002 Audit Committee Meeting . . . . . . . . . . . . . . . . . . . . . 85

THE INDIVIDUAL DEFENDANTS' KNOWLEDGE OF AND/OR DELIBERATE
RECKLESSNESS AS TO THE FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

A.    Stephen P. Gardner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                            ii

Exhibit D
0127

## TABLE OF CONTENTS
### (Continued)

|  |  | Page |
|---|---|---|
| B. | Matthew A. Gless | 98 |
| C. | Steven S. Spitzer | 104 |
| D. | Ilse Cappel | 106 |
| E. | Richard T. Nelson | 108 |
| F. | Douglas S. Powanda | 114 |
| G. | Frederic B. Luddy | 118 |
| H. | John J. Moores | 120 |
| I. | Charles E. Noell III | 127 |
| J. | Christopher A. Cole | 129 |
| K. | Norris van den Berg | 131 |
| L. | Thomas G. Watrous | 132 |

DEFENDANT JOHN J. MOORES CONTROLLED PEREGRINE AND CERTAIN OF ITS OFFICERS AND DIRECTORS ........................................... 132

ARTHUR ANDERSEN'S PARTICIPATION IN THE FRAUD ...................... 142

1.   Fiscal Year 2000 ................................................ 149

2.   Fiscal Year 2001 ................................................ 151

3.   Fiscal Year 2002 ................................................ 157

AWSC'S PARTICIPATION IN THE FRAUD ................................... 165

KPMG'S PARTICIPATION IN THE FRAUD ................................... 176

THE FALSE STATEMENTS ................................................ 182

1Q 2000 ............................................................. 182

2Q 2000 ............................................................. 184

3Q 2000 ............................................................. 187

4Q 2000 ............................................................. 189

1Q 2001 ............................................................. 192

2Q 2001 ............................................................. 194

# TABLE OF CONTENTS
## (Continued)

|  |  | **Page** |
|---|---|---|
| | 3Q 2001 | 196 |
| | 4Q 2001 | 199 |
| FISCAL YEAR 2001 ANNUAL REPORT | | 201 |
| REMEDY PROXY STATEMENT | | 202 |
| | 1Q 2002 | 202 |
| | 2Q 2002 | 205 |
| | 3Q 2002 | 208 |
| THE TRUTH BEGINS TO EMERGE | | 211 |
| BASIS OF FACTUAL ALLEGATIONS | | 214 |
| DEFENDANTS' CONCEALMENT OF WRONGDOING | | 214 |
| THERE IS NO STATUTORY SAFE HARBOR APPLICABLE TO THE ALLEGATIONS OF THIS COMPLAINT | | 215 |
| COUNT I | (Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder And Of Section 20(a) Of The Exchange Act) | 215 |
| COUNT II | (Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9 Promulgated Thereunder And Of Section 20(a) Of The Exchange Act - Harbinger Acquisition) | 220 |
| COUNT III | (Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9 Promulgated Thereunder And Of Section 20(a) Of The Exchange Act - Harbinger Acquisition - Arthur Andersen, AWSC And Stulac) | 224 |
| COUNT IV | (Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9 Promulgated Thereunder And Of Section 20(a) Of The Exchange Act - Remedy Acquisition) | 227 |
| COUNT V | (Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9 Promulgated Thereunder And Of Section 20(a) Of The Exchange Act - Remedy Acquisition - Arthur Andersen, AWSC And Stulac) | 230 |
| COUNT VI | (Violations Of Section 11 Of The Securities Act - The Harbinger Acquisition) | 234 |
| COUNT VII | (Violations Of Section 15 Of The Securities Act - The Harbinger Acquisition) | 238 |
| COUNT VIII | (Violations Of Section 11 Of The Securities Act - The Remedy Acquisition) | 240 |

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                iv

Exhibit D
0129

**TABLE OF CONTENTS**
(Continued)

|  | Page |
|---|---|
| COUNT IX    (Violations Of Section 15 Of The Securities Act - The Remedy Acquisition) | 244 |
| PRAYER FOR RELIEF | 245 |
| JURY DEMAND | 246 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    v

#105317

Exhibit D
0130

1    Pursuant to the Court's November 21, 2003 Order, Lead Plaintiffs, on behalf of themselves

2  and all others similarly situated, for their First Amended Complaint, allege as follows:

3                                              **SUMMARY**

4    1.    This is a securities class action brought on behalf of all persons and entities (the

5  "Class") who purchased or otherwise acquired the securities of Peregrine Systems, Inc.

6  ("Peregrine" or the "Company") between July 22, 1999 and May 3, 2002, inclusive (the "Class

7  Period"). This action is also brought on behalf of all persons and entities who held Harbinger

8  Corporation common stock or Remedy Corporation common stock and received Peregrine

9  common stock in connection with mergers between each of those companies and Peregrine.

10  Included within the Class are all those who, during the Class Period, purchased Peregrine

11  securities on the open market or who acquired Peregrine securities as a result of a merger

12  transaction. The defendants are certain of Peregrine's former officers and directors, its former

13  independent auditor, an individual partner thereof and a related entity, and certain major

14  customers of Peregrine.

15    2.    Peregrine represents one of the most egregious financial frauds ever committed.

16  As alleged herein in detail, the senior management, as well as all directors of Peregrine, were

17  complicit in the Company's accounting fraud. This case also involves unprecedented insider

18  stock sales by individuals who knew of, or were deliberately reckless with regard to the fraud,

19  while they were enriching themselves. This lawsuit is an attempt to recover the massive losses

20  incurred by public investors and to help restore the integrity of this country's capital markets.

21  Contrary to its published story of ever increasing success, Peregrine was a house of cards,

22  propped up by books and records that had been "cooked" by senior officers of the Company with

23  the knowledge and/or deliberate recklessness of members of Peregrine's Board of Directors.

24  Peregrine stands with Enron, Tyco, WorldCom, and Adelphia in the rogue's gallery of corporate

25  accounting frauds.

26    3.    At all relevant times, Peregrine developed and marketed software products that

27  enabled business customers to be more competitive by reducing infrastructure costs and

28  increasing efficiency. The Company also developed and marketed business-to-business and

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    1

Exhibit D
0131

1  integration software to reduce the costs of electronic commerce.  By the beginning of the Class

2  Period, Peregrine had adopted a business model of aggressively growing its business through

3  acquisitions and other strategic alliances.  That business model required Peregrine to report ever

4  increasing revenue so as to increase its share price.  Peregrine planned on and used its stock as

5  the primary currency to pay for acquisitions by means of stock for stock mergers and strategic

6  alliances.  With an increasing share price, Peregrine was able to complete at least thirteen (13)

7  acquisitions or strategic alliances during the first eleven (11) quarters of the Class Period, with an

8  announced value exceeding $3.4 billion.  The higher the price of Peregrine stock, the fewer the

9  number of shares Peregrine would have to issue for each acquisition.  That was significant to the

10  individually named defendants herein who served as officers or directors Peregrine because they

11  owned a substantial number of shares of Peregrine common stock and did not want the value of

12  their holdings diluted by the issuance of too many new shares.  Thus, in order to keep up the

13  price of the Company's stock, it was imperative that Peregrine meet Wall Street's expectations

14  and continue to report strong demand for its products so that investors could expect record sales

15  and earnings growth to continue quarter after quarter.

16          4.      During the Class Period, Peregrine reported quarterly increases in revenue:

| Announcement Date | Reporting Period (Ending Date) | Reported Revenue | Reported Growth in Revenue Compared With Prior Year Results |
|---|---|---|---|
| 7/21/99 | 1Q 00 (6/30/99) | $51.6 million | 137% |
| 10/20/99 | 2Q 00 (9/30/99) | $57.8 million | 95% |
| 1/20/00 | 3Q 00 (12/31/99) | $67.5 million | 67% |
| 4/26/00 | 4Q 00 (3/31/00) | $76.3 million | 66% |
| 7/19/00 | 1Q 01 (6/30/00) | $94.3 million | 83% |
| 10/24/00 | 2Q 01 (9/30/00) | $142.7 million | 147% |
| 1/24/01 | 3Q 01 (12/31/00) | $156.6 million | 132% |
| 4/26/01 | 4Q 01 (3/31/01) | $171 million | 124% |
| 7/24/01 | 1Q 02 (6/30/01) | $172 million | 82% |
| 10/24/01 | 2Q 02 (9/30/01) | $175 million | 23% |
| 1/24/02 | 3Q 02 (12/31/01) | $175.2 million | 12% |

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)                                                                           2

1      5.     During the Class Period, Peregrine also reported dramatic increases in annual

2  revenue as follows:

| Announcement Date | Reporting Period | Reported Revenue | Reported Growth in Revenue Compared With Prior Year Results |
|---|---|---|---|
| 4/26/00 | Fiscal Year 2000 | $253.3 million | 83% |
| 4/26/01 | Fiscal Year 2001 | $564.7 million | 123% |

6.     On February 28, 2003, Peregrine filed with the United States Securities and Exchange Commission ("SEC") restated financial results for its fiscal years 2000 and 2001, and the first three (3) reporting quarters of fiscal year 2002. By these restatements the Company has admitted that it improperly recognized over $500 million in revenue during the restated periods. These restatements are also an admission that each document publishing the originally announced financial results for the restated periods contained untrue statements of material fact. Thus, Peregrine has admitted that each of the press releases and the annual and quarterly reports filed on SEC Forms 10-K and 10-Q and all other SEC filings incorporating or including such financial information, for the periods ending June 30, 1999 through and including December 31, 2001, contained untrue statements of material fact. The devastating impact of the accounting restatement is reflected by a comparison of the originally reported results with actual results, as set forth below.

### Fiscal Year Ended March 31, 2000 ($000 omitted)

| Income Statement | As Reported | Restatement Adjustment | Restated Amount |
|---|---|---|---|
| Revenue | $253,300 | ($121,668) | $131,632 |
| Net Loss | ($25,070) | ($192,348) | ($217,418) |

| Cash Flow Statement | As Reported | Restatement Adjustment | Restated Amount |
|---|---|---|---|
| Cash Flow Provided By Operations | $57,611 | ($92,373) | ($34,762) |
| Advances From Factored Receivables | ----- | ($90,885) | ($90,885) |

//

//

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)        3

Exhibit D
0133

**Fiscal Year Ended March 31, 2001 ($000 omitted)**

| Income Statement | As Reported | Restatement Adjustment | Restatement Amount |
|---|---|---|---|
| Revenue | $564,683 | ($254,105) | $213,353 |
| Net Loss | ($852,241) | ($922,276) | ($1,844,517) |

| Cash Flow Statement | As Reported | Restatement Adjustment | Restatement Amount |
|---|---|---|---|
| Cash Flow Provided By Operations | ($10,171) | ($113,618) | ($97,316) |
| Advances From Factored Receivables | ----- | ($180,372) | ($180,372) |

7.      Through Board of Directors meetings, their contacts with other directors and senior management, and other means, the individually named defendants and defendants Arthur Andersen LLP learned material, adverse nonpublic information concerning Peregrine's financial condition and negative prospects beginning prior to and continuing throughout the Class Period, which information they failed to disclose to the investing public.

8.      Specifically, at a Board of Directors meeting on April 14, 1999, the individually named defendants then serving on the Board, which was at that time chaired by defendant John J. Moores, approved the use of the sell-in method of accounting.  The issue was presented for approval to the full Board by Chief Financial Officer David Farley (now deceased), because of the serious ramifications of adopting this unusual and extremely aggressive method of accounting for software license revenue.  As a result of this accounting change, Peregrine began to record revenues as if it had fully completed the software sales process when it "sold" software to resellers, even though the resellers had no commitments from end users or even identified end users interested in the product.  Farley informed the full Board that application of the sell-in method, as opposed to the sell-through method (*i.e.*, recording sales when the software was actually purchased by an end user), **was the only means by which Peregrine could meet its quarterly revenue goals.**

9.      Farley signaled the entire Board that Peregrine was embarking on an accounting fraud by informing Board members that sell-in was not the "preferred method."  There was never any public disclosure of this material change in accounting policies.  As alleged hereinbelow,

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)                                                                    4

Exhibit D
0134

1  Peregrine instead affirmatively misrepresented its revenue recognition policy. Notwithstanding a

2  negative financial report to the Board on April 14, 1999, and adoption of a new, highly

3  aggressive accounting policy as a result, shortly thereafter, in what was to continue as a pattern

4  throughout virtually all of the Class Period, on April 26, 1999, Peregrine issued a very positive

5  press release describing 1999 as "an incredible year of growth" with an increase in fourth quarter

6  revenues of 129% over the prior year's fourth quarter results.

7        10.    By the next quarter, notwithstanding the aggressive accounting method the Board

8  had approved in April 1999, Peregrine's financial prospects had worsened. According to

9  defendant Stephen P. Gardner, Peregrine's Chief Executive Officer, the second quarter of fiscal

10  year 2000 (the quarter ended September 30, 1999) was "the toughest quarter we have

11  experienced since June of 1997." In his quarterly report to the Board dated October 15, 1999,

12  defendant Gardner alerted the individually named defendants then on the Board as to a specific

13  problem arising from use of the sell-in accounting treatment, as follows:

> **We have now reached a level of channel activity that is
> concerning as we look to the future**. We have a large amount of
> inventory in the channel that must be sold through, and this must
> be done as we simultaneously continue to grow our direct business.
> Sales rep productivity in the direct sales area was at a very low
> level (less than $1 million annualized) in the September quarter.
> (Emphasis added).

18        11.    Consistent with Farley's previous warning to the Board, while revenue was being

19  booked upon sell-in to the channel partners, there was no concurrent sell-through to end users.

20  Peregrine and its channel partners were unable to reduce hugely bloated inventory levels. End

21  user demand for Peregrine software was disappearing. Exacerbating the problem was that

22  Peregrine was unable to effectuate any significant amount of direct sales. These facts were

23  disclosed to and known by Board members as of the start of the Class Period, **but were never**

24  **disclosed to the investing public.**

25        12.    Nevertheless, on October 20, 1999, Peregrine again issued another positive press

26  release reporting enormous gains over the prior year: "We are delighted with our continued rapid

27  growth. . . ."

28        13.    On January 18, 2000, defendant Gardner alerted the individually named

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                      5

Exhibit D
0135

1  defendants serving on the Board that, like the second quarter, the third quarter of fiscal year 2000

2  (the quarter ended December 31, 1999) "was a very tough quarter."

3  **Our channel business is now a cause for concern . . .** We have
been much more successful generating sales to channels and

4  getting partners to buy into our message and vision. We have not
been as successful, and in some cases unsuccessful, in getting the

5  sell-through that would remove the inventory of software from the
channels. . . . **The net of this is that we are now at a level of**

6  **channel inventory that makes our auditors uncomfortable.
This will take us two to three quarters to work through.**

7  (Emphasis added).

8     14.    The defendants serving on the Board as of January 2000 thereby knew that (i) the

9  channel was stuffed with software that could not be sold; (ii) Arthur Andersen was

10  uncomfortable with the amount of inventory in the channel; and (iii) it would take 2 to 3 quarters

11  to work through the problems.

12     15.    None of the foregoing adverse information was publicly revealed. Contrary to the

13  adverse information the Board learned on January 18, 2000, Peregrine's January 20, 2000 press

14  release boasted that "once again, we report a record quarter for revenue and income."

15  Peregrine's internal financial reports did not improve through fiscal year 2001. On

16  July 17, 2000, defendant Gardner's "Review and Outlook" for the first quarter of fiscal year 2001

17  (the quarter ended June 30, 2000), informed the Board that "[i]t was a very tough quarter."

18     16.    Notwithstanding the continuing negative financial developments within the

19  Company, in or about February 2000, Board members were aware that Peregrine intended to

20  make its largest acquisition ever, a $1.5 billion purchase of Harbinger Corporation. These

21  defendants also knew that the acquisition, once announced, would depress the price of Peregrine

22  stock. This was due not only to the market's natural tendency to depress the price of the shares

23  of an acquiring company in a transaction of this size, but because Harbinger had a slower growth

24  rate and lower operating margins than those purportedly achieved by Peregrine, a sure indication

25  that market analysts would question the wisdom of the transaction for Peregrine. In fact, one

26  Board member, defendant Charles E. Noell III, opposed the proposed acquisition. Board

27  members were continuously updated in the January - February 2000 timeframe as to the progress

28  of the Harbinger acquisition. In four (4) days of insider selling between February 15 and 18,

1  2000, defendants John J. Moores, Christopher A. Cole, Matthew C. Gless, Frederic B. Luddy,

2  and Douglas S. Powanda sold 4.3 million shares of Peregrine stock for over $194 million, with

3  defendant Moores' trading accounting for $177 million of this amount in just two days.  So

4  egregious was this insider selling that in an e-mail exchange between defendant Richard T.

5  Nelson and Farley, the selling defendants' conduct was denigrated and referred to as "the hogs

6  are at the trough."

7        17.    This insider selling occurred when the selling defendants knew of, and traded on,

8  two material facts that were not known to the investing public; specifically, that Peregrine's

9  channel sales were out of control, there was minimal sell-through, and its auditors were

10  "uncomfortable" with the level of inventory in the channel, and (ii) that the Company was about

11  to make the biggest acquisition in its history that would in the short term depress the price of

12  Peregrine shares.  Further, these February 2000 insider sales by the aforementioned individually

13  named selling defendants occurred during a "lockup" period by which Peregrine had barred its

14  directors from engaging in trading due to their possession of material, nonpublic inside

15  information.  Peregrine's then General Counsel Eric Deller told investigators in May 2002 that,

16  "[f]rom the end of 1999 through February of 2001, all section 16 officers and directors were

17  prohibited from trading."  This was confirmed in defendant Gardner's "Fiscal Q3 2000 Review

18  and Outlook" report dated January 18, 2000, by which the individually named defendants were

19  informed that "given the uncertainty in the quarter due to the nature of the EDS deal, and our

20  own concerns regarding the uncertainty in the direct sales forecast, **we are going to extend the**

21  **lock-down period** for all Section 16 officers and directors until such time that the forecast is

22  firm, the EDS deal is signed or committed."  (Emphasis added).  The forecast was never firmed

23  up.  The EDS deal was not announced until April 2000.

24        18.    Peregrine's financial fortunes continued to deteriorate throughout fiscal year 2000.

25  On October 16, 2000, in defendant Gardner's "Review and Outlook" report for the second

26  quarter of fiscal year 2001 (the quarter ended September 30, 2000), he informed Board members

27  that:

28        Another quarter is behind us.  As you know, it was a real nail-biter,

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                      7

1    but in the end we pulled it off.  We had some significant wins and
2    some great orders, **but we also had to borrow from the future to make the present happen.**" (Emphasis added).

3          19.    On January 15, 2001, defendant Gardner's "Review and Outlook" (for the quarter

4  ending December 31, 2000) alerted these same Board members that "Our direct business in

5  North America was a disaster." He continued by stating that "our continued heavy reliance on

6  alliance and channel partners leaves me cautious."

7          20.    At a July 18, 2001 Board meeting, defendant Gardner informed Board members of

8  a barter transaction that had occurred with Critical Path, Inc. ("Critical Path"). At this Board

9  meeting, defendant Nelson discussed the fact that defendant Gardner and two other Peregrine

10  employees had already been deposed by the SEC in connection with this transaction. Former

11  General Counsel Deller has affirmed in an interview with investigators that Gardner's testimony

12  to the SEC and Peregrine's production of documents were "common knowledge to Board

13  members" at this time. Nelson's handwritten notes as to what transpired at this Board meeting

14  reflect a discussion of how Peregrine could "spin" this "public relations" concern. In a May 2001

15  e-mail from Deller to defendant Gardner, he expressed concern about where the SEC

16  investigation would lead and stated "[m]ore ominously, [the SEC] told me they were sending

17  another subpoena and what the contents would be ... Here is the disturbing one: They also said

18  they would be asking for a copy of PRGN's revenue recognition policy." This reflects guilty

19  knowledge, shared with Gardner, that Peregrine's revenue recognition practices were illegal.

20         21.    On October 2, 2001, defendants Gardner and Luddy received an e-mail with

21  attached documents from a Peregrine salesperson in Australia, Ron Hall, informing them that

22  Peregrine software license agreements contained side letters and were otherwise without

23  commercial substance, and represented "channel stuffing in their crudest form." The message

24  went on to state that, "[w]ere the attached documents, any of the 'other' contracts mentioned

25  above, or this correspondence to fall into the hands of the 'Wall Street Journal' or a curious

26  analyst, Peregrine Systems will be under serious and immediate scrutiny." Defendant Gardner

27  immediately forwarded this e-mail to defendant Moores, who was assured that this individual

28  was being "taken care of." In an e-mail exchange dated October 5, 2001 between defendants

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)        8

#105317

Exhibit D
0138

1    Gless, Gardner, and General Counsel Deller, it was stated "[w]e need to fire this guy.  That is a

2    given."  Defendant Gardner arranged to have the e-mail sender terminated as part of a supposed

3    lay off, to hide the fact that he was being fired for blowing the whistle on Peregrine's revenue

4    recognition fraud.  When he learned of his termination due to his branch office's alleged

5    "redundancy," Hall sent an e-mail dated October 25, 2001 to his manager stating:

6            Attached is a very important document I sent to the US a short time
             ago - Steve Gardner, Eric Deller, Matt Gless, Andy Cahill, John
7            Moores, Fred Luddy all received copies.  **I sent it because I
             believe what you're doing with Partner contracts here is**
8            **unethical, immoral and unconscionable.  There is also no**
             **justification to book revenue when no product has been**
9            **ordered, there is a 'sales guarantee' and there is little**
             **likelihood of payment if things don't go as we predicted during**
10           **discussions. ...** Here is the document, it's self explanatory.  My
             closing comment that anyone who objected to the "channel
11           stuffing" partner approach would be laid off is ironically relevant.
             (Emphasis added).

12

13           22.    Throughout the Fall of 2001, senior management of Peregrine, including

14   defendants Gardner, Gless, and Nelson, as well as Arthur Andersen, were repeatedly informed of

15   the use of side letters excusing or deferring payment on software license sales, and the existence

16   of large uncollectible accounts receivable from channel transactions.  This same month, October

17   2001, the members of the Audit Committee of the Board (defendants Noell, Thomas G. Watrous

18   and Rodney T. Dammeyer) were explicitly informed by Arthur Andersen that specific instances

19   of questionable recognition of revenue on channel sales had added millions to the Company's

20   sales numbers which, as announced, had just met Wall Street earnings targets as provided by

21   defendants Gardner and Gless.

22           23.    Beginning in February 2002, Peregrine's fraud garnered the constant and intense

23   attention of Peregrine's Board members.  Upon seeing that Peregrine's participation in

24   questionable Critical Path barter transactions was reported in a newspaper article, defendant

25   Moores arranged to hire his own lawyer to conduct a secret internal investigation in a self-serving

26   attempt to separate and exonerate himself from the obvious, but as yet publicly undisclosed,

27   massive accounting fraud ongoing within Peregrine.  By April 25, 2002, defendant Moores was

28   informed that a successor accounting firm, KPMG LLP, had affirmatively concluded that there

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
           Master File No. 02-CV-0870 J(RBB)                                                                    9

                                                                                        Exhibit D
                                                                                        0139

1  had been accounting fraud within Peregrine and would likely go public with this information.

2  Moores arranged to have himself appointed as Chairman of the Board, so as to be in a position to

3  control the flow of information, position himself as "above the fray," and to squelch any

4  suggestion of his personal involvement in the wrongful conduct.  In a further attempt to insulate

5  himself and cover up his involvement, Moores had his personal counsel conduct a purported

6  "independent" investigation of the facts.  In truth, Moores had arranged to have an investigation

7  conducted that would cast senior management and the auditors of Peregrine as the only

8  wrongdoers, and exonerate himself and his business cronies who had served as his eyes and ears

9  on the Peregrine Board.  However, as the facts became known, and the extent of Moores's

10  knowledge of the fraud and trading on inside information gradually were exposed, coupled with

11  the announcement of a massive restatement on February 28, 2003, Moores was finally forced to

12  relinquish all positions within Peregrine.  As of the date of submission of this Amended

13  Complaint, and notwithstanding guilty pleas by three former senior officers of Peregrine, an SEC

14  investigation is continuing, as is a criminal investigation by the U.S. Department of Justice.

15      24.    The foregoing summary of critical events at Peregrine during the Class Period

16  demonstrates that Board members and Arthur Andersen knew, or were deliberately reckless in

17  not knowing, that a financial fraud was afoot at Peregrine.  This fraud involved the following

18  financial and accounting manipulations:

19      •    Peregrine's reported revenues were generated primarily from two sources: (1)

20  product licensing revenues from resellers, distributors and end users, and (2) service and support

21  revenues.  Peregrine could not properly recognize revenue from the sale of software licenses to

22  resellers, distributors or end users unless: (i) an unconditional contract had been signed; (ii) the

23  product had been delivered; (iii) the fee was "fixed and determinable;" (iv) the risk of concession

24  was deemed remote; (v) no significant vendor obligations remained; and (vi) collection of the

25  receivable was probable.  Hundreds of millions dollars of reported revenue was improperly

26  recognized by Peregrine during the Class Period on transactions in which these required criteria

27  under Generally Accepted Accounting Principles ("GAAP"), which were acknowledged in its

28  own SEC filings, had not been met.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    10

Exhibit D
0140

1    ● Revenue was recognized by Peregrine despite the existence of both oral and

2  written agreements and side letters with resellers under which they had no obligation to pay

3  Peregrine for product until it was sold-through to an end user. **The practice of recognizing**

4  **revenue on agreements where there was no fixed obligation to pay (*i.e.*, sell-in), was**

5  **authorized by the full Board and widely known to exist throughout the Company.** The

6  amount of a resellers' "commitment" which had not sold-through to the end user was closely

7  monitored by Peregrine and was referred to as the "burn." A former regional sales director was

8  quoted as saying, "[Burn] was common and openly discussed in the management ranks . . . This

9  was a house of cards waiting to blow up."

10   ● Peregrine improperly recognized revenue on transactions which were in reality

11  product swaps or barter transactions with third parties, entered into to allow Peregrine to meet

12  publicly announced revenue goals;

13   ● Peregrine materially misrepresented its balance sheet and statement of liabilities

14  by failing to include significant obligations to financial institutions. These obligations arose out

15  of Peregrine's undisclosed business practice of factoring substantial portions of its accounts

16  receivable and treating those borrowings as sales of receivables, in violation of GAAP. During

17  the Class Period, the amount of debt omitted from Peregrine's financial statements reached as

18  high as $180 million and, by August 29, 2002, was approximately $103 million;

19   ● Because Peregrine improperly treated the foregoing factoring transactions as

20  "sales" of accounts receivable, it understated its accounts receivable reflected on its balance sheet

21  by as much as $180 million during the Class Period. This massive understatement of accounts

22  receivable caused Peregrine to materially misrepresent and understate its Days Sales Outstanding

23  ("DSO"). DSO is the average number of days it takes a company to collect its accounts

24  receivable, and is a key financial metric used by investors and securities analysts to gauge the

25  quality of a company's reported revenue and the collectibility of its accounts receivable;

26   ● Peregrine understated option compensation expense that it was required to record

27  during the Class Period by approximately $100 million;

28   ● Peregrine was constantly in need of, or had run out of, cash to run its operations,

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    11

Exhibit D
0141

1   in contrast to the image it portrayed of a highly successful business enterprise. The Company

2   repeatedly needed to access the capital markets to raise cash during the Class Period. Because of

3   this desperate need for repeated cash infusions, no disclosure could be made by the defendants of

4   the material adverse information regarding the Company's adverse financial fortunes as alleged

5   herein because any such disclosure would render it impossible to raise the needed cash and

6   would have led to the revelation of Peregrine's accounting fraud and/or possible bankruptcy;

7        •    Despite its rapid growth, the Company failed to maintain adequate systems of

8   internal accounting and financial controls throughout the Class Period, which was a "red flag" to

9   each of the defendants that Peregrine's senior management could not and did not accurately

10   report the Company's revenues and earnings in compliance with GAAP;

11        •    The members of the Audit Committee of the Board of Directors knowingly and/or

12   with deliberate recklessness failed to carry out their obligations notwithstanding knowledge of

13   Peregrine's bogus accounting as conveyed to them by Arthur Andersen;

14        •    There were numerous significant manual adjustments to software license and

15   maintenance revenue;

16        •    There was a failure to record the deferred tax effects for accruals in Peregrine's

17   various business combinations;

18        •    There was an inability to quantify the amount of sales to resellers (and their

19   identities) during particular accounting periods; and

20        •    There were substantial delays in providing, or an inability to provide, information

21   such as trial balances, general ledgers and subledgers that would customarily be readily available

22   from a company's accounting systems.

23        25.    The foregoing accounting manipulations were engaged in by high level executive

24   officers of the Company, and were known to or, with deliberate recklessness, disregarded by the

25   individually named defendants who served as members of Peregrine's Board of Directors. These

26   Board members lent their names to public statements which they knew were false, or acted with

27   deliberate recklessness as to their truth or falsity. During the Class Period, while Peregrine was

28   falsely reporting record financial results, certain of the individually named defendants

Exhibit D
0142

1  collectively sold more than $450 million of Peregrine stock while knowing or, with deliberate

2  recklessness disregarding, the material undisclosed adverse information about Peregrine's

3  financial results and operations herein alleged.  A huge portion of this insider selling occurred at

4  a time when the individually named selling defendants -- but not the investing public -- knew of

5  the planned $1.5 billion acquisition of Harbinger Corporation and knew that the acquisition

6  would be negatively received by the market.  These selling defendants sold massive quantities of

7  Peregrine shares based on this insider knowledge in violation of Company prohibitions on selling

8  and before the public learned of the proposed transaction.

9       26.    The massive accounting fraud alleged herein was nurtured and condoned by

10  defendant Arthur Andersen LLP which abrogated its duties and responsibilities as Peregrine's

11  purportedly "independent" outside accountant.  In an extraordinary example of financial

12  chicanery, Arthur Andersen actually functioned as a confederate of Peregrine's senior

13  management in carrying out their accounting fraud, often disregarding complaints and concerns

14  of lower level Peregrine financial personnel.  As alleged in greater detail herein, prior to the

15  public revelation of the accounting fraud, Arthur Andersen knew about the accounting

16  irregularities at Peregrine, but took no action to correct Peregrine's accounting manipulations,

17  failed to inform the investing public that Peregrine was engaging in accounting fraud, and did not

18  resign its position as it should have given its knowledge of Peregrine's accounting defalcations.

19  The lack of independence between Arthur Andersen and Peregrine was a major contributing

20  factor in the perpetuation -- and concealment -- of the accounting fraud alleged herein.  Among

21  other things, Arthur Andersen provided the Company with unqualified annual audit opinions, and

22  reviewed and approved throughout the Class Period, the Company's quarterly financial reports,

23  even though it knew (i) that the Company's internal accounting and financial controls were

24  grossly deficient, (ii) that the Company was recognizing material amounts of revenue in violation

25  of GAAP, (iii) that the Company was classifying loans as sales in violation of applicable

26  accounting standards and principles, and (iv) that Peregrine otherwise was manipulating the

27  Company's accounts at quarter-end and year-end in order to meet pre-established revenue targets.

28       27.    The public dissemination of materially false and misleading financial statements

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                    13

Exhibit D
0143

1 and other positive statements about the Company's business and operations caused Peregrine's

2 share price to trade at artificially inflated prices throughout the Class Period. As the false

3 financial results were reported throughout the Class Period, Peregrine's stock price increased

4 from approximately $13.125 per share at the beginning of the Class Period to a Class Period high

5 of over $78.00 per share (adjusted for stock splits). As the fraud was revealed and assimilated by

6 the market, the price of Peregrine common stock declined to $0.89 per share on the trading day

7 after the close of the Class Period.

8 <u>**JURISDICTION AND VENUE**</u>

9     28.     Counts I through V of this Complaint arise under Sections 10(b), 14(a) and/or

10 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b), §78n(a)

11 and §78t(a), respectively, and the rules and regulations promulgated thereunder, including SEC

12 Rule l0b-5, 17 C.F.R. §240.l0b-5, and SEC Rule 14a-9, 17 C.F.R. §240.14a-9. This Court has

13 jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act,

14 15 U.S.C. §78aa. Counts VI through IX of this Complaint arise under Sections 11 and/or 15 of

15 the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77k and §77o. This Court has

16 jurisdiction over this action under §22(a) of the Securities Act, 15 U.S.C. §77v(a). This Court

17 also has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337.

18     29.     Venue is proper in this District pursuant to Section 27 of the Exchange Act,

19 15 U.S.C. §78aa, Section 22(a) of the Securities Act, 15 U.S.C. §77v(a), and 28 U.S.C. §1391(b).

20 The wrongs alleged herein occurred, in substantial part, in this District. At all relevant times,

21 Peregrine conducted, and still conducts, significant business in this District and maintains its

22 principal place of business in this District. At all relevant times, the defendants named herein

23 conducted substantial business and/or resided in this District, or committed violations of United

24 States law by acts committed in this District.

25     30.     In connection with the facts and conduct alleged in this Complaint, defendants,

26 directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

27 not limited to, the United States mails, interstate telephone communications, and the facilities of

28 the national securities markets.

#105317      FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)      14

Exhibit D
0144

**THE PARTIES**

A.    **Lead Plaintiffs**

31.    (a) Lead Plaintiff David Levy purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(b) Lead Plaintiff Leighton Powell purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(c) Lead Plaintiff David Schenkel purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(d) Lead Plaintiff John Virden purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(e) Lead Plaintiff Conrad Willemse purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(f) Lead Plaintiff Bill Holman purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(g) Lead Plaintiff Bob Benesko purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(h) Lead Plaintiff Michael Slavitch purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(i) Lead Plaintiff Richard Maheu purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(j) Lead Plaintiff Mark Rollins purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(k) The Lead Plaintiffs identified in subparagraphs (a)-(j) above are sometimes herein collectively referred to as to the Loran Group.

(l) Lead Plaintiff Heywood Waga held Harbinger Corporation shares and acquired Peregrine registered common stock in connection with Peregrine's acquisition of Harbinger Corporation which was consummated on or about June 16, 2000 and was damaged thereby.

Exhibit D
0145

**B.**   **Other Plaintiffs**

(m)  Plaintiff John Sutliff ("Sutliff") held Harbinger Corporation shares and acquired Peregrine registered common stock in connection with Peregrine's acquisition of Harbinger Corporation which was consummated on or about June 16, 2000 and was damaged thereby.

(n)  Plaintiff M. Clifford Balch, Jr., Trustee of the Balch Family Trust ("Balch"), held Remedy Corporation shares and acquired Peregrine registered common stock in connection with Peregrine's acquisition of Remedy Corporation which was consummated on or about August 27, 2001 and was damaged thereby.

(o)  Plaintiff Alan Hylton ("Hylton") held Remedy Corporation shares and acquired Peregrine registered common stock in connection with Peregrine's acquisition of Remedy Corporation which was consummated on or about August 27, 2001 and was damaged thereby.

**C.**   **Peregrine Systems, Inc.**

32.   Peregrine was incorporated in California in 1981, reincorporated in Delaware in 1994, and went public with its initial public offering ("IPO") in April 1997.  The Company is headquartered in San Diego, California.  Peregrine is an unnamed defendant herein.  But for Peregrine's September 22, 2002 filing for protection from its creditors under Chapter 11 of the United States Bankruptcy Code, it would be named as a defendant.

33.   On June 30, 2003, the SEC filed a complaint against Peregrine in this Court.  In relevant part, the SEC complaint alleged as follows:

> This case involves a massive financial fraud by defendant
> Peregrine Systems, Inc., a publicly traded San Diego-based
> software company.  The purpose of the fraud was to inflate
> Peregrine's revenue and stock price.  To achieve its unlawful
> purpose, Peregrine filed materially incorrect financial statements
> with the Commission for 11 consecutive quarters between
> April 1, 1999 and December 31, 2001 . . .  In February 2003,
> Peregrine restated its financial results for its fiscal years 2000 and
> 2001, and for the first three quarters of fiscal 2002.  Peregrine
> reduced previously reported revenue of $1.34 billion by $509
> million . . . .

34.   On July 22, 2003, Peregrine consented to entry of a Final Judgment in the SEC

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                16

Exhibit D
0146

1  action against it.  Among other things, the Final Judgment (i) permanently enjoined Peregrine

2  and related persons from violating the antifraud provisions of the federal securities laws; (ii)

3  required the Company to retain an Internal Auditor acceptable to the SEC who is required to

4  report directly to the Audit Committee of Peregrine's Board of Directors, and to assess and

5  enforce Peregrine's accounting control structure and to ensure that Peregrine's financial

6  condition and results are accurately reported in Peregrine's public financial statements; (iii)

7  required Peregrine to establish a Corporate Compliance Program and appoint a Corporate

8  Compliance Officer acceptable to the SEC whose duties include assessing and reporting on

9  Peregrine's compliance with recognized standards of "best practices" with respect to corporate

10  governance and to ensure that Peregrine's Board of Directors (and its committees) have

11  appropriate powers, structure, composition and resources; and (iv) required Peregrine to

12  commence a training and education program for its officers and employees, to prevent violations

13  of the federal securities laws.

14      35.    Lead Plaintiffs filed Class Proofs of Claim against Peregrine in its bankruptcy

15  case on behalf of themselves and the Class and Sub-Classes of securities purchasers defined

16  herein.  These Class Proofs of Claim were based on the violations of law alleged herein.  On

17  October 14, 2003, Lead Plaintiffs settled their claims against Peregrine pursuant to an Amended

18  Settlement Agreement which was approved by the United States Bankruptcy Court for the

19  District of Delaware.

20      **D.    Defendants**

21      36.    (a)  Defendant Stephen P. Gardner was initially hired by Peregrine as Vice

22  President, Strategic Acquisitions on May 19, 1997.  As of January 20, 1998, Gardner was

23  promoted to Executive Vice President and assumed principal responsibility for the day-to-day

24  operations of Peregrine.  He was one of three members of the "Office of the Chairman,"

25  established as of that date, the other members being defendant Moores and David A. Farley.  At a

26  Board of Directors meeting on April 16, 1998, defendant Moores sought the appointment of

27  Gardner as President, Chief Executive Officer, and director, positions Gardner assumed on that

28  date.  Gardner also became Chairman of the Board of Directors on July 19, 2000.  He was

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                          17

1    terminated from all positions at Peregrine on May 3, 2002.  During the Class Period, while in

2    possession of material, undisclosed adverse information about Peregrine, Gardner sold 452,512

3    shares of Peregrine common stock and received gross proceeds of approximately $14,030,526.

4          (b)  Defendant Matthew C. Gless was hired as Peregrine's corporate controller on

5    April 18, 1996.  From 1990 until April 1996, Gless held various accounting and financial

6    management positions at BMC Software, Inc. ("BMC Software"), a company founded by

7    defendant Moores, which is headquartered in Houston, Texas.  Gless's wife also worked for

8    BMC Software.  She subsequently worked at JMI Services, Inc. ("JMI Services"), a company

9    owned and controlled by defendant Moores.  Gless became Vice President, Finance and

10    Peregrine's Chief Accounting Officer on November 30, 1999.  He served as Chief Financial

11    Officer and a member of the Board of Directors from November 1, 2000 until May 5, 2002.

12    During the Class Period, while in possession of material, undisclosed adverse information about

13    Peregrine, Gless sold 169,250 shares of Peregrine common stock and received gross proceeds of

14    approximately $3,993,188.75.  On April 16, 2003, the SEC filed a Complaint against Gless

15    which alleged that he violated, *inter alia*, Section 10(b) of the Exchange Act by knowingly or

16    recklessly making misrepresentations and omissions of fact with the intent of materially

17    misstating Peregrine's publicly reported financial results.  That same day Gless pled guilty to a

18    criminal information charging him with a conspiracy, beginning no later than June 1999, to

19    commit, among other offenses, securities fraud.  Gless's guilty plea is attached hereto as

20    Appendix A and is incorporated herein by this reference.  By his guilty plea, Gless has effectively

21    admitted liability to the Class identified herein.

22          (c)  Defendant Steven S. Spitzer was hired by Peregrine as Vice President,

23    Alliances in August 1997.  He became Vice President, Managed Service Providers, in April

24    2000, and returned to his former position as Vice President, Alliances in March 2001, until he

25    was terminated on June 28, 2002.  During the Class Period, while in possession of material

26    undisclosed adverse information about Peregrine, Spitzer sold 185,000 shares of Peregrine

27    common stock and received gross proceeds of approximately $5,230,000.  On June 16, 2003, the

28    SEC filed a complaint against Spitzer in this Court alleging that from at least December 1999, he

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                     18

1 | knowingly or recklessly participated in a scheme by which Peregrine materially misrepresented

2 | its publicly reported financial results, including its revenue, in violation of, *inter alia*,

3 | Section 10(b) of the Exchange Act.  That same day, a criminal information was filed against

4 | Spitzer charging securities fraud, to which he pled guilty.  Spitzer's guilty plea is attached hereto

5 | as Appendix B and is incorporated herein by this reference.  By his guilty plea, Spitzer has

6 | effectively admitted liability to the Class identified herein.

7 |         (d)  Defendant Ilse Cappel was employed at Peregrine from September 1993 until

8 | she left the Company in June 2002.  Cappel was Senior Manager, Treasury from

9 | September 3, 1993, and became Director, Treasury on April 1, 2001.  Cappel's primary

10 | responsibilities included financing accounts receivables, international collections, and forecasting

11 | cash and DSO.  Immediately prior to and during the Class Period, while in possession of

12 | material, undisclosed adverse information about Peregrine, Cappel sold approximately 16,249

13 | shares of Peregrine common stock and received gross proceeds of approximately $334,287.  On

14 | November 22, 2002, the SEC filed a Complaint against Cappel alleging that she committed bank

15 | fraud by selling falsified and illusory Peregrine receivables to banks.  That same day, Cappel pled

16 | guilty to a criminal information charging her with a scheme beginning no later than June 1999 to

17 | defraud a federally insured bank by making false statements, misrepresenting the true financial

18 | condition of Peregrine, and fabricating invoices.  Cappel's guilty plea is attached hereto as

19 | Appendix C and is incorporated herein by this reference.  By her guilty plea, Cappel has

20 | effectively admitted liability to the Class identified herein.

21 |         (e)  Defendant Richard T. Nelson served as Peregrine's Vice President and

22 | General Counsel from November 8, 1995 to March 2000.  He formerly worked for BMC

23 | Software, and had made numerous investments with defendant Moores.  Starting in February

24 | 1997, Nelson also served as Peregrine's Corporate Secretary.  Nelson was Peregrine's Vice

25 | President, Corporate Development from March 2000 to April 2001.  Nelson thereafter served as

26 | Senior Vice President, IMG Operations until May 6, 2002 when he was appointed interim Chief

27 | Executive Officer.  During the Class Period, while in possession of material undisclosed adverse

28 | information about Peregrine, Nelson sold 375,000 shares of Peregrine common stock and

1 received gross proceeds of approximately $8,827,120.

2          (f)  Defendant Douglas S. Powanda was hired by Peregrine on February 18, 1992

3 as Sales Manager with fifteen years of experience in the software business.  During the Class

4 Period, Powanda held the positions of Director of Sales, Director of International Sales, Vice

5 President of International Sales, Vice President of North American Sales, Vice President and

6 General Manager of International Sales, Executive Vice President for Operations, Executive Vice

7 President, Worldwide Sales (as of January 1998), until he ceased working as an employee of

8 Peregrine in February 2001, but continued to serve as a consultant with regard to major accounts.

9 Pursuant to an employment agreement dated April 1, 2000, which was prepared in September

10 2000 and backdated, Powanda was entitled to a specified amount of stock options provided he

11 reached specified sales target numbers in the multi-millions of dollars.  Powanda ultimately hit

12 the target number of $100 million in sales specified in his employment agreement, and was

13 therefore entitled to 100,000 shares of stock, which he received between July 2000 and the end of

14 the fiscal year on March 31, 2001.  From April 2001 to June 2001 Powanda took a 90 day

15 sabbatical.  He orally resigned in July 2001, but as of July or August 2001, he was encouraged

16 by defendant Gardner to continue working for the Company and had responsibility for certain

17 large accounts.  During the Class Period, while in possession of material undisclosed adverse

18 information about Peregrine, Powanda sold approximately 862,446 shares of Peregrine common

19 stock and received gross proceeds of approximately $24,286,288.

20          (g)  Defendant Frederic B. Luddy served as Vice President, Research and

21 Development, and Chief Technology Officer of Peregrine from January 1998 through the Class

22 Period.  During the Class Period, while in possession of material undisclosed adverse

23 information about Peregrine, Luddy sold 465,763 shares of Peregrine common stock and

24 received gross proceeds of approximately $11,823,660.

25          (h)  Defendant John J. Moores served as a member of Peregrine's Board of

26 Directors from October 1989 through the Class Period, and as Chairman of its Board of Directors

27 from March 1990 until July 2000.  During the Class Period, Moores also chaired the

28 Compensation Committee of Peregrine's Board of Directors.  Moores left the Peregrine Board in

#105317     FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                20

Exhibit D
0150

1  served as President and Chief Executive Officer of Peregrine from 1986 until 1989. Since 1992,

2  Cole has been President and Chief Executive Officer of Questrel, Inc., UrStudios, Inc. and

3  Headlamp, Inc., each of which is a software development company. During the Class Period,

4  while in possession of material undisclosed adverse information about Peregrine, Cole sold

5  1,304,000 shares of Peregrine common stock and received gross proceeds of approximately

6  $24,762,415.

7       (k)  Defendant Norris van den Berg served as a member of the Board of Directors

8  of Peregrine from January 1992 until he resigned in October 2000. van den Berg was a member

9  of the Audit Committee of Peregrine's Board of Directors during the Class Period until his

10  resignation. van den Berg has also served as a General Partner of the JMI Equity Fund, an entity

11  controlled by defendant Moores, and served as a Director of NEON Systems, Bridge Transfer

12  Corporation and Skunkware, Inc., companies also controlled by defendant Moores. During the

13  Class Period, while in possession of material undisclosed adverse information about Peregrine,

14  van den Berg sold 40,000 shares of Peregrine common stock for gross proceeds of $1,728,000.

15       (l)  Defendant Richard A. Hosley II, served as a member of the Board of Directors

16  of Peregrine from January 1992 until his resignation on June 15, 2000. Hosley was a member of

17  the Audit Committee of Peregrine's Board of Directors from April 22, 1999 until his resignation.

18  Hosley had previously served as President and Chief Executive Officer of BMC Software, a

19  company founded by defendant Moores. Hosley has had a 40 year personal friendship and

20  business relationship with defendant Moores.

21       (m)  Defendant William D. Savoy served as a member of the Board of Directors

22  of Peregrine from on or about June 15, 2000, the effective date of the Harbinger acquisition, on

23  whose Board he served, through the end of the Class Period. He became a member of the Audit

24  Committee of Peregrine's Board of Directors on October 17, 2000 and served in that position

25  until October 17, 2001. Since 1988, Savoy has served as President of Vulcan Northwest, Inc., a

26  privately held venture capital and investment firm based in Seattle, Washington controlled by

27  Paul G. Allen. Savoy served as a director of the following companies while contemporaneously

28  sitting on Peregrine's Board of Directors and its Audit Committee: Telescan, TicketMaster

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                22

1    Online City Search, USA Networks, Metricom, Charter Communications, Drugstore.com,

2    Go2Net, Value America and High Speed Access Corporation.

3          (n)    Defendant Thomas G. Watrous served as a member of the Board of Directors

4    of Peregrine from January 1999 through the end of the Class Period.  He became a member of the

5    Audit Committee of Peregrine's Board of Directors on April 17, 2000.  Watrous was a senior

6    partner with the management consulting firm of Andersen Consulting (now known as

7    Accenture), which was previously an affiliate of defendant Arthur Andersen LLP.  During the

8    Class Period, while in possession of material undisclosed adverse information about Peregrine,

9    Watrous sold 15,000 shares of Peregrine common stock and received gross proceeds of

10    approximately $811,200.

11          (o)    Defendant Rodney T. Dammeyer served as a member of the Board of

12    Directors of Peregrine from June 29, 2001 through the end of the Class Period.  He became

13    Chairman of the Audit Committee as of the Committee's meeting on October 24, 2001.

14    Dammeyer worked for defendant Arthur Andersen beginning in 1962, and was an audit partner

15    of the firm until 1979.  He thereafter served as Chief Financial Officer of various public

16    companies including Northwest Industries and Household International.  He spent 15 years with

17    Itel, and its successor Anixter International, Inc., including serving as its Chief Executive Officer

18    from January 1993 to February 1998.  While with Anixter, Dammeyer also served as Managing

19    Director and Managing Partner of Equity Group Corporate Investments, a diversified

20    management and investment firm.  Dammeyer has been a director of numerous public

21    companies, and served on the audit committees of several of those companies, including

22    Stericycle, Inc. and TeleTech Holdings, Inc.  He has also served as a trustee of Van Kampen

23    Closed-End Mutual Funds.

24          (p)    Defendant Arthur Andersen LLP ("Arthur Andersen") was a firm of certified

25    public accountants.  Arthur Andersen was engaged by Peregrine to provide independent

26    accounting and auditing services, as well as tax and consulting services, and to give Peregrine

27    accounting advice and consultation regarding its annual and quarterly reports filed with the SEC.

28    Arthur Andersen falsely represented, in its audit opinions on Peregrine's fiscal years 2000 and

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                  23

Exhibit D
0153

1  2001 financial statements incorporated in SEC Forms 10-K filed for those years, that the

2  Company's financial statements fairly presented the Company's financial condition and results of

3  operations in conformity with GAAP and had been audited by Arthur Andersen in accordance

4  with Generally Accepted Auditing Standards ("GAAS"). In addition, Arthur Andersen reviewed

5  and approved of the materially false and misleading quarterly financial statements published by

6  Peregrine for each of the quarters of fiscal years 2000 and 2001 and the first, second and third

7  quarters of fiscal year 2002. On April 5, 2002, Arthur Andersen was replaced by KPMG LLP as

8  Peregrine's independent auditor. Arthur Andersen was paid approximately $4 million in fees for

9  its auditing, accounting, and consulting work for Peregrine since being retained in July 1996.

10       (q) Defendant Daniel F. Stulac was an employee and partner of defendant Arthur

11  Andersen at all relevant times. Stulac provided accounting and auditing services to Peregrine in

12  connection with its annual and quarterly reports filed with the SEC during the Class Period.

13  Stulac was the audit engagement partner for the annual audit relating to Peregrine's fiscal year

14  2001 financial statements incorporated in the SEC Form 10-K filed for that year, which falsely

15  represented that the financial statements fairly presented the Company's financial condition and

16  results of operations in conformity with GAAP and had been audited in accordance with GAAS.

17       (r) Defendant AWSC Société Coopérative, en liquidation ("AWSC"), is a société

18  coopérative organized under the Swiss Federal Code of Obligations. During the Class Period,

19  AWSC was comprised of the AWSC member firms and their respective partners, including

20  Arthur Andersen and Arthur Andersen Germany. AWSC served as the coordinating entity for

21  the international network of the various Arthur Andersen firms. During the Class Period, AWSC

22  set the policies and procedures to be used by AWSC members, including Arthur Andersen,

23  throughout the world and also during the Class Period conducted audits and reviews of the

24  international segments of Peregrine's business which were incorporated in Peregrine's published

25  financial results.

26       (s) Defendant KPMG LLP is a firm of certified public accountants, and was one

27  of Peregrine's principal customers during the Class Period. During the Class Period, KPMG

28  entered into agreements with Peregrine for delivery of software which it knew were nothing more

#105317        FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                              24

Exhibit D
0154

1  than "parking" arrangements, whereby Peregrine would deliver software to KPMG which KPMG

2  was not obligated to pay for.  KPMG knew that these arrangements were for the sole purpose of

3  permitting Peregrine to report revenues which met Peregrine's published earnings estimates and

4  which revenues KPMG knew Peregrine would not and did not obtain.

5          (t) Defendant BearingPoint, Inc. ("BearingPoint"), formerly known as KPMG

6  Consulting, Inc. ("KMPG Consulting"), is a large publicly held business consulting, systems

7  integration and managed services firm.  KPMG Consulting was one of Peregrine's principal

8  customers during the Class Period.  During the Class Period, KPMG Consulting entered into

9  agreements with Peregrine for the delivery of software which it knew were nothing more than

10  "parking" arrangements, whereby Peregrine would deliver software to KPMG Consulting which

11  KPMG Consulting was not obligated to pay for.  KPMG Consulting knew that these

12  arrangements were for the sole purpose of permitting Peregrine to report revenues which met

13  Peregrine's published earnings estimates which revenues KPMG Consulting knew Peregrine

14  would not and did not obtain.

15          (u)  Defendant Larry Rodda is a certified public accountant who was at all

16  relevant times a principal of KPMG LLP and KPMG Consulting.  Rodda was the individual at

17  KPMG LLP and KPMG Consulting who signed agreements with Peregrine during the Class

18  Period on behalf of those firms, which he knew were for the purpose of allowing Peregrine to

19  falsely report that it had attained a certain level of revenues and pursuant to which he knew that

20  KPMG and KPMG Consulting had no obligation to pay.

21          37.      Each of the individually named defendants (other than defendant Rodda) was

22  provided with copies of Peregrine's press releases and SEC filings containing materially false

23  and misleading financial information prior to or shortly after their issuance and had the ability

24  and opportunity to prevent their issuance or to cause them to be corrected.  Each such

25  individually named defendant had a duty to promptly disseminate accurate and truthful

26  information with respect to Peregrine's operations, financial condition and future business

27  prospects, or to cause and direct that such information be disseminated so that the market price of

28  Peregrine's securities would be based on truthful and accurate information.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                          25

#105317

Exhibit D
0155

38. Because of their positions and access to material nonpublic information, each of the individually named defendants who sold Peregrine stock knew, prior to their sales of Peregrine stock during the Class Period, of the material adverse facts specified herein which had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made by Peregrine and certain of its executive officers were materially false and misleading. Each such individually named defendant was in a position to control or influence the contents of, or otherwise cause corrective disclosures to be made in the public dissemination of the false and misleading information and failed to do so in order to protect Peregrine's desire to grow through acquisition and in order to allow certain of these defendants to sell substantial amounts – more than $450,000,000.00 – of Peregrine common stock while its share price was artificially inflated and while they were in possession of material nonpublic adverse information.

## CLASS ALLEGATIONS

39. Lead Plaintiff the Loran Group brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on their own behalf and on behalf of a class consisting of all other similarly situated persons or entities who purchased or otherwise acquired Peregrine securities from July 22, 1999 through May 3, 2002. The foregoing identified period during which the securities law violations alleged herein were committed, was not arbitrarily selected by Lead Plaintiff the Loran Group. Rather, by its restatements announced on February 28, 2003, Peregrine has admitted that the financial results it published applicable to the period between April 1, 1999 (the commencement of the first quarter of fiscal year 2000) and December 31, 2001 (the end of the third quarter of fiscal year 2002) were materially misstated. Further, investors in Peregrine securities were not informed until, at the earliest, May 3, 2002, that an accounting fraud may have occurred at Peregrine. In keeping with its fiduciary obligations to the Class, and based on Peregrine's admissions, Lead Plaintiff the Loran Group is dutibound to allege the period from July 22, 1999 (when Peregrine announced results for the first quarter of fiscal year 2000) through May 3, 2002 as the period during which purchasers of Peregrine securities were defrauded. This period is a direct consequence of the timing and scope

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    26

Exhibit D
0156

1  of Peregrine's admitted accounting fraud.

2       40.    This action is also brought by Lead Plaintiff Heywood Waga and the other

3  plaintiffs identified in paragraph 31(m)-(o) on behalf of two Sub-Classes. The first Sub-Class

4  consists of all persons and entities who held shares of Harbinger Corporation and who acquired

5  Peregrine registered common stock in connection with Peregrine's acquisition of Harbinger

6  Corporation, which was consummated on or about June 16, 2000 (the "Harbinger Acquisition").

7  The second Sub-Class consists of all persons and entities who held shares of Remedy

8  Corporation and who acquired Peregrine registered common stock in connection with Peregrine's

9  acquisition of Remedy Corporation, which was consummated on or about August 27, 2001 (the

10  "Remedy Acquisition").

11      41.    Excluded from the Class and Sub-Classes are any defendants, any officers and

12  directors of Peregrine, members of their families, Peregrine and any of its parents, subsidiaries,

13  officers, directors, or affiliates, any entity in which any excluded person has a controlling interest,

14  directly or indirectly, and each of their respective legal representatives, heirs, successors, and

15  assigns.

16      42.    The members of the Class and Sub-Classes are so numerous that joinder of all

17  members is impracticable. Peregrine common stock was actively traded on the NASDAQ

18  throughout the Class Period. As of March 31, 2001, Peregrine had more than 160 million shares

19  issued and outstanding and approximately 85,000 beneficial holders of its shares. Plaintiffs

20  believe that there are tens of thousands of Class and Sub-Class members who are geographically

21  dispersed throughout the United States.

22      43.    Plaintiffs' claims are typical of those of other applicable Class and Sub-Class

23  members. Plaintiffs and the Class and Sub-Classes sustained damages due to the defendants'

24  common course of wrongful conduct.

25      44.    Plaintiffs will fairly and adequately protect the interests of these applicable Class

26  and Sub-Class members. They have retained counsel who are competent and experienced in

27  securities litigation and class actions. Plaintiffs have no interests that conflict with those of the

28  other applicable Class and Sub-Class members.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                              27

Exhibit D
0157

45. Common questions of law or fact exist as to all Class and Sub-Class members. Those common questions predominate over any potential individual issues. Among the common questions of law or fact to the Class or Sub-Classes are the following:

(a) whether the public statements issued by Peregrine and defendants, including Peregrine's financial statements and filings with the SEC contained material misrepresentations and/or omitted to state material facts;

(b) whether the market price of Peregrine securities during the Class Period was manipulated or artificially inflated due to the activities complained of herein;

(c) whether the federal securities laws were violated by defendants' conduct as alleged herein;

(d) whether defendants acted negligently, knowingly or with deliberate recklessness in committing the wrongful acts complained of herein;

(e) whether statements by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and finances of Peregrine;

(f) whether defendants pursued the fraudulent scheme and common course of wrongdoing as alleged herein; and

(g) whether members of the Class and Sub-Classes have sustained damages and, if so, the proper measure of such damages.

46. A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Because the damages suffered by individual Class or Sub-Classes members may be relatively small, the expense and burden of individual litigation makes it virtually impossible for them to individually seek redress for defendants' wrongful conduct.

47. Plaintiffs know of no difficulty in the management of this litigation that would preclude its maintenance as a class action. The names and addresses of Class and Sub-Classes members are available from the Company or its transfer agent. Notice can be provided to Class and Sub-Classes members by first class mail and publication.

//

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                    28

#105317

Exhibit D
0158

## PEREGRINE SECURITIES TRADED ON AN EFFICIENT MARKET

48.     As to the claims asserted under the Exchange Act, plaintiffs rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine.  The market for Peregrine securities was, at all relevant times, an efficient market for the following reasons, among others:

          a.     Peregrine's common stock was listed on the NASDAQ, a highly efficient market that quickly reflects all publicly available information concerning a listed company;

          b.     As a regulated issuer, Peregrine filed periodic public reports with the SEC, including Forms 10-K for fiscal years 2000 and 2001 and other financial statements that contained material misrepresentations and/or omitted material facts during the Class Period, as alleged herein, causing the price of Peregrine's stock to trade at artificially inflated prices;

          c.     Peregrine's senior management regularly met with and provided Company-related information to stock market analysts, institutional investors, fund managers and other market professionals;

          d.     Peregrine was followed by several securities analysts employed by major brokerage firms who wrote research reports, which were distributed to the sales force and customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

          e.     The brokerage firms following Peregrine during the Class Period included First Union Capital Markets; CIBC World Markets Corp.; U.S. Bancorp Piper Jaffray, Inc.; Thomas Weisel Partners; and Bear Stearns & Co., Inc.  Each of these companies relied upon Peregrine's financial statements, as well as statements made by senior management during conference calls and meetings with analysts, in compiling their reports and making their recommendations.  First Union, CIBC, Piper Jaffray and Bear Stearns each rated Peregrine a "strong buy," "buy," or "attractive" in their research reports disseminated immediately following Peregrine's announcement of its quarterly financial results and conference calls during the Class Period.  The analysts' assessments of Peregrine's stock was based, in material part, upon the honesty and accuracy of Peregrine's reported financial results.

---

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                29

Exhibit D
0159

f.     The trading volume of Peregrine's common stock during the Class Period shows that there was a liquid market for Peregrine stock during the Class Period;

g.     Peregrine disseminated information on a market-wide basis through various electronic media services, including issuing press releases through PR Newswire, Business Wire and through the Internet; and

h.     The market price of Peregrine's securities reacted efficiently to new information entering the market.

## OVERVIEW OF THE FRAUD

### A.   The Defendants Intentionally Destroyed Records

49.    Each of the individually named defendants (other than defendants Stulac and Rodda), went to great lengths to ensure that there would be as little documentation as possible of their misconduct and the activities of the Peregrine Board of Directors and committees thereof. Documents were intentionally destroyed. Procedures were implemented to make it impossible to retrieve e-mail. There was a Company policy in place during the Class Period to shred all Board-related materials disseminated in connection with Board meetings, which each of the individually named defendants (other than defendants Stulac and Rodda) followed. The purpose and intent of these policies and procedures was to make it as difficult as possible for there to be any scrutiny of the activities of Peregrine senior management and its Board members and to secrete from the public and/or any regulatory authorities the true facts regarding the conduct of the defendants named herein.

50.    On July 17, 2000, defendant Nelson sent a memo to the Board members at that time (defendants Gardner, Moores, Noell, Cole, van den Berg, Savoy, and Watrous) stating as follows:

> With respect to all materials distributed at board meetings or in advance of the meetings in preparation for a board meeting, each board member shall retain such materials for no longer than a period of one month from the time of the board meeting. Prior to or at the end of the one-month period, **all physical documents shall be destroyed by the shredding of those documents. Any board materials which may have been received by e-mail should be deleted and erased from e-mail.**

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    30

Exhibit D
0160

1

2                                    *       *       *

                     With respect to e-mailed materials, I would advise that you print

3                      those materials upon receipt and immediately destroy the e-mailed
                     copy.  This practice will ensure your compliance with our policy

4                      with respect to soft copies of board materials.  (Emphasis added).

5       51.     The minutes of the Peregrine Board of Directors meetings were doctored to

6 eliminate any potentially incriminating or controversial material.  Defendant Nelson was

7 primarily responsible for keeping the minutes and for "cleansing" them of potentially damaging

8 information.  Often times there were multiple versions of minutes of the same meetings.

9 However, by design, the formally approved minutes are bare bones and uniformly unenlightening

10 as to what transpired at Board meetings.  Each of the individually named defendants (excluding

11 defendants Stulac and Rodda) received copies of the doctored minutes and knew that they did not

12 accurately and truthfully reflect what transpired at the Board meetings.  None of these defendants

13 sought to change this policy or compel honest reporting of Board discussions.

14       52.     In or about May 2001, Peregrine senior management took additional steps to

15 cover up their misconduct.  At the direction of defendants Gardner, Gless, and Nelson, the

16 Company at that time purchased an e-mail shredding software from Authentica Inc. for at least

17 $100,000.  This software constituted an online shredding system that scrambled e-mail messages

18 and limited access to the software key needed to decrypt them.  The software allowed e-mail to

19 effectively self-destruct.  It also allowed the sender of e-mail to bar recipients from forwarding,

20 copying or printing e-mail.  To make e-mail messages "disappear," access to the key is

21 withdrawn after a given period of time.  Senior Peregrine executives and Board members

22 (defendants Gardner, Glass, Spitzer, Powanda, Nelson, Moores, Noell, and van den Berg) used

23 the Authentica shredding software to send e-mails to one another knowing that their

24 communications would be difficult if not impossible to reconstruct.  Although certain internal e-

25 mails survived this effort at destruction and are discussed herein, it was the intention of the

26 defendants to destroy as much of the paper trail of their conduct as possible.

27       53.     Defendants Moores and Noell also often communicated regarding Peregrine

28 business through use of handheld Blackberrys, which allow for remote, wireless

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)
                                                                           31

Exhibit D
0161

1    communications.  It was widely known at the time that Blackberry communications were

2    essentially impossible to trace or reproduce.  These defendants used their Blackberrys to

3    communicate regarding Peregrine because they knew of, and wanted to take advantage of, the

4    secrecy afforded by this mode of communication, to obscure their misconduct as alleged herein,

5    and to make it as difficult as possible to reconstruct their activities.

6    **B.    Peregrine's Internal Accounting Process**

7        54.    During the Class Period, Peregrine was a provider of software and services which

8    was designed to reduce the cost of doing business.  Peregrine offered products and services to

9    address infrastructure resource management, employee relationship management (or self-

10   service), and e-commerce technologies and services.  Specifically, Peregrine's products and

11   services were intended to make its customers more competitive in their markets by reducing

12   costs associated with three primary business processes: (a) management of infrastructure assets,

13   from the point of procurement through deployment, use, maintenance, change, and ultimately

14   disposition; (b) employee procurement of required infrastructure, including e-procurement,

15   employee self-service, knowledge access, and reservation of shared assets, such as conference

16   rooms and office space in remote locations; and (c) e-transaction management, which reduced

17   costs among buyers, suppliers, and market places as customers attempted to transact business

18   through a global web of connected trading partners.

19       55.    The Company's premier product has been "ServiceCenter," which is a service

20   desk software system that assists businesses in managing their internal computer networks and

21   related assets.  During fiscal year 1998, Peregrine decided to expand its product base to include

22   not only technology management software, but also physical asset management software and

23   services.

24       56.    Primarily through acquisitions, the Company expanded its product menu for asset

25   management, fleet management, facilities management, rail management and telecommunication

26   management.  The most significant of its acquisitions included: (i) the June 2000 acquisition of

27   Harbinger Corporation, which provided software enabling e-transaction management and other e-

28   business products and services; (ii) the December 2000 acquisition of IBM's Tivoli Service Desk

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
#105317    Master File No. 02-CV-0870 J(RBB)                                                    32

1   and customer base enabling; and (iii) the August 2001 acquisition of Remedy Corporation, a

2   supplier of IT service management and customer relationship management software.  These

3   acquisitions were stock for stock mergers.

4        57.    The Sales Operations department was responsible for generating the contract

5   documents for all Peregrine sales.  Peregrine used several types of agreements to license software

6   depending on the type of customer (*e.g.*, end user, reseller, system integrator).  Peregrine's

7   various contracts included the Standard License Agreement ("SLA"), the Reseller Agreement,

8   the Value Added Reseller ("VAR") agreement and the Solution Integrator agreement.

9        58.    None of these license agreements specified products to be licensed, pricing or

10   payment terms.  Deal-specific terms were contained in a separate exhibit to the license contract,

11   which Peregrine called the "Schedule A."

12        59.    Channel contracting relationships involved entering into a contract (including a

13   Schedule A) with the channel partner.  Within the last year of operations before disclosure of the

14   accounting fraud, Peregrine developed a "Schedule "P" to document partner sales to end users.

15   The Company used the Schedule P to invoice the channel partner when the resale occurred.

16        60.    Prior to the creation of the Schedule P, both channel sales and end user sales were

17   documented on the standard Schedule A.  Schedules A's involving channel sales with identified

18   end users were identifiable because the "bill to" address would reflect the channel partner and the

19   "ship to" address would identify the end user.  Sales constituting channel burn, however, were

20   not apparent on the face of the contract.

21        61.    Sales Operations sent the executed Schedule A (or Schedule P) to the Revenue

22   Manager within the Finance Department, to book the revenue (or track the channel burn).  The

23   revenue recognition decision was automatic: the Company always recognized license revenue

24   immediately, the only question was how much of the sales price would be deferred for

25   maintenance.

26        62.    After October 2001, Sales Operations began sending draft, pre-execution

27   Schedule A's electronically to the Revenue Group via a "Schedule A Quotes" folder in Microsoft

28   Outlook.  Once approved, the draft Schedule A was sent back to Sales Operations for the sales

Exhibit D
0163

1   representative to obtain the customer's signature. Sales Operations electronically sent the

2   executed Schedule A to the Revenue Group. The Revenue Group reviewed the contract for a

3   second time using the same approval matrix, calculated the license-maintenance revenue split,

4   and sent the Schedule A to the Billing Department.

5          63.     Using the Schedule A from the Revenue Group, the Billing Department created a

6   customer file and entered key contract information (salesperson; customer; product and number

7   of units purchased; license amount; maintenance plan purchased; due date; payment terms) into a

8   PeopleSoft "order management" system. The system generated an invoice and posted the license

9   and maintenance amounts to accounts receivable in the general ledger.

10         64.     For license revenue, the system would bill the entire amount up front (consistent

11   with immediate revenue recognition), regardless of extended payment terms.

12         65.     For channel sales, Billing created an original invoice for the entire amount of the

13   purchase. When the channel partner sold-through to an end user and so advised Peregrine,

14   Billing created two additional invoices: (i) a new invoice to the channel partner for payment

15   based on the resale to the end user, and (ii) a "credit invoice" against channel partner's original

16   invoice (crediting the partner for the channel burn).

17         66.     When payment on an invoice (receivable) came due, the data that the Billing

18   Department entered into PeopleSoft uploaded directly into GetPaid, the software used by the

19   Collections Department.

20         67.     Although Treasury had responsibility for assessing the creditworthiness of

21   customers, the Company had no procedure for doing so until after the end of the Class Period.

22   This allowed the Company to book revenue on sales to channel partners who had failed to burn

23   existing inventory or pay a prior channel invoice.

24         68.     Peregrine's foreign offices followed their own sales operations processes and used

25   their own contract documents. The Europe, Middle East, and Africa Division ("EMEA") had a

26   haphazard sales operations process and few controls over revenue recognition. EMEA sales

27   representatives did not use standard contract documents or license agreements. Information

28   reported from overseas often was incomplete and/or inaccurate, when reported at all.

#105317   FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                              34

Exhibit D
0164

69.    The financial reporting breakdown inside Peregrine was particularly egregious with respect to worldwide revenue reconciliation. In order to perform a worldwide reconciliation, each foreign office was supposed to send revenue information, along with copies of the executed Schedule A's, to the domestic Revenue Group. However, the foreign countries did not report accurate or complete revenue information, rarely sent all executed Schedule A's, and usually delivered them only after the close of the quarter.

70.    The Revenue Group received only about 50-60% of the international Schedule A's. Without accurate revenue information or complete contract documents for the foreign transactions, the domestic Finance personnel could never reconcile the EMEA revenue report. The lack of Schedule A's from overseas made it impossible for the domestic office to account properly for license sales.

71.    In recognition that there were no financial controls over worldwide operations, the Company had been implementing a plan to improve worldwide operations through the Sales Operations Process Integration ("SOPI") project. The goal of the SOPI project was to create a worldwide "end-to-end" integrated system that would capture every aspect of the Company's transactions from sales negotiations, to contracting, to revenue recognition, to invoicing, to collections. In addition, the SOPI project was to integrate the international offices into Peregrine's domestic systems. The project was never implemented and was halted due to the revelations of accounting fraud and resulting downsizing.

72.    Lack of communication, disorganization and management conflict within the domestic Finance Department and between the domestic and international Finance offices aggravated the Company's problems. Conflicts, dispute, and distrust were rampant among the Finance personnel.

73.    Treasury was responsible for accounts receivable and for maintaining the accounts receivables report. However, Treasury could not reconcile the receivables report to the balance sheets because the Controller maintained the necessary information regarding what revenue was booked, billed and written off. Thus, for most of the Class Period, the Company had no accounts receivable detailed subledger that reconciled with the receivable balance reported in the

Exhibit D
0165

1 │ Company's financial statements.

2 │     74.    During the Class Period, Peregrine had two kinds of software customers: end

3 │ users and resellers. The Company initially sold software almost entirely to end users. In or about

4 │ 1996, the Company began to focus on the benefits of partnering with resellers who could attempt

5 │ to broaden the distribution of Peregrine products. The effort did not succeed, however, until

6 │ defendant Spitzer joined the Company in August 1997 and recruited other sales representatives

7 │ experienced in developing channel relationships.

8 │     75.    Early in Peregrine's partner program, resellers typically bought product from

9 │ Peregrine only when an end user was already identified and ready to buy. In these transactions,

10 │ sell-in and sell-through were synonymous. Over time, Peregrine placed diminishing importance

11 │ on sell-through, however, and sought the sales and earnings boost delivered by large sell-in

12 │ channel deals without identified or committed end users.

13 │     76.    Peregrine's sales organization consisted of two groups. The "field" (or "direct")

14 │ sales force concentrated on selling to end users, irrespective of whether the software inventory

15 │ resided with Peregrine or with a channel partner. The "Alliance" sales force developed

16 │ relationships with channel partners and concentrated on selling into the channel.

17 │     77.    The Alliance sales group historically had been structured around target industries

18 │ and key partner relationships, specifically KPMG and other major accounting and consulting

19 │ firms, as well as Peregrine's primary partner, IBM.

20 │     78.    Each quarter, Peregrine's Regional divisions – North America, EMEA, Asia

21 │ Pacific, Harbinger (EMG) and Alliances – independently built their own sales forecasts. Sales

22 │ Operations prepared the North America forecast. The forecast was updated and refined through

23 │ conference calls, held bi-weekly, weekly and ultimately daily as the end of a quarter approached.

24 │ During these calls, the Area Vice Presidents reported deals that had been finalized and forecast

25 │ projected sales. They assigned rough probabilities to sale closure (*e.g.* "commitment,"

26 │ "expectation," "upside" or "pipeline").

27 │     79.    On the working day following each Regional forecasting call, Peregrine held a

28 │ worldwide conference call during which input was received from the Regional Vice Presidents

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    36

Exhibit D
0166

1  on their sales forecasts. Sales Operations prepared a consolidated worldwide sales forecast

2  which included a section called "On-Top." "On-Top" identified sales that typically were

3  negotiated by senior management (including defendants Gardner and Gless) and frequently

4  materialized into the forecast near the end of the quarter.

5       80.    Defendants Gardner and Gless used the worldwide forecast to give market

6  guidance on the Company's anticipated sales revenue. After the last day of the quarter, Sales

7  Operations reconciled the forecast to the Finance department's revenue report.

8       81.    Intense pressure from defendants Gardner, Gless, Nelson, Spitzer, and Powanda

9  accompanied the quarter-end "count down" as forecasted sales came in and the gap closed on the

10  Company's target revenue.

11       **C    How The Fraud Was Committed**

12       82.    By the commencement of the Class Period, the individually named defendants on

13  the Board (defendants Gardner, Moores, Noell, Cole, van den Berg, Hosley, and Watrous),

14  together with defendants Nelson and Powanda, had adopted a business model for Peregrine

15  which emphasized growth through acquisitions and strategic alliances. In addition, these

16  defendants focused sales and marketing efforts on Fortune 500 companies and large transactions

17  with those companies in order to generate substantial increases in reported revenue. Increases in

18  reported revenues were expected to and did fuel the increase in the share price of Peregrine

19  common stock.

20       83.    The dramatic rise in the price of Peregrine common stock provided the means for

21  the Company to pursue acquisitions and strategic alliances while using its common stock as

22  currency for these purchases or alliances. During the Class Period, Peregrine completed more

23  than ten (10) acquisitions and three (3) additional strategic alliances for a stated value exceeding

24  $3.4 billion. Appendix D hereto, which is incorporated herein by reference, identifies the

25  acquisitions and alliances entered into by Peregrine during the Class Period. Each of these

26  transactions was approved by Peregrine's Board of Directors.

27       84.    GAAP prohibits recognition of any revenue from sales to channel partners unless

28  specific criteria are met. Therefore, Peregrine represented in its filings with the SEC both before

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                37

Exhibit D
0167

1  and during the Class Period that the Company recognized revenues from product license sales to

2  service providers or partners, system integrators or resellers only if the transaction met these

3  criteria.

4      85.    In its fiscal year 1999 Form 10-K filed with the SEC on or about June 29, 1999

5  (shortly before the commencement of the Class Period), Peregrine set forth its revenue

6  recognition policy with respect to sales of license agreements:

7          Revenues from license agreements are recognized currently,
           provided that all of the following conditions are met: a
8          noncancellable license agreement has been signed, the product has
           been delivered, there are no material uncertainties regarding
9          customer acceptance, collection of the resulting receivable is
           deemed probable and risk of concession is deemed remote, and no
10         other significant vendor obligations exist.

11     86.    Peregrine made substantially the same representation concerning its revenue

12  recognition policy in each of its quarterly and annual reports filed with the SEC during the Class

13  Period.  For example, the Form 10-K for fiscal year 2000 filed with the SEC on or about

14  May 10, 2000 included the following statement as to Peregrine's revenue recognition policy from

15  license agreements:

16         Revenues from direct and indirect license agreements are
           recognized currently, provided that all of the following conditions
17         are met: a noncancellable license agreement has been signed, the
           product has been delivered, there are no material uncertainties
18         regarding customer acceptance, collection of the resulting
           receivable is deemed probable, risk of concession is deemed
19         remote, and we have no other significant obligations associated
           with the transaction.
20

21  Peregrine thereby assured the investing public throughout the Class Period that its revenues were

22  not improperly inflated through the improper and premature recognition of revenue from sell-in

23  transactions which were not completed.  The vast majority of Peregrine's reseller deals, on which

24  revenue was immediately recognized upon an agreement with the reseller, involved situations

25  where the reseller had no obligation to pay Peregrine, or the payment was contingent on a further

26  sale to end users.

27     87.    As the size of the license agreements pursued by Peregrine grew, the Company's

28  difficulty in closing these transactions increased.  Purchase commitments from end users required

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                      38

Exhibit D
0168

1 | approval at the top echelons of management of extremely large corporations. Further, without a

2 | purchase commitment from an end user, Peregrine's resellers were unwilling to enter into

3 | irrevocable, noncontingent software licensing agreements and unconditionally obligate

4 | themselves to purchase product with uncertain sell-through prospects. Instead, resellers required

5 | significant inducements, in the form of discounts, rebates and the like, to take on Peregrine

6 | products and to enter into contingent transactions.

7 |     88.    Faced with these obstacles to reporting consistent revenue growth, the

8 | individually named defendants on the Board embarked upon a scheme in which they knowingly

9 | violated Peregrine's own publicly announced revenue recognition policies as set forth above.

10 | They caused Peregrine to inflate its reported revenue through the undisclosed sell-in revenue

11 | recognition policy, and use of side agreements, oral and written, with resellers. These side

12 | agreements were necessary to induce resellers to enter into large software license agreements so

13 | that Peregrine could report revenue consistent with prior public guidance given to securities

14 | analysts and investors by Peregrine's senior management, including defendants Gardner and

15 | Gless.

16 |     89.    In these transactions, Peregrine knowingly recognized revenue from software

17 | licensing deals with resellers despite the fact that one or more conditions for proper recognition

18 | of revenue under GAAP were never met, including the following: (i) the fee owed to Peregrine

19 | was not fixed and determinable; (ii) collectability of the fee was not probable; or (iii) the

20 | resellers' obligation to pay for the product was contingent upon subsequent sale of the product to

21 | an end user. In addition, Peregrine provided certain resellers with side payments, deep discounts

22 | and rebates to induce them into "purchasing" license agreements where no end user had

23 | committed to purchase the product.

24 |     90.    In its restatement, Peregrine admitted the illegality of its revenue recognition

25 | practices by stating as follows:

26 |         During fiscal years 2002, 2001 and 2000, Peregrine recognized
         revenue when it "sold in" to a third party reseller, regardless of
27 |         whether the reseller had a firm commitment from an end-user to
         purchase the software. In many cases, revenue was recognized
28 |         despite the fact that the purchase commitments with resellers were

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)

1    not fixed, but were subject to conditions and contingencies. As a
      result, revenue has been restated to reflect revenue only upon
2    completion of the ultimate sale to an end-user customer.

3    91.    One confidential witness, a former senior officer of a Peregrine reseller, described

4    the breadth and scope of Peregrine's illegal revenue recognition practices as follows:

5        I became aware in my dealings with Peregrine of what it meant to
         work off the "burn" – namely, I learned that there were many other
6        transactions similar to RTG [Rainier Technology Group, Inc.]
         wherein the prepayment commitments had to be "worked-off" over
7        time by selling the software and that Peregrine had improperly
         recognized these transactions as revenue when they should have
8        waited for the software to be sold through. Personally, as one of
         the stronger resellers pushing Peregrine software, I became a
9        trusted insider, or "in the club" as it was referred to – that meant
         that they trusted me and told me things that they would not say to
10       others.

11       Other trusted insider/resellers in Tier II included:

12           1.    Intuition (out of Atlanta)
             2.    Predictive Systems (out of New York City)
13           3.    Column Business Systems
             4.    Evergreen
14           5.    TIG-Technical Integration Group (out of San Diego)
             6.    Denali
15
         Tier I resellers included:
16
             1.    KPMG
17           2.    Accenture (which was an Arthur Andersen successor)
             3.    IBM Global
18           4.    Siemens
             5.    Perot Systems
19
         All of the above Tier I and Tier II resellers were involved in "wink
20       and nod" transactions – involving prepayments and "burn" – I was
         made privy to this information at a dinner [in February 2002] with
21       myself, Joe Reichner and Gary Lenz [former Peregrine executives].
         Peregrine would offer kickbacks to the resellers sometimes things
22       such as tickets and box seats to sporting events and more complex
         transactions that involved cash.
23

24    92.    In addition, Peregrine improperly recognized revenue on "swap" transactions.

25    These were transactions without any economic substance. They involved the contemporaneous

26    purchase and sale of product with customers which were designed solely to increase reported

27    revenue of Peregrine.

28    93.    A former Peregrine employee, who was a Director of the Alliance Group, stated

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
              Master File No. 02-CV-0870 J(RBB)                                                                40

Exhibit D
0170

1    her understanding of swaps at Peregrine as follows:

2          . . . Peregrine would say to the customer, if you commit to x dollar
      amount of purchases — we will commit a comparable amount in
3      consulting services to you. I knew that these type of swaps
      happened regarding PricewaterhouseCoopers, KPMG and Seibel,
4      the latter was a software swap. . . Predictive was another company
      that was involved in a product for guaranteed software services
5      swap with Peregrine.

6    94.    On June 3, 2002, Peregrine filed with the SEC a Form 8-K in which it admitted

7    such revenue recognition irregularities:

8          Revenue recognition irregularities, principally arising in the
      Company's indirect [i.e., reseller] channel sales and, to a lesser
9      extent, arising in connection with commercial transactions
      involving contemporaneous product purchase activities and
10      investments or acquisitions [i.e., swaps.] KPMG has advised that
      correcting these irregularities would have the effect generally of
11      delaying to later periods, or nullifying revenue recognized from
      product sales.

12

13    95.    As detailed below, the individually named defendants caused and/or allowed

14    Peregrine to recognize revenue based on such improper revenue transactions and Arthur

15    Andersen and AWSC allowed such transactions to be recognized notwithstanding knowledge

16    that they violated GAAP and the Company's own publicly stated revenue recognition policy.

17    **1.    Improper Revenue Recognition**

18    96.    In early 1999, a meeting took place in the office of defendant Powanda, the then

19    Executive Vice President of Worldwide Operations for Peregrine. Defendant Gardner and then

20    Chief Financial Officer Farley were present. During the meeting, there was a discussion as to

21    whether revenue would be recognized currently on a transaction with IBM Global Services

22    ("IBM"). During the meeting, Gardner told Powanda that Peregrine would book as revenue the

23    pre-commitments made by IBM in order to meet Peregrine's revenue goals.

24    97.    A former Peregrine employee, who was a Director of the InfraCenter Workgroup

25    ("ICW Group"), a group within the Alliance Group, recalls this meeting as follows:

26          I was involved directly in a conversation in early 1999 with Doug
      Powanda, who I reported to specific to I believe IBM Global
27      Services which is one of the very first deals where channel stuffing
      was involved -- Powanda stated to me that Farley had told him that
28      "we can begin to recognize pre-commitment sales in Q4, January-

---

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
      Master File No. 02-CV-0870 J(RBB)                                                                41

Exhibit D
0171

March 1999" -- Powanda told me that "we can really start to use it" referring to booking pre-commitments . . . When I commented [to] him that we can't do this since I believed it to be wrong based on my prior experience with these matters, . . . Powanda just naively shrugged his shoulders.

I also remember that both Farley and Gardner popped their heads into Powanda's office during this meeting and acknowledged that we [should] go ahead with the IBM commitment. It was from this point in early 1999 that Peregrine had made the wholesale decision to book pre-committed re-seller sales as revenue -- after they signed-off on the IBM deal that day in Powanda's office -- things really started to go downhill for Peregrine. Powanda was actually ready to fire Spitzer when he said that Spitzer will get the commitments and we will book them -- this was in the March-April 1999 time frame.

98.     Another former Director of the Alliance Group similarly recalled a meeting in late 1998 involving defendants Powanda and Nelson, and CFO Farley, where they stated that going forward it would be company policy to book "commitments" from resellers as revenue irrespective of whether the reseller had a firm commitment from an end user.

99.     The meetings, agreements, and discussions regarding recognition of revenue immediately upon sell-in to a channel partner regardless of the absence of a valid and binding commitment to pay reflected implementation by Company employees of the April 1999 Board-approved revenue recognition policy. Peregrine's Board explicitly sanctioned Peregrine's revenue recognition fraud.

100.     Pursuant to the Board's authorization to record revenue pursuant to sell-in, throughout the Class Period, defendants Gardner, Gless, Nelson, Powanda and Spitzer authorized Peregrine's sales personnel to enter into transactions with resellers where there was no obligation to pay Peregrine until the product was sold-through to the end user in order to meet public revenue guidance. Pursuant to the Board's authorization, revenue on such transactions was nonetheless recorded in full, immediately, in order to meet Peregrine's publicly stated revenue goals.

101.     Throughout the Class Period, defendant Gardner was actively involved in negotiating many of the larger pre-commitments from resellers which were improperly booked as revenue. After the revenue had been booked, defendants Gardner and Gless became actively

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)                                        42

#105317

Exhibit D
0172

1  involved in overseeing Peregrine's efforts to assist sales by the resellers to end users so as to be

2  able to collect money from the resellers on sell-through.

3        102.    The active involvement of defendant Gardner was recounted by a former

4  Peregrine employee, who was a Director of the ICW Group, as follows:

5  > In March of 2000 in a conversation with Spitzer, he talked about
> the intent of the company to prematurely book pre-commitments as

6  > revenue. Spitzer stated that "I am just following orders from
> Gardner and I am getting paid commissions on the pre-

7  > commitments as they are booked -- and I won't take the fall --
> every quarter I vest my 28,000 option shares."

8

9  > I remember asking Spitzer where the deals were coming from that
> made our quarters when we are getting e-mails constantly to the

10 > effect that we are going to miss the quarter and then we make it at
> the last minute -- Spitzer told me that he was getting paid on these
> deals and that they were coming from Gardner – Spitzer told me

11 > that the deals that Gardner got involved in were all big and over
> $500,000.

12

13       103.    Peregrine's Board-authorized practice of improperly booking revenue on

14 transactions with resellers spread worldwide in order for Peregrine to meet its publicly

15 announced revenue goals. As one former Peregrine employee, who was a Director of the ICW

16 Group, recalled:

17 > Powanda brought the practice of booking pre-commitments to
> Europe – he was head of European sales and later worldwide sales,

18 > then Europe again – Dominic O'Reilly and Jerry Crook were
> involved – Europe was heavily involved with the booking

19 > prematurely of pre-commitments in 1999 and 2000. O'Reilly was
> Gardner's buddy from a previous life – or company.

20

21       104.    During the Class Period, Peregrine was able to "make its numbers" to the surprise

22 of many of its employees who were actively working on closing deals. One former Peregrine

23 employee, who was a Director of the Alliance Group, described the situation as follows:

24 > All of a sudden at the end of a quarter . . . there was always some
> deal that came from nowhere . . . a deal would just get done . . . it

25 > just came! These deals came from all the big 5, KPMG, EDS,
> IBM, Fujitsu . . . we had 175 business partners.

26

27 > I knew that there was something wrong with many of these last
> minute deals because in my role I was getting partners ready to sell

28 > our products . . . and I was surprised because I knew specifically
> that these partners were not ready to sell our product yet; they

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
#105317    Master File No. 02-CV-0870 J(RBB)    43

Exhibit D
0173

1  weren't ramping up to sell our product; and in fact they were
2  asking us for our help to sell our products for them.

3  105.    Another former employee, who was a Vice President, Supply Chain Group,

4  recalled the "magic" involved in Peregrine "making its numbers" as follows:

5          . . . The Prokom situation was in June of 2001 and the end of the
        quarter.  The company as a reseller agreed to purchase $5 million
6        in software from Peregrine – and by way of Day's side letter did
        not have to pay for any software until they sold it – yet Peregrine
7        booked the entire $5 million as revenue at the end of the quarter.

8          I participated in weekly forecast meetings where accounts and the
        potential closing of sales were discussed for each quarter – there
9        was never any discussion of Prokom as an account that had the
        potential to be closed as a sale – if any sale was closed or had a
10       good possibility of closing prior to the quarter's end you would
        have known about it from our weekly meetings – Prokom was
11       never even on the radar screen at our meetings.

12         When we heard after the quarter's end about the Prokom sale, we
        were simply in awe and I asked Day "how did you do that -- how
13       could you hit your forecast number when Prokom wasn't ever
        discussed in the forecast meetings?"

14
        In July or August 2001, Jerry Crook in a conversation told me
15       about how Peregrine made the numbers for the prior quarter, --
        "Magic Quadrant Partners," he said -- "when you really need to
16       count on them at the end of the quarter -- you can go to them and
        they come through."

17

18  106.    Another former Peregrine employee, who was a Director of the ICW Group, also

19  recalled the "magic" involved:

20         I was in a June 1999 staff meeting headed by Powanda with Spitzer
        and Crook discussing specifics as to how and in what accounts we
21       were going to meet our sales numbers . . . Crook was going
        through every account regarding EMEA (Europe, Middle East and
22       Africa) and saying we would make this here and when – and then
        he referred to the Magic Quadrant Partners being able to make the
23       next 40% of his sales target and that it was subject to working with
        Powanda – Crook was referring to the use of pre-commitments
24       booked as revenue to help make earnings estimates.

25         I remember e-mails each quarter close to the end of the quarter
        declaring that the quarter was in trouble – and then lo and behold
26       there were e-mails describing that we had met our quarter and
        congratulating EMEA on its efforts in this regard.

27

28  107.    Attempts at collecting on these phony accounts receivable proved fruitless unless

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
#105317  Master File No. 02-CV-0870 J(RBB)                                                      44

1   sell-through to the end user had occurred.  For example, in the March/April 2000 time period,

2   Peregrine made an effort to collect from 20 to 25 reseller partner accounts including accounts at

3   O-E Systems, Barnhill and Corporate Software.  The total value of these unpaid pre-

4   commitments at that time was more than $10 million.  When these resellers were contacted, they

5   expressed anger, telling Peregrine collectors that they were being billed net 30 days for the

6   balance of their unpaid "commitments" despite the fact that defendant Gardner and other

7   executives from Peregrine had told them, at the time that the pre-commitments were made, that

8   they did not have to pay for software until it was sold-through to the end user.

9       108.    A former Peregrine employee who was a Director of the ICW Group and involved

10  in the collection effort recalled that:

11          It was Spitzer who told me directly that the pre-commitments had
            been taken into revenue by the company.  O-E Systems was one
12          account; Barnhill for $1.25 million was another -- Peregrine put
            this company in a box by extracting an unattainable commitment
13          from them and then acquired them when they failed to pay; and
            Corporate Software was another -- there was a list of these
14          accounts.  When I started to call these partners they became very
            angry telling me that they were getting billed net 30 days for the
15          balance of their unpaid commitments when they were told by
            Spitzer, Steve Gardner and others from Peregrine at the time of the
16          commitments that they did not have to pay for software that they
            were unable to sell-though.

17

18      **2.    Quarters Were Improperly Kept Open To Meet Revenue And
              Earnings Targets**

19      109.    Peregrine engaged in other improper accounting practices in order to maintain the

20  appearance of revenue growth.  This included holding the books open for the Company's

21  reporting quarters past the end of the fiscal period, sometimes for as long as seven (7) days.  This

22  occurred on a regular basis throughout the Class Period.

23      110.    In its restatement, Peregrine admitted that quarters were improperly kept open.  In

24  this regard, Peregrine stated:

25          In addition, Peregrine previously recorded numerous transactions
            as revenue in a given period, although the sales order was not
26          completed until after the end of the fiscal period.  Revenue has
            been restated to record these transactions in the proper periods.

27

28      111.    A former member of the Alliance Group recalls the quarters being kept open as

#105317
FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    45

Exhibit D
0175

1 | follows:

2 | Starting in 1999, Spitzer would tell me each quarter that if I had
any outstanding deals pending, that I had a few extra days after the
3 | month's end in the quarter to process them – other Alliance
managers were told the same thing.

4 |

5 | Also, in 1999, it was routine at the end of a quarter to see John
Moores, who had an office next door to our offices roam the halls
of our building with Farley and Powanda. Moores and the others
6 | wanted to know how the quarter ended.

7 | 112.   A former Director of the Alliance Group stated that there were repeated

8 | occurrences where,

9 | "We were not at the number for the quarter by the end of the month
and then mysteriously we would hear that we had made the quarter.
10 | Quarters were held open as a practice each and every quarter over
my six and one-half year tenure with the company ranging from 2-
11 | 5 days after the calender end of the quarter. It was an ongoing joke
in the company and was referred to as being the 34th or 35th of the
12 | month. It got worse quarter by quarter after 2000 when the
prevailing attitude in the company was that we had to make our
13 | quarters at all costs."

14 | 113.   One former employee of Peregrine, who worked in sales at the ICW Group,

15 | recalled the quarters being kept open as follows:

16 | I can recall specifically by e-mail and through verbal directives
coming from Bill Moore, Doug Powanda and Maree Chung, that
17 | we were going to keep the quarter open for 3 days, 4 days and
sometimes 7 days specifically referring to each quarter ending in
18 | March 2000, June 2000, September 2000 and December 2000.
The relayed intent was to bring in more sales so that the company
19 | could meet its earnings targets for the previous quarter. . .

20 | 114.   Another former employee, who also worked in sales, recalled the quarters being

21 | kept open as follows:

22 | Leaving the quarter open happened on a regular basis . . . it was
almost on a "wink-wink" basis. It was standard operating
23 | procedure. My earliest recollection was in 2001. The quarter
would stay open if we had not made our number or if we were
24 | close to making our number – I remember that quarters were left
open from 2001 until when I left the company . . .

25 |

26 | I remember specifically at the end of the fiscal year 2001, March
2001 that Andy Cahill, a senior sales manager, wandered into
Inside Sales – he knew and understood that we were still working
27 | on deals for the quarter when the quarter should have been closed.

28 | 115.   By holding open the quarters, Peregrine added additional sales into the affected

Exhibit D
0176

1  periods and thereby artificially inflated the Company's reported revenue in order to meet publicly

2  announced revenue goals set by Peregrine management. This practice of keeping the quarters

3  open was widely known at Peregrine. Instructions to hold quarters open so as to allow the

4  Company to make revenue goals were given to employees in the sales department through verbal

5  directives as well as by e-mail.

6              3.    **Improper Balance Sheet Accounting**

7     116.    Due to Peregrine's practice of improperly booking revenue on contingent sales

8  agreements, the Company accumulated millions of dollars in accounts receivable which

9  defendants knew could not be collected. This in turn resulted in increasingly large numbers for

10  Peregrine's DSO. DSO is an analytical tool used by financial analysts and investors to assess the

11  quality of a company's receivables, as well as its revenue. DSO represents the average number

12  of days which a company takes to collect on its accounts receivable. Defendants engaged in a

13  scheme to conceal the increasing difficulties in the collection of Peregrine's accounts receivable

14  by manipulating DSO.

15     117.    In order to reduce the Company's DSO figures and its reported accounts

16  receivable, defendant Gless, after consultation with defendant Gardner, instructed defendant

17  Cappel, Peregrine's Senior Treasury Manager, to remove receivables from the Company's

18  balance sheet by "selling" them to banks at the end of each quarter. Cappel thus calculated the

19  dollar amount of receivables that had to be "sold" to banks to reach a target range set by Gardner

20  and Gless for the DSO, and "sold" the requisite amount for cash. The receivables were then

21  removed from Peregrine's balance sheet. This practice was not disclosed in Peregrine's public

22  statements, and created the illusion that Peregrine's customers were paying on a more timely

23  basis than they actually were. This scheme also helped conceal the existence of the contingent

24  sales which were being entered into by Peregrine throughout the Class Period.

25     118.    Toward the end of the quarter ending June 30, 1999, Peregrine had "sold" all

26  available accounts receivable but still had not reached its targeted DSO. Defendants Cappel and

27  Gless and other Peregrine personnel prepared invoices for transactions, which had not yet closed,

28  in the total amount of $12 million, and then sold them to banks as receivables. When some of

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                        47

#105317

Exhibit D
0177

1   the contracts ultimately did not close, Peregrine was left with a shortfall of several million

2   dollars.

3       119.    In June 2001, Cappel told Gless that Peregrine would miss the targeted DSO

4   number for the quarter.  With Gless's approval, Cappel created a false invoice in the amount of

5   $19.58 million and sold it to a bank.  Peregrine's cash flow was thereby overstated and its

6   accounts receivable were understated on its books and records.

7       120.    Peregrine also distorted and falsified its DSO and balance sheet by improperly

8   accounting for cash collected from its customers.  Peregrine had an agreement with its lender

9   banks that the Company would collect on receivables that it "sold" to the banks, and remit

10  payment to the banks within a certain time period.  Peregrine had a practice of reducing its

11  accounts receivable when it "sold" the accounts to a bank while still retaining the monies from

12  the collections on these accounts until such time as it had to pay them to its banks.  When the

13  money was collected by Peregrine from the customers whose receivables had been "sold" to

14  banks, Cappel would again reduce the Company's accounts receivable, thus resulting in what

15  Cappel called a "double dip."

16      121.    Peregrine also failed to include its liability to the bank for these "sales" on its

17  accounts payable and it would record the cash received for the benefit of the banks as its own

18  instead of holding it in trust as required.  Peregrine would then remit the payments to the banks in

19  the next quarter and reverse the "double dip" entries.  These "double dips" occurred almost every

20  quarter during the Class Period beginning in September 1999.  The double dips resulted in

21  artificially reduced accounts receivable as well as an artificial increase in Peregrine's reported

22  cash.

23      122.    For example, on December 11, 2001, a Peregrine customer made an early payment

24  of $13.8 million on a receivable which Peregrine had sold to a bank.  The customer's payment

25  was not due until February 13, 2002.  Peregrine's contract required it to receive and hold

26  payments on receivables in trust and to remit them within two weeks.  Instead, Peregrine did

27  neither.  As a result, its accounts receivable for the quarter were understated by $13.8 million as

28  was its liability to the bank.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                              48

Exhibit D
0178

123. Peregrine's transactions with its banks as alleged above did not constitute a "sale" of the receivables. Rather, these transactions were nothing more than borrowings from the banks. Throughout the Class Period, Peregrine routinely borrowed money from financial institutions and treated the funds received as proceeds from the sale of assets as opposed to borrowings as required by GAAP. The amount of the undisclosed liabilities reached up to $180 million during the Class Period and exceeded $100 million by the end of the Class Period. The effect of this accounting irregularity was to significantly understate Peregrine's liabilities.

124. In its restatement, Peregrine admitted that "these factoring arrangements should have been recorded as loans instead of sales of receivables." Accordingly, Peregrine restated its balance sheet to reflect the accounts receivable and related bank loans. As of March 31, 2000 and 2001, the undisclosed liability of the Company on these loans was approximately $90 million and $180 million, respectively.

### 4. Concealment Of Write Off Of Receivables

125. Peregrine also violated GAAP by including the write off of receivables in the expense category of "Acquisition costs and other," and in other accounts. For example, Peregrine did so with respect to a $3 million receivable of Barnhill as of March 31, 2000. In a June 6, 2002 letter to the SEC, KPMG stated that they had advised Peregrine "and its audit committee that the classification of the write offs of accounts receivable or revenue reversals recorded as an "'Acquisition costs and other' expense in [Peregrine's] statement of operations was not in accordance with generally accepted accounting principles."

126. As admitted by Peregrine in its restatement, "[m]any accounts receivable balances arising from improperly recorded revenue transactions . . . were inappropriately charged to bad debt expense, cost of acquisitions or accrued liabilities. The restated results reflect those transactions as reductions in previously reported revenue."

### 5. Understatement Of Stock Option Compensation

127. Peregrine also understated by approximately $100 million the represented value of stock option compensation. In its restatement, Peregrine admitted to its improper accounting for stock option compensation and therefore restated its financial statements with respect to stock

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                      49

Exhibit D
0179

1  option accounting.  In its restatement, Peregrine states:

2   Based on Peregrine's past practice, many employee stock options
    contained exercise prices that were below the common stock
3   market values on the dates the options were granted. Under APB
    Opinion No. 25, the Company should have recorded compensation
4   cost equal to the aggregate difference between the fair value of the
    stock and the exercise price of the options granted. The Company
5   also accelerated the vesting periods for certain options which had
    previously been granted to employees. Under FASB Interpretation
6   No. 44, "Accounting for Certain Transactions Involving Stock
    Compensation, an Interpretation of APB Opinion No. 25" ("FIN
7   44"), the acceleration of vesting of stock options after June 30,
    2000 could cause an accounting charge for the affected options.
8   The consolidated financial statements, as restated, now reflect the
    appropriate accounting for stock options.

9

10      **6.      Failure To Implement And Maintain Adequate Internal Accounting
                 Controls**

11

12      128.    The individually named defendants (other than defendant Rodda) and defendants

13  Arthur Andersen and AWSC knew, or with deliberate recklessness disregarded, throughout the

14  Class Period, that Peregrine was experiencing pervasive deficiencies in its internal accounting

15  controls and that the financial information generated for inclusion in Peregrine's financial

16  statements was grossly inaccurate and unreliable.

17      129.    The Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §78m(b)(2), was enacted

18  on the principle that accurate record-keeping is an essential ingredient in promoting management

19  responsibility and is an affirmative requirement for publicly held American corporations to

20  strengthen the accuracy of corporate books and records.  The representations made by a company

21  in its financial statements and in other financial disclosures to the public are the representations

22  of that company's management.

23      130.    Pursuant to the FCPA, every issuer having a class of securities registered pursuant

24  to §12 of the Exchange Act, 15 U.S.C. §78l, shall:

25          (a)      Make and keep books, records, and accounts which, in reasonable detail,

26  accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

27          (b)      Devise and maintain a system of internal accounting controls sufficient to

28  provide reasonable assurances that:

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    50

1          (1)  transactions are executed in accordance with management's general or

2    specific authorization;

3          (2)  transactions are recorded as necessary (i) to permit preparation of

4    financial statements in conformity with GAAP or any other criteria applicable to such statements,

5    and (ii) to maintain accountability for assets;

6          (3)  access to assets is permitted only in accordance with management's

7    general or specific authorization; and

8          (4)  the recorded accountability for assets is compared with the existing

9    assets at reasonable intervals and appropriate action is taken with respect to any differences.

10         131.  Moreover, SEC Rule 13b-2, promulgated pursuant to the FCPA, was enacted to

11   (i) assure that an issuer's books and records accurately and fairly reflect its transactions and the

12   disposition of assets, (ii) protect the integrity of the independent audit of issuer financial

13   statements that are required under the Exchange Act, and (iii) promote the reliability and

14   completeness of financial information that issuers are required to file with the Commission or

15   disseminate to investors pursuant to the Exchange Act.

16         132.  To comply with the FCPA, GAAP and SEC rules, and to accomplish the

17   objectives of accurately recording, processing, summarizing and reporting financial data, a public

18   company is required to establish and maintain adequate internal financial and accounting

19   controls.  Contrary to the requirements of the FCPA, GAAP and SEC rules, the individually

20   named defendants (other than defendant Rodda) failed to implement and maintain adequate

21   internal accounting and financial controls and defendants Arthur Andersen and AWSC had

22   knowledge of such deficiencies.  The indicia of the lack of internal accounting controls at

23   Peregrine included the following:

24         (a)   the use of oral and written "side agreements" allowing for nonpayment by

25   customers;

26         (b)   the absence of formal minutes from any meetings of the Audit Committee;

27         (c)   substantial delays in providing, or inability to provide, information such as

28   trial balances, general ledgers and subledgers that would customarily be readily available from a

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                            51

Exhibit D
0181

1  company's accounting systems;

2          (d)    the presentation of manually prepared schedules when such information

3  would customarily be readily available from computerized accounting systems;

4          (e)    the inability to quantify the amount of sales to resellers during particular

5  accounting periods;

6          (f)    the inability to provide a list of resellers used during particular accounting

7  periods;

8          (g)    the existence of numerous, significant manual adjustments to software

9  license and maintenance revenue;

10         (h)    the preparation of the registrant's fiscal 2001 tax provision based upon *pro*

11 *forma* earnings rather than earnings computed in accordance with GAAP; and

12         (i)    the failure to record the tax deferred effects for accruals recorded in

13 Peregrine's various business combinations.

14    133.    The Company's lack of adequate internal controls or a properly functioning Audit

15 Committee, combined with the tremendous pressure placed on the Company's employees and its

16 Board of Directors to increase dramatically reported revenue, created an environment that

17 encouraged the type of accounting fraud that Peregrine has admitted caused material

18 overstatements of Peregrine's financial results during the Class Period. The Company's lack of

19 adequate internal accounting controls constituted a "red flag" for both the individually named

20 defendants (other than defendant Rodda) and defendants Arthur Andersen and AWSC.

21    **D.    Participation Of The Board Of Directors In Peregrine's Accounting Fraud**

22    134.    Shortly before the commencement of the Class Period, the individually named

23 defendants (other than defendant Rodda) were informed that the Company needed to rely more

24 heavily on channel sales to boost revenue and compete in its market segment. However, channel

25 sales were known by these defendants to be susceptible to manipulation and abuse, especially

26 where the sell-in accounting method is used. As applied to channel sales, the sell-in method

27 resulted in revenue recognition when software product was delivered to the channel partner and

28 thereby "sold into" the distribution channel. Under GAAP, the channel partner was obligated to

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                52

Exhibit D
0182

1    have a binding commitment from a third party to purchase the software at the time of delivery in

2    order for there to be proper revenue recognition under GAAP.

3        135.    The propriety of revenue recognition in software sales, and the risk of fraud in

4    such transactions, was a widely known problem in the software industry during the Class Period,

5    and was known to experienced professionals in the software industry, including members of the

6    Peregrine Board, specifically defendants Moores, Noell, Cole, van den Berg, Hosley, Savoy, and

7    Dammeyer, who had extensive experience in the industry. There were numerous high profile

8    examples of accounting fraud in the software industry throughout the 1990s involving improper

9    revenue recognition which were known to the Peregrine Board members, including Informix,

10   Network Associates, and McKesson HBOC.

11        136.    Prior to the Class Period, channel sales accounted for a small portion of

12   Peregrine's software license revenues. For the first three quarters of fiscal year 1999 (*i.e.*, April

13   to December 1998), the Company recorded only $4.8 million in total channel sales, representing

14   less than 10% of license revenues for the period. A change in the Company policy regarding

15   channel sales approved by the Board ushered in the era of fraud at Peregrine.

16        1.      **October 1998 Report To Board Of Directors**

17        137.    Channel sales took on new significance with defendant Gardner's elevation to the

18   positions of President and Chief Executive Officer. In preparation for the Board's quarterly

19   meeting in October 1998, Gardner prepared a report to all Company directors concerning the

20   state of the Company. Entitled "Review and Outlook," these reports were distributed each

21   quarter to Board members prior to the Company's quarterly Board meetings. The reports were

22   intended to serve as a basis for discussion at the quarterly board meetings. Defendants Moores,

23   Nelson, Noell, Cole, Hosley, and van den Berg received and reviewed Gardner's October 1998

24   "Review and Outlook" report at the time it was disseminated prior to the October 1998 Board

25   meeting.

26        138.    In his quarterly report dated October 1998, Gardner advised the Board members

27   that with respect to channel sales there had been "lots of smoke, little fire," and revenue from

28   channel sales was "absent." Gardner advised Board members that "We are going to move

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                       53

Exhibit D
0183

1  Channels under Worldwide Sales and Marketing, focus on 3 relationships and make it happen.

2  This change will be made in the next few weeks . . ."

3         2.    **April 1999 Report To Board Of Directors**

4      139.   By the fourth quarter of fiscal year 1999, ending March 31, 1999, the Company

5  was in the midst of the new channel strategy.  Channel sales rose to $6.7 million, representing

6  22% of all license revenues that quarter, more than double prior quarters.

7      140.   The Company intended to raise these numbers even higher.  On April 21-24,

8  1999, the Company's sales force met at the La Costa Resort and Spa in La Costa, California for

9  its annual Sales Kick-Off.  At the meeting, channel sales were a featured topic.  In a presentation

10  at this event, defendant Powanda spoke concerning "Integrating our Channel Partners."  In a 90-

11  minute presentation that same day, defendant Spitzer, Vice President, Alliances, spoke on the

12  topic, "Using the Channel in FY 00 – Key to Closing Business."

13      141.   In conjunction with the Sales Kick-Off meeting, the Board of Directors met at La

14  Costa on the afternoon of April 22, 1999.  The meeting was conducted to review both quarterly

15  results and results for the recently-completed fiscal year, including an "outlook and budget" for

16  fiscal year 2000 and executive compensation issues.  In addition, given the proximity of the Sales

17  Kick-Off meeting, defendant Gardner encouraged the directors to take advantage of the

18  opportunity it afforded and "to attend as much of the kick-off as you like."  Attendees at this

19  Board meeting included defendants Gardner, Moores, Nelson, Noell, Cole, Hosley, van den Berg,

20  and Watrous.

21      142.   Defendant Gardner's  report in connection with this Board meeting was dated

22  April 19, 1999 and was titled "Fiscal Year 1999 Review, including details of the 4th Quarter."

23  Defendants Moores, Nelson, Noell, Cole, Hosley, van den Berg, and Watrous received and read

24  this report at the time it was disseminated to the Board members in April 1999.  The report

25  contained a section headed "**Continued Strong US performance, particularly in Channels.**"

26  It stated that,

27            This was the first quarter that channels contributed meaningfully to
          revenue. Steve Spitzer's team came through in a big way.

28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)          54

#105317

Exhibit D
0184

1                                       *        *        *

2          Given the favorable valuation of the company, it is time to proceed
           with a follow-on offering to raise additional cash for acquisition
3          purposes. We would propose a follow-on offering which would
           net $70 to $100 million in cash for the company in the May 1999
4          time period. The total offering size would depend upon the
           appetite for our equity in the market and the desires of other selling
5          shareholders.

6    Commenting on related issues, Gardner informed the Board members that in the area of

7    "customer satisfaction" an external survey showed "a negative trend from the survey six months

8    earlier." As to productivity of sales personnel, Gardner advised the Board members that "[o]ur

9    median performer is not producing enough and we have too many people who were on-quota all

10   year who produced very little." In projecting results for Fiscal Year 2000, Gardner informed the

11   Board members as follows: **"We are targeting to exceed budget, as a global organization**

12   **with $300 million revenue and at least $0.65 EPS for FY 2000; This is our 300/200**

13   **program."** (Emphasis added). In explaining the program to the Board members, Gardner

14   relayed that "if we meet the goal of $300 million in revenue in FY2000 with an EPS of at least

15   $0.65 per share, that every employee will be fully vested at the end of one-year in 300 options for

16   Peregrine stock at an exercise price set in April of 1999 ... Please approve the 300/200 program

17   option grant and the attached budget submission." The program was approved by the Board as

18   proposed. Gardner also advised the Board of a major organizational change to achieve the

19   300/200 goal, which involved putting defendant Powanda in charge of the "Operations Group,"

20   including sales, marketing, professional services and customer support. Powanda's new title was

21   Executive Vice President for Operations. One of the reasons offered by Gardner for Powanda's

22   promotion, and related increase in proposed compensation, was that he helped to achieve the

23   Company goal of increasing channel revenue from less than 5% in the first half of the year to

24   over 15% in the second half.

25          143.   Like the Sales Kick-Off meeting, channel activity was a topic addressed at the

26   April 1999 Board meeting, a reflection of the recent increase in channel sales and, more

27   importantly, their anticipated future growth. Then Chief Financial Officer Farley presented to the

28   Board the issue of whether to apply the more aggressive sell-in method rather than the sell-

#105317   FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
           Master File No. 02-CV-0870 J(RBB)                                                         55

           Exhibit D
           0185

1   through method of accounting to the Company's channel sales.

2       144.    Farley told the Board that the sell-in method was not the "preferred" method of

3   accounting.  He explained that it was only by using the sell-in method, that the Company would

4   meet its financial goals for the prior quarter (the fourth quarter of fiscal year 1999), which had

5   ended three weeks earlier.  He warned that, without adopting the new approach, the Company

6   would fail to meet stock market expectations.  Farley had insisted that the Board be made aware

7   of this proposed change in accounting treatment of channel sales and signify its consent, which

8   the Board did at this meeting.  Defendants Gardner, Moores, Nelson, Noell, Cole, Hosley, van

9   den Berg, and Watrous specifically approved of the use of this new more aggressive accounting

10  method at the April 1999 Board meeting.

11      145.    At the April 22, 1999 meeting, Board members also were told that defendant

12  Arthur Andersen, the Company's auditor, was not comfortable with any level of channel activity

13  which accounted for more than 25% of revenue.  In the just-completed fourth quarter of fiscal

14  year 1999, 22% of license revenue derived from channel sales and it was clear from Gardner's

15  report to the Board that channel sales would represent an increasing percentage of license

16  revenue.

17      146.    Farley stated at the April 1999 Board meeting that adopting the sell-in method

18  would not be a panacea for problems the Company was experiencing.  For example, by applying

19  the more aggressive sell-in method for the prior quarter, the Company would meet revenue

20  expectations only by cutting into revenue for the coming first quarter of fiscal year 2000 ending

21  June 30, 1999.  It was in essence borrowing revenue from the future.  This confirmed to Board

22  members that there was an underlying and continuing weakness in Peregrine's overall sales

23  efforts.

24      147.    On April 26, 1999, the Company announced its financial results for the quarter

25  ending March 31, 1999 and its year-end results for fiscal year 1999.  According to the

26  announcement, and applying the undisclosed sell-in accounting treatment, the Company posted

27  revenues of $46.1 million for the quarter, a 129% increase over the prior year's comparable

28  period, and revenues of $138.1 million for fiscal year 1999, a 123% increase over results for

#105317     FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                          56

                                                                                    Exhibit D
                                                                                    0186

1  fiscal year 1998. These reported numbers met Wall Street expectations. The investing public

2  was never informed that the reported results attained throughout the Class Period were only

3  achieved as a result of the Board's approval of a change to the sell-in method of revenue

4  recognition at this meeting.

5          3.    **October 1999 Report To Board Of Directors**

6      148.    The individually named defendants (other than defendants Savoy, Dammeyer and

7  Rodda) were aware of the deepening problems with Peregrine's channel activities, as reflected in

8  defendant Gardner's report for the Board's October 19, 1999 meeting. Defendants Moores,

9  Nelson, Noell, Cole, Hosley, van den Berg, and Watrous received and reviewed Gardner's

10  October 15, 1999 "Fiscal Q2 2000 Review and Outlook" at the time it was disseminated prior to

11  the October 1999 Board meeting. Gardner presented an ominous report to these defendants:

12          [T]his was the toughest quarter we have experienced since June of
        1997. A decent performance from the West, a strong quarter (but

13          still small) from Asia/Pacific Latin America and **a very strong
        channel performance** allowed us to compensate for these major

14          deficiencies. **We have now reached a level of channel activity
        that is concerning as we look to the future. We have a large

15          amount of inventory in the channel that must be sold through,
        and this must be done as we simultaneously continue to grow

16          our direct businesses.** (Emphasis added).

17      149.    All of the channel inventory described by Gardner had been recorded as revenue

18  pursuant to the policy previously approved by the Board.

19      150.    The ability to sell the burgeoning channel inventory was compounded by a crisis

20  in the direct sales area. Although the Company needed "to grow its direct sales," those efforts

21  had to overcome the fact that it faced a "direct sales challenge." As reported by Gardner, "Sales

22  rep productivity in the direct sales area was at a very low level (less than $1 million annualized)

23  in the September quarter." This reflected a 29% drop in productivity. Gardner advised the

24  defendants that it was only because of a "strong channel performance" that the Company was

25  able to overcome these "major deficiencies." In other words, loading up the channel with

26  inventory that could not ultimately be sold was allowing the Company to maintain the illusion of

27  prosperity and success. The defendants identified in paragraph 148 were specifically informed of

28  this fact in connection with the October 1999 Board meeting.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
    Master File No. 02-CV-0870 J(RBB)    57

Exhibit D
0187

151.    In the face of these serious and fundamental problems confronting the Company in late 1999, defendant Gardner proposed an exit strategy for himself and defendant Powanda. Rather than waiting for the Company's problems to grow worse, Gardner sought Board approval for the creation of an e-business website, InfraPlace.com, as a separate company to be run by defendants Gardner and Powanda, together with Farley.  In answering the question he posed in this report, "So, are all the rats moving on?," he acknowledged that current management was not the right "operating management team" to take the Company to $1 billion in revenue.  Gardner stated that Peregrine had "12 to 18 months to get the right team in place before we have a crisis point . . ." Attendees at this meeting included defendants Gardner, Moores, Nelson, Cole, Noell, Hosley, van den Berg, and Watrous.

152.    On October 20, 1999, the Company announced results for the second quarter of fiscal year 2000 ending September 30, 1999 in a publicly disseminated press release.  It reported revenues of $57.8 million, a 95% increase over the prior year's second quarter.  No disclosure was made concerning the Company's increasing level of channel activity and its vital importance to meeting published earnings estimates, the exploding inventory levels, the weaknesses in direct sales, senior management's request to leave the Company, or the coming crisis point in 12-18 months.

153.    The crisis from bloated channel inventory deepened in the third quarter of fiscal year 2000 ending December 31, 1999.  Channel sales remained high, at $18.6 million, representing 40% of license revenues, and inventory rose sharply to $57.1 million, an amount equal to 84% of license revenues for the quarter.  With a quarterly burn rate of less than $3 million, the Company would need almost 20 months to dispose of existing inventory.

### 4.    January 2000 Report To Board Of Directors

154.    On January 18, 2000, Gardner disseminated a report to defendants Moores, Nelson, Noell, Cole, Hosley, Watrous, and van den Berg, which they each received and reviewed, and which was prepared in connection with the January 20, 2000 Board meeting. Defendant Gardner told the Board members in his report that it was a "very tough quarter":

Once again, however, this was a very tough quarter.  The opening

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)    58

Exhibit D
0188

1  lines from Dickens['] <u>Tale of Two Cities</u> summarizes it best: "It
2  was the best of times, it was the worst of times. It was a time of
   wisdom. It was a time of foolishness."

3                              * * *

4  Why was it the worst of times?

5  •    We have a $2 million professional services revenue
        shortfall compared to plan with little or no warning. Half
6       of the reason for this was Y2K, the remainder was **the shift
        toward selling through alliances, which had not been**
7       **adequately factored into the plan** . . . .

8  •    **Our bread and butter business went to hell. The deals
        between $75K and $500K just were missing in action.**
9       Some of this may also be Y2K effect, most of it was
        undoubtably due to the huge sales force re-engineering we
10      have undertaken. In other words, we did this to
        ourselves ... I suspect we have one more quarter, and
11      perhaps two, of hand-holding and close upper management
        involvement in sales. **Sales force productivity is at a
12      ridiculously low level. The US is substantially under $1
        million per person and EMEA is right around $1
13      million/person, while we need both to be closer to $1.5
        million per person.** Big deals and excellent individual
14      performances were required to cover the shortfall, when
        they should have been the icing on the cake.

15 •    . . . **The US was even worse.** We had a bad forecast to
16      begin with, a gradual improvement in the middle part of the
        quarter, and then a $4 million melt-down in the last week of
17      the quarter. Only the KPMG deal with Sodexho/Marriott
        and Gold mine saved the US performance.

18                      *         *         *

19
   Why was it a time of foolishness?
20
21 •    . . . I have come to the conclusion that we are at the
        awkward teenage stage of our existence. We are much
        bigger than we were but not big enough to be taken
22      seriously . . .

23 •    **Our channel business is now a cause for concern.** We
        are victims of both our own success and a changing
24      accounting and regulatory landscape. We have been much
        more successful generating sales to channels and getting
25      partners to buy into our message and vision. **We have not
        been as successful, and in some cases unsuccessful, in
26      getting the sell-through that would remove the
        inventory of software from the channels. Rather than a
27      3 to 6 month latency, the inventory is moving in closer
        to 9 months as partners ramp up.** Due to several highly
28      publicized incidents at other companies (Informix,

#105317   FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
          Master File No. 02-CV-0870 J(RBB)                                              59

                                                                          Exhibit D
                                                                            0189

**Network Associates, HBOC), the rules are tightening
and practices are being re-examined. The net of this is
that we are now at a level of channel inventory that
makes our auditors uncomfortable.** (Emphasis added).

155.    By his report, Gardner informed Board members that channel sales were a serious ongoing problem.  Defendant Gardner also informed the Board of material adverse developments regarding direct sales, and that "big deals" were required to cover the shortfall, to ensure that the Company did not disappoint market expectations.

156.    Gardner stressed in his report that achieving $75 million in revenue for the fourth quarter of fiscal year 2000 was "important," but would not be easy.  To reach that figure while simultaneously holding down or reducing channel inventory, would require three concurrent developments: (i) an increase in direct sales productivity to an annualized $1.5 million level per salespersons: (ii) a "couple of big deals," citing a prospective large sale to Electronic Data Systems ("EDS"); and (iii) completion of some acquisitions before the end of the quarter.  Without the latter two elements (*i.e.*, a large deal and the acquisitions), revenues for the fourth quarter would be only $64 million, well below Wall Street expectations.

### 5.    February 2000 Activity Regarding the Harbinger Acquisition

157.    By February 2000, defendants Gardner, Moores, Nelson, Noell, Cole, Luddy, and Powanda were aware of material nonpublic information concerning a planned acquisition of Harbinger Corporation, an Atlanta-based e-commerce transaction delivery firm.  When it later was announced, the Company's proposed acquisition of Harbinger was negatively received by the investing public, causing a 36% drop in the first day alone in the Company's stock price, and erasing over $2.5 billion in shareholder equity.

158.    In pursuing the Harbinger acquisition, defendants privately had concluded that the acquisition would depress the price of Peregrine stock.  They knew that Harbinger had a slower growth rate and lower operating margins (based on then-reported financial results) than did the Company, and the strategic fit with Harbinger was unlikely to be readily apparent to the investing public.

159.    Consideration of the Harbinger acquisition began in late 1999.  Serious

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)

Exhibit D
0190

1  discussions involving executives of both companies took place in January 2000 and February

2  2000, with updates to key Board members, including defendants Moores and Noell.  The

3  transaction was finalized and documented in March 2000 and publicly announced April 5, 2000.

4  Costing more than $1.5 billion, Harbinger was the largest acquisition in the Company's history.

5  Given its sheer size, and the strategic departure it represented, the acquisition was reviewed and

6  analyzed by the individually named defendants (other than defendants Savoy, Dammeyer and

7  Rodda) well before its public announcement.

8      160.    In early November 1999, defendant Gardner and Farley traveled to Baltimore for a

9  meeting with defendant Noell's old firm, Deutsche Bank Alex. Brown, whose affiliate Deutsche

10  Bank Securities Inc. acted as the Company's investment banker.  On November 8, 1999,

11  defendant Gardner placed a call to Karl Will, managing director in Deutsche Bank Alex. Brown's

12  San Francisco office, who was the senior investment banker representing the Company on the

13  transaction.  Thereafter, Deutsche Bank Alex. Brown forwarded to the Company background

14  information concerning Harbinger, including stock price and ownership information, SEC filings,

15  public news articles, and a recent Harbinger presentation for a technology conference hosted by

16  Deutsche Bank Alex. Brown.

17      161.    In the ensuing weeks, Farley kept certain key Board members updated on the

18  unfolding Harbinger transaction, including defendants Noell and Moores.  He also coordinated

19  the sale of insider shares.  According to phone records, during the two-week period of insider

20  selling from February 15-29, 2000, he made at least five telephone calls either to the main

21  number at JMI Services or directly to defendant Noell's office at JMI Services.

22      162.    Farley was in regular contact with brokers responsible for selling the Company's

23  stock on behalf of defendants, which according to defendant Noell included Deutsche Bank Alex.

24  Brown and Goldman Sachs.  According to phone records, Farley placed at least 25 calls to

25  Deutsche Bank Alex. Brown (Brett Clifford) and at least 23 calls to Goldman Sachs during the

26  six-week period from mid January 2000 through the end of February 2000.

27      163.    Frequent meetings and calls ensued as the Harbinger deal progressed.  According

28  to a Form S-4 filed with the SEC for the merger, defendant Gardner met again with Deutsche

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                            61

Exhibit D
0191

1   Bank Alex. Brown in January 2000, when he authorized contact with Harbinger. Thereafter, on

2   February 8, 2000, he talked by phone with the Harbinger Chief Executive Officer and its General

3   Counsel concerning "the benefits of a strategic relationship between the companies."

4       164.    Additional calls followed in the next several days as the deal gathered momentum.

5   On February 14-16, 2000, calls were made to the Harbinger CEO. On February 14-15, calls were

6   made to the Deutsche Bank banker, including by defendant Gardner.

7       165.    Between February 15 and 18, 2000, defendants Moores, Cole, Gless, Luddy, and

8   Powanda sold 4.3 million shares of Company stock for over $194 million, with Moores

9   accounting for over $177 million in just two days of trading. At the time, Peregrine stock traded

10   at or near record highs, closing at an all-time high on February 16, 2000. The insider selling

11   proceeds for the selling defendants in these four days exceeded Peregrine's total reported

12   revenues over the prior three quarters.

13       166.    According to phone records, Farley placed nine calls to defendant Moores' broker

14   at Deutsche Bank Alex. Brown on February 17, 2000, with the last call not concluded until

15   7:30 p.m. EST. In addition, he called the Houston office of Goldman Sachs two times, where a

16   broker retained by defendant Moores was employed, and another three calls were placed from the

17   Company to numbers associated with Deutsche Bank Alex. Brown. On the following day,

18   February 18, 2000, as the selling continued, Farley made two calls to Deutsche Bank Alex.

19   Brown and another three to Goldman Sachs. One of his last calls that day was to JMI Services,

20   the investment firm of defendants Moores and Noell.

21       167.    Given the ramifications of the Harbinger acquisition, defendants Moores and

22   Noell kept abreast of the discussions. On February 22, 2000, defendant Gardner and Farley

23   traveled to Houston for what expense records refer to as a "JMI Meeting," where they were

24   joined by defendant Luddy, the Company's chief technology officer.

25       168.    Prior to departing for the JMI meeting early on February 22, Farley made two calls

26   each to Deutsche Bank Alex. Brown and to Goldman Sachs, all shortly before or just after the

27   commencement of stock market trading that day. Upon arriving in Houston later that morning,

28   he again made calls to Deutsche Bank Alex. Brown and Goldman Sachs. In addition, he

Exhibit D<br>0192

1  accessed the browser function on his cell phone some sixteen times before the close of the

2  markets that day, on average once every fifteen minutes.

3       169.    The day after the JMI meeting, February 23, 2000, Farley again placed calls to

4  Deutsche Bank Alex. Brown and Goldman Sachs at or near the time that the markets opened.  He

5  also continued monitoring his browser, initiating some 28 sessions in only two hours, or once

6  every six minutes, before departing Houston.

7       170.    Upon their return to the Company's offices on February 24, 2000, Farley was

8  again in contact with Deutsche Bank Alex. Brown and Goldman Sachs, and he placed a call to

9  defendant Noell as well.  By the end of the day, defendant Gardner and Farley booked airline

10  tickets to San Francisco, where on February 29, they traveled with defendant Nelson for a dinner

11  meeting with Harbinger executives.

12       171.    Thus, the Company's management committed to a face-to-face meeting with

13  Harbinger after the trip to Houston for the JMI Services meeting.  Coupled with Farley's constant

14  monitoring of his browser while in Houston, his repeated phone calls to Deutsche Bank Alex.

15  Brown and Goldman Sachs, and the presence of the Company's chief technology officer in

16  Houston, these facts demonstrate that the "JMI meeting" was an update on both the Harbinger

17  acquisition and the ongoing insider stock sales.

18       172.    Upon agreement from defendants Moores and Noell, the discussions with

19  Harbinger moved forward, with defendants Gardner and Nelson, and Farley meeting the

20  Harbinger CEO, chief financial officer, and general counsel in San Francisco for a dinner on

21  February 29, 2000.  According to the Form S-4, after a discussion of their respective businesses,

22  the San Francisco meeting focused on strategic alternatives for the companies, including "a

23  possible business alliance, joint venture, or business combination."

24       173.    Prior to traveling to San Francisco, Farley called defendant Noell at his JMI

25  Services office.  Noell had not been a supporter of the Harbinger acquisition.  He believed that

26  Harbinger's slower reported growth and lower operating margins were likely to cause Peregrine's

27  stock price to fall upon announcement of the transaction.  In an e-mail two years later, defendant

28  Moores recollected that "Noell was the only dissenting voice on the board."  As for Moores's

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                 63

#105317

Exhibit D
0193

1  own position, he noted: "I forget (conveniently, in all likelihood) what I thought at the time."

2      174.    Formal approval of the Harbinger acquisition was given on April 5, 2000 with all

3  directors voting in favor, including defendant Noell. The vote occurred after defendant Moores'

4  stockholdings in Peregrine had been reduced by over $177 million, before the material risks

5  accompanying the Harbinger acquisition became publicly known.

6      175.    When announced, the Harbinger acquisition caused the Company's stock to fall

7  from $58 to $36.75 in a single day of trading on then-record volume of 23 million shares. The

8  downward spiral in the stock price continued over the next several weeks, until it went under $18

9  per share in late May 2000.

10      176.    Pursuant to the terms of the merger agreement, as announced on April 5, 2000, the

11  Company acquired all of the outstanding stock of Harbinger at an exchange ratio of 0.75 share of

12  the Company's stock for each share of Harbinger stock.

13      177.    During the period February 15-19, 2000, defendants Moores, Cole, Gless, Luddy,

14  and Powanda, knowing material nonpublic adverse information concerning the Harbinger deal,

15  sold more than 6 million shares of Company common stock, obtaining proceeds exceeding $193

16  million.

17      6.    **July 2000 Report To The Board Of Directors**

18      178.    In his quarterly report for the summer 2000 Board meeting, provided to and read

19  by defendants Moores, Nelson, Noell, Cole, van den Berg, Watrous, and Savoy in advance of the

20  July 18, 2000 Board meeting, defendant Gardner gave the Board a very negative depiction of

21  events at Peregrine:

22      Well, we made it through the first quarter. That is probably the
    best summary I can give. **It was a very tough quarter**. . . . It was

23      not easy and we did not accomplish everything we should have
    accomplished.

24

25      The second half of the quarter was consumed with closing
    business. This is what we always do for in the second half of a
    quarter, but this time, though, it was very hard. **Our forecasts out**

26      **of North America evaporated in the final 10 days. We knew**
    **we had a weak forecast in EMEA from the starting day of the**

27      **quarter, and we have to scramble at the end to get some key**
    **deals done.** The Harbinger operation (now our e-Business

28      Connectivity Group) also saw a real fall-out of forecasted business

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    64

#105317

Exhibit D
0194

1    in the closing days of the quarter.  The bottom line is that **what on
2    June 20th looked like a quarter that would allow us to carry $10
     to 12 million of backlog into Q2 while beating EPS
3    expectations by a penny, turned into a quarter that closed with
     effectively no backlog and with EPS on target and the ability to
     scrape into a penny over with tightened expenses.**
4
     We will show approximately $94 million in top line revenue and
5    $0.10 EPS against a $0.09 expectation; however, **we go into the
     always-difficult September quarter essentially naked . . . .**
6    (Emphasis added.)

7    Under the heading "Areas of Concern," Gardner noted the following:

8        •    Average productivity per direct sales rep fell to a 3 year
              low.  The "bread-and-butter" deals in the $100K to $500K
9             range basically dropped off the radar screen.

10       •    Sales management weakness in France, Germany,
              Asia/Pacific/Latin America, and parts of the US became
11            apparent.

12   Regarding the "Outlook for Q2," Gardner informed the Board members of the following:

13       Budget numbers call for $145 million in total revenue. . . .  Given
         the recent shortfall in forecasts and our growing concerns about the
14       productivity of our sales teams, **this number may be very
         difficult to reach.**
15
         Our current forecast roll-up would indicate a downside of about
16       $130 million, or a $15 million shortfall. . . .  If we close a few of
         these large deals and we do not have another fall-out of the "bread-
17       and-butter" business forecast, we will fill the gap and make the
         numbers.  We even have the potential to carry a backlog into the
18       December quarter, but **it would be somewhat miraculous. . . .**

19                            *          *          *

20       In short, it is going to be a tough quarter again, and without a
         backlog cushion to absorb any shortfall or potential inability to pull
21       in the needed large deals.  (Emphasis added.)

22   179.   In addition to the foregoing business setbacks, defendant Gardner reported to the

23   Board members the difficult cash position of the Company, the need to raise cash, and the

24   inability to do a public offering because of the business uncertainties:

25       We came out of the quarter with about $70 million in cash.
         However, we have some large payments due for acquisition-related
26       charges, build-out of the San Diego campus, and other items that
         will drain cash this quarter.  Our current projection is that we will
27       end the quarter with $35 million.  **This is not enough.**

28       We would like to raise a minimum of $50 million and up to $250

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    65

1    to $300 million if market conditions permit.  However, given the
     uncertainty surrounding the September quarter outlook, it is hard to
2    proceed with any type of public offering.  (Emphasis added).

3        180.    On July 20, 2000, the Company announced its financial results for the first quarter

4    of fiscal year 2001, ending June 30, 2000.  According to the announcement, Peregrine had

5    revenues of $94.3 million for the quarter, an 83% increase over the previous year's comparable

6    period.  Neither the announcement nor related SEC filings disclosed material nonpublic adverse

7    information, including (i) that the Company had continuing concerns about its sales teams, whose

8    productivity was at a three-year low, (ii) that its mid-size market continued to seriously

9    underperformance, (iii) that it had no sales backlog for the coming "always difficult" quarter, (iv)

10   that it was running out of cash and could not complete a public offering because there was

11   substantial doubt as to whether the Company would meet its earnings target for the second

12   quarter of fiscal year 2001 ending September 30, 2000.

13       **7.    October 2000 Report To The Board Of Directors**

14       181.    In his October 16, 2000 report to the Board members, which was received and

15   reviewed by defendants Gless, Moores, Nelson, Noell, Cole, Savoy, and Watrous at the time it

16   was disseminated, Gardner reported as follows:

17       Another quarter is behind us.  As you know it was a nail-biter, but
         in the end we pulled it off ... [w]e also had to borrow from the
18       future to make the present happen.  **In other words, we had to
         grant some extraordinary terms on a few deals in the closing**
19       **hours of the quarter to move business into the September time
         period.  This will clearly impact December and March,** but I
20       think the damage will be manageable.

21                           *          *          *

22       [S]ales productivity its far from where we want it ... The average
         rep and the average deal is missing in action.
23
                             *          *          *
24
         We don't have enough [cash] ... We need to raise cash now.
25       (Emphasis added).

26       182.    As for plans to raise cash, Gardner suggested a convertible preferred debt issue of

27   $150 to $250 million in the market as a Rule 144 offering.  One reason for his suggestion was

28   that by doing this type of private offering "[w]e also avoid the overhead and delay of an SEC

#105317

1  filing and review process ..." Gardner observed that the Company was "saved" by "huge deals

2  with alliance partners." It was known to Board members, or with deliberate recklessness,

3  disregarded by them, that these "huge deals" were fully contingent transactions with resellers

4  pursuant to the sell-in, Board approved improper accounting method.

5      183.   With regard to the Company's chronic shortage of cash, according to notes of a

6  October 9, 2000 sales group meeting taken by Taylor Barada, Gardner's special assistant and

7  nephew of defendant Noell, defendant Gardner announced that the "line of credit is how we live

8  between [the] first two weeks and last two weeks" of each quarter, and "we need to raise cash."

9  Attendees at this meeting included defendants Gardner, Luddy, Powanda, and Gless.

10      184.   On October 24, 2000, the Company announced its financial results for the second

11  quarter of fiscal year 2001 ending September 30, 2000. According to the announcement,

12  Peregrine had revenues of $142.7 million for the quarter, a 147% increase over the previous

13  year's comparable period. Neither the announcement nor related SEC filings disclosed material

14  nonpublic adverse information, including: (i) that results for the Company's mid-size transaction

15  market remained extremely unsatisfactory, (ii) that it relied on "huge deals," which were

16  contingent, with alliance partners to meet its forecasts, (iii) that the productivity of its sales force

17  continued to deteriorate, (iv) that it had to grant "extraordinary terms" to get key deals done, (v)

18  that the Company had to "borrow from the future to make the quarter," and (vi) that there was a

19  desperate need for cash.

20      **8.**   **January 2001 Report To The Board Of Directors**

21      185.   The foregoing material problems persisted in the ensuing quarter. In his report to

22  the Board for the third quarter of fiscal year 2001 ending December 31, 2000, which was

23  provided to and read by defendants Gless, Moores, Nelson, Noell, Cole, Savoy, and Watrous in

24  advance of the January 26, 2001 Board meeting, Gardner reported that "there were also some

25  substantial business disappointments." He advised that the Company's "direct business in North

26  America was a disaster," with only slightly more than $13 million of business on a plan of over

27  $50 million and a forecast late in the final month of the quarter of almost $40 million. Sales

28  representative productivity was 68% of plan, and U.S. productivity less than 50% of plan.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                      67

#105317

Exhibit D
0197

1    Continued "heavy reliance on alliance and channel partners" remained a concern, such that

2    defendant Gardner was "cautious" about the Company's prospects going into the fourth quarter.

3        186.    On January 24, 2001, the Company announced its financial results for the third

4    quarter of fiscal year 2001 ending December 31, 2000. According to the announcement, it had

5    revenues of $156.6 million for the quarter, a 132% increase over the previous year's comparable

6    period. Neither the announcement nor related SEC filings disclosed material nonpublic adverse

7    information, including: (i) that the Company's direct business in North America was a "disaster,"

8    (ii) that the continued "heavy reliance" on alliance and channel partner contingent deals made its

9    CEO "cautious" concerning the future, and (iii) that the productivity of the sale force was

10   unsatisfactory and materially below plan. In addition, the Company completed a desperately

11   needed $270 million private convertible securities offering in the quarter. Public disclosure of

12   the material adverse facts reported to the Board members in the January 15, 2001 report would

13   have made this offering impossible to close.

14           **9.    April 2001 Report to Board of Directors**

15       187.    On April 16, 2001 Gardner disseminated a report to the Board members regarding

16   the fourth quarter of fiscal year 2001 ending March 31, 2001, and the outlook for fiscal year

17   2002. This report was received and read by defendants Gless, Moores, Nelson, Noell, Cole,

18   Savoy, and Watrous prior to the quarterly Board meeting. In his report, defendant Gardner stated

19   that "the difficulty of the quarter leads us to be more cautious about the next couple of quarters

20   than we have been previously..." Gardner referred to the "massive expansion of our relationship

21   with IBM" as the highlight of the quarter. However, he observed that very large deals with Fleet

22   Boston, Morgan Stanley, and ABN AMRO Bank (each with greater than $10 million potential)

23   were scrapped because the customers "were not prepared to spend any money." He further told

24   the Board members that management "are very concerned about the irrational buyer behavior

25   now being seen in the market ..."

26           **10.    July 2001 Report To The Board Of Directors**

27       188.    In early July 2001, Gardner disseminated a report to the Board members regarding

28   the first quarter of fiscal year 2002 ended June 30, 2001. This report was received and read by

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
#105317    Master File No. 02-CV-0870 J(RBB)                                                    68

Exhibit D
0198

1    defendants Gless, Moores, Nelson, Noell, Cole, Savoy, Watrous, and Dammeyer prior to the July

2    18, 2001 Board meeting. Among the items discussed by Gardner in this report were renewal of

3    concerns regarding available cash:

> Cash will decrease to approximately $240 million due to
> investments made during the quarter in Remedy stock (when we
> were contemplating a hostile bid) and other investments made in
> private equity placements in strategic partners ... There was also a
> cash outflow in the quarter to fund severance and restructuring
> costs associated with the lay-off 290 people we undertook at the
> beginning of the quarter. We are becoming very tight with further
> cash expenditures as we get ready for the closure of the Remedy
> deal. **We anticipate after closure and payment of the cash
> portion of that deal that we will have $150 to $170 million in
> cash for operations. If we see a favorable market window
> during the coming 180 days post-closing of Remedy, we will
> probably want to go out with a common equity offering, fully
> marketed, to raise an additional $200 to $300 million.**
> (Emphasis in original).

12          189.    In addition, defendant Gardner informed the Board about the overall status of the

13   Company's business. He called the quarter "difficult," and advised that "Europe did weaken

14   dramatically in the final weeks of the quarter ..." Further,

> [The] "Infrastructure Management Group (IMG) team struggled in
> the quarter as the economic downturn really impacted both new
> name sales and reduced average deal sizes." "We now know that
> Europe is weakening, which we had not assumed last quarter, and
> that this weakness is flying into a seasonally weak period in Europe
> anyway. We are seeing signs of a mild recovery or at least stability
> in the US, but that is very fragile. **We also have less backlog to
> work with going into September than we did in June, but a
> very large pipeline.** I believe the quarter is quite achievable, but
> as always, there is plenty of risk and uncertainty that we will need
> to manage through. Our close rate on end-user deals with direct
> sales will have to improve ... **My larger concern is December, in
> which we had guided to a fair amount of sequential growth
> assuming that we would see normal year-end buying patterns
> and a recovering economy. Both assumptions are in question.**
> (Emphasis added).

24          190.    At a July 18, 2001 Board meeting at the J.W. Marriott Hotel in New York City,

25   attended by defendants Gless, Nelson, Noell, Cole, Savoy, Watrous, and Dammeyer, these

26   defendants were advised that the Company had received an inquiry from the SEC regarding

27   transactions with Critical Path, a software company based in San Francisco that principally

28   focused on Internet communications. They learned that a national business magazine, *Business*

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    69

Exhibit D
0199

1    a $150 million LOC. We can run the company at these levels but it
     is a bit tight. We plan on filing a shelf registration shortly, not to
2    sell stock at current levels, but to have the ability to do so should
     market conditions change. Ideally, we would raise an additional
3    $200 to $300 million in capital.

4    The Company's continuing need to access the capital markets to raise cash to fund operations

5    made it imperative that there be no disclosure of the material adverse facts reported to the Board

6    by defendant Gardner.

7          194.    On October 24, 2001 Peregrine issued a press release reporting its results for the

8    second quarter of fiscal year 2002 ending September 30, 2001. The press release characterized

9    the results as "disappointing relative to our original expectations," but made no mention of the

10   continuing material problems afflicting Peregrine's business, including (i) the need to collect

11   contributions from employees to make its earnings estimate for the quarter ending December 31,

12   2001 and (ii) the tight cash situation and the need to raise additional capital.

13          **12.    December 2001 Report To The Board Of Directors**

14         195.    On December 31, 2001, Gardner sent a report by e-mail to, among others,

15   defendants Gless, Moores, Nelson, Noell, Cole, Watrous, and Dammeyer, which they received

16   and reviewed at the time it was disseminated, and which provided a summary of the third quarter

17   of fiscal year 2002 ending December 31, 2001. Gardner reported as follows:

18         **This was a very tough quarter. The final numbers are not yet
           in and it will take a couple of weeks to get all the detailed
19         information about expenses, balance sheet items, and
           breakdown of revenue, but it is clear today that we missed our
20         external revenue targets by a wide margin (about $40 million)
           and we missed our internal targets by a wider margin. My
21         best guess is that we will end at approximately $175 to $180
           million in revenue. For the first time as a public company we
22         will post a loss in operating results per share. We estimate that
           loss to be about $14 - $16 million or about $0.06 to $0.08 per
23         share. This was against an expectation of a $0.10 profit.**

24                          *        *        *

25         **Of the approximately $40 million miss versus external goals,
           roughly $28 million was in EMEA ... As we inspected the EMEA
26         pipeline, which had been represented to us as being over $50
           million strong in license sales, we found a lot that was not
27         qualified or forecastable.**

28                          *        *        *

---

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    71

Exhibit D
0201

It will take awhile to work through the issues, and while we made good progress in getting rid of some of the dead wood this past quarter, we still need to pay a lot of attention to EMEA over the quarters to come.... I do not really expect EMEA to be 100% healthy until the December quarter of 2002.

\*     \*     \*

We had a very weak US quarter in our sales to Managed Service Providers (EDS, IBM, Unisys, Fujitsu, Compaq) as their business slowed and they delayed orders, chosing (sic) instead to fully deploy software that we had sold to them earlier on in the year. The almost total absence of MSP customer business cost us about $5 to $7 million in our expectations.

\*     \*     \*

Xanadu continues to show great promise. **Due to some quality issues discovered in test, the product did not go into general availability status until December 19th, so impact on the quarter was minimal.** (Emphasis added).

196.    By his December 31, 2001 report, defendant Gardner highlighted for the Board members numerous material problems afflicting Peregrine's business which were not known to the investing public. In particular, Gardner identified the EMEA division as a major source of problems, and clearly alluded to improper revenue recognition by his reference to $50 million in license sales which "was not qualified or forecastable."

### 13.    January 2002 Report To The Board Of Directors

197.    In the first half of January 2002, Gardner followed up his December 31, 2001 e-mail report with another report which was disseminated to the defendants identified in paragraph 195 and which they received and reviewed in connection with the January 25, 2002 Board meeting. He reported that "[n]othing has changed with regard to the major areas of concern: EMEA, MSP business, and the business integration product suite and sales approach." Gardner further informed Board members that at a Morgan Stanley conference in Phoenix, "we had the opportunity to talk to dozens of investors one-on-one, including all of our largest holders. We have spoken to numerous buy and sell side analysts. The general tone is one of disappointment, but a continued belief in the Peregrine story and support of management."

198.    Defendant Gardner also informed Board members by this report that "[t]he loss in the quarter did violate some covenants on the LOC [line of credit] but [defendant] Matt [Gless]

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                          72

#105317

Exhibit D
0202

1   has worked with the banks to get agreement on those ..." As to merger activity, Gardner alluded

2   to the fact that Peregrine itself would likely be a takeover target, stating "I would expect that the

3   sharks will gather **now that there is blood in the water**, and I will discuss adoption of a Poison

4   Pill at the board meeting." (Emphasis added). The desperate situation at Peregrine was

5   illuminated by Gardner's suggestion for significant changes in the structure of the business:

6   "[w]e are looking at taking non-strategic assets and either (a) encapsulating them into stand-alone

7   operations with separate management and clear cash flow and profit targets, (b) selling them, or

8   (c) shutting them down. I think it is fair to say that most of the assets in this category come from

9   the Harbinger acquisition and the CRM side of the Remedy acquisition."

10      199.    On the heels of Gardner's very negative report to the Board members, on

11  January 24, 2002, Peregrine issued a press release announcing its results for the third quarter of

12  fiscal year 2002 ended December 31, 2001. While admitting being "disappointed in the results,"

13  the press release attributed the problems solely to "global economic weakness, particularly in

14  Europe." The press release quoted Gardner as stating, "We are committed to returning to

15  operating profitability, and we are continuing to take appropriate steps to improve our revenue

16  performance and contain our expenses." The press release omitted any mention of the crisis

17  internally at Peregrine, including violations of covenants on the Company's line of credit and

18  consideration of significant restructuring of the company's business and widespread violation of

19  GAAP arising from improper revenue recognition.

20      200.    On February 19, 2002, Peregrine announced that its Board had adopted a

21  Stockholder Rights Plan under which Peregrine would issue a dividend of one right for each

22  share of its common stock held by stockholders of record as of the close of business on

23  March 12, 2002. The press release went on to state, "[t]he plan was not adopted in response to

24  any specific attempt to acquire the company." This was a false statement, as the plan was

25  adopted in specific regard to then ongoing merger negotiations with BMC Software.

26      **14.    February 2002 Report To The Board Of Directors**

27      201.    Defendants Gless, Moores, Nelson, Noell, Cole, Savoy, Watrous, and Dammeyer

28  received and reviewed Gardner's report to the Board dated February 23, 2002 at the time it was

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                73

1  disseminated.  Gardner reported on fulfilling the "commitments made to the board during the

2  January 15, 2002 meeting."  These included significant cost reductions through a reduction in

3  workforce.  This Board update also mentions the ongoing "Texas discussions," which is a

4  reference to a possible acquisition of Peregrine by BMC Software.  In the face of this interest in

5  acquiring the Company, any disclosure of the material adverse facts made known to the Board

6  through Gardner's reports would have killed this potential transaction.

7          **15.**    **March 2002 Report To The Board Of Directors**

8       202.    Defendant Gardner's next update for Board members was dated March 22, 2002,

9  which was received and reviewed on or about that date by defendants Gless, Moores, Nelson,

10  Noell, Cole, Savoy, Watrous, and Dammeyer.  The critical feature of this report is the reported

11  precariousness of meeting earnings estimates provided to the investment community.  Gardner

12  asks for help in this regard: "If the forecast is met (and I stress there remains a lot of work to be

13  done next week), then we will exceed street expectations for total revenue. **Keep your fingers,**

14  **and anything else you can think of, crossed.**"  (Emphasis added).

15       203.    As to the potential BMC Software transaction, Gardner reported: "[d]iscussions

16  continue and I expect we will have something definitive to discuss early next month.  At this

17  point, I am positive toward doing a deal."  Once again, Gardner thereby signaled fellow Board

18  members that any disclosure of adverse material information such as he had previously reported

19  would undo the potential transaction.

20       204.    The Company's situation was known internally to be so precarious at this point

21  that Gardner requested that Board members,  "[k]eep thinking good thoughts, we can use all the

22  help we can get."

23          **16.**    **April 2002 Report To The Board Of Directors**

24       205.    On April 4, 2002 Gardner reported by e-mail to defendants Gless, Moores,

25  Nelson, Noell, Cole, Watrous, and Dammeyer, that Peregrine had received an offer from BMC

26  Software for 0.76 shares of BMC stock for each Peregrine share.  He advised Board members

27  that he had "negotiated them up from 0.6 per share 5 weeks ago to 0.76, and I believe that is as

28  far as we can go."  Gardner stated his position on the proposed deal as follows:

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                     74

I am now changing my recommendation to strongly support this offer based upon four factors: (1) my much more pessimistic outlook for the timing of a positive upturn in our revenues leading me to believe that we need to be part of a larger organization to have the potential to prosper, **or perhaps even to survive ...**"

Given the conclusion that the merger transaction was desirable, any disclosure of the material adverse nonpublic information known to Gardner and reported by him to the Board members, would destroy any opportunity for the merger to be effectuated.

206.    Gardner's report on the Company's operations were gloomy: "[t]he long and the short of the immediate situation is that we have had another very disappointing close to a quarter. Between Wednesday night and Sunday evening of last week, worldwide commit forecast dropped by over $17 million.... The impact of this is that instead of being comfortably above street estimates, we are now struggling to make street estimates."

207.    Gardner also reported to Board members the alternatives to a sale of the company. They included "staying the course," but reported that "we could get very low on cash.... Therefore, I believe that it is imperative that we raise $100 to $200 million through private placement."

**E.      Audit Committee Members Knew Of Or Were Deliberately Reckless With Regard To Peregrine's Accounting Fraud**

208.    The following defendants served on the Audit Committee of Peregrine's Board of Directors during the referenced portions of the Class Period:  Noell (April 22, 1999 through the end of the Class Period), van den Berg (April 22, 1999 through October 17, 2000), Hosley (April 22, 1999 through June 15, 2000), Savoy (October 17, 2000 through October 17, 2001) Watrous (April 17, 2001 through the end of the Class Period) and Dammeyer (October 24, 2001 through the end of the Class Period).  Defendant Watrous was a former senior partner of Andersen Consulting, an affiliate of or related party to defendant Arthur Andersen and AWSC. Defendant Dammeyer was a former audit engagement partner of Arthur Andersen.  As alleged herein, defendants Noell, van den Berg and Hosley were business partners of defendant Moores in numerous other ventures.  Defendant Savoy represented the interests of Paul G. Allen and his investment vehicle, Vulcan, on the Peregrine Board.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                      75

Exhibit D
0205

209. Peregrine publicly represented that the purpose of its Audit Committee was "to review with the Company's management such matters as internal accounting controls and procedures, the plan and results of the annual audit, and suggestions of the accountants for improvements in accounting procedures [and] to nominate independent accountants."

210. By April 2000, Peregrine's Board of Directors had adopted a written Charter to govern its Audit Committee. Under the heading "Responsibilities," the Audit Committee was charged with the following:

1. Reviewing on a continuing basis the adequacy of the Company's system of internal controls;

2. Reviewing the independent auditors' proposed audit scope and approach;

3. Reviewing and providing guidance with respect to the external audit and the Company's relationship with its external auditors by (i) selecting, and evaluating the performance of the independent auditors; (ii) reviewing the independent auditors' fee arrangements, proposed audit scope and approach; (iii) obtaining a statement from the independent auditors regarding relationships and services with the Company which may impact independence and presenting this statement to the board, and to the extent there are relationships, monitoring and investigating them; (iv) reviewing the independent auditors' peer review conducted every three years; and (v) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies and disagreements with management and any other matters described in SAS No. 61, as may be modified or supplemented;

4. Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

5. Reviewing before release, and recommending to the Board of Directors for inclusion in the Company's annual report on Form 10-K, the audited financial statements and management's Discussion and Analysis of Financial Condition and Results of Operations;

6. Ensuring that the Company's independent auditors review the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                                      76

Exhibit D
0206

7. Reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release;

8. Overseeing compliance with the requirements of the Securities and Exchange Commission for disclosure of auditor's services and audit committee members and activities;

9. Reviewing management's monitoring of compliance with the Company's standards of business conduct and with the Foreign Corrupt Practices Act;

10. Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

11. Providing oversight and review of the Company's asset management policies, including an annual review of the Company's investment policies and performance for cash and short-term investments;

12. Reviewing the Company's compliance with employee benefit plans;

13. Overseeing and reviewing the Company's policies regarding information technology and management information systems;

14. If necessary, instituting special investigations and, if appropriate, hiring special counsel or experts to assist;

15. Reviewing related party transactions for potential conflicts of interest;

16. Reviewing its own structure, processes and membership requirements;

17. Providing a report in the Company's proxy statement in accordance with the requirements of Item 306 of Regulation S-K and Item 7(e) (3) of Schedule 14A; and

18. Performing other oversight functions as requested by the full Board of Directors.

211. The Charter also provided that the Audit Committee was required to meet at least three (3) times a year and maintain written minutes of its meetings.

212. No minutes of any Audit Committee meetings exist. The reason is that the Company, through defendants Gless and Nelson, one or both of whom regularly attended these meetings, did not want a record of the matters discussed at Audit Committee meetings, and the members of the Audit Committee were complicit in this failure to follow Company policy by

#105317   FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    77

Exhibit D
0207

1  failing to insist on the keeping of minutes to record the activities of the Committee.

2      213.   The lack of Audit Committee meeting minutes demonstrates that the Audit

3  Committee did not function as represented to the investing public.  The fundamental failure of

4  the Audit Committee allowed Peregrine to operate without adequate internal accounting controls

5  at a time when Peregrine was growing rapidly and engaging in numerous acquisitions and

6  strategic alliances, and permitted the pervasive accounting fraud to go forward in the face of

7  detailed information presented to the Committee that Peregrine was continuously and egregiously

8  violating GAAP.

9      214.   During the Class Period, all of the Audit Committee meetings were attended by,

10  among others, defendants Gless and Nelson, representing Peregrine management, even though

11  one purpose of an Audit Committee is to provide oversight of management's activities.  By the

12  presence of Gless and Nelson, and their failure to insist on their recusal from Committee

13  meetings, the members of the Committee were knowingly and/or deliberately reckless in their

14  conduct of Committee business.

15      215.   In light of the lack of adequate internal accounting controls, the aggressive growth

16  of the Company and the lack of a functioning Audit Committee, defendants Noell, van den Berg,

17  Hosley, Watrous, Savoy, and Dammeyer, while on the Audit Committee, knew or were

18  deliberately reckless in not knowing of the fraudulent accounting practices alleged herein.

19  Moreover, as Audit Committee members, each of these defendants had control over Peregrine

20  with respect to the accounting and disclosure policies and practices of the Company.

21          **1.   July 6, 1999 Audit Committee Meeting**

22      216.   During the period April 1999 through February 2000, a single Audit Committee

23  meeting was conducted.  Defendants Noell, van den Berg, and Hosley attended a July 6, 1999

24  Audit Committee meeting.  Defendant Nelson was also in attendance.  This meeting occurred on

25  the heels of the Board's April 1999 adoption of a new, highly aggressive accounting policy (sell-

26  in) for the express purpose of allowing the Company to meet first quarter fiscal year 2000

27  forecasts, and which policy was known to be inconsistent with that used by Peregrine's

28  competitors.  Adoption of this policy was a landmark event in the context of the Company's

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
#105317   Master File No. 02-CV-0870 J(RBB)                                                          78

Exhibit D
0208

1  revenue recognition policy and its overall accounting.  However, the Audit Committee at this

2  meeting failed to give any attention to either the implementation of this policy or its ramifications

3  for the Company's accounting and financial reporting.  The defendants attending this meeting

4  thereby knowingly and/or with deliberate recklessness failed to fulfill their oversight

5  responsibilities with regard to Peregrine's accounting and the related public disclosures.

6           **2.**     **April 25, 2000 Audit Committee Meeting**

7       217.     Defendant Noell attended an April 25, 2000 special Audit Committee meeting at

8  which defendant Arthur Andersen provided a handout entitled "Year-end Audit Committee

9  Meeting Fiscal 2000."  Noell received and reviewed this presentation at the time of the meeting.

10       218.     The April 25, 2000 presentation includes a "Risk Assessment" Section which

11  provides a discussion of "why," "approach" and "results" for the following "risks:" revenue

12  recognition software, revenue recognition (service/other), financial reporting evaluation,

13  integration of acquisitions/purchase accounting, acquired in-process research and development,

14  accounting process and controls, and legal/environment.  By this meeting, defendant Noell was

15  put on notice that revenue recognition was a high risk area of the audit, especially in light of the

16  Board's adoption of the sell-in methodology, and that there were major issues with Peregrine's

17  internal controls, especially in light of its frenetic acquisition program.

18           **3.**     **January 24, 2001 Audit Committee Meeting**

19       219.     At a meeting between defendant Noell and Arthur Andersen audit engagement

20  partner Stulac on January 24, 2001, Noell was informed that the Company had engaged in two

21  barter transactions with New Era of Networks and Extricity.  Although these transactions were

22  relatively small in amount, Noell learned that Peregrine was engaging in and recognizing revenue

23  on transactions with no commercial substance.

24           **4.**     **April 25, 2001 Audit Committee Meeting**

25       220.     Defendants Noell and Watrous attended an Audit Committee meeting on

26  April 25, 2001.  Also in attendance was defendant Nelson and representatives of defendant

27  Arthur Andersen including Stulac.  At this meeting, Arthur Andersen made a presentation

28  entitled "Year-End Audit Committee Meeting Fiscal 2001."  It included a section entitled

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                         79

1   "Business Audit - Significant Business Risks" which highlighted "control issues in Europe" as a

2   problem area.  This was a reference to, and there was a discussion of, serious problems with

3   revenue recognition in the EMEA division of the Company.  At this meeting, Stulac specifically

4   suggested that it would be appropriate for the Company to move to revenue recognition based on

5   sell-through as opposed to the then operative sell-in method because he knew, and conveyed to

6   the Audit Committee members, based on Arthur Andersen's audit procedures for the quarterly

7   reviews and year end audit, that Peregrine was improperly recognizing revenue immediately in

8   full, on sell-in transactions where there was no binding commitment on the part of resellers.

9   Defendant Watrous inquired at this meeting as to how "aggressive" Peregrine was with regard to

10  revenue recognition, and he was informed by Stulac that Peregrine was more aggressive than one

11  of its leading competitors, citing as an example SAP, which applied the sell-through method.  At

12  this meeting, defendants Noell and Watrous were informed by Peregrine's auditor that the

13  Company's revenue recognition policy was different in material respects from those of its

14  competitors who were in the same business.  They also knew at this time, or were deliberately

15  reckless in not knowing, that Peregrine's revenue recognition policy was not truthfully disclosed

16  in its SEC filings.  However, no change was made, recommended or even considered in the

17  Company's revenue recognition policy.

18              **5.    June 29, 2001 Audit Committee Meeting**

19         221.    Defendants Noell, Watrous, and Savoy attended an Audit Committee meeting on

20  June 29, 2001.  Also in attendance were defendant Nelson and Arthur Andersen audit

21  engagement partner Stulac.  At this meeting, there was a discussion of the fact that the SEC was

22  reviewing transactions between Peregrine and Critical Path for possible improper revenue

23  recognition and that defendant Gardner's testimony had been taken by the SEC on June 19, 2001,

24  as had the testimony of Taylor Barada, Gardner's special assistant, on June 20, 2001.  Noell

25  informed defendant Moores of these developments following the Audit Committee meeting.

26  This SEC inquiry into Peregrine's transactions with Critical Path was an additional red flag to

27  Audit Committee members that Peregrine was engaged in highly aggressive accounting practices

28  that were drawing the scrutiny of the SEC and which called for heightened vigilance by Audit

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                        80

                                                                        Exhibit D
                                                                        0210

1    Committee members, which was not forthcoming.

2              6.    **July 23, 2001 Audit Committee Meeting**

3         222.    Defendants Noell, Watrous, and Savoy attended an Audit Committee meeting on

4    July 23, 2001. Also in attendance were defendant Nelson and Arthur Andersen representatives,

5    including audit engagement partner Stulac. At this meeting, numerous material problems were

6    discussed with regard to Peregrine's accounting. Channel sales collections, particularly with

7    regard to KPMG transactions, were identified as a serious problem, and were referred to as a

8    "poor fact" and it was stated that the auditors were "very concerned." This related to the inability

9    to collect on channel sales to KPMG and problems with "installation." Further, it was discussed

10   that virtually all of Peregrine's major competitors, or analogous companies, such as PeopleSoft,

11   Oracle, SAP and ASP Technologies no longer were selling through channel partners, and that all

12   their sales were direct. Stulac characterized the revenue recognition practices within Peregrine as

13   "in a state of flux." Peregrine's revenue recognition policy was referred to as "old" and one that

14   "needs to be replaced." Defendant Watrous specifically stated that he was "concerned" about

15   these facts. He asked Stulac, "on a scale of 1 to 10 with 10 being the most 'clean'" how

16   Peregrine's revenue recognition procedures would rank?" Stulac responded they would rank in

17   the "5-7" range. Watrous queried why Peregrine was not a "10." He was told that the problems

18   were attributable to: (i) software customers delaying purchases until late in the quarter to get

19   discounts, (ii) as a result, the quarter ends were extremely busy, (iii) the European controller

20   position was vacant, (iv) there was a failure on the part of Peregrine to appropriately merge the

21   overseas processes, (v) the European sales force "used more aggressive revenue recognition,"

22   and (vi) the frequent acquisitions made by Peregrine required the merging of different accounting

23   systems, which had not been accomplished. Based on these disclosures, Watrous concluded that

24   Peregrine was not implementing "best practices" and that there was a need to change accounting

25   policies. Defendant Savoy observed that the auditors (defendant Arthur Andersen) should be

26   spending time with management dealing with these revenue recognition issues. However, it was

27   the Audit Committee's duty to challenge management on the clear and continuous accounting

28   violations that were brought to the Committee members' attention. These discussions were a red

---

1  flag to Audit Committee members that Peregrine was engaging in highly aggressive and

2  improper accounting transactions, that internal controls were abysmal if not non-existent, and

3  that the Company's revenue recognition policy was not being followed by its major competitors

4  in the same line of business, and was therefore presumptively improper.  No actions were taken

5  by the Audit Committee in response to this discussion of material failures in Peregrine's internal

6  controls and accounting.

7      223.  At this meeting, there was also a further discussion of Peregrine's transactions

8  with Critical Path and a decision was made to have Arthur Andersen review these transactions

9  even though they had already been recorded as revenue.

10          **7.  October 24, 2001 Audit Committee Meeting**

11     224.  Defendant Dammeyer chaired an October 24, 2001 Audit Committee meeting.

12  Defendants Noell and Watrous also attended this meeting.  Also in attendance were defendants

13  Gless and Nelson, Peregrine's General Counsel, Deller, and its Vice President, Finance, B.J.

14  Rassam, as well as several individuals from defendant Arthur Andersen, including a new audit

15  engagement partner, Ross Baldwin, as well as Robert S. Shanley, a Phoenix-based National

16  Practice Director for the Western Region.  Mr. Shanley's presence at this meeting was a clear

17  indication that major problems in Peregrine's accounting, and material adverse information, was

18  to be discussed.

19     225.  A document entitled "Audit Committee Meeting Quarterly Review Q2 2002" was

20  handed out at this meeting.  Although it bore a legend reading "This is Restricted to Audit

21  Committee Use Only," it was nonetheless provided to defendants Gless and Nelson, who were

22  not members of the Audit Committee.  At this meeting, the Arthur Andersen personnel told the

23  Peregrine directors that there had been breakdowns in internal control surrounding revenue

24  recognition during the quarter ended September 30, 2001, and identified 6-7 revenue transactions

25  which were challenged by Arthur Andersen, including deals with Fujitsu for $6 million, Total

26  Infosystems for $10 million and Unisys for $6.1 million.  The auditors specifically discussed that

27  such transactions adversely impacted the "quality of earnings."  With regard to the Unisys

28  transaction, the auditors discussed how the arrangement included a specified undelivered version

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)

#105317

82

1    upgrade, which rendered revenue recognition on this transaction improper.  As to "control

2    breakdowns," the auditors informed the Audit Committee members that this related to the

3    revenue process of not properly identifying all contract terms that could prevent or reduce

4    revenue recognition, particularly on large contracts.  This was a specific reference to the

5    existence of side letters eliminating or otherwise impacting the obligation to pay.  Attached to the

6    document handed out at this meeting by Arthur Andersen was a sheet entitled "Types of Potential

7    Misstatements" which discussed in detail Statement of Position ("SOP") 97-2 and its application

8    to potential misstatements related to software revenue recognition and the application of this

9    GAAP principle.  This document was handed out to show the Audit Committee members how

10   Peregrine was intentionally and repeatedly violating GAAP.  In response to this discussion,

11   defendant Gless acknowledged at the meeting that "the Company needs to review its revenue

12   recognition process and tighten its controls."  The discussions at this meeting made clear that

13   Peregrine was engaged in accounting fraud.  Defendants Noell, Watrous, and Dammeyer, from

14   their participation in this meeting knew, or were deliberately reckless in not knowing, that

15   Peregrine's revenue recognition was improper and violated GAAP as a result of, among other

16   items, the existence of side letters, and that there were no adequate internal controls.  Defendant

17   Noell informed defendant Moores of what transpired at this Audit Committee meeting shortly

18   after it concluded.

19          **8.    February 12, 2002 Special Audit Committee Meeting**

20          226.    On February 12, 2002 defendant Moores arranged to conduct a special meeting of

21   the Audit Committee, even though he was not formally a member of the Committee.

22   Defendants Moores, Noell, Watrous, and Dammeyer participated in this meeting.  Also in

23   attendance were defendants Gardner and Gless.  The purpose of the meeting was to discuss the

24   fact that on January 29, 2002, the SEC had opened an inquiry of Peregrine, including requests for

25   documents and information regarding barter transactions and sales, in particular involving

26   Critical Path.  The defendants participating in the meeting were informed of the SEC activity.

27   Further, there was a discussion of a recent news story that had appeared in the press drawing a

28   connection between Critical Path and Peregrine.  Notwithstanding the participating defendants'

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    83

1   knowledge of the SEC scrutiny of the Company, they failed to make any public disclosure of this

2   material fact. The omission to disclose this material fact was particularly egregious because just

3   a few days prior to this meeting, on February 8, 2002, a Peregrine spokeswoman was quoted in

4   the press as stating, "We have fully cooperated with the SEC's investigation of Critical Path and

5   will continue to do so as necessary, but there is no formal investigation of Peregrine." The

6   defendants who participated in the February 12, 2002 meeting had read, or had been informed of,

7   this article, and also knew that the SEC's sights were in fact trained on Peregrine as a result of its

8   transactions with Critical Path, yet failed to inform the investing public of this fact.

9             **9.**    **April 2, 2002 Audit Committee Meeting**

10         227.   Defendants Noell, Watrous, and Dammeyer attended an Audit Committee meeting

11   on April 2, 2002. Also in attendance were defendants Nelson and Gless, Peregrine General

12   Counsel Deller, and B.J. Rassam, Vice President, Finance. Among the matters discussed at this

13   meeting were the ongoing SEC inquiry. Nonetheless, no member of the Committee insisted

14   upon public disclosure of the SEC activity. One of the open audit issues discussed at this

15   meeting was "desired improvement in sales cut-off," referring to a discussion about issues that

16   had arisen with regard to the timing of revenue recognized by the Company and the numerous

17   examples of transactions being dated after the end of a quarter but nevertheless being improperly

18   recorded in that quarter. Also discussed at this meeting was the replacement of Arthur Andersen

19   as the Company's independent auditor and the installation of KPMG in that position. Defendant

20   Noell reported to defendant Moores after the conclusion of the meeting as to the substance of

21   what was discussed.

22         228.   In the period following this Audit Committee meeting, defendant Dammeyer, as

23   Chairman of the Committee, had significant interactions with KPMG  He spoke with Brian

24   Allen of KPMG on April 22 and 25 or 26, 2002. During these calls, Allen identified certain

25   accounting matters which KPMG was focusing on, including revenue recognition. Allen told

26   Dammeyer that numerous transactions reviewed by KPMG reflected improper revenue

27   recognition, including findings of extended payment terms in violation of SOP 97-2, and other

28   examples of concessions on deals with extended terms. Specific identification was made of the

1   deals with Prokom (for $10 million) and MGX. He identified deals recorded under the sell-in

2   method which did not reflect payment having been made, particularly identifying foreign

3   transactions as an area of concern. He discussed the fact that if the reporting was changed to a

4   sell-through basis, which he urged based on the current practice in the software industry, that

5   there would be a dramatic change in reportable revenue and a need for a possible restatement.

6   Allen also reported to defendant Dammeyer the existence of side letters which he had been told

7   had been discovered beginning in June 2001 by defendants Gardner, Gless, and Nelson. Also

8   referenced in this conversation was the discovery by KPMG that Peregrine accounts receivable

9   with extended payment terms had been sold to banks and removed from the Company's balance

10  sheet. Allen also drew Dammeyer's attention to the accounting for certain mergers, including

11  Harbinger and Extricity, whereby write offs had been taken by Peregrine in the "acquisition cost

12  and other" line item which were inappropriate. Notwithstanding the devastating information

13  given to Dammeyer, the Chairman of Peregrine's Audit Committee, he made no public

14  disclosure of this information and failed to insist that Peregrine make a public disclosure.

15          **10.    April 29, 2002 Audit Committee Meeting**

16          229.    Defendants Noell, Watrous, and Dammeyer participated in an April 29, 2002

17  Audit Committee meeting. At that meeting, Allen of KPMG informed the Committee that

18  KPMG had discovered $26 million in accounts receivable impairments embedded in a write off

19  taken in the second quarter of fiscal year 2001. The write off was associated with the line item

20  "acquisition and other" and appeared to relate to the Harbinger acquisition. KPMG believed

21  these write offs were improper. KPMG also advised the Committee that in reviewing Arthur

22  Andersen's workpapers, KPMG discovered a $3.8 million transaction from Germany which

23  reflected improper revenue recognition. In addition, KPMG told the Committee that there were

24  significant sales to distributors in the first and second quarters of fiscal year 2001, but a relatively

25  small number of sales to distributors in the third and fourth quarters. They reported that a $12

26  million transaction (Prokom) and an $8 million transaction (MGX) remained unpaid at year end.

27  KPMG said it was "unusual" for a company to have two large receivables unpaid at year-end,

28  and that it had not received a satisfactory explanation of these facts from the Company. KPMG

1  further informed Dammeyer that Arthur Andersen had concluded that the Company's accounting

2  for the Critical Path transactions was wrong.  Also disclosed was that defendant Gless had

3  confessed to KPMG that he had learned of at least seven side letters in EMEA in August or

4  September 2001, and had consulted with defendant Gardner about his findings.  However,

5  KPMG informed Committee members that it had learned of a December 6, 2001 e-mail from

6  Geoffrey Boonen to defendant Gless and B.J. Rassam whose subject line read "Cleaning -

7  Confidential" and which discussed twenty-one side letters.  KPMG explicitly raised the

8  possibility of a need for a restatement of Peregrine's previously published financial statements.

9  The discussions at this Audit Committee meeting were relayed to defendant Moores by either or

10  both defendants Noell and Dammeyer.  Defendants made no disclosure of the damning

11  information provided by KPMG on April 29, 2002.  Instead, the Company caused a press release

12  to be issued on April 30, 2002 referring to a delay in the planned earnings release "pending

13  continued audit activities of KPMG."  Defendant Moores and the Audit Committee members

14  knew that a fraud had been uncovered, yet failed to make or insist upon any appropriate

15  disclosures.  Seeking to distance himself as much as possible from the tarnish of his role as

16  Chairman of Peregrine's Audit Committee, Dammeyer submitted a short resignation letter to

17  defendant Moores on May 24, 2002.

18                          *         *         *

19          230.    As a result of their participation in the foregoing Audit Committee meetings,

20  defendants Noell, Watrous, Savoy, and Dammeyer, as well as defendant Moores through the

21  information be obtained from defendants Noell and Dammeyer, and his participation in the

22  February 12, 2002 Audit Committee meeting, learned of specific material problems in

23  Peregrine's revenue recognition practices, that material amounts of revenue had been improperly

24  recognized, that there were materially inadequate internal controls, and that the Company's

25  transactions were being scrutinized by the SEC.  Yet they made no disclosure of these material

26  facts and failed to correct Peregrine's materially misleading statements to the public regarding its

27  accounting practices and its financial results, and failed to insist on the Company making such

28  disclosures.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                              86

Exhibit D
0216



231.    Notwithstanding knowledge of material adverse information from their participation in the Audit Committee meetings, defendant Noell signed Peregrine's reports on Form 10-K for the fiscal years ending March 31, 2000 and March 31, 2001 and all Peregrine registration statements (on Forms S-3, S-4 and S-8) filed with the SEC during the Class Period, and approved the issuance of quarterly financial results during fiscal years 2000 and 2001 and the first three quarters of fiscal year 2002.  Defendants van den Berg and Hosley signed Peregrine reports on Form 10-K for the fiscal year 2000 and Peregrine registration statements filed with the SEC until they resigned from Peregrine's Board.  They also approved the issuance of quarterly financial results during fiscal year 2000.  Defendants Savoy and Watrous signed Peregrine's report on Form 10-K for fiscal year 2001 and Peregrine's registration statements filed with the SEC while they sat on Peregrine's Board.  They approved the issuance of Peregrine's quarterly financial results during fiscal year 2001 and the first three quarters of fiscal year 2002.  These acts were committed while these defendants knew of, or were deliberately reckless with regard to, the material adverse nonpublic information herein alleged.

**THE INDIVIDUAL DEFENDANTS' KNOWLEDGE OF AND/OR DELIBERATE RECKLESSNESS AS TO THE FRAUD**

232.    Each of the individually named defendants who served on the Peregrine Board of Directors immediately prior to and during the Class Period learned of material adverse facts regarding the business and operations of the Company through written, oral, and in some cases e-mailed reports provided to them by defendant Gardner, as well as through their access to current financial reports regarding the operations of the Company, including their role as Audit Committee members (as to defendants Noell, Watrous, Hosley, Savoy, and Dammeyer).  Gardner's reports are alleged in detail in paragraphs 137-207 hereof.  As a result of receiving and reading these reports, or gaining access to such information through their Board and/or Audit Committee participation, each of these defendants had knowledge of the following facts and knew, or with deliberate recklessness disregarded, that none of these material adverse facts were disclosed to Class members in Peregrine's press releases or SEC filings, or otherwise:

- Peregrine had implemented the highly aggressive sell-in method of

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    87

#105317

Exhibit D
0217

recognizing for revenue immediately upon the sale of software licenses regardless of whether there was a firm commitment from the reseller, or an identified and committed end user, because absent such accounting treatment the Company would miss earnings targets provided by senior management to the investment community;

•   As a result of approving the sell-in accounting method, the Company consistently was borrowing from potential future revenue streams to make its current revenue and earnings targets, making it increasingly difficult if not impossible for the Company to report the consistent growth that it represented to the market and that would allow it to continue on its strategy of growth through acquisition by stock mergers;

•   There was massive inventory in the channel that neither Peregrine nor its resellers could sell, which was hard evidence that GAAP accounting was not being followed in the recording of revenue throughout the Class Period, because Peregrine was recording revenue simply upon entering into agreements with the resellers pursuant to the Board's approval;

•   In the aftermath of the Board and Sales Force meetings in April 1999, channel sales rapidly increased. For fiscal year 1999, channel sales accounted for only 13% of all license revenue, with the bulk of those sales coming in the fourth quarter. In contrast, during fiscal year 2000 (April 1, 1999 to March 31, 2000), the Company equaled or exceeded the 25% maximum set by Arthur Andersen in all quarters. As shown below, at the close of fiscal year 2000, channel sales represented over 38% of all license revenues, nearly triple the percentage of channel sales a year earlier and well past the auditor's maximum:

| Fiscal Quarter | Channel Sales | as % of Total License Revenues |
|---|---|---|
| 4Q/99 | $6,700,000 | 22% |
| 1Q/00 | $12,677,896 | 40% |
| 2Q/00 | $19,287,692 | 52% |
| 3Q/00 | $18,600,273 | 40% |
| 4Q/00 | $12,409,381 | 24% |
| **Total FY 2000** | **$62,975,242** | **38%** |

•   From $6.5 million at the end of fiscal year 1999, channel inventory levels

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                      88

Exhibit D
0218

1    peaked at over $57 million in December 1999, before falling to a level of $34.9 million in March

2    2000, and then rising again to $49.6 million by September 2000.  Channel inventory levels rose

3    so quickly that in some quarters they threatened to exceed license revenues reported in the same

4    quarter:

| Fiscal Quarter | Channel Inventory | as % of Total Revenue |
|---|---|---|
| 4Q/99 | $6,500,000 | 14% |
| 1Q/00 | $21,080,000 | 42% |
| 2Q/00 | $40,137,168 | 69% |
| 3Q/00 | $57,150,842 | 84% |
| 4Q/00 | $38,793,304 | 50% |
| 1Q/01 | $34,888,893 | 37% |
| 2Q/01 | $49,577,302 | 35% |

13         •      Channel partners were unable to sell the inventory even when assisted by

14   the Company's sales force.  Internally, the Company tracked "burn," sales out of the inventory of

15   its channel partners.  Its ability to "burn" inventory was dwarfed by the sheer size of the channel

16   inventory that partners were accumulating;

17         •      In the second quarter of fiscal year 2000 ending September 30, 1999, the

18   Company burned $2.2 million of channel inventory.  But at quarter's end overall channel

19   inventory was $40.1 million.  At that rate, the sales force would have needed 18 months to

20   eliminate existing channel inventory, without any allowances for future channel inventory

21   increases.  Less than six months after the change to the sell-in method of accounting, quarterly

22   channel sales had reached $19 million, representing 52% of all license revenues, and channel

23   inventory was more than two-thirds of license revenue;

24         •      In the ensuing third quarter of fiscal year 2000 ending December 31, 1999,

25   the Company improved its "burn" of channel inventory to $2.9 million.  However, there was a

26   much larger jump in channel inventory during the quarter to $57.1 million.  The Company's sales

27   force would have needed nearly 20 months to eliminate this inventory;

28         •      Peregrine had a direct sales crisis arising from weak and diminishing direct

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    89

1   sales and poor sales force productivity, such that reliance on stuffing the channel and recording

2   revenue in violation of GAAP before an end user could be found became necessary to meet

3   revenue and earnings estimates;

4            •    Peregrine's auditors were uncomfortable with the level of revenue based

5   on sell-in to the channel, and discussed with the Audit Committee known violations of applicable

6   revenue recognition principles;

7            •    Excessive use of channel deals to create revenue was forcing the Company

8   to consistently rely on "big deals" to cover shortfalls in revenue, which deals were difficult to

9   complete and which often demanded extraordinary terms such that recognition of revenue on

10  such transactions was improper;

11           •    As of October 1999, the Chief Executive Officer of the Company,

12  defendant Gardner, wanted to implement an "exit strategy" for himself and the Company's

13  leading salesman, defendant Powanda, and warned of the Company coming to a "crisis point" in

14  12 to 18 months; and

15           •    Throughout the Class Period the Company was constantly in need of cash,

16  resulting in undisclosed "sales" of receivables to purportedly raise cash, and the need to access

17  the capital markets to fund operations, creating a situation where any earnings miss or disclosure

18  of the fundamental problems underlying the Company's business would lead to disastrous

19  consequences.

20                        *        *        *

21       233.    In addition to the foregoing material facts, which were known to, or with

22  deliberate recklessness disregarded, by each of the individually named defendants (other than

23  defendant Rodda), the allegations in paragraphs 236-368 below set forth additional evidence of

24  these defendants' knowledge and/or deliberate recklessness.  In addition, Appendix E hereto,

25  which is incorporated herein by this reference, provides detailed allegations as to specific

26  transactions whereby revenue was knowingly, or with deliberate recklessness, improperly

27  recorded, and identifies specific defendants involved in such transactions.

28       234.    In connection with the allegations made below regarding the individual

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    90

#105317

1    defendants' insider sales of Peregrine shares, during the Class Period Peregrine had adopted a

2    formal Insider Trading Policy.  The policy required "that all directors and executive officers of

3    the Company refrain from conducting transactions involving the purchase or sale of the

4    Company's securities other than during the period commencing at the open of market on the third

5    trading day following the date of the public disclosure of the financial results for a particular

6    fiscal quarter or year and continuing until the close of market on the last day of the second

7    calendar month of the next quarter."  In addition, there were other black-out periods which were

8    imposed and which related to Company specific events.  For example, from September 1, 1999

9    through February 8, 2001, there was a black out on trading by Peregrine insiders based on a

10   series of Company events.  As a result, during the Class Period, although there were 699 public

11   trading days, the black-out periods referenced above meant that officers and directors could trade

12   during only 225 of those days.   As alleged herein, certain of these corporate blackout periods

13   were disregarded by the individual selling defendants.

14        235.    With regard to the prices at which the individual defendants sold Peregrine stock,

15   the peak price for Peregrine stock during the Class Period occurred during a quarterly black-out

16   period.  Accordingly, it was illegal for Peregrine insiders to sell at peak prices during the Class

17   Period, yet they did so.  The following chart shows the number of days during the Class Period

18   that officers and directors could trade outside of the corporate black-out periods, by price range

19   for Peregrine stock:

| Price Range | Number Of Available Trading Days Peregrine Stock Traded In Price Range During The Class Period | Percentage Of Available Trading Days At Price Range |
|---|---|---|
| $0.00-$9.99 | 79 | 35% |
| $10.00-$19.99 | 43 | 19% |
| $20.00-$29.99 | 76 | 34% |
| $30.00-$39.99 | 27 | 12% |
| $40.00-$49.99 | 0 | 0% |
| $50.00-$59.99 | 0 | 0% |

Exhibit D
0221

| $60.00-$69.99 | 0 | 0% |
| $70.00-$79.99 | 0 | 0% |

A.  **Stephen P. Gardner**

236.    Gardner, together with defendant Gless, was responsible for and created Peregrine's communications to securities analysts and investors during the Class Period. Gardner reviewed, authorized, and participated in the dissemination of Peregrine's financial results throughout the Class Period and signed Peregrine's reports on Form 10-K for the fiscal years ending March 31, 2000 and March 31, 2001.  Gardner signed all of the registration statements (on Forms S-3, S-4 and S-8) filed by Peregrine during the Class Period.  Gardner approved of the filing with the SEC of Peregrine's reports on Form 10-Q throughout the Class Period.  Gardner did so although he knew that the financial statements contained therein were materially false.  Gardner also reviewed and approved of the release of all of Peregrine's press releases and other financial reports issued during the Class Period while knowing of, or with deliberate recklessness disregarding, their falsity.

237.    Gardner knew that Peregrine set unrealistically aggressive growth targets and pressured its sales personnel each quarter to make the numbers.  Gardner presided over periodic sales meetings in Peregrine's headquarters which were also attended by CFO Farley (until his death) and/or CFO Gless and its top sales executives including defendant Powanda and his direct reports and subsequently Joseph G. Reichner, Vice President, Alliances and his direct reports. The primary purpose of these meetings was to update and discuss the financial outlook for the current quarter and to review large license agreements anticipated to close during the quarter. Through these meetings and computerized reports received from defendant Gless which tracked the Company's "burn," *i.e.*, commitments from resellers not yet sold-through to the end user, Gardner closely monitored the progress of these anticipated deals, as well as Peregrine's progress towards meeting revenue targets in each quarter during the Class Period.

238.    From these executive management meetings and his own direct involvement in the Company's sales activities as particularized herein, Gardner knew that resellers were unwilling to commit to large license agreements unless an end user committed to purchase the

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                 92

#105317

Exhibit D
0222

1   product from the reseller. Gardner also knew that, to induce resellers to issue purchase orders

2   without contingencies for these products, Peregrine had to and did in fact enter into written or

3   oral side agreements which made payment contingent upon sale of the product to the intended

4   end user. Notwithstanding the foregoing, and pursuant to the policy approved by Peregrine's

5   Board, Gardner authorized and approved Peregrine's recognition of revenue derived from

6   contingent sales to resellers in violation of GAAP, thereby artificially inflating the Company's

7   revenues and earnings.

8        239.   In 2000, David Thatcher, CEO of Critical Path and former CFO of Peregrine,

9   initiated discussions with Gardner regarding a possible barter transaction. The transactions that

10   the two CEOs negotiated were, from beginning to end, a barter. The parties always contemplated

11   simultaneous exchanges of software and a superfluous exchange of checks. In an e-mail dated

12   September 14, 2000 from Gardner to Sue Wagner and Diana Hyland, Director of Business

13   Development, Gardner described the contemplated transaction as "a basic barter deal." The

14   purchases were inter-dependent and both companies were motivated by a desire to recognize

15   revenue and, in Peregrine's case, to earn a cash "spread." As alleged herein, the details of this

16   bogus barter transaction were discussed with the members of the Audit Committee at meetings in

17   April 2001, July 2001, and with defendant Moores on February 12, 2002.

18        240.   As to the Critical Path barter, contemporaneous e-mails indicate that Gardner (i)

19   led the negotiation, (ii) understood that Critical Path's desire to recognize revenue was its primary

20   motivating factor and (iii) was not concerned with what Peregrine was purchasing. The nominal

21   value of the transaction increased dramatically near the end of the negotiation under

22   circumstances where there was no corresponding increase in the underlying consideration.

23   Gardner knew or with deliberate recklessness disregarded that recording revenue pursuant to this

24   transaction was improper.

25        241.   Gardner met with defendant Gless on at least a quarterly basis to arrive at the

26   DSO which the Company would represent to the investing public. Once the number was agreed

27   upon, Gardner, through Gless, would have defendant Cappel "sell" the necessary receivables to

28   banks in order to reduce the Company's stated accounts receivable and increase the Company's

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                   93

Exhibit D
0223

1  reported cash. These "sales" were illusory. They were borrowings, as Peregrine has admitted in

2  its restatement.

3       242.    Gardner knew that Peregrine's revenue recognition for channel sales presented a

4  legal problem. He brought this "concern" to the Board's attention in January 2000. The

5  magnitude of the channel sales transactions in the ensuing quarters where no end user customer

6  was contractually committed to buy the software product and the Company had received no cash,

7  were material and by their sheer magnitude were known to Gardner. Gless reminded Gardner of

8  the growing problem in writing in an e-mail dated November 20, 2000:

9            We all realize current period effects associated with prior qtr.
          activities. We are all aware of KPMG/Morgan Stanley. Other

10            notable transactions:

11                      Network Consult/Debis
                    FrontRange

12                      Hyperion
                    KPMG/Avnet

13                      KPMG/CitiGroup

14            excluding MS. total value of 'other' deals is approx. $22 mil. This
          recent activity is on top of 'other' prior activity. **We must close**

15            **this business this quarter or otherwise risk potential
          exposure."** (Emphasis added).

16

17       243.    On February 1, 2001, defendant Gardner received a letter from an attorney for

18  William K. Moore, formerly Vice President Sales, North America. The letter asserted that

19  Moore was terminated for refusing to follow instructions of Gardner and others to commit illegal

20  acts. Specifically, the letter to Gardner stated in pertinent part as follows:

21            Shortly after he began with Peregrine [on September 1, 1999] Mr.
          Moore learned of certain unethical and illegal sales practices,

22            **specifically that Peregrine's revenues were being manipulated
          through unlawful "channel stuffing" practices**. From the time

23            that Mr. Moore first learned of these practices in an October 21,
          1999 e-mail, he objected and refused to engage in these practices.

24            In April 2000 ... Mr. Moore reiterated his objections to channel

25            stuffing as practiced by Peregrine ... and in December 2000 [was]
          directed to broker an illegal transaction. Specifically, Mr. Moore

26            participated in a conference call with .... you, during which concern
          was expressed that the company was unlikely to meet its fiscal

27            2001 third quarter revenue projections. The adverse consequences
          of failing to meet the revenue projections on the company's stock

28            price were self-evident, and .... asked Mr. Moore to travel to

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)

Exhibit D
0224

Colorado to meet with one of Peregrine's strategic partners, Frontrange. **Mr. Moore was told to solicit, in effect, a phantom order of between $5-10 million in consideration for a 2 ½ percent kickback.** Mr. Moore met with the principals of Frontrange, as instructed, but because of his personal objections to this clearly unethical and illegal practice failed to consummate the transaction.

We believe that the channel stuffing practices engaged in by Peregrine, for the purpose of manipulating revenue projections to support its stock price, is in violation of various state and federal laws, including, but not necessarily limited to, Securities Act of 1933, 15 U.S.C.§§77q, et seq., and Corporations Code §25401. (Emphasis added).

244.    An e-mail from Gless to Joe Reichner dated "August 1, 2001 11:43 AM" on the subject of "burn" attached a report entitled "partner-ww-june.xls," similar to a spreadsheet entitled "Worldwide Special Attention Invoices." Gless provided the report in response to Reichner's expression of frustration that "I can't seem to get a clear picture of outstanding positions with each of our partners worldwide" and questioned "[h]ow can I get an accurate schedule?" In Gless' response, he states:

this report is not indicative in all cases of revenue booking. This is the report we use for collection purposes. This report is extremely confidential. Please do not distribute. I have sent versions of this report to . . . Gardner. . . . We have discussed KPMG in great detail and understand actions to be taken.

245.    Reichner also reported on a meeting of Peregrine senior management in early 2001, where he raised the issue of sales transactions that were recorded as revenue, but did not actually result in the Company receiving payment. Among the people at the meeting were defendants Gardner, Gless, and Powanda. Reichner said that he tried to convince the group that Peregrine should "take the hit," get rid of all the bad receivables, and start afresh. Reichner said that the entire group was extremely resistant to the idea, with defendant Powanda being one of the most vocal in opposition. According to Reichner, Gardner "didn't want to hear about it."

246.    William Moore, Vice President Sales, North America, has also stated that he was in a management meeting in the fourth quarter of fiscal year 2000 with defendants Gardner, Gless and others where Moore suggested that Peregrine just "take the hit" and write off the problematic receivables. According to Moore, Gardner looked at him "like he was crazy" and

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)
#105317
95

Exhibit D
0225

1    rejected the idea out of hand.

2        247.    On November 11, 2000, Gardner received an e-mail from Gless listing $22

3    million in "other" deals that posed the "risk" of "potential exposure" if they did not "close this

4    quarter," but that had already been booked and were still being carried as revenue.  Gardner knew

5    during the Class Period that Peregrine had "revenue" on its books that was in fact non-existent

6    and knew that substantial, material amounts of revenue on Peregrine's books should not have

7    been recorded.

8        248.    Gardner was intensively involved in assuring that the revenue guidance he gave to

9    Wall Street was fulfilled each quarter.  He reviewed sales forecasts and provided "on top"

10   information to enhance the Sales department's forecasts.  He monitored "countdown"

11   information, keeping track of how each quarter's revenues were shaping up as the Company

12   neared each end of its accounting period.  He was personally involved in closing large "on top"

13   transactions at the ends of quarters.

14       249.    Gardner routinely approved improper accounting involving Peregrine's merger

15   deals to hide unwanted charges and expenses.  For example, in September 2001, Gardner was

16   told that former outside directors of Harbinger, which had been acquired by Peregrine in 2000

17   were unable to exercise some options on Peregrine shares.  They complained to Gardner, who

18   was advised by General Counsel Deller that "fixing this problem ... would result in a very

19   significant comp charges to Peregrine."  Gardner's response was to advise Deller and defendants

20   Gless and Nelson by e-mail dated September 5, 2001, "I think we need to fix this and **find a way**

21   **to bury the compensation charge in the Remedy deal** if we can.." (Emphasis added).

22       250.    Gardner knew that the Company engaged in quarter end channel transactions

23   calculated to achieve revenue forecasts, and that an immense amount of Peregrine's previously

24   recorded revenues would never be realized.  The Company's quarterly reports on Form 10-Q and

25   its annual reports on Form 10-K do not mention any problem of this nature or magnitude.

26   Gardner repeatedly painted a "big picture" of Peregrine as a thriving enterprise with steadily

27   increasing revenues and growing profitability, after adjustments for acquisition costs.  The "big

28   picture" was false.  Gardner's detailed reports to the Board alleged herein in paragraphs 137-207

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                          96

Exhibit D
0226

1  demonstrate both Gardner's knowledge of the falsity of his public portrayal and that he conveyed

2  his knowledge to Board members.

3      251.    Gardner engaged in the following sales of Peregrine stock during the Class Period

4  while knowing of material adverse nonpublic information concerning the Company.

| Date | Number of Shares | Sales Price | Proceeds Received |
|------|------------------|-------------|-------------------|
| 08/04/99 | 12,500 | $28.63 | $  357,875.00 |
| 08/04/99 | 7,500 | $28.63 | $  214,725.00 |
| 08/05/99 | 7,500 | $28.71 | $  215,325.00 |
| 08/06/99 | 5,000 | $28.50 | $  142,500.00 |
| 08/09/99 | 5,000 | $28.72 | $  143,600.00 |
| 08/09/99 | 42,500 | $28.72 | $ 1,220,600.00 |
| 08/13/99 | 12,500 | $31.93 | $  399,125.00 |
| 08/13/99 | 7,500 | $31.93 | $  239,475.00 |
| 02/22/00 | 35,000 | $43.31 | $ 1,515,850.00 |
| 02/23/00 | 15,000 | $43.90 | $  658,500.00 |
| 02/23/00 | 25,000 | $43.90 | $ 1,097,500.00 |
| 02/23/00 | 117,762 | $43.90 | $ 5,169,751.80 |
| 02/24/00 | 37,238 | $45.11 | $ 1,679,806.18 |
| 02/24/00 | 20,262 | $45.11 | $  914,018.82 |
| 09/04/01 | 2,250 | $27.50 | $    61,875.00 |
| **Total Sold:** | **352,512[1]** | | **$14,030,526.80** |

252.    This insider selling was unusual and suspicious, both in timing and amount.

Many of the sales came on the heels of Peregrine's various press releases falsely announcing

"record" levels of revenues and improving balance sheet metrics, including cash and DSO, which

Gardner knew or was deliberately reckless in not knowing, were materially false and misleading.

---

[1]    This amount reflects the total number of shares unadjusted for stock splits. On January 20, 2000, Peregrine announced a two-for-one split of its common stock. The market price for Peregrine stock reflected the stock split beginning February 21, 2000. The total number of shares sold by Gardner during the Class Period adjusted to account for this stock split is 452,512.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                           97

Exhibit D
0227

1  252,512² shares were sold during what were Company imposed black-out periods. Gardner sold

2  most of the shares he held during the Class Period (250,262) when he knew of the impending,

3  although as yet undisclosed, purchase of Harbinger and that the announcement would depress the

4  price of Peregrine stock. Further, Gardner was barred from selling during this time period but

5  nonetheless sold, in violation of Company policy. Before the Class Period, Gardner held

6  661,500 shares and sold 200,000, or 30% of his holdings.³ During the Class Period, Gardner

7  held 1,551,063 shares and sold 452,512, or 29% of his Class Period holdings. Almost 85% of

8  Gardner's proceeds from insider sales were derived from sales during the Class Period.

9      **B.    Matthew A. Gless**

10      253.    Defendant Gless has pled guilty to securities fraud and is awaiting sentencing.

11      254.    Gless approved of and participated in the dissemination of Peregrine's financial

12  results throughout the Class Period and signed Peregrine's reports on Forms 10-K or 10-Q filed

13  with the SEC for all quarters during the Class Period and for the fiscal years ending March 31,

14  2000 and March 31, 2001 and for the first three quarters of fiscal year 2002. Gless also signed

15  all the registration statements (on Forms S-3, S-4 and S-8) filed with the SEC by Peregrine

16  during the Class Period. Gless did so although he knew that the financial statements contained

17  therein were materially false.

18      255.    Gless was one of the principal orchestrators of the scheme alleged herein to inflate

19  Peregrine's reported revenues throughout the Class Period. During the Class Period, Gless

20  authorized the booking of revenue on contingent transactions with resellers even though he knew

21  that revenue recognition on such transactions was improper under GAAP, violated the

22  Company's publicly stated revenue recognition policies, and that in many instances recorded

23  revenue would never be obtained.

24  _____

25  ²⁄    Throughout this Amended Complaint, the number of shares sold during the Company
    imposed black-out periods are not adjusted to reflect stock splits effective February 12, 1999 and
26  February 21, 2000.

27  ³⁄    Throughout this Amended Complaint, the number of shares sold and held used to compute
    the percentage of holdings have been adjusted to reflect stock splits effective February 12, 1999
28  and February 21, 2000.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
    Master File No. 02-CV-0870 J(RBB)                                                        98

Exhibit D
0228

256.   Gless actively participated in sales meetings with defendant Gardner and top sales executives, including defendant Powanda and his direct reports and subsequently Reichner, Vice President, Alliances and his direct reports.  Gless monitored Peregrine's total dollar exposure on contingent reseller transactions.  Gless did so by creating a computerized report which tracked the "burn," or the dollar amount of "commitment" by reseller and how much of that "commitment" had not yet sold-through to the end user.  Gless also tracked the dollar exposure to financial institutions on account of borrowings Peregrine had made when factoring accounts receivable.  Gless at all times kept Gardner informed of the total exposure from such improperly recorded transactions.

257.   Gless was also responsible for reviewing and approving the terms of all licensing agreements whose terms varied from standard terms provided to customers, as well as all large transactions.  Gless knew that he and Gardner had authorized sales personnel to tell resellers throughout the Class Period that they could return product which was not ultimately purchased by end users and that payment to Peregrine was not due until the product had sold-through to the end user.  Nonetheless, revenue was recorded on such transactions pursuant to Board approval obtained in April 1999.  This practice was known to be a violation of Peregrine's publicly stated revenue recognition policy.  Among other things, Gless authorized the use of side agreements to memorialize such terms.  Gless knew that the side agreements rendered the agreements contingent in nature and that revenue recognition on such transactions was an intentional violation of GAAP.  Nevertheless, Gless knowingly allowed material amounts of such transactions to be booked in each quarter during the Class Period.

258.   Gless also instructed any returned product or bad debts not to be charged against revenue accounts but instead instructed that they be improperly included on Peregrine's financial statements under the line item "Acquisition costs and other."  Because Peregrine made numerous acquisitions during the Class Period (*see* Appendix D hereto), Gless had numerous opportunities to misuse this line item.  Gless did so in order to avoid decreasing the amount of Peregrine's reported revenue.

259.   Gless actively participated in negotiating the terms of and/or the accounting for

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                99

#105317

Exhibit D
0229

1    the bogus swap transaction with Critical Path alleged herein.

2        260.    Gless urged employees to communicate in ways that could not be traced.  In a

3    May 4, 2001 e-mail to B.J. Rassam regarding "$15.5M A/R Write-Off Detail" he wrote "Let's be

4    careful of how we communicate.  Not sure e-mail is appropriate means of communication."  In

5    an e-mail dated September 14, 2001, Rassam noted that,

6            MG [defendant Matt Gless] tells me not to give KP [Kate
             Patterson, Peregrine's head of investor relations] any info of
7            confidential nature due to MG telling a story different than reality
             to the Street about various fin'l matters such as LT Other Assets
8            having LT A/R in there (indicating a cash flow problem to PRGN);
             not sure what his story is and don't really want to know.  Also
9            during discussion threatens to use a knife to cut me up (and asserts
             he has a big knife) if I give away confidential PRGN info.

10

11        261.    At the end of each quarter during the Class Period, Gardner and Gless discussed

12   the level of DSO that Peregrine was willing publicly to report.  After reaching agreement on the

13   DSO figure to be publicly reported, Gless, with Gardner's authorization, instructed Cappel to

14   "sell" sufficient receivables to banks so as to meet the desired DSO number.  As more fully

15   alleged below, Cappel "sold" Peregrine receivables to banks and reduced Peregrine's receivables

16   by the amount of the "sale."  However, there was no sale.  The transactions were borrowings

17   from the banks which were based on specific receivables.  Gardner and Gless, with the

18   participation of Cappel, materially understated Peregrine's DSO, its accounts receivables and its

19   liabilities to the banks, which reached $180 million during the Class Period, and also thereby

20   materially overstated Peregrine's true cash position during the Class Period.

21        262.    Gless made key decisions to misrepresent Peregrine's financial condition by (i)

22   recognizing revenue on transactions that he knew were contingent or lacked economic substance;

23   (ii) improperly accounting for write offs as acquisition costs and expenses, acquisition accruals,

24   and liability accruals; and (iii) financing Peregrine's accounts receivable without adequate

25   disclosure -- including selling fake invoices to banks and engaging in improper accounting for

26   collections -- all in order to manipulate the Company's DSO and deceive market analysts and

27   investors.

28        263.    Gless was actively involved in managing the Company's response to the flood of

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                     100

#105317

Exhibit D
0230

1    side letters that came to light in October, November and December 2001. On December 6, 2001,

2    he received an e-mail from Geoffrey Boonen, Area Vice President of Commercial Operations for

3    EMEA, identifying more than 21 EMEA transactions involving side letters and other improper

4    revenue recognition techniques.

5    264.    Gless had also approved revenue recognition on transactions without signed

6    contracts. For instance, in the fourth quarter of fiscal year 2002, Peregrine received a letter of

7    intent on a potential deal with ABN AMRO. The deal did not close by the end of the quarter, but

8    Gless nonetheless directed Michael Fake, a staff accountant, to book revenue of $900,000 based

9    solely on the letter of intent.

10    265.    Gless routinely approved quarter-end transactions with "out clauses" and other

11    contingencies. For instance, Gless approved an out clause giving British Telecom ("BT") the

12    right to cancel a transaction because "they really needed the BT contract for that quarter." Gless

13    directed Dorothy Trill, European Financial Controller, to book the $12,545,910 revenue despite

14    the out clause. When Trill questioned this, Gless came up with a baseless rationale, *i.e.*, that

15    because Harbinger had recorded revenue up front, and every Harbinger deal had an out clause,

16    and Peregrine had acquired Harbinger, Peregrine was also allowed to recognize revenue where

17    there were out clauses.

18    266.    Gless directed that there be revenue recognition on quarter-end sales to channel

19    partners with a history of non-payment, such as KPMG. For instance, although Patrick Towle,

20    Manager of Revenue Accounting, was uncomfortable booking a deal with KPMG involving

21    contemplated resale to the State of Florida given KPMG's history of non-payment, Gless directed

22    him to record it.

23    267.    Gless also approved revenue recognition on sales for which revenue should never

24    have been recognized in the first place based on a rationale that the Company had sold the related

25    receivable to a bank. For instance, in March 2001, Gless instructed Cappel to sell the BT

26    receivable with an out clause to Wells Fargo Bank, and Peregrine had to repurchase the contract

27    when BT exercised the out clause. On several occasions, Peregrine booked revenue on contracts

28    sold to banks on which revenue should not have been recognized, and repurchased them later,

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    101

Exhibit D
0231

1  including contracts with KPMG Consulting, Edward Jones, BT, and Systematics.

2      268.    Gless refused to write off or adequately reserve for uncollectible accounts

3  receivable that languished on the Company's books.  He routinely received and reviewed the

4  Special Attention Invoices list prepared by the Treasury department reflecting channel and

5  uncollectible receivables worldwide.  He also received and reviewed the quarterly Back Out list

6  of channel and uncollectible receivables.  Although these lists clearly highlighted the Company's

7  growing problem of stale and uncollectible receivables, Gless did not establish an adequate bad

8  debt reserve, did not write down revenue and receivables, and did not follow GAAP and restate

9  the Company's financial statements for the periods when the revenue was improperly recognized.

10     269.    Gless used the occasion of Peregrine's acquisitions to pad accruals and hide large

11  write offs by misclassifying them as "acquisition costs and other expenses," "acquisition

12  accruals" and "accrued liabilities."  In calendar year 2001, Gless concealed $91.6 million in write

13  offs through misclassifications.  The Remedy acquisition in the second quarter of fiscal year

14  2002 provided a convenient opportunity.  The Company padded the acquisition expense accrual

15  and used it as a "cookie jar" to immediately write off $16.9 million in unrelated receivables.

16     270.    Gless specifically approved "double counting" of revenue from transactions with

17  IBM.  When the Company was running short on new revenue in the last two quarters of fiscal

18  year 2002, Gless took the position that IBM end user contracts, which otherwise would be

19  counted as "burn" against IBM's channel receivable, could be recorded as Peregrine new revenue.

20     271.    Gless established DSO targets that he wanted market analysts to infer from the

21  Company's financial statements.  He knew that the Company's "natural" DSO, absent bank

22  financing, was much higher than his targets.  Cappel prepared quarterly DSO forecasts and

23  shared them with Gless.  Gless directed Company personnel to "close the gap" between the

24  Company's "natural" and target DSO through undisclosed bank financing of receivables.  He

25  resisted disclosure of the true nature of the Company's bank financing.  He deliberately sought to

26  mislead market analysts as to the quality of the Company's revenue and receivables and hide the

27  Company's long term channel contracts and bad debts from the public.

28     272.    At June 30, 1999 and June 30, 2001, the Company ran short of receivables

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                 102

#105317

Exhibit D
0232

1   available for sale to the banks and could not close the gap between the "natural" and target DSO.

2   Accordingly, Gless directed creation of false "off line" invoices and the related sale of

3   receivables that did not exist. In June 1999, Gless ordered Denise Mastro, Assistant Controller,

4   to create "off line" invoices totaling at least $12 million.

5       273.    In June 2001, Cappel advised Gless that Peregrine was going to fall about $20

6   million short of its DSO target, and there were no more receivables available to sell. Gless

7   directed her to create an invoice for KPMG Consulting, which was based loosely on several aged

8   KPMG Consulting invoices on which he said collection would be forthcoming. Cappel created a

9   fake invoice for $19,580,596 and sold it to Wells Fargo Bank, thereby depressing the Company's

10  quarter-end receivables balance and DSO, and improving its reported cash position. Peregrine

11  repurchased this "receivable" in November 2001.

12      274.    The Company retained responsibility for collecting on financed receivables. At

13  Gless' direction, Cappel misapplied cash collections before remitting the money to the banks.

14  She reduced receivables by the amount collected (taking a "double dip" since the Company had

15  already taken the receivables off its books upon sale to the bank), increased Peregrine's own cash

16  account (instead of placing the money in a bank trust account), and failed to show any payable to

17  the bank. Gless directed this practice every quarter, which had the effect of artificially

18  depressing the Company's reported receivable balance and DSO. Then, in the ensuing quarter, he

19  directed Cappel to reverse these accounting entries. At quarter-end December 31, 2001, Gless

20  directed a "double dip" on a $13.8 million IBM collection. The only purpose for this improper

21  accounting was to present misleading financial statements at quarter end.

22      275.    Gless engaged in the following sales of Peregrine stock during the Class Period

23  while knowing of material adverse nonpublic information concerning the Company.

24

25

| Date | Number of Shares | Sales Price | Proceeds Received |
|------|------------------|-------------|-------------------|
| 07/26/99 | 3,125 | $30.01 | $    93,781.25 |
| 07/26/99 | 11,250 | $30.01 | $  337,612.50 |
| 08/17/99 | 1,250 | $33.00 | $    41,250.00 |
| 08/26/99 | 5,000 | $34.50 | $  172,500.00 |

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                103

Exhibit D
0233

| | Date | Shares | Price | Amount |
|---|---|---|---|---|
| 1 | 08/26/99 | 5,000 | $35.00 | $ 175,000.00 |
| 2 | 02/15/00 | 9,000 | $45.44 | $ 408,960.00 |
| 3 | 02/15/00 | 4,000 | $45.63 | $ 182,520.00 |
| 4 | 02/15/00 | 5,000 | $44.50 | $ 222,500.00 |
| 5 | 02/15/00 | 5,000 | $45.00 | $ 225,000.00 |
| 6 | 02/15/00 | 2,500 | $45.50 | $ 113,750.00 |
| | 02/15/00 | 500 | $45.50 | $ 22,750.00 |
| 7 | 02/15/00 | 6,250 | $46.00 | $ 287,500.00 |
| 8 | 02/15/00 | 7,750 | $46.00 | $ 356,500.00 |
| 9 | 02/15/00 | 10,000 | $45.19 | $ 451,900.00 |
| 10 | 02/23/00 | 5,000 | $46.00 | $ 230,000.00 |
| 11 | 02/25/00 | 8,000 | $50.00 | $ 400,000.00 |
| 12 | 02/25/00 | 500 | $54.00 | $ 27,000.00 |
| | 02/25/00 | 2,000 | $54.50 | $ 109,000.00 |
| 13 | 02/25/00 | 1,000 | $54.38 | $ 54,380.00 |
| 14 | | | | |
| 15 | 02/25/00 | 1,500 | $54.19 | $ 81,285.00 |
| 16 | **Total Sold:** | **93,625** | | **$3,993,188.75** |

18    276.    This insider selling was unusual and suspicious, both in timing and amount.

Many of the sales came on the heels of Peregrine's various press releases falsely announcing

"record" levels of revenues and improving balance sheet metrics, including cash and DSO, which

Gless knew or was deliberately reckless in not knowing, were materially false and misleading.

68,000 shares were sold during Company imposed black-out periods.  Before the Class Period,

Gless held 97,000 shares and sold 12,000, or 12% of his holdings.  During the Class Period,

Gless held 285,000 and sold 169,250, or 59% of his Class Period holdings.  97% of Gless's

proceeds from insider sales were derived from sales during the Class Period.

**C.    Steven S. Spitzer**

277.    Defendant Spitzer has pled guilty to securities fraud and is awaiting sentencing.

278.    Spitzer joined Peregrine several months after its IPO at a time when virtually all

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)
104

Exhibit D
0234

1  of Peregrine's software license sales were to end users. By the end of the third quarter of fiscal

2  year 1998 (December 31, 1997), however, approximately 15% of Peregrine's total license

3  revenue was being generated through resellers like GE Capital and ATT Capital under Spitzer's

4  leadership. Gardner reported to the Board in the report dated October 16, 1998 that the channels

5  were generating "lots of smoke, little fire" and that he was going to move Spitzer's department

6  "under Worldwide Sales and Marketing" -- defendant Powanda's responsibility -- and "focus in

7  on 2 or 3 relationships and make it happen."

8      279.   Spitzer's cultivation of a relationship with KPMG ultimately bore fruit in March

9  1999 when Peregrine and KPMG signed a letter agreement by which Peregrine loaned $500,000

10  to KPMG and KPMG committed to purchase $2.5 million of Peregrine software and pay for it by

11  March 31, 2001. Spitzer signed the agreement and, according to Spitzer, everyone in senior

12  management, including Gardner, was aware of and approved the agreement knowing that its

13  payment obligations were fictitious. From December 1999 through December 2000, Spitzer was

14  involved in a number of transactions with KPMG in which he arranged for KPMG to sign

15  Schedule A's committing KPMG to purchase more than $35 million of software licenses in

16  connection with particular entities who were potential end users but with whom Peregrine had

17  not finalized a transaction.

18      280.   Virtually all of these transactions were done in the last few days of a quarter and

19  were motivated by an intention to recognize revenue on a sale of software licenses that otherwise

20  could not have been recognized in that quarter. Spitzer used his relationship with defendant

21  Larry Rodda and later Jim Murphy at KPMG to facilitate these transactions. More than $32

22  million of these transactions were eventually written off by Peregrine because the prospective

23  end users did not buy Peregrine software, and KPMG refused to pay. Spitzer understood when

24  these transactions were entered into that KPMG would not pay. Spitzer has admitted that the

25  structure of the KPMG/Avnet transaction raised red flags. The KPMG/Citigroup transaction was

26  done at the same time and under virtually identical terms.

27      281.   According to Reichner, KPMG Consulting's Murphy (who succeeded defendant

28  Rodda as the Peregrine relationship manager) told Reichner that KPMG Consulting did not view

#105317   FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    105

Exhibit D
0235

1   the outstanding accounts receivable as an actual obligation because of conversations between

2   Rodda and Spitzer.  Murphy told Reichner that these transactions were done as an

3   "accommodation" and there was an understanding that KPMG Consulting would not have to pay

4   on them.

5        282.   Spitzer knew that an understanding had been reached that Peregrine would not

6   enforce the contractual payment terms against KPMG if contemplated end user deals did not

7   close.  He knew that the Company's financial reports were materially misstated as a result of the

8   KPMG and other transactions in which he participated.

9        283.   Spitzer was involved in other transactions where revenue was improperly

10  recognized.  In the fourth quarter of fiscal year 2001, for example, Spitzer assisted in the

11  negotiation of a $2.5 million license transaction with FMI, a software reseller in which Peregrine

12  had made an investment.  In an April 3, 2001 e-mail to FMI's Mark Douglas, Spitzer writes:

13  "Peregrine will also provide FMI with flexibility on payment terms, should that be necessary."

14       284.   Between August 12, 1999 and May 24, 2001, Spitzer sold 185,000 shares of

15  Peregrine common stock for proceeds of approximately $5.23 million, at prices ranging between

16  $15.74 and $52.42 per share.

17       285.   This insider selling was unusual and suspicious, both in timing and amount.  The

18  sales came on the heels of Peregrine's various press releases falsely announcing "record" levels

19  of revenues and improving balance sheet metrics, including cash and DSO, which Spitzer knew

20  or was deliberately reckless in not knowing, were materially false and misleading.  The sale of

21  20,000 shares on February 25, 2000 occurred during a Company imposed black-out period.

22  Before the Class Period Spitzer held 165,000 shares and sold 110,000 or 67% of his holdings.

23  During the Class Period, Spitzer held 185,000 shares and sold 185,000, or 100% of his Class

24  Period holdings.

25       **D.    <u>Ilse Cappel</u>**

26       286.   Defendant Cappel has pled guilty to fraud during the Class Period and is awaiting

27  sentencing.

28       287.   Cappel has admitted that in June 2001, she prepared and sold a false $19 million

#105317     FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                106

Exhibit D
0236

1  invoice to Wells Fargo Bank purportedly reflecting an obligation of KPMG Consulting. The

2  invoice was only loosely based on several uncollected, aging KPMG Consulting receivables,

3  none of which were due in the amount or on the date reflected on the false invoice. Peregrine

4  purchased this $19 million "receivable" from Wells Fargo in November 2001. Cappel knew that

5  Peregrine used this transaction to fraudulently decrease its DSO for the first quarter of fiscal year

6  2001.

7      288.   Cappel was responsible for forecasting cash and collections worldwide and

8  maintained an informal, worldwide accounts receivable aging report which did not reconcile to

9  the general ledger. Cappel knew that these receivables were uncollectible and that the Company

10  did not offset them with an adequate bad debt reserve.

11      289.   Cappel knew of and facilitated Peregrine's efforts to create an artificially low

12  DSO by selling receivables to banks. She prepared internal analyses of "natural" DSO and the

13  amount of cash that Peregrine would have to raise -- or accounts receivable that it would have to

14  sell -- in order to arrive at the internally generated target for DSO. She knew that Gless set the

15  target DSO as a number that he wanted analysts to infer from the financial statements. She also

16  knew that Peregrine did not disclose the nature or extent of its bank financing program.

17  Therefore, she knew that analysts and the market would be misled about the company's true or

18  "natural" DSO.

19      290.   Cappel also engaged in improper accounting for cash received from customers at

20  quarter end on accounts that had been sold to banks. She referred to this improper accounting as

21  "double dipping." When payments were received near the end of a quarter, but not yet due to the

22  bank, Cappel did not book an entry reflecting any cash was payable to the bank. Instead, she

23  recorded the cash payment and reduced receivables as though the accounts receivable still

24  belonged to Peregrine. This artificially decreased Peregrine's DSO and increased cash at quarter

25  end. Cappel reversed these entries when she forwarded the collections to the bank in the

26  following quarter.

27      291.   Cappel deliberately sold receivables for maintenance revenue to banks when she

28  knew that these were not eligible for sale under Peregrine's agreements with the banks. The

1    purpose and effect was to artificially reduce Peregrine's DSO.

2       292.    Cappel participated in the falsification of Peregrine's DSO and its understatement

3    of accounts receivable and of its liabilities to the banks which reached up to $180 million during

4    the Class Period.  Through these devices, Cappel also participated in the overstatement of

5    Peregrine's true cash accounts receivable and liability position reflected on Peregrine's financial

6    statements.

7       293.    Between March 17, 1999 and January 2, 2002, Cappel sold 16,249 shares of

8    Peregrine common stock, for total proceeds of $334,287, at split-adjusted prices ranging between

9    $14.45 and $30.25 per share.  She sold 10,116 shares at $14.45 per share on January 2, 2002, just

10   hours before Peregrine preliminarily announced disappointing results for the quarter ended

11   December 31, 2001, for proceeds of $146,176.  The announcement of disappointing results was

12   made after the market closed.  The following day Peregrine stock closed at $9.26.  This insider

13   selling was unusual and suspicious both in timing and amount.

14   **E.**    **Richard T. Nelson**

15      294.    Defendant Nelson is a licensed CPA and was, at relevant times, an active member

16   of the California Bar.  As an auditor employed by KPMG, he was involved in the audit of BMC

17   Software in 1997-88.  In the course of his various responsibilities over the years at Peregrine,

18   Nelson became aware of numerous matters that revealed the Company was engaged in fraudulent

19   financial reporting.  As Corporate Secretary, Nelson attended every Board of Directors meeting

20   and Audit Committee meeting during the Class Period.

21      295.    As alleged in paragraph 49-52 above, Nelson directed a document destruction

22   program while at Peregrine and instructed all Board members to destroy any material handed out

23   at or before a Board meeting within thirty (30) days.  This was done for the purpose of masking

24   the defendants' wrongful conduct and making their activities as difficult as possible to

25   reconstruct.

26      296.    As Corporate Secretary, Nelson was responsible for maintenance of the corporate

27   minute book and for the preparation of minutes of the meetings of the Board of Directors and its

28   committees.  Nelson prepared minutes of Board meetings that did not accurately reflect the

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                          108

#105317

Exhibit D
0238

1  substance of what occurred at those meetings and purged from the final version of the minutes

2  any potentially damaging material.  For example, he omitted any mention of the Critical Path

3  barter transactions from the final minutes of the Board meeting conducted on July 18, 2001, even

4  though the subject was discussed at that meeting.  He also failed to keep minutes of Audit

5  Committee meetings.

6        297.  As Peregrine grew, Nelson's responsibilities burgeoned.  Nelson had primary

7  responsibility for corporate reporting and deal making, including the due diligence and

8  documentation for Peregrine's frequent acquisitions.  This activity became so intense that in

9  March 2000, Nelson was promoted to Vice President, Corporate Development, reporting directly

10  to defendant Gardner, at which time he relinquished his position as General Counsel.

11        298.  Nelson was also responsible for drafting and filing SEC Forms 10-K and 10-Q,

12  and up to October 2000 was the principal draftsman of press releases that announced quarterly

13  results.  Based on his knowledge of the material adverse facts herein alleged, Nelson knew, or

14  with deliberate recklessness disregarded, that each such document was materially false and

15  misleading.

16        299.  Nelson also served as the Compliance Officer for Peregrine's insider trading

17  policy until March 2000.  Nelson failed to fulfill his duties as the Compliance Officer because he

18  permitted substantial insider selling to occur during black-out periods.

19        300.  Nelson worked with the Arthur Andersen audit partner Daniel Stulac to formulate

20  Peregrine's stock option pricing policy.  By this process, the Board approved the number of stock

21  options to be granted on a quarterly basis.  Nelson knew that pursuant to the policy, defendant

22  Gardner dated the option grants retroactively based on the lowest stock price of the quarter, and

23  that this policy was unheard of for a public company and had the effect of understating the

24  Company's option expense.  Notwithstanding his knowledge during the Class Period of the

25  existence of this accounting manipulation, which had the effect of artificially boosting

26  Peregrine's reported earnings, Nelson took no steps to correct or otherwise challenge its

27  implementation.

28        301.  On April 30, 2001, Nelson was copied on a memo from defendant Gless regarding

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)         109

Exhibit D
0239

1   a transaction with CI Software Solutions which identified it as a barter, no cash to exchange

2   hands, and referred to it as a "Powanda deal." Nelson knew that revenue from this transaction

3   was improperly recorded by Peregrine.

4        302.   In the spring of 2001, John Benjamin, Peregrine's Treasurer, prepared and

5   delivered to Nelson a four-page report in which he explained to Nelson in detail that Peregrine

6   was engaging in the sale of short term receivables to mask the impact that uncollectible

7   receivables were having on Peregrine's DSO number. Benjamin took Nelson through the

8   reseller/channel issues reflected in Special Attention Invoices showing massive unpaid

9   receivables. Benjamin also explained to Nelson at this meeting the facts regarding bank

10  financing of receivables. Based on this meeting, Benjamin expected Nelson to be "outraged" at

11  Peregrine's efforts at bank financing to manipulate DSO. Benjamin never heard from Nelson

12  again, and Nelson took no steps to force Peregrine to cease its improper practices with regard to

13  either bank financings or receivables.

14       303.   On September 11, 2001, Nelson was copied on an e-mail from defendant Gardner

15  discussing the existence of a side letter on a transaction with IDOM, a Spanish reseller, rendering

16  revenue from this transaction illusory. Nelson knew such revenue was improperly recorded.

17       304.   Nelson received direct knowledge of aging and uncollectible accounts receivable

18  from his discussions with Geoffrey Boonen, Vice President, EMEA Commercial Operations. He

19  learned from these discussions that Boonen was having problems collecting receivables, yet the

20  Company's financial reports failed to account for uncollectible receivables and failed to

21  adequately inform investors of the level of such receivables. Nelson was a recipient of two e-

22  mails from Boonen dated October 30, 2001 and November 6, 2001 outlining outstanding EMEA

23  channel and other international accounts receivable greater than $500,000 which showed total

24  such receivables in the tens of millions of dollars. Nelson felt safe in not raising the issue of

25  uncollectible accounts receivable because he knew that Peregrine was making so many

26  acquisitions that its operating financial results, and in particular, material amounts of aged

27  accounts receivable, were being buried in the "acquisition and other" line item expense

28  associated with acquired companies. In fact, numerous uncollectible accounts receivable were

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                     110

Exhibit D
0240

1    written off in the "Acquisition and Other Expense" line items of Peregrine's financial statements.

2    Nelson further knew of two transactions (IMS and Barnhill) where Peregrine made an investment

3    in a reseller because the entity had an outstanding receivable with Peregrine that it could not or

4    would not pay.  To hide the existence of the receivable, Peregrine simply gave these entities the

5    money they owed to Peregrine.

6         305.    Nelson had specific knowledge in November and December 2001 from reports he

7    received regarding EMEA sales activity, that EMEA salesmen did not believe they were going to

8    make their sales quotas in light of the amount of unburned inventory in the channel, and knew

9    from these reports that the EMEA resellers were unable to effectuate significant sales of

10   inventory.

11        306.    Nelson knew of a questionable relationship with MGX, a large South African

12   company which acted as a reseller of Peregrine software.  In June 2001, Peregrine and MGX

13   executed a master distribution agreement whereby MGX agreed to sell $13,800,000 of Peregrine

14   product, and had until June 2003 to pay Peregrine.  In December 2001, Peregrine made an

15   investment in MGX, and gave MGX 1.5 million shares of stock (worth approximately $17

16   million) and received a promissory note, convertible into MGX stock, in return.  A portion of the

17   proceeds of MGX's sale of the Peregrine stock it received ($5 million) was earmarked to pay

18   amounts due Peregrine in January and June 2002 under the June 2001 agreement.  Defendant

19   Gardner informed Nelson of MGX's position that it had a side letter that allowed it not to pay,

20   and that it therefore needed an investment.  By an e-mail dated November 24, 2001, Gardner

21   informed Board members, including Nelson that, "[w]e would also insist upon accelerated

22   payment of the long-term receivables due us as a partial use of proceeds, that this would actually

23   benefit our cash position as well, we should do it."

24        307.    Nelson was involved in Peregrine's transactions with Critical Path in the second

25   quarter of fiscal year 2001 and learned of the details of these transactions, including that their

26   dollar volumes doubled shortly before the deals closed.  He became aware of the SEC's

27   investigation of the Critical Path transactions in the Summer of 2001 and the acknowledgment by

28   Gardner and others in the contemporaneous documentation that the deals were considered to be a

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    111

Exhibit D
0241

1   barter transaction.

2       308.   In October 2001, Nelson learned of an e-mail (later confirmed to be from Ron

3   Hall) of Peregrine's Asia Pacific division sent to Gardner asserting that Peregrine's Asia Pacific

4   division had entered into sham transactions with resellers that had improperly been recorded as

5   revenue.  Nelson participated in the plan to terminate the e-mail sender ostensibly as part of a

6   lay-off, so that he would not contend he was terminated for blowing the whistle on Peregrine's

7   revenue recognition fraud.

8       309.   In October 2001, Nelson met with Andy Cahill, Executive Vice President of

9   Peregrine, to discuss side letters that had been uncovered which excused payment by resellers.

10  On October 30, 2001, Nelson received an e-mail from Gless attaching a list of International Past

11  Due invoices as of 9/30/01 greater than $500,000 which totaled $29.8 million and which showed

12  this amount to be $49 million at 12/31/01.  Nelson took no steps to ensure that these amounts

13  were properly recorded.  Nelson learned in November or December 2001 from Boonen by e-mail

14  that a number of side letters had been discovered in Europe that impaired the collectibility of a

15  substantial amount of accounts receivable on Peregrine's books.  In November - December 2001,

16  Nelson spent ten days reviewing Peregrine's operations in Europe.  Between November 6-10,

17  2001, Nelson met with Boonen at Peregrine's Paris office to discuss the side letters raised in the

18  Boonen e-mail.  At this meeting, Boonen told Nelson that there were serious problems in the

19  business practices of the EMEA division, including huge uncollectible receivables and side

20  letters rendering the payment obligation on licenses unenforceable.

21      310.   Nelson knew that Peregrine signed an agreement with Prokom in June 2001.  In

22  December 2001, Nelson learned that a side letter had been signed with this reseller by Richard

23  Day, Vice President for Emerging Markets.  Nelson learned that the side letter relieved Prokom

24  of payment obligations until Prokom had achieved a certain sell-through rate.  In December

25  2001, Nelson also learned of a side letter with MGX which made contingent its obligation to pay

26  pursuant to a $12 million transaction.  In April 2002, Nelson learned of a December 2000

27  agreement with BT Ignite which had a 30 day cancellation clause.  When BT Ignite exercised its

28  cancellation clause, a second agreement was entered into purporting to cancel the cancellation,

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                              112

#105317

Exhibit D
0242

1 modifying the original agreement by rescheduling payment terms and providing for Peregrine's

2 purchase of consulting services from this entity. These transactions rendered the BT Ignite

3 obligations illusory.

4      311.    On November 14, 2001, Geoffrey Boonen, Assistant Vice President of

5 Commercial Operations for EMEA, forwarded to Nelson by e-mail a spreadsheet identifying

6 seven agreements which reflected material amounts of revenue that Boonen believed could not

7 be properly recorded.

8      312.    Nelson learned in February 2002 of the SEC's charges against Critical Path

9 involving the Peregrine transactions, and later that the SEC was intending to charge Gardner with

10 SEC violations stemming from the Critical Path transactions, yet made no public disclosure of

11 these material facts.

12      313.    Nelson made the following sales of Peregrine common stock during the Class

13 Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Sales Price | Proceeds Received |
|---|---|---|---|
| 08/16/99 | 12,500 | $33.25 | $ 415,625.00 |
| 08/16/99 | 37,500 | $33.00 | $1,237,500.00 |
| 08/23/99 | 25,000 | $33.50 | $ 837,500.00 |
| 08/26/99 | 1,000 | $35.25 | $ 35,250.00 |
| 08/31/99 | 11,500 | $32.63 | $ 375,245.00 |
| 02/15/01 | 200,000 | $29.63 | $5,926,000.00 |
| **Total Sold:** | **287,500** | | **$8,827,120.00** |

23      314.    This insider selling was unusual and suspicious, both in timing and amount. The

24 sales came on the heels of Peregrine's various press releases falsely announcing "record" levels

25 of revenues and improving balance sheet metrics, including cash and DSO, which Nelson knew

26 or was deliberately reckless in not knowing, were materially false and misleading.

27      315.    *Before the Class Period Nelson held 386,500 shares and sold 133,500, or 35% of*

28 *his holdings. During the Class Period, Nelson held 457,451 shares and sold 375,000, or 82% of*

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)          113

#105317

Exhibit D
0243

1  his Class Period holdings.  Approximately 90% of Nelson's proceeds from insider sales were

2  derived from sales during the Class Period.

3    **F.    Douglas S. Powanda**

4    316.    Powanda participated in the creation and dissemination of Peregrine's false

5  financial results throughout the Class Period until he resigned.  Powanda did so by authorizing

6  sales personnel to enter into sales transactions which included written and oral side agreements,

7  whereby resellers were not obligated to pay Peregrine until they sold the product through to the

8  end user.  Powanda knew through discussions with defendants Gardner, Gless, Nelson and

9  Spitzer that Peregrine improperly recognized revenue on such transactions.

10    317.    Powanda knew that Peregrine set unrealistically aggressive growth targets and

11  pressured its sales personnel each quarter to make the numbers.  Powanda attended periodic sales

12  meetings in Peregrine's headquarters which were also attended by Gardner, CFO Farley (until his

13  death) and/or CFO Gless and Peregrine's top sales executives including defendant Powanda's

14  direct reports.  The primary purpose of these meetings was to update and discuss the financial

15  outlook for the current quarter and to review large license agreements anticipated to close during

16  the quarter.  Through these meetings and computerized reports received from defendant Gless

17  which tracked the Company's "burn," *i.e.*, commitments from resellers not yet sold-through to

18  the end user, Powanda closely monitored the progress of these anticipated deals, as well as

19  Peregrine's progress towards meeting quarterly revenue targets.

20    318.    By January 1998, Powanda was Peregrine's Executive Vice President of

21  Worldwide Sales reporting directly to Gardner.  He served in that position until approximately

22  April 2000.  At that point, Gardner and Powanda negotiated a compensation plan providing

23  Powanda with substantial cash, approximately $750,000 in commissions, which was paid

24  pursuant to this plan on March 15, 2001 and April 30, 2001.  During fiscal year 2001, Powanda

25  led the "Get It!" sales team, helped negotiate the IBM/Tivoli Service Desk transactions and

26  worked with Gardner and other senior executives to close major deals with Peregrine's Alliance

27  partners, and other resellers.  In April 2001, Powanda took a three (3) month sabbatical.  Upon

28  his return, he was employed in the Office of the Chairman and acted as a consultant until he left

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    114

Exhibit D
0244

1   the Company in the Spring of 2002.

2       319.    Powanda was involved in multiple transactions whereby revenue was improperly

3   recognized including agreements with Corporate Software & Technology, CI Solutions, British

4   Telecom, Action, Systematics, and Barnhill. *See* Appendix E hereto. These transactions were

5   negotiated near the end of a quarter, were large in dollar volume and were designed to permit

6   Peregrine to equal or exceed its revenue and pro forma earnings forecasts to the investment

7   community. Powanda was a confidant of defendant Gardner and often was called upon by

8   Gardner to generate sales revenue for the Company, particularly when it appeared that Peregrine

9   might miss its earnings estimates. Powanda and Gardner, for example, often traveled to Europe

10  at the end of quarters to meet customers and "close" deals. One of Powanda's primary sales

11  techniques was to entertain customers lavishly at strip clubs and then use his entertaining to later

12  call in chits for Peregrine business. Powanda kept a drawer in his office, known as the "magic

13  drawer," which was filled with contracts that he could pull out at quarter's end to purportedly

14  book revenue.

15      320.    Powanda, along with defendant Spitzer, was an architect of the KPMG

16  relationship. Although the main interface with KPMG was Spitzer, Powanda was directly

17  involved in the KPMG/Morgan Stanley transaction. Powanda negotiated with Morgan Stanley

18  for an "enterprise license" agreement, a very large sale. Powanda claimed to have a letter

19  agreement. He asked Spitzer to have KPMG finalize the deal, and KPMG would receive a large

20  services contract. Powanda knew that KPMG had done similar "favors" for Peregrine in the past,

21  whereby it would sign agreements knowing it had no real payment obligation.

22      321.    At the meeting called by Reichner of Peregrine senior management in early 2001,

23  where he tried to convince the group that Peregrine should "take the hit" and get rid of all the bad

24  receivables it was aware of, Powanda was among the most vocal opponents of this idea.

25      322.    Powanda knew, or was deliberately reckless in not knowing, that revenues he

26  participating in creating for Peregrine were improperly recorded. On January 5, 2001, defendants

27  Gardner, Gless and Powanda received an e-mail stating, "At the last second of the last hour of

28  the 37th of December" and proceeding to congratulate the sales team for obtaining a deal. The e-

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                115

1  mail is a clear reference to the closing of a large transaction after the end of the quarter on

2  December 31, 2001, but nonetheless to be recorded as if obtained in that quarter. Powanda

3  responded, "Congratulations to all on a spectacular team effort. This is truly the "A" team." His

4  e-mail directed that it should be "deleted on April 14, 2001."

5      323.    As a reward for his success in obtaining deals whereby revenue could ostensibly

6  be recorded, and in Gardner's absence, on January 22, 2001 Powanda was appointed to an

7  "operating committee" to manage the Company consisting of himself and defendants Gless and

8  Nelson. Gardner stated in an e-mail, "This will be Doug's [Powanda's] first assignment in his

9  new Office of the Chairman role."

10     324.    On October 2, 2001 Powanda received an e-mail from Kevin Tumulty, Area Vice

11  President, EMEA Alliances and Channels, stating "We're still trying to make the quarter."

12  However, the quarter had ended on September 30, 2001. The e-mail went on to enlist Powanda's

13  help in closing deals with ICL and Computacenter. The e-mail also states "Hope to get $1.5

14  million from Merkandilidata in next hour or so." Powanda knew such revenue, obtained outside

15  of the quarter, was improperly recorded in the already closed quarter.

16     325.    According to a former employee, Peregrine management fraudulently faxed

17  purchase orders and other accounting/audit-related documents from one Peregrine office to

18  another during end of quarter audits. Management would change dates and add new date stamps

19  so that they could include sales for the quarter after the quarter had closed. Powanda sanctioned

20  this practice and laughed about it.

21     326.    An Area Vice President, E-business Programs reporting to Doug Powanda, has

22  stated: "Powanda told me in 1999 that the fax machine in his office on the second floor (at the

23  end of the mahogany row next to the accounting department in the old building), was 3 days

24  back-dated so that customer contracts that were closed after the quarter could be faxed through to

25  his fax machine and back-dated. I sat in the office between Farley and Powanda. Those that had

26  direct knowledge of this machine was a tightly held secret. Powanda's fax machine was the

27  collection point for improperly booked Euro deals."

28     327.    In light of Powanda's education and extensive experience in the software

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    116

Exhibit D
0246