# Exhibit D
# Continued

1   business, he knew the criteria to determine whether revenue could be recognized on a particular

2   transaction, and that the deals described herein did not satisfy the relevant criteria.  Powanda

3   knew, or was deliberately reckless in disregarding, that Peregrine's reported revenues in fiscal

4   year 2000 and fiscal year 2001 were materially overstated.

5       328.  Powanda made the following sales of Peregrine common stock during the Class

6   Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Sales Price | Proceeds Received |
|------|------------------|-------------|-------------------|
| 08/16/99 | 10,000 | $33.00 | $    330,000.00 |
| 08/16/99 | 6,250 | $33.00 | $    206,250.00 |
| 02/17/00 | 30,000 | $45.98 | $ 1,379,400.00 |
| 02/17/00 | 20,000 | $46.19 | $    923,800.00 |
| 02/17/00 | 10,000 | $45.94 | $    459,400.00 |
| 02/17/00 | 20,000 | $46.13 | $    922,600.00 |
| 02/17/00 | 20,000 | $46.22 | $    924,400.00 |
| 02/17/00 | 10,000 | $46.44 | $    464,400.00 |
| 02/23/00 | 2,500 | $44.94 | $    112,350.00 |
| 02/23/00 | 5,000 | $45.19 | $    225,950.00 |
| 02/24/00 | 22,500 | $45.00 | $ 1,012,500.00 |
| 02/24/00 | 10,000 | $45.13 | $    451,300.00 |
| 02/24/00 | 10,000 | $46.00 | $    460,000.00 |
| 02/24/00 | 2,500 | $45.56 | $    113,900.00 |
| 02/24/00 | 10,000 | $46.38 | $    463,800.00 |
| 02/24/00 | 7,500 | $45.50 | $    341,250.00 |
| 02/25/00 | 5,000 | $47.75 | $    238,750.00 |
| 02/25/00 | 10,000 | $48.13 | $    481,300.00 |
| 02/25/00 | 5,000 | $47.00 | $    235,000.00 |
| 02/08/01 | 400,000 | $28.08 | $11,232,000.00 |
| 05/10/01 | 10,000 | $28.20 | $282,000.00 |
| 05/16/01 | 8,750 | $26.50 | $231,875.00 |
| 05/16/01 | 30,000 | $26.50 | $795,000.00 |

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    117

Exhibit D
0247

| | | | |
|---|---|---|---|
| 05/16/01 | 1,250 | $26.50 | $33,125.00 |
| 05/21/01 | 20,946 | $28.00 | $586,488.00 |
| 05/21/01 | 14,000 | $28.05 | $392,700.00 |
| 05/21/01 | 10,000 | $28.10 | $281,000.00 |
| 05/21/01 | 10,000 | $28.15 | $281,500.00 |
| 05/21/01 | 1,900 | $28.25 | $53,675.00 |
| 05/21/01 | 600 | $28.25 | $16,950.00 |
| 05/21/01 | 2,500 | $28.25 | $70,625.00 |
| 05/21/01 | 10,000 | $28.30 | $283,000.00 |
| **Total Sold:** | **736,196** | | **$24,286,288.00** |

329.    This insider selling was unusual and suspicious, both in timing and amount. All of the sales came on the heels of Peregrine's various press releases falsely announcing "record" levels of revenues and improving balance sheet metrics, including cash and DSO, which Powanda knew or was deliberately reckless in not knowing, were materially false and misleading.

330.    Powanda was constantly advocating his removal from the list of Company insiders subject to black-out periods. In an e-mail to Eric Deller on July 20, 2000, Powanda pleaded, "get me off the 16B list!!!" 200,000 shares were sold by Powanda during Company imposed black-out periods. Before the Class Period Powanda held 837,100 shares and sold 804,000, or 96% of his holdings. During the Class Period, Powanda held 862,446 shares and sold 862,446, or 100% of his Class Period holdings. 78% of Powanda's proceeds from insider sales were derived from sales during the Class Period.

### G.    Frederic B. Luddy

331.    Defendant Luddy was involved in numerous major decisions regarding the Company, including acquisitions, was in frequent and close contact with defendants Gardner and Moores regarding Company business, and knew or recklessly disregarded that Peregrine's public statements throughout the Class Period were materially false and misleading. On October 3, 2001, Luddy received a copy of an e-mail from Ron Hall, a salesperson in Peregrine's

#105317     FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)     118

Exhibit D
0248

1  Asia Pacific division, which attached several Peregrine license agreements and pointed out why

2  they did not represent legitimate revenues. The text of the e-mail is set forth in paragraph 336

3  hereof. This e-mail put Luddy on notice that Peregrine was engaging in revenue recognition

4  fraud. Luddy took no steps to investigate or inquire about the subject of this e-mail, or to make

5  any public disclosure of the matters discussed therein.

6        332.   Luddy made the following sales of Peregrine common stock during the Class

7  Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Sales Price | Proceeds Received |
|------|------------------|-------------|-------------------|
| 08/11/99 | 3,224 | $30.22 | $ 97,429.28 |
| 08/25/99 | 6,250 | $33.63 | $ 210,187.50 |
| 02/15/00 | 22,500 | $43.50 | $ 978,750.00 |
| 02/16/00 | 10,000 | $44.19 | $ 441,900.00 |
| 02/16/00 | 10,000 | $44.25 | $ 442,500.00 |
| 02/16/00 | 25,000 | $44.40 | $ 1,110,000.00 |
| 02/16/00 | 20,000 | $44.81 | $ 896,200.00 |
| 02/08/01 | 10,000 | $28.00 | $ 280,000.00 |
| 02/09/01 | 56,000 | $28.01 | $ 1,568,560.00 |
| 02/09/01 | 50,000 | $28.53 | $ 1,426,500.00 |
| 02/12/01 | 20,924 | $27.94 | $ 584,616.56 |
| 02/12/01 | 50,000 | $28.07 | $ 1,403,500.00 |
| 02/13/01 | 5,000 | $28.82 | $ 144,100.00 |
| 02/14/01 | 33,000 | $27.94 | $ 922,020.00 |
| 08/01/01 | 16,000 | $28.16 | $ 450,560.00 |
| 08/01/01 | 10,891 | $28.10 | $ 306,037.1 |
| 08/01/01 | 20,000 | $28.04 | $ 560,800.00 |
| **Total Sold:** | **368,789** | | **$11,823,660.44** |

26        333.   This insider selling was unusual and suspicious, both in timing and amount. All

27  of the sales came on the heels of Peregrine's various press releases falsely announcing "record"

28  levels of revenues and improving balance sheet metrics, including cash and DSO, which Luddy

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)    119

Exhibit D
0249

1  knew, or was deliberately reckless in not knowing, were materially false and misleading.

2      334.    Before the Class Period Luddy held 416,144 shares and sold 397,196, or 95% of

3  his holdings.  During the Class Period, Luddy held 465,763 shares and sold 465,763, or 100% of

4  his Class Period holdings.  Approximately 75% of Luddy's proceeds from insider sales were

5  derived from sales during Class Period.

6      **H.    John J. Moores**

7      335.    Defendant Moores signed Peregrine's Forms 10-K filed with the SEC for the

8  fiscal years ending March 31, 2000 and March 31, 2001 and the Peregrine registration statements

9  (on Forms S-3, S-4 and S-8) filed with the SEC during the Class Period.  He also reviewed and

10  approved the issuance of quarterly financial results for fiscal years 2000 and 2001 and the first

11  three quarters of fiscal year 2002.

12      336.    On October 3, 2001, Ron Hall, a Peregrine sales executive in its Asia Pacific

13  division, sent the following e-mail to defendants Gardner, Gless, and Luddy.  In recognition that

14  the sender was knowledgeable of Peregrine's ongoing fraud and threatened to expose the fraud,

15  Gardner immediately forwarded the e-mail to defendant Moores.  The e-mail stated:

16          Attached are documents that should be of fundamental interest to
            yourself and all copied recipients.

17

18          They pertain directly to business activities in Asia Pacific, more
            specifically Australia.  In all likelihood also Europe, where
            Dominic O'Riley was previously engaged in executive

19          management capacity.

20          The attached 'Schedule A' for Planwell Technology may well be
            familiar, as $2 million AUD [Australian dollars] of revenue

21          (perhaps more ) was booked on September 30th, 2001 under #
            SCA-AU-002918V01.

22
            The underpinning Partner Addendum, contract # 01AB300901 may

23          not be so familiar.  I understand that you don't see all these partner
            agreements.

24
            I strongly suggest you give these documents careful scrutiny,

25          paying particular attention to page 8 of the 'Partner Addendum,'
            the 'Sales Guarantee' clause.  Then inspect the overall wording and

26          associated legality of the contract, the implied Peregrine
            responsibility and associated consequent acceptable non-payment

27          should targets not be achieved due to failure to meet this contracted
            responsibility.  It might pay to look at the maintenance terms,

28          payment terms, territory, support implications and other Peregrine

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    120

Exhibit D
0250

1  responsibilities.

2  My legal background suggests that the overall contract worthiness is questionable. At the least, certainly not what a shareholder (or
3  an analyst) would pin faith on.

4  While in the process, it would be recommended you check the underpinning contracts for the following Australian Partner
5  agreements, where large revenue amounts have already been recognised:

6
7  IMS - booked for $10 million AUD in March, 2001 - $22 million dollars gross sales required to achieve target.

8  Kinetica - booked for $1 million AUD in June, 2001 - $1.4 million
9  gross sales required to achieve target.

10  TELE IP - booked for $2 million in September, 2001 - $3.2 million gross sales required to achieve target.

11  Planwell Technology - attached, booked for $5 million in September, 2001 - $10 million gross sales required to achieve
12  target.

13  That's $36 million gross sales required for these partners to collectively achieve target. With implied and/or contracted sales
14  guarantees.

15  Of note, IMS ($22 million dollar AUD Target) haven't booked ONE SINGLE DEAL or burnt one dollar of revenue since they
16  signed in March, 2001. I repeat, NO business in 6 months on a $22 million AUD commit!

17
18  Without the IMS 'sale' of $10 million nett AUD in March, 2001, Australia would only have sold some $4 million dollars gross
19  software for all of last year! They're promising $36 million this year?

20  **The above mentioned 'contracts' have a few similarities:**

21  **1. They represent ludicrous and irresponsible targets and commitments - little wonder that no 'Partner' has paid up**
22  **front, particularly when you consider the current economic climate and last year's 'real' software sales.** I am reliably
23  informed that these partners were touted figures between $30 and $40 million sales in Australia for last year.

24
25  **2. The payment terms are extremely loose, extensively delayed and underpinned by the 'guaranteed sales' clause, which any**
     **good lawyer would use to avoid liability if things didn't work**
26  **out as Peregrine have promised.** Kinetica haven't yet paid for deals that were booked in June, before their partner 'agreement'
27  was signed. Yet revenue has been booked and valuable resources are being expended supporting their activities. What's the chances
28  of them paying up if targets aren't met?

1    3. In the main, Partner 'Addendums' - the real contract - aren't
signed off by Peregrine US and are exposed to non-compliance and
2    potential litigation. 'Unconscionable Contract' comes to mind.

3    Yet Mr. Walsh and Mr. O'Riley are pressuring Sales Reps in Asia
Pacific and Australia to find MORE Partners - so long as they
4    commit bookable dollars up front. Their war cry is "anything less
than $10 million AUD isn't worth doing the business".
5
**Come on, what are Peregrine selling here, Amway?**
6    **Vapourware? Where's the commercial substance to these so**
**called 'contracts'.**
7
For the record, the $10 million dollar IMS deal that Mr. Walsh
8    'won his stripes for' in March, has yielded absolutely NOTHING
to date - not one cent worth of 'real' business (apart from the initial
9    revenue booking).

10    I also note he Mr. Walsh doesn't manage the account and has no
involvement in it's progress. It's been offloaded to a very
11    inexperienced Sales person. Next March should be interesting
when Peregrine try to get IMS to reload - or PAY for that matter.
12    Still, Peregrine have booked the revenue. What will this do to
Peregrine's partnering credability? Or Stock value?
13
**Were the attached documents, any of the other 'contracts'**
14    **mentioned above, or this correspondence to fall into the hands**
**of the 'Wall Street Journal' or a curious analyst, Peregrine**
15    **Systems will be under serious and immediate scrutiny. That is**
**not my intention, but as a well meaning Peregrine investor**
16    **with Peregrine's best interests at heart, I feel compelled to**
**demand your attention to these contracts and the revenue**
17    **booked from them.**

18    **This is a blatant example of what can be termed 'Channel**
**stuffing', in their crudest form. The analysts have other**
19    **names.**

20    Mr. Walsh and Mr. O'Riley have both been personally warned as
to the lack of substance to these contracts, yet have chosen to
21    ignore those warnings. **I can only assume that as responsible**
**executives and directors of Peregrine, you would have no**
22    **knowledge of the underpinning contracts to the Schedule A's**
**you receive on Partnering agreements.**
23
**This type of contract should immediately cease and 'real'**
24    **revenue be recognised, ie., where PRODUCT is actually**
**DELIVERED and payment is probable.**
25
Terry Walsh' and Dominic O'Riley's contracts with Peregrine
26    should immediately be reviewed due to breach of fiduciary duty.

27    Reliable information suggests that a major Asia Pacific restructure
will be announced on October 8th, 2001. This will include the
28    termination of a number of staff, mainly sales related. I assume

---

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                            122

Exhibit D
0252

these staff will include anyone that has openly objected to the Channel stuffing. 'Amway' approach outlined above.

I look forward to your urgent attention to this correspondence in the hope that this is not the case. (Emphasis added).

Sincerely Yours.

337.    By this e-mail, defendant Moores was placed on specific, direct notice of Peregrine's ongoing revenue recognition fraud. The bogus contracts referred to by the e-mail, which were material in amount, involving in excess of $22 million AUD, were attached for review. Further, the sender pointed out that the contracts were related to Dominic O'Riley who had previously worked in management in EMEA. The e-mail sender urged that revenue recognition fraud had likely occurred in Europe as well. At this time, in the Fall of 2001, defendants Gardner, Gless, and Nelson were aware that significant revenue recognition fraud had been uncovered in Europe. The e-mail notes that on one contract involving a $22 million AUD commitment, not one dollar of sales had occurred. There were no real commitments and Peregrine was selling "vaporware" pursuant to the attached contracts, which had no commercial substance. The e-mail sender further notes that the investing public would understand these contracts to reflect accounting fraud within Peregrine. The sender also urged that such contracts should cease being part of Peregrine's business and ones where "real" revenue with product actually delivered and payment probable recognized as revenue. Less than an hour after receipt of this e-mail, defendant Moores responded to Gardner as follows: "I can't figure out why (sic) the hell is complaining about," and left it at that. Notwithstanding specific, credible information set forth in the e-mail, including copies of contracts showing Peregrine's revenue recognition fraud, Moores failed to take any follow-up steps or to make any disclosure of what he had learned. Such conduct was, at a minimum, deliberately reckless.

338.    Throughout calendar year 2001 and until the first public disclosure of accounting irregularities at Peregrine in May 2002, Moores repeatedly discussed at Board meetings and otherwise the poor cash position of the Company and its ever increasing expenses. Moores knew that the Company had insufficient cash to run its operations, and was dependent on the existence of its bank line of credit and access to the capital markets to obtain needed funds. In November

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)    123

Exhibit D
0253

1  2001, Moores met with defendants Nelson and Luddy to discuss the need to significantly reduce

2  Peregrine's expenses. As a result of his keen awareness of the cash poor situation the Company

3  consistently found itself in during the Class Period, Moores knew that there was incentive for

4  senior management to be dishonest about the true financial performance of the Company. The

5  October 2001 e-mail put Moores on notice that, consistent with the Board approved revenue

6  recognition policy which he authorized, Peregrine routinely entered into bogus software license

7  sale transactions designed to create the illusion that significant revenue was being generated

8  when, in fact, there was no substance to such agreements.

9        339.  Moores's knowledge of the Company's undisclosed cash crisis is highlighted in

10  an October 27, 2001 e-mail from defendant Nelson to defendants Gardner and Gless, and

11  General Counsel Deller discussing the need to raise money through an equity offering:

12        In peppering [defendant] Charlie [Noell] stress to him the cash
position, which we've talked about many times at board meetings.

13  You might share, verbally, Matt's cash forecast **(the point being
that cash is precariously low)**. Finally, remind him of the cash

14  conservation measures we're taking. Charlie already knows, **in the
words of JJM [defendant John J. Moores] – we're the largest

15  company in the world that lives hand to mouth**. I think the
point will be made with Charlie, without being stated ..... he has a

16  fiduciary duty to the company and shareholders to not let a cash
death spiral happen.

17

18        Having done that, I think you call JJM [defendant John J. Moores]
and talk through the issue, just in an inquiring/I'm not clear

19  approach.  Tell him your not sure you see what's got Charlie's
dander, two things likely will happen ... (1) John will shed some

20  light, and (2) John will laugh ( I guess there are three) and say
something like ... Charlie's nuts, this makes all the sense in the

21  world... then he may carry the torch for you.

22  **EACH OF YOU SHOULD DELETE THIS AFTER
READING ... AND FROM YOUR DELETE FOLDER. (I'd

23  make you eat it but these monitors are hard to digest).**
(Emphases added).

24        340.  In response, defendant Gardner advised Nelson that, "I've already made those

25  points by email but have no reply. **John has also been on the email dialog but has now gone

26  quiet.**" (Emphasis added).

27        341.  Moores knew that public disclosure of the constant cash crisis or accounting

28  irregularities would lead to a severe diminution in the value of his enormous stock holdings and

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                 124

1   could lead to possible bankruptcy, as in fact happened upon disclosure of the fraud. However, by

2   that time, Moores had liquidated the vast majority of his Peregrine stock holdings, obtaining

3   hundreds of millions of dollars at the expense of public investors.

4          342.    In February 2002, Moores learned of the guilty plea by David Thatcher, CEO of

5   Critical Path, and reports of Peregrine's involvement in the transactions giving rise to the guilty

6   plea, including the nature of the transactions, *i.e.*, a barter of goods without economic substance

7   for purposes of revenue recognition. Moores had prior dealings with Thatcher when Thatcher

8   served as Peregrine's Chief Financial Officer in 1995. He had forced Thatcher's resignation

9   from Peregrine based on concerns about Thatcher's integrity. Moreover, Moores had experience

10  with so-called "reciprocal" transactions. In 1998, Moores had learned of a proposed transaction

11  between Peregrine and NEON Systems, a company in which Moores held a very substantial

12  (40%) equity stake. Defendant Gardner had worked on the proposal which Moores understood

13  was a contemporaneous purchase of software between the companies. Moores told investigators

14  that he believed this type of transaction "had the potential for self-dealing." Thus, Moores was

15  familiar with the Critical Path-Peregrine type of barter transaction and knew it was improper and

16  was likely entered into for purposes of generating bogus revenue. Notwithstanding his

17  knowledge and experience with regard to both the type of transaction involved and the

18  individuals (Thatcher and Gardner), Moores failed to make any disclosure to Peregrine investors

19  as to his knowledge of this wrongful conduct. Instead, Moores arranged to retain his own

20  counsel to "investigate" the matter, and whose overriding goal was to protect Moores himself

21  from potential liability and embarrassment, including with regard to Moores's massive insider

22  selling. Disclosure of Moores's knowledge of this bogus Critical Path barter deal would have

23  cast Moores in a negative light. Instead, Moores hoped to be able to "manage" the problem

24  without having the bright light of public scrutiny trained on himself. Thus, he failed to disclose

25  his knowledge of Peregrine's improper accounting practices in February 2002.

26         343.    Defendant Moores's knowledge of improper accounting transactions at Peregrine

27  was also obtained from his attendance at a special Audit Committee meeting held on

28  February 12, 2002. At that time, Audit Committee members (defendants Noell, Watrous, and

---

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                            125

1    Dammeyer) and defendant Moores were told that the SEC had opened an inquiry into Peregrine's

2    role in the Critical Path transactions. Moores perceived at that time that defendants Gardner and

3    Nelson were not treating the situation with the appropriate degree of seriousness given their

4    closeness to the improper transactions, and intervened to insist upon his own choice of a criminal

5    defense attorney to continue handling the matter, so as best to protect himself while attempting to

6    divert blame to others. Moores at all times sought to protect himself and made no public

7    disclosures of the extent of his knowledge.

8         344.   In the weeks following the February 12, 2002 meeting, Moores met repeatedly

9    with defendant Nelson. Moores learned that Nelson was opposing Moores's counsel's efforts

10   and Nelson told Moores "that an extensive investigation might suggest bad answers to questions

11   that had never been asked." Further, Moores learned in late April 2002 that KPMG had

12   contacted the Chairman of Peregrine's Audit Committee, defendant Dammeyer, and reported the

13   existence of fraud in some of Peregrine's transactions, including use of side letters and extended

14   payment terms. Moores's counsel told Moores in late April 2002 that he believed Gardner,

15   Gless, and Nelson were dishonest.

16        345.   At a special Audit Committee meeting on April 29, 2002, Moores was informed

17   by KPMG as to its belief that fraudulent accounting had occurred at Peregrine. Moores

18   continued to fail to make any disclosure to the investing public. Instead, by the end of the Class

19   Period, he arranged to have himself re-appointed as Chairman of the Peregrine Board so that he

20   could better control events and protect himself.

21        346.   Moores made the following sales of Peregrine common stock during the Class

22   Period, while knowing of material adverse nonpublic information:

23
| Date | Number of Shares | Sales Price | Proceeds Received |
| --- | --- | --- | --- |
| 07/26/99 | 1,522,719 | $28.50 | $ 43,397,491.50 |
| 07/26/99 | 970,923 | $28.50 | $ 27,671,305.50 |
| 02/17/00 | 1,143,016 | $46.06 | $ 52,647,316.96 |
| 02/17/00 | 251,436 | $46.06 | $ 11,581,142.16 |
| 02/18/00 | 2,122,736 | $43.68 | $ 92,721,108.48 |

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                    126

Exhibit D
0256

| | | | |
|---|---|---|---|
| 02/18/00 | 466,960 | $43.68 | $ 20,396,812.80 |
| 02/28/00 | 408,220 | $51.35 | $ 20,962,097.00 |
| 02/28/00 | 89,799 | $51.35 | $  4,611,178.65 |
| 02/29/00 | 89,799 | $52.65 | $  4,727,917.35 |
| 02/29/00 | 408,220 | $52.65 | $ 21,492,783.00 |
| 02/08/01 | 77,000 | $30.19 | $  2,324,630.00 |
| 02/12/01 | 175,000 | $28.00 | $  4,900,000.00 |
| 02/13/01 | 385,000 | $28.54 | $ 10,987,900.00 |
| 02/15/01 | 1,104,022 | $29.67 | $ 32,756,332.74 |
| 02/16/01 | 280,000 | $29.76 | $  8,332,800.00 |
| 02/16/01 | 218,978 | $28.91 | $  6,330,653.98 |
| 02/20/01 | 210,000 | $30.04 | $  6,308,400.00 |
| 02/23/01 | 506,223 | $30.52 | $ 15,449,925.96 |
| 02/26/01 | 360,000 | $28.97 | $ 10,429,200.00 |
| 02/27/01 | 50,000 | $26.70 | $  1,335,000.00 |
| 02/28/01 | 90,000 | $25.29 | $  2,276,100.00 |
| **Total Sold:** | **10,930,051** | | **$401,640,096.08** |

347.    This insider selling was unusual and suspicious, both in timing and amount. Many of the sales came on the heels of Peregrine's various press releases falsely announcing "record" levels of revenues and improving balance sheet metrics, including cash and DSO, which Moores knew, or was deliberately reckless in not knowing, were materially false and misleading.

348.    Moores sold 4,980,186 shares during Company imposed black-out periods. Before the Class Period, Moores held 39,098,756 shares and sold 17,123,768, or 44% of his holdings. During the Class Period, Moores held 18,515,263 shares and sold 17,407,841, or 94% of his Class Period holdings. 72% of Moores's total proceeds from insider sales of Peregrine stock were derived from sales during the Class Period.

**I.    Charles E. Noell III**

349.    In addition to the allegations regarding Noell previously made herein, the following allegations further demonstrate Noell's knowledge and/or deliberate recklessness as to

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)                                                                127

Exhibit D
0257

1  the fraud at Peregrine during the Class Period.

2      350.   In October 2001, defendant Nelson orally advised Noell about the e-mail received

3  from the Australian whistleblower.  Noell did nothing in response.

4      351.   In or about January 2002, Noell became aware of a detailed representation letter to

5  defendant Arthur Andersen signed by defendants Gless and Gardner.  This letter indicated that

6  Arthur Andersen requested management to represent, among other things, that no side letters

7  existed excusing any payment obligation on license agreements for the sale of software.  This

8  was a highly unusual term in a representation letter, had not been incorporated in the prior years'

9  representation letters, and was a "red flag" that Peregrine's auditor had become aware of the

10 existence of side letters on transactions which rendered revenue recognition improper.  Noell

11 ignored these facts and made no disclosure or investigation of this matter.

12     352.   On February 5, 2002, Noell e-mailed defendants Nelson, Gardner, Moores and

13 Gless asking if management had ever received any employee communications relating to

14 accounting or financial concerns.  In response, Nelson informed Noell of the e-mail from the

15 employee in the Asia Pacific region alleged in paragraph 336 which drew attention to Peregrine's

16 improper revenue recognition practices.

17     353.   At a special Audit Committee meeting on February 12, 2002 which Noell

18 attended, there was a discussion of "barter transactions" that Peregrine had entered into pursuant

19 to which revenue recognition was improper.  Noell was aware at this time that the SEC had

20 initiated an inquiry regarding Peregrine.  He also learned in the ensuing weeks from defendant

21 Moores that defendants Gardner and Nelson were resisting factual inquiries made by Moore's

22 hand-picked counsel.

23     354.   A few days before the April 29, 2002 special Audit Committee meeting, Noell

24 was told of the existence of multiple side letters affecting potentially as much as $50 million in

25 recorded revenue.

26     355.   At an Audit Committee meeting on April 29, 2002, Noell learned from KPMG of

27 fraudulent accounting at Peregrine including 21 potentially questionable transactions, including

28 side letters, channel sales with contingencies and swap transactions.  Noell failed to make any

#105317
FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    128

Exhibit D
0258

disclosure of these facts and did not insist on the Company making any such disclosure.

356.    Noell made the following sales of Peregrine common stock during the Class Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Sales Price | Proceeds Received |
|------|------------------|-------------|-------------------|
| 02/23/00 | 90,000 | $43.31 | $3,897,900.00 |
| 02/15/01 | 68,978 | $29.76 | $2,052,785.28 |
| 02/16/01 | 15,397 | $28.91 | $ 445,127.27 |
| **Total Sold:** | **174,375** | | **$6,395,812.55** |

357.    This insider selling was unusual and suspicious, both in timing and amount. Many of the sales came on the heels of Peregrine's various press releases falsely announcing "record" levels of revenues and improving balance sheet metrics, including cash and DSO, which Noell knew, or was deliberately reckless in not knowing, were materially false and misleading.

358.    Noell sold 90,000 shares during a Company imposed black-out period. Before the Class Period, Noell held 515,428 shares and sold 274,000 or 53% of his holdings. During the Class Period, Noell held 187,543 shares and sold 174,375, or 93% of his Class Period holdings. Approximately 74% of Noell's proceeds from insider sales were derived from sales during the Class Period.

**J.    Christopher A. Cole**

359.    In addition to the allegations regarding Cole previously made herein, the following allegations demonstrate Cole's knowledge and/or deliberate recklessness as to the fraud at Peregrine during the Class Period.

360.    Cole learned on February 5, 2002, of a Department of Justice press release regarding the guilty plea of Critical Path's CEO relating to transactions with Peregrine. By February 8, 2002, Cole knew of an SEC investigation of Peregrine's involvement with Critical Path from reading an article in the *San Diego Union Tribune*. On February 13 and 14, 2002, Cole sold 300,000 shares of Peregrine stock based on the material adverse information he obtained between February 5 and 12, 2002. On March 8, 2002, defendant Gardner receive an e-mail from

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                    129

Exhibit D
0259

1    Ron Hall with the subject line reading "What in the hell is Cole doing?" The text of the message

2    read: "You've just about got everything back to normal and this idiot [defendant Cole] decides to

3    sell hundreds of thousands of shares. Nice one Cole ... you imbecile. The market's shaking.

4    Thanks to one fool. What are you doing about it Steve? Gardner forwarded the message the

5    same day to, among others, defendant Gless, with the message, "Good question." Plainly, Cole

6    was trading on material nonpublic information with regard to the impropriety of Peregrine's

7    conduct vis-a-vis Critical Path, and his knowledge that defendant Moores had initiated a Special

8    Audit Committee meeting to investigate this and related accounting improprieties.

9        361.    Cole made the following sales of Peregrine common stock, during the Class

10   Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Sales Price | Proceeds Received |
|------|------------------|-------------|-------------------|
| 07/27/99 | 35,000 | $30.01 | $1,050,350.00 |
| 07/28/99 | 15,000 | $30.10 | $451,500.00 |
| 08/02/99 | 1,000 | $31.00 | $31,000.00 |
| 08/12/99 | 10,000 | $31.06 | $310,600.00 |
| 08/13/99 | 5,000 | $32.00 | $160,000.00 |
| 08/16/99 | 15,000 | $32.73 | $490,950.00 |
| 08/26/99 | 20,000 | $34.72 | $694,400.00 |
| 02/15/00 | 30,000 | $44.22 | $1,326,600.00 |
| 02/16/00 | 80,000 | $44.95 | $3,596,000.00 |
| 02/17/00 | 10,000 | $46.19 | $461,900.00 |
| 02/24/00 | 5,000 | $46.75 | $233,750.00 |
| 02/24/00 | 5,000 | $46.50 | $232,500.00 |
| 02/24/00 | 10,000 | $46.13 | $461,300.00 |
| 02/25/00 | 130,000 | $50.33 | $6,542,900.00 |
| 02/08/01 | 13,500 | $30.03 | $405,405.00 |
| 02/15/01 | 25,000 | $30.10 | $752,500.00 |
| 02/20/01 | 61,500 | $30.56 | $1,879,440.00 |
| 11/20/01 | 56,000 | $18.14 | $1,015,840.00 |

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)
130

Exhibit D
0260

| Date | Number of Shares | Sales Price | Proceeds Received |
|---|---|---|---|
| 11/27/02 | 56,000 | $18.58 | $1,040,480.00 |
| 02/05/02 | 55,000 | $7.05 | $387,750.00 |
| 02/06/02 | 35,000 | $6.53 | $228,550.00 |
| 02/07/02 | 110,000 | $6.67 | $733,700.00 |
| 02/13/02 | 100,000 | $7.51 | $751,000.00 |
| 02/14/02 | 200,000 | $7.62 | $1,524,000.00 |
| **Total Sold:** | **1,083,000** | | **$24,762,415.00** |

362.    This insider selling was unusual and suspicious, both in timing and amount.  Cole sold 270,000 shares during Company imposed black-out periods.   Before the Class Period, Cole held 2,523,284 shares and sold 330,000, or 13% of his holdings.  During the Class Period, Cole held 2,339,534 shares and sold 1,304,000 or 56% of his Class Period holdings.  Almost 86% of Cole's proceeds from insider sales were derived from sales during the Class Period.

**K.    Norris van den Berg**

363.    In addition to the allegations regarding van den Berg previously made herein, the following allegations demonstrate van den Berg's knowledge and/or deliberate recklessness as to the fraud at Peregrine during the Class Period.

364.    Van den Berg engaged in the following insider selling of Peregrine shares during the Class Period while knowing of material adverse information.

| Date | Number of Shares | Sales Price | Proceeds Received |
|---|---|---|---|
| 02/22/00 | 40,000 | $43.20 | $1,728,000.00 |
| **Total Sold:** | **40,000** | | **$1,728,000.00** |

365.    All 40,000 shares were sold during a Company imposed black-out period.  Before the Class Period, van den Berg held 402,144 shares and sold 270,000, or 67% of his holdings.  During the Class Period, van den Berg held 78,744 shares and sold 40,000 or 51% of his Class Period holdings.  Almost 42% of van den Berg's proceeds from insider sales were derived from sales during the Class Period.

Exhibit D
0261

## L.    Thomas G. Watrous

366.    In addition to the allegations regarding Watrous previously made herein, the following allegations demonstrate Watrous's knowledge and/or deliberate recklessness as to the fraud at Peregrine during the Class Period.

367.    Watrous engaged in the following insider selling of Peregrine shares during the Class Period while knowing material adverse nonpublic information about the Company.

| Date | Number of Shares | Sales Price | Proceeds Received |
|---|---|---|---|
| 02/25/00 | 15,000 | $54.08 | $811,200.00 |
| **Total Sold:** | **15,000** | | **$811,200.00** |

368.    All 15,000 shares were sold during a Company imposed black-out period.  Before the Class Period, Watrous held 20,000 shares and sold 10,000, or 50% of his holdings.  During the Class Period, Watrous held 25,000 shares and sold 15,000 or 60% of his Class Period holdings.  Almost 86% of Watrous's proceeds from insider sales were derived from sales during the Class Period.

## DEFENDANT JOHN J. MOORES CONTROLLED PEREGRINE AND CERTAIN OF ITS OFFICERS AND DIRECTORS

369.    At all relevant times, Peregrine and certain officers and directors of the Company, including defendants Gardner, Gless, Nelson, Noell, van den Berg, and Hosley, were controlled and dominated by defendant Moores.  Moores first became involved with Peregrine in 1989 when it was struggling to sell its first software product.  By 1990, Moores became Peregrine's Chairman of the Board and took on the responsibility of raising financing for the Company during its developmental stage.  By early 1997, Moores arranged for Peregrine to commence its IPO.  By that time, total annual revenues of the Company were less than $24 million.  At the time of the IPO, Moores and his business partners (*i.e.*, defendants Noell, Hosley and van den Berg) owned or had an interest in more than 11 million shares or in excess of 83% of the issued and outstanding shares of Peregrine common stock.

370.    In addition, there were substantial related party transactions between Moores and

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)                                                                                      132

Exhibit D
0262

Peregrine. The IPO prospectus disclosed these relationships and transactions as follows:

> John J. Moores, the Chairman of the Company's Board of Directors and the majority stockholder of the Company, is party to a Continuing and Unconditional Guaranty dated November 13, 1995 (as subsequently amended) with NationsBank of Texas, N.A. ("NationsBank"), pursuant to which Mr. Moores guaranteed the Company's obligations under its bank line of credit agreement and term loan with NationsBank. As of December 31, 1996, the Company's outstanding obligations under such credit line and term loan were $4.3 million and $1.7 million, respectively. The Company intends to repay the outstanding balance of the revolving line of credit with a portion of the proceeds from this offering . . .

> From time to time since becoming a stockholder of the Company, JMI Equity Fund, L.P. ("JMI") has made working capital loans to the Company on an as-needed basis in amounts up to $250,000, typically bearing interest at the prime rate announced by major commercial banks. At December 31, 1996, the Company owed JMI approximately $250,000 in connection with such advances. Mr. Moores is a limited partner of JMI and Charles E. Noell III, a director of the Company, is General Partner of JMI. JMI holds, prior to this offering, more than 10% of the Company's outstanding Common Stock.

> The Company and JMI are parties to a sublease pursuant to which the Company subleases approximately 13,310 square feet of office space at its San Diego headquarters to JMI Services, Inc., an investment management company ("JMI Services"). The term of the sublease is from June 1, 1996 through October 21, 2003. The sublease provides for initial monthly rental payments of $16,638 to increase by $666 per month on each anniversary of the sublease. Mr. Moores serves as Chairman of the Board of JMI Services, and Mr. Noell serves as President and Chief Executive Officer . . .

> Pursuant to an Acquisition Agreement dated November 29, 1995 among the Company, Skunkware, Inc. ("Skunkware") and Peregrine/Bridge Transfer Corporation, a database software subsidiary of the Company ("PBTC"), the Company sold all the outstanding shares of PBTC to Skunkware for an aggregate purchase price of approximately $559,000. In addition, under the Acquisition Agreement, the Company receives a royalty on certain license sales of PBTC. The royalty payments to the Company are limited to an aggregate of $677,000 . . . Mr. Moores is a controlling stockholder of Skunkware, and Mr. Noell was president of Skunkware. Pursuant to the Acquisition Agreement, the Company provides certain computer and administrative resources to PBTC for a monthly fee of $37,500.

> Pursuant to an Agreement and Plan of Merger dated as of November 30, 1995, the Company acquired XVT Software, Inc., a development tools software company ("XVT"). In connection with the acquisition, the Company issued approximately 2,018,808 shares of its Common Stock in exchange for all of XVT's issued and outstanding preferred and common stock. Mr. Moores and

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)
133

Exhibit D
0263

1    persons and entities affiliated with Mr. Moores owned substantially
2    all of XVT's outstanding capital stock, and in connection with the
     acquisition, the Company issued 1,579,436 shares of the
3    Company's Common Stock to Mr. Moores and affiliated persons
     and entities.

4    371.    The IPO prospectus also represented that Peregrine was controlled by Moores.  In
5    this regard, the IPO prospectus stated:

6    Upon completion of this offering, the Company's officers, directors
     and their affiliates together will beneficially own approximately
7    75.9% of the outstanding shares of Common Stock (73.1% if the
     Underwriters' over-allotment option is exercised in full). In
8    particular, John J. Moores, Chairman of the Company's Board of
     Directors, and entities affiliated with Mr. Moores collectively will
9    own approximately 67.0% of the outstanding shares of Common
     Stock (64.0% if the Underwriters' over-allotment option is
10   exercised in full). As a result, these stockholders will be able to
     control most matters requiring stockholder approval, including the
11   election of directors and the approval of mergers, consolidations
     and sales of all or substantially all of the assets of the Company.
12

13   372.    Even though Moores' title during the Class Period was that of a director, he

14   participated in the day-to-day activities of the Company and was a *de facto* officer of the

15   Company.  Moores kept in constant contact with defendants Gardner, Nelson, Powanda, Noell,

16   van den Berg, and Hosley regarding Peregrine's affairs.  At a meeting of the Peregrine Board on

17   January 20, 1998, Moores as Chairman, announced the resignations of Alan Hunt as an officer

18   and director, and Doug Garn, as Vice President, North America Sales.  Defendant Gardner was

19   appointed by Moores and ratified by the Board to assume principal responsibility for the day-to-

20   day operations of the Company, and an Office of the Chairman was created to assist Gardner.

21   The members of the Office of the Chairman were defendants Moores, Gardner and Farley.  At

22   this meeting, Moores was responsible for, initiated and led the discussion about promoting

23   Gardner.  At a subsequent Board meeting on April 16, 1998, defendant Moores initiated and led a

24   discussion seeking the promotion of defendant Gardner to the position of President and CEO,

25   which appointments were made at the meeting.  In 1999, a Peregrine PowerPoint presentation

26   identifies Moores as a member of the "Senior Management Team."  Moores was identified first

27   on the list, with his name listed above even those of Gardner and Farley.  This document was

28   used to solicit business for the Company, as well as investment capital.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                            134

Exhibit D
0264



373.    By the beginning of the Class Period, Moores and his family trusts owned almost 11 million shares of Peregrine common stock which, at that time, represented 22.3% of all issued and outstanding shares.  Moores was Peregrine's largest shareholder.  Throughout the Class Period, Moores, as a result of his dominant shareholdings, sat on Peregrine's Board of Directors and headed the Compensation Committee of the Board, and acted as Chairman of the Board from March 1990 until July 2000.  Three business partners of Moores, defendants Noell, van den Berg and Hosley, represented Moores' interests on Peregrine's Audit Committee.

374.    A further indication of Moores's control of Peregrine is the fact that he chose to sublease space from Peregrine for his venture company, JMI Services.  The purpose of locating JMI Services and affiliated entities in space subleased from Peregrine was to keep a close proximity to Peregrine and its executive officers so as to facilitate the monitoring of Peregrine's operations by Moores and Noell, who was the President and Chief Executive Officer of JMI Services and a General Partner of JMI Equity along with defendant van den Berg.

375.    Defendant Moores's day-to-day involvement in Peregrine's business is further shown by the fact that he installed key operating and executive personnel within the Company.  These individuals had significant roles in Peregrine's accounting, finance, legal, corporate, technology, business development, mergers and acquisitions and customer service departments.  They kept Moores and his close business associates, including defendants Noell, van den Berg, and Hosley, advised on key operating and financial issues at Peregrine.  One former Vice President, Product Marketing stated that "Moores's influence on Luddy was unbelievable and Luddy knew everything that went on in the Company.  Moores was hands on managing the Company through Nelson, Luddy, and Farley before he died.  Luddy had a personal relationship with Moores."  A former Vice President, Marketing noted that Moores had substantial contact with Gardner and Luddy and they were frequently on Moores's private jet.  One former Peregrine Vice President in Marketing recalled that Luddy had told him that: "All I want to do is work for John Moores and fly around in his jet."

376.    Moores obtained the services of Alan Hunt to be Peregrine's Chief Executive Officer prior to the Company's IPO in 1997.  Hunt resigned in early 1998.  Moores and his

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    135

Exhibit D
0265

1 business partners (defendants Noell, van den Berg and Hosley) on the Peregrine Board then

2 caused defendant Gardner to be elevated to the position of Peregrine's Chief Executive Officer.

3 Prior to that time, Moores was instrumental in causing Peregrine to hire Gardner to work on

4 Peregrine's mergers and acquisitions.

5      377.   Former CFO Farley was a long-time business associate of Moores. From

6 December 1984 until October 1994, Farley held various accounting and financial positions at

7 BMC Software, a Houston based company founded by Moores. From November 1994 to

8 November 1995, Farley was Vice President, Finance, Chief Financial Officer and a director of

9 XVT Software, Inc. ("XVT"), a company controlled by Moores and which was acquired by

10 Peregrine in November 1995 in a related party transaction. Farley became Peregrine's Chief

11 Financial Officer in October 1995 a month prior to Peregrine's closing of the XVT acquisition.

12 Farley worked closely with defendants Gardner and Gless and kept Moores and Moores's

13 partner, defendant Noell, current on key operating and financial issues at Peregrine.

14      378.   Defendant Gless was also a long-time business associate of Moores. Moores was

15 instrumental in installing Gless at Peregrine initially as its corporate controller. From 1990 to

16 April 1996, Gless held various accounting and financial positions at Houston based BMC

17 Software, a company founded by defendant Moores. Gless worked closely with defendant

18 Gardner and kept Moores and Moores's partner, defendant Noell, current on key operational and

19 financial issues at Peregrine. Defendant Gless's wife, Wendy Gless, also worked at BMC

20 Software and owed her job there to Moores.

21      379.   Moores also caused Peregrine to hire defendant Nelson as its General Counsel in

22 1995. Moores knew Nelson through a foundation he established for which Nelson worked. At

23 the time, Nelson was a Houston-based attorney. In June 2000, Nelson contacted Moores

24 regarding his interest in obtaining a directorship in a private or public company. On December 3,

25 2001, Nelson told Moores of his intent to leave Peregrine. Moores wanted Nelson to stay with

26 Peregrine and used his control over defendant Gardner to have him offer Nelson responsibility

27 for the entire Xanadu product line. As a result, Nelson remained at Peregrine. In the fiscal year

28 2000, Nelson was promoted to the position of Vice President, Corporate Development. When

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                136

Exhibit D
0266

1  the accounting irregularities at Peregrine were first disclosed publicly in May 2002, Moores

2  appointed Nelson as interim Chief Executive Officer of Peregrine.

3      380.    Moores caused the Company to hire defendant Luddy as Executive Vice President

4  for Research & Development and Chief Technology Officer. Moores knew Luddy from the

5  software business community.

6      381.    Moores arranged Peregrine's hiring of Taylor Barada, the nephew of defendant

7  Noell, a key confidant of Moores on the Board. Barada worked closely with defendants Gardner,

8  Gless, and Nelson throughout most of the Class Period. Indeed, from June 2000 to May 2001,

9  Barada held the position of "Steve Gardner's Special Assistant," for which his annual

10  compensation was approximately $165,000. Barada was involved in Peregrine's business

11  development and mergers and acquisition program. Until he left the Company in December

12  2002, Barada kept Moores, Noell and van den Berg current on key operating issues at the

13  Company.

14      382.    Moores was also instrumental in Peregrine's hiring of William G. Holsten

15  ("Holsten"). During much of the Class Period, Holsten was Peregrine's Senior Vice President,

16  Customer Services. Prior to his employment at Peregrine, Holsten was employed by XVT where

17  he was Vice President, Professional Services. XVT was a company controlled by Moores, which

18  was acquired by Peregrine in November 1995 in a related party transaction. Holsten kept Moores

19  and Noell current on key operating issues during the Class Period.

20      383.    Moores's control of, and day-to-day involvement in, Peregrine's affairs is further

21  evidenced by his oversight of the integration of Remedy following its acquisition. Moores had a

22  particular interest in directing defendant Gardner's activities in this regard. As reflected in an e-

23  mail dated June 26, 2001 from Moores's cohort, defendant Noell, to defendant Gardner: "I

24  believe that John [Moores] and I can be helpful to you and should probably stay around to help

25  you with the Board through this transition year."

26      384.    Defendant Moores's conduct following the point in time in February 2002 that he

27  learned of the guilty plead by David Thatcher, CEO of Critical Path and reports of Peregrine's

28  involvement in Critical Path transactions, further demonstrates the control exercised by Moores

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    137

over Peregrine and defendants Gardner, Gless, Nelson, and Noell.  Moores completely controlled the Company's conduct in response to the February 2002 events. Although not formally a member of Peregrine's Audit Committee, Moores caused to be convened the February 12, 2002 special Audit Committee meeting.  Over objections from defendants Gardner, Gless, and Nelson, he demanded and put in place his personal choice of counsel to conduct an investigation. Thereafter, Moores continued to dominate and control Peregrine through the investigation conducted by his counsel. He attended an April 29, 2002 Audit Committee meeting at which KPMG informed Moores and the other attendees of Peregrine management's lack of cooperation in their work.  Moores established an office inside Peregrine after this meeting.  He personally attended an Audit Committee interview of defendant Gless.

385.    To formalize what had been evident all along from Moores's conduct since February 2002, *i.e.,* his domination and control of the Company's conduct, Moores was formally appointed Chairman of the Board at a meeting on May 4, 2002.  Moores continued in that position through the ensuing revelations of accounting fraud and the Company's bankruptcy. Moores's involvement during this period was designed to ensure that he could control the public disclosures of Peregrine, and avoid blame for the massive fraud that occurred at Peregrine.  On November 18, 2002, defendant Watrous sent an e-mail to defendants Moores and Noell regarding a suggestion Moores had made for a nominee to the Board: "[w]ouldn't we (sic) opening up ourselves to more criticism for bringing another of John Moores's cronies)?"  As independent investors in the Company represented by the Committee of Unsecured Creditors in Peregrine's bankruptcy case began to scrutinize the factual record, they concluded that Moores had culpability for the financial debacle at Peregrine, or at a minimum, had unlawfully profited from his massive insider selling.  After the Company's settlement with the Committee of Unsecured Creditors was announced on February 28, 2003, Moores and his cohorts on the Board were forced to relinquish control.  Moores subsequently resigned as a Board member.

## DEFENDANTS ARTHUR ANDERSEN AND AWSC ACTED AS ONE FIRM

386.    Arthur Andersen was formed in Illinois in 1913 as an accounting and consulting partnership under the name "Arthur Andersen & Co."  In 1977, as it increased its global

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                      138

Exhibit D
0268

1  presence, it created a new structure: the Andersen Worldwide Organization ("AWO"), comprised

2  of a Swiss cooperative entity, AWSC, which acts as an umbrella entity for the AWO member

3  firms, the partners of AWSC, and the individual partners of Arthur Andersen, including its

4  offices around the globe, which together, operated as a single global partnership or joint venture.

5  The model adopted by AWSC Partners was meant to preserve "The Heart of Partnership

6  Culture," including income sharing among the member firms of the two business units and

7  common governance model. The AWO structure was and is designed to maintain the "one firm"

8  concept, and was intended to foster the belief that the firm operated as a single entity. In its

9  promotional literature, including its Web site, the firm marketed itself as "one firm" "a single

10  worldwide operating structure" that "think[s] and act[s] as one."

11        387.    In fact, the Federal Election Committee Advisory Opinion No. 2000-36 dated

12  December 18, 2000, concluded:

13              Prior to the effective date of the arbitration order, AC [Andersen
              Consulting] and AA [Arthur Andersen] were signatories to
14              MFIFA's [Member Firm Interfirm Agreements] entered into with
              the AWSC [Andersen Worldwide Societe Cooperative] and were
15              thereby subject to coordination and limited governance by the same
              body. **Such an arrangement may have been, in some way, akin**
16              **to the relationship of subsidiaries of the same parent entity,**
              although neither partnership was owned by the AWSC. (Emphasis
17              added).

18        388.    AWO is the instrumentality through which the "one firm" concept became reality.

19  The guiding principle was that the member firms' practices shall be correlated and coordinated

20  on an international basis. It was achieved in four distinct ways.

21              (a)      **Partner Overlap:** AWO was a partnership made up of more than 4,800

22  partners from 390 offices in 84 different countries worldwide. Simultaneously, the partners of

23  AWO also were partners (or the equivalent) in the entities that make up those offices. Thus, all

24  of those offices were managed by individuals who were both local partners (or the equivalent)

25  and partners of AWO. Every member firm and its practice partners entered into a Member Firm

26  Inter Firm Agreement ("MFIFA") with AWSC.

27              (b)      **Sharing of Costs and Profits:** AWO coordinated the sharing of costs and

28  allocation of revenues and profits among its partners and its offices around the world. As one of

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                           139

#105317

Exhibit D
0269

AWO's top clients, fees from Peregrine were distributed directly and indirectly around the world. Profits were shared globally. In fact, fees from U.S. operations funded offices in Europe, Asia and Australia for years. Compensation for AWO partners was based on units granted to partners. Global earnings were added together and then divided by the number of units outstanding, resulting in earnings per unit ("EPU"). Partners then were paid their share of profits by multiplying the EPU by the number of units they hold.

(c)    **Global Setting of Professional Standards:** AWO purported to establish the professional standards and principles under which its offices operated. AWO international offices entered into a standard agreement with AWO under which they agreed to be bound by those professional standards and principles. An office of AWO that breached the agreement was subject to removal from the organization. The Assurance Professional Standards Group had firm-wide responsibility for providing guidance on the professional standards to be followed by AWO's offices.

(d)    **Infrastructure and Administration:** AWO handled all borrowing on behalf of its international offices, and maintained the financial records, payroll and employee and health benefits of those international offices as well. All of AWO's offices also share global computer operations, a worldwide tax structure and training facilities. By establishing a legal, financial and administrative infrastructure, AWO enabled each of its offices around the world to function as, and to appear to clients as, an extension of a single, global entity.

389.    AWO instituted its "one-firm" concept through partner overlays, global setting of standards, sharing of costs and profits and infrastructure and administration. Moreover, AWO's news releases confirmed they functioned and operated as a single worldwide operation:

- Andersen refers to the brand identity adopted by member firms of the Andersen **"global client service network."**

- "With world-class skills in assurance, tax, consulting and corporate finance, Arthur Andersen has more than 77,000 people in 84 countries **who are united by a single worldwide operating structure** that fosters inventiveness, knowledge sharing and a focus on client success."

- Andersen spokesman Dave Tabolt – **"We conduct more than 30,000 audits around the world every year . . . ."**

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)    140

Exhibit D
0270

1    • **"AA is already much more integrated globally than the**
**rest of the Big Five.** As Mr. Berardino [the former CEO]
2    points out, 'there is one name over the door. We're not an
alphabet soup.' The cohesiveness of AA's culture has been
3    a source of humor to outsiders, who have labeled its bean
counters 'Androids.' **While some rivals are still**
4    **struggling with a complicated array of national**
**partnerships, and thus different systems for sharing**
5    **pay, AA partners enjoy a single, and possibly unique,**
**system of remuneration: they receive a list of what each**
6    **of them has earned in the past year."**

7    AWO Web site (Andersen.com) confirmed that it was one worldwide organization:

8    • **"Our 390 offices may be scattered amid 84 different**
**countries, but our voice is the same. No matter where**
9    **you go, or who you talk to, we act with one vision.**
**Without boundaries."**

10

11   Arthur Andersen's 2001 recruiting brochure confirmed that it was one worldwide firm:

12   • "We will, in Arthur Andersen's own words, '**act as one**
**firm and speak with one voice.** It is a united family that
13   **operates across hierarchies, geographical boundaries,**
client groupings, service lines and competencies and feels
14   like the kinship of understanding and shared
responsibility."

15

16   390.    AWO managed, directed and controlled its international offices in two

17   overlapping groups: by practice areas (also known as "lines of service") and by geographical

18   location.

19   391.    Each practice group was managed by a global practice director who oversaw,

20   directed and controlled the operations of each practice group worldwide. Regional practice

21   directors reported to the global practice director and managed, directed and controlled the

22   practice group within their regions.

23   392.    AWO also grouped its offices into several geographic regions and assigned a

24   managing partner to each region.

25   393.    In addition to overlapping partners, AWO and Arthur Andersen shared officers in

26   common as well. For example, the former Chief Executive Officer and Managing Partner of

27   AWO (Berardino), was also the Chief Executive Officer and Managing Partner of Arthur

28   Andersen.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    141

Exhibit D
0271

394.    AWO and Arthur Andersen shared more than partners and officers. They shared the same address. In its promotional literature, AWO stated that its headquarters were located at 33 West Monroe Street, Chicago, Illinois 60603. That is the same address as the headquarters of Arthur Andersen.

395.    The components of this organization ignored corporate formalities in referring to themselves or to each other. This firm's worldwide personnel regularly exchanged correspondence and e-mails that were labeled "Andersenwo" – short for "world organization." Andersen continually relied on and touted its global abilities to provide resources to its clients and attract international and domestic business. Documents authored by Arthur Andersen often bore the insignia and logos of AWO, including "Andersen-Worldwide," "Andersen," and "Arthur Andersen." In its promotional literature, Andersen used the names "Andersen Worldwide," "Andersen," and "Arthur Andersen LLP" interchangeably. In addition, Andersen sometimes used only the name "Andersen" and did not differentiate between Arthur Andersen and its offices around the globe.

396.    Financially, the firm operated as a "one firm" global enterprise. For fiscal 2000, 44% of its revenues derived from North America, 33% of its revenues from Europe, Middle East, India and Africa, 13% from Asia/Pacific and 10% from Latin America. Of the $9.3 billion in revenues in 2001, North American operations contributed about half, or $4.49 billion, and Europe, Middle East, Africa, Asia/Pacific and Latin America operations contributed about half, or $4.85 billion.

## ARTHUR ANDERSEN'S PARTICIPATION IN THE FRAUD

397.    Paragraphs 208-229 above are incorporated in this section alleging the liability of Arthur Andersen as though fully set forth herein.

398.    In soliciting the Peregrine business, defendant Arthur Andersen boasted of its expertise in the software industry. In its February 1996 proposal letter to Peregrine, Arthur Andersen wrote:

> Our people understand the business, accounting and tax issues that impact emerging companies and will provide proactive creative solutions. We pride ourselves on being similar to the clients we

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    142

1   serve – entrepreneurial, hands on, highly motivated and accessible.

2   399.   At that time, Arthur Andersen also touted its diligence in performing audit

3   services for their clients:

4   Although it is believed that every accounting firm can perform an audit, the value a client receives as part of that process varies
5   widely.  We believe the difference between firms lies in the approach, commitment, concern and competence of those
6   individuals who perform the audit.  **We audit the business, not just the financial statements**.  Accordingly, we will devote
7   significant time to planning, analyzing audit and business risks, supervising and reviewing the audit team's work.  (Emphasis
8   added).

9   400.   Arthur Andersen also noted that its commitment to learning the "business

10  operations and controls" of the company and maintaining a continuous dialogue with

11  management throughout the year and not just during the audit.  It stated:

12  We add value beyond the frame of the primary services we are providing.  We strive to understand the operational and financial
13  issues that are important to your success and help you address those matters, as well as anticipate new issues.  **Our inquiries of**
14  **your business operations and controls will extend beyond the accounting and finance functions and include sales and**
15  **marketing, customer service, software development, administration and organization and information systems**.
16  Accordingly, we anticipate maintaining a continuous dialog with Peregrine throughout the year, not just at audit time.  In short, we
17  want to be a partner of Peregrine throughout the year so that the year-end audit is a non-event, with no last minute "surprises" or
18  unanticipated accounting adjustments.  (Emphasis added).

19  401.   Based on the foregoing representations, Peregrine retained the services of Arthur

20  Andersen in July 1996.

21  402.   Arthur Andersen was engaged by Peregrine to provide independent auditing and

22  accounting services throughout the Class Period.  Arthur Andersen's San Diego office was

23  engaged to examine and issue opinions on Peregrine's fiscal 2000 and 2001 year-end financial

24  statements and to perform review services with respect to Peregrine's interim results in fiscal

25  years 2000, 2001 and the first three quarters of fiscal year 2002.  For fiscal year 2000, Dan

26  Bigelow was the audit engagement partner.  For fiscal year 2001, defendant Stulac was the audit

27  engagement partner.  Stulac had been the audit manager on the Peregrine account prior to

28  becoming an Arthur Andersen partner in 2001.  Arthur Andersen extensively utilized the services

#105317     FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                 143

Exhibit D
0273

1  of defendant AWSC in the course of performing its audit and review services for the Peregrine

2  engagements. In its audit opinions, Arthur Andersen falsely represented that Peregrine's

3  financial statements for fiscal years 2000 and 2001 were presented in accordance with GAAP and

4  that Arthur Andersen's audits had been performed in accordance with GAAS.

5      403.    Arthur Andersen consented to the use of its false audit opinions on Peregrine's

6  fiscal years 2000 and 2001 financial statements in Peregrine's annual reports on Form 10-K for

7  those years and in Peregrine's registration statements on Forms S-3, S-4 and S-8, which were

8  filed with the SEC during the Class Period. Arthur Andersen's issuance of materially false audit

9  opinions on Peregrine's fiscal 2000 and 2001 financial statements and Arthur Andersen's failure

10 to require revision of Peregrine's false interim financial statements in 2000, 2001 and 2002 filed

11 with the SEC was in violation of GAAS.

12     404.    Arthur Andersen knew, or recklessly disregarded, that Peregrine's financial

13 statements were false and prepared in violation of GAAP. Among other things, Arthur Andersen

14 knew, or recklessly disregarded (i) that Peregrine had improperly recorded over $500 million in

15 revenues; (ii) that the Company's liabilities had been understated by up to $180 million; (iii) that

16 the Company's option compensation was understated by $100 million during the Class Period;

17 (iv) that the Company's reported accounts receivable were consistently understated by a material

18 amount during the Class Period; (v) that the Company's reported cash position was materially

19 overstated during the Class Period; (vi) that the Company's liabilities were materially understated

20 throughout the Class Period; and (vii) that the Company failed to disclose adequately the nature

21 of and the revenue recognized from product/service swaps which it entered into.

22     405.    Arthur Andersen knew from its audit and review work, or was deliberately

23 reckless with regard to the fact that the Company had material weaknesses in its internal

24 accounting control structure such that no reliance could be placed on the Company's financial

25 reporting system. For example, Arthur Andersen knew that the Company's Audit Committee did

26 not function properly for several reasons. First, it failed to hold regular meetings in fiscal year

27 2000. Only one such meeting was conducted. Second, the Audit Committee and Arthur

28 Andersen routinely allowed defendants Gless and Nelson to participate in, and control the agenda

#105317     FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                  144

Exhibit D
0274

1  for and substance of the meetings. This contravened the express purpose of the meetings, which

2  was to provide oversight of management. Third, Arthur Andersen knew that no minutes were

3  prepared and retained to document the activities of the Committee. This was a deliberate attempt

4  to hide from scrutiny the Committee's activities.

5      406.  Arthur Andersen also knew of and approved the intentionally wrongful revenue

6  recognition practices engaged in by Peregrine. The firm explicitly approved of improper revenue

7  recognition on channel sales of at least 25% of the contract amount even where there was no

8  commitment from the reseller or an end user to pay. Arthur Andersen also was routinely

9  consulted by defendant Gless regarding how to structure transactions with customers so as to

10  permit current and improper revenue recognition. Arthur Andersen also knew of and approved

11  the failure of the Company to treat transactions with financial institutions as borrowings rather

12  than sales. Arthur Andersen also designed the Company's stock option plans and knew of and

13  approved the massive understatement of stock option compensation expense. Arthur Andersen

14  also knew of the wholesale unreliability of the Company's internal accounting controls which, in

15  light of the Company's tremendous growth, was a blatant "red flag" that Arthur Andersen chose

16  to ignore because of, among other things, its lack of independence from Peregrine and the

17  pressure put on Arthur Andersen partners by its management to increase revenue.

18      407.  Arthur Andersen falsely endorsed the propriety of Peregrine's financial statements

19  because it desired to retain Peregrine as a client, to continue generating substantial fees from its

20  engagement and to secure additional business from Peregrine, including lucrative consulting

21  business. The partners responsible for the Peregrine engagement were motivated to participate in

22  the wrongdoing alleged herein because their incomes were directly tied to the fees generated

23  from Peregrine.

24      408.  In addition, Arthur Andersen was not independent of its client because certain

25  senior executives of Peregrine, such as Joseph G. Reichner, Louis Blatt, Gary Lenz, Thomas

26  Smith and two members of the Audit Committee, defendants Watrous and Dammeyer, were

27  former members of Arthur Andersen or an affiliate. Its compromised independence is further

28  demonstrated by the detailed background statement on Joseph G. Reichner, a former Arthur

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                              145

Exhibit D
0275

1  Andersen partner, a former Board member of defendant AWSC and a former Senior Vice

2  President of Peregrine, as set forth in a press release announcing Reichner's employment with

3  UBmatrix. In pertinent part, the press release reads as follows:

4      Mr. Reichner spent 31 years with Arthur Andersen starting his
    career in the Audit and Business Risk practice for the first eleven

5      years and then was admitted to the Worldwide Partnership to
    develop a new consulting practice offering for a worldwide

6      rollout . . .

7      After retiring from Andersen in 2000, he was recruited by
    Peregrine Systems, Inc. to be Senior Vice President Alliances,

8      Verticals and Business Development. In that role he developed
    programs that generated or influenced over 50% of worldwide

9      revenue. Joe also created and was President of a new business,
    Peregrine Financial Management to expand the B to B enablement

10      business offerings into the e-Finance marketplace and was serving
    as COO of the Integrated Solutions Group.

11

12      409.   Arthur Andersen also earned substantial fees from Peregrine which were unrelated

13  to its audit services. Thus, for fiscal year 1999, the firm was paid $181,000 for consultation

14  relating to business valuations, consultation related to tax matters, and assistance with due

15  diligence and acquisition-related matters. As of May 1, 2000, Arthur Andersen had completed

16  significant work assisting Peregrine in integrating Telco Research and Barnhill, and had begun to

17  support and would continue work on assisting with the Harbinger acquisition. This work

18  represented an additional $420,000 in fees, plus related out of pocket expenses. On

19  June 29, 2001, Arthur Andersen reported to Peregrine that it received during the fiscal year ended

20  March 31, 2001, $358,000 for tax consulting, $20,000 for tax return preparation, and $72,000 for

21  other business consulting services, or a total of $450,000. On top of these amounts, the firm

22  billed $459,000 for the year end audit and related reviews, an additional $25,000 for an audit of

23  the Company's 401(k) Plan, and $119,000 for other services including assistance with due

24  diligence, SEC correspondence, and related matters.

25      410.   With respect to Peregrine's audited financial statements for 2000, Arthur

26  Andersen represented, in its audit opinion dated April 25, 2000, the following:

27      REPORT OF INDEPENDENT ACCOUNTANTS
    To Peregrine Systems, Inc.:

28

Exhibit D
0276

1     We have audited the accompanying consolidated balance sheets of Peregrine Systems, Inc. (a Delaware corporation) and subsidiaries

2     as of March 31, 2000 and 1999, and the related consolidated statements of operations, stockholders' equity (deficit) and cash

3     flows for each of the three years in the period ended March 31, 2000. These consolidated financial statements and the schedule

4     referred to below are the responsibility of the Company's management. Our responsibility is to express an opinion on these

5     consolidated financial statements and the schedule based on our audits.

6

7     We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance

8     about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis,

9     evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting

10    principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We

11    believe that our audits provide a reasonable basis for our opinion.

12    In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Peregrine

13    Systems, Inc. and subsidiaries as of March 31, 2000 and 1999, and the results of their operations and their cash flows for each of the

14    three years in the period ended March 31, 2000 in conformity with accounting principles generally accepted in the United States.

15

16    Our audits were made for the purpose of forming an opinion on the basic financial statements taken as a whole. The schedule listed in the index to the consolidated financial statements is presented for

17    purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic consolidated

18    financial statements. The schedule has been subjected to the auditing procedures applied in the audits of the basic consolidated

19    financial statements and, in our opinion, fairly states, in all material respects, the financial data required to be set forth therein in

20    relation to the basic financial statements taken as a whole.

21       411.   With respect to Peregrine's audited financial statements for 2001, Arthur

22  Andersen represented, in its audit opinion dated April 26, 2001, the following:

23    REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

24    To the Stockholders of Peregrine Systems, Inc.:

25    We have audited the accompanying consolidated balance sheets of Peregrine Systems, Inc. (a Delaware corporation) and subsidiaries

26    as of March 31, 2001 and 2000, and the related consolidated statements of operations, stockholders' equity and cash flows for

27    each of the three years in the period ended March 31, 2001. These consolidated financial statements and the schedule referred to

28    below are the responsibility of the Company's management. Our

#105317     FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)     147

Exhibit D
0277

responsibility is to express an opinion on these consolidated financial statements and the schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Peregrine Systems, Inc. and subsidiaries as of March 31, 2001 and 2000, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2001 in conformity with accounting principles generally accepted in the United States.

Our audits were made for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. The schedule listed in the index to the consolidated financial statements is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic consolidated financial statements. The schedule has been subjected to the auditing procedures applied in the audits of the basic consolidated financial statements and, in our opinion, fairly states, in all material respects, the financial data required to be set forth therein in relation to the basic consolidated financial statements taken as a whole.

/s/ Arthur Andersen LLP

412.    The foregoing audit opinions were materially false and misleading due to Arthur Andersen's failure to comply with GAAS and the fact that Arthur Andersen knew, or was deliberately reckless with regard to the fact that Peregrine's financial statements were not prepared in conformity with GAAP, causing Arthur Andersen's reports to be in violation of GAAS and SEC rules.  The SEC has stressed the importance of meaningful audits being performed by independent accountants:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting . . . Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.

SEC Accounting Series Release No. 296.  Arthur Andersen did not meaningfully perform its

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                148

Exhibit D
0278

1  audit function with regard to Peregrine.

## 1.  **Fiscal Year 2000**

3      413.   On April 25, 2000, Arthur Andersen signed an unqualified audit opinion on

Peregrine's financial statement for the fiscal year 2000 ending March 31, 2000 which it knew

would be relied on by the market.  This audit opinion was materially false and misleading

because it failed to note in either the textual portion of the opinion letter, or in any accompanying

footnotes to the financial statements, that Peregrine's Board had approved of a material change in

accounting policy, *i.e.*, the change to sell-in, which change materially impacted the fourth quarter

of fiscal year 1999 results incorporated in the year end results, and continued to affect the

Company's results throughout the Class Period.  The change was designed to provide Peregrine

with an immediate revenue and earnings boost so that it could meet its published expectations for

the quarter.  It was known to Arthur Andersen that the policy had been changed for application to

the fourth quarter of fiscal year 1999, that it had been changed to provide for revenue recognition

immediately upon execution of a software license agreement with resellers even though there

was no commitment to pay and no identified end user committed to pay, and to allow the

Company to meet fourth quarter and year end published earnings and revenue forecasts.  Arthur

Andersen knew the new policy would continue to be applied going forward.  Further, Arthur

Andersen knew that the Company's published descriptions of its revenue recognition policy were

materially inaccurate in light of the change made at the April 1999 Board meeting.

20      414.   Arthur Andersen advised the Company in April 1999 that it would be

"uncomfortable" with any level of channel sales that exceeded 25% of revenue.  Yet throughout

the Class Period, including in fiscal year 2000, the amount of channel inventory greatly exceeded

this level, as alleged in paragraph 232 herein.  Arthur Andersen did not insist that its client reign

in this ballooning channel inventory and made no disclosure to the investing public that the

Company's newly adopted revenue recognition policy was improper and resulting in materially

overstated revenue.  Arthur Andersen reviewed each of the quarterly financial statements and

press releases issued by Peregrine in fiscal year 2000 but failed to require disclosure of the

accounting policy change or to require disclosure or explanation of the artificial boost to

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                149

Exhibit D
0279

1  Peregrine's reported revenues and earnings caused by this accounting policy change. The fiscal

2  year 2000 audit opinion was also materially misleading for failure to make any disclosure of

3  serious accounting issues that arose from work performed by defendant AWSC and known to

4  Arthur Andersen with regard to Peregrine's German subsidiary. An e-mail message dated April

5  14, 2000 from Daniel Mair of AWSC in Frankfurt, Germany, to Nevanna Sacks, the audit

6  manager on the Peregrine account, reported several material problems in Peregrine's EMEA

7  division. First, the message noted that "the company had problems meeting their budget. Also,

8  according to Peregrine Germany, meeting the budget seems to be tight on Group level, therefore

9  Peregrine Germany has been instructed to record the least amount of expenses possible." This

10  message went on to state as follows:

> During our review we became aware of the following SOP 97-2
> [revenue recognition] relevant issues:
>
> • "channel sales": the company uses resellers to market their
> software (in addition to their own sales force). According to our
> discussions with Mrs. Goetz some resellers only purchase when
> they also have a fixed customer order, others, though, order a larger
> quantity (to receive better prices) and then start marketing the
> software. **The latter category of resellers represents "bad
> revenue" in our opinion...**
>
> • "Due Dates large than 12 months": the company sometimes
> grants due dates larger than 12 months which would cause "bad
> revenue" according to SOP 97-2.
>
> [A] significant amount of customers are resellers, whose ability to
> pay their debts can not be judged. As you can see, more than 50%
> of A/R are overdue by more than 60 days. The company did not
> set up any bad debt provisions, as in the companies' opinion they
> will collect the full amounts.

22      415.    By this e-mail, both Arthur Andersen and AWSC were aware of material errors in

23  the EMEA division's revenue recognition.

24      416.    The failure to insist on appropriate disclosure was particularly egregious given

25  that in January 2000, Stulac raised directly with the Company Arthur Andersen's concern about

26  the level of inventory in the channel, notwithstanding its knowledge that revenues were recorded

27  as if such inventory had been sold.

28      417.    In the Summer of 2000, Arthur Andersen, working in conjunction with defendant

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                      150

Exhibit D
0280

1  Nelson, designed a stock option compensation plan for Peregrine employees that, when applied,

2  was an intentional violation of GAAP.  This plan allowed for exercise prices on stock options

3  that were below the common stock market values on the dates options were granted.   Peregrine

4  recorded the related compensation cost applying this formulation developed by Arthur Andersen.

5  However, GAAP, specifically APB Opinion No. 25, required that stock option compensation

6  cost be recorded as the aggregate difference between the fair value of the stock and the exercise

7  price of the options granted.  The plan, devised and approved by Arthur Andersen, was known to

8  both it and defendant Nelson to be contrary to stock option compensation plans typically in place

9  at comparable companies.  In addition, with the approval of Arthur Andersen, Peregrine

10 accelerated the vesting period for certain options which had been previously granted to

11 employees.  Under FASB Interpretation No. 44, acceleration of vesting of options after

12 June 30, 2000 caused an accounting charge for the affected options.  Arthur Andersen's

13 intentional and/or deliberately reckless design of stock option plans and the accounting therefor

14 that violated GAAP contributed to $100 million of Peregrine's accounting restatement

15 announced in February 2003.

16          2.      **Fiscal Year 2001**

17          418.    On April 26, 2001, Arthur Andersen signed an unqualified audit opinion on

18 Peregrine's financial statement for fiscal year 2001 ending March 31, 2001 which it new would

19 be relied upon by the market.  This audit opinion was materially false and misleading because it

20 continued to fail to disclose in either the textual portion of the opinion letter, or in any

21 accompanying footnote disclosure to the financial statements, that Peregrine's revenues and

22 earnings were artificially boosted by application of the sell-in accounting method as approved by

23 the full Board in April 1999 for use beginning in the fourth quarter of fiscal year 1999.

24          419.    In the March 2001 calendar quarter, B.J. Rassam, Vice President of Finance and

25 Controller began looking closely at the Company's accounting for consolidations and in the

26 EMEA division.  He became concerned over what he was seeing, and could not understand how

27 the Company had accounted for its accounts receivable.  Rassam raised these issues with

28 defendant Gless, who did not adequately respond.  Rassam tried to obtain a detailed accounts

Exhibit D
0281

1  receivable subledger that tied to the balance sheet, but was told one did not exist. He was told

2  that Arthur Andersen had not been concerned about the lack of an accounts receivable subledger

3  that did not tie to the balance sheet. Rassam was told that one could not be prepared because of

4  lack of information from EMEA. This was confirmed to Rassam by defendant Cappel.

5      420.    Rassam was concerned because he understood the accounts receivable to be the

6  most critical component for the auditors and the biggest area of audit risk. As a result, Rassam

7  contacted Arthur Andersen audit engagement partner Stulac and complained that he could not

8  understand the Company's accounting for accounts receivable. In January 2001, Stulac had met

9  Rassam and gave him certain Arthur Andersen memos on Peregrine's process flows and internal

10  controls. He also gave Rassam a listing of "audit differences" for fiscal year 2000. Rassam was

11  stunned to learn that there were only $200,000 in audit differences and that Arthur Andersen's

12  corrections actually increased revenue. Stulac told Rassam at that time that Arthur Andersen had

13  not seen the need for a management letter in years. Stulac said to Rassam at this time, "[a]t

14  Peregrine, you've got to go along to get along."

15      421.    Arthur Andersen audit manager Nevanna Sacks told Rassam that the firm had not

16  seen an accounts receivable detailed subledger for at least two years. Still attempting to

17  understand the receivables, Rassam was shown a spreadsheet that tracked channel receivables

18  worldwide. This document showed $106 million in outstanding channel accounts receivable. It

19  was not reconciled to an accounts receivable subledger.

20      422.    In April 2001, when Arthur Andersen was about to give Peregrine an unqualified

21  audit opinion on its financial statements, Rassam asked at a meeting with Stulac and Sacks how

22  they could issue the audit opinion without seeing an accounts receivable subledger. Stulac

23  showed Rassam a one page summary prepared by Treasury which identified the total amount of

24  accounts receivable adjustments to get to the balance sheet number, but which had no details and

25  no breakdown by country or customer.

26      423.    After this meeting, Sacks came to Rassam and "spilled her guts." She told

27  Rassam she felt like a lone person voicing concerns regarding Peregrine's lack of an accounts

28  receivable subledger. She said that Arthur Andersen had virtually no communication with the

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                152

1   Treasurer and that other Peregrine personnel had been argumentative and tried to intimidate her.

2   Although Sacks complained of this to Stulac, nothing was done about it. Stulac promised to talk

3   with defendant Gless about the problem, and would go out drinking and smoking cigars with

4   Gless, but nothing was resolved. Sacks told Rassam that she and Leslie Sadoff, the Arthur

5   Andersen senior staff auditor, felt like they were on an island by themselves in trying to

6   understand Peregrine's accounting.

7        424.   On July 23, 2001, Rassam sent an e-mail to, among others, defendants Gless,

8   Nelson, and Stulac regarding "Disclosure of Impairment and Related Charges." He informed

9   these defendants as follows:

10              Not meant to be preaching, but just to ensure everyone is on the
                same page.

11

12              When the above events begin to appear at issue, they require
                disclosure. As a result you can expect the SEC to review the
                adequacy of disclosures in the current and earlier filings, to help

13              ensure that such charges do not occur 'out of the blue' and without
                detailed warning to the average investor.

14

15              It is not unusual for the Division of Corp Fin and the Office of
                Chief Accountant to look at the disclosures made to a company's
                Board and Audit Committee re: these events. Information that has

16              been requested by the SEC includes budgets, operating CF
                forecasts, strategic business plans, level of revenues from major

17              customers, and analysts' reports in order to assess whether they are
                consistent with and support the financial reporting and disclosures

18              to investors.

19              As you know we wrote-off - $600 million during Q4 '01. Addition
                write-offs during FY '02 may occur. Without being overly

20              pessimistic, please help ensure that our upcoming and other future
                filings are compliant w/the above and that communications w/the

21              Board and Audit Committee are all consistent w/that provided the
                3rd parties. Thanks, B.J.

22

23   Rassam's plea to defendants Gless, Nelson, Stulac and, through Stulac, Arthur Andersen and

24   AWSC, for full and truthful disclosure of the write offs which Peregrine buried in the

25   "acquisition and other" line item, were ignored.

26        425.   At a dinner in July 2001 with Stulac and Sacks, Rassam told them that Peregrine

27   had an internally generated spreadsheet showing accounts receivable of between $80-$100

28   million at December 31, 2000. Peregrine's published financial statements did not reflect this

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                      153

Exhibit D
0283

1    material fact, nor were they corrected to reflect this information.

2       426.    In the June-July 2001 timeframe, Sacks told Rassam that in the Fall of 2000,

3 Peregrine had obtained financing in the amount of approximately $270 million from private

4 investors. She told Rassam that a "due diligence" issue arose because Peregrine did not have a

5 detailed accounts receivable subledger tied to the general ledger. Arthur Andersen assisted

6 Peregrine in obtaining these funds by "going along" with Peregrine's false statements to help

7 ensure the financing would be accomplished.

8       427.    In April 2001, Rassam worked with Gless on the March 2001 quarterly write off,

9 which ultimately was $15 million. At Gless's instruction, and with the knowledge and approval

10 of Stulac, this write off was made against the reserve for "acquisition cost and other expense,"

11 rather than as a bad debt expense or directly against revenue. Rassam questioned Stulac as to the

12 propriety of this accounting as Rassam knew it was wrongful. Stulac said to Rassam that as long

13 as the amount of the write off was less than 5% of the "acquisition cost" line item, then it was not

14 material and could be written off in this manner. Stulac stated that if the revenue was "good"

15 when booked and later went "bad," it could be booked as an expense and not as a direct reduction

16 of revenue. Rassam disagreed with Stulac, but did not insist on the proper accounting for fear of

17 losing his job. Moreover, Rassam was in the awkward position of observing the chief accounting

18 officer of the Company, defendant Gless, actually working with the auditor, defendant Arthur

19 Andersen, to cook the Company's books. Similar bad debt write offs had been taken and

20 acquiesced in by Stulac and Arthur Andersen at the quarters ending June 30, 2000,

21 September 30, 2000, and December 31, 2000 as "accrued acquisition expenses."

22       428.    Rassam directly questioned Arthur Andersen about the December 2000

23 transaction involving IBM/Tivoli. He believed this was a concurrent "swap" type of transaction.

24 He questioned Stulac how the two transactions could be treated separately, and Stulac told

25 Rassam that he had personally structured the transaction for defendant Gless. When Gless

26 learned that Rassam had questioned Stulac, Rassam was thereafter excluded by Gless from

27 further involvement in revenue recognition oversight.

28       429.    By an e-mail dated April 12, 2001, the Arthur Andersen team in San Diego

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)

1  assigned to Peregrine, consisting of audit engagement partner Stulac and senior staff auditor

2  Leslie Sadoff were warned of serious problems in EMEA by AWSC. The subject of the e-mail

3  was "Early Warning Peregrine Systems Germany." By this e-mail, the auditors assisting from

4  defendant AWSC reported that "we have visited with Peregrine Systems GmbH today and

5  identified revenue recognition issues that we would like to inform you about ..." The e-mail

6  identified contracts with CENITH AG Systemhaus for 1,000,000 EUR, GE CompuNet Computer

7  AG & Co. for 2,000,000 EUR and Systematics AG with contracts totaling $12,000,000 as

8  involving improper revenue recognition. The e-mail sated "In all cases fees are not fixed and

9  determinable (payments - in part - are due in over 12 month), the customers are all resellers and

10  delivery has not occurred. Therefore it is not appropriate to recognize any revenue from these

11  contracts at March 31, 2001." The message also makes reference to preliminary information that

12  EURO 14.6 million was recognized, improperly, on these contracts. Ominously, the memo went

13  to state "[w]e are awaiting further license contracts for our review, so there could potentially

14  come up more revenue recognition issues once we receive further information next week." This

15  e-mail also identified problems with aged receivables: "[w]e have preliminary information about

16  aged accounts receivables, mainly towards resellers that in our opinion should be reversed

17  against revenue. They amount to approximately EURO 1.8 mill."

18      430.   By e-mail dated April 25, 2001 from representatives of AWSC to Stulac and

19  Sacks, serious problems within EMEA continued to be reported. It was reported to the Arthur

20  Andersen personnel that, "[d]ue to serious problems concerning information flow and quality we

21  can only report our preliminary findings today. As the implementation of Peoplesoft for PS

22  Germany was very problematic, the company was not able to provide the necessary

23  documentation for our work." This e-mail went on to repeat the concerns previously

24  communicated regarding "bad revenue" and failure to set up sufficient bad debt reserves.

25      431.   On May 30, 2001, the AWSC representatives in Germany e-mailed the Arthur

26  Andersen audit engagement team (Stulac, Sacks and Sadoff) with a summary of their

27  management recommendations. It stated that:

28          ... [a]ccounting and financial reporting information quality is poor.

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
#105317   Master File No. 02-CV-0870 J(RBB)                                                      155

Namely, subledgers for Accounts Receivables and Accounts Payables do not tie into the General Ledger. During the audit it was not possible to get a detailed revenue listing from the system, nor was it possible to get detailed reports for other significant account balances such as deferred revenue, prepaid expenses and other, or similar. **Therefore it is not possible to obtain the necessary information in order to assess the correctness of a number of significant account balances....During our audit we became aware of a number of revenue recognition issues (e.g. channel sales, due dates larger than 12 months, missing dates and signatures on contracts)."...** Summarizing the above, company's accounting and financial reporting need significant improvement and immediate attention. (Emphasis added).

432.    By e-mail dated August 1, 2001, Philippe Turowski and Mair of AWSC repeated all of the serious issues and concerns in their prior e-mail of May 30, 2001, and specifically reported that license revenue of 2,720,314 EUR on several transactions (with Materna Information & Communications GbmH, Arxes Network Communication Consulting AG, Detsche Bank AG, MSE Middleware Sorewae Engineering GmbH, and HAN DATAPORT Software GmbH) was misstated. Among the reasons for this conclusion were that "Arxes, MSE and HANB Dataport are all initial orders by resellers, where no end-user has been specified. Therefore we believe that revenue should not have been recognized." This was an acknowledgment that Peregrine's entire Board-authorized revenue recognition policy since the fourth quarter of fiscal year 1999 based on sell-in resulted in improperly recognized revenue. As to accounts receivable totaling 13,473,500 EUR, AWSC reported that "more than 32% of A/R are overdue by more than 90 days, 28% overdue by more than 120 days. **The company did not set up any bad debt provisions.**" (Emphasis added). The AWSC personnel concluded that a bad debt reserve should be set up, but "company's management believes that no bad debt allowance is necessary." The e-mail concluded by listing several accounts receivable (Systematics, Network Constul, GE Compunet, Maiks, Fleet and Arxes) for a total of 18,695,701 EUR as "questionable revenue." An e-mail dated October 19, 2001 from AWSC representatives in Germany to Stulac, Sacks and Sadoff repeated all of the concerns highlighted in the August 1, 2001 e-mail. These e-mail reports to Arthur Andersen in San Diego reflect actual knowledge of numerous material deficiencies in the accounting in Peregrine's EMEA division which constituted a red flag that Peregrine was violating fundamental accounting rules and practices

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                156

Exhibit D
0286

1  and was engaging in an accounting fraud.

2      433.    Through the assistance of AWSC in its audits and reviews of Peregrine's financial

3  statements, Arthur Andersen learned of numerous accounting irregularities in Peregrine's EMEA

4  division.  According to Dorothy Trill, European Financial Controller, the auditors from Arthur

5  Andersen - United Kingdom, who conducted the statutory audits for EMEA, were "very

6  surprised" by the revenue recognition practices that the San Diego office of Arthur Andersen

7  permitted, and "raised their eyebrows" at these practices.  In particular, they frowned on the San

8  Diego auditors approving booking of contracts as revenue which had extended payment terms.

9  They believed the Arthur Andersen audit team was "out to lunch" because there was never any

10  follow-up with regard to the serious accounting issues raised in EMEA, especially Germany.

11      434.    In the Fall and in December 2001, from conversations with defendant Gless,

12  including conversations over drinks at the Doubletree Hotel near Peregrine's office, Stulac was

13  made aware of the existence of side letters applicable to agreements entered into by Peregrine's

14  EMEA division, which letters excused and/or made contingent payment by resellers with whom

15  Peregrine had entered into license agreements and pursuant to which revenue had been

16  recognized.  By this knowledge, Arthur Andersen was provided with yet further evidence that its

17  client was engaging in a revenue recognition fraud and that representations of its management

18  regarding matters directly relevant to financial reporting could not be relied upon.

19      435.    In response to the information about side letters, Arthur Andersen took no action,

20  failed to correct its previously issued audit opinions, failed to require that its client disclose any

21  of these matters, and failed to itself inform the investing public of its client's fraud.

22          **3.**    **Fiscal Year 2002**

23      436.    In the first quarter of fiscal year 2002 ending June 30, 2001, Rassam discussed

24  with Stulac Peregrine's "off balance sheet risk" in connection with the sale of accounts

25  receivable to banks.  Stulac told Rassam that it was acceptable to keep these transactions off the

26  balance sheet.  In May 2001, Rassam had learned that the Company had bought back receivables

27  from banks.  He believed this created real "off balance sheet risk."  Rassam obtained

28  spreadsheets dated May 2001 which showed that Peregrine had repurchased receivables.  One

---

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)

1  spreadsheet is in the form of an e-mail listing seven receivables repurchased from Wells Fargo

2  Bank and Fleet Bank totaling more than $17 million, on which customers had never paid.

3  Another spreadsheet listed receivables that had been sold to Fleet Bank, Wells Fargo, and Silicon

4  Valley Bank as of March 31, 2001 totaling over $130 million. Rassam forwarded these

5  spreadsheets to Arthur Andersen on July 12, 2001. In the accompanying e-mail Rassam stated "I

6  think this supports my assertion that we disclose off B/S risk. Please advise." After a meeting

7  with Peregrine's Treasurer, Benjamin, about these receivables, Arthur Andersen personnel Sacks

8  and Sadoff came out of the meeting "white as ghosts" because it confirmed for them that their

9  client's personnel were liars, including defendant Gless. Rassam asked Stulac why bank

10  financing of accounts receivable had not been disclosed in Peregrine's public filings pursuant to

11  FAS 140 and Stulac told Rassam that it was because "Gless did not want it disclosed." In

12  deferring to its client's fraud, Arthur Andersen itself committed fraud. Arthur Andersen

13  deliberately chose to conceal the truth and played a significant role in Peregrine's ability to

14  misrepresent its financial condition to investors.

15      437.  In the quarter ending September 30, 2001, Arthur Andersen conducted a firmwide

16  review of its top 20 riskiest clients worldwide, and was considering whether to fire them.

17  Peregrine was on the list, as was Enron. As a result of this ongoing review, Arthur Andersen

18  replaced Stulac with a new audit engagement partner. The new partner, Ross Baldwin, told

19  Sacks that the Arthur Andersen partner reviewing the client was ashamed at the quality of the

20  workpapers relating to the Peregrine audits and reviews, and believed that the absence of an

21  accounts receivable subledger was unforgivable.

22      438.  In July 2001, Rassam sent an e-mail to Stulac and Sacks complaining that he still

23  had not seen an accounts receivable detailed subledger tying to the general ledger. In his e-mail,

24  Rassam questioned the difference between a spreadsheet Arthur Andersen had seen in December

25  2000 and the spreadsheet Rassam had told the Andersen personnel about. Rassam demanded

26  that Stulac inform the Audit Committee. Stulac resisted.

27      439.  Peregrine wrote off approximately $40 million in receivables in the quarter ending

28  September 30, 2001. Of this amount, $25 million was written off as "acquisition expense and

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                 158

1   other" consistent with prior write offs since June 2000.  Stulac maintained that this accounting

2   treatment was acceptable as long as the write off was less than 5% of the line item, and because

3   there was an overlap of channel partners between Peregrine and Remedy, which had recently

4   been acquired.  Rassam knew this accounting treatment was wrong, but Stulac and Gless insisted

5   on it.  They effectuated this accounting treatment through post-closing journal entries made by

6   Gless in the presence of and in conjunction with Stulac.  Subsequently, in a letter dated April 5,

7   2002, from Arthur Andersen to defendant Gless, the firm acknowledged that there should have

8   been disclosures of the purchase accrual write offs.  Peregrine's write offs of accounts receivable

9   should were required under GAAP to have been recorded as reversals of revenue.

10       440.    On July 20, 2001, Rassam forwarded an e-mail received from Jim Ingram, a

11  Peregrine employee, to defendants Gless, Stulac, and through Stulac, Arthur Andersen and

12  AWSC , referring to,

13              "[t]he absolute mess I inherited from the old regine (sic) (e.g. local
                currency ledgers out of balance; intercompany accounts which
14              have not been reconciled; an aging report which has not, and still
                does not tie-in to the G/L, ad nauseum)...I'm a little frightened by
15              this inasmuch as I can ill afford to loose (sic) my license to practice
                should forensic auditors ever decide to pay us a visit.
16

17  Even Peregrine's own employees mocked the work, or absence of work, of the Company's

18  auditors, Arthur Andersen, and highlighted the Company's abysmal lack of internal controls.

19       441.    Arthur Andersen assigned a new audit engagement partner, Ross Baldwin, to the

20  Peregrine account beginning with the review of the second quarter of fiscal year 2002 (the

21  quarter ending September 30, 2001).  Baldwin moved to San Diego in August 2001 from the

22  firm's Sacramento office.  Baldwin had first encountered Peregrine when he visited in April or

23  May of 2001 to meet with Stulac and Sacks, the Peregrine audit manager, to learn more about his

24  impending assignment as the audit engagement partner for the Peregrine account.  Defendants

25  Gardner, Gless, and Nelson resisted the change in audit engagement partners from Stulac to

26  Baldwin as they knew from working with him closely that Stulac was malleable and readily

27  willing to allow Peregrine to violate accounting rules to help the Company achieve the financial

28  results it wanted.  Stulac rarely questioned Peregrine's accounting decisions and focused on

Exhibit D
0289

1    making the client happy, rather than challenging management's accounting decisions.

2        442.    During Baldwin's tenure as engagement partner, he observed deficiencies in the

3    prior reviews and annual audits and sought to make changes.  For example, he requested

4    management representation letters from Peregrine's sales department because of the information

5    that came to his attention in the Fall of 2001 that certain sales transactions contained unusual

6    terms, including side letter agreements eliminating or deferring the obligation to pay, which

7    rendered revenue recognition improper.  Defendant Nelson nevertheless prevailed upon Baldwin

8    to back off this request.  The refusal of management to allow the sales department to provide

9    representation letters was a red flag to Arthur Andersen that there were purported revenue

10   generating transactions which Peregrine relied on which in fact did not consist of revenue that

11   could properly be recognized under GAAP.

12       443.    In light of the knowledge Baldwin obtained regarding the existence of side letters

13   and the resulting improper revenue recognition, Baldwin changed the form of management

14   representation letters from that which were used in prior quarters and in connection with the

15   2001 audit.  Specifically, he included a line item in the representation letters stating that there

16   were no side letters in existence.  Baldwin knew that side letters existed and incorporated this

17   language in the representation letters to provide cover for Arthur Andersen in an attempt to

18   protect the firm in the event that the side letters became public.  Baldwin knew that Arthur

19   Andersen's client was dishonest and would sign the false representation letters, and concluded

20   that the existence of these false management representation letters would purportedly give Arthur

21   Andersen a legal defense in the event of exposure of its client's fraud.

22       444.    During the course of his work on the Peregrine reviews, Baldwin observed that

23   there was a low return rate on confirmation letters that Arthur Andersen had sent to customers in

24   connection with the 2001 year end audit.  Baldwin believed the return rate on such confirmation

25   letters was too low, was inadequate to give comfort as to the validity of many of the transactions

26   that Peregrine engaged in, and needed to be increased.  This was yet another red flag that many of

27   Peregrine's transactions were not properly documented and could not be considered to have

28   generated legitimate revenue.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
         Master File No. 02-CV-0870 J(RBB)                                                                      160

                                                                                           Exhibit D
                                                                                           0290

445.    Several Arthur Andersen personnel participated in the October 24, 2001 Audit Committee meeting in connection with the second quarter of fiscal year 2002, including Baldwin. One such person was Arthur Andersen Western Region National Practice Director Robert S. Shanley.  He attended the meeting because Arthur Andersen had learned of material issues with regard to the propriety of Peregrine's revenue recognition, specifically, that several material transactions involved revenue recognized where there were side letters which made payment illusory, or significantly delayed payment.  In light of this awareness of Peregrine's accounting manipulations, the Arthur Andersen personnel anticipated a difficult and antagonistic meeting. In fact, there was significant conflict at this meeting between the Peregrine personnel and the Arthur Andersen personnel.  Baldwin went over 6-7 transactions where Arthur Andersen had detected improper revenue recognition on contracts, including Fujitsu, Total Infosystems, Unisys, CMS Energy, and Aetna.  In addition, Baldwin discussed examples of internal "control breakdowns" that had been observed by Arthur Andersen in the recording of revenue from these transactions.   Gless admitted that there had been control breakdowns.  Such "control breakdowns" included a reference to clauses in license agreements which contained "non-standard" terms relieving the customer of any payment obligation, and further noting some agreements which were undated.  Baldwin handed out a sheet entitled "Types of Potential Misstatements" which was a detailed analysis of how violations of SOP 97-2 arise, the GAAP standard governing recognition of revenue for software sales, which Baldwin stated had been violated in numerous instances by Peregrine.

446.    Defendants Gless and Nelson aggressively challenged Baldwin.  Gless claimed that Baldwin did not have sufficient experience with software accounting and that he was "overstepping" his role in challenging the revenue recognition from these contracts.  The highly aggressive and defensive reaction of Peregrine management to the auditors' discussion of Peregrine's revenue recognition practices was yet another red flag that Peregrine management was engaged in deliberate accounting manipulations for which they would brook no disagreement.  Further, during this meeting, defendants Gless and Nelson pressed for the reinstatement of Stulac as audit engagement partner.

447.    Notwithstanding the clearly intentional and repeated violations of GAAP which Arthur Andersen had observed in the transactions discussed with defendants Gless and Nelson at this meeting, it nonetheless abandoned its role as "public watchdog" and bowed to the wishes of its client, agreeing to accept the "significant accounting judgments" made by the Company. Arthur Andersen thereby acquiesced in Peregrine's accounting fraud.

448.    Arthur Andersen conducted a review of the financial results for the third quarter of fiscal year 2002 ending December 31, 2001.  In connection with its review, Arthur Andersen continued to note material deficiencies in Peregrine's accounting practices.  At a January 22, 2002 Audit Committee meeting these issues were raised.  In addition to the members of the Audit Committee as of that date (defendants Noell, Watrous, and Dammeyer), Peregrine management was represented by defendants Gless and Nelson, and General Counsel Deller also participated.

449.    Among the material accounting issues which Arthur Andersen knew of and discussed at this meeting were the following.  Several contracts pursuant to which revenue was being recognized lacked any dates.  A transaction with Smith Barney that was recognized as revenue at December 31, 2001 was dated January 3, 2002, beyond the end of the third quarter. Baldwin further identified the following as areas where Arthur Andersen had become aware of accounting deficiencies: (i) the presence of numerous contracts with 30 day rights of return, which rendered revenue recognition improper; (ii) multiple errors in quarterly debit entries from Europe; (iii) several Xanadu transactions that were to include a deferred transaction fee to be recorded on a monthly basis only, but which were immediately recognize as revenue; (iv) transactions with acceptance clauses without the proper acceptance documentation; and (v) two large reseller deals that were improperly recognized as revenue on a sell-in basis, *i.e.* Prokom and MGX.  Thus, Arthur Andersen continued to have knowledge of continuing improper accounting engaged in by Peregrine but took no steps to correct Peregrine's misstated quarterly financial statements or to otherwise disclose the accounting irregularities, or insist on correction of misstated amounts.

450.    As a result of its review procedures with regard to the third quarter of fiscal year

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                        162

Exhibit D
0292

1   2002, Arthur Andersen was aware of an accumulation of Peregrine receivables in the amount of

2   $87 million, yet the Company recorded a bad debt reserve of only $14 million. Arthur Andersen

3   knew, or was deliberately reckless in disregarding, that the recorded amount of bad debt reserve

4   was materially inadequate, which rendered the third quarter financial statement false and

5   misleading.

6       451.    On February 2, 2002, Baldwin participated in a conference call with defendants

7   Gless and Nelson regarding various open accounting matters that existed even after the third

8   quarter press release and Audit Committee meeting. Peregrine issued its press release before

9   resolution of numerous open items which were subject to further audit procedures. The

10  Company's premature release of its results before its auditors had resolved open issues was yet

11  another red flag to Arthur Andersen that its client was engaged in an accounting fraud and could

12  not be relied upon to provide truthful and accurate information or to report its transactions in

13  accordance with applicable accounting rules.

14      452.    In February 2002, Baldwin had a conversation with Rassam, during which the fact

15  that Peregrine had a large amount of impaired receivables was discussed. Baldwin stated to

16  Rassam that 100% of the impaired receivables would have to be written off at the end of the

17  quarter, whereas Rassam suggested that the write off be taken over a "number of quarters."

18  Rassam further told Baldwin at this time that he did not want to "crash the bus and kill all the

19  passengers." This conversation was further evidence for Arthur Andersen that its client was

20  committing accounting fraud, yet it did nothing to disclose its client's fraud. Instead, the firm

21  continued to allow the public to rely on financial statements it knew were materially false and

22  misleading.

23      453.    At a special meeting of the Audit Committee conducted on February 12, 2002

24  which Baldwin attended, the issue of Peregrine's transactions with Critical Path was raised.

25  Although this matter had first been raised at the July 2001 Audit Committee meeting, Arthur

26  Andersen had not completed a final analysis of the transactions for revenue recognition purposes.

27  Nonetheless, at the February 2002 meeting, defendant Gless falsely represented to the Audit

28  Committee that Arthur Andersen had reached a final conclusion that the transactions were

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    163

#105317

Exhibit D
0293

1  appropriately accounted for. Baldwin knew this to be untrue, as the analysis previously initiated

2  by Arthur Andersen was incomplete and had not been reviewed by a partner. As of this meeting,

3  and based on defendant Gless's false representation to the Audit Committee, Arthur Andersen

4  knew that its client was dishonest and, given the history of multiple material issues with its

5  accounting practices, was engaged in accounting fraud. Further, on March 11, 2002, Arthur

6  Andersen communicated to defendants Gardner and Gless that the Company's accounting for the

7  Critical Path transactions did not meet the requirements of SOP 97-2.

8       454.   Baldwin authored a memorandum dated March 29, 2002. In it he discussed

9  consideration of possible restatement of the prior year's financial statements based on the fact

10 that Peregrine had used the "acquisition and other" line item in its balance sheet for the improper

11 purpose of writing off $25 million of Peregrine's, rather than acquired companies', receivables.

12 In other words, Arthur Andersen knew that Peregrine had defrauded readers of its financial

13 statements by incorporating inappropriate amounts in the "acquisition and other" line item.

14 Notwithstanding this knowledge, Arthur Andersen failed to require a restatement, failed to

15 withdraw its prior years' unqualified audit opinions, and made no disclosure to the investing

16 public of its knowledge of this fraud.

17      455.   Arthur Andersen also knew as of March 2002 that Peregrine was recording

18 revenue pursuant to agreements that were signed after the close of the quarter in which the

19 revenue was recorded. The March 2002 Baldwin memorandum indicated that the firm's cut-off

20 testing had generally occurred 9 to 15 days after period end. Based on the knowledge gained

21 through its review work, Arthur Andersen knew that it needed to test the cut-off much closer to

22 the end of the period because of recurring examples of agreements without dates, or dates that

23 fell outside of the period in which the revenue was recorded. Rassam objected to this plan,

24 providing yet further indication that Peregrine did not want its auditor to review its end of period

25 transactions in time for the results to be incorporated in the quarterly or year end financial

26 statements. This was another red flag to Arthur Andersen that its client was engaged in

27 accounting fraud and manipulation.

28 //

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                    164

#105317

Exhibit D
0294

## AWSC'S PARTICIPATION IN THE FRAUD

456. AWSC assisted in both the year-end fiscal 2000 and 2001 audits of Peregrine and all of the quarterly reviews during the Class Period. Ross Baldwin, the Arthur Andersen audit engagement partner beginning September 1, 2001, told investigators that for the quarterly reviews beginning for the second quarter of fiscal year 2002, the San Diego Arthur Andersen audit team "requested that Arthur Andersen World Wide (*i.e.*, defendant AWSC), assist in support of the Peregrine reviews and audits." AWSC did so. For each period under review or audit, Arthur Andersen in San Diego would send a memo to the appropriate AWSC office describing the scope of procedures to be conducted by the AWSC foreign office.

457. As alleged in paragraphs 413-455 above, which are incorporated herein by reference, AWSC knew of Peregrine's accounting fraud through its accounting work on Peregrine's EMEA division, in particular, Peregrine Germany. As a result of its work, AWSC auditors learned (i) that a major division of Peregrine was engaged in revenue recognition fraud, (ii) that many of the contracts pursuant to which it reported revenue were undated and/or outside of the relevant period, (iii) that there were materially deficient internal accounting controls such that it was not possible for the auditors to completely understand EMEA's accounting transactions; and (iv) there were materially deficient bad debt reserves and that Company personnel actively resisted establishing appropriate reserves.

458. Notwithstanding AWSC's knowledge of Peregrine's accounting fraud, it took no steps to insist on correction of misleading financial statements or otherwise make disclosure of Peregrine's accounting fraud.

459. Both Arthur Andersen and AWSC violated GAAS in connection with their audit and review work. GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relate to the conduct of auditors in performing and reporting on audit engagements. Statements on Auditing Standards are recognized by the AICPA as the interpretation of GAAS. Arthur Andersen's representations concerning Peregrine's fiscal 2000 and 2001 financial statements were materially false and misleading when made, because Arthur Andersen knew that those financial statements were not prepared in accordance with GAAP nor

Exhibit D
0295

1   had Arthur Andersen or AWSC conducted their audits in accordance with GAAS. Arthur

2   Andersen knew that its reports would be relied upon by potential investors in Peregrine

3   securities. Moreover, Arthur Andersen and AWSC's failure to require Peregrine to revise its

4   false interim financial reports was a violation of GAAS due to Arthur Andersen and AWSC's

5   knowledge of factors indicating Peregrine's deviation from GAAP in the presentation of its

6   interim results for each of the quarterly periods in 2000, 2001 and for the first three quarters of

7   fiscal 2002. As to the published interim financial results, which they reviewed and approved,

8   Arthur Andersen and AWSC also knew that such results would be relied upon by potential

9   investors in Peregrine securities and that such materially inaccurate results would be incorporated

10  in the Company's announced year end results.

11      460.    Under GAAS, as set forth in AICPA AU §326, Evidential Matter, the auditor is

12  required to obtain sufficient, competent evidential matter through inspection, observation,

13  inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial

14  statements under audit. AU §326.01. When an auditor believes that financial statements contain

15  material departures from GAAP, the auditor should express a qualified or adverse opinion. *See*

16  AU §508.20, §508.35-.60.

17      461.    In violation of GAAS and contrary to the representations in its opinions on

18  Peregrine's fiscal 2000 and 2001 financial statements, Arthur Andersen did not obtain sufficient

19  competent evidential matter to support Peregrine's assertions regarding its financial statements

20  for fiscal 2000 and 2001 and failed to modify its reports to express a qualified or adverse

21  opinion. In fact, Arthur Andersen was aware of several factors which contradicted or gave rise to

22  serious questions regarding Peregrine's internal accounting controls:

23          a.    Peregrine had weak and/or non-existent internal accounting controls and

24  thus no ability to generate reliable financial statements under GAAP;

25          b.    The absence of any minutes of the Audit Committee;

26          c.    The existence of numerous significant manual adjustments to software

27  license and maintenance revenue;

28          d.    The failure to record the deferred tax effects for accruals recorded in

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                              166

1  Peregrine's various business combinations;

2        e.     The inability to quantify the amount of sales to resellers (and their identity)

3  during particular accounting periods;

4        f.     The existence of side letters or license agreements which rendered revenue

5  recognition pursuant thereto improper;

6        g.     Substantial delays in providing, or an inability to provide, information

7  such as trial balances, general ledgers and subledgers that would customarily be readily available

8  from a company's accounting systems; and

9        h.     Peregrine did not have a functioning Audit Committee independent of

10 Peregrine senior management.

11     462.   In addition, Arthur Andersen and AWSC violated AU §316 concerning

12 *Consideration of Fraud in a Financial Statement Audit* and AU §317, *Illegal Acts by Clients* by

13 failing to expand audit procedures in the face of numerous "red flags" concerning the reliability

14 of Peregrine's financial statements.  AU §316 requires that the auditor plan and perform an audit

15 to obtain reasonable assurance about whether the financial statements are free of material

16 misstatement, whether caused by error or fraud.  AU §317 requires the auditor to give

17 consideration to the possibility of illegal acts by a client in an audit of financial statements.  For

18 the reasons alleged above, in conducting its audits of Peregrine's fiscal 2000 and 2001 financial

19 statements and reviews of the interim quarterly results for those periods and the first three

20 quarters of fiscal year 2002, Arthur Andersen and AWSC knew or recklessly disregarded facts

21 and circumstances which showed Peregrine and its senior management was committing a fraud

22 and/or committing illegal acts which rendered the financial statements unreliable and materially

23 misstated.

24     463.   In November 1998, the AICPA circulated to public accounting firms Practice

25 Alert 98-3 entitled "Revenue Recognition Issues."  The Practice Alert identified various issues

26 which required "special consideration" by auditors.  Among the issues identified were the

27 following: (i) significant sales or volume of sales that are recorded at or near the end of the

28 reporting period; (ii) unusual volume of sales to distributors/resellers; (iii) barter transactions;

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)            167

#105317

Exhibit D
0297

1  and (iv) the existence of "side agreements." Each of these conditions existed at Peregrine during

2  the Class Period and required Arthur Andersen and AWSC to employ heightened scrutiny.

3      464.    The Practice Alert also put auditors on notice that a "company constantly

4  increasing sales that 'always meets or exceeds' budgeted sales targets and that result in the 'build

5  up' of accounts receivable may warrant extra attention. When a substantial portion of the

6  company's sales occur at the end of the accounting period, extra caution in auditing revenue

7  transactions is appropriate." Despite notice of specific types of problems which were occurring

8  at Peregrine, Arthur Andersen and AWSC knowingly or with deliberate recklessness failed to

9  employ "extra caution," "extra attention" or "special consideration" as dictated by the facts and

10 circumstance of the Peregrine engagements.

11     465.    Given these factors, Arthur Andersen and AWSC knew or recklessly disregarded

12 that Peregrine's audited financial statements for fiscal years 2000 and 2001 were misstated and

13 Arthur Andersen should have modified its reports to be adverse or withdrawn from the

14 engagement. Similarly, Arthur Andersen and AWSC knew or with deliberate recklessness

15 disregarded that Peregrine's unaudited interim financial statements for each of the reporting

16 quarters of 2000, 2001 and the first three quarters of 2002 were misstated and not prepared in

17 accordance with GAAP. However, in order to keep Peregrine as a client and continue to generate

18 lucrative consulting business from Peregrine, Arthur Andersen issued unqualified opinions on

19 April 25, 2000 and April 26, 2001, falsely representing that Peregrine's audited financial

20 statements were presented in conformity with GAAP and that Arthur Andersen's audits had been

21 conducted in conformity with GAAS.

22     466.    Peregrine and Arthur Andersen have since admitted that Peregrine's fiscal 2000

23 and 2001 audited financial statements as well as Peregrine's interim financial results for fiscal

24 years 2000, 2001 and the first three quarters of fiscal 2002 were materially misstated and cannot

25 be relied on.

26     467.    Arthur Andersen and AWSC had a duty under GAAS to insist on revision of

27 Peregrine's false interim financial reports for fiscal years 2000 and 2001 and the first three

28 quarters of fiscal year 2002 when they became aware that the results were misstated. Arthur

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                           168

Exhibit D
0298

1  Andersen and AWSC knowingly participated in Peregrine's false financial reporting by its failure

2  to require such revisions on a timely basis, which was in violation of GAAS.

3       468.  Arthur Andersen and AWSC reviewed and approved of each of the financial

4  statements reflecting Peregrine's interim quarterly results which were issued during the Class

5  Period.  As to the interim results for the quarters in fiscal 2001 and 2002, SEC Rule 10-01 of

6  Regulation S-X, 17 CFR §210.10-01(d) required Arthur Andersen and AWSC to review

7  Peregrine's interim financial information prior to the Company filing its quarterly reports on

8  Form 10-Q, using professional standards and procedures for conducting such reviews, as

9  established by GAAS.

10       469.  GAAS, as set forth in AU §§722.20-.22 states:

11       .20  As a result of performing the services described in paragraph
.05, the accountant may become aware of matters that cause him or
12  her to believe that interim financial information, filed or to be filed
with a specified regulatory agency, is probably materially misstated
13  as a result of a departure from generally accepted accounting
principles. In such circumstances, the accountant should discuss
14  the matters with the appropriate level of management as soon as
practicable.

15

16       .21  If, in the accountant's judgment, management does not
respond appropriately to the accountant's communication within a
17  reasonable period of time, the accountant should inform the audit
committee, or others with equivalent authority and responsibility
18  (hereafter referred to as the audit committee), of the matters as
soon as practicable. This communication may be oral or written. If
19  information is communicated orally, the accountant should
document the communication in appropriate memoranda or
20  notations in the working papers.

21       .22  If, in the accountant's judgment, the audit committee does
not respond appropriately to the accountant's communication
22  within a reasonable period of time, the accountant should evaluate
(a) whether to resign from the engagement related to interim
23  financial information, and (b) whether to remain as the entity's
auditor or stand for reelection to audit the entity's financial
24  statements. The accountant may wish to consult with his or her
attorney when making these evaluations.

25       470.  Due to Arthur Andersen and AWSC's knowledge of Peregrine's internal control

26  structure obtained from auditing procedures and reviews performed during Peregrine's audits,

27  and from its other work performed for Peregrine, as well as the Arthur Andersen and AWSC's

28  frequent contacts with Peregrine personnel, Arthur Andersen and AWSC knew or with deliberate

Exhibit D
0299

1 recklessness disregarded that Peregrine was falsely reporting its results in the Company's interim

2 financial statements during fiscal years 2000 and 2001 and the first three quarters of fiscal year

3 2002.  Statement on Auditing Standards No. 71, *Interim Financial Information* (AU§722), sets

4 forth the professional standards and guidance for conducting interim reviews.  Among the

5 analytical review procedures to be implemented, based on the auditor's knowledge of financial

6 reporting practices and significant accounting matters, are: (i) inquiries concerning internal

7 controls; (ii) analytical review procedures; and (iii) reading the interim financial information for

8 conformity with GAAP.  Based on the foregoing, Arthur Andersen and AWSC knew, or were

9 deliberately reckless in not knowing, of Peregrine's misstated interim financial results for fiscal

10 years 2000 and 2001 and the first three quarters of fiscal year 2002, and failed to insist on

11 revision of the false interim financial statements.

12        471.    Based on Arthur Andersen's false audit opinions and the failure to qualify and/or

13 modify its reports to identify Peregrine's false financial reporting, Arthur Andersen violated the

14 following GAAS standards, among others:

15              a.      The second general standard which requires that the auditors should

16 maintain an independence in mental attitude in all matters relating to the engagement;

17              b.      The third general standard which requires that due professional care is to

18 be exercised in the performance of the audit and preparation of the report;

19              c.      The first standard of field work which requires that the audit is to be

20 adequately planned and that assistants should be properly supervised;

21              d.      The second standard of field work which requires that the auditor should

22 obtain a sufficient understanding of internal controls so as to plan the audit and determine the

23 nature, timing and extent of tests to be performed;

24              e.      The third standard of field work which requires that sufficient competent

25 evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial

26 statements under audit; and

27              f.      The third standard of reporting which requires that informative disclosures

28 are regarded as reasonably adequate unless otherwise stated in the report.

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                          170

Exhibit D
0300

472.    SEC Regulation S-X (17 C.F.R. §210.4-01(a) (1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a). The responsibility for preparing financial statements that conform to GAAP rests with corporate management as set forth in Section 110.03 of the AICPA Professional Standards:

> The financial statements are management's responsibility. . . Management is responsible **for adopting sound accounting policies and for establishing and maintaining internal control** that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . .Thus, the fair presentation of financial statements in conformity with [GAAP] is an implicit and integral part of management's responsibility. (Emphasis added).

473.    Pursuant to these requirements, Peregrine represented in its annual reports on Form 10-K and quarterly reports on Forms 10-Q filed with the SEC during the Class Period as detailed below, that its financial results were presented appropriately, in accordance with GAAP, in substantially these terms:

> Revenues from direct and indirect license agreements are recognized, provided that all of the following conditions are met: a noncancellable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable; risk of concession is deemed remote; and no other significant vendor obligations exist.

474.    Contrary to these representations, Peregrine inflated its revenues and net income during the Class Period by improperly recognizing revenue on the types of transactions set forth above. AICPA SOP 97-2, entitled *Software Revenue Recognition*, which governs the accounting for the product license sales by Peregrine during the Class Period, sets forth the criteria under which a software vendor is permitted to recognize revenue derived from software license agreements. Specifically, ¶ .08 of SOP 97-2 precludes recognition of revenue from license sales,

#105317
FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                171

Exhibit D
0301

1    where the contract "does not require significant production, modification, or customization of

2    software," unless all of the following criteria are met: (i) persuasive evidence of an arrangement

3    exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv)

4    collectability is probable (*i.e.*, is likely to occur).

5        475.   Each of these requirements for revenue recognition must be met regardless of

6    whether the software is sold directly to the end user, or through a reseller.  For example, ¶ .18 of

7    this SOP expressly provides that the delivery requirement "applies whether the customer is a user

8    or a reseller."  Further, SOP 97-2 expressly precludes recognition of revenue from product

9    license sales to resellers where the fee is not fixed and determinable, or collectability is not likely

10   to occur.  In such circumstances, if the sale to the reseller is not final but, in reality, is contingent

11   upon the reseller's subsequent sale of the product to the end user, no revenue generating

12   transaction has occurred.

13       476.   Thus, ¶ .30 of SOP 97-2 requires consideration of the following factors, among

14   others, to evaluate whether product license sales to resellers are legitimate, final sales, and

15   recognition of revenue from the agreement is appropriate:

16           i. Business practices, the reseller's operating history,
             competitive pressures, informal communications, or other factors
17           indicate that payment is substantially contingent on the reseller's
             success in distributing individual units of the product.
18
             ii. Resellers are new, undercapitalized, or in financial
19           difficulty and may not demonstrate an ability to honor a
             commitment to make fixed or determinable payments until they
20           collect cash from their customers.

21           iii. Uncertainties about the potential number of copies to be
             sold by the reseller may indicate that the amount of future returns
22           cannot be reasonably estimated on delivery; examples of such
             factors include the newness of the product or marketing channel,
23           competitive products, or dependence on the market potential of
             another product offered (or anticipated to be offered) by the
24           reseller.

25           iv. Distribution arrangements with resellers require the
             vendor to rebate or credit a portion of the original fee if the vendor
26           subsequently reduces its price for a product and the reseller still has
             rights with respect to that product (sometimes referred to as price
27           protection) . . .

28       477.   As detailed above, Arthur Andersen and AWSC knowingly or with deliberate

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                        172

#105317

1   recklessness caused Peregrine to recognize revenue from sales to both resellers and end users

2   where one or more conditions for proper recognition of revenue under GAAP were not met,

3   including the following: (i) the product was never delivered to the purchaser; (ii) the purchaser's

4   obligation to pay for the product was not fixed and determinable; (iii) collectability of the fee was

5   not probable; or (iv) the reseller's obligation to pay for the product was contingent upon

6   subsequent sale of the product to the end user.

7       478.    Defendants sought to conceal these facts by entering into multiple agreements

8   with respect to each product license sale: (i) a primary contract, which provided for the reseller to

9   take delivery of the product, and providing no right of return; and (ii) a verbal or written side

10  agreement designed to make the sale of the product contingent upon performance of additional

11  obligations.

12      479.    The falsification of Peregrine's DSO resulted from Peregrine understating its

13  accounts receivable in violation of the following GAAP principles including Statement of

14  Financial Accounting Concepts ("Concepts Statement") No. 5, ¶83; Concepts Statement No. 2,

15  ¶¶58-59; Concepts Statement No. 2, ¶¶95-97; and Concepts Statement No. 2, ¶79. Peregrine's

16  overstatement of its reported cash position also violated the GAAP principles including Concepts

17  Statement No. 2, ¶¶58-59, 79 and 95-97.

18      480.    Further, Peregrine's ultimate disclosure that it would restate its previously

19  reported financial results during the Class Period constitutes an admission that each of these

20  statements, as included in the Company's press releases and Forms 10-K and 10-Q, were

21  materially false and misleading when issued. Indeed, under Statement of Financial Accounting

22  Standards No. 16, *Prior Period Adjustments*, restatements are only permitted, and are required,

23  for the correction of errors or fraudulent financial reporting.

24      481.    Peregrine's announced restatement confirms that the Company's financial results

25  for fiscal years of 2000 and 2001 and for the first three quarters of fiscal year 2002 were

26  materially false and misleading when disseminated.

27      482.    As a result of these accounting improprieties, Arthur Andersen and AWSC caused

28  Peregrine's reported financial results to violate at least the following provisions of GAAP for

1    which each defendant is necessarily responsible:

2            a.    the principle that revenues must be realizable (collectible) and earned prior

3    to recognition (Statement of Financial Accounting Concepts ("Concepts Statement"), No. 5,

4    ¶83);

5            b.    the principle that financial reporting should provide information that is

6    useful to present and potential investors and creditors and other users in making rational

7    investment, credit and similar decisions (Concepts Statement No. 1, ¶34);

8            c.    the principle that financial reporting should be reliable in that it represents

9    what it purports to represent.  That information should be reliable as well as relevant is a notion

10   that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

11           d.    the principle of completeness, which means that nothing is left out of the

12   information that may be necessary to ensure that it validly represents underlying events and

13   conditions (Concepts Statement No. 2, ¶79);

14           e.    the principle that conservatism be used as a prudent reaction to uncertainty

15   to try to ensure that uncertainties and risks inherent in business situations are adequately

16   considered.  The best way to avoid injury to investors is to try to ensure that what is reported

17   represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97);

18           f.    GAAP's requirement of the disclosure of an existing condition, situation

19   or set of circumstances involving an uncertainty when there is at least a reasonable possibility

20   that a loss or an additional liability may have been incurred.  (Statement of Financial Accounting

21   Standards No. 5 (Accounting for Contingencies.));

22           g.    the principle that financial reporting should provide information about an

23   enterprise's financial performance during a period.  Investors and creditors often use information

24   about the past to help in assessing the prospects of an enterprise.  Thus, although investment and

25   credit decisions reflect investors' expectations about future enterprise performance, those

26   expectations are commonly based at least partly on evaluations of past enterprise performance

27   (Concepts Statement No. 1, ¶42);

28           h.    the principle that financial reporting should provide information about

Exhibit D
0304

1  how management of an enterprise has discharged its stewardship responsibility to owners

2  (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management

3  offers common stock of the enterprise to the public, it voluntarily accepts wider responsibilities

4  for accountability to prospective investors and to the public in general.  (Concepts Statement

5  No. 1, ¶50); and

6      i.   the principle that financial reporting should provide information about the

7  economic resources of an enterprise, the claims to those resources, and the effects of transactions,

8  events and circumstances that change resources and claims to those resources.  (Concepts

9  Statement No. 1, ¶40).

10     483.  The magnitude, duration and pervasiveness of the accounting manipulations

11  alleged herein, all of which violated the foregoing provisions of GAAP, compels the conclusion

12  that these improper accounting methods were implemented by Peregrine knowingly, and that as

13  alleged hereinabove, Arthur Andersen and AWSC directly participated in Peregrine's accounting

14  fraud.  They knew of improper revenue recognition (manipulation and failure to disclose change

15  in accounting policy, multiple, repeated violations of SOP 97-2 including side letters and holding

16  open quarters after the cut-off for purposes of recording sales), improper accounting for stock

17  option expense, improper accounting for bad debt reserves, improper recording of sales of

18  receivables to banks, but nevertheless knowingly consented to the falsification of Peregrine's

19  financial statements.  At best, Arthur Andersen's conduct was an egregious refusal to see the

20  obvious, *i.e.*, that its client was perpetrating an accounting fraud.  No reasonable accountant

21  would have made the same decisions that were made by Arthur Andersen if confronted with the

22  same facts, as is borne out by the conclusions reached by KPMG upon becoming successor

23  accountant in April 2002.  Based on the same facts available to Arthur Andersen, KPMG

24  concluded that Peregrine had committed accounting fraud and that its financial statements

25  required restatement.  Arthur Andersen was heavily involved in the day-to-day accounting

26  practices of the Company, it had actual knowledge of specific improper transactions and

27  accounting for such transactions, it acquiesced in accounting judgments of its client which it

28  knew to be wrong, and nonetheless issued unqualified audit opinions certifying Peregrine's

#105317  FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)  175

Exhibit D
0305

1  publicly filed financial statements complied with GAAP and that its auditing complied with

2  GAAS, as well as allowing publication of, and failing to correct, interim financial statements it

3  knew were materially inaccurate.

### KPMG'S PARTICIPATION IN THE FRAUD

5      484.   Defendants KPMG LLP, BearingPoint, and Rodda (collectively, "KPMG")

6  directly participated in Peregrine's fraud. They did so by engaging in transactions with Peregrine

7  so Peregrine could book revenue before deals with anticipated end users were completed. In

8  doing so, KPMG deliberately chose to conceal the truth and played a significant role in

9  Peregrine's ability to misrepresent its financial condition to investors. In exchange for its

10  participation in the scheme, KPMG was awarded lucrative services contracts.

11      485.   Peregrine's partnership relationship with KPMG began to form in late 1998, when

12  KPMG was providing consulting services to Microsoft Corporation. Defendant Spitzer had

13  several meetings with defendant Rodda, a KPMG principal based in KPMG's Sacramento office.

14  Rodda, Spitzer, and others at Peregrine negotiated an "alliance" arrangement between Peregrine

15  and KPMG. The April 1, 1999 letter agreement provided that Peregrine would provide KPMG

16  with $500,000 to fund the hiring, training, and certification of staff to sell and install Peregrine

17  software and that KPMG agreed to "an up-front license commitment" of $2.5 million in

18  Peregrine software over a two year period.

19      486.   After the "alliance" arrangement was in place, Peregrine frequently approached

20  KPMG at the end of a quarter and asked to "park" software with KPMG. This occurred when

21  Peregrine knew it could not complete a direct sale in time to record revenue for that quarter but

22  needed the revenue to help it meet its publicly announced revenue projections. In such instances,

23  Peregrine asked KPMG whether it would enter into a deal for the anticipated amount of the sale

24  to the end user. Peregrine would then immediately book the revenue from the transaction with

25  KPMG even though the deal with the end user had not yet been completed. In return, KPMG

26  received the service portion of the contract, which often was worth hundreds of thousands of

27  dollars. Peregrine also assured KPMG that it would not enforce the payment terms as against

28  KPMG. Examples of transactions where "parking" occurred include deals in which Sodexho

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                    176

Exhibit D
0306

1    Marriott, Citigroup Global Technology, Inc. ("Citigroup"), Avnet, Inc., and Morgan Stanley Dean

2    Witter ("Morgan Stanley"), who were identified as the potential end users.  Defendant KPMG

3    knew that Peregrine proposed these "parking" arrangements so it could falsely represent to

4    investors that it had obtained revenue from such unfinished deals.

5        487.    The documentation for various transactions between Peregrine and KPMG

6    evidences the fact that the deals had no commercial substance.  For instance, in a transaction in

7    which Sodexho Marriott was identified as the intended end user, there were multiple sets of

8    inconsistent paperwork.  Peregrine had in its files two different Schedule A attachments to the

9    license agreement and a Product Registration Agreement.  These documents reflect different

10    dollar amounts and structure the deal differently.  One Schedule A is dated December 31, 1999

11    and reflects the sale of $4 million in software to reseller KPMG.  The Product Registration Form

12    also is dated December 31, 1999 and reflects the sale of $6.5 million to reseller KPMG.  It

13    appears that Peregrine was able to complete its transaction directly with Sodexho Marriott in the

14    following quarter because there is also a Schedule A directly between Peregrine and Sodexho

15    Marriott without using KPMG as a reseller.  That document is dated March 31, 2000 and is for

16    just $2 million in software.

17        488.    Defendant Spitzer has confirmed to investigators that the Sodexho Marriott

18    transaction was a "parking" transaction.  Spitzer said he learned that the transaction would not be

19    completed by the end of December 1999.  Thus, Spitzer called Larry Rodda at KPMG to inquire

20    whether KPMG would participate in the scheme and, in return, get the service portion of the

21    contract when the deal was actually completed with Sodexho Marriott.  Rodda told Spitzer that

22    KPMG would participate.  Defendant Gless structured the deal so there would be a Schedule A

23    between Peregrine and KPMG dated December 31, 1999.  When the deal between Peregrine and

24    Sodexho Marriott was eventually completed, KPMG's payment obligation to Peregrine was to be

25    offset by Sodexho Marriott's contract.  Indeed, attached to a December 30, 1999 e-mail from

26    Spitzer to Rodda is a handwritten note stating: "Payments directly to PSI [Peregrine Systems,

27    Inc.] to clear KPMG payments."

28        489.    In February 2000, KPMG received a letter from Peregrine asking it to confirm to



1  Peregrine's auditors "the balance due us as of Dec. 31, 1999 and certain terms regarding your

2  recent purchase." It also asked KPMG to "describe any unfulfilled obligations or contingencies

3  under this contract at December 31, 1999." Attached was the Schedule A signed in December

4  1999. Rodda wrote "no exceptions" on the letter and signed his name. He did so even though he

5  knew the December 31, 1999 Schedule A was phony and did not reflect a real transaction.

6      490.    KPMG was also awarded a significant services contract for assisting Peregrine

7  with a transaction for intended end user Citigroup. KPMG knew from the beginning that

8  Peregrine sought its help so Peregrine could falsely represent that it had closed the deal in the

9  June 2000 quarter even though it had not yet been completed. As with the Sodexho Marriott

10  transaction, defendant Spitzer called defendant Rodda to inquire whether KPMG would sign the

11  contract in the June quarter in exchange for receiving the $500,000 services portion of the

12  contract. Rodda told Spitzer that KPMG would participate. KPMG knew that the transaction

13  was not completed by June 30, 2000. This is evidenced by an e-mail from Jim Mowrer of

14  KPMG to Spitzer dated August 30, 2000, two months after revenue was booked by Peregrine, in

15  which Mowrer inquired about when the deal with Citigroup would be completed.

16      491.    KPMG and defendant Rodda knew that there was never any intention for KPMG

17  to pay for the Citigroup deal. An e-mail dated September 26, 2000, apparently sent by defendant

18  Spitzer to the accounting department, states:

19          VM [voicemail] from Larry Rodda, **this is a pass through invoice.**
            KPMG has an identical invoice posted with Peregrine for
20          7,526,150. This was arranged by Larry [sic] Spitzer for a sale with
            CitiGroup. Per Sch A Peregrine will act as KPMG's agent to
21          invoice & and [sic] collect with respect to all products. (Emphasis
            added.)
22

23      492.    Peregrine also improperly recorded $2,285,128 in revenue from a transaction

24  where the end user was identified as Avnet, Inc. ("Avnet") in the first quarter of fiscal year 2000.

25  The money was never paid. Defendant Rodda signed the Schedule A on behalf of KPMG.

26  Defendant Spitzer confirmed to investigators that the Avnet transaction was similar to the one

27  involving Citigroup. Toward the end of the first quarter of fiscal year 2001, Bill Moore

28  (Peregrine's Vice President of North American Sales) told Spitzer that the Avnet contract was

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                178

Exhibit D
0308

1  stuck in Avnet's purchasing or procurement department, and that the deal would not get done by

2  the end of the quarter. Moore asked Spitzer to see if KPMG would allow the software to be

3  "parked" with KPMG in the meantime so Peregrine could recognize the revenue immediately.

4  As with the Citigroup arrangement, Moore said that Peregrine would give KPMG part of the

5  servicing revenue. Spitzer recalled that the invoicing was to work as it had in the Sodexho

6  Marriott deal, *i.e.*, when a contract was signed with Avnet it would offset the KPMG deal.

7       493.    KPMG's knowledge that the Avnet deal was a phony transaction is evidenced by a

8  June 30, 2000 e-mail message Spitzer received from Shane Eliason (a Peregrine senior account

9  representative). Eliason provided the following "Avnet Update:"

10       .    The site visit went as expected yesterday (Thursday) for Avnet.
            They have an offsite budget meeting today (the last day of their
11          FY) and due to the holidays, we will not get feedback until next
            Wednesday. **Bill Moore has suggested an out clause and**
12          **backdating that we are aggressively pursuing.** The commitment
            is there to sign as soon as budgets are agreed to, but Avnet has to
13          get their budget piece finished. I will keep you posted. (Emphasis
            added.)
14

15  In other words, the terms that made the KPMG/Avnet revenue not immediately recognizable

16  were expressly discussed and negotiated with defendant Rodda.

17       494.    KPMG's knowledge that the Avnet deal was a sham is also evidenced in

18  documents from its own files. Among KPMG's documents was a letter dated August 1, 2000

19  from Kathlene Pizzoferrato (a contracts administrator at Peregrine) to defendant Rodda enclosing

20  two Schedule As. An undated handwritten Post-It note attached to the letter states: "**The Avnet**

21  **transaction is paper only.** No cash flow. No license flow. No revenue." (Emphasis added.)

22  The handwriting on the Post-It is defendant Rodda's. Indeed, the Avnet deal had no substance.

23  Peregrine wrote off the entire contract value of $2,285,128 in the second quarter of fiscal year

24  2002 to "accrued liabilities" in connection with Peregrine's acquisition of Remedy.

25       495.    Peregrine also entered into a transaction with KPMG wherein Morgan Stanley

26  was identified as the end user. Peregrine's records contain a Schedule A dated

27  September 29, 2000. It reflects a licensing fee of $10 million and maintenance fees of $1.5

28  million. The Schedule A was signed by Rodda for KPMG Consulting.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
            Master File No. 02-CV-0870 J(RBB)                                179

Exhibit D
0309

1      496.   Defendant Spitzer received a call from defendant Powanda who said he was

2  negotiating a very large sale with Morgan Stanley.  Powanda said he had a letter agreement with

3  the company.  Powanda told Spitzer that if KPMG could finalize the deal, KPMG would receive

4  a large services contract.  Spitzer then called defendant Rodda, who said that KPMG would sign

5  the agreement.  Spitzer told investigators that Rodda's revenue target had been increased by

6  KPMG and, therefore, Rodda wanted to structure the revenue flow the same way they had

7  structured the Citigroup transaction, *i.e.*, to flow the cash through KPMG.  A copy of the

8  Schedule A for the deal which came from KPMG's files has a Post-It note stating:

9          Jim – Here is $11.5M revenue potential for you. **You will need to**

        **work with Spitzer to flow the cash so you get credit for the**

10          **revenue.**  (Emphasis added.)

11  The Post-It note is signed with defendant Rodda's initials.  The entire $11.5 million was

12  recognized as revenue by Peregrine.  Rodda, as an experienced auditor, knew this was wrongful.

13      497.   Other phony transactions were also made between Peregrine and KPMG.  KPMG

14  signed at least nine software license agreements with Peregrine during the Class Period, as

15  summarized in the chart below:

| Fiscal Qtr | KPMG Entity | End user | Schedule A amount | License Revenue | Payment Received | Defendants who participated |
|------------|-------------|----------|-------------------|-----------------|------------------|----------------------------|
| 4Q 99 | KPMG LLP | none identified | $2.5m | $1.4m | $0 | Powanda, Spitzer, Gless, Gardner, Rodda |
| 3Q 00 | KPMG LLP | Sodexho Marriott | $4.0m | $4.1m | $2.0m | Powanda, Spitzer |
| 4Q 00 | KPMG Consulting | HHS | $2.3m | $2.0m | $2.3m | Powanda, Spitzer, Gless |
| 1Q 01 | KPMG LLP | Citigroup | $7.1m | $6.1m | $0 | Spitzer, Gless, Rodda |
| 1Q 01 | KPMG Consulting | Avnet | $2.3m | $2.0m | $0 | Spitzer, Gless, Rodda |
| 2Q 01 | KPMG Consulting | Morgan Stanley | $11.5m | $10.0m | $0 | Spitzer Rodda |

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)

| | | | | | | |
|---|---|---|---|---|---|---|
| 3Q 01 | KPMG Consulting | Honeywell | $1.4m | $1.2m | $0 | Spitzer, Gless |
| 3Q 01 | KPMG Consulting | Boeing | $2.4m | $2.0m | $0 | Spitzer, Gless |
| 3Q 01 | KPMG Consulting | Honeywell | $2.1m | $1.8m | $0 | Gless |
| 1Q 02 | KPMG Consulting | JP Morgan | $1.7m | $1.5m | $0 | |
| **TOTAL:** | | | **$37.3m** | **$32.1m** | **$4.3m** | |

498.    KPMG's deliberate decision to conceal the truth and to play a significant role in Peregrine's misrepresentation of its financial condition is also evidenced by its payment history. As indicated above, KPMG paid Peregrine for only one transaction in full (HHS) and for only half of another transaction (Sodexho Marriott). No payments at all were ever made on any of the other transactions. Nonetheless, Peregrine recorded $32.1 million in license revenue from these transactions during fiscal years 2000-2002. It subsequently had to write off $30.8 million, or 96%, of this amount.

499.    As an accounting firm, KPMG was fully aware that Peregrine's conduct was a deliberate violation of GAAP. Defendant Rodda, the primary KPMG representative in several of the phony deals, worked in KPMG's Risk and Advisory Services practice, which advised KPMG clients regarding accounting and auditing matters. Further, in connection with at least some of the transactions, Rodda sought the approval and consent of others at KPMG to enter into the "parking" transactions.

500.    When Peregrine entered into the September 2000 KPMG/Morgan Stanley transaction for $11,500,000, KPMG already owed Peregrine $12,221,000. When the $11,500,000 was due in December 2000 (resulting in a total amount owed to Peregrine of $23,721,000), Peregrine nevertheless entered into the December 2000 KPMG/Honeywell and KPMG/Boeing transactions for an additional $5,912,000. With only one transaction fully paid, one transaction partially paid, and an outstanding balance due of $35,633,000, Peregrine entered into the KPMG/JP Morgan Stanley deal in June 2001 for an additional $1,710,000.

501.    SOP 97-2 requires the fee to be fixed or determinable before revenue may be

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)    181

Exhibit D
0311

1  recognized. It also requires that collectibility be probable at the time revenue is recognized.

2  KPMG's huge accounts receivable balance was evidence that future sales would not be collected.

3  As an accounting firm, KPMG was fully aware that Peregrine was using the phony "sales" to

4  KPMG to recognize revenue before all requirements of SOP 97-2 were satisfied. Nonetheless,

5  KPMG chose to conceal the truth and play a significant role in Peregrine's ability to misrepresent

6  its financial condition to investors so it could obtain lucrative service contracts through

7  Peregrine.

8       502.    Based on the foregoing allegations, the following statements issued during the

9  Class Period were materially false and misleading.

10  <div align="center">**THE FALSE STATEMENTS**</div>

11  **1Q 2000**

12       503.    On July 21, 1999, Peregrine issued a press release stating that Peregrine had

13  achieved "record" quarterly revenues of $51.6 million for the first quarter of fiscal year 2000

14  which ended on June 30, 1999, a 137% increase in revenues over revenues reported in the

15  first fiscal quarter of the prior year. Peregrine stated that "[o]verall results were driven by a 131

16  percent increase in license revenue over the comparable quarter in the prior year." Defendant

17  Gardner was quoted in the release as saying: "We are extremely pleased with the outstanding

18  growth in both our software license sales and our professional services activity in the first fiscal

19  quarter . . ."

20       504.    The individually named defendants (other than defendants Rodda, Savoy, and

21  Dammeyer) read and approved the issuance of Peregrine's July 21, 1999 false press release. As

22  part of its quarterly review work, Arthur Andersen read and approved of the foregoing Peregrine

23  press release. These defendants knew, or were deliberately reckless in not knowing, that the

24  financial information contained in the foregoing statement was materially false and misleading

25  for the reasons set forth above.

26       505.    On July 21, 1999, Peregrine management, led by defendant Gardner, held a

27  conference call with investors and securities analysts. The purpose of the conference call was to

28  give Peregrine management the opportunity to discuss with investors the Company's first quarter

Exhibit D
0312

1  results.  During the conference call, Peregrine management reported on Peregrine's previously

2  released financial results for the quarter.  In addition, Peregrine management stated that it saw

3  strength in its product lines, distribution channels and geographic regions, that international

4  revenues had increased 195% or 47% of total reported revenue and that DSO finished the quarter

5  at 76 days within Company expectations.

6       506.  On July 22, 1999, the brokerage firm CIBC World Markets ("CIBC") issued a

7  report based on the conference call with Peregrine management.  In its report, CIBC repeated

8  Peregrine's previously released financial results and noted that Peregrine management had

9  indicated that:  "Peregrine saw strength across its product lines, distribution channels and

10  geographies."  The report also stated that "International revenues soared an incredible 195% to

11  make up 47% of the mix as Peregrine focused its attention on the world market" and that DSO

12  finished the quarter at 76 days.  Relying on management's representations and Peregrine's

13  publicly released financial results, CIBC raised its earnings estimates and rated Peregrine's stock

14  a "strong buy."

15       507.  On July 22, 1999, First Union Capital Markets ("First Union") also issued a report

16  on Peregrine based on the prior day's conference call with Peregrine management.  In its report,

17  First Union repeated Peregrine's previously released financial results and raised its earnings

18  estimates in reliance on Peregrine's publicly released financial results and management's

19  representations.  As a result, First Union rated Peregrine a "buy" in its report dated July 22, 1999.

20       508.  In response to the information disseminated by Peregrine and the contents of the

21  analyst reports based on information provided by Peregrine management, Peregrine's stock

22  closed at $15.34 per share on July 22, 1999.

23       509.  The individually named defendants (other than defendants Rodda, Savoy, and

24  Dammeyer) either knew or were deliberately reckless in not knowing that the financial

25  information provided to investors and securities analysts in the foregoing conference call was

26  materially misleading for the reasons set forth above.  These defendants knew that securities

27  analysts would rely on their materially false and misleading statements in writing their research

28  reports which would be disseminated to the investing public.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                          183

Exhibit D
0313

510.    On August 13, 1999, the Company filed its Form 10-Q for the first quarter of fiscal year 2000 with the SEC.  The Form 10-Q reported the false financial statements that were included in the July 21, 1999 press release.  Defendant Gless signed the Form 10-Q in his capacity as Vice President of Finance and Chief Accounting Officer.

511.    The 10-Q also contained the following statement on revenue recognition:

> Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable; risk of concession is deemed remote; and no other significant vendor obligations exist.

512.    The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, there was no disclosure of a material change in its accounting policy as applied to the first quarter of fiscal year 2000, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth above.

513.    The individually named defendants (other than defendants Rodda and Savoy) and Arthur Andersen and AWSC read and approved the filing of the foregoing Form 10-Q with the SEC.  Each of these defendants either knew, or were deliberately reckless in not knowing, that the financial information contained in the Form 10-Q was materially false and misleading for the reasons set forth above.

**2Q 2000**

514.    On October 20, 1999, Peregrine issued a press release announcing that the Company had achieved "record" quarterly results for the second quarter of fiscal year 2000 ended September 30, 1999.  Peregrine stated that total revenues "increased 95 percent to a record $57.8 million" compared to revenue reported in the comparable prior year period.  Peregrine credited a 121% increase in software license revenues over the prior year comparable period.  Defendant Gardner was quoted as saying:

> We are delighted with our continued rapid growth and with the on-going development of customer demand for our end-to-end Infrastructure Management solutions. . . . This quarter marked a

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)

significant maturation of our alliances on a global basis, leading to
both increased software license sales via alliances and a shift in
some service revenue growth to some of our partners. . . .

515.    The individually named defendants (other than defendants Rodda, Savoy, and Dammeyer) read and approved the issuance of Peregrine's October 20, 1999 false press release. As part of its quarterly review work, Arthur Andersen and AWSC read and approved of the foregoing Peregrine press release.  These defendants knew, or were deliberately reckless in not knowing, that the financial information contained in the foregoing press release was materially false and misleading for the reasons set forth above.

516.    On October 20, 1999, Peregrine management, led by defendant Gardner, held a conference call with investors and securities analysts.  The purpose of the conference call was to give Peregrine management the opportunity to discuss with investors the Company's second quarter results.  During the conference call, Peregrine management reported on Peregrine's previously released financial results for the quarter.  In addition, Peregrine management stated that they continued to see strength for all of Peregrine's products in all geographical regions, that the Company was working on a number of very large orders which would have a material positive impact on future revenues and earnings and that the balance sheet had improved this quarter with $24.9 million in cash on hand.

517.    On October 21, 1999, CIBC issued and disseminated a report based on the conference call with Peregrine management.  In its report, CIBC repeated Peregrine's previously released financial results and noted that Peregrine management had indicated that the Company "executed flawlessly in the quarter with strength across all product lines and geographies." Management was also reported as representing that there were a number of "mega deals" that were likely to close and which would have a "material positive impact on the top-and-bottom line in the quarter in which they close" and that there was improvement in the balance sheet.  Relying on management's representations and Peregrine's publicly released financial results, CIBC continued its "strong buy" rating.

518.    On October 21, 1999, First Union issued a report on Peregrine based the prior day's conference call with Peregrine management.  In its report, First Union repeated Peregrine's

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    185

#105317

Exhibit D
0315

1    previously released financial results and noted management's statements concerning the "mega

2    deals," and that they were being described as between 20% to 25% of a quarter's revenue.  As a

3    result, First Union reiterated its assessment on Peregrine as a "strong buy" in its report dated

4    October 21, 1999.

5         519.    In response to the information disseminated by Peregrine and the contents of the

6    analyst reports based on information provided by Peregrine management, Peregrine's stock

7    closed at $20.875 per share on October 22, 1999.

8         520.    The individually named defendants (other than defendants Rodda, Savoy, and

9    Dammeyer) either knew or were deliberately reckless in not knowing that the financial

10   information provided to investors and securities analysts in the foregoing conference call was

11   materially misleading for the reasons set forth above.  These defendants knew that securities

12   analysts would rely on their materially false and misleading statements in writing their research

13   reports which would be disseminated to the investing public.

14        521.    On  November 14, 1999, the Company filed its Form 10-Q for the second quarter

15   of 2000 with the SEC.  It incorporated the financial statements that were included in the

16   October 20, 1999 press release.  Defendant Gless signed the Form 10-Q in his capacity as Vice

17   President of Finance and Chief Financial Officer.

18        522.    The 10-Q also included the following statement on revenue recognition:

19             Revenues from direct and indirect license agreements are
               recognized currently, provided that all of the following conditions
20             are met: a noncancelable license agreement has been signed; the
               product has been delivered; there are no material uncertainties
21             regarding customer acceptance; collection of the resulting
               receivable is deemed probable; risk of concession is deemed
22             remote; and no other significant vendor obligations exist.

23        523.    The foregoing statements were materially false and misleading because

24   Peregrine's reported revenue was materially overstated, there was no disclosure of a material

25   change in its accounting policy as applied to the second quarter of fiscal year 2000, its accounts

26   receivable were understated, its cash balances were overstated, its liabilities were understated and

27   its DSO were understated for the reasons set forth above.

28        524.    The individually named defendants (other than defendants Rodda, Savoy, and

#105317

1  Dammeyer) and Arthur Andersen and AWSC read and approved the filing of the foregoing Form

2  10-Q with the SEC.  Each of these defendants either knew, or were deliberately reckless in not

3  knowing, that the financial information contained in the foregoing Form 10-Q was materially

4  false and misleading for the reasons set forth above.

5  **3Q 2000**

6      525.    On January 20, 2000, Peregrine issued a press release announcing "record"

7  quarterly results for the third quarter of fiscal year 2000 ended December 31, 1999.  Peregrine

8  stated that the Company had achieved total revenues of $67.5 million, a 67% increase compared

9  with revenues reported in comparable prior year period.  Defendant Gardner was quoted as

10  saying:

11          "[W]e had a number of large transactions and a remarkably strong
             surge of both interest and initial sales from our new Get.It! and
12          Get.Resources! employee self service and e-procurement products.
             In addition, we exceeded our expectations for the launch of our
13          new midrange solution, InfraCenter for Workgroups."

14      526.    The individually named defendants (other than defendants Rodda, Savoy, and

15  Dammeyer) read and approved the issuance of Peregrine's January 20, 2000 press release.  As

16  part of its quarterly review work, Arthur Andersen and AWSC read and approved of the

17  foregoing Peregrine press release.  These defendants knew, or were deliberately reckless in not

18  knowing, that the financial information contained in the foregoing press release was materially

19  false and misleading for the reasons set forth above.

20      527.    On January 20, 2000, Peregrine management, led by defendant Gardner, held a

21  conference call with investors and securities analysts.  The purpose of the conference call was to

22  give Peregrine management the opportunity to discuss with investors the Company's quarterly

23  results.  During the conference call, Peregrine management reported on Peregrine's previously

24  released financial results for the quarter.  In addition, Peregrine management stated that customer

25  acceptance Peregrine's new Get.It! e-products far surpassed expectations and that the balance

26  sheet remained strong with cash increasing and DSO remaining steady at an acceptable level of

27  79 days.

28      528.    On January 21, 2000, CIBC issued a report based on the conference call with

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                187

1  Peregrine management.  In its report, CIBC repeated Peregrine's previously released financial

2  results and noted that "[t]he enthusiastic reception of Peregrine's New Get.It! e-procurement

3  products far exceeded management's expectations, and generated $5 million in sales in just three

4  weeks of release."  The report also indicated "that the deal pipeline was more active than usual."

5  CIBC also noted that:

6        The balance sheet remained strong this quarter, increasing
       $300,000 to $25.2 million with cash remaining at $0.38 per share.
7        Accounts receivable rose $8.5 million $59.6 million, with DSO
       remaining steady at 79, also within what management regards as an
8        acceptable range.  Deferred revenues grew $9.8 million to $31.3
       million, and were made up solely of customer support.

9

10       529.    Relying on management's representations and Peregrine's publicly released

11  financial results,  CIBC continued to rate Peregrine as a "strong buy."  On January 21, 2000, First

12  Union also issued a report on Peregrine based on the prior day's conference call with Peregrine

13  management.  In its report, First Union repeated Peregrine's previously released financial results

14  and reiterated its rating on Peregrine as a "strong buy."

15       530.    In response to the information disseminated by Peregrine management and the

16  contents of the analyst reports based on information provided by Peregrine management,

17  Peregrine's stock rose to $44.53 per share at the close of trading on January 24, 2000.

18       531.    The individually named defendants (other than defendants Rodda, Savoy, and

19  Dammeyer) either knew or were deliberately reckless in not knowing that the financial

20  information provided to investors and securities analysts in the foregoing conference call was

21  materially false and misleading for the reasons set forth above.  These defendants knew that

22  securities analysts would rely on their materially false and misleading statements in writing their

23  research reports which would be disseminated to the investing public.

24       532.    On February 11, 2000, the Company filed its Form 10-Q for the third quarter of

25  fiscal year 2000 with the SEC.  It incorporated the financial statements that were included in the

26  January 20, 2000 press release.  Defendant Gless signed the Form 10-Q in his capacity as Vice

27  President of Finance and Chief Accounting Officer.

28       533.    The Form 10-Q also included the following statement on revenue recognition:

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                          188

Exhibit D
0318

1  Revenues from direct and indirect license agreements are
2  recognized currently, provided that all of the following conditions
   are met: a noncancelable license agreement has been signed; the
   product has been delivered; there are no material uncertainties
3  regarding customer acceptance; collection of the resulting
   receivable is deemed probable; risk of concession is deemed
4  remote; and no other significant vendor obligations exist.

5      534.    The foregoing statements were materially false and misleading because

6  Peregrine's reported revenue was materially overstated, there was no disclosure of a material

7  change in its accounting policy as applied to the third quarter of fiscal year 2000, its accounts

8  receivable were understated, its cash balances were overstated, its liabilities were understated and

9  its DSO were understated for the reasons set forth above.

10     535.    The individually named defendants (other than defendants Rodda, Savoy, and

11 Dammeyer) and Arthur Andersen and AWSC read and approved the filing of the foregoing Form

12 10-Q with the SEC.  Each of these defendants either knew, or were deliberately reckless in not

13 knowing, that the financial information contained in the foregoing 10-Q was materially false and

14 misleading for the reasons set forth above.

15 **4Q 2000**

16     536.    On April 26, 2000, Peregrine issued a press release regarding Peregrine's fourth

17 quarter of fiscal year 2000 and fiscal year 2000 financial results.  It stated that the Company had

18 "record" quarterly revenues of $76.3 million (a 66% increase compared with revenues in the

19 comparable prior year period) and "record" annual revenue of $253.3 million (a 83% increase

20 over prior year revenues).  Defendant Gardner was quoted as saying that "[t]he market remains

21 strong" and the "our products continue to lead in their respective areas."

22     537.    The individually named defendants (other than defendants Rodda, Savoy, and

23 Dammeyer) read and approved the issuance of Peregrine's April 26, 2000 press release.  As part

24 of its audit procedures, Arthur Andersen and AWSC read and approved of the foregoing

25 Peregrine press release.  These defendants knew, or were deliberately reckless in not knowing,

26 that the financial information contained in the foregoing statements was materially false and

27 misleading for the reasons set forth above.

28     538.    On April 26, 2000, Peregrine management, led by defendant Gardner, held a

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                         189

Exhibit D
0319

1  conference call with investors and securities analysts. The purpose of the conference call was to

2  give Peregrine management the opportunity to discuss with investors the Company's fourth

3  quarter and fiscal year 2000 results. During the conference call, Peregrine management reported

4  on Peregrine's previously released financial results for the quarter. In addition, Peregrine

5  management stated that the Company had closed a very large order with EDS, that the Company

6  had excellent visibility into the next quarter and that the Company expected a $40-$50 million

7  dollar revenue contribution from Get.It! for the year.

8      539.    On April 27, 2000, CIBC issued a report based on the conference call with

9  Peregrine management. In its report, CIBC noted that Peregrine management had indicated that:

> Peregrine's 4Q00 results indicate that its core business remains
> strong. During the quarter, the company closed a particularly large
> deal with EDS; the size of the deal was not disclosed, but
> management implied that the company has "great visibility into the
> next quarter." We regard this as an extremely positive sign that
> there is no slowdown in Peregrine's business, which was a concern
> last quarter.

14  The report also stated that "management comments referring to a $40-50 million revenue

15  contribution from Get.It! for the year [which] would imply a significant ramp-up must be in

16  store," as well as management's indication "that it was seeing a strong rebound in mid-size deal

17  flow ($100,000 - $300,000) . . ." Relying on management's representations and Peregrine's

18  publicly released financial results, but expressing concern over possible logistical and integration

19  difficulties associated with the acquisition of Harbinger, CIBC rated Peregrine's stock as "Hold."

20      540.    In response to the information disseminated by Peregrine and the contents of the

21  analyst reports based on information provided by Peregrine management, Peregrine's stock

22  closed at $24.06 per share on April 28, 2000.

23      541.    The individually named defendants (other than defendants Rodda, Savoy, and

24  Dammeyer) either knew or were deliberately reckless in not knowing that the financial

25  information provided to investors and securities analysts in the foregoing conference call was

26  materially misleading for the reasons set forth above. These defendants knew that securities

27  analysts would rely on their materially false and misleading statements in writing their research

28  reports which would be disseminated to the investing public.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
           Master File No. 02-CV-0870 J(RBB)                                                190

                                                                              Exhibit D
                                                                              0320

542.    On May 10, 2000, the Company filed its Form 10-K for the fiscal year 2000 with the SEC. It incorporated the financial statements that were included in the April 26, 2000 press release.

543.    The Form 10-K also included the following statement on revenue recognition:

> Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed, the product has been delivered, there are no material uncertainties regarding customer acceptance, collection of the resulting receivable is deemed probable; risk of concession is deemed remote, and we have no other significant obligations associated with the transaction.

544.    Defendant Gless signed the Form 10-K in his capacity as Vice President of Finance and Chief Accounting Officer and defendant Gardner signed in his capacity as President, Chief Executive Officer, and a director of the Company. In addition, defendants Moores, Noell, van den Berg, Watrous and Hosley signed the Form 10-K for fiscal 2000 as directors of the Company. The Form 10-K contained an unqualified audit report by defendant Arthur Andersen on Peregrine's year end financial statements for fiscal 2000.

545.    The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, there was no disclosure of a material change in its accounting policy as applied to the fourth quarter of fiscal year 2000, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth above.

546.    The individually named defendants (other than defendants Rodda, Savoy, and Dammeyer) and Arthur Andersen and AWSC read and/or signed Peregrine's Form 10-K for fiscal 2000. Each of these defendants either knew, or were deliberately reckless in not knowing, that the financial information contained in the foregoing 10-K was materially false and misleading for the reasons set forth above.

547.    On May 22, 2000, Peregrine filed Amendment No. 1 to its Form S-4 Registration Statement with the SEC. The Amendment contained a Joint Proxy Statement and Prospectus, the purpose of which was to solicit proxies from Harbinger shareholders to approve of the proposed

merger of Peregrine and Harbinger.  The Joint Proxy contained a discussion of Peregrine's

business, and incorporated Peregrine's audited financial statements for the fiscal year ending

March 31, 2000.  The Joint Proxy also stated that Peregrine's "selected consolidated financial

data derives from the consolidated financial statements of Peregrine Systems, Inc. and its

subsidiaries," and that "[t]hese financial statements have been audited by Arthur Andersen LLP,

independent public accountants."  The Amendment was signed by defendants Gardner, Gless,

Moores, Cole, Hosley, Noell, van den Berg and Watrous.  Arthur Andersen and AWSC

consented to the use of the false audit report for the fiscal year ending March 31, 2000.

548.    Each of the individually named defendants who signed Amendment No. 1

identified in the prior paragraph, and Arthur Andersen and AWSC, either knew or were

deliberately reckless in not knowing, that the financial information contained in the Joint Proxy

was materially false and misleading for the reasons set forth above.

**1Q 2001**

549.    On July 19, 2000, Peregrine issued a press release announcing "record" quarterly

financial results for the first quarter of fiscal year 2001 ended June 30, 2000 which, according to

Peregrine, were "driven by a 95 percent increase in software license revenues."  Peregrine

announced that total revenues had increased by 83% "to a record $94.3 million" compared to

revenues reported in the comparable prior year period.  Defendant Gardner was also quoted in the

release as saying:

> Growth in the Get.It! Business was very strong this quarter, and
> continued to reflect customer recognition that Get.Resources!TM
> offers a unique lifecycle approach to the e-procurement process
> associated with assets used inside our customers' businesses . . .
> We were also very pleased to see strong performance from our
> Infrastructure Management products, including several large
> transactions and some key competitive wins[.]

550.    The individually named defendants (other than defendants Rodda, Hosley, and

Dammeyer) read and approved the issuance of Peregrine's July 19, 2000 press release.  As part of

its quarterly review work, the Arthur Andersen and AWSC read and approved of the foregoing

Peregrine press release.  Each of these defendants either knew or were deliberately reckless in not

knowing that the financial information contained in the foregoing statement was materially false

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                    192

1   and misleading for the reasons set forth above.

2       551.   On July 19, 2000, Peregrine management, led by defendant Gardner, held a

3   conference call with investors and securities analysts.  The purpose of the conference call was to

4   give Peregrine management the opportunity to discuss with investors the Company's first quarter

5   results of operations.  During the conference call, Peregrine management reported on Peregrine's

6   previously released financial results for the quarter.  In addition, Peregrine management stated

7   that the Company's cash position more than doubled to $70 million and that the increase in

8   accounts receivable (to $128 million) and DSO (to 122 days) was attributable to the Harbinger

9   acquisition.

10       552.   On July 20, 2000, CIBC issued a report based on the conference call with

11   Peregrine management.  In its report, CIBC repeated Peregrine's previously released financial

12   results and noted that Peregrine's earnings per share of $0.10 had beaten CIBC's estimate of

13   $0.09 and that Peregrine management had indicated that:

> On the balance sheet, cash more than doubled to $70 million from
> $34 million, which equates to $0.57 per share, up from $0.29.
> Accounts receivable rose significantly to $128 million from $70
> million, with the increase attributed to Harbinger.  As a result, days
> sales outstanding rose to 122 from 82.  Management indicated that
> it intends to address the receivables issue; consequently, DSO
> should trend down sharply in the next quarter.

18   Relying on management's representations and Peregrine's publicly released financial results,

19   CIBC gave Peregrine's stock a "buy" rating.

20       553.   In response to the information disseminated by Peregrine management and the

21   contents of the analyst reports based on information provided by Peregrine management,

22   Peregrine's stock closed at $29.25 per share on July 21, 2000.

23       554.   The individually named defendants (other than defendants Rodda, Hosley, and

24   Dammeyer) either knew or were deliberately reckless in not knowing that the financial

25   information provided to investors and securities analysts in the foregoing conference call was

26   materially misleading for the reasons set forth above.  These defendants knew that securities

27   analysts would rely on their materially false and misleading statements in writing their research

28   reports which would be disseminated to the investing public.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                     193

555.    On August 14, 2000, the Company filed its Form 10-Q for the first quarter of fiscal year 2001 with the SEC. It incorporated the financial statements that were included in the July 19, 2000 press release. Defendant Gless signed the Form 10-Q in his capacity as Vice President of Finance and Chief Accounting Officer.

556.    The Form 10-Q also included the following statement on revenue recognition:

> Revenues from license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed, the product has been delivered, there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable, risk of concession is deemed remote, and no other significant vendor obligations exist.

557.    The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, there was no disclosure of a material change in its accounting policy as applied to the first quarter of fiscal year 2001, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth above.

558.    The individually named defendants (other than defendants Rodda, Hosley, and Dammeyer) and the Arthur Andersen and AWSC, read and approved the filing of the foregoing Form 10-Q with the SEC. Each of these defendants either knew, or were deliberately reckless in not knowing, that the financial information contained in the foregoing statement was materially false and misleading for the reasons set forth above.

**2Q 2001**

559.    On October 3, 2000, Peregrine issued a press release stating that Peregrine's financial results for the second quarter of fiscal year 2001 ended September 30, 2000 would "meet or exceed consensus earnings per share estimates of $.11 per share and total revenue of $142 million." Peregrine issued another press release on October 24, 2000 that announced "record" quarterly results for the second quarter of fiscal year 2001, with revenues of $142.7 million. The press release noted that "[t]he record second quarter results were driven by a 136% increase in software license revenues over the comparable prior year period." The release also noted that "total revenues for the second quarter increased 147%" . . . compared with revenues in

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    194

#105317

Exhibit D
0324

1    the comparable prior year period. In addition, defendant Gardner was quoted in the release as

2    saying:

> 3    We had a remarkable quarter of growth in our infrastructure
> management solutions and Get.It! employee self service solutions.
> 4    This quarter saw a large number of new products, technology, and
> alliances come to fruition, further establishing the basis for
> 5    continued growth into the future.

6      560.    The individually named defendants (other than defendants Rodda, Hosley, and

7    Dammeyer) read and approved the issuance of Peregrine's October 3 and October 24, 2000 press

8    releases (except as to defendant van den Berg with regard to the October 24, 2000 press release).

9    As part of its quarterly review work, Arthur Andersen and AWSC read and approved of the

10    October 24, 2000 Peregrine press release. These defendants knew, or were deliberately reckless

11    in not knowing, that the financial information contained in the foregoing statements was

12    materially false and misleading for the reasons set forth above.

13      561.    On October 24, 2000, Peregrine management, led by defendant Gardner, held a

14    conference call with investors and securities analysts. The purpose of the conference call was to

15    give Peregrine management the opportunity to discuss with investors the Company's second

16    quarter fiscal year 2001 results. During the conference call, Peregrine management reported on

17    Peregrine's previously released financial results for the quarter. In addition, Peregrine

18    management stated that the Company expected to be cash flow positive during the second half of

19    the year and that accounts receivable rose to $165 million while DSO fell from 122 days to 106

20    days.

21      562.    On October 25, 2000, CIBC issued a report based on the conference call with

22    Peregrine management. Relying on management's representations and Peregrine's publicly

23    released financial results, CIBC rated Peregrine's stock a "buy."

24      563.    In response to the information disseminated by Peregrine management and the

25    contents of the analyst reports based on information provided by Peregrine management,

26    Peregrine's stock closed at $23.00 per share on October 26, 2000.

27      564.    The individually named defendants (other than defendants Rodda, Hosley, and

28    Dammeyer) either knew or were deliberately reckless in not knowing that the financial

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)      195

#105317

Exhibit D
0325

1 information provided to investors and securities analysts in the foregoing conference call was

2 materially misleading for the reasons set forth above. These defendants knew that securities

3 analysts would rely on their materially false and misleading statements in writing their research

4 reports which would be disseminated to the investing public.

5      565.    On November 14, 2000, the Company filed its Form 10-Q for the second quarter

6 of fiscal year 2001 with the SEC. It incorporated the financial statements that were included in

7 the October 24, 2000 press release. Defendant Gless signed the Form 10-Q in his capacity as

8 Vice President of Finance and Chief Accounting Officer.

9      566.    The Form 10-Q also included the following statement on revenue recognition:

10      Revenues from direct and indirect license agreements are
recognized currently, provided that all of the following conditions

11      are met: a noncancelable license agreement has been signed; the
product has been delivered; there are no material uncertainties

12      regarding customer acceptance; collection of the resulting
receivable is deemed probable; risk of concession is deemed

13      remote; and no other significant vendor obligations exist.

14      567.    The foregoing statements were materially false and misleading because

15 Peregrine's reported revenue was materially overstated, there was no disclosure of a material

16 change in its accounting policy as applied to the second quarter of fiscal year 2001, its accounts

17 receivable were understated, its cash balances were overstated, its liabilities were understated and

18 its DSO were understated for the reasons set forth above.

19      568.    The individually named defendants (other than defendants Rodda, Hosley, van

20 den Berg, and Dammeyer) and Arthur Andersen and AWSC, read and approved the filing of

21 Peregrine's Form 10-Q with the SEC. Each of these defendants either knew, or were deliberately

22 reckless in not knowing, that the financial information contained in the foregoing 10-Q was

23 materially false and misleading for the reasons set forth above.

24 **3Q 2001**

25      569.    On January 24, 2001, Peregrine issued a press release that announced "record"

26 quarterly financial results for the third quarter of fiscal year 2001 ended December 31, 2000, with

27 total revenues of $156.6 million. The release stated that "[t]otal revenues . . . climbed by 132%"

28 compared with revenues in the comparable prior period. Peregrine stated that these results were

#105317

Exhibit D
0326

1   "driven by a 114% increase in software license revenues over the comparable prior year period .

2   . ." Defendant Gardner was quoted as saying that "[d]espite uncertainty and turbulence in the

3   economy, particularly in the United States, we exceeded our objectives for the December

4   quarter."

5         570.   The individually named defendants (other than defendants Rodda, Hosley, van

6   den Berg, and Dammeyer) read and approved the contents of Peregrine's January 24, 2001 press

7   release. As part of their quarterly review work, Arthur Andersen and AWSC read and approved

8   of the foregoing Peregrine press release. These defendants knew, or were deliberately reckless in

9   not knowing, that the financial information contained in the foregoing statement was materially

10   false and misleading for the reasons set forth above.

11         571.   On January 24, 2001, Peregrine management, led by defendant Gardner, held a

12   conference call with investors and securities analysts. The purpose of the conference call was to

13   give Peregrine management the opportunity to discuss with investors the Company's third

14   quarter fiscal year 2001 results. During the conference call, Peregrine management reported on

15   Peregrine's previously released financial results for the quarter. In addition, Peregrine

16   management stated that the balance sheet improved as DSOs fell to 97 days from 106 days last

17   quarter and that the Company expected to make additional progress on this front by the end of

18   the fourth quarter and that international revenues had increased over 37%.

19         572.   On January 25, 2001, CIBC issued a report based on the conference call with

20   Peregrine management. In its report, CIBC repeated Peregrine's previously released financial

21   results and noted that Peregrine management had indicated that:

22             During the quarter the balance sheet strengthened. Accounts
                 receivables were flat at $165 million while DSOs fell to 97 from

23             106 last quarter as the company stepped up its collection activities.
                 Management expects to make additional progress on this front and

24             expects DSOs to fall to the low 90s by the end of the fourth-
                 quarter. Deferred revenue increased 22% sequentially

25             ($15 million) to $83 million. Management attributed the increase
                 to some recent wins in its EMG operation.

26

                              *       *       *

27

28             Internationally, Peregrine knocked the cover off the ball. License
                 revenue increased over 37% sequentially to $40.8 million. Driving

---

#105317     FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
               Master File No. 02-CV-0870 J(RBB)                                   197

Exhibit D
0327

1   this growth were several large deals in the quarter in the
    infrastructure and e-markets groups.  Management believes that
2   what the company witnessed in the quarter is quite sustainable and
    is shifting resources to Europe and Asia.
3

4   Relying on management's representations and Peregrine's publicly released financial results,

5   CIBC rated Peregrine's stock a "buy."

6        573.    In response to the information disseminated by Peregrine management and the

7   contents of the analyst reports based on information provided by Peregrine management,

8   Peregrine's stock rose to $29.81 per share at the closing of trading on January 29, 2001.

9        574.    The individually named defendants (other than defendants Rodda, Hosley, van

10  den Berg, and Dammeyer) either knew or were deliberately reckless in not knowing that the

11  financial information provided to investors and securities analysts in the foregoing conference

12  call was materially misleading for the reasons set forth above.  These defendants knew that

13  securities analysts would rely on their materially false and misleading statements in writing their

14  research reports which would be disseminated to the investing public.

15       575.    The Form 10-Q also included the following statement on revenue recognition:

16      Revenues from direct and indirect license agreements are
        recognized currently, provided that all of the following conditions
17      are met: a noncancelable license agreement has been signed; the
        product has been delivered; there are no material uncertainties
18      regarding customer acceptance; collection of the resulting
        receivable is deemed probable; risk of concession is deemed
19      remote; and no other significant vendor obligations exist.

20       576.    The foregoing statements were materially false and misleading because

21  Peregrine's reported revenue was materially overstated, there was no disclosure of a material

22  change in its accounting policy as applied to the third quarter of fiscal year 2001, its accounts

23  receivable were understated, its cash balances were overstated, its liabilities were understated and

24  its DSO were understated for the reasons set forth above.

25       577.    The individually named defendants (other than defendants Rodda, Hosley, van

26  den Berg, and Dammeyer) and Arthur Andersen and AWSC read and approved the filing of the

27  foregoing Form 10-Q with the SEC.  Each of these defendants either knew, or were deliberately

28  reckless in not knowing, that the financial information contained in the foregoing 10-Q was

#105317     FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)     198

Exhibit D
0328

1    materially false and misleading for the reasons set forth above.

2    **4Q 2001**

3        578.    On April 4, 2001, Peregrine issued a press release stating that its revenues and

4    earnings per share for the fourth quarter of fiscal year 2001 ended March 31, 2001, would be

5    consistent with guidance previously provided to investors by the Company.  Specifically, it stated

6    that "[f]or the fiscal fourth quarter ended March 31, 2001, the Company expects to report license

7    revenues of approximately $105 million, total revenues of approximately $170 million and

8    earnings per share of $0.16 . . ."  Defendant Gardner is quoted as saying that "[d]espite

9    challenging economic conditions worldwide, we were able to meet our objectives for the quarter

10   and deliver strong profitable results, the sixteenth consecutive quarter we have done so."  After

11   this press release was issued, Peregrine's stock gained $5.25 per share, closing at $19.06 per

12   share on April 5, 2001.

13       579.    The individually named defendants (other than defendants Rodda, Hosley, van

14   den Berg, and Dammeyer) read and approved the issuance of Peregrine's April 4, 2001 press

15   release.  These defendants knew, or were deliberately reckless in not knowing, that the financial

16   information contained in the foregoing statement was materially false and misleading for the

17   reasons set forth above.

18       580.    On April 26, 2001, Peregrine issued a press release confirming the preliminary

19   results it had announced on April 4.  It stated that revenue for the fourth quarter of fiscal year

20   2001 was "a record $171.0 million, an increase of 124 percent from the same quarter a year ago."

21   For fiscal year 2001, the press release states that revenue totaled $564.7 million an increase of

22   123% from the prior year.  In the April 26 release, defendant Gardner was also quoted as saying:

23           Our results this quarter in the face of challenging economic
             conditions demonstrate the value of our solutions . . . As we enter
24           fiscal 2002, we remain confident in our market position and the
             opportunity we address . . .
25
             We were particularly pleased with the strength of our sales through
26           managed services providers and our professional services partners.
             As we continue to meet major milestones in our corporate
27           development and build our solutions portfolio, these relationships
             become increasingly important to our ability to extend our reach to
28           new customers and markets.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    199

Exhibit D
0329

581.    Peregrine's stock closed at $25.60 per share on April 27, 2001.

582.    The individually named defendants (other than defendants Rodda, Hosley, van den Berg, and Dammeyer) read and approved the issuance of Peregrine's April 26, 2001 press release.  As part of its audit procedures, Arthur Andersen and AWSC read and approved of the foregoing Peregrine press release.  These defendants knew, or were deliberately reckless in not knowing, that the financial information contained in the foregoing statements was materially false and misleading for the reasons set forth above.

583.    On April 26, 2001, Peregrine management, led by defendant Gardner, held a conference call with investors and securities analysts.  The purpose of the conference call was to give Peregrine management the opportunity to discuss with investors the Company's fourth quarter fiscal year 2001 results.  During the conference call, Peregrine management reported on Peregrine's previously released financial results for the quarter.  In addition, Peregrine management stated that the Company met its earnings per share guidance and that key balance sheet metrics improved or remained steady (such as a cash increase of $38 million) with DSOs remaining essentially flat at 95 days.

584.    On April 27, 2001, CIBC issued a report based on the conference call with Peregrine management.  In its report, CIBC noted that Peregrine management had indicated that:

> Not only was the company able to meet its EPS expectation, but key balance sheet metrics also improved or held steady.  Even though accounts receivables showed a moderate $15 million increase in the quarter, DSOs were essentially flat at 95.  Deferred revenue, which consists almost exclusively of service related activities (maintenance, network usage, etc.) climbed $12 million $14% sequentially) to $95 million.  Cash increased in the quarter by about $38 million to $287 million.  Management attributed the growth to financing activity in the quarter, option exercises, acquisitions (Extricity brought some cash) as well as a moderate amount of cash flow from operations.

Relying on management's representations and Peregrine's publicly released financial results, CIBC rated Peregrine's stock a "strong buy."

585.    In response to the information disseminated by Peregrine and the contents of the analyst reports based on information provided by Peregrine management, Peregrine's stock closed at $25.78 per share on April 30, 2001.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)
200

Exhibit D
0330

586.    The individually named defendants (other than defendants Rodda, Hosley, van den Berg, and Dammeyer) either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the foregoing conference call was materially misleading for the reasons set forth above. These defendants knew that securities analysts would rely on their materially false and misleading statements in writing their research reports which would be disseminated to the investing public.

## FISCAL YEAR 2001 ANNUAL REPORT

587.    On June 29, 2001, the Company filed its Form 10-K for fiscal year 2001 with the SEC. It incorporated the financial statements that appeared in the April 26, 2001 press release. Defendant Gless signed the Form 10-K in his capacity as Vice President of Finance and Chief Accounting Officer, defendant Gardner signed it in his capacity as Chief Executive Officer and Chairman of the Board of Directors and defendants Moores, Noell, Watrous and Savoy signed it as directors of the Company.

588.    Peregrine's financial statements contained in the Form 10-K were audited by the Arthur Andersen and AWSC and contained Arthur Andersen's unqualified audit report on Peregrine's fiscal 2001 financial statements.

589.    The Form 10-K also included the following statement on revenue recognition:

> Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable; risk of concession is deemed remote; and no other significant vendor obligations exist.

590.    The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, there was no disclosure of a material change in its accounting policy as applied to the fourth quarter of fiscal year 2001, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth above.

591.    The individually named defendants who signed the Form 10-K read and approved its contents and approved its filing with the SEC. Each of these defendants and Arthur Andersen

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                    201

Exhibit D
0331

1   and AWSC either knew, or were deliberately reckless in not knowing, that the financial

2   information contained in the Form 10-K was materially false and misleading for the reasons set

3   forth above.

4   **REMEDY PROXY STATEMENT**

5       592.   On July 23, 2001, Peregrine filed Amendment No. 1 to its Form S-4 Registration

6   Statement with the SEC. The Amendment contained a Joint Proxy Statement and Prospectus, the

7   purpose of which was to solicit proxies from Remedy Corporation shareholders to approve of the

8   proposed merger of Peregrine and Remedy. The Joint Proxy contained a discussion of

9   Peregrine's business, and incorporated by reference Peregrine's financial statements (and audit

10  reports) for the three years ended March 31, 2001. The Joint Proxy also stated that:

11              Peregrine's selected consolidated financial data is presented below
                as of March 31, 2001, 2000, 1999, 1998 and 1997 and for each of
12              the years in the five-year period ended March 31, 2001, and derives
                from the consolidated financial statements of Peregrine Systems,
13              Inc. and its subsidiaries, which financial statements have been
                audited by Arthur Andersen LLP, independent public accountants.
14

15      593.   The Amendment was signed by each of the individual defendants who were

16  Peregrine directors at that time. Arthur Andersen and AWSC consented to the use of the false

17  audit reports for the fiscal years ending March 31, 2000 and 2001. Each of these defendants and

18  Arthur Andersen and AWSC either knew, or were deliberately reckless in disregarding, that the

19  financial information for the fiscal years ending 2000 and 2001 contained in or incorporated into

20  the Joint Proxy was materially false and misleading for the reasons set forth above.

21  **1Q 2002**

22      594.   On July 24, 2001, Peregrine issued a press release announcing its financial results

23  for the first quarter of fiscal year 2002 ended June 30, 2001. Peregrine stated that revenues for

24  the quarter were a "record $172.0 million, an increase of 82% from the same quarter a year ago."

25  In the release, defendant Gardner was quoted as saying: "We were pleased to post significant top-

26  line [revenue] growth in this challenging economic environment[.]"

27      595.   The individually named defendants (other than defendants Rodda, Hosley, and

28  van den Berg) read and approved the issuance of Peregrine's July 24, 2001 press release. As part

Exhibit D
0332

1   of its quarterly review work, Arthur Andersen and AWSC read and approved of the foregoing

2   Peregrine press release. These defendants knew, or were deliberately reckless in not knowing,

3   that the financial information contained in the foregoing statement was materially false and

4   misleading for the reasons set forth above.

5         596.    On July 24, 2001, Peregrine management, led by defendant Gardner, held a

6   conference call with investors and securities analysts. The purpose of the conference call was to

7   give Peregrine management the opportunity to discuss with investors the Company's first quarter

8   fiscal year 2002 results of operations. During the conference call, Peregrine management

9   reported on Peregrine's previously released financial results for the quarter. In addition,

10  Peregrine management stated that it was comfortable with analysts projections of 30%-40%

11  revenue growth and 25%-35% earnings per share growth based on the strength of its business

12  and that DSOs were 99 days and expected to decrease in the next quarter to 80-90 days.

13        597.    On July 24, 2001, Bear Stearns & Co., Inc. ("Bear Stearns") issued a report based

14  on the conference call with Peregrine management. In its report, Bear Stearns repeated

15  Peregrine's previously released financial results and noted that Peregrine management had

16  indicated that it saw "positive growth in Asia Pacific, Africa, and Eastern Europe." The report

17  also stated that:

18            In sharp contrast to the norm, management reiterated revenue and
              EPS guidance of 30-40% top line growth and 25-35% EPS growth
19            for the full FY02, citing strength in all areas of business (product
              mix, geographic mix, and a return to strength in key vertical
20            markets).

21  Relying on management's representations in the conference call and Peregrine's publicly

22  released financial results, Bear Stearns gave Peregrine a "buy" rating.

23        598.    On July 25, 2001, CIBC also issued a report based on the prior day's conference

24  call with Peregrine management. In its report, CIBC repeated Peregrine's previously released

25  financial statements and noted that Peregrine management had indicated that: "Peregrine's

26  revenues of $172 million came in ahead of expectations, which the Street had pegged at $165

27  million." The report also stated that "Management noted that the strong verticals during the

28  quarter were financial, telecom, high tech, and government and that the mix was a return to a

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                      203

1   more typical mix, after the financial vertical was very weak in the March quarter. Excluding

2   acquisitions, the company indicated that year over year revenue growth was about 50%."

3   Accordingly, CIBC rated Peregrine a "strong buy" in its report dated July 25, 2001.

4       599.   On July 25, 2001, U.S. Bancorp Piper Jaffray ("Piper Jaffray") issued a report

5   based on the prior day's conference call with Peregrine management. In its report, Piper Jaffray

6   noted that Peregrine management had exceeded the revenue expectations and that Peregrine

7   management indicated that "[t]he Company expects to approach DSOs of 80-90 days in the

8   coming quarter." Relying on management's representations and Peregrine's publicly released

9   financial results, Piper Jaffray rated Peregrine's stock a "strong buy."

10      600.   In response to the information disseminated by Peregrine and the contents of the

11  analyst reports based on information provided by Peregrine management,  Peregrine stock rose to

12  $27 per share at the close of trading on July 26, 2001.

13      601.   The individually named defendants (other than defendants Rodda, Hosley, and

14  van den Berg) either knew or were deliberately reckless in not knowing that the financial

15  information provided to investors and securities analysts in the foregoing conference call was

16  materially misleading for the reasons set forth above. These defendants knew that securities

17  analysts would rely on their materially false and misleading statements in writing their research

18  reports which would be disseminated to the investing public.

19      602.   On August 14, 2001, the Company filed its Form 10-Q for the first quarter of

20  fiscal year 2002 with the SEC. It incorporated the financial statements that were included with

21  the July 24, 2001 press release. Defendant Gless signed the Form 10-Q in his capacity as

22  Executive Vice President and Chief Accounting Officer.

23      603.   The Form 10-Q also included the following statement on revenue recognition:

24          Revenues from direct and indirect license agreements are
            recognized, provided that all of the following conditions are met: a
25          noncancelable license agreement has been signed; the product has
            been delivered; there are no material uncertainties regarding
26          customer acceptance; collection of the resulting receivable is
            deemed probable; risk of concession is deemed remote; and no
27          other significant vendor obligations exist.

28      604.   The foregoing statements were materially false and misleading because

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)

1  Peregrine's reported revenue was materially overstated, there was no disclosure of a material

2  change in its accounting policy as applied to the first quarter of fiscal year 2002, its accounts

3  receivable were understated, its cash balances were overstated, its liabilities were understated and

4  its DSO were understated for the reasons set forth above.

5  .    605.    The individually named defendants (other than defendants Rodda, Hosley, and

6  van den Berg) and Arthur Andersen and AWSC read and approved the filing of Peregrine's 10-Q

7  for the first quarter of fiscal year 2002 with the SEC.  Each of these defendants either knew, or

8  were deliberately reckless in not knowing, that the financial information contained in the

9  foregoing 10-Q was materially false and misleading for the reasons set forth above.

10  **2Q 2002**

11  606.    On October 3, 2001, Peregrine issued a press release announcing the Company's

12  preliminary financial results for the second quarter of fiscal year 2002 ended

13  September 30, 2001.  It stated that "Peregrine expects to report quarterly revenue of

14  approximately $175 million.  Based on these revenues, the company expects to report net income

15  of approximately $.05 per share, excluding acquisition costs and restructuring charges."  The

16  press release quotes defendant Gardner as saying:

17      Like many companies in our industry, the tragic events of
        September 11 and the subsequent effect on the global economy
18      impacted our September quarter results.  However, even during
        these challenging times, we were able to generate approximately
19      $175 million in total revenue, demonstrating the strength of our
        product portfolio and the value proposition we deliver to our
20      customers . . .

21  607.    The individually named defendants (other than defendants Rodda, Hosley, and

22  van den Berg) read and approved the issuance of Peregrine's October 3, 2001 press release.

23  These defendants knew, or were deliberately reckless in not knowing, that the financial

24  information contained in the foregoing statement was materially false and misleading for the

25  reasons set forth above.

26  608.    On October 24, 2001, Peregrine issued a press release confirming the preliminary

27  financial results it had previously announced for the second quarter of fiscal year 2002.  It stated

28  that total revenues were a "record" $175 million, an increase of 23% from that reported in the

---

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                205

Exhibit D
0335

1    second quarter of fiscal 2001.

2        609.    The individually named defendants (other than defendants Rodda, Hosley, and

3    van den Berg) read and approved the issuance of Peregrine's October 24, 2001 press release. As

4    part of its quarterly review work, Arthur Andersen and AWSC read and approved of the

5    foregoing Peregrine press release. These defendants knew, or were deliberately reckless in not

6    knowing, that the financial information contained in the foregoing statement was materially false

7    and misleading for the reasons set forth above.

8        610.    On October 24, 2001, Peregrine management, led by defendant Gardner, held a

9    conference call with investors and securities analysts. The purpose of the conference call was to

10    give Peregrine management the opportunity to discuss with investors the Company's second

11    quarter fiscal year 2002 results of operations. During the conference call, Peregrine management

12    reported on Peregrine's previously released financial results for the quarter. In addition,

13    Peregrine management stated that guidance for the remainder of the current and following year

14    remain unchanged, that the Company expected to finish the fiscal year with $140-$150 million in

15    cash and that DSOs for Peregrine on a stand alone basis were 99 days and 113 days when

16    including recently acquired Remedy.

17        611.    On October 24, 2001, CIBC issued a report based on the conference call with

18    Peregrine management. In its report, CIBC repeated Peregrine's previously released financial

19    results and noted that Peregrine management had indicated that:

20            Guidance for the remainder of this year and next year remain
             unchanged. The Company expects revenue of $450 million in the
21            second half and a snap back in operating margins, which were 8%
             this quarter, vs. 17% last year. Management indicated that
22            operations appeared to be returning to a more normal pace after a
             virtual standstill in late September. Peregrine expects to finish the
23            fiscal year with $140 million to $150 million in cash.

24        612.    On October 24, 2001, Bear Stearns issued a report based on the conference call

25    with Peregrine management. In its report, Bear Stearns repeated Peregrine's previously released

26    financial results and noted that Peregrine management had indicated that:"Management affirmed

27    guidance -- we are maintaining estimates."

28        613.    On October 25, 2001, Thomas Weisel Partners ("Weisel") issued a report based

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)
                                                                                206

Exhibit D
0336

1  on the conference call with Peregrine management.  In its report, Weisel repeated Peregrine's

2  previously released financial results and noted that Peregrine management had indicated that

3  "management commentary was encouraging."

4      614.    On October 25, 2001, Piper Jaffray issued a report based on the conference call

5  with Peregrine management.  In its report, Piper Jaffray repeated Peregrine's previously released

6  financial results and noted that Peregrine management had stated that the Company reported

7  revenues in line with expectations, finished the quarter with $142 million in cash and DSOs for

8  Peregrine, excluding Remedy, remained essentially flat at 99 days.

9      615.    Relying on management's representations and Peregrine's publicly released

10 financial results, CIBC, Bear Stearns, Weisel and Piper Jaffray each rated Peregrine a "buy."

11     616.    In response to the information disseminated by Peregrine and the contents of the

12 analyst reports based on information provided by Peregrine management, Peregrine's stock

13 closed at $16.46 per share on October 26, 2001.

14     617.    The individually named defendants (other than defendants Rodda, Hosley, and

15 van den Berg) either knew or were deliberately reckless in not knowing that the financial

16 information provided to investors and securities analysts in the foregoing conference call was

17 materially misleading for the reasons set forth above.  These defendants knew that securities

18 analysts would rely on their materially false and misleading statements in writing their research

19 reports which would be disseminated to the investing public.

20     618.    On November 21, 2001, Peregrine filed its Form 10-Q for the second quarter of

21 fiscal year 2002 with the SEC.  It incorporated the financial statements that appeared in the

22 October 24, 2001 press release.  Defendant Gless signed the Form 10-Q in his capacity as

23 Executive Vice President and Chief Accounting Officer.

24     619.    The Form 10-Q also stated the following on revenue recognition:

25          Revenues from direct and indirect license agreements are
            recognized, provided that all of the following conditions are met: a

26          noncancelable license agreement has been signed; the product has
            been delivered; there are no material uncertainties regarding

27          customer acceptance; collection of the resulting receivable is
            deemed probable; risk of concession is deemed remote; and no

28          other significant vendor obligations exist.

---

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    207

1    620.   The financial statements in the Form 10-Q for the second quarter of fiscal year

2  2002 were materially false and misleading when made because Peregrine's reported revenue was

3  materially overstated, there was no disclosure of a material change in its accounting policy as

4  applied to the second quarter of fiscal year 2002, its accounts receivable were understated, its

5  cash balances were overstated, its liabilities were understated and its DSO were understated for

6  the reasons set forth above.

7    621.   The individually named defendants (other than defendants Rodda, Hosley, and

8  van den Berg) and Arthur Andersen and AWSC read and approved the issuance of Peregrine's

9  filing of the 10-Q with the SEC.  Each of these defendants either knew, or were deliberately

10  reckless in not knowing, that the financial information contained in the foregoing statements

11  were materially false and misleading for the reasons set forth i above.

12  **3Q 2002**

13    622.   On January 2, 2002, Peregrine issued a press release announcing the Company's

14  preliminary results for the third quarter of fiscal year 2002 ended December 31, 2001.  It stated

15  that Peregrine anticipated total revenues of approximately $175 million.

16    623.   The individually named defendants (other than defendants Rodda, Hosley, and

17  van den Berg) read and approved the issuance of Peregrine's January 2, 2002 press release.

18  These defendants knew, or were deliberately reckless in not knowing, that the financial

19  information contained in the foregoing statement was materially false and misleading for the

20  reasons set forth above.

21    624.   On January 3, 2002, Peregrine management, led by defendant Gardner, held a

22  conference call with investors and securities analysts.  The purpose of the conference call was to

23  give Peregrine management the opportunity to discuss with investors the Company's third

24  quarter fiscal year 2002 preliminary results.  During the conference call, Peregrine management

25  reported on Peregrine's previously released preliminary financial results for the quarter.

26    625.   On January 3, 2002, CIBC issued a report based on the conference call with

27  Peregrine management.  In its report, CIBC repeated Peregrine's previously released preliminary

28  financial results.  Relying on management's representations and Peregrine's publicly released

---

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                          208

1  financial results, CIBC gave Peregrine's stock a "buy" rating.

2      626.    On January 3, 2002, Piper Jaffray issued a report based on the conference call

3  with Peregrine management.  In its report, Piper Jaffray repeated Peregrine's previously released

4  preliminary financial results and gave Peregrine's stock a rating of "outperform."

5      627.    On January 3, 2002, Bear Stearns issued a report based on the conference call with

6  Peregrine management.  In its report, Bear Stearns repeated Peregrine's previously released

7  financial results and rated Peregrine's stock as "attractive."

8      628.    In response to the information disseminated by Peregrine and the contents of the

9  analyst reports based on information provided by Peregrine management, Peregrine's stock

10  closed at $9.40 per share on January 4, 2002.

11      629.    The individually named defendants (other than defendants Rodda, Hosley, and

12  van den Berg) either knew or were deliberately reckless in not knowing that the financial

13  information provided to investors and securities analysts in the foregoing conference call was

14  materially misleading for the reasons set forth above.  These defendants knew that securities

15  analysts would rely on their materially false and misleading statements in writing their research

16  reports which would be disseminated to the investing public.

17      630.    On January 24, 2002, Peregrine issued a press release confirming that total

18  revenues for the third quarter of fiscal year 2002 were $175.2 million.

19      631.    The individually named defendants (other than defendants Rodda, Hosley, and

20  van den Berg) read and approved the issuance of Peregrine's January 24, 2002 press release.  As

21  part of its quarterly review work, Arthur Andersen and AWSC read and approved of the

22  foregoing press release.  These defendants knew, or were deliberately reckless in not knowing,

23  that the financial information contained in the foregoing statement was materially false and

24  misleading for the reasons set forth above.

25      632.    Such statements were materially false and misleading because Peregrine's

26  reported revenue was materially overstated, its accounts receivable were understated, its cash

27  balances were overstated, its liabilities were understated and its DSO were understated for the

28  reasons set forth above.

---

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                              209

Exhibit D
0339

633.   On January 24, 2002, Peregrine management held a conference call with investors and securities analysts.  The purpose of the conference call was to give Peregrine management the opportunity to discuss with investors the Company's third quarter fiscal year 2002 results. During the conference call, Peregrine management reported on Peregrine's previously released financial results for the quarter.  In addition, Peregrine management stated that its DSO remained essentially flat at 100 up one day from the prior quarter and that the Company finished the quarter with approximately $107 million in cash.

634.   On January 24, 2002, CIBC issued a report based on the conference call with Peregrine management.  In its report, CIBC repeated Peregrine's previously released financial results and noted that the "Company appears to be on the right track."  Relying upon management's representations and Peregrine's publicly released financial results, CIBC rated Peregrine's stock a "buy."

635.   On January 24, 2002, Piper Jaffray and Bear Stearns also issued reports based on the conference call with Peregrine management.  Piper Jaffray and Bear Stearns each repeated Peregrine's previously released financial results and rated Peregrine's stock as "outperform" and "attractive," respectively.

636.   In response to the information disseminated by Peregrine and the contents of the analyst reports based on information provided by Peregrine management, Peregrine's stock closed at $7.95 per share on January 25, 2002.

637.   The individually named defendants (other than defendants Rodda, Hosley, and van den Berg) either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the foregoing conference call was materially misleading for the reasons set forth above.  These defendants knew that securities analysts would rely on their materially false and misleading statements in writing their research reports which would be disseminated to the investing public.

638.   On February 14, 2002, Peregrine filed its Form 10-Q for the third quarter of fiscal year 2002 with the SEC.  It incorporated the financial statements that appeared in the January 24, 2002 press release.  The Form 10-Q was signed by defendant Gless in his capacity as

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                          210

Exhibit D
0340

1  Executive Vice President and Chief Accounting Officer.

2    639.    The foregoing statements were materially false and misleading because

3  Peregrine's reported revenue was materially overstated, there was no disclosure of a material

4  change in its accounting policy as applied to the third quarter of fiscal year 2002, its accounts

5  receivable were understated, its cash balances were overstated, its liabilities were understated and

6  its DSO were understated for the reasons set forth above.

7    640.    The individually named defendants (other than defendants Rodda, Hosley, and

8  van den Berg) and Arthur Andersen and AWSC read and approved the filing of Peregrine's Form

9  10-Q with the SEC.  Each of these defendants either knew, or were deliberately reckless in not

10  knowing, that the financial information contained in the foregoing Form 10-Q was materially

11  false and misleading for the reasons set forth above.

12                    **THE TRUTH BEGINS TO EMERGE**

13    641.    On April 5, 2002, Peregrine issued a press release announcing that it was

14  replacing Arthur Andersen as its independent auditor with KPMG.  It quoted defendant Gardner

15  as saying that "we have the highest regard for our audit team's work ethic," but "in light of the

16  current uncertainties at Arthur Andersen [relating to Enron], we felt it was in the best interest of

17  our company and shareholders to retain KPMG as our independent auditors at this time."

18    642.    After the close of trading on April 30, 2002, Peregrine issued a press release

19  announcing that it would delay the release of its financial results for the fourth quarter and year-

20  end 2002.  The results were supposed to have been announced on May 2, 2002, but now would

21  be delayed until the week of May 6, 2002 due to the "continued audit activities by KPMG, the

22  company's independent auditors."

23    643.    Before the market opened on May 6, 2002 (and approximately thirty (30) days

24  after the engagement of KPMG), Peregrine issued a press release announcing (i) the discovery of

25  accounting irregularities; (ii) an internal accounting investigation; and (iii) the resignation of

26  defendants Gardner and Gless.

27    644.    Peregrine's stock price fell approximately 67% in response to this disclosure.  On

28  May 3, 2002, Peregrine stock closed at $2.57 per share.  On the next trading day (May 6, 2002),

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                      211

Exhibit D
0341

1    Peregrine common stock closed at $0.89 per share on extremely heavy volume.

2        645.    On May 28, 2002, Peregrine filed a Form 8-K with the SEC stating that its Board

3    of Directors had terminated its engagement of KPMG as its auditor.  Approximately $35 million

4    of the then estimated $100 million in improperly recognized revenue came from questionable

5    transactions with KPMG's consulting arm.

6        646.    In a Form 8-K filed with the SEC on June 3, 2002 (which was dated

7    May 24, 2002), Peregrine stated that, in the course of its engagement, KPMG had informed the

8    Company's Audit Committee and other Board members that:

9            a.    Information had come to the attention of KPMG that had
             led it to no longer be able to rely on representations by some
10           members of management. This information consisted principally of
             customer documentation and accounting information provided by
11           personnel within the company's sales and finance organizations
             which, when taken together, pointed out accounting
12           inconsistencies, errors and irregularities, principally in the
             company's indirect channel sales; and
13

14           b.    KPMG had concluded the information provided to it during
             the course of its audit activities would impact the fairness and
15           reliability of the company's audited financial statements for fiscal
             2000 and 2001 and for each of the three subsequent unaudited
16           quarterly periods reported by the company for fiscal 2002.  On May
             23, 2002, the Company announced that it would be restating its
17           financial statements for fiscal 2000 and 2001 and each of the first
             three quarters of fiscal 2002.

18       647.    In the Form 8-K, Peregrine stated that the "questions and issues" raised about

19    Peregrine's financial statements by KPMG fell into four categories:

20           a.    Revenue recognition irregularities, principally arising in the
             company's indirect channel sales and, to a lesser extent, arising in
21           connection with commercial transactions involving
             contemporaneous product purchase activities and investments or
22           acquisitions.  KPMG has advised that correcting these irregularities
             would have the effect generally of delaying to later periods, or
23           nullifying, revenue recognized from product sales;

24           b.    Accounting and transparency-of-presentation issues
             associated with the accounting treatment for impaired accounts
25           receivable. KPMG has advised that some write-offs of impaired
             accounts receivable should have been accounted for as errors in the
26           previous recognition of revenue. KPMG also advised that where
             write-offs of impaired accounts receivable were appropriately
27           made, reclassification of those adjustments as bad debt or as a
             reversal of revenue would be appropriate;

28

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                      212

Exhibit D
0342

c.     The appropriateness, from an accounting perspective, of the manner in which the company recorded on its balance sheet the financing of some of its accounts receivable with three banks; and

d.     KPMG has advised that the financing of some of these accounts receivable should be recorded for balance sheet purposes as loan transactions and not as sales of accounts receivable.

648.     On June 5, 2002, Peregrine filed a Form 8-K/A for the purpose of filing a letter from KPMG to the SEC. In its letter, KPMG noted that the prior statements made by Peregrine in the June 3, 2002 Form 8-K were inaccurate or incomplete in that KPMG had determined that it was necessary to significantly expand the scope of the fiscal 2002 audit, and recommended an internal investigation by forensic auditing experts "into the various indicators of possible fraud."

649.     On June 27, 2002, Peregrine issued a press release announcing that the NASDAQ Stock Market had notified the Company of its intention to delist the Company at the opening of trading on August 30, 2002 because it had not filed periodic reports with the SEC. On August 16, 2002 Peregrine announced in a press release that it had been given further notification of noncompliance by the NASDAQ based on the stock's failure to maintain a bid price over $1.00 per share.

650.     On August 29, 2002 Peregrine issued a press release announcing that it was "restructuring" its accounts receivable, and that management now estimated the overstatement of revenue during the eleven quarter period (ending the third quarter of fiscal year 2002) to be $250 million. In this release, Peregrine also quantified the amount of debt not reflected on its financial statements (up to $180 million) and the amount by which it had understated stock option compensation ($100 million).

651.     On August 29, 2002 Peregrine issued another press release announcing that NASDAQ would delist the Company from the NASDAQ National Market at the opening of trading on August 30, 2002 because the Company "had not filed periodic reports with the Securities and Exchange Commission."

652.     On September 22, 2002 Peregrine, "[c]iting the financial and legal issues raised by the company's inability to file audited financial reports for the 2000, 2001 and 2002 fiscal years, among other reasons," announced in a press release that it had filed a voluntary petition to

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                    213

Exhibit D
0343

1   reorganize under Chapter 11 of the U.S. Bankruptcy Code.

2   653.    On February 28, 2003, Peregrine filed with the SEC its restatement of its financial

3   statements for fiscal years 2000 and 2001 and the first three quarters of fiscal year 2002.

4   ## BASIS OF FACTUAL ALLEGATIONS

5   654.    The basis for Lead Plaintiffs' factual allegations as alleged herein consists of the

6   following: (i) review of documents produced by Peregrine to the SEC and the U.S. Department

7   of Justice in connection with those authorities' investigation of Peregrine and certain former

8   officers and directors of Peregrine including investigatory interviews of witnesses; (ii) a review

9   of Peregrine press releases; (iii) a review of Peregrine SEC filings; (iv) a review of BMC

10  Software's SEC filings; (v) a review of Peregrine's website; (vi) a review of securities analysts'

11  reports on Peregrine; (vii) a review of reports, articles and discussions concerning Peregrine

12  and/or its accounting irregularities contained in the print and electronic media; (viii) interviews

13  of witnesses; (ix) a review of the trading volume and pricing of Peregrine; (x) consultations with

14  expert consultants; (xi) a review of complaints filed in other pending actions; (xii) a review of

15  pleadings filed in Peregrine's bankruptcy case; and (xiii) a review of the guilty pleas of

16  defendants Gless, Spitzer and Cappel.

17  ## DEFENDANTS' CONCEALMENT OF WRONGDOING

18  655.    Defendants actively concealed their wrongdoing as alleged herein such that no

19  reasonable investor would have been put on inquiry or actual notice of Peregrine's wrongdoing

20  as alleged herein until, at the earliest, May 6, 2002 when Peregrine announced the resignations of

21  defendants Gardner and Gless and the commencement of an investigation into potential

22  accounting irregularities.  These consolidated actions were filed within one year of May 6, 2002.

23  As to defendants KPMG, KPMG Consulting, Rodda, and Dammeyer, Lead Plaintiffs were

24  unaware of the facts supporting the allegations against these defendants until they had access to

25  and were able to review Peregrine's document production to the SEC and U.S. Department of

26  Justice beginning in December 2003.

27  //

28  //

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    214

#105317

Exhibit D
0344

**THERE IS NO STATUTORY SAFE HARBOR**
**APPLICABLE TO THE ALLEGATIONS OF THIS COMPLAINT**

656. The statutory safe harbor provision for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead herein. The vast majority of the statements plead herein as being false are not "forward-looking statements" but are statements of financial results which are statements of historical fact and which are not protected by the statutory safe harbor. To the extent that there are any forward-looking false statements alleged, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements plead herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made the particular speaker knew that the particular forward-looking statement was false.

**COUNT I**

**(Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5**
**Promulgated Thereunder And Of Section 20(a) Of The Exchange Act)**

657. Plaintiffs incorporate by reference Paragraphs 1 through 656, as though fully set forth herein.

658. This Count with regard to the claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder is asserted by Lead Plaintiffs the Loran Group and the Class against all defendants.

659. These defendants carried out a plan, scheme, and course of conduct which was intended to and did:

        (a)    deceive the investing public, including plaintiffs and other Class Members;

        (b)    artificially inflate and maintain the market price of Peregrine securities; and

        (c)    cause Class members to acquire Peregrine securities at artificially inflated

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    215

Exhibit D
0345

1  prices.

2      660.    In furtherance of this unlawful scheme, these defendants employed devices,

3  schemes and artifices to defraud plaintiffs and Class members.  They made untrue statements of

4  material fact and/or omitted to state material facts necessary to make the statements made not

5  misleading.  In addition, these defendants engaged in acts, practices, and a course of business that

6  operated as a fraud and deceit upon plaintiffs and Class members.  These defendants did so to

7  maintain artificially inflated market prices for Peregrine's securities in violation of Section 10(b)

8  of the Exchange Act and Rule 10b-5 promulgated thereunder.

9      661.    In addition to the duties of full disclosure imposed on defendants as a result of

10  their making or approving of affirmative statements and reports, or their participation in the

11  making of affirmative statements and reports to the investing public, the defendants had a duty to .

12  promptly disseminate truthful information that would be material to investors in compliance with

13  the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R.

14  210.01 *et seq.*) and S-K (17 C.F.R. 229.10 *et seq.*) and other SEC regulations, including accurate

15  and truthful information with respect to the Company's operations and performance so that the

16  market price of the Company's securities would be based on truthful, complete and accurate

17  information.

18      662.    The liability of the individually named defendants (other than defendant Rodda)

19  arises from the following facts as more specifically alleged above:

20          (a)    they were high-level executives at the Company and were members of the

21  Company's senior management team or were members of the Company's Audit or Compensation

22  Committees;

23          (b)    by virtue of their responsibilities and activities as senior officers and

24  directors of the Company, they were privy to and participated in the drafting, reviewing and/or

25  approving the misleading statements, press releases, reports and other public  representations

26  about Peregrine, and/or were engaged in authorizing or entering into the fraudulent transactions

27  alleged herein, and/or signed the Company's public filings with the SEC which contained the

28  materially misleading statements as alleged herein;

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS --
Master File No. 02-CV-0870 J(RBB)                                                              216

Exhibit D
0346

     (c)     they knew of or had access to the material, adverse, nonpublic information about Peregrine's financial results and business, which were materially at odds with reported financial results; and

     (d)     they were aware of the Company's dissemination of information to the investing public which they knew or were deliberately reckless in not knowing was materially false and misleading.

663.    Arthur Andersen and AWSC were engaged by Peregrine to provide the auditing and accounting services to Peregrine and to audit Peregrine's annual financial results and to review Peregrine's quarterly financial results during fiscal year 2000 and 2001 and the first three quarters of fiscal 2002. Defendant Stulac was the engagement or concurring partner for Arthur Andersen on the Peregrine engagements. Stulac and Arthur Andersen used the services of AWSC in connection with the Peregrine engagements. As a result, Arthur Andersen and AWSC owed a duty of full and complete disclosure to shareholders and prospective shareholders of Peregrine. Arthur Andersen and AWSC breached that duty by failing to fully and adequately disclose Peregrine's true financial condition through the issuance of unqualified audit reports on Peregrine's audited financial statements for fiscal years 2000 and 2001 and by failing to cause Peregrine to revise or withdraw materially false interim financial statements as alleged herein. Arthur Andersen's and AWSC's actions or inactions, as alleged herein, violated GAAS as set forth above.

664.    Defendants KPMG, BearingPoint, and Rodda directly participated in Peregrine's fraud. They did so by engaging in transactions with Peregrine so Peregrine could book revenue before deals with anticipated end users were completed. In doing so, the KPMG Defendants deliberately chose to conceal the truth and played a significant role in Peregrine's ability to misrepresent its financial condition to investors. In exchange for its participation in the scheme, the KPMG Defendants were awarded lucrative services contracts. At the end of a quarter, the KPMG Defendants frequently agreed to have Peregrine software "parked" with them. This occurred when Peregrine knew it could not complete a direct sale in time to record revenue for that quarter but needed the revenue to meet its publicly announced revenue projections. In such

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    217

Exhibit D
0347

1   instances, the KPMG Defendants would enter into a deal for the anticipated amount of the sale to

2   the end user. The KPMG Defendants knew that Peregrine would immediately book revenue

3   from such transactions even though a deal with the end user had not yet been completed. The

4   KPMG Defendants further knew that Peregrine proposed the "parking" arrangements so it could

5   falsely represent to investors that it had obtained revenue from such incomplete transactions.

6       665.    The defendants named herein had actual knowledge of the misrepresentations and

7   omissions of material facts set forth herein, or acted with deliberate recklessness in that they

8   failed to ascertain and to disclose such facts, even though such facts were readily available to

9   them. These defendants' material misrepresentations and/or omissions were done knowingly or

10  with deliberate recklessness to conceal Peregrine's true financial condition from the investing

11  public and to support the artificially inflated price of its securities.

12      666.    As a result of the dissemination of the materially false and misleading information

13  and failure to disclose material facts, the market price of Peregrine securities was artificially

14  inflated throughout the Class Period. In ignorance of the fact that the market price of Peregrine

15  securities was artificially inflated, and relying directly or indirectly on the false and misleading

16  statements by these defendants, or upon the integrity of the market in which Peregrine securities

17  trade, plaintiffs and Class members purchased Peregrine securities at artificially inflated prices

18  and were damaged thereby.

19      667.    At the time of the alleged misrepresentations and omissions, plaintiffs and Class

20  members were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other

21  Class members known of the defendants' false statements as alleged herein they would not have

22  purchased Peregrine securities.

23      668.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and

24  Class members suffered damages in connection with their purchase or acquisition of Peregrine

25  securities during the Class Period.

26      669.    This Count with regard to the claim under Section 20(a) of the Exchange Act is

27  asserted by Lead Plaintiffs the Loran Group and the Class against defendants Gardner, Gless,

28  Moores, Nelson, Noell, Cole, van den Berg, Hosley, Watrous, Savoy, and Dammeyer based on

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                              218

Exhibit D
0348

1  their control of Peregrine. In addition, this control person claim is asserted against defendant

2  Moores based on his control of defendants Gardner, Gless, Nelson, Luddy, Noell, van den Berg,

3  and Hosley, and against defendant AWSC based on its control of Arthur Andersen.

4      670.    Defendants Gardner, Gless, Moores, Nelson, Noell, Cole, van den Berg, Hosley,

5  Watrous, Savoy, and Dammeyer were controlling persons of Peregrine within the meaning of

6  Section 20(a) of the Exchange Act. By virtue of their executive positions, Board membership,

7  and stock ownership (as more specifically alleged above), these defendants had the power to

8  influence and control (and did influence and control, directly or indirectly) the decision-making

9  of the Company, including the content and dissemination of the various statements which

10  plaintiffs contend are materially false and misleading. These defendants were provided with or

11  had unlimited access to the Company's internal reports, press releases, public filings and other

12  statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements

13  were issued and had the ability to prevent the issuance of the false statements or cause the false

14  statements to be corrected.

15      671.    Peregrine violated Section 10(b) and Rule 10b-5 by the issuance of materially

16  false and misleading statements as alleged herein. By virtue of their positions as controlling

17  persons of Peregrine, defendants Gardner, Gless, Moores, Nelson, Noell, Cole, van den Berg,

18  Hosley, Watrous, Savoy, and Dammeyer are liable to plaintiffs and the Class pursuant to Section

19  20(a) of the Exchange Act.

20      672.    Defendant Moores was a controlling person of defendants Gardner, Gless, Nelson,

21  Luddy, Noell, van den Berg, and Hosley, within the meaning of Section 20(a) of the Exchange

22  Act. By virtue of his long standing business entanglements with these defendants and his

23  instrumental role in placing them in senior executive and director positions at Peregrine,

24  defendant Moores had the power and influence to control, and did influence and control, directly

25  and indirectly, the conduct of these defendants in connection with their Peregrine-related

26  activities.

27      673.    By virtue AWSC's relationship to Arthur Andersen with respect to accounting and

28  auditing work performed for Peregrine, as more fully alleged above, defendant AWSC was a

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                        219

Exhibit D
0349

1  control person of Arthur Andersen within the meaning of Section 20(a) of Exchange Act.

2  AWSC had the power and influence to control, and did influence and control, directly and

3  indirectly, the contents of Arthur Andersen's audit reports and quarterly review work both of

4  which are alleged to have caused damage to the Class.

5      674.  Arthur Andersen violated Section 10(b) and Rule 10b-5 by the issuance of

6  materially false and misleading statements as alleged herein.  By virtue of its position as a

7  controlling person of Arthur Andersen, AWSC is liable to plaintiffs and the Class pursuant to

8  Section 20(a) of the Exchange Act.

9      675.  As a direct and proximate cause of defendants' wrongful conduct, plaintiffs and

10  Class Members suffered damages in connection with their purchase or acquisition of Peregrine

11  securities.

12  <div align="center">**COUNT II**</div>

13  <div align="center">**(Violations Of Section 14(a) Of The Exchange Act And**
**Rule 14a-9 Promulgated Thereunder And Of**
14  **Section 20(a) Of The Exchange Act - Harbinger Acquisition)**</div>

15      676.  Plaintiffs Waga and Sutliff incorporate by reference, as though fully set forth

16  herein, Paragraphs 4, 6, 8, 10-11, 13, 18-19, 24 (bullet points only), 28-30, 31(l) - (o), 32, 36(a) -

17  (b), (h) - (l), (n), 37, 40-48, 54-58, 60-70, 72-82, 84, 87, 90, 92-94, 100, 103, 137-146, 148-151,

18  153-156, 159, 167, 171-172, 178-179, 181, 185, 187-190, 232 (bullet points only), 369-385, 547,

19  592 and 642-654 above.

20      677.  This Count is asserted by Plaintiffs Waga and Sutliff on behalf of all those who

21  held Harbinger common stock on May 22, 2000 and still held those shares on June 16, 2000 and

22  exchanged those shares for shares issued by Peregrine in connection with Peregrine's acquisition

23  of Harbinger Corporation (the "Harbinger Sub-Class").

24      678.  This Count is asserted against defendants Gardner, Gless, Moores, Cole, Hosley,

25  Noell, van den Berg and Watrous on behalf of the Harbinger Sub-Class, for violations of

26  Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9, 17 C.F.R. §240.14a-9.  This

27  Count is based solely on those defendants' negligent conduct.

28      679.  Each defendant named in this Count solicited proxies by means of the Joint Proxy

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                           220

Exhibit D
0350

1    Statement and Prospectus filed on or about May 22, 2000 as part of Amendment No. 1 to

2    Peregrine's Form S-4 Registration Statement (the "Harbinger Joint Proxy"). The Harbinger Joint

3    Proxy was distributed by defendants named herein to Harbinger shareholders. They each

4    permitted the use of their names in the Harbinger Joint Proxy.

5         ·680.    The Harbinger Joint Proxy was a "proxy solicitation" within the meaning of

6    Section 14 of the Exchange Act, and Rule 14a-9 promulgated thereunder.

7         681.    Each of the defendants named in this Count signed Amendment No. 1 to the

8    Peregrine Registration Statement which contained the Harbinger Joint Proxy, thus allowing it to

9    be filed with the SEC. These defendants were members of Peregrine's Board of Directors at all

10   relevant times.

11        682.    The Harbinger Joint Proxy contained or incorporated by reference Peregrine's

12   audited financial statements for the fiscal year ending March 31, 2000. These financial

13   statements were materially false and misleading for the reasons set forth above.

14        683.    The Harbinger Joint Proxy was materially false and misleading, in that it

15   contained the foregoing false and misleading statements of material fact and failed to disclose

16   material facts necessary to make the statements made not false and misleading.

17        684.    The defendants named in this Count sought to secure Harbinger shareholder

18   approval of the Peregrine/Harbinger merger by means of the materially false and misleading

19   Harbinger Joint Proxy and permitted the use of their names to solicit proxies from the Harbinger

20   Sub-Class.

21        685.    The facts herein referenced in paragraph 676 and the following facts give rise to a

22   strong inference that each of the defendants named in this Count acted with the requisite state of

23   mind for liability under Section 14(a) and Rule 14a-9, *i.e.*, negligence, at the time they issued or

24   caused to be issued the Harbinger Joint Proxy and permitted the use of their names in the

25   Harbinger Joint Proxy. As detailed more fully above, these defendants were negligent in not

26   knowing that the Harbinger Joint Proxy contained misstatements of material fact and that it

27   omitted to state material facts necessary in order to make the statements made therein not false or

28   misleading.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                221

Exhibit D
0351

686.    The defendants named in this Count (except Gless) were members of the Peregrine Board on April 14, 1999 when the Company implemented a radical change.  It was at a meeting on that date that the Board approved of the use of the sell-in method of accounting although they were told that the sell-in method was not the preferred method.  The Board members were informed that only by using that method would Peregrine meet its quarterly revenue goals.  Thus, the Board should have been aware that a weakness existed in Peregrine's sales efforts, which needed to be watched consistently.  Moreover, the Board was informed that the Company's auditors would be uncomfortable if the channel activity accounted for more than 25% of the Company's revenue.  From that point forward, the members of the Board were on notice that they needed to scrutinize the Company's revenue closely, along with the Company's revenue recognition policies, and to satisfy themselves that the sell-in method was not being utilized improperly and that revenue was being recognized appropriately.

687.    The members of the Board were given a further reason to assure themselves that the Company's revenue was proper by their receipt of the quarterly Review and Outlook reports send by defendant Gardner.  These reports, as detailed above, consistently painted a bleak picture of Peregrine's anticipated revenue while the Company incredibly was able to meet analyst expectations at the last moment of almost every quarter.  Thus, while Gardner was reporting severe trouble with the Company's "bread and butter" business, and informing the Board that channel activity was a cause for concern and that the Company was borrowing from the future, the Board did not take actions necessary to correct the problems.  Even when Gardner reported that channel inventory had reached a level that made the auditors uncomfortable, the Board took no appropriate action.

688.    Indeed, as detailed above, as channel sales increased quickly and dramatically, inventory was also becoming overly bloated -- sure signs that the Company was having problems selling to end users -- yet the Company was purportedly making its revenue number.  The defendants named in this Count were sophisticated businessmen, many of whom had years of experience in the software industry and, their failure to miss these warning signs was negligent.

689.    Defendants named in this Count acted as controlling persons of Peregrine within

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)
222

Exhibit D
0352

1 the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

2 positions, and their ownership and contractual rights, participation in and/or awareness of the

3 Company's operations and/or intimate knowledge of the false financial statements contained in

4 the Harbinger Joint Proxy, these defendants had the power to influence and control and did

5 influence and control, directly or indirectly, the decision-making of Peregrine, including the

6 content and dissemination of the various statements which plaintiffs contend are false and

7 misleading. These defendants were provided with or had unlimited access to Peregrine's

8 misleading financial statements contained in the Harbinger Joint Proxy alleged by plaintiffs to be

9 misleading prior to and/or shortly after these statements were issued and had the ability to

10 prevent the issuance of the statements or cause the statements to be corrected.

11      690. In particular, each of these defendants had direct and supervisory involvement in

12 the day-to-day operations of the Company and, therefore, is presumed to have had the power to

13 control or influence the particular transactions giving rise to the securities violations as alleged

14 herein, and exercise the same.

15      691. As detailed above, the defendants named in this Count controlled Peregrine.

16 Certainly, for purposes of the distribution of the Harbinger Joint Proxy, the Board had control of

17 whether such distribution should be made and the contents thereof.

18      692. Beyond the Harbinger transaction, Moores also had control of Peregrine through

19 his control and domination of the Board. As stated in detail above, almost every Board member

20 had ties to Moores, which allowed Moores to have a great deal of influence over those Board

21 members. Moreover, by his control of these Board members, Moores and these Board members

22 effectively controlled Peregrine.

23      693. The Merger required and received the affirmative vote of the Harbinger

24 shareholders at the Special Meeting of Harbinger shareholders held on June 16, 2000.

25 Accordingly, the materially false and misleading Harbinger Joint Proxy was an essential link in

26 the accomplishment of Peregrine's acquisition of Harbinger.

27      694. Based on the foregoing, the defendants named in this Count have violated

28 Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated by the SEC thereunder and

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                223

1   by virtue of their positions as controlling persons, these defendants have violated Section 20(a) of

2   the Exchange Act.

3        695.    As a direct and proximate result of these defendants' wrongdoing, Plaintiffs Waga

4   and Sutliff and the other members of the Harbinger Sub-Class have sustained injury and damages

5   by reason of these defendants' misrepresentations contained in the Harbinger Joint Proxy in

6   connection with the Peregrine's acquisition of Harbinger.

7                                        **COUNT III**

8                    **(Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9**
                         **Promulgated Thereunder And Of Section 20(a) Of The**
9            **Exchange Act - Harbinger Acquisition - Arthur Andersen, AWSC And Stulac)**

10       696.    Plaintiffs Waga and Sutliff  incorporate by reference, as though fully set forth

11  herein, the paragraphs referenced in Paragraph 676 above and Paragraphs 36(p) - (r), 95, 132,

12  208-212, 217-219, 386-396, 398-403, 411-412, 429-433, 460-461, 470-472, 476, and 482 above.

13       697.    This Count is asserted by Plaintiffs Waga and Sutliff on behalf of the Harbinger

14  Sub-Class.

15       698.    This Count is asserted against Arthur Andersen, AWSC and Stulac on behalf of

16  the Harbinger Sub-Class for violations of Section 14(a) of the Exchange Act, 15 U.S.C. §78n,

17  and Rule 14a-9, 17 C.F.R. §240.14a-9.

18       699.    The Joint Proxy which was included in Peregrine's May 22, 2000 Amendment 1

19  to its S-4 Registration Statement filed with the SEC and distributed to Harbinger shareholders

20  (the "Harbinger Joint Proxy") was a "proxy solicitation" within the meaning of Section 14 of the

21  Exchange Act, and Rule 14a-9 promulgated thereunder.  This Count is based solely on

22  defendants' negligent conduct.

23       700.    Arthur Andersen and AWSC consented to the use of Arthur Andersen's name in

24  the Harbinger Joint Proxy to solicit proxies from Plaintiffs Waga and Sutliff and other members

25  of the Harbinger Sub-Class.

26       701.    Arthur Andersen and AWSC also consented to the inclusion and/or the

27  incorporation by reference, in the Harbinger Joint Proxy, of Arthur Andersen's unqualified audit

28  report on Peregrine's fiscal year 2000 financial statements, as set forth in Peregrine's Form 10-K

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                224

Exhibit D
0354

1   for the year ending March 31, 2000, and consented to all references to Arthur Andersen in the

2   registration statement, which included a reference to it under the caption "Experts," and under

3   the caption "Peregrine Selected Consolidated Financial Data," where it was noted that the

4   consolidated financial data was based upon financial statements audited by Arthur Andersen.

5   Stulac was the representative of Arthur Andersen and AWSC for the Peregrine account.

6          702.   Arthur Andersen's audit report on Peregrine's financial statements for the year

7   ending March 31, 2000, which was included and/or incorporated by reference into the Harbinger

8   Joint Proxy, was materially false and misleading for the reasons set forth above.

9          703.   The following facts and the facts referenced in paragraph 696 above give rise to a

10  strong inference that Arthur Andersen, AWSC and Stulac acted with the requisite state of mind

11  for liability under Section 14(a) and Rule 14a-9, *i.e.*, negligence, in permitting Arthur Andersen's

12  name to be used in conjunction with the solicitation of proxies pursuant to a proxy statement that

13  contained material misrepresentations and omissions.  As detailed more fully above, Arthur

14  Andersen, AWSC and Stulac should have known at the time that consent to the use of Arthur

15  Andersen's name in the Harbinger Joint Proxy was given that Arthur Andersen's audit report on

16  Peregrine's financial statements for the year ending March 31, 2000, which were included and/or

17  incorporated by reference to in the Harbinger Joint Proxy, was materially false and misleading.

18         704.   Arthur Andersen, AWSC and Stulac were aware that when the Company adopted

19  the sell-in method, it did so in order to meet its quarterly revenue estimates.  Moreover, these

20  defendants  knew that the sell-in method was an aggressive revenue recognition procedure, which

21  was not the preferred method.

22         705.   Arthur Andersen had informed the Company when it adopted the sell-in method

23  that it would be uncomfortable if channel activity reached 25% of the Company's revenue, yet

24  even when that number was far exceeded, Arthur Andersen, AWSC and Stulac consented to

25  Arthur Andersen's unqualified audit report to be included in the Harbinger Joint Proxy.

26         706.   As detailed above, plenty of warning signs existed that should have alerted Arthur

27  Andersen, AWSC and Stulac that severe problems existed with the Company's accounting.

28  Auditor guidelines for items that should receive special consideration identified almost the exact

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                           225

1    type of situation as the one that existed at Peregrine, such as significant sales volume occurring

2    near the end of the quarter, unusual volume of sales to resellers, barter transactions and side

3    agreements. Messages about "bad revenue," inquiries from the SEC, and complaints about

4    revenue recognition were either provided to Arthur Andersen, discovered by it or readily

5    available to it had it sought to look. Instead, Arthur Andersen, AWSC and Stulac ignored the

6    warning signs and allowed the Company to continually spiral downward into a deeper revenue

7    hole.

8        707.    In addition, Arthur Andersen, AWSC and Stulac should have been aware that

9    problems existed at the Company that required further investigation on their part because of the

10    lack of Audit Committee minutes, the failure to hold regular meetings during fiscal year 2000,

11    and the participation of members of management in the Audit Committee deliberations. The

12    failure to respond to the above repeated warning signs demonstrates Arthur Andersen's, AWSC's

13    and Stulac's negligence.

14        708.    Arthur Andersen and Stulac were also involved in designing the Company's stock

15    option compensation plan, which allowed for the exercise prices to be below the common stock

16    market values when the options were granted. This plan was also a part of Peregrine's

17    restatement, and a further sign that should have alerted Arthur Andersen, AWSC and Stulac that

18    a problem existed at Peregrine.

19        709.    The Merger required and received the affirmative vote of the Harbinger

20    shareholders at the Special Meeting of Harbinger shareholders held on June 16, 2000.

21    Accordingly, the materially false and misleading Harbinger Joint Proxy was an essential link in

22    the accomplishment of the Peregrine's acquisition of Harbinger.

23        710.    Based on the foregoing, Arthur Andersen, AWSC and Stulac violated

24    Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated by the SEC thereunder.

25        711.    As a direct and proximate result of Arthur Andersen, AWSC's and Stulac's

26    wrongful conduct, plaintiffs and other members of the Harbinger Sub-Class have sustained injury

27    and damages by reason of defendants' misrepresentations contained in the Harbinger Joint Proxy

28    in connection with the Peregrine's acquisition of Harbinger.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
#105317    Master File No. 02-CV-0870 J(RBB)                                         226

Exhibit D
0356

1    712.    Defendants AWSC and Stulac acted as controlling persons of Arthur Andersen

2    within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their

3    control of and/or interlocking officers, partners and finances and/or awareness of the Arthur

4    Andersen's operations and/or intimate knowledge of the false financial statements contained in

5    the Harbinger Joint Proxy, these defendants had the power to influence and control and did

6    influence and control, directly or indirectly, the decision-making of Arthur Andersen, including

7    the content and dissemination of the various statements which plaintiffs contend are false and

8    misleading.  These defendants were provided with or had unlimited access to Peregrine's

9    misleading financial statements contained in the Harbinger Joint Proxy alleged by plaintiffs to be

10   misleading and had the ability to prevent the issuance of the statements or cause the statements to

11   be corrected.

12    713.    In particular, each of these defendants had direct and supervisory involvement in

13   the day-to-day operations of the Arthur Andersen and, therefore, is presumed to have had the

14   power to control or influence the particular transactions giving rise to the securities violations as

15   alleged herein, and exercised the same.

16    714.    As set forth above, defendants AWSC and Stulac, by virtue of their positions as

17   controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.

18   As a direct proximate result of these defendants' wrongful conduct, plaintiffs named in this Count

19   and other members of the Harbinger Sub-Class suffered damages in connection with their

20   acquisition of shares of Peregrine.

21                                **COUNT IV**

22              **(Violations Of Section 14(a) Of The Exchange Act And**
                  **Rule 14a-9 Promulgated Thereunder And Of**
23              **Section 20(a) Of The Exchange Act - Remedy Acquisition)**

24    715.    Plaintiffs Balch and Hylton incorporate by reference, as though fully set forth

25   herein, Paragraphs 36(m), 36(o), 686-688, and all paragraphs referenced in Paragraph 676 above

26   except Paragraphs 36(k) and 36(l).

27    716.    This Count is asserted by Plaintiffs Balch and Hylton on behalf of all those who

28   held Remedy common stock on July 23, 2001 and still held those shares on August 27, 2001 and

Exhibit D
0357

1  exchanged those shares for shares issued by Peregrine in connection with Peregrine's acquisition

2  of Remedy Corporation (the "Remedy Sub-Class").

3      717.  This Count is asserted against defendants Gardner, Gless, Moores, Savoy, Cole,

4  Noell, Watrous, and Dammeyer on behalf of the Remedy Sub-Class, for violations of

5  Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9, 17 C.F.R. §240.14a-9. This

6  Count is based solely on those defendants' negligent conduct.

7      718.  Each defendant named in this Count solicited proxies by means of the Joint Proxy

8  Statement and Prospectus filed on or about July 23, 2001 as part of Amendment No. 1 to

9  Peregrine's Form S-4 Registration Statement (the "Remedy Joint Proxy"). The Remedy Joint

10  Proxy was distributed to Remedy shareholders by defendants named herein. They each permitted

11  the use of their names in the Remedy Joint Proxy.

12      719.  The Remedy Joint Proxy was a "proxy solicitation" within the meaning of

13  Section 14 of the Exchange Act, and Rule 14a-9 promulgated thereunder.

14      720.  Each of the defendants named in this Count signed Amendment No. 1 to the

15  Peregrine Registration Statement which contained the Remedy Joint Proxy allowing it to be filed

16  with the SEC. These defendants were members of Peregrine's Board of Directors at all relevant

17  times.

18      721.  The Remedy Joint Proxy contained or incorporated by reference Peregrine's

19  audited financial statements for the fiscal years ending March 31, 2000 and March 31, 2001.

20  Each of these financial statements were materially false and misleading for the reasons set forth

21  above.

22      722.  The Remedy Joint Proxy was materially false and misleading in that it contained

23  false and misleading statements of material fact and failed to disclose material facts necessary to

24  make the statements made not false and misleading.

25      723.  The defendants named in this Count sought to secure Remedy shareholder

26  approval of the Peregrine/Remedy merger by means of the materially false and misleading

27  Remedy Joint Proxy and permitted the use of their names to solicit proxies from the Remedy

28  Sub-Class.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – Master File No. 02-CV-0870 J(RBB)   228

#105317

Exhibit D
0358

724.    The following facts and the facts referenced in paragraph 715 above give rise to a strong inference that each of the defendants named in this Count acted with the requisite state of mind for liability under Section 14(a) and Rule 14a-9, *i.e.*, negligence, at the time they issued or caused to be issued the Remedy Joint Proxy and permitted the use of their names in the Remedy Joint Proxy. As detailed more fully above, these defendants were negligent in not knowing that the Remedy Joint Proxy contained misstatements of material fact and that it omitted to state material facts necessary in order to make the statements made therein not false or misleading.

725.    Defendants named in this Count acted as controlling persons of Peregrine within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements contained in the Remedy Joint Proxy, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Peregrine, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. These defendants were provided with or had unlimited access to Peregrine's misleading financial statements contained in the Remedy Joint Proxy alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

726.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

727.    As detailed above, defendants named in this Count controlled Peregrine. Certainly, for purposes of the distribution of the Remedy Joint Proxy, the Board had control of whether such distribution should be made and the contents thereof.

728.    Beyond the Remedy transaction, Moores also had control of Peregrine through his control and domination of the Board. As stated in detail above, almost every Board member had ties to Moores, which allowed Moores to have a great deal of influence over those Board

1  members. Moreover, by his control of these Board members, Moores and these Board members

2  effectively controlled Peregrine.

3      729.    The Merger required and received the affirmative vote of the Remedy

4  shareholders at the Special Meeting of Remedy shareholders held on August 27, 2001.

5  Accordingly, the materially false and misleading Remedy Joint Proxy was an essential link in the

6  accomplishment of Peregrine's acquisition of Remedy.

7      730.    Based on the foregoing, the defendants named in this Count have violated

8  Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated by the SEC thereunder and

9  by virtue of their positions as controlling persons, these defendants have violated Section 20(a) of

10  the Exchange Act.

11      731.    As a direct and proximate result of these defendants' wrongdoing, plaintiffs and

12  the other members of the Remedy Sub-Class have sustained injury and damages by reason of

13  these defendants' misrepresentations contained in the Remedy Joint Proxy in connection with

14  Peregrine's acquisition of Remedy.

15  <div align="center"><strong>COUNT V</strong></div>

16  <div align="center"><strong>(Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9<br>Promulgated Thereunder And Of Section 20(a) Of The</strong></div>

17  <div align="center"><strong>Exchange Act - Remedy Acquisition - Arthur Andersen, AWSC And Stulac)</strong></div>

18      732.    Plaintiffs Balch and Hylton incorporate by reference, as though fully set forth

19  herein, the paragraphs referenced in Paragraphs 696 and 715 above.

20      733.    This Count is asserted by Plaintiffs Balch and Hylton on behalf of the Remedy

21  Sub-Class.

22      734.    This Count is asserted against Arthur Andersen, AWSC and Stulac on behalf of

23  the Remedy Sub-Class, for violations of Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and

24  Rule 14a-9, 17 C.F.R. §240.14a-9. This Count is based solely on defendants' negligent conduct.

25      735.    The Joint Proxy which was included in Peregrine's July 23, 2001 Amendment 1 to

26  its S-4 Registration Statement filed with the SEC and distributed to Remedy shareholders (the

27  "Remedy Joint Proxy") was a "proxy solicitation" within the meaning of Section 14 of the

28  Exchange Act, and Rule 14a-9 promulgated thereunder.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –<br>Master File No. 02-CV-0870 J(RBB)    230

Exhibit D<br>0360

736.    Arthur Andersen and AWSC consented to the use of Arthur Andersen's name in the Remedy Joint Proxy to solicit proxies from Plaintiffs and other members of the Remedy Sub-Class.

737.    Arthur Andersen and AWSC also consented the inclusion and/or to the incorporation by reference, in the Remedy Joint Proxy, of Arthur Andersen's unqualified audit reports on Peregrine's consolidated financial statements as of March 31, 2000 and March 31, 2001, and consented to all references to Arthur Andersen in the registration statement, which included a reference to it under the caption "Experts," and under the caption "Peregrine Selected Consolidated Financial Data," where it was noted that the consolidated financial data was audited by Arthur Andersen. Stulac was the representative of Arthur Andersen and AWSC for the Peregrine account

738.    Arthur Andersen's audit reports on Peregrine's financial statements for the years ending March 31, 2000 and March 31, 2001, which were included and/or incorporated by reference in the Remedy Joint Proxy, were materially false and misleading for the reasons set forth above.

739.    The following facts and the facts referenced in paragraph 732 above give rise to a strong inference that Arthur Andersen, AWSC and Stulac acted with the requisite state of mind for liability under Section 14(a) and Rule 14a-9, i.e., negligence, in permitting Arthur Andersen's name to be used in conjunction with the solicitation of proxies pursuant to a proxy statement that contained material misrepresentations and omissions. As detailed more fully above, Arthur Andersen, AWSC and Stulac should have known at the time that consent to the use of Arthur Andersen's name in the Remedy Joint Proxy was given that Arthur Andersen's audit reports on Peregrine's financial statements for the years ending March 31, 2000 and March 31, 2001, which were included and/or incorporated by reference in the Remedy Joint Proxy, were materially false and misleading.

740.    Arthur Andersen, AWSC and Stulac were aware that when the Company adopted the sell-in method, it did so in order to meet its quarterly revenue estimates. Moreover, these defendants knew that the sell-in method was an aggressive revenue recognition procedure, which

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                      231

#105317

Exhibit D
0361

1  was not the preferred method.

2      741.   Arthur Andersen had informed the Company when it adopted the sell-in method

3  that it would be uncomfortable if channel activity reached 25% of the Company's revenue, yet

4  even when that number was far exceeded, Arthur Andersen, AWSC and Stulac allowed Arthur

5  Andersen's unqualified audit report to be incorporated or included in the Remedy Joint Proxy.

6      742.   As detailed above, plenty of warning signs existed that should have alerted Arthur

7  Andersen, AWSC and Stulac that severe problems existed with the Company's accounting.

8  Auditor guidelines for items that should receive special consideration identified almost the exact

9  type of situation as the one that existed at Peregrine, such as significant sales volume occurring

10  near the end of the quarter, unusual volume of sales to resellers, barter transactions and side

11  agreements.  Messages about "bad revenue," inquiries from the SEC, and complaints about

12  revenue recognition were either provided to Arthur Andersen, discovered by it or readily

13  available to it had it sought to look.  Instead, Arthur Andersen, AWSC and Stulac ignored the

14  warning signs and allowed the Company to continually spiral downward into a deeper revenue

15  hole.

16      743.   In addition, Arthur Andersen, AWSC and Stulac should have been aware that

17  problems existed at the Company that required further investigation on their part because of the

18  lack of Audit Committee minutes, the failure to hold regular meetings during fiscal year 2000,

19  and the participation of members of management in the Audit Committee deliberations.  The

20  failure to respond to the above repeated warning signs demonstrates Arthur Andersen's, AWSC's

21  and Stulac's negligence.

22      744.   Arthur Andersen and Stulac were also involved in designing the Company's stock

23  option compensation plan, which allowed for the exercise prices to be below the common stock

24  market values when the options were granted.  This plan was also a part of Peregrine's

25  restatement, and a further sign that should have alerted Arthur Andersen, AWSC and Stulac that

26  a problem existed at Peregrine.

27      745.   The Merger required and received the affirmative vote of the Remedy

28  shareholders at the Special Meeting of Remedy shareholders held on August 27, 2001.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                        232

Exhibit D
0362

1   Accordingly, the materially false and misleading Remedy Joint Proxy was an essential link in the

2   accomplishment of Peregrine's acquisition of Remedy.

3       746.    Based on the foregoing, Arthur Andersen, AWSC and Stulac violated

4   Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated by the SEC thereunder.

5       747.    As a direct and proximate result of Arthur Andersen, AWSC and Stulac's

6   wrongdoing, plaintiffs and other members of the Remedy Sub-Class have sustained injury and

7   damages by reason of Arthur Andersen and AWSC's misrepresentations in connection with the

8   Peregrine's acquisition of Remedy.

9       748.    Defendants AWSC and Stulac acted as controlling persons of Arthur Andersen

10  within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their

11  control of and/or interlocking officers, partners and finances and/or awareness of the Arthur

12  Andersen's operations and/or intimate knowledge of the false financial statements contained in

13  the Remedy Joint Proxy, these defendants had the power to influence and control and did

14  influence and control, directly or indirectly, the decision-making of Arthur Andersen, including

15  the content and dissemination of the various statements which plaintiffs contend are false and

16  misleading.  These defendants were provided with or had unlimited access to Peregrine's

17  misleading financial statements contained in the Remedy Joint Proxy alleged by plaintiffs to be

18  misleading and had the ability to prevent the issuance of the statements or cause the statements to

19  be corrected.

20      749.    In particular, each of these defendants had direct and supervisory involvement in

21  the day-to-day operations of the Arthur Andersen and, therefore, is presumed to have had the

22  power to control or influence the particular transactions giving rise to the securities violations as

23  alleged herein, and exercise the same.

24      750.    As set forth above, defendants AWSC and Stulac, by virtue of their positions as

25  controlling persons, are liable pursuant to Section 20(a) of the Exchange Act.  As a direct

26  proximate result of these defendants' wrongful conduct, plaintiffs named in this Count and other

27  members of the Remedy Sub-Class suffered damages in connection with their acquisition of

28  shares of Peregrine.

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                233

Exhibit D
0363

**COUNT VI**

**(Violations Of Section 11 Of The Securities Act - The Harbinger Acquisition)**

751.    Plaintiffs Waga and Sutliff incorporate by reference, as though fully set forth herein, Paragraphs 6, 28-30, 31(l) - (o), 32, 36(a), 36(b), 36(h) - (l), 36(n), 36(p), 36(r), and 40-48 above.

752.    This Count is asserted against defendants Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, Arthur Andersen and AWSC.  This Count is based solely on defendants' negligent conduct.

753.    This Count is asserted by Plaintiffs Waga and Sutliff on behalf of a Sub-Class consisting of all persons and entities who acquired Peregrine registered common stock in connection with Peregrine's acquisition of Harbinger Corporation which was consummated on or about June 16, 2000 (the "Harbinger Sub-Class").

754.    On or about May 22, 2000, the defendants named herein issued, caused the issuance, and/or signed Amendment No. 1 to its Form S-4/A Registration Statement that was filed with the SEC (the Harbinger Registration Statement) in connection with Peregrine's acquisition of Harbinger.  The Harbinger Registration Statement included a Proxy/Prospectus, which provided, *inter alia*, for special meetings to be held on June 16, 2000 in which shareholders of both Peregrine and Harbinger were solicited to vote to approve the consummation of the proposed merger between the two companies.  Under the terms of the proposed merger, each outstanding share of Harbinger common stock would be exchanged for 0.75 of a share of Peregrine common stock, and each option to purchase Harbinger common stock would be exchanged for an option to purchase Peregrine common stock at the same exchange ratio.

755.    Defendants Gardner, Gless, Moores, Cole, Hosley, Noell, Van Den Berg and Watrous signed the Harbinger Registration Statement.  The Harbinger Registration Statement contained untrue statements of material fact and/or omitted to state material facts necessary to make statements therein not misleading.

756.    In particular, the Proxy/Prospectus contained Peregrine financial statements for

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                                            234

#105317

Exhibit D
0364

1  the Company's fiscal year ended March 31, 2000 along with an unqualified audit opinion on

2  those financial statements issued by Peregrine's auditor, Arthur Andersen, dated April 25, 2000.

3  Defendant AWSC consented to Arthur Andersen being named as having certified its opinion as

4  to Peregrine's financial statements.  The Proxy/Prospectus included a "Consolidated Statements

5  Of Operations" for Peregrine for its fiscal year ended March 31, 2000 which reported, among

6  other things that Peregrine had achieved Total Revenues of $253,300,000 ($168,467,000

7  attributed to Licenses Revenues and $84,833,000 attributed to Services Revenues), and that

8  Peregrine had a Net Loss of $25,070,000 for that fiscal year.

9        757.    The Proxy/Prospectus included a section entitled "Notes To Consolidated

10  Financial Statements." Under the caption "Company Operations And Summary Of Significant

11  Accounting Policies" the Proxy/Prospectus provided Peregrine's revenue recognition policy and

12  stated:

13              REVENUE RECOGNITION

14              We generate revenues from licensing the rights to use our
            software products primarily to end-users.  We also generate
15              revenues from post-contract support (maintenance), consulting and
            training services performed for customers who license our
16              products.  We do not provide professional services unrelated to our
            products.

17

18              Revenues from direct and indirect license agreements are
            recognized currently, provided that all of the following conditions
19              are met: a noncancellable license agreement has been signed, the
            product has been delivered, there are no material uncertainties
            regarding customer acceptance, collection of the resulting
20              receivable is deemed probable, risk of concession is deemed
            remote, and we have no other significant obligations associated
21              with the transaction. . .

22  [Emphasis added.]

23        758.    The "Management's Discussion And Analysis Of Financial Condition And

24  Results Of Operations" section of the Proxy/Prospectus stated with respect to revenue that:

25              Our revenues are derived from product licensing and services.
            Services are comprised of maintenance, professional services, and
26              training. . .

27              Revenues from license agreements are recognized currently,
            provided that all of the following conditions are met: a
28              noncancelable license agreement has been signed, the product has

1
2
3

been delivered, there are no material uncertainties regarding customer acceptance, collection of the resulting receivable is deemed probable, the risk of concession is deemed remote, and no other significant vendor obligations exist. . .

* * *

4
5
6

REVENUES.  Total revenues were $253.3 million, $138.1 million and $61.9 million for the fiscal years ended 2000, 1999 and 1998, representing period-to-period increases of 83% and 123% for the fiscal 2000 and 1999 periods . . .

7
8
9
10
11
12
13
14
15

LICENSES.  License revenues were $168.4 million, $87.4 million and $38.8 million in fiscal 2000, 1999 and 1998, representing 67% of total revenues in fiscal 2000 and 63% in both fiscal 1999 and 1998.  Total license revenues increased 93% and 125% period-to-period for fiscal 2000 and 1999.  Domestic license revenues increased 73% in fiscal 2000 and 135% in fiscal 1999, while international license revenues increased 125% and 111% in fiscal 2000 and 1999.  The increases in license revenues are attributable to increased demand for new and additional licenses of our infrastructure resource management applications, from new and existing customers, larger transaction sizes, expansion of our domestic and international sales forces, and acquisitions.  We expect larger transaction sizes from a limited number of customers to account for a large percentage of license revenues for the foreseeable future.  Management believes these trends will fluctuate period to period in absolute dollars and as a percentage of total revenues.

16
17
18
19

During the past three years, we have increased the number of channels that we use to distribute our products.  The majority of our products are distributed through our direct sales organization.  The balance is derived through indirect sales channels and alliance partners, including value added resellers and systems integrators.  Revenues derived through indirect channels now comprise a significant portion of our total license revenues. . .

20
21
22
23
24
25
26

SERVICES.  Services revenues consist of support, consulting and training services.  Service revenues were $84.8 million, $50.7 million and $23.1 million for fiscal years 2000, 1999 and 1998, representing 33% of total revenues in fiscal 2000 and 37% in both fiscal 1999 and 1998.  Total services revenues increased 67% and 120% period-to-period for fiscal 2000 and 1999.  Domestic services increased 63% in fiscal 2000 and 111% in fiscal 1999, while international services revenues increased 78% and 140% in fiscal 2000 and 1999, respectively.  The dollar increases are attributable to maintenance agreements and related billings from our expanded installed base of customers and an increase in consulting and training revenues related to the implementation of our software from initial license agreements and related expansion . . .

27

[Emphasis added.]

28

759.  The above material statements of fact contained in the Harbinger Registration

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                    236

Exhibit D
0366

1  Statement were untrue for among other reasons:

2          (a)    Peregrine's fiscal 2000 financial statements were false as its reported

3  revenue was materially overstated and its reported net loss was materially understated;

4          (b)    revenue was improperly recognized on software contracts that were

5  subject to cancellation and therefore collection of that revenue was not probable;

6          (c)    the rate of revenue growth was materially overstated due to, among other

7  things, improper recognition of revenue;

8          (d)    the fiscal 2000 financial statements were not presented in accordance with

9  GAAP; and

10         (e)    the fiscal 2000 financial statements were not audited in accordance with

11 GAAS.

12     760.    On May 24, 2002, Arthur Andersen withdrew its audit opinion on Peregrine's

13 fiscal 2000 financial statements because that opinion could not be relied upon.

14     761.    On February 28, 2003, Peregrine issued restated financial statements for, among

15 other periods, its fiscal year ended March 31, 2000.  The restated figures relative to those

16 contained in the Harbinger Registration Statement are as follows (in thousands):

|                  | As Contained in Registration Statement (In $000) | As Restated (In $000) |
|------------------|--------------------------------------------------|-----------------------|
| License Revenue  | $168,467                                         | $53,329               |
| Services Revenue | $ 84,833                                         | $78,303               |
| Total Revenue    | $253,300                                         | $131,632              |
| Net Loss         | ($ 25,070)                                        | ($217,418)            |

22     762.    Defendants' false statements, misrepresentations, and omissions caused the

23 market price of Peregrine securities to be artificially inflated at the time of the merger with

24 Harbinger.  On June 16, 2000, the date of the merger with Harbinger, the market price of

25 Peregrine common stock closed at $25.56 per share.

26     763.    The defendants named herein from Peregrine's board each had a duty to make a

27 reasonable and diligent investigation of the truthfulness and accuracy of the statements contained

28 in the Harbinger Registration Statement.  They had a duty to ensure that such statements were

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                        237

Exhibit D
0367

1   true and accurate and that there were no omissions of material facts that would make the

2   statements made misleading.  These defendants failed to do so.

3          764.    Arthur Andersen and AWSC each had a duty to make a reasonable and diligent

4   investigation of the truthfulness and accuracy of the Peregrine financial statements contained in

5   the Harbinger Registration Statement.  They had a duty to ensure such statements were true and

6   there were no omissions of material facts that would make the statements made misleading.

7   Arthur Andersen and AWSC failed to do so.  Instead, Arthur Andersen and AWSC consented to

8   the inclusion of its materially false and misleading audit report on Peregrine's fiscal year 2000

9   financial statements.  Arthur Andersen and AWSC audit report was contained in the Harbinger

10  Registration Statement with the knowledge and consent of Arthur Andersen and AWSC.

11         765.    None of the defendants named herein made a reasonable investigation or

12  possessed reasonable grounds for the belief that the statements contained in the Harbinger

13  Registration Statement were true and without omissions of any material facts and were not

14  misleading.  The defendants named herein, in the exercise of reasonable care, should have known

15  of the misstatements and omissions contained in the Registration Statement and Prospectus as set

16  forth above.

17         766.    Plaintiffs and the Sub-Class Members who acquired Peregrine common stock

18  pursuant to the Harbinger Registration Statement did so without knowledge of the materially

19  untrue statements or omissions in the Registration Statement.  As a direct and proximate result of

20  the defendants' wrongdoing,  the Harbinger Sub-Class Members have suffered substantial

21  damages.

22                                    **COUNT VII**

23         **(Violations Of Section 15 Of The Securities Act - The Harbinger Acquisition)**

24         767.    Plaintiffs Waga and Sutliff incorporate by reference, as though fully set forth

25  herein, the paragraphs referenced in Paragraphs 676, 696 and 751-772 above, only to the extent

26  that they allege negligence only.

27         768.    This Count is asserted against defendants Gardner, Gless, Moores, Cole, Hosley,

28  Noell, van den Berg, Watrous, Arthur Andersen and AWSC.  This Count is based solely on

#105317      FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                        238

Exhibit D
0368

1   defendants' negligent conduct.

2        769.   Each of the individual defendants named in this Court was a controlling person of

3   Peregrine within the meaning of Section 15 of the Securities Act at the time of the Harbinger

4   Registration Statement and had the power and authority to cause the issuer to engage in the

5   wrongful conduct complained of herein, including the issuance of the false and misleading

6   statements and omissions in the Prospectus. In addition, defendants AWSC and Stulac were

7   controlling persons of Arthur Andersen within the meaning of Section 15 of the Securities Act at

8   the time of the Harbinger Registration Statement and had the power and authority to cause the

9   issuer to engage in the wrongful conduct complained of herein, including the issuance of the false

10   and misleading statements and omissions in the Harbinger Joint Proxy.

11        770.   Certainly, for purposes of the distribution of the Harbinger Joint Proxy, the Board

12   members named in this Count had control of whether such distributions should be made and the

13   contents thereof. Beyond the Harbinger transaction, Moores also had control of Peregrine

14   through his control and domination of the Board. As stated in detail above, almost every Board

15   member had ties to Moores, which allowed Moores to have a great deal of influence over those

16   Board members. Moreover, by his control of these Board members, Moores and these Board

17   members effectively controlled Peregrine.

18        771.   None of the individual defendants mentioned in this Count or defendants AWSC

19   or Stulac made a reasonable investigation or possessed reasonable grounds for the belief that the

20   statements contained in the Harbinger Joint Proxy were true and devoid of any omissions of

21   material facts. Therefore, by reason of their positions of control, as alleged herein, each of these

22   defendants is jointly and severally liable to plaintiffs bringing this Court and other members of

23   the Harbinger Sub-Class as a result of the wrongful conduct alleged herein.

24        772.   Plaintiffs and the Sub-Class Members who acquired Peregrine common stock

25   pursuant to the Harbinger Registration Statement did so without knowledge of the materially

26   untrue statements or omissions in the Registration Statement. As a direct and proximate result of

27   the defendants' wrongdoing, the Harbinger Sub-Class Members have suffered substantial

28   damages.

#105317   FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                                239

Exhibit D
0369

1

## COUNT VIII

2

### (Violations Of Section 11 Of The Securities Act - The Remedy Acquisition)

3      773.    Plaintiffs Balch and Hylton incorporate by reference, as though fully set forth

4  herein, Paragraphs 6, 28-30, 31(l) - (o), 32, 36(a), 36(b), 36(h) - (j), 36(m) - (n), 36(p), 36(r), and

5  40-48 above.

6      774.    This Count is asserted against defendants Gardner, Gless, Moores, Savoy, Cole,

7  Noell, Watrous, Arthur Andersen and AWSC.  This Count is based solely on defendants'

8  negligent conduct.

9      775.    This Count is asserted by Plaintiffs Balch and Hylton on behalf of a Sub-Class

10  consisting of all persons and entities who acquired Peregrine registered common stock in

11  connection with Peregrine's acquisition of Remedy Corporation which was consummated on or

12  about August 27, 2001 (the "Remedy Sub-Class").

13      776.    On or about July 23, 2001, the defendants issued, caused the issuance, and/or

14  signed Amendment No. 1 to a Form S-4 Registration Statement that was filed with the SEC (the

15  "Remedy Registration Statement") in connection with Peregrine's acquisition of Remedy.  The

16  Remedy Registration Statement included a Proxy/Prospectus which provided, *inter alia*, for a

17  special meeting of Remedy stockholders to be held on August 27, 2001 in which shareholders of

18  Remedy were solicited to vote to approve the consummation of the proposed merger of Peregrine

19  and Remedy.  Under the terms of the proposed merger, each outstanding share of Remedy

20  common stock would be exchanged for $9.00 in cash and 0.9065 of a share of Peregrine common

21  stock, and each option to purchase Remedy common stock would be exchanged for an equivalent

22  amount of Peregrine common stock based on the value of stock and cash which each share of

23  Remedy common stock was to receive in the merger.

24      777.    Defendants Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous signed the

25  Remedy Registration Statement.  The Remedy  Registration Statement contained untrue

26  statements of material fact and/or omitted to state material facts necessary to make statements

27  therein not misleading.

28      778.    In particular, the Proxy/Prospectus, under the heading "Peregrine Selected

---

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                        240



1  Consolidated Financial Data," contained consolidated operating results for, *inter alia*, the

2  Company's fiscal years ended March 31, 2001 and March 31, 2000.  The financial dated included

3  the following:

| YEAR ENDED MARCH 31, | 2001 (in 000s) | 2000 (in 000s) |
|---|---|---|
| STATEMENT OF OPERATIONS DATA: | | |
| Revenues: Licenses | $ 354,610 | $168,467 |
|      Services | $ 210,073 | $ 84,833 |
| Total revenues | $ 564,683 | $ 253,300 |
| Total costs and expenses | $1,378,090 | $ 261,956 |
| Income (loss) from operations | $ (813,407) | $ (8,656) |
| Net income (loss) | $ (852,241) | $ (25,070) |
| Net income (loss) per share diluted | $ (6.16) | $ (0.24) |

10       779.  The Remedy Registration Statement also incorporated by reference Peregrine's

11  Annual Report on Form 10-K for the fiscal year ended March 31, 2001, which contained, *inter*

12  *alia*, Peregrine's consolidated financial statements as of March 31, 2000 and as of

13  March 31, 2001, including an unqualified audit opinion of Arthur Andersen on those financial

14  statements.  Defendant AWSC consented to Arthur Andersen being named as having certified its

15  opinion as to Peregrine's financial statements.

16       780.  Peregrine's Form 10-K for the fiscal year ended March 31, 2001 stated as follows

17  in connection with the Company's revenue recognition:

> Revenues from direct and indirect license agreements are
> recognized currently, provided that all of the following conditions
> are met: a noncancellable license agreement has been signed, the
> product has been delivered, there are no material uncertainties
> regarding customer acceptance, collection of the resulting
> receivable is deemed probable, risk of concession is deemed
> remote, and we have no other significant obligations associated
> with the transaction.  Revenues from post-contract support services
> are recognized ratably over the term of the maintenance period,
> generally one year.  Maintenance revenues which are bundled with
> license agreements, are unbundled using vendor specific objective
> evidence.  Professional services revenues are primarily related to
> implementation services most often performed on a time and
> material basis under separate service agreements for the installation
> of our products.  Revenues from professional services and
> customer training are recognized as the respective services are
> performed.

27  [Emphasis added.]

28       781.  The Remedy Registration Statement also included a Consent of Independent

Exhibit D
0371

1    Public Accountants signed by Arthur Andersen which stated:

2            As independent public accountants, we hereby consent to the
        incorporation by reference in this registration statement of our
3        report dated April 26, 2001 included in Peregrine Systems, Inc.
        Form 10-K for the year ended March 31, 2001 and to all references
4        to our Firm included in this registration statement.

5        782.    The above material statements of fact contained in the Remedy Registration

6    Statement were untrue for among other reasons:

7            (a)    Peregrine's fiscal 2000 and 2001 financial statements were each false as its

8    reported revenue was materially overstated and its reported net loss was materially understated;

9            (b)    revenue was improperly recognized on software contracts that were

10    subject to cancellation and therefore collection of that revenue was not probable;

11            (c)    the rate of revenue growth reflected in the fiscal 2000 and 2001 data was

12    materially overstated due to, among other things, improper recognition of revenue;

13            (d)    the fiscal 2000 and 2001 financial statements were not presented in

14    accordance with GAAP; and

15            (e)    the fiscal 2000 and 2001 financial statements were not audited in

16    accordance with GAAS.

17        783.    On May 24, 2002, Arthur Andersen withdrew its audit opinion on Peregrine's

18    fiscal 2000 and 2001 financial statements as its opinions with respect to those financial

19    statements could not be relied upon.

20        784.    On February 28, 2003, Peregrine issued restated financial statements for, among

21    other periods, its fiscal years ended March 31, 2000 and March 31, 2001. The restated figures

22    relative to those contained in the Remedy Registration Statement are as follows (in thousands):

23
|  | As Contained in Registration Statement (in $000) | | As Restated (in $000) | |
| --- | --- | --- | --- | --- |
|  | Fiscal 2000 | Fiscal 2001 | Fiscal 2000 | Fiscal 2001 |
| License Revenue | $168,467 | $ 354,610 | $53,329 | $ 94,918 |
| Services Revenue | $ 84,833 | $ 210,073 | $78,303 | $ 118,435 |
| Total Revenue | $253,300 | $ 564,683 | $131,632 | $ 213,353 |
| Net Loss | $(25,070) | $(852,241) | $(217,418) | $(1,844,517) |

28        785.    As a result of the defendants' false statements, misrepresentations, and omissions,

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                    242

Exhibit D
0372

1   the price of Peregrine securities was artificially inflated at the time of the merger with Remedy.

2   On August 27, 2001, the date of the merger with Remedy, the market price of Peregrine stock

3   closed at $23.01 per share.

4        786.   The defendants who were members of Peregrine's board of directors named

5   herein each had a duty to make a reasonable and diligent investigation of the truthfulness and

6   accuracy of the statements contained in the Remedy Registration Statement. They had a duty to

7   ensure that such statements were true and that there were no omissions of material facts that

8   would make the statements made misleading. These defendants failed to do so. These

9   defendants signed the Remedy Registration Statement.

10        787.   Arthur Andersen and AWSC each had a duty to make a reasonable and diligent

11   investigation of the truthfulness and accuracy of the Peregrine financial statements contained in

12   the Remedy Registration Statement. They had a duty to ensure such statements were true and

13   there were no omissions of material facts that would make the statements made misleading.

14   Arthur Andersen and AWSC failed to do so. Instead, they consented to the inclusion of the

15   materially false and misleading audit reports on Peregrine's fiscal year 2000 and fiscal year 2001

16   financial statements. These audit reports were contained in the Remedy Registration Statement

17   with the knowledge and consent or the acquiescence of defendants Arthur Andersen and AWSC.

18        788.   None of the defendants named herein made a reasonable investigation or

19   possessed reasonable grounds for the belief that the statements contained in the Remedy

20   Registration Statement were true and without omissions of any material facts and were not

21   misleading.

22        789.   The defendants named herein, in the exercise of reasonable care, should have

23   known of the misstatements and omissions contained in the Remedy Registration Statement as

24   set forth above.

25        790.   Plaintiffs and the Remedy Sub-Class Members who acquired Peregrine common

26   stock pursuant to the Remedy Registration Statement did so without knowledge of the materially

27   untrue statements or omissions in the Registration Statement. As a direct and proximate result of

28   the defendants' wrongdoing, the Remedy Sub-Class Members have suffered substantial

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)          243

Exhibit D
0373

1  damages.

2  <center>**COUNT IX**</center>

3  <center>**(Violations Of Section 15 Of The Securities Act - The Remedy Acquisition)**</center>

4      791.    Plaintiffs Balch and Hylton incorporate by reference, as though fully set forth

5  herein, the paragraphs referenced in Paragraphs 715, 732 and 773-790 above, only to the extent

6  that they allege negligence only.

7      792.    This Count is asserted against defendants Gardner, Gless, Moores, Savoy, Cole,

8  Noell, Watrous, Arthur Andersen and AWSC. This Count is based solely on defendants'

9  negligent conduct.

10      793.    Each of the individual defendants named in this Court was a controlling person of

11  Peregrine within the meaning of Section 15 of the Securities Act at the time of the Remedy

12  Registration Statement and  had the power and authority to cause the issuer to engage in the

13  wrongful conduct complained of herein, including the issuance of the false and misleading

14  statements and omissions in the Prospectus. In addition, defendants AWSC and Stulac were

15  controlling persons of Arthur Andersen within the meaning of Section 15 of the Securities Act at

16  the time of the Remedy Registration Statement and  had the power and authority to cause the

17  issuer to engage in the wrongful conduct complained of herein, including the issuance of the false

18  and misleading statements and omissions in the Remedy Joint Proxy.

19      794.    Certainly, for purposes of the distribution of the Remedy Joint Proxy, the Board

20  members named in this Count had control of whether such distributions should be made and the

21  contents thereof.  Beyond the Remedy transaction, Moores also had control of Peregrine through

22  his control and domination of the Board. As stated in detail above, almost every Board member

23  had ties to Moores, which allowed Moores to have a great deal of influence over those Board

24  members.  Moreover, by his control of these Board members, Moores and these Board members

25  effectively controlled Peregrine.

26      795.    None of the individual defendants mentioned in this Count or defendants AWSC

27  or Stulac made a reasonable investigation or possessed reasonable grounds for the belief that the

28  statements contained in the Remedy Joint Proxy were true and devoid of any omissions of

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)    244

Exhibit D
0374

1   material facts.  Therefore, by reason of their positions of control, as alleged herein, each of these

2   defendants is jointly and severally liable to plaintiffs bringing this Court and other members of

3   the Remedy Sub-Class as a result of the wrongful conduct alleged herein.

4        796.   Plaintiffs and the Sub-Class Members who acquired Peregrine common stock

5   pursuant to the Remedy Registration Statement did so without knowledge of the materially

6   untrue statements or omissions in the Registration Statement.  As a direct and proximate result of

7   the defendants' wrongdoing, the Remedy Sub-Class Members have suffered substantial damages.

8                              **PRAYER FOR RELIEF**

9        WHEREFORE Plaintiffs, on behalf of themselves and the Class, demand judgment

10  against defendants, and each of them, as follows:

11       A.   Determining that this action is properly maintainable as a class action pursuant to

12  Rule 23 of the Federal Rules of Civil Procedure and certifying the Class and Sub-Classes;

13       B.   Declaring and determining that the defendants violated the federal securities laws

14  by reason of their conduct alleged herein;

15       C.   Awarding monetary damages against all of the defendants, jointly and severally,

16  in favor of plaintiffs and the Class and Sub-Classes for the damages suffered as a result of the

17  wrongdoing complained of herein together with prejudgment interest from the date of the

18  wrongdoing to the date of the entry of judgment;

19       D.   Awarding plaintiffs their costs, expenses, and disbursements incurred in this

20  action, including reasonable attorneys' and experts' fees and costs;

21       E.   Granting extraordinary equitable and/or injunctive relief as permitted by law,

22  equity and federal and state statutory provisions sued on hereunder, including attaching,

23  impounding, imposing a constructive trust upon or otherwise restricting the proceeds of

24  Defendants' trading activities or their other assets so as to assure that plaintiffs and the Class

25  have an effective remedy; and

26       F.   Awarding plaintiffs and the Class such other relief as the Court may deem just and

27  proper.

28  //

#105317    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)                                                   245

Exhibit D
0375

1

## JURY DEMAND

2     Plaintiffs hereby demand a trial by jury.

3   Dated: April 3, 2004                    GOLD BENNETT CERA & SIDENER LLP

4

5                                           By: _____
                                                 Solomon B. Cera
6
                                            Attorneys for Section 10(b) Lead Plaintiff The
7                                           Loran Group And All Others Similarly Situated

8                                                  - and -

9                                           STULL, STULL & BRODY

10                                          By: _____
11                                               Howard T. Longman

12                                          ABRAHAM & ASSOCIATES

13                                          By: _____
14                                               Lawrence D. Levit

15                                          Attorneys for Section 11 Lead Plaintiff
                                            Heywood Waga And All Others Similarly
16                                          Situated

17

18

19

20

21

22

23

24

25

26

27

28

---

#105317

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
Master File No. 02-CV-0870 J(RBB)

246

Exhibit D
0376