# EXHIBIT E

FILED

03 NOV 21 AM 11:02

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

IN RE PEREGRINE SYSTEMS, INC.
SECURITIES LITIGATION

This Document Relates to: All Actions

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 02cv870-J (RBB)

**ORDER:**

**(1) GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS; AND**
[Doc. Nos. 250, 257, 260, 265, 271, 279,
283, 286, 290, 293]

**(2) DENYING PLAINTIFF THE
LORAN GROUP'S MOTION TO
STRIKE.**
[Doc. No. 314]

Before the Court are thirteen motions: eleven motions to dismiss, a motion to strike, and a motion to quash service of process. This Order concerns ten of the motions to dismiss and the motion to strike.[1] The motions to dismiss were filed by Defendants Steve Gardner ("Gardner"), Arthur Andersen LLP ("Arthur Andersen"), Douglas S. Powanda ("Powanda"), John J. Moores ("Moores"), Richard T. Nelson ("Nelson"), Daniel Stulac ("Stulac"), Frederick B. Luddy ("Luddy"), William D. Savoy ("Savoy"), Charles E. Noell III ("Noell") and Norris Van Den Berg ("van den Berg") jointly, and Richard A. Hosley ("Hosley") (collectively "Defendants").

---

[1] The eleventh motion to dismiss and motion to quash were filed by Defendant Andersen Worldwide, S.C. ("Andersen Worldwide"). Although those motions are currently under submission, the Court will consider them in a separate order.

395 [1]

Exhibit E
0377

1  [Doc. Nos. 250, 257, 260, 265, 271, 279, 283, 286, 290, 293]. Defendants Matthew C. Gless

2  ("Gless"), Thomas Watrous ("Watrous"), Ilse Cappel ("Cappel"), Steven S. Spitzer ("Spitzer"),

3  and Christopher Cole ("Cole") joined in the motions to dismiss. [Doc. Nos. 269, 275, 276, 277,

4  303.] Lead plaintiffs the Loran Group[2] (the "Loran Plaintiffs") and Heywood Waga (the "Waga

5  Plaintiffs") oppose the motions. [Doc. Nos. 312, 316]. Moreover, the Loran Group filed a

6  motion to strike materials submitted by Defendants. [Doc. No. 314]. Defendants Powanda,

7  Gardner, Nelson, Noell and van den Berg jointly, and Moores oppose the Loran Group's motion

8  to strike. [Doc. Nos. 330, 333, 335, 337, 339]. For the reasons set forth below, the Court

9  GRANTS in part and DENIES in part Defendants' motions to dismiss; and DENIES the Loran

10  Plaintiffs' motion to strike.

11

12                           ***Background Facts***

13        Plaintiffs bring this class action on behalf of purchasers and persons who otherwise

14  acquired shares of Peregrine Systems, Inc. ("Peregrine" or the "Company") securities from July

15  22, 1999 to May 3, 2002 (the "Class Period"). (Consolidated Compl. ("CC") ¶¶ 1, 54.)

16  Peregrine, a San Diego-based provider of software and services aimed at reducing the cost of

17  doing business, became a publicly traded company in 1997.[3] (CC ¶¶ 2, 40, 43, 128.) The

18  Company sought to make businesses more competitive by reducing the costs associated with

19  three principal areas: (a) infrastructure resource management; (b) employee relationship

20  management (or self-service); and (c) e-commerce technologies and services. (CC ¶ 128.)

21  Plaintiffs allege that Peregrine management and Peregrine directors, with the knowledge of

22  Arthur Andersen, improperly recognized revenue in excess of $500 million in order to meet

23  company revenue targets, increase the Company's stock price, and complete at least thirteen

24  acquisitions or strategic alliances during the first eleven quarters of the Class Period while using

25  its shares to finance the acquisitions or alliances.

26  _____

27     [2] The Loran Group consists of lead plaintiffs David Levy, Leighton Powell, David Schenkel, John Virden, Conrad Willemse, Bill Holman, Bob Benesko, Michael Slavitch, Richard Maheu, and Mark Rollins. (Consolidated Compl. ¶¶ 39(a) - (k).) These lead plaintiffs purchased or otherwise

28  acquired Peregrine securities during the Class Period.

     [3] Peregrine common stock was listed on the NASDAQ. (CC ¶ 61(a).)

                                     02cv870-J (RBB)

Exhibit E
0378

1    The CC alleges ten counts against seventeen defendants, including violations of Sections

2    10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and

3    Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"). Counts based

4    upon Sections 10(b) and 20(a) of the Exchange Act are asserted by a class of purchasers of

5    Peregrine securities during the Class Period, while the counts relating to Section 14(a) of the

6    Exchange Act and Sections 11, 12, and 15 of the Securities Act are made on behalf of two

7    subclasses. (CC ¶ 54.) The first subclass consists of persons and entities which held shares of

8    Harbinger Corporation ("Harbinger"), but subsequently acquired Peregrine shares following the

9    acquisition of Harbinger on June 16, 2000. (*Id.*) The second subclass consists of persons and

10   entities that held shares of Remedy Corporation ("Remedy"), but later acquired Peregrine

11   common stock after the acquisition of Remedy on August 27, 2001. (*Id.*)

12   Defendants in this action held the following positions at Peregrine during the Class

13   Period: Gardner served as President, Chief Executive Officer ("CEO"), a director, and Chairman

14   of the Board of Directors; Gless was Chief Accounting Officer ("CAO"), Chief Financial

15   Officer ("CFO"), and a director; Cappel held various positions including Senior Treasury

16   Manager and was responsible for financing accounts receivables, international collections and

17   forecasting cash and Days Sales Outstanding ("DSO");[4] Powanda was either Vice President of

18   Worldwide Sales or Executive Vice President, Worldwide Operation; Nelson was Vice

19   President, Corporate Development, Vice President, IMG Operations, and Corporate Secretary;

20   Spitzer served as either Vice President, Channel Sales or Vice President, Alliances; Luddy was

21   Vice President, Research and Development, and Chief Technology Officer; Moores was

22   Chairman of the Board of Directors; and Cole, Hosley, Noell, van den Berg, Watrous, and Savoy

23   were all directors. (CC ¶¶ 49, 62, 71, 79, 84, 89, 94.) The latter five individuals also served on

24   the Peregrine Audit Committee during the Class Period. (CC ¶ 120.) Defendant Arthur

25   Andersen was an accounting firm retained by Peregrine to provide independent accounting,

26

27

28

---

[4] DSO is the average number of days that a company would need to collect its accounts
receivable. (CC ¶ 9.)

3

02cv870-J (RBB)

Exhibit E
0379

1   auditing, and consulting services from July 1996 until April 5, 2002.[5]  (CC ¶¶ 49(q), 477.)

2   Finally, Defendant Stulac was a partner in Arthur Andersen who performed accounting and audit

3   services for Peregrine.  (CC ¶ 49(s).)  The CC alleges that Peregrine regularly engaged in

4   improper revenue recognition and issued false or misleading statements to the public.[6]

5            Before addressing the specific factual allegations contained in Plaintiffs' CC, the Court

6   notes that three members of Peregrine management who are named as defendants have pled

7   guilty to criminal charges concerning securities fraud.  Defendants Gless, Spitzer and Cappel all

8   pled guilty to criminal securities violations.  Pursuant to the Loran Plaintiffs' and Arthur

9   Andersen's request, the Court takes judicial notice of the criminal records of Defendants Gless,

10  Spitzer, and Cappel.  Courts may take judicial notice of matters of public record, including but

11  not limited to court records.  *See Emrich v. Touche Ross & Comp.*, 846 F.2d 1190, 1198 (9th Cir.

12  1988) (holding that a court may look to items in the record of a court case or to matters of

13  general public record when ruling on a Rule 12(b)(6) motion); *United States v. Wilson*, 631 F.2d

14  118, 119 (9th Cir. 1980) ("[A] court may take judicial notice of its own records in other cases, as

15  well as the records of an inferior court in other cases."); *F.T.C. v. J.K. Publications, Inc.*, 99 F.

16  Supp. 2d 1176, 1198 n. 61 (C.D. Cal. 2000) (taking judicial notice of information contained in

17  the criminal dockets of the Central District of California); *U.S. ex rel. Robinson Rancheria*

18  *Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (courts "may take notice of

19  proceedings in other courts, both within and without the federal judicial system, if those

20  proceedings have a direct relation to matters at issue.").  Accordingly, judicial notice of

21  Defendants' criminal records is proper.  Where individuals in a company have pled guilty to

22  securities fraud, such a case "does not present the question of *whether* the fraud actually

23  happened, but rather who *knew* about it, who participated in it, and who can be *held liable* for

24  it."  *See In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1020 (C.D. Cal. 2003)

25  _____

26  [5] Plaintiffs have also named Andersen Worldwide as a defendant.  (CC ¶ 49(b).)  As stated
    above, a motion to dismiss and a motion to quash filed by Andersen Worldwide are currently under

27  submission but are not being considered in this Order.

28  [6] Peregrine filed a voluntary Chapter 11 Petition on September 22, 2002.  (CC ¶ 46.)  Pursuant to
    11 U.S.C. § 362, the Company cannot be named as a defendant in this action because of an automatic
    stay.  Moreover, the SEC has filed suit against Peregrine for violation of Section 10(b) of the Exchange
    Act.

                                        4                            02cv870-J (RBB)

1   (noting that four former Homestore.com executives had pled guilty to criminal charges involving

2   securities fraud and insider trading) (emphasis in original).

3

4   **A.      Peregrine's Financial Statements**

5         During the Class Period, Peregrine reported quarterly increases in revenue for eleven

6   consecutive quarters. (CC ¶ 3.) Similarly, Peregrine also reported significant annual increases.

7   (CC ¶ 4.) Specifically, the Company reported annual revenue in the amounts of $253.3 million

8   on April 26, 2000, and $564.7 million on April 26, 2001. (*Id.*) Thirty-six pages of the 169-page

9   complaint contain specific allegations of false and misleading statements made by Peregrine, its

10  officers, and its directors. (CC ¶¶ 279-465.) These false statements appeared in press releases,

11  SEC filings and securities analysts' research reports. The CC alleges that statements made in

12  each press release, SEC filing and research report during the Class Period were materially false

13  and misleading because "Peregrine's reported revenue was materially overstated, its accounts

14  receivable were understated, its cash balances were overstated, its liabilities were understated

15  and its DSO were understated . . .." (CC ¶¶ 286, 307, 311, 314, 320, 335, 340, 344, 347, 350,

16  355, 359, 362, 367, 371, 374, 379, 386, 395, 400, 405, 408, 411, 418, 423, 427, 438, 442, 445,

17  452, 456, 461, 464). The public misstatements from each quarter are described below in detail.

18        **1.      Q1 2000**

19        On July 21, 1999, Peregrine issued a press release stating that it had "record" quarterly

20  revenues of $51.6 million for the first quarter of Fiscal Year 2000, ending on June 30, 1999.

21  (CC ¶ 279.) This constituted a 137% increase in revenues over revenues from the first quarter in

22  the previous year. (*Id.*) The CC alleges that these statements were false and misleading because

23  "Peregrine's reported annual revenue was overstated by more than $120 million, its accounts

24  were understated, its cash balances were overstated, its liabilities were understated by more than

25  $90 million and its DSO were understated." (CC ¶ 280.) The CC further notes that the

26  Peregrine Defendants,[7] other than Savoy, and Arthur Andersen read and approved the press

27  release. (CC ¶ 281.) Following a conference call led by Defendant Gardner on July 21, 1999

28

---

[7] The Peregrine Defendants include Gardner, Gless, Cappel, Powanda, Spitzer, Nelson, Luddy, Moores, Noell, van den Berg, Watrous, Hosley, and Savoy. (CC ¶ 49.)

Exhibit E
0381

1  with investors and securities analysts, the brokerage firms CIBC World Markets ("CIBC") and

2  First Union Capital Markets ("First Union") issued reports on July 22, 1999 concerning

3  Peregrine's positive performance. (CC ¶ 282-284.)

4         On August 13, 1999, the Company filed its 10-Q for Q1 2000 with the Securities and

5  Exchange Commission ("SEC"), which included its financial statements and the July 21, 1999

6  press release. (CC ¶ 290.) The Form 10-Q was read and approved by the Peregrine Defendants,

7  other than Defendant Savoy, and Arthur Andersen. (CC ¶ 293.) Moreover, in his capacity as

8  Vice President of Finance and CAO, Defendant Gless signed the Form 10-Q. (*Id.*) In addition,

9  the Form 10-Q contained its statement on revenue recognition, in which it explained that

10 contingent transactions are not recognized as revenue. (CC ¶ 291.) The 10-Q contained the

11 following statement on revenue recognition:

12        Revenues from direct and indirect license agreements are recognized currently, provided
          that all of the following conditions are met: a noncancelable license agreement has been
13        signed; the product has been delivered; there are no material uncertainties regarding
          customer acceptance; collection of the resulting receivable is deemed profitable; risk of
14        concession is deemed remote; and no other significant vendor obligations exist.

15 (CC ¶ 291.)

16        Furthermore, the CC alleges that Defendants Moores, Gless, Gardner, Spitzer, Nelson,

17 and Luddy engaged in insider trading after the July 21, 1999 press release. (CC ¶¶ 288-289,

18 294-299.) Specifically, on July 26, 1999, Defendant Moores sold 2,493,642 shares of Peregrine

19 common stock and received proceeds in the amount of $71,068,797. (CC ¶ 288.) On the same

20 day, Defendant Gless sold 14,375 shares and accumulated $431,394. (CC ¶ 289.) Following the

21 filing of the 10-Q, Defendant Gless traded an additional 11,250 shares and received proceeds

22 totaling $383,750. (CC ¶ 297.) Moreover, Defendant Gardner sold 100,000 shares for

23 approximately $2,993,225 on August 4, 1999. (CC ¶ 294.) Finally, in mid-August, Defendants

24 Spitzer, Powanda, Nelson, and Luddy sold 27,500, 16,250, 87,500, and 9,474 shares of

25 Peregrine common stock respectively, while receiving gross proceeds of $866,250, $536,250,

26 $2,919,870, and $307,616 respectively. (CC ¶¶ 294-99.)

27        2.    Q2 2000

28        On October 20, 1999, Peregrine issued a press release stating that total revenues for Q2

2000 "increased 95% to a record $57.8 million" compared to revenue for the same quarter the

Exhibit E
0382

1   previous year. (CC ¶ 300.) Similar to the previous press release, the Peregrine Defendants,

2   other than Savoy, and Arthur Andersen, read and approved the October 20, 1999 press release.

3   (CC ¶ 302.) Once again, Defendant Gardner led a conference call with investors and securities

4   analysts, which was followed by reports being issued by CIBC and First Union. (CC ¶¶ 304,

5   305.) Moreover, Defendant Gless signed and filed the Company's Form 10-Q for Q2 2000 with

6   the SEC, which included Peregrine's revenue recognition policy. (CC ¶ 309.) The Form 10-Q

7   was read and approved by the Peregrine Defendants, other than Savoy, and Arthur Andersen.

8   (CC ¶ 312.)

9         **3.    Q3 2000**

10        Peregrine issued a press release on January 20, 2000 in which it announced total revenues

11  of $67.5 million for Q3 2000, a 67% increase from revenues for the same quarter in the prior

12  year. (CC ¶ 313.) Similar to the previous press releases, the Peregrine Defendants, not

13  including Savoy, and Arthur Andersen reviewed the January 20, 2000 press release prior to its

14  issuance. (CC ¶ 315.) On the same day, Peregrine management held a conference call with

15  investors and securities analysts, which led to the publication of positive reports by CIBC and

16  First Union on January 21, 2000. (CC ¶¶ 316-318.) The Company subsequently submitted its

17  Form 10-Q for Q3 2000 on February 11, 2000 containing its revenue recognition policy. (CC ¶¶

18  322-323.) The 10-Q was approved by Arthur Andersen and the Peregrine Defendants, other than

19  Savoy, and was signed by Defendant Gless in his capacity as Vice President of Finance and

20  CAO. (CC ¶¶ 322, 325.)

21        Following the filing of the Form 10-Q for Q3 2000, the CC alleges that Defendants

22  Luddy, Moores, Powanda, Gardner, Gless, Noell, van den Berg, and Spitzer engaged in insider

23  trading. (CC ¶¶ 326-333.) According to the CC, the following trades occurred between

24  February 15 and February 25, 2000: Defendant Luddy sold 87,500 shares and received proceeds

25  of approximately $3,869,350; Defendant Moores sold 4,980,186 shares for a total of

26  $229,140,356; Defendant Powanda sold 200,000 shares and received proceeds of approximately

27  $8,750,560; Defendant Gardner sold 250,262 shares and received $11,035,426; Defendant Gless

28  received $3,263,045 shares following the sale of 68,000 shares; Defendant Noell sold 90,000

shares for a total of $3,897,900; Defendant van den Berg accumulated $1,728,000 after selling

Exhibit E
0383

1  40,000 shares; and Defendant Spitzer sold 20,000 shares and received proceeds of roughly

2  $1,048,400. (*Id.*)

3         **4.    Q4 2000 and Fiscal Year 2000**

4         On April 26, 2000, Peregrine issued a press release about its Q4 2000 and Fiscal Year

5  2000, in which it stated that the Company had "record" quarterly revenues of $76.3 million and

6  "record" annual revenue of $253.3 million, an 83% increase over prior annual revenues. (CC ¶

7  334.) Before its issuance, the press release was reviewed by Arthur Andersen and the Peregrine

8  Defendants, excluding Savoy. (CC ¶ 336.) This public release was followed by a conference

9  call on April 26 with investors and the dissemination of a report by CIBC. (CC ¶¶ 337-338). On

10  May 10, 2000, the Company filed its Form 10-K for Fiscal Year 2000 and included its revenue

11  recognition policy once again. (CC ¶ 342.) Defendant Gless, in his capacity as Vice President

12  of Finance, Defendant Gardner, in his capacity as President, CEO and a director, and Defendants

13  Moores, Noell, van den Berg, Watrous and Hosley, in their capacity as directors of Peregrine,

14  signed the Form 10-K. (CC ¶ 343.) Moreover, the Peregrine Defendants, other than Savoy, and

15  Arthur Andersen approved of the Form 10-K for Fiscal Year 2000. (CC ¶ 345.)

16         Furthermore, on May 22, 2000, Peregrine filed Amendment No. 1 to its Form S-4

17  Registration Statement with the SEC, which contained a Joint Proxy Statement and Prospectus.

18  (CC ¶ 346.) The purpose of this filing was to "solicit proxies from Harbinger shareholders to

19  approve the proposed merger of Peregrine and Harbinger." (*Id.*) The Joint Proxy incorporated

20  Peregrine's audited financial statements for Fiscal Year 2000. (*Id.*) The Peregrine Defendants,

21  excluding Savoy, signed the Amendment. (*Id.*)

22         Defendants Nelson and Luddy request that the Court take judicial notice of Peregrine's

23  Form S-4 Registration Statement filed on May 22, 2000. In ruling on a motion to dismiss, courts

24  may take judicial notice of a document if it is relied on in the complaint and its authenticity is

25  not disputed. *Parrino v. FHP Inc.*, 146 F.3d 699, 706 (9th Cir. 1998). Because the Loran

26  Plaintiffs acknowledge that the CC's allegations are based on "a review of Peregrine's SEC

27  filings," (Loran Plaintiffs Opp'n to Def.s' Req. for Judicial Notice at 2), coupled with the fact

28  that Plaintiffs do not dispute this document's authenticity, it is proper for the Court to take

judicial notice of Gardner's SEC filings. *See In re Silicon Graphics Sec. Litig.*, 183 F.3d 970,

Exhibit E
0384

1    986 (9th Cir. 1999) (citing *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (noting that it is
2    proper to consider SEC filings "whose contents are alleged in the complaint and whose
3    authenticity no party questions, but which are not physically attached to the [plaintiff's]
4    pleading.") (internal quotations omitted).  Because allegations contradicted by documents
5    referenced in the pleadings or judicially noticed information may be disregarded by courts,
6    *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998), the Court will
7    disregard Paragraph 346 to the extent that it alleges Luddy, Nelson, Powanda, Cappel, and
8    Spitzer signed Peregrine's Form S-4 Registration Statement.  Upon review of this document,
9    only Defendants Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, and Watrous
10   provided their signatures. (*See* Nelson's Judicial Notice Req. Ex. 3 at 2-4; CC ¶ 563.)

11           **5.     Q1 2001**
12           On July 19, 2000, Peregrine issued a press release with its quarterly results for Q1 2001.
13   (CC ¶ 349.)  In the press release, Peregrine announced that "total revenues [] increased by 83%
14   'to a record $94.3 million' compared to revenues reported in the comparable prior year period."
15   (*Id.*)  The press release had been approved by the Peregrine Defendants, except for Defendants
16   Savoy and Hosley, and Arthur Andersen.  (CC ¶ 351.)  On the same day as the press release,
17   Defendant Gardner led a conference call with investors and securities analysts.  (CC ¶ 352.)
18   This conference call was followed by the publication of a positive report by CIBC, in which
19   CIBC gave Peregrine stock a "buy" rating.  (CC ¶ 353.)  Moreover, the Company filed its Form
20   10-Q for Q1 2001 on August 14, 2000, which included its revenue recognition policy.  (CC ¶
21   358.)  Furthermore, Arthur Andersen and the Peregrine Defendants, excluding Hosley and van
22   den Berg, read and approved the filing of the Company's 10-Q for Q1 2001.  (CC ¶ 360.)

23           **6.     Q2 2001**
24           On October 24, 2000, Peregrine issued a press release stating that it recorded record
25   revenues for Q2 2001 in the amount of $142.7 million.  (CC ¶ 361.)  The Peregrine Defendants,
26   other than Hosley and van den Berg, and Arthur Andersen reviewed the press release prior to its
27   issuance.  (CC ¶ 363.)  On the same day as the press release, Defendant Gardner led a
28   conference call with investors and securities analysts.  (CC ¶ 364.)  Following the conference
     call, CIBC again issued its report rating Peregrine stock as a "buy."  (CC ¶ 365.)  On November

Exhibit E
0385

1  14, 2000, Peregrine filed its Form 10-Q with the SEC, which was signed by Defendant Gless and

2  included its revenue recognition policy. (CC ¶¶ 369, 370.) The Peregrine Defendants, excluding

3  Hosley and van den Berg, and Arthur Andersen read and approved the filing of Peregrine's Form

4  10-Q for Q2 2001. (CC ¶ 372.)

### 7.    Q3 2001

6  On January 24, 2001, Peregrine issued a press release announcing its revenues for Q3

7  2001. (CC ¶ 373.) For this quarter, the press release stated that the Company received total

8  revenues of $156.6 million, a 132% increase from the previous year's third quarter. (*Id.*)

9  Similar to prior press releases relating to quarterly revenue reports, this press release had been

10  pre-approved by Arthur Andersen and the Peregrine Defendants, not including Hosley and van

11  den Berg. (CC ¶ 375.) A conference call by Peregrine management, led by Gardner, was held

12  with investors and securities analysts on the same day. (CC ¶ 376.) CIBC subsequently issued a

13  report indicating that Peregrine's stock was a "buy." (CC ¶ 377.)

14  The CC further alleges that Defendants Luddy, Moores, Powanda, Nelson, and Noell

15  engaged in insider trading following the issuance of the press release throughout February 2001.

16  (CC ¶¶ 381-83, 388-89.) Specifically, according to the CC, Defendants Luddy, Moores,

17  Powanda, Nelson and Noell sold 224,924 shares, 3,456,223 shares, 11,232,000 shares, 200,000

18  shares, and 84,375 shares respectively. (*Id.*) These defendants received gross proceeds of

19  $6,229,296, $101,430,942, $11,232,000, $5,926,000, and $2,497,912 respectively. (*Id.*) On

20  February 14, 2001, Peregrine filed its Form 10-Q for Q3 2001 with the SEC following approval

21  by Arthur Andersen and the Peregrine Defendants, excluding Hosley and van den Berg. (CC ¶¶

22  384, 387.) Similar to the previous 10-Qs, this 10-Q was signed by Defendant Gless and included

23  the Company's policy of not recognizing revenue on contingent transactions. (CC ¶¶ 384-385.)

### 8.    Q4 2001 and Fiscal Year 2001

25  On April 4, 2001, Peregrine issued a preliminary press release relating to its earnings for

26  Q4 2001, in which the Company announced, "[f]or the fiscal fourth quarter end[ing] March 31,

27  2001, [Peregrine] expects to report license revenues of approximately $105 million, total

28  revenues of approximately $170 million and earnings per share of $0.16 . . . ." (CC ¶ 390.) On

the following day, Peregrine's stock jumped $5.25 per share to $19.06 per share. (*Id.*) The CC

Exhibit E
0386

1   alleges that these statements were false "because Peregrine's reported annual revenue was

2   overstated by more than $250 million, its accounts receivable were understated, its cash balances

3   were overstated by more than $180 million, its liabilities were understated and its DSO were

4   understated . . . ." (CC ¶ 391.) On April 26, 2001, Peregrine issued a second press release

5   concerning its revenues for Q4 2001 confirming its earlier statements. (CC ¶ 393.) Moreover,

6   the April 26, 2001 press release announced revenues for Fiscal Year 2001 totaling $564.7

7   million., a 123% increase from the previous year. (*Id.*) Both press releases were approved by

8   the Peregrine Defendants, except for Hosley and van den Berg, and the April 26, 2001 press

9   release was also reviewed by Arthur Andersen prior to its issuance. (CC ¶¶ 392, 396.)

10      Similar to the events described above in previous quarters, Defendant Gardner led a

11  conference call with investors and securities analysts in the presence of Peregrine management

12  on the same day as the press release. (CC ¶ 397.) This conference call was followed by the

13  publication of a report by CIBC, in which Peregrine was once again described as a "strong buy."

14  (CC ¶ 398.) On June 29, 2001, Peregrine filed its Form 10-K for Fiscal Year 2001 with the

15  SEC, which incorporated its press release from April 26, 2001 and included financial statements

16  audited by Arthur Andersen. (CC ¶¶ 402, 403.) The 10-K was signed by Defendant Gless, in

17  his capacity as Vice President of Finance and CAO, Defendant Gardner in his capacity as CEO

18  and Chairman of the Board of Directors, and Defendants Moores, Noell, Watrous, and Savoy as

19  directors of Peregrine. (CC ¶ 402.) Each individual who signed the Form 10-K read and

20  approved its contents. (CC ¶ 406.) Additionally, the 10-K recited the Company's policy on

21  revenue recognition. (CC ¶ 404.)

22      Furthermore, Peregrine filed Amendment No. 1 to its Form S-4 Registration Statement

23  with the SEC on July 23, 2001. (CC ¶ 407). This Amendment included a Joint Proxy Statement

24  and Prospectus for the purpose of soliciting proxies from Remedy Corporation shareholders to

25  approve the proposed merger of Peregrine and Remedy. (*Id.*) Moreover, the Joint Proxy

26  contained Peregrine's financial statements for the previous three fiscal years, which are alleged

27  to be false and misleading. (CC ¶¶ 407, 408.) According to the CC, the Peregrine Defendants,

28  other than Hosley and van den Berg, signed the Amendment, while Arthur Andersen agreed to

    the use of its audit reports from Fiscal Years 2000 and 2001. (CC ¶ 409.) Pursuant to Defendant

Exhibit E
0387

1   Luddy's request, the Court takes judicial notice of the Registration Statement filed with the SEC

2   on July 23, 2001. (*See* Luddy Req. for Judicial Notice Ex. C.) Accordingly, it appears that

3   Defendants Gardner, Gless, Moores, Cole, Noell, Savoy, and Watrous signed the July 23, 2001

4   Remedy Registration Statement. (*See also* CC ¶ 586.)

5            **9.    Q1 2002**

6            On July 24, 2001, the Company announced in a press release that revenues for Q1 2002

7   were a "record $172 million, an increase of 82% from the same quarter a year ago." (CC ¶ 410.)

8   The Peregrine Defendants, excluding Hosley and van den Berg, consented to the issuance of the

9   press release, as did Arthur Andersen. (CC ¶ 412.) Once again, Defendant Gardner held a

10  conference call with investors and securities analysts, which was followed by a report from

11  CIBC describing Peregrine's exceptional performance and rating the Company's stock as a

12  "strong buy." (CC ¶¶ 413, 415.) Other reports reflecting Peregrine's strong performance in Q1

13  2002 were also published on July 24 and July 25, 2001 by Bear Stearns & Co., Inc. ("Bear

14  Stearns") and U.S. Bancorp Piper Jaffray ("Piper Jaffray"). (CC ¶¶ 414, 416.) Following the

15  July 24, 2001 press release, Defendant Luddy sold 46,981 shares of Peregrine common stock for

16  a total of approximately $1,317,397 on August 1, 2001. (CC ¶ 420.) On August 14, 2001,

17  Peregrine filed its Form 10-Q for Q1 2002 with the SEC, which included the Company's

18  financial statements for the quarter, its revenue recognition policy, and the signature of

19  Defendant Gless. (CC ¶¶ 421-422.) Arthur Andersen and the Peregrine Defendants, excluding

20  Hosley and van den Berg, reviewed the 10-Q for Q1 2002 before its submission to the SEC.

21  (CC ¶ 424.) The CC further alleges that Defendant Gardner sold 2,250 shares on September 4,

22  2001 resulting in proceeds of $61,875. (CC ¶ 425.)

23           **10.   Q2 2002**

24           On October 24, 2001, Peregrine issued a press release announcing total revenues of $175

25  million for Q2 2002, an increase of 23% from the second quarter of the previous year. (CC ¶

26  429.) This press release confirmed an earlier press release issued on October 3, 2001. (*See* CC ¶

27  426.) Arthur Andersen and the Peregrine Defendants, except for Hosley and van den Berg,

28  approved the October 24, 2001 press release prior to its issuance. (CC ¶.430.) Moreover,

Peregrine management, led by Defendant Gardner, held a conference call with investors and

Exhibit E
0388

1  securities analysts on October 24, 2001. (CC ¶ 431.) CIBC, Bear Stearns, Piper Jaffray, and

2  Thomas Weisel Partners ("Weisel") issued reports analyzing Peregrine's strong performance for

3  Q2 2002. (CC ¶¶ 432-36.) Moreover, on November 31, 2001, Peregrine filed its Form 10-Q for

4  Q2 2002 with the SEC, which incorporated the financial statements included in the October 24,

5  2001 press release. (CC ¶ 440). The 10-Q was signed by Defendant Gless, contained the

6  Company's revenue recognition policy, and was pre-approved by Arthur Andersen and the

7  Peregrine Defendants, excluding Hosley and van den Berg. (CC ¶¶ 440, 441, 443.)

8       **11.    Q3 2002**

9       On January 2, 2002, Peregrine announced in a press release that it anticipated roughly

10  $175 million in total revenues. (CC ¶ 444.) Prior to its issuance, the press release was reviewed

11  by the Peregrine Defendants, excluding Hosley and van den Berg. (CC ¶ 446.) On the

12  following day, Gardner led a conference call with investors and securities analysts regarding the

13  Company's financial results for Q3 2002. (CC ¶ 447.) On January 3, 2002, CIBC, Piper Jaffray

14  and Bear Stearns each issued positive reports relating to Peregrine's anticipated revenues for Q3

15  2002. (CC ¶¶ 448-450.) Three weeks after the publication of these reports, Peregrine issued a

16  second press release verifying that revenues for Q3 2002 totaled $175.2 million. (CC ¶ 454.)

17  This second press release was approved by both Arthur Andersen and the Peregrine Defendants,

18  other than Hosley and van den Berg. (CC ¶ 455.) On the same day as the issuance of this

19  second press release, Peregrine management conducted a conference call with investors and

20  securities analysts. CIBC, Piper Jaffray and Bear Stearns subsequently issued reports depicting

21  Peregrine's strong performance. (CC ¶¶ 458-59.) On February 14, 2002, Peregrine filed its

22  Form 10-Q for Q3 2002 with the SEC, which included its January 24, 2002 press release. (CC ¶

23  463.) In addition to Arthur Andersen, the Peregrine Defendants, except for Hosley and van den

24  Berg, reviewed the 10-Q prior to its filing with the SEC. (CC ¶ 465.)

25

26  **B.    Restatement of Peregrine's Financial Statements**

27       In May 2002, Peregrine disclosed its intention to restate all financial statements publicly

28  issued between June 30, 1999 and December 31, 2001. (CC ¶ 11.) This time span includes the

Company's Fiscal Year 2000, Fiscal Year 2001, and the first three quarters of Fiscal Year 2002.

13

Exhibit E
0389

(*Id.*)  While the financial statements for Fiscal Years 2000 and 2001 were audited by Arthur
Andersen, the financial statements for the first three quarters of Fiscal Year 2002 were
unaudited. (*Id.*)  Both Peregrine and Arthur Andersen warned the public that the financial
statements for these years were not reliable. (*Id.*)  On February 28, 2003, Peregrine submitted to
the SEC its audited financial statements for the fiscal year ending March 31, 2002, as well as its
restatement of audited financial statements for the fiscal years ending on March 31, 2000 and
2001. (CC ¶ 12.)  In its restatement, Peregrine admitted that it improperly recognized more than
$500 million in revenue, and that it materially misrepresented its balance sheet and statement of
liabilities by understating its debt by as much as $130 million. (CC ¶¶ 7, 8, 33.)  The CC alleges
that the admittedly false financial statements caused the Company's share price to rise to an
inflated value. (CC ¶ 20.)  While Peregrine common stock was valued at approximately $13 per
share at the commencement of the Class Period, shares were trading as high as $78 per share
during the Class Period. (CC ¶ 21.)  Peregrine common stock, however, was trading at only
$0.89 per share on the day immediately following the close of the Class Period. (*Id.*)

### *Legal Standard*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency
of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal of a claim
under this Rule is appropriate only where "it appears beyond doubt that the plaintiff can prove
no set of facts in support of the claim which would entitle him to relief." *Conley v. Gibson*, 355
U.S. 41, 45-46 (1957); *Navarro*, 250 F.3d at 732.  Dismissal is warranted under Rule 12(b)(6)
where the complaint lacks a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*,
749 F.2d 530, 533-34 (9th Cir. 1984); *see Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989)
("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.").
Alternatively, a complaint may be dismissed where it presents a cognizable legal theory yet fails
to plead essential facts under the theory. *Robertson*, 749 F.2d at 534.

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all
factual allegations and must construe them in the light most favorable to the nonmoving party.
*Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  However, legal conclusions

14

02cv870-J (RBB)

Exhibit E
0390

1   need not be taken as true merely because they are cast in the form of factual allegations. *Roberts*

2   *v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987); *W. Mining Council v. Watt*, 643 F.2d 618,

3   624 (9th Cir. 1981). When ruling on a motion to dismiss, the Court may consider the facts

4   alleged in the complaint, documents attached to the complaint, documents relied upon but not

5   attached to the complaint when authenticity is not contested, and matters of which the Court

6   takes judicial notice. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998); *Branch v.*

7   *Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994); *MGIC Indem. Co. v. Weisman*, 803 F.2d 500, 504

8   (9th Cir. 1986). In the present action, the complaint alleges violations of Section 10(b), Section

9   14(a), and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and

10  violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act").

11

12                            *Discussion*

13  **I.**    **Failure to State a Claim under Section 10(b) and Rule 10b-5**

14        **A.**    **Pleading Requirements of Section 10(b) and Rule 10b-5**

15        Section 10(b) of the Exchange Act makes it unlawful to use in connection with "the mails

16  or facilities of interstate commerce" any "manipulative or deceptive device or contrivance in

17  contravention of such rules and regulations as the Commissioner may prescribe." 15 U.S.C. §

18  78j. SEC Rule 10b-5, promulgated under section 10(b), provides:

19           It shall be unlawful for any person, directly or indirectly, by the use of any means or
             instrumentality of interstate commerce, or of the mails or of any facility of any national

20          securities exchange,
             (a) To employ any device, scheme or artifice to defraud,

21          (b) To make any untrue statement of a material fact or to omit to state a material fact
             necessary in order to make the statements made, in the light of the circumstances under

22          which they were made, not misleading, or
             (c) To engage in any act, practice, or course of business which operates and would

23          operate as a fraud or deceit upon any person, in connection with the purchase or sale of
             any security.

24

25  17 C.F.R. § 240.10b-5. In order to state a claim under Section 10(b) and SEC Rule 10b-5, a

26  plaintiff must state the following: (1) defendants made a false statement or omission with regard

27  to a material fact; (2) in connection with the purchase or the sale of a security; (3) with scienter;

28  (4) upon which plaintiff reasonably relied; (5) to his or her harm or detriment. *Binder v.*

*Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999), *cert. denied*, 528 U.S. 1154 (2000); *Paracor*

Exhibit E
0391

1 | *Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996).

2 | In December 1995, Congress enacted the Private Securities Litigation Reform Act of

3 | 1995 ("PSLRA"), which mandates that complaints alleging securities fraud comply with the

4 | heightened pleading standards of both the PSLRA and Rule 9(b) of the Federal Rules of Civil

5 | Procedure. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002). Under

6 | Ninth Circuit caselaw, Rule 9(b) imposes two distinct requirements on complaints alleging

7 | securities fraud. First, the basic notice requirements of Rule 9(b) require the complaint to "state

8 | precisely the time, place, and nature of the misleading statements, misrepresentations, or specific

9 | acts of fraud." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994). The Rule imposes a second

10 | requirement that the complaint "set forth an explanation as to why the statement or omission

11 | complained of was false and misleading." *Yourish v. California Amplifier*, 191 F.3d 983, 993

12 | (9th Cir. 1999) (quoting *In re GlenFed Sec. Litig.*, 42 F.2d 1541, 1548 (9th Cir. 1994) (en

13 | banc)). A complaint may satisfy this second requirement in several ways. It may demonstrate

14 | that the false or misleading character of a statement was clear from facts that existed all along

15 | and were later revealed. *Yourish*, 191 F.3d at 994; *In re GlenFed*, 191 F.3d at 1549; *DeMarco v.*

16 | *DepoTech Corp.*, 149 F. Supp. 2d 1212, 1223 (S.D. Cal. 2001) (Whelan, J.). It may also "point[]

17 | to inconsistent contemporaneous statements or information . . . which were made by or available

18 | to the defendants." *Yourish*, 191 F.3d at 994 (quoting *In re GlendFed*, 42 F.3d at 1549);

19 | *DeMarco*, 149 F. Supp. 2d at 1223. A complaint may not, however, demonstrate that a

20 | statement was false or misleading when made "merely by pointing to later inconsistent

21 | statements or conditions." *In re GlenFed*, 42 F.3d at 1548; *DeMarco*, 149 F. Supp. 2d at 1223.

22 | Through the PSLRA, Congress clarified and strengthened the particularity requirements

23 | of Rule 9(b) as applied in the context of federal securities class action lawsuits. Under the

24 | PSLRA, a complaint must identify (1) each statement alleged to have been misleading, (2) the

25 | reason or reasons why the statement is misleading, and (3) all facts on which that belief is

26 | formed. 15 U.S.C. § 78u-4(b)(1); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 996 (9th Cir.

27 | 1999). If allegations are made on information and belief, "a plaintiff must provide, in great

28 | detail, all the relevant facts forming the basis of her belief. It is not sufficient for a plaintiff's

pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate

16

Exhibit E
0392

1    discovery, facts that will validate her claim." *Silicon Graphics*, 183 F.3d at 985. If reports or

2    other writings form the basis of a plaintiff's belief, the plaintiff should mention "the sources of

3    her information with respect to the reports, how she learned of the reports, who drafted them, or

4    which officers received them." *Id.* If a complaint relies on unnamed, confidential sources, a

5    person need not be named "provided they are described in the complaint with sufficient

6    particularity to support the probability that a person in the position occupied by the source would

7    possess the information alleged." *In re Seebeyond Technologies Corp. Sec. Litig.*, 266 F. Supp.

8    2d 1150, 1158-59 (C.D. Cal. 2003) (citing *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir.

9    2000)). "To contribute meaningfully toward a 'strong inference' of scienter, [] allegations

10   attributed to unnamed sources must be accompanied by enough particularized detail to support a

11   reasonable conviction in the informant's basis of knowledge." *In re Northpoint*

12   *Communications Group, Inc. Sec. Litig.*, 221 F. Supp. 2d 1090, 1097 (N.D. Cal. 2002). A

13   complaint should at least include each witness's job title and describe their responsibilities

14   within the Company. *Id.* Exact dates of employment, however, need not be included, as it

15   "would significantly erode the confidentiality of these sources." *In re Seebeyond*, 266 F. Supp.

16   2d at 1159.

17       Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst &*

18   *Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976); *Silicon Graphics*, 183 F.3d at 975. With

19   regard to this element, the PSLRA requires complaints alleging federal securities fraud to "state

20   with particularity facts giving rise to a strong inference that the defendant acted with the required

21   state of mind." 15 U.S.C. § 78u-4(b)(2). As interpreted by the Ninth Circuit, this language

22   requires a private securities plaintiff to plead, particular facts that constitute strong

23   circumstantial evidence of deliberately reckless or conscious misconduct. *Silicon Graphics*, 183

24   F.3d at 977. Recklessness satisfies the scienter requirement only insofar as it reflects some

25   degree of conscious or deliberate conduct; i.e., "a degree of recklessness that strongly suggests

26   actual intent." *Id.* at 979.

27       In order to determine whether scienter has been alleged with sufficient particularity,

28   courts must collectively consider allegations of scienter. *Broudo v. Dura Pharmaceuticals, Inc.*,

     339 F.3d 933, 940 (9th Cir. 2003) (remanding case to district court to perform the final step of

                                                                    02cv870-J (RBB)

Exhibit E
0393

1  considering a complaint's allegations collectively); *No. 84 Employer-Teamster Joint Council*

2  *Pension Trust Fund v. Am. West Holding Corp.* ("*Am. West*"), 320 F.3d 920, 938 (9th Cir. 2003)

3  ("Beyond each individual allegation [courts] consider whether the total of plaintiffs' allegations,

4  even though individually lacking, are sufficient to create a strong inference that defendants acted

5  with deliberate or conscious recklessness.") (internal quotations omitted).  If the plaintiff fails to

6  satisfy the pleading requirement set forth in Rule 9(b) and the PSLRA, the latter provides that

7  "the court shall, on the motion of any defendant, dismiss the complaint[.]"  15 U.S.C. § 78u-

8  4(b)(3)(A).  Although the PSLRA established heightened pleading requirements for securities

9  fraud actions, the Ninth Circuit has stated that "[i]n this era of corporate scandal, when insiders

10  manipulate the market with the complicity of lawyers and accountants, we are cautious to raise

11  the bar of the PSLRA any higher than that which is required under its mandates." *Am. West*, 320

12  F.3d at 946.

13

14  **B.    False Financial Statements**

15         The crux of Plaintiffs' claims is that Defendants published false financial statements

16  containing inflated revenues.  Plaintiffs allege that Peregrine's financial statements were false

17  because Defendants engaged in improper accounting practices.  Specifically, the CC alleges that

18  Defendants improperly booked revenue in violation of Generally Accepted Accounting

19  Principles ("GAAP").  Generally Accepted Accounting Principles are the basic postulates that

20  govern the accounting practices of business entities.  These principles establish guidelines for

21  measuring, recording and classifying the transactions of a business enterprise. *See Reiger v.*

22  *Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1009 (S.D. Cal. 2000) (Whelan, J.).

23         "Properly pled, overstating of revenues may state a claim for securities fraud, as under

24  GAAP, 'revenue must be *earned* before it can be recognized.'" *Hockey v. Medhekar*, 30 F.

25  Supp. 2d 1209, 1216 (N.D. Cal. 1998) (quoting *Provenz v. Miller*, 102 F.3d 1478, 1484 (9th Cir.

26  1996)) (emphasis in original).  In order to state a claim for accounting fraud, the complaint must

27  "plead facts sufficient to support a conclusion that [d]efendant [] prepared the fraudulent

28  financial statements and the alleged financial fraud was material." *Hockey*, 30 F. Supp. 2d at

1216 (internal quotations omitted).  When a complaint alleges improper revenue recognition,

Exhibit E
0394

1   "plaintiffs should allege basic details as the approximate amount by which revenues and earnings

2   were overstated, the products involved in the contingent transaction, the dates of any of the

3   transactions, or the identities of any of the customers or [company] employees involved in the

4   transaction." *In re Peerless Sys. Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 991 (S.D. Cal. 2002)

5   (Lorenz, J.) (internal quotations omitted).  Each detail, however, need not be alleged, so long as

6   "a court can discern whether the alleged GAAP violations were minor or technical in nature, or

7   whether they constituted widespread and significant inflation of revenue." *In re McKesson*

8   *HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).

9           Furthermore, failure to follow GAAP, by itself, does not fulfill the scienter requirement.

10  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 387 (9th Cir. 2002).  In order

11  for allegations of GAAP violations to establish scienter, the complaint must allege facts

12  indicating "that [the defendant] knew or must have been aware of the improper revenue

13  recognition, [or] intentionally or knowingly falsified the financial statements[.]" *Id.* at 390-91.

14  Moreover, a complaint must "allege specific contemporaneous conditions known to the

15  defendants that would strongly suggest that the defendants understood that their recognition of

16  revenues . . . would result in overstated revenues." *Vantive*, 283 F.3d at 1091.  Although GAAP

17  violations, alone, generally do not raise a strong inference of scienter, "[this] does not mean that

18  detailed allegations of GAAP violations cannot support a strong inference of scienter."

19  *McKesson*, 126 F. Supp. 2d at 1273 ("Courts that have discounted allegations of GAAP

20  violations as evidence of fraud have never held that GAAP violations are proper or cannot

21  constitute fraud.").  If a complaint describes significant GAAP violations with sufficient

22  particularity, such allegations may provide powerful evidence of scienter. *Id.* ("After all, books

23  do not cook themselves.").  According to the CC, Peregrine (1) improperly recognized revenue

24  on contingent transactions; (2) held quarters open past the quarter's end; and (3) improperly

25  treated several of its accounts receivables on its balance sheet.

26

27          **1.      Improper Revenue Recognition**

28  Peregrine generated its revenues primarily from two sources: (1) product licensing

02cv870-J (RBB)

1  revenues to resellers, distributors and end-users, and (2) services and support revenues.[8] (CC. ¶

2  5).  According to the CC, improper revenue recognition typically occurred in two scenarios: (1)

3  swap or barter transactions; and (2) reseller commitments.  A swap or barter transaction is a two-

4  party reciprocal transaction, where each party agrees to trade services or products and then book

5  the exchange as a sale in order to recognize revenue.  *See In re Homestore.com, Inc. Sec. Litig.*,

6  252 F. Supp. 2d 1018, 1022 (C.D. Cal. 2003).  Instead of recognizing the exchange as a sale for

7  purposes of revenue, GAAP requires that each party "'net out' the cost of the reciprocal

8  transaction (making the net revenue zero), and report the two transactions as linked." *Id.* at

9  1023.  The CC alleges that Peregrine regularly engaged in swap transactions, where the

10  Company agreed to provide consulting services in exchange for a purchase commitment for a

11  Peregrine product.  (CC ¶¶ 140-141, 179, 180-181, 189, 194-199, 210-211.)

12      As for the reseller commitments, pursuant to GAAP, the Company could not recognize

13  revenue from the sale of software licenses unless certain conditions had been satisfied.  (*Id.*).

14  Under GAAP, revenue may not be recognized until (1) an unconditional contract had been

15  signed; (2) the product had been delivered; (3) the fee was "fixed and determinable;" (4) the risk

16  of concession was deemed remote; (5) no significant vendor obligations remained; and (6) the

17  risk of collecting the receivable was probable.  (CC ¶ 5.)  The CC purports that Peregrine

18  prematurely recognized revenue based on pre-commitment sales.  (CC ¶¶ 144, 147-151, 155-

19  156, 170-173, 174-176, 177-178, 182, 183, 184.)  Moreover, the CC alleges that the Company

20  "provided certain resellers with side payments, deep discounts and rebates to induce them into

21  'purchasing' license agreements where no end-user had committed to purchase the product."

22  (CC ¶ 137.)  Furthermore, Plaintiffs allege that Peregrine routinely entered into "side"

23  agreements with resellers, thus enabling resellers to escape the purported sale. (CC ¶ 135.)

24      In addition to violating GAAP, recognition of contingent transactions violated Peregrine's

25  own revenue recognition policy contained in each of its SEC filings.  While Peregrine was

26  recognizing revenue where no end-user had committed to purchasing the product, the Company

27

28  _____
   [8] Peregrine implemented a business model in which growth would occur through acquisitions and
   strategic alliances.  (CC ¶ 130.)  Such a business model required that the Company report increasing
   revenue each quarter in order to increase its share price.  (CC ¶ 2.)  During the Class Period, Peregrine
   reported significant quarterly increases in revenue in each quarter.  (CC ¶ 3.)

Exhibit E
0396

1 | included the following policy in several SEC filings:

2 |     Revenues from direct and indirect license agreements are recognized currently, provided
3 |     that all of the following conditions are met: a noncancelable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed profitable; risk of
4 |     concession is deemed remote; and no other significant vendor obligations exist.

5 | (*See, e.g.*, CC ¶ 291.)  Peregrine later admitted that "[i]n many cases, revenue was recognized

6 | despite the fact that the purchase commitments with resellers were not fixed, but where subject

7 | to conditions and contingencies." (CC ¶ 138.)  In total, the CC alleges that Peregrine improperly

8 | recognized more than $500 million where the GAAP conditions had not been fulfilled.  (CC ¶¶

9 | 5, 7, 33.)

10 |

11 |         **a.    General Allegations Not Relating to Individual Transactions**

12 |     The CC identifies twenty-one specific transactions where Peregrine prematurely and

13 | improperly booked revenue.  (*See* CC ¶¶ 158-214.)  Before addressing the sufficiency of these

14 | allegations, the Court notes that the CC contains several broad allegations about Peregrine's

15 | accounting irregularities.  (*See* CC ¶¶ 135, 136, 137, 140.)  Although these allegations are likely

16 | included as a means of introducing specific transactions, such general allegations, alone, do not

17 | comply with the stringent pleading standards of the PSLRA and Rule 9(b).

18 |     Moreover, the CC includes several block quotes from former Peregrine employees not

19 | relating to any individual transactions.  (*See, e.g.*, CC ¶¶ 139, 141, 145, 149.)  For example, a

20 | former Peregrine employee, who was a Director of the InfraCenter Workroup ("ICW") recalled

21 | the following:

22 |     In March of 2000 in a conversation with Spitzer, he talked about the intent of the company to prematurely book pre-commitments as revenue.  Spitzer stated that 'I am just
23 |     following orders from Gardner and I am getting paid commissions on the pre-commitments as they are booked – and I won't take the fall – every quarter I vest my
24 |     28,000 option shares.'

25 |     I remember asking Spitzer where the deals were coming from that made our quarters when we are getting e-mails constantly to the effect that we are going to miss the quarter
26 |     and then we make it at the last minute – Spitzer told me that he was getting paid on these deals that they were coming from Gardner – Spitzer told me that the deals that Gardner
27 |     got involved in were all big and over $500,000.

28 | (CC ¶ 149.)  Although this quote does suggest that Spitzer and Gardner were fully aware that

pre-commitments were being booked as revenue, this unnamed, former employee's statement

02cv870-J (RBB)

1  fails to identify a specific transaction of which an individual defendant was aware. Moreover, in

2  order to sufficiently allege improper revenue recognition, a complaint should plead such facts as

3  the approximate amount by which earnings were overstated, the products involved in the

4  contingent transaction, the date of the transactions, or the identity of the customer or Peregrine

5  employee involved in the transaction. *Peerless*, 182 F. Supp. 2d at 991. Accordingly, such

6  allegations are not presented with sufficient particularity.

7      Furthermore, the CC alleges that certain Peregrine defendants, including Gardner, Gless,

8  Powanda, and Spitzer, attended "periodic sales meetings" where reports tracking the Company's

9  "burn," i.e., commitments from resellers not yet sold through to the end-user, were reviewed.

10  (CC ¶¶ 66, 73, 81, 86.) The CC, however, fails to identify any further details about these

11  meetings or reports. "If a plaintiff is to rely on the existence of reports as establishing

12  knowledge, she must 'include adequate corroborating details,' such as the 'sources of her

13  information with respect to the reports, how she learned of the reports, who drafted them, ...

14  which officers received them,' and 'an adequate description of their contents.'" *Vantive*, 283

15  F.3d at 1079, 1087-88 (citing *Silicon Graphics*, 183 F.3d at 985). Nowhere in the CC do

16  Plaintiffs describe the basis for their knowledge of the "burn" reports nor any particular details

17  about their contents. The CC should describe transactions discussed in a report or at a particular

18  meeting. Moreover, the mere fact that a particular defendant knew that a reseller had not sold a

19  product through to an end-user does not shed any light on whether the defendant knew how the

20  transaction had been booked. Accordingly, the CC's general allegations involving "periodic

21  sales meetings" and reports do not comply with the pleading requirements of Rule 9(b) and the

22  PSLRA.

23      The CC further alleges that a meeting with Defendants Powanda and Nelson, among

24  others, took place in late 1998. (CC ¶ 146). According to another former Director of the

25  Alliance Group, that meeting included a discussion where "it would be the company policy to

26  book 'commitments' from resellers as revenue irrespective of whether the reseller had a firm

27  commitment from an end-user." (*Id.*). It is not clear from the CC as to how this former Director

28  of the Alliance Group had knowledge of this meeting. Moreover, the CC does not allege that

02cv870-J (RBB)

Exhibit E
0398

1    Defendants Powanda and Nelson were aware of any specific transactions being improperly

2    booked.

3

4                    **b.    The Twenty-One Improperly Recorded Transactions**

5        Although the CC does contain allegations that are simply too broad, the CC also identifies

6    twenty-one specific improperly-booked transactions. According to the CC, "each of these

7    transactions was carried out pursuant to the directions of Peregrine senior management,

8    including defendants Gardner, Powanda and Gless." (CC ¶ 157.) The sufficiency of each

9    allegation as pled is addressed below.

10                            **1.    KPMG**

11        The CC alleges that KPMG LLP ("KPMG") was part of the Alliance Group created by

12   Peregrine for the purpose of integrating Peregrine software at customer locations and promoting

13   the sale of the Company's products. (CC ¶ 158.) Peregrine created the Alliance Group to

14   facilitate sales through indirect distribution channels by establishing distribution relationships

15   with services providers or partners, system integrators, and resellers. (CC ¶ 129.) Despite

16   having this relationship with KPMG, Peregrine did not receive payment until the product sold-

17   through to an end-user. (*Id.*) Moreover, KPMG was not responsible for payment on the product

18   that KPMG was unable to sell-through to the end-user. (CC ¶ 159.) In violation of GAAP,

19   Peregrine booked revenue prematurely before the sell-through to the end-user. (CC ¶ 158.)

20        According to a former Peregrine employee who was a Director of the Alliance Group,

21   KPMG placed three orders for end-users that were improperly recorded. (CC ¶ 159.) These

22   included orders for the federal government's Department of Health and Human Services in the

23   amount of $2 million, Deuthsche Bank for $4 to $5 million, and Pfizer, Inc. for $2.1 million.

24   (*Id.*). Although these orders occurred in 1999, the CC fails to state whether these orders took

25   place within the Class Period after July 22, 1999. More importantly, the CC does not allege that

26   these transactions were booked as revenue in financial statements disseminated to the public

27   within the Class Period. Moreover, the booking of these transactions as revenue is not attributed

28   to an individual defendant. Accordingly, these three transactions have not been sufficiently pled.

         In addition to these three orders, the CC addresses the resale of Service Center and Asset

Exhibit E
0399

1    Center products ranging between $5 and $7 million. (CC ¶ 160.) According to another Director

2    of the Alliance Group, the KPMG account was handled by Defendants Powanda and Spitzer.

3    (*Id.*) The CC alleges that there was a side letter from early 2001 stating that KPMG had no

4    payment obligation until the sell-through to the end-user. (*Id.*) Although the CC does provide

5    the products, the customer, and the amount of the transaction, it fails to state that any of the

6    named defendants were aware, or were deliberately reckless in not knowing, of both the side

7    letter and the booking of the transaction as revenue. *See DSAM*, 288 F.3d at 390-91 (stating that

8    the complaint must allege facts "that [the defendant] knew or must have been aware of the

9    improper revenue recognition, [or] intentionally or knowingly falsified the financial statements .

10    . ."); *Vantive*, 283 F.3d 1091 (holding that a complaint must "allege specific contemporaneous

11    conditions known to the defendants that would strongly suggest that the defendants understood

12    that their recognition of revenues . . . would result in overstated revenues.").

13          Furthermore, according to a former sales executive involved in sales to the Alliance

14    Group, "Peregrine used KPMG 'to carry the paper' on one or two transactions per quarter." (CC

15    ¶ 161.) Although the CC does state that these transactions involved millions of dollars, the CC

16    fails to cite any additional improperly booked transactions other than those mentioned above.

17    Moreover, the Court notes that the factual basis for almost every allegation contained in the CC

18    is that of an undisclosed, confidential Peregrine employee. (*See, e.g.*, CC ¶¶ 159, 160, 161.) As

19    stated above, in order for the Court to ascertain whether such individuals have a sufficient basis

20    of knowledge, the CC must "describe[] in the complaint with sufficient particularity . . . [how] a

21    person in the position occupied by the source would possess the information alleged."

22    *Seebeyond*, 266 F. Supp. 2d at 1158-59 (citing *Novak*, 216 F.3d at 313-14). The CC fails to

23    describe how a former sales executive involved in sales to the Alliance Group would know that

24    "Peregrine used KPMG 'to carry the paper' on one or two transactions per quarter." It is not

25    clear from the CC why a person in such a position would have access to the information alleged.

26    The CC does not allege that this former sales executive handled the KPMG account. In contrast,

27    the Court finds that the CC provides enough detail with respect to the allegations based upon the

28    former Directors of the Alliance Group that the KPMG account was handled by Powanda and

Spitzer. (CC ¶ 160.) It is highly probable that a person in that position would know which

Exhibit E
0400

1  Peregrine employees handled particular accounts.  However, the CC does not provide sufficient

2  facts as to why a former Director of the Alliance Group would know how many orders KPMG

3  placed for end-users in 1999.  (*See* CC ¶ 159.)

4        Despite these shortcomings, courts are not limited to the allegations in the complaint

5  when considering a Rule 12(b)(6) motion to dismiss.  Although courts generally consider only

6  the complaint in a motion to dismiss for failure to state a claim, courts may consider a document

7  not included with the complaint if it is specifically referenced in the complaint and its

8  authenticity is not questioned. *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994).  Moreover,

9  courts may consider a matter that is properly the subject of judicial notice under Fed. R. Evid.

10  201 without converting the motion to one for summary judgment. *MGIC Indem, Corp. v.*

11  *Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282

12  (9th Cir. 1986), *abrogated on other grounds by Astoria Federal Sav. and Loan Ass'n v.*

13  *Solimino*, 501 U.S. 104 (1991).

14        The Loran Plaintiffs request that the Court take judicial notice of records from criminal

15  proceedings against Defendant Spitzer.  While Spitzer did join in the motion to dismiss, he does

16  not oppose the request for judicial notice.  In Spitzer's criminal case, he pled guilty to charges of

17  conspiracy to commit securities fraud.  Rule 201 of the Federal Rules of Evidence allows courts

18  to take judicial notice of facts "not subject to reasonable dispute in that it is either (1) generally

19  known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready

20  determination by resort to resources whose accuracy cannot reasonably be questioned." Fed. R.

21  Evid. 201.  Additionally, courts may take judicial notice of matters of public record, including

22  but not limited to court records. *See Emrich v. Touche Ross & Comp.*, 846 F.2d 1190, 1198 (9th

23  Cir. 1988) (holding that a court may look to items in the record of a court case or to matters of

24  general public record when ruling on a Rule 12(b)(6) motion); *United States v. Wilson*, 631 F.2d

25  118, 119 (9th Cir. 1980) ("[A] court may take judicial notice of its own records in other cases, as

26  well as the records of an inferior court in other cases."); *F.T.C. v. J.K. Publications, Inc.*, 99 F.

27  Supp. 2d 1176, 1198 n. 61 (C.D. Cal. 2000) (taking judicial notice of information contained in

28  the criminal dockets of the Central District of California).  As a public record, judicial notice of

records from Spitzer's criminal case is proper.

Exhibit E
0401

1    In the guilty plea entered before Judge Whelan in Criminal Case No. 03cr1665W,[9] Spitzer

2 acknowledges that he "structured and booked as revenue, and caused to be structured and

3 booked, transactions that violated . . . GAAP and Peregrine's stated revenue recognition policy."

4 (Spitzer Plea Agreement ¶ 9.)  Specifically, Spitzer admitted that he improperly booked

5 contingent transactions in December 1999, September 2000, and March 2001.  (*Id.* ¶ 11.)

6 Moreover, Spitzer admitted that he "knowingly, willfully, and with an intent to defraud"

7 engaged in fraudulent activities while at Peregrine.  (*See id.* ¶ 13.)  Because Defendant Spitzer

8 has already admitted to possessing an actual intent to defraud investors in his criminal action,

9 coupled with the fact that the CC has alleged a connection between Spitzer and KPMG, the

10 Court finds that the averments concerning the transaction with KPMG involving the resale of

11 Service Center and Asset Center products ranging between $5 and $7 million are sufficient.

12 (*See* CC ¶ 160.)

13

14              **2.    IBM**

15    Similar to KPMG, the CC alleges that IBM routinely received side letters providing that

16 payment was not required until the actual sell-through to the end-user.  (CC ¶ 164.)  According

17 to a former member of the Alliance Group, IBM "would buy inventory at our request and hold it

18 until Peregrine could sell it through - IBM was acting like a bank."  (*Id.*)  The CC alleges that

19 transactions involving IBM ranging from $2 to $4 million regularly occurred at the end of the

20 reporting period.  As one former member of the Alliance Group recalled, "Doug Powanda was

21 very close to IBM . . . and would go to IBM regularly at the end of a quarter to close a deal with

22 IBM because [Peregrine] needed X millions to make the quarter.  It was common knowledge

23 around the company in 1999 and 2000 when Powanda was North America sales manager, that he

24 would go to IBM . . . and make this happen - . . . he was known as the 'miracle worker.'" (*Id.*)

25    Additionally, the CC avers that Defendants Gardner and Powanda, among others,

26 attended a meeting in early 1999 in which there was a discussion of revenue recognition relating

27 to an unspecified IBM transaction.  (CC ¶ 144.)  The CC alleges that Gardner informed Powanda

28

---

[9] On June 16, 2003, minutes were filed indicating that Spitzer pled guilty to the count of conspiracy to commit a number of fraudulent acts.  (Loran Plaintiffs' Req. for Judicial Notice Ex. L.)

02cv870-J (RBB)

Exhibit E
0402

1   that the Company "would book as revenue the pre-commitments made by IBM in order to meet

2   Peregrine's revenue goals." (*Id.*) A former Peregrine employee, who was a Director of the ICW

3   Group, recalled a conversation with Defendant Powanda:

> I was involved directly in a conversation in early 1999 with Doug Powanda, who I
> reported to specific to I believe IBM Global Services which is one of the very first deals
> where channel stuffing was involved - Powanda stated to me that Farley had told him that
> 'we can begin to recognize pre-commitment sales in Q4, January - March 1999 -
> Powanda told me that 'we can really start to use it' referring to the pre-commitments . . .
> When I commented [to] him that we can't do this since I believed it to be wrong based on
> my prior experiences with these matters, . . . Powanda just naively shrugged his
> shoulders.
>
> I also remember that both Farley and Gardner popped their heads into Powanda's office
> during this meeting and acknowledged that we [should] go ahead with the IBM
> commitment. It was from this point in early 1999 that Peregrine had made the wholesale
> decision to book pre-committed sales as revenue - after they signed-off on the IBM deal
> that day in Powanda's office – things really started to go downhill for Peregrine.

12  (CC ¶ 145.) Although it is not clear how a former Director of the ICW Group would possess the

13  information alleged by virtue of his position, the basis of his or her knowledge arises from a

14  conversation with Powanda. The undisclosed, confidential employee's account of this meeting

15  suggests to the Court that Defendants Powanda and Gardner were aware of the booking of pre-

16  commitment sales. In fact, it appears that defendant Powanda had been informed of the

17  questionable nature of such a booking. Nevertheless, the CC does not identify the product

18  involved nor the date of this early 1999 transaction with IBM. Moreover, the transaction alleged

19  to have been discussed in this meeting related to pre-commitment sales in Q4, January-March

20  1999. However, the Class Period does not begin until July 21, 1999 with a press release stating

21  quarterly revenues for Q1 2000. (CC ¶ 279.) Consequently, the Court need not consider

22  allegations concerning transactions appearing in financial statements prior to the Class Period.

23  With that said, however, the Court notes that reports or meetings taking place before the Class

24  Period may nevertheless strengthen an inference of scienter. Thus, transactions with IBM have

25  not been pled with sufficient particularity.

26

27              **3.    Accenture**

28      Accenture, formerly the consulting division of Arthur Andersen, entered into a $8-$10

    million arrangement with Peregrine at the end of Fiscal Year 2000. (CC ¶ 167.) According to a

Exhibit E
0403

1    former member of the Alliance Group, Peregrine gave Accenture a side letter, which relieved

2    Accenture of any obligation to pay for the product until it was sold-through to an end-user.  (*Id.*)

3    In violation of GAAP, the Company booked the order from Accenture as revenue.  (*Id.*)

4    Although the CC does sufficiently identify a transaction that was improperly recognized as

5    revenue, the CC fails to sufficiently allege scienter for any individual defendant.  Moreover, the

6    CC fails to state how a former member of the Alliance Group was in a position to possess the

7    information alleged.  Accordingly, this transaction has not been alleged with sufficient

8    particularity.

9

10                            **4.      Tivoli**

11           In connection with an asset purchase agreement, Tivoli Systems, Inc. ("Tivoli") agreed to

12    purchase $58.9 million of software licenses from Peregrine. (CC ¶ 168.)  The CC alleges that

13    the software license purchase agreement should have been offset by Peregrine's asset purchase

14    agreement, but instead was improperly recorded as revenue.  (*Id.*)  Nevertheless, the CC fails to

15    allege that a particular individual possessed knowledge of the accounting treatment of this

16    transaction.  As a result, this transaction has not been pled with adequate particularity.

17

18                            **5.      CI Software Solutions**

19           According to the CC, CI Software Solutions ("CI Software") placed an order with

20    Peregrine in the amount of $500,000 in late 1999. (CC ¶ 171.)  Similar to KPMG, IBM, and

21    Accenture, Peregrine booked the order as revenue although CI Software was under no obligation

22    to actually pay for the software until it was sold-through to the end-user.  (*Id.*)  Additionally, as a

23    small company, CI Software lacked the necessary resources to finance such a purchase.  (*Id.*)

24    Furthermore, CI Software placed another order for software in the amount of $5 million two

25    months after the initial purchase order, which was also improperly booked as revenue.  (CC ¶

26    172.)  According to a former Peregrine employee, who was a product specialist in the InfraTools

27    business unit, the second purchase order seemed "really strange . . . because how really could

28    this start-up company that never even made or paid on its first $500,000 commitment, now

suddenly just a few months later be[] entering into a commitment for $5 million which was 10

Exhibit E
0404

1   times as large[.]" (CC ¶ 173.)  Moreover, this unnamed, confidential employee identified

2   Defendant Powanda as being "involved with CI." (*Id.*)  Despite sufficiently identifying two

3   transactions with CI Software, the CC fails to connect the fraudulent accounting of this

4   transaction to a specific defendant.  Furthermore, the CC fails to state how this former Peregrine

5   employee was in a position to possess the information alleged.

6

7                          **6.     O-E Systems**

8          The CC alleges that Peregrine entered into a transaction with O-E Systems, Inc. ("O-E

9   Systems") in September 1999, in which O-E Systems agreed to resell between $500,000 and

10  $750,000 of Peregrine software.  (CC ¶ 174.)  Similar to the aforementioned transactions, the

11  agreement was conditioned on the reseller's ability to sell-through the product to an end-user.

12  (*Id.*)  Knowledge of this transaction is based upon the recollection of a former Peregrine

13  employee, who was a sales representative in the ICW Group.  This former employee identifies

14  Defendant Spitzer as generating the sales commitment from O-E Systems.  (CC ¶ 175.)

15  Moreover, the former employee noted that O-E Systems had still not paid anything relating to

16  the deal as of August 2000.  (*Id.*)  Despite the fact that the reseller's payment obligation was

17  contingent on the sale-through to the end-user, Peregrine recognized the transaction as revenue

18  in September 1999.  Although the CC fails to raise a strong inference of scienter, the Court may

19  look to documents outside a complaint that are subject to judicial notice.  *Mack*, 798 F.2d at

20  1282.  While Spitzer's criminal records may establish a strong inference of scienter, the CC

21  nevertheless fails to include sufficient details about how a former sales representative in the

22  ICW Group was in a position to know that Spitzer was involved with O-E Systems.

23  Accordingly, any accounting fraud involving this transaction has not been adequately alleged.

24

25                          **7.     Barnhill**

26         In 1999, Barnhill Management Corporation ("Barnhill"), a small reseller of the

27  Company's software, entered into a $3 million commitment with Peregrine.  (CC ¶ 177.)

28  According to a former Peregrine employee who was a Director of the ICW Group, Powanda

    offered Michael Witt, Barnhill's president, an envelope with cash in the range of $25,000 to

                                          29                        02cv870-J (RBB)

1  $50,000 "if Witt would cause Barnhill to make a commitment for Peregrine software in the

2  amount of $3 million." (*Id.*)  The CC further alleges that Powanda and Peregrine knew that

3  Barnhill lacked sufficient financial resources to pay for the software without selling-through to

4  the end-user. (*Id.*)  Nevertheless, Peregrine prematurely booked this revenue in violation of

5  GAAP.  Although the CC identifies Powanda as having knowledge of the improper booking, it is

6  not clear to the Court how this confidential informant is in a position to make that determination.

7  In order for the Court to ascertain whether such individuals have a sufficient basis of knowledge,

8  the CC must "describe[] in the complaint with sufficient particularity . . . [how] a person in the

9  position occupied by the source would possess the information alleged." *Seebeyond*, 266 F.

10  Supp. 2d at 1158-59 (citing *Novak*, 216 F.3d at 313-14).  Here, Plaintiffs have failed to state in

11  great detail how this former ICW Group director possesses the information alleged.

12      Furthermore, although the transfer of money to Barnhill in conjunction with Barnhill

13  making the commitment to purchase software from Peregrine does seem somewhat suspicious,

14  this alone does not raise a strong inference of scienter.  The circumstances surrounding the

15  transfer of money to Barnhill are open to speculation.  The Court cannot rely on such conjecture

16  when determining whether a *strong* inference of scienter exists.  The CC must plead more facts

17  that tend to establish Powanda's state of mind with respect to this transaction.

18      Moreover, according to a former sales executive involved in sales to the Alliance Group,

19  "bad deals" placed at Barnhill reached $15 million. (CC ¶ 178.)  In order to write off

20  receivables relating to Barnhill purchase orders, Peregrine acquired Barnhill on March 24, 2000.

21  (*Id.*)  Following the acquisition, Peregrine "improperly buried the write-off in the line item

22  "Acquisition Costs and Other." (*Id.*)  The CC, however, fails to state in great detail that any

23  individual defendant knew or was deliberately reckless is not knowing of the improper nature of

24  such an accounting practices.  Accordingly, the pleadings involving Barnhill are not alleged with

25  sufficient particularity.

26

27          **8.    ICL**

28      Another transaction where revenue was improperly recognized involved ICL.  In this

alleged swap transaction, each entity prepared separate purchase contracts. (CC ¶ 179.)

Exhibit E
0406

1   According to a former Peregrine employee who was a product specialist in the InfraTools

2   business unit, while ICL ordered $3 to $4 million of Peregrine's Service Center and Asset Center

3   software products, Peregrine purchased software from ICL consisting of Peregrine Service

4   Center products that had been customized to follow IT Infrastructure Library ("ITIL") standards.

5   (*Id.*)  Peregrine, however, improperly booked ICL's order of Peregrine product in violation of

6   GAAP.  (*Id.*)  Nevertheless, no defendant has been named in relation to this transaction.

7   Moreover, the CC does not allege facts establishing a sufficient basis of knowledge with respect

8   to the former Peregrine employee.  Accordingly, the Court finds that the allegations concerning

9   ICL have not been adequately alleged.

10

11

12                              **9.      Critical Path**

13          In addition to the transactions described above, revenue was improperly recognized in a

14  swap transaction involving Critical Path Inc. ("Critical Path") in September 2000.  (CC ¶¶ 180,

15  181.)  According to David Thatcher ("Thatcher"), the former president of Critical Path, "[the]

16  transaction was driven by the need to report revenue . . . ."  (CC ¶ 180.)  In order "[t]o avoid the

17  appearance that the transaction was a software swap, Critical Path and Peregrine prepared

18  separate contracts for each purchase, each paid the full amounts owed, and made payment to

19  each other on different days."  (*Id.*)  Moreover, Thatcher acknowledged speaking directly to

20  Gardner about the software swap.  (*Id.*)  Thatcher further noted that persons "working on the

21  deal were *consciously* avoiding disclosure of the true nature of the transaction."  (*Id.*) (emphasis

22  added).  Additionally, the CC alleges that each company "swapped" software at approximately

23  $3 million from one another and booked the total value of the sale as revenue in violation of

24  GAAP.  (CC ¶ 181.)

25          Nevertheless, Defendant Gardner contends that the allegations fail to provide specifics

26  regarding the particular software and any facts suggesting that Gardner knew that the

27  transactions were not independent transactions.  (Pl. Gardner's Mem. P. & A. Supp. Mot.

28  Dismiss at 7.)  The CC sufficiently alleges the name of the company conducting the transaction

    with Peregrine and an individual with knowledge of the negotiations and purpose for the

                                                    31                              02cv870-J (RBB)

1  transaction. Moreover, Thatcher's statements imply that Defendant Gardner knew of the nature

2  of the transaction, as well as its effect of increasing revenue. Although the CC fails to allege

3  specifics about the software itself, the Court finds that Plaintiffs have sufficiently alleged

4  financial fraud relating to improper revenue recognition of the Critical Path transaction.

5  Defendant Gardner cites to an unpublished case from the Northern District of California

6  providing the necessary criteria for pleading improper revenue recognition. *See In re Oak Tech.*

7  *Sec. Litig.*, No. 96-20552, 1997 WL 448168, at * 8 (N.D. Cal. Aug. 1, 1997). There, the district

8  court required the plaintiffs to allege "particular transactions where revenues were improperly

9  recorded, including the names of the customers, the terms of the specific transactions, when the

10  transactions occurred, and the approximate amount of the fraudulent transactions." *Id.* Even

11  applying the factors listed in this decision, Plaintiffs need not describe the specific software

12  contained in the transaction. Accordingly, the Court finds that the software swap with Critical

13  Path has been pled with sufficient particularity with respect to Defendant Gardner.

14

15  **10.  Edward Jones**

16  According to a former Peregrine employee who was a Director of the ICW Group,

17  Defendant Powanda was "responsible" for an account with Edward Jones which "featured a $3-4

18  million pre-commitment that was booked inappropriately." (CC ¶ 182.) The CC, however, fails

19  to identify the dates of this improper revenue recognition. Accordingly, it cannot be ascertained

20  whether this transaction was recorded in any financial statements disseminated during the Class

21  Period. Moreover, the CC fails to allege facts that Defendant Powanda "knew or must have

22  been aware of the improper revenue recognition, [or] intentionally or knowingly falsified the

23  financial statements[.]" *DSAM*, 288 F.3d at 390-91. Furthermore, simply identifying the

24  confidential informant as a Director of the ICW Group does not state all facts forming the basis

25  of Plaintiffs' belief. Accordingly, the allegations involving Edward Jones are insufficient.

26

27  **11.  Corporate Software**

28  Although subject to contingencies, Peregrine booked revenue on a $3.5 million pre-

commitment transaction in March 2000 concerning Corporate Software. (CC ¶ 183.) A former

Exhibit E
0408

1   Peregrine employee who was a Director of the ICW Group recalled the following:

2        Chad White told me that in Q4, March 2000, his account Corporate Software, after
         Gardner and Spitzer talked with them, had entered into an additional $3.5 million
3        commitment.

4        White told me that Spitzer told him in the airport prior to meeting with this customer that
         Gardner had already negotiated the additional commitment and that the purpose of the
5        meeting was window dressing – and since the deal was already done by Gardner, nothing
         should be said or done to mess it up.

6

7   (*Id.*) Following a review of the confidential informant's comments, it does not appear that the

8   commitment was necessarily obtained in an effort to generate artificial revenue. Nevertheless,

9   the transaction was improperly recorded as revenue. Although the quoted excerpt fails to

10  establish scienter on the part of either Defendants Gardner or Spitzer, with respect to Defendant

11  Spitzer, the Court finds that his guilty plea raises a strong inference of scienter. Accordingly,

12  allegations involving this account with regard to only Defendant Spitzer are sufficient.

13

14               **12.    Citigroup**

15        Another purported transaction where revenue was improperly recognized relates to a deal

16  with Citigroup, Inc.'s Global Technology Infrastructure Group ("Citigroup"). (CC ¶ 184.)

17  Plaintiffs' source for this transaction is an e-mail from a Peregrine employee described in a Los

18  Angeles Times (the "Times") article on October 1, 2002. According to the Times' article,

19  although the sale was not actually completed until December 2000, "Peregrine [] booked the deal

20  in September 2000 after it got a nonbinding letter of acquisition from Citigroup." (*Id.*)

21  Nevertheless, the CC does not attribute knowledge of the improper booking of this transaction to

22  any individual defendant. Accordingly, this transaction has not been adequately pled.

23

24               **13.    Systematics AG**

25        In March 2001, Peregrine allegedly entered into a transaction with Systematics AG

26  ("Systematics"), a German software reseller. (CC ¶ 185.) Although Systematics agreed to

27  purchase $12 million of Peregrine software, the reseller received a side letter from Peregrine

28  which conditioned any payment obligation on the selling through to the end-user. (*Id.*) The CC

    specifically alleges that Sarah Forest, in-house counsel at Peregrine's IMEA operating division,

                                    33                          02cv870-J (RBB)

1  and Defendant Powanda "were involved in the issuance of the side-letter to Systematics." (*Id.*)

2  According to a former Peregrine employee in the Alliance Group, "Systematics had no intention

3  to pay – I had seen the side-letter which Spitzer and Cahill were also aware of – I had told them

4  that [Peregrine] should not have booked this transaction because Systematics had a side letter

5  from [Peregrine]." (CC ¶ 187.)  The confidential informant also noted:

6       In March 2002, I was on a conference call with Spitzer and Cahill trying to resolve this
         deal - Systematics told us they had no intention of paying and referred to their side letter
7       and Peregrine's commitment to either reduce the payment or drive business through
         Systematics.

8

9  (*Id.*)  Furthermore, according to a former Director of the Alliance Group, while in the office of

10  Defendant Gless, Gless and Andrew Cahill instructed that copies of the side letter be removed

11  from their offices because "neither of them wanted a copy in their office." (CC ¶ 186.)  Despite

12  the existence of a side-letter, Peregrine improperly booked all or a significant portion of the

13  Systematics transaction in March 2001 and subsequently "sold" the receivable to Fleet Bank.

14  (CC ¶ 188.)  According to a former employee in the Alliance Group, after booking a pre-

15  commitment transaction with Systematics in the amount of $12 million as an account receivable

16  in March 2001, Peregrine allegedly sold the receivable to Fleet Bank. (CC ¶¶ 187, 188.)

17  Although this does sufficiently allege improper accounting, there is no indication that the "sale"

18  of the receivable can be attributed to a specific defendant.

19       The pleadings concerning Systematics point fingers at three defendants: Powanda, Gless

20  and Spitzer.  Regarding Powanda, the CC fails to provide the Court with any facts forming the

21  basis for the belief that Powanda was involved with the issuance of the side-letter.  Moreover,

22  there are no facts alleged in the CC that suggest Powanda knew or was deliberately reckless in

23  not knowing of the improper revenue recognition.  With respect to Defendant Spitzer, however,

24  the CC does explicitly allege that he was aware of the side letter. (CC ¶ 187.)  Of equal

25  importance is the fact that the unnamed, confidential source informed Spitzer that the transaction

26  should not have been booked as revenue. (*Id.*)  Moreover, because the confidential informant's

27  knowledge stems from communications with Spitzer, as opposed to his job status within the

28  Company, the Court finds that the CC alleges sufficient details as to how this individual

possesses the information alleged. As a result, the averments against Spitzer concerning the

Exhibit E
0410

1  Systematics March 2001 transaction have been alleged with sufficient particularity. As to

2  Defendant Gless, the quoted excerpt strongly suggests that he wanted no affiliation with the

3  side-letter. The Court finds that Gless's reaction creates a strong inference that he knew of the

4  nature of the side-letter and its effect of conditioning payment on the sale of products to end-

5  users. Accordingly, the CC states a claim against Defendants Gless and Spitzer with adequate

6  particularity.

7          The Court's finding of sufficient allegations of scienter against Gless and Spitzer is

8  bolstered by their guilty pleas in concurrent criminal actions for various securities violations.

9  Pursuant to requests submitted by the Loran Plaintiffs and the Arthur Andersen Defendants, the

10  Court takes judicial notice of the records contained in Gless' criminal case, Criminal Case No.

11  03cr1090W. (Loran Plaintiffs' Req. for Judicial Notice, Exs. E, G, H; Arthur Andersen Req. for

12  Judicial Notice Exs. A, B; Stulac Req. for Judicial Notice and Notice of Lodgment Exs. 1, 2.)

13          In his criminal case, Gless pled guilty to one count of conspiracy and one count of fraud.

14  (Gless Plea Agreement at 1-2.) Specifically, Defendant Gless admitted that he "signed and

15  submitted the [] financial reports, knowing that they contained materially false statements and

16  omissions and intending to deceive and defraud the securities analysts, the SEC, the investing

17  public, and other who rely upon them[.]" (*Id.* ¶ 9.) Moreover, Gless admitted that he signed

18  more than nine management representation letters sent to Peregrine's independent auditors that

19  Peregrine's financial statements were in accordance with GAAP. (*Id.* ¶ 10.) Furthermore, Gless

20  admitted that he and "other members of Peregrine's management team" would meet near the end

21  of each quarter to determine how much more revenue was needed to meet securities analysts'

22  expectations, and subsequently create fraudulent transactions and book the revenue in violation

23  of GAAP. (*Id.* ¶ 12.) Additionally, as a means of lowering Peregrine's DSO, Gless admitted

24  that he "directed Peregrine employees to remove aging receivables from Peregrine's balance

25  sheet by selling them to banks at quarter end." (*Id.* ¶ 15.) Gless also admitted to conspiring with

26  Cappel to create a false invoice in order to perpetrate a sale of an account receivable to Wells

27  Fargo HSBC Trade Bank, N.A., dated June 29, 2001, for $19,580,596. (*Id.* ¶ 18.) These

28  admissions corroborate the Court's finding that allegations of Gless' state of mind with respect

to the Systematics AG transaction are sufficient.

02cv870-J (RBB)

Exhibit E
0411

1

### 14.    Action Computer Supplies

2  Another swap transaction involved a deal with Action Computer Supplies ("Action

3  Computer") in 2001. (CC ¶ 189). According to a former Peregrine employee who was a product

4  specialist in the InfraTools business unit, Action Computer submitted an order for $10 million of

5  Peregrine software which was improperly booked as revenue. (*Id.*) In order to complete the

6  barter, Peregrine placed an order for the rights to Action Computer's XML based component

7  catalog for Peregrine software. (*Id.*) Despite these allegations, the CC fails to connect the

8  transaction with an individual defendant and thus fails to raise a strong inference of scienter as

9  required in Rule 10b-5 claims.

10

11

### 15.    Prokom Software

12  In June 2001, Peregrine entered into an agreement with Prokom Software, S.A.

13  ("Prokom"), a Polish company, in which Prokom agreed to resell $10 million in Peregrine

14  software to end-users. (CC ¶ 190.) Prokom received a side letter from Richard Day, the head of

15  Peregrine's Emerging Markets business in Eastern Europe and Africa, stating that Prokom need

16  not pay Peregrine if the software could not be sold through to end-users. (*Id.*) To support this

17  allegation, the CC includes statements from a former Peregrine employee who was a product

18  specialist in the InfraTools business unit, a former Peregrine employee that was in sales, and a

19  former Director of the Alliance Group. (CC ¶¶ 190-192.) Although these confidential

20  informants do implicate various Peregrine employees having knowledge of side-letters, the CC

21  fails to identify any defendants possessing the requisite state of mind for this specific

22  transaction. Accordingly, the CC fails to state a claim in accordance with the PSLRA and Rule

23  9(b).

24

25

### 16.    eXchangeBridge

26  EXchangeBridge, Inc. ("EXB") is a provider of electronic and paper transaction

27  processing services to the food brokerage industry. (CC ¶ 194.) As of February 2001, Peregrine

28  owned approximately 78% of the preferred stock (with voting rights) in this corporation. (CC ¶

195.) Moreover, two members of Peregrine management, including Defendant Nelson,

02cv870-J (RBB)

Exhibit E
0412

1  constituted of two-thirds of EXB's board of directors. (*Id.*) The CC alleges that Nelson, on

2  behalf of Peregrine, agreed to purchase an EXB note and another debt owed to Crossmark, a

3  customer of EXB, for $1.5 million in Peregrine stock. (CC ¶ 197.) In exchange for the

4  purchase, Crossmark agreed to "purchase" roughly $1.6 million of software from Peregrine

5  through EXB. (CC ¶ 198.) According to the CC, "Nelson insisted that EXB – and thus

6  Peregrine – recognize the full $1.6 million software license fee immediately in the June 2001

7  quarter despite the fact that the transaction was nothing more than a contingent swap

8  transaction." (CC ¶ 199.) Further, the CC alleges that EXB's CFO was fired after objecting to

9  Nelson's accounting treatment. (*Id.*) Although the CC does provide the Court with several

10  details concerning the EXB swap transaction, the CC fails to provide the Court with a sufficient

11  basis of knowledge. Plaintiffs do not set forth any facts forming the basis of their belief.

12  Moreover, the CC fails to allege facts indicating that Defendant Nelson "knew or must have

13  been aware of the improper revenue recognition . . .." *DSAM*, 288 F.3d at 391. Accordingly, the

14  EXB transaction has not been properly pled.

15

16  ### 17.  MGX

17      The CC alleges that MGX, a South African reseller of Peregrine software, entered into a

18  pre-commitment transaction with Peregrine in 2001 for software in the value of roughly $2

19  million. (CC ¶ 200.) In violation of GAAP, however, Peregrine booked the deal as revenue

20  although "MGX was not obligated to pay Peregrine until the software was sold-through to the

21  end-user." (*Id.*) Despite internal discussions of MGX's lack of performance on this transaction,

22  Peregrine received another order from MGX for software in September 2001 in the amount of

23  $12 million. (CC ¶ 201.) Like the first order, Peregrine booked the $12 million pre-commitment

24  as revenue. (CC ¶ 204.) According to both a former Peregrine employee, who was a product

25  specialist in the InfraTools business unit, and a former Director of the Alliance Group, MGX

26  received side letters indicating that the payment obligation was contingent on selling-through to

27  the end-user. (CC ¶¶ 202, 203.) Nevertheless, the CC fails to demonstrate that any defendant

28  possessed the requisite scienter for the improper booking of revenue. The CC does not identify a

single defendant as having any involvement with these transactions. Moreover, it is not clear

Exhibit E
0413

1  how the confidential informants possess the information alleged.

2

3  ### 18.    RTG

4  The CC alleges that Peregrine improperly recognized revenue on a transaction in March

5  2001 with Rainier Technology Group ("RTG"), where RTG agreed to purchase one of

6  Peregrine's software packages, Xanadu, for $2 million. (CC ¶ 205.) According to a former

7  senior officer of a Peregrine seller involved with this transaction, between December 2001 and

8  March 2002, he informed several individuals at Peregrine, including Defendant Gardner, that

9  "Xanadu was not engineered and did not work and that it was at least one year away from being

10  able to be sold off the shelf . . . ." (CC ¶ 206.) This confidential informant also told these

11  individuals at Peregrine that "RTG had no revenues, no D&B, was a shell company and would

12  be bankrupt before the invoice arrived." (*Id.*) This individual further noted:

13  > I also told them that I had heard that they had booked this transaction as revenue in Q4,
   > 2001 and that I was really surprised as such. It was a little later that they re-approached

14  > us offering us luxury box seats to the Buick Open to ostensibly keep the lid on this matter.

15  (*Id.*) The Court finds that the allegations involving this transaction are sufficiently alleged

16  because the CC identifies the date of the transaction and the software involved in the deal.

17  Moreover, the fact that the unnamed former employee purportedly informed Gardner of the

18  improper accounting treatment of the RTG transaction in Q4 2001 establishes a strong inference

19  that Gardner was fully aware of the its improper booking.

20

21  ### 19.    FM International

22  According to a former member of the Alliance Group, in September 2001, Peregrine

23  obtained a $2 million commitment from FM International ("FM") and booked the transaction as

24  revenue despite sending FM a side letter. (CC ¶ 208.) In fact, the CC alleges that Defendant

25  Spitzer authored the side letter to FM's President Mark Douglas stating that payment was not

26  required unless the product sold-through to the end-user. (*Id.*) Although the CC identifies

27  Spitzer as authoring the side letter, it is not apparent that Spitzer had knowledge of the improper

28  accounting treatment for this transaction. The allegations relating to the FM transaction are

distinguishable from the Systematics transaction, which the Court concludes satisfies the

Exhibit E
0414

1  heightened pleading standards of the PSLRA and Rule 9(b). In contrast to the Systematics

2  transaction, the CC fails to alleges that Defendant Spitzer knew about the booking of the FM

3  transaction as revenue. Nevertheless, the Court finds that Spitzer's criminal records raise a

4  strong inference of scienter. Accordingly, the allegations involving FM with respect to

5  Defendant Spitzer are sufficient.

6

7                      **20.   Fujitsu**

8      Another software swap transaction involved Fujitsu Transactional Services ("Fujitsu") in

9  December 2001. (CC ¶ 210.) In exchange for Fujitsu's purchase of $10 million worth of

10  Peregrine products, Peregrine was to provide "solution" software to Fujitsu. (*Id.*) According to

11  a former Peregrine employee who was a Senior Manager, Strategic Corporate Accounts, "Fujitsu

12  was getting invoices from Peregrine but was not paying Peregrine[,] [and] Peregrine was getting

13  invoices from Fujitsu but was not paying Fujitsu." (CC ¶ 211.) Moreover, this confidential

14  informant recalled the following:

15         I realized in March 2002 that Fujitsu was not paying its invoices to Peregrine and I was
           not certain that we should continue to provide support services. I went to a financial
16         analyst in the Finance department who was responsible for invoices to inquire about this
           situation. I was shown two invoices with notes written in pen and signed by Matt Gless
17         on each invoice stating that Peregrine was waiving the fees owed by Fujitsu in lieu of
           services. The note stated that it was "ok" that Fujitsu did not have to pay and the service
18         was not rendered. The two invoices were put into the accounting system as revenue,
           however. The company's finance person traced the 2 Fujitsu invoices accounting to
19         $500,000 to $1 million each in the system that had not been paid and showed me that they
           ha[d] been posted as revenue - yet I knew that Fujitsu was not paying Peregrine.
20

21  (*Id.*) The allegations concerning this transaction tend to indicate that Defendant Gless was

22  aware of the swap transaction. Although the CC, by itself, fails to establish a strong inference

23  that Gless knew or must have known of the improper revenue recognition, the Court may

24  consider documents subject to judicial notice. *Mack*, 798 F.2d at 1282. Because the Court has

25  taken judicial notice of Gless's criminal records relating to his activities at Peregrine, the Court

26  finds that Plaintiffs have raised a strong inference of scienter with respect to this transaction.

27

28

Exhibit E
0415

1

**21.    British Telecom**

2    The final transaction alleged to have involved improper revenue recognition relates to

3    British Telecom ("BT"). (CC ¶ 213.) In a deal involving a reported $30 million, BT agreed to

4    purchase Xanadu and Peregrine's Service Center product. (*Id.*) According to a former Peregrine

5    employee who was a product specialist in the InfraTools business unit, Defendants Gardner and

6    Luddy knew that Xanadu was not yet ready for delivery. (*Id.*) Despite the fact that Xanadu

7    would not be ready for release for several months, Defendant Luddy recommended releasing the

8    product to BT. (*Id.*) BT, however, refused to accept this prematurely delivered product. (*Id.*)

9    Peregrine nevertheless booked the transaction as revenue. (*Id.*) Although the CC alleges that

10   Defendants Luddy and Gardner knew that Xanadu was not ready for release, and that Luddy still

11   recommended its release, these facts do not demonstrate that either individual possessed the

12   requisite mental state for the improper accounting treatment of this transaction. Accordingly, the

13   Court finds that the CC has not sufficiently alleged accounting fraud for this transaction.

14

15   **2.    Holding the Books Open Past the Quarter's End**

16   In addition to improper revenue recognition, the CC alleges that Peregrine would

17   routinely keep its quarters open "in order to maintain the appearance of revenue growth . . .,

18   sometimes for as long as seven (7) days." (CC ¶ 215.) In fact, the Company has admitted that it

19   "recorded numerous transactions as revenue in a given period, although the sales order was not

20   completed until after the end of the fiscal period." (CC ¶216.) According to a former member

21   of the Alliance Group, "[s]tarting in 1999, Spitzer would tell me each quarter that if I had any

22   outstanding deals pending, that I had a few extra days after the month's end in the quarter to

23   process them . . . ." (CC ¶ 217.) This unnamed individual further recalled the following:

24       It was an ongoing joke in the company and was referred to as being the 34th or 35th of
         the month. It got worse quarter by quarter after 2000 when the prevailing attitude in the
25       company was that we had to make our quarters at all costs.

26   (CC ¶ 218.) Additionally, the CC includes the statements of two other former Peregrine

27   employees and the practice of keeping quarters open during the Class Period. (CC ¶¶ 219, 220.)

28   Nevertheless, the CC does not identify a single transaction that was booked as revenue while a

quarter was kept open. Accordingly, the Court finds the CC's allegations involving keeping

40

02cv870-J (RBB)

Exhibit E
0416

1  quarters open to be insufficient as stated in their present form.

2

3          **3.    Improper Balance Sheet Accounting**

4          The CC alleges that Peregrine improperly treated several of its accounts receivable. (CC

5  ¶¶ 8, 18, 31, 69, 77, 223-226, 227-230.)  In violation of GAAP, the Company regularly treated

6  loans as sales of accounts receivables.  This reduction in its accounts receivable enabled

7  Peregrine to conceal its contingent sales and understate its debt on financial statements and the

8  accounts receivables on its balance sheet by as much as $180 million. (CC ¶¶ 8, 9.)  Moreover,

9  the understatement of the Company's accounts receivables decreased its DSO, a value utilized

10 by investors and securities analysts to ascertain the quality of a company's reported revenue.

11 (CC ¶ 9.)  Additionally, the understatement of accounts receivable allowed the Company to

12 retain cash that might otherwise have been used to pay down its liabilities.  (CC ¶¶ 226-28.)

13 This practice was not disclosed in Peregrine's public statements.  (CC ¶ 223.)

14         Moreover, under GAAP, classifying a write-off of an account receivable in the expense

15 category of "Acquisition costs and other" is improper.  (CC ¶ 231.)  Nevertheless, Peregrine

16 admitted that "[m]any accounts receivable balances arising from improperly recorded revenue

17 transactions . . . were inappropriately charged to bad debt expense, cost of acquisitions or

18 accrued liabilities."  (CC ¶ 232.)  In addition to concealing write-offs of accounts receivable, the

19 Company admitted to understating the value of its stock option compensation by approximately

20 $100 million.  (CC ¶ 233.)

21         With regard to the treatment of various accounts receivables, in general terms, the CC

22 alleges that "Defendant Gless, after consultation with defendant Gardner, instructed Ilse Cappel,

23 Peregrine's Senior Treasury Manager, to remove receivables from the Company's balance sheet

24 by 'selling' them to banks at the end of the quarter." (CC ¶ 223.)  Moreover, the CC states that,

25 near the end of the quarter ending June 30, 1999, "Cappel, defendant Gless, and other Peregrine

26 personnel prepared invoices for transactions, which had not yet closed, in the total amount of

27 $12 million, and then sold them to banks." (CC ¶ 224.)  The CC further alleges that Gless

28 approved of Cappel creating a false invoice in the amount of $19.58 million and selling it to a

bank in June 2001. (CC ¶ 225.)  Moreover, looking to Gless' plea agreement from his criminal

Exhibit E
0417

1  case, Gless admitted that he "directed Peregrine employees to remove aging receivables from

2  Peregrine's balance sheet by selling them to banks at quarter end." (Gless Plea Agreement ¶

3  15.) Specifically, Gless admitted to conspiring with Cappel to create a false invoice in order to

4  perpetrate a sale of an account receivable to Wells Fargo HSBC Trade Bank, N.A., dated June

5  29, 2001, for $19,580,596. (*Id.* ¶ 18.)

6        Pursuant to requests filed by the Loran Plaintiffs, Arthur Andersen, and Stulac, the Court

7  takes judicial notice of the records in the criminal action against Cappel in Criminal Case No.

8  02cr3014W. (Loran Req. for Judicial Notice Exs. A, B, C, D; Arthur Andersen Req. for Judicial

9  Notice Exs. C, D; Stulac Req. for Judicial Notice and Notice of Lodgment Exs. 3, 4.) In that

10  action, the parties entered into a plea agreement where Cappel pled guilty to conspiracy to

11  commit bank fraud. (*See* Loran Plaintiffs' Req. for Judicial Notice Ex. B ("Cappel Plea

12  Agreement").) As part of the conspiracy, Cappel admitted the following:

13      [She] fabricated a Peregrine invoice to KPMG Consulting LLC, dated June 29, 2001, for
$19,580,596, that was sold to Wells Fargo HSBC Trade Bank, N.A., as if it were a valid,
14      enforceable account receivable, based on a completed transaction with KPMG
Consulting, when in actual fact, it was not, because Peregrine had no valid contract with
15      KPMG Consulting LLC at that time for that amount under those terms.

16  (*Id.* ¶ 7.) Without the same specificity, the CC does allege that Cappel was involved with the

17  improper booking of this transaction. Based upon Defendants Gless and Cappel's plea

18  agreements, the Court finds that the sale of the receivable to Wells Fargo has been sufficiently

19  alleged.

20

21  **C.**    **The Group Published Doctrine**

22        According to the Loran Plaintiffs, statements made in press releases and SEC filings may

23  be attributed to Defendants Gardner, Gless, Cappel, Powanda, Spitzer, Nelson, Luddy, and

24  Moores by virtue of their positions in the Company. (Loran Opp'n at 19-20.) In pre-PSLRA

25  actions, courts could presume that false or misleading public statements issued by a company are

26  collectively made by the officers of that company.[10] *In re GlenFed, Inc.*, 60 F.3d 591, 593 (9th

27

28        [10] The group published doctrine typically applies to prospectuses, registration statements, annual
reports, and SEC filings, but does not apply to analyst reports. *Allison v. Brooktree Corp.*, 999 F. Supp.
1342, 1350 (S.D. Cal. 1998) (Miller, J.).

Exhibit E
0418

1    Cir. 1995). Application of this doctrine was limited to only those defendants that either

2    "participated in the day-to-day corporate activities or had a special relationship with the

3    corporation, such as participation in preparing and communicating group information at

4    particular times." *Id.* Following passage of the PSLRA, courts have struggled to determine

5    whether the doctrine continues to be viable. *See, e.g., In re Homestore.com Inc. Sec. Litig.*, 252

6    F. Supp. 2d 1018, 1031 (C.D. Cal. 2003). In *Homestore.com*, the district court addressed the

7    validity of the doctrine. 252 F. Supp. 2d at 1031. Following a review of other district court

8    cases in the Ninth Circuit, the court held "at a minimum, plaintiffs must explain the nature of the

9    misrepresentation in the published statement, and establish that the defendants were involved in

10    the day-to-day management of those parts of the corporation involved in the alleged fraud." *Id.*

11    (citing *Pegasus Holdings v. Veterinary Ctrs. of Am., Inc.*, 38 F. Supp. 2d 1158, 1166 (C.D. Cal.

12    1998)). Moreover, when analyzing the liability of an individual defendant under the "group

13    published doctrine," "plaintiffs must indicate the statements that they contend fall under the

14    doctrine." *Homestore.com*, 252 F. Supp. 2d at 1031 (citing *In re Autodesk, Inc. Sec. Litig.*, 132

15    F. Supp. 2d 833, 846 (N.D. Cal. 2000)).

16       Nevertheless, courts in this district have held that the vitality of the "group published

17    doctrine" is suspect. *See Allison*, 999 F. Supp. at 1350; *In re Dura Pharm., Inc. Sec. Litig.*, No.

18    99CV0151-L (NLS), 2000 WL 33176043, at *11 (S.D. Cal. July 11, 2000) (Lorenz, J.); *In re*

19    *Ashworth, Inc. Sec. Litig.*, No. 99CV0121-L (JAH), 2000 WL 33176041, at *12 (S.D. Cal. July

20    18, 2000) (Lorenz, J.). In *Allison*, the Honorable Jeffrey T. Miller stated, "[t]o permit a judicial

21    presumption as to particularity simply cannot be reconciled with the statutory mandate that

22    plaintiffs must plead specific facts as to each act or omission by the defendant." 999 F. Supp. 2d

23    at 1350. Judge Miller further noted that the "group published doctrine" improperly permits an

24    inference "based solely on defendant's status as an officer or director of a corporation." *Id.* It is

25    not reasonable to presume in every case that every officer joined in the scheme to defraud

26    investors. *Id.* The Honorable M. James Lorenz agreed with Judge Miller's rationale in his two

27    rulings on the issue, but noted that "there may be circumstances where it would be appropriate to

28    attribute statements to a group of defendants, such as where a corporations's officers and

directors are few in number and made corporate decisions on a group basis. *Dura*, 2000 WL

Exhibit E
0419

1  33176043, at *11 n. 6; *Ashworth*, 2000 WL 33176041, at *12 n. 3. This Court finds the rationale

2  set forth in *Allison, Dura*, and *Ashworth* to be persuasive. Permitting plaintiffs to attribute

3  statements to a group of individuals does not comply with the PSLRA, which requires plaintiffs

4  to allege that "*the* defendant" made a misleading statement or omission. *See* 15 U.S.C. § 78u-

5  4(b) (emphasis added). Accordingly, the Court holds that Plaintiffs must state facts with

6  particularity tying each alleged false and misleading statement to an individual defendant. Thus,

7  the group pleading doctrine does not save the transactions which fail to allege involvement of a

8  particular defendant.

9

10      **D.     Scheme Theory of Liability**

11          As to defendants that are not alleged to have made any false or misleading statements, the

12  Loran Plaintiffs contend that any fraudulent conduct in connection with the purchase or sale of

13  securities is actionable. (Loran Opp. at 21.) In essence, the Loran Plaintiffs seek to hold non-

14  speaking defendants liable for engaging in a "course of business" or a "device, scheme, or

15  artifice" that operates as a fraud. *See Affiliated Ute Citizens v. U.S.*, 406 U.S. 128, 152-53

16  (1972). A scheme theory of liability is "fundamentally inconsistent with judicial interpretations

17  of section 10(b)[.]" *Pegasus Holdings v. Veterinary Ctr. of Am., Inc.*, 38 F. Supp. 2d 1158, 1164

18  (C.D. Cal. 1998). Section 10(b) "prohibits only the making of a material misstatement (or

19  omission) . . . or the commission of a manipulative act." *Central Bank of Denver v. First*

20  *Interstate Bank of Denver*, 511 U.S. 164, 191 (1994).

21          Although courts have found liability where the actor is a non-speaking corporate insider,

22  *Cooper v. Pickett*, 137 F.3d 616, 624-25 (9th Cir. 1998); *Howard v. Everex Sys. Inc.*, 228 F.3d

23  1057 (9th Cir. 2000), *Central Bank* requires that a plaintiff allege facts that demonstrate a

24  primary violation of Section 10(b) by each and every defendant. *Central Bank*, 511 U.S. at 191.

25  Individual defendants who actually "employ" the scheme to defraud investors are considered

26  "primary violators." *Id.; see also Homestore*, 252 F. Supp. 2d at 1040. In contrast, persons who

27  merely participate in or facilitate the scheme are "secondary violators." *Homestore*, 252 F.

28  Supp. 2d at 1040. Because the Supreme Court has held that there is no "aidor and abettor"

liability under Section 10(b), only primary violators may be held liable under Section 10(b).

Exhibit E
0420

1  *Central Bank*, 511 U.S. at 191. Accordingly, defendants who have not been alleged to have

2  made any false or misleading statements, may not be held liable under the Loran Plaintiff's

3  "scheme" theory of liability.[11]

4

5      **E.    Peregrine's SEC Filings**

6      Several defendants contend that they are not alleged to have been involved with any of

7  the twenty-one transactions described above in which revenue was improperly recognized. To

8  this end, these defendants argue that they never made a public misstatement. (*See, e.g.,* Moores

9  P. & A. at 6-7; Moores Reply at 2.) Rather, the extent of their involvement with the alleged

10  fraud is that their signatures appear on various SEC filings. Specifically, the CC alleges that

11  Defendants Gless, Gardner, Moores, Noell, van den Berg, Watrous, and Hosley signed the Form

12  10-K for Fiscal Year 2000, (CC ¶ 343); Defendants Gardner, Gless, Moores, Cole, Hosley,

13  Noell, van den Berg, and Watrous signed Amendment No. 1 to the Form S-4 Registration

14  Statement filed on May 22, 2000, (CC ¶ 346); Defendants Gless, Gardner, Moores, Noell,

15  Watrous, and Savoy signed the Form 10-K for Fiscal Year 2001, (CC ¶ 402); and Defendants

16  Gardner, Gless, Moores, Cole, Noell, Savoy, and Watrous signed Amendment No. 1 to the Form

17  S-4 Registration Statement filed on July 23, 2001. (CC ¶ 409.) The Loran Plaintiffs argue that

18  liability attaches to any defendant that signed a SEC filing. (Loran Opp'n at 20-21).

19  Accordingly, the Court must determine whether a signature on a SEC filing containing false

20  financial information constitutes making a public misstatement.

21      "Key corporate officers should not be allowed to make important false statements

22  knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to

23  be involved in the preparation of those statements." *Howard v. Everex*, 228 F.3d 1057, 1062

24  (9th Cir. 2000). "While a signature alone may not be enough to establish liability, the signing of

25  _____

26  [11] The Loran Plaintiffs claim that "[t]he Ninth Circuit has long embraced the principle that making a false or misleading statement is not the only way a defendant may be liable under § 10(b) and Rule 10b-5." (Loran Opp'n at 22). In support of this assertion, the Loran Plaintiffs cite to language in

27  *Am. West*, where the Ninth Circuit stated, "Section 10(b) and Rule 10b-5 are not limited to misrepresentations or omissions of material fact. . . Thus, the fact that [] [a defendant did not] ma[ke]

28  any of the allegedly misleading statements does not shield them from liability." 320 F.3d at 937. In *Am. West*, the Ninth Circuit was referring to establishing Section 10(b) liability by means of insider trading. Insider trading is addressed in Section L of Part I of this Order.

02cv870-J (RBB)

Exhibit E
0421

1 [the company's] filing does establish that [an individual] made 'statements' within the meaning

2 of the act and the rule." *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1033 (C.D.

3 Cal. 2003). Because the SEC filings contained the false financial statements at issue, the Court

4 finds that the defendants signing SEC filings did make a false or misleading statement to the

5 public. *See Howard*, 228 F.3d at 1061-63 (finding that "a corporate official . . . who, acting

6 with scienter, signs a SEC filing containing misrepresentations, 'make[s]' a statement so as to be

7 liable as a primary violator under § 10(b)[]"); *AUSA Life Ins. Co. v. Dwyer* (*In re JWP Inc., Sec.*

8 *Litig.*), 928 F. Supp. 1239, 1255-56 (S.D.N.Y. 1996) (holding that a director with the requisite

9 level of scienter that signs a Form 10-K may be held liable as a primary violator under Section

10 10(b)). Such a finding, however, does not impose Section 10(b) liability unless Plaintiffs can

11 establish scienter.

12

13     **F.    Peregrine's Press Releases**

14     Following the end of each fiscal quarter, the CC alleges that Peregrine issued a press

15 release concerning the Company's financial results for that quarter. (*See, e.g.*, CC ¶ 361). The

16 press release typically would announce the total revenue for the quarter and include a quote from

17 Defendant Gardner. For example, on October 24, 2000, Peregrine issued a press release in

18 which Gardner was quoted as saying the following:

19         We had a remarkable quarter of growth in our infrastructure management solutions and
        Get.It! employee self service solutions. This quarter saw a large number of new products,

20         technology, and alliances come to fruition, further establishing the basis for continued
        growth into the future.

21

22 (CC ¶ 361.) Statements included in the press release, other than the language directly quoted by

23 Defendant Gardner, may not be attributed to an individual defendant because the PSLRA

24 requires more particularized pleading than allowed by the pre-PSLRA "group published

25 doctrine." *See Allison*, 999 F. Supp. at 1350. Similarly, the CC fails to allege statements made

26 by specific individuals during conference calls, which formed the basis for statements made in

27 analysts' reports. Liability for the quoted language, however, requires further discussion.

28     The CC alleges that Gardner's statements in the press release were materially false and

misleading because Peregrine's reported revenue was materially overstated. (CC ¶ 362.)

      02cv870-J (RBB)

Exhibit E
0422

1    Defendant Gardner contends that his comments were merely expressions of optimism, or

2    "puffing." (Gardner P. & A. at 9.)  As a general rule, general statements of corporate optimism

3    are not actionable.  *See, e.g., Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal.

4    1998).  "Vague, amorphous statements are not actionable because reasonable investors do not

5    consider 'soft' statements or loose predictions important in making investment decisions." *Id.*

6    (citing *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993)).  Unless a statement

7    would significantly alter the total mix of information available to investors, it does not matter

8    how untrue a statement may be. *Id.* (citations omitted).  Nevertheless, whether a public

9    statement constitutes puffing is a "fact specific question that should ordinarily be decided by a

10   jury." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996).  "[O]nly if the adequacy

11   of the disclosure or the materiality of the statement is so obvious that reasonable minds [could]

12   not differ are these issues appropriately resolved as a matter of law." *Fecht v. Price Co.*, 70 F.3d

13   1078, 1081 (9th Cir. 1995) (citations omitted).  Defendant Gardner's statements in the October

14   24, 2000 press release, as well as the other press releases referenced in the CC, lack specificity

15   and likely were not relied upon by a reasonable investor making an investment decision.

16   However, because it cannot be said that no investor would rely on Gardner's statements, the

17   Court finds that the CC has sufficiently alleged materiality.

18

19   **G.    Liability Involving Securities Analysts' Statements**

20        At the end of each of Peregrine's reporting quarters, the CC alleges that Peregrine

21   management, led by Defendant Gardner, held a conference call with investors and securities

22   analysts concerning Peregrine's quarterly performance.  (*See* CC ¶¶ 282, 303, 316, 337, 352,

23   364, 376, 397, 413, 431, 447.)  For example, following the issuance of a press release for Q2

24   2001, Defendant Gardner led a conference call with investors and securities analysts.  (CC ¶

25   364.)  During this call, the CC alleges that "Peregrine management" stated that the Company

26   expected an increase in cash flow over the second half of Fiscal Year 2001, accounts receivable

27

28

Exhibit E
0423

1    rose to $165 million, and the DSO fell from 122 days to 106 days.[12] (CC ¶ 364.) Following the

2    conference call, CIBC issued its report rating Peregrine stock as a "buy." (CC ¶ 365.) In its

3    report, CIBC indicated the following:

> On the balance sheet, cash declined to $35.2 million from $70 million. The decrease
> resulted from cash acquisition costs relating to the Harbinger transaction. Management
> expects the company to be cash flow positive during the second half of the year, but this
> is a situation that we will continue to monitor. Accounts receivable rose to $165 million
> from $128 million, but DSOs fell to 106 from 122. The decline was related to
> management's efforts to better control DSOs from the recently acquired e-commerce
> business. Management is focused on achieving further reductions and expects DSOs to
> fall to the 95-100 level in the third-quarter.

9    (*Id.*)

10    An insider defendant can be liable for analysts' reports if the defendant either (1) makes

11    false or misleading statements to analysts "with the intent that the analysts communicate those

12    statements to the market," *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1998); or (2) puts his or

13    her imprimatur on the analysts' statements. *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th

14    Cir. 1996). Because Plaintiffs have not alleged that any of the defendants endorsed the analysts'

15    public statements, it appears that Plaintiffs contend that Defendants are liable under the first

16    theory. However, even under the first theory, Plaintiffs' allegations fall short of the PSLRA's

17    requirements. Although Plaintiffs do identify some statements made during the conference call,

18    Plaintiffs allege only that information contained in the analysts' reports was "based on the

19    conference call with Peregrine management." (CC ¶ 365.) Alleging that the statements were

20    made by "Peregrine management" does not suffice. *See In re Secure Computing Corp. Sec.*

21    *Litig.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001) (plaintiffs adequately pled liability for analyst

22    report under *Cooper* theory by identifying defendant's false statement to analysts, their locations,

23    the speakers, the content of the statements, and the specific time and place it was made).

24    Because the CC fails to allege specific statements made by particular individuals, the Court finds

25    that allegations concerning the analyst reports are inadequate under the PSLRA.

26    ///

27    ///

28

---

[12] "Peregrine management" includes Defendants Gardner, Gless, Cappel, Nelson, Spitzer,
Powanda and Luddy. (CC ¶ 49(a))

02cv870-J (RBB)

Exhibit E
0424

1    **H.    Allegations that the Peregrine Defendants "Read and Approved" Press**
         **Releases and SEC Filings**

2

3        According to the CC, the "Peregrine Defendants"[13] and Arthur Andersen read and

4    approved several press releases and SEC filings.[14]  (*See* CC ¶¶ 281, 293, 302, 312, 315, 322,

5    336, 345, 351, 360, 363, 372, 375, 387, 392, 396, 406, 412, 424, 430, 443, 446, 455, 465.)

6    Following these allegations, the CC states in a conclusory fashion that "[e]ach of these

7    defendants either knew or were deliberately reckless in not knowing that the financial

8    information contained [therein] . . . was materially false and misleading . . .." *See, e.g.,* CC ¶

9    302.)  The Court, however, finds that the CC fails to describe the role of each of the Peregrine

10   Defendants in reviewing the Company's financial statements with sufficient particularity. *See In*

11   *re Oak Tech. Sec. Litig.*, No. 96-20552 SW, 1997 WL 448168, * 11 (N.D. Cal. Aug. 1, 1997)

12   (finding allegations that members of the Audit Committee "reviewed and approved the issuance

13   of Oak's false financial statements" to be insufficient).  Moreover, the fact that the Peregrine

14   Defendants reviewed these documents does not establish a strong inference that each individual

15   knew or must have known that revenue was improperly recognized. *Reiger v. Price Waterhouse*

16   *Coopers LLP*, 117 F. Supp. 2d 1003, 1010 (S.D. Cal. 2000) (Whelan J.) (citing *In re Software*

17   *Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994) (finding no scienter where "the plaintiffs

18   presented no direct evidence that [the defendant] knew or recklessly disregarded errors in the

19   financial statements; and noting the lack of any facts suggesting actual awareness of revenue

20   improprieties, such as "letters, notes, memos, telephone calls, or conversations[.]").  Even access

21   to internal data reflecting company wrongdoing is insufficient to create an inference of

22   deliberate or conscious recklessness.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th

23   Cir. 2002).  The Court further notes that allegations against Defendant Moores reflecting his

24   purported "hands-on" managerial style are similarly deficient.  *Vantive*, 283 F.3d at 1088

25   (finding general allegations about a "hands-on" management style to be insufficient).  In order to

26   comply with *Silicon Graphics*, Plaintiffs must "plead, in great detail, facts that constitute strong

27   _____

28   [13] The Peregrine Defendants include Gardner, Gless, Cappel, Powanda, Spitzer, Nelson, Luddy,
     Moores, Noell, van den Berg, Watrous, Hosley, and Savoy. (CC ¶ 49.)

     [14] Several allegations specifically exclude Defendants Savoy, Hosley, and van den Berg.

                                              49                          02cv870-J (RBB)

1   circumstantial evidence of deliberately reckless or conscious misconduct." 183 F.3d at 974.

2   Thus, broad allegations that an individual read and approved Peregrine's financial statements,

3   without more, does not comply with the pleading requirements of Rule 9(b) and the PSLRA.

4

5   **I.**    **Peregrine's Alleged Lack of Internal Accounting Controls and a Functioning Audit Committee**

6

7   Notwithstanding Defendants Moores and Cole, every Peregrine director identified in the

8   CC served as a member of Peregrine's Audit Committee. (CC ¶49(j)-(p).) Defendants Watrous,

9   Noell, van den Berg, Hosley, and Savoy each held a position on the Audit Committee during at

10   least a portion of the Class Period. (*Id.*) The purpose of the Audit Committee was "to review

11   with the Company's management such matters as internal accounting controls and procedures,

12   the plan and result of the annual audit, and suggestions of the accountants for improvement in

13   accounting procedures [and] to nominate independent accountants." (CC ¶ 121.) The Peregrine

14   Board of Directors had adopted a written Charter to govern the Audit Committee. (*See* CC ¶

15   122.) Pursuant to the Charter, the Audit Committee was mandated to hold a meeting at least

16   three times per year and maintain minutes of the meetings. (CC ¶ 123.) Because no meetings

17   were held during Fiscal Years 1999 and 2000, coupled with the inability of Peregrine

18   management to produce minutes for meetings in Fiscal Year 2001 upon request, the CC alleges

19   that "the Audit Committee was not functioning as represented to the public[,] . . . [which]

20   allowed Peregrine to operate without adequate internal accounting controls at a time when

21   Peregrine was growing rapidly and engaging in numerous acquisitions and strategic alliances."

22   (CC ¶ 125.) As a result of the alleged lack of a functioning Audit Committee, the CC alleges

23   that Defendants Noell, van den Berg, Hosley, and Watrous "knew or were deliberately reckless

24   in not knowing of the fraudulent accounting practices."[15] (CC ¶ 126.) According to the CC, the

25   fact that Peregrine had inadequate accounting controls was a "red flag" that should have alerted

26   members of the Audit Committee to the fraud. (CC ¶¶ 14-17, 126.)

27

28      [15] Although Defendant Savoy is alleged to have served on the Peregrine Audit Committee, (CC ¶ 120), Plaintiffs do not aver that Savoy knew or was deliberately reckless in not knowing of Peregrine's alleged accounting improprieties. (CC ¶ 126.)

Exhibit E
0426

1     Although these outside directors are not alleged to have been involved with any of the

2  improperly booked transactions, Plaintiffs attempt to attribute liability to these board members as

3  a result of their status as directors and audit committee members. (*See* Loran Opp'n at 25-27;

4  CC ¶¶ 119, 126.)  Such allegations, however, lack sufficient particularity.  The CC fails to allege

5  even a single meeting, conversation, document, piece of correspondence, or other source of

6  information from which any of the directors learned of the alleged fraud. (*See* Noell and van den

7  Berg Reply Br. at 3.)  Plaintiffs' allegations that senior Peregrine management reported to board

8  members, including Moores and Noell, information concerning the Company's business plans

9  does not demonstrate that board members knew or must have been aware of Peregrine's

10  accounting improprieties. (CC ¶ 118.) "Allegations that outside directors merely held positions

11  on committees responsible for the preparation and disclosure of a corporation's finances are

12  insufficient to set forth the circumstances constituting fraud with particularity." *In re Oak Tech.*

13  *Sec. Litig.*, No. 96-20552 SW, 1997 WL 448168, *11 (N.D. Cal. Aug. 1, 1997).  Although the

14  CC does describe in detail the duties imposed on the Audit Committee, the CC fails to identify

15  any information which the Audit Committee had a duty to monitor and that would have disclosed

16  the fraud had the Committee complied with its duty. *See In re Worldcom, Inc. Sec. Litig.*, No. 02

17  Civ. 3288 (DLC), 2003 WL 21219049, at * 22 (S.D.N.Y. May 19, 2003) ("[T]he Complaint does

18  not identify what the Audit Committee members would have learned from exercising [their]

19  responsibilities that would have put them on notice that the SEC filings that they signed were

20  inaccurate.") Similarly, the Court finds averments that outside directors were Moores' "eyes and

21  ears on the Audit Committee" to be insufficient.  Allegations regarding personal or prior

22  business relationships are not probative of fraud. *See, e.g., Homestore*, 252 F. Supp. 2d at 1037

23  (rejecting scienter allegations based upon a personal relationship). Accordingly, the Court finds

24  that allegations against the outside directors "do not adequately establish that [they] had

25  knowledge of the supposedly 'true but concealed' circumstances concerning [Peregrine's]

26  problems[.]" *Vantive*, 283 F.3d at 1087.

27

28

02cv870-J (RBB)

Exhibit E
0427

1  **J.    The Magnitude of the Restatement**

2        The Loran Plaintiffs also contend that the magnitude of the Company's restatements

3  "strongly indicates that each of the individual defendants knew or[] recklessly disregarded[]

4  Peregrine's accounting fraud." (Loran Plaintiffs' Opp'n at 27). Defendant Gardner responds to

5  this argument by noting that the large size of a restatement does not raise a strong inference that

6  original numbers were reported with deliberate recklessness. *See In re Northpoint*

7  *Communications Group, Inc. Sec. Litig.*, 184 F. Supp. 991, 1003 (N.D. Cal. 2001). In

8  *Northpoint*, the defendant company revised its revenues downward from $30 million to $24

9  million. *Id.* at 996. Although the court acknowledged that $6 million was a large revision, the

10  court noted that the revision only occurred once. *Id.* at 1003. The court further distinguished

11  those facts from a Massachusetts district court case where the defendants had restated their

12  revenues on at least four separate occasions following disclosures by the various accountants

13  following their resignation from the company. *Id.* (discussing *Gelfer v. Pegasystems, Inc.*, 96 F.

14  Supp. 2d 10, 16 (D. Mass. 2000).

15        To support their contention that the sheer size of the restatement establishes a strong

16  inference of scienter, the Loran Plaintiffs cite to multiple district court cases outside the Ninth

17  Circuit. (*See* Loran Opp'n at 27, citing *In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620,

18  637 (E.D. Va. 2000); *Pegasystems*, 96 F. Supp. 2d at 16.) Although neither the filing of a

19  restatement nor GAAP violations, by themselves, give rise to a strong inference of scienter, the

20  *MicroStrategy* court held that "the *nature* of such a restatement or [GAAP] violation, however,

21  may ultimately do so." 115 F. Supp. 2d at 635. Specifically, the court took the following factors

22  into consideration:

23        [T]he magnitude of the restated financials and the pervasiveness and repetitiveness of [the
        company's] GAAP violations; the simplicity of the accounting principles violated . . .,
24        and the importance of the contracts involved.

25  *Id.* at 636.

26        There, the complaint alleged that MicroStrategy "reported aggregate 'record' net income

27  of $18.9 million for 1997, 1998, and 1999, when, in fact, the Company incurred a net loss for

28  those years of more than $36 million." *Id.* The court further noted that "common sense and

logic dictate that the greater the magnitude of a restatement of violation of GAAP, the more

1  likely it is that such a restatement or violation was made consciously or recklessly." *Id.* The

2  court concluded that "the alleged GAAP violations and the subsequent restatements are of such a

3  great magnitude–amounting to a night-and-day difference with regard to MicroStrategy's

4  representations of profitability–as to compel an inference that fraud or recklessness was afoot."

5  *Id.; see also Chalverus v. Pegasystems, Inc.,* 59 F. Supp. 2d 226, 234 (D. Mass. 1999) (quoting

6  *Marksman Partners v. Chantal Pharm. Corp.,* 927 F. Supp. 1297, 1314 (C.D. Cal. 1996)

7  ("significant overstatements of revenue 'tend to support the conclusion that defendants acted

8  with scienter'"); *Carley Capital Group v. Deloitte & Touche,* 27 F. Supp. 2d 1324, 1339-40

9  (N.D. Ga. 1998) ("[w]hile alleging a misapplication of [GAAP] standing alone is insufficient,

10  such allegation when combined with a drastic overstatement of financial results can give rise to a

11  strong inference of scienter . . . [and] the totality and magnitude of the . . . accounting violations

12  [may] constitute strong circumstantial evidence of recklessness or conscious misbehavior"); *In*

13  *re Baan Co. Sec. Litig.,* 103 F. Supp. 2d 1, 21 (D.D.C. 2000) ("the magnitude of the [GAAP]

14  error can play a role" in inferring scienter).

15        In addition to the large size of the restatement, the court addressed the complexity of the

16  alleged GAAP violation.  Specifically, the defendants violated the "simple principle that revenue

17  cannot be recognized for unexecuted contracts and/or where there are significant obligations

18  and/or contingencies relating to such contracts." *MicroStrategy,* 115 F. Supp. 2d at 637 (internal

19  quotations omitted).  Moreover, the defendants failed to comply with their publicly-stated

20  revenue recognition policy. *See id.*

21        In *Pegasystems,* the court held that the magnitude and frequency of restatements created a

22  strong inference of scienter. *Pegasystems,* 96 F. Supp. 2d at 16.  In support of this ruling, the

23  court relied on First Circuit caselaw.  In the First Circuit, recklessness is defined as the

24  following:

25        [A] highly unreasonable omission, involving not merely simple, or even inexcusable,
          negligence, but an extreme departure from the standards of ordinary care, and which
26        presents a danger of misleading buyers or sellers that is either known to the defendant or
          is so obvious the actor must have been aware of it.

27

28  *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 198 (1st Cir. 1999) (quoting *Sundstrand Corp. v.*

    *Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977)).  In contrast to the First Circuit's

Exhibit E
0429

1   interpretation of scienter, the Ninth Circuit has held that recklessness satisfies the scienter

2   requirement only insofar as it reflects some degree of conscious or deliberate conduct; i.e., "a

3   degree of recklessness that strongly suggests actual intent." *Silicon Graphics*, 183 F.3d at 979.

4   Accordingly, this Court must apply the Ninth Circuit's more stringent interpretation of the

5   PSLRA.

6         In *Pegasystems*, the defendants restated financial results for the first and second quarters

7   of 1998, and revised the projected results for the third quarter of 1998, correcting an

8   overstatement of $18 million in revenue. 96 F. Supp. 2d at 16. This amount constituted 27% of

9   total revenue for these quarters. *Id.* Here, as stated above, Peregrine restated eleven consecutive

10  quarters, correcting an overstatement of roughly $509 million. The sheer magnitude of such a

11  figure is quite apparent and tends to suggest that the improper treatment of revenue was

12  systematic. Nevertheless, unlike *Pegasystems*, Peregrine filed a restatement on only one

13  occasion. Moreover, the defendants in *Pegasystems* were deemed to be on notice of improper

14  accounting practices as a result of prior litigation. 96 F. Supp. 2d at 15. Although the

15  restatement in the instant case significantly overshadows that amount of revenue restated in

16  *Pegasystems*, the case before this Court is clearly distinguishable from *Pegasystems*.

17        This Court agrees with *MicroStrategy* that the magnitude of the restatement, the

18  repetitiveness of the alleged GAAP violations, the simplicity of the alleged GAAP violation, and

19  the failure to comply with a company's own publicly-acknowledged revenue recognition policy

20  tend to lend probative weight to allegations that GAAP violations give rise to an inference of

21  scienter. *See MicroStrategy*, 115 F. Supp. 2d at 637 n. 33 (citing *Rehm v. Eagle Finance Corp.*,

22  954 F. Supp. 1246, 1255-56 (N.D. Ill. 1994) (noting that "the magnitude of reporting errors may

23  lend weight to allegations of recklessness where defendants were in a position to detect errors")).

24  Nevertheless, there is persuasive caselaw within the Ninth Circuit concluding that courts should

25  not infer scienter from the magnitude of fraud. *See Reiger v. Price Waterhouse Coopers LLP*,

26  117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000) (Whelan, J.), *aff'd sub nom. DSAM Global Value*

27  *Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002). In *Reiger*, where the defendant

28  restated its financial results to reflect a loss of $2.45 million instead of the previously reported

$2.36 million profit, this Court explained the difficulty of such an inference.

54                                                    02cv870-J (RBB)

Inferring scienter from the magnitude of fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the [defendant] acted with scienter. To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of inferences: (1) because the magnitude of the fraud was large, conspicuous warning signs must have existed; (2) these warning signs must have been available to the [defendant] . . .; (3) these warning signs must have made the fraud obvious and conspicuous to the [defendant]; and therefore (4) the [defendant] must have known of the fraud. The factual assumptions incorporated into this inferential chain lack evidentiary support in many securities fraud cases, and obscure the potentially infinite number of innocuous reasons a[] [defendant] may fail to detect a fraud of large magnitude. . . . [M]agnitude of fraud supports an inference of scienter only when the plaintiff pleads specific and detailed facts showing that the magnitude either enhanced the suspiciousness of specifically identified transactions, or made the overall fraud glaringly conspicuous.

117 F. Supp. 2d at 1013. Although *Reiger* involved allegations against an outside accounting firm, the chain of inferences described above applies equally to Peregrine directors and officers. In order for the magnitude of Peregrine's restatement to raise a strong inference of scienter, Plaintiffs must demonstrate in great detail that the magnitude of the fraud either enhanced specific, already-suspicious transactions, or caused the fraud to be "glaringly conspicuous." *Id.* at 1013. Moreover, in cases where the magnitude of GAAP errors did raise an inference of scienter, those courts also inferred scienter from "additional, specific allegations that the defendants had actual knowledge of relevant facts from which scienter could be inferred." *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002) (distinguishing *McKesson HBOC*, 126 F. Supp. 2d at 1273-74). Accordingly, the Court finds that Plaintiffs' allegations concerning the magnitude of the fraud fail to raise a strong inference of scienter.

## K.    Inferred Knowledge of Core Business Operations

The Loran Plaintiffs contend that the CC has established a strong inference of scienter because "a company's key officers and directors are presumed to know (or are deliberately reckless in not knowing) critical facts about a company's operations." (Loran Opp'n at 25.) In support of their position, the Loran Plaintiffs cite to multiple district court cases, including a case from the Eastern District of Washington. *See Epstein v. Itron*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998) (holding that "facts critical to a business' core operation or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers). Nevertheless, as noted by the Ninth Circuit in recent opinion, *Epstein* predates *Silicon Graphics*.

Exhibit E
0431

1   *See In re Read-Rite Corp. Sec. Litig.*, 335 F. 3d 843, 848 (9th Cir. 2003). In that decision, the

2   Ninth Circuit held that a complaint must comply with the PSLRA by "alleg[ing] particular facts

3   that give rise to a 'strong inference' of scienter on the part of Defendants." *Id.* at 849. In

4   accordance with *Read-Rite*, the Court finds that the mere status of a defendant within the

5   Company, without more, is insufficient to establish a strong inference of scienter.[16]

6        In order to infer that a company's key officers are aware of "core operations or an

7   important transaction," the complaint must lay a proper factual foundation. *Northpoint*, 184 F.

8   Supp. 2d at 998; *Northpoint II*, 221 F. Supp. 2d at 1104. "Such a foundation requires, at a

9   minimum, a showing (with all requisite particularity) that the critical facts were actually known

10  within the company." *Northpoint*, 184 F. Supp. 2d at 998. In *Northpoint*, a district court in the

11  Northern District of California held that "it can be inferred that both [] []the CEO[] and [] []the

12  CFO[], by virtue of their positions within NorthPoint, would be aware of issues, including

13  NorthPoint's [alleged improper revenue recognition]." *Id.* Unnamed, confidential informants

14  discussed these two defendants as often being "in the know." *Id.* Moreover, because the alleged

15  accounting practices "[fell] neatly within [the CEO and CFO's] presumptive bailiwicks,"

16  coupled with the small size of the corporation, the court found that a sufficiently strong

17  inference existed that these two defendants knew or were deliberately reckless toward the

18  improper revenue recognition. *Id.*

19       In contrast to *Northpoint*, Plaintiffs fail to allege a proper factual basis demonstrating that

20  Defendants actually knew critical facts. Nevertheless, the Loran Plaintiffs argue that the size of

21  several improperly booked transactions "were so large that none of the defendants, including the

22  outside directors, can seriously claim that they were unaware of them." (Loran Opp'n at 26.)

23  Moreover, Plaintiffs point to two transactions booked in Q4 2000. As described above,

24

25       [16] In addition to *Epstein*, the Loran Plaintiffs rely on three cases from district courts outside of the
        Ninth Circuit. *See Angres v. Smallworldwide PLC*, 94 F. Supp. 2d 1167, 1175 (D. Colo. 2000); *In re*
26      *Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 826 (E.D. Pa. 2001); *In re Campbell Soup Co.*
        *Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001). Each of these cases individually held that practices
27      concerning the "core business" of a company can be attributed to individual plaintiffs. Nevertheless, this
        doctrine has been called into doubt by *Read-Rite*. Accordingly, the Court "must determine whether
28      particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally
        or [with] deliberate recklessness made false or misleading statements to investors." *Ronconi v. Larkin*,
        253 F.3d 423, 429 (9th Cir. 2001).

Exhibit E
0432

1  Peregrine improperly booked an $8-10 million deal with Accenture and a $5 million transaction

2  with CI Software in Q4 2000.  (CC ¶¶ 167, 172.)  Because revenue for this quarter totaled

3  approximately $76.3 million, (CC ¶ 3), these two deals alone consisted of nearly 20% of the

4  quarter's revenue.  In essence, the Loran Plaintiffs believe that Defendants were deliberately

5  reckless in not knowing of the improper revenue recognition because the transactions were so

6  large.  However, the size of the transactions does not constitute strong circumstantial evidence of

7  deliberately reckless or conscious misconduct.  Recklessness satisfies the scienter requirement

8  only insofar as it reflects some degree of conscious or deliberate conduct, i.e., "a degree of

9  recklessness that strongly suggests actual intent." *Silicon Graphics*, 183 F.3d at 979.  Although

10 improperly booked transactions may have constituted a large portion of Peregrine's revenue in a

11 given quarter, this fact is not sufficient in establishing deliberate conduct on the part of

12 Defendants.  Moreover, as discussed above, this Court has declined to infer scienter based solely

13 upon the magnitude of accounting fraud because to do so "invites a court to speculate as to the

14 existence of specific (but unpled and unidentified) warning signs that show the [defendant] acted

15 with scienter." *Reiger*, 117 F. Supp. 2d at 1013. Accordingly, it is not appropriate for the Court

16 to infer that Defendants had knowledge of Peregrine's core business operations.

17

18 **L.    Defendants' Insider Trading** [17]

19       Plaintiffs allege that a strong inference of scienter exists because of widespread insider

20 trading on the part of Defendants. "If insiders owning much of a company's stock make rosy

21 characterizations of company performance to the market while simultaneously selling off all

22 their stock for no apparent reason, their sales may support inferences both that their rosy

23 characterizations were false and that they knew it." *Ronconi v. Larkin*, 253 F.3d 423, 434-35

24 (9th Cir. 2001).  However, unusual or suspicious stock sales by corporate insiders constitute

25 circumstantial evidence of scienter only if the trading is "dramatically out of line with prior

26 trading practices at times calculated to maximize the personal benefit from the undisclosed

27 _____

28     [17] The Ninth Circuit has held "the lack of stock sales by a defendant is not dispositive as to scienter." *Am. West*, 320 F.3d at 944. Accordingly, insider trading is not necessary in stating a Section 10(b) claim.

02cv870-J (RBB)

Exhibit E
0433

1  inside information." *Silicon Graphics*, 183 F.3d at 986 (quoting *In re Apple Computer Sec.*

2  *Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989)). In evaluating whether insiders' stock sales are

3  unusual or suspicious, courts consider (1) the amount and percentage of shares sold, (2) the

4  timing of the sales, and (3) whether the sales were consistent with the insider's prior trading

5  history. *Silicon Graphics*, 183 F.3d at 986. Another factor meriting consideration is whether the

6  insider had any limitations on his or her ability to trade. *See Am. West*, 320 F.3d at 938. In the

7  present action, the CC alleges that more than 12 million shares were collectively sold by

8  Defendants Gardner, Gless, Powanda, Spitzer, Nelson, Luddy, Moores, Noell, and van den Berg

9  during the Class Period for gross proceeds exceeding $450 million.[18] (CC ¶ 466). For the

10  reasons set forth below, the Court finds that Defendants' stock sales, as alleged in the CC, do not

11  raise a strong inference of scienter.

12       As an initial matter before addressing each individual defendant's stock sales, the Court

13  notes that the number and percentage of shares sold, as alleged in the CC, fail to take into

14  account splits in Peregrine common stock. Several defendants urge the Court to account for

15  splits when calculating the amount and percentage of shares sold. (*See, e.g.,* Noell and van den

16  Berg P. & A. at 6-7.) According to the NASDAQ Daily Stock Price Record,[19] Peregrine stock

17  split two-for-one on February 12, 1999 and again on February 18, 2000. (Pastuszenski Decl. Ex.

18  C.) Although the Court agrees that stock splits should be taken into account, *see, e.g., Plevy v.*

19  *Haggerty*, 38 F. Supp. 2d 816, 834 n. 12 (C.D. Cal. 1998), adjusting the amount of shares sold

20  by Defendants would only weaken Plaintiffs' already tenuous allegations concerning insider

21  trading. As discussed in detail below, regardless of the figures provided by Plaintiffs, the timing

22  of Defendants' sales and the lack of information about each individual's prior trading history

23

24  [18] The Loran Plaintiffs also contend that individual defendants may be held liable under Section 10(b) under the "disclose or abstain" rule. (Loran Opp'n at 21.) This doctrine, however, does not apply

25  to cases based upon the "fraud-on-the-market" theory. *See, e.g., In re Seagate Tech, II Sec. Litig.*, 843 F. Supp. 1341, 1369-70 (N.D. Cal. 1994). Moreover, standing to assert a duty to disclose extends only to

26  contemporaneous traders during the purported insider trading. In the present action, the fraud-on-the-market theory forms the basis of Plaintiffs' claims. (CC ¶ 61.) Moreover, the CC does not allege that

27  any of the plaintiffs traded shares at the same time as any of the individual defendants. Accordingly, this theory does not establish liability as to any of the defendants.

28  [19] Pursuant to Defendants van den Berg and Noell's request, the Court takes judicial notice of the Daily Stock Price Record, which lists the daily closing prices of Peregrine common stock from April 9, 1997 through June 28, 2002. (*See* Noell and van den Berg Req. for Judicial Notice Ex. B.)

1    suggest that Defendants' stock sales do not establish a strong inference of scienter. Moreover, as

2    an additional matter, the Court notes that Plaintiffs have selected an unusually long class period

3    of approximately 145 weeks. *See Vantive*, 283 F.3d at 1092 (a class period of 63 weeks

4    "allowed the plaintiffs to sweep as many stock sales into their totals as possible, thereby making

5    the stock sales appear more suspicious than they would be with a shorter class period.").

6

7               **1.**    **Shares Sold by Defendant Gardner**

8       According to the CC, Defendant Gardner sold a total of 352,512 shares and received

9    proceeds of roughly $14,030,526.80 during the Class Period.[20] (CC ¶ 466.) Prior to the Class

10    Period, Gardner sold no shares in 1997 or 1998,[21] but did sell 100,000 shares in 1999 for gross

11    proceeds of approximately $2.5 million. (CC ¶ 468.) Shares sold during the Class Period

12    constituted 22.08% of his total Peregrine stock portfolio. (Gardner P. & A. at 12.) Moreover,

13    Gardner's sales are limited to only early August 1999 and late February 2000. (CC ¶ 466.) Only

14    one sale occurred outside this time frame, which took place in September 2001. (*Id.*)

15       On July 21, 1999, Peregrine issued a press release stating that Peregrine had achieved

16    "record" quarterly revenues of $51.6 million for the first quarter of Fiscal Year 2000. (CC ¶

17    279.) Additionally, the press release quotes Gardner as saying, "We are extremely pleased with

18    the outstanding growth in both our software license sales and our professional services activity

19    in the first fiscal quarter . . . ." (*Id.*) The CC alleges that the public release was materially false

20    and misleading because the Company's reported annual revenue was overstated by more than

21    $120 million, while its liabilities were understated by roughly $90 million. (CC ¶ 280.)

22

23        [20] In ruling on a motion to dismiss, courts may take judicial notice of a document if it is relied on in the complaint and its authenticity is not disputed. *Parrino*, 146 F.3d at 706. Because the Loran Plaintiffs acknowledge that the CC's allegations are based on "a review of Peregrine's SEC filings," (Loran Plaintiffs Opp'n to Def.s' Req. for Judicial Notice at 2), it is proper for this Court to take judicial notice of Gardner's SEC filings. Although the Loran Plaintiffs dispute the accuracy of these documents, Plaintiffs "substantial reliance on the forms as a basis for [their] allegations substantially weakens [their] position." *Silicon Graphics*, 183 F.3d at 986. "Having raised questions about [officers'] stock sales, [and] based [their] allegations on [officers'] SEC filings, . . ., [Plaintiffs] can hardly complain when [the officers] refer to the same information in their defense." *Id.* (internal quotations omitted). Accordingly, the Court takes judicial notice of Gardner's SEC forms 3, 4, and 5. *See also Allison v. Brooktree*, 999 F. Supp. 1343, 1352 n. 3 (S.D. Cal. 1998) (taking judicial notice of the defendants' Forms 4).

       [21] Defendant Gardner notes that he did not join the company until May 1997, and the first vesting of shares did not occur until May 1998. (Gardner P. & A. at 14 n.15.)

Exhibit E
0435

1    Furthermore, Gardner held a conference call with several investors and securities analysts on

2    July 21, 1999, who subsequently published positive reports concerning Peregrine's future. (CC

3    ¶¶ 281-285.)  Despite Gardner's "rosy characterizations" about the Company, Gardner sold

4    100,000 Peregrine shares for a total of approximately $2,933,225 between August 4, 1999 and

5    August 13, 1999. (CC ¶ 294.)

6            On January 20, 2000, Peregrine issued a press release for Q3 2000 announcing revenues

7    in the amount of $67.5 million, a 67% increase from the same quarter in the previous year. (CC

8    ¶ 313.)  Once again, Gardner was quoted in the press release:

9            [W]e had a number of large transactions and a remarkably strong surge of both interest
             and initial sales from our new Get.It! and Get.Resources! employee self service and e-
10           procurement products.  In addition, we exceeded our expectations for the launch of our
             new midrange solution, InfraCenter for Workgroups.
11

12   (*Id.*)  Following the press release, a conference call with investors and securities analysts, led by

13   Gardner, was held. (CC ¶ 316.)  Several positive reports resulting from this conference call were

14   issued to the public. (CC ¶¶ 317, 318.)  Between February 22, 2000 and February 24, 2000,

15   Gardner sold 250,262 shares of Peregrine common stock for a total value of roughly

16   $11,035,426. (CC ¶ 329.)

17           Defendant Gardner contends that sale of only 22.08% of his total Peregrine stock

18   holdings is not a suspicious percentage. (Gardner P. & A. at 12; Gardner Reply at 3.)  In

19   *Ronconi*, the Ninth Circuit held that an insider's sale of 17% of his total holdings was not

20   enough to be suspicious. *See* 253 F.3d at 435.  In addition, in *Vantive*, the Ninth Circuit held

21   that an insider's sale of 26% was not "terribly unusual or suspicious, given the complaint's

22   failure to connect [defendant's] sales with any particular allegedly misleading statements." 283

23   F.3d at 1094.  In contrast to *Vantive*, Plaintiffs have connected all but one of Gardner's stock

24   sales to false or misleading statements.  By this standard, the amount sold by Gardner, 22.08%,

25   may in fact be somewhat suspicious.

26           Nevertheless, Gardner contends that his purchase of Peregrine stock negates any

27   inference of scienter. (Gardner P. & A. at 13-14; Gardner Reply 4-5); *see Allison v. Brooktree*

28   *Corp.*, 999 F. Supp. 1342, 1352-53 (S.D. Cal. 1998) (Miller J.).  Between February 8, 2001 and

     February 2002, Gardner purchased 24,500 shares of Peregrine common stock for a total of

02cv870-J (RBB)

1  $355,085. (Gardner P. & A. at 13.)  The Loran Plaintiffs, however, refer to these stock

2  purchases as being in "trifling amounts." (Loran Opp'n at 33 n. 20) (citing *Seebeyond*, 266 F.

3  Supp. 2d at 1168-69).  In *Allison*, the plaintiffs filed a securities fraud complaint against

4  Brooktree Corporation ("Brooktree") and several corporate insiders, including James Bixby

5  ("Bixby"), Brooktree's CEO.  999 F. Supp. at 1345.  The fact that the plaintiffs failed to allege

6  that Bixby made any stock sales, coupled with the fact that Bixby purchased company stock

7  during the Class Period, led the court to find that any inference of scienter was negated.  *Id.* at

8  1352.  Similar to *Allison*, Gardner purchased company shares during the Class Period in the

9  amount of $355,085.  In contrast, however, Gardner did sell 22.08% of his total Peregrine

10  portfolio.  In comparison to Gardner's sales, the Court finds his purchases to be insignificant.

11        Defendant Gardner further argues that his stock sales are not suspiciously timed because

12  they occurred when the Company's stock price was well below the Class Period peak.  (Gardner

13  P. & A. at 14; Gardner Reply at 5.)  Following a review of the price of Peregrine common stock

14  throughout the entire Class Period, the Court finds that the timing is not indicative of an insider

15  seeking "to maximize the personal benefit from the undisclosed inside information." *Silicon*

16  *Graphics*, 183 F.3d at 986.  At the beginning of the Class Period, July 22, 1999, the price per

17  share of Peregrine common stock was $15.34.  (*See* Lear Decl. Ex. B.)  The price per share

18  slowly rose from this date until it reached its peak on March 27, 2000 at $79.50 per share.  (*Id.*)

19  While Gardner's sales in August 1999 ranged between $14.38 and $15.94 per share, his

20  February 2000 sales sold between $43.62 and $46.62 per share.  (*Id.*)  Although Gardner's sales

21  in August 1999 and February 2000 occurred on the heels of the false or misleading revenue

22  reports, Gardner's sales occurred well below the peak price. *See Vantive*, 283 F.3d at 1093-94

23  (noting that there was no strong inference of scienter where the majority of shares sold between

24  $20 and $24 per share and the stock price increased for several months, peaking at $39 per

25  share); *Ronconi*, 253 F.3d at 435 (finding that no strong inference existed where insiders

26  "miss[ed] the boat" by selling shares for $53 to $56 per share, although the price peaked at $73

27  per share); *Osher v. JNI Corp.*, 256 F. Supp. 2d 1144, 1164-65 (9th Cir. 2003) (Jones, J.) (where

28  this Court held that the defendants "missed the boat" when they sold their shares between $42

and $70 per share and the peak price was $126).  Furthermore, it is not uncommon for company

1  insiders to trade company stock following the public release of financial statements. *Lipton v.*

2  *Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (finding that the sale of company stock

3  by an officer following the public release of quarterly earnings "does not support an inference

4  that [the officer] knew or should have known that the optimistic reports of [the company]'s

5  projected growth were false"). Accordingly, the Court does not find Gardner's sales to be

6  suspiciously timed.

7      In addition to addressing the amount and timing of Gardner's sales, the Court must

8  consider whether the sales were consistent with the insider's prior trading history. *Silicon*

9  *Graphics*, 183 F.3d at 986. Defendant Gardner notes that he did not join the company until May

10  1997, and the first vesting of shares did not occur until May 1998. (Gardner P. & A. at 14 n.15;

11  Lear Decl. ¶¶ 3, 4, 7, Exs. A, B, E). Prior to the Class Period, Gardner sold 28.76% of his shares

12  in 1999 and received proceeds of roughly $2.5 million. (CC ¶ 468.) Based upon these figures,

13  there does not appear to any inconsistency with Gardner's prior trading history.

14      Ignoring the above, the Loran Plaintiffs seek to establish a strong inference of scienter

15  based upon the sheer magnitude of gross revenues received by Gardner. The Loran Plaintiffs

16  contend that the Ninth Circuit has found proceeds less than the amount received here to be

17  suspicious. In *Provenz*, a case cited by the Loran Plaintiffs where a defendant received proceeds

18  in the amount of $1.4 million, the Ninth Circuit found the sale of 90,000 shares to be suspicious

19  because this amount was "almost six times more stock than he had sold during the twelve

20  months preceding the class period[.]" 102 F.3d at 1491. In contrast to *Provenz*, Gardner actually

21  sold a large percentage of his shares before the Class Period.

22      The Loran Plaintiffs also rely on two district court cases within the Ninth Circuit for the

23  proposition that insider trading is "suspicious" where the dollar amounts involved are

24  significantly high. *See In re PETsMART Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 1000 (D. Az.

25  1999); *Seebeyond*, 266 F. Supp. 2d at 1168-69. In *PETsMART*, the district court noted that

26  "[t]wenty percent of a corporate insider's shares, especially where the dollar amounts involved

27  are high, [] may constitute a 'suspicious amount' sufficient to support a scienter allegation." 61

28  F. Supp. 2d at 1000. Nevertheless, the court did acknowledge that stock sales "require[d] a

showing that the trading was in amounts dramatically out of line with prior trading practices, at

Exhibit E
0438

1  times calculated to maximize personal benefit from undisclosed inside information." *Id.*

2  (citations omitted). There, the court held that the sale of 25% of an insider's shares did not

3  establish scienter because the plaintiffs failed to sufficiently allege misstatements prior to the

4  sale date. *Id.* As a result, the court did not address prior trading history. Moreover, the Loran

5  Plaintiffs' reliance on *Seebeyond* is misplaced. There, the court found $18 million in revenue to

6  be significant when coupled with evidence in the complaint that the defendants lied to analysts

7  and investors. *Seebeyond*, 266 F. Supp. 2d at 1169. As a result, both *PETsMART* and

8  *Seebeyond* are inapposite.

9  　　　　The Court notes that the total proceeds received by Gardner during the Class Period,

10  $14,030,526.80, far exceeds the proceeds preceding the Class Period. Nevertheless, focus on the

11  total proceeds alone is not appropriate. "[L]arge numbers do not necessarily create a strong

12  inference of fraud." *Vantive*, 283 F.3d at 1093. This is especially true when the large numbers

13  are consistent with prior trading. *See Am. West*, 320 F.3d 920, 938 (9th Cir. 2003) ("Insider

14  stock sales are only suspicious when they are dramatically out of line with prior trading

15  practices[.]") Accordingly, the Court holds that CC does not sufficiently allege that Gardner's

16  pre-Class Period sales are "dramatically out of line with prior trading practices." *Silicon*

17  *Graphics*, 183 F.3d at 986.[22]

18  　　　　As stated above, the Court takes judicial notice of Gardner's Forms 3, 4, and 5. In

19  addition to these documents, Gardner submitted the following supplemental documents: (1) a

20  summary of class period sales of Peregrine shares, (2) a summary of pre-class period sales of

21  Peregrine shares, (3) a chart depicting the average sale price of Peregrine shares sold, and (4)

22  two charts summarizing Plaintiffs' allegations and Gardner's corresponding responses. (*See*

23  Lear Decl. in Supp. Def. Gardner's Mot. to Dismiss CC Exs. C, D, and E; Holl Decl. in Supp. of

24

25  　　[22] The Loran Plaintiffs also rely on an unpublished case from the Northern District of California, where the court found insider trading to be suspicious despite the complaint's failure to include the

26  defendants' prior trading history. *See In re Terayon Communications Sys. Inc.*, No. C 00-01967, 2002 WL 989480, at *12 (N.D. Cal. Mar. 29, 2002). There, the court did not look at the insider trading in

27  isolation. Rather, the court considered the insider trading "in conjunction" with other factors, including the fact that the defendants' sales occurred shortly after the issuance of false or misleading statements.

28  *Id.* In conjunction with the stock sales, the Court found that the defendants had knowledge of the falsity of their statements as a result of numerous communications. In contrast to *Terayon*, the CC fails to plead the existence of communications with Defendants demonstrating actual knowledge.

02cv870-J (RBB)

Exhibit E
0439

1  Def. Gardner's Mot. to Dismiss CC Exs. A, B.)  The Loran Plaintiffs move to strike these

2  documents pursuant to Rule 12(f), which permits courts to strike "from any *pleading* any

3  insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R.

4  Civ. P. 12(f) (emphasis added).  Because the motion to strike does not involve a pleading, Rule

5  12(f) is not an appropriate basis to strike documents attached to a motion to dismiss.  Although

6  these charts were submitted to the Court to facilitate the review of voluminous documents, they

7  have not been relied upon.  Moreover, the Court has already taken judicial notice of the

8  information reflected in these charts.  Accordingly, the Loran Plaintiffs' motion to strike the

9  three documents attached to the Lear Declaration is DENIED as moot.

10

11  **2.    Shares Sold by Defendant Gless**

12  Defendant Gless joins Defendant Gardner in his motion to dismiss. [Doc. No. 269.]  As

13  discussed above, the Court takes judicial notice of Gless' criminal records in Criminal Case No.

14  03cr1090W. (Loran Plaintiffs' Req. for Judicial Notice, Exs. E, G, H; Arthur Andersen Req. for

15  Judicial Notice Exs. A, B; Stulac Req. for Judicial Notice and Notice of Lodgment Exs. 1, 2.)

16  Although Gless' guilty plea sufficiently demonstrates that Gless knowingly engaged in

17  fraudulent activities while at Peregrine, the CC includes allegations of Gless' insider trading.

18  (CC ¶ 466.)  According to the CC, Gless sold 93,625 shares and received proceeds exceeding

19  $4,083,188 during the Class Period. (*Id.*).  Prior to the Class Period, Gless sold 3,000 shares in

20  1997 and 1998 for gross proceeds of approximately $120,000.  (CC ¶ 469.)  The CC, however,

21  does not include sufficient information in order for the Court to calculate the percentages of total

22  holdings sold both before and during the Class Period.  Accordingly, insider trading by Gless

23  cannot be utilized to create a strong inference of scienter.

24

25  **3.    Shares Sold by Defendant Powanda**

26  According to the CC, Defendant Powanda sold 616,250 shares for a total of $20,518,810

27

28

Exhibit E
0440

1  during the Class Period.[23]  (CC ¶ 466.)  Prior to the Class Period, Powanda sold 250,000 shares

2  and received roughly $6.6 million in revenue.  (CC ¶ 470.)  Similar to Defendant Gardner,

3  Powanda's sales primarily occurred in August 1999 and February 2000 shortly after the

4  dissemination of Peregrine's financial statements for the previous quarter.  (CC ¶ 466.)

5  Powanda also sold 400,000 shares on February 8, 2001, receiving $11,232,000 in proceeds.  (*Id.*)

6  The price per share of Peregrine common stock at the time of these sales ranged between $28

7  and $46.  (*Id.*)  Despite these allegations, the CC fails to demonstrate that Powanda's sales

8  during the Class Period were a significant divergence from sales prior to the Class.  With the

9  information currently alleged in the CC, the Court is unable to ascertain the percentages of total

10  holdings sold during each period.  (*See* Powanda Reply at 7.)  Instead, the CC provides the

11  percentage of total revenues, a factor not requiring consideration.  *See Ronconi*, 253 F.3d at 435.

12  Moreover, the price at which each share was sold was far below the peak price of Peregrine

13  common stock.  Accordingly, the Court finds that Powanda's stock sales do not create a strong

14  inference of scienter.

15

16          **4.      Shares Sold by Defendant Luddy**

17          The CC alleges that Defendant Luddy sold 368,789 and received gross proceeds totaling

18  $11,823,660.44 during the Class Period.  (CC ¶¶ 466, 473.)  Prior to the Class Period, it is

19  averred in the CC that Luddy sold 131,174 shares of Peregrine common stock for a total sum of

20  $3,908,702.[24]  (CC ¶ 473.)  Similar to the treatment of Defendant Powanda's shares, the CC

21  focuses on the percentage of *proceeds* received from insider sales.  The CC alleges that 75% of

22

23          [23] The Court notes that the figures in the CC are misleading, as they do not take Peregrine stock
splits into consideration.  (*See* Powanda P. & A. at 12.)  Because the CC contains other shortcomings,

24  the Court need not adjust these figures.  Nevertheless, the Court takes judicial notice of Powanda's Form
4s, Peregrine's Form 10-Qs for Q1 2000, Q2 2000, Q3 2000, Q1 2001, Q2 2001, Q3 2001, Q1 2002, and

25  Q2 2002, as well as Peregrine Form 10-Ks for Fiscal Years 2000 and 2001.  (*See* Powanda's Req. for
Judicial Notice Exs. A - AA.)

26          [24] Defendant Luddy requests that the Court take judicial notice of his Form 4 filings with the
SEC, which reflect the amount of shares sold.  (Luddy P. & A. at 4.)  According to this document, Luddy

27  sold 126,714 shares for gross proceeds of $3,724,973.87.  (*Id.*).  As noted by Defendant Luddy, however,
"[t]he modest difference is of no importance."  (*Id.* at 4 n. 5).  In addition, Luddy requests judicial notice

28  of excerpts from Peregrine's Forms S-4A filed with the SEC on May 22, 2000 and July 23, 2001,
excerpts from Peregrine's Form 10-K filed with the SEC on June 29, 2001, and the daily closing price
history of Peregrine common stock.  Accordingly, the Court takes judicial notice of these documents.

Exhibit E
0441

1  the proceeds from Luddy's sales were received during the Class Period. (*Id.*) As stated above,

2  the proper focus is the percentage of *total holdings* sold during the Class Period. Without

3  allegations incorporating this percentage, the Court is unable to apply all three prongs of the test

4  described in *Ronconi*.

5       Moreover, where an insider's trading gives rise to an inference of scienter, the insider's

6  failure to utter any of the allegedly misleading statements may help to dispel the inference.

7  *Silicon Graphics*, 183 F.3d at 987-88 (although an insider sold 75.3% of his total holdings,

8  which consisted of 65% of the total shares sold by all insiders during the class period, finding

9  that the insider's stock sales did not give rise to a strong inference of deliberate recklessness

10  because the insider (1) was legally forbidden to trade before the class period, and (2) did not

11  make any of the allegedly false statements); *Vantive*, 283 F.3d at 1094 (finding no circumstantial

12  evidence of fraud where a defendant failed to utter a word or participate in preparing public

13  statements). Here, the CC does not allege that Luddy individually made any false or misleading

14  statements. In addition, Defendant Luddy sold his shares well below the peak price of Peregrine

15  common stock. While common stock in the Company peaked at $79.50, Luddy sold his shares

16  for no more than $44.81 per share. Accordingly, the CC's allegations of Luddy's inside sales as

17  giving rise to a strong inference of scienter are deficient.[25]

18

19       **5.    Shares Sold by Defendant Nelson**

20       According to the CC, Defendant Nelson sold 287,500 shares and received gross proceeds

21  totaling $8,845,870 during the Class Period. (CC ¶¶ 466, 471.) Prior to the Class Period, the

22  CC alleges that Nelson sold 33,375 shares of Peregrine common stock for a total sum of

23  $784,218.75. (CC ¶ 471.) Similar to Plaintiffs' allegations concerning insider trading involving

24  Defendants Powanda and Luddy, the CC provides the Court with only the percentage of

25  proceeds received from insider sales. The CC alleges that 92% of the proceeds from Nelson's

26

27       [25] The Court further notes that other allegations identifying Defendant Luddy by name appear to
be too general and conclusory. For example, the CC alleges that Luddy knew that Peregrine was
28  improperly recognizing revenue and knew from Gardner of Peregrine's decision to recognize revenue on
reseller pre-commitments. (CC ¶¶ 97, 149.) Such allegations lack specificity and do not comply with
either Rule 9(b) or the PSLRA.

Exhibit E
0442

1  sales were received during the Class Period. (*Id.*) As stated above, the appropriate focus is the

2  percentage of total holdings sold during the Class Period. Without allegations incorporating this

3  percentage, the Court is unable to apply all three prongs of the test set forth in *Ronconi*.

4      Despite Plaintiffs' failure to offer these figures, the Court takes judicial notice of the SEC

5  filings accompanying Nelson's motion to dismiss. Prior to the Class Period, Nelson appears to

6  have sold 15,000 of his 34,000 shares, or 44%.[26] (*See* Nelson's Req. for Judicial Notice Ex. 5.)

7  During the Class Period, it appears that Nelson sold shares on two occasions, August 1999 and

8  February 2001. During the first trading window, Nelson sold 87,500 shares, which consisted of

9  40% of his holdings at that time. (Nelson Mem of P. & A. in Supp. of Def. Nelson's Mot. to

10  Dismiss the CC at 10.) During the next trading window in February 2001, Nelson sold 200,000

11  shares of a total 276,000, or 72% of his total holdings. In addition to the 276,000 shares,

12  however, Nelson had vested options for another 121,100 shares. Accordingly, Nelson sold

13  50.37% of his total holdings including vested options.[27] *See Osher*, 256 F. Supp. 2d at 1163-65

14  (where this Court included vested options when calculating an individual's total holdings).

15      Although the amounts sold by Nelson, 40% and 50%, may be somewhat suspicious,

16  "large numbers do not necessarily create a strong inference of fraud." *Vantive*, 283 F.3d at 1093.

17  The Court further notes that Nelson only sold a small sum of the shares with which Plaintiffs are

18  concerned – 287,500 out of almost eleven million shares that Plaintiffs claim were sold pursuant

19  to Defendants' fraudulent scheme. *See Silicon Graphics*, 183 F.3d at 987 (fact that defendant

20  sold only 5% of shares with which the plaintiff was concerned weakened an inference of fraud).

21  Additionally, the timing of Nelson's sales does not appear to be suspicious. Although the price

22  of Peregrine stock reached a market high of $79 per share, the CC alleges Nelson's shares to be

23  sold at a high of $35.25 per share. Such timing is not indicative of an insider seeking "to

24

---

25  [26] The Court notes that this figure may not be accurate, as Plaintiffs have alleged that Nelson sold

26  33,375 shares before the Class Period. (CC ¶ 471.) The Form 4 submitted by Defendant Nelson reflects
   the sale of only 15,000 shares. As a result, Defendant Nelson may have sold additional shares prior to

27  the Class Period which are not included in this Form 4.

28  [27] Although courts generally consider the percentage of holdings sold during the Class Period as a
   whole, *see, e.g., Osher*, 256 F. Supp. 2d at 1163-65, the Court has not been provided enough information
   in order to calculate that figure. Specifically, the Court is unable to determine Nelson's total holdings
   during the Class Period.

02cv870-J (RBB)

Exhibit E
0443

1  maximize the personal benefit from the undisclosed inside information." *Silicon Graphics*, 183

2  F.3d at 986; *see also Vantive*, 283 F.3d at 1093-94 (noting that there was no strong inference of

3  scienter where the majority of shares sold between $20 and $24 per share and the stock price

4  increased for several months, peaking at $39 per share); *Ronconi*, 253 F.3d at 435 (finding that

5  no strong inference existed where insiders "miss[ed] the boat" by selling shares for $53 to $56

6  per share, although the price peaked at $73 per share); *Osher*, 256 F. Supp. 2d at 1164-65 (where

7  this Court held that the defendants "missed the boat"when they sold their shares between $42

8  and $70 per share and the peak price was $126).  Moreover, it is not uncommon for company

9  insiders to trade company stock following the public release of financial statements. *Lipton v.*

10  *Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (finding that the sale of company stock

11  by an officer following the public release of quarterly earnings "does not support an inference

12  that [the officer] knew or should have known that the optimistic reports of [the company]'s

13  projected growth were false").  Furthermore, Nelson's sales of 40% and 51% were not

14  dramatically out of line with his pre-Class Period sales of 44%.

15       Finally, the Court notes that Defendant Nelson is alleged to have only been involved with

16  the EXB transaction, which was allegedly booked as revenue in the June 2001 quarter.  Because

17  Nelson's stock sales all occurred prior to this quarter, the Court finds that Nelson's sales are not

18  "able to be related to the challenged statements." *See Vantive*, 283 F.3d at 1093.  Moreover,

19  Nelson's latest sale in the Class Period occurred fifteen months before the dissemination of

20  unfavorable information about Peregrine. *See id.* (finding no strong inference of scienter where

21  the defendant's stock sales (1) took place during the first month in a fifteen-month class period,

22  (2) were well below the peak price, and (3) did not coincide with other insiders' sales).

23  Accordingly, Nelson's stock sales do not support a strong inference of scienter.[28]

24

25       **6.    Shares Sold by Defendant Moores**

26       The volume of Peregrine common stock sold by Defendant Moores was by far greater

27  _____

28  [28] The Loran Plaintiffs filed a motion to strike certain materials submitted by Defendants,
    including Nelson's chart summarizing his vested options as of February 15, 2001. (*See* Loran Mot. to
    Strike at 4.)  Because the Court has not relied on the document in its ruling, Plaintiff's motion to strike is
    DENIED as moot.

Exhibit E
0444

1  than that of any other defendant. The CC alleges that Moores sold 10,930,051 shares and

2  received proceeds exceeding $401,640,096.08. Because the stock sale proceeds are a staggering

3  amount, the Loran Plaintiffs argue that this amount is "unusual enough to support a *scienter*

4  allegation." (Loran Opp'n at 36.) (emphasis in original). In a decision from the Central District

5  of California, the court found that the sale of 300,000 shares, or 20% of the defendant's total

6  holdings, with net proceeds of approximately $6,300,000, supported an inference of scienter.

7  *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal.

8  1996). The court's finding of an inference of scienter, however, is located in the court's

9  discussion of the "motive" prong of the "motive and opportunity" test. *Id.* Because the Ninth

10 Circuit ruled that this test does not comport with the PSLRA, *Silicon Graphics*, 183 F.3d at 979,

11 Plaintiffs' reliance on *Marksman Partners* is misplaced.

12      Although Defendant Moores' gross proceeds are quite large, the Court must also consider

13 the percentage of shares sold. *Silicon Graphics*, 183 F.3d at 986. The CC only alleges the

14 amount of shares sold and the proceeds received by Moores. Despite Plaintiffs' failure to

15 include the percentage of shares sold based upon Moores' total holdings, the Loran Plaintiffs

16 have provided these percentages in their opposition. (Loran Opp'n at 37.) As noted by Moores,

17 however, the CC nor the opposition state Moores' total holdings of Peregrine common stock.[29]

18 (Moores' Reply at 10.) Although Moores' total holdings have not been alleged in the CC,

19 Moores does not appear to dispute the Loran Plaintiffs' calculation. (*See id.*)

20      In their Opposition, the Loran Plaintiffs contend that Moores sold 23%, 37%, and 73% of

21 his holdings during three "trading windows." (Loran Opp'n at 37.) It is not clear to the Court

22 why the Loran Plaintiffs have chosen to divide these percentages. Generally, courts consider the

23 percentage of total holdings sold during the Class Period, as a whole, rather than dividing the

24 Class Period into multiple trading windows. *See, e.g., Osher*, 256 F. Supp. 2d at 1163-65;

25  _____

26 [29] Pursuant to Defendant Moores' request, the Court takes judicial notice of Moores' SEC Forms 4. (*See* DeGeeter Decl. in Supp. of Moores' Mot. to Dismiss Ex. B.) In addition to the Forms 4, Moores has also submitted a summary of stock sales. (*See* DeGeeter Decl. Ex. E.) Because these charts are

27 interpretations of information contained in SEC filings, rather than the actual filings themselves, the Loran Plaintiffs move to strike the stock sale summary. (Loran Mot. to Strike at 3.) The Loran Plaintiffs

28 contend that the chart is unnecessary, as the Court has taken judicial notice of the actual SEC filings. (*Id.*); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998). Nevertheless, because the Court has not relied on the charts themselves, the motion to strike is DENIED as moot.

02cv870-J (RBB)

1   *Allison*, 999 F. Supp. at 1352-53. With that said, assuming *arguendo* the accuracy of these

2   figures, Moores' sales during the first trading window in July 1999 may constitute a suspicious

3   amount.

4        In addition to analyzing the amount and percentage of shares sold, courts must consider

5   the timing of the sales. *Silicon Graphics*, 183 F.3d at 986. As stated above, Defendant Moores'

6   sales of Peregrine stock are limited to three different trading windows: July 1999, February

7   2000, and February 2001. (CC ¶ 466.) The misstatements issued by Defendant Moores, the

8   Forms 10-K for Fiscal Years 2000 and 2001, as well as the Amendment No. 1 to the Form S-4

9   Registration Statement, were filed with the SEC on May 10, 2000, June 29, 2001, and July 23,

10   2001 respectively. (CC ¶¶ 343, 402, 407.) "[S]tock sales are helpful only in demonstrating that

11   certain statements were misleading and made with knowledge or deliberate recklessness when

12   those sales are able to be related to the challenged statements." *Vantive*, 283 F.3d at 1093.

13   Upon reviewing the timing of Moores' sales, no sale ever took place immediately following the

14   dissemination of Peregrine's financial statements. Moreover, the fact that Defendant Moores

15   sold his shares far below the peak stock price for Peregrine supports a finding that his sales were

16   not "calculated to maximize the personal benefit from the undisclosed inside information."

17   *Silicon Graphics*, 183 F.3d at 986.

18        Finally, the Court must consider whether Moores' sales were consistent with his prior

19   trading history. *Id.* The CC alleges that Moores sold roughly 6,000,000 shares for gross

20   proceeds of approximately $162 million before the Class Period. (CC ¶ 139.) Because Plaintiffs

21   have not indicated how many shares Moores possessed prior to the Class Period, it is difficult to

22   evaluate how Moores' sales during the Class Period compare with his prior trading. In addition,

23   Plaintiffs have failed to allege information concerning Moores' total holdings. Accordingly,

24   after analyzing the relevant factors that can be ascertained by the Court at this stage, the Court

25   finds that the allegations fail to raise a strong inference of scienter.

26

27       **7.**    **Shares Sold by Defendants Noell and van den Berg**

28        Defendants Noell and van den Berg, both Peregrine board members, contend that their

sales of Peregrine common stock do not establish the requisite level of scienter under Section

02cv870-J (RBB)

1  10(b). Prior to the Class Period, van den Berg sold 95,200 shares, while his total holdings

2  exceeded 117,472 shares.[30] (Noell and van den Berg P. & A. at 6; Pastuszenski Decl. Ex. A.)

3  As for Defendant Noell, the Form 4s reflect sales of 107,000 shares prior to the Class Period.[31]

4  (Noell and van den Berg P. & A. at 6; Pastuszenski Decl. Ex. B.) Noell's sales before the Class

5  Period produced proceeds exceeding $2,221,510. (CC ¶¶ 475-76.) During the Class Period,

6  while van den Berg sold 40,000 shares, Noell sold approximately 174,375. (CC ¶ 466;

7  Pastuzenski Decl. Ex. A, B.) Although not mentioned in the CC, the Loran Plaintiffs state that

8  Noell's three sales amounted to 62%, 71%, and 55% respectively. (Loran Opp'n at 38.)

9  Similarly, the Loran Plaintiffs contend that van den Berg sold 51% of his total holdings during

10  the Class Period. Defendants van den Berg and Noell each received proceeds of roughly

11  $1,728,000 and $6,395,812.55 respectively. (CC ¶ 466.)

12          Although the amount of shares sold during the Class Period may be considered high, the

13  sales do not appear to be dramatically out of line with prior trading practices. While van den

14  Berg sold 81% of his total holdings before the Class Period, he sold 88% during the Class

15  Period.[32] Moreover, both van den Berg and Noell received no more than $43 per share – well

16  below the peak stock price of $79, which tends to demonstrate that the timing of the sales was

17  not "calculated to maximize the personal benefit from the undisclosed inside information."

18  *Silicon Graphics*, 183 F.3d at 986. Accordingly, the Court finds that CC fails to allege that van

19

20

21  _____

22  [30] The Court takes judicial notice of Defendants van den Berg and Noell's Forms 4. (*See* Pastuszenski Decl. Ex. A, B.) As discussed above, the number of stocks sold have not been altered to account for stock splits.

23

24  [31] After reviewing Noell's Forms 4, the Court is unable to determine his total holdings during the Class Period. It appears that Noell's total holdings of Peregrine common stock before the Class Period were 138,714 shares. The Court is uncertain whether Noell's total holdings during the Class Period was

25  187,453 because the Form 4s do not appear to account for all of Noell's stock acquisitions.

26  [32] The Court notes that the CC fails to include Defendant van den Berg's prior trading history, which must be included in order for this Court "to conclude that [] trading was dramatically out of line

27  with prior trading practices." *Ronconi*, 253 F.3d at 435-36. Moreover, without allegations relating to total stock holdings, the Court cannot calculate the percentage of shares sold. Accordingly, the Court

28  must refer to each defendant's Form 4, which have been incorporated by reference in the CC. In addition, stock options should be included when computing the percentage of total holdings sold. *Vantive*, 283 F.3d at 1092 n.12 (citing *Silicon Graphics*, 183 F.3d at 986-87).

02cv870-J (RBB)

Exhibit E
0447

1  den Berg and Noell's stock sales were "unusual" or "suspicious."[33]

2

3        **8.**    **Shares Sold by Defendant Spitzer**

4        Defendant Spitzer joined in the motions to dismiss the CC filed by Defendants Moores,

5  Gardner, and Hosley. [Doc. No. 277.] Spitzer served as either Vice President, Channel Sales or

6  Vice President, Alliance from August 1997 until mid-2000. (CC ¶ 49(h).) As discussed above,

7  the Court notes that Spitzer pled guilty to charges of conspiracy to commit securities fraud.

8  Plaintiffs now seek to bolster their allegations of Spitzer's scienter with evidence of his stock

9  sales. Although the CC alleges that Spitzer sold 47,500 shares and received $1,914,650 in

10 revenue from the sale of Peregrine common stock, (CC ¶ 466), the CC fails to present

11 information concerning his trading history before the Class Period.[34] Consequently, the CC's

12 allegations relating to Spitzer's insider trading fall short of demonstrating scienter.

13

14       **9.**    **Shares Sold by Defendant Cappel**

15       Defendant Cappel joined in the motions to dismiss filed by Defendants Gardner, Hosley,

16 Moores, and Noell and van den Berg. [Doc. Nos. 277, 297.] Plaintiffs seek to use allegations of

17 insider trader by Cappel to raise of strong inference of scienter. Although the CC does strongly

18 indicate that a fraudulent scheme was in place at Peregrine, the CC does not sufficiently allege

19 Cappel's stock trades as establishing scienter. According to the CC, Cappel sold 16,249 shares

20 of Peregrine common stock and received $334,287 in revenue during the Class Period. (CC ¶

21 466.) Similar to the allegations against Spitzer, the CC's allegations against Cappel are

22 deficient, as no information is provided concerning stock sales before the Class Period. Without

23 such information, the Court is unable to compare trades during the Class Period with Cappel's

24

25     [33] The Loran Plaintiffs move to strike three charts depicting Noell and van den Berg's stock sales
before and during the Class Period. (*See* Pastuszenski Decl. Exs. D, E, F; DeGeeter Decl. Exs. F, G, H.)

26 Because the Court has taken judicial notice of the SEC filings themselves, these charts are unnecessary
and not have been taken into consideration by the Court. *See Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821

27 (C.D. Cal. 1998). Accordingly, the Loran Plaintiffs' motion to strike is DENIED as moot.

28     [34] In their opposition brief, the Loran Plaintiffs contend that Spitzer realized $1,384,100 in
revenue prior to the Class Period. (Loran Opp'n at 43.) However, the Court is unable to locate this fact
in the CC.

02cv870-J (RBB)

Exhibit E
0448

1    prior trading history.

2

3        **M.    Increased Cash Bonuses**

4            According to the CC, cash bonuses paid to Defendants Gardner, Powanda, and Nelson

5    dramatically increased as a result of the improper revenue recognition. (CC ¶ 104.) This

6    allegation suggests that these three defendants had the motive to generate fraudulent financial

7    statements. Nevertheless, courts have repeatedly "rejected efforts to characterize incentive

8    compensation as a substantial motive for fraud, because holding this to be a sufficient motive

9    'would effectively eliminate the state of mind requirement as to all corporate officers and

10   defendants.'" *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1274 (N.D. Cal.

11   2000) (quoting *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994)). Accordingly, the Court

12   finds that the cash bonuses paid to Gardner, Powanda, and Nelson do not raise a strong inference

13   of scienter.

14

15       **N.    Arthur Andersen's Involvement in the Fraud**

16           Arthur Andersen, a firm of certified public accountants, was retained by Peregrine to give

17   accounting advice and act as the Company's independent auditor. (CC ¶ 49(q).) In fact, Arthur

18   Andersen issued audit opinions regarding Peregrine financial statements for Fiscal Years 2000

19   and 2001. (*Id.*) In Peregrine's filings with the SEC, Arthur Andersen represented that the

20   Company's financial statements were in conformity with GAAP and were audited in accordance

21   with Generally Accepted Auditing Standards ("GAAS"). (*Id.*) The purported GAAS violations

22   include the failure to obtain adequate documentation for critical revenue transactions, (CC ¶

23   256), test management's assertions concerning the collectability of revenue, (CC ¶ 266), and

24   remain independent from Peregrine. (CC ¶¶ 248-49.) The CC further alleges that Arthur

25   Andersen's representations were false, which is not disputed by Arthur Andersen. (CC ¶ 254;

26   Arthur Andersen Reply Br. at 4 n. 2.) Moreover, the following is averred in the CC:

27           [T]he Arthur Andersen Defendants knew, or recklessly disregarded (1) that Peregrine had
             improperly recorded over $500 million in revenues; (2) that the Company's liabilities had
28           been understated by up to $180 million; (3) that the Company's option compensation was
             understated by $100 million during the Class Period; (4) that the Company's reported
             accounts receivable were consistently understated by a material amount during the Class

                                              73                          02cv870-J (RBB)

1    Period; (5) that the Company's reported cash position was materially overstated during
     the Class Period; (6) that the Company's liabilities were materially understated
2    throughout the Class Period; and (7) that the Company failed to disclose adequately the
     nature of and the revenue recognized from product/service swaps which it entered into.

3

4    (CC ¶ 246.) Apparently as a means of establishing a strong inference of scienter, Plaintiffs

5    allege that "the Arthur Andersen Defendants were routinely consulted by defendant Gless

6    regarding how to structure transactions with customers so as to permit current revenue

7    recognition." (CC ¶ 247.)

8            Upon reviewing the allegations against both Arthur Andersen and Stulac, the Court finds

9    them to be nothing more than bald assertions. As stated above,"[v]iolations of GAAP or GAAS,

10   standing alone, do not satisfy the particularity or strong inference requirements of the [PSLRA]

11   because they provide no specific facts upon which a court can infer the state of mind of the

12   accountant or its client, at any specific point in time." *Reiger*, 117 F. Supp. 2d at 1009-10.

13   Plaintiffs allegations fail to provide the Court with any details or facts giving rise to a strong

14   inference of scienter. Rather, the CC states in a conclusory fashion that Arthur Andersen knew

15   or was deliberately reckless in not knowing of Peregrine's accounting irregularities. Such

16   allegations do not comport with the standard set forth by the Ninth Circuit in *Silicon Graphics*.

17   "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of

18   intentional or knowing misconduct." *Silicon Graphics*, 183 F.3d at 977. In order to establish

19   scienter with respect to Arthur Andersen, Plaintiffs must allege facts "to establish that [Arthur

20   Andersen] knew or must have been aware of the improper revenue recognition, intentionally or

21   knowingly falsified the financial statements, or that the audit was such an extreme departure'

22   from reasonable accounting practice that [Arthur Andersen] knew or had to have known that its

23   conclusions would mislead investors." *DSAM*, 288 F.3d at 391 (internal quotations omitted).

24   Similarly, Plaintiffs may demonstrate scienter by proving "that the accounting practices were so

25   deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or

26   to investigate the doubtful, or that the accounting judgments which were made were such that no

27   reasonable accountant would have made the same decisions if confronted with the same facts."

28   *DSAM*, 288 F.3d at 390 (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 627-28 (9th Cir.

     1994).

                                              74                                    02cv870-J (RBB)

1    The factual allegations in this case are similar to those rejected in *Software Toolworks*

2 and *DSAM*. In *Software Toolworks*, where the plaintiffs alleged that sales agreements were

3 "poorly documented, informal and conditional," the transactions were risky, management was

4 under pressure for favorable earnings and the accountants obtained only oral confirmations of

5 some agreements, the Ninth Circuit found that such allegations that an accountant failed to

6 investigate established only a negligent audit rather than scienter. 50 F.3d at 627-28. In *DSAM*,

7 where it was alleged that the auditor egregiously failed to detect millions of dollars in revenue

8 that had been improperly recognized in violation of GAAP, the Ninth Circuit affirmed the

9 district court's dismissal of the complaint. 288 F.3d at 387. The court held that "mere

10 allegations that an accountant negligently failed to closely review files or follow GAAP cannot

11 raise a strong inference of scienter."[35] *Id.* at 390 (citing *Software Toolworks*, 50 F.3d at 628).

12    The Loran Plaintiffs contend that Arthur Andersen's failure to investigate "red flags"

13 supports a finding of scienter. (Loran Opp'n at 49.) These "red flags" consisted of the

14 following:

15    (1) Peregrine had weak or non-existent internal accounting controls and therefore no
ability to generate reliable financial statements; (2) there was no functioning Audit

16    Committee; (3) there were no minutes in existence of any Audit Committee meetings; (4)
requested significant manual adjustments were made to software license and maintenance

17    revenue; (5) there was a known failure to record the deferred tax effects for accruals
recorded in Peregrine's various business combinations; (6) there was an inability to

18    quantify the amount of sales to resellers and to even establish their identities; (7)
Peregrine was unable to provide, or there were substantial delays in providing, trial

19    balances, general ledgers and subledgers that would customarily be readily available.

20 (Loran Opp'n at 50; CC ¶¶ 234-39, 256.) The Loran Plaintiffs contend that "deliberately

21 ignoring 'red flags' such as those alleged here can constitute the sort of recklessness necessary to

22 support a § 10(b) violation." (Loran Opp'n at 52.) As stated above, however, the CC does not

23 allege facts demonstrating any "deliberate" action taken by Arthur Andersen. Although such

24 circumstances may demonstrate a negligent audit, the CC's allegations do not establish that

25 Arthur Andersen recklessly or knowingly falsified Peregrine's financial statements. Moreover,

26 in accordance with *DSAM*, allegations of Arthur Andersen's failure to detect the improper

27

28    [35] Even where the defendant accounting firm allegedly "had in its hands the very documentation
that clearly showed [the company's] violation of GAAP," the Ninth Circuit affirmed the district court's
finding of no scienter. *DSAM*, 288 F.3d at 390-91.

75                                           02cv870-J (RBB)

1   revenue recognition, without more, does not establish a strong inference of deliberate

2   recklessness under *Silicon Graphics*.

3          The Loran Plaintiffs further argue that Arthur Andersen chose to ignore these "red flags"

4   "because of, among other things, its lack of independence from Peregrine and the pressure put

5   on [Arthur Andersen] partners by its management to increase revenue." (CC ¶ 247.) Despite the

6   fact that the CC explains Arthur Andersen's motive for engaging in the alleged fraud, the Ninth

7   Circuit has rejected the "motive and opportunity" test. *Silicon Graphics*, 183 F.3d at 979; *see*

8   *also Reiger*, 117 F. Supp. 2d at 1011 ("The lack of rational economic incentive for an

9   independent accountant to participate in fraud, the client's central role in providing information

10  to the accountant, and the complex professional judgment required to perform an audit, make it

11  exceedingly difficult for a securities plaintiff to plead facts suggesting that an independent

12  accountant acted with the deliberate state of mind now required to withstand a motion to

13  dismiss."). According to the Loran Plaintiffs, motive, combined with "red flags," establish

14  scienter. (Loran Opp'n at 52) (citing *Howard*, 228 F.3d at 1064). However, such reliance on

15  *Howard* is misplaced. There, the court addressed this issue in the context of a motion for

16  judgment as a matter of law brought by the CEO. *Howard*, 228 F.3d at 1060. The Court

17  specifically distinguished the standard on summary judgment or JMOL from that of a motion to

18  dismiss. *Id.* at 1064. Although *Silicon Graphics* held that "a mere showing of motive and

19  opportunity would not suffice to survive a motion to dismiss," *Id.*, the *Howard* court noted that

20  *Silicon Graphics* did not alter the standard on summary judgment or JMOL. Because the matter

21  before the Court is a motion to dismiss, the Court finds that motive, combined with red flags, is

22  insufficient.

23         Additionally, as discussed above, this Court has declined to infer scienter based solely

24  upon the magnitude of accounting fraud because to do so "invites a court to speculate as to the

25  existence of specific (but unpled and unidentified) warning signs that show the accountant acted

26  with scienter." *Reiger*, 117 F. Supp. 2d at 1013. Nevertheless, the Loran Plaintiffs cite to

27  *Homestore.com* for the proposition that the magnitude of the accounting fraud may support an

28  inference of scienter. (Loran Opp'n at 52-53.) There, the court identified several allegations

giving rise to the inference of scienter, including one relating to the fact that Homestore restated

Exhibit E
0452

1  seven quarters of revenue for a total of $193 million. 252 F. Supp. 2d at 1044. According to the

2  court, "[t]his evidences an accounting and auditing debacle amounting to more than gross

3  negligence." *Id.*

4      Similar to Homestore, Peregrine restated eleven quarters for a total exceeding $500

5  million. Nevertheless, the instant action is distinguishable from *Homestore.com*. There, the

6  complaint alleged that the auditor

7      (1) was heavily involved in the day-to-day accounting practices of the company, (2) had
       actual knowledge of specific improper transactions and the accounting thereof, (3) even

8      objected to some of these transactions but not to identical transactions, and (4)
       nonetheless issued an unqualified audit opinion certifying that Homestore's publicly filed

9      financial statements complied with the GAAP and that its auditing complied with the
       GAAS.

10

11  *Id.* at 1043. In contrast to *Homestore.com*, no facts are averred that support an inference of

12  actual knowledge of improper transactions. Accordingly, Plaintiffs have failed to state a Section

13  10(b) claim against Defendants Arthur Andersen and Stulac.

14

15      **O.    Looking at the CC in Its Entirety**

16      As stated above, courts must consider allegations of scienter collectively in order to

17  determine whether scienter has been alleged with sufficient particularity. *Broudo*, 339 F.3d at

18  940 (remanding case to district court to perform final step of considering the complaint's

19  allegations as a whole). "Beyond each individual allegation [courts] consider whether the total

20  of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong

21  inference that defendants acted with deliberate or conscious recklessness." *Am. West*, 320 F.3d

22  at 938 (internal quotations omitted). As instructed by the Ninth Circuit, this Court must view the

23  CC in its entirety to determine whether scienter has been sufficiently alleged.

24      Although some of Plaintiffs' averments are individually lacking, the Court finds that the

25  CC sufficiently alleges the existence of a fraudulent scheme by improperly recognizing

26  contingent transactions as revenue. This scheme included the publication of false financial data

27  in SEC filings, press releases, and securities analysts' statements. As a whole, these allegations

28  comply with the stringent pleading standard set forth in the PSLRA. However, for the reasons

    set forth above, the Court finds allegations concerning only some of the Defendants to be

                                        77                          02cv870-J (RBB)

1  sufficient. Specifically, the CC states with adequate particularity Section 10(b) claims against

2  Defendants Gardner, Gless, Spitzer, and Cappel. Accordingly, the motions to dismiss filed by

3  these defendants are DENIED. As to Defendants Powanda, Moores, Nelson, Luddy, Hosley,

4  Noell, van den Berg, Watrous, Savoy, Cole, Arthur Andersen, and Stulac, however, their

5  motions to dismiss are GRANTED with respect to the Section 10(b) claims. Accordingly,

6  Plaintiffs' Section 10(b) claims against these individuals are DISMISSED without prejudice, and

7  Plaintiffs are GRANTED leave to amend their complaint within **60 days** after this Order is

8  stamped "filed." Plaintiffs shall correct the pleading deficiencies as noted herein.

9

10  **II.    Section 11 of the Securities Act**

11          Plaintiffs Waga and Sutliff also allege violations of § 11 of the Securities Act against

12  Defendants Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, and the Arthur

13  Andersen Defendants on behalf of the Harbinger Subclass, while Plaintiffs Balch and Hylton, on

14  behalf of the Remedy Subclass, assert § 11 claims against Defendants Gardner, Gless, Moores,

15  Savoy, Cole, Noell, Watrous, and the Arthur Andersen Defendants.[36] (CC ¶¶ 560, 561, 583,

16  584.) Section 11 imposes liability for false statements or omissions of material fact in

17  registration statements. *See* 15 U.S.C. § 77k. In order to state a claim under § 11, plaintiffs

18  must allege "(1) that the registration statement contained an omission or misrepresentation, and

19  (2) that the omission or misrepresentation was material, that is it would have misled a reasonable

20  investor about the nature of his or her investment." *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399,

21  1403-04 (9th Cir. 1996) (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994)). Section

22  11 claims are not governed by the heightened pleading standards of the PSLRA, and scienter

23  need not be alleged. *Id.* at 1404. Although fraud is not an essential element in Section 11

24  claims, a plaintiff may choose to allege that the defendant has engaged in fraudulent conduct.

25  Such a Section 11 claim is said to be "grounded in fraud" or to "sound in fraud." *Vess v. Ciba-*

26  *Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). If a Section 11 claim is grounded in

27  fraud, "the pleading of that claim as a whole must satisfy the particularity requirements of Rule

28

---

[36] Of the Arthur Andersen Defendants, only Defendant Stulac has moved for dismissal of Plaintiffs' Section 11 and 12 claims.

02cv870-J (RBB)

9(b)." *Id.* at 1103-04; *see Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002); *Stac*, 89 F.3d at 1404-05 (Rule 9(b) applies to § 11 claims grounded in fraud). However, it is only those allegations relating to fraudulent conduct that must satisfy the heightened pleading requirements of Rule 9(b). *Vess*, 317 F.3d at 1105. "Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." *Id.* Even if averments of fraud are made in a Section 11 claim, but are insufficiently pled under Rule 9(b), "a district court should disregard those averments, or 'strip' them from the claim." *Id.*

On May 22, 2000, Peregrine filed Amendment No. 1 to its Form S-4 Registration Statement with the SEC in connection with its acquisition of Harbinger. (CC ¶ 562.) This registration statement (the "Harbinger Registration Statement") contained Peregrine's financial statements for Fiscal Year 2000, as well as an unqualified audit opinion on those financial statements issued by Arthur Andersen dated April 25, 2000. (CC ¶ 564.) Moreover, the Harbinger Registration Statement included a Proxy Statement/Prospectus, which provided that special meetings be held on June 16, 2000 for the purpose of approving the proposed merger of Peregrine and Harbinger. (CC ¶ 562.) The terms of the proposed merger provided that each outstanding share of Harbinger common stock would be exchanged for 0.75 of a share of Peregrine common stock. (*Id.*) Each option to purchase Harbinger shares was to be exchanged for an option to purchase Peregrine shares at the same exchange ratio. (*Id.*). Defendants Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, and Watrous signed the Harbinger Registration Statement. (CC ¶ 563.) The CC alleges that "[t]he Harbinger Registration Statement contained untrue statements of material fact and/or omitted to state material facts necessary to make statements therein not misleading." (*Id.*) According to Plaintiffs Waga and Sutliff, the Registration Statement was false because Peregrine's financial statements overstated revenues and understated liabilities, revenue was improperly recognized on contingent transactions, and the financial statements did not comport with GAAP, GAAS, nor the Company's own revenue recognition polices. (CC ¶ 567.)

With respect to the acquisition of Remedy, Peregrine filed Amendment No. 1 to its Form S-4 Registration Statement with the SEC on July 23, 2001. (CC ¶ 585.) This registration statement (the "Remedy Registration Statement") contained Peregrine's financial statements

02cv870-J (RBB)

Exhibit E
0455

1  from Fiscal Years 2000 and 2001, in addition to Arthur Andersen's unqualified audit opinion on

2  those statements. (CC ¶ 588.) Moreover, the Proxy/Prospectus included with the Remedy

3  Registration Statement contained a section entitled "Peregrine Selected Consolidated Financial

4  Data," which consisted of the Company's operating results for Fiscal Years 2000 and 2001. (CC

5  ¶587.) Furthermore, the Proxy/Prospectus provided for a special meeting to be held on August

6  27, 2001 for Remedy Shareholders to approve the proposed merger. (CC ¶ 585.) Under the

7  terms of the proposed merger, outstanding shares of Remedy common stock would be exchanged

8  for $9 per share in cash and 0.9065 of a share of Peregrine common stock. (*Id.*) Options to

9  purchase Remedy shares "would be exchanged for an equivalent amount of Peregrine common

10  stock based on the value of stock and cash which each share of Remedy common stock was to

11  receive in the merger." (*Id.*) The CC alleges that the Remedy Registration Statement was false

12  for the same reasons as the Harbinger Registration Statement. Moreover, it is averred that

13  Defendants Gardner, Gless, Moores, Savoy, Cole, Noell, and Watrous signed the Remedy

14  Registration Statement. (CC ¶ 586.)

15

16      A.    **Sufficiency of Plaintiffs' Section 11 Claims**

17          The CC states that the misrepresentations appeared in the financial statements included

18  with the Harbinger and Remedy Registration Statements filed with the SEC. Moreover, the CC

19  explains that the financial statements were false because of the accounting irregularities

20  contained therein. Several Defendants, including Defendants Gardner, Hosley, Noell, van den

21  Berg and Stulac, argue that these averments are insufficient because they do not comply with the

22  heightened pleading standards of Rule 9(b). As stated above, Rule 9(b) applies only to those

23  allegations involving fraudulent conduct. *Vess*, 317 F.3d at 1104-05. Because the Loran

24  Plaintiffs stated that Defendants participated in "one of the largest securities frauds in history,"

25  certain defendants, including Defendant Gardner, contend that Plaintiffs' Section 11 claims

26  sound in fraud and, thus, must satisfy Rule 9(b)'s heightened pleading standards. (Gardner

27  Reply at 11.)

28          Although the defendants are correct that Section 11 claims "grounded in fraud" must

satisfy the particularity requirements of Rule 9(b), *Stac*, 89 F.3d at 1404-05, Plaintiffs' Section

02cv870-J (RBB)

1   11 claims do not allege that Defendants engaged in fraudulent conduct.  In fact, the Waga

2   Plaintiffs, who allege the Section 11 claims, "disavow reliance on, or incorporation of,

3   allegations in the CC that may be deemed as 'sounding in fraud.'" (Waga Opp'n at 23.)

4   Plaintiffs base their Section 11 claims "solely on defendants' negligent conduct." (CC ¶¶ 560,

5   583.)  The Court recognizes that a statement disclaiming allegations sounding in fraud in

6   connection with a Section 11, by itself, cannot preclude a finding that the claim is actually

7   grounded in fraud.  *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 n. 5 (9th Cir. 2000); *see*

8   *also Seebeyond*, 266 F. Supp. 2d at 1172.   As noted in *Vess*, however, even if Section 11 claims

9   do include averments of fraudulent conduct lacking sufficient particularity, the Court need only

10   "strip" them from the claims.  *Vess*, 317 F.3d at 1105; *In re Calpine Corp. Sec. Litig.*, --- F.

11   Supp. 2d ---, No. C 02-1200 SBA, 2003 WL 22351414, *22 (N.D. Cal. Aug. 28, 2003).

12   Accordingly, the Court may separate the Loran Plaintiffs' averments of fraud from the Waga

13   Plaintiffs' Section 11 claims to determine whether a claim has been stated.  Applying Rule 8(a)

14   to the allegations not grounded in fraud supporting the Section 11 claims, the Court concludes

15   that Plaintiffs' Section 11 claims are sufficient.

16        Moreover, the Court notes each individual identified as a defendant in Plaintiffs' Section

17   11 claims is properly named as such.  Section 11 liability attaches to "(1) every person who

18   signed the registration statement; (2) every person who was a director ...at the time of the filing;"

19   and (3) "every accountant ... who has with his consent been named as having prepared or

20   certified any part of the registration statement[.]" 15 U.S.C. § 77k.  Each defendant named in

21   Counts VI and IX, the Section 11 claims, either signed the registration statements, sat on the

22   board at the time of their filing, or was an accountant who certified Peregrine's financial

23   statements.  With respect to the "Arthur Andersen Defendants," the CC alleges that "[t]he Arthur

24   Andersen audit reports were contained in the [] Registration Statement[s] with the knowledge

25   and consent or the acquiescence of defendants Arthur Andersen, Stulac and Andersen

26   Worldwide." (CC ¶¶ 572, 596.)  Accordingly, naming these individuals as defendants in the

27   Section 11 claim is proper.

28

02cv870-J (RBB)

**B.    The Due Diligence Defense**

Under Section 11, where a defendant relies on an expert, he or she may escape liability for misrepresentations in the registration statement by demonstrating that he or she "had no reasonable ground to believe and did not believe ... that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(C).  Accountants are recognized as "experts" for purposes of Section 11.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421 (9th Cir. 1994).  According to Defendants Moores, Savoy and Hosley, Plaintiffs' Section 11 claims "must be dismissed because the Complaint establishes an absolute defense to liability."  (Moores P. & A. at 26; Savoy P. & A. at 17-19; Hosley P. & A. at 18-19.) These defendants contend that dismissal is appropriate because the due diligence defense appears on the face of the complaint.  *See McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990) ("For a complaint to be dismissed because the allegations give rise to an affirmative defense, the defense clearly must appear on the face of the pleading.").

Despite Defendants' contention, the CC does not clearly state that any defendant "had no reasonable ground to believe and did not believe" that the statements made in the Harbinger and Remedy Registration Statements, including Peregrine's audited financial statements for Fiscal Years 2000 and 2001, were untrue.  The fact that Peregrine retained the services of Arthur Andersen to provide independent accounting and auditing services does not say anything about the reasonableness of believing Arthur Andersen's statements or that the defendants did in fact believe the truth of Arthur Andersen's statements.  Similarly, Peregrine's statement in the Harbinger Registration Statement that its consolidated financial statements "are included in reliance upon the authority of [Arthur Andersen] as experts in giving [their audit reports]" does not establish the reasonableness of Peregrine's reliance on Arthur Andersen's expertise.[37]  By arguing that the CC should be dismissed on this ground, Defendants are asking the Court to determine the reasonableness of their reliance.  However, it is not appropriate to resolve questions of reasonableness on a motion to dismiss.  *See In re Enron Corp. Sec., Derivative &*

---

[37] Pursuant to Defendant Savoy's request, the Court takes judicial notice of the Harbinger Registration Statement.  (*See* Savoy Req. for Judicial Notice, Ex. P.)

02cv870-J (RBB)

Exhibit E
0458

1    *ERISA Litig.*, 258 F. Supp. 2d 576, 597 (S.D. Tex. 2003).

2         Moreover, just as the Court refused to apply the group pleading doctrine and attribute

3    statements made by Peregrine to individual defendants, the Court declines to impute Peregrine's

4    reliance statement to any individual defendants.  Additionally, despite Defendants Savoy's and

5    Hosley's contention to the contrary, Plaintiffs need not allege facts showing that Savoy's

6    reliance on Arthur Andersen was unreasonable, as pleading allegations relating to an affirmative

7    defense is not Plaintiffs' burden.[38]  *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*,

8    258 F. Supp. 2d 576, 597 (S.D. Tex. 2003) (citing *Lone Star Ladies Inv. Club v. Schlotzky's Inc.*,

9    238 F.3d 363, 369 (5th Cir. 2001) ("Due diligence in response to a § 11 claim 'is an affirmative

10   defense that must be pleaded and proved.'").  Defendants fail to cite to any authority in the Ninth

11   Circuit or elsewhere dismissing a Section 11 claim because the due diligence defense appeared

12   on the fact of a complaint.  *See In re Hamilton Bankcorp., Inc. Sec. Litig.*, 194 F. Supp. 2d 1353,

13   1357 (S.D. Fla. 2002) ("The Underwriter Defendants' contentions that they were entitled to and

14   did rely on the financial statements certified by Hamilton's auditor, Deloitte, is an affirmative

15   defense which cannot be resolved on a motion to dismiss.").  For the reasons set forth above, the

16   Court finds that the due diligence defense does not appear on the face of the CC.  Accordingly,

17   Defendants' motions to dismiss Plaintiffs' Section 11 claims are DENIED.

18

19   **III.    Section 12(a)(2) of the Securities Act**

20         Plaintiffs Waga and Sutliff, on behalf of the Harbinger Subclass, assert a claim under

21   Section 12(a)(2) against Defendants Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg,

22   and Watrous, while Plaintiffs Balch and Hylton, on behalf of the Remedy Subclass, have

23   asserted a § 12(a)(2) claim against Defendants Gardner, Gless, Moores, Savoy, Cole, Noell and

24   Watrous.  (CC ¶ 577, 602.)  Section 12(a)(2) imposes liability on sellers of securities if they

25   _____

26   [38] According to Defendant Hosley, "the Harbinger Plaintiffs[] must plead the existence of 'red
flags' that would have made reliance upon Anderson's expert opinions unreasonable." (Hosley P. & A.

27   at 19.)  Hosley's reliance on *Software Toolworks* for this proposition is misplaced.  There, the issue
before the court, on a motion for summary judgment, was whether an underwriter's reliance on

28   expertised financial statements was reasonable as a matter of law.  *In re Software Toolworks*, 50 F.3d at
623.  The court did not address whether dismissal of a Section 11 claim on a motion to dismiss under
Rule 12(b)(6) was proper.  Contrary to Hosley's contention, *Software Toolworks* did not involve the
sufficiency of Section 11 pleadings.

Exhibit E
0459

1  offer or sell a security, "by means of a prospectus or oral communication" that contains untrue

2  statements or material omissions. 15 U.S.C. § 77*l*(a)(2); *Falkowski*, at 1133-34. Similar to

3  Section 11 claims, the heightened pleading requirements of Rule 9(b) apply to only those to

4  those averments alleging fraudulent conduct. *Vess*, 317 F.3d at 1103-05. Moreover, "if

5  particular averments of fraud are insufficiently pled under Rule 9(b), a district court should

6  'disregard' those averments, or 'strip' them from the claim." *Id.* at 1305. Allegations of non-

7  fraudulent conduct are subject to Rule 8(a)'s pleading standards. *Id.* For the same reasons set

8  forth in this Court's Section 11 analysis, the Court finds that Plaintiffs' Section 12 claims are not

9  grounded in fraud. Accordingly, the Section 12 claims need only satisfy Rule 8(a).

10       In the present action, Defendants contend that Plaintiffs have failed to allege that they are

11  statutory § 12 sellers under the standard set forth in *Pinter v. Dahl*, 486 U.S. 622 (1988). In

12  *Pinter*, the Supreme Court held that liability under the predecessor to § 12(a)(1) attaches to (1)

13  individuals that pass title to a security, and (2) those who solicit a purchase, "motivated at least

14  in part by a desire to serve his own financial interests or those of the securities owner." 486 U.S.

15  at 647; *see also Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 535 (9th Cir. 1989); *In re

16  Proxima Corp. Sec. Litig.*, No. 93-1139-IEG (LSP), 1994 WL 374306, *5 (S.D. Cal. May 3,

17  1994) (Gonzalez, J.) ("One is liable under § [12(a)(2)] as a seller if one either (a) passes title to

18  the plaintiff for value, or (b) successfully solicits the purchase, while motivated at least in part by

19  a pecuniary interest."). The Ninth Circuit has applied this interpretation to the predecessor of §

20  12(a)(2). *Moore*, 885 F.2d at 536. Plaintiffs argue that Defendants are sellers because (1) "they

21  signed the Harbinger and/or Remedy Registration Statements which incorporated by reference

22  their respective Proxy/Prospectus[,]" and (2) they "solicited the purchase of Peregrine stock

23  motivated at least in part by a desire to serve their own financial interests or those of the seller of

24  the securities." (Waga Opp'n at 18.)

25       Regarding the Plaintiffs' first argument, the Court finds that Defendants do not qualify as

26  statutory § 12 "sellers" under the definition set forth in *Pinter*. Under the second definition in

27  *Pinter*, an individual may not be held liable as a "seller" ""unless [he or she] actively 'solicited'

28  the Plaintiffs' purchase of securities to further their own financial motives." *In re Stratosphere

Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1120 (D. Nev. 1998) (citing *Shaw v. Digital Equip. Corp.*,

1 | 82 F.3d 1194, 1215 (1st Cir. 1996)); *see also In re Musicmaker.com Sec. Litig.*, No. CV00-2018

2 | CAS (MANX), 2001 WL 34062431, at *14 (C.D. Cal. June 4, 2001) ("The defendant must have

3 | actively participated in solicitation of the sale of the security."); *Persky v. Turley*, Nos. CIV 88-

4 | 1830-PHX-SMM; CIV 88-2089-PHX-SMM, 1991 WL 327434, at *8 (D. Ariz. Dec. 19, 1991).

5 | In *Stratosphere*, the court stated that "[r]efusing to hold Defendants liable solely on the basis that

6 | they signed the Registration Statement and Prospectus comports with the Supreme Court's

7 | guidance in *Pinter*[.]" 1 F. Supp. 2d at 1120-21; *see also Musicmaker.com*, 2001 WL 34062431,

8 | at *14 ("[M]erely signing the registration statement does not suffice to make a defendant a

9 | person who sold or solicited the sale of the security.").

10 |      In *Pinter*, not satisfied with extending § 12 liability to those who solicit securities sales

11 | for financial gain, the petitioner argued that liability should extend to those "whose participation

12 | in the buy-sell transaction is a substantial factor in causing the transaction to take place." 486

13 | U.S. at 649 (citing *Pharo v. Smith*, 621 F.2d 656, 667 (5th Cir. 1980)). The Court declined to

14 | adopt the substantial-factor approach. *Id.* at 650. "[Section] 12's failure to impose express

15 | liability for mere participation in unlawful sales transactions suggests that Congress did not

16 | intend that the section impose liability on participants collateral to the offer or sale." *Id.* The

17 | Court cited to Section 11 as a provision of the Securities Act expressly extending primary

18 | liability to "collateral participants." The Court noted the following:

19 |     Section 11 of the Securities Act, 15 U.S.C. § 77k, lends strong support to the conclusion
    that Congress did not intend to extend § 12 primary liability to collateral participants in

20 |     the unlawful securities sales transaction. . . . Section 11(a) explicitly enumerates the
    various categories of persons involved in the registration process who are subject to suit

21 |     under that section, including many who are participants in the activities leading up to the
    sale. There are no similar provisions in § 12, and therefore we may conclude that

22 |     Congress did not intend such persons to be defendants in § 12 actions.

23 | 486 U.S. at 650 n. 26. As described above, Section 11 liability attaches to "(1) every person who

24 | signed the registration statement; (2) every person who was a director ...at the time of the filing;"

25 | (3) "every person . . . about to become a director;" (4) "every accountant, engineer, or appraiser .

26 | . . who has with his consent been named as having prepared or certified any part of the

27 | registration statement;" and (5) every underwriter. 15 U.S.C. § 77k. In *Stratosphere*, the district

28 | court interpreted *Pinter* as barring § 12 liability for persons who sign registration statements

because such persons have not been expressly enumerated in § 12 in a manner similar to that in §

Exhibit E
0461

11. 1 F. Supp. 2d at 1121. This Court agrees with *Stratosphere*'s interpretation and finds

additional support for such a reading in other caselaw within the Ninth Circuit.

In *In re Fortune Sys. Sec. Litig.*, 604 F. Supp. 150, 160-64 (N.D. Cal. 1984), when the

Ninth Circuit still utilized the "substantial participation" test, the district court addressed the

difference between Section 11 and Section 12(a)(2). There, the court noted that "[e]xpansion of

[§ 12(a)(2)] liability by broadly defining 'seller' to include effectively all potential § 11

defendants would irretrievably blur the two sections together, by destroying the carefully crafted

defenses and definitions of persons liable built into the respective statutes." *Fortune Sys.*, 604 F.

Supp. at 163. The following hypothetical discussed in *Fortune Sys.* helps explain the differences

between the two statutes.

> [A] director of the issuer sued under § 11 would have to prove that he made reasonable investigation of the facts in the prospectus and reasonably believed them to be true. If the same director were found to be a "seller" simply because he signed the registration statements, he could escape § 12 liability by proof merely that he did not know and by the exercise of reasonable care (whether or not such care was actually exercised) could not have known of the misstatement.

*Id.* at 163-64. The court continued, "[w]here Congress has enacted statutes specifically defining

liabilities for particular acts, the courts should not in the guise of 'statutory interpretation'

broaden such liabilities in a way that renders meaningless the limitations and conditions that

Congress has designed." *Id.* at 164. Although this ruling was issued when the Ninth Circuit still

utilized the "substantial participation" test, its comparison of Sections 11 and 12 is still

applicable today. Accordingly, the Court finds that the mere signing of a registration statement

does not constitute active participation in soliciting the sale of stock.

Despite the Court's holding, several courts have concluded that signing an allegedly

misleading registration statement is sufficient to prove that an individual was a § 12 "seller."

*See, e.g., Proxima*, 1994 WL 374306, at *5 ("[S]ince the prospectus itself is a solicitation

document, those individual defendants who signed the Registration Statement [] effectively were

soliciting the public to purchase Proxima stock.");[39] *Kensington Capital Management v. Oakley,*

---

[39] In addition to alleging that the defendants signed the registration statement, the complaint averred that the individual defendants encouraged the public to purchase Proxima stock during road shows and telemarketing sales pitches, and disseminated false Proxima Prospectuses. *Proxima*, 1994

Exhibit E
0462

1  *Inc.*, 1999 WL 816964, at *4 (C.D. Cal. Jan. 14, 1999) (quoting *Proxima*); *Picard Chem. Profit*

2  *Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1133 (W.D. Mich. 1996) ("[T]he Perrigo

3  defendants who actually signed the Registration Statements may be said to have solicited the

4  public to purchase Perrigo stock."). Most cases reaching this conclusion rely on the definition of

5  a "prospectus." The Supreme Court has defined the term "prospectus" as "a document soliciting

6  the public to acquire securities." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574 (1995).

7  Accordingly, courts have found that signing a registration statement containing a prospectus

8  constitutes solicitation under *Pinter*. Although a prospectus is a solicitation document, attaching

9  liability to registration signers does not comport with the statutory scheme for Sections 11 and

10  12 discussed in *Pinter*. If Congress had intended to hold such individuals liable, without

11  conducting more active forms of solicitation, Congress would have done so. *See Pinter*, 486

12  U.S. at 650. Accordingly, Plaintiffs have failed to state a claim against Defendants under § 12

13  by merely alleging that Defendants signed the registration statements. Thus, Defendants motions

14  to dismiss Counts VIII and X, the Section 12 claims, are GRANTED. Plaintiffs' Section 12

15  claims are DISMISSED without prejudice, and Plaintiffs are GRANTED leave to amend their

16  complaint within **60 days** after this Order is stamped "filed." Plaintiffs shall correct the pleading

17  deficiencies as noted herein.

18

19  **IV.    Section 14(a) of the Exchange Act**

20       Plaintiffs Waga and Sutliff have asserted claims against Defendants Gardner, Gless,

21  Moores, Cole, Hosley, Noell, van den Berg, Watrous and Arthur Andersen on behalf of the

22  Harbinger Subclass, while Plaintiffs Balch and Hylton have brought claims against Defendants

23  Gardner, Gless, Moores, Savoy, Cole, Noell, Watrous and Arthur Andersen on behalf of the

24  Remedy Subclass, for violations of Section 14(a) of the Exchange Act, 15 U.S.C. §78n, Rule

25  14a-9, 17 C.F.R. §240.14a-9. (CC ¶¶ 506, 519, 530, 543.) Rule 14a-9, promulgated under

26  Section 14(a), provides:

27       No solicitation subject to this regulation shall be made by means of any proxy statement,
         form of proxy, notice of meeting or other communication, written or oral, containing any
28

---

WL 374306, at *5.

02cv870-J (RBB)

Exhibit E
0463

statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which had become false or misleading.

17 C.F.R. § 240.14a-9(a).  The Waga Plaintiffs allege that Defendants utilized false and misleading Joint Proxies to secure shareholder approval of the mergers with Harbinger and Remedy.  (CC ¶¶ 512, 536.)

A.    State of Mind for Section 14(a) Claims

With the exception of Defendant Gardner, the Section 14(a) defendants contend that the standard for pleading a Section 14(a) claim is scienter.  The Waga Plaintiffs, however, argue that Section 14(a) claims only require a showing of negligence.  Although neither the Supreme Court nor the Ninth Circuit have determined whether scienter is necessary for liability under § 14(a), *see Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091 n. 5 (1991); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444 n. 7 (1976), multiple district courts and circuit courts of appeal have ruled on the issue.  Defendants cite to two cases for the proposition that scienter is the requisite state of mind for § 14(a) claims.  *See Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428 (6th Cir. 1980) (concluding that "scienter should be an element of liability in private suits under the proxy provisions as they apply to outside accountants[]"); *Zatkin v. Primuth*, 551 F. Supp. 39, 45 (S.D. Cal. 1982) (Enright, J.) (finding *Adams* to be persuasive "in the absence of Ninth Circuit authority").  The Second, Third, and Eighth Circuits, however, have held that negligence is the appropriate standard for § 14 claims.  *See Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988); *Gould v. Am.-Hawaiian S.S. Co.*, 535 F.2d 761, 777-78 (3d Cir. 1976) (holding that "a standard of due diligence as opposed to actual knowledge or gross knowledge is quite appropriate" for a § 14 claim against "an outside nonmanagement director"); *Herskowitz v. Nutri/Sys., Inc.*, 857 F.2d 179, 190 (3d Cir. 1988) (applying a negligence standard for liability under § 14 to an investment banker rendering a fairness opinion in connection with a leveraged buyout because it "knows full well that it will be used to solicit shareholder approval, and is well paid for the service it performs[]"); *Shidler v. All Am. Life &*

88

Exhibit E
0464

1  *Fin. Corp.*, 775 F.2d 917, 927 (8th Cir. 1985). Moreover, at least one court within the Ninth

2  Circuit has provided some thoughtful analysis on the issue in its finding that negligence is

3  necessary for liability under § 14(a). *McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248,

4  1263-64 (N.D. Cal. 2000). As discussed in detail below, this Court finds the reasoning set forth

5  in *McKesson* to be persuasive.

6         Although neither the Ninth Circuit nor the Supreme Court have determined whether

7  scienter is necessary for liability under § 14(a), the Supreme Court has held that scienter is the

8  appropriate standard for § 10(b) claims. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976).

9  Before reaching this conclusion, the Court analyzed the language of § 10(b). *Id.* Because

10  "Section 10(b) makes unlawful the use or employment of 'any manipulative or deceptive device

11  or contrivance[,]'" the Court concluded that "[t]he words 'manipulative or deceptive' used in

12  conjunction with 'device or contrivance' strongly suggest that s 10(b) was intended to proscribe

13  knowing or intentional misconduct." *Id.*; *see also Aaron v. SEC*, 446 U.S. 680, 691 (1980)

14  (stating that the Court in *Hochfelder* relied on three factors: (1) the language of § 10(b), (2) its

15  legislative history, and (3) the structure of civil liability of provisions in the 1933 and 1934 Acts,

16  but noting that "the language of the statute[] . . . was sufficient, standing alone, to support the

17  Court's conclusion that scienter is required in a private damages under § 10(b).").

18         In *Aaron*, the Court looked to the language of § 17(a) of the 1934 Act to determine

19  whether scienter was the proper standard of care. 446 U.S. at 695-700. Because § 17(a)(1)

20  makes it unlawful "to employ any device, scheme, or artifice to defraud," the Court held that

21  such language "plainly evinces an intent on the part of Congress to proscribe only knowing or

22  intentional misconduct." *Id.* at 696. Moreover, "the terms 'device,' 'scheme,' and 'artifice' all

23  connote knowing or intentional practices." *Id.* With respect to § 17(a)(2), however, the Court

24  held that there is no scienter requirement. *Id.* Section 17(a)(2) prohibits any person from

25  obtaining money or property "by means of any untrue statement of a material fact or any

26  omission to state a material fact[.]" *See id.* Such language "is devoid of any suggestion

27  whatsoever of a scienter requirement." *Id.*

28         In contrast to § 10(b) and § 17(a)(1), the language of Rule 14a-9 does not reference a

"manipulative or deceptive device or contrivance," or use the terms "device," "scheme," or

89

Exhibit E
0465

1   "artifice." *See McKesson*, 126 F. Supp. at 1263; *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d

2   1281, 1298-1301 (2d Cir. 1973) (recognizing that Section 14(a) contains "no such evil sounding

3   language[,]" i.e. "any manipulative or deceptive device or contrivance"). In fact, the language of

4   Rule 14a-9 more closely resembles the language of § 17(a)(2). Rule 14a-9 prohibits solicitation

5   by means of a proxy statement that "is false or misleading with respect to any material fact, or

6   which omits to state any material fact." 17 C.F.R. § 240.14a-9(a). Such language, on its face,

7   does not imply a scienter requirement.

8       Nevertheless, in *Adams*, the Sixth Circuit held that scienter is the appropriate standard for

9   outside accountants in a § 14(a) action. 623 F.2d at 428; *see also Zatkin*, 551 F. Supp. at 45. In

10  contrast to the corporate issuer, the court noted that the accountant "does not directly benefit

11  from the proxy vote and is not in privity with the stockholder." *Adams*, 623 F.2d at 428. The

12  court expressed a fear that imposition of a negligence standard would create "potential liability

13  for relatively minor mistakes." *Id.* The court also examined the legislative history of § 14,

14  which contains discussions identifying the aim of § 14 as penalizing "unscrupulous" and

15  "dishonest" behavior. *Id.* at 429-31.

16      In *Herskowitz*, however, the Third Circuit rejected the conclusion reached in *Adams*.

17  *Herskowitz*, 857 F.2d at 190. There, the court was confronted with a § 14 claim against an

18  investment banker rendering a fairness opinion in connection with a leveraged buyout. *Id.* at

19  189-90. The Third Circuit relied on its prior holding in *Gould*, in which it had held that "a

20  standard of due diligence as opposed to actual knowledge or gross knowledge is quite

21  appropriate" for a § 14 claim against "an outside nonmanagement director." 535 F.2d at 777-78.

22  In *Gould*, the court analogized § 14(a) and Rule 14a-9 to § 11, which imposes liability for false

23  registration statements and applies a negligence standard. *Id.* at 777. Both sections "proscribe[]

24  a type of disclosure or lack of it, . . . and each enumerates specific classes of individuals who

25  bear liability for failure to meet the required standard of disclosure." *Id.* Moreover, "each

26  involves single specific documents which are of primary importance in two fundamental areas of

27  securities regulation, sales of securities and the exercise of the shareholders' voting power." *Id.*

28  In addition to relying on *Gould*, the *Herskowitz* court noted the following:

        [S]ince an investment banker rendering a fairness opinion in connection with a leveraged

Exhibit E
0466

1    buyout knows full well that it will be used to solicit shareholder approval, and is well paid
    for the services it performs, we see no convincing reason for not holding it to the same
2    standard of liability as the management it is assisting.

3    *Id.* at 190.

4       Similar to the *McKesson* court, this Court agrees with the rationale set forth in *Herskowitz*

5    and *Gould*. *See also Brady v. Anderson*, No. CV 97-2154 (Shx), 1998 U.S. Dist. LEXIS 20774,

6    * 17 (C.D. Cal. May 27, 1998) (concluding that negligence is the appropriate standard for Rule

7    14a-9 claims). Furthermore, as noted in *McKesson*, "the *Adams* court's concerns about holding

8    outside auditors liable for minor mistakes seems misplaced, because even under a negligence

9    standard plaintiffs only prevail if they prove that the misstatements were material and that the

10    defendants deviated from an appropriate standard of care." 126 F. Supp. 2d at 1264. Moreover,

11    despite the discussion of intentional misconduct by Congress during the passage of § 14, the

12    plain language of the statute does not contemplate a scienter requirement. As noted by the

13    Supreme Court, the "purpose of § 14(a) is to prevent management or others from obtaining

14    authorization for corporate action by means of deceptive or inadequate disclosure in proxy

15    solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). The fact that § 14(a) protects

16    against "inadequate disclosure" implies that plaintiffs need not prove intentional misconduct.

17    Accordingly, this Court finds that negligence is the appropriate standard for § 14(a) actions.

18

19    **B.**    **Sufficiency of Plaintiffs' Section 14(a) Claims**

20       According to Defendants, § 14(a) claims are subject to the stringent pleading

21    requirements of the PSLRA. The PSLRA applies to "any private action arising under []

22    [C]hapter [2B]." 15 U.S.C. § 78u-4(b)(2). Because Section 14(a) is part of Chapter 2B, *see* 15

23    U.S.C. § 78n, the Court agrees with Defendants that Plaintiffs' Section 14(a) and Rule 14a-9

24    claims must comply with heightened pleading requirements of the PSLRA. *See McKesson*, 126

25    F. Supp. 2d at 1266-67; *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at * 4

26    (S.D.N.Y. May 9, 2003) (requiring plaintiffs to comply with the standards imposed by the

27    PSLRA). Pursuant to the PSLRA, a plaintiff must "state with particularity all facts giving rise to

28    a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

    4(b)(2). As discussed above, the required state of mind for § 14(a) claims is negligence. Thus,

02cv870-J (RBB)

1   Plaintiffs must plead with particularity facts giving rise to a strong inference of negligence. *See*

2   *McKesson*, 126 F. Supp. 2 at 1267; *Unilab*, 2003 WL 21058251, at * 4.

3       Upon reviewing the CC, Plaintiffs simply allege that Defendants were "negligent in not

4   knowing that the [proxies] contained misstatements of material fact and that [they] omitted to

5   state material facts necessary in order to make the statements made therein false or misleading."

6   (CC ¶¶ 513, 537.) As to Arthur Anderson, Plaintiffs allege that they "should have known at the

7   time it consented to the use of its name in the [proxies] that its audit reports on Peregrine's

8   financial statements . . . were materially false and misleading. (CC ¶¶ 524, 548.) Plaintiffs'

9   conclusory allegations do not comply with the PSLRA. In *McKesson*, the Court found similar

10  allegations to be deficient. *See* 126 F. Supp. 2d at 1267 (allegations that the defendants "acted

11  negligently and without due care in distributing, or causing to be distributed, the Joint Proxy

12  Statement containing the false and misleading statements [and] omissions" fail to state a claim

13  under the PSLRA).

14      According to the Waga Plaintiffs, "the sheer size of Peregrine's restatement, along with

15  the sheer amount of accounting irregularities, demonstrates that defendants were negligent."

16  (Waga Opp'n at 26-27.) According to the CC, Peregrine overstated revenue for the fiscal years

17  ending March 31, 2000 and 2001 by $121.7 million and $254.1 million, respectively. (CC ¶¶ 34,

18  35).[40] As described in *Reiger*, inferring negligence from the magnitude of accounting errors

19  "invites a court to speculate as to the existence of specific (but unpled and unidentified) warning

20  signs" that demonstrate the defendant acted negligently. 117 F. Supp. 2d at 1013. Based upon

21  the magnitude of accounting irregularities, Plaintiffs are asking the Court to conclude that

22  unspecified warning signs must have been available to Defendants and that Defendants should

23  have conducted an investigation. *See id.* Plaintiffs, however, fail to describe with particularity

24  actions that Defendants could have taken to discover the accounting improprieties. Moreover,

25  the CC fails identify a single meeting, conversation, document, piece of correspondence, or other

26  source of information from which any of the defendants could have learned of the falsity of

27  Peregrine's financial statements. *See, e.g., Bank of Am. Corp. Sec. Litig.*, 78 F. Supp. 2d 976,

28

---

[40] Plaintiffs incorporate by reference Paragraphs 1(b), 33-38, 39(l)-(o), 40-49, and 54-61 into their Section 14(a) claims. (*See* CC ¶¶ 504, 517, 528, 541.)

Exhibit E
0468

1    (E.D. Mo. 1999) (holding that plaintiffs had complied with the PSLRA by adequately alleging

2    the existence of an internal report). Additionally, the fact that a defendant signed the proxy

3    statement does not speak to his or her state of mind. Thus, Plaintiffs have failed to plead with

4    particularity facts establishing a strong inference of negligence.[41] Accordingly, Defendants

5    motions to dismiss Counts II, III, IV, and V, the Section 14(a) and Rule 14a-9 claims, are

6    GRANTED. Plaintiffs' Section 14 claims are DISMISSED without prejudice, and Plaintiffs are

7    GRANTED leave to amend their complaint within **60 days** after this Order is stamped "filed."

8    Plaintiffs shall correct the pleading deficiencies as noted herein.

9

10   **V.    Control Person Liability - Section 20(a) of the Exchange Act**

11   Plaintiffs assert a theory of "control person" liability against the Peregrine Defendants,

12   Andersen Worldwide, and Stulac under § 20(a) of the Exchange Act.[42] (CC ¶ 553.) The

13   Peregrine Defendants and Stulac have moved to dismiss this claim. Section 20(a) establishes

14   joint and several liability for controlling persons who aid and abet violations of the Exchange

15   Act absent a finding of good faith and lack of inducement. *Am. West*, 320 F.3d at 945. In order

16   to establish a prima facie case under § 20(a), a plaintiff must prove: "(1) a primary violation of

17   federal securities laws . . .; and (2) that the defendant exercised actual power or control over the

18

19

20

21   [41] The Waga Plaintiffs rely on several cases from district courts outside the Ninth Circuit to

22   support their contention that the Section 14(a) claims are pled with sufficient particularity. *See In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 377-78 (D.N.J. 1999). In *Cendant*, the court found that

23   allegations that "defendants acted negligently in the issuance of a proxy statement which contained a material misrepresentation" were sufficient. *Id.* at 378. However, the court did not apply the stringent

24   pleading standards of the PSLRA to the complaint. Accordingly, the Court does not find this case persuasive.

25   [42] Section 20(a) of the Exchange Act provides:

26   Every person who, directly or indirectly, controls any person liable under any provision of this

27   chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is

28   liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

Exhibit E
0469

1   primary violator."[43]  *Howard*, 228 F.3d at 1065.  "[I]n order to make out a prima facie case, it is

2   not necessary to show actual participation or the exercise of power; however, a defendant is

3   entitled to a good faith defense if he can show no scienter and an effective lack of participation."

4   *Id.*  "Whether [a defendant] is a controlling person is an intensely factual question, involving

5   scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the

6   defendant's power to control corporate actions."  *Id.* (citing *Kaplan v. Rose*, 49 F.3d 1363, 1382

7   (9th Cir. 1994)).  The SEC defines "control" as "the possession, direct or indirect, of the power

8   to direct or cause the direction of the management and policies of a person, whether through the

9   ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.  "[T]raditional

10  indicia of control" for purposes of § 20(a) include owning stock and having a seat on the board

11  of directors.  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996);

12  *Am. West*, 320 F.3d at 945-46.  Although stock ownership and board membership are relevant

13  when determining control, a complaint must allege facts showing that the individual defendant

14  participated in the day-to-day affairs of the company.  *See Howard*, 228 F.3d at 1067 n.13.

15        According to the Loran Plaintiffs, Defendants Gardner, Gless, Cappel, Powanda, Spitzer,

16  Nelson, and Luddy qualify as "control persons" because of their status as "high ranking

17  executives."  (Loran Opp'n at 55.)  With respect to Powanda, Spitzer, Nelson, and Luddy, the

18  Loran Plaintiffs contend that "control person" liability attaches because they were the executives

19  in charge of Peregrine's sales department.  (*Id.*).  "Ordinarily, the status or position of an alleged

20  controlling person, by itself, is insufficient to presume or warrant a finding of power to control

21  or influence."  *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987).

22  Nevertheless, if corporate officers consist of a narrowly-defined group and participate in the day-

23  to-day operations of the company, then "it is reasonable to presume that these officers had the

24  power to control or influence the particular transactions giving rise to the securities violation."

25  *Id.*; *see also Howard*, 228 F.3d at 1066 (finding allegations that a CEO "participated in the

26  release of [] financial statements and signed off on the statements as correct" to be sufficient for

27

28  _____

[43] Because the Court has determined that the CC does sufficiently allege primary violations of Section 10(b) against Defendants Gardner, Gless, Spitzer, and Cappel, the Court need only concern itself with the second prong of Section 20(a) liability.

Exhibit E
0470

1  § 20(a) liability); *Kaplan*, 49 F.3d at 1382 (ruling, on a motion for summary judgment, that a

2  CEO and board member's "participation in the daily affairs of a relatively small company . . .

3  suffices to establish a material question of fact whether he was a controlling person"); *In re*

4  *Amylin Pharm., Inc. Sec. Litig.*, No. 01CV1455 BTM (NLS), 2002 WL 31520051, *10 (S.D.

5  Cal. Oct. 10, 2002) (Moskowitz, J.) (finding allegations that a defendant was the Chairman and

6  CEO of Amylin, and "as such had power and authority to engage in the conduct that is alleged to

7  be wrongful[,]" to be sufficient).

8       Upon reviewing the CC, the Court finds that the CC sufficiently alleges that Defendants

9  Gardner and Gless were involved with Peregrine's day-to-day affairs and had the power to

10  control improper transactions. (*See* CC ¶¶ 62-70 (Gardner); ¶¶ 71-78 (Gless)). Due to

11  Gardner's status as CEO and Gless' status as CAO and CFO, coupled with their day-to-day

12  operational control of Peregrine, it is reasonable for this Court to presume that they are

13  "controlling persons." *See Wool*, 818 F.2d at 1441. Moreover, the CC includes allegations

14  reflecting these individual's control relationships. For example, a former Director of the ICW

15  recalled Spitzer stating that he was "following orders from Gardner" in booking contingent

16  transactions as revenue. (CC ¶ 149.) Moreover, Defendant Gless admitted that he "directed

17  Peregrine employees to remove aging receivables from Peregrine's balance sheet by selling them

18  to banks at quarter end." (Gless Plea Agreement ¶ 15.) As noted above, the CC need not allege

19  that individual defendants actually participated in the wrongful conduct. At a later stage in these

20  proceedings, each defendant will be given an opportunity to assert a good faith defense or lack

21  of participation. *See In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001)

22  (citing *Howard*, 228 F.3d at 1065).

23       With regard to Defendants Powanda, Spitzer, Nelson, Luddy, and Cappel, however, the

24  Court is unable to presume that these individuals had the power and authority to direct others to

25  engage in wrongful conduct. In contrast to Defendants Gardner and Gless, these individual

26  defendants did not serve as Peregrine's CEO, CFO, and CAO. Although each of these

27  individuals may have overseen areas within the Company in which the fraud occurred, the CC

28  does not sufficiently plead that these individuals exercised "a significant degree of day-to-day

operational control, amounting to the power to dictate another party's conduct or operations."

1    *McKesson*, 126 F. Supp. 2d at 1277 (internal quotations omitted).  Moreover, the CC does not

2    identify how Powanda, Spitzer, Nelson, Luddy, and Cappel controlled specific Section 10(b)

3    defendants.  In addition, absent allegations to the contrary, the Court agrees with Luddy that it is

4    unreasonable to presume that a Chief Technology Officer is a "controlling person" with respect

5    to accounting irregularities.  Accordingly, dismissal of the Section 20(a) claims against

6    Defendants Powanda, Spitzer, Nelson, Luddy, and Cappel is appropriate.

7         As to the board member defendants, Moores, Noell, van den Berg, Watrous, Hosley,

8    Cole, and Savoy, the CC fails to allege that these individuals were involved with Peregrine's

9    day-to-day operations.  The fact that the Board held nine meetings in Fiscal Year 2000 and

10   nineteen meetings in Fiscal Year 2001 does not establish that any individual board members

11   were actively involved with Peregrine on a daily basis.  Nevertheless, the Loran Plaintiffs allege

12   that these individuals are "controlling persons" because they signed the SEC filings containing

13   Peregrine's false financial statements.  (Loran Opp'n at 54.)  Accordingly, the Court must

14   determine whether this is sufficient to allege Section 20(a) liability.

15        In an unpublished decision from the Northern District of California, a court addressed the

16   effect of an individual defendant's signature on a SEC filing in which false and misleading

17   statements were allegedly made.  *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C 99-

18   00109 SBA, 2000 WL 1727405, *16 (N.D. Cal. Sep. 29, 2000).  There, Berger, a member of

19   Splash's board, signed Splash's Prospectus and Registration Statement.  Despite the court's

20   finding that "[t]he fact that Splash sought Berger's signature unquestionably suggests the

21   possibility of control[,]" the court noted such general allegations, "[a]lthough close," do not

22   constitute particular evidence of control.  *Id.*  The court's holding stemmed from the plaintiffs

23   failure to "allege control with particularity."  *Id.*  Several courts within the Ninth Circuit,

24   primarily in the Northern District of California, require that the plaintiff plead the circumstances

25   of the control relationship with sufficient particularity to satisfy Rule 9(b).  *See, e.g., id*; *Howard*

26   *v. Hui*, No. C 92-3742-CRB, 2001 WL 1159780, *4 (N.D. Cal. Sep. 24, 2001); *Oak Tech.*, 1997

27   WL 446168, at *14.

28        The Loran Plaintiffs contend that the directors' signatures, by themselves, are sufficient to

     allege a section 20(a) claim.  For this proposition, the Loran Plaintiffs rely on an unpublished

Exhibit E
0472

1   decision from the Southern District of New York.  There, the court held that an allegation that a

2   defendant signed an SEC filing that contained false statements "is sufficient to allege control of

3   the authors of the filing, and the management and policies of the corporation behind the

4   misrepresentations."  *In re WorldCom, Inc. Sec. Litig.*, 2003 WL 21219049, *24 (S.D.N.Y. May

5   19, 2003).  Nevertheless, this Court finds the conclusion reached in *Splash* to be in accordance

6   with Ninth Circuit precedent.  Although a signature strongly suggests that an outside director

7   could exercise control, absent allegations of particularized facts of a control relationship, active

8   involvement in the Company's day-to-day affairs, or control over the preparation and release of

9   financial statements, Section 20(a) liability has not been sufficiently alleged.[44]  *See Howard*, 228

10  F.3d at 1067 n.13 (requiring a showing that a board member "was active in the day-to-day affairs

11  of [the company] or that he exercised specific control over the preparation and release of the

12  financial statements.").  Moreover, with respect to Defendant Moores, allegations that he

13  controlled the identity of Peregrine's executives and placed business associates on the Audit

14  Committee are insufficient.  Because the CC fails to plead the circumstances of the control

15  relationships, the motions to dismiss the Section 20(a) claims against Defendants Moores, Noell,

16  van den Berg, Watrous, Hosley and Savoy are GRANTED.  Finally, with regard to Defendant

17  Stulac, the CC fails to allege any facts demonstrating a control relationship between this outside

18  accountant and any primary violators.  Accordingly, his motion to dismiss the Section 20(a)

19  claim is also GRANTED.  Plaintiffs' Section 20(a) claims against Defendants Powanda, Spitzer,

20  Nelson, Luddy, Cappel, Moores, Noell, van den Berg, Watrous, Hosley, Cole, Savoy, and Stulac

21  are DISMISSED without prejudice, and Plaintiffs are GRANTED leave to amend their

22  complaint within **60 days** after this Order is stamped "filed."  Plaintiffs shall correct the pleading

23  deficiencies as noted herein.

24

25

26

27      [44] Although the Court finds it reasonable to presume that Defendant Gardner, as the CEO, and
    Defendant Gless, as the CFO and CAO, are "controlling persons," the Court declines to make the same
28  presumption with the Peregrine board members on the basis that they signed SEC filings.  Unlike
    Gardner and Gless, outside directors typically are not involved with a company's daily affairs absent
    allegations to the contrary.

02cv870-J (RBB)

Exhibit E
0473

**VI.    Control Person Liability - Section 15 of the Securities Act**

Finally, the CC alleges violations under § 15 of the Securities Act against Defendants Gardner, Gless, Moores, Savoy, Cole, Hosley, Noell, van den Berg, Watrous and the Arthur Andersen Defendants. (CC ¶¶ 560, 577, 583, 602.)  With the exception of Arthur Andersen and Andersen Worldwide, each of the defendants has moved to dismiss the § 15 claims.  Section 15, 15 U.S.C. § 77o, establishes liability for persons who control persons who violate §§ 11 and 12. Although the Court has granted Defendants' motions to dismiss the § 12 claims, Plaintiffs' § 11 claims still remain.  Consequently, Defendants may be liable derivatively under § 15 for the § 11 violations.  Because § 15 is analogous to § 20(a) of the Exchange Act, cases interpreting the meaning of "controlling person" under § 20(a) are applicable to the determination of whether a defendant is a "controlling person" under § 15.  *Durham v. Kelly*, 810 F.2d 1500, 1503 (9th Cir. 1987).  For the reasons set forth in the Court's analysis of § 20(a), the motions to dismiss filed by Defendants Gardner and Gless are DENIED, while the motions to dismiss filed by Defendants Moores, Savoy, Cole, Holsey, Noell, van den Berg, and Watrous are GRANTED.

As to Defendant Stulac, liability under § 15 requires further discussion.  In order to establish liability as a "controlling person," a plaintiff must allege with particularity facts demonstrating "the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."  *Howard*, 228 F.3d at 1065.  As stated above, "control" is defined as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person[.]" 17 C.F.R. § 230.405.  The CC avers that Stulac "was a partner in Arthur Andersen, and performed accounting and audit services for Peregrine."  (CC ¶ 49(s).)  The CC further alleges that Stulac was "either Arthur Andersen's audit engagement partner or concurring partner in performing accounting and auditing services for Peregrine."  (*Id.*)  Such allegations fail to demonstrate that Defendant Stulac "had the power to control or influence [Arthur Andersen]."  *Harmonic*, 163 F. Supp. 2d at 1086.  In addition, the Court notes that Plaintiffs have not provided the Court with any caselaw imposing § 15 liability on an employee of an independent accounting firm.  Accordingly, the Court finds that Plaintiffs have failed to state a claim under § 15 against Stulac.  Defendant Stulac's motion to dismiss the § 15 claims is GRANTED.  Plaintiffs' Section 15 claims against Defendants Moores, Noell, van

02cv870-J (RBB)

1  den Berg, Watrous, Hosley, Cole, Savoy, and Stulac are DISMISSED without prejudice, and

2  Plaintiffs are GRANTED leave to amend their complaint within **60 days** after this Order is

3  stamped "filed." Plaintiffs shall correct the pleading deficiencies as noted herein.

4

5                                    *Conclusion*

6           Having read the parties' briefs and considered arguments and evidence presented,

7  **IT IS HEREBY ORDERED** that:

8      (1)    Defendant Gardner's motion to dismiss is **GRANTED** with respect to the Section

9              12(a)(2) and Section 14(a) claims; but is **DENIED** as to the Section 10(b), Section

10             11, Section 20(a), and Section 15 claims;

11     (2)    Defendant Gless' motion to dismiss is **GRANTED** with regard to the Section

12             12(a)(2) and Section 14(a) claims; but is **DENIED** as to the Section 10(b), Section

13             11, Section 20(a), and Section 15 claims;

14     (3)    Defendant Powanda's motion to dismiss is **GRANTED** in its entirety;

15     (4)    Defendant Spitzer's motion to dismiss is **DENIED** with respect to the Section

16             10(b) claim, but is **GRANTED** as to the Section 20(a) and Section 15 claims;

17     (5)    Defendant Cappel's motion to dismiss is **DENIED** as to the Section 10(b) claim,

18             but is **GRANTED** with respect to the Section 20(a) and Section 15 claims;

19     (6)    Defendant Nelson's motion to dismiss is **GRANTED** in its entirety;

20     (7)    Defendant Luddy's motion to dismiss is **GRANTED** in its entirety;

21     (8)    Defendant Moores' motion to dismiss is **GRANTED** as to the Section 10(b),

22             Section 12(a)(2), Section 14(a), Section 20(a), and Section 15 claims, but is

23             **DENIED** with regard to Plaintiffs' Section 11 claims;

24     (9)    Defendant Hosley's motion to dismiss is **GRANTED** as to the Section 10(b),

25             Section 12(a)(2), Section 14(a), Section 20(a), and Section 15 claims, but is

26             **DENIED** with regard to Plaintiffs' Section 11 claim;

27     (10)   Defendants Noell's motion to dismiss is **GRANTED** as to the Section 10(b),

28             Section 12(a)(2), Section 14(a), Section 20(a), and Section 15 claims, but is

              **DENIED** with regard to Plaintiffs' Section 11 claims;

Exhibit E
0475

1     (11)  Defendant van den Berg's motion to dismiss is **GRANTED** as to the Section

2           10(b), Section 12(a)(2), Section 14(a), Section 20(a), and Section 15 claims, but is

3           **DENIED** with regard to Plaintiffs' Section 11 claim;

4     (12)  Defendant Watrous' motion to dismiss is **GRANTED** as to the Section 10(b),

5           Section 12(a)(2), Section 14(a), Section 20(a), and Section 15 claims, but is

6           **DENIED** with regard to Plaintiffs' Section 11 claims;

7     (13)  Defendant Savoy's motion to dismiss is **GRANTED** as to the Section 10(b),

8           Section 12(a)(2), Section 14(a), Section 20(a), and Section 15 claims, but is

9           **DENIED** with regard to Plaintiffs' Section 11 claim;

10    (14)  Defendant Cole's motion to dismiss is **GRANTED** as to the Section 10(b), Section

11          12(a)(2), Section 14(a), Section 20(a), and Section 15 claims, but is **DENIED** with

12          respect to Plaintiffs' Section 11 claims;

13    (16)  Defendant Arthur Andersen's motion to dismiss is **GRANTED** in its entirety;

14    (17)  Defendant Stulac's motion to dismiss is **GRANTED** as to the Section 10(b),

15          Section 20(a), and Section 15 claims, but is **DENIED** with regard to Plaintiffs'

16          Section 11 claims;

17    (18)  The Loran Group's motion to strike is **DENIED** in its entirety as moot; and

18    (19)  Plaintiffs are **GRANTED** leave to amend their complaint within **60 days** after this

19          Order is stamped "filed."

20

21

22  Dated: 11-21-03

23                             NAPOLEON A. JONES, JR.

                                United States District Judge

24

25  cc: Judge Brooks

      All Counsel of Record and Parties Without Counsel

26

27

28

                                  02cv870-J (RBB)

Exhibit E
0476