# EXHIBIT F

FILED

MAR 30 2005

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

In re:

PEREGRINE SYSTEMS, INC.
SECURITIES LITIGATION

CASE NO. 02CV870-BEN (RBB)

**ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTIONS TO
DISMISS (Docket Nos. 443, 452, 457,
468, 472, 474, 476, 481, 491, and 536)**

I.

## INTRODUCTION.

This is a class action on behalf of all those who bought or acquired Peregrine Systems, Inc. ("Peregrine") stock between July 22, 1999 and May 3, 2002. ("Class Period"). During the Class Period, Peregrine overstated its financial results for the fiscal years 2000, 2001, and the first three quarters of 2002. On May 6, 2002, Peregrine announced it had discovered accounting irregularities during these fiscal years. Plaintiffs now seek damages based on the dramatic fall of Peregrine's stock following this statement.

Plaintiffs are divided into one main class and two sub-classes. The main class is represented by Lead Plaintiff the Loran Group.[1] The Loran Group includes all those who purchased or acquired Peregrine stock during the Class Period. The Loran Group seeks recovery under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) 78t(a), and the

---

[1] The Loran Group consists of lead plaintiffs David Levy, Leighton Powell, David Schenkel, John Virden, Conrad Willemse, Bill Holman, Bob Benesko, Michael Slavitch, Richard Maheu, and Mark Rollins. (See, Amended Consolidated Complaint ("Complaint") ¶¶ 31(a)-(j).)

Exhibit F
0477

1   Securities Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5.

2         The two sub-classes are represented by Lead Plaintiff Heywood Waga and three individual

3   named Plaintiffs--John Sutliff, M. Clifford Balch, Jr., and Alan Hylton.  The sub-classes include

4   those who obtained Peregrine's stock when it merged with Harbinger and Remedy Corporations.

5   Heywood Waga and John Sutliff represent all persons and entities who held shares in Harbinger,

6   but later acquired Peregrine's stock when Peregrine acquired Harbinger on or about June 16, 2000

7   ("the Harbinger Sub-Class").  M. Clifford Balch, Jr. and Alan Hylton represent those who held

8   shares of Remedy, but then acquired Peregrine stock when Peregrine acquired Remedy on or about

9   August 27, 2001 ("the Remedy Sub-Class.").  These Plaintiffs seek recovery under Sections 11 and

10  15 of the Securities Exchange Act of 1933, 15 U.S.C. §§ 77k, 77o, as well as Sections 14(a) and

11  20(a) of the 1934 Act, 15 U.S.C. §§78n(a), 78t(a).

12        There were initially thirty one (31) related cases, which were consolidated.  The initial

13  consolidated complaint was dismissed with leave to amend.  The operative Amended Consolidated

14  Complaint will be referred to as "Complaint."  The Complaint names as Defendants Peregrine

15  management, board executives, and auditors.[2]  All Defendants separately and/or jointly move to

16  dismiss.[3]  Individual Defendants will be referred to by their last names; the auditors--Arthur

17  Andersen LLP and AWSC Société Coopérative, en liquidation, will be referred to as "Arthur

18  Andersen" and "AWSC" respectively.  Except when distinguishing among the Defendants, the

19  Court uses "Defendants" to refer to all of Defendants collectively.  When referring to Plaintiffs'

20  Opposition, that reference is limited to the Opposition as to the particular Defendant's or

21  Defendants' Motion.

22        At least three Defendants--Gless, Spitzer, Cappel--have pled guilty to securities fraud.

23  Peregrine has also consented to entry of a Final Judgment in an action brought by the Securities

24  Exchange Commission ("SEC").  SEC's complaint alleged:

25  _____

26        [2] The Complaint also names as Defendants Peregrine's Business Associates--KPMG, Inc.,
    BearingPoint, and Larry Rodda.  These Defendants have been dismissed and are no longer parties to
27  this action.  (See, Order dated January 19, 2005; docket No. 594.)

28        [3] Defendant Douglas S. Powanda withdrew his Motion on January 26, 2005.  (Docket No.
    597.)

02cv870-BEN (RBB)

Exhibit F
0478

This case involves a massive financial fraud by defendant Peregrine Systems, Inc., a publicly traded San Diego-based software company. The purpose of the fraud was to inflate Peregrine's revenue and stock price. To achieve its unlawful purpose, Peregrine filed materially incorrect financial statements with the Commission for 11 consecutive quarters between April 1, 1999 and December 31, 2001 . . . In February 2003, Peregrine restated its financial results for its fiscal years 2000 and 2001, and for the first three quarters of fiscal 2002. Peregrine reduced previously reported revenue of $1.34 billion by $509 million . . . .

Accordingly, there is no question that Peregrine committed fraud. Now, the question is "who can be **held liable** for it." In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d 1018, 1020 (C.D.Cal. 2003) (Emphasis original). In this regard, the Court has already found that Plaintiffs state a Section 10(b) claim against Gardner, Gless, Spitzer, and Cappel. The Court has also found that Plaintiffs adequately state claims for control liabilities under Sections 20(a) and 15(a) against Gardner and Gless. These Defendants do not move to dismiss on those claims. (See, e.g., Gardner's Motion at 3:7.) Thus, the Court's discussion of those claims will be limited to the remaining Defendants.

As to the remaining Defendants and claims, after reviewing all the papers submitted and hearing oral arguments, for the reasons that follow, the Court finds that Plaintiffs fail to state a: (1) Section 10(b) claim against Nelson, Luddy, Moores, Noell, Cole, van den Berg, Hosley, Savoy, Watrous, Dammeyer, Stulac, Arthur Andersen, and AWSC; (2) Section 14(a) claim against Moores, Cole, Hosley, Noell, van den Berg, Watrous, Stulac, and AWSC; (3) Section 20(a) control liability claim against Moores, Nelson, Noell, Cole, van den Berg, Hosley, Watrous, Savoy, Dammeyer, Stulac and AWSC; (4) Section 11 claim against AWSC, and (5) Section 15(a) claim against Moores, Savoy, Cole, Noell, Watrous, Arthur Andersen and AWSC.

However, Plaintiffs adequately state a: (1) Section 14(a) claim against Gless, Gardner, and Arthur Andersen; and (2) Section 11 claim against Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, and Arthur Andersen.

///
///
///
///

- 3 -

Exhibit F
0479

## II.

## FACTS.

"As required by Federal Rule of Civil Procedure 12(b)(6), the facts are presented in the light most favorable to the Plaintiffs. Under the incorporation by reference doctrine, [the Court] also consider[s] documents submitted by Defendants that were referenced in the [C]omplaint and whose authenticity has not been questioned." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 925 (9th Cir. 2003); see also, United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) ("[A] document . . . may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of plaintiff's claim."); Parrino v. FHP, Inc., 146 F.3d 699, 705 -706 (9th Cir. 1998) ("A district court ruling on a motion to dismiss may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading."); Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) ("If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them."). But, "this is a narrow exception . . . . It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998). The Court will also "consider material which is properly submitted [or attached] as part of the complaint . . . ." Parrino v. FHP, Inc., 146 F.3d 699, 705-06 (9th Cir. 1998).

The Court will not rely on or recite "legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." Clegg v. Cult Awareness Network, 18 F.3d 752, 755 (9th Cir. 1994). Judicial notice will be taken of the criminal records filed in this Court against certain Peregrine executives, and the Court will refer to them as needed. See, United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980) ("[A] court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases."); U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (Courts "may take notice of proceedings in other courts, both within and without the federal

02cv870-BEN (RBB)

Exhibit F
0480

1    judicial system, if those proceedings have a direct relation to matters at issue."); F.T.C. v. J.K.

2    Publications, Inc., 99 F. Supp. 2d 1176, 1198 n. 61 (C.D.Cal. 2000) (Taking judicial notice of

3    information contained in the criminal dockets of the Central District of California).

4    **A.    Defendants.**

5         At the outset, Peregrine is not a defendant in this action, as it voluntarily filed for protection

6    under Chapter 11 of the United States Bankruptcy Code. See, 11 U.S.C. § 362.

7         Turning to the Defendants, the following is the position, or relation, each had with

8    Peregrine during the Class Period: **Gardner** was the President, Chief Executive Officer, director,

9    and Chairman of the Board of Directors until his termination on May 3, 2002[4]; **Gless** served as

10   Chief Accounting Officer, Chief Financial Officer and director until May 5, 2002[5]; **Spitzer** was

11   hired by Peregrine as Vice President, Alliances, later became Vice President, Managed Service

12   Providers, and returned to his former position as Vice President, Alliances until he was terminated

13   on June 28, 2002[6]; **Cappel** acted as Treasury Senior Manager and later the Director of Treasury

14   until June 2002.[7] Cappel's duties included financing accounts receivables, international

15   collections, and forecasting cash and Days Sales Outstanding ("DSO")[8]; **Nelson** served as Vice

16   President, Corporate Secretary, General Counsel, Vice President, Corporate Development, and

17   _____

18        [4] Gardner was recently indicted by the SEC.

19        [5] On April 16, 2003, the SEC filed a Complaint against Gless which alleged that he violated,
     inter alia, Section 10(b) of the Exchange Act by knowingly or recklessly making misrepresentations
20   and omissions of fact with the intent of materially misstating Peregrine's publicly reported financial
     results. That same day Gless pled guilty to a criminal information charging him with a conspiracy,
21   beginning no later than June 1999, to commit, among other offenses, securities fraud.

22        [6] On June 16, 2003, the SEC filed a complaint against Spitzer in this Court alleging that from
     at least December 1999, he knowingly or recklessly participated in a scheme by which Peregrine
23   materially misrepresented its publicly reported financial results, including its revenue, in violation of,
     inter alia, Section 10(b) of the Exchange Act. That same day, a criminal information was filed against
24   Spitzer charging securities fraud, to which he pled guilty.

25        [7] On November 22, 2002, the SEC filed a Complaint against Cappel alleging that she
     committed bank fraud by selling falsified and illusory Peregrine receivables to banks. That same day,
26   Cappel pled guilty to a criminal information charging her with a scheme beginning no later than June
     1999 to defraud a federally insured bank by making false statements, misrepresenting the true financial
27   condition of Peregrine, and fabricating invoices.

28        [8] DSO is the average number of days that a company needs to collect its accounts receivable.

Exhibit F
0481

1  Senior Vice President, IMG Operations; **Luddy** served as Vice President, Research and

2  Development, and Chief Technology Officer; **Moores** was a director, and served as the Chairman

3  of the Board of Directors from March 1990 until July 2000.  Moores also chaired the

4  Compensation Committee.  Moores left Peregrine in February 2003; **Noell** was a director and

5  served on the Audit and Compensation Committees; **Cole** was a director; **van den Berg** was a

6  director and served on the Audit Committee until his resignation in October 2000; **Hosley** was a

7  director and served on the Audit Committee until his resignation on June 15, 2000; **Savoy** became

8  a director on June 15, 2000, the date of the Harbinger acquisition, on whose Board he served,

9  through the end of the Class Period.  He also served on the Audit Committee from October 17,

10  2000 to October 17, 2001; **Watrous** was director and served on the Audit Committee; **Dammeyer**

11  became a director on June 29, 2001 and also served as the Chairman of the Audit Committee from

12  October 24, 2001; **Arthur Andersen** served as the accountant and auditor from July 1996 to April

13  5, 2002; **Stulac**, an employee and partner of Arthur Andersen, provided accounting and auditing

14  services; and AWSC audited and reviewed international segments of Peregrine's business which

15  were incorporated in Peregrine's published financial results.[9]

16      **B.      Why the Fraud Was Committed.**

17          At all relevant times, Peregrine developed and marketed software products that enabled

18  business customers to reduce infrastructure costs and increase efficiency.  Peregrine also developed

19  and marketed business-to-business and integration software to reduce the costs of electronic

20  commerce.

21          By the beginning of the Class Period, Peregrine sought to grow through acquisitions and

22  other strategic alliances.  This expanded Peregrine's product menu for asset management, fleet

23  management, facilities management, rail management and telecommunication management.

24  Peregrine used its stock to pay for the acquisitions and strategic alliances.

25          Income from software licensing substantially represented Peregrine's revenues and played a

26  significant role in determining the market value of its stock.  The higher the price of Peregrine

27

28      [9] Defendant Douglas S. Powanda withdrew his Motion without prejudice on January 26, 2005.
    Therefore, his relation to the case will not be discussed in this Order.  (Docket No. 597.)

Exhibit F
0482

1  stock, the fewer the number of shares Peregrine would have to issue for each acquisition.

2  Peregrine's executives--who owned a substantial number of Peregrine stock-- also did not want the

3  value of their holdings diluted by issuing too many new shares.

4      Accordingly, Peregrine chose to report high revenues so that investors could expect record

5  sales and earnings growth to continue quarter after quarter. With an increasing share price,

6  Peregrine was able to complete at least thirteen (13) acquisitions or strategic alliances during the

7  Class Period, with an announced value exceeding $3.4 billion. The most significant of its

8  acquisitions included: (i) the June 2000 acquisition of Harbinger Corporation, which provided

9  software enabling e-transaction management and other e-business products and services; (ii) the

10  December 2000 acquisition of IBM's Tivoli Service Desk and customer base enabling; and (iii) the

11  August 2001 acquisition of Remedy Corporation, a supplier of IT service management and

12  customer relationship management software. These acquisitions were stock for stock mergers.

13      **C.    How the Fraud Was Committed.**

14      **1.    Improper Revenue Recognition.**

15      Peregrine had two kinds of software customers: end users and resellers. Peregrine initially

16  sold software almost entirely to end users. In or about 1996, Peregrine started partnering with

17  resellers to broaden its product distribution. Early in Peregrine's partner program, resellers bought

18  product from Peregrine only when an end user was already identified and ready to buy. In these

19  transactions, "sell-in" and "sell-through" were synonymous. Over time, Peregrine sought to

20  increase its sales and earnings through large sell-in channel deals without identified or committed

21  end users.

22      Generally Accepted Accounting Principles[10], or "GAAP", prohibits recognition of any

23  revenue from sales to channel partners unless specific criteria are met. Peregrine represented in its

24  filings with the SEC that it recognized revenues consistent with GAAP. In the Form 10-K

25

26      [10] Generally Accepted Accounting Principles, or GAAP, are "a series of general principles followed by accountants." United States v. Basin Elec. Power Coop., 248 F.3d 781, 786 (8th Cir.

27  2001). More specifically, GAAP "are the official standards adopted by the American Institute of Certified Public Accountants (the 'AICPA'), a private professional association, through three successor

28  groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the 'APB'), and the Financial Accounting Standards Board (the 'FASB')." Ganino v. Citizens Utils. Co., 228 F.3d 154, 160 n. 4 (2d Cir. 2000).

Exhibit F
0483

1  Peregrine filed with the SEC on or about June 29, 1999 (shortly before the Class Period), Peregrine

2  set forth its revenue recognition policy on sales of license agreements:

3           Revenues from license agreements are recognized currently,
         provided that all of the following conditions are met: a
4           noncancellable license agreement has been signed, the product has
         been delivered, there are no material uncertainties regarding
5           customer acceptance, collection of the resulting receivable is deemed
         probable and risk of concession is deemed remote, and no other
6           significant vendor obligations exist.

7  Peregrine made a similar representation about its revenue recognition policy in each of its quarterly

8  and annual reports filed with the SEC during the Class Period.

9           To achieve the appearance of increasing revenue, Peregrine began to violate its own

10  revenue recognition policy.  On its reseller deals, Peregrine prematurely recognized revenue when

11  it entered into an agreement with the reseller.  Under the agreements, however, the reseller either

12  had no obligation to pay Peregrine or the payment was contingent on a further sale to end users.  In

13  other words, Peregrine recognized revenue before one or more conditions under GAAP were met--

14  (i) before the fee owed to Peregrine was not fixed and determinable; (ii) before collectability of the

15  fee was probable; or (iii) while the resellers' obligation to pay for the product was still contingent

16  on subsequent sale of the product to an end user.  Peregrine also recognized revenue on "swap"

17  transactions.  Swap transactions lack economic substance.  They involve the contemporaneous buy

18  and sale of a product, designed solely to increase reported revenue.

19           Peregrine's decision to prematurely recognize revenue dated back to late 1998 and early

20  1999.  During that time, Peregrine's board authorized recording of revenue based on the sell-in

21  method.  In 1999, for example, a meeting took place in Powanda's office.  Gardner and the then

22  Chief Financial Officer Farley (now deceased) were present.  During the meeting, there was a

23  discussion as to whether revenue would be recognized currently on a transaction with IBM Global

24  Services.  Gardner told Powanda that Peregrine would book IBM's pre-commitments as revenue so

25  that Peregrine could meet revenue goals.

26           A former Peregrine employee, who was a Director of the InfraCenter Workgroup ("ICW

27  Group"), a group within the Alliance Group, recalls:

28           I was involved directly in a conversation in early 1999 with Doug
         Powanda, who I reported to specific to I believe IBM Global

- 8 -

02cv870-BEN (RBB)

1     Services which is one of the very first deals where channel stuffing
2     was involved -- Powanda stated to me that Farley had told him that
    "we can begin to recognize pre-commitment sales in Q4, January-
    March 1999" -- Powanda told me that "we can really start to use it"
3     referring to booking pre-commitments . . . When I commented [to]
    him that we can't do this since I believed it to be wrong based on my
4     prior experience with these matters, . . . Powanda just naively
    shrugged his shoulders.

5

6     I also remember that both Farley and Gardner popped their heads into Powanda's
    office during this meeting and acknowledged that we [should] go ahead with the
    IBM commitment. It was from this point in early 1999 that Peregrine had made the
7     wholesale decision to book pre-committed re-seller sales as revenue -- after they
    signed-off on the IBM deal that day in Powanda's office -- things really started to
8     go downhill for Peregrine. Powanda was actually ready to fire Spitzer when he said
    that Spitzer will get the commitments and we will book them -- this was in the
9     March-April 1999 time frame.

10         Another former Director of the Alliance Group similarly recalled a meeting in late 1998

11 involving Powanda and Nelson, and Farley. During the meeting, they stated that from now on it

12 would be company policy to book "commitments" from resellers as revenue irrespective of

13 whether the reseller had a firm commitment from an end user.

14         Gardner, Gless, Nelson, Powanda and Spitzer then authorized Peregrine's sales personnel

15 to enter into transactions with resellers where there was no obligation to pay Peregrine until the

16 product was sold-through. Revenue on such transactions was recorded in full right away.

17         Gardner negotiated many of the larger pre-commitments from resellers which were

18 improperly booked as revenue. After the revenue had been booked, Gardner and Gless oversaw

19 Peregrine's efforts to assist sales by the resellers to end users so as to be able to collect money from

20 the resellers on sell-through.

21         Gardner was actively involved in the improper revenue recognitions. As a former

22 Peregrine employee, who was a Director of the ICW Group, recounts:

23

24     In March of 2000 in a conversation with Spitzer, he talked about the
    intent of the company to prematurely book pre-commitments as
25     revenue. Spitzer stated that "I am just following orders from
    Gardner and I am getting paid commissions on the pre-commitments
26     as they are booked -- and I won't take the fall -- every quarter I vest
    my 28,000 option shares."

27     I remember asking Spitzer where the deals were coming from that
    made our quarters when we are getting e-mails constantly to the
28     effect that we are going to miss the quarter and then we make it at
    the last minute -- Spitzer told me that he was getting paid on these

1    deals and that they were coming from Gardner – Spitzer told me that
     the deals that Gardner got involved in were all big and over
2    $500,000.

3    Peregrine's practice of improperly booking revenue spread worldwide.  As one former Peregrine

4    employee, who was a Director of the ICW Group, recalled:

5        Powanda brought the practice of booking pre-commitments to
         Europe – he was head of European sales and later worldwide sales,
6        then Europe again – Dominic O'Reilly and Jerry Crook were
         involved – Europe was heavily involved with the booking
7        prematurely of pre-commitments in 1999 and 2000.  O'Reilly was
         Gardner's buddy from a previous life – or company.
8

9        Also, on April 14, 1999, the Board officially adopted the use of the sell-in method of

10   accounting.  That is the Board abandoned the "sell-through" method of accounting and switched to

11   the practice of recognizing revenue on agreements where there was no obligation to pay–the sell-in

12   method.  Accordingly, Peregrine would recognize revenues when it "sold" software to resellers,

13   despite the resellers' lack of commitments from end users to buy the product.  This was the heart of

14   Peregrine's revenue recognition fraud which led to the false and misleading statements issued

15   during the class period.

16       To make matters worse, Peregrine could not collect on the accounts receivable unless sell-

17   through to the end user had occurred.  For example, in the March/April 2000 time period,

18   Peregrine made an effort to collect from 20 to 25 reseller partner accounts including accounts at O-

19   E Systems, Barnhill and Corporate Software.  The total value of these unpaid pre-commitments

20   was more than $10 million.  When these resellers were contacted, they expressed anger, telling

21   Peregrine collectors that they were being billed net 30 days for the balance of their unpaid

22   "commitments" despite the fact that Gardner and other executives from Peregrine had told them, at

23   the time that the pre-commitments were made, that they did not have to pay for software until it

24   was sold-through to the end user.

25       As a former Peregrine employee who was a Director of the ICW Group and involved in the

26   collection effort recalled:

27       It was Spitzer who told me directly that the pre-commitments had
         been taken into revenue by the company.  O-E Systems was one
28       account; Barnhill for $1.25 million was another -- Peregrine put this
         company in a box by extracting an unattainable commitment from

                                        - 10 -

them and then acquired them when they failed to pay; and Corporate
Software was another -- there was a list of these accounts. When I
started to call these partners they became very angry telling me that
they were getting billed net 30 days for the balance of their unpaid
commitments when they were told by Spitzer, Steve Gardner and
others from Peregrine at the time of the commitments that they did
not have to pay for software that they were unable to sell-through.

## 2.    Quarters Were Improperly Kept Open

Peregrine engaged in other improper accounting practices to maintain the appearance of

revenue growth. Peregrine held its books open for its reporting quarters past the end of the fiscal

period, sometimes for as long as seven (7) days. By holding open the quarters, Peregrine added

additional sales into the affected periods to artificially inflate its reported revenue. In its

restatement, Peregrine admitted this:

> In addition, Peregrine previously recorded numerous transactions as
> revenue in a given period, although the sales order was not
> completed until after the end of the fiscal period. Revenue has been
> restated to record these transactions in the proper periods.

This practice of keeping the quarters open was widely known at Peregrine. As a former

member of the Alliance Group recalls:

> Starting in 1999, Spitzer would tell me each quarter that if I had any
> outstanding deals pending, that I had a few extra days after the
> month's end in the quarter to process them – other Alliance
> managers were told the same thing.

> Also, in 1999, it was routine at the end of a quarter to see John
> Moores, who had an office next door to our offices roam the halls of
> our building with Farley and Powanda. Moores and the others
> wanted to know how the quarter ended.

Another former Director of the Alliance Group stated that there were repeated occurrences where,

> "We were not at the number for the quarter by the end of the month
> and then mysteriously we would hear that we had made the quarter.
> Quarters were held open as a practice each and every quarter over my
> six and one-half year tenure with the company ranging from 2-5 days
> after the calender end of the quarter. It was an ongoing joke in the
> company and was referred to as being the 34th or 35th of the month.
> It got worse quarter by quarter after 2000 when the prevailing
> attitude in the company was that we had to make our quarters at all
> costs."

One other former employee of Peregrine, who worked in sales at the ICW Group, recalled:

> I can recall specifically by e-mail and through verbal directives
> coming from Bill Moore, Doug Powanda and Maree Chung, that we
> were going to keep the quarter open for 3 days, 4 days and

- 11 -

Exhibit F
0487

1    sometimes 7 days specifically referring to each quarter ending in
     March 2000, June 2000, September 2000 and December 2000. The
2    relayed intent was to bring in more sales so that the company could
     meet its earnings targets for the previous quarter. . . .
3

4    Another former employee, who also worked in sales, recalled:

5        Leaving the quarter open happened on a regular basis . . . it was
         almost on a "wink-wink" basis. It was standard operating procedure.
         My earliest recollection was in 2001. The quarter would stay open if
6        we had not made our number or if we were close to making our
         number – I remember that quarters were left open from 2001 until
7        when I left the company . . .

8        I remember specifically at the end of the fiscal year 2001, March
         2001 that Andy Cahill, a senior sales manager, wandered into Inside
9        Sales--he knew and understood that we were still working on deals
         for the quarter when the quarter should have been closed.
10

11   **3.    Improper Balance Sheet Accounting**

12       As noted above, Peregrine booked revenue on contingent sales agreements. Peregrine thus

13   accumulated funds in accounts receivable. This increased Peregrine's DSO. DSO represents the

14   average number of days a company takes to collect on its accounts receivable. Analysts and

15   investors then use the DSO to assess the quality of a company's receivables and revenue.

16       Defendants manipulated Peregrine's DSO. Specifically, Gless, after consulting with

17   Gardner, instructed Cappel to remove receivables from Peregrine's balance sheet by "selling" them

18   to banks. Accordingly, at the end of each quarter, Cappel would calculate the dollar amount of

19   receivables that had to be "sold" to banks to reach a target range set by Gardner and Gless for the

20   DSO, and "sold" the requisite amount for cash. The receivables were then removed from

21   Peregrine's balance sheet. This practice was not disclosed in Peregrine's public statements, and

22   created the appearance that Peregrine's customers were paying on a more timely basis than they

23   actually were. The practice also concealed the contingent sales into which Peregrine entered.

24       For example, toward the end of the quarter ending June 30, 1999 (first quarter of fiscal year

25   2000) Peregrine had "sold" all available accounts receivable but still had not reached its targeted

26   DSO. Thus, Cappel and Gless prepared invoices for transactions, which had not yet closed, for

27   $12 million, and then sold them to banks as receivables. When some of the contracts ultimately

28   did not close, Peregrine was left with a shortfall of several million dollars.

02cv870-BEN (RBB)

Exhibit F
0488

1    In June 2001, Cappel told Gless that Peregrine would miss the targeted DSO for the

2    quarter. With Gless's approval, Cappel created a false invoice in the amount of $19.58 million and

3    sold it to a bank. Peregrine's cash flow was thereby overstated and its accounts receivable were

4    understated.

5    Peregrine also distorted and falsified its DSO and balance sheet by improperly accounting

6    for cash collected from its customers. Peregrine had agreed with its banks that Peregrine would

7    collect on receivables that it "sold" to the banks, and remit payment within a certain time.

8    Peregrine, however, would reduce its accounts receivable when it "sold" the accounts to a bank

9    while still retaining the monies from the collections on these accounts until such time as it had to

10    pay them to its banks. When Peregrine collected from the customers whose receivables had been

11    "sold" to banks, Cappel would again reduce Peregrine's accounts receivable, thus resulting in what

12    Cappel called a "double dip."

13    Peregrine also failed to include its liability to the bank for these "sales" and would record

14    the cash received as its own instead of holding it in trust for the bank. Peregrine would then remit

15    the payments to the banks in the next quarter and reverse the "double dip" entries. These "double

16    dips" occurred almost every quarter beginning in September 1999. The double dips resulted in

17    artificially reduced accounts receivable as well as an artificial increase in Peregrine's reported cash.

18    For example, on December 11, 2001, a Peregrine customer made an early payment of $13.8

19    million on a receivable which Peregrine had sold to a bank. The customer's payment was not due

20    until February 13, 2002. Peregrine's contract required it to receive and hold payments in trust and

21    remit them within two weeks. Instead, Peregrine did neither. As a result, its accounts receivable

22    for the quarter were understated by $13.8 million as was its liability to the bank.

23    Peregrine's transactions with its banks did not constitute a "sale" of the receivables.

24    Rather, these transactions were nothing more than borrowings from the banks. Peregrine routinely

25    borrowed money from lenders and treated the funds as proceeds from the sale of assets as opposed

26    to borrowings. The amount of the undisclosed liabilities reached up to $180 million during the

27    Class Period and exceeded $100 million by the end of the Class Period. This significantly

28    understated Peregrine's liabilities.

02cv870-BEN (RBB)

Exhibit F
0489

1    In its restatement, Peregrine admitted that "these factoring arrangements should have been

2 recorded as loans instead of sales of receivables." Accordingly, Peregrine restated its balance sheet

3 to reflect the accounts receivable and related bank loans. As of March 31, 2000 and 2001,

4 Peregrine's undisclosed liability on these loans was approximately $90 million and $180 million,

5 respectively.

6    **4.    Concealment Of Write Off Of Receivables**

7    Peregrine also violated GAAP by including the write off of receivables in the expense

8 category of "Acquisition costs and other," and in other accounts. For example, Peregrine did so

9 with respect to a $3 million receivable of Barnhill as of March 31, 2000. In a June 6, 2002 letter to

10 the SEC, KPMG, Peregrine's business associate, stated that they had advised Peregrine "and its

11 audit committee that the classification of the write offs of accounts receivable or revenue reversals

12 recorded as an "'Acquisition costs and other' expense in [Peregrine's] statement of operations was

13 not in accordance with generally accepted accounting principles."

14    As admitted by Peregrine in its restatement, "[m]any accounts receivable balances arising

15 from improperly recorded revenue transactions . . . were inappropriately charged to bad debt

16 expense, cost of acquisitions or accrued liabilities. The restated results reflect those transactions as

17 reductions in previously reported revenue."

18    **5.    Understatement Of Stock Option Compensation**

19    Peregrine also understated the represented value of its stock option compensation by about

20 $100 million. In its restatement, Peregrine admitted:

21         Based on Peregrine's past practice, many employee stock options
          contained exercise prices that were below the common stock market
22         values on the dates the options were granted. Under APB Opinion
          No. 25, the Company should have recorded compensation cost equal
23         to the aggregate difference between the fair value of the stock and
          the exercise price of the options granted. The Company also
24         accelerated the vesting periods for certain options which had
          previously been granted to employees. Under FASB Interpretation
25         No. 44, "Accounting for Certain Transactions Involving Stock
          Compensation, an Interpretation of APB Opinion No. 25" ("FIN
26         44"), the acceleration of vesting of stock options after June 30, 2000
          could cause an accounting charge for the affected options. The
27         consolidated financial statements, as restated, now reflect the
          appropriate accounting for stock options.

28

- 14 -

02cv870-BEN (RBB)

1     **6.**     **Failure To Implement And Maintain Adequate Internal Accounting Controls**

2        Peregrine failed to implement and maintain adequate internal accounting. According to the

3 Complaint, Peregrine's accounting did not comply with The Foreign Corrupt Practices Act

4 ("FCPA"), 15 U.S.C. §78m(b)(2). FCPA was designed to ensure accurate record-keeping to

5 strengthen the accuracy of corporate books and records.

6        Moreover, the Complaint alleges, SEC Rule 13b-2, promulgated under FCPA, was enacted

7 to: (i) assure that an issuer's books and records accurately and fairly reflect its transactions and the

8 disposition of assets, (ii) protect the integrity of the independent audit of issuer financial statements

9 that are required under the Exchange Act, and (iii) promote the reliability and completeness of

10 financial information that issuers are required to file with the Commission or disseminate to

11 investors pursuant to the Exchange Act.

12        To comply with the FCPA, GAAP and SEC rules, and to accomplish the objectives of

13 accurately recording, processing, summarizing and reporting financial data, a public company is

14 required to establish and maintain adequate internal financial and accounting controls. Contrary to

15 the requirements of the FCPA, GAAP and SEC rules, Defendants failed to implement and

16 maintain adequate internal accounting and financial controls and Arthur Andersen and AWSC had

17 knowledge of such deficiencies. The Complaint also alleges Peregrine's lack of adequate internal

18 accounting was a "red flag" for Defendants.

19     **D.**     **The Resulting False Statements.**

20        Peregrine reported eleven (11) quarterly revenue increases during the Class Period.

21 Peregrine also reported annual revenue increases for the years 2000 and 2001. These statements

22 appeared in press releases, SEC filings and analysts' reports. According to the Complaint, all the

23 statements "were materially false and misleading because Peregrine's reported revenue was

24 materially overstated, there was no disclosure of a material change in its accounting policy as

25 applied to the first quarter of fiscal year 2000, its accounts receivable were understated, its cash

26 balances were overstated, its liabilities were understated and its DSO were understated . . . ." (See

27 e.g., Complaint ¶ 512.) The Complaint also sets forth other reasons that are specific to some of the

28 statements, which will be set forth below. The alleged misstatements from each quarter are

Exhibit F
0491

1  discussed in turn.

2      **1.**      **1st Quarter of 2000 (April 1, 1999 to June 30, 1999)**

3      On July 21, 1999, Peregrine issued a press release stating it had achieved "record" quarterly

4  revenues of $51.6 million for the first quarter of fiscal year 2000, ending June 30, 1999.  Peregrine

5  further stated that "[o]verall results were driven by a 131 percent increase in license revenue over

6  the comparable quarter in the prior year."  Gardner was quoted: "We are extremely pleased with

7  the outstanding growth in both our software license sales and our professional services activity in

8  the first fiscal quarter . . . ."

9      All Defendants, except Savoy and Dammeyer, read and approved the press release.  Nelson

10  was the principal draftsman of the press release.

11      On July 21, 1999, Peregrine management, led by Gardner, held a conference call with

12  investors and analysts.  During the call, Peregrine management reported on Peregrine's previously

13  released financial results for the quarter.  Peregrine management also reported that it saw strength

14  in its product lines, distribution channels and geographic regions, that international revenues had

15  increased 195% or 47% of total reported revenue and that DSO finished the quarter at 76 days

16  within Peregrine expectations.

17      On July 22, 1999, the brokerage firm CIBC World Markets ("CIBC") reported Peregrine's

18  previously released financial results[11] and that Peregrine management had indicated: "Peregrine

19  saw strength across its product lines, distribution channels and geographies."  The report also

20  stated that "International revenues soared an incredible 195% to make up 47% of the mix as

21  Peregrine focused its attention on the world market" and that DSO finished the quarter at 76 days.

22  CIBC raised its earnings estimates and rated Peregrine's stock a "strong buy."

23      On July 22, 1999, First Union Capital Markets ("First Union") also issued a report.  In it,

24  First Union repeated Peregrine's previously released financial results and raised its earnings

25  estimates.  First Union rated Peregrine a "buy."

26      Peregrine's stock closed at $15.34 per share on July 22, 1999.

27

28      [11]  Unless otherwise noted, all analyst reports repeated Peregrine's financial statements included in the respective press release.

02cv870-BEN (RBB)

Exhibit F
0492

1    On  August 13, 1999, Peregrine filed its Form 10-Q with the SEC.  Gless signed the 10-Q

2  as Vice President of Finance and Chief Accounting Officer.  The 10-Q included Peregrine's July

3  21, 1999 press release.  The 10-Q also included Peregrine's revenue recognition policy:

4    Revenues from direct and indirect license agreements are recognized
currently, provided that all of the following conditions are met: a
5    noncancelable license agreement has been signed; the product has
been delivered; there are no material uncertainties regarding
6    customer acceptance; collection of the resulting receivable is deemed
probable; risk of concession is deemed remote; and no other
7    significant vendor obligations exist.[12]

8  All Defendants, except Savoy, read and approved the 10-Q.

9    Following the filing of the 10-Q, Defendant Gless traded an additional 11,250 shares and

10  received proceeds totaling $383,750.  Moreover, Defendant Gardner sold 100,000 shares for

11  approximately $2,993,225 on August 4, 1999.  Finally, in mid-August, Spitzer, Powanda, Nelson,

12  and Luddy sold 27,500, 16,250, 87,500, and 9,474 shares of Peregrine common stock respectively,

13  while receiving gross proceeds of $866,250, $536,250, $2,919,870, and $307,616 respectively.

14    **2.    2nd Quarter of 2000 (July 1, 1999 to September 30, 1999)**

15    On October 20, 1999, Peregrine issued a press release announcing that it had achieved

16  "record" quarterly results for the second quarter of 2000, ending September 30, 1999.  Peregrine

17  stated the total revenues "increased 95 percent to a record $57.8 million" from the same quarter a

18  year ago.  Gardner was quoted:

19    We are delighted with our continued rapid growth and with the on-
going development of customer demand for our end-to-end
20    Infrastructure Management solutions. . . . This quarter marked a
significant maturation of our alliances on a global basis, leading to
21    both increased software license sales via alliances and a shift in some
service revenue growth to some of our partners. . . .

22

23    All Defendants, except Savoy and Dammeyer, read and approved the press release.  Nelson

24  was the principal draftsman of the press release.

25    On October 20, 1999, Peregrine management, led by Gardner, held a conference call with

26  investors and analysts.  During the conference, Peregrine management reported on Peregrine's

27

28    [12] Unless otherwise noted, any further reference to Peregrine's revenue recognition policy is
a reference to this quoted language.

- 17 -

Exhibit F
0493

1    previously released financial results for the quarter. Peregrine management also stated that they

2    continued to see strength for all of Peregrine's products in all geographical regions, that Peregrine

3    was working on a number of very large orders which would have a material positive impact on

4    future revenues and earnings and that the balance sheet had improved this quarter with $24.9

5    million in cash on hand.

6         On October 21, 1999, CIBC reported that Peregrine management had indicated that

7    Peregrine "executed flawlessly in the quarter with strength across all product lines and

8    geographies." Management was also reported as representing that there were a number of "mega

9    deals" that were likely to close and which would have a "material positive impact on the top-and-

10   bottom line in the quarter in which they close" and that there was improvement in the balance

11   sheet. CIBC continued its "strong buy" rating.

12        On October 21, 1999, First Union reported the Peregrine management's statements

13   concerning the "mega deals," and that they were being described as between 20% to 25% of a

14   quarter's revenue. First Union again assessed Peregrine a "strong buy."

15        Peregrine's stock closed at $20.875 per share on October 22, 1999.

16        On November 14, 1999, Peregrine filed its Form 10-Q with the SEC. Gless signed the 10-

17   Q as Vice President of Finance and Chief Financial Officer. The Form incorporated the financial

18   statements from the October 20, 1999 press release and Peregrine's revenue recognition policy.

19   All Defendants (other than Savoy and Dammeyer) read and approved the 10-Q.

20        **3.    3rd Quarter of 2000 (October 1, 1999 to December 31, 1999)**

21        On January 20, 2000, in a press release, Peregrine reported "record" quarterly results for the

22   third quarter of fiscal year 2000, ending December 31, 1999. Peregrine stated it had achieved

23   revenues of $67.5 million, a 67% increase from the same quarter a year ago. Gardner was quoted:

24        "[W]e had a number of large transactions and a remarkably strong
          surge of both interest and initial sales from our new Get.It! and
25        Get.Resources! employee self service and e-procurement products.
          In addition, we exceeded our expectations for the launch of our new
26        midrange solution, InfraCenter for Workgroups."

27        All Defendants (Savoy and Dammeyer) read and approved the press release. Nelson was

28   the principal draftsman of the press release.

- 18 -

Exhibit F
0494

1    On January 20, 2000, Peregrine management, led by Gardner, held a conference call with

2    investors and analysts.  At the conference, Peregrine management reported on Peregrine's

3    previously released financial results for the quarter.  Peregrine management also stated that

4    customer acceptance of Peregrine's new Get.It! e-products far surpassed expectations and that the

5    balance sheet remained strong with cash increasing and DSO remaining steady at an acceptable

6    level of 79 days.

7    On January 21, 2000, CIBC reported "[t]he enthusiastic reception of Peregrine's New

8    Get.It! e-procurement products far exceeded management's expectations, and generated $5 million

9    in sales in just three weeks of release."  The report also indicated "that the deal pipeline was more

10   active than usual."  CIBC also noted:

> The balance sheet remained strong this quarter, increasing $300,000
> to $25.2 million with cash remaining at $0.38 per share.  Accounts
> receivable rose $8.5 million to $59.6 million, with DSO remaining
> steady at 79, also within what management regards as an acceptable
> range.  Deferred revenues grew $9.8 million to $31.3 million, and
> were made up solely of customer support.

15   CIBC continued to rate Peregrine as a "strong buy."  First Union also rated Peregrine a

16   "strong buy."

17   Peregrine's stock rose to $44.53 per share at the close of trading on January 24, 2000.

18   On February 11, 2000, Peregrine filed its Form 10-Q with the SEC.  Gless signed the 10-Q

19   as Vice President of Finance and Chief Accounting Officer.  The 10-Q included the January 20,

20   2000 press release and Peregrine's revenue recognition policy.  All Defendants (other than Savoy

21   and Dammeyer) read and approved the 10-Q.

22   **4.     4th Quarter of 2000 (January 1, 2000 to March 31, 2000) and Fiscal Year 2000**

23   On April 26, 2000, Peregrine issued a press release, stating it had "record" quarterly

24   revenues of $76.3 million (a 66% increase compared with revenues in the comparable prior year

25   period) and "record" annual revenue of $253.3 million (a 83% increase over prior year revenues).

26   Gardner was quoted: "[t]he market remains strong" and "our products continue to lead in their

27   respective areas."

28   All Defendants, except Savoy and Dammeyer, read and approved the press release.  Nelson

02cv870-BEN (RBB)

Exhibit F
0495

1   was the principal draftsman of the press release.

2          On April 26, 2000, Peregrine management, led by Gardner, held a conference call with

3   investors and analysts.  During the conference, Peregrine reported on Peregrine's previously

4   released financial results for the quarter.  Peregrine management also stated that Peregrine had

5   closed a very large order with EDS, that Peregrine had excellent visibility into the next quarter and

6   that it expected a $40-$50 million revenue contribution from Get.It! for the year.

7          On April 27, 2000, CIBC reported that Peregrine management had indicated:

8              Peregrine's 4Q00 results indicate that its core business remains
               strong.  During the quarter, the company closed a particularly large
9              deal with EDS; the size of the deal was not disclosed, but
               management implied that the company has "great visibility into the
10             next quarter."  We regard this as an extremely positive sign that there
               is no slowdown in Peregrine's business, which was a concern last
11             quarter.

12  The report also stated that "management comments referring to a $40-50 million revenue

13  contribution from Get.It! for the year [which] would imply a significant ramp-up must be in store,"

14  as well as management's indication "that it was seeing a strong rebound in mid-size deal flow

15  ($100,000 - $300,000) . . . ."  Expressing concern over possible logistical and integration

16  difficulties associated with the acquisition of Harbinger, CIBC rated Peregrine's stock as "Hold."

17         Peregrine's stock closed at $24.06 per share on April 28, 2000.

18         On May 10, 2000, Peregrine filed its Form 10-K with the SEC.  It incorporated the

19  financial statements that were included in the April 26, 2000 press release.  The 10-K also included

20  Peregrine's revenue recognition policy.  The10-K further included Arthur Andersen's unqualified

21  audit report on Peregrine's year end financial statements for the fiscal 2000.  Gless, Gardner,

22  Moores, Noell, van den Berg, Watrous and Hosley signed the 10-K.

23         On May 22, 2000, Peregrine filed Amendment No. 1 to its Form S-4 Registration

24  Statement with the SEC.  The Amendment contained a Joint Proxy Statement and Prospectus. The

25  Amendment solicited proxies from Harbinger shareholders for approval of the proposed merger of

26  Peregrine and Harbinger.  The Joint Proxy talked about Peregrine's business, and included

27  Peregrine's audited financial statements for the fiscal year 2000.  The Joint Proxy also stated that

28  Peregrine's "selected consolidated financial data derives from the consolidated financial statements

- 20 -

Exhibit F
0496

1  of Peregrine Systems, Inc. and its subsidiaries," and that "[t]hese financial statements have been

2  audited by Arthur Andersen LLP, independent public accountants."  The Amendment/Registration

3  Statement was signed by Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg and Watrous.

4  Arthur Andersen and AWSC consented to the use of their audit report for the fiscal year 2000.

5      **5.    1st Quarter of 2001 (April 1, 2000 to June 30, 2000)**

6          On July 19, 2000, Peregrine issued a press release announcing "record" quarterly financial

7  results for the first quarter of fiscal year 2001, ending June 30, 2000.  According to Peregrine, the

8  results were "driven by a 95 percent increase in software license revenues."  Peregrine announced

9  that total revenues had increased by 83% "to a record $94.3 million" from the same quarter a year

10  ago.  Gardner was quoted:

11              Growth in the Get.It! Business was very strong this quarter, and
               continued to reflect customer recognition that Get.Resources!TM
12              offers a unique lifecycle approach to the e-procurement process
               associated with assets used inside our customers' businesses . . . We
13              were also very pleased to see strong performance from our
               Infrastructure Management products, including several large
14              transactions and some key competitive wins[.]

15  All Defendants (other than Hosley and Dammeyer) read and approved the press release.  Nelson

16  was the principal draftsman of the press release.

17          On July 19, 2000, Peregrine management, led by defendant Gardner, held a conference call

18  with investors and analysts.  During the conference, Peregrine management reported on Peregrine's

19  previously released financial results for the quarter.  Peregrine management also stated Peregrine's

20  cash position more than doubled to $70 million and that the increase in accounts receivable (to

21  $128 million) and DSO (to 122 days) was attributable to the Harbinger acquisition.

22          On July 20, 2000, CIBC reported Peregrine's previously released financial results.  CIBC

23  noted that Peregrine's earnings per share of $0.10 had beaten CIBC's estimate of $0.09.  CIBC also

24  reported that Peregrine management had indicated:

25              On the balance sheet, cash more than doubled to $70 million from
               $34 million, which equates to $0.57 per share, up from $0.29.
26              Accounts receivable rose significantly to $128 million from $70
               million, with the increase attributed to Harbinger.  As a result, days
27              sales outstanding rose to 122 from 82.  Management indicated that it
               intends to address the receivables issue; consequently, DSO should
28              trend down sharply in the next quarter.

02cv870-BEN (RBB)

Exhibit F
0497

1   CIBC gave Peregrine's stock a "buy" rating.

2        Peregrine's stock closed at $29.25 per share on July 21, 2000.

3        On August 14, 2000, Peregrine filed its Form 10-Q with the SEC.  Gless signed the 10-Q as

4   Vice President of Finance and Chief Accounting Officer.  The 10-Q incorporated the financial

5   statements that were included in the July 19, 2000 press release.  The 10-Q also included

6   Peregrine's revenue recognition policy.  All Defendants (other than Hosley and Dammeyer) read

7   and approved the 10-Q.

8        According to the Complaint, "[n]either the announcement nor related SEC filings disclosed

9   material nonpublic adverse information, including (i) that the Company had continuing concerns

10  about its sales teams, whose productivity was at a three-year low, (ii) that its mid-size market

11  continued to seriously underperformance, (iii) that it had no sales backlog for the coming 'always

12  difficult' quarter, (iv) that it was running out of cash and could not complete a public offering

13  because there was substantial doubt as to whether the Company would meet its earnings target for

14  the second quarter of fiscal year 2001 ending September 30, 2000." (Complaint ¶ 180.)  The

15  Complaint also alleges the statements "were materially false and misleading because Peregrine's

16  reported revenue was materially overstated, there was no disclosure of a material change in its

17  accounting policy as applied to the first quarter of fiscal year 2001, its accounts receivable were

18  understated, its cash balances were overstated, its liabilities were understated and its DSO were

19  understated . . . ." (Id. at 557.)

20       6.   **2nd Quarter of 2001 (July 1, 2000 to September 30, 2000)**

21       On October 3, 2000, Peregrine issued a press release on the second quarter of fiscal year

22  2001, ending September 30, 2000.  Peregrine stated its financial results would "meet or exceed

23  consensus earnings per share estimates of $.11 per share and total revenue of $142 million."

24  Peregrine issued another press release on October 24, 2000 announcing "record" quarterly results

25  for the second quarter of fiscal year 2001, with revenues of $142.7 million.  The press release

26  noted that "[t]he record second quarter results were driven by a 136% increase in software license

27  revenues over the comparable prior year period."  The release also noted that "total revenues for

28  the second quarter increased 147%" . . . compared with revenues in the comparable prior year

02cv870-BEN (RBB)

Exhibit F
0498

1   period. In addition, Gardner was quoted:

2           We had a remarkable quarter of growth in our infrastructure
        management solutions and Get.It! employee self service solutions.
3       This quarter saw a large number of new products, technology, and
        alliances come to fruition, further establishing the basis for
4       continued growth into the future.

5           All Defendants (other than Hosley and Dammeyer) read and approved both press releases

6   (except van den Berg with regard to the October 24, 2000 press release and Arthur Andersen with

7   regard to the October 3, 2000 press release).

8           On October 24, 2000, Peregrine management, led by defendant Gardner, held a conference

9   call with investors and analysts. During the call, Peregrine management reported on Peregrine's

10  previously released financial results for the quarter. In addition, Peregrine management stated that

11  Peregrine expected to be cash flow positive during the second half of the year and that accounts

12  receivable rose to $165 million while DSO fell from 122 days to 106 days.

13          On October 25, 2000, CIBC issued a report, the contents of which are not alleged in the

14  Complaint, except that CIBC rated Peregrine's stock a "buy."

15          Peregrine's stock closed at $23.00 per share on October 26, 2000.

16          On November 14, 2000, Peregrine filed its Form 10-Q with the SEC. Gless signed the 10-

17  Q as Vice President of Finance and Chief Accounting Officer. The 10-Q incorporated the financial

18  statements from the October 24, 2000 press release as well as Peregrine's revenue recognition

19  policy.

20          All Defendants (other than Hosley, van den Berg, and Dammeyer) read and approved

21  the 10-Q.

22          According to the Complaint, "[n]either the announcement nor related SEC filings disclosed

23  material nonpublic adverse information, including: (i) that results for the Company's mid-size

24  transaction market remained extremely unsatisfactory, (ii) that it relied on 'huge deals,' which were

25  contingent, with alliance partners to meet its forecasts, (iii) that the productivity of its sales force

26  continued to deteriorate, (iv) that it had to grant 'extraordinary terms' to get key deals done, (v)

27  that the Company had to 'borrow from the future to make the quarter,' and (vi) that there was a

28  desperate need for cash." (Complaint ¶ 184.)

Exhibit F
0499

1      **7.    3rd Quarter of 2001 (October 1, 2000 to December 31, 2000)**

2      On January 24, 2001, Peregrine issued a press release on its "record" quarterly financial

3 results for the third quarter of fiscal year 2001.  The press release stated that Peregrine had total

4 revenues of $156.6 million.  The release also stated that "[t]otal revenues . . . climbed by 132%"

5 compared with revenues in the comparable prior period.  Peregrine also stated that these results

6 were "driven by a 114%  increase in software license revenues over the comparable prior year

7 period . . . ."  Gardner was quoted: "[d]espite uncertainty and turbulence in the economy,

8 particularly in the United States, we exceeded our objectives for the December quarter."

9      All Defendants (other than Hosley, van den Berg, and Dammeyer) read and approved the

10 press release.

11      On the same day, Peregrine management, led by defendant Gardner, held a conference call

12 with investors and analysts.  During the conference, Peregrine management reported on Peregrine's

13 previously released financial results for the quarter.  In addition, Peregrine management stated that

14 the balance sheet improved as DSOs fell to 97 days from 106 days last quarter and that Peregrine

15 expected to make additional progress on this front by the end of the fourth quarter.  The

16 management also stated that international revenues had increased over 37%.

17      On January 25, 2001, CIBC reported Peregrine's previously released financial results.  It

18 also reported that Peregrine management had indicated:

19             During the quarter the balance sheet strengthened.  Accounts
               receivables were flat at $165 million while DSOs fell to 97 from 106
20             last quarter as the company stepped up its collection activities.
               Management expects to make additional progress on this front and
21             expects DSOs to fall to the low 90s by the end of the fourth-quarter.
               Deferred revenue increased 22% sequentially ($15 million) to $83
22             million.  Management attributed the increase to some recent wins in
               its EMG operation.
23

                       *         *         *
24

25             Internationally, Peregrine knocked the cover off the ball.  License
               revenue increased over 37% sequentially to $40.8 million.  Driving
26             this growth were several large deals in the quarter in the
               infrastructure and e-markets groups.  Management believes that what
27             the company witnessed in the quarter is quite sustainable and is
               shifting resources to Europe and Asia.

28 ///

1  CIBC rated Peregrine's stock a "buy."

2      Peregrine's stock rose to $29.81 per share at the closing of trading on January 29, 2001.

3      Peregrine also filed its 10-Q with the SEC, which included its revenue recognition policy.

4  All Defendants (other than Hosley, van den Berg, and Dammeyer) read and approved the 10-Q.

5  The Complaint is silent as to who signed the 10-Q.

6      According to the Complaint, "[n]either the announcement nor related SEC filings disclosed

7  material nonpublic adverse information, including: (i) that the Company's direct business in North

8  America was a 'disaster,' (ii) that the continued 'heavy reliance' on alliance and channel partner

9  contingent deals made its CEO 'cautious' concerning the future, and (iii) that the productivity of

10  the sale force was unsatisfactory and materially below plan.  In addition, the Company completed a

11  desperately needed $270 million private convertible securities offering in the quarter." (Complaint

12  ¶ 186.)

13      **8.    4th Quarter of 2001 (January 1, 2001 to March 31, 2001) and Fiscal Year 2001**

14      On April 4, 2001, Peregrine issued a press release on its revenues and earnings for the

15  fourth quarter of fiscal year 2001, ending March 31, 2001.  The release stated that "[f]or the fiscal

16  fourth quarter end[ing] March 31, 2001, [Peregrine] expects to report license revenues of

17  approximately $105 million, total revenues of approximately $170 million and earnings per share

18  of $0.16 . . . ."  Gardner is quoted: "[d]espite challenging economic conditions worldwide, we were

19  able to meet our objectives for the quarter and deliver strong profitable results, the sixteenth

20  consecutive quarter we have done so."  After the press release, Peregrine's stock gained $5.25 per

21  share, closing at $19.06 per share on April 5, 2001.

22      All Defendants (other than Hosley, van den Berg, Dammeyer, Arthur Andersen, and

23  AWSC) read and approved the press release.

24      On April 26, 2001, Peregrine issued a press release confirming the preliminary results it

25  had announced on April 4.  It stated that revenue for the fourth quarter of fiscal year 2001 was "a

26  record $171.0 million, an increase of 124 percent from the same quarter a year ago."  The press

27  release also stated that revenue totaled $564.7 million--a 123% increase from the year before.  In

28  the April 26 release, Gardner was also quoted:

1
2
3

> Our results this quarter in the face of challenging economic conditions demonstrate the value of our solutions . . . As we enter fiscal 2002, we remain confident in our market position and the opportunity we address . . .

4
5
6

> We were particularly pleased with the strength of our sales through managed services providers and our professional services partners. As we continue to meet major milestones in our corporate development and build our solutions portfolio, these relationships become increasingly important to our ability to extend our reach to new customers and markets.

7      Peregrine's stock closed at $25.60 per share on April 27, 2001.

8      All Defendants (other than Hosley, van den Berg, and Dammeyer) read and approved the

9   April 26, 2001 press release.

10      On April 26, 2001, Peregrine management, led by defendant Gardner, held a conference

11   call with investors and analysts. During the call, Peregrine management reported on Peregrine's

12   previously released financial results for the quarter. In addition, Peregrine management stated that

13   Peregrine met its earnings per share guidance and that key balance sheet metrics improved or

14   remained steady (such as a cash increase of $38 million) with DSOs remaining essentially flat at 95

15   days.

16      On April 27, 2001, CIBC reported that Peregrine management had indicated:

17
18
19
20
21
22

> Not only was the company able to meet its EPS expectation, but key balance sheet metrics also improved or held steady. Even though accounts receivables showed a moderate $15 million increase in the quarter, DSOs were essentially flat at 95. Deferred revenue, which consists almost exclusively of service related activities (maintenance, network usage, etc.) climbed $12 million ($14% sequentially) to $95 million. Cash increased in the quarter by about $38 million to $287 million. Management attributed the growth to financing activity in the quarter, option exercises, acquisitions (Extricity brought some cash) as well as a moderate amount of cash flow from operations.

23   CIBC rated Peregrine's stock a "strong buy."

24      Peregrine's stock closed at $25.78 per share on April 30, 2001.

25      On June 29, 2001, Peregrine filed its Form 10-K with the SEC. Gless, Gardner, Moores,

26   Noell, Watrous and Savoy signed the 10-K. The Form incorporated the financial statements that

27   appeared in the April 26, 2001 press release and Peregrine's revenue recognition policy.

28      Arthur Andersen and AWSC audited Peregrine's financial statements in the 10-K. The 10-

- 26 -

Exhibit F
0502

1  K also included Arthur Andersen's unqualified audit report on Peregrine's fiscal 2001 financial

2  statements.

3          On July 23, 2001, Peregrine filed Amendment No. 1 to its Form S-4 Registration Statement

4  with the SEC. The Amendment included a Joint Proxy Statement and Prospectus, the purpose of

5  which was to solicit proxies from Remedy Corporation shareholders to approve the proposed

6  merger of Peregrine and Remedy. The Proxy also included Peregrine's financial statements (and

7  audit reports) for the previous three fiscal years. The Proxy also stated:

8                  Peregrine's selected consolidated financial data is presented below as
                   of March 31, 2001, 2000, 1999, 1998 and 1997 and for each of the
9                  years in the five-year period ended March 31, 2001, and derives from
                   the consolidated financial statements of Peregrine Systems, Inc. and
10                 its subsidiaries, which financial statements have been audited by
                   Arthur Andersen LLP, independent public accountants.

11

12          Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous signed the Amendment. The

13  Complaint also alleges that Arthur Andersen and AWSC agreed to the use of their audit reports for

14  the fiscal years 2000 and 2001.

15      **9.      1st Quarter of 2002 (April 1, 2001 to June 30, 2001)**

16          On July 24, 2001, Peregrine issued a press release on its financial results for the first

17  quarter of fiscal year 2002, ending June 30, 2001. Peregrine stated that revenues for the quarter

18  were a "record $172.0 million, an increase of 82% from the same quarter a year ago." Gardner was

19  quoted: "We were pleased to post significant top-line [revenue] growth in this challenging

20  economic environment[.]"

21          All Defendants (other than Hosley and van den Berg) read and approved the press release.

22          The Complaint alleges that after the press release, on August 1, 2001, Luddy sold 46,981

23  shares of Peregrine common stock for a total of approximately $1,317,397.

24          On July 24, 2001, Peregrine management, led by Gardner, held a conference call with

25  investors and analysts. During the conference, Peregrine management reported on Peregrine's

26  previously released financial results for the quarter. In addition, Peregrine management stated that

27  it was comfortable with analysts projections of 30%-40% revenue growth and 25%-35% earnings

28  per share growth based on the strength of its business and that DSOs were 99 days and expected to

- 27 -

Exhibit F
0503

1    decrease in the next quarter to 80-90 days.

2         On July 24, 2001, Bear Stearns & Co., Inc. ("Bear Stearns") reported Peregrine's

3    previously released financial results and that Peregrine management had indicated it saw "positive

4    growth in Asia Pacific, Africa, and Eastern Europe."  The report also stated:

5             In sharp contrast to the norm, management reiterated revenue and
              EPS guidance of 30-40% top line growth and 25-35% EPS growth
6             for the full FY02, citing strength in all areas of business (product
              mix, geographic mix, and a return to strength in key vertical
7             markets).

8    Bear Stearns gave Peregrine a "buy" rating.

9         On July 25, 2001, CIBC reported that Peregrine management had indicated: "Peregrine's

10   revenues of $172 million came in ahead of expectations, which the Street had pegged at $165

11   million."  The report also stated that "Management noted that the strong verticals during the

12   quarter were financial, telecom, high tech, and government and that the mix was a return to a more

13   typical mix, after the financial vertical was very weak in the March quarter.  Excluding

14   acquisitions, the company indicated that year over year revenue growth was about 50%."  CIBC

15   rated Peregrine a "strong buy."

16        On July 25, 2001, U.S. Bancorp Piper Jaffray ("Piper Jaffray") reported that Peregrine

17   management had exceeded the revenue expectations and that Peregrine management indicated

18   "[t]he Company expects to approach DSOs of 80-90 days in the coming quarter."  Relying on

19   management's representations and Peregrine's publicly released financial results, Piper Jaffray

20   rated Peregrine's stock a "strong buy."

21        Peregrine stock rose to $27 per share at the close of trading on July 26, 2001.

22        On August 14, 2001, Peregrine filed its Form 10-Q with the SEC.  Gless signed the 10-Q

23   as Executive Vice President and Chief Accounting Officer.  The Form included the financial

24   statements from the July 24, 2001 press release and Peregrine's revenue recognition policy.

25        All Defendants (Hosley and van den Berg) read and approved the 10-Q.

26        The Complaint further alleges that Gardner sold 2,250 shares on September 4, 2001

27   resulting in proceeds of $61,875.

28   ///

02cv870-BEN (RBB)

Exhibit F
0504

10.     **2nd Quarter of 2002 (July 1, 2001 to September 30, 2001)**

On October 3, 2001, Peregrine issued a press release announcing preliminary financial results for the second quarter of fiscal year 2002, ending September 30, 2001.  The press release stated that "Peregrine expects to report quarterly revenue of approximately $175 million.  Based on these revenues, the company expects to report net income of approximately $.05 per share, excluding acquisition costs and restructuring charges."  Gardner was quoted:

> Like many companies in our industry, the tragic events of September 11 and the subsequent effect on the global economy impacted our September quarter results.  However, even during these challenging times, we were able to generate approximately $175 million in total revenue, demonstrating the strength of our product portfolio and the value proposition we deliver to our customers . . .

All Defendants (except Hosley, van den Berg, Arthur Andersen and AWSC) read and approved the press release.

On October 24, 2001, in a press release, Peregrine confirmed the preliminary financial results it had announced for the second quarter of fiscal year 2002.  It also stated that total revenues were a "record" $175 million, an increase of 23% from that reported in the second quarter of fiscal 2001.  According to the Complaint, "[t]he press release characterized the results as 'disappointing relative to our original expectations,' but made no mention of the continuing material problems afflicting Peregrine's business, including (i) the need to collect contributions from employees to make its earnings estimate for the quarter ending December 31, 2001 and (ii) the tight cash situation and the need to raise additional capital."  (Complaint ¶ 194.)

All Defendants (other than Hosley and van den Berg) read and approved Peregrine's October 24, 2001 press release.

On October 24, 2001, Peregrine management, led by defendant Gardner, held a conference call with investors and analysts.  During the conference, Peregrine management reported on Peregrine's previously released financial results for the quarter.  In addition, Peregrine management stated that guidance for the remainder of the current and following year remain unchanged, that Peregrine expected to finish the fiscal year with $140-$150 million in cash and that DSOs for Peregrine on a stand alone basis were 99 days and 113 days when including recently

- 29 -

02cv870-BEN (RBB)

1  acquired Remedy.

2      On October 24, 2001, CIBC reported Peregrine's previously released financial results and

3  that Peregrine management had indicated:

4          Guidance for the remainder of this year and next year remain
           unchanged. The Company expects revenue of $450 million in the
5          second half and a snap back in operating margins, which were 8%
           this quarter, vs. 17% last year. Management indicated that
6          operations appeared to be returning to a more normal pace after a
           virtual standstill in late September. Peregrine expects to finish the
7          fiscal year with $140 million to $150 million in cash.

8      On October 24, 2001, Bear Stearns reported Peregrine's previously released financial

9  results and that Peregrine management had indicated: "Management affirmed guidance -- we are

10  maintaining estimates."

11      On October 25, 2001, Thomas Weisel Partners ("Weisel") reported Peregrine's previously

12  released financial results and that Peregrine management had indicated "management commentary

13  was encouraging."

14      On October 25, 2001, Piper Jaffray reported Peregrine's previously released financial

15  results and that Peregrine management had stated that Peregrine reported revenues in line with

16  expectations, finished the quarter with $142 million in cash and DSOs for Peregrine, excluding

17  Remedy, remained essentially flat at 99 days.

18      CIBC, Bear Stearns, Weisel and Piper Jaffray each rated Peregrine a "buy."

19      Peregrine's stock closed at $16.46 per share on October 26, 2001.

20      On November 21, 2001, Peregrine filed its Form 10-Q with the SEC. Gless signed the

21  Form 10-Q as Executive Vice President and Chief Accounting Officer. The 10-Q included the

22  financial statements that appeared in the October 24, 2001 press release and Peregrine's revenue

23  recognition policy. All Defendants (other than Hosley and van den Berg) read and approved the

24  10-Q.

25      **11.    3rd Quarter of 2002 (October 1, 2001 to December 31, 2001)**

26      On January 2, 2002, Peregrine issued a press release on Peregrine's preliminary results for

27  the third quarter of fiscal year 2002, ending December 31, 2001. The press release stated that

28  Peregrine anticipated total revenues of approximately $175 million.

- 30 -                    02cv870-BEN (RBB)

1   All Defendants (other than Hosley, van den Berg, Arthur Andersen and AWSC) read and

2 approved the press release.

3   On January 3, 2002, Peregrine management, led by Gardner, held a conference call with

4 investors and analysts. During the conference, Peregrine management reported on Peregrine's

5 previously released preliminary financial results for the quarter.

6   On the same day, CIBC, Piper Jaffray and Bear Stearns all reported Peregrine's preliminary

7 financial results and gave Peregrine's stock a "buy", "outperform" and "attractive" rating

8 respectively.

9   Peregrine's stock closed at $9.40 per share on January 4, 2002.

10   On January 24, 2002, in a press release, Peregrine confirmed that revenues for the third

11 quarter of fiscal year 2002 were $175.2 million. All Defendants (other than Hosley and van den

12 Berg) read and approved the press release. "While admitting being 'disappointed in the results,'

13 the press release attributed the problems solely to 'global economic weakness, particularly in

14 Europe.' The press release quoted Gardner as stating, 'We are committed to returning to operating

15 profitability, and we are continuing to take appropriate steps to improve our revenue performance

16 and contain our expenses.' The press release omitted any mention of the crisis internally at

17 Peregrine, including violations of covenants on the Company's line of credit and consideration of

18 significant restructuring of the company's business and widespread violation of GAAP arising

19 from improper revenue recognition." (Complaint ¶ 199.)

20   On January 24, 2002, Peregrine management held a conference call with investors and

21 analysts. During the conference, Peregrine management reported on Peregrine's previously

22 released financial results for the quarter. In addition, Peregrine management stated that its DSO

23 remained essentially flat at 100 up one day from the prior quarter and that Peregrine finished the

24 quarter with approximately $107 million in cash.

25   On the same day, CIBC reported the "[Peregrine] appears to be on the right track" and

26 rated Peregrine's stock a "buy." Piper Jaffray and Bear Stearns also rated Peregrine's stock as

27 "outperform" and "attractive," respectively.

28   Peregrine's stock closed at $7.95 per share on January 25, 2002.

- 31 -

Exhibit F
0507

1    On February 14, 2002, Peregrine filed its Form 10-Q with the SEC. The Form was signed

2  by Gless as Executive Vice President and Chief Accounting Officer. The Form incorporated the

3  financial statements that appeared in the January 24, 2002 press release. All Defendants (other

4  than Hosley and van den Berg) read and approved the 10-Q.

5    "On February 19, 2002, Peregrine announced that its Board had adopted a Stockholder

6  Rights Plan under which Peregrine would issue a dividend of one right for each share of its

7  common stock held by stockholders of record as of the close of business on March 12, 2002. The

8  press release went on to state, '[t]he plan was not adopted in response to any specific attempt to

9  acquire the company.' This was a false statement, as the plan was adopted in specific regard to

10  then ongoing merger negotiations with BMC Software." (Complaint ¶ 200.)

11    **E.    Restatement of Peregrine's Financial Statements**

12    On April 5, 2002, in a press release, Peregrine announced that it was replacing Arthur

13  Andersen as its independent auditor with KPMG. Gardner was quoted: "we have the highest

14  regard for our audit team's work ethic," but "in light of the current uncertainties at Arthur

15  Andersen [relating to Enron], we felt it was in the best interest of our company and shareholders to

16  retain KPMG as our independent auditors at this time."

17    After the close of trading on April 30, 2002, Peregrine issued a press release announcing

18  that it would delay the release of its financial results for the fourth quarter and year-end 2002 due

19  to the "continued audit activities by KPMG, the company's independent auditors." The results

20  were supposed to be announced on May 2, 2002.

21    Before the market opened on May 6, 2002, Peregrine issued a press release, stating: (i) the

22  discovery of accounting irregularities; (ii) an internal accounting investigation; and (iii) the

23  resignation of Gardner and Gless.

24    Peregrine's stock price fell approximately 67% in response to this disclosure. On May 3,

25  2002, Peregrine stock closed at $2.57 per share. On the next trading day (May 6, 2002), Peregrine

26  common stock closed at $0.89 per share on extremely heavy volume.

27    On May 23, 2002, Peregrine announced it would be restating its financial statements for

28  2000 and 2001 and each of the first three quarters of 2002.

- 32 -

02cv870-BEN (RBB)

1    On September 22, 2002 Peregrine, "[c]iting the financial and legal issues raised by the

2    company's inability to file audited financial reports for the 2000, 2001 and 2002 fiscal years,

3    among other reasons," announced in a press release that it had filed a voluntary petition to

4    reorganize under Chapter 11 of the U.S. Bankruptcy Code.

5    On February 28, 2003, Peregrine restated its financial statements for 2000 and 2001 and the

6    first three quarters of 2002 with the SEC. Peregrine admitted that it improperly recognized more

7    than $500 million in revenue, and that it materially misrepresented its balance sheet and statement

8    of liabilities by understating its debt by as much as $130 million.

9    ### III.

10   ### STANDARD OF REVIEW.

11   Defendants move to dismiss under Fed.R.Civ.P. 12(b)(6). "A Rule 12(b)(6) motion tests

12   the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001); see also,

13   Neitzke v. Williams, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a

14   claim on the basis of dispositive issue of law."). "A claim may be dismissed only if 'it appears

15   beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle

16   him to relief.'" Id. (Citations omitted).

17   Under this standard, the Court's review is limited. Even if recovery is very remote and

18   unlikely, Plaintiffs are still entitled to offer evidence to support their claims. See, United States v.

19   City of Redwood City, 640 F.2d 963, 966 (1981) ("[E]ven if the face of the pleadings indicate that

20   recovery is very remote, the claimant is still entitled to offer evidence to support its claims."); see

21   also, Kwai Fun Wong v. U.S., 373 F.3d 952, 969 (9th Cir. 2004) ("[A] court may dismiss a

22   complaint only if it is clear that no relief could be granted under any set of facts that could be

23   proved consistent with the allegations."); Langford v. Atlantic City, 235 F.3d 845, 847 (3d Cir.

24   2000) (The issue is not "whether the plaintiffs will ultimately prevail" but "whether they are

25   entitled to offer evidence to support their claims."); Phelps v. Kapnolas, 308 F.3d 180, 184-85 (2d

26   Cir. 2002) ("Indeed it may appear on the face of the pleading that a recovery is very remote and

27   unlikely but that is not the test."). However, it is not "proper to assume that [a plaintiff] can prove

28   the facts it has not alleged or that the defendants have violated [laws] in ways that have not been

02cv870-BEN (RBB)

Exhibit F
0509

1    alleged." <u>Associated General California, Inc. v. California State Council of Carpenters</u>, 459 U.S.

2    519, 526 (1983).

3                                                    IV.

4         **CLAIMS AND LIABILITIES UNDER SECTION 10(b)and RULE 10b-5.**

5              As a preliminary matter, and as noted above, the Court has already found that Plaintiffs

6    adequately state a Section 10(b) claim against Gardner, Gless, Spitzer, and Cappel.  (<u>See</u>, Court's

7    Order dated November 21, 2003 at 78:13-14: The Complaint "states with adequate particularity

8    Section 10(b) claims against Defendants Gardner, Gless, Spitzer, and Cappel.").  Thus, the Court's

9    discussion will be limited to the remaining Defendants.  Determining whether Plaintiffs state a

10   claim under Section 10(b) against these Defendants, requires application of the following

11   principles.

12        A.     **Pleading Standards.**

13        1.     **Pleading Elements.**

14             Section 10(b) is designed "to insure honest securities markets and thereby promote investor

15   confidence."  <u>United States v. O'Hagan</u>, 521 U.S. 642, 658 (1997); <u>see also</u>, <u>Affiliated Ute Citizens</u>

16   <u>of Utah v. United States</u>, 406 U.S. 128, 151 (1972) (Section 10(b) was designed "to substitute a

17   philosophy of full disclosure for the philosophy of <u>caveat emptor</u> and thus to achieve a high

18   standard of business ethics in the securities industry.").  In this regard, Section 10(b) prohibits:

19        any person . . . to use or employ . . . any manipulative or deceptive device or contrivance in
          contravention of such rules and regulations as the [SEC] may prescribe . . . .
20

21   15 <u>U.S.C.</u> § 78j(b).

22             "Rule 10b-5 is the regulation [SEC] promulgated under Section 10(b)."  <u>Nursing Home</u>

23   <u>Pension Fund, Local 144 v. Oracle Corp.</u>, 380 F.3d 1226, 1229 (9th Cir. 2004).  "The scope of

24   Rule 10b-5 is coextensive with the coverage of § 10(b)."  <u>S.E.C. v. Zandford</u>, 535 U.S. 813, 816

25   fn.1 (2002).  "[T]herefore, [the Court may at times] use § 10(b) to refer to both the statutory

26   provision and the Rule."  <u>Id</u>.

27             Rule 10b-5 prohibits three types of conduct.  <u>See</u>, 17 <u>C.F.R.</u> § 240.10b-5(a)-(c).  First,

28   under the Rule, "it is unlawful . . . '[t]o employ any device, scheme, or artifice to defraud.'"  <u>No.</u>

                                                   - 34 -                    02cv870-BEN (RBB)

1  84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320

2  F.3d 920, 932 (9th Cir. 2003), quoting 17 C.F.R. § 240.10b-5(a).  The Rule "further provides that

3  it is unlawful '[t]o make any untrue statement of a material fact or to omit to state a material fact

4  necessary in order to make the statements made, in the light of the circumstances under which they

5  were made, not misleading.'"  Id., quoting § 240.10b-5(b).  Lastly, the Rule prohibits "any act,

6  practice, or course of business which operates or would operate as a fraud or deceit upon any

7  person . . . ."  17 C.F.R. § 240.10b-5(c).

8      "The majority of securities fraud claims under Section 10(b) are brought pursuant to Rule

9  10b-5(b) for false or misleading statements or omissions."  In re Global Crossing, 322 F.Supp.2d at

10  328.  To plead a case under this provision, a plaintiff must allege the defendant made a materially

11  false statement or omitted a material fact, with scienter, on which the plaintiff relied and was

12  damaged.  See, Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1157 (9th Cir.

13  1996).  "The plaintiff must [also] prove both actual cause ('transaction causation') and proximate

14  cause ('loss causation')."  Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment, 189 F.3d 1017,

15  1025 (9th Cir. 1999).  Defendants can, therefore, be liable for both affirmative misstatements and

16  misleading omissions.

17      But, Section 10(b) and Rule 10b-5(b) do not impose a general duty to disclose material

18  information.  Instead, under Section 10(b), a duty to disclose material information only arises when

19  a defendant makes a statement.[13]  So, even if a Defendant was aware of Peregrine's accounting

20

21      [13] "There is [also] an affirmative duty of disclosure if . . . there is insider trading . . . ."  In re
Ford Motor Co. Securities Litigation, 184 F.Supp. 2d 626, 631-632 (E.D.Mich. 2001); U.S. v. Smith,

22  155 F.3d 1051, 1067 (9th Cir. 1998) ("Under the 'traditional' or 'classical theory' of insider trading
liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his

23  corporation on the basis of material, nonpublic information."); quoting, United States v. O'Hagan, 521
U.S. 642 (1997).  However, as the Court previously found, Plaintiffs cannot state a claim based on

24  allegations of insider trading.  This is because Plaintiffs' case is based on "fraud on the market" theory.
See, Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971, 975 (9th Cir. 1999).  (See also,

25  Complaint ¶ 48.)  Moreover, the Complaint does not allege that any of the Plaintiffs traded shares at
the same time as the Defendants.  Standing to assert a duty to disclose extends only to

26  contemporaneous traders during the alleged insider trading.  See, 15 U.S.C. § 78t-1 (Limiting standing
for insider trading claims to plaintiffs that "contemporaneously" bought or sold securities of the same

27  class); In re Seagate Technology II Securities Litigation, 843 F.Supp. at 1370 ("Because plaintiffs here
were not contemporaneous traders during the alleged insider trading, they have no standing to assert

28  the duty to disclose imposed upon insider traders.").  Therefore, the allegations in the Complaint, in
particular paragraphs 157-177, do not state a claim and are irrelevant to the Court's analysis of

- 35 -                    02cv870-BEN (RBB)

1  improprieties, that Defendant was not required to disclose it unless his or her failure to do so

2  altered a statement that Defendant made.  See, Basic v. Levinson, 485 U.S. 224, 239 n.17 (1988)

3  ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5"); Dirks v. SEC, 463 U.S.

4  646 (1983) (Mere possession of confidential inside information is not sufficient to trigger duty to

5  disclose); Hayes v. Gross, 982 F.2d 104, 106 (3d Cir. 1992) ("[A]n allegation of mismanagement

6  on the part of a defendant will not alone support a claim under § 10(b) or Rule 10b-5; nor will an

7  allegation that a defendant failed to disclose the existence of mismanagement . . . . [H]owever, . . .

8  a complaint does allege an actionable misrepresentation if it alleges that a defendant was aware

9  that mismanagement had occurred and made a material public statement about the state of

10  corporate affairs inconsistent with the existence of the mismanagement."); In re Seagate

11  Technology II Securities Litigation, 843 F.Supp. 1341, 1369 (N.D.Cal. 1994) ("In considering

12  fraud-on-the-market claims brought for omissions of material information, it is important to note

13  that generally, the corporation has no affirmative duty of disclosure."); Friedman v. Rayovac Corp.,

14  291 F.Supp.2d 845, 854 (W.D.Wis. 2003) ("Unless defendants made public statements that would

15  be misleading in the absence of disclosure, they would not be required to reveal any of the

16  company's sales practices."); Time Warner, Inc. Securities Litig., 9 F.3d 259, 267 (2d Cir.1993)

17  ("[A] [defendant] is not required to disclose a fact merely because a reasonable investor would

18  very much like to know that fact.").  There, "even if a reasonable investor would want to know an

19  omitted fact, there is no duty to disclose it unless omitting it alters the meaning of a statement that

20  was made." Friedman v. Rayovac Corp., 295 F.Supp.2d at 988 (Emphasis original).  Accordingly,

21  the Complaint fails to state a claim under Section 10(b) to the extent it merely alleges that a

22  Defendant failed to act on, or disclose, knowing material adverse information about Peregrine's

23  accounting when that Defendant never made a statement.

24      "However, if a defendant makes a statement on a particular issue, and that statement is false

25  or later turns out to be false, the defendant may be under a duty to correct any misleading

26  impression left by the statement." Grossman v. Novell, Inc., 120 F.3d 1112, 1125 (10th Cir. 1997).

27  "Thus, if and when a speaker learns that a prior statement was misleading when made, a duty to

28  _____

Defendants' liability under Section 10(b).

Exhibit F
0512

1  correct arises." In re International Business Machines Corporate Securities Litigation, 163 F.3d

2  102, 109 (2nd Cir. 1998). The defendant must, however, be "certain the recently discovered

3  adverse facts are accurate before making a corrective disclosure." In re MobileMedia Securities

4  Litigation, 28 F.Supp.2d 901, 937 (D.N.J. 1998); Acito v. IMCERA Group, Inc., 47 F.3d 47, 52-53

5  (2d Cir. 1995). Plaintiffs do not assert any such claim against any of the Defendants.

6      Turning once again to the elements, "Section 10(b) and Rule 10b-5 are not limited to

7  misrepresentations or omissions of material fact." No. 84 Employer-Teamster Joint Council

8  Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 937 (9th Cir. 2003); see also,

9  SEC v. Zandford, 535 U.S. at 820 ("[N]either the SEC nor this Court has ever held that there must

10  be a misrepresentation about the value of a particular security in order to run afoul of the Act.").

11  Even absent a fraudulent statement, a defendant can be liable under subsections (a) and (c) of Rule

12  10b-5 for participation in a fraudulent scheme or course of business. Id.

13      Claims under 10b-5(a) and (c) and 10b-5(b) are distinct, with distinct elements. Unlike

14  10b-5(b), which requires a false statement or omission, claims under 10b-5(a) and (c) "are not so

15  restricted." Affiliated Ute Citizens of Utah v. U.S., 406 U.S. 128, 153 (1972); see also, In re

16  Splash Technology Holdings, Inc. Sec. Litig., 2000 WL 1727377 at *13 (N.D.Cal. 2000)

17  ("Whereas 10b-5(b) focuses on fraudulent statements, 10b-5(a) and (c) are not by their terms

18  restricted to statements."). Rather, subsections (a) and (c) of the Rule "encompass the use of 'any

19  device, scheme or artifice,' or 'any act, practice, or course of business' used to perpetuate a fraud

20  on investors." In re Global Crossing, 322 F.Supp.2d at 336-37. See also, Santa Fe Industries, Inc.

21  v. Green, 430 U.S. 462, 477 (1977) ("No doubt Congress meant to prohibit the full range of

22  ingenious devices that might be used to manipulate securities prices"); Herman & MacLean v.

23  Huddleston, 459 U.S. 375, 386 (1983) ("In furtherance of its objective, § 10(b) makes it unlawful

24  to use '**any** manipulative or deceptive device or contrivance' in connection with the purchase or

25  sale of any security" (Emphasis in original)); Superintendent of Insurance v. Bankers Life and

26  Casualty Co., 404 U.S. 6, 11 n. 7 (1971) ("'[Section] 10(b) and Rule 10b-5 prohibit **all** fraudulent

27  schemes in connection with the purchase or sale of securities, whether the artifices employed

28  involved a garden type variety of fraud, or present a unique form of deception.'" (Emphasis

- 37 -

02cv870-BEN (RBB)

1  original).  "Market manipulation, employment of a manipulative device, and engaging in

2  manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying

3  records to reflect non-existent profits, and creating and distributing false research reports favorably

4  reviewing a company are other types of conduct prohibited by § 10(b) and Rule 10b-5 that do not

5  fall within the category of misleading statements and omissions."  In re Enron Corp. Securities,

6  Derivative & ERISA Litigation, 235 F.Supp.2d at 579.

7          To state a claim under these provisions, Plaintiffs must allege: "(1) they were injured; (2) in

8  connection with the purchase or sale of securities; (3) by relying on a market for securities; (4)

9  controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the

10  defendants engaged in the manipulative conduct with scienter."  In re Global Crossing, 322

11  F.Supp.2d at 329.  (Citations omitted).  "Schemes used to artificially inflate the price of stocks by

12  creating phantom revenue fall squarely within" the proscribed conduct.  Id. at 337.

13          While claims under 10b-5(a) and (c) and 10b-5(b) are distinct, there are circumstances

14  under which they overlap--a scheme to publish or issue misleading statements about the financial

15  condition of the corporation to inflate stock prices.  Under such circumstance, a defendant may be

16  held liable not only under Rule 10b-5(b) for the misstatements, but also under Rule 10b-5(a) or (c)

17  for the scheme to publish the statements.  See, Cooper v. Pickett, 137 F.3d 616, 624-625 (9th Cir.

18  1997) (Defendant, "through false statements to analysts, and those analysts, by issuing reports

19  based on statements they knew were false, together engaged in a scheme to defraud the

20  shareholders" under Rule 10b-5(a), and under Rule 10b-5(b) for "Merisel is liable for its own false

21  statements to the analysts.").  However, "[i]f the claimed fraudulent schemes or practices consisted

22  simply of misleading statements or omissions, then they would fall entirely within the ambit of

23  Rule 10b-5(b), and no separate (a) and (c) actions would lie."  Swack v. Credit Suisse First Boston,

24  2004 WL 2203482 at *10 (D.Mass. 2004).

25      **2.      Primary Liability, As Opposed to Secondary, Must be Alleged; No Conspiracy**

26              **Theory.**

27          No matter what subsection of Rule 10b-5 Plaintiffs proceed under, they "may not maintain

28  an aiding and abetting suit under § 10(b)."  Central Bank of Denver, N.A. v. First Interstate Bank

- 38 -

02cv870-BEN (RBB)

1    of Denver, N.A. ("Central Bank"), 511 U.S. 164, 191 (1994).[14]  Thus, to survive dismissal,

2    Plaintiffs must sufficiently allege Defendants were primary, as opposed to secondary, violators of

3    Section 10(b) or Rule 10b-5.  Id.  In other words, Defendants can only be held liable under Section

4    10(b) or Rule 10b-5, if they themselves "employ[ed] a manipulative device or ma[d]e a material

5    misstatement (or omission) on which [Plaintiffs] relie[d] . . . ."  Id. at 191.  Otherwise, liability

6    would attach "when at least one element critical for recovery under Section 10(b) is absent:

7    reliance."  Id. at 180.  As Central Bank explained:

8            A plaintiff must show reliance on the defendant's misstatement or omission to recover
             under 10b-5.  Were we to allow the aiding and abetting action proposed in this case, the
9            defendant could be liable without any showing that the plaintiff relied upon the aider and
             abettor's statements or actions.  Allowing plaintiffs to circumvent the reliance requirement
10           would disregard the careful limits on 10b-5 recovery mandated by our earlier cases.

11   Id. at 180 (Citations omitted).

12           Central Bank also foreclosed a claim for conspiracy to violate Rule 10b-5, in addition to

13   aiding and abetting.  See, e.g., McGann v. Ernst & Young, 95 F.3d 821, 823 (9th Cir. 1996)

14   ("[T]he rationale of Central Bank precludes a private right of action under § 10(b) for 'conspiracy'

15   liability.");  In re GlenFed, Inc. Securities Litigation, 60 F.3d 591, 592 (9th Cir. 1995) (Same).

16           To be primarily liable under Rule 10b-5(b), Defendants must have "substantial

17   participation or intricate involvement" in the preparation of fraudulent statements "even though

18   that participation might not lead to the actor's actual making of the statements."  Howard v. Everex

19   Systems, Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000); see also, In re Software Toolworks, 50

20   F.3d 615, 628-629 n.3 (9th Cir. 1994) (Accountant may become a primary violator under antifraud

21   provision of Section 10(b) where it reviews and plays a "significant role in drafting and editing"

22   two letters, one not identifying the accounting firm, sent by the issuer client to the SEC; a

23   reasonable fact finder could find that the accountants "as members of the drafting group, . . . had

24   access to all information that was available and deliberately chose to conceal the truth"); In re

25   ZZZZ Best Securities Litigation, 864 F.Supp. 960, 970 (C.D.Cal. 1994) (Where accounting firm

26   _____

27           [14] Before Central Bank, courts uniformly allowed aiding and abetting liability under Section
     10(b).  See, Id. at 169 (Listing cases); see also, In re Homestore.com, Inc. Securities Litigation, 252
28   F.Supp.2d 1018,1038 (C.D.Cal. 2003) ("Prior to Central Bank, the lower federal courts had nearly
     uniformly recognized an implied right of action for aiding and abetting liability under Section 10(b)
     and Rule 10b-5.").

Exhibit F
0515

1  was "intricately involved" in the creation of false and misleading documents and the "resulting

2  deception," it may be liable as a primary violator of Section 10(b)); <u>Cashman v. Coopers &</u>

3  <u>Lybrand</u>, 877 F.Supp. 425, 432-34 (N.D.Ill. 1995) (Primary liability may be established against

4  accountants "centrally involved" in preparation of alleged false or misstated information for

5  prospectuses or promotional material issued to investors that the accounting firm certified, audited,

6  prepared or reported.); <u>McNamara v. Bre-X Minerals Ltd.</u>, 57 F.Supp.2d 396, 426 (E.D.Tex. 1999)

7  ("[I]f a defendant played a 'significant role' in preparing a false statement actually uttered by

8  another, primary liability will lie"); <u>In re Homestore.com, Inc. Securities Litigation</u>, 252 F.Supp.2d

9  1018, 1039 (C.D.Cal. 2003) ("[P]ersons 'outside' a corporation have been held liable as primary

10  violators in private actions brought by shareholders of that corporation if those persons

11  substantially and directly participated in the creation of false or misleading statements to the

12  investing public."). "Allegations that [a Defendant] 'prepared, directed or controlled,' helped

13  create' or 'materially assisted in' preparing false statements" [Peregrine] issued "place [his or her]

14  involvement well beyond the realm of 'aiding and abetting' liability precluded by <u>Central Bank</u>."

15  <u>In re Global Crossing</u>, 322 F.Supp.2d at 334.

16        Defendants can also be primarily liable under Rule 10b-5(b) if they "made misleading

17  statements [to others] with the intent that [they] communicate those statements to the market."

18  <u>Cooper v. Pickett</u>, 137 F.3d 616, 624 (9th Cir. 1997). "In such circumstances, it was the

19  defendant's original statement which misled investors--the person who communicated the

20  statement to investors served as a mere conduit for [the] defendant's statement." <u>Copland v.</u>

21  <u>Grumet</u>, 88 F.Supp.2d 326, 333 (D.N.J. 1999).

22        Corporate defendants, furthermore, may be directly liable under 10b-5(b) for providing

23  false or misleading information to analysts where the corporate defendant intentionally used the

24  analysts to disseminate false information to the public. In such a case, the defendants are not

25  charged with aiding and abetting or secondary liability, but rather with primary liability. <u>Cooper v.</u>

26  <u>Pickett</u>, 137 F.3d at 624, <u>Warshaw v. Xoma Corp.</u>, 74 F.3d 955, 959 (9th Cir.1996) ("The

27  Complaint asserts that [defendant] intentionally used these third parties to disseminate false

28  information to the investing public. If this is true, [defendant] cannot escape liability simply

1  because it carried out its alleged fraud through the public statements of third parties.").

2  Lastly, "the signing of [the company's] filing does establish that [an individual] made

3  'statements' within the meaning of the act and the rule." In re Homestore.com, Inc. Sec. Litig.,

4  252 F. Supp. 2d at 1033; see also, Howard v. Everex, 228 F.3d 1057, 1061-63 (9th Cir. 2000)

5  (Finding that "signers of documents should be held responsible for the statements in the document

6  . . . a corporate official . . . who, acting with scienter, signs a SEC filing containing

7  misrepresentations, 'make[s]' a statement so as to be liable as a primary violator under § 10(b).").

8  Turning to Rule 10b-5(a) and (c), for primary liability to attach, "each [D]efendant [must]

9  commit[] a manipulative or deceptive act in furtherance of the scheme." Cooper v. Pickett, 137

10  F.3d at 624 ("Central Bank does not preclude liability based on allegations that a group of

11  defendants acted together to violate the securities laws, as long as each defendant committed a

12  manipulative or deceptive act in furtherance of the scheme."); see also, In re Global Crossing, 322

13  F.Supp.2d at 336; In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp. 2d

14  549, 693 (S.D.Tex. 2002) ("[U]nder Rule 10b-5(a) and (c), where a group of Defendants allegedly

15  participated in a scheme to defraud the public and enrich themselves in connection with the

16  purchase or sale of securities, any Defendant that itself, with the requisite scienter, actively

17  employed a significant material devise, contrivance, scheme or artifice and defraud or actively

18  engaged in a significant, material act, practice, or course of business that operated as a fraud or

19  deceit upon any person in connection with the purchase or sale of any security may be primarily

20  liable."). So "a complaint alleging that more than one defendant participated in a 'scheme' to

21  defraud must allege a primary violation of § 10(b) by each defendant." In re Enron Corp.

22  Securities, Derivative & ERISA Litigation, 235 F.Supp.2d at 591.

23  Although there is no secondary liability, Section 20(a) of the 1934 Act and Section 15 of

24  the 1933 Act, impose liability on persons who control those who have committed violations of

25  federal securities law. See, No. 84 Employer-Teamster Joint Council Pension Trust Fund v.

26  America West Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003) ("In order to prove a prima facie

27  case under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities law

28  and (2) that the defendant exercised actual power or control over the primary violator."); see also,

- 41 -

02cv870-BEN (RBB)

Exhibit F
0517

1   Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990) ("Although § 15 is not

2   identical to § 20(a), the controlling person analysis is the same."). Thus, even where Plaintiffs'

3   claims are insufficient to establish primary liability against a particular Defendant, they may be

4   sufficient to state a claim for control person liability against that Defendant. See, Central Bank,

5   511 U.S. at 184.

6       3.    **Pleading Requirements Under The Private Securities Litigation Reform Act**

7             **("PSLRA").**

8           Plaintiffs must also comply with the PSLRA.  Enacted in 1995, PSLRA "imposes a

9   heightened pleading standard for alleging violations under the Securities Exchange Act of 1934."

10  In re Read-Rite Corp., 335 F.3d 843, 845-846 (9th Cir. 2003); see also, Desaigoudar v. Meyercord,

11  223 F.3d 1020, 1021 (9th Cir. 2000) ("[T]he PSLRA . . . modified the liberal, notice pleading

12  standard found in the Federal Rules of Civil Procedure," such that the courts "now examine a

13  securities fraud complaint to determine whether the plaintiff has complied with the more stringent

14  pleading standards of the PSLRA."); In re Silicon Graphics Inc. Securities Litigation, 183 F.3d

15  970, 973 (9th Cir. 1999) (In 1995, "Congress enacted PSLRA.").[15]

16          "Before the passage of the PSLRA, the pleading requirements in private securities fraud

17  litigation were governed by Fed.R.Civ.P. 9(b), which required only that 'falsity' be pled with

18  particularity; scienter could be averred generally.  The PSLRA changed the pleading requirements

19  . . . by requiring that a complaint plead with particularity both falsity and scienter."  Lipton v.

20  Pathogenesis Corp., 284 F.3d 1027, 1034 (9th Cir. 2002).[16]

21

---

22  [15] "The purpose of this heightened pleading requirement was generally to eliminate abusive
    securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'" In
23  re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1084 -1085 (9th Cir. 2002). However, "[t]he
    PSLRA was designed to eliminate frivolous or sham actions, . . . not actions of substance." Nursing
24  Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1235 (9th Cir. 2004).

25  [16] Specifically, the PSLRA imposes at least two pleading requirements on securities actions,
    referred to as paragraph (b)(1) and paragraph (b)(2). Paragraph (b)(1) applies to securities claims "in
26  which the plaintiff alleges that the defendant" either "made an untrue statement of a material fact" or
    "omitted to state a material fact." 15 U.S.C. § 78u-4(b)(1). Paragraph (b)(2) applies to claims "in
27  which the plaintiff may recover money damages only on proof that the defendant acted with a
    particular state of mind." 15 U.S.C. § 78u-4(b)(2).  The requirements of the PSLRA must be read
28  consistently with its purpose. See, Barrett v. Van Pelt, 268 U.S. 85, 90-91(1925). Congress enacted
    the information and belief pleading requirement because "[n]aming a party in a civil suit for fraud is

- 42 -

Exhibit F
0518

1    Thus, where material misstatements or omissions are alleged under Rule 10b-5(b), a

2   complaint must "specify each statement alleged to have been misleading [and] the reason or

3   reasons why the statement is misleading." In re Vantive Corp. Securities Litigation, 283 F.3d

4   1079, 1085 (9th Cir. 2002);15 U.S.C. § 78u4(b)(1). If allegations are made on information and

5   belief[17], "a plaintiff must provide, in great detail, all the relevant facts forming the basis for her

6   belief." In re Silicon Graphics Inc. Securities Litigation, 183 F.3d at 985; see also, 15 U.S.C. §

7   78u4(b)(1) ("[I]f an allegation regarding the statement or omission is made on information and

8   belief, the complaint shall state with particularity all facts on which that belief is formed.").

9    Similarly, in cases where a fraudulent scheme is alleged, i.e., claims under Rule 10b-5(a)

10  and (c), a plaintiff must specify "what manipulative acts were performed, which defendants

11  performed them, when the manipulative acts were performed, and what effect the scheme had on

12  the market for the securities at issue." In re Global Crossing, 322 F.Supp.2d at 330; In re Blech

13  Sec. Litig., 961 F.Supp. 569, 580 (S.D.N.Y.1997).

14   "[T]he PSLRA [also] requires that the Complaint state with particularity facts giving rise

15  to a strong inference that the defendant acted with the required state of mind, or scienter." Nursing

16  Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d at 1230; 15 U.S.C. § 78u-4(b)(2); see

17  also, In re Silicon Graphics Inc. Securities Litigation, 183 F.3d at 975 ("The 'required state of

18  mind' in § 78u-4(b)(2) refers to the scienter. . . ."); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193

19  n.12 (1976) ("[T]he term 'scienter' refers to a mental state embracing intent to deceive,

20  manipulate, or defraud.").

21   This requires pleading "in great detail, facts that constitute strong circumstantial evidence

22  of deliberately reckless or conscious misconduct." In re Silicon Graphics Inc., 183 F.3d at 974; see

23  also, Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d at 1230 ("The required

24

25  a serious matter. Unwarranted fraud claims can lead to serious injury to reputation for which our legal
    system effectively offers no redress." H.R. Conf. Rep. 104-369 at 41. The purpose of the information
26  and belief requirement--indeed, the purpose of all of the PSLRA's heightened pleading requirements--
    was to weed out meritless lawsuits at the pleading stage.
27

28   [17] "Allegations are deemed to have been made on information and belief until the plaintiffs
    demonstrate that they have personal knowledge of the facts." In re Vantive Corp. Securities Litigation,
    283 F.3d 1079, 1085 (9th Cir. 2002).

- 43 -

1    state of mind is one of 'deliberate recklessness.'  Recklessness only satisfies scienter under § 10(b)

2    to the extent that it reflects some degree of intentional or conscious misconduct.").

3        Great detail means a plaintiff "must provide a list of all relevant circumstances in great

4    detail." Id. at 984.  Deliberate recklessness, or conscious misconduct, is a "highly unreasonable

5    omission, involving not merely simple, or even inexcusable negligence, but an extreme departure

6    from the standards of ordinary care, and which presents a danger of misleading buyers or sellers

7    that is either known to the defendant or is so obvious that the actor must have been aware of it."

8    DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 389 (9th Cir. 2002).  "To allege

9    a 'strong inference of deliberate recklessness,' plaintiffs must state facts that come closer to

10   demonstrating intent, as opposed to mere motive and opportunity." Id; see also, Lipton v.

11   Pathogenesis Corp., supra, 284 F.3d at 1035 ("[P]laintiffs who plead the required state of mind in

12   general terms of mere 'motive and opportunity' or 'recklessness' fail to meet the PSLRA's

13   heightened pleading requirements.").

14       "Scienter is [the] essential element of a § 10(b) claim." In re Read-Rite Corp., 335 F.3d

15   843, 846 (9th Cir. 2003); see also, Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035 n.15 (9th

16   Cir. 2002) ("Scienter is an essential element of a § 10(b) or Rule 10b-5 claim.").  "In assessing

17   whether Plaintiffs have sufficiently pled scienter [the Court] must consider whether the total of

18   plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference

19   that defendants acted with deliberate or conscious recklessness." Nursing Home Pension Fund,

20   Local 144 v. Oracle Corp., 380 F.3d at 1230; see also, No. 84 Employer-Teamster Joint Council

21   Pension Trust Fund v. America West Holding Corp., 320 F.3d at 932 (The Court "must determine

22   whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants

23   intentionally or with deliberate recklessness made false or misleading statements.").  "In

24   determining whether a strong inference of scienter exists, [the Court] must consider all reasonable

25   inferences, whether or not favorable to the plaintiff." Id; see also, Gompper v. VISX, Inc., 298

26   F.3d 893, 897 (9th Cir. 2002) (Noting the "inevitable tension . . . between the customary latitude

27   granted the plaintiff on a [12(b)(6)] motion to dismiss . . . and the heightened pleading standard set

28   forth under the PSLRA"); see also, No. 84 Employer-Teamster Joint Council Pension Trust Fund

02cv870-BEN (RBB)

Exhibit F
0520

1  v. America West Holding Corp., 320 F.3d at 945 ("In sum, although recognizing that some of

2  Plaintiffs' allegations are individually lacking, we hold that the allegations in their totality are

3  sufficient to meet the stringent pleading standard set forth in the PLSRA.").

4       "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not

5  raise a strong inference of scienter, a Rule 12(b)(6) dismissal is proper." Lipton v. Pathogenesis

6  Corp., 284 F.3d at1035; see also, No. 84 Employer-Teamster Joint Council Pension Trust Fund v.

7  America West Holding Corp., 320 F.3d at 931 -932 ("If a plaintiff fails to plead either the alleged

8  misleading statements or scienter with particularity, his or her complaint must be dismissed.").

9       In sum, under the PSLRA, "the [C]omplaint must contain allegations of specific

10 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately

11 reckless false or misleading nature of the statements when made." Ronconi v. Larkin, 253 F.3d

12 423, 432 (9th Cir. 2001). "If a plaintiff fails to plead either the alleged misleading statements or

13 scienter with particularity, the complaint must be dismissed." In re Syncor Intern. Corp. Securities

14 Litigation, 327 F.Supp.2d 1149, 1156 (C.D.Cal. 2004).

15      However, "[a]lthough pleading securities fraud after the PSLRA can no longer be described

16 as merely 'notice pleading,' courts must be careful not to set the hurdles so high that even

17 meritorious actions cannot survive a motion to dismiss.  Such a regime would defeat the remedial

18 goals of the federal securities laws." In re PetSmart, Inc. Securities Litigation, 61 F.Supp.2d 982,

19 988 (D.Ariz. 1999); see also, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 200 (1976).  In particular,

20 whether a statement is misleading and whether adverse facts are adequately disclosed are generally

21 questions that should be left to the trier of fact.  See, Fecht v. Price Co., 70 F.3d 1078, 1081 (9th

22 Cir. 1995).  "[O]nly if 'reasonable minds' could not disagree that the challenged statements were

23 not misleading should the district court dismiss under 12(b)(6)." Warshaw v. Xoma Corp., 74 F.3d

24 955, 959 (9th Cir. 1996).

25      **4.    No Claim Can Be Sustained Under the Group Published Doctrine.**

26      The "group published" or "group pleading" doctrine presumes that false and misleading

27 information conveyed in documents, including press releases, are made by the collective action of

28 the officers of the corporation.  See, In re GlenFed. Sec. Litig., 60 F.3d 591, 593 (9th Cir.1995)

- 45 -

Exhibit F
0521

1 ("In cases of corporate fraud where the false and misleading information is conveyed in

2 prospectuses, registration statements, annual reports, press releases, or other 'group published

3 information,' it is reasonable to presume that these are the collective actions of the officers."). The

4 doctrine thus "allows Plaintiffs to attribute statements to individual defendants based upon their

5 corporate titles, rather than pleading facts that show that a defendant actually made, authored, or

6 communicated a statement." In re Syncor Intern. Corp. Securities Litigation, 327 F.Supp.2d 1149,

7 1171 (C.D.Cal. 2004). To rely upon this presumption, "plaintiffs' complaint must contain

8 allegations that . . . [the defendant] either participated in the day-to-day corporate activities or had a

9 special relationship with the corporation, such as participation in preparing or communicating

10 group information at particular times." In re GlenFed., 60 F.3d at 593.

11       Since PSLRA's enactment, courts have struggled to determine the continued viability of the

12 group published doctrine. The Ninth Circuit has not decided the issue, and the district courts are

13 split. Compare, In re Secure Computing Corp., 184 F.Supp.2d 980, 991 (N.D.Cal. 2001)

14 (Reaffirming its finding that the group published information presumption survives the PSLRA);

15 In re Splash Techs. Holdings, Inc. Sec. Litig., 2000 WL 1727377 at *24-25 n.18 (N.D.Cal. 2000)

16 (Assuming that the group pleading doctrine survived the PSLRA); Stanley v. Safeskin Corp., 2000

17 WL 33115908 at *4 (S.D.Cal. 2000) (Rejecting argument that group pleading doctrine did not

18 survive the PSLRA); with Allison v. Brooktree Corp., 999 F.Supp. 1342, 1350-51 (S.D.Cal. 1998)

19 (Ruling that the PSLRA is fundamentally inconsistent with the group published information

20 doctrine); In re Ashworth, Inc. Securities Litigation, 2000 WL 33176041 at *12 (S.D.Cal. 2000)

21 (Same); In re Syncor Intern. Corp. Securities Litigation, 327 F.Supp.2d 1149, 1172 (C.D.Cal.2004)

22 (Same).

23       In Allison v. Brooktree Corp., this Court found that the group-published information

24 doctrine is inconsistent with the PSLRA because the doctrine allows facts to be presumed while

25 "the PSLRA specifically requires that the untrue statements or omissions be set forth with

26 particularity as to 'the defendant.'" Id. at 1350 ("[T]he continued vitality of the judicially created

27 group-published doctrine is suspect since the PSLRA specifically requires that the untrue

28 statements or omissions be set forth with particularity as to 'the defendant' and that scienter be

02cv870-BEN (RBB)

Exhibit F
0522

1 │ plead in regards to 'each act or omission' sufficient to give 'rise to a strong inference that **the**

2 │ **defendant** acted with the required state of mind.'") (Emphasis in original). Relying, in part, on

3 │ Allison v. Brooktree Corp., the Fifth Circuit, the first circuit court to address the issue, recently

4 │ found that the "group pleading" doctrine did not survive the PSLRA. See, Southland Secs. Corp.

5 │ v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 363-366 (5th Cir. 2004). The Fifth Circuit concluded

6 │ that group pleading cannot be reconciled with the PSLRA's requirement that Plaintiffs must plead

7 │ specific facts as to each act or omission by the defendants and demonstrate that defendants possess

8 │ the requisite scienter. Id. at 365. Other courts have ruled that the doctrine is no longer applicable

9 │ because it is inconsistent with the PSLRA's requirement that scienter must be pleaded with

10 │ particularity for each defendant. See Coates v. Heartland Wireless Communications, Inc., 26

11 │ F.Supp.2d 910, 916 (N.D.Tex.1998) ("It is nonsensical to require that a plaintiff specifically allege

12 │ facts regarding scienter as to each defendant, but to allow him to rely on group pleading in

13 │ asserting that the defendant made the statement or omission.").

14 │     "It has also been suggested that the group-published information doctrine is no longer

15 │ viable because it is inconsistent with the overall spirit of the PSLRA in general, and the PSLRA's

16 │ discovery stay provision at § 78u-4(b)(3)(B) in particular." In re Lockheed Martin Corp. Securities

17 │ Litigation, 272 F.Supp.2d 928, 935 (C.D.Cal. 2002). "Group pleading arguably allows plaintiffs to

18 │ name, as defendants, people or corporations who cannot be tied by specific facts to allegedly false

19 │ or misleading statements without discovery. But, 'Congress clearly intended that complaints in

20 │ [post-PSLRA] securities actions should stand or fall based on the actual knowledge of the plaintiffs

21 │ rather than information produced by the defendants after the action has been filed.'" Id, quoting

22 │ Medhekar v. United States Dist. Court, 99 F.3d 325, 328 (9th Cir.1996).

23 │     The group-published doctrine is also inconsistent with the PSLRA as it requires courts to

24 │ accept a plaintiff's belief regarding the individual liability of a corporate officer even when the

25 │ belief is based on the officer's job title alone. The doctrine could essentially be a mechanism for

26 │ pleading an officer's involvement in the issuance of a corporate statement based on information

27 │ and belief. The PSLRA permits pleading on information and belief, but, as noted above, only if

28 │ the complaint states with particularity all facts on which the belief is formed. See,15 U.S.C. § 78u-

02cv870-BEN (RBB)

Exhibit F
0523

1  4(b)(1). Implicit in this requirement is a mandate that the stated facts provide an adequate basis for

2  the asserted belief. Thus, a plaintiff can attribute to a particular defendant a false or misleading

3  statement contained in a group-published document based on information and belief as long as the

4  plaintiff satisfies the corresponding PSLRA requirements. For example, if the alleged misleading

5  statement appears in a press release issued by a company discussing financial performance, a

6  plaintiff could plead on information and belief that the chief financial officer is responsible for

7  making the statement if the plaintiff can plead with specificity why the officer's position directly

8  involves such duties or why a specific corporate policy requires that chief financial officer make

9  such releases. Coates v. Heartland Wireless Communications, Inc., 26 F.Supp.2d at 916 n. 2

10  (Holding that "[b]ecause a plaintiff can plead on the basis of information and belief, he need not

11  rely on group pleading."). Under no circumstances should the group-published information

12  doctrine relieve plaintiffs of their burden to plead scienter. See,15 U.S.C. § 78u-4(b)(2); In re

13  Digital Island Sec. Litig., 223 F.Supp.2d 546, 553 (D.Del. 2002) ("[C]ourts have reasoned that the

14  requirement under the PSLRA that scienter be pled with particularity as to each defendant would

15  be rendered meaningless should group pleading survive").

16       Courts favoring the continued application of the group-published information doctrine offer

17  only modest support for their positions. Some courts simply point out that the doctrine has nothing

18  to do with scienter and reaffirm the reasonableness of the doctrine's underlying presumption. See,

19  BankAmerica Corp. Secs. Litig., 78 F.Supp.2d 976, 988 (E.D.Mo. 1999) ("[T]he doctrine has

20  nothing to do with scienter. Rather, it is a reasonable presumption that the contents of company-

21  published documents and press releases are attributable to officers and directors with inside

22  knowledge of and involvement in the day-to-day affairs of the company."). At least two courts in

23  the Ninth Circuit, including one in this District, partially based their decision to continue

24  recognizing group pleading because the Ninth Circuit's opinion in Silicon Graphics failed to

25  question the enduring viability of the doctrine. See, Stanley v. Safeskin Corp., 2000 WL

26  33115908, at *4 (S.D.Cal. 2000) ("The Ninth Circuit in Silicon Graphics neither accepted nor

27  refuted the district court's reliance on this doctrine."); In re Stratosphere Corp. Sec. Litig., 1

28  F.Supp.2d 1096, 1108 (D.Nev. 1998) (Citing the defendant's failure to offer case authority for the

02cv870-BEN (RBB)

Exhibit F
0524

1  doctrine's abolition as a second reason for its decision).

2      Accordingly, to the extent Plaintiffs rely on the group pleading doctrine, that reliance is

3  rejected.  The group published doctrine permits an inference of wrongdoing not based on

4  Defendant's conduct, but based solely on Defendant's status as an officer or director of a

5  corporation.  This is in contravention of the PSLRA's pleading requirements.  Under the PSLRA,

6  "a complaint seeking to attribute information published by an organization to an individual

7  defendant should state, with particularity, facts indicating that the individual defendant was directly

8  involved in the preparation of the allegedly misleading statements."  In re Lockheed Martin Corp.

9  Securities Litigation, 272 F.Supp.2d at 936.

10      Plaintiffs must allege facts tying each of the alleged misstatements and omissions to each of

11  the Defendants.  See, In re Boeing Securities Litigation, 40 F.Supp.2d 1160, 1166 (W.D.Wash.

12  1998) ("[A] plaintiff must attribute the misleading statements upon on which his claim is based to

13  a particular defendant."); In re Silicon Graphics, Inc. Sec. Litig., 970 F.Supp. 746, 752 (N.D.Cal.

14  1997) ("[T]he plaintiff is obligated to distinguish among those they sue and enlighten each

15  defendant as to his or her part in the alleged fraud.").

16      **B.    Section 10(b) Liability Under Rule 10b-5(a) and (c).**

17      As noted above, subsections (a) and (c) of Rule 10b-5 prohibit "the use of 'any device,

18  scheme or artifice,' or 'any act, practice, or course of business' used to perpetuate a fraud on

19  investors."  In re Global Crossing, 322 F.Supp.2d at 336-37.  To state a claim under these

20  provisions, Plaintiffs must allege: "(1) they were injured; (2) in connection with the purchase or

21  sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by

22  defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative

23  conduct with scienter."  In re Global Crossing, 322 F.Supp.2d at 329.  (Citations omitted).  Only

24  elements (4) and (5) are at issue.

25      Manipulative conduct in Section 10(b) "connotes intentional or willful conduct designed to

26  deceive or defraud investors by controlling or artificially affecting the price of securities."  Ernst &

27  Ernst v. Hochfelder, 425 U.S. at 199.  This includes "practices, such as wash sales, matched orders,

28  or rigged prices, that are intended to mislead investors by artificially affecting market activity."

02cv870-BEN (RBB)

Exhibit F
0525

1   <u>Santa Fe Indust. v. Green</u>, 430 U.S. 462, 476 (1977) (Citations omitted).  Courts have also found

2   that "[s]chemes used to artificially inflate the price of stocks by creating phantom revenue fall

3   squarely within" the manipulative conduct proscribed under Section 10(b).  <u>In re Global Crossing</u>,

4   322 F.Supp.2d at 337.  Lastly, a defendant could be liable under Rule 10b-5(a) or (c) for a scheme

5   to publish false or misleading statements.  <u>See</u>, <u>Cooper v. Pickett</u>, 137 F.3d 616, 624-625 (9th Cir.

6   1997) (Defendant, "through false statements to analysts, and those analysts, by issuing reports

7   based on statements they knew were false, together engaged in a scheme to defraud the

8   shareholders" under Rule 10b-5(a), and under Rule 10b-5(b) for "Merisel is liable for its own false

9   statements to the analysts.").

10          Here, as to the remaining Defendants, the Complaint only appears to charge Nelson and

11   Luddy with violating Rule 10b-5(a) and (c).  However, as alleged, the Complaint fails to state a

12   claim against these Defendants.

13          As to Nelson, the Complaint appears to charge him with "[s]chemes used to artificially

14   inflate the price of stocks by creating phantom revenue."  <u>In re Global Crossing</u>, 322 F.Supp.2d at

15   337.  The Court must first determine whether Nelson was a primary actor, <u>i.e.</u>, "committed a

16   manipulative or deceptive act in furtherance of the scheme."  <u>Cooper v. Pickett</u>, 137 F.3d at 624.

17   "Those who actually 'employ' the scheme to defraud investors are primary violators, while those

18   who merely participate in or facilitate the scheme are secondary violators."  <u>In re Homestore.com,</u>

19   <u>Inc. Securities Litigation</u>, 252 F.Supp.2d at 1040.  Further, "whether a defendant was a primary

20   violator rather than an aider and abettor turns on the nature of his acts, not on his state of mind

21   when he performed them."  <u>In re Global Crossing, Ltd. Securities Litigation</u>, 322 F.Supp.2d at 330;

22   <u>see also</u>, <u>SEC v. U.S. Environmental, Inc.</u>, 155 F.3d at 111 ("[W]hether Romano was a primary

23   violator rather than an aider and abetter turns on the nature of his acts, not on his state of mind

24   when he performed them.").

25          Against this backdrop, the Complaint fails to allege Nelson was a primary actor.  The

26   Complaint first alleges "Nelson was pushing to renegotiate the deal [involving Peregrine and

27   Crossmark] in an attempt to artificially increase reported revenues for the June 2001 quarter at

28   Peregrine." (Complaint Exh. E at 10.)  The Complaint then alleges "[i]n violation of GAAP,

Exhibit F
0526

1   Nelson insisted that . . . Peregrine recognize the full [revenue for the] software license fee

2   immediately in the June 2001 quarter despite the fact that the transaction was nothing more than a

3   contingent transaction" and that Peregrine in fact did so. (Id. at 11.)  The Complaint also alleges

4   Nelson "signed the agreement on behalf of Peregrine" in a deal involving IBM "which gave rise to

5   improper revenue recognition." (Complaint Exh. E at 42-43.)  Accordingly, the only conduct

6   alleged against Nelson is that he was somehow involved in the renegotiations of an alleged

7   contingent deal,  that he "insisted" that Peregrine recognize revenue on a contingent deal, and that

8   he "signed" a deal involving side letters.  Such allegations are insufficient to give rise to primary

9   liability under Central Bank.  In In re Global Crossing, Ltd. Securities Litigation, the complaint

10  alleged defendant had "masterminded" the improper accounting schemes "used to circumvent

11  GAAP and inflate the Company's revenues, that it actively participated in structuring each swap,

12  that it was intimately involved in all of [the] accounting functions, and that it directly participated

13  in the creation of the misleading 'pro forma' numbers that concealed these practices from

14  investors." 322 F.Supp.2d at 336.  The court found that defendant's "allegedly central role in these

15  schemes, as their chief architect and executor" is enough for "potential liability as a primary

16  violator under Section 10(b)." Id; see also, SEC v. U.S. Environmental, Inc., 155 F.3d at 109

17  (Finding primary act where defendants, among other manipulative acts, "traded [company] shares

18  among themselves 'for the purpose of creating the appearance of an actual market for trading

19  [company] shares' and thus raising [the company's] stock price.").  No such allegations have been

20  made here.

21          The Complaint also fails to state a claim against Luddy.   Again, the Complaint fails to

22  allege Luddy ever engaged in any act proscribed under Rule 10b-5(a) and (c).  The only allegations

23  against Luddy are that he "recommended the commercial release to" British Telecome ("BT")

24  when "Peregrine was not in a position to deliver a commercially viable product to BT."

25  (Complaint Exh. E at 16.)  Under Central Bank and PSLRA, such allegations are insufficient to

26  state a claim.  See, Cooper v. Pickett, 137 F.3d at 624 (For primary liability to attach under

27  subdivisions (a) and (c) "each [D]efendant [must] commit[] a manipulative or deceptive act in

28  furtherance of the scheme."); In re Global Crossing, 322 F.Supp.2d at 330 (For claims under Rule

02cv870-BEN (RBB)

Exhibit F
0527

1   10b-5(a) and (c), under PSLRA, a plaintiff must specify "what manipulative acts were performed .

2   . . and what effect the scheme had on the market for the securities at issue."). Accordingly, the

3   Complaint fails to state a claim against Nelson and Luddy under Rule 10b-5(a) and (c).

    **C.**    **Section 10(b) Liability Under Rule 10b-5(b) For Misleading Statements or**

5           **Omissions.**

6         Most of the Complaint is devoted to Defendants' alleged misstatements or omissions. As

7   noted in Section II (D), <u>supra</u>, Peregrine reported eleven (11) quarterly revenue increases as well as

8   annual revenue increases for years 2000 and 2001. These statements appeared in press releases,

9   analysts' reports, and SEC filings. To survive dismissal, the Complaint must allege, with respect

10   to each Defendant: (1) a primary act; (2) falsity; (3) scienter; (4) reliance; and (5) causation. Only

11   elements (1) through (3) are at issue. Accordingly, the Court will first determine, as alleged, which

12   of the Defendants was a primary actor with respect to: (1) Peregrine's press releases; (2) analysts'

13   reports; and (3) Peregrine's SEC filings. The Court will then determine whether the Complaint

14   adequately pleads falsity. Lastly, the Court will determine whether the Complaint adequately

15   alleges scienter.

16       **1.**    **Primary Actors.**

17       **a.**    **Press Releases.**

18         Peregrine issued press releases on its financial results at the end of each quarter for the

19   fiscal years 2000, 2001 and the first three quarters of 2002. The press releases typically would

20   report the total revenue for the quarter, the increase in revenue as compared to the same quarter a

21   year ago, and a quote from Gardner. For example, at the end of the first quarter of 2000, Peregrine

22   issued a press release stating it had achieved "record" quarterly revenues of $51.6 million.

23   Peregrine further stated that "[o]verall results were driven by a 131 percent increase in license

24   revenue over the comparable quarter in the prior year."   Gardner was quoted: "We are extremely

25   pleased with the outstanding growth in both our software license sales and our professional

26   services activity in the first fiscal quarter . . . ."

27         The Complaint alleges some of the Defendants "read and approved" these press releases.

28   (<u>See</u>, <u>e.g.</u> Complaint ¶ 515.) The Complaint also alleges Nelson was the "principal draftsman of

- 52 -

1  the press releases" up to October 2000. (Complaint ¶ 298.) Therefore, Nelson allegedly drafted

2  the press releases following quarters one through four in 2000 and the first quarter of 2001.

3      As alleged, under PSLRA and Central Bank, only Nelson is a primary violator of Section

4  10(b) but only as to the press releases following quarters one through four in 2000 and the first

5  quarter of 2001. Under Central Bank, to be a primary actor, a Defendant must have a "substantial

6  participation or intricate involvement" or "prepared, directed or controlled", or "materially assisted

7  in" preparing the press releases. Howard v. Everex Systems, Inc., 228 F.3d at 1061; In re Global

8  Crossing, 322 F.Supp.2d at 334. According to the Complaint, Nelson was a "principal draftsman

9  of the press releases" following quarters one through four in 2000 and the first quarter of 2001. At

10 this stage, such allegations are sufficient.

11     Under PSLRA, Nelson can only be held liable for press releases following quarters one

12 through four in 2000 and the first quarter of 2001; statements from the press releases attributed to

13 Gardner, cannot be imputed to Nelson or any other Defendant.

14     Moreover, Defendants who allegedly "read and approved" the press releases are not

15 primary actors. Allegations that a Defendant "read" and "approved" the press releases are

16 insufficient to show a primary act. See, id. at 333-34; In re Autodesk Inc. Sec. Litig, 132

17 F.Supp.2d 833, 845 (N.D.Cal. 2000) ("For claims against corporate insiders, a plaintiff must allege

18 that the defendants were involved in the preparation of the allegedly misleading statement."); In re

19 Rent-Way Securities Litigation, 209 F.Supp.2d 493, 503 (W.D.Pa. 2002) ("Central Bank precludes

20 holding PwC liable based on its review and approval of Rent-Way's unaudited 1999 and 2000

21 quarterly reports. Significantly, these statements were prepared and issued solely by Rent-Way, and

22 consequently contained no misrepresentations attributable to PwC upon which investors could

23 have relied."); In re Kendall Square Research Corp. Sec. Litig., 868 F.Supp. 26, 28 (D.Mass. 1994)

24 ("Because [defendant] did not actually engage in the reporting of the financial statements . . . but

25 merely reviewed and approved them, the statements are not attributable to [defendant] and thus

26 [defendant] cannot be found liable for making a material statement."); In re Oak Tech. Sec. Litig.,

27 1997 WL 448168 at *11 (N.D.Cal. 1997) (finding allegations that members of the Audit

28 Committee "reviewed and approved the issuance of Oak's false financial statements" to be

- 53 -

Exhibit F
0529

1  insufficient); Danis v. USN Communications, Inc.,121 F.Supp.2d 1183, 1193 (N.D.Ill. 2000)

2  ("Plaintiffs cannot establish that Deloitte violated Rule 10b-5 by examining USN's 1997 unaudited

3  financial report. Aiding and abetting fraud is not sufficient for Rule 10b-5 liability.").

4    Accordingly, the Complaint sufficiently alleges that Nelson was a primary actor in that he

5  drafted the press releases following quarters one through four in 2000 and the first quarter of 2001.

6    **b.**  **Analysts' Statements.**

7    At the end of each quarter, Peregrine management, led by Gardner, held a conference call

8  with investors and analysts and reported on Peregrine's performance.  For example, the Complaint

9  alleges, at the end of the third quarter of 2000, Peregrine management, led by Gardner, held a

10  conference call with investors and analysts.  At the conference, Peregrine management reported on

11  Peregrine's previously released financial results for the quarter.  Peregrine management also stated

12  that customer acceptance of Peregrine's new Get.It! e-products far surpassed expectations and that

13  the balance sheet remained strong with cash increasing and DSO remaining steady at an acceptable

14  level of 79 days.

15    Following the conference, CIBC reported "[t]he enthusiastic reception of Peregrine's New

16  Get.It! e-procurement products far exceeded management's expectations, and generated $5 million

17  in sales in just three weeks of release."  The report also indicated "that the deal pipeline was more

18  active than usual."  CIBC also noted:

19    The balance sheet remained strong this quarter, increasing $300,000 to $25.2 million with
  cash remaining at $0.38 per share.  Accounts receivable rose $8.5 million to $59.6 million,

20    with DSO remaining steady at 79, also within what management regards as an acceptable
  range.  Deferred revenues grew $9.8 million to $31.3 million, and were made up solely of

21    customer support.

22  CIBC continued to rate Peregrine as a "strong buy."  First Union also rated Peregrine a "strong

23  buy."

24    The Complaint then alleges Defendants, excluding some, "either knew or were deliberately

25  reckless in not knowing that the financial information provided to investors and securities analysts

26  in the . . . conference call was materially false and misleading" and that "defendants knew that

27  securities analysts would rely on their materially false and misleading statements in writing their

28  research reports which would be disseminated to the investing public." (See, e.g. Complaint ¶

- 54 -

02cv870-BEN (RBB)

1    531.) As alleged, no Defendant is liable for these statements.

2        "[C]orporate defendants may be directly liable under 10b-5 for providing false or

3 misleading information to third-party securities analysts" if they intended "the analysts

4 communicate those statements to the market." <u>Cooper v. Pickett</u>, 137 F.3d at 624; <u>see also</u>, <u>id.</u>

5 ("Merisel is alleged to have made misleading statements to the analysts with the intent that the

6 analysts communicate those statements to the market. This is not aiding and abetting or secondary

7 liability; the complaint alleges that Merisel is liable for its own false statements to the analysts.").

8 Liability may also attach if Defendants "put their imprimatur, express or implied, on the [analysts']

9 projections." <u>In re Syntex Corp. Securities Litigation</u>, 95 F.3d 922, 934 (9th Cir. 1996); <u>see also</u>,

10 <u>Allison v. Brooktree Corp.</u>, 999 F.Supp. 1342, 1349 (S.D.Cal.1998) ("In the context of analyst

11 statements, Rule 9(b) is satisfied where it is alleged 'that the insider provided misleading

12 information to an analyst, that the analyst relied on this information in preparing a report and that

13 the insider somehow endorsed or approved the report prior to or after its publication.'"); <u>Picard</u>

14 <u>Chemical, Inc. Profit Sharing Plan v. Perrigo Co.</u>, 940 F.Supp. 1101, 1126 (W.D.Mich.1996)

15 ("Under Rule 9(b), statements made originally by independent market analysts are not actionable

16 unless a plaintiff can plead with particularity who among defendants supplied the information, how

17 it was supplied, and how defendants could have controlled the content of the statement."). Viewed

18 from either angle, Plaintiffs fail to state a claim for these statements.

19        Although Plaintiffs identify some statements made during the conference call, Plaintiffs

20 allege only that "contents of the analyst reports [were] based on information provided [or

21 representations made] by Peregrine management." (Complaint ¶ 530.) Plaintiffs, however, fail to

22 allege any particular Defendant made any particular statements "with the intent that the analysts

23 communicate those statements to the market." <u>Cooper v. Pickett</u>, 137 F.3d at 624; <u>see also</u>,

24 <u>Copland v. Grumet</u>, 88 F.Supp.2d 326, 333 (D.N.J. 1999); <u>c.f.</u> <u>In re Secure Computing Corporation</u>

25 <u>Securities Litigation</u>,184 F.Supp.2d 980, 990 (N.D.Cal. 2001) ("For each analyst statement alleged

26 to be attributable to Defendants, Plaintiffs sufficiently plead the conduit theory of liability.

27 Plaintiffs allege a specific false and misleading statement by Defendants regarding the financial

28 status of Secure, directly communicated to analysts at a specific place and time, followed on the

- 55 -

02cv870-BEN (RBB)

1   very next day by analysts' recommendations to buy Secure stock. These allegations identify the

2   dates of Defendants' misleading and false statements, their locations, the speakers, the content of

3   the statements, and the dates (in each case the following day), contents and speakers of the

4   analysts' statements. These allegations are sufficient to plead liability for the analysts'

5   statements."). Also, "[t]he courts that have considered whether a plaintiff can proceed against an

6   individual or corporate defendant based on an allegation of a statement attributed to the corporate

7   defendant's 'management' have held such allegations are insufficient to survive a motion to

8   dismiss." In re Pinnacle Systems, Inc., 2002 WL 31655187 at *4 (N.D.Cal. 2002); see also, Klein

9   v. General Nutrition Cos., 186 F.3d 338, 345 (3rd Cir. 1999) (Holding allegation that corporate

10   defendant's 'management' made statements to analyst insufficient to survive motion to dismiss

11   because '[t]he complaint fails to attribute the statement to any specific member of [ ]

12   management"); In re Visual Networks, Inc. Sec. Litig., 217 F.Supp.2d 662, 668 (D.Md. 2002)

13   (Holding allegation that 'senior management' made statement to analyst insufficient to survive

14   motion to dismiss; observing '[p]laintiffs do not point to, and the court has been unable to find, a

15   single case where statements to analysts from 'senior management,' and not named individuals,

16   provide the basis for a PSLRA claim").

17        Nor have Plaintiffs alleged that any Defendant endorsed the analysts' statements. As

18   "Defendants never endorsed or adopted the statements of analysts; they never put their imprimatur

19   on the projections." In re Syntex Corp. Securities Litigation, 95 F.3d at 934. At best, as alleged,

20   "the[] statements were the culmination of a one-way flow of information, from [Peregrine]

21   representatives to analysts and from the analysts to their customers." Id. (Dismissing on such

22   allegations). Thus, Defendants "did not adopt or entangle [themselves] in the analysts' statements

23   Accordingly, Plaintiffs have failed to state a claim for liability based on analysts' statements." Id;

24   see also, In re Miller Industries Sec. Litig.,12 F.Supp.2d 1323, 1329 (N.D.Ga.1998) ("To hold a

25   defendant company liable for statements made by securities analysts, a plaintiff must show that the

26   defendant sufficiently entangled itself with the analysts' forecast to render the predictions

27   attributable to the defendant."); Elkind v. Liggett & Meyers, Inc., 635 F.2d 156, 162 (2d Cir.1980)

28   (Same).

02cv870-BEN (RBB)

c.    **SEC Filings.**

During the class period, Peregrine filed nine (9) 10-Q forms in 2000, 2001, and 2002 as well as two (2) 10-K forms in 2000 and 2001 with the SEC. Peregrine also filed two Amendment No.1s to its S-4 Registration Statements with the SEC regarding mergers with Harbinger and Remedy.

The 10-Q and 10-K forms included Peregrine's press releases and financial statements for the quarter preceding the filing and Peregrine's general revenue recognition policy. The 10-K forms also included an unqualified audit report by Arthur Andersen on Peregrine's year end financial statements for each respective fiscal year.

The S-4 Registration Statements solicited proxies from Harbinger and Remedy shareholders regarding Peregrine's proposed merger with those corporations. These Statements included information on Peregrine's business and Peregrine's audited financial statements. The Harbinger proxy included Peregrine's financial statements for 2000, while the Remedy proxy included Peregrine's financial statements for 1999, 2000, and 2001. The proxies also stated that Peregrine's "selected consolidated financial data derives from the consolidated financial statements of Peregrine Systems, Inc. and its subsidiaries," and that "[t]hese financial statements have been audited by Arthur Andersen LLP, independent public accountants." (Complaint ¶¶ 547 and 592.) According to the Complaint, Arthur Andersen and AWSC consented to the use of the false audit reports in these Statements.

The Complaint alleges Nelson "was . . . responsible for drafting and filing SEC Forms 10-K and 10-Q" although it does not identify for which years or quarters. (Complaint ¶ 298.) The Complaint then identifies the Defendants who signed these SEC filings:

Gless signed the 10-Q forms. The Complaint is silent, however, as to who signed the 10-Q for the third quarter of 2001,

Gless, Gardner, Moores, Noell, van den Berg, Watrous and Hosley signed the 10-K for the Fiscal Year 2000,

Gless, Gardner, Moores, Noell, Watrous and Savoy signed 10-K for the Fiscal Year 2001,

Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg and Waltrous signed

- 57 -

Exhibit F
0533

1  Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and

2  Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous signed Amendment No.1 to the

3  S-4 Registration Statement on Remedy merger proposal.

4  As alleged, the Complaint fails to adequately allege that Nelson was a primary actor in that

5  he made a statement in the SEC filings.  The Complaint merely alleges Nelson "was . . .

6  responsible for drafting and filing SEC Forms 10-K and 10-Q." (Complaint ¶ 298.)  Such

7  allegations are not sufficient to show a primary act on Nelson's part.  Unlike other Defendants,

8  Nelson did not sign the SEC filings.  "Plaintiffs, therefore, must allege that [Nelson] substantially

9  participated or was intricately involved in preparing the statements."  In re Cylink Securities

10  Litigation, 178 F.Supp.2d 1077, 1085 (N.D.Cal. 2001); see also, Howard v. Everex Systems, Inc.,

11  228 F.3d at 1061 n.5; Cooper v. Pickett, 137 F.3d at 624.  No such allegations have been made.

12  By contrast, any and all Defendants who signed these SEC filings made statements making

13  them primary actors under Section 10(b) and Rule 10b-5.  See, In re Homestore.com, Inc. Sec.

14  Litig., 252 F. Supp. 2d at 1033 ("[T]he signing of [the company's] filing does establish that [an

15  individual] made 'statements' within the meaning of the act and the rule."); Howard v. Everex, 228

16  F.3d at 1061-63 ("[S]igners of documents should be held responsible for the statements in the

17  document . . . a corporate official . . . who, acting with scienter, signs a SEC filing containing

18  misrepresentations, 'make[s]' a statement so as to be liable as a primary violator under § 10(b).");

19  In re Enron Corp. Securities, Derivative & ERISA Litigation, 258 F.Supp.2d at 587 ("A corporate

20  official . . . who on behalf of the corporation signs a document that is filed with the SEC that

21  contains material misrepresentations, such as a fraudulent Form 10-K, regardless of whether he

22  participated in the drafting of the document, 'makes' a statement and may be liable as a primary

23  violator under § 10(b) for making a false statement.").

24  Similarly, Arthur Andersen was a primary actor in issuing unqualified audit reports on

25  Peregrine's 2000 and 2001 financial statements, which were included in Peregrine's 10-Ks for

26  2000 and 2001.  Further, Arthur Andersen, along with AWSC, were primary actors for consenting

27  to the use of their audit reports in the two S-4 Registration Statements regarding Harbinger and

28  Remedy merger proposals.  See, Central Bank, 511 U.S. at 191 ("Any person or entity, including

Exhibit F
0534

1  a[n] accountant . . . who makes a material misstatement (or omission) . . . may be liable as a

2  primary violator under 10b-5."); Vosgerichian v. Commodore Intern, 862 F.Supp. 1371, 1378

3  (E.D.Pa.1994) (Dismissing claims against accountant based on misrepresentations made by client,

4  but holding that accountant's unqualified opinion could be the basis of primary liability); In re

5  Kendall Square Research Corp. Sec., 868 F.Supp. 26, 28-29 (D.Mass. 1994) (Same).

6         Thus, under Section 10(b) and Rule 10b-5(b), all Defendants who signed the SEC filings

7  were primary actors in that they made statements.  Further, Arthur Andersen and AWSC were

8  primary actors in issuing, or consenting to the use of, the audit reports.  However, under PSLRA

9  and Central Bank, each Defendant's potential liability is limited to the respective statements they

10  made:  (1) **Gless** for the statements in the: (a) eight (8) 10-Q[18] forms filed in 2000, 2001, and the

11  first three quarters of 2002, (b) 10-K for the Fiscal Year 2000, (c) 10-K for the Fiscal Year 2001,

12  (d) Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (e)

13  Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal; (2) **Gardner** for

14  the statements in the: (a) 10-K for the Fiscal Year 2000, (b)10-K for the Fiscal Year 2001, (c)

15  Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (d)

16  Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal; **Moores** for the

17  statements in the: (a) 10-K for the Fiscal Year 2000, (b) 10-K for the Fiscal Year 2001, (c)

18  Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (d)

19  Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal; **Noell** for the

20  statements in the: (a)10-K for the Fiscal Year 2000, (b) 10-K for the Fiscal Year 2001, (c)

21  Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (d)

22  Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal; **van den Berg**

23  for the statements in the: (a) 10-K for the Fiscal Year 2000, and (b) Amendment No.1 to the S-4

24  Registration Statement on Harbinger merger proposal; **Waltrous** for the statements in the: (a)10-K

25  for the Fiscal Year 2000, (b) 10-K for the Fiscal Year 2001; (c) Amendment No.1 to the S-4

26

27         [18]  They were actually nine (9) 10-Q forms filed with the SEC.  However, as noted, the
Complaint is silent as to who signed the 10-Q form for the third quarter of 2001.  See, Lee v. City of
28  Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) ("[W]hen the legal sufficiency of a complaint's
allegations is tested by a motion under Rule 12(b)(6), review is limited to the complaint.").

Exhibit F
0535

1   Registration Statement on Harbinger merger proposal, and (d) Amendment No.1 to the S-4

2   Registration Statement on Remedy merger proposal; **Hosley** for the statements in the: (a) 10-K for

3   the Fiscal Year 2000, and (b) Amendment No.1 to the S-4; **Savoy** for the statements in the: (a) 10-

4   K for the Fiscal Year 2001, and (b) Amendment No.1 to the S-4 Registration Statement on

5   Remedy merger proposal; **Cole** for the statements in the: (a) Amendment No.1 to the S-4

6   Registration Statement on Harbinger merger proposal, and (b) Amendment No.1 to the S-4

7   Registration Statement on Remedy merger proposal; **Arthur Andersen** for the statements in the:

8   (a) 10-K for the Fiscal Year 2000, (b) 10-K for the Fiscal Year 2001, (c) Amendment No.1 to the

9   S-4 Registration Statement on Harbinger merger proposal, and (b) Amendment No.1 to the S-4

10  Registration Statement on Remedy merger proposal; and **AWSC** for the statements in the: (a)

11  Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (b)

12  Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal.

13        **d.    Conclusion.**

14        Only primary actors can be held liable under Section 10(b) and Rule 10b-5. <u>See, Central</u>

15  <u>Bank</u>, 511 U.S. 164. A Defendant is a primary actor under Rule 10b-5(b), if that Defendant had

16  "substantial participation or intricate involvement" in the preparation of fraudulent statements

17  <u>Howard v. Everex Systems, Inc.</u>, 228 F.3d at 1061 n.5; or "made misleading statements [to others]

18  with the intent that [they] communicate those statements to the market." <u>Cooper v. Pickett</u>, 137

19  F.3d at 624; or signed the statement. <u>See, Howard v. Everex</u>, 228 F.3d at 1061-63.

20        Against this backdrop, with respect to the press releases, only Nelson was a primary actor

21  in that he drafted them following quarters one through four in 2000 and the first quarter of 2001.

22  No Defendant was a primary actor with respect to the analyst reports. As for the SEC filings, only

23  the Defendants identified above in bold are primary actors.

24        Accordingly, as alleged, the Complaint fails to state a claim under Section 10(b) and Rule

25  10b-5 against Luddy, Dammeyer and Stulac. Specifically, the Complaint fails to allege these

26  Defendants either employed a scheme to defraud or made any statements.

27        As for the other Defendants, whether they can be held liable, depends on whether the

28  Complaint adequately alleges falsity, scienter, causation, reliance and damages. <u>See, Paracor</u>

02cv870-BEN (RBB)

Exhibit F
0536

1 | Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1157 (9th Cir. 1996); Central Bank,

2 | 511 U.S. at 191.  Only falsity and scienter are at issue.  Each is discussed in turn.

3 |   **2. Falsity.**

4 |    The Complaint adequately alleges the above statements--press releases and SEC filings--

5 | were false or misleading.   As mentioned above, to adequately plead falsity under PSLRA,

6 | Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why

7 | the statement is misleading, and, if an allegation regarding the statement or omission is made on

8 | information and belief, the complaint shall state with particularity all facts on which that belief is

9 | formed." 15 U.S.C. § 78u-4(b)(1).  Plaintiffs "must [also] show that the statements were

10 | misleading as to a material fact.  It is not enough that a statement is false or incomplete, if the

11 | misrepresented fact is otherwise insignificant."  Basic Inc. v. Levinson, 485 U.S. at 238; see also,

12 | Freedman v. Louisiana-Pacific Corp., 922 F.Supp. 377, 388 (D.Or. 1996) ("[W]hether an omission

13 | is material and whether a statement is misleading are two interrelated, but separate, fact-specific

14 | inquiries.").  Plaintiffs have satisfied these requirements.

15 |    First, Plaintiffs adequately identify each and every statement, including Peregrine's

16 | quarterly press releases and SEC filings, they allege was misleading.  The Complaint then sets

17 | forth why the statements were misleading.  Specifically, the Complaint alleges the statements

18 | omitted crucial material information regarding Peregrine's changed revenue recognition policy,

19 | and that Peregrine falsely reported its accounts receivable, liabilities, DSO, and cash balances.

20 | (See, e.g., Complaint ¶¶ 512 and 545: The 10-Q and 10-K filings "were materially false and

21 | misleading because Peregrine's reported revenue was materially overstated, there was no

22 | disclosure of a material change in its accounting policy as applied to the first quarter of fiscal year

23 | 2000, its accounts receivable were understated, its cash balances were overstated, its liabilities

24 | were understated, and its DSO were understated . . . .").

25 |    Plaintiffs further allege the reasons why Peregrine's change in its revenue-recognition

26 | practice was fraudulent or misleading.  According to the Complaint, Peregrine began to account for

27 | its revenues from indirect sales in a much more "aggressive" fashion than it previously had done

28 | by prematurely recognizing millions in revenues and recording revenues on software licenses to

02cv870-BEN (RBB)

1  resellers even though the resellers were not obligated to pay for those licenses until they

2  sublicensed the product to the ultimate consumer.  The result, the Complaint alleges, was that

3  Peregrine's indirect sales' figures were inflated and materially misleading.  Plaintiffs further allege

4  "Peregrine materially misrepresented its balance sheet and statement of liabilities by failing to

5  include significant obligations to financial institutions.  These obligations arose out of Peregrine's

6  undisclosed business practice of factoring substantial portions of its accounts receivable and

7  treating those borrowings as sales of receivables, in violation of GAAP."  (Complaint ¶ 24.)

8  Plaintiffs also allege that, in violation of GAAP, Peregrine regularly treated loans as sales of

9  accounts receivables.  This practice, Plaintiffs allege, enabled Peregrine to conceal its contingent

10  sales and understate its debt on financial statements and the accounts receivables on its balance

11  sheet by as much as $180 million.  Understatement of its accounts receivables decreased Peregrine

12  DSO, misleading investors and analysts about the quality of Peregrine's reported revenue.

13  Moreover, using Peregrine's actual restatements to the public, the Complaint sets forth the

14  representations made, what financial figures were given, and what the alleged true financial figures

15  were.  Plaintiffs have thus explicitly pled the specific material misstatements and omissions, and,

16  for each misstatement or omission, have stated why they are misleading.  In essence, Plaintiffs

17  allege that Peregrine reported and recognized millions in revenue before it actually earned it under

18  GAAP, in some cases having never earned it.  Plaintiffs also provide charts and figures setting

19  forth the discrepancy between the revenues Peregrine recognized and what it should have

20  recognized under GAAP.  Plaintiffs' allegations thus "specify each statement alleged to have been

21  misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

22      Plaintiffs also include corroborating details of the internal reports, cite to specific reports,

23  mention the dates or contents of reports and allege their sources of information about the reports.

24  In other words, Plaintiffs have alleged with particularity statements that were false and/or

25  misleading when made; they have also demonstrated contemporaneous facts which demonstrate

26  the falsity of the defendants' statements. See, In re GlenFed Sec. Litig., 42 F.3d 1541, 1548 (9th

27  Cir. 1994) (En banc) (A complaint may satisfy falsity by "pointing to inconsistent

28  contemporaneous statements or information . . . which were made by or available to the

Exhibit F
0538

1    defendants."); see also, Glaser v. Enzo Biochem, Inc., 303 F.Supp.2d 724, 735 (E.D.Va. 2003)

2    ("The Court finds that this allegation is pled with enough specificity because Plaintiffs provide the

3    reasons the statement is false and state with particularity the facts underlying the

4    misrepresentation.").

5           Plaintiffs likewise identify the substance of the false or misleading statements and plead the

6    corroborating details indicating how, when, and under what circumstances the statements were

7    communicated to the public. See, In re Secure Computing Corp. Sec. Litig., 184 F.Supp.2d 980,

8    990 (N.D.Cal. 2001). Attachments to the Complaint also identify various transactions where

9    Peregrine prematurely and improperly booked revenue. The Complaint further identifies the dates,

10   identities of transacting third party companies, the products, and the amount of the transaction.

11   Therefore, the PSLRA has clearly served its purpose by putting the Defendants on notice of the

12   specific misstatements and omissions that are at issue. See, Cooper v. Pickett, 137 F.3d at 627

13   ("Overall, the complaint identifies the circumstances of the alleged fraud so that defendants can

14   prepare an adequate answer.").

15          Plaintiffs have not generally averred that the statements were misleading. Nor are the

16   proffered reasons speculative or vague. Rather, Plaintiffs have provided reasonable explanations

17   as to why they believe specific statements or omissions were false or misleading. "Properly pled,

18   overstating of revenues may state a claim for securities fraud, under GAAP, revenue must be

19   earned before it can be recognized." Hockey v. Medhekar, 30 F.Supp.2d 1209, 1216 (N.D.Cal.

20   1998); see also, Provenz v. Miller, 102 F.3d 1478, 1484 (9th Cir. 1996). Plaintiffs' specific

21   references to improper revenue recognition under the GAAP, including improper balance sheet

22   accounting on contingent sales agreements and failure to include liabilities to banks, are

23   sufficiently particular, and that is all that the PSLRA requires. See, Queen Uno Ltd. Partnership v.

24   Coeur D'Alene Mines Corp., 2 F.Supp.2d 1345, 1354 (D.Colo. 1998) ("Neither Rule 9(b) nor the

25   Reform Act requires that Plaintiffs do more.").

26          Whether Plaintiffs' explanations are accurate is not an issue at this stage. See, Mayer v.

27   Mylod, 988 F.2d 635, 639 (6th Cir.1993) (Explaining, in reversing dismissal of a securities fraud

28   complaint alleging deceptive corporate statements, "[w]hether the statements here were true or

- 63 -

Exhibit F
0539

1   false is not an issue to be decided under Rule 12(b)(6)"). At a later stage, the issue of the

2   reasonableness of Defendants' belief in their statements, or the accuracy of Plaintiffs' accounting

3   explanations, may arise again. At this stage, however, it is simply not within the Court's purview

4   to make such determinations.

5           To be sure, the Supreme Court has noted,

6           GAAP is not the lucid or encyclopedic set of pre-existing rules that [it might be perceived]
            to be. Far from a single-source accounting rule book, GAAP encompasses the conventions,
7           rules, and procedures that define accepted accounting practice at a particular point in time.
            GAAP changes and, even at any one point, is often indeterminate. The determination that a
8           particular accounting principle is generally accepted may be difficult because no single
            source exists for all principles.
9

10  Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 100 (Citation omitted). Indeed, GAAP "tolerate[s]

11  a range of 'reasonable' treatments, leaving the choice among alternatives to management." Thor

12  Power Tool Co. v. Comm'r, 439 U.S. 522, 544 (1979). But although financial accounting is a

13  "process that involves continuous judgments and estimates," it nevertheless has "as its foundation

14  the principle of conservatism, with its corollary that possible errors in measurement should be in

15  the direction of understatement rather than overstatement of net income and net assets." Shalala v.

16  Guernsey Mem'l Hosp., 514 U.S. at 100 (Citation omitted). "Even assuming . . . [Peregrine's]

17  accounting . . . was arguably consistent with the terms of certain specific accounting standards, this

18  would not insulate [Defendants] . . . as a matter of law from liability under securities laws, because

19  under both GAAP and the securities laws, business entities and their accountants are required to

20  provide whatever additional information would be necessary to make the statements in their

21  financial reports fair and accurate, and not misleading." In re Global Crossing, 322 F.Supp.2d at

22  340, citing 17 C.F.R. § 230.408 (Requiring that "in addition to the information expressly required

23  to be included in a registration statement, there shall be added such further material information, if

24  any, as may be necessary to make the required statements, in the light of the circumstances under

25  which they were made, not misleading."). Plaintiffs allege Peregrine, despite statements to the

26  public that its revenues were being recognized in accordance with GAAP, it recognized revenue on

27  contingent, swap, and barter transactions and did not tell the public about it. In any event, again,

28  "[w]hether or not [Peregrine's] practice of accounting . . . was ever acceptable under the applicable

- 64 -

02cv870-BEN (RBB)

1  provisions of GAAP cannot be determined in advance of the development of the record. Eventual

2  evidence on industry practice or expert testimony are likely to shed light on this question, but at the

3  current procedural phase, the plaintiffs' assertion that they were not generally accepted must be

4  taken as true." In re Global Crossing, 322 F.Supp.2d at 339.

5         The Complaint also adequately alleges that the omissions were material. Defendants may

6  be liable under Section 10 and Rule 10b-5 if they made statements that a reasonable investor would

7  consider in deciding whether to buy Peregrine's stock. "[A] fact is material if there is a

8  'substantial likelihood' that a reasonable investor would consider it important in his or her decision

9  making." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding

10  Corp., 320 F.3d 920, 934 (9th Cir. 2003) (Citations omitted). "[T]here must be a substantial

11  likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

12  investor as having significantly altered the 'total mix' of information made available. In other

13  words, materiality depends on the significance the reasonable investor would place on the withheld

14  or misrepresented information." Id; see also, Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)

15  (A fact is material if there is a substantial likelihood "that the disclosure of the omitted fact would

16  have been viewed by the reasonable investor as having significantly altered the 'total mix' of

17  information made available."). All investing is based to some degree on investors' perceptions of

18  how the company is doing financially. Defendants would not be responsible if its investors'

19  perceptions were based solely on Defendants' predictions about Peregrine's financial prospects, or

20  if Defendants disclosed the basis for Peregrine's recognition of revenue. That is not the case,

21  however. Rather, the allegations are that Defendants misstated Peregrine's finances which formed

22  a false basis for its investors' perceptions. If Peregrine's public disclosures of its financial viability

23  was based on fraudulent accounting or proscribed under GAAP, Plaintiffs justifiably relied on such

24  disclosures in deciding to invest. See, Lindelow v. Hill, 2001 WL 830956 at *3 (N.D.Ill. 2001)

25  ("[T]he disclosure required by the securities law is measured not by literal truth, but by the ability

26  of the material to accurately inform rather than mislead prospective buyers."). If investors had

27  been fully aware of Peregrine's accounting methods, the market could better have weighed the

28  value of the statements, and the securities would have been appropriately priced. That is, if, as

02cv870-BEN (RBB)

Exhibit F
0541

1  Plaintiffs allege, Peregrine would have disclosed that its true recognition policy and practice--

2  Peregrine recognizing revenue before it was earned under the GAAP--then such information no

3  doubt would "have been viewed by the reasonable investor as having significantly altered the 'total

4  mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. at 231-32.

5      Moreover, the alleged misrepresentations or omissions are "in-actionable as a matter of law

6  only when reasonable minds cannot differ on the question of materiality. Whether a statement is

7  misleading and whether adverse facts are adequately disclosed are generally questions that should

8  be left to the trier of fact." Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir.1995); Kaplan v. Rose,

9  49 F.3d 1363, 1375 (9th Cir.1994) ("'[M]ateriality' is a fact-specific issue[ ] which should

10 ordinarily be left to the trier of fact"). "Therefore, only if the adequacy of the disclosure or the

11 materiality of the statement is so obvious that reasonable minds could not differ are these issues

12 appropriately resolved as a matter of law." Fecht v. Price Co., 70 F.3d 1078, 1080 -1081 (9th Cir.

13 1995); Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir.1996) ("[O]nly if 'reasonable minds'

14 could not disagree that the challenged statements were not misleading should the district court

15 dismiss under 12(b)(6)."). "Similarly, whether a public statement is misleading, or whether

16 adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact."

17 Fecht v. Price Co., 70 F.3d at 1081. Accordingly, while not all investors may have considered all

18 the alleged omissions to be important in their decision making, other investors could have. Id.

19 The Complaint, therefore, sets forth public statements and omissions that reasonable jurors could

20 find to be materially misleading. In sum, the Complaint adequately alleges the existence of a

21 fraudulent scheme to inflate revenue by recognizing contingent, consignment, or even non-existent

22 transactions as sales. This scheme culminated in the publication of false financial data in the

23 company's publicity and SEC filings. The Court next turns to the allegations concerning

24 particular Defendants and their complicity in the alleged fraud, i.e., scienter.

25      **3.      Scienter.**

26      The Court must now determine whether, considered as a whole, the Complaint adequately

27 pleads scienter on the part of each Defendant found to be a primary actor. See, Broudo v. Dura

28 Pharmaceuticals, Inc., 339 F.3d 933, 940 (9th Cir. 2003) ("This court has made clear that

Exhibit F
0542

1   allegations of scienter must be collectively considered: Beyond each individual allegation we also

2   consider whether **the total of plaintiffs' allegations,** even though individually lacking, are

3   sufficient to create a strong inference that defendants acted with deliberate or conscious

4   recklessness.") (Emphasis in original; citations and quotations omitted).

5         Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," which

6   includes "recklessness." Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996) ("To establish

7   scienter, plaintiffs must show that defendants had  a mental state embracing an intent to deceive,

8   manipulate, or defraud.  Plaintiffs can establish scienter by proving either actual knowledge or

9   recklessness.").

10        "In and of itself, the magnitude of an erroneous financial statement is insufficient to raise a

11  strong inference that a defendant acted with scienter." In re Rent-Way Securities Litigation, 209

12  F.Supp.2d 493, 506 (W.D.Pa. 2002); see also, In re SCB Computer Technology, Inc. Sec. Litig.,

13  149 F.Supp.2d 334, 357 (W.D.Tenn.2001) (The "magnitude of an erroneous financial statement

14  caused by allegedly fraudulent representations, without more, cannot sustain a finding that an

15  auditor acted with scienter.");  Reiger v. Price Water House Coopers LLP, 117 F.Supp.2d 1003,

16  1013 (S.D.Cal.2000), aff'd, 288 F.3d 385 (9th Cir. 2002).

17        "[T]o establish scienter in a securities fraud case alleging non-disclosure of potentially

18  material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material

19  fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely

20  mislead investors." City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1260-1261

21  (10th Cir. 2001).  In other words, "a fact [must be] so obviously material that the defendant must

22  have been aware both of its materiality and that its non-disclosure would likely mislead investors."

23  Id.  "[A]llegations that the defendant possessed knowledge of facts that are later determined by a

24  court to have been material, without more, is not sufficient to demonstrate that the defendant

25  intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a

26  company's shareholders in order to deceive, manipulate, or defraud." Id; see also, Schlifke v.

27  Seafirst Corp., 866 F.2d 935, 946 (7th Cir. 1989) ("The plaintiffs submit that the Bank's actual

28  knowledge of the facts withheld amply establishes the necessary degree of scienter; however, this

02cv870-BEN (RBB)

Exhibit F
0543

1   argument misconstrues the relevant inquiry. The question is not merely whether the Bank had

2   knowledge of the undisclosed facts; rather, it is the danger of misleading buyers that must be

3   actually known or so obvious that any reasonable man would be legally bound as knowing.").

4   Accordingly, allegations that a Defendant was generally aware of facts that the Court has deemed

5   material at this stage, by itself, is not sufficient to show scienter.

6        Further, "allegations that defendants should have anticipated future events and made certain

7   disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."

8   City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1260 -1261 (10th Cir. 2001). As

9   to individual Defendant board or committee members, the Complaint must "allege specific

10  contemporaneous conditions known to the [D]efendants that would strongly suggest that the

11  [D]efendants understood that their recognition of revenues . . . would result in overstated

12  revenues." In re Vantive, 283 F.3d at 1091; see also, Ronconi v. Larkin, 253 F.3d 423, 432 (9th

13  Cir. 2001) ("[T]he [C]omplaint must contain allegations of specific 'contemporaneous statements

14  or conditions' that demonstrate the intentional or the deliberately reckless false or misleading

15  nature of the statements when made."); Novak v. Kasaks, 216 F.3d 300, 308 (2nd Cir. 2000)

16  (Allegations of recklessness include "defendants' knowledge of facts or access to information

17  contradicting their public statements" or "fact demonstrating that defendants failed to review or

18  check information they had a duty to monitor or ignored obvious signs of fraud."). For example,

19  Plaintiffs may allege "contemporaneous receipt of a report with information directly at odds with

20  an alleged misrepresentation, the inference being that the conflicting data was timely read and

21  remembered;" or "statements by witnesses that they told the actor the true facts before the false

22  statement was made, the inference being that the actor heard and remembered the information, saw

23  the discrepancy, and made the statement anyway." In re Northpoint Communications Group, Inc.,

24  Sec. Litig., 184 F.Supp.2d 991, 997 (N.D.Cal. 2001) (Citation omitted).

25       "General allegations of defendants' 'hands-on' management style, their interaction with

26  other officers and employees, their attendance at meetings, and their receipt of unspecified weekly

27  or monthly reports are [also] insufficient." In re Daou Systems, Inc. Securities Litigation, 397 F.3d

28  704, 718 (9th Cir. 2005). "However, specific admissions from top executives that they are

Exhibit F
0544

1   involved in every day detail of the company and that they monitored portions of the company's

2   database are factors in favor of inferring scienter in light of improper accounting reports." Id;

3   Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1234 (9th Cir. 2004) ("It

4   is reasonable to infer that the Oracle executives' [admissions of] detail-oriented management style

5   led them to become aware of the allegedly improper revenue recognition of such significant

6   magnitude that the company would have missed its quarterly earnings projection but for the

7   adjustments.").

8        As to auditor Defendants--Arthur Andersen and AWSC--"the mere publication of

9   inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish

10  scienter.  Rather, scienter requires more than a misapplication of accounting principles.  The

11  plaintiff must prove that the accounting practices were so deficient that the audit amounted to no

12  audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the

13  accounting judgments which were made were such that no reasonable accountant would have made

14  the same decisions if confronted with the same facts." DSAM Global Value Fund v. Altris

15  Software, Inc., 288 F.3d at 390; see also, In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426

16  (9th Cir.1994) (In establishing scienter, "[t]he plaintiff must prove that . . . the accounting

17  judgments which were made were such that no reasonable accountant would have made the same

18  decisions if confronted with the same facts.").

19       Against this backdrop, the Court will address the Complaint's allegations as to each

20  Defendant to determine whether these allegations by themselves, or as a whole, give rise to a

21  strong inference of scienter on the part of that Defendant.  See, No. 84 Employer-Teamster Joint

22  Council Pension Trust Fund v. America West Holding Corp., 320 F.3d at 945 ("In sum, although

23  recognizing that some of Plaintiffs' allegations are individually lacking, we hold that the

24  allegations in their totality are sufficient to meet the stringent pleading standard set forth in the

25  PLSRA.").  The Court's "task is . . . to determine whether the Complaint alleges facts that, if true,

26  would, by forming the basis for a strong inference, 'convince a reasonable person that the

27  defendant knew a statement was false or misleading.'" City of Monroe Employees Retirement

28  System v. Bridgestone Corp., ----F.3d----, 2005 WL 264130 at 25 (6th Cir. 2005), quoting, Adams

- 69 -

02cv870-BEN (RBB)

1    v. Kinder-Morgan, Inc., 340 F.3d 1083, 1105 (10th Cir. 2003).

2          a.    **Quarterly Review and Outlook Reports Disseminated To The Board.**

3          The Complaint sets forth various quarterly review and outlook reports that Gardner

4    allegedly disseminated to Peregrine's board members. (Complaint ¶¶ 137-206.) The members

5    included Moores, Nelson, Noell, Cole, Hosley, van den Berg, Watrous, and Savoy. From the

6    reports, the Complaint alleges, these Defendants learned that Peregrine's financial statements

7    during the Class Period were false or misleading.

8          The reports range from October 1998 to March 2002. Not all the reports, however, are

9    relevant to Defendants' scienter. The Complaint charges Defendants with making false or

10   misleading statements in press releases and SEC filings following the end of fiscal years 2000,

11   2001 and the first three quarters of 2002. Therefore, Defendants' alleged false or misleading

12   statements first occurred on July 21, 1999, when Peregrine issued its first press release, and ended

13   on February 14, 2002, when Peregrine filed its Form 10-Q for the third quarter of fiscal year 2002

14   with the SEC. Further, as for the Defendants found to be primary actors, the latest statement

15   attributed to them is Amendment No.1 to Peregrine's Form S-4 Registration Statement regarding

16   the Remedy merger. This statement was filed on July 23, 2001. Thus, only the reports that were

17   issued on or before July 23, 2001 are relevant to a Defendant's scienter. See, Ronconi v. Larkin,

18   253 F.3d at 432 (To show scienter, "the complaint must contain allegations of specific

19   'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately

20   reckless false or misleading nature of the statements when made."); Yourish v. California

21   Amplifier, 191 F.3d 983, 997 (9th Cir.1999) ("It is clearly insufficient for plaintiffs to say that a

22   later, sobering revelation makes an earlier, cheerier statement a falsehood."); Osher v. JNI Corp.,

23   256 F.Supp.2d at 1159 (Defendant "allegedly made false statements during the conference call on

24   October 16, 2000. It seems, however, that the 'Sxxx' email was circulated after the alleged false

25   statements. Thus, the email does not necessarily establish that the fourth quarter was 'not looking

26   so great' on October 16, 2000."); In re Global Crossing, 322 F.Supp.2d at 346 ("[D]efendants

27   cannot be held liable for failing to anticipate future events . . . ."); In re Homestore.com, Inc.

28   Securities Litigation, 347 F.Supp.2d 769, 781 (C.D.Cal. 2004) ("[T]he Court finds that these

Exhibit F
0546