# Exhibit F
# Continued

1    emails clearly relate to a transaction between AOL and Homestore during a time period in question

2    in this case."). With this limitation, the reports are discussed in turn.

3           **(i)    October 1998 Report to Board of Directors.**

4          The Complaint alleges in a "report dated October 1998, Gardner advised the Board

5    members that with respect to channel sales there had been 'lots of smoke, little fire,' and revenue

6    from channel sales was 'absent.' Gardner advised Board members that 'We are going to move

7    Channels under Worldwide Sales and Marketing, focus on 3 relationships and make it happen.

8    This change will be made in the next few weeks . . . .'" (Complaint ¶ 137.) This report does not

9    raise a strong inference of scienter. The Defendants are charged with issuing false or misleading

10   financial statements for the fiscal years 2000, 2001 and part of 2002. To establish scienter,

11   Plaintiffs must "specifically allege[] [D]efendants' knowledge of facts or access to information

12   contradicting their public statements." Novak, 216 F.3d at 308 The report does not make any

13   reference to revenue earned in these years. It simply speaks of Peregrine's general business,

14   including sales planning and marketing strategy. It neither suggests, nor provides any information,

15   that Peregrine was engaged or was going to engage in improper revenue recognition. See, In re

16   NAHC Securities Litigation, 2001 WL 1241007 at *19 (E.D.Pa. 2001) ("Where plaintiffs contend

17   that the defendants had access to contrary facts, they must specifically identify . . . statements

18   containing this information.").

19          **(ii)    Farley's April 1999 Meeting With The Board Of Directors.**

20         The Complaint alleges that on April 14, 1999, Peregrine's "[t]hen Chief Financial Officer

21   Farley presented to the Board the issue of whether to apply the more aggressive sell-in method

22   rather than the sell-through method of accounting to the Company's channel sales." (Complaint ¶

23   143.) Farley, the Complaint alleges, "explained that it was only by using the sell-in method, that

24   the Company would meet its financial goals for the prior quarter (the fourth quarter of fiscal year

25   1999), which had ended three weeks earlier. He [also] warned that, without adopting the new

26   approach, the Company would fail to meet stock market expectations." (Id. ¶ 144.) According to

27   the Complaint, Farley then "informed the . . . Board" that the "sell-in [method] was not the

28   'preferred method.'" (Id. ¶¶ 8 and 9.) The Complaint then alleges, "[Defendants] then serving on

02cv870-BEN (RBB)

Exhibit F
0547

1   the Board [Gardner, Moores, Nelson, Noell, Cole, Hosley, van den Berg, and Watrous] . . .

2   approved the use of the sell-in method of accounting." (Id. ¶ 8.) As alleged, this meeting did not

3   give rise to a strong inference of scienter on the part of any Defendant.

4        According to the Complaint, in applying the "sell-in" method of accounting, Peregrine

5   began to record or recognize revenue on contingent transactions in violation of GAAP.  (Complaint

6   ¶ 8 and 134: "As applied to channel sales, the sell-in method resulted in revenue recognition when

7   software product was delivered to the channel partner and thereby 'sold into' the distribution

8   channel.  Under GAAP, the channel partner was obligated to have a binding commitment from a

9   third party to purchase the software at the time of delivery in order for there to be proper revenue

10   recognition under GAAP.").  Also, according to the Complaint "by applying the more aggressive

11   sell-in method for the prior quarter [fourth quarter of 1999], the Company would meet revenue

12   expectations only by cutting into revenue for the coming first quarter of fiscal year 2000 ending

13   June 30, 1999." (Id. ¶ 146.)  However, there are no allegations that, during the meeting,

14   Defendants learned, or were otherwise informed, that the application of the "sell-in" method would

15   result in such consequences.  That is the Complaint "fails to allege" that from the meeting

16   Defendants learned any information "that would strongly suggest that the [D]efendants understood

17   that their recognition of revenues" based on the sell-in method "would result in overstated

18   revenues" during the Class Period. In re Vantive Corp. Securities Litigation, 283 F.3d at 1091.  At

19   best, the allegations suggest that Defendants were informed that the application of the "sell-in"

20   method somehow permitted Peregrine to meet its "financial goals" for the fiscal year 1999, which

21   is not part of the Class Period.  Similarly, although the Complaint alleges Defendants were

22   informed that the "sell-in" method was "not" the "preferred method", it fails to also allege that the

23   method per se violated GAAP.

24        To be sure, Peregrine's failure to disclose that its revenues were derived from the sell-in

25   method made its financial statements materially misleading.  However, as noted above,

26   "allegations that the defendant possessed knowledge of facts that are later determined by a court to

27   have been material, without more, is not sufficient to demonstrate that the defendant intentionally

28   withheld those facts from, or recklessly disregarded the importance of those facts to, a company's

Exhibit F
0548

1  shareholders in order to deceive, manipulate, or defraud." <u>City of Philadelphia v. Fleming</u>

2  <u>Companies, Inc.</u>, 264 F.3d at 1260 -1261; <u>see also</u>, <u>Schlifke v. Seafirst Corp.</u>, 866 F.2d 935, 946

3  (7th Cir. 1989) ("The plaintiffs submit that the Bank's actual knowledge of the facts withheld

4  amply establishes the necessary degree of scienter; however, this argument misconstrues the

5  relevant inquiry.  The question is not merely whether the Bank had knowledge of the undisclosed

6  facts; rather, it is the danger of misleading buyers that must be actually known or so obvious that

7  any reasonable man would be legally bound as knowing.").  Rather, the Complaint must allege a

8  Defendant both: "(1) . . . knew of the potentially material fact, and (2) . . . that failure to reveal the

9  potentially material fact would likely mislead investors."  <u>City of Philadelphia v. Fleming</u>

10  <u>Companies, Inc.</u>, 264 F.3d at 1260-1261.  In other words, "a fact [must be] so obviously material

11  that the defendant must have been aware both of its materiality and that its non-disclosure would

12  likely mislead investors."  <u>Id</u>.  "[A]llegations that defendants should have anticipated future events

13  and made certain disclosures earlier than they actually did do not suffice to make out a claim of

14  securities fraud."  <u>City of Philadelphia v. Fleming Companies, Inc.</u> 264 F.3d at 1261; <u>see also</u>, <u>In re</u>

15  <u>GlenFed</u>, 42 F.3d at 1548 (Finding "no reason to assume that what is true at the moment plaintiff

16  discovers it was also true at the moment of the alleged misrepresentation . . . .")  Here, from the

17  meeting, Defendants allegedly only learned of, and adopted, the application of the sell-in method to

18  Peregrine's financial statements for the fourth quarter of 1999.  As alleged, however, they did not

19  learn that applying the sell-in method would result in recording revenue on contingent transactions

20  in violation of the GAAP.  Nor is there any allegation that Defendants were somehow privy to this

21  fact.  <u>See</u>, <u>In re Secure Computing Corp. Securities Litigation</u>, 120 F.Supp.2d 810, 819 (N.D.Cal.

22  2000) (Dismissing complaint because it "ha[d] not alleged facts that adequately explain why

23  [defendant] was not entitled to recognize revenue on [a] contract during the fourth quarter of

24  1998"; the complaint must "clarify the precise reasons why [defendant] was not entitled to

25  recognize revenue on the . . . contract during the fourth quarter of 1998.");  <u>Coble v. Broadvision</u>

26  <u>Inc.</u>, 2002 WL 31093589 at *8 (N.D.Cal. 2002) ("The mere fact that BroadVision sold products to

27  Hewlett-Packard which Hewlett-Packard had not already sold to end users is wholly insufficient to

28  support a strong inference, or even anything more than a weak inference, of scienter.  The

02cv870-BEN (RBB)

Exhibit F
0549

1  allegations as to 'creative revenue deals' are too vague and non-specific to support any reasonable

2  inference in favor of plaintiffs."). "Allegations of a violation of GAAP provisions . . ., without

3  corresponding fraudulent intent, are not sufficient to state a securities fraud claim." Chill, 101 F.3d

4  at 270. Reckless conduct or scienter in a Section 10(b) claim "represents an extreme departure

5  from the standards of ordinary care . . . to the extent that the danger was either known to the

6  defendant or so obvious that the defendant must have been aware of it." Id. at 269. A "complaint

7  alleging accounting irregularities fails to raise a strong inference of scienter if it alleges no facts to

8  show that Defendants knew or could have known of the errors, or that their regular accounting

9  procedures should have alerted them to the errors sooner than they actually did." Fidel v. Farley,

10  392 F.3d 220, 230 (6th Cir. 2004). "The assumption that [Defendants] acted with deliberate

11  recklessness . . . requires an impermissible inferential leap." In re U.S. Aggregates, Inc. Securities

12  Litigation, 235 F.Supp.2d 1063, 1075 -1076 (N.D.Cal. 2002). Accordingly, the information

13  disclosed in meeting, even if true, falls short of establishing scienter.

14      **(iii)    April 1999 Report To Board Of Directors.**

15      The Complaint alleges that a meeting took place "on the afternoon of April 22, 1999 . . . to

16  review both quarterly results and results for the recently-completed fiscal year [1999], including an

17  'outlook and budget' for fiscal year 2000 and executive compensation issues." (Complaint ¶ 141.)

18  According to the Complaint, in the meeting, a report entitled "Fiscal Year 1999 Review, including

19  details of the 4th Quarter" was "disseminated." (Id. ¶ 142.) The report read:

20      This was the first quarter that channels contributed meaningfully to revenue. Steve
    Spitzer's team came through in a big way.

21

22              *        *        *

23      Given the favorable valuation of the company, it is time to proceed with a
    follow-on offering to raise additional cash for acquisition purposes. We

24      would propose a follow-on offering which would net $70 to $100 million in
    cash for the company in the May 1999 time period. The total offering size

25      would depend upon the appetite for our equity in the market and the desires
    of other selling shareholders.

26

27  (Id.) The Complaint then alleges "Gardner informed the Board members that in the area of

28  'customer satisfaction' an external survey showed 'a negative trend from the survey six months

02cv870-BEN (RBB)

Exhibit F
0550

1   earlier.' As to productivity of sales personnel, Gardner advised . . . that '[o]ur median performer is

2   not producing enough and we have too many people who were on-quota all year who produced

3   very little.' In projecting results for Fiscal Year 2000, Gardner informed the Board members as

4   follows: 'We are targeting to exceed budget, as a global organization with $300 million revenue

5   and at least $0.65 EPS for FY 2000; This is our 300/200 program.' In explaining the program to

6   the Board members, Gardner relayed that 'if we meet the goal of $300 million in revenue in

7   FY2000 with an EPS of at least $0.65 per share, that every employee will be fully vested at the end

8   of one-year in 300 options for Peregrine stock at an exercise price set in April of 1999 . . . Please

9   approve the 300/200 program option grant and the attached budget submission.'" (Id.) The

10  Complaint then alleges the "program was approved by the Board as proposed" and that "Gardner

11  also advised the Board of a major organizational change to achieve the 300/200 goal, which

12  involved putting defendant Powanda in charge of the 'Operations Group,' including sales,

13  marketing, professional services and customer support. Powanda's new title was Executive Vice

14  President for Operations. One of the reasons offered by Gardner for Powanda's promotion, and

15  related increase in proposed compensation, was that he helped to achieve the Company goal of

16  increasing channel revenue from less than 5% in the first half of the year to over 15% in the second

17  half." (Id.)

18      Lastly, the Complaint alleges that at the meeting, "Board members also were told that

19  defendant Arthur Andersen, the Company's auditor, was not comfortable with any level of channel

20  activity which accounted for more than 25% of revenue. In the just-completed fourth quarter of

21  fiscal year 1999, 22% of license revenue derived from channel sales and it was clear from

22  Gardner's report to the Board that channel sales would represent an increasing percentage of

23  license revenue." (Id. ¶ 145.)

24      As alleged, this meeting did not raise an inference of scienter. Again, the Complaint

25  charges Defendants with making misleading financial statements for fiscal years 2000, 2001, and

26  first three quarters of 2002. The Complaint must thus plead the information in the meeting was

27  different than "what [a Defendant] was telling the public **at the same time.**" In re Silicon

28  Graphics Inc. Securities Litigation, 183 F.3d at 1000 (Emphasis original). No information in the

- 75 -

02cv870-BEN (RBB)

Exhibit F
0551

1    alleged meeting even hints at Peregrine's accounting or finances during those years. See, In re

2    Syntex Corp. Sec. Litig., 95 F.3d 922, 929 (9th Cir.1996) ("Plaintiffs have not pled facts indicating

3    that Defendants had inside knowledge that contradicted their public statement."); c.f, In re

4    Homestore.com, Inc. Securities Litigation, 347 F.Supp.2d 769, 781 (C.D.Cal. 2004) ("[T]he Court

5    finds that these emails clearly relate to a transaction between AOL and Homestore during a time

6    period in question in this case.").

7         **(iv)    October 1999 Report To Board Of Directors.**

8        The Complaint alleges Gardner issued a "report for the Board's October 19, 1999 meeting"

9    entitled "Fiscal Q2 2000 Review and Outlook." (Complaint ¶ 148.) The report stated:

10       [T]his was the toughest quarter we have experienced since June of 1997. A decent
     performance from the West, a strong quarter (but still small) from Asia/Pacific Latin

11   America and a very strong channel performance allowed us to compensate for these major
     deficiencies. We have now reached a level of channel activity that is concerning as we

12   look to the future. We have a large amount of inventory in the channel that must be sold
     through, and this must be done as we simultaneously continue to grow our direct

13   businesses.

14   (Id.)

15       These allegations do not give rise to a strong inference of scienter. From the allegations, at

16   best, Defendants learned that Peregrine might be engaging in channel stuffing. "Channel stuffing

17   is defined as the oversupply of distributors in one quarter to artificially inflate sales, which will

18   then drop in the next quarter as distributors no longer make orders while depleting their excess

19   supply." In re Ramp Networks, Inc. Securities, 201 F.Supp.2d 1051, 1077 (N.D.Cal.2002). Thus,

20   "[a] number of courts have held that 'channel stuffing' gives rise to a 'very weak' inference of

21   scienter-if any at all-in § 10(b) actions because there are a number of legitimate reasons for

22   attempting to achieve sales earlier." Id; see also, In re Splash Tech. Holdings Securities Litig., 160

23   F.Supp.2d. 1059, 1075-76 (N.D.Cal. 2001) ("[T]his Circuit has rejected 'channel stuffing'

24   claims.") (citations and quotations omitted); In re Trex Co., Inc. Securities Litigation, 212

25   F.Supp.2d 596, 608 -609 (W.D.Va. 2002) ("Allegations of channel stuffing, standing alone, are

26   insufficient to sustain the state of mind requirement in a securities fraud claim because 'there may

27   be a number of legitimate reasons for attempting to achieve sales earlier' than in the normal

28   course."), quoting, Greebel v. FTP Software Inc., 194 F.3d at 185 (Concluding that channel

02cv870-BEN (RBB)

Exhibit F
0552

1  stuffing allegations "[do] not support a strong inference of scienter"). In other words, engaging in

2  channel stuffing is not inconsistent with earning high revenues and thus reporting high revenues in

3  the financial statements. "Plaintiffs have not alleged sufficient facts to show that Defendants knew

4  or recklessly disregarded at the time of making the transactions that customers would be returning

5  products . . . ." Johnson v. Tellabs, Inc., 262 F.Supp.2d 937, 957 (N.D.Ill. 2003). "Even if channel

6  stuffing was rampant at [Peregrine] during the [C]lass [P]eriod, this does not necessarily mean that

7  [D]efendants' failure to disclose it made any of [D]efendants' statements false or misleading",

8  much less prove they did so with scienter. Friedman v. Rayovac Corp., 295 F.Supp.2d at 987. See

9  also, City of Philadelphia v. Fleming Companies, Inc. 264 F.3d at 1261; Coble v. Broadvision Inc.,

10  2002 WL 31093589 at *8 (N.D.Cal. 2002) ("The mere fact that BroadVision sold products to

11  Hewlett-Packard which Hewlett-Packard had not already sold to end users is wholly insufficient to

12  support a strong inference, or even anything more than a weak inference, of scienter. The

13  allegations as to 'creative revenue deals' are too vague and non-specific to support any reasonable

14  inference in favor of plaintiffs.").

15       **(v)     January 2000 Report To Board Of Directors.**

16       According to the Complaint, "[o]n January 18, 2000, Gardner disseminated a report . . . in

17  connection with the January 20, 2000 Board meeting." (Complaint ¶ 154.) The report stated:

18       Once again, however, this was a very tough quarter. The opening lines from Dickens['] Tale of Two Cities summarizes it best: "It was the best of times, it was the worst of times.

19  It was a time of wisdom. It was a time of foolishness."

20                      ***

21  Why was it the worst of times?

22  We have a $2 million professional services revenue shortfall compared to plan with little or no warning. Half of the reason for this was Y2K, the remainder was the shift toward selling through alliances, which had not been adequately factored into the plan . . ..

23  Our bread and butter business went to hell. The deals between $75K and $500K just were missing in action. Some of this may also be Y2K effect, most of it was undoubtably due to

24  the huge sales force re-engineering we have undertaken. In other words, we did this to ourselves . . . I suspect we have one more quarter, and perhaps two, of hand-holding and

25  close upper management involvement in sales. Sales force productivity is at a ridiculously low level. The US is substantially under $1 million per person and EMEA is right around

26  $1 million/person, while we need both to be closer to $1.5 million per person. Big deals and excellent individual performances were required to cover the shortfall, when they

27  should have been the icing on the cake.

28  The US was even worse. We had a bad forecast to begin with, a gradual improvement in the middle part of the quarter, and then a $4 million melt-down in the last week of the

02cv870-BEN (RBB)

Exhibit F
0553

1     quarter. Only the KPMG deal with Sodexho/Marriott and Gold mine saved the US
2     performance.

3     Why was it a time of foolishness?

4         . . . I have come to the conclusion that we are at the awkward teenage stage of our
          existence. We are much bigger than we were but not big enough to be taken seriously . . .
5
          Our channel business is now a cause for concern. We are victims of both our own success
6         and a changing accounting and regulatory landscape. We have been much more successful

7         generating sales to channels and getting partners to buy into our message and vision. We
          have not been as successful, and in some cases unsuccessful, in getting the sell-through that
8         would remove the inventory of software from the channels. Rather than a 3 to 6 month
          latency, the inventory is moving in closer to 9 months as partners ramp up. Due to several
9         highly publicized incidents at other companies (Informix, Network Associates, HBOC), the
          rules are tightening and practices are being re-examined. The net of this is that we are now
10        at a level of channel inventory that makes our auditors uncomfortable.

11    (Complaint ¶ 154.) The report also stated:

12        Why was it the best of times?

13        We exceeded every expectation we could reasonably have had from our launch of our
          employee self-service and e-procurement application: Get.It!
14
15        Our mid-range market entry, InfraCenter for Workgroups, exceeded every expectation and
          garnered numerous positive comments from customers and analysts. We now [have] the
16        number one product in the mid-range space, based on analyst assessment.

17
          We hit some of the very large deals we were looking for: $10 million with ICL for Get.It!
18        And the ServiceCenter/AssetCenter combination to use throughout Europe for their
          outsourcing business and internal needs; $5 million with Goldmine for a combination of
19        InfraTools, InfraCenter for Workgroups, and Knowlix iKnow as a world-wide Master
          VAR; and over $5 million with KPMG for Sodexho/Marriott for a combination of
20        AssetCenter, ServiceCenter, and FacilityCenter.

21
          We had some incredibly strategic wins: Excite@home selected Get.It! and AssetCenter
22        beating the incumbent Remedy and Ariba competition. We beat Ariba and Oracle at ABM
          AMRO bank for Get.Resources! e-procurement. We have been quietly told that Morgan
23        Stanley will use Get.It! instead of the $3 million investment they made in Ariba, who they
          were the lead underwriter for. PriceWaterhouse Coopers selected us just after the quarter
24        ended to be their worldwide Service Desk, and during the quarter we booked close to
          $500K of business form various parts of PwC, despite a huge competitive push from
25        IBM/Tivoli, PwC's audit client.

26
          Why was it a time of wisdom?
27        We did some really smart things this quarter. Get.It! was better launched than any product
          we have ever had....Better yet, we actually sold a lot of it, beating all expectations. Ariba,
28        after 3 years, today has about 50 customers. In 4 weeks, we are up to 6 customers . . . .

- 78 -

Exhibit F
0554

1    I believe we will add at least 12 more this quarter, and double that in Q1 of FY 2001, so we
2    should cross-over Ariba sometime in the next 12 months . . . .

3    The positioning of Get.It! as a full employee self service solution and not just e-
     procurement gives us huge running room ahead. The positioning of Get.Resources! as a
4    full life-cycle management solution and not just a purchasing solution also gave us
5    immediate differentiation versus Ariba.

6
     Our technology continues to chug along at a great pace. We are truly doing some cutting
7    edge work with the business application XML and with the integration with wireless and
     Palm clients. We are getting smarter and smarter about how we can integrate all of out
8    products without having to rewrite them all.

9
     We did one very small acquisition this quarter: KKO. KKO brings us a terrific submarket
10   to our fleet management solution. We now have RailAnywhere to extend FleetAnywhere
     into the rail and transit market. This is an under-served market with huge potential and
11   billions of dollars of assets and asset maintenance cost. We should recoup our full
     investment with revenue that I believe will close this quarter at New Jersey Transit and
12   Sema Group in the UK

13
     We added come great partners this quarter who are changing the way we work our partners
14   model . . . .

15

16   (Noell's Exh. D at 1, 3.) This information does not raise a strong inference of scienter. The

17   information gave both a positive and negative projection of Peregrine's business. Courts have

18   found that such documents are insufficient to put a plaintiff on notice of fraud, much less "reveal

19   the potentially material fact would likely mislead investors" or that "defendant must have been

20   aware both of its materiality and that its non-disclosure would likely mislead investors."

21   Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1260-1261. See also, Bovee v. Coopers

22   & Lybrand, 320 F.Supp.2d 646, 655 (S.D.Ohio 2004) ("In reviewing the various forms of public

23   disclosures made . . . the Court concludes that, despite the many negative comments about MAW's

24   financial wherewithal and corporate stability, reassuring statements were also made that could have

25   negated the 'storm warning' effect of the disclosures. In this regard, the Court notes . . . it is not

26   the 'storm warning' that triggers the limitations period. . . . ."); In re Infonet Services Corp.

27   Securities Litigation, 310 F.Supp.2d at 1115 (Concluding that the "statements alone do not

28   constitute adequate warnings of the upcoming storm, as the reports' warnings were accompanied

02cv870-BEN (RBB)

Exhibit F
0555

1   by positive statements."). Moreover, "[t]he existence of documents raising concerns about the

2   company's business does not show that a positive outlook is reckless when revealed to be

3   inaccurate in hindsight." In re Northern Telecom Ltd. Securities Litigation, 116 F.Supp.2d 446,

4   465 (S.D.N.Y. 2000); see also, In re Carter-Wallace, Inc. Securities Litig., 220 F.3d 36, 40-42 (2d

5   Cir. 2000) (Dismissing allegations that defendants "turned a blind eye" to reports of adverse side

6   effects of company's drug).

7            **(vi)    July 2000 Report To The Board Of Directors.**

8            The Complaint alleges Gardner's "quarterly report for the summer 2000 Board meeting . . .

9   gave . . . very negative depiction of events at Peregrine" including: "(i) that the Company had

10  continuing concerns about its sales teams, whose productivity was at a three-year low, (ii) that its

11  mid-size market continued to seriously under performance [sic], (iii) that it had no sales backlog

12  for the coming 'always difficult' quarter, (iv) that it was running out of cash and could not

13  complete a public offering because there was substantial doubt as to whether the Company would

14  meet its earnings target for the second quarter of fiscal year 2001 ending September 30, 2000."

15  (Complaint ¶¶178 and 180.) The Complaint then alleges that despite these facts, Peregrine

16  reported that it "had revenues of $94.3 million for the quarter, an 83% increase over the previous

17  year's comparable period." (Id.) As alleged, the report does not establish that any Defendant

18  knowingly or recklessly falsely reported that Peregrine "had revenues of $94.3 million for the

19  quarter, an 83% increase over the previous year's comparable period."

20           At the outset, having reviewed Gardner's report in full, as alleged in the Complaint, the

21  Court cannot say that Defendants learned what Plaintiffs allege they learned. In other words, the

22  report does not say what Plaintiffs attribute to it. For example, Plaintiffs allege that from the report

23  Defendants learned Peregrine "was running out of cash." But the report also said that Peregrine

24  "came out of the quarter with about $70 million in cash . . .[o]ur current projection is that we will

25  end the quarter with $35 million." (Id. ¶ 178.) Furthermore, the report specifically stated that

26  Peregrine "will show approximately $94 million in top line revenue . . . ." (Id.) As for Plaintiffs'

27  assertion that Peregrine "had no sales backlog for the coming 'always difficult' quarter", the report

28  actually stated that "[i]f we close a few of these large deals and we do not have another fall-out of

02cv870-BEN (RBB)

Exhibit F
0556

1  the 'bread-and-butter' business forecast, we will fill the gap and make the numbers. We even have

2  the potential to carry a backlog into the December quarter . . . ." (Id.) Further, there is no

3  suggestion in the report "that . . . there was substantial doubt as to whether the Company would

4  meet its earnings target for the second quarter of fiscal year 2001 ending September 30, 2000."

5  Rather, the report assured the board members that it was possible to "fill the gap and make the

6  numbers." (Id. ¶ 178.)

7        Moreover, even if the Court attributes Plaintiffs' interpretation to the report, it still would

8  not raise a strong inference of scienter. For example, even if Defendants knew of, and failed to

9  disclose that, there was a concern in Peregrine that its sales teams' productivity was at a three-year

10  low, that would not make Peregrine's financial statements misleading. "If the challenged

11  statement is not false or misleading, it does not become actionable merely because it is

12  incomplete." In re Vantive Corp. Securities Litigation, 283 F.3d at 1085. Having concerns about

13  its employee productivity did not mean that Peregrine could not earn "revenues of $94.3 million

14  for the quarter." "The question is not merely whether [a Defendant] had knowledge of the

15  undisclosed facts; rather, it is the danger of misleading buyers that must be actually known or so

16  obvious that any reasonable man would be legally bound as knowing." City of Philadelphia v.

17  Fleming Companies, Inc., 264 F.3d at 1260. Moreover, Section 10(b) and Rule 10b-5(b) do not

18  impose a general duty to disclose information, unless failing to do so materially altered a statement

19  made. In re Seagate Technology II Securities Litigation, 843 F.Supp. at 1369. Accordingly, the

20  report does not establish a strong inference of scienter.

21      **(vii)  October 2000 Report To The Board Of Directors.**

22        The Complaint alleges that "[i]n his October 16, 2000 report to the Board members,

23  Gardner reported:

24              Another quarter is behind us. As you know it was a nail-biter, but in
              the end we pulled it off . . . [w]e also had to borrow from the future
25              to make the present happen. In other words, we had to grant some
              extraordinary terms on a few deals in the closing hours of the quarter
26              to move business into the September time period. This will clearly
              impact December and March, but I think the damage will be
27              manageable.

28              [S]ales productivity its far from where we want it . . . The average rep and the
              average deal is missing in action.

02cv870-BEN (RBB)

Exhibit F
0557

1
2
We don't have enough [cash] . . . We need to raise cash now.

3  (Complaint ¶ 181.)  This report did not raise a strong inference of scienter.  Despite the alleged

4  negative information, the report also contained positive information.  For example, the report also

5  stated "[w]e won some great deals, even in the e-BCG side of the business.  And from

6  understanding our true strengths, we will build the future . . . The Get.It! product line continues to

7  exceed every forecast.  We will report better than $17 million in Get.it! revenue this quarter, up

8  from $12 million last quarter and $6 million the quarter before.  This will exceed all external

9  expectations . . ."  (Noell's Exh. E at 3.)  "[A]s long as the public statements are consistent with

10 reasonably available data, corporate officials need not present an overly gloomy or cautious picture

11 of current performance and future prospects . . . ."  Novak v. Kasaks, 216 F.3d at 309 (internal

12 citations omitted).  Also, as noted above, "[t]he existence of documents raising concerns about the

13 company's business does not show that a positive outlook is reckless when revealed to be

14 inaccurate in hindsight."  In re Northern Telecom Ltd. Securities Litigation, 116 F.Supp.2d at 465.

15 Moreover, even if Peregrine was having "difficulties," Plaintiffs fail to allege the difficulties were

16 so severe that defendants knew, or must have known, that Peregrine could not produce the

17 revenues disclosed in its financial statements.  Accordingly, this report did not raise a strong

18 inference of scienter.

19      **(viii)    January 2001 Report To The Board Of Directors.**

20      The Complaint alleges that "[i]n his report to the Board for the third quarter of fiscal year

21 2001 . . . in advance of the January 26, 2001 Board meeting, Gardner reported that 'there were

22 also some substantial business disappointments.' . . . Company's 'direct business in North America

23 was a disaster,' with only slightly more than $13 million of business on a plan of over $50 million

24 and a forecast late in the final month of the quarter of almost $40 million, Sales representative

25 productivity was 68% of plan, U.S. productivity less than 50% of plan, . . . [c]ontinued 'heavy

26 reliance on alliance and channel partners' remained a concern, such that . . . Gardner was

27 'cautious' about the Company's prospects going into the fourth quarter."  (Complaint ¶ 185.)  The

28 Complaint then alleges Defendants acted with scienter when announcing Peregrine's "financial

- 82 -

02cv870-BEN (RBB)

1  results for the third quarter of fiscal year 2001 . . ." which stated that Peregrine "had revenues of

2  $156.6 million for the quarter, a 132% increase over the previous year's comparable period." (Id. ¶

3  186.)

4      As alleged, the report does not raise a strong inference that any Defendant knew or was

5  reckless that Peregrine's financial statement for the third quarter of fiscal year 2001 was false or

6  misleading. "[T]o establish scienter in a securities fraud case alleging non-disclosure of potentially

7  material facts", the plaintiff must not only demonstrate" that "the defendant knew of the potentially

8  material fact" but also that "the defendant knew that failure to reveal the potentially material fact

9  would likely mislead investors." City of Philadelphia v. Fleming Companies, Inc., 264 F.3d

10  at 1260 -1261. Here, failing to disclose the alleged information in Gardner's report did not make

11  Peregrine's financial statement misleading or actionable. Gardner's statements in the report were

12  too "general for a reasonable investor to take into account when making an investment decision."

13  In re Boston Technology, Inc. Securities Litigation, 8 F.Supp.2d 43, 63 (D.Mass. 1998). Thus, the

14  information was not even material. Moreover, again "[t]he existence of documents raising

15  concerns about the company's business does not show that a positive outlook is reckless when

16  revealed to be inaccurate in hindsight." In re Northern Telecom Ltd. Securities Litigation, 116

17  F.Supp.2d at 465; see also, Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d. 12, 20

18  (D.Mass. 2000) (Plaintiffs "cannot merely speculate in hindsight that because [defendant] ran into

19  a sales slowdown and reduced revenue by the end of the Class Period" that earlier statements "of

20  good corporate health . . . must have been inaccurate"); Colby v. Hologic, Inc., 817 F.Supp. 204,

21  215 (D.Mass. 1993) ("[D]efendants' . . . alleged 'materially adverse' knowledge of [the corporate

22  defendant's] decline in September is largely inferred from their November acknowledgment of

23  'continued' declining sales. That sort of inferred omission by hindsight admission is rejected

24  herein as a basis for a duty to disclose"). Accordingly, Plaintiffs have not pleaded any

25  particularized facts that would suggest that Defendants knew of or recklessly disregarded the

26  falsity of the Peregrine's financial statements.

27      **(ix)    April 2001 Report to Board of Directors.**

28      According to the Complaint, on "April 16, 2001 Gardner disseminated a report to the Board

Exhibit F
0559

1  members regarding the fourth quarter of fiscal year 2001 . . . and the outlook for fiscal year 2002.

2  In his report, . . . Gardner stated that 'the difficulty of the quarter leads us to be more cautious

3  about the next couple of quarters than we have been previously . . . .' Gardner referred to the

4  'massive expansion of [Peregrine's] relationship with IBM' as the highlight of the quarter.

5  However, he observed that very large deals with Fleet Boston, Morgan Stanley, and ABN AMRO

6  Bank (each with greater than $10 million potential) were scrapped because the customers 'were not

7  prepared to spend any money.' He further told the Board members that management 'are very

8  concerned about the irrational buyer behavior now being seen in the market . . . ." (Complaint ¶

9  187.)

10      As alleged, the report does not give rise to a strong inference of scienter. See, In re

11  Northern Telecom Ltd. Securities Litigation, 116 F.Supp.2d at 465 ("The existence of documents

12  raising concerns about the company's business does not show that a positive outlook is reckless

13  when revealed to be inaccurate in hindsight."); Rothman v. Gregor, 220 F.3d 81, 90 (2nd Cir.

14  2000) ("Generally, poor business judgment is not actionable under section 10(b) . . . The fact that

15  management's optimism about a prosperous future turned out to be unwarranted is not

16  circumstantial evidence of conscious fraudulent behavior or recklessness."); Decker v. Massey-

17  Ferguson, Ltd., 681 F.2d 111, 117 (2d Cir.1982) ("[E]conomic prognostication, though faulty, does

18  not, without more, amount to fraud.") In re Symbol Techs. Class Action Litig., 950 F.Supp. 1237,

19  1246 (E.D.N.Y. 1997) ("The evidence shows, at most, that Symbol's senior management relied on

20  internal forecasts that turned out, in hindsight, to be inaccurate. This is not fraud.").

21      **(x)   July 2001 Report To The Board Of Directors**.

22      The Complaint alleges that "[a]t a July 18, 2001 Board meeting at the J.W. Marriott Hotel

23  in New York City, . . . [D]efendants were advised that the [Peregrine] had received an inquiry from

24  the SEC regarding transactions with Critical Path, a software company based in San Francisco that

25  principally focused on Internet communications. They learned that a national business magazine,

26  Business Week, had contacted the Company in connection with an upcoming article concerning

27  Critical Path, raising the possibility that Peregrine would be linked publicly with the ongoing

28  federal investigation." (Complaint ¶ 190.) These allegations are insufficient to show a strong

02cv870-BEN (RBB)

Exhibit F
0560

1  inference of scienter.

2          At the outset, the report does not contradict any statements Defendants allegedly made.

3  See, In re Syntex Corp. Sec. Litig., 95 F.3d at 929  ("Plaintiffs have not pled facts indicating that

4  Defendants had inside knowledge that contradicted their public statement.").  Secondly, "[t]o

5  contribute meaningfully toward a 'strong inference' of scienter, [] allegations attributed to

6  unnamed sources must be accompanied by enough particularized detail to support a reasonable

7  conviction in the informant's basis of knowledge."  In re Northpoint Communications Group, Inc.

8  Sec. Litig., 221 F. Supp. 2d 1090, 1097 (N.D.Cal. 2002).  Here, the Complaint merely alleges that

9  defendants "were advised" without identifying who advised them.  Simply referring to Business

10  Week as a source is likewise insufficient.  "If a plaintiff is to rely on the existence of reports as

11  establishing knowledge, she must 'include adequate corroborating details,' such as the 'sources of

12  her information with respect to the reports, how she learned of the reports, who drafted them, . . .

13  which officers received them,' and 'an adequate description of their contents.'"  In re Vantive, 283

14  F.3d at 1079, 1087-88 (Citations omitted); see also, Novak v. Kasaks, 216 F.3d at 309  ("Where

15  plaintiffs contend defendants had access to contrary facts, they must specifically identify the

16  reports or statements containing this information.");  San Leandro Emergency Medical Group Profit

17  Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 811 (2nd Cir. 1996) ("Plaintiffs'

18  unsupported general claim of the existence of confidential company sales reports that revealed the

19  larger decline in sales is insufficient to survive a motion to dismiss.");  Arazie v. Mullane, 2 F.3d

20  1456, 1467 (7th Cir. 1993) ("[R]eferences to unreleased or internal information that allegedly

21  contradict[s] [defendants'] public statements" should indicate such matters as "who prepared the

22  projected figures, when they were prepared, how firm the numbers were, or which [company]

23  officers reviewed them.").  It is not enough to allege that there was "confidential non-public

24  information" that contradicted the false statement.  Yourish v. California Amplifier, 191 F.3d 983,

25  994 (9th Cir. 1999).  Plaintiffs must also provide "some detail about the alleged information, other

26  than that its substance contradicted the substance of the identified statement."  Id. at 995.

27  Moreover, that there was a "possibility that Peregrine would be linked publicly with the ongoing

28  federal investigation" is too speculative or tenuous to raise a strong inference that any Defendant

- 85 -

02cv870-BEN (RBB)

1  knew that Peregrine was involved in a fraud.

2       (xi)    October 2001 Report To The Board Of Directors.

3       The Complaint alleges "[o]n or about October 15, 2001, Gardner disseminated a report to

4  the members of the Board . . . in connection with the Board meeting conducted on

5  October 17, 2001. He informed the Board . . . '[a]s of right now, forecasts from our sales teams at

6  the 'commit' level are skittish and a bit below the level we need for even the lowered guidance for

7  the December quarter.' Gardner reported that the only way [Peregrine] would be able to meet its

8  earnings per share guidance was by starting, in January 2002, to require employee contributions to

9  benefits plans 'for the first time ever.' He advised the Board members: '[t]his $30 million savings

10  will permit us to make our EPS guidance against the lower revenue guidance.'" (Complaint ¶

11  192.) Again, Gardner's statements in the report were too "general for a reasonable investor to take

12  into account when making an investment decision." In re Boston Technology, Inc. Securities

13  Litigation, 8 F.Supp.2d at 63; see also, City of Philadelphia v. Fleming Companies, Inc., 264 F.3d

14  at 1260-1261 ("[T]o establish scienter in a securities fraud case alleging non-disclosure of

15  potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially

16  material fact, and (2) the defendant knew that failure to reveal the potentially material fact would

17  likely mislead investors."). Moreover, "[t]he existence of documents raising concerns about the

18  company's business does not show that a positive outlook is reckless when revealed to be

19  inaccurate in hindsight." In re Northern Telecom Ltd. Securities Litigation, 116 F.Supp.2d at 465.

20  "[W]hat is [also] missing is an explanation of why these particular problems contradicted the

21  public statements made by Defendants." Osher v. JNI Corp., 308 F.Supp.2d 1168, 1188 (S.D.Cal.

22  2004). The information concerns Earnings Per Share numbers, not the revenue numbers--they are

23  two different metrics. The report does nothing to establish that Defendants' statements were false.

24       (xii)    December 2001 Report To The Board Of Directors.

25       The Complaint alleges "[o]n December 31, 2001, Gardner [prepared] a report . . . , which

26  provided a summary of the third quarter of fiscal year 2002 ending December 31, 2001."

27  (Complaint ¶ 195.) The report stated:

28       This was a very tough quarter. The final numbers are not yet in and it will take a couple of
         weeks to get all the detailed information about expenses, balance sheet items, and

02cv870-BEN (RBB)

Exhibit F
0562

1  breakdown of revenue, but it is clear today that we missed our external revenue targets by a
   wide margin (about $40 million) and we missed our internal targets by a wider margin. My
2  best guess is that we will end at approximately $175 to $180 million in revenue. For the
   first time as a public company we will post a loss in operating results per share. We
3  estimate that loss to be about $14 - $16 million or about $0.06 to $0.08 per share. This was
   against an expectation of a $0.10 profit.
4

5       This report does not raise a strong inference of scienter. The Complaint alleges during the

6  third quarter of 2002, certain Defendants made the following false or misleading statements. First,

7  in a press release, it was stated that Peregrine "anticipated total revenues of approximately $175

8  million." (Complaint ¶ 622.) The Complaint further alleges "[o]n January 24, 2002, Peregrine

9  issued a press release confirming that total revenues for the third quarter of fiscal year 2002 were

10  $175.2 million." (Id. ¶ 630.) Lastly, the Complaint alleges "[o]n February 14, 2002, Peregrine

11  filed its Form 10-Q for the third quarter of fiscal year 2002 with the SEC, [which] incorporated the

12  financial statements that appeared in the January 24, 2002 press release." (Id. ¶ 638.) There is

13  nothing in the report "contradicting [Defendants'] public statements." Novak v. Kasaks, 216 F.3d

14  at 308. Indeed, the report stated that in all likelihood Peregrine "will end at approximately $175 to

15  $180 million in revenue" for that quarter. See, In re Syntex Corp. Sec. Litig., 95 F.3d at 929

16  ("Plaintiffs have not pled facts indicating that Defendants had inside knowledge that contradicted

17  their public statement.").

18       (xiii)   Conclusion.

19       The foregoing reports fail to establish scienter on the part of any Defendant. The reports

20  fail to show that Defendants had inside knowledge that contradicted their public statement. At

21  times, Plaintiffs have also failed to provide any detail about the alleged information underlying the

22  reports or that their substance contradicted the substance of the identified statements. That is there

23  is no explanation of why the particular problems Peregrine allegedly faced contradicted the

24  statements Defendants made. The allegations fail to even show that, from the reports, Defendants

25  could have learned of information contradicting their public statements, much less that they

26  actually did learn such information (or that they were deliberately reckless as to the falsity of their

27  statements). In short, the reports "do not adequately establish that [any Defendant] had knowledge

28  of the supposedly 'true but concealed' circumstances concerning [Peregrine's] problems[.]" In re

- 87 -

Exhibit F
0563

1  Vantive, 283 F.3d at 1087. For these reasons, and all the reasons set forth above, the quarterly

2  review and outlook reports fail to raise a strong inference of scienter.

3     **b.     Adequate Internal Accounting Controls.**

4     The Complaint next alleges "[i]n light of the lack of adequate internal accounting controls,

5  the aggressive growth of the Company and the lack of a functioning Audit Committee, . . . Noell,

6  van den Berg, Hosley, Watrous, Savoy, and Dammeyer[19], while on the Audit Committee, knew or

7  were deliberately reckless in not knowing of the fraudulent accounting practices alleged herein."

8  (Complaint ¶ 215.) The Court disagrees.

9     "A pleading of scienter may not rest on the inference that defendants must have been

10  aware of the misstatement based on their positions within the company." Abrams v. Baker Hughes

11  Inc., 292 F.3d 424, 432 (5th Cir. 2002); see also, In re Homestore.com, Inc. Securities Litigation,

12  252 F.Supp.2d 1018, 1037 (C.D.Cal. 2003) ("Neither [defendant's] position within the company,

13  Vice President of Human Resources, nor her personal relationship with [upper management] can

14  lead to any inference of deliberate recklessness."); In re Oak Tech. Sec. Litig., 1997 WL 448168 at

15  *11 (N.D.Cal. 1997) ("Allegations that outside directors merely held positions on committees

16  responsible for the preparation and disclosure of a corporation's finances are insufficient to set

17  forth the circumstances constituting fraud with particularity.").

18     "[B]lanket allegations of weak internal controls [also] do not alone suffice as a basis for

19  inferring scienter." In re Rent-Way Securities Litigation, 209 F.Supp.2d 493, 508 (W.D.Pa. 2002);

20  see also, Reiger v. Price Waterhouse Coopers LLP, 117 F.Supp.2d 1003, 1009 n. 5 (S.D.Cal. 2000)

21  (Allegations of "weak internal accounting controls" at the audited company were "boilerplate 'red

22  flags'" and could not support a strong inference of scienter). Similarly, "failure to follow

23  professional standards by itself does not necessarily establish scienter, nor does the use of

24  unreasonable accounting procedures." In re Ikon Office Solutions, Inc. Securities Litigation, 131

25  F.Supp.2d 680, 703 (E.D.Pa. 2001). Thus, allegations that the "members of the Committee were

26  knowingly and/or deliberately reckless in their conduct of Committee business" does not establish

27  _____

28     [19]  As explained above, the Complaint does not adequately allege that Dammeyer either employed a scheme to defraud or made any statements. Thus, the issue of his scienter or mental state is irrelevant.

- 88 -                                02cv870-BEN (RBB)

1    scienter. (Complaint ¶ 214.) "[T]he Complaint does not identify what the Audit Committee

2    members would have learned from exercising these responsibilities that would have put them on

3    notice that the SEC filings that they signed were inaccurate." In re WorldCom, Inc. Securities

4    Litigation, 294 F.Supp.2d 392, 418 (S.D.N.Y. 2003).

5        c.    Information or Reports Disseminated to the Audit Committee.

6        The Complaint next points to various audit committee meetings, alleging that from the

7    information discussed at these meetings, the identified Defendant attendees learned that "Peregrine

8    was improperly recognizing revenue immediately in full, on sell-in transactions where there was no

9    binding commitment on the part of resellers." (Complaint ¶ 220.) For example, the Complaint

10   alleges "Noell and Watrous attended an Audit Committee meeting on April 25, 2001." (Id.) "Also

11   in attendance was . . . Nelson and representatives of . . . Arthur Andersen including Stulac." (Id.)

12   In the meeting, the Complaint alleges, "Stulac specifically suggested that it would be appropriate

13   for [Peregrine] to move to revenue recognition based on sell-through as opposed to the then

14   operative sell-in method because he knew, and conveyed to the Audit Committee members, based

15   on Arthur Andersen's audit procedures for the quarterly reviews and year end audit, that Peregrine

16   was improperly recognizing revenue immediately in full, on sell-in transactions where there was no

17   binding commitment on the part of resellers." (Id.) The Complaint then alleges "Watrous

18   inquired at this meeting as to how 'aggressive' Peregrine was with regard to revenue recognition,

19   and he was informed by Stulac that Peregrine was more aggressive than one of its leading

20   competitors, citing as an example SAP, which applied the sell-through method." (Id.) For the

21   reasons that follow, these allegations are insufficient to raise a strong inference of scienter.

22       "[S]cienter [is] a mental state embracing intent to deceive, manipulate, or defraud." In re

23   Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1424 (9th Cir. 1994), quoting, Ernst &

24   Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). "Thus, the complaint must allege that the

25   defendants made false or misleading statements either intentionally or with deliberate

26   recklessness." In re Daou Systems, Inc. Securities Litigation, 397 F.3d 704, 718 (9th Cir. 2005).

27   "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of

28   intentional or conscious misconduct." Nursing Home Pension Fund, Local 144 v. Oracle Corp.,

- 89 -

02cv870-BEN (RBB)

1   380 F.3d 1226, 1230 (9th Cir. 2004). "This means that the Plaintiffs must allege specific facts

2   showing that each Defendant acted with severe recklessness." Druskin v. Answerthink, Inc., 299

3   F.Supp.2d 1307, 1323 (S.D.Fla. 2004).

4         The Court must consider "whether the total of plaintiffs' allegations, even though

5   individually lacking, are sufficient to create a strong inference that defendants acted with deliberate

6   or conscious recklessness." In re Daou Systems, Inc. Securities Litigation, 397 F.3d at 718. "In

7   considering whether a strong inference of scienter has been pled, the [C]ourt must consider **all**

8   reasonable inferences to be drawn from the allegations, including inferences unfavorable to the

9   plaintiffs." Id. at 718 (Emphasis in original); see also, Nursing Home Pension Fund, Local 144 v.

10  Oracle Corp., 380 F.3d at 1230 ("In determining whether a strong inference of scienter exists, [the

11  Court] must consider all reasonable inferences, whether or not favorable to the plaintiff.");

12  Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) (Noting the "inevitable tension . . .

13  between the customary latitude granted the plaintiff on a [12(b)(6)] motion to dismiss . . . and the

14  heightened pleading standard set forth under the PSLRA").

15        Under this standard, the committee Defendants were not deliberately reckless, or did not act

16  with an intent to deceive or defraud the public. Specifically, according to the Complaint, in a

17  subsequent committee meeting, wherein the same Defendants attended, and after learning that

18  Peregrine was "improperly" recognizing revenue, "Watrous specifically stated that he was

19  'concerned' . . . [and] asked Stulac, 'on a scale of 1 to 10 with 10 being the most clean how

20  Peregrine's revenue recognition procedures would rank?'" (Complaint ¶ 222.). To this, the

21  Complaint alleges "Stulac responded they would rank in the '5-7' range." (Id.) Watrous, the

22  Complaint alleges, then "queried why Peregrine was not a '10' [and] was told that the problems

23  were attributable to: (i) software customers delaying purchases until late in the quarter to get

24  discounts, (ii) as a result, the quarter ends were extremely busy, (iii) the European controller

25  position was vacant, (iv) there was a failure on the part of Peregrine to appropriately merge the

26  overseas processes, (v) the European sales force 'used more aggressive revenue recognition', and

27  (vi) the frequent acquisitions made by Peregrine required the merging of different accounting

28  systems, which had not been accomplished." (Id.) In other words, shortly after learning that

02cv870-BEN (RBB)

Exhibit F
0566

1  Peregrine was recognizing revenue "improperly," the committee Defendants acted reasonably, not

2  recklessly.  They promptly investigated.  Moreover, the reasons they were told why Peregrine's

3  revenue recognition procedure "was not a 10" was not inconsistent or contrary to the statements

4  they made regarding Peregrine's financial statements.  For example, the reasons did not anyway

5  hint or suggest that Peregrine's revenue figures were based on transactions involving side

6  agreements, or contingent or barter transactions.  Nor were the reasons "so obviously material that

7  the defendant must have been aware both of its materiality and that [their] non-disclosure would

8  likely mislead investors."  City of Philadelphia v. Fleming Companies, Inc., 264 F.3d at 1261.  In

9  sum, "[b]ecause Plaintiffs have failed to plead facts that show that [committee Defendants]

10  consciously disregarded [a] 'red flag[]' that would have revealed the errors prior to their inclusion

11  in public statements, . . . the Complaint fails to allege facts that give rise to a strong inference of

12  scienter under § 10(b) and Rule 10b-5."  In re Comshare Inc. Securities Litigation, 183 F.3d 542,

13  554 (6th Cir. 1999).  That the Committee members " had access to the documents that revealed

14  [Peregrine's] improper revenue recognition . . . [by itself] does not strongly compel an inference of

15  intentional or deliberately reckless conduct . . . ."  DSAM Global Value Fund v. Altris Software,

16  Inc., 288 F.3d 385, 390 (9th Cir. 2002).  The Complaint fails to "allege facts sufficient to give rise

17  to a strong inference Defendants engaged in conduct which was highly unreasonable and which

18  represented an extreme departure from the standards of ordinary care."  In re Nice Systems, Ltd.

19  Securities Litigation, 135 F.Supp.2d 551, 587 (D.N.J. 2001).[20]

20      d.    "Ron Hall's" Email.

21      The Complaint alleges "[o]n October 3, 2001[21], Ron Hall, a Peregrine sales executive in its

22

_____

23      [20]  The Complaint also points to some other audit committee meeting.  For essentially the reasons why the review and outlook reports did not establish scienter, the meetings also fail to show

24  scienter.  Specifically, the Complaint fails to show that from the meetings, Defendants somehow had inside knowledge that contradicted their public statement, provide any detail about the alleged

25  information underlying the reports or that their substance contradicted the substance of the identified statements, and allegedly occurred after Defendants allegedly made their statements.

26

27      [21]  The Court recognizes that this email came after any of the Defendants made any of the statements alleged to be false or misleading.  As noted, as to the Defendants found to be primary

28  actors, the latest statement attributed to them is Amendment No.1 to Peregrine's Form S-4 Registration Statement regarding the Remedy merger.  This statement was filed on July 23, 2001.  However, since Plaintiffs are given leave to amend, and the potential importance of this email was raised during the

- 91 -

Exhibit F
0567

1   Asia Pacific division, sent [an] e-mail to . . . [which] Gardner immediately forwarded . . . to . . .

2   Moores." (Complaint ¶ 336.) "The email stated:

3       Attached are documents that should be of fundamental interest to yourself and all copied
    recipients.

4

5       They pertain directly to business activities in Asia Pacific, more specifically Australia. In
    all likelihood also Europe, where Dominic O'Riley was previously engaged in executive
    management capacity.

6

7       The attached 'Schedule A' for Planwell Technology may well be familiar, as $2
    million AUD [Australian dollars] of revenue (perhaps more) was booked on
    September 30th, 2001 under # SCA-AU-002918V01.

8

9       The underpinning Partner Addendum, contract # 01AB300901 may not be so
    familiar. I understand that you don't see all these partner agreements.

10      I strongly suggest you give these documents careful scrutiny, paying particular attention to
    page 8 of the 'Partner Addendum,' the 'Sales Guarantee' clause. Then inspect the overall

11      wording and associated legality of the contract, the implied Peregrine responsibility and
    associated consequent acceptable non-payment should targets not be achieved due to failure

12      to meet this contracted responsibility. It might pay to look at the maintenance terms,
    payment terms, territory, support implications and other Peregrine responsibilities.

13

14      My legal background suggests that the overall contract worthiness is questionable. At the
    least, certainly not what a shareholder (or an analyst) would pin faith on.

15      While in the process, it would be recommended you check the underpinning
    contracts for the following Australian Partner agreements, where large revenue

16      amounts have already been recognised:

17      IMS - booked for $10 million AUD in March, 2001 - $22 million dollars gross sales
    required to achieve target.

18

19      Kinetica - booked for $1 million AUD in June, 2001 - $1.4 million gross sales
    required to achieve target.

20      TELE IP - booked for $2 million in September, 2001 - $3.2 million gross sales
    required to achieve target.

21

22      Planwell Technology - attached, booked for $5 million in September, 2001 - $10 million
    gross sales required to achieve target.

23      That's $36 million gross sales required for these partners to collectively achieve
    target. With implied and/or contracted sales guarantees.

24

25      Of note, IMS ($22 million dollar AUD Target) haven't booked ONE SINGLE
    DEAL or burnt one dollar of revenue since they signed in March, 2001. I repeat,
    NO business in 6 months on a $22 million AUD commit!

26

27      Without the IMS 'sale' of $10 million nett AUD in March, 2001, Australia would only
    have sold some $4 million dollars gross software for all of last year! They're promising

28

hearing on March 4, 2005, the Court will address it.

02cv870-BEN (RBB)

Exhibit F
0568

$36 million this year?

The above mentioned 'contracts' have a few similarities:

1.  They represent ludicrous and irresponsible targets and commitments - little wonder that no 'Partner' has paid up front, particularly when you consider the current economic climate and last year's 'real' software sales.  I am reliably informed that these partners were touted figures between $30 and $40 million sales in Australia for last year.

2.  The payment terms are extremely loose, extensively delayed and underpinned by the 'guaranteed sales' clause, which any good lawyer would use to avoid liability if things didn't work out as Peregrine have promised.  Kinetica haven't yet paid for deals that were booked in June, before their partner 'agreement' was signed.  Yet revenue has been booked and valuable resources are being expended supporting their activities.  What's the chances of them paying up if targets aren't met?

3.  In the main, Partner 'Addendums' - the real contract - aren't signed off by Peregrine US and are exposed to non-compliance and potential litigation.  'Unconscionable Contract' comes to mind.

Yet Mr. Walsh and Mr. O'Riley are pressuring Sales Reps in Asia Pacific and Australia to find MORE Partners - so long as they commit bookable dollars up front.  Their war cry is "anything less than $10 million AUD isn't worth doing the business".

Come on, what are Peregrine selling here, Amway?  Vapourware?  Where's the commercial substance to these so called 'contracts.'

For the record, the $10 million dollar IMS deal that Mr. Walsh 'won his stripes for' in March, has yielded absolutely NOTHING to date - not one cent worth of 'real' business (apart from the initial revenue booking).

I also note he Mr. Walsh doesn't manage the account and has no involvement in it's progress.  It's been offloaded to a very inexperienced Sales person.  Next March should be interesting when Peregrine try to get IMS to reload - or PAY for that matter.  Still, Peregrine have booked the revenue.  What will this do to Peregrine's partnering credibility?  Or Stock value?

Were the attached documents, any of the other 'contracts' mentioned above, or this correspondence to fall into the hands of the 'Wall Street Journal' or a curious analyst, Peregrine Systems will be under serious and immediate scrutiny.  That is not my intention, but as a well meaning Peregrine investor with Peregrine's best interests at heart, I feel compelled to demand your attention to these contracts and the revenue booked from them.

This is a blatant example of what can be termed 'Channel stuffing', in their crudest form.  The analysts have other names.

Mr. Walsh and Mr. O'Riley have both been personally warned as to the lack of substance to these contracts, yet have chosen to ignore those warnings.  I can only assume that as responsible executives and directors of Peregrine, you would have no knowledge of the underpinning contracts to the Schedule A's you receive on Partnering agreements.

This Type of contract should immediately cease and real revenue be recognised, ie., where PRODUCT is actually DELIVERED and payment is probable.

02cv870-BEN (RBB)

Exhibit F
0569

1    Terry Walsh' and Dominic O'Riley's contracts with Peregrine should immediately
2    be reviewed due to breach of fiduciary duty.

3    Reliable information suggests that a major Asia Pacific restructure will be announced on
     October 8th, 2001. This will include the termination of a number of staff, mainly sales
4    related. I assume these staff will include anyone that has openly objected to the Channel
     stuffing. 'Amway' approach outlined above.

5    I look forward to your urgent attention to this correspondence in the hope that this is
6    not the case."

7    (Complaint ¶ 336.) The Complaint also alleges when Hall "learned of his termination due to his

8    branch office's alleged 'redundancy,' [he] sent an e-mail dated October 25, 2001 to his manager

9    stating:

10
              Attached is a very important document I sent to the US a short time
11            ago -  . . .John Moores . . . received [a] cop[y]. I sent it because I
              believe what you're doing with Partner contracts here is unethical,
12            immoral and unconscionable. There is also no justification to book
              revenue when no product has been ordered, there is a 'sales
13            guarantee' and there is little likelihood of payment if things don't go
              as we predicted during discussions . . . . Here is the document, it's
14            self explanatory. My closing comment that anyone who objected to
              the "channel stuffing" partner approach would be laid off is
15            ironically relevant."

16   (Id. ¶ 21.) For the reasons that follow, the email does not establish a strong inference of scienter.

17          At the outset, the Complaint does not allege Moores ever received, or was otherwise aware,

18   of the October 25, 2001 email. Notwithstanding, both the October 3rd and October 25th emails are

19   simply irrelevant to Moores' scienter; the emails came **after** Moores made his alleged statements.

20   As noted above, according to the Complaint, Moores is potentially responsible for four statements-

21   - the Form 10-K filed in May 2000, Amendment No.1 to the S-4 Registration Statement on the

22   Harbinger merger proposal again filed in May 2000, Form 10-K filed in June 2001, and

23   Amendment No.1 to the S-4 Registration Statement on the Remedy merger proposal filed in July

24   2001. Thus, the last statement Moores allegedly made was in June 2001.

25          To show scienter, the Complaint must plead "contrast[s] between what [Moores] w[as]

26   hearing internally about" Peregrine's accounting practices and financial condition, "and what [he]

27   was telling the public **at the same time**." In re Silicon Graphics Inc. Securities Litigation, 183

28   F.3d at 1000 (Emphasis original). Accordingly, the Complaint must "point[ ] to inconsistent

- 94 -

02cv870-BEN (RBB)

1   contemporaneous statements or information . . . which were made by or available to" Moores. <u>In</u>

2   <u>re GlenFed</u>, 42 F.3d at 1548; <u>see also</u>, <u>In re Read-Rite Corp.</u>, 335 F.3d 843, 847 (9th Cir. 2003)

3   ("[W]e hold that the district court correctly concluded that Plaintiffs did not point to any specific

4   evidence, such as contemporaneous reports or statements of others, in support of their allegations

5   of scienter."). By contrast, the Complaint cannot successfully allege Moores knew that the

6   statements were false or misleading when he made them "merely by pointing to **later** inconsistent

7   statements or conditions." <u>Id</u>. (Emphasis added). "It is clearly insufficient for [P]laintiffs to say

8   that a later, sobering revelation makes an earlier, cheerier statement a falsehood." <u>Yourish v.</u>

9   <u>California Amplifier</u>, 191 F.3d 983, 997 (9th Cir. 1999); <u>see also</u>, <u>In re GlenFed</u>, 42 F.3d at 1548

10  (Finding "no reason to assume that what is true at the moment plaintiff discovers it was also true at

11  the moment of the alleged misrepresentation . . . ."); <u>Aldridge v. A.T. Cross Corp.</u>, 284 F.3d 72, 83

12  (1st Cir.2002) ( "[T]he fact that the defendants published statements when they knew facts

13  suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of

14  scienter."). Therefore, the emails, which came in October 2001 and after Moores made his last

15  statement, are simply irrelevant and cannot establish Moores' scienter. <u>See</u>, <u>Ronconi v. Larkin</u>,

16  253 F.3d at 432 (To establish scienter, "the complaint must contain allegations of specific

17  '**contemporaneous** statements or conditions' that demonstrate the defendants knew or were

18  deliberately reckless of the false or misleading nature of the statements when made.") (Emphasis

19  added); <u>see also</u>, <u>Osher v. JNI Corp.</u>, 256 F.Supp.2d at 1159 (Defendant "allegedly made false

20  statements during the conference call on October 16, 2000. It seems, however, that the 'Sxxx'

21  email was circulated after the alleged false statements. Thus, the email does not necessarily

22  establish that the fourth quarter was 'not looking so great' on October 16, 2000."); <u>In re Global</u>

23  <u>Crossing</u>, 322 F.Supp.2d at 346 ("[D]efendants cannot be held liable for failing to anticipate future

24  events . . . .").

25         Moreover, the emails are insufficiently pled under the PSLRA. "Under the PSLRA . . . the

26  [P]laintiffs are required to allege in detail facts giving rise to a strong inference of scienter." <u>In re</u>

27  <u>Vantive Corp. Securities Litigation</u>, 283 F.3d at 1091. They have failed to do so. Specifically,

28  Moores has submitted the email the Complaint alleges "Ron Hall" sent in October 3, 2001.

Exhibit F
0571

1  (Moores Motion Attached Exh. "P"; Johnson Decl. ¶ 16.)  As previously noted, "[a] district court

2  ruling on a motion to dismiss may consider documents whose contents are alleged in a complaint

3  and whose authenticity no party questions, but which are not physically attached to the plaintiff's

4  pleading."  Parrino v. FHP, Inc., 146 F.3d 699, 705 -706 (9th Cir. 1998).  Plaintiffs do not question

5  the authenticity of the document.

6      The exhibit submitted reveals that the October 3, 2001 email was anonymously sent.  No

7  where in the contents of the email is there any reference to Ron Hall.  Plaintiffs must thus state

8  "the sources of [their] information with respect to the [emails], [and] how [they] learned of the

9  [emails] . . . ."  Silicon Graphics, 183 F.3d at 985; Novak, 216 F.3d at 309 ("Where plaintiffs

10  contend defendants had access to contrary facts, they must specifically identify the reports or

11  statements containing this information."); San Leandro, 75 F.3d at 812 ("Plaintiffs' unsupported

12  general claim of the existence of confidential company sales reports that revealed the larger decline

13  in sales is insufficient to survive a motion to dismiss.").  Indeed, "[i]t is not sufficient for a

14  [P]laintiff[s'] pleadings to set forth a belief that certain unspecified sources will reveal, after

15  appropriate discovery, facts that will validate [their] claim."  Id.  "Silicon Graphics and the PSLRA

16  require Plaintiffs to allege the specific content of the documents upon which the plaintiff relied,

17  identifying who prepared and who reviewed them, and setting out sources of . . . information with

18  respect to the reports."  In re Peerless Systems, Corp. Securities Litigation, 182 F.Supp.2d 982, 994

19  (S.D.Cal. 2002) (Citations omitted).   Plaintiffs fail to allege how they learned that Ron Hall was

20  the sender.  If Plaintiffs are relying on a "confidential source", they must "reveal with particularity

21  the sources of their information . . . . Naming sources is unnecessary so long as the sources are

22  described with sufficient particularity to support the probability that a person in the position

23  occupied by the source would possess the information alleged and the complaint contains adequate

24  corroborating details."  In re Daou Systems, Inc. Securities Litigation, 397 F.3d at 712 (Citations

25  and quotations omitted).  As it now stands, however, Plaintiffs' allegations are insufficient under

26  the PSLRA.

27      Lastly, the exhibit dispels any suggestion that there was a strong inference that Moores was

28  deliberately reckless, or acted with an intent to deceive or defraud the public.  See, In re Worlds of

- 96 -

02cv870-BEN (RBB)

Exhibit F
0572

1  Wonder Securities Litigation, 35 F.3d at 1424 ("[S]cienter [is] a mental state embracing intent to

2  deceive, manipulate, or defraud."); Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380

3  F.3d at 1230 ( "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects

4  some degree of intentional or conscious misconduct."). The exhibit reveals that less than an hour

5  after receiving the October 3, 2001 email, Moores forwarded the email to Gardner, then chairman

6  and CEO of Peregrine, inquiring about what the sender was "complaining about." (Moores Motion

7  Attached Exh. "P".) The exhibit then reveals that Gardner informed Moores that Peregrine "will

8  book a whopping $1.7 million [in the] quarter out of all of Asia Pacific (Japan, Australia,

9  Singapore, China, etc.)", and that "it [was] pretty clear that the amounts [the sender] [was]

10  referring to ha[d] no bearing on [Peregrine's] revenue recognition policies." (Id.) Gardner also

11  assured Moores that he "will investigate" the matter. (Id.) The Complaint is silent as to what

12  Moores did them after, and the Court cannot speculate that Moores acted recklessly. "The Reform

13  Act does not permit district courts to speculate as to the existence of unpled and unidentified facts

14  that could raise a strong inference of scienter." Reiger v. Price Waterhouse Coopers LLP, 117

15  F.Supp.2d 1003, 1011 (S.D.Cal. 2000). Accordingly, the alleged emails do not establish scienter.

16      **e.**    **Improperly Recorded Transactions.**

17      Attachments to the Complaint identify seventeen (17) improperly booked transactions.

18  See, Parrino v. FHP, Inc., 146 F.3d 699, 705-06 (The Court may "consider material which is

19  properly submitted [or attached] as part of the complaint . . . ."). Nelson is implicated in four

20  transactions.[22] For the reasons that follow, the allegations regarding these transactions fail to show

21  scienter on the part of Nelson.

22      **(i)**    **eXchangeBridge**

23      EXchangeBridge, Inc. ("EXB") provides electronic and paper transaction processing

24  services to the food brokerage industry. (Complaint Attached Exh. "E" at 10.) As of February

25  2001, Peregrine owned approximately 78% of the preferred stock (with voting rights) in this

26

27  [22] The Complaint identifies other Defendants--Gardner, Gless, Cappel, Spitzer, and Powanda who were allegedly involved in the transactions. As noted, however, the Court has already found that, under Section 10(b), Plaintiffs adequately state a claim against Gardner, Gless, Cappel, and Spitzer,

28  and thus will not discuss their involvement. Similarly, the Court will not discuss Powanda's liability as he withdrew his Motion. (Docket No. 597.)

02cv870-BEN (RBB)

Exhibit F
0573

1    corporation. (Id.) Moreover, two members of Peregrine management, including Nelson,

2    constituted two-thirds of EXB's board of directors. (Id.) The Complaint alleges Nelson, on behalf

3    of Peregrine, agreed to purchase an EXB note and another debt owed to Crossmark, a customer of

4    EXB, for $1.5 million in Peregrine stock. (Id.) In exchange for the purchase, Crossmark agreed to

5    "purchase" roughly $1.6 million of software from Peregrine through EXB. (Id.) According to the

6    Complaint, "Nelson insisted that EXB – and thus Peregrine – recognize the full $1.6 million

7    software license fee immediately in the June 2001 quarter despite the fact that the transaction was

8    nothing more than a contingent swap transaction." (Id. at 11) Further, the Complaint alleges that

9    EXB's CFO was fired after objecting to Nelson's accounting treatment. (Id.)

10          Although the Complaint provides details concerning the EXB swap transaction, it fails to

11   provide sufficient basis of knowledge. See, Novak, 216 F.3d at 309 ("Where plaintiffs contend

12   defendants had access to contrary facts, they must specifically identify the reports or statements

13   containing this information."). The Complaint fails to allege any facts forming the basis of

14   Plaintiffs' belief. The Complaint also fails to allege facts indicating that Nelson "knew or must

15   have been aware of the improper revenue recognition . . .." DSAM, 288 F.3d at 391.

16          Moreover, as previously discussed, Nelson is only responsible for press releases following

17   quarters one through four in 2000 and the first quarter of 2001, which ended June 30, 2000. The

18   press release following the first quarter of 2001 was allegedly issued on July 19, 2000. The EXB

19   transaction was recorded June 30, 2001, at close of second quarter of 2002 and after Nelson

20   allegedly made the false statements. See, Ronconi v. Larkin, 253 F.3d at 432 (To show scienter,

21   "the complaint must contain allegations of specific 'contemporaneous statements or conditions'

22   that demonstrate the intentional or the deliberately reckless false or misleading nature of the

23   statements when made."); Yourish v. California Amplifier, 191 F.3d at 997 ("It is clearly

24   insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement

25   a falsehood."); In re GlenFed, 42 F.3d at 1548 (Finding "no reason to assume that what is true at

26   the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation . . .

27   ."). As such, the EXB transaction does not show scienter.

28   ///

Exhibit F
0574

1         (ii)     **Critical Path, Inc.**

2         The Complaint next alleges revenue was improperly recognized in a swap transaction

3 involving Critical Path Inc. ("Critical Path") in September 2000. (Complaint Attached Exh. "E" at

4 17.) The Complaint then alleges "[e]-mail correspondence . . . shows that . . . Nelson . . . knew the

5 transaction was merely a swap for which revenue could not be recognized." (Id.) However, the

6 only "e-mails" Nelson allegedly received was first "'the latest' version of Critical Path documents

7 on September 27, 2000" and then another "e-mail . . . attaching the 'Final, Final' version of the

8 documents." (Id. at 18.) These allegations are insufficient to show Nelson "knew or must have

9 been aware of the improper revenue recognition . . . ." DSAM, 288 F.3d at 391. Moreover, the

10 transaction was allegedly booked no sooner than September 2000, which again is after Nelson

11 made his alleged false or misleading statements.

12         (iii)    **IBM/Tivoli**

13         The Complaint alleges "transactions with IBM gave rise to improper revenue recognition."

14 (Complaint Attached Exh. "E" at 42.) The only allegations against Nelson are that he "signed the

15 agreement on behalf of Peregrine." (Id. at 43.) Needless to say, these allegations are insufficient

16 to show Nelson "knew or must have been aware of the improper revenue recognition . . . ."

17 DSAM, 288 F.3d at 391.

18         (iv)    **CI Software Solutions**

19         Lastly, according to the Complaint, "Peregrine entered into several transactions with CI

20 Software Solutions" ("CI Software") for which Peregrine booked the orders as revenue although CI

21 Software was under no obligation to pay for the software until it was sold-through to the end-user.

22 (Complaint Attached Exh. "E" at 50.) The revenue from one of the transactions was allegedly

23 recorded "in the fourth quarter of fiscal year 2000 . . . ." (Id.) The Complaint then alleges "Nelson

24 knew" these transactions were "improper." (Id.) As support, the Complaint points to an email

25 Nelson allegedly wrote on April 18, 2001: "The original Reseller Agreement between the

26 companies was put in place largely because we were led to believe that CI [Software] would be

27 successful in winning CSC as a Peregrine System customer for asset management, which has yet to

28 happen." (Id.) These allegations fail to show Nelson "knew or must have been aware of the

1  improper revenue recognition . . .."  <u>DSAM</u>, 288 F.3d at 391.  Indeed, the email Nelson allegedly

2  wrote suggests that he believed "that CI [Software] would be successful in winning CSC as a

3  Peregrine System customer . . .."

4        Moreover, the revenue from this alleged improper transaction was recorded "in the fourth

5  quarter of fiscal year 2000", which ended March 30, 2000.  There are, however, no allegations that

6  "point[ ] to inconsistent contemporaneous statements or information . . . which were made by or

7  available to" Nelson before March 30, 2000 or at the time of his alleged statement following the

8  fourth quarter of 2000 on April 26, 2000.  <u>In re GlenFed</u>, 42 F.3d at 1548; <u>see also</u>, <u>In re Silicon</u>

9  <u>Graphics Inc. Securities Litigation</u>, 183 F.3d at 1000 (The Complaint must plead "contrast[s]

10  between what [Defendant] w[as] hearing internally about and what [he] was telling the public **at**

11  **the same time.**") (Emphasis original); <u>In re Read-Rite Corp.</u>, 335 F.3d at 847 ("[W]e hold that the

12  district court correctly concluded that Plaintiffs did not point to any specific evidence, such as

13  contemporaneous reports or statements of others, in support of their allegations of scienter.").  As

14  such, the transaction does not give rise to scienter.

15        **f.     Insider Trading.**

16        Plaintiffs allege that a strong inference of scienter exists because of widespread insider

17  trading on the part of various Defendants.  "Insider trading in suspicious amounts or at suspicious

18  times is probative of bad faith and scienter."  <u>In re Apple Computer Securities Litigation</u>, 886 F.2d

19  1109, 1117 (9th Cir. 1989); <u>see also</u>, <u>In re Daou Systems, Inc. Securities Litigation</u>, 397 F.3d at

20  718 ("[T]he PSLRA neither prohibits nor endorses the pleading of insider trading as evidence of

21  scienter, but requires that the evidence meet the 'strong inference' standard.").  But, "[i]nsider

22  trading is suspicious only when it is dramatically out of line with prior trading practices at times

23  calculated to maximize the personal benefit from undisclosed inside information." <u>Silicon</u>

24  <u>Graphics</u>, 183 F.3d at 986.  "Among the relevant factors to consider are: (1) the amount and

25  percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were

26  consistent with the insider's prior trading history."  <u>Id</u>.  "The central question, then, is whether the

27  stock transactions in question were so 'suspicious' or 'unusual' as to give rise to the strong

28  inference of fraudulent intent."  <u>Ressler v. Liz Claiborne, Inc.</u>, 75 F.Supp.2d 43, 58 (E.D.N.Y.

Exhibit F
0576

1    1999). "[M]ere pleading of insider trading, without regard to context or strength of inferences to

2    be drawn, is not enough . . . . At a minimum, the trading must be in a context where defendants

3    have incentives to withhold material, nonpublic information, and it must be unusual, well beyond

4    the normal patterns of trading by those defendants." In re Securities Litigation BMC Software,

5    Inc., 183 F.Supp.2d 860, 900 (S.D.Tex. 2001). "Even if these factors reveal stock sales to be

6    'suspicious,' some courts will not infer scienter on the basis of stock sales alone." In re Copper

7    Mountain Securities Litigation, 311 F.Supp.2d 857, 874 (N.D.Cal. 2004) (Citations omitted). See

8    also, Ronconi, 253 F.3d at 435 ("[N]ot every sale of stock by a corporate insider shows that the

9    share price is about to decline. A corporate insider may sell stock to fund major family expenses,

10    diversify his portfolio, or arrange his estate plan. He may sell stock twice a year when the college

11    tuition for his children is due.").

12         Against this backdrop, the Court will determine whether a Defendant's alleged insider

13    trading shows scienter on his part. Before doing so, however, the Court notes the following

14    limitations. As previously noted, Plaintiffs cannot state a claim based on allegations of insider

15    trading. This is because Plaintiffs' case is based on the "fraud on the market" theory. See,

16    Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971, 975 (9th Cir. 1999). (See also,

17    Complaint ¶ 48.) Moreover, the Complaint does not allege that any of the Plaintiffs traded shares

18    at the same time as the Defendants. Standing to assert a duty to disclose extends only to

19    contemporaneous traders during the alleged insider trading. See, 15 U.S.C. § 78t-1 (Limiting

20    standing for insider trading claims to plaintiffs that "contemporaneously" bought or sold securities

21    of the same class); In re Seagate Technology II Securities Litigation, 843 F.Supp. at 1370

22    ("Because plaintiffs here were not contemporaneous traders during the alleged insider trading, they

23    have no standing to assert the duty to disclose imposed upon insider traders."). Therefore, the

24    Complaint's allegations that certain Defendants engaged in insider trading without making

25    disclosure of material information do not state a claim. (See, Complaint ¶ ¶ 16 and 177).

26    Similarly, Plaintiffs cannot establish scienter based on allegations that from February 15, 2000 to

27    February 19, 2000, certain Defendants engaged in insider trading based on undisclosed information

28    relating to Peregrine's acquisition of Harbinger. Plaintiffs do not allege any false or misleading

Exhibit F
0577

1    statements relating to Peregrine's acquisition of Harbinger.  See, In re Vantive Corp. Securities

2    Litigation, 283 F.3d at 1094.  Moreover, and because the Complaint does not allege Defendants

3    made any statements regarding the Harbinger merger, they did not have a duty to disclose anything

4    about the proposed merger.  See, Friedman v. Royovac Corp., 295 F.Supp.2d at 988 ("[E]ven if a

5    reasonable investor would want to know an omitted fact, there is no duty to disclose it unless

6    omitting it alters the meaning of a statement that was made.").  With these limitations in mind, the

7    Court will now determine whether each Defendant's alleged insider trading establishes scienter on

8    the part of any particular Defendant.

9             (i)     **Luddy's Insider Trading.**

10            As previously noted,  the Complaint fails to state a Section 10(b) claim against Luddy.

11   Luddy has neither employed a scheme to defraud or made any false or misleading statements.

12   Thus, the Court need not address whether Luddy's scienter, but will do so anyways.

13            Luddy's alleged insider trading does not establish scienter on his part.  The Complaint

14   alleges Luddy sold 368,789 shares, and received gross proceeds totaling $11,823,660.44.

15   (Complaint ¶ 332.)  Before the Class Period, the Complaint alleges, Luddy held 416,144 shares and

16   sold 397,196, or 95% of his holdings.  (Id. ¶ 334.)  During the Class Period, Luddy held 465,763

17   shares and sold 465,763, or 100% of his Class Period holdings.  (Id.)  Approximately 75% of

18   Luddy's proceeds from insider sales were derived from sales during the Class Period.

19            Based on these figures, Luddy's sales were not dramatically out of line with his trading

20   before the Class Period.  His sales were relatively consistent, and Luddy did not sell significantly

21   more stock during the Class Period than he did before it.  In fact, Luddy sold virtually the same

22   amount of shares.  Moreover, "[l]arge numbers of stock sales by themselves do not necessarily

23   create a strong inference of fraud."  In re Syncor Intern. Corp. Securities Litigation, 327 F.Supp.2d

24   1149, 1164 (C.D.Cal. 2004).  Rather, as noted above, the Court must find the stock sales to be

25   "dramatically out of line with prior trading practices at times calculated to maximize the personal

26   benefit from undisclosed inside information."  Silicon Graphics, 183 F.3d at 986; Osher v. JNI

27   Corp., 256 F.Supp.2d 1144, 1163 (S.D.Cal. 2003) ("[U]nusual or suspicious stock sales by

28   corporate insiders constitute circumstantial evidence of scienter only if the trading is 'dramatically

02cv870-BEN (RBB)

Exhibit F
0578

1    out of line with prior trading practices at times calculated to maximize the personal benefit from

2    the undisclosed inside information.'"). The sales in which Luddy engaged during the Class Period

3    adhered to the pattern of his prior sales and do not appear to be "unusual" in either their amount or

4    their timing.

5          The Complaint also fails to tie Luddy's sales with any of the alleged false or misleading

6    statements. The "trading must coincide with false or misleading statements--a missing link in this

7    case. Absent additional evidence, it is not possible to draw a strong inference of scienter based on

8    improper trading on material, non-public information." In re Navarre Corp. Securities Litigation,

9    299 F.3d 735, 748 (8th Cir. 2002) (Citations omitted). "Finally, [Luddy] is not alleged to have

10   uttered a word, or have participated in preparing statements, during the entire [C]lass [P]eriod.

11   There accordingly is no basis for finding circumstantial evidence of fraud in [Luddy's] stock

12   sales." In re Vantive Corp. Securities Litigation, 283 F.3d at 1094; see also, Silicon Graphics, 183

13   F.3d at 987-88 (Insider's failure to utter any of the allegedly false statements helped dispel an

14   inference of fraud that the plaintiffs asserted flowed from that insider's stock sales). (See also,

15   Plaintiffs' Opposition at 6:3-4: Luddy "is not quoted in press releases or did not personally speak

16   to securities analysts . . . ."); Chan v. Orthologic Corp., 1998 WL 1018624 at *12 n. 9 (D.Ariz.

17   1998) ("Plaintiffs cannot use allegations of insider trading to attribute misstatements to insiders

18   who are not otherwise identified as [responsible] for such misstatements."); Head v. NetManage,

19   Inc., 1998 WL 917794 at *5 (N.D.Cal. 1998) (Defendant's trades not suspicious, "particularly in

20   light of the fact that he is not alleged to have personally made any of the false statements").

21        **(ii)    Van den Berg's Insider Trading.**

22          According to the Complaint, "[b]efore the Class Period, van den Berg held 402,144 shares

23   and sold 270,000, or 67% of his holdings. During the Class Period, on February 22, 2000, van den

24   Berg held 78,744 shares and sold 40,000 or 51% of his Class Period holdings. (Complaint ¶ 365.)

25   The Complaint further alleges "[a]ll 40,000 shares were sold during [Peregrine's] imposed black-

26   out period." (Id.) As alleged, van den Berg's alleged insider trading does not establish scienter.

27          "The mere fact that insider stock sales occurred does not suffice to establish scienter."

28   Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1224 (1st Cir.1996). To create an inference of

Exhibit F
0579

1   scienter, Plaintiffs must establish that the stock sales during the Class Period were "suspicious" or

2   "unusual." In re Apple Computer Secs. Litig., 886 F.2d at 1117 ("Insider trading in suspicious

3   amounts or at suspicious times is probative of bad faith and scienter").  Van den Berg's insider

4   trading was isolated or limited to a single occurrence.  This is not sufficient to enhance any

5   inference of scienter.  In other words, van den Berg's "trading history is too limited to give rise to

6   an inference of intent to defraud." In re Securities Litigation BMC Software, Inc., 183 F.Supp.2d

7   at 901 -902; see also, In re Silicon Graphics, 183 F.3d at 987 (Stock sales cannot be viewed as

8   'unusual' where defendant "ha[s] no significant trading history for purposes of comparison").

9          Moreover, no inference can be drawn that van den Berg wanted to "maximize [his]

10  personal benefit from undisclosed inside information." In re Silicon Graphics, 183 F.3d at 986.

11  The Complaint alleges van den Berg violated Section 10(b) by making false or misleading

12  statements about the financial health of Peregrine in May 2000, including statements in: (a) 10-K

13  for the Fiscal Year 2000, which was published in May 10, 2000, and (b) May 22, 2000

14  Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal.  (See,

15  Plaintiffs' Opposition at 7:23-25.)  But ven den Berg allegedly engaged in the insider trading

16  before he made the statements--in February 2000--not after.  See, Wenger v. Lumisys, Inc., 2

17  F.Supp.2d at 1251 (Stock sales not suspicious where "none of the sales occurred at suspicious

18  times such as immediately before a negative earnings announcement").  Lastly, that van den Berg

19  allegedly traded during Peregrine's imposed black-out period, by itself, is insufficient to establish

20  that his trading was "suspicious."  According to the Complaint, "from September 1, 1999 through

21  February 8, 2001, there was a black out on trading by Peregrine insiders based on a series of

22  Company events.  As a result, during the Class Period, although there were 699 public trading

23  days, the black-out periods referenced above meant that officers and directors could trade during

24  only 225 of those days."  (Complaint ¶ 234.)  "But, courts have repeatedly held that the mere

25  existence of stock sales does not raise a strong inference of fraudulent intent.  Plaintiffs have the

26  burden at the pleading stage of explaining why the stock sales were unusual or suspicious." In re

27  PETsMART, 61 F.Supp.2d at 1000.  What the Complaint fails to allege is what these "series of

28  Company events" were and why or how they were significant to van den Berg's, or any other

Exhibit F
0580

1    Defendant's, mental state. See, Ochs v. Shearson Lehman Hutton Inc., 768 F.Supp. 418, 427

2    (S.D.N.Y. 1991) ("Knowledge is a state of mind. So is intent to defraud, or 'scienter.'").

3        **(iii)    Nelson's Insider Trading.**

4        The Complaint alleges "[b]efore the Class Period Nelson held 386,500 shares and sold

5    133,500, or 35% of his holdings. During the Class Period, Nelson held 457,451 shares and sold

6    375,000, or 82% of his Class Period holdings. Approximately 90% of Nelson's proceeds from

7    insider sales were derived from sales during the Class Period." (Complaint ¶ 315.) As the

8    Complaint reflects, during the Class Period, Nelson sold shares two times, August 1999 and

9    February 2001. In August 1999, Nelson sold 87,500 shares, which consisted of 40% of his

10   holdings at that time. In February 2001, Nelson sold 200,000 shares of a total 276,000, or 72% of

11   his total holdings. Based on these allegations, the Court previously found that Nelson's trading did

12   not establish scienter on his part. (See, Order dated November 21, 2003 at 67-69.) The Complaint

13   makes no additional, or materially different, allegations. The insider trading allegations are

14   essentially identical to the claims of insider trading allegations the Court previously dismissed.

15   Thus, for the same reasons stated in the Court's original Order, Nelson's alleged insider trading

16   does not establish scienter on his part.

17       **(iv)    Noell's Insider Trading.**

18       Noell's alleged insider trading does not establish scienter on his part. The Complaint

19   alleges "[b]efore the Class Period, Noell held 515,428 shares and sold 274,000 or 53% of his

20   holdings. During the Class Period, Noell held 187,543 shares and sold 174,375, or 93% of his

21   Class Period holdings. Approximately 74% of Noell's proceeds from insider sales were derived

22   from sales during the Class Period." (Complaint ¶ 358.) According to the Compliant, however,

23   Noell's trading during the Class Period occurred once in February 2000, and twice in February

24   2001. (Id. at 356.) As alleged, Noell's "trading history is too limited to give rise to an inference of

25   intent to defraud." In re Securities Litigation BMC Software, Inc., 183 F.Supp.2d at 901 -902; see

26   also, In re Silicon Graphics, 183 F.3d at 987 (Stock sales cannot be viewed as 'unusual' where

27   defendant "ha[s] no significant trading history for purposes of comparison"). Moreover, Noell

28   received at most $43 per share--well below the peak stock price of $79. Accordingly, his alleged

- 105 -

Exhibit F
0581

1  sales were not "calculated to maximize the personal benefit from the undisclosed inside

2  information." Silicon Graphics, 183 F.3d at 986.

3       (v)    **Watrous' Insider Trading.**

4       The Complaint alleges "[b]efore the Class Period, Watrous held 20,000 shares and sold

5  10,000, or 50% of his holdings.  During the Class Period, Watrous held 25,000 shares and sold

6  15,000 or 60% of his Class Period holdings.  Almost 86% of Watrous's proceeds from insider

7  sales were derived from sales during the Class Period." (Complaint ¶ 368.)  Watrous alleged

8  insider trading during the Class Period occurred only one time--February 25, 2000.  (Id.¶ 367.)  As

9  alleged, Watrous's "trading history is too limited to give rise to an inference of intent to defraud."

10  In re Securities Litigation BMC Software, Inc., 183 F.Supp.2d at 901-902; see also, In re Silicon

11  Graphics, 183 F.3d at 987 (Stock sales cannot be viewed as 'unusual' where defendant "ha[s] no

12  significant trading history for purposes of comparison").

13       (vi)    **Cole's Insider Trading.**

14       The Complaint alleges "[b]efore the Class Period, Cole held 2,523,284 shares and sold

15  330,000, or 13% of his holdings.  During the Class Period, Cole held 2,339,534 shares and sold

16  1,304,000 or 56% of his Class Period holdings.  Almost 86% of Cole's proceeds from insider sales

17  were derived from sales during the Class Period." (Complaint ¶ 362.)  Cole's alleged insider

18  trading occurred during July 1999, August 1999, February 2000, February 2001, November 2001,

19  November 2002, and February 2002.  See, Silicon Graphics, 183 F.3d at 986 (In determining

20  whether stock sales give rise to scienter, the court must consider "the timing of the sales . . . .').

21  The fraudulent conduct attributed to Cole are his alleged misleading statements in Amendment No.

22  1 to the S-4 Registration Statement on Harbinger merger proposal and Amendment No.1 to the S-4

23  Registration Statement on Remedy merger proposal.  These statements were filed with the SEC on

24  May 22, 2000 and July 23, 2001 respectively.  "[S]tock sales are helpful only in demonstrating that

25  certain statements were misleading and made with knowledge or deliberate recklessness when

26  those sales are able to be related to the challenged statements." In re Vantive, 283 F.3d at 1093.

27  None of Cole's alleged sales took place immediately following the dissemination of his alleged

28  false or misleading statements, or otherwise linked to those statements.  See, In re Navarre Corp.

02cv870-BEN (RBB)

Exhibit F
0582

1  Securities Litigation, 299 F.3d at 748. Moreover, Cole received at most $50 per share--well below

2  the peak stock price of $79. Accordingly, his alleged sales were not "calculated to maximize the

3  personal benefit from the undisclosed inside information." Silicon Graphics, 183 F.3d at 986.

4  Cole's alleged insider trading does not establish scienter on his part.

5       (vii)   Moores's Insider Trading.

6       The volume of shares Moores sold was greater than that of any other Defendant.

7  According to the Complaint, "[b]efore the Class Period, Moores held 39,098,756 shares and sold

8  17,123,768, or 44% of his holdings. During the Class Period, Moores held 18,515,263 shares and

9  sold 17,407,841, or 94% of his Class Period holdings. 72% of Moores' total proceeds from insider

10 sales of Peregrine stock were derived from sales during the Class Period." (Complaint ¶ 348.)

11 However, "[l]arge numbers of stock sales by themselves do not necessarily create a strong

12 inference of fraud." In re Syncor Intern. Corp. Securities Litigation, 327 F.Supp.2d at 1164; see

13 also, Wenger v. Lumisys, Inc., 2 F.Supp.2d 1231, 1251 (N.D.Cal. 1998)( "[S]tock sales alone

14 cannot create a strong inference of scienter." ); In re Splash Technology Holdings, Inc. Securities

15 Litigation, 160 F.Supp.2d 1059,1081 (N.D.Cal. 2001) ("Although viable circumstantial evidence

16 of scienter, stock sales alone cannot create a strong inference of scienter."). Similarly, as noted,

17 "[i]nsider stock sales are not inherently suspicious; they become so only when the level of trading

18 is 'dramatically out of line with prior trading practices at times calculated to maximize the personal

19 benefit from undisclosed inside information.'" In re Vantive Corp., 283 F.3d at 1092 (quoting

20 Ronconi, 253 F.3d at 435). "[C]omplaints based on insider trading must allege more than that the

21 defendant benefitted from trading because of a false statement or misleading omission; the insider

22 trades have to be 'unusual,' either in the amount of profit made, the amount of stock traded, the

23 portion of stockholdings sold, or the number of insiders involved, before they will give rise to the

24 required inference of scienter." Florida State Bd. of Admin. v. Green Tree Financial Corp., 270

25 F.3d 645, 659 (8th Cir. 2001).

26       Even if stock sales alone sufficed, the sales here do not appear unusual nor suspicious. As

27 noted above, to determine scienter, the Court must consider the timing of Moores's alleged sales.

28 According to the Complaint, Moores sold his shares during July 1999, February 2000, and

Exhibit F
0583

1   February 2001. (Complaint ¶ 346.)  The fraudulent conduct Moores allegedly engaged in was

2   making false or misleading statements in the: (a) 10-K for the Fiscal Year 2000, (b) 10-K for the

3   Fiscal Year 2001, (c) Amendment No.1 to the S-4 Registration Statement on Harbinger merger

4   proposal, and (d) Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal.

5   These statements were filed with the SEC on May 10, 2000, June 29, 2001, May 22, 2000, and

6   July 23, 2001.  As such, none of the alleged sales are related to, or immediately following, the

7   alleged making of the false or misleading statements.  See, In re Navarre Corp. Securities

8   Litigation, 299 F.3d at 748; Wenger v. Lumisys, Inc., 2 F.Supp.2d at 1251 (Stock sales not

9   suspicious where "none of the sales occurred at suspicious times such as immediately before a

10   negative earnings announcement").  Moreover, Moores received at most about $53.00 per share--

11   far below the peak stock price of $79.  (Complaint ¶ 346.)  Thus, his sales were not "calculated to

12   maximize the personal benefit from the undisclosed inside information."  Silicon Graphics, 183

13   F.3d at 986.  Accordingly, as alleged, Moores' alleged insider trading do not establish scienter on

14   his part.

15      g.    Allegations of Improper Motive To Commit Fraud.

16      Defendants' motive to falsely report Peregrine's revenue is repeatedly referenced in the

17   Complaint.  (See, e.g., Complaint ¶¶ 82-83 ).  For example, Plaintiffs allege that Defendants had a

18   motive to inflate the stock price because a high price would help them pursue "acquisitions and

19   strategic alliances while using [Peregrine's] common stock as currency for these purchases or

20   alliances."  (Id. ¶ 83; see also, Id. ¶ 3: "The higher the price of Peregrine stock, the fewer the

21   number of shares Peregrine would have to issue for each acquisition.  That was significant to the

22   individually named defendants herein who served as officers or directors Peregrine because they

23   owned a substantial number of shares of Peregrine common stock and did not want the value of

24   their holdings diluted by the issuance of too many new shares.  Thus, in order to keep up the price

25   of the Company's stock, it was imperative that Peregrine meet Wall Street's expectations and

26   continue to report strong demand for its products so that investors could expect record sales and

27   earnings growth to continue quarter after quarter.")  Under the PSLRA, these generalized

28   assertions of motive, without more, are inadequate to establish scienter.  Plaintiffs fail to attribute

- 108 -

02cv870-BEN (RBB)

1   the alleged motive to any particular Defendant.  Moreover, such motivations are far too common to

2   support an inference of scienter.  See, Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir.

3   2002) ("If scienter could be pleaded merely by alleging that officers and directors possess motive

4   and opportunity to enhance a company's business prospects, virtually every company in the United

5   States that experiences a downturn in stock price could be forced to defend securities fraud actions.

6   [Defendants'] alleged desires to obtain favorable financing and to expand abroad are in themselves

7   ordinary and appropriate corporate objectives.  Such routine business objectives, without more,

8   cannot normally be alleged to be motivations for fraud.  To hold otherwise would be to support a

9   finding of fraudulent intent for all companies that plan to lower costs and expand sales."); Abrams

10  v. Baker Hughes Inc., 292 F.3d 424, 434 (5th Cir. 2002) ("The plaintiffs allege that the defendants

11  were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive

12  compensation and the desire to sell stock at inflated prices. This court has held that similar

13  allegations were insufficient to support an inference of scienter."); Nathenson v. Zonagon Inc.,

14  267 F.3d 400, 420 (5th Cir. 2001) ("[A]llegations that corporate officers and directors would

15  benefit from enhancing the value of their stock and/or stock options and that the corporation would

16  benefit by receiving more for its shares to be issued in [an upcoming] public offering are . . .

17  insufficient to support a strong inference of scienter."); Tuchman v. DSC Communications Corp.,

18  14 F.3d 1061, 1068-69 (5th Cir.1994) ("Incentive compensation can hardly be the basis on which

19  an allegation of fraud is predicated . . . [W]ere the opposite true, the executives of virtually every

20  corporation . . . would be subject to fraud allegations.  It does not follow that because executives

21  have components of their compensation keyed to performance, one can infer fraudulent intent.");

22  Tarica v. McDermott Int'l, Inc., 2000 WL 1346895 at *10 (E.D.La. 2000) (Corporate acquisitions

23  do not provide legally sufficient bases for scienter; they "are routine corporate events, and the

24  courts reject motive theories that would almost universally permit an inference of fraud").

25          h.      Arthur Andersen and AWSC's Scienter.

26          As previously noted, Arthur Andersen is potentially responsible for their alleged false audit

27  opinions, or statements, in Peregrine's Form 10Ks filed in 2000 and 2001 as well as the two S-4

28  Registrations Peregrine filed in connection with Harbinger and Remedy merger proposals.  AWSC

- 109 -

02cv870-BEN (RBB)

1   is potentially responsible only for the two S-4 Registrations. According to the Complaint, "Arthur

2   Andersen was engaged by Peregrine to provide independent auditing and accounting services

3   throughout the Class Period" and AWSC assisted Arthur Andersen. (Complaint ¶¶ 402 and 456.)

4   Most of the allegations against both Arthur Andersen and AWSC are substantially identical,

5   though the allegations against Arthur Andersen are more inclusive. Thus, for purposes of

6   efficiency, the Court will refer to Arthur Andersen when analyzing scienter on the part of both

7   Defendants.

8       To adequately allege scienter, the Complaint must now show that Arthur Andersen's

9   "accounting practices were so deficient that the audit amounted to no audit at all, or an egregious

10  refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which

11  were made were such that no reasonable accountant would have made the same decisions if

12  confronted with the same facts." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385,

13  390 (9th Cir. 2002). The Complaint must allege "facts to establish that [Arthur Andersen] knew or

14  must have been aware of the improper revenue recognition, intentionally or knowingly falsified the

15  financial statements, or that the audit was such 'an extreme departure' from reasonable accounting

16  practice that [Arthur Andersen] 'knew or had to have known' that its conclusions would mislead

17  investors." Id. at 390-391. Thus, recklessness on the part of an independent auditor entails a

18  mental state so culpable that it "approximate[s] an actual intent to aid in the fraud being

19  perpetrated by the audited company." Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 121 (2d

20  Cir.1982); Pegasus Fund, Inc. v. Laraneta, 617 F.2d 1335, 1341 (9th Cir.1980) (Auditor's

21  recklessness "must come closer to being a lesser form of intent [to deceive or defraud] than merely

22  a greater degree of ordinary negligence.") (Internal quotations omitted).

23      Aside from the foregoing pleading requirements, Plaintiffs must also meet several

24  additional obstacles. First, a large independent accountant will rarely, if ever, have any rational

25  economic incentive to participate in its client's fraud. Unlike the officers and directors of the

26  companies it represents, an independent accountant has no ability to line its pockets through insider

27  trading, and no incentive to cover up corporate mismanagement. The accountant's success

28  depends on maintaining a reputation for honesty and integrity, requiring a plaintiff to overcome the

02cv870-BEN (RBB)

Exhibit F
0586

1    irrational inference that the accountant would risk its professional reputation to participate in the

2    fraud of a single client.  See, In re Worlds of Wonder Securities Litig., 35 F.3d 1407, 1427 n.7 (9th

3    Cir. 1994); Melder v. Morris, 27 F.3d 1097, 1103 (5th Cir.1994); DiLeo v. Ernst & Young, 901

4    F.2d 624, 629 (7th Cir. 1990) ("An accountant's greatest asset is its reputation for honesty,

5    followed closely by its reputation for careful work.  Fees for two years' audits could not approach

6    the losses [defendant] would suffer from a perception that it would muffle a client's fraud.").

7            Second, because an independent accountant often depends on its client to provide the

8    information base for the audit, it is almost always more difficult to establish scienter on the part of

9    the accountant than on the part of its client.  See, Bily v. Arthur Young & Co., 834 P.2d 745, 762

10   (1992) ("An auditor is a watchdog, not a bloodhound.  As a matter of commercial reality, audits are

11   performed in a client-controlled environment."); Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir.

12   2000) ("[T]he failure of a non-fiduciary accounting firm to identify problems with the defendant-

13   company's internal controls and accounting practices does not constitute reckless conduct

14   sufficient for § 10(b) liability."); Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000) (Reversing

15   dismissal of securities complaint in favor of corporation and its officers, but affirming dismissal as

16   to independent accountant).

17           Lastly, the report generated by an independent accountant often represents a "professional

18   opinion based on numerous and complex factors."  Bily v. Arthur Young & Co., 834 P.2d at 763.

19   "Although ultimately expressed in shorthand form, the report is the final product of a complex

20   process involving discretion and judgment on the part of the auditor at every stage. Using different

21   initial assumptions and approaches, different sampling techniques, and the wisdom of 20-20

22   hindsight, few CPA audits [are] immune from criticism."  Id.; see also, In re GlenFed, Inc.

23   Securities Litig., 42 F.3d 1541, 1549 (9th Cir. 1994) (En banc) (Recognizing that "flexible

24   accounting concepts do not always (or perhaps ever) yield a single correct figure."); Lovelace v.

25   Software Spectrum, Inc., 78 F.3d 1015, 1020-21 (5th Cir.1996) (Same).  "In sum, the lack of a

26   rational economic incentive for an independent accountant to participate in fraud, the client's

27   central role in providing information to the accountant, and the complex professional judgment

28   required to perform an audit, make it exceedingly difficult for a securities plaintiff to plead facts

- 111 -

02cv870-BEN (RBB)

1  suggesting that an independent accountant acted with the deliberate state of mind now required to

2  withstand a motion to dismiss." Reiger v. Price Waterhouse Coopers, LLP, 117 F.Supp.2d 1003,

3  1008 (S.D.Cal. 2000). Against this backdrop, the Complaint fails to show scienter on the part of

4  Arthur Andersen or AWSC.

5       The Complaint first alleges that "[i]n its audit opinions, Arthur Andersen falsely

6  represented that Peregrine's financial statements for fiscal years 2000 and 2001 were presented in

7  accordance with GAAP and that Arthur Andersen's audits had been performed in accordance with

8  GAAS." (Complaint ¶ 402.) The Complaint also alleges that "Arthur Andersen knew, or was

9  deliberately reckless with regard to the fact that Peregrine's financial statements were not prepared

10  in conformity with GAAP, causing Arthur Andersen's reports to be in violation of GAAS and SEC

11  rules." (Complaint ¶ 412; see also, ¶ 417: "Arthur Andersen's intentional and/or deliberately

12  reckless design of stock option plans and the accounting therefor ... violated GAAP ....").

13  These allegations are conclusory and insufficient to show scienter. Plaintiffs have not alleged

14  knowing or severely reckless publishing of materially false information by specific factual

15  allegations. Nor do Plaintiffs show what Arthur Andersen's method of auditing was and whether it

16  was rejected by industry practice or an independent auditor's opinion. "Therefore, [P]laintiffs have

17  insufficiently pleaded scienter based on conscious behavior or severe recklessness with respect to

18  [Arthur Andersen's] non-compliance with GAAP." Mortensen v. AmeriCredit Corp., 123

19  F.Supp.2d 1018, 1026 -1027 (N.D.Tex. 2000); see also, In re Comshare, Inc. Sec. Litig., 183 F.3d

20  at 553 ("Although Plaintiffs speculate that it is likely that Defendants knew of the GAAP

21  violations because they occurred over a long period of time, claims of securities fraud cannot rest

22  on speculation and conclusory allegations.").

23       Moreover, "[t]he mere publication of inaccurate accounting figures, or a failure to follow

24  GAAP, without more, does not establish scienter." In re Software Toolworks Inc., 50 F.3d 615,

25  627 (9th Cir. 1994). "[S]cienter requires more than a misapplication of accounting principles."

26  DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d at 390. "Courts [also] uniformly hold

27  that allegations of GAAP and GAAS violations are insufficient, without more, to state a securities

28  fraud claim." Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 362 (1st Cir. 1994); see also,

02cv870-BEN (RBB)

1  <u>Reiger v. Altris Software</u>, 1999 WL 540893 at *7 (S.D.Cal. 1999) ("[A]llegations that an

2  accountant or auditor conducted an inadequate audit by violating accounting or auditing principles

3  do not, without more, adequately plead a strong inference of scienter."); <u>Chill v. General Elec. Co.</u>,

4  101 F.3d 263, 270 (2d Cir.1996) ("Allegations of a violation of GAAP provisions or SEC

5  regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud

6  claim."). Indeed, "mistakes in accounting calculations, unreasonable accounting procedures, or

7  even outright violations of professional standards, without more, simply do not establish scienter."

8  <u>In re Ikon Office Solutions, Inc. Securities Litigation</u>, 131 F.Supp.2d 680, 692 (E.D.Pa. 2001); <u>see</u>

9  <u>also, In re Worlds of Wonder</u>, 35 F.3d 1407, 1426 (9th Cir. 1994) ("The mere publication of

10 inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish

11 scienter."). "Only where such allegations are coupled with evidence that the violations or

12 irregularities were the result of the defendant's fraudulent intent to mislead investors may they be

13 sufficient to state a claim." <u>City of Philadelphia v. Fleming Companies, Inc.</u>, 264 F.3d 1245, 1261

14 (10th Cir. 2001); <u>see also, Abrams v. Baker Hughes, Inc.</u>, 292 F.3d 424, 432 (5th Cir. 2002) ("The

15 party must know that it is publishing materially false information, or must be severely reckless in

16 publishing such information."). No such allegations have been made.

17        The Complaint next alleges "Arthur Andersen knew from its audit and review work, or was

18 deliberately reckless with regard to the fact that [Peregrine] had material weaknesses in its internal

19 accounting control structure such that no reliance could be placed on [Peregrine's] financial

20 reporting system . . . which in light of [Peregrine's] tremendous growth, was a blatant 'red flag'

21 that Arthur Andersen chose to ignore . . . ." (Complaint ¶ 406, 422 and 423.)  Again, these

22 allegations are insufficient because they are not pled with the particularity required by the PSLRA.

23 There are no specifics as to how "Arthur Andersen knew from its audit and review work . . . that

24 [Peregrine] had material weaknesses in its internal accounting control structure." The Complaint

25 must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately

26 reckless or conscious misconduct." <u>DSAM Global Value Fund v. Altris Software, Inc.</u>, 288 F.3d at

27

28

- 113 -

02cv870-BEN (RBB)

1  388 -389.  If allegations are made on information and belief[23], "a plaintiff must provide, in great

2  detail, all the relevant facts forming the basis for her relief." In re Silicon Graphics Inc. Securities

3  Litigation, 183 F.3d at 985.  "There are no allegations identifying specific conversations, Board

4  meetings, or reports where [Arthur Andersen] purportedly learned of the true and adverse

5  information." In re Peerless Systems, Corp. Securities Litigation, 182 F.Supp.2d 982, 994

6  (S.D.Cal. 2002).  Notwithstanding, "a plaintiff cannot establish scienter by arguing that an

7  independent auditor ignored a client's lack of internal controls, failed to exercise additional

8  scrutiny despite knowing its client had reasons to engage in fraudulent accounting due to its need

9  to raise additional financing and desire to locate an acquirer or merger partner, and neglected to

10  investigate obvious and easily discoverable fraud." In re SCB Computer Technology, Inc.

11  Securities Litigation, 149 F.Supp.2d 334, 363 (W.D.Tenn 2001); see also, Reiger v. Price

12  Waterhouse Coopers LLP, 117 F.Supp.2d at 1009 n. 5 ("Plaintiffs also rely on boilerplate 'red

13  flags,' present in almost every securities fraud action, that the audited company had weak internal

14  accounting controls and needed to report strong revenues.  These allegations do not meet the

15  particularity and strong inference requirements of the Reform Act, and do not warrant further

16  comment.").  "[E]ven if [Arthur Andersen] failed to report such deficiencies . . . , such failure is

17  not a basis for concluding that [Arthur Andersen] misrepresented that its audit report complied

18  with GAAS." In re SmarTalk Teleservices Securities, Inc. Litigation, 124 F.Supp.2d 505, 524

19  (S.D.Ohio 2000) see also, Monroe v. Hughes, 31 F.3d 772, 774-75 (9th Cir. 1994) ("Neither

20  applicable professional standards nor any legal authority of which we are aware, however, treat

21  deficiencies in internal controls of a company as material to the audit report itself.").

22      The Complaint next alleges "Arthur Andersen falsely endorsed the propriety of Peregrine's

23  financial statements because it desired to retain Peregrine as a client, to continue generating

24  substantial fees from its engagement and to secure additional business from Peregrine, including

25  lucrative consulting business."  (Complaint ¶ 407; see also, ¶ 409: "Arthur Andersen [] earned

26  substantial fees from Peregrine . . . for consultation relating to business valuations, consultation

27  _____

28  [23] "Allegations are deemed to have been made on information and belief until the plaintiffs demonstrate that they have personal knowledge of the facts." In re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1085 (9th Cir. 2002).

02cv870-BEN (RBB)

Exhibit F
0590

1 related to tax matters, and assistance with due diligence and acquisition-related matters.").

2 Scienter can be pleaded by alleging a defendant had a motive and opportunity to commit fraud.

3 Motive entails "concrete benefits that could be realized by one or more of the false statements and

4 wrongful nondisclosures alleged" while opportunity entails "the means and likely prospect of

5 achieving concrete benefits by the means alleged." Shields v. Citytrust Bancorp, Inc., 25 F.3d

6 1124, 1130 (2nd Cir. 1994). Most courts have held that an accounting firm's desire to maintain the

7 fees flowing from the relationship with its client, standing alone, is not a sufficient "motive" to

8 raise a strong inference of scienter. See, In re Worlds of Wonder Sec. Litig., 35 F.3d at 1427 n.7

9 ("It is highly improbable that an accountant would risk surrendering a valuable reputation for

10 honesty and careful work by participating in a fraud merely to obtain increased fees."); DiLeo v.

11 Ernst & Young, 901 F.2d 624, 629 (7th Cir. 1990) (Rejecting allegations that accounting firm's

12 desire to garner fees from clients was sufficient motive to commit fraud: "An accountant's greatest

13 asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two

14 years' audits could not approach the losses [the accountant] would suffer from a perception that it

15 would muffle a client's fraud."); Melder v. Morris, 27 F.3d 1097, 1103 (5th Cir. 1994) (Rejecting

16 as economically irrational plaintiff's claim accounting firm's purported motive to garner fees); In

17 re Health Management, Inc. Sec. Litig., 970 F.Supp.192, 202 (E.D.N.Y. 1997) (Rejecting motive

18 and opportunity allegations against independent accounting firm because "receipt of professional

19 fees is not a sufficient motive to plead a 'strong inference' of scienter."); Zucker v. Sasaki, 963

20 F.Supp. 301, 308 (S.D.N.Y. 1997) ("[M]ere receipt of compensation and the maintenance of a

21 profitable professional business relationship for auditing services does not constitute a sufficient

22 motive for purposes of pleading scienter."); Kennilworth Partners L.P. v. Cendant Corp., 59

23 F.Supp.2d 417, 429 (D.N.J. 1999) ("[S]tatement[s that] could be made in relation to the auditor of

24 every corporation" are not sufficient to raise the inference of scienter, because "if it were sufficient

25 . . ., it might make every auditor liable in cases of securities fraud.").

26        The Complaint then alleges "[i]t was known to Arthur Andersen that [Peregrine's

27 accounting] policy had been changed for application to the fourth quarter of fiscal year 1999, that it

28 had been changed to provide for revenue recognition immediately upon execution of a software

02cv870-BEN (RBB)

Exhibit F
0591

1  license agreement with resellers even though there was no commitment to pay and no identified

2  end user committed to pay, and to allow the Company to meet fourth quarter and year end

3  published earnings and revenue forecasts.  Arthur Andersen knew the new policy would continue

4  to be applied going forward." (Complaint ¶ 413.)  The Complaint also alleges "Arthur Andersen . .

5  . was routinely consulted by . . .  Gless regarding how to structure transactions with customers so

6  as to permit current and improper revenue recognition.  Arthur Andersen also knew of and

7  approved the failure of the Company to treat transactions with financial institutions as borrowings

8  rather than sales." (Id. ¶ 406.)  These allegations are conclusory.  What is missing are "specific

9  facts demonstrating [Arthur Andersen's] knowledge or state of mind . . . ."  In re Homestore.com,

10  Inc. Securities Litigation, 252 F.Supp.2d at 1043; see also, Yadlosky v. Grant Thornton, L.L.P.,

11  120 F.Supp.2d 622, 631 (E.D.Mich. 2000) ("Plaintiff's allegation that the auditors knew or should

12  have known 'that many of MCA's properties were illegally pledged as collateral for more than one

13  party' lacks alleged factual support for the conclusion.").  The Complaint must "plead, in great

14  detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious

15  misconduct."  DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d at 388-389.  It does

16  not.

17        To be sure, the Complaint points to "an email dated April 12, 2001" alleging that it

18  "identified revenue recognition issues" including identifying "contracts totaling $12,000,000 as

19  involving improper revenue recognition." (Complaint ¶ 429.)  Again, "[t]hese allegations are

20  insufficient because they are not pled with the particularity required by the PSLRA."  Osher v. JNI

21  Corp., 308 F.Supp.2d 1168, 1187 (S.D.Cal. 2004).  Plaintiffs again fail to state "the sources of

22  [their] information with respect to the [emails], [and] how [they] learned of the [emails] . . . ."

23  Silicon Graphics, 183 F.3d at 985.  Indeed, "[i]t is not sufficient for a plaintiff[s'] pleadings to set

24  forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will

25  validate [their] claim."  Id.  "Silicon Graphics and the PSLRA require Plaintiffs to allege the

26  specific content of the documents upon which the plaintiff relied, identifying who prepared and

27  who reviewed them, and setting out sources of . . . information with respect to the reports."  In re

28  Peerless Systems, Corp. Securities Litigation, 182 F.Supp.2d 982, 994 (S.D.Cal. 2002) (Citations

- 116 -                                    02cv870-BEN (RBB)

1    omitted).  If Plaintiffs are relying on a "confidential source", they must "reveal with particularity

2    the sources of their information . . . . Naming sources is unnecessary so long as the sources are

3    described with sufficient particularity to support the probability that a person in the position

4    occupied by the source would possess the information alleged and the complaint contains adequate

5    corroborating details."  In re Daou Systems, Inc. Securities Litigation, 397 F.3d at 712 (Citations

6    and quotations omitted).  The Complaint fails to meet these requirements.

7         Moreover, the allegations are insufficient so show scienter.  Even allegations that an

8    independent auditor possessed documents that would have revealed improper revenue recognition

9    if they had been properly reviewed pursuant to GAAP and GAAS, only "raise an inference of gross

10   negligence, but not fraud."  Reiger v. Price Waterhouse Coopers, LLP 117 F.Supp.2d at 1012.  In

11   Software Toolworks, the plaintiffs alleged that sales agreements were "poorly documented,

12   informal and conditional," the transactions were risky, management was under pressure for

13   favorable earnings and the accountants obtained only oral confirmations of some agreements, the

14   Ninth Circuit found that such allegations that an accountant failed to investigate established only a

15   negligent audit rather than scienter.  50 F.3d at 627-28.  In DSAM, it was alleged that the auditor

16   egregiously failed to detect millions of dollars in revenue that had been improperly recognized in

17   violation of GAAP, the Ninth Circuit affirmed the district court's dismissal of the complaint.  288

18   F.3d at 387.  The court held that "mere allegations that an accountant negligently failed to closely

19   review files or follow GAAP cannot raise a strong inference of scienter."  Id. at 390 (citing

20   Software Toolworks, 50 F.3d at 628).  Even where the defendant accounting firm allegedly "had in

21   its hands the very documentation that clearly showed [the company's] violation of GAAP," the

22   Ninth Circuit affirmed the district court's finding of no scienter.  DSAM, 288 F.3d at 390-91

23   ("Appellants argue that Pricewaterhouse must have consciously disregarded the improper revenue

24   recognition because it had access to the documents that revealed Altris' improper revenue

25   recognition at the very time it conducted the original audit.  That fact does not strongly compel an

26   inference of intentional or deliberately reckless conduct as opposed to ordinary carelessness.").

27         In sum, Plaintiffs have failed to allege any facts to establish that Arthur Andersen or

28   AWSC knew or must have been aware of the improper revenue recognition, intentionally or

- 117 -

02cv870-BEN (RBB)

1  knowingly falsified the financial statements, or that the audit was such an extreme departure from

2  reasonable accounting practice that it knew or had to have known that its conclusions would

3  mislead investors.  The Complaint suffers from the same deficiency identified by the court in

4  DSAM.  There, the plaintiff alleged that the defendant's auditor "egregiously failed to see the

5  obvious" GAAP violations in the financial statements.  288 F.3d at 387.  The plaintiff in DSAM

6  alleged specific "red flags" that should have put the defendant on notice of the GAAP violations.

7  In particular, the fees for the transaction at issue were exorbitant, the transaction was recorded on

8  the last day of the year, and the transaction was described as "special."  These facts all suggested

9  that the auditor should have undertaken further investigation before approving the transaction.  Id.

10  at 389.  Despite the admitted failure to comply with GAAP and the undisputedly suspicious nature

11  of the transaction, the court held that "the allegations of negligence are insufficient to establish a

12  strong inference of deliberate recklessness."  Id. at 391.  Thus, under DASM, even an obvious

13  failure to follow GAAP does not give rise to an inference of scienter.

14          The Complaint also fails to identify with sufficient particularity any letters, notes, memos,

15  telephone calls, or conversations that suggest that Arthur Andersen and AWSC knew about

16  Peregrine's revenue scheme.  Plaintiffs' purported "red flags" consist of Arthur Andersen's

17  possession of documentation which, if properly reviewed under GAAP and GAAS, would have

18  revealed improperly recognized revenue.  At most, however, these allegations raise an inference of

19  gross negligence, but not fraud.  Plaintiffs must allege facts showing that the magnitude and

20  obviousness of Peregrine's accounting errors was so severe that Arthur Andersen's audit

21  transcended mere negligence and represented either a disregard of the obvious errors or a refusal to

22  identify the fraud.  The Complaint does nothing more than allege violations of GAAP, which

23  cannot alone establish scienter.

24          Nor does the Complaint allege that Arthur Andersen or AWSC had an extensive role in the

25  management of a Peregrine, thus putting on notice of the fraud.  Moreover, inferring scienter from

26  the magnitude of Peregrine's fraud invites a court to speculate as to the existence of specific

27  warning signs that show Arthur Andersen acted with scienter.  See, Reiger v. Price Waterhouse

28  Coopers LLP,117 F.Supp.2d at 1013 ("Inferring scienter from the magnitude of fraud invites a

- 118 -

02cv870-BEN (RBB)

Exhibit F
0594

1   court to speculate as to the existence of specific (but unpled and unidentified) warning signs that

2   show the accountant acted with scienter.  To travel from magnitude of fraud to evidence of

3   scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of

4   inferences."); see also, Zucker v. Sasaki, 963 F.Supp. 301, 308 (S.D.N.Y. 1997) (Holding that

5   plaintiff failed to establish scienter where plaintiff's "allegations refer simply to violations of basic

6   auditing principles without reference as to how [auditor's] violations were the result of intentional

7   deceit or how they rise to the level of recklessness").  Magnitude of fraud only supports an

8   inference of scienter when the plaintiff alleges specific and detailed facts showing that the

9   magnitude either enhanced the suspiciousness of specifically identified transactions or made the

10   overall fraud glaringly conspicuous.  Id.  Further, Arthur Andersen and AWSC's relationship with

11   Peregrine "does not impute the accountant with knowledge of every idiosyncratic detail associated

12   with [Peregrine's] business."  Reiger v. Price Waterhouse Coopers LLP, 117 F.Supp.2d at 1009.

13   For all the foregoing reasons, the Complaint fails to show Arthur Andersen or AWSC acted with

14   scienter.

15         **D.    Conclusion.**

16         For the reasons set forth above, the Complaint fails to state a claim under Section 10(b) and

17   Rule 10b-5 against Nelson, Luddy, Moores, Noell, Cole, van den Berg, Hosley, Savoy, Watrous,

18   Dammeyer, Stulac, Arthur Andersen, and AWSC.  Specifically, the Complaint fails to allege

19   Luddy, Dammeyer, and Stulac either employed a scheme to defraud or made any statements.  As to

20   other Defendants, while the Complaint sufficiently alleges a primary act on their part in that they

21   made statements, it fails to allege they did so with scienter. There are no allegations identifying

22   specific conversations, board meetings, or reports where these individuals purportedly learned of

23   the true and adverse information regarding Peregrine's fraud.  Further, there are no allegations

24   showing that any of these Defendants directed sales personnel to enter into contingent contracts, or

25   otherwise directed the alleged improper revenue recognition.  Accordingly, in this regard, these

26   Defendants' Motions are GRANTED.

27   ///

28   ///

02cv870-BEN (RBB)

Exhibit F
0595

## V.

## CLAIMS AND LIABILITY UNDER SECTION 14(a) and RULE 14a-9.

Plaintiffs Waga and Sutliff allege violations of Section 14(a) of the Exchange Act, 15 U.S.C. §78n and Rule 14a-9, 17 C.F.R. §240.14 against Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, Arthur Andersen, AWSC, and Stulac on behalf of the Harbinger Subclass, while Plaintiffs Balch and Hylton allege these violations against Gardner, Gless, Moores, Savoy, Cole, Noell, Watrous, Dammeyer, Arthur Andersen, AWSC, and Stulac on behalf of the Remedy Subclass. (Complaint ¶¶ 678, 698, 717 and 734.)

Section 14(a) makes it unlawful

for any person . . . in contravention of such rules and regulations as the [SEC] may prescribe . . . , to solicit or to permit the use of his name to solicit any proxy . . . .

15 U.S.C. § 78n(a). Rule 14a-9(a) of the Proxy Regulations (17 C.F.R. § 240.14a-9) states that "No solicitation subject to this regulation shall be made . . . which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." Id. A misstatement or omission is material under Rule 14a-9 "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).[24]

At the outset, the Complaint fails to adequately allege that Stulac and AWSC either "solicit[ed] or . . permit[ed] the use of [their] names to solicit any proxy . . . ." 15 U.S.C. § 78n(a). The Complaint bases Section 14 and Rule 14a-9 liability on two proxies. The first proxy was "included in Peregrine's May 22, 2000 Amendment 1 to its S-4 Registration Statement filed with the SEC and distributed to Harbinger shareholders . . . ." (Complaint ¶ 699.) The Complaint alleges Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg and Watrous signed the proxy. (Id. ¶ 681.) The Complaint also alleges "Arthur Andersen and AWSC consented to the use of

---

[24] Whether the proxies contained materially false statements is not an issue. As discussed above, at this stage, the Complaint adequately alleges the statements at issue, including Peregrine's financial statements included in the proxies, were misleading as they omitted material information.

02cv870-BEN (RBB)

Exhibit F
0596

1  Arthur Andersen's name" in the proxy. (<u>Id</u>. ¶ 700.)

2      The second proxy was "included in Peregrine's July 23, 2001 Amendment 1 to its S-4

3  Registration Statement filed with the SEC and distributed to Remedy shareholders . . . ." (<u>Id</u>. ¶

4  735.) The Complaint alleges Gardner, Gless, Moores, Savoy, Cole, Noell, Watrous, and

5  Dammeryer signed the proxy. (<u>Id</u>. ¶ 720.) The Complaint also alleges "Arthur Andersen and

6  AWSC also consented [to] the inclusion and/or to the incorporation by reference . . . of Arthur

7  Andersen's unqualified audit reports on Peregrine's consolidated financial statements . . . ." (<u>Id</u>. ¶

8  737.)

9      As alleged, the Complaint fails to state a claim against Stulac and AWSC. The Complaint

10 is silent as to Stulac's role with regard to the proxies, and the Court has already found that

11 "Stulac's name appears nowhere in the Registration Statements" and thus "cannot be held liable . .

12 . for false or misleading statements found therein." (Order dated January 21, 2004 at 5:22-25.) As

13 for AWSC, the Complaint does not allege AWSC was named, or that it signed, or permitted the

14 use of its name, in the proxies or the Registration Statements. It merely alleges AWSC consented

15 to the use of Arthur Andersen's name or audit reports in the proxies. "Neither Section 14(a) nor

16 Rule 14a-9 suggests that liability may attach in an instance in which a defendant has not actively

17 solicited proxies, but merely has observed another doing so on behalf of the same camp in the

18 proxy dispute." <u>Caspary v. Louisiana Land and Exploration Co.</u>, 579 F.Supp. 1105, 1110

19 (D.C.N.Y. 1983); <u>see also</u>, <u>Mendell v. Greenberg</u>, 612 F.Supp. 1543, 1552 (D.C.N.Y. 1985)

20 ("Since plaintiff does not allege that Drexel directly solicited any proxies or was a party to such

21 solicitations, any claim of liability as a principal against Drexel is legally insufficient."). For this

22 threshold reason, the Complaint fails to state a Section 14(a) claim against AWSC and Stulac.

23     All other moving Defendants assert the Complaint fails to allege, with sufficient

24 particularity, that they acted with the required state of mind. With the exception of Gless, Gardner,

25 and Arthur Andersen, the Court agrees.

26     Unlike Section 10(b), pleading scienter is not required for stating a Section 14(a) and Rule

27 14a-9 claims. The required standard is negligence. (<u>See</u>, Order dated November 21, 2003 at 91:

28 "[T]his Court finds that negligence is the appropriate standard for § 14(a) actions."); <u>see also</u>, <u>In re</u>

Exhibit F
0597

1  <u>McKesson HBOC, Inc. Securities Litigation</u>, 126 F.Supp.2d 1248, 1267 (N.D.Cal. 2000)

2  ("Plaintiff concedes that the negligence required for a Section 14(a) claim is a 'state of mind.'");

3  <u>Bond Opportunity Fund v. Unilab Corp.</u>, 2003 WL 21058251 at *4 (S.D.N.Y. 2003) ("Numerous

4  other courts have held that the negligence standard also applies to § 14(a) claims against individual

5  defendants."). "In enforcing that standard, courts should apply the standard of due diligence rather

6  than the standard of actual knowledge or gross negligence." <u>In re Reliance Securities Litigation</u>,

7  135 F.Supp.2d 480, 511 (D.Del. 2001).

8         Like Section 10(b) claims, however, to adequately plead Section 14(a) and Rule 14a-9

9  claims, Plaintiffs "must comply with heightened pleading requirements of the PSLRA." (<u>Id.</u> at

10  92:5-6.) Thus, Plaintiffs must "state with particularity all facts giving rise to a strong inference

11  that the defendant acted with" negligence. 15 <u>U.S.C.</u> § 78u-4(b)(2); <u>see also</u>, <u>In re McKesson</u>

12  <u>HBOC, Inc. Securities Litigation</u>, 126 F.Supp.2d at 1267 ("[A] Section 14(a) plaintiff must plead

13  with particularity facts that give rise to a strong inference of negligence."). Mere allegations that

14  Defendants "acted negligently and without due care in distributing, or causing to be distributed, the

15  Joint Proxy Statement containing the false and misleading statements [and] omissions" will not

16  suffice. <u>Id</u>.

17         Here, there is no question that Gless acted with the requisite state of mind.  In his plea

18  agreement filed in the Court, and attached to the Complaint, Gless admitted that he "signed and

19  submitted the [] financial reports, knowing that they contained materially false statements and

20  omissions and intending to deceive and defraud the securities analysts, the SEC, the investing

21  public, and others who rely upon them[.]" (Complaint Attached Exh. A, Gless Plea Agreement ¶

22  9.) <u>See also</u>, <u>Parrino v. FHP, Inc.</u>, 146 F.3d at 705-06 (District court may "consider material which

23  is properly submitted [or attached] as part of the complaint . . . ."). The Complaint also alleges that

24  the proxies "incorporated Peregrine's audited financial statements." (Complaint ¶¶ 547, 592, 676

25  and 715.) Thus, the Complaint adequately states a claim against Gless for both proxies filed in

26  connection with the Harbinger and Remedy mergers.

27         Similarly, the attachments to the Complaint show with sufficient particularity that Gardner

28  also acted with the requisite state of mind, but only as to the Remedy proxy.  According to the

02cv870-BEN (RBB)

Exhibit F
0598

1   Complaint, revenue was improperly recognized in a swap transaction involving Critical Path Inc.

2   ("Critical Path") at the end of September 2000. (Complaint Attached Exh. "E" at 17.) In his guilty

3   plea, David Thatcher, the former president of Critical Path, stated that "[the] transaction was

4   driven by the need to report revenue . . . ." (Id.) In order "[t]o avoid the appearance that the

5   transaction was a software swap, Critical Path and Peregrine prepared separate contracts for each

6   purchase, each paid the full amounts owed, and made payment to each other on different days."

7   (Id.) Moreover, Thatcher acknowledged speaking directly to Gardner about the software swap.

8   (Id.: "I spoke with the CEO of Peregrine about the software swap.") (See also, Complaint ¶ 36.)

9   Thatcher further noted that persons "working on the deal were **consciously** avoiding disclosure of

10  the true nature of the transaction." (Id.) (Emphasis added). Additionally, the Complaint alleges

11  that each company "swapped" software at approximately $3 million from one another and booked

12  the total value of the sale as revenue in violation of GAAP. (Complaint attached Exhibit "F".)

13       While the Complaint does not specifically allege in which of the Peregrine's quarterly

14  financial statements the Critical Path transaction was recorded, it does allege Peregrine entered into

15  the transaction the end of September 2000 which "gave rise to improper revenue recognition by

16  Peregrine." (Complaint attached Exh. "F".)  Thus, the Court can reasonably draw an inference

17  that the transaction was recorded in the second quarter of 2001, ending September 30, 2000.  The

18  Complain thus alleges with sufficient particularity facts giving rise to a strong inference that

19  Gardner either knew or should have known that Peregrine's financial statement for the second

20  quarter of 2001, which was included in the Remedy proxy, was overstated by about 3 million

21  dollars and thus false or misleading. (See, Complaint ¶¶ 592 and 721.)

22       However, the Complaint does not sufficiently allege that Gardner acted with the requisite

23  state of mind with respect to the Harbinger proxy. According to the Complaint, the proxy included

24  "Peregrine's audited financial statements for the fiscal year ending March 31, 2000", i.e., financial

25  statements for 2000. (Complaint ¶¶ 547 and 682.) The only alleged improper transaction

26  Peregrine entered into that year was with Corporate Software & Technology.  According to the

27  Complaint, Peregrine prematurely booked revenue on a $3.8 million transaction with Corporate

28  Software "immediately upon execution of the agreement." (Complaint Attached Exh. "K".)

02cv870-BEN (RBB)

1    Unlike the above Critical Path transaction, the Complaint fails to show that the transaction was

2    necessarily entered into the generate artificial revenue despite the fact that the transaction was

3    improperly recorded as revenue. Thus, the Complaint fails to allege with sufficient particularity

4    facts giving rise to a strong inference that Gardner either knew or should have known that

5    Peregrine's financial statement for the fiscal year 2000 was overstated.

6           Turning to Arthur Andersen, the Complaint alleges with sufficient particularity that Arthur

7    Andersen was negligent. The Complaint alleges "plenty of warning signs existed that should have

8    alerted Arthur Andersen . . . that severe problems existed with [Peregrine's] accounting. Auditor

9    guidelines for items that should receive special consideration identified almost the exact type of

10   situation as the one that existed at Peregrine, such as significant sales volume occurring near the

11   end of the quarter, unusual volume of sales to resellers, barter transactions and side agreements.

12   Messages about 'bad revenue,' inquiries from the SEC, and complaints about revenue recognition

13   were either provided to Arthur Andersen, discovered by it or readily available to it had it sought to

14   look." (Complaint ¶ 706.) The Complaint also alleges "Arthur Andersen [was] . . . involved in

15   designing [Peregrine's] stock option compensation plan, which allowed for the exercise prices to

16   be below the common stock market values when the options were granted. This plan was also a

17   part of Peregrine's restatement, and a further sign that should have alerted Arthur Andersen . . .

18   that a problem existed at Peregrine." (Id. ¶ 708.) The Complaint further alleges Arthur Andersen

19   "designed a stock option compensation plan for Peregrine employees that, when applied, was a[] . .

20   . violation of GAAP" and specifically explains why it was so. (Id. ¶ 417.) Still further, the

21   Complaint alleges specific facts that put Arthur Andersen on notice that Peregrine was recording

22   revenue in violation of GAAP. (Id. ¶ 414.)

23          At this stage, the "[C]ourt must accept as true Plaintiffs' assertions that Arthur Andersen

24   failed to abide by [GAAP] requirements." In re Sunterra Corp. Securities Litigation, 199

25   F.Supp.2d 1308, 1333 (M.D.Fla. 2002). While such allegations do not raise an inference of

26   scienter, they do "raise an inference of gross negligence" which goes beyond the required standard.

27   Reiger v. Price Waterhouse Coopers LLP, 117 F.Supp.2d at 1012. See also, In re Reliance

28   Securities Litigation, 135 F.Supp.2d at 511 ("[C]ourts should apply the standard of due diligence

- 124 -

02cv870-BEN (RBB)

1    rather than the standard of actual knowledge or gross negligence.").

2        As to all other Defendants--Moores, Cole, Hosley, Noell, van den Berg, Watrous, Savoy,

3    and Dammeyer--the Complaint fails to "state with particularity all facts giving rise to a strong

4    inference that the [D]efendants acted with" negligence. 15 U.S.C. § 78u-4(b)(2). The Complaint

5    relies on the April 14, 1999 board meeting and the review and outlook reports discussed above to

6    show that these Defendants were negligent. (Complaint ¶¶ 686, 687 and 715.) However, as

7    explained above, there is no particular information in the alleged April 1999 meeting and the

8    review and outlook reports from which Defendants could have learned of the falsity of Peregrine's

9    financial statements. Nor does the Complaint point to any specific information Defendants

10   overlooked that would have warned them that Peregrine was engaging in fraud. Bond Opportunity

11   Fund v. Unilab Corp., 2003 WL 21058251 at *4 ("[W]here plaintiffs contend that the defendants

12   had access to facts contrary to those stated in the proxy materials, they must specifically identify

13   the reports or statements containing this information."). "Under Section 14(a), the Defendants are

14   'only responsible for revealing those material facts reasonably available to them.'" Hayes v.

15   Crown Central Petroleum Corp., 249 F.Supp.2d 725, 733 (E.D.Va. 2002) (Citations omitted).

16   Moreover, that these Defendants signed the proxies does not speak to their state of mind. See,

17   SEC v. U.S. Environmental, 155 F.3d at 111. Plaintiffs have failed to describe with particularity

18   actions that these Defendants could have taken to discover the accounting improprieties. Thus,

19   Plaintiffs have failed to plead with particularity facts establishing a strong inference of negligence.

20       In sum, the Complaint states a Section 14(a) claim against Gless and Arthur Andersen as to

21   both the Harbinger and Remedy proxies. As to Gardner, the Complaint only states a Section 14(a)

22   claim as to the Remedy proxy. As to all other Defendants--Moores, Cole, Hosley, Noell, van den

23   Berg, Watrous, AWSC, and Stulac, the Complaint fails to adequately state a Section 14(a) claim.

24                                          **VI.**

25               **CONTROL LIABILITY UNDER SECTION 20(a).**

26       The Complaint alleges Section 20(a) liability against Moores, Nelson, Noell, Cole, van den

27   Berg, Hosley, Watrous, Savoy, and Dammeyer "based on their control of Peregrine." (See,

28   Complaint ¶ 669.) The Complaint further alleges Section 20(a) liability against "Moores based on

                                          - 125 -

Exhibit F
0601

1   his control of . . . Gardner, Gless, Nelson, Luddy, Noell, van den Berg, and Hosley, and against

2   AWSC and Stulac based on their control of Arthur Andersen. (See, Complaint ¶ 669, 672, 673,

3   689, 712, 725 and 748.)

4        Section 20(a) of the Exchange Act provides:

5        Every person who, directly or indirectly, controls any person liable under any provision of
         this chapter or of any rule or regulation thereunder shall also be liable jointly and severally
6        with and to the same extent as such controlled person to any person to whom such
         controlled person is liable, unless the controlling person acted in good faith and did not
7        directly or indirectly induce the act or acts constituting the violation or cause of action.

8   15 U.S.C. § 78t(a).

9        "To establish 'controlling person' liability, the plaintiff must show that a primary violation

10  was committed and that the defendant 'directly or indirectly' controlled the violator." Paracor

11  Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996). "[I]t is not

12  necessary to show actual participation or the exercise of actual power" over the violator. Howard

13  v. Everex Systems, Inc., 228 F.3d 1057, 1065 (9th Cir. 2000). That is "[p]laintiff need not show

14  that the defendant was a culpable participant in the violation . . . ." Id; see also, Hollinger v. Titan

15  Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990) (En banc) ("Today . . . we hold that a plaintiff

16  is **not** required to show 'culpable participation' to establish that [defendant] was a controlling

17  person under § 20(a).") (Emphasis original).[25] Thus, "[t]o establish the liability of a controlling

18  person, the plaintiff does not have the burden of establishing that person's scienter distinct from

19  the controlled corporation's [or the individual's] scienter." Arthur Children's Trust v. Keim, 994

20  F.2d 1390, 1398 (9th Cir. 1993); see also, In re Cylink Securities Litigation, 178 F.Supp.2d 1077,

21  1089 (N.D.Cal. 2001) ("Despite the urging of at least one of the individual defendants, plaintiffs

22  need not allege the controlling person's scienter or that they 'culpably participated' in the alleged

23  wrongdoing."). Similarly, "the question that must be answered on a motion to dismiss is whether

24  plaintiffs have adequately alleged that defendants possessed power or influence over the controlled

25

26        [25] The Ninth Circuit had a different controlling liability test as set out in Wool v. Tandem
          Computers, Inc., 818 F.2d 1433, 1440 (9th Cir.1987) (Plaintiff must allege that 1) the individual
27        defendants had the power to control or influence [the company] and 2) the individual defendants were
          culpable participants in [the company's] alleged illegal activity). The second prong of this test was
28        overruled in Hollinger v. Titan Capital Corp., 914 F.2d at1575 (9th Cir.1990); see also, Howard, 228
          F.3d at 1066, n. 10.

- 126 -

Exhibit F
0602

1   person, but not whether such power or influence was in fact exercised in the transactions in

2   question." In re Musicmaker.com Securities Litigation, 2001 WL 34062431 at *16 (C.D.Cal.

3   2001).

4          Plaintiffs here prevail on the first prong. As noted above, to "establish 'controlling person'

5   liability" Plaintiffs must first "show that a primary violation was committed" under the Exchange

6   Act, i.e., either Section 10(b) or Section14(a). Paracor Finance, Inc. v. General Elec. Capital

7   Corp., 96 F.3d at 1161. Plaintiffs allege "Peregrine violated Section 10(b) . . . by issuance of

8   materially false or misleading statements." (Complaint ¶ 671.) Although Peregrine is not a party

9   to this action, Plaintiffs adequately allege that Gless and Gardner have violated Sections 10(b) and

10  14(a) of the Exchange Act. See, Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1435 (9th

11  Cir. 1995) ("In litigation involving Section 10(b) of the Securities Exchange Act and SEC Rule

12  10b-5, even though a corporation is incapable of acting except through individual directors and

13  officers, the cumulative knowledge of its directors and officers is imputed to it . . . . [A]

14  corporation's knowledge need not be possessed by a single officer or agent; the cumulative

15  knowledge of all its agents will be imputed to the corporation."); In re Stat-Tech Securities

16  Litigation, 905 F.Supp. 1416, 1422 (D.Colo. 1995) ("Because a corporation can act only through

17  its agents, the rule is that the actions of corporate officers and directors are attributable to the

18  corporate entity."). Similarly, as discussed above, Plaintiffs adequately allege Arthur Andersen's

19  primary liability under Section 14(a).

20         Turning to the second prong: "Whether the defendant is a controlling person is an intensely

21  factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the

22  corporation and the defendant's power to control corporate actions." Howard v. Everex Systems,

23  Inc., 228 F.3d at 1065; see also, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1441 (9th

24  Cir.1987) ("[T]he concept of control, in the context of the securities law, is an elusive notion for

25  which no clear-cut rule or standard can be devised."). "The SEC has defined 'control' to mean:

26  '[T]he possession, direct or indirect, of the power to direct or cause the direction of the

27  management and policies of a person, whether through ownership of voting securities, by contract,

28  or otherwise.'" Howard v. Everex Systems, Inc., 228 F.3d at 1065, quoting 17 C.F.R. § 230.405.

- 127 -

Exhibit F
0603

1    Moreover, Plaintiffs must plead the circumstances of the control relationship with sufficient

2    particularity.  See, In re Oak Technology Securities Litigation, 1997 WL 448168 at *14 (N.D.Cal.

3    1997) ("While Plaintiffs correctly note that section 20(a) 'premises liability solely on the control

4    relationship,' they fail to recognize the requirement that the circumstances of that 'control

5    relationship' be pled with particularity."); Wietschner v. Monterey Pasta Co., 294 F.Supp.2d 1102,

6    1110 (N.D.Cal. 2003); Howard v. Hui, 2001 WL 1159780 at *4 (N.D.Cal. 2001) (Same).

7        "[T]he status or position of an alleged controlling person, by itself, is insufficient to

8    presume or warrant a finding of power to control or influence."  Wool v. Tandem Computers Inc.,

9    818 F.2d 1433, 1441 (9th Cir. 1987).  Similarly, "[m]ere titles are not adequate indicators of

10    control authority."  Wanetick v. Mel's of Modesto, Inc., 811 F.Supp. 1402, 1407 (N.D.Cal. 1992).

11    Rather, Plaintiffs must "show[] that [Defendants] w[ere] active in the day-to-day affairs of

12    [Peregrine] or that [they] exercised . . . specific control over the preparation and release of the

13    financial statements."  Howard v. Everex Systems, Inc, 228 F.3d at 1067 n. 13.  Merely alleging

14    that Defendants "'reviewed and approved financial statements . . . does not rise to a level of

15    supervision or participation sufficient for a § 20(a) violation."  Id.  Nor is "ownership of stock," by

16    itself, sufficient.  Id.

17        Here, as to Moores, Nelson, Noell, Cole, van den Berg, Hosley, Watrous, Savoy, and

18    Dammeyer, there are no particularized allegations that they were in active in day-to-day affairs of

19    Peregrine.  As the Court previously found, "that the Board held nine meetings in Fiscal Year 2000

20    and nineteen meetings in Fiscal Year 2001 does not establish that any individual board members

21    were actively involved with Peregrine on a daily basis."  (Court's Order dated November 21, 2003

22    at 96:22-24.)  Nor are there sufficient allegations to show that these Defendants were in any way

23    involved in the alleged misleading press releases other than that they "read and approved" them.

24    Indeed, in many instances, the Complaint even expressly excludes Savoy, Dammeyer, Hosley, and

25    van den Berg from the individuals who allegedly read and approved the statements.  And, although

26    the Complaint alleges Nelson was the "principal draftsman of the press releases," (Complaint ¶

27    298), such allegations are insufficient.  See, In re Splash Technology Holdings, Inc. Securities

28    Litigation, 2000 WL 1727405 at *16 (N.D.Cal. 2000).  Equally insufficient are Plaintiffs'

02cv870-BEN (RBB)

Exhibit F
0604

1  conclusory allegations that these Defendants qualify as "controlling persons of Peregrine" by

2  "virtue of their executive positions, Board membership, and stock ownership . . . [and that] these

3  [D]efendants had the power to influence and control (and did influence and control, directly or

4  indirectly) the decision-making of [Peregrine], including the content and dissemination."

5  (Complaint ¶ 670.)  See, In re Gupta Corp. Securities Litigation, 900 F.Supp. 1217, 1242-1243

6  (N.D.Cal. 1994).

7       To be sure, the Complaint does allege Moores, Noell, Cole, van den Berg, Hosley,

8  Watrous, Savoy signed some of the alleged false or misleading SEC filings.  However, as the Court

9  found, under Ninth Circuit law, "[a]lthough a signature strongly suggests that an outside director

10  could exercise control, absent allegations of particularized facts of a control relationship, active

11  involvement in the Company's day-to-day affairs, or control over the preparation and release of

12  financial statements, Section 20(a) liability has not been sufficiently alleged."  (Id.); see also, In re

13  Splash Technology Holdings, Inc. Securities Litigation, 2000 WL 1727405 at *16 ( [Defendant's]

14  signature unquestionably suggests the possibility of control.  Likewise, the complaint's general,

15  conclusory allegations of [defendant's] access to unspecified inside information and his purported

16  ability to prevent the issuance of the alleged false reports in this case suggest the possibility of

17  control.  Although close, these general allegations do not constitute particular evidence of

18  control.").

19       With regard to Moores, Plaintiffs further allege he controlled the identity of Peregrine's

20  executives, kept contact with various board members regarding Peregrine's affaires, and placed

21  business associates on Peregrine's Audit Committee or Board.  (See, Complaint ¶¶ 372, 375, 377,

22  378, 379, 380.)  These allegations are insufficient.  "The control person inquiry looks at the day-to-

23  day affairs of the company, not pre-existing or even on-going personal or professional relationships

24  between the control person and the purported controllee."  In re Homestore.com, Inc. Securities

25  Litigation, 347 F.Supp.2d 790, 810 (C.D.Cal. 2004); see also, Paracor Fin., Inc. v. General Elec.

26  Capital Corp., 96 F.3d 1151, 1162 (9th Cir.1996) (Internal quotations omitted) (Control inquiry

27  revolves around the "management and policies of the corporation . . . .").  Plaintiffs also allege

28  Moores was a founder of Peregrine and owned substantial shares of Peregrine.  (Complaint ¶¶ 370

Exhibit F
0605

1   and 373.)  Again these allegations do not necessarily mean that Moores exercised control over the

2   "management and policies" of Peregrine, nor that he directed its day-to-day affairs in any sense.

3   As noted above, "at least some indicia of such control is a necessary element of 'controlling

4   person' liability."  Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1163 (9th

5   Cir. 1996) (Dismissing on allegations that defendant "founded [the Company] in 1974, sold it for

6   $30 million in 1981, and returned as CEO and Chairman in 1985.").

7        Plaintiffs also fail to state a control liability claim against Stulac and AWSC.  As explained

8   above, to establish liability as a 'controlling person,' Plaintiffs must allege with particularity facts

9   demonstrating "the defendant's participation in the day-to-day affairs of the corporation and the

10  defendant's power to control corporate actions."  Howard, 228 F.3d at 1065.  Further, "control" is

11  defined as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the

12  management and policies of a person[.]" 17 C.F.R. § 230.405.  No particularized allegations are

13  made showing that either Stulac or AWSC "had the power to control or influence [Arthur

14  Andersen]."  Harmonic, 163 F. Supp. 2d at 1086.  Accordingly, Plaintiffs fail to state a Section

15  20(a) claim against Moores, Nelson, Noell, Cole, van den Berg, Hosley, Watrous, Savoy,

16  Dammeyer, Sutlac, and Arthur Andersen.

17                                    **VII.**

18                **CLAIMS AND LIABILITY UNDER SECTION 11.**

19        In Counts VI and VIII, the Complaint alleges Gardner, Gless, Moores, Cole, Hosley, Noell,

20  van den Berg, Watrous, Savoy, Arthur Andersen and AWSC violated Section 11 of the 1933 Act.

21  For the reasons that follow, the Complaint adequately states a claim against all Defendants under

22  Section 11, except for AWSC.

23        At the outset, the Court denies Plaintiffs' request to strike Moores, Noell, van den Berg,

24  Hosley, and Savoy's motions to dismiss.  (Docket No. 536.)  Plaintiffs appear to move to strike the

25  motions under Fed.R.Civ.P. 12(f).  Under that Rule, the court "may order stricken from any

26  pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

27  Id.  "Under the express language of the rule, only pleadings are subject to motions to strike."

28  Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983); see also, Thomas &

- 130 -                        02cv870-BEN (RBB)

1    Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 161

2    (C.D.Cal. 2002) ("Defendants move to strike the declaration of Robert Tollison, plaintiffs' expert.

3    At the outset, the Court notes that the present Motion is not properly a motion to strike, which

4    should be addressed to the pleadings only."); Wimberly v. Clark Controller Co., 364 F.2d 225, 227

5    (6th Cir.1966) (Rule 12(f) "specifically relates to matters to be stricken from pleadings but does

6    not make provision for testing the legal sufficiency of affidavits by a motion to strike"); Dawson v.

7    City of Kent, 682 F.Supp. 920, 922 (N.D.Ohio 1988) (Rule 12(f) "relates only to pleadings and is

8    inapplicable to other filings"), aff'd 865 F.2d 257 (6th Cir.1988); Ernest Seidelman Corp. v.

9    Mollison, 10 F.R.D. 426, 427 (S.D.Ohio 1950) ("Rule 12(f) is applicable only to motions to strike

10   portions of 'pleadings.'"). But see, Mount Sinai Hospital v. Borg-Warner Corp., 527 F.Supp. 922,

11   926 (D.C.N.Y. 1981) ("While Federal Rule of Civil Procedure 12(f) authorizes the court on its

12   own motion to order stricken 'any pleading' that contains 'impertinent, or scandalous matter,' the

13   Court is of the view that it encompasses briefs, affidavits or any document submitted to the

14   Court."). Rule 12(f), therefore, does not provide a proper basis for striking Defendants' motions.

15        Moreover, Plaintiffs' basis for moving to strike is without merit. Plaintiffs argue that

16   Defendants should not permitted to move to dismiss because the Court upheld the Section 11

17   claims against them in the original complaint. However, when Plaintiffs amended their complaint,

18   that complaint superseded the original one and is the operative complaint. See, Gonzalez v. Paine,

19   Webber, Jackson & Curtis, Inc., 493 F. Supp. 499, 501 (S.D.N.Y. 1980).

20        Turning to the merits, "Section 11 provides for civil liability for filing a false registration

21   statement." Falkowski v. Imation Corp., 309 F.3d at 1133. A registration statement "means a

22   filing that includes the prospectus and other information required by section 7 of the Securities

23   Act." 12 C.F.R. § 16.2(m). A prospectus is defined as "an offering document that includes the

24   information required by section 10(a) of the Securities Act." 12 C.F.R. § 16.2(1). Section 11

25   liability attaches to "(1) every person who signed the registration statement; (2) every person who

26   was a director . . . at the time of the filing;" and (3) "every accountant . . . who has with his consent

27   been named as having prepared or certified any part of the registration statement[.]" 15 U.S.C. §

28   77k; see also, Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983) ("Section 11 of the

1  1933 Act allows purchasers of a registered security to sue certain enumerated parties [the issuer, its

2  directors or partners, underwriters and accountants who are named as having prepared or certified

3  the registration statement] in a registered offering when false or misleading information is included

4  in a registration statement."). "Liability . . . is virtually absolute, even for innocent misstatements."

5  Id; see also, In re Stac Electronics Securities Litigation, 89 F.3d 1399, 1404 (9th Cir. 1996) ("No

6  scienter is required for liability under § 11; defendants will be liable for innocent or negligent

7  material misstatements or omissions."). "A Section 11 plaintiff needs to plead only that the

8  registration statement contained a material omission or misrepresentation." In re CBT Group PLC

9  Securities Litigation, 2000 WL 33339615 at *2 (N.D.Cal. 2000), citing Kaplan v. Rose, 49 F.3d

10  1363, 1371 (9th Cir.1994); see also, In re Twinlab Corp. Sec. Litig., 103 F.Supp.2d 193, 201

11  (E.D.N.Y. 2000) ("Section 11 'places a relatively minimal burden on a plaintiff,' requiring simply

12  that the plaintiff allege that he purchased the security and that the registration statement contains

13  false or misleading statements concerning a material fact.") quoting, Herman & MacLean v.

14  Huddleston, 459 U.S. at 381-82.

15      Sections 11 is "not governed by the heightened pleading standards of the PSLRA . . . ."

16  Falkowski v. Imation Corp., 309 F.3d 1123, 1133 -1134 (9th Cir. 2002).  But, it is "subject to

17  Federal Rule of Civil Procedure 9(b)."  Id.  However, "only allegations ('averments') of fraudulent

18  conduct must satisfy the heightened pleading requirements of Rule 9(b).  Allegations of non-

19  fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."  Vess v.

20  Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003).  "The only consequence of a holding

21  that Rule 9(b) is violated with respect to a § 11 claim would be that any allegations of fraud would

22  be stripped from the claim.  The allegations of innocent or negligent misrepresentation, which are

23  at the heart of a § 11 claim, would survive."  Id.  (Emphasis in original).  "Thus, if particular

24  averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those

25  averments, or 'strip' them from the claim.  The court should then examine the allegations that

26  remain to determine whether they state a claim."  Id.  This is not an issue, however, as the

27  Complaint sufficiently states a Section 11 claim under Rule 9(b).

28      The Complaint bases Section 11 liability on two registration statements.  Count VI is based

- 132 -

02cv870-BEN (RBB)

1   on the Form S-4 Registration Statement Peregrine filed regarding the acquisition of Harbinger on

2   May 22, 2000.  This claim is asserted against Gardner, Gless, Moores, Cole, Hosley, Noell, van

3   den Berg, Watrous, Arthur Andersen and AWSC.  According to the Complaint, Gardner, Gless,

4   Moores, Cole, Hosley, Noell, van den Berg, and Watrous signed the Registration.  (Complaint ¶

5   755.)  The Registration included Peregrine's financial statements for the fiscal year 2000 along

6   with Arthur Andersen's unqualified audit opinion on those financial statements.  (Id. ¶ 756.)  The

7   Statement also included Peregrine's policy on revenue recognition.  According to the Complaint,

8   the Statement was false because Peregrine's financial statements were overstated, revenue was

9   improperly recognized on contingent transactions, and the financial statements did not comport

10  with GAAP, GAAS or Peregrine's own revenue recognition polices.  (Id. ¶ 759.)

11          Count VIII of the Complaint is based on the Form S-4 Registration Statement Peregrine

12  filed regarding the acquisition of Remedy on July 23, 2001.  This claim is asserted against

13  Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, Savoy, Arthur Andersen and

14  AWSC.  (Complaint ¶ 774.)  Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous singed the

15  Registration.  (Id. ¶ 777.)  This Registration included Peregrine's financial statements from Fiscal

16  Years 2000 and 2001 along with Arthur Andersen's unqualified audit opinion on those financial

17  statements.  The Statement also included Peregrine's revenue recognition policy.  According to the

18  Complaint, this Statement was false for essentially the same reasons the Statement for the

19  Harbinger acquisition was false.

20          As alleged, the Complaint fails to state a claim against AWSC.  As noted, Section 11

21  liability attaches to "every accountant . . . who has with his consent been named as having prepared

22  or certified any part of the registration statement[.]"  15 U.S.C. § 77k.  The only allegations against

23  AWSC are that it "consented to Arthur Andersen being named" in the registration statement.

24  (Complaint ¶ 756.)  No allegations are made that AWSC either signed or consented to be named as

25  having prepared or certified the challenged Registration Statements.  See, Herman & Mclean v.

26  Huddleston, 459 U.S. 375, 386 n.22 (1983) ("[C]ertain individuals who play a part in preparing the

27  registration statement generally cannot be reached by a Section 11 action.  These include . . .

28  accountants with respect to parts of a registration statement which they are not named as having

- 133 -

Exhibit F
0609

1  prepared or certified.").

2      As to all other Defendants named, however, the Complaint adequately states a Section 11

3  claim under both Rules 9(b) and 8(a).  Under Rule 8, all that is required is "a short and plain

4  statement of the claim showing that the pleader is entitled to relief." Id.  The Complaint meets this

5  standard.  According to the Complaint, each Defendant either signed the registration statements,

6  sat on the board at the time of their filing, or was an accountant who certified Peregrine's financial

7  statements.  See, Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir. 1994) ("Section 11 states that any

8  signer of the registration statement, any partner or director of the issuer, any professional involved

9  in preparing or certifying the statement, and any underwriter of a registration statement may be

10  liable . . . .").

11      Rule 9(b) provides that "in all averments of fraud and mistake, the circumstances

12  constituting the fraud or mistake shall be pleaded with particularity." Id.  "A complaint meets this

13  standard if it alleges the time, place and content of the alleged fraudulent representation or

14  omission; the identity of the person engaged in the fraud; and 'the circumstances indicating

15  falseness' of 'the manner in which [the] representations [or omissions] were false and

16  misleading.'" Genna v. Digital Link Corp., 25 F.Supp.2d 1032, 1037-1038 (N.D.Cal. 1997),

17  quoting, GlenFed, 42 F.3d at 1547-48; Williams v. WMX Technologies, Inc., 112 F.3d 175, 177-

18  78 (5th Cir. 1997) (To satisfy Rule 9(b)'s pleading requirements, the plaintiffs must "specify the

19  statements contended to be fraudulent, identify the speaker, state when and where the statements

20  were made, and explain why the statements were fraudulent.").  Here, the Complaint adequately

21  sets forth why the statements were false, which the Court has already found to be material and

22  sufficient at this stage. (See, Section IV(B)(3)(a).)  The Complaint also both "alleges the time,

23  place and content of the alleged fraudulent representation or omission" and "the identity of the

24  person engaged in the fraud." Genna v. Digital Link Corp., 25 F.Supp.2d at 1037-1038. (See,

25  Complaint ¶¶ 754, 755, 756, 776, 777, and 778.)  The Complaint's allegations are also specific

26  enough "to give [D]efendants notice of the particular misconduct which is alleged to constitute the

27  fraud charged so that they can defend against the charge and not just deny that they have done

28  anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir.1985). See also, Kaplan v.

02cv870-BEN (RBB)

Exhibit F
0610

1  Rose, 49 F.3d at 1371 ("The plaintiff in a § 11 claim must demonstrate (1) that the registration

2  statement contained an omission or misrepresentation, and (2) that the omission or

3  misrepresentation was material, that is, it would have misled a reasonable investor about the nature

4  of his or her investment.").

5    Accordingly, under both Rules 8(a) and 9(b), the Complaint adequately states a Section 11

6  claim against Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, Savoy, and

7  Arthur Andersen.

8                                                    **VIII.**

9                            **CONTROL LIABILITY UNDER SECTION 15.**

10    The Complaint alleges control liability under Section 15 against Gardner, Gless, Moores,

11  Cole, Hosley, Noell, van den Berg, Watrous, Arthur Andersen and AWSC. The Court has already

12  determined Plaintiffs adequately state a claim against Gardner and Gless. As to the remaining

13  Defendants, Plaintiffs fail to state a claim.

14    "Section 15(a) of the 1933 Securities Act imposes joint and several liability upon every

15  person who controls any person liable under [S]ections[] 11 . . . ." In re Daou Systems, Inc.

16  Securities Litigation, 397 F.3d at 725; see also, In re Diasonics Securities Litigation, 599 F.Supp.

17  447, 459 (N.D.Cal. 1984), quoting 15 U.S.C. § 77o ("Section 15 of the Securities Act of 1933

18  provides for 'secondary liability' for 'every person who, by or through stock ownership, agency, or

19  otherwise, . . ., controls any person liable under [Section 11] . . . ."). Specifically, the Section 15(a)

20  provides:

21        Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant
          to or in connection with an agreement or understanding with one or more other persons by
22        or through stock ownership, agency, or otherwise, controls any person liable under sections
          77k or 77l of this title, shall also be liable jointly and severally with and to the same extent
23        as such controlled person to any person to whom such controlled person is liable, unless the
          controlling person had no knowledge of or reasonable ground to believe in the existence of
24        the facts by reason of which the liability of the controlled person is alleged to exist.

25  Id. "Although § 15 is not identical to § 20(a), the controlling person analysis is the same."

26  Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990); see also, In re Daou

27  Systems, Inc. Securities Litigation, 397 F.3d at 725 ("'Controlling person' under both of the above

28  acts is given the same interpretation because section 20(a) [of the Exchange Act] is an analogue of

Exhibit F
0611

1   section 15 of the Securities Act."). For the reasons set forth in the Court's analysis of Section

2   20(a), Plaintiffs fail to state a Section 15(a) claim against any of the named Defendants.

3                                                    IX.

4                                            CONCLUSION.

5          For the reasons set forth above, IT IS HEREBY ORDERED:

6          (1)    Gardner's motion to dismiss Section 14(a) claims as to the Remedy proxy statement

7   is DENIED;

8          (2)    Gless' motion to dismiss is DENIED in its entirety;

9          (3)    Nelson's motion to dismiss is GRANTED in its entirety;

10         (4)    Luddy's motion to dismiss is GRANTED in its entirety;

11         (8)    Moores' motion to dismiss is GRANTED as to the Section 10(b), Section 14(a),

12  Section 20(a), and Section 15 claims, but is DENIED with regard to Section 11;

13         (9)    Hosley's motion to dismiss is GRANTED as to the Section 10(b), Section 14(a),

14  and Section 20(a) claims, but is DENIED with regard to Section 11;

15         (10)   Noell's motion to dismiss is GRANTED as to the Section 10(b), Section 14(a),

16  Section 20(a), and Section 15 claims, but is DENIED with regard to Section 11;

17         (11)   van den Berg's motion to dismiss is GRANTED as to the Section 10(b), Section

18  14(a), and Section 20(a) claims, but is DENIED with regard to Section 11;

19         (12)   Watrous' motion to dismiss is GRANTED as to the Section 10(b), Section

20  12(a)(2), Section 14(a), Section 20(a), and Section 15 claims, but is DENIED with regard to

21  Section 11;

22         (13)   Savoy's motion to dismiss is GRANTED as to the Section 10(b), Section 14(a),

23  Section 20(a), and Section 15 claims, but is DENIED with regard to Section 11;

24         (14)   Cole's motion to dismiss is GRANTED as to the Section 10(b), Section 14(a),

25  Section 20(a), and Section 15 claims, but is DENIED with respect to Section 11 claim;

26         (16)   Arthur Andersen's motion to dismiss is GRANTED as to Section 10(b), Section

27  15(a), but is DENIED as to Section 14(a) and Section 11;

28         (17)   Stulac's motion to dismiss is GRANTED in its entirety;

                                                - 136 -                        02cv870-BEN (RBB)

1    (18)    AWSC's motion to dismiss is **GRANTED** in its entirety;

2    (18)    Plaintiffs Waga and Stuliff's motion to strike is **DENIED**; and

3    (19)    Plaintiffs are **GRANTED** leave to amend their complaint within **60 days** after this

4  Order is stamped "filed."

5

6  Dated: 3/30/05

7                                              ROGER T. BENITEZ
                                               United States District Judge

8

9  cc: Judge Brooks
       All Counsel of Record and Parties Without Counsel

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 137 -                                02cv870-BEN (RBB)

Exhibit F
0613