# Exhibit H



# FORM S-4/A

## PEREGRINE SYSTEMS INC - PRGN

**Filed: May 22, 2000 (period: )**

Pre-effective amendment to an S-4 filing

Exhibit H
0615

# Table of Contents

S-4/A - S-4/A

Signature:

## PART II

SIGNATURES
EXHIBIT INDEX
EX-3.1B (EXHIBIT 3.1B)

EX-8.1 (EXHIBIT 8.1)

EX-8.2 (EXHIBIT 8.2)

EX-23.1A (EXHIBIT 23.1A)

EX-23.2A (EXHIBIT 23-2A)

EX-23.6 (EXHIBIT 23.6)

Exhibit H
0616

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON MAY 22, 2000

REGISTRATION NO. 333- 36744

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

--------------------------------

AMENDMENT NO. 1
TO
FORM S-4

REGISTRATION STATEMENT

UNDER

THE SECURITIES ACT OF 1933

--------------------------------

PEREGRINE SYSTEMS, INC.

(Exact name of registrant as specified in its charter)

| DELAWARE | 7372 | 95-3773312 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

12670 HIGH BLUFF DRIVE, SAN DIEGO, CALIFORNIA 92130
(858) 481-5000

(Address, including zip code, and telephone number, including area code, of
registrant's principal executive offices)

ERIC P. DELLER
VICE PRESIDENT AND GENERAL COUNSEL
PEREGRINE SYSTEMS, INC.
12670 HIGH BLUFF DRIVE
SAN DIEGO, CALIFORNIA 92130
(858) 481-5000

(Name, address, including zip code, and telephone number, including area code,
of agent for service)

--------------------------------

COPIES TO:

| DOUGLAS H. COLLOM | ERIC P. DELLER | ROD J. HOWARD | JOHN C. YATES | LOREN B. WIMPFHEIMER |
|---|---|---|---|---|
| STEVE L. CAMAHORT | Vice President and | ASHOK K. LALWANI | JEFFREY L. SCHULTE | Vice President and |
| ROBERT F. KORNEGAY | General Counsel | MADELEINE RANDAL | SETH A. COHEN | General Counsel |
| G. SCOTT GIESLER | Peregrine Systems, Inc. | Brobeck, Phleger & | BRANDY A. BAYER | Harbinger Corporation |
| LIA ROSE ALIOTO | 12670 High Bluff Drive | Harrison LLP | Morris, Manning & | 1277 Lenox Park |
| Wilson Sonsini Goodrich | San Diego, California | Two Embarcadero Place | Martin, L.L.P. | Boulevard |
| & Rosati | 92130 | 2200 Geng Road | 1600 Atlanta Financial | Atlanta, Georgia 30319 |
| Professional | (958) 481-5000 | Palo Alto, California | Center | (404) 467-3000 |
| Corporation | | 94303 | 3343 Peachtree Road, | |
| 650 Page Mill Road | | (650) 424-0160 | N.E. | |
| Palo Alto, California | | | Atlanta, Georgia 30326 | |
| 94304-1050 | | | (404) 233-7000 | |
| (650) 493-9300 | | | | |

--------------------------------

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO THE PUBLIC:
UPON COMPLETION OF THE MERGER OF A SUBSIDIARY OF PEREGRINE SYSTEMS, INC. WITH
HARBINGER CORPORATION AS DESCRIBED HEREIN.

--------------------------------

If the securities being registered on this Form are to be offered in
connection with the formation of a holding company and there is compliance with
General Instruction G, check the following box. / /

If this Form is filed to register additional securities for an offering
pursuant to Rule 462(b) under the Securities Act, check the following box and

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0617

list the Securities Act registration statement number of the earlier effective
registration statement for the same offering. / /

   If this Form is a post-effective amendment filed pursuant to Rule 462(d)
under the Securities Act, check the following box and list the Securities Act
registration statement number of the earlier effective registration statement
for the same offering. / /

                    --------------------------------

   THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR
DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL
FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION
STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(A) OF
THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME
EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(A),
MAY DETERMINE.

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

Exhibit H
0618

[LOGO]

[LOGO]

May 22, 2000

To the holders of Peregrine common stock and Harbinger common stock:

After careful consideration, the boards of directors of Peregrine Systems, Inc. and Harbinger Corporation have approved the merger of Harbinger and Peregrine. As a result of the merger, Harbinger will become a wholly-owned subsidiary of Peregrine, and shareholders of Harbinger will become stockholders of Peregrine. To achieve this organizational structure, a subsidiary of Peregrine will merge into Harbinger, and Peregrine will issue its common stock in exchange for the outstanding shares of Harbinger common stock.

In connection with the merger, each outstanding share of Harbinger common stock will be exchanged for 0.75 of a share of Peregrine common stock. Peregrine common stock is traded on the Nasdaq National Market under the trading symbol "PRGN." On May 19, 2000, the closing price of Peregrine common stock was $19.25 per share, and the closing price of Harbinger common stock, which is traded on the Nasdaq National Market as "HRBC," was $14.13. We encourage you to obtain more recent quotations, however.

The attached proxy statement/prospectus provides detailed information concerning Peregrine, Harbinger, the merger agreement, the merger, and the proposals related to the merger. Please review carefully all of the information contained in the joint proxy statement/prospectus. IN PARTICULAR, YOU SHOULD CAREFULLY CONSIDER THE DISCUSSION IN THE SECTION ENTITLED "RISK FACTORS" BEGINNING ON PAGE 12.

After careful consideration, the boards of directors of both Peregrine and Harbinger have determined the merger to be fair to, and in the best interests of, their respective shareholders. Each board has approved the merger agreement setting out the terms of the proposed merger.

Peregrine and Harbinger each believe that the Internet has redefined the beginning and end points of business processes. We believe that, through the Internet, businesses are now challenged to extend their operations beyond traditional internal constraints and to interact directly with their supplier base. At the same time, suppliers are challenged to reach customers in new ways, notably by making their products and services available over the Internet and through web-based marketplaces for goods and services. We believe business is evolving toward an end-to-end process for managing business assets and infrastructure from the time they are acquired until they are retired. We believe that combining Harbinger and Peregrine can link the internal processes associated with managing assets with the external processes associated with acquiring them. Harbinger's reasons for the merger are discussed in greater detail beginning on page 50, and Peregrine's reasons for the merger are discussed in greater detail on page 61. A copy of the merger agreement is attached as Annex A to the joint proxy statement/prospectus.

In connection with the merger, both Peregrine and Harbinger will hold a special meeting of their respective shareholders. The matters to be submitted for consideration at these special meetings are described in the attached notice of special meeting and in the joint proxy statement/prospectus.

THE BOARD OF DIRECTORS OF HARBINGER RECOMMENDS THAT HOLDERS OF HARBINGER COMMON STOCK VOTE FOR APPROVAL AND ADOPTION OF THE MERGER AGREEMENT AND APPROVAL OF THE MERGER. THE BOARD OF DIRECTORS OF PEREGRINE RECOMMENDS THAT HOLDERS OF PEREGRINE COMMON STOCK VOTE FOR APPROVAL OF THE ISSUANCE OF SHARES OF PEREGRINE COMMON STOCK IN CONNECTION WITH THE MERGER.

The Harbinger special meeting will be held on June 16, 2000 at 9:00 a.m. (local time) at the J.W. Marriott Hotel, 3300 Lenox Road N.E., Atlanta, Georgia 30326. Only shareholders who held shares of Harbinger at the close of business on May 22, 2000 will be entitled to vote at the Harbinger special meeting.

Exhibit H
0619

The Peregrine special meeting will be held on June 16, 2000 at 9:00 a.m. (local time) at the Del Mar Hilton, 15575 Jimmy Durante Boulevard, Del Mar, California 92014. Only stockholders who held shares of Peregrine at the close of business on May 15, 2000 will be entitled to vote at the Peregrine special meeting.

Please use this opportunity to take part in an important business decision for Peregrine and Harbinger by voting at your special meeting. Whether or not you plan to attend your special meeting, please submit your proxy by following the instructions on the enclosed proxy card. Submitting a proxy does NOT deprive you of the right to attend the meeting and vote your shares in person.

YOUR VOTE IS VERY IMPORTANT. We appreciate your consideration of the merger.

Sincerely,

[SIG]                                           [SIG]
STEPHEN P. GARDNER                              JAMES M. TRAVERS
President and Chief Executive Officer           President and Chief Executive Officer
Peregrine Systems, Inc.                         Harbinger Corporation

You may also obtain additional information about Harbinger and Peregrine without charge by following the instructions in the section entitled "Where you can find more information" in the joint proxy statement/prospectus.

THE DATE OF THIS JOINT PROXY STATEMENT/PROSPECTUS IS MAY 22, 2000, AND IT IS FIRST BEING MAILED OR OTHERWISE DELIVERED TO HOLDERS OF PEREGRINE COMMON STOCK AND HARBINGER COMMON STOCK ON OR ABOUT MAY 24, 2000.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION, NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SHARES OF PEREGRINE COMMON STOCK TO BE ISSUED IN CONNECTION WITH THE MERGER, NOR HAVE THEY DETERMINED WHETHER THIS JOINT PROXY STATEMENT/PROSPECTUS IS ADEQUATE OR CORRECT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0620

[LOGO]

------------------------

NOTICE OF SPECIAL MEETING OF SHAREHOLDERS
TO BE HELD JUNE 16, 2000

------------------------

A special meeting of the shareholders of Harbinger Corporation will be held at the J.W. Marriott Hotel, 3300 Lenox Road N.E., Atlanta, Georgia 30326 on June 16, 2000 at 9:00 a.m., local time, for the following purposes:

1.  To consider and vote on proposals:

   - to approve and adopt the Agreement and Plan of Merger and Reorganization, dated as of April 5, 2000, by and among Peregrine Systems, Inc., Soda Acquisition Corporation and Harbinger Corporation. A copy of the merger agreement is attached as Annex A to the accompanying joint proxy statement/prospectus; and

   - to approve the merger of Harbinger Corporation and Soda Acquisition Corporation, a wholly owned subsidiary of Peregrine, whereby holders of Harbinger common stock will receive 0.75 of a share of Peregrine common stock for each share of Harbinger common stock they own.

2.  To transact any other business that may properly come before the special meeting or any adjournments or postponements of the special meeting.

The accompanying joint proxy statement/prospectus describes the merger agreement and the proposed merger. We encourage you to read it carefully.

Only shareholders who held shares of Harbinger common stock at the close of business on May 22, 2000 are entitled to vote at the special meeting.

YOUR VOTE IS VERY IMPORTANT. PLEASE SUBMIT YOUR PROXY ACCORDING TO THE INSTRUCTIONS ON THE ENCLOSED PROXY CARD.

                              By Order of the Board of Directors

                              [SIG]

                              Loren B. Wimpfheimer
                              SECRETARY

Atlanta, Georgia
May 22, 2000

TO ASSURE THAT YOUR SHARES ARE REPRESENTED AT THE MEETING, PLEASE SUBMIT YOUR PROXY ACCORDING TO THE INSTRUCTIONS ON THE ATTACHED PROXY CARD, WHETHER OR NOT YOU PLAN TO ATTEND THE MEETING. YOU CAN REVOKE YOUR PROXY AT ANY TIME BEFORE IT IS VOTED. SUBMITTING YOUR PROXY DOES NOT PREVENT YOU FROM ATTENDING THE MEETING AND VOTING YOUR SHARES IN PERSON. IF YOUR SHARES ARE HELD IN AN ACCOUNT AT A BROKERAGE FIRM OR A BANK, YOU MUST INSTRUCT THEM HOW TO VOTE YOUR SHARES. IF YOU DO NOT VOTE OR DO NOT INSTRUCT YOUR BROKER OR BANK HOW TO VOTE, IT WILL HAVE THE SAME EFFECT AS VOTING AGAINST THE MERGER AGREEMENT AND THE MERGER.

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0621

[LOGO]

------------------------

NOTICE OF SPECIAL MEETING OF STOCKHOLDERS
TO BE HELD JUNE 16, 2000

------------------------

A special meeting of the stockholders of Peregrine Systems, Inc. will be held at the Del Mar Hilton, 15575 Jimmy Durante Boulevard, Del Mar, California 92014 on June 16, 2000 at 9:00 a.m., local time, for the following purposes:

1.  To consider and vote on a proposal to issue shares of Peregrine common stock in connection with the proposed merger of Harbinger Corporation with a wholly owned subsidiary of Peregrine as set forth in the Agreement and Plan of Merger and Reorganization, dated as of April 5, 2000 among Peregrine, Harbinger, and Soda Acquisition Corporation, a wholly owned subsidiary of Peregrine. Each outstanding share of Harbinger common stock will be converted into 0.75 of a share of Peregrine common stock in connection with the merger. A copy of the merger agreement is attached as Annex A to the accompanying joint proxy statement/ prospectus.

2.  To transact any other business that may properly come before the special meeting or any adjournments or postponements of the special meeting.

The accompanying joint proxy statement/prospectus describes the merger agreement and the proposed merger. We encourage you to read it carefully.

Only shareholders who held shares of Peregrine common stock at the close of business on May 15, 2000 are entitled to vote at the special meeting.

YOUR VOTE IS VERY IMPORTANT. PLEASE SUBMIT YOUR PROXY ACCORDING TO THE INSTRUCTIONS ON THE ATTACHED PROXY CARD.

By Order of the Board of Directors

[SIG]

Richard T. Nelson
SECRETARY

San Diego, California
May 22, 2000

TO ASSURE THAT YOUR SHARES ARE REPRESENTED AT THE MEETING, PLEASE SUBMIT YOUR PROXY ACCORDING TO THE INSTRUCTIONS ON THE ATTACHED PROXY CARD, WHETHER OR NOT YOU PLAN TO ATTEND THE MEETING. YOU CAN REVOKE YOUR PROXY AT ANY TIME BEFORE IT IS VOTED. SUBMITTING YOUR PROXY DOES NOT PREVENT YOU FROM ATTENDING THE MEETING AND VOTING YOUR SHARES IN PERSON. IF YOUR SHARES ARE HELD IN AN ACCOUNT AT A BROKERAGE FIRM OR A BANK, YOU MUST INSTRUCT THEM HOW TO VOTE YOUR SHARES.

Exhibit H
0622

TABLE OF CONTENTS

|  | PAGE |
|---|---|
| QUESTIONS AND ANSWERS ABOUT THE MERGER | 1 |
| SUMMARY OF THE JOINT PROXY STATEMENT/PROSPECTUS | 5 |
|    The Companies | 5 |
|    The Merger | 5 |
| RISK FACTORS | 12 |
|    Risks relating to the merger | 12 |
|    Risks relating to Peregrine | 18 |
|    Risks relating to Harbinger | 27 |
| SELECTED HISTORICAL AND PRO FORMA FINANCIAL DATA | 36 |
|    Peregrine selected consolidated historical financial information | 36 |
|    Harbinger selected consolidated historical financial information | 36 |
|    Selected unaudited pro forma condensed combined financial information | 37 |
|    Comparative per share data | 38 |
| MARKET PRICE AND DIVIDEND INFORMATION | 40 |
|    Peregrine common stock | 40 |
|    Harbinger common stock | 40 |
|    Recent share prices | 41 |
|    Shareholders | 41 |
|    Dividends | 41 |
| THE SPECIAL MEETINGS | 42 |
|    Date, time and place of the special meetings | 42 |
|    Purposes of the special meetings | 42 |
|    Recommendations of the boards of directors | 42 |
|    Record dates and outstanding shares | 43 |
|    Vote and quorum required | 43 |
|    Treatment of abstentions and broker non-votes | 44 |
|    Expenses of proxy solicitation | 44 |
|    Methods of voting | 44 |
|    Revoking your proxy | 45 |
| THE MERGER | 46 |
|    Background of the merger | 46 |
|    Joint reasons for the merger | 49 |
|    Harbinger's reasons for the merger | 50 |
|    Recommendation of Harbinger's board of directors | 52 |
|    Opinion of Goldman, Sachs & Co., financial advisor to Harbinger | 52 |
|    Peregrine's reasons for the merger | 61 |
|    Recommendation of Peregrine's board of directors | 62 |
|    Opinion of Deutsche Bank Securities Inc., financial advisor to Peregrine | 63 |
|    Fee arrangements with Peregrine's financial advisor | 70 |
|    Accounting treatment | 70 |
|    Material United States federal income tax considerations of the merger | 70 |
|    Delisting and deregistration of Harbinger common stock | 72 |
|    Listing of Peregrine common stock to be issued in the merger | 72 |

i

Exhibit H
0623

|                                                                                                    | PAGE |
|----------------------------------------------------------------------------------------------------|------|
| Regulatory compliance.................................                                              | 72   |
| Appraisal rights......................................                                              | 73   |
| Federal securities laws consequences; stock transfer restrictions.........................................    | 73   |
| Interests of some of Harbinger's executive officers, directors, and shareholders........................      | 73   |
|                                                                                                    |      |
| THE MERGER AGREEMENT...................................                                             | 75   |
|                                                                                                    |      |
| General..............................................                                              | 75   |
| The merger............................................                                             | 75   |
| Effective time and closing of the merger..............                                             | 75   |
| Procedure to exchange certificates....................                                             | 76   |
| Warrants, stock options and employee benefits.........                                             | 76   |
| Representations and warranties........................                                             | 77   |
| Covenants relating to conduct of business of Harbinger and Peregrine......................................     | 79   |
| Additional agreements.................................                                             | 82   |
| Conditions precedent to the merger....................                                             | 87   |
| Termination; amendment and waiver.....................                                             | 88   |
|                                                                                                    |      |
| AGREEMENTS RELATED TO THE MERGER.......................                                             | 91   |
|                                                                                                    |      |
| Peregrine stockholders' voting agreements.............                                             | 91   |
| Harbinger shareholders' voting agreements.............                                             | 91   |
| Stock option agreement................................                                             | 92   |
| Affiliate agreements..................................                                             | 94   |
|                                                                                                    |      |
| BUSINESS OF PEREGRINE..................................                                             | 95   |
|                                                                                                    |      |
| Overview..............................................                                             | 95   |
| Corporate background..................................                                             | 95   |
| Industry background...................................                                             | 95   |
| Products..............................................                                             | 96   |
| Product integration...................................                                             | 101  |
| Product development; product authorship model.........                                             | 101  |
| Technology............................................                                             | 102  |
| Sales and marketing...................................                                             | 103  |
| Professional services and customer support............                                            | 104  |
| Competition...........................................                                             | 104  |
| Intellectual property.................................                                             | 106  |
| Employees.............................................                                             | 107  |
| Properties............................................                                             | 107  |
|                                                                                                    |      |
| PEREGRINE SELECTED CONSOLIDATED FINANCIAL DATA.............                                         | 108  |
|                                                                                                    |      |
| PEREGRINE MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.....................  | 109  |
|                                                                                                    |      |
| Overview..............................................                                             | 109  |
| Results of operations.................................                                             | 111  |
| Comparison of fiscal years ended March 31, 2000, 1999, and 1998.............................................   | 111  |
| Liquidity and capital resources.......................                                             | 114  |
| Recent accounting pronouncements......................                                             | 114  |
| Quantitative and qualitative disclosures about market risk..................................................    | 115  |
|                                                                                                    |      |
| UNAUDITED PRO FORMA COMBINED CONDENSED FINANCIAL STATEMENTS..............................................       | 116  |
|                                                                                                    |      |
| PEREGRINE MANAGEMENT..................................                                              | 120  |
|                                                                                                    |      |
| Executive officers and directors......................                                             | 120  |

ii

Exhibit H
0624

|  | PAGE |
|---|---|
| Board of directors | 122 |
| Executive compensation | 123 |
| Summary compensation table | 123 |
| Option grants in fiscal year 2000 | 125 |
| Aggregate option exercises in last fiscal year and fiscal year-end option values | 126 |
| Employment agreements and change in control arrangements | 126 |
| Limitations on directors' and officers' liability and indemnification | 126 |
| Stock plans | 127 |
| PEREGRINE RELATED PARTY TRANSACTIONS | 130 |
| PEREGRINE PRINCIPAL STOCKHOLDERS | 131 |
| BUSINESS OF HARBINGER | 132 |
| Business-to-business e-commerce | 133 |
| The Internet and Internet Protocol | 135 |
| The Harbinger solution | 136 |
| Strategy | 136 |
| Capabilities | 138 |
| E-Commerce center | 140 |
| Catalog data management | 142 |
| Application services and software | 142 |
| E-Commerce services | 144 |
| Sales and marketing | 145 |
| Product development | 145 |
| Competition | 146 |
| Intellectual property rights | 146 |
| Employees | 148 |
| Governmental regulations and industry standards | 148 |
| Properties | 148 |
| Legal proceedings | 149 |
| SELECTED FINANCIAL DATA OF HARBINGER | 150 |
| HARBINGER MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 151 |
| Overview | 151 |
| Stock repurchase program | 151 |
| Acquisitions and investments | 151 |
| Results of operations | 153 |
| Three months ended March 31, 2000 compared to three ended March 31, 1999 | 153 |
| 1999 compared to 1998 | 156 |
| 1998 compared to 1997 | 158 |
| Liquidity and capital resources | 161 |
| Euro conversion | 161 |
| Quantitative and qualitative disclosures about market risks | 161 |
| HARBINGER MANAGEMENT | 162 |
| Executive officers and directors | 162 |
| Election and compensation of directors | 164 |
| Board committees | 165 |
| Compensation committee interlocks and insider participation | 165 |
| Executive compensation | 166 |

iii

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0625

| | PAGE |
|---|---|
| Summary compensation table | 166 |
| Option grants in last fiscal year | 167 |
| Agreements with employees | 167 |
| 401(k) profit sharing plan | 168 |
| Stock option plans and stock purchase plan | 169 |
| HARBINGER RELATED PARTY TRANSACTIONS | 173 |
| HARBINGER PRINCIPAL SHAREHOLDERS | 174 |
| DESCRIPTION OF PEREGRINE CAPITAL STOCK | 176 |
| General | 176 |
| Common stock | 176 |
| Preferred stock | 176 |
| Antitakeover effects of provisions of certificate of incorporation and bylaws | 177 |
| COMPARISON OF RIGHTS OF HOLDERS OF HARBINGER COMMON STOCK AND PEREGRINE COMMON STOCK | 178 |
| EXPERTS | 193 |
| LEGAL MATTERS | 193 |
| PEREGRINE STOCKHOLDER PROPOSALS | 193 |
| HARBINGER SHAREHOLDER PROPOSALS | 193 |
| WHERE YOU CAN FIND MORE INFORMATION | 194 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F-1 |

EXHIBITS
--------

| | |
|---|---|
| Annex A | Agreement and Plan of Merger and Reorganization |
| Annex B | Form of Harbinger Stock Option Agreement |
| Annex C | Form of Harbinger Voting Agreement |
| Annex D | Form of Peregrine Voting Agreement |
| Annex E | Opinion of Goldman, Sachs & Co. |
| Annex F | Opinion of Deutsche Bank Securities Inc. |

iv

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0626

QUESTIONS AND ANSWERS ABOUT THE MERGER

REFERENCES IN THIS JOINT PROXY STATEMENT/PROSPECTUS TO "WE," "US," "OUR," OR "OURS" REFER, AS THE CONTEXT MAY REQUIRE, TO PEREGRINE, HARBINGER OR THE COMBINED COMPANY AFTER THE MERGER.

Q: WHAT IS THE PROPOSED MERGER TRANSACTION? (SEE PAGE 46)

A: The proposed merger transaction is to combine the businesses of Peregrine and Harbinger. To combine the companies, a subsidiary of Peregrine will merge into Harbinger. As a result, Harbinger will become a wholly owned subsidiary of Peregrine. For a more complete description of the merger, see the section entitled "The Merger."

Q: WHY ARE PEREGRINE AND HARBINGER PROPOSING THE MERGER? (SEE PAGES 49, 50 AND 61)

A: Peregrine and Harbinger are proposing the merger because they believe the combined company will be well positioned to offer solutions for managing, acquiring and disposing of the many assets comprising corporate infrastructure.

Peregrine and Harbinger each believe that the Internet has redefined the beginning and end points of business processes. We believe that, through the Internet, businesses are now challenged to extend their operations beyond traditional internal constraints and to interact directly with their supplier base. At the same time, suppliers are challenged to reach customers in new ways, notably by making their products and services available over the Internet and through web-based marketplaces for goods and services. We believe business is evolving toward an end-to-end process for managing business assets and infrastructure from the time they are acquired until they are retired. We believe that combining Harbinger and Peregrine can link the internal processes associated with managing assets with the external processes associated with acquiring them.

A more complete discussion of the companies' respective reasons for proposing the merger is contained under the captions "Peregrine's reasons for the merger" on page 61 and "Harbinger's reasons for the merger" on page 50.

Q: WHAT PERCENTAGE OF PEREGRINE WILL THE FORMER HARBINGER SHAREHOLDERS AND CURRENT PEREGRINE STOCKHOLDERS OWN IMMEDIATELY FOLLOWING THE MERGER?

A: Immediately following the merger, the former shareholders of Harbinger and the current stockholders of Peregrine will have approximately the following aggregate ownership interests in Peregrine common stock:

|  | PEREGRINE COMMON STOCK OUTSTANDING | PEREGRINE COMMON STOCK, ASSUMING EXERCISE OF ALL OUTSTANDING HARBINGER OPTIONS AND WARRANTS |
| --- | --- | --- |
| Former Harbinger shareholders....... | 21.5% | 24.6% |
| Current Peregrine stockholders....... | 78.5% | 75.4% |

Q: WHAT WILL HARBINGER SHAREHOLDERS RECEIVE IN EXCHANGE FOR HARBINGER COMMON STOCK IN THE MERGER? (SEE PAGE 75)

A: When the merger is completed, Harbinger shareholders will receive 0.75 of a share of Peregrine common stock in exchange for each outstanding share of Harbinger common stock.

Peregrine will not issue fractional shares. Instead of issuing fractional shares, Peregrine will pay Harbinger shareholders cash for any fractional shares of Peregrine common stock they would have otherwise received. The cash amount paid will be based on the average closing price of Peregrine common stock over the five trading days prior to the merger.

The merger agreement, a contract among Peregrine, Harbinger, and a

Exhibit H
0627

subsidiary of Peregrine, is attached to this joint proxy
statement/prospectus as

1

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Annex A. You should read the merger agreement carefully as it is the legal document that sets forth the parties' rights.

Q: HOW WILL THE MERGER AFFECT OPTIONS AND WARRANTS TO ACQUIRE HARBINGER COMMON STOCK? (SEE PAGE 76)

A: Options and warrants to purchase shares of Harbinger common stock will be converted into options and warrants to purchase shares of Peregrine common stock after completion of the merger. The number of shares covered by these options and warrants, and their applicable exercise prices, will be adjusted using the merger exchange ratio of 0.75 of a share of Peregrine common stock for each share of Harbinger common stock that was subject to the applicable option or warrant prior to the merger.

Q: WILL HARBINGER SHAREHOLDERS BE ABLE TO TRADE THE PEREGRINE COMMON STOCK THAT THEY RECEIVE IN THE MERGER? (SEE PAGE 73)

A: Yes. The Peregrine common stock will be listed on the Nasdaq National Market under the symbol "PRGN." Certain persons who are deemed affiliates of Harbinger will be required to comply with Rule 145 under the Securities Act of 1933 if they sell their shares of Peregrine common stock received in the merger.

Q: WHAT SHAREHOLDER APPROVALS ARE NEEDED TO COMPLETE THE MERGER? (SEE PAGES 43)

A: For Harbinger, holders of a majority of the outstanding shares of Harbinger's common stock must approve and adopt the merger agreement and approve the merger.

For Peregrine, a majority of the shares of Peregrine common stock present and voting at the Peregrine special meeting, in person or by proxy, must approve the issuance of Peregrine common stock in connection with the merger.

In order to conduct business at each of the special meetings, a majority of Peregrine's outstanding common stock must be present and voting, in person or by proxy.

Q: DOES THE BOARD OF DIRECTORS OF HARBINGER RECOMMEND VOTING IN FAVOR OF THE MERGER? (SEE PAGE 52)

A: Yes. After careful consideration, Harbinger's board of directors, by the unanimous vote of the directors present, recommends that Harbinger shareholders vote in favor of approval and adoption of the merger agreement and approval of the merger.

Q: DOES THE BOARD OF DIRECTORS OF PEREGRINE RECOMMEND VOTING IN FAVOR OF THE ISSUANCE OF PEREGRINE COMMON STOCK IN THE MERGER? (SEE PAGE 62)

A: Yes. After careful consideration, Peregrine's board of directors unanimously recommends that Peregrine stockholders vote in favor of the issuance of Peregrine common stock in the merger.

Q: ARE THERE RISKS I SHOULD CONSIDER IN DECIDING WHETHER TO VOTE FOR THE MERGER? (SEE PAGE 12)

A: Yes. In evaluating the merger, you should carefully consider the factors discussed in the section entitled "Risk Factors" beginning on page 12.

Q: WHAT DO I NEED TO DO NOW? (SEE PAGE 44)

A: After carefully reading and considering the information contained in this joint proxy statement/prospectus, please submit your Peregrine or Harbinger proxy according to the instructions on the enclosed proxy card as soon as possible. If you do not submit a proxy or attend your special meeting and vote in person, your shares will not be represented or voted at your meeting.

Q: CAN I SUBMIT MY PROXY BY TELEPHONE OR OVER THE INTERNET? (SEE PAGE 44)

A: You may be able to submit your proxy by telephone or over the Internet. You should refer to the proxy card included with your materials for instructions about how to vote. If you vote by telephone or over the Internet, you do not need to complete and mail your proxy card.

2

Exhibit H
0620

Q:  WHAT DO I DO IF I WANT TO CHANGE MY VOTE AFTER I HAVE SUBMITTED MY PROXY? (SEE PAGE 45)

A: You can change your vote at any time before your proxy is voted at your special meeting. There are three ways for you to do this:

- send notice to the secretary of Peregrine or Harbinger (as applicable) that you wish to revoke your proxy;

- send notice to the secretary of Peregrine or Harbinger (as applicable) that you wish to change your proxy; or

- attend your special meeting and vote in person.

Q:  IF MY SHARES ARE HELD IN "STREET NAME" BY MY BANK OR BROKER, WILL MY BANK OR BROKER VOTE MY SHARES FOR ME? (SEE PAGE 44)

A: Your bank or broker will vote your shares only if you provide instructions on how to vote by following the instructions provided to you.

If you do not instruct your bank or broker how to vote your shares, it will not have discretionary authority to vote your shares on the matters currently proposed to be presented at the special meetings. As a result, your bank or broker may deliver a proxy card expressly indicating that it is NOT voting your shares. This indication that a broker is not voting your shares is referred to as a "broker non-vote." Broker non-votes will be counted for the purpose of determining the presence or absence of a quorum at the special meetings. Because the merger requires the approval of holders of a majority of the Harbinger common stock outstanding, a broker non-vote at the Harbinger special meeting will be equivalent to a vote against adoption and approval of the merger agreement and against approval of the merger. Although broker non-votes will be counted for purposes of determining the presence of a quorum at the Peregrine special meeting, they will not be deemed "votes cast" with respect to proposals currently expected to be considered at the Peregrine special meeting. Accordingly, a broker non-vote will not effect the outcome of voting on the proposal to approve the issuance of shares of Peregrine common stock in connection with the merger.

Q:  WHAT HAPPENS IF A HARBINGER SHAREHOLDER DOESN'T VOTE? (SEE PAGE 44)

A: If a Harbinger shareholder doesn't submit a proxy or vote at the Harbinger special meeting, it will have the same effect as a vote against adoption and approval of the merger agreement and approval of the merger.

- If you submit a proxy and do not indicate how you want to vote, your proxy will be counted as a vote to adopt and approve the merger agreement and to approve the merger.

- If you submit a proxy and affirmatively elect to abstain from voting, your proxy will have the same effect as a vote against adoption and approval of the merger agreement and against approval of the merger.

Q:  WHAT HAPPENS IF A PEREGRINE STOCKHOLDER DOESN'T VOTE? (SEE PAGE 44)

A: If you are a Peregrine stockholder and do not submit a proxy or vote at the Peregrine special meeting, your shares will not be counted as present for purposes of determining the presence or absence of a quorum and will have no effect on the outcome of the proposal to approve the issuance of Peregrine common stock in the merger. Your broker could, however, submit a "broker non-vote," which would have the effect described in the question concerning shares held in "street name."

- If you submit a proxy and do not indicate how you want to vote, your proxy will be counted as a vote to approve the issuance of shares of Peregrine common stock in connection with the merger.

3

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0630

– If you submit a proxy and affirmatively elect to abstain from voting, your proxy will be counted as present for the purpose of determining the presence of a quorum but will not be voted at the special meeting. Consequently, your abstention will have the same effect as a vote against the issuance of Peregrine's common stock in connection with the merger.

Q: WHEN AND WHERE IS THE HARBINGER SPECIAL MEETING?

A: The Harbinger special meeting will take place at the J.W. Marriott Hotel, 3300 Lenox Road N.E., Atlanta, Georgia 30326 on June 16, 2000 at 9:00 a.m., local time.

Q: WHEN AND WHERE IS THE PEREGRINE SPECIAL MEETING?

A: The Peregrine special meeting will take place at the Del Mar Hilton, 15575 Jimmy Durante Boulevard, Del Mar, California 92014 on June 16, 2000 at 9:00 a.m., local time.

Q: WHEN DO YOU EXPECT THE MERGER TO BE COMPLETED? (SEE PAGE 75)

A: We are working to complete the merger as quickly as possible. In addition to receiving the required approvals from holders of Peregrine common stock and Harbinger common stock, we must also receive clearance for the merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. We hope to complete the merger before June 30, 2000.

Q: SHOULD HARBINGER SHAREHOLDERS SEND IN THEIR STOCK CERTIFICATES NOW? (SEE PAGE 76)

A: No. After the merger is completed, the exchange agent will send Harbinger shareholders written instructions for exchanging their Harbinger stock certificates for Peregrine stock certificates.

Q: WHAT ARE THE TAX CONSEQUENCES OF THE MERGER TO ME? (SEE PAGE 70)

A: Peregrine and Harbinger each expect the merger to qualify as a tax-free reorganization for U.S. federal income tax purposes. A Harbinger shareholder will recognize gain or loss on any fractional share of Peregrine common stock for which cash is received in lieu of a fractional share.

Please carefully review the information under the caption "Material United States federal income tax consequences of the merger," beginning on page 70, for a description of the material U.S. federal income tax consequences of the merger. The tax consequences to you will depend on the facts of your own situation. Please consult your tax advisors for a full understanding of the tax consequences of the merger to you .

Q: AM I ENTITLED TO APPRAISAL RIGHTS? (SEE PAGE 73)

A: No. Neither holders of Harbinger common stock nor holders of Peregrine common stock are entitled to appraisal rights in connection with the merger.

Q: WILL THE RIGHTS OF A HARBINGER SHAREHOLDER CHANGE AS A RESULT OF THE MERGER? (SEE PAGE 178)

A: Yes. The rights of Peregrine stockholders are governed by Delaware law while the rights of Harbinger shareholders are governed by Georgia law. In addition, Harbinger shareholder rights are currently governed by Harbinger's articles of incorporation and bylaws, while Peregrine stockholder rights are governed by Peregrine's certificate of incorporation and bylaws. Harbinger shareholders will become Peregrine stockholders as a result of the merger and, accordingly, their rights will be governed by Delaware law and the certificate of incorporation and bylaws of Peregrine.

Q: WHOM SHOULD I CALL WITH QUESTIONS? (SEE PAGE 194)

A: If you have any questions about the merger or any related transaction, please call the investor relations department of Harbinger at (404) 467-3000 or of Peregrine at (858) 481-5000. You may also obtain additional information about Peregrine or Harbinger from documents filed

Exhibit H
0631

with the Securities and Exchange Commission without charge upon written
or oral request by following the instructions in the section entitled
"Where You Can Find More Information" on page 194.

4

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

SUMMARY OF THE JOINT PROXY STATEMENT/PROSPECTUS

THIS SUMMARY HIGHLIGHTS SELECTED INFORMATION FROM THIS JOINT PROXY STATEMENT/PROSPECTUS AND MAY NOT CONTAIN ALL OF THE INFORMATION THAT IS IMPORTANT TO YOU. FOR A MORE COMPLETE UNDERSTANDING OF THE MERGER, YOU SHOULD CAREFULLY READ THE REST OF THIS JOINT PROXY STATEMENT/PROSPECTUS, INCLUDING THE "RISK FACTORS" SECTION BEGINNING ON PAGE 12 AND THE OTHER DOCUMENTS TO WHICH WE REFER. SEE "WHERE YOU CAN FIND MORE INFORMATION."

THE COMPANIES

PEREGRINE SYSTEMS, INC.

Peregrine refers to itself as "The Infrastructure Management Company." It offers business organizations an integrated suite of packaged infrastructure resource management application software. These software applications are designed to manage the various aspects of organizational infrastructure from the moment an asset is leased, acquired, or taken from existing stock until the moment it is taken out of service. Infrastructure assets include computers, computer networks, telecommunication assets, physical plant and facilities, corporate car or truck fleets, and many other assets. In addition, Peregrine has recently introduced products designed to automate the processes associated with the procurement and use of infrastructure assets.

Soda Acquisition Corporation is a wholly owned subsidiary of Peregrine that was recently formed solely for the purpose of the merger. It does not conduct any business and has no material assets. In connection with the merger of Peregrine and Harbinger, Soda Acquisition will be merged with and into Harbinger. Harbinger will then become a wholly owned subsidiary of Peregrine, and Soda Acquisition will no longer exist as a separate corporation.

Peregrine was incorporated in California in 1981 and reincorporated in Delaware in 1994. Peregrine's principal executive offices are located at 12670 High Bluff Drive, San Diego, California 92130, and its telephone number is (858) 481-5000. Soda Acquisition has the same address and telephone number as Peregrine.

HARBINGER CORPORATION

Harbinger is a leading provider of business-to-business electronic commerce products and services. It develops, markets, and supports business-to-business e-commerce software products and provides network communications and consulting services that help businesses automate the cycle of transactions required in the electronic procurement of goods and services.

Harbinger was incorporated in Georgia in 1988. Harbinger's principal executive offices are located at 1277 Lenox Park Boulevard, Atlanta, Georgia 30319, and its telephone number is (404) 467-3000.

THE MERGER

SUMMARY OF THE MERGER

The merger involves a business combination of Peregrine and Harbinger. To combine the companies, a subsidiary of Peregrine will merge into Harbinger. As a result, Harbinger will become a wholly owned subsidiary of Peregrine.

In connection with the merger, each outstanding share of Harbinger common stock will be exchanged for 0.75 of a share of Peregrine common stock. Peregrine will not issue fractional shares in connection with the merger. Instead of issuing fractional shares, Peregrine will pay Harbinger shareholders cash for any fractional shares of Peregrine common stock they would have otherwise received.

5

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0633

REASONS FOR THE MERGER (SEE PAGES 49, 50 AND 61)

The boards of directors of both Peregrine and Harbinger believe that the merger and the merger agreement are fair to, and in the best interests of, their respective companies and shareholders. Peregrine and Harbinger have each identified several reasons that they believe the merger will be beneficial to each company and each company's shareholders.

Peregrine and Harbinger each believe that the Internet has redefined the beginning and end points of business processes. We believe that, through the Internet, businesses are now challenged to extend their operations beyond traditional internal constraints and to interact directly with their supplier base. At the same time, suppliers are challenged to reach customers in new ways, notably by making their products and services available over the Internet and through web-based marketplaces for goods and services. We believe business is evolving toward an end-to-end process for managing business assets and infrastructure from the time they are acquired until they are retired. We believe that combining Harbinger and Peregrine can link the internal processes associated with managing assets with the external processes associated with acquiring them. Our reasons are discussed in greater detail under the captions "Joint reasons for the merger" on page 49, "Harbinger's reasons for the merger" beginning on page 50 and "Peregrine's reasons for the merger" beginning on page 61.

RISKS ASSOCIATED WITH PEREGRINE, HARBINGER, AND THE MERGER

The merger poses a number of risks to both companies and their respective shareholders. In addition, both Peregrine and Harbinger are subject to various risks associated with their businesses. These risks are discussed in greater detail under the caption "Risk Factors" beginning on page 12. Peregrine and Harbinger both encourage you to read and consider all of these risks carefully.

THE SPECIAL MEETINGS (SEE PAGE 42)

Peregrine and Harbinger will each hold a special meeting of its shareholders in connection with the merger. The purpose of Harbinger's meeting will be to obtain shareholder approval and adoption of the merger agreement with Peregrine and shareholder approval of the merger. The purpose of Peregrine's meeting will be to obtain stockholder approval of the issuance of shares of Peregrine common stock in connection with the merger, as required by the rules of The Nasdaq Stock Market.

Harbinger's special meeting will be held at 9:00 a.m., local time, on June 16, 2000 at the J.W. Marriott Hotel, 3300 Lenox Road N.E., Atlanta, Georgia 30326. Peregrine's special meeting will be held on June 16, 2000 at 9:00 a.m., local time, at the Del Mar Hilton, 15575 Jimmy Durante Boulevard, Del Mar, California 92014.

RECOMMENDATIONS OF THE BOARDS OF DIRECTORS (SEE PAGE 42)

The board of directors of Harbinger has concluded that the merger agreement and the merger are fair to, and in the best interests of, Harbinger and its shareholders. By the unanimous vote of the directors present, the board of directors of Harbinger has recommended that Harbinger's shareholders vote in favor of the approval and adoption of the merger agreement and in favor of approval of the merger.

The board of directors of Peregrine has also concluded that the merger agreement and the merger are fair to, and in the best interests of, Peregrine and its stockholders. It has unanimously recommended that Peregrine's stockholders vote in favor of the issuance of Peregrine's common stock in connection with the merger.

6

Exhibit H
0634

RECORD DATES (SEE PAGE 43)

The close of business on May 15, 2000 has been fixed as the record date for determining the holders of Peregrine common stock entitled to notice of and to vote at the Peregrine special meeting.

The close of business on May 22, 2000 has been fixed as the record date for determining the holders of Harbinger common stock entitled to notice of and to vote at the Harbinger special meeting.

VOTING POWER (SEE PAGE 43)

On the Harbinger record date, 40,057,369 shares of Harbinger common stock were outstanding. Each record holder of shares of Harbinger common stock will be entitled at the special meeting to one vote for each Harbinger share held on the record date.

On the Peregrine record date, 109,356,814 shares of Peregrine common stock were outstanding. Each record holder of shares of Peregrine common stock will be entitled to one vote for each Peregrine share held on the record date.

VOTING AGREEMENTS OF OFFICERS, DIRECTORS, AND SIGNIFICANT SHAREHOLDERS (SEE PAGE 91)

Of Harbinger's outstanding shares, 5,987,524 shares are beneficially owned by executive officers, directors, and significant shareholders who are deemed to be affiliates of Harbinger and who signed voting agreements. These shares represented approximately 14.5% of Harbinger's total outstanding shares on the record date. Each of these affiliates has agreed to vote his or her shares at Harbinger's special meeting in favor of the merger agreement and the merger.

Of Peregrine's outstanding shares, 12,017,621 shares are held by executive officers, directors, and significant stockholders who are deemed to be affiliates of Peregrine and who signed voting agreements. These shares represented approximately 10.8% of Peregrine's total outstanding shares on the record date. Each of these affiliates has agreed to vote his or her shares at Peregrine's special meeting in favor of the issuance of Peregrine common stock in connection with the merger.

VOTE REQUIRED FOR APPROVAL (SEE PAGE 43)

PEREGRINE'S SPECIAL MEETING

In order for a vote to be taken at the Peregrine special meeting, a quorum, consisting of a majority of Peregrine's outstanding common stock at the Peregrine record date, must be present and voting, either in person or by proxy. In order for the merger to become effective, holders of a majority of the shares present at the special meeting, in person or by proxy, must vote in favor of the issuance of shares of Peregrine common stock in connection with the merger. Holders of approximately 10.8% of the outstanding shares of Peregrine common stock have agreed to vote in favor of the issuance of shares of Peregrine common stock in connection with the merger and will be present, in person or by proxy, at the special meeting.

HARBINGER'S SPECIAL MEETING

In order for a vote to be taken at the Harbinger special meeting, a quorum, consisting of a majority of Harbinger's outstanding common stock at the record date, must be present and voting, either in person or by proxy. In order for the merger to become effective, holders of at least a majority of Harbinger's outstanding common stock at the Harbinger record date must adopt and approve the merger agreement and approve the merger. Holders of approximately 14.5% of the outstanding shares of Harbinger common stock have agreed to vote for the merger agreement and the merger and will be present, in person or by proxy, at the special meeting.

7

Exhibit H
0635

TREATMENT OF ABSTENTIONS AND BROKER NON-VOTES (SEE PAGE 44)

If you submit a proxy that indicates an abstention from voting in all matters, your shares will be counted as present for the purpose of determining the existence of a quorum, but they will not be voted on any matter at the applicable special meeting. Abstentions at the Harbinger special meeting will have the same effect as a vote against adoption and approval of the merger agreement and against approval of the merger because the approval of holders of a majority of the Harbinger common stock outstanding is required for adoption and approval of the merger agreement and approval of the merger. Abstentions at the Peregrine special meeting will also have the same effect as a vote against the issuance of Peregrine's common stock in connection with the merger.

Banks and brokers who are the registered holders of shares held for the benefit of their clients will not have discretionary voting authority with respect to the matters to be considered at the special meetings. As a result, if you hold your shares in "street name" (I.E., through your bank or broker), your bank or broker will only vote your shares if you provide them with instructions to do so by following the procedures indicated in your proxy materials. If you do not provide instructions with your proxy, your bank or broker may deliver a proxy card expressly indicating that it is NOT voting your shares. This indication that a broker is not voting your shares is referred to as a "broker non-vote."

Broker non-votes will be counted for the purpose of determining the presence or absence of a quorum at both special meetings. Because the merger requires the approval of holders of a majority of the Harbinger common stock outstanding, a broker non-vote at the Harbinger special meeting will be equivalent to a vote against adoption and approval of the merger agreement and against approval of the merger. Although a broker non-vote will be counted for purposes of determining the presence or absence of a quorum at the Peregrine special meeting, it will not be deemed a "vote cast" with respect to proposals currently expected to be considered at the Peregrine special meeting. Accordingly, a broker non-vote will not affect the outcome of voting on the proposal to approve the issuance of shares of Peregrine common stock in connection with the merger.

OPINIONS OF OUR FINANCIAL ADVISORS (SEE PAGES 52 AND 63)

In deciding to approve the merger, the boards of directors of both Peregrine and Harbinger considered opinions from their respective financial advisors as to the fairness, from a financial point of view, of the exchange ratio in the merger. In deciding to approve the merger, Harbinger's board of directors considered the opinion of its financial advisor, Goldman, Sachs & Co., and Peregrine's board of directors considered the opinion of its financial advisor, Deutsche Bank Securities Inc.

The full texts of the written opinions of our advisors are attached to this joint proxy statement/ prospectus as Annex E and Annex F. You should read these opinions carefully and completely for a description of the assumptions made and matters considered by the financial advisors and the limitations of the reviews the advisors conducted. The opinion of Goldman Sachs is directed to Harbinger's board, and the opinion of Deutsche Bank is directed to Peregrine's board. Neither Goldman Sachs' opinion nor Deutsche Bank's opinion addresses the prices at which Peregrine's common stock will trade after the merger. Neither Goldman Sachs nor Deutsche Bank is making any recommendation as to how you should vote your shares at your special meeting.

INTERESTS OF SOME OF HARBINGER'S EXECUTIVE OFFICERS, DIRECTORS, AND SHAREHOLDERS (SEE PAGE 73)

Harbinger shareholders should consider that some officers and directors of Harbinger have interests in the merger that are different from their interests. These interests include:

- under Harbinger's employment agreement with James M. Travers, its President and Chief Executive Officer, all unvested options he holds at the time of the merger will become immediately vested when the merger is completed;

8

Exhibit H
0636

- some options granted to other executive officers of Harbinger provide for accelerated vesting if the officer's employment is actually or constructively terminated within 180 days. The executive officers of Harbinger who will receive this benefit are James K. McCormick, Harbinger's Chief Financial Officer; Douglas L. Roberts, Harbinger's Senior Vice President, Worldwide Sales; Daniel L. Manack, Harbinger's Executive Vice President, Global Operations; and Gerald Diamond, Harbinger's Senior Vice President, Worldwide Product Development;

- Peregrine has agreed to appoint two members of Harbinger's board of directors to its board of directors upon the effectiveness of the merger. Peregrine and Harbinger have not yet determined which Harbinger directors will become Peregrine directors; and

- Peregrine has agreed to continue to indemnify and provide directors' and officers' insurance coverage for the current officers and directors of Harbinger for a period of six years following the merger.

NO OTHER SOLICITATION OR NEGOTIATION BY HARBINGER (SEE PAGE 82)

Subject to some exceptions involving a superior acquisition proposal, Harbinger has agreed that it will not solicit, initiate, or engage in discussions with another party concerning an acquisition or business combination with, or investment from, any other party while the merger is pending.

CONDITIONS TO THE MERGER (SEE PAGE 87)

Peregrine's and Harbinger's obligations to complete the merger are subject to satisfaction or waiver of a number of closing conditions. These conditions include the following:

- Harbinger's shareholders must have adopted and approved the merger agreement and approved the merger;

- Peregrine's stockholders must have approved the issuance of shares of Peregrine common stock in connection with the merger;

- there must be no effective injunction or order preventing the completion of the merger;

- all waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act must have expired or been terminated early;

- Peregrine and Harbinger must each have received an opinion of its tax counsel that the merger will qualify as a reorganization under Section 368(a) of the Internal Revenue Code;

- the representations and warranties of Peregrine and Harbinger must be true and correct on the closing of the merger unless the failure to be true and correct would not have a material adverse effect; and

- Peregrine and Harbinger must have each complied in all material respects with their respective obligations and agreements under the merger agreement.

If either Peregrine or Harbinger waives any condition to the closing of the merger, they will each consider at the time whether the facts and circumstances of the waiver make a resolicitation of proxies from shareholders appropriate.

TERMINATION OF THE MERGER AGREEMENT (SEE PAGE 88)

The merger agreement may be terminated, and the proposed merger may be abandoned before (but not after) it becomes effective, under the following conditions:

- Peregrine and Harbinger may mutually agree to terminate the merger agreement and cancel the merger;

9

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0637

- Either Peregrine or Harbinger may terminate the merger agreement if a governmental entity prohibits the merger;

- Either Peregrine or Harbinger may terminate the merger agreement if the merger has not occurred on or before October 31, 2000 and the company seeking to terminate was not the principal cause for the delay;

- Either Peregrine or Harbinger may terminate the merger agreement if the required shareholder approvals are not obtained at the special meetings;

- Harbinger may terminate the merger agreement if Peregrine has breached a representation, warranty, or obligation under the merger agreement, the applicable breach would cause closing conditions not to be met, and Peregrine has not cured the applicable breach within 30 days;

- Peregrine may terminate the merger agreement if Harbinger has breached a representation, warranty, or obligation under the merger agreement, the applicable breach would cause closing conditions not to be met, and Harbinger has not cured the applicable breach within 30 days; and

- Peregrine may terminate the merger agreement if the Harbinger board of directors withdraws or changes its recommendation that Harbinger's shareholders adopt and approve the merger agreement and approve the merger.

PAYMENT OF TERMINATION FEES BY HARBINGER (SEE PAGE 89)

In the event the merger agreement is terminated, Harbinger may be required to pay Peregrine a termination fee of $50 million. At least $20 million of the termination fee must be paid in cash, and the balance may be paid in shares of Harbinger's common stock.

FEDERAL TAX CONSEQUENCES OF THE MERGER (SEE PAGE 70)

The merger is structured so that Harbinger's shareholders generally will not recognize gain or loss for United States federal income tax purposes (other than taxes payable because of cash received by Harbinger shareholders in lieu of fractional shares). It is a condition to the merger that both Peregrine and Harbinger receive an opinion from their respective tax counsel concerning this tax treatment. Please carefully review the information "Material United States federal income tax consequences of the merger," beginning on page 70, for a description of the material U.S. federal tax consequences of the merger. The tax consequences to you will depend on the facts of your own situation. Please consult your tax advisors for a full understanding of the tax consequences of the merger to you.

ACCOUNTING TREATMENT OF THE MERGER (SEE PAGE 70)

Peregrine intends to account for the merger as a purchase for financial accounting purposes. As a result of this accounting treatment, Peregrine will record goodwill on its balance sheet, which will be amortized along with other intangible assets over a five year period. In addition, Peregrine will incur a charge for in-process research and development, currently estimated at $66.1 million, in the quarter in which the merger is completed.

RESTRICTIONS ON RESALE OF PEREGRINE COMMON STOCK ISSUED IN THE MERGER (SEE PAGE 73)

The shares of Peregrine common stock that Harbinger shareholders receive in the merger will be freely tradable after the merger unless the shareholder is considered an affiliate of Harbinger under applicable federal securities law. Affiliates of Harbinger may only sell the shares of Peregrine common stock they receive in the merger in compliance with Rule 145 under the Securities Act of 1933, however. Each person that Harbinger believes to be an affiliate has signed an agreement acknowledging his or her obligation to sell in compliance with Rule 145.

10

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0638

ANTITRUST APPROVALS (SEE PAGE 72)

    The merger is subject to waiting periods and other provisions of United
States and applicable foreign antitrust laws. Peregrine and Harbinger have made
the required filings with the United States Department of Justice and the
Federal Trade Commission. The applicable waiting periods have not expired as of
the date of this joint proxy statement/prospectus. The merger may not be
completed until these waiting periods have expired or been terminated.
Nevertheless, the Department of Justice, the Federal Trade Commission, or a
foreign regulatory agency or other governmental or private person may challenge
the merger at any time, including after it is completed.

TRANSFER OF YOUR STOCK CERTIFICATES (SEE PAGE 76)

    If the merger becomes effective, you will receive a transmittal letter from
the exchange agent in the merger instructing you how to exchange your Harbinger
stock certificates. PLEASE DO NOT SEND ANY STOCK CERTIFICATES UNTIL YOU HAVE
RECEIVED THIS INSTRUCTION LETTER. If you have any questions, you may contact
Peregrine's transfer agent, ChaseMellon Shareholder Services, L.L.C. at 400
South Hope Street, Fourth Floor, Los Angeles, California 90071. Their telephone
number is (213) 553-9700. Please do not contact ChaseMellon with questions about
the exchange of certificates until after the merger has been completed.

COMPARATIVE MARKET PRICE DATA (SEE PAGE 40)

    Both Peregrine's and Harbinger's common stock currently trade on the Nasdaq
National Market. Peregrine trades under the symbol PRGN, and Harbinger trades
under the symbol HRBC. The following table presents trading information about
our common stock on April 5, 2000 and May 19, 2000. April 5, 2000 was the last
trading day prior to the time the merger agreement was executed and publicly
announced. May 19, 2000 was the last practicable trading day prior to the time
we mailed this joint proxy statement/prospectus.

|                | HARBINGER COMMON STOCK | | | PEREGRINE COMMON STOCK | | |
|                | HIGH | LOW | CLOSE | HIGH | LOW | CLOSING |
|----------------|--------|--------|--------|--------|--------|---------|
| April 5, 2000  | $25.250 | $19.438 | $24.125 | $60.500 | $53.375 | $58.000 |
| May 19, 2000   | 15.375 | 13.938 | 14.125 | 20.375 | 18.750 | 19.250 |

FORWARD LOOKING STATEMENTS IN THIS JOINT PROXY STATEMENT/PROSPECTUS

    This joint proxy statement/prospectus contains forward-looking statements
within the meaning of the Securities Act of 1933 and the Securities Exchange Act
of 1934. These statements include statements relating to the business, results
of operations, and financial condition of both Peregrine and Harbinger as well
as similar statements about the business, results of operations, and financial
condition of the combined company after the merger. Words such as will, would,
may, could, anticipates, expects, intends, plans, believes, seeks, estimates,
and similar expressions often identify forward-looking statements.

    These forward-looking statements are not guarantees of the future
performance of Peregrine, Harbinger, or the combined company after the merger.
These forward looking statements are subject to many risks and uncertainties
that could cause actual results to differ materially from those contemplated by
the forward-looking statements. In evaluating the merger, you should carefully
consider the discussion of these and other factors in the section entitled "Risk
Factors" beginning on page 12.

                                     11

Exhibit H
0639

RISK FACTORS

THE MERGER INVOLVES A HIGH DEGREE OF RISK. BY VOTING IN FAVOR OF THE MERGER, SHAREHOLDERS OF HARBINGER WILL BE CHOOSING TO INVEST IN PEREGRINE'S COMMON STOCK. BY VOTING IN FAVOR OF THE ISSUANCE OF SHARES OF PEREGRINE'S COMMON STOCK IN CONNECTION WITH THE MERGER, STOCKHOLDERS OF PEREGRINE WILL BE CHOOSING TO ISSUE A SUBSTANTIAL NUMBER OF PEREGRINE'S SHARES IN ORDER TO COMPLETE THE MERGER TRANSACTION WITH HARBINGER. BOTH HARBINGER SHAREHOLDERS AND PEREGRINE STOCKHOLDERS WILL BE ASSUMING THE ADDITIONAL RISKS ASSOCIATED WITH THE MERGER AND THE ON-GOING OPERATIONS OF THE COMBINED COMPANY. SHAREHOLDERS OF HARBINGER AND STOCKHOLDERS OF PEREGRINE SHOULD CAREFULLY CONSIDER THE FOLLOWING FACTORS IN DETERMINING HOW TO VOTE.

RISKS RELATING TO THE MERGER

IF OUR CUSTOMER MARKETS DO NOT PERCEIVE BENEFITS FROM INTEGRATING PEREGRINE'S INFRASTRUCTURE MANAGEMENT PRODUCTS WITH HARBINGER'S E-BUSINESS AND INTERNET PROCUREMENT SOLUTIONS, OUR COMBINED REVENUES MAY NOT GROW OR MAY NOT SUSTAIN THE HISTORICAL GROWTH RATES OF EITHER COMPANY, OUR BUSINESS WOULD BE ADVERSELY AFFECTED, AND OUR STOCK PRICE COULD DECLINE.

The success of the merger depends on market acceptance of our strategic initiative to integrate Peregrine's infrastructure management software products with Harbinger's e-business and internet procurement offerings. If customers do not perceive benefits from combining our product lines, we will not realize the principal strategic benefit that our managements currently anticipate from the merger. As a result, we would not experience increased revenues as a result of the merger and could experience declining revenues or substantially slower revenue growth than either company experienced prior to the merger. Any of these events would have an adverse effect on our combined operating results and could lead to a decline in Peregrine's stock price.

BOTH PEREGRINE'S AND HARBINGER'S EXISTING BUSINESSES ARE RELATIVELY NEW AND STILL DEVELOPING. IT IS DIFFICULT TO PREDICT HOW THE COMBINED COMPANY'S BUSINESS WILL EVOLVE OR WHETHER A MARKET WILL DEVELOP OR, IF DEVELOPED, CONTINUE TO EXIST FOR OUR INTEGRATED PRODUCT OFFERINGS.

Because each of our independent businesses is still developing, it is hard for us to predict how the business of the combined company will evolve and whether it will achieve market acceptance. If we cannot develop an integrated product line that achieves and maintains market acceptance, our business and operating results will be harmed. Peregrine's and Harbinger's existing markets are each new, developing, and relatively unproven. Beginning in late 1997, Peregrine began to shift its product strategy beyond providing software products to manage the help desks that support users of internal corporate computer networks. Through acquisitions and internal product development, Peregrine expanded its product line in an effort to develop a market for infrastructure resource management software solutions that help companies manage the various assets in their corporate infrastructures, including their computer networks and other information technology assets. More recently, Peregrine has further expanded its product line to offer products that help manage assets that are not purely technology assets. These additional products help manage corporate assets such as corporate car and truck fleets, rail fleets and physical plant and facilities. In addition, in the second half of fiscal 2000, Peregrine introduced GET.IT!, a line of employee self-service products that facilitate the acquisition and use of infrastructure assets, services, and information. Harbinger historically focused on providing electronic commerce software products and network servers and has recently shifted its strategy toward creating and supporting Internet-based trading solutions. In connection with this strategic shift, Harbinger is now offering its products on a subscription basis over harbinger.net for a recurring fee in lieu of a one-time license payment. You should carefully review the more detailed discussion of the risks associated with each of our individual businesses. These discussions are contained under the risk factors captioned "Risks relating to Peregrine" and "Risks relating to Harbinger."

SHAREHOLDERS OF HARBINGER WILL RECEIVE A FIXED NUMBER OF SHARES OF PEREGRINE'S COMMON STOCK, REGARDLESS OF CHANGES IN THE PRICE OF PEREGRINE'S COMMON STOCK OR HARBINGER'S COMMON STOCK.

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0640

Shareholders of Harbinger will receive 0.75 of a share of Peregrine common stock for each share of Harbinger common stock held by them at the time the merger becomes effective. There will be no adjustment to this exchange ratio for any changes in the market price of either Peregrine common stock or Harbinger common stock. In addition, neither Peregrine nor Harbinger may terminate the merger agreement or "walk away" from the merger solely because of changes in the market price of either company's common stock. In addition to fluctuations relating to changing market assessments of each company individually, the share prices of Peregrine common stock and Harbinger common stock are by nature subject to general stock market fluctuations, particularly fluctuations in the market value of technology companies. Peregrine's and Harbinger's stock prices have experienced substantial volatility historically and extremely strong volatility since the announcement of the merger. We cannot predict or give any assurances as to the market price of Peregrine's or Harbinger's common stock before the merger or at any time after the merger.

WE MAY EXPERIENCE PROBLEMS INTEGRATING THE BUSINESSES OF PEREGRINE AND HARBINGER. ANY INTEGRATION PROBLEMS COULD CAUSE US TO INCUR SUBSTANTIAL UNANTICIPATED COSTS AND EXPENSES, WHICH WOULD HARM OUR OPERATING RESULTS.

If we fail to integrate our businesses successfully, we will incur substantial costs, which will increase our expenses and reduce any earnings or potentially result in operating losses, and we will fail to achieve the expected synergies and cost reductions of the merger. In addition, integration problems could divert management's attention from other business opportunities, which could result in slower revenue growth than anticipated or in declines in revenue. Integrating Peregrine's business with Harbinger's business will be complex, time-consuming, and expensive. It may disrupt both companies' businesses if not completed in a timely and efficient manner. Peregrine and Harbinger are both global companies with substantial operations throughout the world, and integrating geographically separate and dispersed organizations may be difficult. Peregrine has never attempted to integrate a merger with a company as large as Harbinger.

Specific integration challenges faced by Peregrine and Harbinger include the following:

- retaining existing customers and strategic partners;

- retaining and integrating management and other key employees of both companies;

- combining product offerings and product lines effectively and quickly, including technical integration by our respective engineering teams;

- integrating sales efforts so that customers can easily do business with the combined company;

- transitioning multiple locations around the world to common systems, including common information technology systems;

- persuading employees that the business cultures of the two companies are compatible;

- successfully developing and promoting a unified brand strategy and marketing it to existing and prospective customers; and

- developing and maintaining uniform standards, controls, procedures, and policies.

THE MERGER COULD IMPAIR EXISTING RELATIONSHIPS OF PEREGRINE AND HARBINGER WITH SUPPLIERS, CUSTOMERS, STRATEGIC PARTNERS, AND EMPLOYEES, WHICH COULD HAVE AN ADVERSE EFFECT ON OUR INDIVIDUAL AND COMBINED BUSINESSES AND FINANCIAL RESULTS.

The public announcement of the merger could substantially impair important business relationships of either company. Impairment of these business relationships could reduce our revenues or increase

13

Exhibit H
0641

our expenses, either of which would harm our financial results. Specific examples of situations in which we could experience problems include the following:

- suppliers, distributors, or customers of either Peregrine or Harbinger could decide to cancel or terminate existing arrangements, or fail to renew those arrangements, as a result of the merger;

- potential customers who are currently negotiating with Peregrine or Harbinger with respect to the purchase or license of their products and services may delay purchases, or defer or terminate negotiations, as a result of uncertainty about the merger;

- customers of Harbinger who use products of Peregrine's competitors could terminate or delay orders with Harbinger because they question Harbinger's continued commitment to provide products and enhancements, or to support products, used in conjunction with products of Peregrine's competitors;

- key employees of Harbinger, particularly those for whom vesting of options or other benefits will accelerate as a result of the merger, may decide to terminate their employment; and

- other current or prospective employees of Peregrine and Harbinger may experience uncertainty about their future roles with the combined company, which could adversely affect our ability to attract and retain key management, sales, marketing, and technical personnel.

THE MERGER COULD RESULT IN SLOWER REVENUE GROWTH RATES FOR THE COMBINED COMPANY THAN THOSE APPLICABLE TO PEREGRINE PRIOR TO THE MERGER, WHICH COULD ADVERSELY AFFECT THE OPERATING RESULTS OF THE COMBINED COMPANY AND LEAD TO A DECLINE IN ITS STOCK PRICE. HARBINGER'S REVENUES AND PROFITS COULD DECREASE AS IT TRANSITIONS TO A BUSINESS MODEL THAT EMPHASIZES RECURRING SERVICES REVENUES.

Peregrine may not be able to maintain its recent revenue growth rates after the merger, which could have an adverse effect on its operating results and could lead to a decline in its stock price. Peregrine's revenues grew from $62 million in fiscal 1998 to $138 million in fiscal 1999 and $253 million in fiscal 2000. Harbinger has experienced substantially slower growth rates than Peregrine in recent periods, with revenues growing from $118 million in fiscal 1997 to $135 million in fiscal 1998 to $156 million in fiscal 1999. Harbinger is currently changing its business model by creating and supporting internet-based trading solutions that assist companies to automate their procurement processes and by providing customers with the ability to use Harbinger's products on a hosted subscription basis. The risks associated with the transition in Harbinger's business model are more fully discussed under "Risks related to Harbinger." If the merger does not create the product and financial synergies management currently anticipates, and particularly if Harbinger's business transition is not successful, the combined company's revenue growth rates could be substantially lower than Peregrine's recent growth rates. In addition, if Peregrine and Harbinger experience integration problems, management's attention could be diverted from Peregrine's existing core business and lead to slower revenue growth rates for that business. Even if the merger is not completed, Peregrine's management does not believe that its historical growth rates can necessarily be maintained. A more detailed discussion of Peregrine's business and associated risks is contained under the caption "Risks related to Peregrine."

HARBINGER AND SOME OF ITS CURRENT AND FORMER OFFICERS AND DIRECTORS ARE DEFENDANTS IN SHAREHOLDER LITIGATION FOR WHICH HARBINGER IS NOT INSURED. THE OUTCOME OF THIS LITIGATION, IF DETERMINED ADVERSELY TO HARBINGER, COULD HAVE AN ADVERSE EFFECT ON THE COMBINED COMPANY'S FINANCIAL CONDITION AFTER THE MERGER.

If outstanding shareholder litigation against Harbinger were decided adversely to Harbinger, or Harbinger were required to settle this litigation for a substantial sum, our financial condition as a combined company after the merger could be materially and adversely affected. In September 1999, a complaint was filed against Harbinger and some of its current and former officers and directors in the

14

Exhibit H
0642

United States District Court for the Northern District of Georgia. The complaint alleges causes of action for misrepresentation and violations of federal securities laws. An amended complaint was filed in March 2000, alleging additional causes of action, including allegations relating to accounting improprieties. The complaints relate to actions by Harbinger during the period from February 1998 to October 1998. Harbinger did not maintain directors' and officers' liability insurance during this period. As a result, Harbinger is not insured with respect to any potential liability of Harbinger or any officer or director of Harbinger. Harbinger is, however, obligated under agreements with each of its officers and directors to indemnify them for the costs incurred in connection with defending themselves against this litigation and is obligated to indemnify them to the maximum extent permitted under applicable law if they are held liable.

The pending litigation is still in the early stages. As a result, we are unable to estimate the damages, or range of damages, that Harbinger or the combined company might incur in connection with this litigation. In addition, defending the litigation will involve substantial direct expenses and will likely result in a diversion of management's time and attention away from business operations, which could have an adverse effect on the results of operations of Harbinger or the combined company.

FUTURE ACQUISITIONS BY THE COMBINED COMPANY COULD COMPOUND ANY INTEGRATION PROBLEMS RESULTING FROM THE MERGER OF PEREGRINE AND HARBINGER AND COULD ADVERSELY AFFECT OUR COMBINED OPERATING RESULTS. CONVERSELY, INTEGRATING PEREGRINE AND HARBINGER COULD CONSUME SUBSTANTIAL RESOURCES AND MANAGEMENT TIME, CAUSING US TO FOREGO POTENTIAL ACQUISITIONS THAT WOULD FURTHER OUR STRATEGIC OBJECTIVES.

Future acquisitions could make integrating Peregrine and Harbinger more difficult and could adversely affect the operating results of the combined company after the merger. Peregrine and Harbinger have each pursued aggressive acquisition strategies in recent years in efforts to respond to changes in the markets for their products and services. As a combined company, we may continue to make strategic acquisitions or significant investments in businesses that offer complementary products, services, and technologies. If we experience problems with these acquisitions, or these acquisitions do not ultimately provide the strategic and financial benefits anticipated, our financial results as a combined company could be harmed.

On the other hand, we could be prevented from pursuing important strategic acquisitions and investments if management resources are consumed with integration issues arising from the merger of Peregrine and Harbinger. The markets for our products are constantly changing, and our management believes it is important to be able to respond to these changes quickly, which may require us to acquire other companies or technologies. If the merger of Peregrine and Harbinger leaves us unable to focus on these strategic objectives as a result of integration or other issues, our future revenues and operating results could be adversely affected, and our stock price could decline.

PEREGRINE'S REPORTED FINANCIAL RESULTS WILL SUFFER AS A RESULT OF PURCHASE ACCOUNTING TREATMENT OF THE MERGER AND THE AMORTIZATION OF GOODWILL AND OTHER INTANGIBLE ASSETS.

Purchase accounting treatment of the merger will result in a net loss for Peregrine for the foreseeable future, which could have a material and adverse effect on the market price of Peregrine's common stock. Under purchase accounting, Peregrine will record the following as an asset on its balance sheet:

- the fair value of the consideration given for Harbinger's outstanding common stock;

- the fair value of the consideration given for outstanding options and warrants to purchase Harbinger common stock, which Peregrine will assume in connection with the merger; and

- merger-related direct transaction costs, including the fees of our legal, accounting, and financial advisors.

15

Exhibit H
0643

Peregrine will allocate these costs to individual Harbinger assets acquired and liabilities assumed. These assets and liabilities will include various identifiable intangible assets such as acquired technology, acquired trademarks and tradenames, and acquired workforce. Intangible assets, including goodwill, will be amortized over a five year period. In addition, Peregrine will allocate a portion of the purchase price for acquiring Harbinger to in-process research and development. In-process research and development, which is currently estimated at $66.1 million for Harbinger, will be expensed in the quarter in which the merger is completed.

As described in the Unaudited Pro Forma Condensed Combined Financial Statements beginning on page 116, the amount of purchase cost allocated to goodwill and other intangibles is estimated to be approximately $1.3 billion. If goodwill and other intangible assets were amortized in equal annual amounts following completion of the merger, the accounting charge attributable to these items would be approximately $250.0 million per fiscal year.

PEREGRINE STOCKHOLDERS MAY NOT REALIZE A BENEFIT FROM THE MERGER COMMENSURATE WITH THE OWNERSHIP DILUTION THEY WILL EXPERIENCE IN CONNECTION WITH THE MERGER.

If the combined company is unable to realize the strategic and financial benefits currently anticipated from the merger, Peregrine stockholders will have experienced substantial dilution of their ownership interest without receiving any commensurate benefit. In connection with the merger, Peregrine anticipates it will issue approximately 35.6 million shares of its common stock (including options being assumed), representing approximately 32.5% of its outstanding common stock prior to the merger.

OFFICERS AND DIRECTORS OF HARBINGER HAVE CONFLICTS OF INTEREST THAT MAY INFLUENCE THEM TO SUPPORT OR APPROVE THE MERGER.

Some of the directors and officers of Harbinger are parties to agreements, or participate in other arrangements, that give them interests in the merger that are different from your interests. These potential conflicts of interests include the following:

- as a result of the merger, unvested options held by James M. Travers, Harbinger's President and Chief Executive Officer, will immediately vest;

- some officers of Harbinger will be entitled to severance payments and additional accelerated vesting of options if they are terminated by the combined company after completion of the merger;

- Peregrine has agreed that Harbinger will be entitled to designate two current directors of Harbinger who are reasonably acceptable to Peregrine to serve on the combined company's board of directors; and

- Peregrine has agreed to cause the combined company to indemnify each present and former Harbinger officer and director against liabilities arising out of his or her services as an officer or director. The combined company will maintain officers' and directors' liability insurance to cover any of these liabilities for the next six years.

For the above reasons, the directors and officers of Harbinger receiving these benefits could be more likely to vote to approve the merger agreement than if they did not have these interests. Harbinger shareholders should consider whether these interests may have influenced these directors and officers to support or recommend the merger.

Officers and directors of Harbinger beneficially owning approximately 5,987,524 shares of Harbinger's common stock, representing 14.5% of all outstanding shares of Harbinger common stock entitled to vote at the Harbinger special meeting, have agreed to vote in favor of the merger. In addition, officers and directors of Peregrine beneficially owning approximately 12,017,621 shares of

16

Exhibit H
0644

Peregrine's common stock, representing 10.8% of all outstanding shares of Peregrine common stock entitled to vote at the special meeting, have agreed to vote at the Peregrine special meeting in favor of the issuance of Peregrine common stock in connection with the merger. The share ownership numbers in this paragraph include shares which could be purchased upon exercise of options within 60 days of May 15, 2000 with respect to Peregrine shares and within 60 days of April 30, 2000 with respect to Harbinger shares.

THE STOCK PRICES OF PEREGRINE AND HARBINGER HAVE BEEN EXTREMELY VOLATILE IN THE PAST, HAVE BEEN INCREASINGLY VOLATILE SINCE THE ANNOUNCEMENT OF THE MERGER, AND SHOULD BE EXPECTED TO REMAIN VOLATILE IN THE FUTURE.

The market for technology stocks is particularly volatile, and both Peregrine and Harbinger have experienced substantial swings in their stock prices in recent periods. In addition, their stock prices have each been extremely volatile since the announcement of the merger. The following factors could cause the stock price of Peregrine, Harbinger, or after the merger, the combined company to fluctuate significantly:

- announcements by Peregrine, Harbinger, the combined company, or any of their competitors of significant contracts, new products or technological innovations, acquisitions, strategic relationships, joint ventures, or capital commitments;

- changes in financial estimates or recommendations by securities analysts, including changes in estimates and recommendations relating to the merger;

- changes in market valuations of software and business-to-business e-commerce companies; and

- general fluctuations in stock market prices and volumes.

FAILURE TO COMPLETE THE MERGER COULD HAVE A NEGATIVE IMPACT ON THE STOCK PRICE OF PEREGRINE AND/OR HARBINGER AS WELL AS A NEGATIVE IMPACT ON THEIR BUSINESSES AND FINANCIAL RESULTS.

If the merger is not completed for any reason, Peregrine and Harbinger may be subject to a number of material risks, including the following:

- Harbinger may be required under certain circumstances to pay Peregrine a termination fee of $50.0 million, at least $20.0 million of which must be paid in cash and the balance of which may be paid in Harbinger common stock based on a price per share of $24.125;

- the price of Peregrine and/or Harbinger common stock may decline to the extent that the relevant current market price reflects a market assumption that the merger will be completed. The companies' stock prices may also decline because of uncertainty concerning the stand-alone prospects of either company; and

- some costs related to the mergers, such as legal, accounting, financial advisory, and financial printing fees must be paid even if the mergers are not completed.

THE MERGER MAY PROCEED DESPITE MATERIAL ADVERSE CHANGES TO EITHER PEREGRINE'S OR HARBINGER'S RESPECTIVE BUSINESSES THAT RESULT FROM THE ANNOUNCEMENT OF THE MERGER, FROM CHANGES AFFECTING THE ECONOMY OR THE SOFTWARE INDUSTRY GENERALLY, AND FROM OTHER CAUSES.

In general, either Peregrine or Harbinger may decline to complete the merger if there is a material adverse change affecting the other company between the date of the merger agreement and the completion of the merger. However, certain types of changes, even if they have a material adverse effect on Peregrine or Harbinger, will not permit the parties to abandon the merger. For example, neither company may terminate the merger agreement as a result of any of the following:

- changes in either company's stock price or trading volume;

17

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0645

- either company's failure to meet or exceed the earnings estimates of
  research analysts;

- either company's failure to meet or exceed its own internal earnings
  estimates;

- changes in either company's industry that do not disproportionately affect
  that company;

- changes affecting the United States economy generally; or

- changes resulting from the announcement and pendency of the merger.

If these types of adverse changes occur and Peregrine and Harbinger must still complete the merger, the benefits of the merger to Peregrine and Harbinger may be reduced, the trading price of either Peregrine common stock or Harbinger common stock could decline prior to the merger, and the price of Peregrine common stock after the merger could be adversely affected.

RISKS RELATING TO PEREGRINE

PEREGRINE HAS A HISTORY OF LOSSES, CANNOT PREDICT ITS FUTURE OPERATING RESULTS, AND CANNOT ASSURE ITS FUTURE PROFITABILITY. IN ADDITION, MANAGEMENT DOES NOT BELIEVE ITS RECENT REVENUE GROWTH RATES ARE NECESSARILY SUSTAINABLE.

Prediction of Peregrine's future operating results is difficult, if not impossible, and we have incurred substantial losses in recent years. If we continue to incur losses, if our revenues decline or grow at a slower rate, or if our expenses increase without commensurate increases in revenues, our operating results will suffer and our stock price may fall. Through March 31, 2000, we had recorded cumulative net losses of approximately $64.9 million, including approximately $113.4 million related to the write-off of acquired in-process research and development and the amortization of goodwill and other intangible assets in connection with several acquisitions completed since late 1997. We have also incurred, and expect to continue to incur, substantial expenses associated with the amortization of intangible assets. In addition, our management does not believe our recent growth rates are necessarily sustainable in the future or indicative of future growth rates. If our revenue growth rates slow or our revenues decline, our operating results could be seriously impaired because many of our expenses are fixed and cannot be easily or quickly changed.

PEREGRINE'S REVENUES VARY SIGNIFICANTLY FROM QUARTER TO QUARTER FOR NUMEROUS REASONS BEYOND ITS CONTROL. QUARTER-TO-QUARTER VARIATIONS COULD RESULT IN SUBSTANTIAL DECREASES IN PEREGRINE'S STOCK PRICE IF ITS REVENUES OR OPERATING RESULTS ARE LESS THAN MARKET ANALYSTS ANTICIPATE.

Our revenues or operating results in a given quarter could be substantially less than anticipated by market analysts, which could result in substantial declines in our stock price. In addition, quarter-to-quarter variations could create uncertainty about the direction or progress of our business, which could also result in stock price declines. Our revenues and operating results will vary from quarter to quarter for many reasons beyond our control. As a result, our quarterly revenues and operating results are not predictable with any significant degree of accuracy. Reasons for variability of our revenues and operating results include the following:

- SIZE, TIMING, AND CONTRACTUAL TERMS OF ORDERS. Our revenues in a given
  quarter could be adversely affected if we are unable to complete one or
  more large license agreements, if the completion of a large license
  agreement is delayed, or if the contract terms prevent us from recognizing
  revenue during that quarter. In addition, when negotiating large software
  licenses, many customers tend to time their negotiations until quarter-end
  in an effort to improve their ability to negotiate more favorable pricing
  terms. As a result, we tend to recognize a substantial portion of our
  revenues in the last month or weeks of a quarter, and license revenues in
  a given quarter will substantially depend on orders booked during the last
  month or weeks of a quarter. Our revenue growth in recent periods has been
  attributable in part to an increase in the number of large license
  transactions we completed in a given period. We expect our reliance on
  these large

18

Exhibit H
0646

transactions to continue for the forseeable future. If we are unable to complete a large license transaction in a particular quarter, our revenues and operating results could be materially below the expectations of market analysts, and our stock price could fall.

- ANNOUNCEMENTS BY PEREGRINE OR OUR COMPETITORS. Announcements of new products or releases by us or our competitors could cause customers to delay purchases pending the introduction of the new product or release. In addition, announcements by us or our competitors concerning pricing policies could have an effect on our revenues in a given quarter.

- CUSTOMER BUDGETING CYCLES. Our quarter-to-quarter revenues will depend on customer budgeting cycles. If customers change their budgeting cycles, or reduce their capital spending on technology, our revenues could decline.

- CHANGES IN PRODUCT MIX. Changes in our product mix could adversely affect our operating results because some products provide higher margins than others. For example, margins on software licenses tend to be higher than margins on maintenance services.

- CHANGES IN METHOD OF SALE. Our profit margins will tend to vary based on whether a sale was made through our direct sales force or through a reseller or other strategic partner. Sales through indirect channels tend to be less profitable, and if sales through indirect channels increased relative to direct sales, our operating results could be harmed. Sales through indirect channels, including distributors, third party resellers, and system integrators, represent a significant percentage of our total sales. We expect this trend to continue in the future. As a result, we could experience a shortfall in our revenues, or a substantial decline in our rate of revenue growth, if sales through our indirect channels were to decrease or were to increase at a slower rate. We have less ability to manage our sales through indirect channels and less visibility about our channel partner's success in selling our products. As a result, we could experience unforeseen variability in our revenues and operating results for a number of reasons, including the following:

  - inability of our channel partners to sell our products;

  - a decision by our channel partners to favor products that compete with Peregrine's;

  - inability of our channel partners to manage the timing of their purchases from Peregrine against their sales to end-users, resulting in substantial inventories of unsold licenses held by our channel partners; or

  - our inability to increase the number of channel partners that sell our products or to maintain relationships with existing channel partners.

- CANCELLATION OF LICENSES OR MAINTENANCE AGREEMENTS. Cancellations of licenses or maintenance contracts could reduce our revenues and harm our operating results. In particular, our customers tend to renew their maintenance contracts on an annual basis. Substantial cancellations of maintenance agreements, or a substantial failure to renew maintenance contracts, would reduce our revenues and harm our operating results.

THE LONG SALES CYCLE FOR PEREGRINE'S PRODUCTS MAY CAUSE SUBSTANTIAL FLUCTUATIONS IN OUR REVENUES AND OPERATING RESULTS.

Delays in customer orders could result in our revenues being substantially below the expectations of market analysts. In addition, we may incur substantial sales and marketing expenses during a particular period in an effort to obtain orders. If we are unsuccessful in generating offsetting revenues during that period, our revenues and earnings could be substantially reduced or we could experience a large loss. We are likely to experience delays in customer orders because the sales cycle for our products is long and unpredictable. Specifically, our customers' planning and purchase decisions involve

19

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0647

a significant commitment of resources and a lengthy evaluation and product qualification process. The sales cycle for our products requires us to engage in a sales cycle that, if it results in a sale, takes six to nine months to complete. The length of the sales cycle may be extended beyond six or nine months due to factors over which we have little or no control, including the size of the transaction and the level of competition we encounter in our sales activities. During the sales cycle, we typically provide a significant level of education to prospective customers regarding the use and benefits of our products. Any delay in the sales cycle of a large license or a number of smaller licenses could have an adverse effect on our results of operation and financial condition.

SEASONAL TRENDS IN SALES OF PEREGRINE'S SOFTWARE PRODUCTS MAY RESULT IN A PERIODIC REDUCTION IN ITS REVENUES AND IMPAIRMENT OF ITS OPERATING RESULTS.

Seasonality in our business could result in our revenues in a given period being less than market estimates. Seasonality could also result in quarter-to-quarter decreases in our revenues. In either of these events, seasonality could have an adverse impact on our results of operations. Historically, our revenues and operating results in our December quarter have tended to benefit, relative to our June and September quarters, from purchase decisions made by the large concentration of customers with calendar year-end budgeting requirements. Revenues and operating results in our March quarter have tended to benefit from the efforts of our sales force to meet fiscal year-end sales quotas. These historical patterns may change over time, however, particularly as our operations become larger and the sources of our revenue change or become more diverse. For example, our international operations have expanded significantly in recent years, particularly in Europe. We also have an international presence in the Pacific Rim and Latin America. We may experience variability in demand associated with seasonal buying patterns in these foreign markets. As an example, the September quarter is typically weaker in Europe for many technology companies, including Peregrine, due to the European summer holiday season.

IF A MARKET FOR PEREGRINE'S INFRASTRUCTURE RESOURCE MANAGEMENT SOFTWARE AND ASSET PROCUREMENT SOLUTIONS DOES NOT DEVELOP, WE WILL BE UNABLE TO SELL OUR PRODUCTS OR INCREASE OUR REVENUES. THE MARKET FOR OUR PRODUCTS IS STILL RELATIVELY NEW AND UNPROVEN.

If the market for our infrastructure management software products does not continue to develop as Peregrine anticipates, Peregrine's business and operating results would be adversely affected, and our financial condition could deteriorate. Until recently, Peregrine's product strategy focused on providing software products that help to manage business computer networks and other information technology assets. Beginning in late 1997, we began to broaden our product line to offer products capable of managing multiple aspects of a business enterprise's infrastructure, including its physical plant and facilities, its telecommunications networks, its distribution systems, and its corporate car and rail fleets. Prior to our introduction of these products, an integrated software solution for managing corporate infrastructure assets did not exist in the market. Rather, corporations purchased software to manage specific components of their infrastructure. In the second half of fiscal 2000, Peregrine attempted to further expand its infrastructure management product line by introducing GET.IT!, a line of employee self-service products that facilitate the acquisition and use of infrastructure assets, services, and information. As a result, the market for our products is still new and unproven and is continuing to develop. If a market for infrastructure management solutions fails to develop, or develops in ways we do not anticipate, our business would be seriously impaired. In particular, our revenues and operating results would decrease, and we could experience losses.

IF PEREGRINE DOES NOT RESPOND ADEQUATELY TO ITS INDUSTRY'S EVOLVING TECHNOLOGY STANDARDS, OR DOES NOT CONTINUE TO MEET THE SOPHISTICATED NEEDS OF ITS CUSTOMERS, SALES OF ITS PRODUCTS MAY DECREASE.

As a result of rapid technological change in our industry, our competitive position in existing markets, or in markets we may enter in the future, could be eroded rapidly by product advances and technological changes. We may be unable to improve the performance and features of our products as

20

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0648

necessary to respond to these developments. In addition, the life cycles of our products are difficult to estimate. Our growth and future financial performance depend in part on our ability to improve existing products and develop and introduce new products that keep pace with technological advances, meet changing customer needs, and respond to competitive products. Our product development efforts will continue to require substantial investments. We may not have sufficient resources to make these investments. In addition, if we are required to expend substantial resources to respond to specific technological or product changes, our operating results would be adversely affected.

IF PEREGRINE CANNOT ATTRACT EXPERIENCED SALES PERSONNEL, SOFTWARE DEVELOPERS, AND HIGHLY-TRAINED CUSTOMER SERVICE PERSONNEL, IT WILL NOT BE ABLE TO SELL AND SUPPORT ITS PRODUCTS.

If we are not successful in attracting and retaining qualified sales personnel, software developers, and customer service personnel, our revenue growth rates could decrease, or our revenues could decline, and our operating results could be materially harmed. Our products and services require a sophisticated selling effort targeted at several key people within our prospective customers' organizations. This process requires the efforts of experienced sales personnel as well as specialized consulting professionals. In addition, the complexity of our products, and issues associated with installing and maintaining them, require highly trained customer service and support personnel. We intend to hire a significant number of these personnel in the future and train them in the use of our products. We believe our success depends in large part on our ability to attract and retain these key employees. Competition for these employees is intense, and we have in the past experienced difficulty recruiting qualified employees.

PEREGRINE'S BUSINESS WOULD BE HARMED IF ONE OR MORE MEMBERS OF ITS SENIOR MANAGEMENT TEAM CHOSE TO LEAVE PEREGRINE.

The loss of the services of one or more our executive officers or key employees, or the decision of one or more of these individuals to join a competitor, could adversely affect our business and harm our operating results and financial condition. Our success depends to a significant extent on the continued service of our senior management and other key sales, consulting, technical, and marketing personnel. None of our senior management is bound by an employment agreement. In addition, only a few employees who were significant shareholders of businesses we acquired are bound by noncompetition agreements. Peregrine does not maintain key man life insurance on any of its employees.

IF PEREGRINE FAILS TO MANAGE EXPANSION EFFECTIVELY, THIS WILL PLACE A SIGNIFICANT STRAIN ON ITS MANAGEMENT AND OPERATIONAL RESOURCES.

Our recent growth rates have placed a significant strain on our management and operational resources. Peregrine has expanded its operations rapidly in recent years and intends to continue to expand in order to pursue market opportunities that management believes are attractive. Our customer relationships could be strained if we are unable to devote sufficient resources to them as a result of our growth, which could have an adverse effect on our future revenues and operating results.

NEW PRODUCT INTRODUCTIONS OR ENHANCEMENTS OF EXISTING PRODUCTS BY PEREGRINE'S COMPETITORS COULD ADVERSELY AFFECT ITS ABILITY TO SELL ITS PRODUCTS.

If Peregrine cannot compete effectively in its markets by offering products that are comparable in functionality, ease of use, and price to those of its competitors, our revenues will decrease, and our operating results would be adversely affected. The markets for Peregrine's products are highly competitive and diverse, and the technologies for infrastructure management software products can change rapidly. New products are introduced frequently and existing products are continually enhanced.

21

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0649

We face competition from a number of sources in the markets for our infrastructure resource management and e-procurement software solutions.

- In the markets for our infrastructure resource management solutions, we face competition from:

  - providers of internal help desk software applications for managing information technology service desks, such as Remedy Corporation and Tivoli Systems, that compete with our enterprise service desk software;

  - providers of asset management software, including Remedy, MainControl, and Janus Technologies;

  - providers of facilities management software, including Archibus, Facilities Information Systems, and Assetworks (a division of CSI-Maximus);

  - providers of transportation management software that competes with our fleet management and rail management software, including Control Software (a division of CSI-Maximus) and Project Software and Development Inc.;

  - information technology and systems management companies such as IBM, Computer Associates, Network Associates, Hewlett-Packard, and Microsoft;

  - numerous start-up and other entrepreneurial companies offering products that compete with the functionality offered by one or more of our infrastructure management products; and

  - the internal information technology departments of those companies with infrastructure management needs.

- In the markets for procurement and e-procurement solutions, we have experienced competition from:

  - established competitors in the business-to-business internet commerce solution market, such as Ariba and CommerceOne; and

  - established providers of enterprise resource planning software that are entering the market for procurement and e-procurement solutions, including Oracle and SAP.

Many of our current and potential competitors have substantially greater financial, technical, marketing, and other resources than we have. As a result, they may be able to respond more quickly to new or emerging technologies and changes in customer needs. They may also be able to devote greater resources than we can to the development, promotion, and sale of their products. We may not be able to compete successfully against current and future competitors, which could have an adverse effect on our future revenues and operating results.

NEW COMPETITORS AND ALLIANCES AMONG EXISTING COMPETITORS COULD IMPAIR PEREGRINE'S ABILITY TO RETAIN AND EXPAND ITS MARKET SHARE.

Additional competition from new entrepreneurial companies or established companies entering our markets could have an adverse effect on our business, revenues, and operating results. In addition, alliances among companies that are not currently direct competitors could create new competitors with substantial market presence. Because few barriers to entry exist in the software industry, we anticipate additional competition from new and established companies as well as business alliances. We expect that the software industry will continue to consolidate. In particular, we expect that large software companies will continue to acquire or establish alliances with our smaller competitors, thereby increasing the resources available to these competitors. These new competitors or alliances could rapidly acquire significant market share at our expense.

22

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0650

SYSTEM MANAGEMENT COMPANIES MAY ACQUIRE INFRASTRUCTURE MANAGEMENT AND/OR HELP DESK SOFTWARE COMPANIES AND CLOSE THEIR SYSTEMS TO OUR PRODUCTS, HARMING PEREGRINE'S ABILITY TO SELL ITS PRODUCTS.

If large system management providers close their systems to our products, our revenues and operating results would be seriously harmed. Our ability to sell our products depends in large part on our products' compatibility with and support by providers of system management products, including Tivoli, Computer Associates, and Hewlett-Packard. Both Tivoli and Hewlett-Packard have acquired providers of help desk software products. These large, established providers of system management products and services may decide to close their systems to competing vendors like Peregrine. They may also decide to bundle their products that compete with our products with other products for enterprise licenses for promotional purposes or as part of a long-term pricing strategy. If that were to happen, our ability to sell our products could be adversely affected. Increased competition may result from acquisitions of help desk and other infrastructure resource management software vendors by system management companies. Increased competition could result in price reductions, reductions in our gross margins, or reductions in our market share. Any of these events would adversely affect our business and operating results.

PEREGRINE MAY BE UNABLE TO EXPAND ITS BUSINESS AND INCREASE ITS REVENUES IF IT IS UNABLE TO EXPAND ITS DISTRIBUTION CHANNELS.

If we are unable to expand our distribution channels effectively, our business, revenues, and operating results could be harmed. In particular, we will need to expand our direct sales force and establish relationships with additional system integrators, original equipment manufacturers, and other third party channel partners who market and sell our products. If we cannot establish these relationships, or if our channel partners are unable to market our products effectively or provide cost-effective customer support and service, our revenues and operating results will be harmed. Even where we are successful in establishing a new third-party relationship, our agreement with the third party may not be exclusive. As a result, our partners may carry and actively promote competing product lines.

IF PEREGRINE IS UNABLE TO EXPAND ITS BUSINESS INTERNATIONALLY, PEREGRINE'S BUSINESS, REVENUES, AND OPERATING RESULTS COULD BE HARMED.

In order to grow our business, increase our revenues, and improve our operating results, Peregrine believes it must expand internationally. If we expend substantial resources pursuing an international strategy and are not successful, our revenues would be less than we or market analysts anticipate, and our operating results would suffer. International revenues represented approximately 36.0% of Peregrine's business in each of fiscal 1998 and 1999 and approximately 41.0% of Peregrine's business in fiscal 2000. We have several international sales offices in Europe as well as offices in Japan, Singapore, and Australia. International expansion will require significant management attention and financial resources, and we may not be successful expanding our international operations. We have limited experience in developing local language versions of our products or in marketing our products to international customers. We may not be able to successfully translate, market, sell, and deliver our products internationally.

CONDUCTING BUSINESS INTERNATIONALLY POSES RISKS THAT COULD AFFECT PEREGRINE'S FINANCIAL RESULTS.

Even if we are successful in expanding our operations internationally, conducting business outside North America poses many risks that could adversely affect our operating results. These include the following:

- gains and losses resulting from fluctuations in currency exchange rates, for which hedging activities may not adequately protect us;

- longer payment cycles;

23

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0651

- difficulties in staffing and managing international operations;

- problems in collecting accounts receivable; and

- the adverse effects of tariffs, duties, price controls, or other restrictions that impair trade.

IF IMMIGRATION LAWS LIMIT PEREGRINE'S ABILITY TO RECRUIT AND EMPLOY SKILLED TECHNICAL PROFESSIONALS FROM OTHER COUNTRIES, ITS BUSINESS AND OPERATING RESULTS COULD BE HARMED.

Limitations under United States immigration laws could prevent us from recruiting skilled technical personnel from foreign countries, which could harm our business if we do not have sufficient personnel to develop new products and respond to technological changes. This inability to hire technical personnel could lead to future decreases in our revenues, or decreases in our revenue growth rates, either of which would adversely affect our operating results. Because of severe shortages for qualified technical personnel in the United States, many companies, including Peregrine, have recruited engineers and other technical personnel from foreign countries. Foreign computer professionals such as those we have employed typically become eligible for employment in the United States by obtaining a nonimmigrant visa. The number of nonimmigrant visas is limited annually by federal immigration laws. In recent years, despite increases in the number of available visas, the annual allocation has been exhausted well before year end.

PEREGRINE HAS MADE SUBSTANTIAL CAPITAL COMMITMENTS THAT COULD HAVE AN ADVERSE EFFECT ON ITS OPERATING RESULTS AND FINANCIAL CONDITION IF ITS BUSINESS DOES NOT GROW.

We have made substantial capital commitments as a result of recent growth in our business that could seriously harm our financial condition if our business does not grow and we do not have adequate resources to satisfy our obligations. In June 1999, Peregrine entered into a series of leases providing us with approximately 540,000 square feet of office space and an option to lease 118,000 square feet. Even excluding the exercise of the option, the leases require a minimum aggregate lease payment of approximately $124.0 million over the twelve year term of the leases. The office space (including the option) is intended for a five building campus in San Diego, California. We plan to fully occupy three of these buildings by the summer of 2000 and for the present time to sublease the remaining two buildings. The capital commitments, construction oversight, and movement of personnel and facilities involved in a transaction of this type and magnitude present numerous risks, including:

- failure to properly estimate the future growth of our business;

- inability to sublease excess office space if we underestimate future growth;

- disruption of operations; and

- inability to match fixed lease payments with fluctuating revenues, which could impair our earnings or result in losses.

PRODUCT DEVELOPMENT DELAYS COULD HARM PEREGRINE'S COMPETITIVE POSITION AND REDUCE ITS REVENUES.

If we experience significant product development delays, our position in the market would be harmed, and our revenues could be substantially reduced, which would adversely affect our operating results. We have experienced product development delays in the past and may experience delays in the future. In particular, we may experience product development delays associated with the integration of recently acquired products and technologies. Delays may occur for many reasons, including an inability to hire sufficient number of developers, discovery of bugs and errors, or a failure of our current or future products to conform to industry requirements.

24

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0652

ERRORS OR OTHER SOFTWARE BUGS IN PEREGRINE'S PRODUCTS COULD RESULT IN
SIGNIFICANT EXPENDITURES TO REMEDY OR CORRECT THE ERRORS OR BUGS.

If we are required to expend significant amounts to correct software bugs or
errors, our revenues could be harmed as a result of our inability to deliver the
product, and our operating results could be impaired as we incur additional
costs without offsetting revenues. Errors can be detected at any point in a
product's life cycle. We have experienced errors in the past that resulted in
delays in product shipment and increased costs. Discovery of errors could result
in any of the following:

- loss of or delay in revenues and loss of customers or market share;

- failure to achieve market acceptance;

- diversion of development resources and increased development expenses;

- increased service and warranty costs;

- legal actions by our customers; and

- increased insurance costs.


PEREGRINE COULD EXPERIENCE LOSSES AS A RESULT OF ITS STRATEGIC INVESTMENTS.


If Peregrine's strategic investments in other companies are not successful,
it could incur losses. Peregrine has made and expects to continue to make
minority investments in companies with businesses or technologies that we
consider to be complementary with those of Peregrine. These investments have
generally been made by issuing shares of our common stock or to a lesser extent
with cash. Many of these investments are in companies whose operations are not
yet sufficient to establish them as profitable concerns. Adverse changes in
market conditions or poor operating results of underlying investments could
result in Peregrine incurring losses or an inability to recover the carrying
value of its investments.


PEREGRINE COULD BE COMPETITIVELY DISADVANTAGED IF IT WERE UNABLE TO PROTECT
ITS INTELLECTUAL PROPERTY.

If we fail to adequately protect our proprietary rights, our competitors
could offer similar products relying on technologies developed by us,
potentially harming our competitive position and decreasing our revenues. We
attempt to protect our intellectual property rights by limiting access to the
distribution of our software, documentation, and other proprietary information
and by relying on a combination of copyright, trademark, and trade secret laws.
In addition, we enter into confidentiality agreements with our employees and
certain customers, vendors, and strategic partners. In some circumstances,
however, we may, if required by a business relationship, provide our licensees
with access to our data model and other proprietary information underlying our
licensed applications.


Despite precautions that we take, it may be possible for unauthorized third
parties to copy aspects of our current or future products or to obtain and use
information that we regard as proprietary. Policing unauthorized use of software
is difficult, and some foreign laws do not protect our proprietary rights to the
same extent as United States laws. Litigation may be necessary in the future to
enforce our intellectual property rights, to protect our trade secrets, or to
determine the validity and scope of the proprietary rights of others. If we are
required to pursue litigation to enforce our proprietary rights, we could incur
substantial costs, and our management's attention could be diverted, either of
which could adversely affect our revenues and operating results.

25

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0653

IF PEREGRINE BECOMES INVOLVED IN A PROTRACTED INTELLECTUAL PROPERTY DISPUTE, OR ONE WITH A SIGNIFICANT DAMAGES AWARD, OR WHICH REQUIRES IT TO CEASE SELLING ITS PRODUCTS, IT COULD BE SUBJECT TO SIGNIFICANT LIABILITY AND THE TIME AND ATTENTION OF ITS MANAGEMENT COULD BE DIVERTED.

In recent years, there has been significant litigation in the United States involving intellectual property rights, including companies in the software industry. Intellectual property claims against Peregrine and any resulting lawsuit, if successful, could subject us to significant liability for damages and invalidate what we currently believe are our proprietary rights. These lawsuits, regardless of their success, would likely be time-consuming and expensive to resolve and could divert management's time and attention. Any potential intellectual property litigation could also force us to do one or more of the following:

- cease selling, incorporating, or using products or services that incorporate the infringed intellectual property;

- obtain from the holder of the infringed intellectual property a license to sell or use the relevant technology, which license may not be available on acceptable terms, if at all; or

- redesign those products or services that incorporate the disputed technology, which could result in substantial unanticipated development expenses.

If we are subject to a successful claim of infringement and we fail to develop noninfringing technology or license the infringed technology on acceptable terms and on a timely basis, our revenues could decline or our expenses could increase.

We may in the future initiate claims or litigation against third parties for infringement of our proprietary rights or to determine the scope and validity of our proprietary rights or the proprietary rights of competitors. These claims could result in costly litigation and the diversion of technical and management personnel's attention.

PEREGRINE MAY BE SUBJECT TO PRODUCT LIABILITY CLAIMS THAT COULD RESULT IN SIGNIFICANT COSTS.

If we are held liable for damages incurred as a result of our products, our operating results could be significantly impaired. Our license agreements with our customers typically contain provisions designed to limit exposure to potential product liability claims. These limitations may not be effective under the laws of some jurisdictions. Although we have not experienced any product liability claims to date, the sale and support of our products entails the risks of these claims.

CONTROL BY PEREGRINE'S OFFICERS AND DIRECTORS MAY LIMIT YOUR ABILITY TO INFLUENCE MATTERS REQUIRING STOCKHOLDER APPROVAL AND COULD DELAY OR PREVENT A CHANGE IN CONTROL, WHICH COULD PREVENT OUR STOCKHOLDERS FROM REALIZING A PREMIUM IN THE MARKET PRICE OF THEIR COMMON STOCK.

The concentration of ownership of our common stock by our officers and directors could delay or prevent a change in control of Peregrine or discourage a potential acquiror from attempting to obtain control of Peregrine. This could cause the market price of our common stock to fall or prevent the stockholders from realizing a premium in the market price of our common stock in the event of an acquisition. Our officers and directors currently own approximately 12,089,321 shares of common stock (including shares issuable upon exercise of options exercisable within 60 days of May 15, 2000), representing approximately 10.9% of our total shares outstanding as of May 15, 2000. Assuming the issuance of 30,043,027 shares of Peregrine common stock in connection with the merger, our officers and directors will own approximately 8.7% of our outstanding common stock (not including shares held by officers and directors of Harbinger who will become officers and directors of Peregrine after the merger). For information about the ownership of common stock by our executive officers and stockholders, see "Peregrine Principal Stockholders."

26

Exhibit H
0654

PROVISIONS IN PEREGRINE'S CHARTER DOCUMENTS AND DELAWARE LAW MAY DISCOURAGE POTENTIAL ACQUISITION BIDS FOR PEREGRINE THAT OUR STOCKHOLDERS OTHERWISE WOULD APPROVE AND MAY PREVENT CHANGES IN OUR MANAGEMENT.

Some provisions of Peregrine's charter documents eliminate the right of stockholders to act by written consent without a meeting and impose specific procedures for nominating directors and submitting proposals for consideration at a stockholder meeting. These provisions are intended to increase the likelihood of continuity and stability in the composition of Peregrine's board of directors and the policies established by our board of directors. These provisions also discourage some types of transactions, which may involve an actual or threatened change of control. These provisions are designed to reduce the vulnerability of Peregrine to an unsolicited acquisition proposal. As a result, these provisions could discourage potential acquisition proposals and could delay or prevent a change of control transaction. These provisions are also intended to discourage common tactics that may be used in proxy fights. As a result, they could have the effect of discouraging third parties from making tender offers for Peregrine's shares. These provisions may prevent the market price of Peregrine common stock from reflecting the effects of actual or rumored takeover attempts. These provisions may also prevent changes in Peregrine's ·management.

Peregrine's board of directors has the authority to issue up to 5,000,000 shares of preferred stock in one or more series. The board of directors can fix the price, rights, preference, privileges, and restrictions of this preferred stock without any further vote or action by our stockholders. The issuance of preferred stock allows Peregrine to have flexibility in connection with possible acquisitions and for other corporate purposes. The issuance of preferred stock, however, may delay or prevent a change in control transaction. As a result, the market price of Peregrine common stock and other rights of holders of Peregrine common stock may be adversely affected, including the loss of voting control to others.

RISKS RELATING TO HARBINGER

HARBINGER'S REVENUES COULD DECREASE AS IT TRANSITIONS TO A BUSINESS MODEL THAT EMPHASIZES RECURRING SERVICES REVENUES AND INVESTMENT IN COMPANIES FROM WHICH IT EXPECTS TO DERIVE LICENSE AND RECURRING REVENUE.

Harbinger is currently transitioning its business model to focus on providing its customers with the ability to have their electronic commerce application hosted on harbinger.net as a subscription service. We expect that this model will provide us with an increase in recurring services revenues but will also result in a decrease in up-front licensing and sales revenue. Under our new model, we provide application hosting, which involves applications owned or licensed by us, or third-party-owned applications licensed by our customers that we host on harbinger.net. Our management believes that this service will allow our customers to access software, connectivity and support services without having to bear significant up-front licensing expenditures. Any delay in the installation of our Internet enabled products or the failure in the implementation of this service could have a material adverse effect on our business and financial results.

We are also making equity investments in companies from which we expect to derive license and recurring revenue. Many of these companies are in the early stages of their growth and therefore their business and revenues may be subject to numerous risks related to early-stage ventures. The success of these companies is dependent on many factors, and their inability to create revenues will result in lower than expected payments to us and there can be no assurance that these investments will result in any benefits or payments to us which are proportionate to our expectations or capital investment. In addition, our business and financial results could also suffer if our revenue from increased volume experienced by existing and new customers does not make up for our loss in revenue from the decrease in the per-customer amount of up-front licensing and charges per message.

27

Exhibit H
0655

HARBINGER'S OPERATING RESULTS COULD FLUCTUATE, CAUSING ITS STOCK PRICE TO FALL.

Although Harbinger has been able to grow our revenue and operating income (before special charges) in the past, we cannot assure that this growth will continue after the merger when Harbinger will operate as a subsidiary of Peregrine or that fluctuations in revenue or operating income growth will not occur in the future.

The following are among numerous factors that could impair our future rates of revenue growth or operating income:

- the discontinuance of historical or acquired lines of business or products and a decrease in the rate of growth of X12 and EDIFACT data transformation software sales;

- our success in focusing development on electronic commerce products and services acceptable to the market; and

- our success in selling complex business-to-business e-commerce solutions to large enterprise customers.

In addition, if our quarterly revenue or operating results fall below the expectations of investors or public market analysts, the price of our common stock could fall substantially. Our quarterly operating results have in the past and may in the future vary or decrease significantly depending on factors over which we have limited or no control, such as:

- revenue from software sales and services;

- the timing of new product and service announcements;

- changes in pricing policies by us and our competitors;

- market acceptance of new and enhanced versions of our products;

- conversion of customers to solutions that are Internet protocol-enabled;

- the size and timing of significant orders;

- changes in operating expenses, strategy or personnel;

- government regulation;

- the introduction of alternative technologies; and

- the effect of acquisitions.

We have experienced losses in the past, and at December 31, 1999, we had an accumulated deficit of approximately $57.0 million. We have taken integration and restructuring related charges in the past and may take similar charges in the future related to these or similar items. We operate with virtually no software product order backlog because our software products typically are shipped shortly after orders are received. As a result, revenues in any quarter are substantially dependent on the quantity of purchases of services requested and product orders received in that quarter. Quarterly revenues also are difficult to forecast because the market for electronic commerce and data transformation software products is rapidly evolving, and our revenues in any period may be significantly affected by the announcements and product offerings of our competitors as well as alternative technologies. Our marketplace and vertical market exchange software and infrastructure products are more complex and expensive compared to our other electronic commerce and Internet products introduced to date, and orders of these products will generally involve significant investment decisions by prospective customers. Accordingly, we expect that in selling our marketplace and vertical market exchange software and infrastructure, we will encounter risks typical of companies that rely on large dollar purchase decisions, including the reluctance of purchasers to commit to major investments in new products and protracted

28

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0656

sales cycles, both of which add to the difficulty of predicting future revenues and may result in quarterly fluctuations.

Our expense levels are based, in part, on our expectations as to future revenues. If revenue levels are below expectations, we may be unable or unwilling to reduce expenses proportionately and operating results are likely to be adversely affected. As a result, we believe that period-to-period comparisons of our results of operations are not necessarily meaningful and should not be relied upon as indications of future performance. Due to all of the foregoing factors, it is likely that in some future quarter or quarters our operating results will be below the expectations of public market analysts and investors.

IF HARBINGER FAILS TO SUCCESSFULLY MANAGE ITS GROWTH, IT COULD HAVE AN ADVERSE EFFECT ON HARBINGER'S FUTURE REVENUES AND OPERATING RESULTS.

Harbinger has recently experienced significant growth in revenue, operations and personnel as we have made strategic acquisitions, added subscribers to harbinger.net, our business-to-business e-commerce center, and increased the number of licensees of our software products. This growth could continue to place a significant strain on our management and operations, including our sales, marketing, customer support, research and development, finance and administrative operations. Achieving and maintaining profitability during a period of expansion will depend, among other things, on our ability to successfully expand our products, services and markets and to manage our operations and acquisitions effectively. Difficulties in managing growth, including difficulties in obtaining and retaining talented management and product development personnel, especially following an acquisition, could have a material adverse effect on our business and financial results.

HARBINGER HAS RECENTLY INTRODUCED SEVERAL NEW PRODUCTS, AND MARKET ACCEPTANCE OF THESE PRODUCTS IS CRITICAL TO OUR SUCCESS.

Harbinger has introduced our business community integration, application service provider, marketplace and vertical market exchange and operations management products. As of March 31, 2000, approximately 30 customers were utilizing these products. Broad and timely acceptance of our recently-introduced products, which is critical to our future success, is subject to a number of significant risks. These risks include:

- our ability to successfully market and sell these products;

- our product's ability to support large numbers of buyers and suppliers;

- operating resource management and procurement on the Internet is a new market;

- our need to enhance the features and services of our products; and

- our need to significantly expand our internal resources to support planned growth of our network.

Although we expect to derive a significant portion of long-term future revenue from our recently introduced products, we have not yet finalized our pricing and revenue model for the services associated with these products. If these products do not achieve the level of market acceptance that we anticipate, our business and financial results would suffer.

NETWORK ENHANCEMENTS, UPGRADES AND OTHER FACTORS COULD CAUSE SERVICE DISRUPTIONS OF HARBINGER.NET.

As Harbinger enhances and upgrades its harbinger.net platform, our customers could suffer temporary service interruptions. We have experienced temporary service disruptions in the past as a result of migrating our customers from our current network switch to an Internet Protocol enabled switch, as well as from hardware and software transitions related to the Internet Protocol enabled

29

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

switch, and these service disruptions may continue. Other factors, such as
unauthorized intervention and access into our servers may also cause service on
harbinger.net to be disrupted. We are taking steps to ensure that such
disruptions do not occur, and that any disruptions that do occur will be
minimal. However, if not rectified in a manner satisfactory to our customers,
any disruptions in our harbinger.net network could result in a loss of customers
and a decline in service revenues, which would severely harm our business.

IF HARBINGER CANNOT INTEGRATE ACQUIRED COMPANIES WITH HARBINGER'S BUSINESS,
HARBINGER'S PROFITABILITY MAY BE ADVERSELY AFFECTED.

Harbinger has completed a number of acquisitions in the past three fiscal
years and may complete additional acquisitions of complementary businesses in
the future. Our profitability may be adversely affected by our ability to
effectively and efficiently integrate these recently acquired companies as well
as our ability to integrate companies that we acquire in the future. Our
acquisitions present a number of risks and challenges, including:

- the integration of the software products of the acquired companies into
  our current suite of products;

- retaining and integrating management and other key employees of Harbinger
  and the acquired companies;

- the integration of the sales forces of acquired companies into our
  existing sales operations;

- the coordination of customer support services;

- the conversion of acquired companies into a uniform infrastructure;

- the integration of international operations of acquired companies with our
  international affiliates; and

- the diversion of our management's attention from other business concerns.

We cannot assure that we can successfully assimilate our operations and
integrate our software products with recently acquired operations, software
products and technologies or that we will be successful in repositioning our
products on a timely basis to achieve market acceptance. Any adverse
developments associated with our integration efforts could have a material
adverse affect on our business and financial results.

If we find it necessary to engage in additional acquisitions, we cannot
assure that we will be able to identify suitable acquisition candidates
available for sale at reasonable prices, consummate any acquisition or
successfully integrate any acquired business into our operations. Operational
and software integration problems may arise if we undertake future acquisitions
of complementary products, technologies or businesses. Future acquisitions may
also result in:

- potentially dilutive issuances of equity securities;

- the incurrence of additional debt;

- the write-off of in-process product development and capitalized product
  costs;

- integration costs; and

- the amortization of expenses related to goodwill and other intangible
  assets.

Future acquisitions may involve numerous additional risks, including
difficulties in the assimilation of the operations, products and personnel of
the acquired company, differing company cultures, the diversion of management's
attention from other business concerns, risks of entering markets in which we
have little or no direct prior experience and the potential loss of key
employees of the acquired

30

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0658

company. The occurrence of any of these risks could materially affect our business and financial results. In addition, if we consummate a significant acquisition in which the consideration consists of stock or other securities, our current shareholders' equity could be significantly diluted. If we consummate a significant acquisition in which the consideration included cash, we could be required to use a substantial portion of our available cash to consummate the acquisition. Acquisition financing may not be available on favorable terms, or at all.

HARBINGER MAY NOT BE ABLE TO COMPETE SUCCESSFULLY AGAINST OTHER COMPANIES.

The business-to-business e-commerce market is new, rapidly evolving and intensely competitive, and Harbinger expects competition to intensify in the future. Barriers to entry are minimal in some segments, and competitors may develop and offer similar services in the future. Our business could be severely harmed if we are not able to compete successfully against current or future competitors. Although we believe that there may be opportunities for several providers of products and services similar to ours, a single provider may dominate the market. We believe there is no current dominant provider in our market. We expect that additional companies will offer competing business-to-business e-commerce solutions in the future.

We have many competitors with substantially greater financial, marketing, personnel and technological resources than we have. We may not be able to compete successfully against current and future competitors, and competitive pressures faced by us could hurt our business and financial results. Other companies offer products and services that may be considered by customers to be acceptable alternatives to our products and services. Certain companies also operate electronic marketplaces for transacting business with their trading partners, and we expect other companies to offer products and services competitive with our Templar, Express and marketplace and vertical market exchange products and services. We expect that other companies may develop and implement similar computer-to- computer networks, some of which may be "public" networks such as ours and some of which may be "private," providing services only to a specific group of trading partners, thereby reducing our ability to increase sales of our network services. In addition, several companies offer PC-based, midrange NT and UNIX, and mainframe and Internet computer software products that compete with our software products. Advanced operating systems and applications software from Microsoft and other vendors also may offer electronic commerce functions that limit our ability to sell our software products.

We believe that the continuing acceptance of business-to-business Internet-based electronic commerce will attract new competitors, including software applications, operating systems and systems integration companies that may bundle electronic commerce solutions with their offerings, and alternative technologies that may be more sophisticated and cost effective than our products and services. Competitive companies may offer certain electronic commerce products or services, such as communications software, network transactional services or consulting at no charge or a deeply discounted charge, in order to obtain the sale of other products or services. Since our agreements with our harbinger.net subscribers generally are terminable upon 30-days notice, we do not have the contractual right to prevent our customers from changing to a competing network.

HARBINGER IS SUBJECT TO RISKS ASSOCIATED WITH THE EMERGENCE OF ELECTRONIC COMMERCE OVER THE INTERNET.

The Internet provides an alternative means of providing electronic commerce to business trading partners. The market for Internet software and services is both emerging and highly competitive, ranging from small companies with limited resources to large companies with substantially greater financial, technical and marketing resources than ours. In addition to Harbinger's Internet-related products and services, several of its existing competitors have introduced their own Internet electronic commerce products and services. Moreover, new competitors, which may include telephone companies and media companies, are likely to increase the provision of business-to-business data transmission services using the Internet. Nor can we assure that the Internet will become an accepted method of

31

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0659

electronic commerce. We cannot assure that Templar end-user software and marketplace and vertical market exchange products, which enable electronic commerce over the Internet, will be accepted in the Internet market or will be competitive with other products based on evolving technologies. If the Internet becomes an accepted method of electronic commerce, we could lose certain customers to other solutions offered by our competitors, which would reduce recurring revenue from network services and have a material adverse affect on our business and financial condition. Even if customers choose our Internet solutions, the revenue gained from the sale of these solutions may not offset the loss of revenue from the sale of our traditional e-commerce solutions.

The use of our Internet electronic commerce products and services will depend in large part upon the continued development of the infrastructure for providing Internet access and services. Use of the Internet for business-to-business electronic commerce services raises numerous issues that greatly impact the development of this market. These issues include reliability, data security and data integrity, timely transmission, and pricing of products and services. Because global commerce and online exchange of information on the Internet is new and evolving, it is difficult to predict with any assurance whether the Internet will prove to be a viable commercial marketplace. The Internet has experienced, and is expected to continue to experience, substantial growth in the number of users and the amount of traffic. We cannot assure that the Internet will continue to be able to support the demands placed on it by this continued growth. In addition, the Internet could lose its viability due to delays in the adoption of new standards and protocols to handle increased levels of Internet activity, or due to increased governmental regulation or the imposition of fees or taxes for its use. We cannot assure that the infrastructure or complementary services necessary to make the Internet a viable commercial marketplace will be developed, or, if developed, that the Internet will become a viable commercial marketplace for products and services such as those offered by us. If the necessary infrastructure or complementary services or facilities are not developed, or if the Internet does not become a viable commercial marketplace, our business and financial results will be materially adversely affected.

HARBINGER MUST CONTINUE TO ADVANCE ITS TECHNOLOGY AND COMPLY WITH INDUSTRY REQUIREMENTS TO REMAIN COMPETITIVE.

The electronic commerce industry is characterized by rapid technological change, frequent new product and service introductions and evolving industry standards. Harbinger's future success will depend in significant part on our ability to anticipate industry standards, to continue to apply advances in electronic commerce product and service technologies, to enhance existing products and services, and to introduce and acquire new products and services on a timely basis to keep pace with technological developments. We cannot assure that we will be successful in timely development, acquisition or marketing new or enhanced products or services that respond to technological change and evolving industry standards, and that meet the requirements of the marketplace and achieve market acceptance. In the past, we have experienced delays in the commencement of commercial shipments of new products and enhancements, resulting in delays or losses of product revenues. These delays or failure in the introduction of new or enhanced products or services, or the failure of such products or services to achieve market acceptance, could have a material adverse affect our business and financial results.

THERE ARE MANY RISKS ASSOCIATED WITH HARBINGER'S INTERNATIONAL OPERATIONS.

Harbinger believes that our continued growth and profitability will require expansion of our international operations through our international subsidiaries, in the United Kingdom, The Netherlands, Germany, Italy and Mexico. This expansion will require financial resources and significant management attention. Our ability to successfully expand our business internationally will also depend upon our ability to attract and retain both talented and qualified managerial, technical and sales personnel and electronic commerce services customers outside the United States and our ability to continue to effectively manage our domestic operations while focusing on international expansion. Certain of our international subsidiaries have experienced operating losses in their recent histories, and

32

Exhibit H
0660

in some cases these operating losses have been significant. Any inability of our international subsidiaries to penetrate international markets in a timely and profitable manner could have a material adverse affect on our business and financial results.

International operations are subject to certain inherent risks, including unexpected changes in regulatory requirements and tariffs, longer payment cycles, increased difficulties in collecting accounts receivable and potentially adverse tax consequences. To the extent international sales are denominated in foreign currencies, gains and losses on the conversion to U.S. dollars of revenues, operating expenses, accounts receivable and accounts payable arising from international operations may contribute to fluctuations in our results of operations. We have not entered into any hedging or other arrangements for the purpose of guarding against the risk of currency fluctuation. In addition, sales in Europe and certain other parts of the world typically are adversely affected in the third calendar quarter of each year because many customers reduce their business activities in the summer months.

THE INABILITY TO ATTRACT AND MAINTAIN MANAGEMENT AND OTHER PERSONNEL MAY ADVERSELY AFFECT HARBINGER.

Our success is largely dependent upon our executive officers and key sales and technical personnel, the loss of one or more of whom could have a material adverse affect on our business and financial results. Our future success will depend in large part upon our ability to attract and retain talented and qualified personnel. In particular, we believe that it will be important for us to hire and retain experienced product development and sales personnel. Competition in the recruitment of highly qualified personnel in the computer software and electronic commerce industries is intense. Our inability to identify, hire and retain such personnel may have a material adverse affect on our business and financial results. We cannot assure that we can retain our key employees or that we can attract qualified personnel in the future. We currently carry a key-person life insurance policy on our CEO, James M. Travers.

HARBINGER IS DEPENDENT UPON ITS ALLIANCE PARTNERS.

Harbinger has various agreements with alliance partners for the distribution and marketing of certain of its software products. These alliance partners pay us royalties representing a percentage of fees generated from the sale of software licensed from us. If our current or future alliance partners are not able to successfully resell our products, our business will suffer.

HARBINGER MAY BE CONFRONTED WITH DEFECTS IN ITS SOFTWARE.

Software products as complex as those offered by Harbinger may contain undetected errors or failures when first introduced or when new versions are released. If software errors are discovered after introduction, we could experience delays or lost revenues during the period required to correct these errors. We cannot assure that, despite testing by us and by current and potential customers, errors will not be found in new products or releases after commencement of commercial shipments. These errors could result in loss of or delay in market acceptance, additional and unexpected expenses to fund further product development or to add programming personnel to complete a development project, and loss of revenue because of the inability to sell the new product on a timely basis, any one or more of which could have a material adverse affect on our business and financial results.

HARBINGER IS DEPENDENT ON ITS DATA CENTERS, WHICH COULD BE DESTROYED OR DAMAGED.

Harbinger's harbinger.net service operations are dependent upon the ability to protect computer equipment and the information stored in our data centers against damage that may be caused by fire, power loss, telecommunication or Internet failures, unauthorized intrusion, computer viruses and disabling devices, our own internal errors and other similar events. Notwithstanding precautions we have taken, we cannot assure that a fire or other natural disaster, including national, regional or local telecommunications outages, would not result in a prolonged outage of our network services. In the

33

Exhibit H
0661

event of a disaster, and depending on the nature of the disaster, it may take from several minutes to several days before our off-site computer system can become operational for all of our customers, and use of the alternative off-site computer would result in substantial additional cost to us. In the event that an outage of our network extends for more than several hours, we will experience a reduction in revenues by reason of such outage. In the event that such outage extends for one or more days, we could potentially lose many of our customers, which would have a material adverse affect on our business and financial results.

HARBINGER IS DEPENDENT ON CERTAIN LICENSE ARRANGEMENTS WITH THIRD PARTIES.


Harbinger relies on certain technology that we license from third parties and other products that are integrated with internally developed software and used in our products to perform key functions or to add important features. We cannot assure that we will be successful in negotiating third-party technology licenses on suitable terms or that such licenses will not be terminated in the future. Moreover, any delay or product problems experienced by such third party suppliers could result in delays in introduction of our products and services until equivalent technology, if available, is identified, licensed and integrated, which could have a material adverse affect on our business and financial results.


HARBINGER'S FAILURE TO ADEQUATELY PROTECT ITS PROPRIETARY RIGHTS MAY ADVERSELY AFFECT HARBINGER.


Harbinger relies primarily on a combination of copyright, patent and trademark laws, trade secrets, confidentiality procedures and contractual provisions to protect our proprietary rights. We seek to protect our software, documentation and other written materials principally under trade secret and copyright laws, which afford only limited protection. We presently have a patent for an electronic document interchange test facility and a patent for an EDI communication system. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our products or to obtain and use information that we regard as proprietary. We cannot assure that our means of protecting our proprietary rights will be adequate or that our competitors will not independently develop similar technology. In distributing many of our products, we rely primarily on "shrink wrap" licenses and increasingly on "click wrap" licenses that are not signed by licensees and, therefore, may be unenforceable under the laws of certain jurisdictions. In addition, we have licensed our products to users and distributors in other countries, and the laws of some foreign countries do not protect our proprietary rights to as great an extent as the laws of the United States. We do not believe that any of our products currently infringe the proprietary rights of third parties. We cannot assure, however, that third parties will not claim infringement by us with respect to current or future products, and we have agreed to indemnify many of our customers for the full cost of such claims. We expect that software product developers will increasingly be subject to infringement claims as the number of products and competitors in electronic commerce grows and the functionality of products in different industry segments overlaps. Any such claims, with or without merit could be time-consuming, result in costly litigation, cause product shipment delays or require us to enter into royalty or licensing agreements and indemnify our customers against resulting liability, if any. Such royalty or licensing agreements, if required, may not be available on terms acceptable to us or at all, which could have a material adverse affect on our business and financial results.

HARBINGER MAY BE SUBJECT TO CHANGING GOVERNMENTAL REGULATIONS.

Harbinger's network services are transmitted to our customers over dedicated and public telephone lines. These lines are governed by Federal and state regulations establishing the rates, terms and conditions for their use. Changes in the legislative and regulatory environment relating to online services or the Internet access industry, including regulatory or legislative changes which directly or indirectly affect telecommunication costs, restrict content or increase the likelihood of competition from regional telephone companies or others, could have a material adverse affect on our business and financial results. The Telecommunications Act of 1996 amended the federal telecommunications laws by

34

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

lifting restrictions on regional telephone companies and others competing with us and imposed certain restrictions regarding obscene and indecent content communicated to minors over the Internet or through interactive computer services. The Telecommunications Act set in motion certain events that will lead to the elimination of restrictions on regional telephone companies providing transport between defined geographic boundaries associated with the provision of their own information services. This will enable regional telephone companies to more readily compete with us by packaging information service offerings with other services and providing them on a wider geographic scale. While provisions of the Telecommunications Act prohibiting the use of a telecommunications device or interactive computer service to send or display indecent material to minors have been held by the U.S. Supreme Court to be unconstitutional, we cannot assure that future legislative or regulatory efforts to limit use of the Internet in a manner harmful to us will not be successful.

Other legislation may also affect our business. The Clinton administration has announced an initiative to establish a framework for global electronic commerce. Also, some countries, such as Germany, have adopted laws regulating aspects of the Internet, and there are a number of bills currently being considered in the United States at the federal and state levels involving encryption and digital signatures, all of which may impact our business. We cannot predict the impact, if any, that the Act and future court opinions, legislation, regulations or regulatory changes in the United States or other countries may have on our business. We believe that we are in compliance with all material applicable regulations. Our Templar product incorporates encryption technology that is subject to U.S. export control regulations. Although this product is currently exportable under licenses granted by the Commerce Department, government regulation in this area is subject to frequent change and we cannot assure that these products will remain exportable.

35

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0663

SELECTED HISTORICAL AND PRO FORMA FINANCIAL DATA

The following tables present selected historical financial data of Peregrine, selected historical financial data of Harbinger, and selected unaudited pro forma condensed combined financial data of Peregrine, which reflects the merger. The information in the tables should be read in conjunction with the financial statements and related notes, which begin on page F-1 of this joint proxy statement/ prospectus, and the unaudited pro forma condensed combined financial statements and related notes, which begin on page 116 of this joint proxy statement/prospectus.

PEREGRINE SELECTED CONSOLIDATED HISTORICAL FINANCIAL INFORMATION

The selected historical financial data of Peregrine have been derived from the audited historical financial data and related notes of Peregrine for each of the years in the five-year period ended March 31, 2000. These historical data provide only a summary. You should read them in conjunction with Peregrine's historical consolidated financial statements and related notes thereto beginning on page F-1 of this joint proxy statement/prospectus.

|  | YEAR ENDED MARCH 31, | | | | |
|---|---|---|---|---|---|
|  | 2000 | 1999 | 1998 | 1997 | 1996 |
|  | (IN THOUSANDS, EXCEPT PER SHARE AMOUNTS) | | | | |
| **HISTORICAL CONSOLIDATED STATEMENT OF OPERATIONS DATA:** | | | | | |
| Total revenues | $253,300 | $138,063 | $61,877 | $35,035 | $23,766 |
| Acquired in-process research and development | 24,505 | 26,005 | 6,955 | -- | -- |
| Amortization of goodwill and other intangible assets | 34,753 | 18,012 | 3,168 | -- | -- |
| Operating income (loss) | (8,656) | (13,739) | 3,903 | 4,688 | (4,266) |
| Net Income (loss) | (25,070) | (23,370) | (616) | 5,802 | (6,411) |
| Net Income (loss) per share--diluted | $ (0.24) | $ (0.27) | $ (0.01) | $ 0.10 | $ (0.13) |
| Shares used in per share computation | 102,332 | 87,166 | 69,520 | 59,856 | 49,324 |

|  | AS OF MARCH 31, | | | | |
|---|---|---|---|---|---|
|  | 2000 | 1999 | 1998 | 1997 | 1996 |
|  | (IN THOUSANDS) | | | | |
| **HISTORICAL CONSOLIDATED BALANCE SHEET DATA:** | | | | | |
| Cash, cash equivalents, and short term investments | $ 33,511 | $ 23,545 | $21,977 | $ 305 | $ 437 |
| Working capital (deficit) | 20,510 | 25,302 | 23,779 | (4,065) | (9,697) |
| Total assets | 523,430 | 207,713 | 83,568 | 19,738 | 13,817 |
| Total debt | 1,331 | 649 | 1,117 | 3,866 | 5,208 |
| Stockholders' equity (deficit) | 411,850 | 150,781 | 55,639 | (2,849) | (8,450) |

HARBINGER SELECTED CONSOLIDATED HISTORICAL FINANCIAL INFORMATION

The selected historical financial data of Harbinger have been derived from the audited historical financial data and related notes of Harbinger for each of the years in the five-year period ended December 31, 1999. The selected historical financial data of Harbinger for the three months ended and as of March 31, 2000 have been derived from unaudited financial data and include, in the opinion of management of Harbinger, all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of Harbinger's results of operations for that period and its financial condition at March 31, 2000. These historical data provide only a summary. You should read them in conjunction

36

Exhibit H
0664

with Harbinger's historical consolidated financial statements and related notes thereto beginning on page F-54 of this joint proxy statement/prospectus.

|  | THREE MONTHS ENDED MARCH 31, | | YEAR ENDED DECEMBER 31, | | | | |
|---|---|---|---|---|---|---|---|
|  | 2000 | 1999 | 1999 | 1998 | 1997 | 1996 | 1995 |
|  | | | (IN THOUSANDS, EXCEPT PER SHARE AMOUNTS) | | | | |
| **HISTORICAL CONSOLIDATED STATEMENT OF OPERATIONS DATA:** | | | | | | | |
| Revenues...................... | $38,407 | $33,503 | $155,514 | $135,151 | $118,221 | $ 89,245 | $60,077 |
| Operating income (loss)....... | 364 | 1,556 | 12,630 | (12,652) | (22,705) | (10,667) | 1,314 |
| Net income (loss)............. | 1,372 | 2,341 | 16,560 | (14,712) | (39,047) | (16,091) | (445) |
| Net income (loss) per share-- diluted.................... | $ 0.03 | $ 0.06 | $ 0.41 | $ (0.35) | $ (1.02) | $ (0.46) | $ (0.02) |
| Shares used in per share computation (diluted)....... | 42,246 | 40,451 | 40,739 | 41,557 | 38,162 | 35,080 | 28,573 |

|  | AS OF MARCH 31, 2000 | AS OF DECEMBER 31, | | | | |
|---|---|---|---|---|---|---|
|  |  | 1999 | 1998 | 1997 | 1996 | 1995 |
|  |  | (IN THOUSANDS) | | | | |
| **HISTORICAL CONSOLIDATED BALANCE SHEET DATA:** | | | | | | |
| Cash, cash equivalents and short term investments.... | $ 79,198 | $ 73,020 | $ 92,307 | $102,144 | $ 65,541 | $ 75,980 |
| Working capital............. | 86,224 | 79,234 | 79,303 | 94,307 | 60,392 | 73,167 |
| Total assets................ | 183,213 | 169,459 | 178,369 | 183,559 | 131,199 | 125,867 |
| Long-term obligations....... | -- | -- | -- | -- | 1,608 | 7,116 |
| Shareholders' equity........ | 134,454 | 124,774 | 120,019 | 130,018 | 94,118 | 93,196 |

SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION

The unaudited pro forma condensed combined financial data is not necessarily indicative of the operating results or financial position that would have been achieved had the merger been consummated as of the beginning of the periods presented and should not be construed as representative or indicative of these amounts for any future date or in any future periods. The information in the table is only a summary and should be read in conjunction with the "Unaudited Pro Forma Combined Condensed Financial Statements" beginning on page 116 and the respective audited

37

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

and unaudited consolidated financial statements of Peregrine and Harbinger, including the notes thereto, beginning on page F-1 of this joint proxy statement/prospectus.

|  | (A) |
|---|---|
|  | (IN THOUSANDS, EXCEPT PER SHARE AMOUNTS) |
| PRO FORMA COMBINED CONDENSED STATEMENT OF OPERATIONS DATA: |  |
| Total revenues................................................ | $ 445,745 |
| Operating income (loss)..................................... | (318,715) |
| Net income (loss)........................................... | (332,792) |
| Net income (loss) per share—diluted........................ | $    (2.51) |
| Shares used in per share computation........................ | 132,409 |

----------------------

(A) Year ended March 31, 2000 for both Peregrine and Harbinger. See "Notes to Unaudited Pro Forma Financial Statements" on page 116.

|  | AS OF MARCH 31, 2000 |
|---|---|
|  | (IN THOUSANDS) |
| PRO FORMA COMBINED CONDENSED BALANCE SHEET |  |
| Cash, cash equivalents, and short-term investments........ | $  112,709 |
| Working capital............................................ | 41,134 |
| Total assets............................................... | 1,940,229 |
| Total debt................................................. | 1,331 |
| Stockholders' equity....................................... | $1,714,290 |

COMPARATIVE PER SHARE DATA

The following table sets forth:

- historical book value per share and historical net income per share data of Peregrine and Harbinger

- unaudited pro forma condensed combined book value per share and unaudited pro forma condensed combined net loss per share data of Peregrine after giving effect to the merger

- unaudited pro forma equivalent condensed combined book value per share and unaudited pro forma equivalent condensed combined net loss per share data of Peregrine common stock based on the exchange ratio of 0.75 of a share of common stock for each share of Harbinger common stock

The information in the table should be read in conjunction with the financial statements of Peregrine and Harbinger and the related notes and the unaudited pro forma condensed combined financial statements and related notes, which begin on page F-1 of this joint proxy statement/ prospectus. The unaudited pro forma condensed combined financial data are not necessarily indicative of the net loss per share or book value per share that would have been achieved had the merger been consummated as of the beginning of the periods presented and should not be construed as representative of these amounts for any future dates or periods.

Although Peregrine and Harbinger have different fiscal years, pro forma per share data are presented on a March 31 fiscal year basis.

The information in the table is only a summary, and you should read it in conjunction with the "Unaudited Pro Forma Combined Condensed Financial Statements" and the notes thereto, beginning on page 116, and the respective audited and unaudited consolidated financial statements of Peregrine and Harbinger, including the notes thereto, beginning on page F-1 of this joint proxy statement/ prospectus.

38

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0666

This information is not necessarily indicative of the future results of operations of the combined company after the merger or the actual results that would have occurred if the merger had been consummated prior to the period indicated.

|  | YEAR ENDED MARCH 31, 2000 |
|---|---|
| HISTORICAL--PEREGRINE (1): | |
| Net (loss) per diluted share............................... | $ (0.24) |
| Net (loss) per basic share................................. | $ (0.24) |

|  | YEAR ENDED DECEMBER 31, 1999 |
|---|---|
| HISTORICAL--HARBINGER | |
| Net income per diluted share.............................. | $ 0.41 |
| Net income per basic share................................ | $ 0.43 |

|  | YEAR ENDED MARCH 31, 2000 |
|---|---|
| PRO FORMA COMBINED NET LOSS(2): | |
| Per Peregrine share--diluted.............................. | $ (2.51) |
| Per Peregrine share--basic................................ | $ (2.51) |

|  | MARCH 31, 2000 |
|---|---|
| PRO FORMA COMBINED BOOK VALUE PER SHARE(3): | |
| Historical--Peregrine..................................... | $ 3.76 |
| Historical--Harbinger.................................... | $ 3.36 |
| Pro forma combined per Peregrine share................... | $ 12.25 |

------------------------

(1) The historical book value per share is computed by dividing stockholders' equity by the number of shares of common stock outstanding at the end of each period.

(2) The pro forma statement of operations excludes the charge of approximately $66.1 million for purchased in-process research and development, which arose from the merger. These charges will be included in the combined company's consolidated financial statements for the period following completion of the merger.

(3) The pro forma combined book value per share is computed by dividing pro forma stockholders' equity by the pro forma number of shares of common stock outstanding at the end of each period.

39

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0667

MARKET PRICE AND DIVIDEND INFORMATION

PEREGRINE COMMON STOCK

Peregrine's common stock has been traded on the Nasdaq National Market under the symbol "PRGN" since April 1997. The following table sets forth the quarterly high and low closing sales prices reported on the Nasdaq National Market for the periods indicated. All prices have been adjusted to reflect two-for-one stock splits of Peregrine common stock effected as stock dividends in February 1999 and February 2000.

|  | HIGH | LOW |
| --- | --- | --- |
| **FISCAL YEAR ENDED MARCH 31, 2000:** | | |
| Fourth Quarter............................................ | $79.500 | $36.625 |
| Third Quarter............................................. | 45.875 | 19.156 |
| Second Quarter............................................ | 20.563 | 12.813 |
| First Quarter............................................. | 17.344 | 8.563 |
| **FISCAL YEAR ENDED MARCH 31, 1999:** | | |
| Fourth Quarter............................................ | $16.813 | $10.625 |
| Third Quarter............................................. | 11.594 | 7.109 |
| Second Quarter............................................ | 10.344 | 5.844 |
| First Quarter............................................. | 7.130 | 4.563 |

HARBINGER COMMON STOCK

Harbinger common stock has been traded on the Nasdaq National Market under the symbol "HRBC" since August 1995. The following table sets forth the quarterly high and low closing sales prices reported on the Nasdaq National Market for the periods indicated.

|  | HIGH | LOW |
| --- | --- | --- |
| **FISCAL YEAR ENDING DECEMBER 31, 2000:** | | |
| First Quarter............................................. | $39.875 | $20.625 |
| **FISCAL YEAR ENDED DECEMBER 31, 1999:** | | |
| Fourth Quarter............................................ | $34.000 | $13.250 |
| Third Quarter............................................. | 17.438 | 10.625 |
| Second Quarter............................................ | 14.063 | 6.125 |
| First Quarter............................................. | 8.563 | 5.063 |
| **FISCAL YEAR ENDED DECEMBER 31, 1998:** | | |
| Fourth Quarter............................................ | $ 9.750 | $ 3.500 |
| Third Quarter............................................. | 24.375 | 5.750 |
| Second Quarter............................................ | 27.563 | 20.250 |
| First Quarter............................................. | 25.500 | 16.000 |

40

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

RECENT SHARE PRICES

The following table provides information about the closing sale price of Peregrine common stock and Harbinger common stock on April 5, 2000 and May 19, 2000. In addition, the table provides an equivalent per-share price for Harbinger common stock on those dates based on the closing price of Peregrine common stock multiplied by the exchange ratio in the merger of 0.75 share of Peregrine common stock per share of Harbinger common stock. April 5, 2000 was the last trading day prior to the execution and public announcement of the merger agreement. May 19, 2000 was the last practicable trading day prior to the mailing of this joint proxy statement/prospectus.

| | PEREGRINE COMMON STOCK | HARBINGER COMMON STOCK | HARBINGER COMMON STOCK EQUIVALENT |
| --- | --- | --- | --- |
| April 5, 2000........................................... | $58.000 | $24.125 | $43.500 |
| May 19, 2000........................................... | $19.250 | $14.125 | $14.438 |

No assurance can be given as to the market prices of Peregrine common stock or Harbinger common stock at any time prior to the merger or as to the market price of Peregrine common stock after the merger. The exchange ratio is fixed and will not be adjusted to compensate shareholders of Harbinger for increases or decreases in the market price of Peregrine common stock which could occur before the merger becomes effective. In the event the market price of Peregrine common stock decreases or increases prior to the effective time, the market value at the effective time of the Peregrine common stock to be received in the merger in exchange for Harbinger common stock would correspondingly increase or decrease. WE URGE SHAREHOLDERS OF HARBINGER AND STOCKHOLDERS OF PEREGRINE TO OBTAIN CURRENT MARKET QUOTATIONS FOR THE HARBINGER COMMON STOCK AND THE PEREGRINE COMMON STOCK.

Following the merger, Harbinger common stock will no longer be listed on the Nasdaq National Market.

SHAREHOLDERS

As of May 15, 2000, Peregrine had issued and outstanding 109,356,814 shares of Peregrine common stock held by 1,296 stockholders of record.

As of May 22, 2000, Harbinger had issued and outstanding 40,057,369 shares of Harbinger common stock held by 245 shareholders of record.

DIVIDENDS

Neither Peregrine nor Harbinger has ever declared or paid cash dividends on its capital stock. Peregrine currently expects to retain future earnings, if any, for use in the operation and expansion of its business and does not anticipate paying any cash dividends in the foreseeable future. Under the merger agreement, Harbinger has agreed not to pay cash dividends pending the effectiveness of the merger.

41

Exhibit H
0669

THE SPECIAL MEETINGS

This joint proxy statement/prospectus is being furnished to you in connection with the solicitation of proxies from shareholders of Harbinger by Harbinger's board of directors and from stockholders of Peregrine by Peregrine's board of directors. On April 5, 2000, Peregrine, Harbinger, and a wholly owned subsidiary of Peregrine entered into the Agreement and Plan of Merger and Reorganization. The merger agreement contemplates a merger of the Peregrine subsidiary into Harbinger. If the merger is completed, Harbinger will become a subsidiary of Peregrine, and shareholders of Harbinger will become stockholders of Peregrine.

Peregrine and Harbinger will each hold a special meeting of its shareholders to vote upon matters in connection with the proposed merger. The boards of directors of Peregrine and Harbinger are soliciting proxies in connection with the matters to be voted upon at the special meetings.

DATE, TIME AND PLACE OF THE SPECIAL MEETINGS

| PEREGRINE SPECIAL MEETING | HARBINGER SPECIAL MEETING |
| --- | --- |
| June 16, 2000 | June 16, 2000 |
| 9:00 a.m., local time | 9:00 a.m., local time |
| Del Mar Hilton Hotel | J.W. Marriott Hotel |
| 15575 Jimmy Durante Boulevard | 3300 Lenox Road N.E. |
| Del Mar, California 92014 | Atlanta, Georgia 30326 |

PURPOSES OF THE SPECIAL MEETINGS

PEREGRINE SPECIAL MEETING

The purpose of Peregrine's special meeting is for holders of Peregrine common stock to approve the issuance of shares of Peregrine common stock in connection with the merger as required by the rules of The Nasdaq Stock Market. In addition, stockholders of Peregrine may transact any other business that may properly come before the Peregrine special meeting or any adjournment or postponement of the special meeting. Examples of other business that could be transacted at the meeting would be a motion to adjourn to a later date to permit further solicitation of proxies, if necessary, or to establish a quorum.

HARBINGER SPECIAL MEETING

The purpose of Harbinger's special meeting is for holders of Harbinger common stock to approve the Agreement and Plan of Merger and Reorganization entered on April 5, 2000 among Harbinger, Peregrine, and a wholly owned subsidiary of Peregrine and to approve the merger contemplated by the merger agreement. In addition, shareholders of Harbinger may transact any other business that may properly come before the Harbinger special meeting or any adjournment or postponement of the special meeting. Examples of other business that could be transacted at the meeting would be a motion to adjourn to a later date to permit further solicitation of proxies, if necessary, or to establish a quorum.

RECOMMENDATIONS OF THE BOARDS OF DIRECTORS

The board of directors of Peregrine has concluded that the merger agreement and the merger are fair to, and in the best interests of, Peregrine and its stockholders. THE PEREGRINE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS OF PEREGRINE VOTE FOR THE PROPOSAL TO APPROVE THE ISSUANCE OF SHARES OF PEREGRINE COMMON STOCK IN CONNECTION WITH THE MERGER.

42

Exhibit H
0670

The board of directors of Harbinger also has concluded that the merger agreement and the merger are fair to, and in the best interests of, Harbinger and its shareholders. THE HARBINGER BOARD OF DIRECTORS, BY THE UNANIMOUS VOTE OF THE DIRECTORS PRESENT, HAS RECOMMENDED THAT SHAREHOLDERS OF HARBINGER VOTE FOR THE PROPOSAL TO ADOPT AND APPROVE THE MERGER AGREEMENT AND APPROVE THE MERGER.

RECORD DATES AND OUTSTANDING SHARES

PEREGRINE SPECIAL MEETING

Stockholders of record who owned Peregrine common stock at the close of business on May 15, 2000 will be entitled to attend and vote at the Peregrine special meeting. On the Peregrine record date, Peregrine had approximately 109,356,814 shares of common stock issued and outstanding. Peregrine had 1,296 stockholders of record on the Peregrine record date and believes that its common stock is held by more than 30,000 beneficial owners.

HARBINGER SPECIAL MEETING

Shareholders of record who owned Harbinger common stock at the close of business on May 22, 2000 will be entitled to attend and vote at the Harbinger special meeting. On the Harbinger record date, Harbinger had approximately 40,057,369 shares of common stock issued and outstanding. Harbinger had 245 shareholders of record on the Harbinger record date and believes that its common stock is held by more than 44,000 beneficial owners.

VOTE AND QUORUM REQUIRED

In order to conduct business at either the Harbinger special meeting or the Peregrine special meeting, a quorum must be present. In each case, a quorum will be present if a majority of the outstanding shares as of the applicable record date are present in person or by proxy at the special meeting.

PEREGRINE SPECIAL MEETING

Holders of Peregrine common stock are entitled to one vote for each share held as of the Peregrine record date. In order for the merger to become effective, holders of at least a majority of the shares of Peregrine common stock present, in person or by proxy, at the Peregrine special meeting must approve the issuance of shares of Peregrine common stock in connection with the merger. Holders of approximately 10.8% of the outstanding shares of Peregrine common stock have entered agreements under which they agreed to vote in favor of the issuance of Peregrine common stock in the merger and to be present, in person or by proxy, at the Peregrine special meeting. Approval of the issuance of Peregrine common stock in connection with the merger is required by the rules of The Nasdaq Stock Market.

HARBINGER SPECIAL MEETING

Holders of Harbinger common stock are entitled to one vote for each share held as of the Harbinger record date. In order for the merger to become effective, holders of at least a majority of Harbinger's outstanding common stock at the Harbinger record date must adopt and approve the merger agreement and approve the merger. Holders of approximately 14.5% of the outstanding shares of Harbinger common stock have entered agreements under which they agreed to vote for approval and adoption of the merger agreement and approval of the merger and to be present, in person or by proxy, at the Harbinger special meeting.

43

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0671

TREATMENT OF ABSTENTIONS AND BROKER NON-VOTES

If you submit a proxy that indicates an abstention from voting in all matters, your shares will be counted as present for the purpose of determining the existence of a quorum, but they will not be voted on any matter at the applicable special meeting. Consequently, your abstention will have the same effect as a vote against the proposal.

Under the rules that govern brokers who have record ownership of shares that are held in "street name" for their clients, the beneficial owners of the shares, brokers have discretion to vote these shares on routine matters but not on non-routine matters. The approval of the merger and the merger agreement at the Harbinger special meeting, and the approval of the issuance of shares of Peregrine common stock at the Peregrine special meeting, are not considered routine matters. Accordingly, brokers will not have discretionary voting authority to vote your shares. A "broker non-vote" occurs when brokers do not have discretionary voting authority and have not received instructions from the beneficial owners of the shares. At both special meetings, broker non-votes will be counted for the purpose of determining the presence of a quorum but will not be counted for the purpose of determining the number of votes cast on a matter. Although a broker non-vote will be counted for purposes of determining the presence or absence of a quorum at the Peregrine special meeting, it will not be deemed a "vote cast" with respect to proposals currently expected to be considered at the Peregrine special meeting. Accordingly, broker non-votes will have no effect on the outcome of the vote on the issuance of shares of Peregrine common stock in the merger. At the Harbinger special meeting, broker non-votes will have the same effect as a vote against the proposal to adopt and approve the merger agreement and to approve the merger.

EXPENSES OF PROXY SOLICITATION

Peregrine and Harbinger will each bear the expenses of this solicitation, including the cost of preparing and mailing this joint proxy statement/prospectus. In addition, we may reimburse brokerage firms and other custodians for their reasonable out-of-pocket expenses for forwarding this joint proxy statement/prospectus to you.

Proxies may be solicited by directors, officers, and employees of Peregrine and Harbinger in person or by telephone, facsimile, or other means of communications. These directors, officers, and employees will not receive additional compensation for their solicitation efforts, but we may reimburse their reasonable out-of-pocket expenses.

Peregrine and Harbinger have jointly retained Georgeson Shareholder Communications, Inc. at an estimated cost of approximately $22,000 to assist them in the solicitation of proxies for the Peregrine special meeting and the Harbinger special meeting.

METHODS OF VOTING

VOTING BY MAIL.  By signing and returning the proxy card in the enclosed prepaid and addressed envelope, you are enabling the individuals named on the proxy card (known as proxies) to vote your shares at the applicable special meeting in the manner you indicate. We encourage you to sign and return the proxy card even if you plan to attend the meeting. In this way, your shares will be voted even if you are unable to attend the meeting.

Your shares will be voted in accordance with the instructions you indicate on the proxy card. If you return the proxy card but do not indicate your voting instructions, your shares will be voted as follows:

   - in the case of Harbinger shareholders, FOR the proposal to adopt and
     approve the merger agreement and to approve the merger; and

44

Exhibit H
0672

– in the case of Peregrine stockholders, FOR the proposal to approve the issuance of shares of Peregrine common stock in connection with the merger.

VOTING BY TELEPHONE.  You may be able to vote by telephone. If so, instructions are included with your proxy card. If you vote by telephone, you do not need to complete and mail your proxy card.

VOTING ON THE INTERNET.  You may be able to vote on the Internet. If so, instructions are included with your proxy card. If you vote on the Internet, you do not need to complete and mail your proxy card.

VOTING IN PERSON AT THE MEETING.  If you plan to attend your company's special meeting and vote in person, you will be provided with a ballot at the meeting. If your shares are registered directly in your name, you are considered the stockholder of record and you have the right to vote in person at your company's special meeting. If your shares are held in the name of your bank, broker or other nominee, you are considered the beneficial owner of shares held in your name. In that case, in order to vote at your company's special meeting, you will need to bring to the special meeting a legal proxy from your broker or other nominee authorizing you to vote these shares.

REVOKING YOUR PROXY

You may revoke or change your proxy at any time before it is voted at your company's meeting. In order to do this, you may either:

– sign and return another proxy bearing a later date;

– if you are a Harbinger shareholder, send notice to Harbinger's secretary, Loren B. Wimpfheimer, that you are revoking your proxy;

– if you are a Peregrine stockholder, send notice to Peregrine's secretary, Richard T. Nelson, that you are revoking your proxy; or

– attend your special meeting and vote in person.

YOUR VOTE IS IMPORTANT. TO ASSURE THAT YOUR SHARES ARE REPRESENTED AT YOUR COMPANY'S SPECIAL MEETING, PLEASE SUBMIT YOUR PROXY ACCORDING TO THE INSTRUCTIONS ON THE ATTACHED CARD, WHETHER OR NOT YOU PLAN TO ATTEND THE MEETING.

45

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

THE MERGER

THIS SECTION OF THE JOINT PROXY STATEMENT/PROSPECTUS DESCRIBES THE MERGER. WHILE WE BELIEVE THAT THE DESCRIPTION COVERS THE MATERIAL TERMS OF THE MERGER AND THE RELATED TRANSACTIONS, THIS SUMMARY MAY NOT CONTAIN ALL OF THE INFORMATION THAT IS IMPORTANT TO YOU. FOR A MORE COMPLETE UNDERSTANDING OF THE MERGER, YOU SHOULD CAREFULLY READ THIS ENTIRE DOCUMENT AND THE OTHER DOCUMENTS TO WHICH WE REFER.

BACKGROUND OF THE MERGER

The markets in which Peregrine and Harbinger sell their products are dynamic, rapidly evolving, and intensely competitive. As a result, each company has actively pursued potential business combinations, corporate acquisition opportunities, alliances, and other strategic transactions as a significant part of its business strategy in an effort to obtain and develop complementary products and technologies.

In January 2000, Stephen P. Gardner, Peregrine's President and Chief Executive Officer, met with representatives of Deutsche Bank to discuss Peregrine's business and its interest in pursuing potential strategic transactions or relationships. Mr. Gardner authorized representatives of Deutsche Bank to approach Harbinger regarding the exploration of a strategic or other business relationship with Peregrine.

In late January 2000, James M. Travers, President and Chief Executive Officer of Harbinger, met with representatives of Deutsche Bank to discuss Harbinger's business and Harbinger's interest in pursuing partnerships, joint ventures and acquisitions. The representatives of Deutsche Bank suggested that Harbinger consider discussing a strategic relationship with Peregrine and provided Mr. Travers certain information concerning Peregrine.

On February 8, 2000, a conference call occurred among Mr. Travers, Mr. Gardner, and Loren B. Wimpfheimer, Harbinger's Vice President of Business Development and General Counsel. Mr. Travers and Mr. Gardner discussed each company's business and the potential benefits of a strategic relationship between the companies. Mr. Travers and Mr. Gardner agreed to meet in person at a later date.

Representatives of both companies were in San Francisco for an analyst conference the week of February 28, 2000. On February 29, Mr. Gardner and Mr. Travers arranged to meet for dinner. Also present for the dinner meeting were David A. Farley, Peregrine's Chief Financial Officer; James K. McCormick, Harbinger's Chief Financial Officer; Richard T. Nelson, Peregrine's Vice President of Corporate Development; Mr. Wimpfheimer; and a representative of Deutsche Bank. The representatives of Peregrine and Harbinger discussed various aspects of each company's business. Mr. Gardner described Peregrine's interest in integrating its infrastructure management product line with internet-based asset procurement solutions. The meeting concluded with a discussion of various strategic alternatives for the two companies, including a possible business alliance, joint venture, or business combination.

On March 1, 2000, Mr. Nelson and Mr. Wimpfheimer met to plan additional meetings between Peregrine and Harbinger. In addition, Peregrine and Harbinger entered into a mutual nondisclosure agreement. Following execution of the nondisclosure agreement, Harbinger provided Peregrine with additional financial and operating information relating to Harbinger.

On March 2, 2000, Mr. Wimpfheimer contacted representatives of Goldman, Sachs & Co. concerning Goldman Sachs' representation of Harbinger.

46

Exhibit H
0674

On March 8 and 9, representatives of the management teams of Peregrine and Harbinger met at a hotel at Dallas-Fort Worth airport. Attending these meetings were Mr. Nelson, Mr. Wimpfheimer, and various senior executives in charge of sales, marketing, and product development activities for Peregrine and Harbinger. Representatives of Goldman Sachs also attended. During these meetings, management of the two companies discussed their businesses and operations in greater detail.

Over the next several weeks, Goldman Sachs assisted Harbinger in its discussions with Peregrine. In addition, Goldman Sachs and Harbinger identified other companies that might be expected to have an interest in a strategic transaction with Harbinger. Representatives of Harbinger and Goldman Sachs made exploratory contact with a number of companies and received inquiries concerning possible transactions with Harbinger from a number of these other companies, but no formal offers.

During the weeks following this meeting, executives of Peregrine and Harbinger and their respective financial and legal advisors exchanged numerous telephone calls concerning possible terms for a potential business combination between the companies.

On March 21, 2000, Harbinger executed an engagement letter with Goldman Sachs pursuant to which Goldman Sachs agreed to act as Harbinger's financial advisor.

On March 22, 2000, the Harbinger board of directors held a special telephonic meeting. Mr. Travers briefed the Harbinger board on the discussions with Peregrine and Harbinger's contacts with other parties to date. Mr. Travers also described the discussions with Peregrine regarding the financial terms for a combination with Peregrine. Goldman Sachs briefed the Harbinger board, and responded to questions, on the key terms of Peregrine's proposal, possible market reaction to a combination of Peregrine and Harbinger, and Peregrine's past history with business combinations. In addition, Goldman Sachs provided the Harbinger board with an overview of the contacts with other parties. Harbinger's board, management, and financial and legal advisors then engaged in an extended discussion of Peregrine and its history, the merits and risks of a combination with Peregrine and possible transaction structures and pricing terms. Brobeck, Phleger & Harrison LLP, special legal counsel to Harbinger, also advised the Harbinger board regarding a number of additional terms proposed by Peregrine and responded to questions raised by the board.

On March 23 and 24, 2000, executives of the two companies and their respective financial and legal advisors participated in a number of phone calls regarding the financial and other terms for the potential combination.

Peregrine entered into an engagement letter, dated as of March 1, 2000, with Deutsche Bank pursuant to which Deutsche Bank agreed to act as Peregrine's financial advisor in connection with a proposed merger with Harbinger.

On March 26, 2000, Mr. Gardner and Mr. Travers had a telephone conversation to review the key financial terms of the potential combination. During this conversation, the executives discussed an exchange ratio of 0.75 of a share of Peregrine common stock for each outstanding share of Harbinger common stock.

On March 27, 2000, Harbinger's board of directors held a special telephonic meeting to review the status of negotiations between Harbinger and Peregrine. Mr. Travers and representatives of Goldman Sachs discussed the financial implications of the proposed 0.75 exchange ratio, including the implied valuation of Harbinger, the implied per-share premium relative to Harbinger's then-current trading price, and the percentage of Peregrine's outstanding common stock that would be held after the merger by former shareholders of Harbinger. In addition, representatives of Goldman Sachs commented on other proposed terms of a combination with Peregrine and provided an overview of contacts with companies other than Peregrine.

47

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0675

From March 29 to March 31, 2000, representatives of Peregrine, Harbinger, and their respective financial and legal advisors held meetings in Atlanta to conduct due diligence on Harbinger. During these meetings, Mr. Gardner and Mr. Farley also made presentations to the Harbinger management team concerning Peregrine.

In addition, between March 30 and April 5, 2000, Peregrine, Harbinger and their respective legal and financial advisors engaged in extensive negotiations with respect to the merger agreement and the related transaction agreements.

On March 30, 2000, Peregrine's board of directors held a special telephonic meeting to discuss the proposed merger with Harbinger. Mr. Gardner summarized Harbinger and its business as well as the recent history of Peregrine's negotiations with Harbinger. Mr. Gardner also reviewed with the board the proposed financial terms of the merger.

From April 1 to 2, 2000, representatives of Peregrine, Harbinger, and their respective financial and legal advisors held meetings in La Jolla, California and at Peregrine's offices in San Diego, California. Representatives of Deutsche Bank and Goldman Sachs were present for portions of these meetings. In addition, several telephone conferences took place among participants who were not present in San Diego. The purpose of these meetings and telephone conferences was to permit Harbinger and its advisors to conduct due diligence of Peregrine.

On April 4, 2000, the board of directors of Peregrine held a special telephonic meeting to consider the proposed merger. Mr. Gardner, together with representatives from Wilson Sonsini Goodrich & Rosati and Deutsche Bank, updated the board with respect to negotiations and discussions since the board's March 30, 2000 meeting. In particular, representatives of Wilson Sonsini Goodrich & Rosati reviewed with the board its legal responsibilities in considering the merger and summarized the drafts of the merger agreement and ancillary transaction agreements, which had been circulated to the board prior to the meeting.

The board of directors of Harbinger also held a special telephonic meeting on April 4 to review the principal strategic, financial, and legal considerations relating to the proposed merger. During the meeting, representatives of Brobeck, Phleger & Harrison LLP, special outside counsel to Harbinger, and Morris, Manning & Martin, L.L.P., regular outside counsel to Harbinger, reviewed with the board of directors its legal and fiduciary duties in connection with the merger and summarized the terms of the most recent draft of the merger agreement and reviewed in detail the terms and effects of certain key provisions. Goldman Sachs then reviewed the financial terms of Peregrine's proposal as well as the terms of comparable recent transactions. In addition, Goldman Sachs summarized the status of contacts with companies other than Peregrine. Following a discussion among the board members, Harbinger's board adjourned the meeting without action and agreed to resume its deliberations on April 5, 2000.

On April 5, 2000, Peregrine's and Harbinger's respective boards each met separately to discuss the final terms of the merger and the proposed merger agreement. At the Peregrine board meeting, Mr. Gardner again reviewed with the board the strategic and business rationale for the proposed merger. Representatives of Peregrine's legal and financial advisors summarized the principal terms of the proposed merger for the board. Representatives of Wilson Sonsini Goodrich & Rosati indicated changes that had been made to the merger agreement since the prior day's meetings. Representatives of Deutsche Bank then reviewed financial analyses they had prepared in connection with their evaluation of the fairness, from a financial point of view, of the proposed exchange ratio. Deutsche Bank's representatives rendered their oral opinion, subsequently confirmed in writing, to the effect that, as of April 5, 2000 and subject to certain assumptions and limitations set forth therein, the exchange ratio was fair to Peregrine from a financial point of view. For a more detailed discussion of Deutsche Bank's analysis and opinion, you should review the section captioned "Opinion of Deutsche Bank Securities Inc., financial advisor to Peregrine" beginning on page 63 and the text of Deutsche Bank's opinion attached as Annex F to this joint proxy statement/prospectus.

48

Exhibit H
0676

After further deliberation, the Peregrine board unanimously:

- determined that the merger is fair to, and in the best interests of, Peregrine's stockholders;

- approved the merger, the merger agreement, and the transactions contemplated in the merger agreement;

- resolved to call a special meeting of Peregrine's stockholders to approve the issuance of Peregrine common stock in connection with the merger as required by the rules of The Nasdaq Stock Market; and

- resolved to recommend that the stockholders of Peregrine vote in favor of the issuance of shares of Peregrine common stock in connection with the merger.

At the meeting of Harbinger's board held on April 5, 2000, the Harbinger board resumed its deliberations regarding the proposed merger. A representative of Brobeck, Phleger & Harrison summarized the results of the parties' further negotiations since the prior day's meeting. Representatives of Goldman Sachs then reviewed financial analyses they had prepared in connection with their evaluation of the proposed exchange ratio. Goldman Sachs' representatives rendered the oral opinion of Goldman Sachs, subsequently confirmed in writing, to the effect that, as of April 5, 2000, and based upon and subject to the various qualifications and assumptions described in the opinion, the exchange ratio was fair from a financial point of view to the holders of Harbinger common stock. For a more detailed discussion of Goldman Sachs' analysis and opinion, you should review the section captioned "Opinion of Goldman, Sachs & Co., financial advisor to Harbinger" beginning on page 52 and the text of Goldman Sachs' opinion attached as Annex E to this joint proxy statement/prospectus.

After further deliberation, the Harbinger board, by a unanimous vote of the directors present:

- determined that the merger agreement and merger are advisable and fair to, and in the best interests of, Harbinger and its shareholders;

- approved the merger, the merger agreement, and the transactions contemplated in the merger agreement;

- resolved to call a special meeting of Harbinger's shareholders to approve the merger and to adopt and approve the merger agreement; and

- resolved to recommend that shareholders of Harbinger vote in favor of adoption and approval of the merger agreement and approval of the merger.

Following the conclusion of the two board meetings, Peregrine and Harbinger finalized, executed and delivered the merger agreement.

On April 5, 2000, the companies issued a joint press release announcing the transaction.

JOINT REASONS FOR THE MERGER

Peregine and Harbinger each believe that the Internet has redefined the beginning and end points of business processes. We believe that, through the Internet, businesses are now challenged to extend their operations beyond traditional internal constraints and to interact directly with their supplier base. At the same time, suppliers are challenged to reach customers in new ways, notably by making their products and services available over the Internet and through web-based marketplaces for goods and services. We believe business is evolving toward an end-to-end process for managing business assets and infrastructure. We believe that combining Harbinger and Peregine can link the internal processes associated with managing assets with the external processes associated with acquiring them.

49

Exhibit H
0677

HARBINGER'S REASONS FOR THE MERGER

In approving the merger agreement and the merger and recommending that Harbinger shareholders approve and adopt the merger agreement and approve the merger, the Harbinger board identified a number of potential benefits from the merger, including the following:

- the Harbinger board's judgment that the two companies have significant complementary strengths and complementary products and solutions;

- the fact that the exchange ratio was at a significant premium over the relative prices of Harbinger common stock then prevailing in the market, and the further opportunity for Harbinger's shareholders to participate in the future growth in value of the combined company as stockholders of Peregrine due to the expected ownership of former Harbinger shareholders immediately following the merger;

- the combined company's potential to be a market leader for e-business solutions delivery, and its ability to offer products and solutions to large, medium and small enterprises;

- the combined company's potential to enable businesses to access multiple e-marketplaces for requisitioning, acquiring, managing and disposing of critical assets, facilities and other operating resources;

- the combined company's ability to be a comprehensive single-source provider for operating and linking e-business networks, e-catalogs and online marketplaces, while managing the full lifecycle and infrastructure of e-business; and

- the combined company's opportunity to participate in the expected growth of infrastructure management, employee self-service and e-marketplace enablement; its capacity for full-life-cycle e-business delivery and operations, its status as a single-source provider of e-business technology, enablement and services; and its potential to leverage global presence in sales, support and alliances.

In identifying these benefits and evaluating the merger, the Harbinger board reviewed a number of factors and sources of information, including the following:

- historical information concerning Harbinger and Peregrine and their respective businesses, financial performance, condition, operations, technology, management and position in the markets, and information and evaluations regarding the two companies' strengths, weaknesses and future prospects;

- the reports and views of Harbinger's management, and the reports of Harbinger's financial advisor, Goldman Sachs, and its legal advisors, Brobeck Phleger & Harrison LLP and Morris, Manning & Martin, L.L.P.

- the two companies' track records for integrating e-business processes for infrastructure management, e-procurement and e-marketplaces (portals), and deploying e-business solutions;

- current financial market conditions and historical market prices, volatility and trading information for Harbinger common stock and Peregrine common stock; and various factors that might affect the market value of Peregrine common stock in the future;

- the premium represented by the exchange ratio and the premiums paid in other recent transactions that could be viewed as comparable, and the negotiations between Harbinger and Peregrine relating to the exchange ratio;

- the alternatives available to Harbinger and the history of contacts with other parties;

50

Exhibit H
0678

- the presentations of Goldman Sachs at the briefing of the Harbinger board on March 22 and 27, 2000 and the meetings of the Harbinger board on April 4 and 5, 2000, and Goldman Sachs' opinion to the effect that, as of April 5, 2000 and based upon and subject to the various qualifications and assumptions described in the opinion, the proposed exchange ratio was fair from a financial point of view to the holders of Harbinger common stock;

- the terms of the merger agreement and related agreements, by themselves and in comparison to the terms of other transactions, and the intensive negotiations between Peregrine and Harbinger, including their negotiations relating to the details of the conditions to the parties' obligations to complete the merger, the no-shop restrictions on Harbinger, the scope of Harbinger's fiduciary out, the parties' termination rights, the termination fee, the voting agreements, and the stock option agreement; and

- the accounting treatment of the merger and the fact that Harbinger was then ineligible for "pooling of interests" treatment as a result of certain past stock repurchases.

The Harbinger board also identified and considered a number of risks and uncertainties in its deliberations concerning the merger, including the following:

- the fact that the exchange ratio is fixed and will not change with increases or decreases in the market price of either company's stock before the closing of the merger, and the possibility that the dollar value of a share of Peregrine stock at the closing of the merger may be more or less than the dollar value of a share of Peregrine stock at the signing of the merger agreement;

- the risk that the potential benefits sought in the merger may not be fully realized, if at all;

- the possibility that the merger may not be consummated and the effect of the public announcement of the merger on Harbinger's sales, customer relations and operating results and Harbinger's ability to attract and retain key management, marketing and technical personnel;

- the risk that despite the efforts of the combined company, key technical, marketing and management personnel might not choose to remain employed by the combined company;

- the risk of market confusion and hesitation and potential delay or reduction in orders;

- the fact that pursuant to the merger agreement, Harbinger is required to obtain Peregrine's consent before it can take a variety of actions between the signing and the closing of the merger;

- Harbinger's limited ability to terminate the merger agreement, including Harbinger's inability to terminate the merger agreement merely because a superior proposal has been made to Harbinger; and

- various other risks associated with the businesses of Harbinger, Peregrine and the combined company and the merger described under "Risk Factors."

The Harbinger board believed that certain of these risks were unlikely to occur or unlikely to have a material impact on the merger or the combined company, while others could be avoided or mitigated by Harbinger or by the combined company, and that, overall, the risks, uncertainties, restrictions and potentially negative factors associated with the merger were outweighed by the potential benefits of the merger.

The foregoing discussion of information and factors considered and given weight by the Harbinger board is not intended to be exhaustive, but is believed to include all of the material factors considered by the Harbinger board. In view of the variety of factors considered in connection with its evaluation of the merger, the Harbinger board did not find it practicable to, and did not, quantify or otherwise assign relative weights to the specific factors considered in reaching its determinations and recommendations.

51

Exhibit H
0679

RECOMMENDATION OF HARBINGER'S BOARD OF DIRECTORS

AFTER CAREFUL CONSIDERATION, BY THE UNANIMOUS VOTE OF THE DIRECTORS PRESENT, THE BOARD OF DIRECTORS OF HARBINGER HAS RECOMMENDED THAT HARBINGER'S SHAREHOLDERS VOTE IN FAVOR OF THE APPROVAL AND ADOPTION OF THE MERGER AGREEMENT AND IN FAVOR OF APPROVAL OF THE MERGER.

OPINION OF GOLDMAN, SACHS & CO., FINANCIAL ADVISOR TO HARBINGER

On April 5, 2000, Goldman Sachs rendered its oral opinion to the board of directors of Harbinger, which was subsequently confirmed by the written opinion of Goldman Sachs, dated April 5, 2000, that as of that date, and based upon and subject to the various qualifications and assumptions described in its opinion, the exchange ratio pursuant to the merger agreement was fair from a financial point of view to the holders of Harbinger common stock.

THE FULL TEXT OF THE WRITTEN FAIRNESS OPINION OF GOLDMAN SACHS, DATED APRIL 5, 2000, WHICH SETS FORTH THE ASSUMPTIONS MADE, PROCEDURES FOLLOWED, MATTERS CONSIDERED, AND LIMITATIONS ON THE REVIEW UNDERTAKEN IN CONNECTION WITH THE OPINION, IS ATTACHED TO THIS JOINT PROXY STATEMENT/PROSPECTUS AS ANNEX E AND IS INCORPORATED HEREIN BY REFERENCE. HARBINGER SHAREHOLDERS SHOULD READ THE OPINION IN ITS ENTIRETY.

In connection with its opinion, Goldman Sachs reviewed, among other things:

– the merger agreement;

– Annual Reports to Shareholders and Annual Reports on Form 10-K of Harbinger for the five years ended December 31, 1999;

– Annual Reports to Shareholders and Annual Reports on Form 10-K of Peregrine for the three fiscal years ended March 31, 1999;

– certain interim reports to shareholders and Quarterly Reports on Form 10-Q of Harbinger and Peregrine;

– certain other communications from Harbinger and Peregrine to their respective shareholders;

– certain internal financial analyses and forecasts for Harbinger prepared by its management; and

– certain cost savings and operating synergies projected by the management of Harbinger to result from the transactions contemplated by the merger agreement.

In addition, Goldman Sachs:

– held discussions with members of the senior management of Harbinger and Peregrine regarding their assessment of the strategic rationale for, and the potential benefits of, the transaction contemplated by the merger agreement and the past and current business operations, financial condition and future prospects of their respective companies;

– reviewed the reported price and trading activity for the Harbinger common stock and Peregrine common stock, which, like many Internet related stocks, have been and are likely to continue to be subject to significant short term price and trading volatility;

– compared certain financial and stock market information for Harbinger and Peregrine with similar information for certain other companies, the securities of which are publicly traded;

– reviewed the financial terms of certain recent business combinations in the enterprise software, business-to-business e-commerce and enterprise e-commerce industries specifically and in other industries generally; and

– performed such other studies and analyses as Goldman Sachs considered appropriate.

52

Exhibit H
0680

Goldman Sachs has relied upon the accuracy and completeness of all of the financial and other information discussed with or reviewed by it and has assumed the accuracy and completeness of this information for purposes of rendering its opinion. In that regard, Goldman Sachs has assumed, with the consent of the board of directors of Harbinger, that the cost savings and operating synergies have been reasonably prepared on a basis reflecting the best currently available judgments and estimates of the management of Harbinger. As Harbinger was aware, Peregrine did not make available to Goldman Sachs Peregrine's projections of expected future performance. Accordingly, Goldman Sachs' review of such matters was limited to discussions with the senior management of Peregrine of certain publicly available estimates of research analysts. Goldman Sachs has also assumed, with the consent of the board of directors of Harbinger, that the estimates of research analysts as commented on by the senior management of Peregrine have been prepared on a basis that does not materially differ from the view of management of Peregrine as to the future performance of Peregrine. Peregrine has advised Goldman Sachs and Harbinger that as a matter of policy it does not adopt or otherwise endorse publicly available estimates of Peregrine's future financial performance by research analysts. Accordingly, no inference should be drawn from the contents of Goldman Sachs' written fairness opinion to Harbinger's board of directors dated April 5, 2000 that Peregrine has endorsed any publicly available estimates of Peregrine's future financial performance by research analysts.

Goldman Sachs has not made an independent evaluation or appraisal of the assets and liabilities of Harbinger or Peregrine or any of their subsidiaries and it has not been furnished with any such evaluation or appraisal of any of these assets or liabilities. The opinion of Goldman Sachs was provided for the information and assistance of the board of directors of Harbinger in connection with its consideration of the transaction contemplated by the merger agreement. Goldman Sachs' opinion does not constitute a recommendation as to how any holder of Harbinger common stock should vote with respect to such transaction.

The following is a summary of the material financial analyses reviewed by Goldman Sachs and used in connection with providing its opinion to the board of directors of Harbinger on April 5, 2000. It does not purport to be a complete description of the analyses performed by Goldman Sachs. The order of analyses described, and the results of those analyses, do not represent relative importance or weight given to those analyses by Goldman Sachs. Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data as it existed on or before April 5, 2000, and is not necessarily indicative of current market conditions.

THE SUMMARY INCLUDES INFORMATION PRESENTED IN TABULAR FORMAT. THESE TABLES SHOULD BE READ TOGETHER WITH THE TEXT OF EACH SUMMARY.

1. SUMMARY OF TRANSACTION MULTIPLES

At the exchange ratio of 0.75 of a share of Peregrine common stock for each share of Harbinger common stock, Goldman Sachs noted that, based on the closing prices of Peregrine common stock of $56.22 and Harbinger common stock of $22.13 on April 4, 2000, the implied price per share being paid in the merger was $42.16, representing a premium of 90.6%. (It should be noted that the closing price of Peregrine common stock on May 19, 2000 was $19.25 and based on that price, the implied price per share of Harbinger common stock based on the same exchange ratio was $14.44.) Goldman Sachs then calculated implied per share prices using average market prices of Peregrine common stock over

53

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0681

selected periods at the exchange ratio of 0.75 and compared these implied per share prices with average market prices of Harbinger common stock over selected periods. The results of this analysis are as follows:

| | IMPLIED VALUES AND IMPLIED PREMIUMS OF THE 0.75 EXCHANGE RATIO | | |
|---|---|---|---|
| | BASED ON CLOSING PRICE OF PEREGRINE COMMON STOCK OF $56.22 ON APRIL 4, 2000 | BASED ON AVERAGE PRICE OF PEREGRINE COMMON STOCK OF $67.94 FOR THE 10-DAY PERIOD ENDED APRIL 4, 2000 | BASED ON AVERAGE PRICE OF PEREGRINE COMMON STOCK OF $68.22 FOR THE 30-DAY PERIOD ENDED APRIL 4, 2000 |
| IMPLIED VALUE PER SHARE OF HARBINGER COMMON STOCK...... | $42.16 | $50.96 | $51.17 |
| PREMIUM TO CLOSING PRICE OF HARBINGER COMMON STOCK OF $22.13 ON APRIL 4, 2000..... | 90.6% | 130.3% | 131.3% |
| PREMIUM TO AVERAGE PRICE OF HARBINGER COMMON STOCK OF $31.71 FOR THE 1-MONTH PERIOD ENDED APRIL 4, 2000...................... | 33.0% | 60.7% | 61.4% |
| PREMIUM TO AVERAGE PRICE OF HARBINGER COMMON STOCK OF $28.53 FOR THE 3-MONTH PERIOD ENDED APRIL 4, 2000...................... | 47.8% | 78.6% | 79.4% |

Goldman Sachs also calculated the implied premium being paid in the merger by comparing the exchange ratio in the merger with the average exchange ratio of the market price of Harbinger common stock over selected periods to the closing price of Peregrine common stock on April 4, 2000. The results of the analysis are as follows:

| | IMPLIED PREMIUMS TO VARIOUS MARKET EXCHANGE RATIOS | |
|---|---|---|
| | BASED ON CLOSING PRICE OF PEREGRINE COMMON STOCK OF $56.22 ON APRIL 4, 2000 | PREMIUM REPRESENTED BY THE IMPLIED EXCHANGE RATIO |
| BASED ON CLOSING PRICE OF HARBINGER COMMON STOCK OF $22.13 ON APRIL 4, 2000.................... | 0.39x | 90.6% |
| BASED ON AVERAGE PRICE OF HARBINGER COMMON STOCK OF $31.71 FOR THE 1-MONTH PERIOD ENDED APRIL 4, 2000........................................ | 0.47x | 61.2% |
| BASED ON AVERAGE PRICE OF HARBINGER COMMON STOCK OF $28.53 FOR THE 3-MONTH PERIOD ENDED APRIL 4, 2000........................................ | 0.55x | 35.2% |

Using the implied values of $42.16, $50.96 and $51.17 per share, Goldman Sachs calculated various financial multiples and ratios of the implied prices for Harbinger for the years 1999 and 2000. Goldman Sachs obtained the 1999 data from Harbinger's Annual Report on Form 10-K for the fiscal year ended December 31, 1999 and the 2000 data from Harbinger's management projections. The analysis was made based on (i) 44.9 million fully diluted shares of Harbinger common stock outstanding, (ii) Harbinger's net debt of ($12.9) million as of December 31, 1999, (iii) Harbinger's 1999 and projected 2000 sales of $155.5 million and $190.0 million, (iv) Harbinger's 1999 and projected 2000 earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $22.1 million and $16.9 million, (v) Harbinger's 1999 and projected 2000 earnings before interest and taxes ("EBIT") of

54

Exhibit H
0682

$12.6 million and $4.5 million and (vi) Harbinger's 1999 and projected 2000
earnings per share ("EPS") of $0.26 and $0.11.

| | IMPLIED TRANSACTION MULTIPLES | | |
|---|---|---|---|
| IMPLIED PRICE PER SHARE | $42.16 | $50.96 | $51.17 |
| Enterprise Value/Sales | | | |
| 1999......................................... | 12.1x | 14.6x | 14.7x |
| 2000 (estimated)............................. | 9.9x | 12.0x | 12.0x |
| Enterprise Value/EBITDA | | | |
| 1999......................................... | 85.1x | 103.0x | 103.4x |
| 2000 (estimated)............................. | 111.3x | 134.7x | 135.2x |
| Enterprise Value/EBIT | | | |
| 1999......................................... | 149.3x | 180.6x | 181.4x |
| 2000 (estimated)............................. | 418.0x | 505.8x | 507.9x |
| P/E Multiple | | | |
| 1999......................................... | 162.2x | 196.0x | 196.8x |
| 2000 (estimated)............................. | 383.7x | 463.7x | 465.6x |

2. HISTORICAL STOCK TRADING ANALYSIS

Goldman Sachs reviewed and compared historical exchange ratios over selected
periods by calculating the ratio of the market price of Harbinger common stock
to the market price of Peregrine common stock on a daily basis and averaging
such ratios over the selected periods. The results of the analysis are
summarized as follows:

| PERIOD FOR WHICH THE DAILY EXCHANGE RATIOS WERE CALCULATED | AVERAGE EXCHANGE RATIO DURING PERIOD |
|---|---|
| April 4, 2000.................................... | 0.39x |
| 1 month ended April 4, 2000..................... | 0.47x |
| 3 months ended April 4, 2000.................... | 0.55x |
| 6 months ended April 4, 2000.................... | 0.63x |
| 1 year ended April 4, 2000...................... | 0.76x |

Goldman Sachs also compared the historical trading prices of Harbinger
common stock and Peregrine common stock with the following: (i) an enterprise
software composite index comprised of the common stock of Baan, BMC Software,
Compuware, Great Plains Software, JD Edwards, JDA Software, Peoplesoft, SAP and
Siebel Systems; (ii) an enterprise e-commerce composite index comprised of the
common stock of i2 Technologies, Microsoft and Oracle; (iii) a
business-to-business e-commerce composite index comprised of the common stock of
Ariba, CommerceOne, FreeMarkets, Internet Capital Group, PCOrder.com,
PurchasePro.com and Vitria; and (iv) the Goldman Sachs Technology Index (GTSI).
The analysis indicated that, for the period from April 5, 1999 to April 4, 2000,
the Harbinger common stock and Peregrine common stock have increased relative to
the enterprise software composite index, business-to-business e-commerce
composite index and GTSI but decreased relative to the enterprise e-commerce
composite index.

3. SELECTED PUBLIC MARKET COMPARABLES

Goldman Sachs reviewed financial information of Harbinger, Peregrine and
comparable companies whose securities are publicly traded. Goldman Sachs
calculated various financial multiples and ratios for Harbinger based on
(i) the market price of the Harbinger common stock on April 4, 2000 and

55

(ii) the implied price per share of the Harbinger common stock being paid in the merger. Such financial multiples and ratios were compared with those for the business-to-business e-commerce companies and enterprise software companies selected for the historical stock trading analysis.

Goldman Sachs also conducted a similar analysis for Peregrine based on the market price of the Peregrine common stock on April 4, 2000. Financial multiples and ratios for Peregrine were compared with those for the enterprise e-commerce companies and enterprise software companies selected for the historical stock trading analysis.

Where applicable, the financial multiples and ratios for Harbinger, Peregrine and the selected companies were calculated using the (i) the closing prices of their common stock on April 4, 2000 and (ii) their respective equity market capitalization. Estimates of revenues and price-to-earning ("P/E") ratios for Harbinger, Peregrine and the selected companies were obtained from the following sources:

- for Harbinger, estimates for the year 2000 were based on average street revenue estimates and estimates for the year 2001 were based on Harbinger's management projections;

- for Peregrine, estimates for the years 2000 and 2001 were based on a publicly available research report dated February 18, 2000; and

- for the selected companies, estimates for the years 2000 and 2001 were based on public filings, estimates of I/B/E/S International, a financial information services provider, and respective publicly available research reports.

The results of the analyses are summarized as follows:

| | BUSINESS-TO-BUSINESS E-COMMERCE | | ENTERPRISE SOFTWARE | | ENTERPRISE E-COMMERCE | | HARBINGER | |
| | RANGE | MEDIAN | RANGE | MEDIAN | RANGE | MEDIAN | MARKET VALUE | TRANSACTION VALUE |
|---|---|---|---|---|---|---|---|---|
| Stock Price as a % of 52-week high......... | 26.7% - 59.6% | 37.6% | 27.3% - 71.5% | 57.3% | 42.8% - 85.9% | 74.3% | 59.1% | NM |
| Revenue Multiple | | | | | | | | |
| 2000 (estimated)..... | 6.2x - 270.4x | 81.5x | 1.4x - 37.5x | 4.3x | 20.8x - 23.8x | 21.3x | 5.0x | 9.9x |
| 2001 (estimated)..... | 32.8x - 169.7x | 61.1x | 1.2x - 26.7x | 3.5x | 15.4x - 21.7x | 18.7x | 3.7x | 7.3x |
| 2000 Revenue Multiple/1997-1999 Revenue Compounded Annual Growth Rate... | 0.1x - 1.0x | 0.3x | 0.1x - 0.4x | 0.1x | 0.3x - 1.0x | 0.8x | 0.3x | 0.7x |
| P/E Multiple | | | | | | | | |
| 2000 (estimated)..... | NM | NM | 14.9x - 132.3x | 59.6x | 49.5x - 262.3x | 105.5x | 201.1x | 383.3x |
| 2001 (estimated)..... | NM | NM | 11.1x - 100.9x | 36.0x | 40.1x - 178.2x | 85.3x | 36.9x | 70.3x |
| IBES 5-year EPS Compounded Annual Growth Rate......... | 25.0% - 95.0% | 50.0% | 20.0% - 40.0% | 26.5% | 25.0% - 40.0% | 25.0% | 35.0% | 35.0% |

| | PEREGRINE |
|---|---|
| Stock Price as a % of 52-week high......... | 70.7% |
| Revenue Multiple | |
| 2000 (estimated)..... | 19.9x |
| 2001 (estimated)..... | 13.9x |
| 2000 Revenue Multiple/1997-1999 Revenue Compounded Annual Growth Rate... | 0.2x |
| P/E Multiple | |
| 2000 (estimated)..... | 124.9x |
| 2001 (estimated)..... | 69.2x |
| IBES 5-year EPS Compounded Annual Growth Rate......... | 47.5% |

4. DISCOUNTED CASH FLOW ANALYSIS

Using Harbinger's management projections, Goldman Sachs calculated and analyzed the sensitivity of the implied equity value for Harbinger on a per share basis based on (i) Harbinger's net debt of ($12.9) million as of December 31, 1999, (ii) 40.1 million basic shares of Harbinger common stock outstanding and (iii) 7.2 million options to purchase Harbinger common stock with a weighted average strike price of $13.54 outstanding.

Goldman Sachs calculated a range of implied equity value for Harbinger on a per share basis by discounting projected future cash flows through 2002 and 2002 unlevered net income terminal multiples ranging from 30.0x to 50.0x at discount rates ranging from 15.0% to 35.0% to June 30, 2000. This analysis showed that the implied equity value of Harbinger common stock ranged from $19.28 to $37.34 per share.

Exhibit H
0684

56

Exhibit H
0685

Using a 40.0x 2002 estimated unlevered net income terminal multiple and a 25.0% discount rate, Goldman Sachs performed a sensitivity analysis to consider the impact of variances in sales growth and EBIT margins of Harbinger on its implied equity value per share. This analysis showed that, with a variance in sales growth ranging from (10.0)% to 10.0% and a variance in EBIT margin ranging from (2.0)% to 2.0%, the implied equity value of Harbinger ranged from $19.74 to $37.02 per share.

5. P/E METHODOLOGIES AND IMPLIED STOCK PRICE ANALYSIS

Using the 2001, 2002 and 2003 fully-diluted EPS estimates for Harbinger common stock provided by Harbinger's management, Goldman Sachs calculated a range of implied future stock prices of Harbinger common stock based on forward EPS multiples ranging from 30x to 50x. Goldman Sachs then analyzed the present value of Harbinger common stock by discounting the implied future stock prices to June 30, 2000 at discount rates ranging from 15% to 35%. This analysis showed that, with 2001, 2002 and 2003 fully-diluted EPS estimates of $0.47, $0.86 and $1.41, the present value of the implied future stock price of Harbinger common stock as of June 30, 2000 would range from $16.39 to $49.84 per share.

6. PRO FORMA MERGER ANALYSIS

Goldman Sachs analyzed the pro forma financial impact of the merger on the fully-diluted cash EPS of Peregrine common stock for the fiscal years ending March 31, 2000 and March 31, 2001. Estimates for Harbinger, as adjusted to reflect Peregrine's fiscal year end of March 31, were based on a publicly available research report dated February 10, 2000 for fiscal 2000 and the fiscal 2000 cash earnings were grown at the I/B/E/S median long term growth rate to estimate fiscal 2001 cash earnings. Estimates for Peregrine were based on publicly available median consensus earnings estimates. Estimates of revenue enhancements and cost reductions that are expected to result from the merger were provided by Harbinger's management. The fully-diluted cash EPS estimates for Harbinger and Peregrine on a stand-alone basis did not include historical transaction goodwill. The analysis was based on the following additional assumptions:

- the merger would result in annual revenue enhancements and cost reductions of $38.2 million on a pre-tax basis;

- the combined company would be subject to a tax rate of 33%;

- 100% of the synergies would be phased in during the year 2001;

- no additional interest expense would be resulted from the merger;

- transaction goodwill amortization was excluded;

- there were 44.9 million and 121.7 million of fully-diluted shares of Harbinger and Peregrine common stock outstanding, respectively; and

- purchase accounting would apply to the combined company.

Taking into account the revenue enhancements and cost reductions expected to result from the merger, the pro forma fully-diluted cash EPS of the combined company would be as follows:

|  | PEREGRINE | HARBINGER | COMBINED COMPANY |
|---|---|---|---|
| 2000 (estimated)........................ | $0.31 | $0.25 | $0.31 |
| 2001 (estimated)........................ | $0.51 | $0.14 | $0.60 |

57

Exhibit H
0686

7. CONTRIBUTION ANALYSIS

Goldman Sachs calculated the respective percentage contribution by Peregrine and Harbinger to the combined company for the years 2001 and 2002. Estimates for Harbinger, as adjusted to reflect Peregrine's fiscal year end of March 31, were based on Harbinger's management projections and estimates for Peregrine were based on a publicly-available research report dated February 18, 2000. Historical data for Harbinger, as adjusted to reflect Peregrine's fiscal year end of March 31, were based on Harbinger's Annual Report on Form 10-K for the fiscal year ended December 31, 1999 and historical data for Peregrine were based on Peregrine's Annual Report on Form 10-K for the fiscal year ended March 31, 1999 and its Quarterly Report on Form 10-Q for the fiscal quarter ended December 31, 1999.

Goldman Sachs computed the relative contribution of Harbinger and Peregrine to the combined company in terms of (i) equity market capitalization, (ii) enterprise value and (iii) pro forma ownership based on the following information or assumptions:

- the market prices of Peregrine common stock and Harbinger common stock were $56.22 and $22.13, respectively, as of April 4, 2000;

- 105.0 million basic shares of Peregrine common stock and 40.1 million basic shares of Harbinger common stock were outstanding as of December 31, 1999;

- 18.5 million options to purchase Peregrine common stock with a weighted average strike price of $5.68 and 7.2 million options to purchase Harbinger common stock with a weighted average strike price of $13.54 were outstanding as of December 31, 1999;

- the options to purchase Harbinger common stock would be rolled-over on a tax-fee basis; and

- the net debts of Peregrine and Harbinger were ($22.9) million and ($12.9) million, respectively, as of December 31, 1999.

The results of the analysis are as follows:

| | % CONTRIBUTION | |
| --- | --- | --- |
| | PEREGRINE | HARBINGER |
| Equity Market Capitalization............................ | 88% | 12% |
| Enterprise Value........................................ | 88% | 12% |
| Pro Forma Ownership..................................... | 78.3% | 21.7% |

In addition, Goldman Sachs computed the relative contribution of Harbinger and Peregrine to the combined company in terms of their respective (i) sales, (ii) EBITDA, (iii) EBIT and (iv) cash net income. Using estimates provided by Harbinger's management, Goldman Sachs also conducted a similar analysis by taking into account the revenue enhancements and cost reductions expected to result from the merger. The analysis was conducted with the following additional assumptions:

- the merger would result in $36.0 million annual revenue enhancements on a pre-tax basis with a margin impact of 70%;

- the merger would result in $13.0 million annual cost reductions on a pre-tax basis;

- the revenue enhancements and cost reductions expected to result from the merger would be subject to a tax rate of 33%; and

- 100% of the revenue enhancements and cost reductions expected to result from the merger would be phased in during 2001.

58

Exhibit H
0687

The table below sets forth the results of the analyses:

|  | WITHOUT REVENUE ENHANCEMENTS AND COST REDUCTIONS | | WITH REVENUE ENHANCEMENTS AND COST REDUCTIONS | |
|  | PEREGRINE | HARBINGER | PEREGRINE | HARBINGER |
| --- | --- | --- | --- | --- |
| **Sales** | | | | |
| LTM.................................. | 59% | 41% | 59% | 41% |
| Fiscal year ended March 31, 2000 (estimated)........................ | 60% | 40% | 64% | 36% |
| Fiscal year ended March 31, 2001 (estimated)........................ | 64% | 36% | 66% | 34% |
| **EBITDA** | | | | |
| LTM.................................. | 79% | 21% | 79% | 21% |
| Fiscal year ended March 31, 2000 (estimated)........................ | 82% | 18% | 86% | 14% |
| Fiscal year ended March 31, 2001 (estimated)........................ | 86% | 14% | 89% | 11% |
| **EBIT** | | | | |
| LTM.................................. | 78% | 22% | 78% | 22% |
| Fiscal year ended March 31, 2000 (estimated)........................ | 83% | 17% | 89% | 11% |
| Fiscal year ended March 31, 2001 (estimated)........................ | 89% | 11% | 92% | 8% |
| **Cash Net Income** | | | | |
| LTM.................................. | 66% | 34% | 66% | 34% |
| Fiscal year ended March 31, 2000 (estimated)........................ | 73% | 27% | 83% | 17% |
| Fiscal year ended March 31, 2001 (estimated)........................ | 87% | 13% | 91% | 9% |

**8. SELECTED TRANSACTION MULTIPLES**

Using the implied value of $42.16 per share being paid in the merger for Harbinger common stock, Goldman Sachs calculated (i) the premium represented by the implied value in relation to the highest market price of Harbinger common stock during the past 52 weeks, (ii) the premium represented by the implied value in relation to the market price of Harbinger common stock on April 4, 2000, (iii) the corresponding LTM revenue multiple and (iv) the corresponding LTM EBITDA multiple. Goldman Sachs then compared such results with publicly available information for similar transactions in the software industry, including the merger between SBC Commerce and Sterling Commerce. The results of the analysis are as follows:

|  | PROPOSED MERGER | SBC/STERLING MERGER | OTHER SOFTWARE TRANSACTIONS | | |
|  | | | HIGH | MEDIAN | LOW |
| --- | --- | --- | --- | --- | --- |
| Premium to 52-week high......... | 12.7% | 22.9% | 44.8% | -3.8% | -50.0% |
| Premium to market.............. | 90.6% | 47.9% | 196.2% | 30.1% | -2.7% |
| LTM Revenue multiple............ | 12.1x | 6.2x | 155.8x | 6.0x | 0.7x |
| LTM EBITDA multiple............. | 85.1x | 16.0x | 1167.2x | 26.0x | 9.8x |

In addition, Goldman Sachs reviewed the premiums and transaction multiples involved in the merger between SBC Commerce and Sterling Commerce. Using such premiums and multiples,

59

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0688

Goldman Sachs computed the implied equity valuation and implied value per share for Harbinger common stock in the merger based on the market price of $22.13 of Harbinger common stock on April 4, 2000. The results of the analysis are as follows:

| PREMIUMS OR MULTIPLES ON WHICH THE IMPLIED VALUATION WAS BASED | IMPLIED EQUITY VALUE | IMPLIED VALUE PER SHARE |
|---|---|---|
| Exchange ratio of 0.75 in this merger......... | $1,881m | $ 42.16 |
| Premium to 52-week high in the SBC/Sterling merger................................... | $1,680m | $ 37 |
| Premium to market in the SBC/Sterling merger................................... | $1,470m | $ 33 |
| LTM Revenue multiple........................... | $ 977m | $ 22 |
| LTM EBITDA multiple............................ | $ 354m | $ 8 |

The preparation of a fairness opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. Selecting portions of the analyses or of the summary set forth above, without considering the analyses as a whole, could create an incomplete view of the processes underlying the opinion of Goldman Sachs. In arriving at its opinion, Goldman Sachs considered the results of all such analyses and did not attribute any particular weight to any factor or analysis considered by it; rather, Goldman Sachs made its determination as to fairness on the basis of its experience and professional judgment after considering the results of all such analyses. No company used in the above analyses as a comparison is directly comparable to Harbinger or Peregrine and no transaction used is directly comparable to the proposed merger.

Goldman Sachs prepared these analyses solely for purposes of providing an opinion to the Harbinger board as to the fairness of the exchange ratio to the holders of shares of Harbinger common stock from a financial point of view and they do not purport to be appraisals, nor do they necessarily reflect the prices at which businesses or securities actually may be sold. Analyses based upon forecasts of future results are not necessarily indicative of actual future results, which may be significantly more or less favorable than suggested by these analyses. Because these analyses are inherently subject to uncertainty and are based upon numerous factors or events beyond the control of the parties or their respective advisors, none of Harbinger, Peregrine or Goldman Sachs assumes responsibility if future results are materially different from those forecasted. As described above, the opinion of Goldman Sachs to the Harbinger board was one of many factors taken into consideration by the Harbinger board in making its determination to approve the merger agreement. The foregoing summary does not purport to be a complete description of the analyses performed by Goldman Sachs.

Goldman Sachs, as part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for estate, corporate and other purposes. Goldman Sachs is familiar with Harbinger, having acted as its financial advisor in connection with, and having participated in certain of the negotiations leading to, the merger agreement. In addition, Goldman Sachs is a full service securities firm and in the ordinary course of its trading activities it may from time to time effect transactions, for its own account or the account of customers, and hold positions in securities or options on securities of Harbinger and Peregrine.

FEE ARRANGEMENTS WITH HARBINGER'S FINANCIAL ADVISOR

Pursuant to a letter agreement dated March 21, 2000 between Harbinger and Goldman Sachs, Harbinger engaged Goldman Sachs to act as its exclusive financial advisor in connection with the possible sale of all or a portion of Harbinger. Pursuant to the terms of this letter:

- if the merger is consummated, Harbinger will pay Goldman Sachs a transaction fee equal to 0.60% of the aggregate consideration paid by Peregrine for the Harbinger common stock

60

Exhibit H
0689

(including amounts paid to holders of options, warrants and convertible
securities) pursuant to the merger agreement, plus the principal amount of
all indebtedness for borrowed money as set forth on the most recent
consolidated balance sheet of Harbinger prior to the completion of the
merger; and

- if the merger agreement is terminated or otherwise not consummated and
  Harbinger is entitled to a payment according to the terms thereof,
  Harbinger will pay Goldman Sachs a transaction fee of the lesser of
  (i) $7 million or (ii) 25% of such payment in cash if and when such
  payment is made to Harbinger.

In addition, Harbinger has agreed to reimburse Goldman Sachs periodically,
upon request, and upon consummation of the merger or upon termination of its
services pursuant to the letter agreement, for its reasonable out-of-pocket
expenses, including the fees and disbursements of Goldman Sachs' attorneys, plus
any sales, use or similar taxes (including additions to such taxes, if any)
arising in connection with any matter referred to in the letter. Harbinger has
also agreed to indemnify Goldman Sachs and certain related persons against
certain liabilities in connection with its engagement, including liabilities
under the federal securities laws.

PEREGRINE'S REASONS FOR THE MERGER

In its decision to recommend and approve the merger, the most important
benefits identified by the board of directors of Peregrine were the following:

- the board of directors believes that the merger will result in a
  complementary coupling of Peregrine's infrastructure management,
  e-procurement, and employee self-service solutions with Harbinger's
  business-to-business e-commerce and procurement offerings;

- the combination of the technical and marketing resources of the two
  companies is expected to lead to a broader product family that will be
  attractive to customers because it will represent an integrated solution
  for managing the acquisition, use, maintenance, and disposal of
  infrastructure assets; and

- the combination of the companies' product lines, sales forces, and
  distribution channels would immediately enhance Peregrine's ability to
  compete in the infrastructure management, e-procurement, and employee self
  service software solution markets.

Peregrine's board of directors consulted with senior management and its
outside legal and financial advisors as part of the process of approving the
merger. In its evaluation, the Peregrine board considered several factors,
including the following:

- the potential strategic benefits of the merger;

- historical information concerning Peregrine's and Harbinger's respective
  businesses, prospects, financial performance and condition, operations,
  technology, management, and competitive position, including public SEC
  reports of the results of operations for each company;

- the view of Peregrine's management of the financial condition, results of
  operations, and business of Peregrine and Harbinger both before and after
  the merger;

- current financial market conditions and historical market prices,
  volatility, and trading information with respect to Peregrine's common
  stock and Harbinger's common stock;

- the exchange ratio for the merger in light of comparable transactions;

- detailed financial analysis and pro forma and other information presented
  to the board, including the opinion of Deutsche Bank to the effect that,
  as of the date of its opinion and

61

Exhibit H
0690

based on and subject to the assumptions and limitations described in the opinion, the exchange ratio in the merger was fair, from a financial point of view, to Peregrine;

- the impact of the merger on Peregrine's customers and employees; and

- reports from Peregrine's management and its legal advisors concerning their due diligence investigations of Harbinger.

The Peregrine board also identified and considered a number of potentially negative factors in its deliberations concerning the merger, including the following:

- the risk that the potential benefits of the merger may not be realized;

- risks associated with recent changes in Harbinger's business plan;

- Harbinger's slower revenue growth rates relative to Peregrine;

- the risks associated with outstanding shareholder litigation against Harbinger and certain former officers and directors of Harbinger, for which Harbinger is not insured and for which it has outstanding indemnification obligations;

- the challenges of integrating the management teams, cultures, and organizations of the two companies, especially in light of the physical distance between Peregrine's headquarters in San Diego, California and Harbinger's headquarters in Atlanta, Georgia as well as the worldwide geographic dispersion of each company's operations;

- the risk of disruption of Peregrine's on-going business, including sales momentum, as a result of uncertainties created by the announcement of the merger;

- the risk that the merger might not be consummated despite the efforts of the parties, even if approved by stockholders;

- the significant adverse impact to the net income of the combined company that will result from charges for the amortization of goodwill and other intangibles in light of purchase accounting treatment for the merger;

- the substantial charges to be incurred in connection with the merger, including the costs of integrating the businesses and transaction expenses arising from the merger;

- the risk that, despite the efforts of the combined company, key technical and management personnel might not remain employed by the combined company; and

- the other factors described in the section of this joint proxy statement/prospectus entitled "Risk Factors" beginning on page 12.

The foregoing discussion of the information and factors considered by Peregrine's board of directors is not intended to be exhaustive but includes the material factors the Peregrine board of directors considered. In view of the complexity of the transaction and the factors, both positive and negative, influencing its decision, the Peregrine board did not find it practical to quantify, rank, or otherwise assign relative or specific weights to these factors. In considering the factors described above, individual members of the Peregrine board of directors may have given different weights to different factors. The Peregrine board considered all these factors as a whole and believed the factors supported its determination to approve the merger.

RECOMMENDATION OF PEREGRINE'S BOARD OF DIRECTORS

AFTER CAREFUL CONSIDERATION, PEREGRINE'S BOARD OF DIRECTORS HAS UNANIMOUSLY DETERMINED THAT THE MERGER IS IN THE BEST INTEREST OF ITS STOCKHOLDERS, HAS UNANIMOUSLY APPROVED THE MERGER AGREEMENT,

62

Exhibit H
0691

AND RECOMMENDS THAT YOU VOTE FOR APPROVAL OF THE ISSUANCE OF SHARES OF PEREGRINE COMMON STOCK IN CONNECTION WITH THE MERGER.

OPINION OF DEUTSCHE BANK SECURITIES INC., FINANCIAL ADVISOR TO PEREGRINE

Pursuant to an engagement letter dated as of March 1, 2000, Peregrine engaged Deutsche Bank to act as financial advisor in the merger and render an opinion as to the fairness, from a financial point of view, of the exchange ratio to Peregrine.

At the April 5, 2000 meeting of Peregrine's board of directors, Deutsche Bank delivered its oral opinion, subsequently confirmed in writing as of the same date, to Peregrine's board of directors to the effect that, as of the date of such opinion, based upon and subject to the assumptions made, matters considered and limits of the review undertaken by Deutsche Bank, the exchange ratio was fair, from a financial point of view, to Peregrine.

THE FULL TEXT OF DEUTSCHE BANK'S WRITTEN OPINION, DATED APRIL 5, 2000, WHICH SETS FORTH, AMONG OTHER THINGS, THE ASSUMPTIONS MADE, MATTERS CONSIDERED AND LIMITS ON THE REVIEW UNDERTAKEN BY DEUTSCHE BANK IN CONNECTION WITH THE OPINION, IS ATTACHED AS ANNEX F TO THIS JOINT PROXY STATEMENT/PROSPECTUS AND IS INCORPORATED HEREIN BY REFERENCE. PEREGRINE STOCKHOLDERS ARE URGED TO READ DEUTSCHE BANK'S OPINION IN ITS ENTIRETY. THE SUMMARY OF THE OPINION OF DEUTSCHE BANK SET FORTH IN THIS JOINT PROXY STATEMENT/PROSPECTUS IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF SUCH OPINION.

In connection with Deutsche Bank's role as financial advisor to Peregrine, and in arriving at its opinion, Deutsche Bank has, among other things, reviewed certain publicly available financial information and other information concerning Peregrine and Harbinger and certain internal analyses and other information furnished to it by Peregrine and Harbinger. Deutsche Bank also held discussions with the members of the senior managements of Peregrine and Harbinger regarding the businesses and prospects of their respective companies and the joint prospects of a combined enterprise. In addition, Deutsche Bank

- reviewed the reported prices and trading activity for the common stock of both Peregrine and Harbinger,

- reviewed recent public research analyst reports concerning Peregrine and Harbinger,

- compared certain financial and stock market information for Peregrine and Harbinger with similar information for selected companies whose securities are publicly traded,

- reviewed the financial terms of selected recent business combinations which it deemed comparable in whole or in part,

- reviewed the terms of a draft of the merger agreement and certain related documents dated April 5, 2000,

- assumed that the pending shareholder lawsuit against Harbinger described under "Risk Factors" on page 12 of this joint proxy statement/prospectus would not have a material adverse effect on Harbinger or Peregrine, and

- performed such other studies and analyses and considered such other factors as it deemed appropriate.

In preparing its opinion, Deutsche Bank did not assume responsibility for the independent verification of, and did not independently verify, any information, whether publicly available or furnished to it, concerning Peregrine or Harbinger, including, without limitation, any financial information, forecasts or projections, considered in connection with the rendering of its opinion. Accordingly, for purposes of its opinion, Deutsche Bank assumed and relied upon the accuracy and completeness of all such information.

63

Exhibit H
0692

Deutsche Bank did not conduct a physical inspection of any of the properties or assets, and did not prepare or obtain any independent evaluation or appraisal of any of the properties, assets or liabilities of Peregrine or Harbinger. With respect to the financial forecasts and projections made available to Deutsche Bank and used in its analysis, Deutsche Bank has assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of Peregrine as to the matters covered thereby. In rendering its opinion, Deutsche Bank expressed no view as to the reasonableness of such forecasts and projections or the assumptions on which they are based. Neither Peregrine nor Harbinger made available to Deutsche Bank any forecasts of future financial performance.

The opinion of Deutsche Bank was necessarily based upon economic, market and other conditions as in effect on, and the information made available to Deutsche Bank as of, the date of such opinion. Although subsequent developments may affect its opinion, Deutsche Bank has assumed no obligation to update, revise or reaffirm it.

In rendering its opinion, Deutsche Bank assumed that, in all respects material to its analysis,

- the representations and warranties of Peregrine, Harbinger and Soda Acquisition contained in the merger agreement are true and correct;

- Peregrine, Harbinger and Soda Acquisition each will perform all of the covenants and agreements to be performed by it under the merger agreement;

- all conditions to the obligation of each of Peregrine, Harbinger and Soda Acquisition to consummate the merger will be satisfied without any waiver thereof;

- all material governmental, regulatory or other approvals and consents required in connection with the consummation of the merger will be obtained;

- in connection with obtaining any necessary governmental, regulatory or other approvals and consents, or any amendments, modifications or waivers to any agreements, instruments or orders to which either Peregrine or Harbinger is a party or subject or by which it is bound, no limitations, restrictions or conditions will be imposed or amendments, modifications or waivers made that would have a material adverse effect on Peregrine or Harbinger or materially reduce the contemplated benefits of the merger to Peregrine; and

- where applicable, the value per share of Peregrine common stock was its closing price on April 5, 2000.

In addition, Deutsche Bank has been advised by Peregrine, and accordingly has assumed for purposes of its opinion, that the merger will be tax-free to each of Peregrine and Harbinger and their respective stockholders and that the merger will be accounted for as a purchase.

Set forth below is a brief summary of some of the financial analyses performed by Deutsche Bank in connection with its opinion and reviewed with Peregrine's board of directors at its meeting on April 5, 2000. These summaries of financial analyses include information presented in a tabular format. In order to understand fully the financial analyses used by Deutsche Bank, the tables must be read with the text of each summary, because the tables alone are not a complete description of the financial analyses.

HISTORICAL EXCHANGE RATIO ANALYSIS. Deutsche Bank reviewed the historical ratio of the daily per share market closing prices of Harbinger common stock to the corresponding prices of Peregrine common stock over the 15-, 30-, 60- and 90-trading day periods prior to April 5, 2000. Deutsche Bank examined the premiums represented by the exchange ratio of 0.75 over the averages of these ratios

64

Exhibit H
0693

over the various periods. The following table summarizes the average exchange ratio over the indicated period and the premium represented by the exchange ratio.

| PERIOD | AVERAGE EXCHANGE RATIO DURING PERIOD | PREMIUM REPRESENTED BY EXCHANGE RATIO |
|--------|-------------------------------------|---------------------------------------|
| April 5, 2000 | 0.4159 | 80.3% |
| 15 trading day average | 0.4404 | 70.3% |
| 30 trading day average | 0.4857 | 54.4% |
| 60 trading day average | 0.5413 | 38.5% |
| 90 trading day average | 0.5738 | 30.7% |

ANALYSIS OF SELECTED PUBLICLY TRADED COMPANIES. Deutsche Bank compared certain financial information and commonly used valuation measurements for Harbinger to corresponding information and measurements for two groups of companies that Deutsche Bank deemed to be comparable to the businesses of Harbinger: a group of five publicly traded companies that Deutsche Bank deemed to be internet software companies, which we refer to as the selected software companies, and a group of six publicly traded companies that Deutsche Bank deemed to be e-commerce enabling companies, which we refer to as the selected e-commerce enabling companies. The following table lists the relevant selected companies:

| SELECTED SOFTWARE COMPANIES | SELECTED E-COMMERCE ENABLING COMPANIES |
|-----------------------------|----------------------------------------|
| Brokat Infosystems | Agile Software |
| Checkfree Holdings | Ariba |
| Intuit | Commerce One |
| QRS | Extensity |
| Sterling Commerce | OnDisplay |
| | VerticalNet |

Deutsche Bank compared, among other things, the enterprise value (determined as the common equity market valuation adjusted by adding the amount of any debt and subtracting the amount of any cash and cash equivalents, as most recently reported) as of April 5, 2000 to revenues for the last four fiscal quarters and projected revenues for calendar years 2000 and 2001 for the selected companies. Based on such analysis, Deutsche Bank computed a range of implied values per share of Harbinger. To calculate the multiples for the selected companies, Deutsche Bank used publicly available information concerning historical and projected financial performance, including published historical financial information as well as revenue and earnings estimates reported by research analysts who cover the selected companies. The following table summarizes the calculations by Deutsche Bank of the multiples of enterprise value to revenues for Harbinger implied by the merger and the mean, median, and ranges of multiples of enterprise value to revenue for the selected companies for the indicated periods.

| REVENUES | HARBINGER IMPLIED MULTIPLES | SELECTED SOFTWARE COMPANIES | | | SELECTED E-COMMERCE ENABLING COMPANIES | | |
|----------|---------------------------|------|--------|-------|------|--------|-------|
| | | MEAN | MEDIAN | RANGE | MEAN | MEDIAN | RANGE |
| TTM | 12.3x | 20.0x | 7.5x | 5.3x to 80.4x | 195.7x | 176.9x | 86.4x to 380.6x |
| CY2000 | 9.9x | 10.1x | 6.4x | 3.5x to 29.4x | 68.1x | 52.9x | 30.5x to 162.1x |
| CY2001 | 7.4x | 7.3x | 6.0x | 2.4x to 17.3x | 37.9x | 31.9x | 14.9x to 93.2x |

Deutsche Bank noted that none of the companies utilized as a comparison is identical to Harbinger. Accordingly, Deutsche Bank believes the analysis of publicly traded comparable companies is not simply mathematical. Rather, it involves complex considerations and qualitative judgments, reflected in Deutsche Bank's opinion, concerning differences in financial and operating characteristics

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0694

of the comparable companies and other factors that could affect the public
trading value of the comparable companies.

ANALYSIS OF SELECTED PRECEDENT TRANSACTIONS. Deutsche Bank reviewed the
financial terms, to the extent publicly available, of twenty-six proposed,
pending or completed merger and acquisition transactions since January 1996
involving companies in the traditional electronic data interchange and
enterprise software industries. We refer to these transactions as the selected
EDI/enterprise software transactions. Deutsche Bank also reviewed the financial
terms, to the extent publicly available, of twenty-eight proposed, pending or
completed merger and acquisition transactions since February 1997 involving
companies in the e-commerce enabling industry. We refer to these transactions as
the selected e-commerce enabling transactions. Deutsche Bank calculated the
ratio of the implied enterprise value of the target in each transaction to the
revenue, operating income and net income of the target company for the four
fiscal quarters preceding the announcement, based on certain information for
each of the selected transactions publicly available at the time of
announcement. Deutsche Bank's analysis did not take into account different
market and other conditions during the periods in which the selected
transactions occurred. The transactions reviewed were:

| SELECTED EDI/ENTERPRISE SOFTWARE TRANSACTIONS | SELECTED E-COMMERCE ENABLING TRANSACTIONS |
| --- | --- |
| SBC Communications / Sterling Commerce | i2 Technologies / Aspect Development |
| Intel / Brokat Infosystems | CheckFree / TransPoint |
| Nortel Networks / Clarify | Kana Communications / Silknet Software |
| PeopleSoft / Vantive | Broadvision / Interleaf |
| Peregrine Systems / Knowlix | Vignette / DataSage |
| TSI International Software / Novera Software | Ariba / TRADEX Technologies |
| Microsoft / Visio | Broadbase / Rubric |
| ADC Telecommunications / Saville Systems | Kana Communications / Business Evolution |
| Peregrine Systems / Innovative Tech Systems | Kana Communications / NetDialog |
| Sterling Commerce / XcelleNet | Ariba / Trading Dynamics |
| I2 Technologies / InterTrans Logistics Solutions | Commerce One / CommerceBid.com |
| Siebel Systems / Scopus Technology | Agile Software / Digital Market |
| IBM (Tivoli Systems) / Software Artistry | Kana Communications / Connectify |
| Scopus Technology / Clear with Computers | Chemdex / Promedix.com |
| Harbinger / Premonos | Kewill Electronic Commerce / Aristo Research, (Aristo Computer) |
| IBM (Tivoli Systems) / Unison Software | Open Market / FutureTense |
| Peregrine Systems / Apsylog (United Software) | eBay / Billpoint |
| Harbinger / ACQUION | Vignette / Diffusion |
| I2 Technologies / Optimax Systems | Amazon.com / Accept.com Financial Services |
| I2 Technologies / Think Systems | Inktomi / Impulse! Buy Network |
| The Baan Company / Aurum Software | CNET / KillerApp |
| Harbinger / Supply Tech | Lucent Technologies / Kenan Systems |
| PeopleSoft / Red Pepper Software | America Online / Netscape Communications |
| Clarify / Metropolis Software | BEA Systems / WebLogic |
| Astea International / Bendata | Inktomi / C2B Technologies |
| IBM / Tivoli Systems | Sun Microsystems / NetDynamics |
| | Netscape Communications / KIVA Software |
| | Open Market / Folio Corp. (Mead Data Central) |

66

Exhibit H
0695

The following table summarizes the calculations by Deutsche Bank of the mean, median and range of multiples of enterprise value to revenues, operating income and net income for the selected transactions and the corresponding multiples for Harbinger implied by the merger.

| TTM | HARBINGER IMPLIED MULTIPLES | SELECTED SOFTWARE COMPANIES | | | SELECTED E-COMMERCE ENABLING COMPANIES | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | MEAN | MEDIAN | RANGE | MEAN | MEDIAN | RANGE |
| Revenue............. | 12.3x | 8.5x | 4.9x | 2.4x to 30.7x | 78.9x | 73.5x | 7.8x to 192.0x |
| Operating Income..... | 151.4x | 85.4x | 40.6x | 19.8x to 233.0x | n/a | n/a | n/a |
| Net Income.......... | 119.9x | 366.7x | 97.8x | 30.1x to 1955.2x | n/a | n/a | n/a |

For transactions in the technology and internet sector announced since January 1, 1999 with transaction values greater than $1 billion in which the stock of the acquired company was publicly traded, Deutsche Bank also calculated the premium of the price at which such transactions were announced or effected to each acquired companies' per share market price for the one day, one week and four weeks prior to the announcement of the transaction and the premium represented by the exchange ratio in the merger (based on the exchange ratio and the per share market price of Peregrine common stock on April 5, 2000) over the per share market price of Harbinger common stock for the one day, one week and four weeks prior to the announcement of the merger. The following table sets forth the selected transactions analyzed by Deutsche Bank:

SELECTED TRANSACTIONS

Spyglass / OpenTV
LHS Group / Sema Group
Aspect Development / i2 Technologies
Apex / Cybex Computer Products
Network Solutions / VeriSign
Mission Critical Software / NetIQ
Sterling Commerce / SBC Communications
CareInsite / Healtheon/WebMD
Medical Manager / Healtheon/WebMD
Sterling Software / Computer Associates
Inprise / Corel
InterVU / Akamai Technologies
Silknet Software / Kana Communications
E-Tek Dynamics / JDS Uniphase
Etec Systems / Applied Materials
Concentric Network / NextLink Communications
USWeb/CKS / Whittman-Hart
DII Group / Flextronics International
Pierce Leahy / Iron Mountain
Clarify / Nortel Networks
Flycast Communications / CMGI

Visio / Microsoft
Smart Modular Technologies / Solectron
Excel Switching / Lucent Technologies
International Network Services / Lucent
  Technologies
Data General / EMC
AboveNet Communications / Metromedia Fiber
  Network
Medical Manager / Synetic
Wang Laboratories / Getronics
FORE Systems / GEC
GeoTel Communications / Cisco Systems
Broadcast.com / Yahoo!
PLATINUM Technology / Computer Associates
Level One Communications / Intel
XYLAN / Alcatel
VLSI Technology / Koninklijke Philips
  Electronics
Sundstrand / United Technologies
GeoCities / Yahoo!
Excite / At Home

67

This premium analysis is summarized in the following table:

|  | TRANSACTION PRICE PREMIUM | | |
|---|---|---|---|
| SELECTED TRANSACTIONS | ONE DAY | ONE WEEK | FOUR WEEKS |
| High......................................... | 196.2% | 188.9% | 235.5% |
| Mean......................................... | 43.9 | 49.8 | 67.7 |
| Median....................................... | 39.6 | 45.5 | 54.6 |
| Low.......................................... | 5.3 | 1.1 | -3.4 |
| Harbinger/Peregrine.......................... | 80.3 | 46.8 | 33.8 |

Deutsche Bank noted that none of the selected transactions was identical to the merger. In evaluating the selected transactions, Deutsche Bank made assumptions and judgments with regard to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond the control of Deutsche Bank, Peregrine or Harbinger. Because the reasons for, and circumstances surrounding, each of the selected transactions analyzed were so diverse, and due to the inherent differences between the operations and financial conditions of Harbinger and Peregrine and the companies involved in the selected transactions, Deutsche Bank believes that a comparable transaction analysis is not simply mathematical. Rather, it involves complex considerations and qualitative judgments, reflected in Deutsche Bank's opinion, concerning differences between the characteristics of the selected transactions and the merger that could affect the value of the subject companies and businesses and Harbinger and Peregrine.

PRO FORMA COMBINED REVENUES AND EARNINGS ANALYSIS.  Deutsche Bank analyzed certain pro forma effects of the merger. Based on its analysis, Deutsche Bank computed the resulting dilution or accretion to the combined company's revenues per share and earnings per share, based on publicly available analyst estimates for Peregrine and Harbinger for calendar year 2000, before taking into account any potential cost savings and other synergies that Peregrine and Harbinger could achieve if the merger were consummated and before non-recurring expenses relating to the merger. Deutsche Bank noted that before taking into account any potential cost savings and other synergies and before such non-recurring costs, the merger would be approximately 15.0% accretive to the combined company's revenues per share and 6.8% dilutive to the combined company's earnings per share (excluding goodwill) for the calendar year 2000. Deutsche Bank also noted that the combined company would require approximately $6.0 million in cost savings (without considering any tax effects) and other synergies to eliminate any dilution to the combined company's earnings per share (excluding goodwill).

CONTRIBUTION ANALYSIS.  Deutsche Bank analyzed the relative contributions of Peregrine and Harbinger to the pro forma revenues, gross margin, and operating income of the combined company, based on research analysts' projections for the respective companies for the last four fiscal quarters and the calendar year ending December 31, 2000 (excluding (1) the effect of any potential cost savings or synergies that may be realized as a result of the merger and (2) non-recurring expenses relating to the merger). The following table summarizes the results of this analysis:

|  | PERCENTAGE CONTRIBUTION TO THE PRO FORMA COMBINED COMPANY BY | |
|---|---|---|
|  | PEREGRINE | HARBINGER |
| TTM Revenues.......................................... | 58.9% | 41.1% |
| CY00 Revenues......................................... | 63.5 | 36.5 |
| TTM Gross Margin...................................... | 62.4 | 37.6 |
| CY00 Gross Margin..................................... | 68.8 | 31.2 |
| TTM Operating Income................................. | 78.3 | 21.7 |
| CY00 Operating Income................................ | 95.0 | 5.0 |

68

Exhibit H
0697

Deutsche Bank compared the results of their analysis to the relative ownership, based on the exchange ratio, by Harbinger's shareholders of approximately 21.4% of the outstanding capital of the combined company on an enterprise value basis.

Deutsche Bank applied the same analysis to the relative contributions of Peregrine and Harbinger to the pro forma net income of the combined company. The results of this analysis are summarized in the following table.

|  | PERCENTAGE CONTRIBUTION TO THE PRO FORMA COMBINED COMPANY BY | |
| --- | --- | --- |
|  | PEREGRINE | HARBINGER |
| TTM Net Income........................................... | 65.0% | 35.0% |
| CY00 Net Income........................................... | 91.6 | 8.4 |

Deutsche Bank compared the results of this analysis to the relative ownership, based on the exchange ratio, of approximately 22.0% of the outstanding capital of the combined company by Harbinger's shareholders on an equity value basis.

The foregoing summary describes all analyses and factors that Deutsche Bank deemed material in its presentation to Peregrine's board of directors and in preparing its the opinion, but is not a comprehensive description of all analyses performed and factors considered by Deutsche Bank in connection with preparing its opinion. The preparation of a fairness opinion is a complex process involving the application of subjective business judgment in determining the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances and, therefore, is not readily susceptible to summary description. Deutsche Bank believes that its analyses must be considered as a whole and that considering any portion of such analyses and of the factors considered without considering all analyses and factors could create a misleading view of the process underlying the opinion. In arriving at its fairness determination, Deutsche Bank did not assign specific weights to any particular analyses.

In conducting its analyses and arriving at its opinions, Deutsche Bank utilized a variety of generally accepted valuation methods. The analyses were prepared solely for the purpose of enabling Deutsche Bank to provide its opinion to Peregrine's board of directors as to the fairness of the exchange ratio to the stockholders of Peregrine and do not purport to be appraisals of or necessarily reflect the prices at which businesses or securities actually may be sold, which are inherently subject to uncertainty. In connection with its analyses, Deutsche Bank made numerous assumptions with respect to industry performance, general business and economic conditions and other matters, many of which are beyond Peregrine's and Harbinger's control. Analyses based on estimates or forecasts of future results are not necessarily indicative of actual past or future values or results, which may be significantly more or less favorable than suggested by such analyses. Because such analyses are inherently subject to uncertainty, being based upon numerous factors or events beyond the control of Peregrine, Harbinger or their respective advisors, none of Peregrine, Deutsche Bank nor any other person assumes responsibility if future results or actual values are materially different from these forecasts or assumptions.

The terms of the merger were determined through negotiations between Peregrine and Harbinger and were approved by Peregrine's board of directors. Although Deutsche Bank provided advice to Peregrine during the course of these negotiations, the decision to enter into the merger was solely that of Peregrine's board of directors. As described above, the opinion and presentation of Deutsche Bank to Peregrine's board of directors were only one of a number of factors taken into consideration by Peregrine's board of directors in making its determination to approve the merger. Deutsche Bank's opinion was provided to Peregrine's board of directors to assist it in connection with its consideration

69

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0698

of the merger and does not constitute a recommendation to any holder of Peregrine common stock as to how to vote with respect to the merger.

Deutsche Bank is an internationally recognized investment banking firm experienced in providing advice in connection with mergers and acquisitions and related transactions. Deutsche Bank is an affiliate of Deutsche Bank AG, and we refer to Deutsche Bank, Deutsche Bank AG and its affiliates collectively as the DB Group. One or more members of the DB Group have, from time to time, provided investment banking and other financial services to Peregrine or its affiliates for which such member has received compensation, including in connection with the acquisition of Innovative Tech Systems, Inc. by Peregrine. In addition, one or more members of the DB Group have provided investment banking services to Harbinger, including in connection with its initial public offering, follow-on public offering, and acquisition of Premenos Technology Corporation. In the ordinary course of business, members of the DB Group publish research reports regarding the software and Internet industries and the business and services of publicly owned companies in the software and Internet industries. Members of the DB Group may actively trade securities and other instruments and obligations of Peregrine and Harbinger for their own account or the account of their customers and, accordingly, may from time to time hold a long or short position in such securities, instruments or obligations.

FEE ARRANGEMENTS WITH PEREGRINE'S FINANCIAL ADVISOR

Peregrine selected Deutsche Bank as financial advisor in connection with the merger based on Deutsche Bank's qualifications, reputation and experience in mergers and acquisitions. Peregrine retained Deutsche Bank pursuant to a letter agreement dated as of March 1, 2000, which we refer to as the engagement letter. As compensation for Deutsche Bank's services in connection with the merger, Peregrine has paid Deutsche Bank a cash fee of $1.35 million and has agreed to pay an additional cash fee of approximately $8.65 million if the merger is consummated. Regardless of whether the merger is consummated, Peregrine has agreed to reimburse Deutsche Bank for reasonable fees and disbursements of Deutsche Bank's counsel and Deutsche Bank's reasonable travel and other out-of-pocket expenses incurred in connection with the merger or otherwise arising out of the retention of Deutsche Bank under the engagement letter. Peregrine has also agreed to indemnify Deutsche Bank and certain related persons to the full extent lawful against certain liabilities, including certain liabilities under the federal securities laws arising out of its engagement or the merger.

ACCOUNTING TREATMENT

The merger will be accounted for as a "purchase" transaction for accounting and financial reporting purposes, in accordance with generally accepted accounting principles. After the merger, the results of operations of Harbinger will be included in the consolidated financial statements of Peregrine. The purchase price will be allocated based on the fair values of the assets acquired and the liabilities assumed. Any excess of cost over fair value of the net tangible assets of Harbinger acquired will be recorded as goodwill and other intangible assets and will be amortized by charges to operations under U.S. generally accepted accounting principles. These allocations will be made based upon valuations and other studies that have not yet been finalized. In addition, Peregrine will incur a charge, for in-process research and development, currently estimated at $66.1 million, in the quarter in which the merger is completed.

MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS OF THE MERGER

The following discussion summarizes the material federal income tax effects of the merger that are generally applicable to holders of Harbinger common stock exchanging their Harbinger stock for Peregrine common stock. This discussion is based on the Internal Revenue Code of 1986, as amended

70

Exhibit H
0699

(the "Code"), applicable Treasury Regulations, judicial authority and administrative rulings and practice, any of which could change retroactively.

Shareholders of Harbinger should be aware that the following discussion does not deal with all federal income tax considerations that may be relevant to Harbinger shareholders in light of their particular circumstances, such as shareholders who are dealers in securities, who are non-U.S. residents or who acquired their Harbinger common stock through stock option or stock purchase programs or in other compensatory transactions. In addition, the following discussion does not address the tax consequences of the merger under foreign, state or local tax laws. Finally, the following discussion does not address the tax consequences of transactions occurring prior to or after the merger (whether or not such transactions are in connection with the merger) including, without limitation, the exercise of options or rights to purchase Harbinger common stock prior to the merger. ACCORDINGLY, HARBINGER SHAREHOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES TO THEM OF THE MERGER, INCLUDING THE APPLICABLE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF THE MERGER.

As a condition to the completion of the merger, Harbinger must receive an opinion of Morris, Manning & Martin, L.L.P., and Peregrine must receive an opinion of Wilson Sonsini Goodrich & Rosati, Professional Corporation, to the effect that the merger will be treated for federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Code. These opinions will neither bind the IRS, nor preclude the IRS or the courts from adopting a contrary position. Neither Peregrine nor Harbinger intends to obtain a ruling from the IRS on the tax consequences of the merger.

In delivering their opinions, tax counsel will rely on customary representations made by Harbinger and Peregrine including those contained in certificates of officers of Harbinger and Peregrine. Provided that such representations are correct as of the time the certificates of merger are filed with the states of Delaware and Georgia, that the merger is consummated in the manner described in the merger agreement and this joint proxy statement/prospectus and that there are no changes in the Code or other applicable law, the merger will be a reorganization within the meaning of Section 368(a) of the Code. Assuming that the merger is a reorganization and that the shares of Harbinger common stock surrendered in the merger were held as a capital assets, the merger will have the following income tax consequences:

- the holders of Harbinger common stock will recognize no gain or loss upon the receipt of Peregrine common stock solely in exchange for their Harbinger common stock in the merger, except with respect to cash received in lieu of fractional shares of Peregrine common stock;

- the aggregate tax basis of the common stock received by the Harbinger shareholders in the merger will be the same as the aggregate tax basis of the Harbinger common stock surrendered in exchange therefor (reduced by any basis allocable to fractional shares for which cash is received);

- the holding period of the Peregrine common stock received by each Harbinger shareholder in the merger will include the holding period of the Harbinger common stock surrendered in exchange therefor;

- a holder of Harbinger common stock receiving cash in the merger in lieu of a fractional interest in Peregrine common stock will be treated as if such holder actually received such fractional share interest and the fractional share interest was subsequently redeemed by Peregrine. A Harbinger shareholder should recognize gain or loss with respect to a cash payment in lieu of a fractional share measured by the difference, if any, between the amount of cash received and the basis in such fractional share;

- neither Harbinger nor Peregrine will recognize gain or loss solely as a result of the merger; and

71

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0700

– a successful IRS challenge to the reorganization status of the merger would result in Harbinger shareholders recognizing gain or loss. The amount of gain or loss for each share of Harbinger common stock surrendered would equal the difference between the stockholder's basis in each share and the fair market value, as of the time of the merger, of the Peregrine common stock and any other consideration received in exchange. A Harbinger shareholder's aggregate basis in the Peregrine common stock so received would equal its fair market value, and the shareholder's holding period for such stock would begin the day after the merger.

This discussion of material federal income tax consequences is intended to provide only a general summary and is not a complete analysis or description of all potential federal income tax consequences of the merger. This discussion does not address tax consequences that may vary with, or are contingent on, individual circumstances. In addition, it does not address any non-income tax or any foreign, state or local tax consequences of the merger. ACCORDINGLY, SHAREHOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES OF THE MERGER, INCLUDING THE APPLICABLE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF THE MERGER IN THEIR PARTICULAR CIRCUMSTANCES.

DELISTING AND DEREGISTRATION OF HARBINGER COMMON STOCK

If the merger is completed, the shares of Harbinger common stock will be delisted from the Nasdaq National Market and will be deregistered under the Securities Exchange Act of 1934. The shareholders of Harbinger will become stockholders of Peregrine, and their rights as stockholders will be governed by Peregrine's restated certificate of incorporation, Peregrine's bylaws and the laws of the State of Delaware. See "Comparison of rights of Harbinger common stock and Peregrine common stock."

LISTING OF PEREGRINE COMMON STOCK TO BE ISSUED IN THE MERGER

It is a condition to the consummation of the merger that Peregrine list the shares of Peregrine common stock to be issued and reserved in connection with the merger on the Nasdaq National Market.

REGULATORY COMPLIANCE

Under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules that have been promulgated under that legislation, business combinations and acquisitions of a sufficient size may not be consummated unless information has been furnished to the Antitrust Division of the U.S. Department of Justice and to the Federal Trade Commission and applicable waiting period requirements have been satisfied or early termination of the waiting period has been granted. The exchange of shares of Harbinger's common stock pursuant to the merger is subject to the provisions of that legislation.

Peregrine and Harbinger have each filed with the Antitrust Division of the U.S. Department of Justice and the Federal Trade Commission a Hart-Scott-Rodino Notification and Report Form with respect to the exchange of shares of Harbinger common stock for Peregrine common stock. Under the applicable provisions of the Hart-Scott-Rodino Antitrust Improvements Act, the transaction cannot be consummated until the expiration of early termination of the waiting period following the filing of the report form by Peregrine and Harbinger. Nevertheless, the Department of Justice, the Federal Trade Commission, or a foreign regulatory agency or other governmental agency may challenge the merger at any time, including after it is completed.

72

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0701

APPRAISAL RIGHTS

Harbinger is incorporated under Georgia law. Under applicable Georgia law, the holders of Harbinger common stock are not entitled to dissenter's or appraisal rights in connection with the merger because Harbinger is a publicly traded company. In addition, holders of Peregrine common stock will not be entitled to dissenter's or appraisal rights in connection with the merger.

FEDERAL SECURITIES LAWS CONSEQUENCES; STOCK TRANSFER RESTRICTIONS

This joint proxy statement/prospectus does not cover any resales of the Peregrine common stock received in the merger, and no person is authorized to make any use of this joint proxy statement/ prospectus in connection with any such resale.

All shares of Peregrine common stock received in the merger will be freely transferable, except that if you are deemed to be an "affiliate" of Harbinger under the Securities Act of 1933, you may resell those shares only in transactions permitted by Rule 145 under the Securities Act or as otherwise permitted under the Securities Act. In addition, various stockholders of Harbinger have entered into affiliate agreements that restrict their ability to transfer the shares of Peregrine common stock that they receive in the merger. Persons who may be affiliates of Harbinger for those purposes generally include individuals or entities that control, are controlled by, or are under common control with, Harbinger, and would not include shareholders who are not officers, directors or principal shareholders of Harbinger.

INTERESTS OF SOME OF HARBINGER'S EXECUTIVE OFFICERS, DIRECTORS, AND SHAREHOLDERS

In considering the recommendation of Harbinger's board of directors with respect to the approval and adoption of the merger agreement and approval of the merger, you should be aware that certain members of the management of Harbinger and Harbinger's board of directors may have interests in the merger that are different from, or in addition to, your interests. Harbinger's board of directors was aware of these interests and considered the following matters, among others, in approving the merger. Other than the merger agreement and the transactions contemplated thereby, there are no past, present or proposed contracts, arrangements, understandings, relationships or transactions between Harbinger and its affiliates and Peregrine and its affiliates.

ASSUMPTION AND ACCELERATION OF STOCK OPTIONS

Pursuant to the merger agreement, Peregrine will assume each outstanding stock option under Harbinger's Amended and Restated 1989 Stock Option Plan, 1996 Stock Option Plan and 1993 Stock Option Plan for Nonemployee Directors.

As of March 31, 2000, Harbinger's executive officers and directors held options to purchase a total of 2,049,598 shares of Harbinger common stock at a weighted average exercise price of $13.38 per share, of which options to purchase 826,472 shares were unvested. Under the pre-existing terms of option and employment agreements entered into with certain employees, officers and directors of Harbinger, these individuals may be entitled to accelerated vesting benefits. In particular, all outstanding options held by James M. Travers, Harbinger's President and Chief Executive Officer, will become fully vested upon completion of the merger. In addition, options outstanding held by some officers of Harbinger will become fully vested in the event of an actual or constructive termination of that officer's employment within 180 days of the merger. In general a termination may be deemed constructive if Peregrine were to terminate the officer's employment without cause or the officer were to terminate his employment for any of the following reasons:

  - assignment to duties materially inconsistent with, or a diminution of, the
    officer's position, duties, titles, responsibilities, and status;

73

Exhibit H
0702

- reduction in base salary; or

- change in location of the officer's principal place of employment by more than 75 miles.

The following table summarizes the terms of the change of control benefits applicable to the identified officers:

| NAME | POSITION WITH HARBINGER | OPTION SHARES TO ACCELERATE UPON MERGER | OPTION SHARES TO ACCELERATE UPON POST-MERGER CONSTRUCTIVE TERMINATION | WEIGHTED AVERAGE EXERCISE PRICE |
|------|--------------------------|------------------------------------------|------------------------------------------------------------------------|----------------------------------|
| James M. Travers......... | President and Chief Executive Officer | 435,992 | -- | $17.78 |
| James K. McCormick....... | Chief Financial Officer | -- | 52,500 | 5.78 |
| Douglas L. Roberts....... | Senior Vice President, Worldwide Sales | -- | 200,000 | 8.87 |
| Daniel L. Manack......... | Executive Vice President, Global Operations | -- | 63,750 | 6.84 |
| Gerald Diamond.......... | Senior Vice President, Worldwide Product Development | -- | 58,577 | 6.81 |

BOARD SEATS.  In accordance with the terms of the merger, two members of Harbinger's board of directors reasonably acceptable to Peregrine will be appointed to Peregrine's board of directors. Peregrine and Harbinger have not yet determined which Harbinger directors will become Peregrine directors.

INDEMNIFICATION.  Under the merger agreement, Peregrine has agreed to honor Harbinger's obligations under indemnification agreements between Harbinger and its directors and officers in effect before the completion of the merger and any indemnification provisions in Harbinger's articles of incorporation and bylaws. Peregrine has also agreed to provide for indemnification provisions in the certificate of incorporation and bylaws of the surviving corporation of the merger that are at least as favorable as Peregrine's provisions and to maintain these provisions for six years from the completion of the merger.

INSURANCE.  Peregrine has agreed to maintain directors' and officers' liability insurance covering the persons or class of persons who are currently covered by Harbinger's directors' and officers' liability insurance policy for six years from the completion of the merger, provided that Peregrine is not required to pay more than 150% of the premium most recently paid for Harbinger's directors and officers' insurance.

As a result of these interests, these directors and officers of Harbinger could be more likely to vote to approve the merger agreement than if they did not hold these interests. Harbinger's shareholders should consider whether these interests may have influenced these directors and officers to support or recommend the merger.

74

THE MERGER AGREEMENT

GENERAL

The following summary of the material terms of the merger agreement is subject to, and qualified in its entirety by, the complete text of the merger agreement. A copy of the merger agreement, as amended, is attached as Annex A to this joint proxy statement/prospectus and is incorporated in this joint proxy statement/prospectus by reference. You should read the full text of the merger agreement, because it, and not this joint proxy statement/prospectus, is the legal document that governs the merger. In the event of any discrepancy between the terms of the merger agreement and the following summary, the merger agreement will control.

THE MERGER

Following the approval and adoption of the merger agreement, attached as Annex A hereto, by the shareholders of Harbinger and the stockholders of Peregrine and the satisfaction or waiver of the other conditions to the merger, Harbinger will merge with Soda Acquisition Corporation, a wholly owned subsidiary of Peregrine. As a result, Soda Acquisition will cease to exist as a separate corporate entity, and Harbinger will continue as the surviving corporation and retain its name as a wholly owned subsidiary of Peregrine. The merger will be effective at the time a certificate of merger is filed with the Secretary of State of the State of Delaware and the Secretary of State of the State of Georgia.

Each share of Harbinger common stock, par value of $0.0001 per share, issued and outstanding immediately before the merger, other than those held in the treasury of Harbinger and those owned by Peregrine or Soda Acquisition, will be cancelled and automatically converted into the right to receive 0.75 of a share of Peregrine common stock upon surrender of the certificate representing shares of Harbinger common stock.

No certificates representing fractional shares of Peregrine common stock will be issued upon the surrender of Harbinger common share certificates. Each holder of a Harbinger common share certificate, at the time of merger, who would otherwise be entitled to receive a fractional share of Peregrine common stock will receive cash. The amount of cash paid in lieu of fractional shares will be the fraction of a share of Peregrine common stock that would be otherwise issued multiplied by the average closing price per share of Peregrine common stock on the Nasdaq National Market for the five trading days prior to the merger. The exchange agent will pay this amount without interest.

The merger agreement provides that at the time the certificate of merger is filed, Harbinger's articles of incorporation will be the articles of incorporation of the surviving entity. The merger agreement further provides that the bylaws of the surviving corporation, as in effect when the certificate of merger is filed, will be the bylaws of Harbinger immediately after the certificate of merger is filed. The merger agreement also provides that those persons who are the directors and officers of Soda Acquisition, when the certificate of merger is initially filed will be the directors and officers of the surviving corporation immediately after the certificate of merger is filed until their successors are duly elected or appointed and qualified.

EFFECTIVE TIME AND CLOSING OF THE MERGER

As soon as practicable, after the satisfaction or waiver of the terms and conditions of the merger agreement, the parties shall file a certificate of merger with the Secretary of State of the State of Delaware as required by the Delaware General Corporation Law and a certificate of merger with the Secretary of State of the State of Georgia in accordance with the relevant provisions of Georgia law. The merger will be effective when the certificates of merger are accepted by the respective secretaries of state. We expect to complete the merger as soon as practicable after June 16, 2000, the date scheduled for the special meetings.

75

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0704

PROCEDURE TO EXCHANGE CERTIFICATES

Peregrine will authorize a bank or trust company acceptable to Harbinger to act as exchange agent. The exchange agent will mail letters of transmittal and instructions regarding the exchange process to each record holder of shares of Harbinger common stock as soon as practicable following the merger. Upon surrender of Harbinger common stock certificates, together with the letter of transmittal duly executed, the Harbinger shareholders of record will receive cash payments for fractional shares and certificates representing Peregrine common stock. Once the holders of certificates previously representing Harbinger common stock surrender these certificates, they will receive any dividends or other distributions on the Peregrine common stock that have a record date after the merger and a payment date before the holder surrenders the Harbinger common share certificate. However, Peregrine will not pay any dividends until the holder of the Harbinger share certificate surrenders that certificate. The holder will also receive any dividends or other distributions with a record date after the merger but before the surrender, and a payment date after the surrender. In each case, taxes will be withheld as required. No interest will be paid or accrued on unpaid dividends or distributions, if any, which will be paid on surrender of Harbinger common share certificates.

No certificates representing fractional shares of Peregrine common stock will be issued upon the surrender of Harbinger common share certificates. Each holder of a Harbinger common share certificate, at the time of merger, who would otherwise be entitled to receive a fractional share of Peregrine common stock will receive cash. The amount of cash paid in lieu of fractional shares will be the fraction of a share of Peregrine common stock that would be otherwise issued multiplied by the average closing price per share of Peregrine common stock on the Nasdaq National Market on five trading days preceding the last full trading day prior to the merger. The exchange agent will pay this amount without interest.

Neither Peregrine, Soda Acquisition, Harbinger, nor the exchange agent will be liable to you for any amount properly delivered to a public official under applicable abandoned property, escheat or similar law.

The exchange agent will deliver Peregrine common stock, any cash in lieu of fractional shares and any unpaid dividends or distribution with respect to Peregrine common stock in exchange for lost, stolen, or destroyed certificates if the record holder of such Harbinger common stock certificates signs an affidavit of loss, theft or destruction. Peregrine may also, in its discretion, require the holder of a lost, stolen or destroyed certificate to deliver a bond in reasonable sum as indemnity against any claim that might be made against Peregrine regarding the alleged lost, stolen or destroyed certificate.

WARRANTS, STOCK OPTIONS AND EMPLOYEE BENEFITS

Upon the completion of the merger, each then-outstanding option and warrant to purchase shares of Harbinger common stock will be assumed by Peregrine. Each Harbinger option and warrant assumed by Peregrine will continue to have the same terms and conditions, except that (a) each Harbinger option and warrant will be exercisable for that number of whole shares of Peregrine common stock equal to the product of the number of shares of Harbinger common stock that were issuable upon exercise of such Harbinger option and warrant immediately prior to the merger multiplied by 0.75, rounded down to the nearest whole number of shares of Peregrine common stock and (b) the per share exercise price for the shares of Peregrine common stock issuable upon exercise of such assumed Harbinger option and warrant will be equal to the quotient determined by dividing the exercise price per share of Harbinger common stock at which such Harbinger option and warrant was exercisable immediately prior to the merger by 0.75, rounded up to the nearest whole cent. Each assumed Harbinger option shall be vested immediately following the merger as to the same percentage of the total number of shares subject thereto as it was vested as of the merger, except that pursuant to the

76

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0705

terms of the option and employment agreements under which the assumed Harbinger options were granted, certain Harbinger options shall accelerate upon the merger.

Pursuant to the merger agreement, outstanding purchase rights under Harbinger's Amended and Restated Employee Stock Purchase Plan, or ESPP, shall be exercised pursuant to the terms of the ESPP prior to the consummation of the merger. Each share of·Harbinger common stock purchased will be converted into the right to receive 0.75 shares of Peregrine common stock. Harbinger agreed in the merger agreement to terminate the ESPP immediately following the exercise of the outstanding purchase rights. Effective immediately preceding the closing of the merger, Harbinger and its subsidiaries and affiliates, shall each terminate all group severance, separation or salary contribution plans, programs or arrangements and all 401(k) plans.

For purposes of determining eligibility to participate, vesting, and accrual or entitlement to benefits where length of service is relevant under any employee benefit plan of Peregrine or any of its subsidiaries, Peregrine will use reasonable efforts to give the employees of Harbinger at the time of the merger, or Affected Employees, service credit for service with Harbinger to the same extent that such service credit was recognized under the employee plans of Harbinger prior the merger. To the extent permitted by Peregrine's employee benefit plans and applicable law permits, Peregrine will: (1) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Affected Employees under any welfare benefit plans that the Affected Employees may be eligible to participate in after the consummation of the merger, other than limitations or waiting periods that are already in effect and that have not been satisfied under any welfare plan maintained for the Affected Employees immediately prior to the consummation of the merger; and (2) provide such Affected Employee with credit for any co-payments and deductibles paid prior to the consummation of the merger in satisfying any deductible or out-of-pocket requirements under any welfare plans that the Affected Employees are eligible to participate in after the consummation of the merger.

Subject to any limitations under the Securities Act, Peregrine will file a registration statement on Form S-8 for the shares of Peregrine common stock issuable upon the exercise of assumed options to purchase Peregrine common stock which were previously options to purchase Harbinger common stock. Peregrine will file this registration statement as soon as is reasonably practicable after the merger, and in no event later than 20 business days after the merger.

REPRESENTATIONS AND WARRANTIES

Peregrine and Harbinger each made a number of representations and warranties in the merger agreement regarding aspects of their respective businesses, financial condition, structure and other facts pertinent to the merger.

HARBINGER REPRESENTATIONS AND WARRANTIES

Harbinger made representations and warranties relating to Harbinger and its subsidiaries regarding, among other things, the following topics:

- corporate organization and its qualification to do business;

- articles of incorporation and bylaws;

- capitalization;

- authorization of the merger agreement;

- regulatory approvals required to complete the merger;

- the effect of the merger on obligations of Harbinger and under applicable laws;

77

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0706

- permits required to conduct Harbinger's business and compliance with those permits;

- compliance with applicable laws;

- filings and reports with the Securities and Exchange Commission;

- financial statements;

- liabilities;

- changes in Harbinger's business since December 31, 1999;

- litigation;

- employee benefit plans;

- labor matters;

- information supplied by Harbinger in this joint proxy statement/prospectus and the related registration statement filed by Peregrine;

- restrictions on the conduct of Harbinger's business;

- title to the properties Harbinger owns and leases;

- taxes;

- environmental laws that apply to Harbinger;

- payments, if any, required to be made to brokers and agents on account of the merger;

- intellectual property used by Harbinger;

- material contracts;

- the fairness opinion received by Harbinger from its financial advisor;

- insurance and claims related thereto;

- approval by Harbinger's board of directors;

- the vote of Harbinger shareholders required to approve the merger; and

- the inapplicability of state takeover statues.

The representations and warranties of Harbinger expire at the effective time of the merger.

PEREGRINE REPRESENTATIONS AND WARRANTIES

Peregrine and Soda Acquisition made representations and warranties relating to Pergrine and Soda Acquisition. These representation and warranties addressed, among other things, the following topics:

- corporate organization and its qualification to do business;

- certificate of incorporation and bylaws;

- capitalization;

- common stock to be issued in the merger;

- authorization of the merger agreement;

- filings and reports with the Securities and Exchange Commission;

- financial statements;

78

Exhibit H
0707

- liabilities;

- compliance with applicable laws;

- compliance with permits required to conduct business;

- changes in the business of Peregrine since December 31, 1999;

- litigation;

- information supplied by Peregrine in this joint proxy statement/prospectus and the related registration statement filed by Peregrine;

- payments, if any, required to be made to brokers and agents on account of the merger;

- the fairness opinion received by Peregrine from its financial advisor;

- approval by Peregrine's board of directors; and

- the vote of Peregrine stockholders required to approve the merger.

The representations and warranties in the merger agreement are complicated and not easily summarized. You are urged to carefully read the sections of the merger agreement entitled "Representations and Warranties of Company" starting on page 6 of Annex A and "Representations and Warranties of Parent and Merger Sub" starting on page 20 of Annex A.

COVENANTS RELATING TO CONDUCT OF BUSINESS OF HARBINGER AND PEREGRINE

HARBINGER CONDUCT OF BUSINESS BEFORE COMPLETION OF THE MERGER

Harbinger agreed that until the earlier of the completion of the merger or the termination of the merger agreement, unless Peregrine consents in writing, Harbinger and its subsidiaries will:

- carry on their business in the ordinary course as currently conducted;

- pay their debts and taxes when due;

- pay or perform other material obligations when due;

- use commercially reasonable efforts to preserve intact their present business organization;

- use commercially reasonable efforts to keep available the services of their present officers and employees; and

- use commercially reasonable efforts to preserve their relationships with customers, suppliers and others with whom they have business dealings.

In addition, unless Peregrine consents in writing or the merger agreement provides otherwise, Harbinger has agreed that, until the earlier of the completion of the merger or the termination of the merger agreement, it and each of its subsidiaries will not and will not agree to:

- waive any stock repurchase rights, accelerate, amend or change the period of exercisability of options or restricted stock, or reprice options granted under any stock plans or authorize cash payments in exchange for any options granted under any of such plans, except pursuant to plans and agreements existing as of the date of the merger agreement and disclosed to Peregrine;

- grant any severance or termination pay to any officer or employee except pursuant to written agreements outstanding, or policies existing, on the date of the merger agreement and as previously disclosed in writing or made available to Peregrine, or adopt any new severance plan;

- transfer or license to any person or entity or otherwise extend, amend or modify in any material respect any rights to intellectual property, or enter into grants to transfer or license to any

79

Exhibit H
0708

person future patent rights, other than non-exclusive licenses in the ordinary course of business and consistent with past practice, provided that in no event shall Harbinger license to any person or entity on an exclusive basis or sell intellectual property;

- declare, set aside or pay any dividends on or make any other distributions on its capital stock or split, combine or reclassify any capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for any capital stock;

- purchase, redeem or otherwise acquire, directly or indirectly, any shares of Harbinger's capital stock or its subsidiaries, except repurchases of unvested shares at cost in connection with the termination of the employment relationship with any employee pursuant to stock option or purchase agreements in effect on April 5, 2000;

- issue, deliver, sell, authorize, pledge or otherwise encumber or propose any of the foregoing with respect to any shares of capital stock or any securities convertible into shares of capital stock, or subscriptions, rights, warrants or options to acquire any shares of capital stock or any securities convertible into shares of capital stock, or enter into other agreements or commitments of any character obligating them to issue any such shares or convertible securities, other than (1) the issuance, delivery and/or sale of (a) Harbinger common stock pursuant to the exercise of stock options outstanding as of April 5, 2000 or granted pursuant to Harbinger's 1993 Stock Option Plan for Nonemployee Directors and (b) shares of Harbinger common stock issuable to participants in Harbinger's Amended and Restated Employee Stock Purchase Plan and (2) the granting of non-discretionary stock options to non-employee directors under the 1993 Stock Option Plan for Nonemployee Directors in an amount not to exceed 135,000 shares in the aggregate;

- cause, permit or propose any amendments to their certificate of incorporation, bylaws or other charter documents;

- acquire or agree to acquire by merging or consolidating with, or by purchasing any equity interest in or a portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets or enter into any material joint ventures, strategic partnerships or alliances;

- sell, lease, license, encumber or otherwise dispose of any properties or assets which are material, individually or in the aggregate, to the business of Harbinger and its subsidiaries, except sales of inventory or non-exclusive licenses of Harbinger's intellectual property in the ordinary course of business and consistent with past practice;

- incur any indebtedness for borrowed money or guarantee any such indebtedness of another person, issue or sell any debt securities or options, warrants, calls or other rights to acquire any debt securities of Harbinger, enter into any "keep well" or other agreement to maintain any financial statement condition or enter into any arrangement having the economic effect of any of the foregoing other than in connection with the financing of ordinary course trade payables consistent with past practice;

- adopt or amend any employee benefit plan, policy or arrangement, any employee stock purchase or employee stock option plan, or enter into any employment contract or collective bargaining agreement (other than offer letters and letter agreements entered into in the ordinary course of business consistent with past practice with employees who are terminable "at will"), pay any special bonus or special remuneration to any director or employee, or increase the salaries or wage rates or fringe benefits (including rights to severance or indemnification) of its directors, officers, employees or consultants;

80

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

- (i) pay, discharge, settle or satisfy any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), or litigation other than the payment, discharge, settlement or satisfaction, in the ordinary course of business consistent with past practice or in accordance with their terms, or liabilities recognized or disclosed in the most recent consolidated financial statements (or the notes thereto) of Harbinger included in certain of Harbinger's filings with the Securities and Exchange Commission since December 31, 1999 or incurred since the date of those financial statements, or (ii) waive the benefits of, agree to modify in any manner, terminate, release any person from or fail to enforce any confidentiality or similar agreement to which Harbinger or any of its subsidiaries is a party or of which either is a beneficiary;

- make any individual or series of related payments outside of the ordinary course of business (other than certain payments to financial, legal, accounting or other professional service advisors);

- except in the ordinary course of business consistent with past practice, modify, amend or terminate any material contract or agreement to which Harbinger or any of its subsidiaries is a party or waive, delay the exercise of, release or assign any material rights or claims thereunder;

- enter into or materially modify any contracts, agreements, or obligations relating to the distribution, sale, license or marketing by third parties of Harbinger's products or products licensed by Harbinger on an exclusive basis;

- revalue any of its assets or, except as required by generally accepted accounting principles, make any change in accounting methods, principles or practices;

- incur or enter into any agreement, contract or commitment outside of the ordinary course of business calling for payments by Harbinger in excess of $350,000 individually;

- take any action that could reasonably be expected to cause the merger to fail to qualify as a "reorganization" under Section 368(a) of the Code;

- engage in any action with the intent to directly or indirectly adversely impact any of the transactions contemplated by the merger agreement;

- make any tax election that, individually or in the aggregate, is reasonably likely to adversely affect in any material respect to the tax liability or tax attributes of Harbinger or any of its subsidiaries or settle or compromise any material income tax liability; or

- agree in writing or otherwise to take any of the actions described above.

PEREGRINE CONDUCT OF BUSINESS BEFORE COMPLETION OF THE MERGER

Peregrine agreed that, until the earlier of the completion of the merger or the termination of the merger agreement pursuant to its terms, neither Peregrine nor its subsidiaries shall do any of the following:

- declare, set aside, or pay any dividends or make any other distributions (whether in cash, stock, equity securities or property) in respect to Peregrine's capital stock, except where (i) an adjustment is made to the exchange ratio in accordance with the merger agreement or (ii) the holders of Harbinger's common stock will otherwise receive an equivalent, proportional dividend or distribution (based on the exchange ratio, as adjusted pursuant to merger agreement) in connection with the merger as if they had been holders of Peregrine's common stock on the record date for such dividend or distribution;

- purchase, redeem, or otherwise acquire, directly or indirectly, any shares of capital stock of Peregrine or its subsidiaries in any amounts that would adversely affect Peregrine's financial condition or liquidity;

81

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

- effect any amendment to Peregrine's certificate of incorporation that would have an adverse effect on the rights of holders of Peregrine's common stock (including the Peregrine common stock to be issued pursuant to the merger agreement);

- engage in any action that could cause the merger to fail to qualify as a "reorganization" under Section 368(a) of the Code;

- engage in any action with the intent to directly or indirectly adversely impact any of the transactions contemplated by the merger agreement;

- following the filing of this joint proxy statement/prospectus, acquire or agree to acquire any business or any corporation, partnership, association or other business organization or division if the acquisition or agreement would require the inclusion in this joint proxy statement/prospectus of pro forma financial information regarding the acquisition; or

- agree in writing or otherwise to take any of the actions described above.

ADDITIONAL AGREEMENTS

    SHAREHOLDER MEETING.  Peregrine and Harbinger have agreed to call meetings of their respective shareholders as promptly as practicable after the date of the merger agreement and to use all reasonable efforts to hold their shareholder meetings on the same day or as soon as practicable after the declaration of effectiveness of the registration statement of which this joint proxy statement/ prospectus is a part. Peregrine and Harbinger may adjourn or postpone their respective shareholder meetings if there is an insufficient number of shares necessary to conduct business. Unless withdrawn in compliance with the nonsolicitation provisions in the merger agreement, Harbinger has agreed to use commercially reasonable efforts to solicit from its shareholders proxies in favor of adoption and approval of the merger agreement and approval of the merger. Peregrine has agreed to use commercially reasonable efforts to solicit from its stockholders proxies in favor of the issuance of Peregrine's common stock pursuant to the merger. Harbinger is obligated to hold its shareholder meeting whether or not Harbinger's board of directors at any time subsequent to the merger agreement determines that the merger agreement is no longer advisable or recommends that Harbinger's shareholders reject it.

    CONFIDENTIALITY, ACCESS TO INFORMATION.  Peregrine and Harbinger agreed that the terms of the confidentiality agreement that they entered into on March 1, 2000 will continue in full force and effect. Peregrine and Harbinger have agreed to provide to the accountants, counsel and other representatives of the other company reasonable access to their properties, books, records and personnel during the period between the date of the merger agreement and the completion of merger.

    NO SOLICITATION.  Until the merger is completed or the merger agreement is terminated, Harbinger has agreed, subject to limited exceptions, not to directly or indirectly take any of the following actions:

- solicit, initiate, encourage or induce the making, submission or announcement of any acquisition proposal;

- participate in any discussions or negotiations regarding any acquisition proposal;

- furnish to any person any information with respect to any acquisition proposal;

- take any other action to facilitate any inquiries or the making of any proposal that constitutes or may reasonably be expected to lead to any acquisition proposal;

- engage in discussions with any person with respect to any acquisition proposal;

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0711

- subject to limited exceptions discussed below, approve, endorse or recommend any acquisition proposal; or

- enter into any letter of intent or similar document or any contract, agreement or commitment contemplating or otherwise relating to any acquisition transaction.

For purposes of the foregoing, any action by any officer, director, affiliate or employee of Harbinger or any investment banker, attorney or other advisor or representative retained by any of them is deemed to be a breach by Harbinger.

The foregoing provisions do not prohibit the board of directors of Harbinger from complying with Rule 14d-9 (Recommendation or Solicitation By the Subject Company and Others) or 14 e-2(a) (Position of a Subject Company with Respect to a Tender Offer) under the Securities Exchange Act of 1934 with regard to tender or exchange offers.

Harbinger has further agreed to cease, as of April 5, 2000, any and all existing activities, discussions or negotiations with any parties conducted prior to that date with respect to any acquisition proposal until the merger is completed or the merger agreement is terminated.

An acquisition proposal is any offer or proposal relating to any acquisition transaction, other than an offer or proposal from Peregrine.

An acquisition transaction is any transaction or series of transactions, other than the merger described in this joint proxy statement/prospectus, involving any of the following:

- the acquisition or purchase from Harbinger of more than a 15% interest in the total outstanding voting securities of Harbinger or any of its subsidiaries;

- any tender offer or exchange offer that if consummated would result in any person or group beneficially owning 15% or more of the total outstanding voting securities of Harbinger or any of its subsidiaries;

- any merger, consolidation, business combination or similar transaction involving Harbinger pursuant to which the shareholders of Harbinger immediately preceding such transaction hold less than 85% of the equity interests in the surviving or resulting entity;

- any sale, lease outside the ordinary course of business, exchange, transfer, license outside the ordinary course of business, acquisition or disposition of more than 15% of the assets of Harbinger; or

- any liquidation, dissolution, recapitalization or other significant corporate reorganization of Harbinger.

Until the merger is completed or the merger agreement is terminated, Harbinger is allowed, in response to an unsolicited bona fide written superior proposal, to engage in discussions and negotiations with and furnish information to, the party making, or recommend to Harbinger's shareholders, the superior proposal (and in connection with such recommendation, withdraw its recommendation of the merger described in this joint proxy statement/prospectus) if all of the following conditions are met:

- the board of directors of Harbinger determines in good faith, after consultation with its outside legal counsel, that failure to take such action would be inconsistent with its fiduciary obligations under applicable law;

- at least two business days prior to furnishing any nonpublic information to, or entering into discussions or negotiations with, such person or group, Harbinger gives Peregrine written notice of Harbinger's intention to furnish nonpublic information to, enter into discussions or negotiations with, such person or group and Harbinger receives from such person or group an

83

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0712

executed confidentiality agreement containing customary limitations on the use and disclosure of all nonpublic written and oral information furnished to such person or group by or on behalf of Harbinger; and

- contemporaneously with furnishing any nonpublic information, Harbinger furnishes the nonpublic information to Peregrine, to the extent the nonpublic information has not been previously furnished by Harbinger to Peregrine.

A superior proposal is an acquisition proposal with respect to which (x) if any cash consideration is involved, is not subject to any financing contingency, or, after consultation with Harbinger's financial advisors, Harbinger's board of directors shall have determined that financing is reasonably likely to be obtained on a timely basis, and with respect to which Harbinger's board of directors has determined in good faith (after consultation with Harbinger's financial advisors) that the acquiring party is capable of consummating the proposed acquisition on the terms proposed, and (y) Harbinger's board of directors has determined in good faith that the acquisition provides greater value to the shareholders of Harbinger than the merger with Peregrine (taking into account the advice of Harbinger's independent financial advisors).

Harbinger has agreed to promptly inform Peregrine, and in any event within 24 hours, of any request for information that Harbinger reasonably believes would lead to an acquisition proposal, or of any acquisition proposal, or any inquiry with respect to or which Harbinger reasonably believes would lead to any acquisition proposal, the material terms and conditions of such request, acquisition proposal or inquiry, and the identity of the person or group making any such request, acquisition proposal or inquiry. Harbinger further agreed to keep Peregrine informed in all material respects of the status and details, including material amendments or proposed amendments, or any such request, acquisition proposal or inquiry.

Harbinger has agreed to provide Peregrine with at least 48 hours prior notice, or such lesser prior notice as provided to the members of Harbinger's board of directors (but in no event less than eight hours), of any meeting of Harbinger's board of directors at which an acquisition proposal is reasonably expected to be up for consideration and 48 hours prior written notice, or such lesser prior notice as provided to the members of Harbinger's board of directors (but in no event less than eight hours), of any meeting of Harbinger's board of directors at which it is reasonably expected to recommend a superior proposal, together with the definitive documentation relating to the superior proposal.

Regardless of whether Harbinger's board of directors has received a superior proposal or withdrawn its recommendation of the merger, Harbinger is obligated under the merger agreement to hold and convene the Harbinger special meeting.

REASONABLE EFFORTS.  Peregrine and Harbinger have each agreed to use their commercially reasonable efforts to take all actions, and do all things, necessary, proper or advisable to conclude and make effective the merger and any transactions contemplated by the merger agreement, including, among other things:

- taking all reasonable acts to cause the conditions precedent to the merger to be satisfied;

- obtaining all necessary actions, nonactions, waivers, consents, approvals, orders and authorizations from governmental entities, making of all necessary registrations, declarations and filings and taking of all reasonable steps as may be necessary to avoid any suit, claim, action, investigation or proceeding by any government entity;

- obtaining all necessary consents, approvals or waivers from third parties;

84

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

– defending any lawsuits or proceedings that challenge the merger agreement or the transactions contemplated by the merger agreement; and

– executing any additional documents necessary to conclude the merger.

NOTICE.  Peregrine and Harbinger have each agreed to give the other prompt notice of any representation or warranty made by it contained in the merger agreement becoming untrue or inaccurate, or any failure to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under the merger agreement.

THIRD PARTY CONSENTS.  Peregrine and Harbinger have agreed that each will use their commercially reasonable efforts to obtain any consents, waivers and approvals under any of its or its subsidiaries' respective agreements, contracts, licenses or leases required to be obtained in connection with the consummation of the merger.

OPTIONS AND WARRANTS.  Upon completion of the merger, each outstanding option and warrant to purchase Harbinger common stock will be assumed by Peregrine. The number of shares of common stock to be received on exercise of the options and warrants will be adjusted based on the exchange ratio, rounded down to the nearest whole number of shares. Each assumed option and warrant, will continue to have the same terms as each had immediately prior to the completion of the merger except that each will be exercisable for shares of Peregrine common stock. The exercise price will be equal to the exercise price per share of Harbinger common stock at which such Harbinger stock option and each outstanding warrant was exercisable immediately prior to the completion of the merger divided by the exchange ratio, rounded up to the nearest whole cent.

AMENDED AND RESTATED EMPLOYEE STOCK PURCHASE PLAN.  Prior to the completion of the merger, outstanding purchase rights under Harbinger's employee stock purchase plan will be exercised, and each share of Harbinger common stock purchased will be converted into the right to receive a number of shares of Peregrine common stock equal to the exchange ratio in the merger. Harbinger will terminate the employee stock purchase plan immediately following this purchase.

Peregrine will file a registration statement on Form S-8 for the shares of Peregrine common stock issuable with respect to assumed Harbinger stock options as soon as is reasonably practicable, and in any event within 20 business days, after the completion of the merger.

EMPLOYEE BENEFITS.  In the merger agreement, Harbinger agreed to terminate all group severance, separation or salary continuation plans, programs or arrangements and all 401(k) plans, effective immediately preceding the closing of the merger. To the extent permitted by Peregrine's employee benefit plans and applicable law, Peregrine agreed to use its reasonable efforts to give persons employed by Harbinger at the completion of the merger full credit for purposes of eligibility, vesting, benefit accrual (excluding benefit accrual under any defined benefit plans) and determination of the level of benefits under any employee benefit plans or arrangement maintained by Peregrine or its subsidiaries for service with Harbinger or its subsidiaries to the same extent recognized by Harbinger prior to the completion of the merger. To the extent permitted by Peregrine's employee benefit plans and applicable law, Peregrine agreed to (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Harbinger employees under any welfare benefit plans that such employees may be eligible to participate in after the completion of the merger, other than waiting periods that are already in effect with respect to such employees and that have not been satisfied as of the completion of the merger under any welfare plan maintained for the Harbinger employees immediately prior to the completion of the merger; and (ii) provide employees of Harbinger at the time of completion of the merger with credit for any co-payments and deductibles paid prior to the completion of the merger in satisfying any deductible or out-of-pocket requirements under any welfare plans that such employees are eligible to participate in after the completion of the merger.

85

Exhibit H
0714

INDEMNIFICATION.  Peregrine has agreed to honor the obligations of Harbinger pursuant to any indemnification agreements between Harbinger and its directors and officers in effect as of the date of the merger and any indemnification provisions under Harbinger's articles of incorporation and bylaws as of April 5, 2000. For a period of six years, the certificate of incorporation and bylaws of the corporation surviving the merger will contain provisions with respect to exculpation and indemnification that are at least as favorable to the directors and officers of Harbinger as those contained in the articles of incorporation and bylaws of Harbinger as of April 5, 2000. These provisions will not be amended, repealed or otherwise modified for a period of six years from the completion of the merger in any way that would adversely affect the rights thereunder of the indemnified parties, unless such modification is required by law.

For a period of six years after the merger, Peregrine will cause the surviving corporation to use its commercially reasonable efforts to maintain in effect, directors' and officers' liability insurance covering those persons who are currently covered by Harbinger's directors' and officers' liability insurance policy with coverage in an amount and scope at least as favorable as that applicable to Harbinger's current directors and officers, PROVIDED, HOWEVER, that in no event will Peregrine or the corporation funding the merger be required to pay an annual premium for coverage in excess of 150% of the annual premium most recently paid by Harbinger. If the annual premium for such coverage exceeds 150% of the annual premium most recently paid by Harbinger, the surviving corporation will provide the maximum coverage available at an annual premium equal to 150% of the annual premium most recently paid by Harbinger.

NASDAQ LISTING.  Peregrine has agreed to authorize for listing on the Nasdaq National Market the shares of Peregrine common stock issuable, and those required to be reserved for issuance, in connection with the merger.

AFFILIATES.  Harbinger agreed to use its commercially reasonable efforts to deliver to Peregrine, as promptly as practicable after April 5, 2000 from each affiliate of Harbinger an executed affiliate agreement, each of which are to be in full force and effect as of the completion of the merger. Peregrine will be entitled to place appropriate legends on the certificates evidencing any Peregrine common stock to be received by a Harbinger affiliate and to issue stop transfer instructions to the transfer agent for the Peregrine common stock, consistent with the terms of the affiliate agreement. See "Agreements related to the merger--Affiliate agreements" for a discussion of the terms of the affiliate agreements.

REGULATORY FILINGS.  Pursuant to the merger agreement, Peregrine and Harbinger have each filed with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice Notification and Report Forms relating to the merger as required by the Hart-Scott-Rodino Antitrust Improvements Act, as well as comparable pre-merger notification forms required by the merger notification or control laws and regulations of any applicable jurisdiction. Peregrine and Harbinger agreed to supply each other with any information required to effect these filings and to supply any additional information that may be required by the relevant authorities; provided, however, that Peregrine shall not be required to agree to any divestiture by Peregrine or Harbinger or any material limitation on the ability to conduct business or to own or exercise control over assets, properties and stock.

PEREGRINE'S BOARD OF DIRECTORS.  Peregrine agreed that its board of directors will take all actions necessary so that two members of Harbinger's board of directors reasonably acceptable to Peregrine, at least one of whom is an independent director of Harbinger's board of directors, shall be appointed to Peregrine's board of directors as of the completion of the merger with a term expiring at the next annual meeting of Peregrine's stockholders.

86

SHAREHOLDER LITIGATION. Until the earlier termination of the merger agreement or the completion of the merger, Harbinger agreed to give Peregrine the opportunity to participate in the defense or settlement of any shareholder litigation against Harbinger or members of Harbinger's board of directors relating to the merger agreement and the transactions contemplated thereby or otherwise and Harbinger shall not settle such litigation without Peregrine's prior written consent.

CONDITIONS PRECEDENT TO THE MERGER

Peregrine, Soda Acquisition, and Harbinger are required to complete the merger only if each of the following conditions is met:

- STOCKHOLDER APPROVAL. The holders of a majority of the outstanding shares of Harbinger common stock have adopted and approved the merger agreement and approved the merger and a majority of the outstanding shares of Peregrine common stock have approved the issuance of shares pursuant to the merger agreement.

- REGISTRATION STATEMENT. The registration statement on Form S-4 of which this joint proxy statement/prospectus is a part has been declared effective under the Securities Act of 1933. No stop order suspending the effectiveness of the Form S-4 has been initiated or issued by the Securities and Exchange Commission and no similar proceedings with respect to this joint proxy statement/prospectus shall be pending or threatened in writing by the Securities and Exchange Commission.

- HART-SCOTT-RODINO ACT. The waiting period applicable to the consummation of the merger under the Hart-Scott-Rodino Antitrust Improvements Act has expired or terminated early and all material foreign antitrust approvals required to be obtained prior to the merger shall have been obtained.

- NO GOVERNMENT ACTION/ORDER. No governmental entity has enacted or issued any statute, rule, regulation, executive order, decree, injunction or other order which is in effect and has the effect of making the merger illegal or otherwise prohibiting it.

- TAX OPINIONS. Peregrine and Harbinger have each received written opinions from their respective tax counsel that the merger will constitute a tax-free reorganization within the meaning of Section 368(a) of the Internal Revenue Code; provided, however, that if their respective tax counsel does not render the opinion, counsel to the other party may render the opinion.

Additionally, the agreement obligates Peregrine and Soda Acquisition, on the one hand, and Harbinger on the other hand, to complete the merger only if, before the merger, the following additional conditions are satisfied or waived:

- Each of the representations and warranties of the other party in the merger agreement is true and correct in all material respects as of April 5, 2000, and as of the closing of the merger, except for failures to be true and correct that do not in the aggregate constitute a material adverse effect (with the exception of Harbinger representations and warranties relating to capitalization, approval of its board of directors and the vote required to approve the merger agreement and merger) and those representations and warranties made as of a particular date which must be true as of that date and do not constitute, in the aggregate, a material adverse effect.

- The other party has performed or complied in all material respects with all agreements and covenants required by the merger agreement to be performed or complied with prior to completion of the merger and the parties have received a certificate from the other with respect to the foregoing signed on behalf of the party by an authorized officer of the party.

87

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0716

In addition, Peregrine is not obligated to complete the merger unless Harbinger receives all consents, waivers and approvals required in connection with the merger and in connection with agreements, contracts, licenses or leases of Harbinger that require them as a result of the merger.

TERMINATION; AMENDMENT AND WAIVER

CONDITIONS TO TERMINATION. Peregrine and Harbinger may terminate the merger agreement at any time prior to the merger, even if the shareholders of Harbinger approve matters related to the merger. The merger agreement may be terminated:

- by Peregrine or Harbinger if the parties mutually consent in writing;

- by Peregrine or Harbinger if the merger has not been effected on or prior to October 31, 2000; however, this right to terminate will not be available to any party whose action or failure to act was the principal cause of the failure of the merger to occur by this date and the action or failure to act constitutes a breach of the merger agreement;

- by Peregrine or Harbinger if any governmental entity issues an order, decree or ruling or takes any action to permanently restrain, enjoin or prohibit the merger, and this order, decree or ruling is final and nonappealable;

- by Peregrine or Harbinger if the shareholders of Harbinger do not approve the merger agreement at the special meeting or at any adjournment or postponement of the special meeting or the stockholders of Peregrine do not approve the issuance of the shares pursuant to the merger at the special meeting or at any adjournment or postponement of the special meeting;

- by Peregrine if Harbinger's board of directors changed, in a manner adverse to Peregrine, its recommendation in favor of the agreement or the merger;

- by Peregrine if Harbinger shall have recommended an acquisition proposal to the shareholders of Harbinger other than the transaction contemplated by the merger agreement;

- by Peregrine if Harbinger fails to comply with the provisions in the merger agreement regarding nonsolicitation;

- by Peregrine if a bonafide acquisition proposal other than the transaction contemplated by the merger agreement is publicly announced or has otherwise become publicly known and Harbinger's board of directors (i) shall have failed to recommend against acceptance of the acquisition proposal, including by taking no position with respect to a tender or exchange offer; or (ii) failed to reconfirm its approval and recommendation of the merger agreement and related transactions within ten business days or Harbinger's board of directors resolves to take any of the actions described above;

- by either Peregrine or Harbinger upon a breach of any representation, warranty, covenant or agreement or if any representation or warranty on their respective part shall have become untrue, in either case such that in the aggregate it constitutes a material adverse effect or a material breach of an agreement or covenant in the merger agreement; provided that if the inaccuracy in the representation or warranty or breach is curable, the affected party may not terminate the merger agreement for 30 days after it delivered notice of the breach and may not terminate the merger agreement if the breach is cured during the 30-day period.

EFFECT OF TERMINATION. In the event of termination of the merger agreement by either Peregrine or Harbinger, the merger agreement will become void; provided, however, that (a) the confidentiality provisions, general provisions and termination provisions will survive and (b) nothing will relieve the parties from any liability for fraud in connection with, or any willful breach of, the merger agreement.

88

Exhibit H
0717

Harbinger has also agreed to pay $50,000,000 to Peregrine in cash and shares of Harbinger common stock, valued for such purpose at $24.125 per share, provided that the cash component must be at least $20 million, in the event that the agreement is terminated:

- by Peregrine if Harbinger's board of directors withdraws, modifies or changes its recommendation of the merger agreement or merger in a manner adverse to Peregrine;

- by Peregrine if Harbinger's board of directors shall have recommended an acquisition proposal to the shareholders of Harbinger other than the transaction contemplated by the merger agreement;

- by Peregrine if Harbinger fails to comply with the provisions in the merger agreement regarding nonsolicitation; or

- by Peregrine if a bonafide acquisition proposal other than the transaction contemplated by the merger agreement is publicly announced or has otherwise become publicly known and Harbinger's board of directors (i) shall have failed to recommend against acceptance of the such acquisition proposal, including by taking no position or indicating its inability to take a position with respect to the acceptance by its shareholders of an acquisition proposal involving a tender or exchange offer; or (ii) failed to reconfirm its approval and recommendation of the merger agreement and related transactions within ten business days or the Harbinger board of directors resolves to take any of the above actions.

In the event the merger agreement is terminated for the reasons set forth immediately above, the termination fee is payable in two installments of equal value. Harbinger is to make the first payment on the termination of the merger agreement for the reasons mentioned above and the second payment on the 30(th) day after the termination of the merger agreement.

In addition, Harbinger must pay the $50 million termination fee in the event the merger agreement is terminated:

- by Peregrine if the merger has not been affected on or prior to October 31, 2000; or

- by Peregrine in the event Harbinger's shareholders fail to approve the merger agreement and merger;

provided that a bonafide acquisition proposal has been announced or shall otherwise have become publicly known, and within 12 months after termination of the merger agreement, Harbinger has entered into a definitive agreement providing for the acquisition of more than 40% of Harbinger or such an acquisition is consummated. Under these circumstances, the termination fee is payable in two installments of equal value. Harbinger is to make the first payment contemporaneously with the execution of the agreement for the acquisition of Harbinger. Harbinger is to make the second payment on the earlier to occur of (i) the consummation of the acquisition; or (ii) the 90(th) day after the date of execution of the definitive agreement relating to the acquisition of Harbinger.

- Should Harbinger satisfy its obligation to pay the termination fee by delivering to Peregrine shares of Harbinger common stock, Peregrine is entitled to registration rights with respect to those shares as described in the option agreement. See "Agreements Related to the Merger--Option Agreement" for a description of the option agreement.

- Except with respect to the termination fee, each party will pay its own costs and expenses whether or not the merger is consummated. However, in the event that either Peregrine or Harbinger terminates the merger agreement upon a breach of any representation, warranty, covenant or agreement, in either case such that the additional conditions to Peregrine and Soda Acquisition's obligations would not be satisfied as of the time of the breach or the time this representation or warranty becomes untrue provided that if this breach is curable by Harbinger

89

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

then Peregrine may not terminate the merger agreement for 30-days after the delivery of written notice by Peregrine to Harbinger of the breach, provided Harbinger continues to exercise commercially reasonable efforts to cure the breach (Peregrine may not terminate the merger if the breach is cured during this 30-day period), the nonterminating party must reimburse the other party for the costs and expenses it incurred in connection with the merger agreement and related transactions. Peregrine and Harbinger will share equally all fees and expenses, other than attorneys' and accountants' fees and expenses, incurred in relation to the printing and filing relating to this Form S-4 and the joint proxy statement/prospectus.

AMENDMENT.  Subject to applicable law, the merger agreement may be amended by the parties at any time by a written instrument signed on behalf of each of the parties to the merger agreement.

EXTENSION; WAIVER.  At any time prior to the completion of the merger, any party to the merger agreement may, in writing:

- extend the time for performance for any obligations of the other parties under the merger agreement;

- waive any inaccuracies in the representations and warranties in the merger agreement made to that party; and

- waive compliance with any of the agreements or conditions of the merger agreement for the benefit of that party.

90

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0719

AGREEMENTS RELATED TO THE MERGER

THIS SECTION OF THE JOINT PROXY STATEMENT/PROSPECTUS DESCRIBES AGREEMENTS RELATED TO THE MERGER AGREEMENT, INCLUDING THE PEREGRINE STOCKHOLDERS' VOTING AGREEMENTS AND THE HARBINGER SHAREHOLDERS' VOTING AGREEMENTS. WHILE WE BELIEVE THAT THESE DESCRIPTIONS COVER THE MATERIAL TERMS OF THESE AGREEMENTS, THESE SUMMARIES MAY NOT CONTAIN ALL OF THE INFORMATION THAT IS IMPORTANT TO YOU.

PEREGRINE STOCKHOLDERS' VOTING AGREEMENTS

As a condition to Harbinger's entering into the merger agreement, Harbinger and each of John J. Moores, Stephen P. Gardner, David A. Farley, Richard A. Hosley, II, Norris Van den Berg, Richard T. Nelson, Frederic B. Luddy, Douglas S. Powanda, William G. Holsten, Matthew C. Gless, Charles E. Noell, III, Christopher A. Cole, and Thomas G. Watrous, Sr. entered into voting agreements. By entering into the voting agreements these Peregrine stockholders have irrevocably appointed the directors of Harbinger as their lawful attorneys and proxies. These proxies give Harbinger the limited right to vote the shares of Peregrine common stock beneficially owned by these Peregrine stockholders, including shares of Peregrine common stock acquired after the date of the voting agreements, in favor of any matter reasonably expected to facilitate the share issuance, in favor of the issuance of shares of Peregrine common stock pursuant to the merger and against any matter that could reasonably be expected to prevent the merger. These Peregrine stockholders may vote their shares of Peregrine common stock on all other matters.

As of the record date, these individuals and entities collectively beneficially owned 12,017,621 shares of Peregrine common stock, or approximately 10.8% of the outstanding Peregrine common stock, all of which are subject to the voting agreements. None of the Peregrine stockholders who are parties to the voting agreements were paid additional consideration in connection with the agreements.

Under these voting agreements, each of these Peregrine stockholders, with the exception of John J. Moores, agrees not to transfer the Peregrine common stock and options owned, controlled or acquired, either directly or indirectly, by that person until the earlier of the termination of the merger agreement or the completion of the merger, unless the transfer is in accordance with the voting agreement and each person to which any shares or any interest in any shares is transferred agrees to be bound by the terms and provisions of the voting agreement. These voting agreements will terminate upon the earlier to occur of the termination of the merger agreement and the completion of the merger.

HARBINGER SHAREHOLDERS' VOTING AGREEMENTS

As a condition to Peregrine's entering into the merger agreement, Peregrine and each of James M. Travers, William B. King, Douglas Roberts, David Bursiek, Stuart Bell, Daniel Manack, David T. Leach, Benn R. Konsynski, David Hildes, John D. Lowenberg, James K. McCormick, Klaus Neugebauer, William D. Savoy, Ad Nederlof and Vulcan Ventures entered into voting agreements. By entering into the voting agreements, these Harbinger shareholders have irrevocably appointed Peregrine as their lawful attorney and proxy. These proxies give Peregrine the limited right to vote all of the shares of Harbinger common stock beneficially owned by these Harbinger shareholders, including shares of Harbinger common stock acquired after the date of the voting agreements, in favor of the merger agreement and merger, in favor of anything that could be reasonably expected to facilitate the merger, against any other acquisition proposal and against any matter that could reasonably be expected to facilitate any other acquisition proposal. These Harbinger shareholders may vote their shares of Harbinger common stock on all other matters.

As of the record date, these individuals and entities collectively beneficially owned 5,987,524 shares of Harbinger common stock, all of which, or approximately 14.5% of the outstanding Harbinger common stock are subject to the voting agreements. None of the Harbinger shareholders who are parties to the voting agreements were paid additional consideration in connection with the agreements.

91

Exhibit H
0720

Under these voting agreements, each of these Harbinger shareholders agreed not to sell the Harbinger common stock and options owned, controlled or acquired, either directly or indirectly, by that person until the earlier of the termination of the merger agreement or the completion of the merger, unless the transfer is in accordance with the voting agreement and each person to which any shares or any interest in any shares is transferred agrees to be bound by the terms and provisions of the voting agreement. These voting agreements will terminate upon the earlier to occur of the termination of the merger agreement and the completion of the merger.

STOCK OPTION AGREEMENT

As a condition to Peregrine's willingness to enter into the merger agreement, Harbinger granted to Peregrine an irrevocable option to acquire up to 8,007,468 shares of Harbinger common stock that represent approximately 19.99% of the issued and outstanding Harbinger common stock as of March 31, 2000. The exercise price of the option is $43.50 per share of Harbinger common stock, payable in cash. The number of shares issuable upon exercise of the option and the exercise price of the option are subject to adjustment to prevent dilution.

The option is intended to increase the likelihood that the merger will be completed. Some of the aspects of the stock option agreement may have the effect of discouraging persons who might now or at any time be interested in acquiring all or a significant interest in Harbinger or its assets before completion of the merger.

If the option becomes exercisable, Harbinger would not be able to account for future transactions under the pooling-of-interests accounting method for some period of time.

EXERCISE EVENTS.  Peregrine may exercise the option, in whole or part, at any time or from time to time, upon the occurrence of any of the following events:

- the termination of the merger agreement by Peregrine if Harbinger's board of directors withdraws, modifies, or changes its recommendation of the merger agreement or the merger in a manner adverse to Peregrine;

- the termination of the merger agreement by Peregrine if Harbinger's board of directors shall have recommended an acquisition proposal to Harbinger's shareholders, other than the transaction contemplated by the merger agreement;

- the termination of the merger agreement by Peregrine if Harbinger fails to comply with the provisions in the merger agreement regarding nonsolicitation;

- the termination of the merger agreement by Peregrine if a bonafide acquisition proposal other than the transaction contemplated by the merger agreement is publicly announced or has otherwise become publicly known and Harbinger's board of directors: (i) shall have failed to recommend against acceptance of the acquisition proposal, including by taking no position with respect to a tender or exchange offer; or (ii) failed to reconfirm its approval and recommendation of the merger agreement and related transactions within ten business days;

- the board of directors resolves to take any of the above actions;

- the termination of the merger agreement because the merger has not been consummated by October 31, 2000, or the termination of the merger agreement because the required approval of Harbinger's shareholders has not been obtained, and prior to this termination a bona fide acquisition proposal shall have been announced or otherwise shall have become publicly known and within 12 months after such termination, Harbinger has entered into a definitive acquisition

92

Exhibit H
0721

agreement providing for an acquisition of Harbinger or a acquisition of Harbinger shall have been consummated, other than the merger contemplated by the merger agreement; or

- the required approval of Harbinger shareholders pursuant to the merger agreement shall have not been obtained.

TERMINATION.  The option will terminate and cease to be exercisable upon the earliest of any of the following:

- the completion of the merger;

- 12 months after termination of the merger agreement based on a failure of the merger to be consummated by October 31, 2000 or the failure to obtain the required approval of Harbinger shareholders if no event causing the termination fee to become payable has occurred;

- 12 months after payment of the termination fee in connection with termination of the merger agreement based on Harbinger's (i) board of directors withdrawing, modifying or changing its recommendation regarding the merger adverse to Peregrine, (ii) board of directors recommendation of another acquisition proposal, (iii) failure to comply with the nonsolicitation provisions, (iv) board of directors' failure to recommend against acceptance and reconfirm its approval of the merger agreement and related transactions after the public announcement of a bonafide proposal to acquire Harbinger or other public knowledge of such an acquisition;

- 12 months after payment of the termination fee in connection with a termination of the merger agreement based on a failure of the merger to have been consummated by October 31, 2000 or failure to obtain the required approval of Harbinger's shareholders; and

- the date on which the merger agreement is otherwise terminated.

REPURCHASE AT THE OPTION OF PEREGRINE.  During the period when the option is exercisable, Peregrine may require Harbinger to repurchase from Peregrine the unexercised portion of the option at a price, called the market/tender offer price, equal to the difference between the higher of (i) the highest price per share offered pursuant to any acquisition proposal and (ii) the highest closing sale price of Harbinger common stock on the Nasdaq National Market for the 20 preceding trading days; and the exercise price. With respect to shares of Harbinger common stock purchased by Peregrine pursuant to exercise of the option, the price of repurchase is equal to the exercise price plus the difference between the market/tender offer price and the exercise price multiplied by the number of shares purchased. In no event will Harbinger be required to pay in excess of an aggregate of $50,000,000 minus the amount of the total termination fee paid by Harbinger to Peregrine.

ECONOMIC BENEFIT TO PEREGRINE IS LIMITED.  The stock option agreement limits the maximum profit to Peregrine, including the amount, if any, paid to Peregrine as a termination fee under the merger agreement, which may be received by Peregrine is limited to $60 million.

REGISTRATION RIGHTS.  The stock option agreement grants registration rights to Peregrine with respect to the shares of Harbinger common stock represented by the option, including the right to demand that Harbinger register all or part of such shares with the Securities and Exchange Commission, provided that Peregrine will only be able to make two such demands, and the right to register all or part of such shares if Harbinger otherwise register effects a registration for its own account.

93

Exhibit H
0722

AFFILIATE AGREEMENTS

In order to induce Peregrine to enter into the merger agreement, each of the Harbinger affiliates has entered into an affiliate agreement at Peregrine's request. Pursuant to the terms of the affiliate agreements, the Harbinger affiliates have represented the following:

- the shares of and options and warrants to purchase shares of Harbinger common stock held by them are not subject to any claim, lien, pledge, charge, security interest or other encumbrance or to any rights of first refusal of any kind;

- there are no options, warrants, calls, rights, commitments or agreements of any character, written or oral, to which the affiliate is party or by which it is bound obligating the affiliate to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any Harbinger common stock, warrants or options or obligating the affiliate to grant or enter into any such option, warrant, call, right, commitment or agreement;

- the affiliate has the sole right to transfer the shares of Harbinger common stock, warrants and options held by it;

- the shares of Harbinger common stock are not subject to preemptive rights created by any agreement to which the affiliate is party; and

- the affiliate has not engaged in any sale or other transfer of Harbinger common stock, warrants or options in contemplation of the merger.

RULE 145.  Each affiliate has agreed not to sell, transfer or otherwise dispose of any Peregrine common stock issued in the merger unless one of the following conditions is met:

- the sale, transfer or other disposition is made in conformity with the requirements of Rule 145(d) under the Securities Act;

- the sale, transfer or other disposition is made pursuant to an effective registration statement under the Securities Act or an appropriate exemption from registration;

- the affiliate delivers to Peregrine a written opinion of counsel, reasonably acceptable to Peregrine in form and substance, that such sale, transfer or other disposition is otherwise exempt from registration under the Securities Act; or

- an authorized representative of the SEC shall have rendered written advice to the affiliate to the effect that the SEC would take no action, or that the staff of the SEC would not recommend that the SEC take any action, with respect to the proposed disposition if consummated.

The form of affiliate agreement is attached as Exhibit C to the merger agreement, which is attached as Annex A to this joint proxy statement/prospectus.

94

Exhibit H
0723

BUSINESS OF PEREGRINE

OVERVIEW

Peregrine refers to itself as "The Infrastructure Management Company." We offer business organizations an integrated suite of packaged infrastructure resource management application software. In addition, we have recently introduced additional products designed to automate the processes associated with the procurement and use of infrastructure assets. These software applications are designed to manage the various aspects of organizational infrastructure from the moment an asset is leased, acquired, or taken from existing inventory until the moment it is taken out of service. Infrastructure assets include computers, computer networks, telecommunication assets, physical plant and facilities, corporate car or truck fleets, and many other assets. Our products are designed to help businesses answer the following questions about each item of corporate infrastructure:

   - What assets does my business own?

   - Where are each of these assets located?

   - How well are each of these assets working?

   - What is the total cost of owning each asset (I.E., the cost of acquiring, maintaining, servicing, and disposing of each asset)?

   - How well is each asset supporting my business?

CORPORATE BACKGROUND

We were incorporated in California in 1981 and reincorporated in Delaware in 1994. Our principal executive offices are located at 12670 High Bluff Drive, San Diego, California 92130. Our telephone number at that address is (858) 481-5000.

INDUSTRY BACKGROUND

Until recently, automated management of organizational infrastructure was not a priority for many companies. Rather, organizations tended to focus their information technology spending on automating external business functions that involve interactions with customers, suppliers, distributors, and other third parties. These applications included building networks for voice and data and implementing software solutions for enterprise resource planning (ERP), customer supply chain management (CSCM), and customer relationship management (CRM). Organizations have become increasingly dependent on these networks, systems, and applications to provide core products and services, and we believe they are now critical components of an organization's operating infrastructure.

Organizational infrastructure has also become larger and more complex. Modern businesses now depend on an array of systems and applications to provide electronic mail and Internet and Intranet services, to manage documents, and to support mission critical ERP, CSCM, and CRM applications. In addition, the various components of infrastructure, including desktop computers, networks, and telecommunications assets, are increasingly linked. In turn, these internal networks and systems depend on a physical infrastructure comprised of cable and wiring in walls, floors, and ceilings that are ultimately part of the buildings and campuses that comprise the larger organizational infrastructure.

We believe that the operational effectiveness of an organization ultimately depends on the efficient acquisition, management, and disposal of these infrastructure assets. Threats to infrastructure pose substantial business risks. Issues raised in connection with Year 2000 remediation, European currency conversion, computer viruses, major facilities relocations, and changes in network environments have resulted in increased awareness of infrastructure dependency by senior business executives and information technology managers. Accordingly, we believe that opportunities exist for providers of an integrated suite of infrastructure resource management software that can assist organizations to acquire, deploy, maintain, and operate infrastructure assets efficiently throughout their life cycle--from the time an organization starts to contemplate the purchase or lease of a new asset to the moment the asset is

95

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0724

removed from service and sold or disposed. We attempt to manage the following major stages in the lifecycle of an asset:

- procurement or lease

- maintenance in inventory

- installation

- data collection

- taking and implementing a service or upgrade request

- asset relocation

- problem management and resolution

- performance tracking

- correlation of performance to service level agreements

- contract management

- removal from service

- disposition or re-use

Until recently, our products focused principally on problem management for an organization's information technology infrastructure. Our principal product suite, SERVICECENTER, is an integrated, enterprise service desk software solution that assists information technology departments to manage and maintain their internal computer networks and related assets. Since 1997, however, we have made several acquisitions intended to broaden our infrastructure resource management product suite beyond management of network help desks.

- In September 1997, we acquired ASSETCENTER, our first asset management product through the acquisition of Apsylog, S.A., a French corporation, and its U.S. parent company.

- In July 1998, we acquired Innovative Tech Systems, a leading provider of facilities management software. Innovative's SPAN-FM product line became our FACILITYCENTER product line.

- In September 1998, we acquired technologies and other assets from related entities operating as International Software Solutions. These technologies expanded the ability of our products to help manage information technology assets by permitting network help desk analysts to interface with users over the corporate network without on-site visits.

- In March 1999, we acquired Prototype, a provider of software products for managing corporate vehicle and equipment fleets.

- In April 1999, we acquired fPrint, a British provider of software used to discover and inventory software located on the computers of individual users on a corporate network.

- In September 1999, we acquired Knowlix, a developer of knowledge management software that assists help desk analysts by managing the intangible technical information and know-how required to assist callers.

- In December 1999, we acquired advanced and light rail management software for the passenger and freight rail industries from KKO & Associates.

- In March 2000, we acquired Telco Research, a provider of software products that help manage telecommunications assets, and Barnhill Management Group, a services and solutions delivery partner with extensive experience in the telecommunications industry.

PRODUCTS

We currently offer over forty infrastructure management and e-procurement software products. The following discussion summarizes our principal product families.

SERVICECENTER

SERVICECENTER is a set of applications intended to maintain the effectiveness and functionality of an organization's information technology infrastructure. SERVICECENTER offers a number of gateway products to the software tools and applications of other vendors. These gateway products include interfaces to system and network management products such as Hewlett-Packard Openview, Computer Associates

96

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0725

Unicenter, and Tivoli TME10. In addition, gateways to enterprise resource planning applications are supported to products such as SAP R3, PeopleSoft, and Oracle.

PRIMARY SERVICECENTER APPLICATIONS

PROBLEM MANAGEMENT.  The problem management application automates the process of reporting and tracking specific problems or classes of problems associated with a business enterprise's network computing environment. Help desk personnel open problem tickets using templates specific to the class of problem reported.

PROBLEM RESOLUTION.  The problem management application works together with our IR EXPERT, a text search expert system that employs advanced technology to allow network operators to retrieve relevant information. This application assists in problem solving, based on prior solutions. The IR EXPERT reduces a user's question, or query, to a number of "terms," refining the query to fit knowledge in the database and then searches resolution databases using related terms. This application is self-learning, so the customer does not have to perform any work to keep the knowledge base up to date.

CHANGE MANAGEMENT.  The change management application provides a functional framework for proposing, accepting, scheduling, approving, reviewing and coordinating network changes.

CONTRACT MANAGEMENT.  The contract management application provides information system departments with the tools they need to track all costs associated with infrastructure problems or change.

INVENTORY CONFIGURATION MANAGEMENT.  The inventory configuration management application provides the service desk with a central repository of information about inventories of networked devices and applications as well as information concerning end-users. Easy access to inventory information permits the service desk to respond to end-user problems, to plan changes and services, and to create accurate reports about the network's status and environmental trends.

REQUEST MANAGEMENT.  The request management application automates and tracks an organization's equipment and services ordering process from initial request through installation and follow-up. Using SERVICECENTER, an end-user identifies and orders products or services from a catalog of items. SERVICECENTER then consolidates requests, forwards orders through an organization's standard approval and order processing procedures, and consolidates orders by vendor. End-users can track the status of requests through SERVICECENTER at all times.

SERVICE LEVEL AGREEMENT MANAGEMENT.  Service level agreements are used by companies to relate the availability and performance of infrastructure to the business mission performed by the infrastructure. Service level agreement management is designed to simplify the task of managing these contracts.

SERVICECENTER INSIGHT.  ServiceCenter Insight is a data mining tool which facilities the ability of the customer to make queries and prepare reports about information in the infrastructure repositories.

SERVICE MANAGEMENT.  Service management is a comprehensive call management tool. The service desk operator uses service management to assess an incoming call and determine whether it is an information request, a call requiring problem management, a request for action to assist an individual or a requirement for a change which would affect multiple elements of the infrastructure.

WORK MANAGEMENT.  Work management is designed to help managers better balance the demands for service and support based on the priority of tasks and the skill set of the workforce. Work management will automatically allocate unassigned or incomplete problem tickets to

97

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0726

individuals. The manager can also assign new work, view progress on assigned items, or reassign work based on changing properties using the drag and drop interface.

E-SERVICECENTER is the Internet-hosted version of SERVICECENTER, which offers a subset of the SERVICECENTER application set to help desk managers on an application service provider basis. If the customer elects this option, we act as the system administrator and operator for the customer. Their users connect to our software over the Internet and receive the benefit of the application without the administrative burden of actually running the server portion of the application. The product is sold in two models. We may enter a perpetual license agreement with the customer and recognize license revenue at the time of initial sale, as with a standard SERVICECENTER license, and recognize maintenance, hosting operations and administration revenues as a recurring payment stream. Alternatively, we may provide a limited-term, noncancelable subscription to use E-SERVICECENTER, where we recognize revenue for license, maintenance, hosting operations and administration on a periodic basis.

ASSETCENTER

ASSETCENTER is a set of applications intended to manage financial information relating to an organization's portfolio of information technology infrastructure investments. Like SERVICECENTER, ASSETCENTER supports gateways to enterprise resource planning and desktop inventory discovery tools.

PRIMARY ASSETCENTER APPLICATIONS

ASSET MANAGEMENT.  The asset management application provides a comprehensive inventory of an organization's equipment, users, suppliers, and contracts. The application provides detailed descriptions of software licenses acquired and their associated rights in order to reconcile them with the software actually installed.

LEASE MANAGEMENT.  The lease management application manages the contractual aspects of leasing and rental by returning, updating and renewing equipment through alarm and messaging features. The application also includes a wide range of methods for calculating lease terms and permits users to evaluate different financing alternatives.

PROCUREMENT MANAGEMENT.  The procurement management application manages the acquisition of information technology products including assets, consumables and services. Procurement management covers the entire purchasing cycle: request, approval, estimate, issuance of purchase orders, delivery and receipt. The application allows users to set up authorization procedures as well as automatic reordering based on user-defined restocking criteria.

COST MANAGEMENT.  The cost management application features analytic and budgetary functions that allow tracking, control, and allocation of information technology related expenses. The application allows users to track costs related to each asset, including both capital and operational expenses (E.G., training, service calls) and to measure the costs of ownership for each asset. The application also allows users to compare accounting and physical inventories to determine the correct valuation of balance sheet assets.

INFRACENTER FOR WORKGROUPS

INFRACENTER FOR WORKGROUPS is a comprehensive asset management technology targeted at the midrange market. INFRACENTER FOR WORKGROUPS offers functionality and applications similar to those offered with our ASSETCENTER product suite. In addition, INFRATOOLS desktop discovery provides complete, accurate, and timely intelligence about desktop users on a network. The premium offering of INFRACENTER FOR WORKGROUPS bundles our INFRATOOLS REMOTE CONTROL product, a graphical remote control application. INFRATOOLS REMOTE CONTROL is designed for everything from help desk and remote support to teaching applications and network management.

98

Exhibit H
0727

FACILITYCENTER

FACILITYCENTER is a set of applications and multiple gateways that are designed to manage assets related to physical plant and facilities. FACILITYCENTER includes space planning, facilities management, work order management, stacking, maintenance management, facilities help desk, cable plant management, computer aided design integrator, data collection, and real estate lease management. Like SERVICECENTER and ASSETCENTER, FACILITYCENTER also supports gateways to external products.

The FACILITYCENTER product suite offers solutions specifically designed to automate facilities, real estate and operations, and maintenance management. E-FACILITYCENTER is the Internet-hosted version of FACILITYCENTER. It offers the FACILITYCENTER application set to real estate and facilities managers on a hosted application service provider basis.

PRIMARY FACILITYCENTER APPLICATIONS

FACILITYCENTER SOLUTION FOR FACILITIES MANAGEMENT. FACILITYCENTER projects occupancy demand and supply scenarios to enable efficient move planning and reduce costs. By interfacing to popular computer-aided-design products, users can view information graphically and manage facilities using a top down approach. The FACILITYCENTER application can also manage project bids, costs and budgets.

FACILITYCENTER SOLUTION FOR OPERATIONS AND MAINTENANCE. OUR FACILITYCENTER solution for operations and maintenance enables preventive maintenance workflow to be streamlined and managed from a single point. It allows managers to automatically schedule preventive maintenance, obtain work order cost estimates, schedule work orders, and obtain information about the status of work orders. Purchasing, receiving and shipping functions also can be administered automatically.

FACILITYCENTER SOLUTION FOR REAL ESTATE. The FACILITYCENTER real estate management solution helps real estate professionals optimize the use of available space, reduce overall occupancy costs and implement continuous improvement strategies and policy tactics. The application tracks owned and leased property including space configuration and utilization.

FLEETANYWHERE

FLEETANYWHERE is a comprehensive, Internet-enabled, fully integrated, Windows-based fleet management system. It is capable of tracking an unlimited number of equipment units and supporting an unlimited number of workstations from any number of locations. FLEETANYWHERE tracks all functions related to the maintenance of equipment fleets, including processing repair and work orders, tracking operating expenses such as for fuel, oil, and licensing, and tracking and billing for equipment usage. Optional modules offer functionality related to bar coding on the shop floor, online employee labor capture, motor pool reservations tracking, shop scheduling, service level agreement tracking, replacement analysis, tire tracking, and fleet optimization.

E.FLEET is the Internet-hosted version of FLEETANYWHERE. It offers the full FLEETANYWHERE application set to fleet managers on an application service provider basis.

99

Exhibit H
0728

GET.IT!

GET.IT! is our employee self-service product suite. The GET.IT! solution offers employee self-service applications designed to improve employee productivity and reduce operating expenses.

GET.IT! APPLICATIONS

GET.RESOURCES!  Get.Resources! assists the traditional asset procurement process by allowing businesses to evaluate total lifecycle costs of an asset. Using a web interface, employees can buy, lease, or take from existing stock needed resources or services. The workflow engine in Get.Resources! routes requisitions through the organization based on local business rules, thereby streamlining the process and reducing cycle time. Get.Resources! is an open e-procurement application that allows organizations to purchase products and resources through CommerceOne's MarketSite or via direct, point-to-point links with suppliers from e-catalogs hosted on either the buyer's or supplier's site.

GET.ANSWERS!  Get.Answers! is a portal interface for accessing and distributing information throughout an organization. With an easy-to-use web interface, Get.Answers! lets any employee tap into the same information base used by information technology support and other infrastructure professionals. The reporting feature in Get.Answers! lets administrators know who is using the system and what information is being used.

GET.SERVICE!  Get.Service! automates the employee service request process through a centralized portal for requesting services ranging from training services to providing lunches for meetings.

COMMANYWHERE

COMMANYWHERE is a communications equipment management system that tracks mobile and portable radios, base and fixed equipment, microwave equipment, console and remote equipment, and 800 megahertz trunked radio system equipment.

KNOWLIX

KNOWLIX is our knowledge management product suite for help desks and customer support centers. KNOWLIX assists help desk and call center analysts by managing the technical information and know-how required to assist callers.

TELEPHONY AND DATA MANAGEMENT SOLUTIONS

In March 2000, we completed our acquisition of Telco Research Corporation Limited, a provider of software products that help manage telecommunications assets. The Telco Research product suite combines hardware and software solutions that help organizations accurately accumulate and allocate telecommunications cost, measure system health and performance, enforce policies, manage security, and control fraudulent use of corporate phone systems.

DATA COLLECTION DEVICES.  We offer intelligent data collectors that monitor and collect the information produced by network switching equipment. These data collectors provide a solution for monitoring and filtering alarms, collecting call detail records and traffic data and obtaining secure access into telephone switches from a central point. These collection devices provide call detail record storage, polling, toll fraud & real-time information concerning the operating status of telecommunications systems.

100

Exhibit H
0729

VOICE SOLUTIONS. We offer solutions to manage the voice communications network for companies of all sizes. This family of products provides customers the ability to understand and control cost and usage, monitor network operating status and maintain network integrity.

PRODUCT INTEGRATION

We have completed numerous acquisition of businesses and technologies since late 1997. As a result, our research and development personnel have focused substantial effort on integrating the acquired products and technologies into a single product suite with a common data repository. In April 1998, we announced and shipped the Peregrine Repository Interface Manager, which we market as PRIM. PRIM integrates common elements between the data schema of SERVICECENTER and ASSETCENTER. We are continuing to expend resources to improve the integration of SERVICECENTER and ASSETCENTER and are beginning the integration of FACILITYCENTER, a product we acquired in connection with the acquisition of Innovative Tech Systems in July 1998. Integration of products of this number and complexity can be costly and time consuming, could result in the diversion of resources from development of new or enhanced products and technologies, and exposes us to a number of risks which are described in greater detail under the caption "Risk Factors" beginning on page 12.

PRODUCT DEVELOPMENT; PRODUCT AUTHORSHIP MODEL

We believe that attracting and retaining talented software developers is an important component of our product development activities. To this end, we have instituted a product authorship incentive program that rewards our developers with commissions based on the market success of the applications designed, written, marketed, and supported by them. Our product authorship program is designed to encourage our developers to evaluate the effectiveness of a product in the actual user environment.

We believe that the ability to deliver new and enhanced products to customers is a key success factor. We have historically developed our products through a consultative process with existing and potential customers. We expect that continued dialogue with existing and potential customers may result in enhancements to existing products and the development of new products. We have in the past devoted and expect to continue to devote a significant amount of resources to developing new and enhanced products. We currently have a number of product development initiatives underway. We cannot predict, however, whether any enhanced products, new products, or product suites will be embraced by existing or new customers. The failure of any of these products to achieve market acceptance would have a material adverse effect on our business, results of operations and financial condition.

Our research and development expenditures in fiscal 2000, 1999, and 1998 were $28.5 million, $13.9 million, and $8.4 million, respectively, representing 11%, 10%, and 14% of total revenues in the respective periods. See "Peregrine Management's Discussion and Analysis of Financial Condition and Results of Operations" beginning on page 109.

The market for our products is subject to rapid technological change, changing customer needs, frequent new product introductions and evolving industry standards that may render existing products and services obsolete. As a result, our position in existing markets or other markets that we may enter could be eroded rapidly by product advances. The life cycles of our products are difficult to estimate. Our growth and future financial performance will depend in part on our ability to enhance existing applications, develop and introduce new applications that keep pace with technological advances, meet changing customer requirements and respond to competitive products. Our product development efforts are expected to continue to require substantial investment. There can be no assurance that we will have sufficient resources to make the necessary investment. We have in the past experienced development delays, and there can be no assurance that we will not experience development delays in the future. There can be no assurance that we will not experience difficulties that could delay or prevent the

101

Exhibit H
0730

successful development, introduction, or marketing of new or enhanced products. In addition, there can be no assurance that any new or enhanced products will achieve market acceptance, or that our current or future products will conform to industry requirements. Our inability, for technological or other reasons, to develop and introduce new and enhanced products in a timely manner could have a material adverse effect on our business, results of operations, and financial condition.

TECHNOLOGY

   Our products rely on a number of standard, commercially available technologies for relational database storage and retrieval and client/server communications. They are designed to support a range of implementations of infrastructure management applications and enterprise service desks within medium sized to large organizations. We have developed other technologies designed to provide a comprehensive environment to build, deploy, and customize a range of applications.

   N-TIERED ARCHITECTURE.  N-tiered architecture applications permit the separation of multiple clients, multiple application servers, and multiple database servers in a single cohesive application implementation. Peregrine's database, business rules, and presentation technologies create an N-tiered client/server architecture intended to provide scalability and flexibility. The tiers are logically separated, allowing changes to the database design or the graphical interface to be made without requiring changes to the business rules or other related tiers.

   EASY CUSTOMIZATION/EXTENSION.  In order to make our software fit customers' needs, Peregrine's products provide a number of tools that enable customers to customize and extend SERVICECENTER, ASSETCENTER, FACILITYCENTER and FLEETANYWHERE. The design of the database, the contents and appearance of the user interface, and the business rules can be modified using Peregrine's standard tools that are provided with the system.

   RAPID APPLICATION DEVELOPMENT ENVIRONMENT.  Peregrine has created a "fill-in-the-blanks" development environment for building and deploying applications. All SERVICECENTER applications are implemented using Peregrine's rapid application development environment. If a customer requires more extensive modification, the system can be customized by changing the applications provided by Peregrine or by implementing new applications using the rapid application development environment. In fiscal 1999, Peregrine introduced an advanced graphical workflow engine in ASSETCENTER, along with technology for simplified tailoring of the application. These technologies are expected to be introduced in future Peregrine applications.

   DISTRIBUTED SERVICES.  Peregrine has distributed a database technology that provides replication services and the capability to move work from one SERVICECENTER system to another. These services are database vendor independent and contain knowledge of the application schema.

   ADAPTERS.  Peregrine provides adapters to industry standard application programming interfaces, such as SMTP, e-mail, and leading vendors' products. These adapters expand the reach of Peregrine's products by allowing them to interact with other products currently in the customer's environment. Peregrine also has created adapters that permit the system to communicate using e-mail, beepers, facsimile, and Lotus Notes. The adapters also provide communication with third party network management tools such as Hewlett-Packard's OpenView, Computer Associates Unicenter, Tivoli's TME, Cabletron's Spectrum, Sun's SunNet Manager and others. In addition, Peregrine has created an open application programming interface permitting software developed by third parties, end-users or Peregrine's professional services group to be integrated into the system.

   INTELLIGENT AGENTS.  Peregrine provides intelligent agents that gather and feed information to SERVICECENTER. The agents provide automated inventory gathering and problem determination data for use in problem resolution and management of an information technology environment. The agents

102

Exhibit H
0731

permit help desk personnel to open, update, and close trouble tickets based on criteria provided by the customers.

JAVA CLIENT.  Peregrine introduced a Java SERVICECENTER graphical user interface client in fiscal 1999. The Java client duplicates the functionality of the SERVICECENTER graphical user interface, allowing access to the entire SERVICECENTER system via the Internet. The Java client is designed for use by production or "heavy" users of the system, while the web client, available for SERVICECENTER, ASSETCENTER, FACILITIES CENTER, and FLEETANYWHERE is designed for the casual user requiring easy, simple access to basic system functions.

SALES AND MARKETING

We sell our software and services in North America and internationally primarily through a direct sales force. A large number of our sales force is based at our San Diego headquarters, but we also have North American sales personnel located in, or in close proximity to, most major cities in the United States and Canada. Our international sales force is located in the metropolitan areas of Amsterdam, Frankfurt, London, Milan, Copenhagen, Munich, Paris, Singapore and Sydney. Our sales model combines telephone and Internet communications for product demonstrations with travel to customer locations to pursue a consultative sales process. In addition to our direct sales strategy, we continue to pursue indirect distribution channels. In the Pacific Rim and Latin America, we have established a network of channel partners. In North America, we have established a network of regional and national systems integrators and channel partners. When sold through direct channels, the sales cycle for our products typically ranges from six to nine months, depending on a number of factors, including the size of the transaction and the level of competition we encounter in our sales activities.

In recent periods, we have devoted significant resources to building our marketing organization and infrastructure. We have significantly expanded product marketing, marketing communications, alliance marketing, telemarketing and sales training. The primary focus of our marketing department is to generate qualified leads for the worldwide direct sales force and to create market awareness programs for Peregrine and our products. As part of our strategy, we have invested significantly in the Internet, developing a new corporate web site during fiscal 2000 and executing an array of web-based marketing programs. In addition, during fiscal 2000, we established an executive briefing center in order to focus our sales efforts at senior levels within our prospective customer's organizations.

We have significantly increased the size of our sales force over the last year and expect to continue hiring sales personnel, both domestically and internationally, over the next twelve months. Competition for qualified sales personnel is intense in the software industry. We also expect to increase the number of our regional, national, system integrator and channel partners, both domestically and internationally. Any failure to expand our direct sales force or other distribution channels could have a material adverse effect on our business, results of operations, and financial condition.

We believe that our continued growth and profitability will require expansion of our international operations, particularly in Europe, Latin America, and the Pacific Rim. We intend to expand international operations and to enter additional international markets, either directly or through international distribution or similar arrangements, which will require significant management attention and financial resources. Competition for suitable distribution partners is intense in many markets outside North America. There can be no assurance that we will be successful in attracting and retaining qualified international distributors or that we will be successful in implementing direct sales programs in selected international markets. If we are unable to obtain qualified international distribution partners or are otherwise unable to successfully penetrate important international markets, our business, results of operations, and financial condition would be materially and adversely affected.

In addition, continued international expansion poses a number of risks associated with conducting business outside the United States, including fluctuations in currency exchange rates, longer payment

103

Exhibit H
0732

cycles, difficulties in staffing and managing international operations, seasonal reduction in business activity during the summer months in Europe and certain other parts of the world, increases in tariffs, duties, price controls, or other restrictions on foreign currencies, and trade barriers imposed by foreign countries, any of which could have a material adverse effect on our business, operating results and financial condition. In addition, we only have limited experience in developing localized versions of our products and marketing and distributing our products internationally. There can be no assurance that we will be able to successfully localize, market, sell, and deliver products internationally. If we are unable to expand our international operations successfully and in a timely manner, our future revenues could decline or grow at a slower rate, and our results of operations and financial condition could be impaired.

PROFESSIONAL SERVICES AND CUSTOMER SUPPORT

Our professional services group provides technical consulting and training to assist customers and business partners in implementing our products.

Our basic consulting services include analyzing user requirements and providing the customer with a starter system that will quickly demonstrate significant benefits of our products. More advanced consulting services include providing turn-key implementations using our Advanced Implementation Methodology, which begins with a structured analysis to map the customer's business rules onto our service desk tools, continues with technical design and construction, and finishes with system roll out. Implementation assistance frequently involves a modest level of process reengineering and the development of interfaces between our products and legacy systems and other tools or systems.

We offer training courses in the implementation and administration of our products. On a periodic basis, we offer product training at our facilities in San Diego, Orlando, Washington D.C., London, Paris, Frankfurt, Amsterdam and Tokyo for customers and business partners. Customer-site training is also available.

We maintain a staff of customer support and customer care personnel, who provide technical support and periodic software updates to our customers and partners. We offer complete technical support services 24 hours a day, five days per week, with critical care services offered 24 hours a day, seven days a week via toll free lines through our local offices in Europe and San Diego. In addition to telephone support, we provide support via facsimile, e-mail, and a web server.

COMPETITION

The markets for Peregrine's products are highly competitive and diverse. The technology for infrastructure management and e-procurement software products can change rapidly. New products are frequently introduced and existing products are continually enhanced. Competitors vary in the size and in the scope and breadth of the products and services offered. In the last few years, we have experienced substantial competition from new competitors of all types and sizes, and we do not foresee a change in the rate of increasing competition.

SOURCES OF EXISTING COMPETITION

We face competition from a number of sources in the markets for our infrastructure resource management and e-procurement software solutions.

- In the markets for our infrastructure resource management products, we face competition from:

  - providers of internal help desk software applications, such as Remedy Corporation and Tivoli Systems, that compete with our enterprise service desk software

104

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0733

- providers of asset management software, including Remedy, MainControl, and Janus Technologies

- providers of facilities management software, including Archibus, Facilities Information Systems, and Assetworks (a division of CSI-Maximus)

- providers of transportation management software that competes with our fleet management and rail management software, including Control Software (a division of CSI-Maximus) and Project Software and Development Inc.

- information technology and systems management companies such as IBM, Computer Associates, Network Associates, Hewlett-Packard, and Microsoft

- numerous start-up and other entrepreneurial companies offering products that compete with the functionality offered by one or more of our infrastructure management products

- the internal information technology departments of those companies with infrastructure management needs.

- In the markets for procurement and e-procurement solutions, we face competition from:

  - established competitors in the business-to-business internet commerce solution market, such as Ariba and CommerceOne; and

  - established providers of enterprise resource planning software that are entering the market for procurement and e-procurement solutions, including Oracle and SAP.

SOURCES OF FUTURE COMPETITION

Because competitors can easily penetrate the software market, we anticipate additional competition from other established and new companies as the market for enterprise infrastructure management applications develops. In addition, current and potential competitors have established or may in the future establish cooperative relationships among themselves or with third parties. Large software companies may acquire or establish alliances with our smaller competitors. We expect that the software industry will continue to consolidate. It is possible that new competitors or alliances among competitors may emerge and rapidly acquire significant market share.

Increased competition may result from acquisitions of other infrastructure management or e-procurement software vendors by system management companies. The results of increased competition including reduction in the price of our products, reduced gross margins, and reduction of market share, could materially adversely affect our business, operating results, and financial condition. In several of our market segments, we believe that there is a distinct trend toward securing market share at the expense of profitability. This could have an impact on the mode and success of our ongoing business in these segments.

GENERAL COMPETITIVE FACTORS IN OUR INDUSTRY

Some of our current and many of our potential competitors have much greater financial, technical, marketing, and other resources. As a result, they may be able to respond more quickly to new or emerging technologies and changes in customer needs. They may also be able to devote greater resources to the development, promotion, and sale of their products. We may not be able to compete successfully against current and future competitors and competitive pressures may materially and adversely affect our business, operating results, and financial condition.

We believe that the principal competitive factors affecting our markets include product features such as adaptability, scalability, ability to integrate with third party products, functionality, ease of use, product reputation, quality, performance, price, customer service and support, effectiveness of sales and

105

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0734

marketing efforts and company reputation. Although we believe that we currently compete favorably with respect to these factors, there can be no assurance that we will maintain our competitive position against current and potential competitors, especially those with greater financial, marketing, service, support, technical, and other resources. In addition, we believe that our future financial performance will depend in large part on our success in continuing to expand our product line of infrastructure management and e-procurement solutions and to create organizational awareness of the benefits of purchasing these integrated solutions from a single vendor.

INTELLECTUAL PROPERTY

    Peregrine's success depends heavily on our ability to maintain and protect our proprietary technology. We rely primarily on a combination of copyright and trademark laws, trade secrets, confidentiality procedures and contractual provisions to protect our proprietary rights, which offer only limited protection. We attempt to protect our intellectual property rights by limiting access to the distribution of our software, documentation and other proprietary information. In addition, we enter into confidentiality agreements with our employees and certain customers, vendors, and strategic partners. These steps may fail to prevent the misappropriation of our intellectual property, particularly in foreign countries where the laws may not protect our proprietary rights as fully as in the United States. Other parties may independently develop competing technology. Attempts may be made to copy aspects of our products or to obtain and use information that we regard as proprietary. Despite precautions we may take, it may be possible for unauthorized third parties to copy aspects of our current or future products or to obtain and use information that we regard as proprietary. In particular, we may provide our licensees with access to our data model and other proprietary information underlying our licensed applications.

    We employ a variety of intellectual property in the development and sale of our products. We believe that the loss of all or a substantial portion of our intellectual property rights would have a material adverse effect on our results of operations. Our intellectual property protection measures might not be sufficient to prevent misappropriation of our technology. From time to time, we may desire or be required to renew or obtain licenses from others in order to further develop and effectively market commercially viable products effectively. Any necessary licenses might not be available on reasonable terms, if at all, and the associated license fees could increase our expenses and impair our results of operations.

    Litigation concerning intellectual property is common among technology companies. In the future, third parties may claim that we infringe their products or technologies. These claims and any resulting lawsuit, if successful, could subject us to significant liability for damages and invalidate our proprietary rights. These lawsuits, regardless of their success, likely would be time-consuming and expensive to resolve and would divert management time and attention. Any potential intellectual property litigation also could force us to do one or more of the following:

    - cease selling, incorporating, or using products or services that
      incorporate the infringed intellectual property;

    - obtain from the holder of the infringed intellectual property right a
      license to sell or use the relevant technology, which license may not
      available on acceptable terms, if at all; or

    - redesign those products or services that incorporate the disputed
      technology.

    We may in the future initiate claims or litigation against third parties for infringement of our proprietary rights or to determine the scope and validity of our proprietary rights or the proprietary rights of our competitors. These claims could result in costly litigation and the diversion of our technical and management personnel's time and attention. As a result, our operating results could suffer, and our financial condition could be harmed.

106

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0735

EMPLOYEES

As of March 31, 2000, Peregrine employed 1,433 persons, including 555 in sales and marketing, 160 in customer support, 257 in professional services, 243 in research and development and 218 in finance and administration. Of our employees, 441 are located outside North America, principally in Europe. None of our employees is represented by a labor union (other than by statutory unions or workers' committees required by law in some European countries). We have not experienced any work stoppages and consider our relations with our employees to be good.

PROPERTIES

Peregrine's principal administrative, sales, marketing, support, research and development and training functions are located at our headquarters facility in San Diego, California. We currently occupy 127,110 square feet of space in San Diego, and the underlying leases extend through August 2003. An additional 13,310 square feet of space at the San Diego headquarters is subleased to JMI Services, Inc., an affiliate of the Company.

In June 1999, we entered into a series of leases providing approximately 540,000 square feet of office space, including an option for approximately 118,000 square feet of space. Excluding the exercise of the option, the leases require minimum lease payments of approximately $124.0 million over their terms, which are approximately twelve years. This office space (including the option) is intended for a five building campus in San Diego, California. Initially, we expect to occupy three of the buildings and sublet the remaining two buildings. We currently occupy one of the three buildings and expect to occupy the balance sometime during the summer of 2000. As part of the relocation to the new campus facility, we intend to sublet our currently leased space on High Bluff Drive for the remaining period of our lease.

We also lease office space for sales, marketing, and professional services staff in most major metropolitan areas of the United States and Canada. In connection with our recent acquisition of Telco Research Corporation Limited, we assumed leases for approximately 37,000 square feet of space in Nashville, Tennessee and 17,000 square feet in Toronto, Ontario. In Europe, we lease space in the metropolitan areas of Amsterdam, Copenhagen, Dublin, Frankfurt, London, Milan, and Paris. In the Pacific Rim, we lease space in Singapore, Sydney, and Tokyo.

107

Exhibit H
0736

PEREGRINE SELECTED CONSOLIDATED FINANCIAL DATA

Peregrine's selected consolidated statement of operations data for each of the years in the five year period ended March 31, 2000 is presented below. Our selected consolidated balance sheet data is presented below as of March 31, 2000, 1999, 1998, 1997, and 1996. Our selected consolidated financial data derives from the consolidated financial statements of Peregrine Systems, Inc. and its subsidiaries. These financial statements have been audited by Arthur Andersen LLP, independent public accountants. The consolidated financial statements as of March 31, 2000 and 1999 and for each of the years in the three-year period ended March 31, 2000, and the report of independent public accountants thereon, are included beginning on page F-1 of this joint proxy statement prospectus. The selected consolidated financial data set forth below is qualified in its entirety by, and should be read in conjunction with, our consolidated financial statements and the notes thereto and "Peregrine's Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this joint proxy statement/prospectus.

|  | YEAR ENDED MARCH 31, | | | | |
|---|---|---|---|---|---|
|  | 2000 | 1999 | 1998 | 1997 | 1996 |
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | | |
| STATEMENTS OF OPERATIONS DATA: |  |  |  |  |  |
| Revenues: |  |  |  |  |  |
| Licenses.................................................. | $168,467 | $ 87,362 | $38,791 | $20,472 | $11,642 |
| Services.................................................. | 84,833 | 50,701 | 23,086 | 14,563 | 12,124 |
| Total revenues...................................... | 253,300 | 138,063 | 61,877 | 35,035 | 23,766 |
| Costs and expenses: |  |  |  |  |  |
| Cost of licenses.......................................... | 1,426 | 1,020 | 326 | 215 | 415 |
| Cost of services.......................................... | 51,441 | 31,561 | 10,326 | 4,661 | 3,526 |
| Sales and marketing...................................... | 101,443 | 50,803 | 22,728 | 15,778 | 11,820 |
| Research and development................................. | 28,517 | 13,919 | 8,394 | 5,877 | 7,742 |
| General and administrative............................... | 19,871 | 10,482 | 6,077 | 3,816 | 4,529 |
| Amortization of intangibles.............................. | 34,753 | 18,012 | 3,168 | -- | -- |
| Acquired in-process research and development costs........ | 24,505 | 26,005 | 6,955 | -- | -- |
| Total costs and expenses............................. | 261,956 | 151,802 | 57,974 | 30,347 | 28,032 |
| Operating income (loss)................................... | (8,656) | (13,739) | 3,903 | 4,688 | (4,266) |
| Interest income (expense) and other...................... | 38 | 664 | 839 | (478) | (286) |
| Income (loss) from continuing operations before income |  |  |  |  |  |
| taxes.................................................... | (8,618) | (13,075) | 4,742 | 4,210 | (4,552) |
| Income tax expense (benefit)............................. | 16,452 | 10,295 | 5,358 | (1,592) | -- |
| Income (loss) from continuing operations.................. | (25,070) | (23,370) | (616) | 5,802 | (4,552) |
| Loss from discontinued operations: |  |  |  |  |  |
| Loss from operations................................... | -- | -- | -- | -- | 781 |
| Loss on disposal....................................... | -- | -- | -- | -- | 1,078 |
| Loss from discontinued operations.................... | -- | -- | -- | -- | (1,859) |
| Net income (loss)........................................ | $(25,070) | $(23,370) | $ (616) | $ 5,802 | $(6,411) |
| Net income (loss) per share--diluted..................... | $ (0.24) | $ (0.27) | $ (0.01) | $ 0.10 | $ (0.13) |
| Shares used in per share calculation..................... | 102,332 | 87,166 | 69,520 | 59,856 | 49,324 |

|  | MARCH 31, | | | | |
|---|---|---|---|---|---|
|  | 2000 | 1999 | 1998 | 1997 | 1996 |
|  | (IN THOUSANDS) | | | | |
| BALANCE SHEET DATA: |  |  |  |  |  |
| Cash and cash equivalents, and short-term investments..... | $ 33,511 | $ 23,545 | $21,977 | $ 305 | $ 437 |
| Working capital (deficit)................................ | 20,510 | 25,302 | 23,779 | (4,065) | (9,697) |
| Total assets............................................. | 523,430 | 207,713 | 83,568 | 19,738 | 13,817 |
| Total debt............................................... | 1,331 | 649 | 1,117 | 3,866 | 5,208 |
| Stockholders' equity (deficit).......................... | 411,850 | 150,781 | 55,639 | (2,849) | (8,450) |

108

Exhibit H
0737

PEREGRINE MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

THE FOLLOWING DISCUSSION AND ANALYSIS SHOULD BE READ IN CONJUNCTION WITH
"SELECTED CONSOLIDATED FINANCIAL DATA OF PEREGRINE" AND PEREGRINE'S FINANCIAL
STATEMENTS AND RELATED NOTES INCLUDED ELSEWHERE IN THIS JOINT PROXY
STATEMENT/PROSPECTUS. THIS DISCUSSION CONTAINS FORWARD-LOOKING STATEMENTS THAT
INVOLVE RISKS AND UNCERTAINTIES. PEREGRINE'S ACTUAL RESULTS COULD DIFFER
MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS AS A RESULT
OF CERTAIN FACTORS INCLUDING THE RISKS RELATED TO PEREGRINE'S BUSINESS DISCUSSED
IN "RISK FACTORS" AND ELSEWHERE IN THIS JOINT PROXY STATEMENT/PROSPECTUS.

OVERVIEW

Peregrine Systems, Inc. is a leading provider of infrastructure management
and e-infrastructure software products and solutions. Our products help
businesses to deploy, maintain, and dispose of numerous aspects of their
corporate infrastructure. Using common shared data, our products help to manage
information technology assets as well as assets relating to corporate facilities
and vehicle fleets. In addition, we have recently introduced products for rail
management and Internet-based asset procurement.

Until late 1997, our product offerings focused principally on managing
information technology assets through a consolidated enterprise service desk
that provided support to users of our customers' information technology systems
and networks. During fiscal 1998, we determined that our customers required a
more comprehensive solution to control and manage their infrastructure assets,
including information technology assets as well as the numerous other assets
that make up business infrastructures. Among other things, we determined that
businesses needed to be able to manage the availability of their assets,
minimize their investments and expense, consolidate data about infrastructure
assets, and interface their asset management solutions to enterprise
applications. Accordingly, we refocused our product development and marketing
strategies to focus on an "infrastructure resource management" strategy.

In order to execute on our infrastructure resource management strategy, we
have completed a number of acquisitions since late 1997. These acquisitions have
been designed to broaden our infrastructure resource management product suite.

- In September 1997, we acquired Apsylog S.A., a provider of asset
  management software focused principally on managing information technology
  assets.

- In July 1998, we acquired Innovative Tech Systems, a provider of software
  products that address management of corporate facilities.

- In September 1998, we acquired technologies and other assets from related
  entities operating as International Software Solutions. These technologies
  expanded the ability of our products to help manage information technology
  assets by permitting network help desk analysts to interface with users
  over the corporate network.

- In March 1999, we acquired Prototype, a provider of software products for
  managing corporate vehicle fleets.

- In April 1999, we acquired fPrint, a British provider of software used to
  discover and inventory software located on the computers of individual
  users on a corporate network.

- In September 1999, we acquired Knowlix, a developer of knowledge
  management software that assists network help desk analysts by managing
  the intangible technical information and know-how required to assist
  callers.

109

Exhibit H
0738

- In March 2000, we acquired Telco Research, a provider of software products that help manage telecommunications assets, and Barnhill Management Group, a services and solutions delivery partner of Peregrine with extensive experience in the telecommunications industry.

Our software products are currently available on most major computer operating platforms; however, for the past several years, over 85% of our license sales have been attributable to the UNIX and Windows NT platforms.

Our revenues are derived from product licensing and services. Services are comprised of maintenance, professional services, and training. License fees are generally due upon the granting of the license and typically include a one-year maintenance and warranty period as part of the license agreement. We also provide ongoing maintenance services, which include technical support and product enhancements, for an annual fee based upon the current price of the product.

Revenues from license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed, the product has been delivered, there are no material uncertainties regarding customer acceptance, collection of the resulting receivable is deemed probable, the risk of concession is deemed remote, and no other significant vendor obligations exist. Revenues from post-contract support services are recognized ratably over the term of the support period, which is generally one year. Maintenance revenues which are bundled with license agreements are unbundled using vendor-specific objective evidence. Consulting revenues are primarily related to implementation services most often performed on a time and material basis under separate service agreements for the installation of our products. Revenues from consulting and training services are recognized as the respective services are performed.

We currently derive a substantial portion of our license revenues from the sale of our infrastructure resource management applications and our e-infrastructure solutions. We expect these products to account for a substantial portion of our revenues for the foreseeable future. As a result, our future operating results are dependent upon continued market acceptance of our infrastructure resource management strategy and applications, including future product enhancements. Substantially all of our license revenues are derived from granting a non-exclusive perpetual license to use our products. Factors adversely affecting the pricing of, demand for or market acceptance of the infrastructure resource management applications, such as competition or technological change, manner of distribution or licensing, and related method of revenue recognition, could have a material adverse effect on our business, operating results, and financial condition.

110

Exhibit H
0739

RESULTS OF OPERATIONS

The following table sets forth for the periods indicated selected consolidated statements of operations data as a percentage of total revenues.

|  | MARCH 31, | | |
|---|---|---|---|
|  | 2000 | 1999 | 1998 |
| STATEMENT OF OPERATIONS DATA: | | | |
| Revenues: | | | |
| Licenses............................................ | 66.5% | 63.3% | 62.7% |
| Services............................................ | 33.5 | 36.7 | 37.3 |
| Total revenues............................... | 100.0 | 100.0 | 100.0 |
| Costs and expenses: | | | |
| Cost of licenses................................ | 0.6 | 0.7 | 0.5 |
| Cost of services................................ | 20.3 | 22.9 | 16.7 |
| Sales and marketing............................. | 40.0 | 36.8 | 36.7 |
| Research and development........................ | 11.3 | 10.1 | 13.6 |
| General and administrative...................... | 7.8 | 7.6 | 9.8 |
| Amortization of intangible assets............... | 13.7 | 13.1 | 5.1 |
| Acquired in-process research and development..... | 9.7 | 18.8 | 11.3 |
| Total costs and expenses..................... | 103.4 | 110.0 | 93.7 |
| Operating income (loss).......................... | (3.4) | (10.0) | 6.3 |
| Interest income and other........................ | -- | 0.5 | 1.3 |
| Income (loss) from before income taxes.......... | (3.4) | (9.5) | 7.6 |
| Income tax expense............................... | 6.5 | 7.4 | 8.7 |
| Net loss........................................... | (9.9)% | (16.9)% | (1.1)% |

COMPARISON OF FISCAL YEARS ENDED MARCH 31, 2000, 1999, AND 1998

REVENUES

REVENUES.  Total revenues were $253.3 million, $138.1 million and $61.9 million for the fiscal years ended 2000, 1999 and 1998, representing period-to-period increases of 83% and 123% for the fiscal 2000 and 1999 periods. The reasons for the revenue increases are more fully discussed below.

LICENSES.  License revenues were $168.4 million, $87.4 million and $38.8 million in fiscal 2000, 1999 and 1998, representing 67% of total revenues in fiscal 2000 and 63% in both fiscal 1999 and 1998. Total license revenues increased 93% and 125% period-to-period for fiscal 2000 and 1999. Domestic license revenues increased 73% in fiscal 2000 and 135% in fiscal 1999, while international license revenues increased 125% and 111% in fiscal 2000 and 1999. The increases in license revenues are attributable to increased demand for new and additional licenses of our infrastructure resource management applications, from new and existing customers, larger transaction sizes, expansion of our domestic and international sales forces, and acquisitions. We expect larger transaction sizes from a limited number of customers to account for a large percentage of license revenues for the foreseeable future. Management believes these trends will fluctuate period to period in absolute dollars and as a percentage of total revenues.

During the past three years, we have increased the number of channels that we use to distribute our products. The majority of our products are distributed through our direct sales organization. The balance is derived through indirect sales channels and alliance partners, including value added resellers and systems integrators. Revenues derived through indirect channels now comprise a significant portion of our total license revenues. We have substantially less ability to manage our sales through indirect

111

Exhibit H
0740

channels and less visibility about our partner's success in selling the products that they have purchased from us. To the extent indirect sales continue to increase as a percentage of total revenues, we could experience unforeseen variability in our future revenues and operating results if our partners are unable to sell our products.

SERVICES.  Services revenues consist of support, consulting and training services. Service revenues were $84.8 million, $50.7 million and $23.1 million for fiscal years 2000, 1999 and 1998, representing 33% of total revenues in fiscal 2000 and 37% in both fiscal 1999 and 1998. Total services revenues increased 67% and 120% period-to-period for fiscal 2000 and 1999. Domestic services increased 63% in fiscal 2000 and 111% in fiscal 1999, while international services revenues increased 78% and 140% in fiscal 2000 and 1999, respectively. The dollar increases are attributable to maintenance agreements and related billings from our expanded installed base of customers and an increase in consulting and training revenues related to the implementation of our software from initial license agreements and related expansion. While these revenues are increasing in absolute dollars, we expect these trends to fluctuate as a percentage of total revenues.

COSTS AND EXPENSES

COST OF LICENSES.  Cost of licenses were $1.0 million, $0.3 million and $0.2 million in fiscal years 2000, 1999 and 1998, each representing less than 1% of total revenues in these periods. Cost of software licenses includes third-party software royalties, product packaging, documentation and production. These costs are expected to remain the same or increase as a percentage of total revenues.

COST OF SERVICES.  Cost of services were $51.4 million, $31.6 million and $10.3 million in fiscal years 2000, 1999 and 1998, representing 20%, 23% and 17% of total revenues in the respective periods. Cost of services primarily consists of personnel, facilities and system costs in providing support, consulting and training services. The dollar increases are attributable to an increase in personnel related costs in order to support the related activities. Cost of services increased as a percentage of related revenues due largely to a greater percentage growth in lower margin consulting revenue compared to support revenue. Consulting and training services generally have lower margins as compared to support services.

SALES AND MARKETING.  Sales and marketing expenses were $101.4 million, $50.8 million and $22.7 million in fiscal years 2000, 1999 and 1998, representing 40% of total revenues in fiscal 2000 and 37% of total revenues in both fiscal 1999 and 1998. Sales and marketing expenses consists primarily of personnel related costs, including commissions and bonuses, facilities and system costs and travel and entertainment. The dollar increases in sales and marketing expenses are attributable to the significant expansion of both the North American and international sales forces, a large increase in general and product specific marketing expenses, much of which related to our e-commerce initiatives, the effect of combining the sales and marketing operations of the acquisitions made during fiscal 2000 and 1999, and the effect of certain operating expense increases. We expect that sales and marketing expenses will continue to increase in absolute dollars as we continue to expand our sales and marketing efforts and establish additional sales offices around the world. If we experience a decrease in sales force productivity or for any other reason a decline in revenues, it is likely that our operating margins will decline as well.

RESEARCH AND DEVELOPMENT.  Research and development expenses were $28.5 million, $13.9 million and $8.4 million in fiscal years 2000, 1999 and 1998, representing 11%, 10% and 14% of total revenues in those periods. Research and development expenses consist primarily of employee salaries, developer bonuses, quality assurance activities and consulting costs. The dollar increases in research and development are due primarily to an increase in the number of personnel conducting research and development, new product initiatives and quality assurance efforts. These costs are expected to increase in absolute dollars but remain relatively the same as a percentage of total revenues.

112

Exhibit H
0741

GENERAL AND ADMINISTRATIVE.  General and administrative expenses were $19.9 million, $10.5 million and $6.1 million in fiscal years 2000, 1999 and 1998, representing 8% of total revenues in fiscal 2000 and 1999 and 10% of total revenues in fiscal 1998. General and administrative expenses consists primarily of employee salaries and overhead for administrative personnel. The dollar increases from year to year are attributable to costs associated with administrative personnel additions and infrastructure expansion to support our growth. These costs are expected to increase in absolute dollars but remain relatively the same as a percentage of total revenues.

AMORTIZATION OF INTANGIBLES AND OTHER ASSETS.  Amortization of intangibles and other assets were $34.8 million, $18.0 million and $3.2 million in fiscal years 2000, 1999 and 1998, representing 14%, 13% and 6% of total revenues in those periods. The dollar and percentage increases are attributable to the amortization of intangible assets and goodwill related to acquisitions made during those respective periods. These costs in future periods will be subject to future potential acquisitions and amortization periods. These costs are typically amortized over a five year period. See Note 1 of Notes to Peregrine Consolidated Financial Statements.

ACQUIRED RESEARCH AND DEVELOPMENT COSTS.  Acquired in-process research and development costs were $24.5 million, $26.0 million and $7.0 million in fiscal years 2000, 1999 and 1998, representing 10%, 19% and 11% of total revenues in those periods. The costs incurred in fiscal 2000 relate to one-time charges associated with the acquisitions of FPrint, Knowlix, and Telco Research. The costs incurred in fiscal 1999 and 1998 relate to one-time charges associated with the acquisitions of Innovative and Apsylog and the acquisition of certain technology and other assets from a group of affiliated entities conducting business as International Software Solutions. These costs in future periods will be subject to future potential acquisitions. See Note 2 of Notes to Peregrine Consolidated Financial Statements.

The value of each acquisition's acquired in-process technology was computed using a discounted cash flow analysis on the anticipated income stream of the related product sales. The value assigned to acquired in-process technology was determined by estimating the costs to develop the purchased in-process technology into commercially viable products, estimating the resulting net cash flows from the projects and discounting the net cash flows to their present value. With respect to the acquired in-process technology, the calculations of value were adjusted to reflect the value creation efforts of the companies acquired prior to the close of each acquisition.

The nature of the efforts required to develop acquired in-process technology into commercially viable products principally relates to the completion of all planning, designing and testing activities that are necessary to establish that the products can be produced to meet their design requirements, including functions, features and technical performance requirements. If the research and development project and technologies are not completed as planned, they will neither satisfy the technical requirements of a changing market nor be cost effective.

No assurance can be given, however, that the underlying assumptions used to estimate expected product sales, development costs or profitability, or the events associated with such projects, will transpire as estimated. We currently believe that actual results have been consistent with forecasts with respect to acquired in-process revenues. Because we do not account for expenses by product, it is not possible to determine the actual expenses associated with any of the acquired technologies. However, we believe that expenses incurred to date associated with the development and integration of the acquired in-process research and development projects are substantially consistent with our previous estimates.

We have completed many of the original research and development projects in accordance with our plans. We continue to work toward the completion of other projects. The majority of the projects are on schedule, but delays may occur due to changes in technological and market requirements for our products. The risks associated with these efforts are still considered high and no assurance can be made

113

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0742

that any upcoming products will meet with market acceptance. Delays in the
introduction of certain products may adversely affect our revenues and earnings
in future quarters.

PROVISION FOR INCOME TAXES

Income tax expenses were $16.5 million, $10.3 million and $5.4 million for
fiscal year 2000, 1999 and 1998. This increase in absolute dollars is
attributable to an increase in operating profits. Excluding the effect on net
income of the acquired in-process research and development costs and
amortization of intangibles, our effective tax rates were 32.5%, 34.0% and 36.0%
for those fiscal years. These costs are expected to increase in absolute dollars
but remain relatively the same as a percentage of operating profits.

LIQUIDITY AND CAPITAL RESOURCES

Our cash, cash equivalents and marketable equity securities increased to
$33.5 million in fiscal year end 2000 from $23.5 million in fiscal 1999. This
increase is attributable to cash provided through ongoing operations, sale or
assignment of accounts receivables and cash received as a result of the exercise
of stock options under our stock incentive plans. Our days sales outstanding in
accounts receivable was 83 as of March 31, 2000 as compared with 76 as of
March 31, 1999. Since March 31, 1999, we have expended significant funds to
strengthen our operating infrastructure, including payments related to our lease
commitments for our recently signed campus leases. These leases require a
minimum aggregate lease payment of approximately $124 million over their twelve
year term. In addition, we have expended significant funds acquiring companies
and technologies subsequent to fiscal year end 1999.

During July 1999, we entered into a $20 million senior credit facility for a
term of three years with a syndicate of financial institutions. The facility is
available for general corporate purposes including acquisitions. We believe that
our current cash, short-term investments, cash flow from operations, and amounts
available under our credit facility will be sufficient to meet our working
capital requirements for at least the next 12 months. Although operating
activities may provide cash in certain periods, to the extent we experience
growth in the future, our operating and investing activities may use cash.
Consequently, any such future growth may require us to obtain additional equity
or debt financing, which may not be available on commercially reasonable terms
or which may be dilutive. As of March 31, 2000, there were no amounts
outstanding with respect to the $20 million senior credit facility.

RECENT ACCOUNTING PRONOUNCEMENTS

In June 1998, the Financial Accounting Standards Board issued Statement of
Financial Accounting Standards No. 133, "Accounting for Derivative Instruments
and Hedging Activities" ("SFAS No. 133"). This statement changes the previous
accounting definition of derivative--which focused on freestanding contracts
such as options and forwards (including futures and swaps)--expanding it to
include embedded derivatives and many commodity contracts. Under the statement,
every derivative is recorded in the balance sheet as either an asset or
liability measured at its fair value. The statement requires that changes in a
derivative's fair value be recognized currently in operations unless specific
hedge accounting criteria are met. SFAS No. 133, as amended by SFAS 137, is
effective for all fiscal quarters of all fiscal years beginning after June 15,
2000. We do not anticipate that the adoption of this amendment will have a
material impact on our financial position or results of operations.

In December 1999, the SEC issued Staff Accounting Bulletin No. 101, "Revenue
Recognition in Financial Statements" ("SAB No. 101"). SAB No. 101, as amended,
is effective no later than the second calendar quarter of fiscal 2001. We are in
the process of evaluating the potential impact of SAB

114

Exhibit H
0743

No. 101, but we anticipate that the impact to our consolidated financial statements, if any, will be insignificant.

QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Other than forward-rate currency contracts described below, which are used for hedging our foreign currency risk, Peregrine does not use derivative financial instruments in its investment portfolio. Our financial instruments consist of cash and cash equivalents, short-term investments, trade accounts and contracts receivable, accounts payable, and long-term obligations. We consider investments in highly liquid instruments purchased with a remaining maturity of 90 days or less at the date of purchase to be cash equivalents. Our exposure to market risk for changes in interest rates relates primarily to our short-term investments and short-term obligations. As a result, we do not expect fluctuations in interest rates to have a material impact on the fair value of these securities.

We conduct business overseas in a number of foreign currencies, principally in Europe. These currencies have been relatively stable against the U.S. dollar for the past several years. As a result, foreign currency fluctuations have not had a material impact historically on our revenues or results of operations. Although we currently derive no material revenues from highly inflationary economies, we are expanding our presence in international markets outside Europe, including the Pacific Rim and Latin America, whose currencies have tended to fluctuate more relative to the U.S. dollar. There can be no assurance that European currencies will remain stable relative to the U.S. dollar or that future fluctuations in the value of foreign currencies will not have a material adverse effect on our business, operating results, revenues and financial condition. Currently, we attempt to mitigate our transaction currency risks through our foreign currency hedging program. The hedging program consists primarily of using forward-rate currency contracts of approximately one month in length to minimize the short-term impact of foreign currency fluctuations. Currency contracts are accounted for in accordance with SFAS No. 52 and receive hedge accounting treatment. To the extent not properly hedged by obligations denominated in local currencies, our foreign operations remain subject to the risks of future foreign currency fluctuations, and there can be no assurances that our hedging activities will adequately protect Peregrine against such risk.

115

Exhibit H
0744

UNAUDITED PRO FORMA COMBINED CONDENSED FINANCIAL STATEMENTS

The following unaudited pro forma condensed financial information assumes a business combination between Peregrine and Harbinger is accounted for as a purchase and is based on the respective historical consolidated financial statements and the notes thereto, which are included in this joint proxy statement/prospectus. The pro forma combined condensed balance sheet combines Peregrine's March 31, 2000 consolidated balance sheet with Harbinger's March 31, 2000 consolidated balance sheet. The pro forma statements of operations combine Peregrine's pro forma results and Harbinger's historical results for the period indicated below. Peregrine's pro forma results for the period indicated below contain pro forma results of operations of Telco Research Corporation and its subsidiaries as though they were acquired on April 1, 1999. The historical and pro forma financial statements of Telco Research Corporation are included in this joint proxy statement/ prospectus beginning on page F-25.

The pro forma information is presented for illustrative purposes only and is not necessarily indicative of the operating results or financial position that would have occurred if the merger had occurred as of the date or during the periods presented nor is it necessarily indicative of future operating results or financial positions.

These pro forma financial statements are based on, and should be read in conjunction with, the historical consolidated financial statements, and the related notes thereto, of Peregrine and Harbinger included in this joint proxy statement/prospectus.

PEREGRINE SYSTEMS, INC.
UNAUDITED PRO FORMA COMBINED CONDENSED BALANCE SHEET
MARCH 31, 2000
AFTER GIVING EFFECT TO THE MERGER
(IN THOUSANDS)

| | HISTORICAL HARBINGER | HISTORICAL PEREGRINE | PRO FORMA ADJUSTMENTS | PRO FORMA COMBINED |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets | | | | |
| Cash and cash equivalents........................ | $ 21,049 | $ 33,511 | -- | $ 54,560 |
| Short-term investments........................... | 58,149 | -- | -- | 58,149 |
| Accounts receivable, net of allowances for doubtful accounts...................................... | 48,289 | 69,940 | -- | 118,229 |
| Deferred tax asset............................... | 2,103 | 4,024 | -- | 6,127 |
| Other current assets............................. | 5,393 | 18,802 | -- | 24,195 |
| Total current assets......................... | 134,983 | 126,277 | -- | 261,260 |
| Property and equipment, net...................... | 25,903 | 29,537 | (4,125) (I) | 51,315 |
| Intangible assets, investments, and other, net... | 17,302 | 367,616 | 1,237,711 (A)(B)(C)(F) | 1,622,629 |
| Deferred income taxes........................... | 698 | -- | -- | 698 |
| Other assets.................................... | 4,327 | -- | -- | 4,327 |
| | $183,213 | $523,430 | $1,233,586 | $1,940,229 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current Liabilities: | | | | |
| Accounts payable................................ | $ 5,452 | $ 19,850 | -- | $ 25,302 |
| Accrued expenses................................ | 19,859 | 49,064 | 73,550 (B) | 142,473 |
| Deferred revenue................................ | 23,448 | 36,779 | (7,950) (I) | 52,277 |
| Current portion of long term debt............... | -- | 74 | -- | 74 |
| Total current liabilities.................... | 48,759 | 105,767 | 65,600 | 220,126 |
| Long-term debt, net of current portion.......... | -- | 1,257 | -- | 1,257 |
| Deferred revenue, net of current portion........ | -- | 4,556 | -- | 4,556 |
| Total liabilities........................... | 48,759 | 111,580 | 65,600 | 225,939 |
| Stockholders' Equity: | | | | |
| Preferred stock................................. | -- | -- | -- | -- |
| Common stock.................................... | 4 | 110 | 26 (B),(D) | 140 |
| Additional paid-in capital...................... | 216,678 | 480,957 | 1,306,024 (B),(D) | 2,003,659 |
| Accumulated deficit............................. | (55,596) | (64,863) | (10,457) (D) | (130,916) |
| Accumulated other comprehensive loss............ | (1,588) | -- | 1,588 (D) | -- |
| Unearned portion of deferred compensation....... | -- | (678) | (154,239) (H) | (154,917) |
| Accumulated other comprehensive loss............ | -- | (666) | -- | (666) |
| Treasury stock, at cost......................... | (25,044) | (3,010) | 25,044 (D) | (3,010) |
| Total stockholders' equity................... | 134,454 | 411,850 | 1,167,986 | 1,714,290 |
| | $183,213 | $523,430 | $1,233,586 | $1,940,229 |

116

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0745

PEREGRINE SYSTEMS, INC.
UNAUDITED PRO FORMA COMBINED CONDENSED STATEMENTS OF OPERATIONS
AFTER GIVING EFFECT TO THE MERGER
(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

| | HISTORICAL HARBINGER | PRO FORMA PEREGRINE | PRO FORMA ADJUSTMENTS | PRO FORMA COMBINED |
|---|---|---|---|---|
| Revenues: | | | | |
| Licenses.................................... | $ 49,881 | $186,228 | $    -- | $ 236,109 |
| Services.................................... | 110,537 | 99,099 | -- | 209,636 |
| Total revenues......................... | 160,418 | 285,327 | -- | 445,745 |
| Costs and Expenses: | | | | |
| Cost of licenses............................ | 4,482 | 3,495 | -- | 7,977 |
| Cost of services............................ | 46,554 | 63,436 | 18,302 (A) (H) | 128,292 |
| Sales and marketing......................... | 43,677 | 107,794 | 25,515 (A) (H) | 176,986 |
| Research and development.................... | -- | 32,264 | 24,360 (A) (H) | 56,624 |
| Product development......................... | 11,018 | -- | (11,018) (A) | -- |
| General and administrative.................. | 33,094 | 23,469 | 10,402 (A) (H) | 66,965 |
| Depreciation and amortization............... | 10,155 | -- | (10,155) (A) | -- |
| Amortization of intangible assets........... | -- | 51,936 | 251,175 (F) (G) | 303,111 |
| Acquired in-process research and development costs..... | -- | 24,505 | -- | 24,505 |
| Total costs and expenses............... | 148,980 | 306,899 | 308,581 | 764,460 |
| Income (loss) from continuing operations........ | 11,438 | (21,572) | (308,581) | (318,715) |
| Interest income, net........................ | 3,960 | 160 | -- | 4,120 |
| Equity in losses of joint ventures.......... | (321) | -- | -- | (321) |
| Income (loss) from continuing operations before income taxes................ | 15,077 | (21,412) | (308,581) | (314,916) |
| Income taxes................................ | 842 | 18,390 | | 19,232 |
| Income (loss) from continuing operations........ | 14,235 | (39,802) | (308,581) | (334,148) |
| Income from disposal of discontinued business........... | 1,356 | -- | -- | 1,356 |
| Net income (loss)........................ | $ 15,591 | $(39,802) | $(308,581) | $(332,792) |
| Net income (loss) per share--basic: | | | | |
| Net income (loss) per share................. | $  0.40 | $  (0.39) | | $  (2.51) |
| Shares used in computation.................. | 38,835 | 102,332 | | 132,409 |
| Net income (loss) per share-diluted: | | | | |
| Net income (loss) per share................. | $  0.38 | $  (0.39) | | $  (2.51) |
| Shares used in computation.................. | 41,331 | 102,332 | | 132,409 |

117

Exhibit H
0746

NOTES TO UNAUDITED PRO FORMA COMBINED CONDENSED FINANCIAL STATEMENTS

1. BASIS OF PRESENTATION

The unaudited pro forma financial statements of Peregrine have been prepared based on the historical financial statements of Peregrine for the year ended March 31, 2000 and for Harbinger for the year ended December 31, 1999 considering the effects of the merger under the purchase method. The pro forma balance sheet of Peregrine at March 31, 2000 has been prepared as if the merger had been consummated at March 31, 2000. The pro forma statement of operations for the year ended March 31, 2000 has been prepared as if the merger had been consummated on April 1, 1999.

In management's opinion, all material adjustments necessary to reflect the effects of the merger have been made. The unaudited pro forma financial statements are not necessarily indicative of the actual financial position at March 31, 2000, or what the actual results of operations of Peregrine would have been assuming the merger had been completed as of April 1, 1999, nor are they indicative of the financial position or results of operations for future periods. The pro forma financial statements should be read in conjunction with the historical financial statements and notes thereto of Peregrine and Harbinger included elsewhere herein.

2. PRO FORMA ADJUSTMENTS AND ASSUMPTION

(A) Harbinger's condensed consolidated financial statements have been adjusted to conform to Peregrine's basis of presentation and to conform to Peregrine's March 31st year end.

(B) The purchase price for the completion of the Harbinger merger was determined by combining the value of Peregrine common stock issued to Harbinger shareholders (approximately 30,077,000 Peregrine common shares valued at $45.50 per share, based on the weighted share price a few days before and after the announcement date of the merger) and the estimated transactions costs for the merger. The estimated direct transaction costs to be incurred by the combined company include transaction fees for investment bankers, attorneys, accountants, financial printing, due diligence costs, and other related charges. The purchase price for the completion of the merger is summarized below (in thousands):

Common stock and additional paid-in capital.................  $1,368,493
Estimated transaction costs, involuntary termination,
   relocation, and other merger related costs................     73,550
                                                              -----------
                                                              $1,442,043
                                                              ===========

The estimated allocation of the purchase price for the completion of the Harbinger merger was determined as follows (in thousands):

Fair value of net assets acquired (net of impact of
   note (I) adjustments)......................................  $ 120,977
Acquired in-process technology...............................     66,053
Intangible assets............................................  1,255,013
                                                              -----------
                                                              $1,442,043
                                                              ===========

118

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0747

The components of the pro forma adjustment to intangible assets, investments, and other, net are as follows (in thousands):

| | |
|---|---:|
| Intangible assets (see above) resulting from this transaction | $1,255,013 |
| Less: Harbinger intangible assets | (17,302) |
| Net adjustment | $1,237,711 |

(C) The intangible assets related to the Harbinger merger will be amortized on a straight-line basis over five years and will be included in the amortization of intangible assets in the combined company's statement of operations.

(D) Elimination of Harbinger shareholders' equity amounts. The components of the pro forma adjustment to accumulated deficit are as follows (in thousands):

| | |
|---|---:|
| Elimination of Harbinger accumulated deficit | $ 55,596 |
| One time charge associated with acquired in-process technology (see note C above) | (66,053) |
| Net adjustment | $(10,457) |

(E) The pro forma statement of operations excludes the $66.1 million charge for acquired in-process research and development costs, which arose from the merger. This charge will be included in the combined company's consolidated financial statements in the period subsequent to the close of the transaction.

(F) Reflects the elimination of Harbinger's capitalized software development costs and intangible assets and related amortization expenses, pending completion of valuation of the capitalized asset.

(G) Reflects the amortization of intangible assets beginning April 1, 1999. The purchase price for the assets of Harbinger was allocated to the tangible and intangible assets of Harbinger based on preliminary estimates of the fair market value of those assets.

(H) Reflects the deferred compensation associated with the issuance of Peregrine stock options in exchange for Harbinger stock options at the exchange ration of 0.75. Amortization of the deferred compensation resulting from the transaction is reflected in the pro forma statement of operations but not reflected in the pro forma balance sheet.

(I) Reflects the adjustment of the carrying value of assets and liabilities to their fair value to Peregrine upon consummation of the transaction.

119

PEREGRINE MANAGEMENT

EXECUTIVE OFFICERS AND DIRECTORS

The following table sets forth certain information with respect to
Peregrine's executive officers and directors as of March 31, 2000.

| NAME | AGE | POSITION |
| ---- | --------- | -------------------------------------------------------------- |
| Stephen P. Gardner.................. | 46 | President, Chief Executive Officer and Director |
| David A. Farley..................... | 44 | Senior Vice President, Finance and Administration, Chief Financial Officer, and Director |
| Matthew C. Gless.................... | 34 | Vice President, Finance, and Chief Accounting Officer |
| William G. Holsten.................. | 63 | Senior Vice President, Customer Service |
| Frederick B. Luddy.................. | 45 | Vice President, Research and Development |
| Douglas S. Powanda.................. | 43 | Executive Vice President, Worldwide Operations |
| Steven S. Spitzer................... | 41 | Vice President, Channel Sales |
| Richard T. Nelson................... | 40 | Vice President, Corporate Development and Secretary |
| Eric P. Deller...................... | 39 | Vice President and General Counsel |
| John J. Moores...................... | 55 | Chairman of the Board of Directors |
| Christopher A. Cole................. | 45 | Director |
| Richard A. Hosley II................ | 55 | Director |
| Charles E. Noell III................ | 47 | Director |
| Norris van den Berg................. | 61 | Director |
| Thomas G. Watrous, Sr............... | 58 | Director |

STEPHEN P. GARDNER has served as our president and chief executive officer
and as a director since April 1998. From January 1998 until April 1998,
Mr. Gardner served as executive vice president and principal executive officer.
From May 1997 until January 1998, he served as vice president, strategic
acquisitions. From May 1996 until May 1997, Mr. Gardner was president of
Thunder & Lightning Company, an internet software company. From March 1995 until
May 1996, Mr. Gardner was president of Alpharel, Inc., a document management
software company. From March 1993 until March 1995, Mr. Gardner was vice
president of Data General Corporation, a manufacturer of multiuser computer
systems, peripheral equipment, communications systems, and related products.

DAVID A. FARLEY has served as our senior vice president, finance and
administration since August 1998, and as our chief financial officer and as a
director since October 1995. Mr. Farley served as vice president, finance from
October 1995 until August 1998 and as our secretary from October 1995 until
February 1997. From November 1994 to November 1995, Mr. Farley was vice
president, finance, and chief financial officer and a director of XVT
Software Inc., a development tools software company. From December 1984 until
October 1994, Mr. Farley held various accounting and financial positions at BMC
Software, Inc., a vendor of software system utilities for IBM mainframe
computing environments, most recently as chief financial officer and as a
director.

MATTHEW C. GLESS has served as our vice president, finance and chief
accounting officer since October 1998. From April 1996 until October 1998,
Mr. Gless served as our corporate controller. From 1990 to April 1996,
Mr. Gless held various accounting and financial management positions at BMC
Software, Inc.

120

Exhibit H
0749

WILLIAM G. HOLSTEN has served as our senior vice president, worldwide professional services since August 1998. Mr. Holsten served as vice president, professional services from November 1995 until August 1998. From July 1994 until November 1995, Mr. Holsten was director of professional services for XVT Software, Inc.

FREDERICK B. LUDDY has served as our vice president, North American research and development and chief technology officer since January 1998. From April 1990 until January 1998, Mr. Luddy served as product architect for our SERVICECENTER product suite.

DOUGLAS S. POWANDA has served as our executive vice president, worldwide operations since April 1999. From August 1999 until April 1999, Mr. Powanda served as senior vice president, worldwide sales and from January 1998 until August 1998, as vice president, worldwide sales. From September 1995 until January 1998, Mr. Powanda served as vice president, international sales.

STEVEN S. SPITZER has served as our vice president, channel sales since August 1997. From 1986 until August 1997, Mr. Spitzer held various positions with FileNet Corporation, a provider of workflow, document-imaging and electronic document management software solutions, most recently as vice president, channel sales.

RICHARD T. NELSON has served as our vice president, corporate development, since March 2000 and as our corporate secretary since February, 1997. Mr. Nelson served as our vice president and general counsel from November 1995 to March 2000. From August 1991 until November 1995, Mr. Nelson was an associate in the Houston, Texas office of Jackson & Walker LLP, a law firm.

ERIC P. DELLER has served as our vice president and general counsel since March 2000. From May 1999 until March 2000, Mr. Deller served as our associate general counsel. From February 1997 to April 1999, Mr. Deller served as Executive Vice President and General Counsel of PeakCare LLC, an internet based provider of health care products. During the same period, he also served as general counsel of The Leeds Group, Inc., an investment and development firm that held a controlling interest in PeakCare. From February 1995 until February 1997, Mr. Deller was an associate at the law firm of McKenna & Cuneo.

JOHN J. MOORES has served as chairman of our board of directors since March 1990 and as a member of our board of directors since March 1989. In 1980, Mr. Moores founded BMC Software, Inc. and served as its president and chief executive officer from 1980 to 1986 and as chairman of its board of directors from 1980 to 1992. Since December 1994, Mr. Moores has served as owner and chairman of the board of the San Diego Padres Baseball Club, L.P. and since September 1991 as chairman of the board of JMI Services, Inc., a private investment company. Mr. Moores also serves as a director and member of the compensation committees of Bindview Development Corp. and Neon Systems, Inc. Mr. Moores also serves as a director of Mission Critical Software, Inc. and LEAP Wireless International.

CHRISTOPHER A. COLE has served as a member of our board of directors since founding the Company in 1981. He also served as its president and chief executive officer from 1986 until 1989. Since 1992, Mr. Cole has served as president and chief executive officer of Questrel, Inc., Ur Studios, Inc., and Headlamp, Inc., each a software development company.

RICHARD A. HOSLEY II has served as a member of our board of directors since January 1992. Prior to retiring from full-time employment, Mr. Hosley served as president and chief executive officer of BMC Software, Inc. Mr. Hosley also serves as a director of Bindview Development Corp.

CHARLES E. NOELL III has served as a member of our board of directors since January 1992. Since January 1992, Mr. Noell has served as president and chief executive officer of JMI Services, Inc., a private investment company, and as a general partner of JMI Equity Partners, L.P., Mr. Noell also serves as a director of Transaction Systems Architects, Inc., and as a director and member of the compensation committee of Neon Systems, Inc.

121

Exhibit H
0750

NORRIS VAN DEN BERG has served as a member of our board of directors since January 1992. Mr. van den Berg has served as a general partner of JMI Equity Partners since July 1991. Mr. van den Berg also serves as director of Neon Systems, Inc.

THOMAS G. WATROUS, SR. has served as a member of our board of directors since January 1999. Prior to retiring from full-time employment in September 1999, Mr. Watrous was a senior partner with the management consulting firm of Andersen Consulting.

BOARD OF DIRECTORS

BOARD COMMITTEES

Our board of directors has standing audit and compensation committees. During fiscal 2000, our audit committee was comprised of Mr. Hosley, Mr. Noell, and Mr. van den Berg. Our compensation committee was comprised of Mr. Moores, Mr. Hosley, Mr. Noell, and Mr. Watrous.

DIRECTOR COMPENSATION

Each member of our board who is not also an employee receives $2,000 for each board meeting and $1,000 for each committee meeting he attends in person. We pay members of our board $500 for telephonic attendance at a board or committee meetings. Directors receive compensation for attendance at committee meetings only if they are members of the applicable committee.

In September 1998, we granted each of Mr. Cole, Mr. Hosley, Mr. Noell, and Mr. van den Berg an option to acquire 50,000 shares of our common stock under our 1994 stock plan. The exercise price for these option grants was $7.50. These options become exercisable over four years, with 25% vesting after one year and the remaining shares vesting in quarterly installments thereafter. These grants expire if not exercised prior to September 2008.

In May 1992, we granted each of Mr. Cole, Mr. Hosley, Mr. Noell, and Mr. Van den Berg an option to acquire 180,000 shares of common stock under our 1991 nonqualified stock option plan at an exercise price of $0.335, the per share fair market value of our common stock on the date of grant. Each of these options vested in annual installments over four years, are now fully exercisable, and expire if not exercised prior to May 2002. In addition, in December 1990, we granted Mr. Cole an option to acquire 450,000 shares of our common stock under a separate nonqualified stock option plan at an exercise price of $0.255 per share, the per share fair market value of our common stock on the date of grant. Following Mr. Cole's resignation as an executive officer of Peregrine and in consideration of his continuing service as a director, we extended the exercisability of the option with respect to 112,500 vested shares for so long as Mr. Cole remains a director of Peregrine but no later than December 2000.

In addition to the option grants described above, directors who are not also employees also receive automatic option grants under our 1997 director option plan. Nonemployee directors who hold or are affiliated with a holder of three percent or more of our outstanding common stock do not receive these automatic option grants. Each new nonemployee director is automatically granted an option to purchase 50,000 shares of our common stock at the time he or she is first elected to our board of directors. Each nonemployee director receives a subsequent option grant to purchase 10,000 shares of our common stock at each annual meeting of our stockholders. All options granted under the director option plan are granted at the fair market value of our common stock on the date of grant. Options granted to nonemployee directors under the director plan become exercisable over four years, with 25% of the shares vesting after one year and the remaining shares vesting in quarterly installments thereafter.

122

Exhibit H
0751

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

Our compensation committee is responsible for determining salaries, incentives and other forms of compensation for directors, officers and other employees. It also administers various incentive compensation and benefit plans. Our compensation committee consist of Mr. Hosley, Mr. Moores, Mr. Noell, and Mr. Watrous. Our president and chief executive officer participates in all discussions and decisions regarding salaries and incentive compensation for all employees and consultants. He is excluded, however, from discussions regarding his own salary and incentive compensation. No interlocking relationship exists between any member of the our compensation committee and any member of any other company's board of directors or compensation committee.

EXECUTIVE COMPENSATION

The following table indicates the compensation earned for services rendered to Peregrine in all capacities during the fiscal years ended March 31, 2000, 1999, and 1998 by our President and Chief Executive Officer and our next five most highly compensated executive officers whose salary and bonus for fiscal 2000 exceeded $100,000.

SUMMARY COMPENSATION TABLE

| | | ANNUAL COMPENSATION | | LONG-TERM COMPENSATION AWARDS | | |
| NAME AND PRINCIPAL POSITION | FISCAL YEAR | SALARY | BONUS | RESTRICTED STOCK AWARDS | SECURITIES UNDERLYING OPTIONS (#) | ALL OTHER COMPENSATION(9) |
| --- | --- | --- | --- | --- | --- | --- |
| Stephen P. Gardner................ President and Chief Executive Officer | 2000 1999 1998 | $250,000 250,040 139,000 | $137,500(1) 343,750 210,000 | $ -- -- 775,000(7) | 291,850 730,000 150,000 | $2,697 2,599 5,156 |
| Frederic B. Luddy................. Vice President, North American Research and Development | 2000 1999 1998 | 150,000 150,000 150,000 | 605,532(2) 555,726 729,060 | -- --- -- | 313,212 112,564 25,000 | 3,385 3,143 2,837 |
| Douglas S. Powanda................ Executive Vice President, Worldwide Operations | 2000 1999 1998 | 225,000 180,000 150,000 | 326,250(3) 359,991 309,523 | -- -- -- | 600 400,000 75,000 | 2,788 3,143 3,946 |
| Richard T. Nelson................. Vice President, Corporate Development | 2000 1999 1998 | 180,000 180,000 180,000 | 213,037(4) 83,790 54,000 | -- -- -- | 80,600 -- 120,000 | 3,282 4,751 3,218 |
| William G. Holsten................ Senior Vice President, Customer Service | 2000 1999 1998 | 180,000 150,000 90,000 | 137,812(5) 210,858 159,547 | -- -- -- | 82,600 -- -- | 6,060 428 127 |
| Steven S. Spitzer................. Vice President, Alliances | 2000 1999 1998 | 151,154 150,000 99,519 | 536,358(6) 247,960 46,250 | -- -- -- | -- -- 420,000(8) | 597 428 127 |

-------------------------------

(1) Bonus compensation for 2000 consists of (i) $50,000 earned and paid in fiscal 2000 and (ii) $87,500 earned in fiscal 2000 to be paid in fiscal 2001. Bonus compensation for 1999 consists of (i) $93,750 earned and paid in fiscal 1999 and (ii) $250,000 earned in fiscal 1999 and paid in fiscal 2000. Bonus compensation for fiscal 1998 includes $50,000 earned in fiscal 1998 and paid in fiscal 1999.

(2) Bonus compensation for 2000 consists of (i) $270,692 of product author commission and $6,000 of bonus earned and paid in fiscal 2000 and (ii) $253,839 of product author commission and $75,000 of bonus earned in fiscal 2000 to be paid in fiscal 2001. Bonus compensation for 1999 consists of (i) $381,406 of product author commission and $11,250 of bonus earned and paid in fiscal 1999 and (ii) $148,070 of product author commission and $15,000 of bonus earned in fiscal 1999 and paid in fiscal 2000. Bonus compensation for fiscal 1998 consists of (i) $555,519 of product authorship commission income earned and paid in fiscal 1998 and (ii) $173,541 of product authorship commission income earned in fiscal 1998 and paid in fiscal 1999.

123

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0752

(3) Bonus compensation for 2000 consists of (i) $55,875 of commission and $50,000 of bonus compensation earned and paid in fiscal 2000 and (ii) $45,375 of commission and $175,000 of bonus compensation earned in fiscal 2000 to be paid in fiscal 2001. Bonus compensation for 1999 consists of (i) $91,648 of commission and $80,551 of bonus earned and paid in fiscal 1999 and (ii) $87,792 of commission and $100,000 of bonus earned in fiscal 1999 and paid in fiscal 2000. Bonus compensation for fiscal 1998 consists of (i) $10,000 of bonus compensation and $195,053 of commission income earned and paid in fiscal 1998 and (ii) $115,570 of commission income earned in fiscal 1998 and paid in fiscal 1999.

(4) Bonus compensation for 2000 consists of (i) $43,037 earned and paid in fiscal 2000 and (ii) $170,000 earned in fiscal 2000 to be paid in fiscal 2001. Bonus compensation for 1999 consists of (i) $20,790 earned and paid in fiscal 1999 and (ii) $63,000 earned in fiscal 1999 and paid in fiscal 2000. Bonus compensation for 1998 was all earned and paid in fiscal 1998.

(5) Bonus compensation for 2000 consists of (i) $56,250 earned and paid in fiscal 2000 and (ii) $81,562 earned in fiscal 2000 to be paid in fiscal 2001. Bonus compensation for 1999 consists of (i) $94,900 earned and paid in fiscal 1999 and (ii) $115,938 earned in fiscal 1999 and paid in fiscal 2000. Bonus compensation for 1998 consists of (i) $144,547 earned and paid in fiscal 1998 and (ii) $15,000 earned in fiscal 1998 and paid in fiscal 1999.

(6) Bonus compensation for 2000 consists of (i) $262,817 of commission and $30,000 of bonus earned and paid in fiscal 2000, (ii) $206,354 of commission and $20,000 of bonus earned in fiscal 2000 to be paid in fiscal 2001, and (iii) $17,187 of bonus earned in fiscal 1999 and paid in fiscal 2000. Bonus compensation for 1999 consists of (i) $56,195 of commission and $19,875 of bonus earned and paid in fiscal 1999 and (ii) $89,077 of commission and $82,813 of bonus earned in fiscal 1999 and paid in fiscal 2000. Bonus compensation for 1998 was earned and paid in fiscal 1998.

(7) In November 1997, we issued Mr. Gardner 200,000 shares of common stock pursuant to a restricted stock agreement. The closing sale price of our common stock on the Nasdaq National Market on October 31, 1997, the last trading date prior to the date of issuance was $3.875 (as adjusted for subsequent stock splits). Such shares vest incrementally over ten years, subject to earlier vesting over six years if we achieve certain financial milestones.

(8) Includes an option to purchase 200,000 shares subsequently canceled.

(9) Consists of group life insurance excess premiums and matching contributions under our 401(k) plan.

124

Exhibit H
0753

OPTION GRANTS IN FISCAL YEAR 2000

The following table provides information relating to stock options granted to each of the executive officers named in the compensation table above during our fiscal year ended March 31, 2000. All of these options were granted under our 1994 stock plan and have a term of 10 years, subject to earlier termination in the event the optionee's services cease.

The exercise price of the options we grant are equal to the fair market value of our common stock based on the closing sales price of our common stock on the Nasdaq National Market on the trading day prior to the date of grant. The exercise price may be paid by cash or check. Alternatively, optionees may exercise their shares under a cashless exercise program. Under this program, the optionee may provide irrevocable instructions to sell the shares acquired on exercise and to remit to Peregrine a cash amount equal to the exercise price and all applicable withholding taxes. The options granted under our 1994 stock plan vest over a four year period. Twenty-five percent will vest on the first anniversary of the date of grant. The balance of the option will vest over the remaining three years at the rate of 6.25% every three months.

On May 5, 1999, Peregrine granted each employee, including each officer, an option to acquire 600 shares of our common stock at an exercise price of $8.56. These options were to vest on the earlier to occur of May 5, 2006 or the date Peregrine achieved certain financial milestones. Peregrine achieved the milestones, and these options are now fully vested.

The potential realizable value of options is calculated by assuming that the price of our common stock increases from the exercise price at assumed rates of stock appreciation of 5% and 10%, compounded annually over the 10 year term of the option, and subtracting from that result the total option exercise price. These assumed appreciation rates comply with the rules of the Securities and Exchange Commission and do not represent our prediction of the performance of our stock price.

All share numbers and exercise prices have been adjusted to reflect a two-for-one stock split effected in the form of a dividend in February 2000. During fiscal 2000, we granted options to acquire 4,293,434 to employees and consultants under our 1994 stock plan.

| | INDIVIDUAL GRANTS | | | | POTENTIAL REALIZABLE VALUES AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTIONS TERM | |
| | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED | PERCENT OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL 2000 | EXERCISE PRICE PER SHARE | EXPIRATION DATE | | |
| NAME | | | | | 5% | 10% |
|------|------|------|------|------|------|------|
| Stephen P. Gardner.... | 600 | * | $ 8.56 | 05/05/09 | $ 3,230 | $ 8,185 |
| | 91,250 | 2.13% | 19.16 | 10/28/09 | 1,108,688 | 2,786,775 |
| | 200,000 | 4.66% | 36.63 | 01/13/10 | 4,608,000 | 11,675,751 |
| Frederic B. Luddy..... | 600 | * | 8.56 | 05/05/09 | 3,230 | 8,185 |
| | 100,000 | 2.33% | 8.56 | 05/05/09 | 538,000 | 1,364,000 |
| | 212,612 | 4.95% | 19.16 | 10/28/09 | 2,583,236 | 6,493,170 |
| Douglas S. Powanda.... | 600 | * | 8.56 | 05/05/09 | 3,230 | 8,185 |
| Richard T. Nelson..... | 600 | * | 8.56 | 05/05/09 | 3,230 | 8,185 |
| | 40,000 | * | 19.16 | 10/28/09 | 486,000 | 1,221,600 |
| | 40,000 | * | 36.63 | 01/13/10 | 921,600 | 2,335,200 |
| William G. Holsten.... | 600 | * | 8.56 | 05/05/09 | 3,230 | 8,185 |
| | 120,000 | 2.79% | 36.63 | 01/13/10 | 2,764,800 | 7,005,600 |
| Steven S. Spitzer..... | 600 | * | 8.56 | 05/05/09 | 3,230 | 8,185 |
| | 2,000 | * | 8.56 | 05/05/09 | 10,760 | 27,280 |
| | 40,000 | * | 19.16 | 10/28/09 | 486,000 | 1,221,600 |
| | 40,000 | * | 36.63 | 01/13/10 | 921,600 | 2,335,200 |

------------------------

* Less than 1%

125

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0754

AGGREGATE OPTION EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION VALUES

The following table provides information relating to option exercises by the executive officers identified in the summary compensation table during Peregrine's fiscal year ended March 31, 2000. In addition, it indicates the number and value of vested and unvested options held by these executive officers as of March 31, 2000.

The "Value Realized" on option exercises is equal to the difference between the fair market value of our common stock on the date of exercise less the exercise price. The "Value of Unexercised In-the-Money Options at March 31, 2000" is based on $67.0625 per share, the closing sales price of our common stock in trading on the Nasdaq National Market on March 31, 2000, less the exercise price, multiplied by the aggregate number of shares subject to outstanding options.

All share numbers and exercise prices have been adjusted to reflect a two-for-one stock split effected in the form of a dividend in February 2000.

| NAME | SHARES ACQUIRED ON EXERCISE | VALUE REALIZED | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT MARCH 31, 2000 | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT MARCH 31, 2000 | |
|---|---|---|---|---|---|---|
| | | | EXERCISABLE(#) | UNEXERCISABLE(#) | EXERCISABLE | UNEXERCISABLE |
| Stephen P. Gardner...... | 468,352 | $11,897,053 | 312,898 | 1,370,600 | $19,306,778 | $77,797,083 |
| Frederic B. Luddy....... | 167,500 | 4,117,200 | 14,102 | 536,738 | 886,200 | 29,791,184 |
| Douglas S. Powanda...... | 262,500 | 8,805,294 | 125,596 | 738,100 | 7,565,180 | 44,981,564 |
| Richard T. Nelson....... | 150,000 | 2,270,563 | 60,000 | 178,100 | 3,900,375 | 9,414,964 |
| William G. Holsten...... | 202,500 | 4,042,842 | 20,000 | 218,100 | 1,300,129 | 9,933,464 |
| Steven S. Spitzer....... | 75,000 | 1,680,111 | 35,000 | 302,600 | 2,237,637 | 17,350,630 |

EMPLOYMENT AGREEMENTS AND CHANGE IN CONTROL ARRANGEMENTS

Peregrine does not currently have any employment contracts in effect with any officer listed in the summary compensation table.

Peregrine and Stephen P. Gardner, our Chief Executive Officer, are parties to a restricted stock agreement dated November 1, 1997 pursuant to which we issued Mr. Gardner 200,000 shares of our common stock. We entered a similar agreement with David A. Farley, our Chief Financial Officer, on November 1, 1995 and issued Mr. Farley 800,000 shares of our common stock. The shares issued to each of Mr. Gardner and Mr. Farley vest incrementally over ten years, subject to earlier vesting over six years contingent upon Peregrine's achieving certain financial milestones. The restricted stock agreements permit either Mr. Gardner or Mr. Farley to surrender shares to satisfy withholding tax obligations that arise as the shares vest. In connection with the lapsing of restrictions on 33,332 shares in April 2000, Mr. Gardner surrendered all 33,332 shares subject to his restricted stock agreement. In connection with the lapsing of restrictions on 404,000 shares in April 2000, Mr. Farley surrendered 202,000 shares subject to his restricted stock agreement. In the event of a merger or change in control of Peregrine, all these shares will become automatically vested.

Under our 1994 stock plan, in the event of a merger or a change in control of Peregrine, vesting of options outstanding under the plan will automatically accelerate. Outstanding options will become fully exercisable, including with respect to shares for which such options would be otherwise unvested.

LIMITATIONS ON DIRECTORS' AND OFFICERS' LIABILITY AND INDEMNIFICATION

Peregrine's amended and restated certificate of incorporation limits the liability of our directors to the maximum extent permitted by Delaware law. Delaware law provides that directors of a corporation

126

Exhibit H
0755

will not be personally liable for monetary damages for breach of their fiduciary duties as directors, except liability for:

- any breach of their duty of loyalty to Peregrine or its stockholders;

- acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemption; or

- any transaction from which the director derived an improper personal benefit.

The limitation of our directors' liability does not apply to liabilities arising under federal securities laws and does not affect the availability of equitable remedies such as injunctive relief or rescission.

Our amended and restated certificate of incorporation and bylaws require us to indemnify our directors and executive officers and permit us to indemnify other officers and employees and agents of Peregrine to the fullest extent permitted by law. We believe that indemnification under our bylaws covers at least negligence and gross negligence on the part of indemnified parties. Our bylaws also permit us to secure insurance on behalf of any officer, director, employee or other agent for any liability arising out of his or her actions in such capacity, regardless of whether our bylaws would permit indemnification.

We have entered into indemnification agreements with each of our officers and directors. These agreements provide for indemnification of our directors and officers for judgments, fines, settlement amounts and certain expenses, including attorneys' fees incurred by the director or executive officer in any action or proceeding. We believe that these provisions and agreements are necessary to attract and retain qualified persons as directors and executive officers.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling Peregrine pursuant to the foregoing provisions, we have been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable.

STOCK PLANS

1994 STOCK OPTION PLAN.  Peregrine's 1994 stock option plan, as amended, provides for the grant of stock options to eligible employees, non-employee directors and consultants. The 1994 plan authorizes grants of incentive stock options within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended, as well as grants of nonstatutory stock options. The 1994 plan was adopted by our board of directors in January 1994 and approved by our stockholders in April 1994. The 1994 plan replaced our nonqualified stock option plan and our 1991 nonqualified stock option plan. Options previously issued under the nonqualified stock option plan and the 1991 nonqualified stock option plan remain exercisable according to their terms. Unless terminated sooner, the 1994 plan will terminate automatically in January 2004. A total of 32,558,570 shares of our common stock was reserved for issuance under the 1994 Plan at March 31, 2000.

The 1994 plan provides for automatic annual increases in the number of shares reserved for issuance under the plan such that, effective on January 1 of each calendar year beginning January 1, 1999 and ending January 1, 2003, the number of shares available for issuance under the plan but not subject to outstanding options will be not less than the lesser of (a) four percent of the aggregate number of shares of our common stock then issued and outstanding or (b) 16,000,000 shares.

The 1994 plan may be administered by our board of directors or a committee of our board. In the case of options intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Internal Revenue Code, the committee must consist of two or more "outside

127

Exhibit H
0756

directors" within the meaning of Section 162(m) of the code. The 1994 plan is currently administered by our board of directors. The administrator has the power to determine the terms of the options granted, including the exercise price, the number of shares subject to each option, the exercisability thereof, and the form of consideration payable upon such exercise. In addition, the administrator has the authority to amend, suspend or terminate the 1994 plan, provided that no action may affect any share of our common stock previously issued and sold or any option previously granted under the 1994 plan.

Options granted under the 1994 plan are not generally transferable by the optionee, and each option is generally exercisable during the lifetime of the optionee only by the optionee. Options granted under the 1994 plan must generally be exercised within ninety days of the end of optionee's status as an employee, consultant, or nonemployee director, within six months after the optionee's termination by disability, or within twelve months after the optionee's death. In no event, however, may the optionee exercise an option later than the expiration of ten-years from the date the option was granted. The administrator of the 1994 plan has the discretion to extend the exercisability of options following a termination of the optionee's employment or status as a director but in no event for more than ten years after the date of grant of such option.

The exercise price of all incentive stock options granted under the 1994 plan must be at least equal to the fair market value of the common stock on the date of grant. The exercise price of nonstatutory stock options granted under the 1994 plan is determined by the administrator, but with respect to nonstatutory stock options intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Internal Revenue Code, the exercise price must at least be equal to the fair market value of our common stock on the date of grant. With respect to any participant who owns stock possessing more than ten percent of the voting power of all classes of our outstanding capital stock, the exercise price of any incentive stock option granted must equal at least 110% of the fair market value on the grant date and the term of the incentive stock option must not exceed five years. The term of all other options granted under the 1994 plan may not exceed ten years.

The 1994 plan provides that in the event of a merger or consolidation of Peregrine with or into another corporation, a sale of substantially all of our assets or certain other changes in control of Peregrine, all outstanding options under the plan will become immediately vested.

As of March 31, 2000, 5,983,400 shares of common stock had been issued upon exercise of options outstanding under both the nonqualified stock option plan and our 1991 nonqualified stock option plan, and 11,538,664 shares of common stock had been issued upon exercise of options outstanding under the 1994 plan. Options to purchase 250,000 shares of common stock at a weighted average exercise price of $0.33 were outstanding under the nonqualified stock option plan and 1991 plan, and options to purchase 17,762,503 shares of common stock at a weighted average exercise price of $9.35 were outstanding under the 1994 Plan.

1997 EMPLOYEE STOCK PURCHASE PLAN. Our 1997 employee stock purchase plan was adopted by our board of directors and approved by our stockholders in February 1997. It became effective on May 1, 1997. A total of 1,000,000 shares of common stock has been reserved for issuance under the purchase plan. The purchase plan, which is intended to qualify under Section 423 of the Internal Revenue Code, has four three-month offering periods each year beginning on the first trading day on or after May 1, August 1, November 1 and February 1. The purchase plan is administered by the board of directors or by a committee appointed by the board. Employees are eligible to participate if they are customarily employed by Peregrine or any participating subsidiary. Our executive officers are not eligible to participate in the 1997 purchase plan.

The 1997 purchase plan permits participants to purchase common stock through payroll deductions of up to 15% of an employee's compensation, including commissions, but excluding overtime, bonuses and other incentive compensation. The price of stock purchased under the 1997 purchase plan is 85%

128

Exhibit H
0757

of the lower of the fair market value of the common stock at the beginning or at the end of each offering period. Shares purchased under the 1997 purchase plan may not be sold or otherwise transferred by a participant for a period of 12 months after the date of purchase. Employees may end their participation at any time during an offering period, and they will be reimbursed the payroll deductions made during that offering period. Participation ends automatically upon termination of employment with Peregrine.

Rights granted under the 1997 purchase plan are not transferable by a participant other than by will, the laws of descent and distribution, or as otherwise provided under the 1997 purchase plan. The 1997 purchase plan provides that, in the event of a merger of Peregrine with or into another corporation or a sale of substantially all of our assets, the board of directors will shorten the offering period then in progress (so that employees' rights to purchase stock under the purchase plan are exercised prior to the merger or sale of assets). In addition, the twelve-month restriction on transfers applicable to shares purchased under the 1997 purchase plan will lapse in such event.

The 1997 purchase plan will terminate in February 2007. The board of directors has the authority to amend or terminate the 1997 purchase plan, except that no action may adversely affect any outstanding rights to purchase stock under the 1997 purchase plan.

1997 DIRECTOR OPTION PLAN. Outside directors are entitled to participate in our 1997 director option plan. Outside directors who directly or indirectly hold more than three percent of our outstanding common stock are not eligible for option grants under the director plan. The director plan was adopted by our board of directors and approved by our stockholders in February 1997, and it became effective on April 8, 1997. Our director plan has a term of ten years, unless terminated sooner by the board. A total of 600,000 shares of common stock has been reserved for issuance under the director plan.

The director plan provides for an automatic initial grant of 25,000 shares of our common stock to each eligible outside director on the date he or she first becomes an outside director. After the initial grant to the eligible outside director, he or she will automatically be granted a subsequent option to purchase 5,000 shares each year on the date of our annual stockholder's meeting, if on that date he or she has served on the board for at least six months. The initial option and each subsequent option have a term of ten years, and the shares subject to the option vest as to 25% of the shares on the first anniversary of the grant date and as to 6 1/4% of the shares on the last day of each consecutive three-month period thereafter. The exercise prices of the initial option and each subsequent option are the fair market value per share of the common stock, generally determined with reference to the closing price of the common stock as reported on the Nasdaq National Market on the date of grant.

In the event of a merger of Peregrine or the sale of substantially all of our assets, each option may be assumed or an equivalent option substituted by the successor corporation. If an option is assumed or substituted for, it shall remain exercisable and shall continue to vest as provided in our director plan. However, if an eligible outside director's status as a director of Peregrine or the successor corporation, as applicable, is terminated following such assumption or substitution, other than upon a voluntary resignation by such outside director, each option granted to such director shall become fully vested and exercisable. If the successor does not agree to assume or substitute for the option, each option shall also become fully vested and exercisable.

Options granted under our director plan must be exercised within three months of the end of the optionee's tenure as a director, or within 12 months after such director's termination by death or disability, but in no event later than the expiration of the option's ten-year term. No option granted under our director plan is transferable by the optionee other than by will or the laws of descent and distribution, and each option is exercisable, during the lifetime of the optionee, only by such optionee.

129

Exhibit H
0758

## PEREGRINE RELATED PARTY TRANSACTIONS

Peregrine and JMI Services, Inc., an investment management company ("JMI Services"), are parties to a sublease under which we sublease approximately 13,310 square feet of office space in San Diego, California to JMI Services. The term of the sublease is from June 1, 1996 through October 21, 2003. The sublease provides for initial monthly rental payments of $16,638 to increase by $666 per month on each anniversary of the sublease. John J. Moores, the chairman of our board of directors, also serves as chairman of the board of JMI Services. Charles E. Noell, III, a director of Peregrine, serves as president and chief executive officer of JMI Services. We believe that the terms of the sublease are at competitive market rates.

We lease a suite at San Diego's Qualcomm Stadium at competitive rates and on an informal basis from the San Diego Padres Baseball Club, L.P. Mr. Moores has served as owner and chairman of the board of the Padres since December 1994. Our annual payments for the suite and game tickets total approximately $50,000.

We are parties to restricted stock agreements with Stephen P. Gardner, our president and chief executive officer, and David A. Farley, our senior vice president and chief financial officer. Under these agreements, we issued 1,000,000 shares of common stock. These agreements are discussed in detail under the caption "Employment agreements and change in control arrangements."

During fiscal year 2000, we issued options to purchase common stock to certain directors under our 1994 stock option plan. These grants are discussed in detail under the caption "Director compensation."

During fiscal year 1999, we purchased a golf club membership for business entertainment use by Douglas S. Powanda, our executive vice president, worldwide operations, at a cost of $70,000. We have agreed with Mr. Powanda that upon termination of his employment, he may purchase the membership from us at our original cost. Subsequent to March 31, 1999, we purchased a similar membership for $70,000 under a similar agreement with Mr. Gardner.

130

Exhibit H
0759

PEREGRINE PRINCIPAL STOCKHOLDERS

The following table provides information relating to the beneficial ownership of Peregrine's common stock as of May 15, 2000 by:

  - each stockholder known by Peregrine to own beneficially more than 5% of our common stock;

  - each of the executive officers named in the summary compensation table on page 123;

  - each of our directors; and

  - all our directors and executive officers as a group.

Beneficial ownership is determined based on the rules of the Securities and Exchange Commission. The column captioned "Number of Shares Beneficially Owned" excludes the number of shares of our common stock subject to options held by that person that are currently exercisable or will become exercisable on or before July 14, 2000. The number of shares subject to options that each beneficial owner has the right to acquire on or before July 14, 2000 is listed separately under the column "Number of Shares Underlying Options." These shares are not deemed exercisable for purposes of computing the beneficial ownership of any other person. Percent of beneficial ownership is based upon 109,356,814 shares of our common stock outstanding as of May 15, 2000. The address for those individuals for which an address is not otherwise provided is c/o Peregrine Systems, Inc., 12670 High Bluff Drive, San Diego, California 92130. Unless otherwise indicated, we believe the stockholders listed have sole voting or investment power with respect to all shares, subject to applicable community property laws.

| NAME AND ADDRESS | NUMBER OF SHARES BENEFICIALLY OWNED | NUMBER OF SHARES UNDERLYING OPTIONS | TOTAL SHARES BENEFICIALLY OWNED | PERCENTAGE OF OUTSTANDING SHARES BENEFICIALLY OWNED |
|---|---|---|---|---|
| PRINCIPAL STOCKHOLDERS | | | | |
| Pilgrim Baxter & Associates, Ltd.(1)......... | 7,140,400 | -- | 7,140,400 | 6.53% |
| 825 Duportail Road | | | | |
| Wayne, Pennsylvania 19087 | | | | |
| Putnam Investments, Inc.(2)................... | 10,557,036 | -- | 10,557,036 | 9.65 |
| One Post Office Square | | | | |
| Boston, Massachusetts 02109 | | | | |
| CURRENT EXECUTIVE OFFICERS AND DIRECTORS | | | | |
| Stephen P. Gardner........................... | 167,836 | 511,768 | 679,604 | * |
| David A. Farley.............................. | 2,135,632 | 450,600 | 2,586,232 | 2.36 |
| Christopher A. Cole.......................... | 1,721,284 | 30,625 | 1,751,909 | 1.60 |
| William G. Holsten........................... | 50,000 | 40,600 | 90,600 | * |
| Richard A. Hosley II......................... | -- | 30,625 | 30,625 | * |
| Frederic B. Luddy........................... | -- | 80,343 | 80,343 | * |
| John J. Moores(3)............................ | 5,752,986 | -- | 5,752,986 | 4.02 |
| Richard T. Nelson............................ | 278,000 | 80,600 | 358,600 | * |
| Charles E. Noell III......................... | 54,428 | 120,625 | 175,053 | * |
| Stephen S. Spitzer........................... | -- | 63,600 | 63,600 | * |
| Douglas S. Powanda........................... | 4 | 237,446 | 237,450 | * |
| Norris van den Berg.......................... | 38,744 | 80,625 | 119,369 | * |
| Thomas G. Watrous, Sr........................ | 10,000 | 22,500 | 32,500 | * |
| All current executive officers and directors as a group (15 persons).................... | 10,312,164 | 1,777,157 | 12,089,321 | 10.88 |

------------------------

* Less than 1%

(1) Based solely on a Schedule 13G, dated February 8, 1999, filed with the Securities and Exchange Commission on February 9, 1999.

(2) Based solely on a Schedule 13G/A, dated May 8, 2000, filed with the Securities and Exchange Commission on May 9, 2000.

Exhibit H
0760

(3) Includes 1,352,590 shares held by Mr. Moores as trustee under various
    trusts, substantially all of which were established for members of
    Mr. Moores' family.

131

Exhibit H
0761