# Exhibit H
# Continued

BUSINESS OF HARBINGER

Harbinger is a leading worldwide provider of business-to-business e-commerce products and services, offering comprehensive, scalable, standards-based, solutions for businesses of all sizes. Harbinger develops, markets and supports business-to-business e-commerce software products and provides network communications and consulting services that help businesses fully automate the cycle of transactions required in the electronic procurement of goods and services. Harbinger is differentiated in the business-to-business e-commerce market by its core competency, which focuses on the end-to-end process of building, managing and integrating complete electronic trading communities which are composed of groups of companies that regularly exchange business-to-business e-commerce transactions. Harbinger believes that this end-to-end process requires domain expertise both as a technology and services provider, but also as a trusted intermediary, which includes managing the exchange and integration of mission-critical transactions, developing and facilitating electronic procurement catalogs enabling and deploying electronic marketplaces and vertical market exchanges, and managing the on-going trading relationships between businesses using these marketplaces and exchanges to communicate their purchasing and settlement transactions with each other.

Harbinger's software products enable businesses to engage in e-commerce with one another by fully integrating e-commerce into their business infrastructure and operations. The software is designed and compatible for use with the most commonly used computer platforms and operating systems, and provides secure and reliable transmission of e-commerce data between businesses via the Internet and legacy networks. Harbinger offers the software as customer-licensed applications for operation on an end-user's server, or on a subscription basis as an Application Service Provider in which the software is hosted on Harbinger's servers and accessed by customers via the Internet. Harbinger provides e-commerce delivery and implementation services for its software, including installation, training and on-going customer support, and additionally the integration of the software and resulting e-commerce data with a customer's business systems. Delivery and implementation services can also include outsourcing services for the operations management of a customer's e-commerce systems, and management of a customer's e-commerce trading community program. Harbinger additionally offers e-commerce network communications and trusted intermediary services via its e-commerce portal on the Internet. The e-commerce center facilitates electronic transaction exchange between businesses using Internet Protocol, the underpinning for the Internet, Intranets, Extranets, Web sites and e-mail, and over standard telephone lines using non-Internet Protocol protocols, such as X.400, X.25 and Bisync.

Harbinger's business-to-business e-commerce products and services are deployed in many combinations to suit the individual needs of its customers, resulting in a comprehensive, scalable, standards-based, e-commerce solution for each customer, thus maximizing the number and value of their e-commerce trading relationships with other businesses. As of March 31, 2000, the Harbinger's customers included leading U.S. and multi-national corporations and government agencies, including the following:

3M Companies
Abbott Labs
Allied Signal
Ameritech
Amoco
AT&T
Baxter Healthcare
Bell Atlantic
Bell Canada
Bellcore
BellSouth
Caterpillar
Chevron
Compaq Computer
Daimler-Chrysler
Dell Computer
Deutsche Telekom
Detroit Edison
Digital Equipment Corp.
Duke Power
DuPont
Dutch PTT Post
Eastman Chemical
Eli Lilly
Environmental Protection   Agency
Exxon
Federal Express
Ford
General Electric
General Motors
Georgia Power
GroceryLink
Hewlett-Packard
Hitachi Data Systems
Honda

132

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0762

IBM
Internal Revenue Service
John Deere
Johnson & Johnson
Johnson Controls
Kmart
Lucent Technologies
MCI
Mitsubishi
Mobil
Northern Telecom
Northrop Grumman
Pacific Gas & Electric
Proctor and Gamble
Reebok International
Sears
Shell
Southern Company
Southwestern Bell
Sports Authority
Sprint
Swisscom
Telstra
Tennessee Valley Authority
Texaco
Texas Instruments
The Limited
Timberland
Toys R Us
TRW
United Parcel Service
United Technologies
Upjohn
US Dept. of Transportation
US Dept. of Defense
US Postal Service
Wal-Mart

     Harbinger focuses day-to-day business operations on five corporate
priorities:

     - revenue growth;

     - customer value renewal;

     - knowledgeable, committed and motivated team;

     - operational excellence; and

     - infrastructure expansion.

     To achieve its objectives in these areas, Harbinger announced that during
2000 it expected to:

     - increase market awareness of Harbinger as the leading business-to-business
       e-commerce solutions provider;

     - capitalize on its e-commerce center (harbinger.net-SM-) as the leading
       portal for mission-critical business-to-business e-commerce;

     - complete the conversion of its approximately 40,000 existing customers to
       Internet-enabled products and services; and

     - maintain operational excellence throughout Harbinger.

BUSINESS-TO-BUSINESS E-COMMERCE

     Business-to-business e-commerce involves the automation of business
processes and transactions through the use of computers and telecommunications
to exchange and electronically process commercial information and transactions
between businesses. In the 1980s, the predominant technology for
business-to-business e-commerce was standards-based data exchange, which
facilitated the computer-to-computer exchange of business transactions between
trading partners using formatted messages. These transactions, typically purchase
orders, shipping notices, invoices and related confirmations, were communicated
between businesses over private service networks, known as value-added networks,
which provided security, auditability and delivery for transactions. In the
1990s, Internet Protocol-based networks including the Internet became more
prominent in the business-to-business e-commerce market and have greatly
expanded the opportunity for software functionality, types of transactions and
the data communications of these transactions between businesses.

     The advantages of business-to-business e-commerce typically include one-time
or eliminated data entry, reduced clerical workload, elimination of paper
records, rapid, accurate and secure exchange of business data, and reduced
operating and inventory carrying costs. Business-to-business e-commerce, for
example, facilitates uniform data communications between trading partners in
different industries,

Exhibit H
0763

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

including customers, suppliers, common carriers, banks and other financial institutions. Standards-based data exchange remains a cornerstone of e-commerce and has historically been the source of the majority of Harbinger's revenue. The Harbinger expects Internet Protocol-based revenue to increase as a percentage of its total revenue. Nevertheless, many business-to-business e-commerce transactions, including those generated by new Internet Protocol-based software applications, follow a common transaction flow originally established using standards-based data exchange.

TRANSACTION FLOW.  Business-to-business e-commerce transactions follow specific execution methods. The following outlines a typical purchasing transaction. First, a trading partner creates with its computer, either manually or electronically, the raw business data for the purchase order. Business data for manual transactions may be created by selecting items from an electronic procurement catalog, whereas automated transactions may be dynamically created by the sending partner's business systems according to predetermined criteria for inventory levels, sales forecasts, etc. Second, e-commerce software on the sending partner's computer converts the raw business data into an acceptable, standards-based, e-commerce purchase order. Third, the purchase order, now in e-commerce format, is electronically transmitted through telecommunications links from the sending partner's computer to the central server of a trusted third party that serves as the transactional intermediary for many trading partners. Telecommunications could be point-to-point between trading partners, but the predominant model remains through intermediaries for reasons of security, auditing and ease of delivery. Fourth, the intermediary receives and processes the transaction for subsequent delivery to the intended trading partner. Fifth, the receiving partner uses e-commerce software, but not necessarily the same brand of e-commerce software employed by the sending partner, to act on the purchase order. Sixth, based on the receiving partner's actions, a follow-up transaction, such as order confirmation, is created and communicated back to the sending partner ostensibly following the same procedures outlined in steps 1-4 above. The transaction exchange, following prescribed execution methods and standard transaction sets including quotes, purchase orders, shipping and receiving notices, invoices, payments and related transaction, continues between the partners through invoicing and settlement.

TRADING COMMUNITIES.  Groups of companies that regularly trade with each other generate a significant number of repetitive business transactions. These groups and the individual companies that comprise their trading communities are prospects for the implementation of business-to-business e-commerce solutions. Early market expansion of business-to-business e-commerce and its associated trading communities was made possible through the establishment of repetitive standard transactions sets based on the ANSI X.12 and UN/EDIFACT formats. Subsets of these standards are now in use across specific industries such as automotive, banking, chemical, financial, grocery, healthcare, petroleum, retail and utilities. The adoption of these standards-based formats as an accepted means of transaction exchange has occurred, in part, because many groups and trade organizations and many large companies within vertical communities increasingly recommend or require their member organizations or trading partners to adopt such formats as the primary method of communicating business transactions. The vast majority of today's business-to-business e-commerce transactions utilize these standard and subset formats. With the growth of Internet Protocol-based e-commerce, the market is also seeing new formats emerge such as extensible markup language or XML, and open buying over the Internet which, like standards-based data exchange in the 1980s, must first achieve market acceptance.

MARKETPLACES AND VERTICAL MARKET EXCHANGES.  Several business-to-business e-commerce trading models have evolved in the market over time including enterprise-centric, consortium and open market. The predominant model, enterprise-centric, dates back to the 1980s, where large companies within a trading group exercised substantial influence over how the group exchanged business-to-business e-commerce transactions. This one-to-many trading model grew up in vertical markets where there were clear industry leaders conducting business around a specialized group of products. Within business-to-business e-commerce, the consortium and open market trading models have emerged in recent years. The consortium model is similar to the enterprise-centric model except that several large

134

Exhibit H
0765

enterprises, sometimes in joint-ventures which include e-commerce technology suppliers, band together to build a marketplace for the exchange of commodity-oriented goods and services. In contrast, the open market model is a many-to-many marketplace for the exchange of commodity-oriented goods and services, where no clear business leaders can dominate the playing field. Transactions within these trading models can flow via Internet or Extranet, public and private third-party networks. The process of building, managing and integrating complete electronic trading communities around these e-commerce trading models has a cascading effect across business segments and markets. Large companies attract mid-market companies, who in turn attract smaller enterprises to engage in business-to-business e-commerce, thus creating an integrated and automated supply chain. This natural evolution and growth results in potential new customers for business-to-business e-commerce software, network communications and consulting services.

According to Gartner Group, business-to-business e-commerce transactions will grow to reach $7.3 trillion worldwide by 2004. Furthermore, Harbinger management estimates that of the 3 million U.S. companies with five or more employees, approximately 200,000, including virtually all of the Fortune 500, have elected to date to make use of business-to-business e-commerce, representing about $45 billion in transaction value. Although many of these businesses are members of existing trading communities, Harbinger believes that the majority use business-to-business e-commerce to communicate with only a small percentage of their suppliers, distributors and customers. For business-to-business e-commerce to achieve analyst growth estimates over the next few years, Harbinger believes penetration and adoption rates within the mid-market and small enterprise will need to sharply increase. Adoption of business-to-business e-commerce and expansion within trading communities will depend on various factors, such as the extent of automation in the industry, the degree to which companies require electronic trading from their trading partners, the level of computer sophistication of businesses in the trading community, the frequency of transactions among trading partners in the community and the economic benefits derived from the trading community by implementing electronic trading, which historically have accrued principally to the larger members of the community.

THE INTERNET AND INTERNET PROTOCOL

The Internet is a collection of interconnected public and private networks that allows any computer on the network to communicate with any other computer on the network over Internet Protocol. Internet Protocol is the common denominator for the Internet as well as for corporate Intranets, Extranets, Web sites and e-mail. Although the Internet affords a lower cost, more robust, and widely available medium for business-to-business e-commerce telecommunications, there are significant actual and perceived concerns relating to the use of the Internet for commercial transactions. These concerns include security, inability to confirm message integrity, vulnerability of messages to interception and fabrication, lack of user support, service or centralized "help desk" support, and difficulties in obtaining reliable assurance of receipt of messages sent or the authenticity of messages received. These difficulties inherent in the Internet are magnified when the Internet is used to transport commercial, mission-critical, business-to-business e-commerce transactions.

To solve the current problems with using the Internet and other Internet Protocol networks for transporting business-to-business e-commerce transactions, Harbinger offers a series of products and services. The harbinger.net e-commerce center provides trusted intermediary services including those for message integrity and accountability, and centralized online customer support. Harbinger software products that operate as Extranets, but do not require a Web browser interface, include secure communications to harbinger.net using secure sockets layer, a security protocol that is widely accepted for Internet Protocol networks. Harbinger Express is an e-commerce extranet product using a Web browser interface and the browser's native secure sockets layer component for secure transmission of transactions to harbinger.net. Harbinger Templar is an e-commerce e-mail product using patented and industry standard encryption technologies for the highly secure transmission of transactions to harbinger.net and directly between trading partners.

135

THE HARBINGER SOLUTION

The Harbinger solution to address business-to-business e-commerce focuses on building, managing and integrating complete electronic trading communities. Harbinger believes that facilitating this end-to-end process requires a combination of technologies and services, surrounding centralized trusted intermediary services that link businesses together in organized trading communities. We believe the following components for trading community development differentiates it from competitors in the market.

- E-COMMERCE CENTER, TRUSTED INTERMEDIARY. Harbinger offers harbinger.net, a transaction portal and e-commerce center, providing Internet Protocol and non-Internet Protocol telecommunications and value-added information services between trading partners, as well as an e-commerce information service accessible to all businesses. The portal also hosts the Harbinger's Application Services business, as well as marketplaces and vertical market exchanges operated by the Harbinger on behalf of itself and others, some of whom are joint-venture partners. Trading services include subscription-based vertical market trading communities, electronic storefronts, online customer care, e-commerce resource center, e-commerce directory and various interconnections to numerous private networks and value added networks.

- CATALOG DATA MANAGEMENT. Harbinger offers a range of tools and services for buyers and suppliers to quickly build and maintain electronic procurement catalogs with fully rationalized data elements for fast search and retrieval by popular catalog engines. Electronic procurement catalogs can be hosted on a subscription basis on harbinger.net under the Harbinger's application service provider program.

- APPLICATION SERVICES AND SOFTWARE. Harbinger offers a fully scalable range of e-commerce software products for trading communities to create marketplaces and vertical market exchanges, build Internet storefronts, implement data security and encryption, and conduct Internet Protocol and non-Internet Protocol telecommunications. Harbinger offers the software as customer-licensed applications for operation on the end-user's server, or on a subscription basis as an application service providers where the software is hosted on Harbinger's servers and accessed via connection to harbinger.net.

- DATA TRANSFORMATION SERVICES AND SOFTWARE. Harbinger offers a fully scalable range of e-commerce software products to perform data transformation between e-commerce formats XML, X12, EDIFACT and the integration of resulting data to its customers business processes such as and systems. Harbinger offers the software as customer-licensed applications for operation on the end-user's server, or on a subscription basis as an application service provider where the software is hosted on Harbinger's servers and accessed via connection to harbinger.net.

- DELIVERY AND IMPLEMENTATION SERVICES. Harbinger offers a full complement of e-commerce delivery and implementation services for its software including installation, training and on-going customer support, and additionally the integration of the software with a customer's business systems. Services can also include outsourcing services for the operations management of a customer's e-commerce systems, and complete development, deployment and management of a customer's e-commerce trading community program.

STRATEGY

Harbinger's objective is to be a leading worldwide provider of Internet Protocol-based, business-to-business e-commerce solutions to businesses of all sizes. To accomplish this objective, we offer a full spectrum of products and services, which enable customers to conduct business-to-business e-commerce over Internet Protocol networks. Harbinger's focus is on building, managing and integrating complete electronic trading communities for its customers on a worldwide basis. Harbinger strives to generate recurring revenue by extending the solution it offers to its current customers while

136

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0767

adding new customers, thus increasing revenue-related traffic to the harbinger.net e-commerce center and increasing market awareness and acceptance for Harbinger and its solutions in the marketplace. Harbinger offers its customers the flexibility of purchasing its solution as a licensed application set or on a subscription basis as a network-delivered service via harbinger.net.

MIGRATE CUSTOMERS TO INTERNET PROTOCOL-BASED PRODUCTS AND SERVICES.  Harbinger believes Internet Protocol-enabled products and services amplify its ability to provide enhanced features and improved service levels to its customers. As a result, throughout 1999 Harbinger engaged in a comprehensive marketing effort to migrate its customers to Internet Protocol-based products and services, with a goal of achieving a 50% penetration by year-end. Harbinger is continuing the migration program during 2000 and intends to achieve further penetration by year-end.

PROVIDE A COMPREHENSIVE RANGE OF INTEGRATED PRODUCTS AND SERVICES.  All products and services offered by Harbinger are or are expected to be IP-enabled, and include e-commerce software for use on the full range of commonly used computer platforms and operating systems, along with industry-standard applications such as Web browsers where required. Harbinger designs its products and services to include significant ease-of-use features while providing a high degree of maintainability and supportability across the customer and product life cycles. Customer self-services for problem reporting, trouble shooting, software updates and similar services are available via online connection to the harbinger.net e-commerce center. The software supports standard formats and transactions for e-commerce, including X12, EDIFACT and XML, and is designed to be adaptable to emerging business-to-business e-commerce facilitates such as open buying over the Internet, RosettaNet and BizTalk. While certain software is designed for installation by the customer, more sophisticated e-commerce applications often require delivery and implementation assistance provided by Harbinger's professional services group. Such instances typically include specific customer requirements for data transformation, as well as integration of the resulting data with the customer's business systems including popular enterprise resource planning Harbinger systems. Finally, all the products and services are compatible with the Harbinger's harbinger.net e-commerce center and seeks to drive recurring revenue through subscription and transaction volume.

FOCUS ON BUILDING, MANAGING AND INTEGRATING TRADING COMMUNITIES.  Harbinger seeks to establish new and larger trading communities by (1) developing marketing and technical competence within specific industries by understanding the needs of major trade organizations and leading enterprises in the industry, and the trading customs and practices of their trading partners, (2) working closely with trading partners to define software and information processing requirements, (3) developing trading community solutions that meet the needs of trading partners in these markets, and (4) providing a wide array of value-added, high-quality products and services to facilitate the adoption and implementation of business-to-business e-commerce solutions across these industries.

DEVELOP NEW BUSINESS-TO-BUSINESS TECHNOLOGIES.  Harbinger's research and development organization is continually working to improve the features, performance and serviceability of its going-forward products and services. The group follows the Software Process Handbook and Product Life Cycle Methodology to adhere to the Software Engineering Institute Capability Maturity Model, which measures the quality and stability of software per line of code. The research and development group is currently evaluating an upgrade to its development standards for 2000, such as Rational Unified process, to better standardize its software development around object-oriented programming. Additionally, Harbinger is currently engaged to develop new business-to-business e-commerce products and services through Harbinger Labs, a separate group within its research and development organization. Harbinger Labs is focused on new business-to-business e-commerce technologies for rollout in the 2001 through 2004 timeframe.

PENETRATE WORLDWIDE MARKETS.  Harbinger intends to aggressively pursue worldwide business-to-business e-commerce opportunities in Europe, the Middle East, Africa, and the Asia-Pacific and Latin American theaters. Harbinger has a direct presence in the United States, Canada, Germany,

137

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0768

Italy, Mexico, The Netherlands and the United Kingdom. Harbinger maintains indirect channels through distributors in countries where it does not have a direct presence and complements the Harbinger's direct sales, marketing and support initiatives in these countries.

MAINTAIN OPERATIONAL EXCELLENCE.  Harbinger's value-proposition is based on a business model of operational excellence. This business model enables Harbinger to pursue sustainable competitive advantage through its ability to deliver products and services to customers at the lowest possible cost, with the highest degree of quality and efficiency, backed by expert customer care. Harbinger is implementing total quality management processes across the organization and expects to achieve ISO 9001 certification by year-end 2000. Harbinger strives to make itself the easiest to do business among all business-to-business e-commerce providers.

PURSUE STRATEGIC ACQUISITIONS AND ALLIANCES.  Harbinger intends to enter new vertical markets, penetrate additional geographic markets and expand its business-to-business e-commerce product and service offerings. Harbinger will continue to seek to acquire complementary technologies and businesses opportunistically, when appropriate and supportable. Harbinger has in the past completed acquisitions to address other e-commerce opportunities on the Internet, enter new vertical markets, acquire complementary technologies and further penetrate international markets. Harbinger also actively seeks strategic alliances with leading professional services companies, software application developers and computer system suppliers to resell, distribute and co-market its business-to-business e-commerce products and services.

INVESTMENT DIVISION FOR EMERGING MARKETPLACE.  Harbinger announced in January 2000 that it was forming a new investment division with $25 million allocated to capitalize emerging marketplaces and vertical market exchanges hosted on harbinger.net. Vulcan Ventures, Inc., Paul Allen's venture capital firm and one of Harbinger's largest and longest standing shareholders, also plans to invest side by side with Harbinger as Harbinger builds equity stakes in the emerging Internet startups. The division will be separately staffed, and allow Harbinger to evaluate new opportunities and make investment decisions in a highly competitive and rapidly changing market environment.

CAPABILITIES

Harbinger offers a comprehensive range of e-commerce products and services for entire trading communities. Harbinger's offerings are divided into three categories: e-commerce software, telecommunications and services. The following chart summarizes these categories and provides the functions and computer operating systems (where applicable) for the offerings.

138

Exhibit H
0769

| NAME | DESCRIPTION |
| --- | --- |
| **E-COMMERCE CENTER, TRUSTED INTERMEDIARY** | |
| HARBINGER.NET | Transaction portal and support center for businesses to conduct e-commerce with suppliers, distributors and customers, regardless of their data and communications requirements. Includes hosted Application Services for Harbinger software and provides service point for hosted marketplaces and vertical market exchanges. Offers online customer care and e-commerce content and information for industry professionals. |
| **CATALOG DATA MANAGEMENT** | |
| HARBINGER KNOWBILITY | Software tools and services for buyers and suppliers to build and maintain electronic procurement catalogs with fully rationalized data elements for fast search and retrieval by popular catalog engines. |

| NAME | FUNCTION | COMPUTER OPERATING SYSTEMS |
| --- | --- | --- |
| **E-COMMERCE APPLICATION SERVICES AND SOFTWARE** | | |
| APPLICATION SERVICE PROVIDER | Subscription-based access and usage of Harbinger software and transaction services hosted on harbinger.net. | |
| MARKETPLACES AND VERTICAL MARKET EXCHANGES | Advanced Internet Protocol gateway technology and back-office e-commerce infrastructure for managing and operating electronic marketplaces and vertical market exchanges. | Windows NT, UNIX |
| HARBINGER EXPRESS | Web-based e-commerce software for creating and exchanging e-commerce transactions (XML, X12, EDIFACT) using a Web browser or an optional thick-client desktop application. | Windows 95, Windows 98, Windows 2000, Windows NT |
| HARBINGER TRUSTEDLINK | Data transformation and integration software for creating and exchanging e-commerce transactions (XML, X12, EDIFACT) | Windows 95, Windows 98, Windows 2000, Windows NT, UNIX, OS/400, MVS |
| HARBINGER TEMPLAR | Data encryption and communications software for highly secure exchange of e-commerce transactions via e-mail over the Internet Protocol networks | Windows 95, Windows 98, Windows 2000, Windows NT, UNIX |
| HARBINGER PRIME FACTORS | Data encryption software for multiple platforms and applications, including ANSI X12.58 and X12.42 standards, generalized file security, ANSI X9.9 and ATM sharing credit and debit networks. | Windows 95, Windows 98, Windows 2000, Windows NT, UNIX, OS/400, MVS, O/S390 |

139

Exhibit H
0770

| NAME | FUNCTION | COMPUTER OPERATING SYSTEMS |
| --- | --- | --- |

**E-COMMERCE SERVICES**

| HARBINGER BUSINESS COMMUNITY INTEGRATION | Outsourcing services for building, managing and integrating complete electronic trading communities with suppliers, distributors and customers. Includes complete marketing programs, information seminars, support materials, telemarketing, trading format creation and distribution, software and services delivery, installation assistance, testing and certification of e-commerce software and telecommunications with trading partners. | |
| HARBINGER OPERATIONS MANAGEMENT | Outsourcing services for operating Harbinger software applications hosted on customer's servers. Includes onsite or remote operation, administration and support of customer's e-commerce systems and resources. | |
| PROFESSIONAL SERVICES | Consulting, project management, installation, integration and ongoing services for Harbinger software applications. | |
| E-COMMERCE PROJECT SERVICES | Development and implementation of e-commerce solutions leveraging Harbinger's application services and software. | |
| TRAINING | Classroom, on-site and Internet-based training classes in the use and operations of Harbinger software applications. | |
| CUSTOMER SUPPORT | Online customer self-service and telephone hotline support in the use and operations of Harbinger software applications, documentation and network services. Includes electronic software updates. | |

**E-COMMERCE CENTER**

HARBINGER.NET. harbinger.net is an Internet Protocol-based portal for application-to-application e-commerce. harbinger.net serves as a clearinghouse for e-commerce information and as a gateway for e-commerce transactions, noting that these transactions will increasingly flow through real-time, universal and persistently connected networks. harbinger.net also serves as an Application Service Provider network, hosting Harbinger e-commerce applications and electronic procurement catalogs, which are accessed and used by customers on a subscription basis. Similarly, harbinger.net also hosts marketplaces and vertical market exchanges sponsored by leading business entities, sometimes in joint venture relationships with Harbinger. Harbinger believes that its business-to-business e-commerce network service offering is one of the largest in the United States as measured by the number of billable subscribers. To manage and facilitate these types of connections, harbinger.net provides a set of features and functions that cover a broad range of e-commerce services. The harbinger.net e-commerce center supports real-time transactions, open network and application interfaces, online customer self-service facilities and e-commerce content for industry professionals. The features, services and capabilities of harbinger.net fall into three general categories: Transaction Services; Customer Services, and Content Services.

PORTAL TRANSACTION SERVICES

- Applications Services--Harbinger software applications hosted and available on a subscription basis.

- Catalog Data Management--harbinger.net will enable the aggregation and rationalization of catalog content for business-to-business e-commerce. Tools and services that allow businesses to submit, review and modify catalog data and then control the release of e-catalogs to customers.

140

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0771

These services are facilitated via harbinger.net through the use of browser utilities and FTP technologies.

- Marketplaces and Vertical Market Exchanges--comprehensive marketplaces and vertical market exchanges hosted on harbinger.net. Includes complete back-office infrastructure for customer initiation, support, billing, etc.

- Internet Storefronts--hosting environment for Internet storefronts.

- Transport Services--harbinger.net provides several mechanisms enabling businesses, trading communities, Internet servicers providers, system integrators, hosting services and others to transmit and receive e-commerce transactions.

- Connectivity--harbinger.net provides connectivity, data communications protocols and transport applications to move transactions through the portal and on to their destination. The primary protocol suite is oriented around Internet Protocol technologies which includes HTTP, SMTP, and FTP. Although many services of harbinger.net require Internet Protocol technologies, other protocols and transports are available, including: Async, Bisync, SNA, X.400 and OFTP.

- Interconnections--interconnections ·to other networks to ensure that transactions are able to flow through the portal and reach their final destination, such as public value added networks such as Harbinger, Sterling, GEIS, IBM and others, private value added networks, and X.400 Networks.

- Value-Added Processing--transactions traversing harbinger.net can be diverted for value-added processing. Some examples of value-added processing are: translation from one e-commerce standard to another; reformatting; standards compliance checking; event triggers based on various criteria; carbon copy to duplicate and forward transactions to additional mailboxes; and redirection of transactions.

- Mailboxing Services--for trading partners who are not immediately accessible for instance if they do not have persistent connection to the network or the connection is down. Unconnected trading partners can access their mailboxes at a later time to pickup their transactions.

- Security--several security and encryption mechanisms are supported for harbinger.net transactions, including secure socket layer and S/MIME.

- Web E-Commerce (Harbinger Express)--harbinger.net provides a Web transaction portal supporting all levels of browser-side applications.

- Transformation and Integration Service--allows businesses to send transactions through the portal in any format and rely on harbinger.net to ensure that the transactions are transformed into the appropriate data format required by trading partners.

- Archiving and Restoral--a standard feature of harbinger.net is the storage and archiving of transactions.

- Communities of Interest --harbinger.net hosts and serves as an intermediary for e-commerce communities of interest. It also serves as a navigation portal for communities of interest that have e-commerce functionality.

PORTAL CUSTOMER SERVICES

- Internet Customer Support System--browser submission, review and modification of trouble tickets and a direct link into the harbinger.net call support system.

141

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0772

- Network Inspector--harbinger.net's transaction tracking system which includes a flexible, powerful browser interface to enable tracing of every transaction, with exact times and checkpoints for each stage of processing and transport.

- Customer Services--harbinger.net also provides the customer services for customer alarm/alert notification, transaction recovery, restoral, retransmission, error viewing and correction, billing review, registration, and electronic software distribution.

Portal Content Services

- E-Commerce Content--harbinger.net also serves as a portal for information and resources associated with e-commerce, including XML, ANSI X12, UN/EDIFACT, OBI, eCo, ANX, news and events associated with e-business, links to associations, organizations, standards bodies, consortiums, vendors, system integrators, consultants, forums and discussion groups, case studies and an e-commerce glossary.

- Commerce Directory Services--the e-commerce directory component of harbinger.net is an open directory of businesses trading electronically.

- my.harbinger--e-commerce managers and specialists can personalize their access and use of harbinger.net to ensure that the content and transactions that are most relevant to their business needs are immediately available to them.

- Trading Rules Repository--harbinger.net serves as a leading repository of trading rules associated with individual businesses and e-commerce data standards, including emerging data standards such as XML.

CATALOG DATA MANAGEMENT

   HARBINGER KNOWBILITY.  Harbinger Knowbility is a comprehensive suite of software tools for buyers and suppliers to create, load, manage and maintain electronic procurement catalogs. Rationalizing data from existing paper catalogs and electronic repositories to create electronic procurement catalogs is often the number one challenge faced by companies trying to establish an online purchasing system. The Knowbility suite produces fully rationalized data elements for fast search and accurate retrieval by popular catalog search engines. Electronic procurement catalogs data and technology have been applied in both supply chain management initiatives for production goods and services, and maintenance, repair and operating supplies for non-production goods and services. Additionally, Harbinger offers complete outsourcing services for electronic procurement catalogs development and maintenance, application service for hosting of electronic procurement catalogs on harbinger.net.

APPLICATION SERVICES AND SOFTWARE

   HARBINGER APPLICATION SERVICES.  Harbinger Application Services provides businesses of all sizes subscription-based access and usage of Harbinger e-commerce software, which is hosted for them on the harbinger.net e-commerce center. In a market experiencing rapid advancement and change, many businesses are opting to rent, rather than permanently license, software applications, thus conserving capital for other strategic initiatives. Harbinger application services can be tailored to the specific needs of each business including any combination of software usage, transaction exchange and support services across the complete range of Harbinger e-commerce software and electronic procurement catalog tools.

142

Exhibit H
0773

HARBINGER MARKETPLACES AND VERTICAL MARKET EXCHANGES. Harbinger Marketplaces and Vertical Market Exchanges are powered by Harbinger's advanced Internet Protocol gateway technologies for rapidly creating, deploying, managing and operating electronic marketplaces, which conform to the enterprise-centric, consortium and open market trading models in today's environment for business-to-business e-commerce. Deploying a full-service, real-time, end-to-end electronic marketplace requires more than a Web site. Harbinger's one-to-many and many-to-many online exchanges may be operated on the sponsor's servers or hosted on harbinger.net under Harbinger's application service provider program, and can be configured with complete front- and back-office e-commerce infrastructures to manage the entire customer life cycle from recruitment to registration, to on-going transaction exchange and billing.

HARBINGER EXPRESS. Harbinger Express is a Web-enabled application that allows a business on one end of an e-commerce transaction to exchange transactions with their trading partner using only an Internet connection and standard Web browser. Frequently small and mid-size enterprises that have been reluctant to implement full-scale e-commerce systems within their businesses use the Express application. Larger enterprises wanting to expand their trading communities with small and mid-size enterprise trading partners often sponsor Express applications as well. Express automatically translates e-commerce transactions to and from hypertext markup language so that trading partners using a Web browser on one end of an exchange receive e-commerce transactions as Web pages, while more sophisticated trading partners on the other end of an exchange receive e-commerce transactions in their preferred format, such as XML, X12, or EDIFACT. For more complex business requirements, the small and mid-size enterprises can use an optional Windows client application, which supports offline document processing and application integration.

HARBINGER TRUSTEDLINK. Harbinger TrustedLink is a family of data transformation and integration software that permits the rapid creation and exchange of e-commerce transactions across a comprehensive range of e-commerce standards such as XML, X12 and EDIFACT. Businesses of all sizes engaged in full-scale e-commerce programs use the TrustedLink product family. TrustedLink facilitates the creation and control of business transactions, such as purchase orders and invoices, and provides data integration and messaging functions for directly interacting with a company's internal business systems, including popular enterprise resource planning systems.

The Windows version of TrustedLink is the leading business-to-business e-commerce software product for the desktop computer market. The OS/400 version of TrustedLink is the leading business-to-business e-commerce software product for the mid-range computer market, operating on the IBM AS/400 computer. The AS/400 is the leading mid-range platform installed worldwide for use as either the main computer for a small or mid-sized business or as a departmental or dedicated processor in a larger business.

HARBINGER INSTANT NET PRESENCE. Harbinger Instant Net Presence allows a company to establish an Internet storefront for their business including a professional Web site and online catalog and ordering suite. The software is designed for SMEs typically implementing their first e-commerce sites and requires no programming skills. Users create their Internet storefront by entering information to the software following an interview format. The storefront can be previewed locally on the desktop using the embedded Microsoft Internet Explorer software, and published for use on the Internet via Harbinger's application services provider program hosted on harginger.net.

HARBINGER TEMPLAR. Harbinger Templar is an open, standards-based solution for enabling secure transmission of digitally designed electronic documents, including XML, X12 and EDIFACT documents, over the Internet and other Internet Protocol networks. Templar supplies security for message transmissions by utilizing public key cryptography techniques licensed from RSA Data Security, Inc. and by implementing security and confidentiality features at the software application level. Templar generates a digital signature for each outbound message that verifies the identity of the

143

sender and automatically detects any alteration of the message upon receipt. Templar automatically tracks message traffic and message integrity and authenticity and provides user-configurable management reports. Templar also maintains transmission records for audit trails. Harbinger markets an exportable version of Templar in compliance with current U.S. export control laws and regulations applicable to encryption technology. Harbinger Templar is protected under U.S. patent.

HARBINGER PRIME FACTORS. Harbinger Prime Factors enables banks and other businesses to secure financial and other information transmitted over internal and external networks. Customers include money center banks, large corporations and government agencies interested in securing data transmitted internally and externally. Prime Factors products operate on computer platforms such as desktop PCs, mid-range UNIX and AS/400, DEC and Tandem machines to MVS mainframes.

E-COMMERCE SERVICES

HARBINGER BUSINESS COMMUNITY INTEGRATION. Harbinger business community integration offers outsourcing services for building, managing and integrating complete electronic trading communities with suppliers, distributors and customers. Many companies do not want the burden of finding new trading partners, integrating them into existing e-commerce program, or managing the ongoing electronic relationships across all trading partners. Business Community Integration is a tailored service to meet the specific trading community needs of each business. The program includes full-service capabilities for implementation and execution of marketing programs, information seminars, support materials, telemarketing, trading format creation and distribution, software and services delivery, installation assistance, testing and certification of e-commerce software and telecommunications with all trading partners.

HARBINGER OPERATIONS MANAGEMENT (OUTSOURCING). Harbinger Operations Management provides outsourcing services for the operation of Harbinger software applications hosted on customers' servers. Many companies want to conserve in-house information technology resources for strategic initiatives other than e-commerce, opting to rely on outside expert services for the operation and maintenance of their e-commerce infrastructure. Operations Management is a tailored service to meet the specific e-commerce operational needs of each customer. Harbinger staff provides outsourcing services either onsite or remotely.

PROFESSIONAL SERVICES. Harbinger Professional Services is staffed by technical consultants providing project management, installation, integration and ongoing services for Harbinger software applications and e-commerce implementations. This is particularly important for the many companies today that are building end-to-end e-commerce infrastructures, which include application-to-application interfaces between their internal business systems and those of their trading partners. These integrated trading relationships require e-commerce software to be tightly coupled with internal business systems, including enterprise resource planning systems, and communicate in real-time via the Internet or near real-time via private networks and value-added networks. Harbinger Professional Services specializes in the delivery and implementation of Harbinger software within complex trading environments.

E-COMMERCE PROJECT SERVICES. Harbinger E-Commerce Project Services specializes in the development and implementation of e-commerce solutions that leverage Harbinger applications and services.

EDUCATION. Harbinger Education provides classroom, on-site and Internet-based training classes in the use and operations of harbinger software applications.

CUSTOMER SERVICE. Harbinger Customer Service provides extensive customer care and ongoing support facilities related to the use and operation of Harbinger software applications, network services and the business processes associated with e-commerce. Customers can tailor their support program to

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0775

include annual maintenance with software updates and product enhancements, along with any combination of no-charge and fee-based services. Harbinger operates multiple hotline "help desks" across North America, Europe and Mexico. Harbinger provides 24 hours a day, seven days a week customer self-services for problem reporting, trouble shooting, software upgrades and downloads are available via online connection to the harbinger.net e-commerce center.

SALES AND MARKETING

Harbinger's principal marketing strategy focuses on establishing complete electronic trading communities and expanding the number of trading partners using Harbinger software and the harbinger.net e-commerce center. Harbinger targets trading communities composed of trading partners in common industries or markets conducting recurring business transactions. To achieve this objective, Harbinger has developed a sales and distribution function that includes direct and indirect channels to promote the implementation of business-to-business e-commerce within trading communities primarily conforming to the enterprise-centric trading model and secondarily to the consortium and open market trading models. Within its direct selling operations, Harbinger utilizes a solutions selling approach to address the needs of its customers and prospective customers.

DIRECT.  Harbinger has direct selling operations based in North America, Europe and Mexico. Applying the best practices associated with solutions selling, Harbinger's direct sales organization seeks to have customers license or subscribe to under an application service provider program its software and sell network and e-commerce services to businesses of all sizes that address the needs and requirements of those businesses e-commerce objectives. As of March 1, 2000, Harbinger employed approximately 250 sales and marketing personnel. Harbinger's compensation strategies are designed to reward sales personnel based upon sales to new customers and the sale of additional products and services to existing customers.

INDIRECT.  Harbinger seeks to complement its direct selling operations through referral partners and distributors, and relies on distributors in the Latin American and Asia-Pacific theaters. Through various alliance programs, Harbinger has established relationships with referral partners, distributors, application software developers, systems integrators and value-added resellers of computer products. Harbinger's objective is to integrate Harbinger's products with those of its business partners and to promote distribution of Harbinger software along with products and services sold by its marketing partners. Harbinger fosters relationships with software vendors who bundle or imbed Harbinger's products with their own products, or which resell Harbinger's products in particular trading communities. Distributors typically sublicense Harbinger's software to end-user customers and pay Harbinger a royalty, while co-marketers typically forward leads to Harbinger in exchange for a percentage referral fee if the sale is completed. Harbinger has relationships with partners such as AT&T, Ariba, Baan, Clarus, Computer Associates, Computer Generated Solutions, Concur, daly.commerce, Data General, Deloitte Consulting, Entrust Technologies, Ernst & Young, Hewlett-Packard, IBM, Intentia, JBA, J.D. Edwards, MAPICS, Marcam, Microsoft, OnDisplay, Optika, Oracle, Peachtree Software, PeopleSoft, PricewaterhouseCoopers, PurchaseSoft, RightWorks, SAP, Sprint, Sun-Netscape Alliance, Sybase, Syntegra Unisys, UUNET Technologies and WebVan for distribution of its products worldwide.

PRODUCT DEVELOPMENT

Harbinger continues to assess the needs of businesses in various trading communities and to develop software programs and network services, which facilitate business-to-business e-commerce transactions via the harbinger.net e-commerce center, or directly over standard telephone lines. Harbinger's product development efforts currently are focused on providing a full range of business-to-business e-commerce solutions to Harbinger customers and prospective customers. In addition,

145

Exhibit H
0776

Harbinger has incorporated into its products certain software licensed to it by other software developers, where appropriate, to reduce product development time.

COMPETITION

The business-to-business e-commerce services and computer software markets are highly competitive. Numerous companies supply business-to-business e-commerce network services, and several competitors target specific vertical markets such as the pharmaceutical, agri-business, retail and transportation industries. Additional competitors provide software designed to facilitate e-commerce transactions and electronic procurement catalog systems and services. Several of Harbinger's most significant competitors provide network services and related software products and services. Harbinger believes that many of its competitors have significantly greater financial and personnel resources than Harbinger, due in part either to their revenue and profitability, or market capitalization.

The market for Internet business-to-business e-commerce software and services is also highly competitive, ranging from small companies with limited resources to large companies with substantially greater financial and marketing resources than Harbinger. Harbinger believes that existing competitors are likely to expand the range of their e-commerce services to include Internet-based capabilities, and that new competitors, which may include telephone companies and media companies, are likely to increasingly offer services which utilize the Internet to provide business-to-business e-commerce services. Additionally, several competitive network service providers allow their subscribers access to the Internet, and several major software and telecommunications companies have Internet access services.

Harbinger believes the principal competitive factors in the commercial business-to-business e-commerce industry include responsiveness to customer needs, efficiency in the delivery of solutions, ease of product use, quality of service, price and value. Harbinger believes it competes favorably with regard to these factors.

INTELLECTUAL PROPERTY RIGHTS

In accordance with industry practice, Harbinger relies primarily on a combination of copyright, patent and trademark laws, trade secrets, confidentiality procedures and contractual provisions to protect its proprietary rights. Harbinger seeks to protect its software, documentation and other written materials principally under trade secret and copyright laws, which afford only limited protection. Harbinger presently has one U.S. patent for an electronic document interchange test facility, one U.S. patent for technology utilized in Harbinger's EDI/Open product and one U.S. patent for an EDI communication system and for technology utilized in Harbinger's Templar product. Harbinger routinely enters into non-disclosure and confidentiality agreements with employees, vendors, contractors, consultants and customers. Despite Harbinger's efforts to protect its proprietary rights, unauthorized parties may attempt to copy aspects of Harbinger's products or to obtain and use information that Harbinger regards as proprietary. There can be no assurance that Harbinger's means of protecting its proprietary rights will be adequate or that competitors will not independently develop similar technology. The laws of certain foreign countries in which Harbinger's products are or may be developed, manufactured, licensed or distributed may not protect Harbinger's products or intellectual property rights to the same extent as do the laws of the United States and thus make the possibility of piracy of Harbinger's technology and products more likely. Harbinger believes that, due to the rapid pace of innovation within the electronic commerce, electronic data interchange and related software industries, factors such as the technological and creative skills of its personnel are more important in establishing and maintaining a leadership position within the industry than are the various legal protections of its technology.

Harbinger does not believe that any of its products infringe the proprietary rights of third parties. There can be no assurance, however, that third parties will not claim infringement by Harbinger with

146

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0777

respect to current or future products. From time to time, Harbinger has received notices which allege, directly or indirectly, that Harbinger's products or other intellectual property rights infringe the rights of others. Harbinger generally has been able to address these allegations without material cost to Harbinger. There can be no assurance, however, that the cost to Harbinger of addressing these allegations will not increase in the future. Harbinger expects that software product developers will increasingly be subject to infringement claims as the number of products and competitors in electronic commerce grows and the functionality of products in different industry segments overlaps. Any such claims, with or without merit, could be time-consuming, result in costly litigation, cause product shipment delays or require Harbinger to enter into royalty or licensing agreements. Such royalty or licensing agreements, if required, may not be available on terms acceptable to Harbinger or at all, which could have a material adverse effect on Harbinger.

In its distribution agreements and certain of its customer or other agreements, Harbinger agrees to indemnify certain parties, which may include customers of parties with which Harbinger has contracted, for any expenses or liabilities resulting from claimed infringements of patents, trademarks or copyrights or certain other intellectual property rights of third parties. In the event of litigation to determine the validity of any third-party claims, such litigation, whether or not determined in favor of Harbinger, could result in significant expense to Harbinger and divert the efforts of Harbinger's technical and management personnel from productive tasks. In the event of an adverse ruling in such litigation, Harbinger might be required to pay money damages, to discontinue the use and sale of infringing products, to expend significant resources to develop non-infringing technology or obtain licenses from third parties. There can be no assurance that licenses from third parties would be available on reasonable commercial terms, if at all. In the event of a successful claim against Harbinger and the failure of Harbinger to develop or license a substitute technology, Harbinger's business and operations results would be materially adversely affected.

THIRD PARTY TECHNOLOGY. Harbinger incorporates in its products software licensed to it by other software developers. These include the public key cryptography software licensed by RSA Data Security, Inc. to Premenos which is used in connection with Templar as well as database software used in the Templar and EDI/Open products and graphical interface software used in EDI products and Templar.

Premenos licensed the public key encryption technology pursuant to a license agreement with RSA, which was transferred to Harbinger in connection with the acquisition of Premenos. The RSA license grants to Harbinger the non-exclusive, non-transferable, non-assignable limited license to incorporate certain functionality within RSA's public key encryption technology into a Premenos product solely to create a bundled product, as defined in the RSA license, to reproduce and sublicense the bundled product, and to use or authorize end-users to use the bundled product in conjunction with a service bureau or internal network or to provide electronic communications, messaging and similar services to third parties. A bundled product is defined as a Harbinger product that represents a significant functional and value enhancement to the RSA technology designed to facilitate the secure exchange of electronic information such as EDI documents over open networks. The RSA license contains a number of restrictions regarding sublicensing of the bundled product to act as a certification authority, as well as other restrictions regarding end-user use, territory and distribution channels. Harbinger is prohibited from selling the bundled product or any product with comparable functionality which does not incorporate the RSA encryption technology, except in certain circumstances, in which event Harbinger is required to pay the otherwise applicable royalty fee to RSA.

Harbinger also incorporates database software licensed from Sybase, Inc. into its Templar and some versions of its EDI/Open products, and incorporates graphical software licensed from third parties into the EDI products and Templar. Although Harbinger seeks and generally receives assurances from third-party software vendors as to the third party's intellectual property rights and the non-infringement by the software of other parties' rights, Harbinger's right to use the software could be

147

Exhibit H
0778

impaired by third party claims. In addition, certain agreements pursuant to which Harbinger uses this software may be terminated in accordance with their terms in certain circumstances.

If Harbinger were deprived of the right to use software incorporated in its products for any reason, there could be serious disruption to its business.

EMPLOYEES

As of March 8, 2000, Harbinger had 1,003 full-time employees of which 309 are technical personnel engaged in maintaining or developing our products or performing related services, 200 are marketing and sales personnel, 314 are customer support and operations personnel, and 180 are involved in administration and finance.

GOVERNMENTAL REGULATIONS AND INDUSTRY STANDARDS

GOVERNMENT REGULATORY AND INDUSTRIAL POLICY RISKS.  Harbinger's network services are transmitted to its customers over dedicated and public communications lines. These transmissions are governed by legislative and regulatory policies establishing charges, terms and conditions affecting communications. Changes in the legislative and regulatory environment relating to online services, EDI or the Internet access industry, including regulatory or legislative changes that directly or indirectly affect telecommunication costs or increase the likelihood of competition from regional telephone companies or others, could have an adverse effect on Harbinger's business. The Telecommunications Act of 1996 amended the federal telecommunications laws by relaxing restrictions on regional telephone companies and others competing with Harbinger. The Telecommunications Act set in motion certain events that will lead to the elimination of restrictions on regional telephone companies providing transport between defined geographic boundaries associated with the provision of their own information services. This will enable regional telephone companies to more readily compete with Harbinger by packaging information service offerings with other services and providing them on a wider geographic scale. While some legislative efforts to govern communications, especially over the Internet, have been held by the U.S. Supreme Court to be unconstitutional, there can be no assurance that future legislative or regulatory efforts to limit use of the Internet in a manner harmful to Harbinger will not be successful. The Clinton Administration has announced an initiative to establish a framework for global electronic commerce. The Children's Online Privacy Protection Act became effective April 21, 2000, and this and future governmental privacy initiatives may affect Harbinger's provision of services. Also, some countries, such as Germany, have adopted laws regulating aspects of the Internet, and there are a number of bills recently adopted or currently being considered in the United States at the federal and state levels involving electronic transactions, encryption and digital signatures, all of which may impact Harbinger. Harbinger cannot predict the impact, if any, that these laws and future court opinions, legislation, regulations or regulatory changes in the United States or other countries may have on its business. Management believes that Harbinger is in compliance with all material applicable regulations. The Harbinger IVAS product and the Harbinger Templar product both incorporate encryption technology which is subject to U.S. export control regulations. Although both products are currently exportable under licenses granted by the Commerce Department, government regulation in this area is subject to frequent change and there can be no assurance that these products will remain exportable.

PROPERTIES

Harbinger occupies 99,560 square feet of office space in Atlanta, Georgia under a lease expiring in 2008, plus options to extend the lease term. This location serves as Harbinger's headquarters and data center. Harbinger also has offices in Michigan, Texas, California, South Carolina, Oregon and Oklahoma, occupying 39,800; 26,000; 73,615; 21,789; 2,100; and 14,700 square feet, respectively. In addition, Harbinger also has offices in The Netherlands, Germany, the United Kingdom, Italy and

148

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0779

Mexico occupying 1,600; 14,546; 7,600; 2,228 and 1,614 square feet, respectively. Harbinger's offices are generally located in suburban office park environments.

LEGAL PROCEEDINGS

   Harbinger is involved from time to time in various legal proceedings incidental to the conduct of its business. In addition, on September 13, 1999, Harbinger and three of its current or former officers and directors, C. Tycho Howle, David Leach and Joel G. Katz, were named in a purported class action lawsuit alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The complaint alleged that during a class period running from February 4, 1998 through October 1, 1998 defendants made materially false and misleading statements, and failed to disclose material facts regarding Harbinger's business condition, future prospects and integration of acquisitions. According to the complaint, these purported misrepresentations and omissions artificially inflated the price of Harbinger's common stock throughout the class period and resulted in substantial losses by members of the purported class. On January 13, 2000, the court entered an order appointing lead plaintiffs and lead plaintiffs' counsel. On March 6, 2000, plaintiffs filed an amended complaint reiterating and expanding upon the basic claims asserted in the original complaint by, among other things, adding allegations regarding Harbinger's accounting practices. Plaintiffs seek certification of the case as a class action, a declaration that defendants violated the federal securities laws, unspecified money damages according to proof, interest, attorneys' fees and costs. Harbinger believes all claims asserted in the action are without merit, and intends to defend the case vigorously.

149

Exhibit H
0780

### SELECTED FINANCIAL DATA OF HARBINGER

The selected financial data of Harbinger set forth below as of December 31, 1995, 1996, 1997, 1998 and 1999 are derived from financial statements of Harbinger audited by KPMG LLP, independent public accountants, which are included elsewhere in this prospectus. The data should be read in conjunction with the Financial Statements and the Notes thereto and with Management's Discussion and Analysis of Financial Condition and Results of Operations appearing elsewhere in this prospectus.

STATEMENTS OF OPERATIONS DATA

| | YEARS ENDED DECEMBER 31, | | | | |
|---|---|---|---|---|---|
| | 1999 | 1998 | 1997 | 1996 | 1995 |
| | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | | |
| Revenues | $155,514 | $135,151 | $118,221 | $ 89,245 | $60,077 |
| Direct costs | $ 50,997 | $ 38,217 | $ 30,510 | $ 23,112 | $14,994 |
| Gross margin | $104,517 | $ 96,934 | $ 87,711 | $ 66,133 | $45,083 |
| Operating income (loss) | $ 12,630 | $(12,652) | $(22,705) | $(10,667) | $ 1,314 |
| Net income (loss) applicable to common Shareholders | $ 16,560 | $(14,712) | $(39,047) | $(16,091) | $ (445) |
| Diluted net income (loss) per share of common stock | $ 0.41 | $ (0.35) | $ (1.02) | $ (0.46) | $ (0.02) |
| Weighted average number of common shares outstanding | 40,739 | 41,557 | 38,162 | 35,080 | 28,573 |

SUPPLEMENTAL INFORMATION STATEMENTS OF
OPERATIONS DATA AS ORIGINALLY REPORTED
(EXCLUDING ACQUISITIONS ACCOUNTED FOR UNDER THE
POOLING-OF-INTERESTS METHOD OF ACCOUNTING)

| | YEARS ENDED DECEMBER 31, | | | | |
|---|---|---|---|---|---|
| | 1999 | 1998 | 1997 | 1996 | 1995 |
| | (IN THOUSANDS EXCEPT PER SHARE DATA) | | | | |
| Revenues(1) | $155,514 | $135,151 | $90,415 | $38,236 | $19,846 |
| Operating income(1) | $ 14,176 | $ 20,138 | $18,791 | $ 7,619 | $ 2,807 |
| Net income applicable to common shareholders(2) | $ 10,762 | $ 13,396 | $12,647 | $ 4,672 | $ 1,363 |
| Diluted net income per share(2) | $ 0.26 | $ 0.36 | $ 0.31 | $ 0.18 | $ 0.07 |

| | AS OF DECEMBER 31, | | | | |
|---|---|---|---|---|---|
| | 1999 | 1998 | 1997 | 1996 | 1995 |
| | (IN THOUSANDS) | | | | |
| Working capital | $ 79,234 | $ 79,303 | $ 94,307 | $ 60,392 | $ 73,167 |
| Total assets | $169,459 | $178,369 | $183,559 | $131,199 | $125,867 |
| Long-term obligations, redeemable preferred stock and puttable common stock | $ -- | $ -- | $ -- | $ 1,608 | $ 7,116 |
| Shareholders' equity | $124,774 | $120,019 | $130,018 | $ 94,118 | $ 93,196 |

--------------------------

(1) The results of operations of Premenos, a pooling-of-interests, are excluded
    from all periods prior to the merger in 4Q97. The results of operations of
    STI, a pooling-of-interests, are excluded from all periods prior to the
    merger in 1Q97. Excludes $27.0 million, $40.6 million and $8.8 million of
    pre-tax charges for 1998, 1997 and 1996, respectively, for purchased
    in-process product development, write-off of software development costs,
    restructuring, acquisition-related and other charges. Excludes $1.5 million

Exhibit H
0781

and $5.8 million in net general and administrative charges for 1999 and 1998 principally related to provisions for doubtful accounts.

(2) Excludes all charges per note * above. In addition, excludes $80,000, $7.0 million and $954,000 for 1999, 1996 and 1995, respectively, of equity in losses of joint ventures. Also excludes $2.4 million loss on extinguishment of debt in 1997. Excludes operating losses of all discontinued operations and income and losses on disposals of discontinued operations totaling $1.4 million, $6.2 million and $14.4 million in 1999, 1998 and 1997, respectively. The resulting net income applicable to common shareholders is tax effected at 39%.

150

Exhibit H
0782

HARBINGER MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS

You should read the following discussion and analysis in conjunction with the consolidated financial statements and related notes included elsewhere in this filing. Except for historical information, the discussion in this filing contains certain forward-looking statements that involve risks and uncertainties. The principal factors that could cause or contribute to differences in our actual results are discussed in the section titled "Risk Factors."

OVERVIEW

Harbinger Corporation generates revenues from e-commerce enablement services and from licensing software that facilitates the exchange of electronic data between businesses. Revenues for enablement services principally include transaction fees on harbinger.net, Harbinger's e-commerce portal; subscription fees for access to applications hosted on harbinger.net as an application service provider; software maintenance; and professional service fees for operations management outsourcing, business community integration, training, consulting and project management. Transaction and subscription fees are a combination of access and usage charges and are recognized as incurred each month. Software maintenance is billed in advance with revenue deferred and recognized ratably over the one-year service period. Revenues for professional services are based on actual services rendered and are recognized as the services are performed. License fees for software are generally recognized upon shipment, net of estimated returns. Software revenues also include royalties due Harbinger under distribution agreements with third parties which are recognized either on shipment of software to a distributor, or upon sales to end users by a distributor, depending on the terms of the distribution agreement.

Harbinger also analyzes its mix of revenues in terms of the recurring versus nonrecurring nature of the revenue streams. Harbinger includes revenues from ongoing software maintenance and transactions on harbinger.net, together with operations management and certain application service provider services in its definition of recurring revenues. Recurring revenues are recognized ratably over the contract period as services are provided or may be billed and recognized on monthly subscription terms generally over a two- to three-year period. Harbinger defines nonrecurring revenues to include one-time professional service enablement contracts, typically for consulting, project management or implementation services, and software licenses.

Harbinger seeks to maximize its recurring revenue streams in order to: 1) promote customer retention, 2) provide increased visibility into long-term revenue and cash flow generating capabilities, and 3) decrease the revenue and cash flow risk associated with singular professional service and software license contracts. Accordingly, in 1999 Harbinger increased its sales and marketing efforts in its recurring revenue programs. Harbinger also seeks to maximize the use of the public Internet as a means of conducting business-to-business e-commerce. Since 1994, Harbinger has invested in enabling its products and services to the Internet and is actively encouraging its current customer base to migrate to Internet-capable technologies.

STOCK REPURCHASE PROGRAM

On April 2, 1999 Harbinger's board of directors approved the purchase of 10% of Harbinger's outstanding common stock over the next 12 months. As of December 31, 1999 Harbinger had repurchased 4,323,050 shares of common stock at an aggregate cost of $25.0 million.

ACQUISITIONS AND INVESTMENTS

Harbinger acquired two companies in 1998 through a combination of $3.5 million in cash and the issuance of 199,497 shares of its common stock. Harbinger completed six acquisitions in 1997 through a

151

Exhibit H
0783

combination of cash totaling $15.1 million, the issuance of 12,514,000 shares of Harbinger's common stock and the issuance of 533,000 stock options. The acquisitions completed during 1998 and 1997 are described in note 2 to Harbinger's accompanying financial statements.

In conjunction with these acquisitions Harbinger assigned personnel to facilitate the integration of the acquired companies into Harbinger's operations. As a result, certain payroll and associated costs or integration activity costs directly related to integration activities are reflected as restructuring and acquisition-related charges within the line titled, "Charge for purchased in-process product development, write-off of software development costs, restructuring, acquisition-related and other charges" in the consolidated statements of operations for 1998 and 1997. These costs and their impact on year-over-year comparisons are more fully explained in note 2 to the consolidated financial statements and the following "Results of Operations."

During 1999 Harbinger became a one-third owner of GLINK, LLC, a joint venture established to develop an electronic marketplace for the grocery industry. Harbinger accounts for its ownership in GLINK using the equity method of accounting, which requires Harbinger to record its share of income and losses of GLINK to the consolidated statements of operations under "Equity in losses of joint ventures" in the period they occur.

In the fourth quarter of 1999 Harbinger announced a substantial increase in its investment in advertising, public relations, sales and technology in order to enhance the awareness of its position as a supplier of e-commerce enablement solutions in an expanding marketplace for business-to-business e-commerce. The investments totaled approximately $3 million in the fourth quarter of 1999, and are estimated to be about $25 million in 2000.

In the first quarter of 2000 Harbinger invested $5.0 million in two privately-held ventures, informally committed to an equity position in a third privately-held venture and recorded software and services revenues totaling $4.6 million from these three transactions, fundamentally exchanging Harbinger's technologies and services for equity positions in the ventures. These revenues excluded $749,000 of revenues and deferred revenues corresponding to the Harbinger's percentage ownership in the ventures which were eliminated in consolidation, as required by the equity method of accounting. Harbinger has determined that it will use the equity method of accounting for these ventures as it believes that it has the ability to exercise significant influence over each entity. These ventures are early-stage enterprises which therefore may be financially volatile, with no assurances on the ultimate value of Harbinger's investments.

152

Exhibit H
0784

RESULTS OF OPERATIONS

The following table presents, for the periods indicated, the percentage relationship of consolidated statements of operations data items to total revenues:

| | THREE MONTHS ENDED MARCH 31, | | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|---|---|
| | 2000 | 1999 | 1999 | 1998 | 1997 |
| Revenues: | | | | | |
| Services........................................ | 70.9% | 75.7% | 69.9% | 65.2% | 53.6% |
| Software........................................ | 29.1 | 24.3 | 30.1 | 34.8 | 46.4 |
| Total revenues............................. | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Direct costs: | | | | | |
| Services........................................ | 27.9 | 31.7 | 29.9 | 25.5 | 19.2 |
| Software........................................ | 2.8 | 3.4 | 2.9 | 2.8 | 6.6 |
| Total direct costs......................... | 30.7 | 35.1 | 32.8 | 28.3 | 25.8 |
| Gross margin............................... | 69.3 | 64.9 | 67.2 | 71.7 | 74.2 |
| Operating costs: | | | | | |
| Selling and marketing........................... | 32.6 | 25.0 | 25.4 | 23.4 | 22.6 |
| General and administrative...................... | 22.6 | 19.6 | 19.9 | 23.8 | 17.6 |
| Depreciation and amortization................... | 7.5 | 6.7 | 6.1 | 6.0 | 6.0 |
| Product development............................. | 5.7 | 9.0 | 7.7 | 7.9 | 12.9 |
| Charge for purchased in-process product development, write-off of software development costs, restructuring, acquisition-related and other charges................ | -- | -- | -- | 20.0 | 34.3 |
| Total operating costs...................... | 68.4 | 60.3 | 59.1 | 81.1 | 93.4 |
| Operating income (loss)....................... | 0.9 | 4.6 | 8.1 | (9.4) | (19.2) |
| Interest income, net............................ | 3.6 | 2.7 | 2.2 | 3.6 | 3.3 |
| Equity in losses of joint ventures.............. | (0.6) | -- | -- | -- | (0.3) |
| Income (loss) from continuing operations before income taxes................................... | 3.9 | 7.3 | 10.3 | (5.8) | (16.2) |
| Income tax expense.............................. | (0.3) | (0.3) | (0.5) | (0.5) | (2.6) |
| Income (loss) from continuing operations........... | 3.6 | 7.0 | 9.8 | (6.3) | (18.8) |
| Loss from operations of TrustedLink Procurement Business and TrustedLink Banker division............. | -- | -- | -- | (1.3) | (8.8) |
| Income (loss) on disposal of TrustedLink Procurement Business and TrustedLink Banker division, including Provisions for operating losses during phase-out Periods................................... | -- | -- | 0.9 | (3.3) | (3.4) |
| Income (loss) before extraordinary item............ | 3.6 | 7.0 | 10.7 | (10.9) | (31.0) |
| Extraordinary loss on debt extinguishment.......... | -- | -- | -- | -- | (2.0) |
| Net income (loss).................................. | 3.6% | 7.0% | 10.7% | (10.9)% | (33.0)% |

THREE MONTHS ENDED MARCH 31, 2000 COMPARED TO THREE MONTHS ENDED MARCH 31, 1999

REVENUES. Total revenues increased 15% to $38.4 million in the first quarter of 2000 from $33.5 million in the first quarter of 1999. Revenues for services increased 7% to $27.2 million in the first quarter of 2000 from $25.4 million in the first quarter of 1999. The increase in service revenues is primarily attributable to an increase in software maintenance revenues for the first quarter of 2000 compared to 1999. Traditional professional services revenues in enablement, training and consulting declined commensurate with Harbinger's deemphasis on large electronic e-commerce enablement

153

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0785

contracts as a source of professional services revenues. Application Service provider, or ASP, services revenues increased $1.9 million over the first quarter of 1999 primarily due to approximately $1.4 million in nonrecurring ASP enablement service revenue from FactorWorks.com, a venture in which Harbinger maintains an equity position.

Of the service revenues from FactorWorks recognized by Harbinger in the three-month period ended March 31, 2000, about $1.1 million was for services previously billed at cost by Harbinger in prior periods. Harbinger had previously agreed to these reduced rates in exchange for a higher percentage of revenue sharing over the life of the multi-year arrangement. During the first quarter of 2000, Harbinger and FactorWorks renegotiated the arrangement such that Harbinger received retroactive services revenues at market rates, an extension of the contract term and certain volume commitments in exchange for a commensurate reduction in the revenue sharing participation.

Revenues from software sales increased 37% to $11.2 million in the first quarter of 2000 from $8.1 million in the first quarter of 1999. This increase is primarily attributable to an increase in software revenues from Harbinger's recently introduced portal service offerings. Software revenues from Harbinger's desktop and AS400 products on a combined basis were consistent in the first quarter of 2000 compared to 1999. During 1999, Harbinger announced plans to migrate the majority of its existing customer base to new internet enabled products and focused primarily on the desktop customers during its 1999 migration initiative. Harbinger intends to focus on migrating its enterprise customers in 2000. Accordingly, the software revenue from desktop products declined in the first quarter of 2000, and software revenue from AS400 products correspondingly increased over the first quarter of 1999.

In the fourth quarter of 1998, Harbinger phased out about 40% of its product lines, collectively referred to as Sunset Products, and discontinued relationships with certain third-party resellers of our software products. On a pro forma basis, core revenues, defined as revenues excluding Sunset products and discontinued third-party resellers, increased to $34.3 million or 89% of total revenues in the first quarter of 2000 compared to $27.1 million or 80.9% of total revenue in the first quarter of 1999.

DIRECT COSTS.  Direct costs for services increased to $10.7 million in the first quarter of 2000 from $10.6 million in the first quarter of 1999. As a percentage of service revenues, these costs were 39.4% in the first quarter of 2000 and 41.9% in the first quarter of 1999. Excluding $1.4 million of nonrecurring application service provider revenues in the first quarter of 2000 for work substantially performed in prior periods, Harbinger's cost of services for 2000 would have been 41.5%. The decrease in the adjusted percentage of cost of services compared to the percentage in the first quarter of 1999 is primarily attributable to an increase in higher-margin software maintenance in the first quarter of 2000. Direct software costs were $1.1 million in the first quarters of both 2000 and 1999 as software amortization and royalties increased and charge-offs of outdated collateral materials decreased in the first quarter of 2000.

SELLING AND MARKETING.  Selling and marketing expenses increased 49% to $12.5 million in the first quarter of 2000 from $8.4 million in the first quarter of 1999. As a percentage of revenues these expenses were 32.6% in 2000 and 25.0% in 1999. In the fourth quarter of 1999, Harbinger announced its intention to spend up to $25 million in marketing, sales and technology development. The increase in selling and marketing expenses is primarily attributable to first quarter 2000 increases in marketing and brand awareness, commissions associated with increased revenues and an accrual for estimated sales taxes.

GENERAL AND ADMINISTRATIVE.  General and administrative expenses increased 32% to $8.7 million in the first quarter of 2000 from $6.6 million in the first quarter of 1999. As a percentage of revenues these expenses were 22.6% in 2000 and 19.6% in 1999. Included in 1999 is a $750,000 credit for recovery of an outstanding royalty receivable from a specific customer that had been reserved for in

154

Exhibit H
0786

1998. Excluding this credit, general and administrative expenses would have been $7.3 million or 21.8% of revenues in 1999. The increase in general and administrative expenses in the first quarter of 2000 is primarily attributable to Harbinger's ongoing investment in information technology, including personnel costs, and increases to Harbinger's allowance for doubtful accounts.

DEPRECIATION AND AMORTIZATION.  Depreciation and amortization increased 28% to $2.9 million in the first quarter of 2000 from $2.2 million in the first quarter of 1999. The increase in depreciation and amortization is due to the purchase of computer hardware and software associated with Harbinger's ongoing investments in its information technology infrastructure.

PRODUCT DEVELOPMENT.  Total expenditures for product development, including capitalized software development costs, decreased 5% to $3.7 million in the first quarter of 2000 from $3.9 million in the first quarter of 1999. Total expenses for product development decreased 27% to $2.2 million in 2000 from $3.0 million in 1999. As a percentage of revenues, product development expenses decreased to 5.7% in 2000 from 9.0% in 1999. The decrease in overall product development expenditures in the first quarter of 2000 compared to 1999 is primarily attributable to a reduction in contract labor. Harbinger capitalized software development costs of $1.5 million and $887,000 in the first quarters of 2000 and 1999, respectively. Capitalization increased in 2000 as products reached technological feasibility at Harbinger Labs, Harbinger's development group devoted to next generation product development. Amortization of capitalized software development costs included in direct costs of software totaled $633,000 and $510,000 in the first quarters of 2000 and 1999, respectively.

EQUITY IN LOSSES OF JOINT VENTURES.  The total equity in losses of joint ventures for the first quarter of 2000 is attributable to Harbinger's one-third ownership in GLink LLC, an electronic marketplace for the grocery industry. Harbinger has also recently acquired equity positions in joint ventures created to establish electronic marketplaces for banking, apparel and the golf and hospitality industries. Harbinger anticipates continued losses from these start-up ventures for the remainder of 2000.

INCOME TAXES.  Harbinger recorded income tax expense of $142,000 and $113,000 in the first quarters of 2000 and 1999, respectively. The increase in taxes for the first quarter of 2000 is due primarily to the earnings in certain foreign countries that cannot be offset by losses in other jurisdictions. The effective tax rates of 9.4% and 4.6% for the first quarters of 2000 and 1999 differ from the expected rate of 39% due to reductions in the deferred tax valuation allowance.

NET INCOME AND EARNINGS PER SHARE.  Harbinger realized net income of $1.4 million or $0.03 per diluted share in the quarter ended March 31, 2000 and $2.3 million or $0.06 per diluted share in the quarter ended March 31, 1999. In order to facilitate comparison of operating results year over year, Harbinger also presents its earnings adjusted for certain charges and credits and tax-effects that result

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0787

in a 39% effective rate (core earnings). A comparison of the quarters ended
March 31, 2000 and 1999 is as follows:

SUPPLEMENTAL INFORMATION:

|  | 2000 | 1999 |
|---|---|---|
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) | |
| Operating income......................................... | $   364 | $1,556 |
| Certain general and administrative credits for recoveries............................................. | -- | (750) |
| Adjusted operating income................................ | 364 | 806 |
| Interest income, net..................................... | 1,391 | 898 |
| Core earnings before income taxes........................ | 1,755 | 1,704 |
| Core earnings net of income taxes at 39%................. | 1,071 | 1,039 |
| Core earnings per share.................................. | $ 0.03 | $ 0.03 |
| Weighted average number of diluted shares outstanding.... | 42,246 | 40,451 |

1999 COMPARED TO 1998

    REVENUES.  Total revenues increased 15% to $155.5 million in 1999 from
$135.2 million in 1998. Revenues for services increased 23.4% to $108.7 million
in 1999 from $88.1 million in 1998. This increase is attributable to growth in
Harbinger's operations management and professional services, as well as growth
in transaction fees on harbinger.net.

    Revenues from software sales decreased 0.6% to $46.8 million in 1999 from
$47.1 million in 1998. In the fourth quarter of 1998, Harbinger phased out about
40% of its product lines, collectively referred to as Sunset Products, and
discontinued relationships with certain third-party resellers of the Harbinger's
software products. The decline in 1999 software sales is primarily attributable
to this phase-out. On a pro forma basis, software sales, net of Sunset Products
and discontinued third-party resellers, increased 24.3% to $40.8 million in 1999
from $32.9 million in 1998. Harbinger is in the process of upgrading its
products to accommodate public Internet data protocols and Windows functionality
and is actively migrating its customer base from old to new technology
platforms. Approximately 23% of software revenues were derived from these
migrations in 1999.

    DIRECT COSTS.  Direct costs for services increased to $46.4 million in 1999
from $34.5 million in 1998. As a percentage of service revenues, these costs
were 42.7% in 1999 and 39.2% in 1998. The increase in direct services costs as a
percentage of services revenues primarily reflects the effects of a higher
proportion of lower-margin professional enablement services revenues in 1999 and
the effect of reallocating personnel costs to integration activity costs in
1998. Direct software costs increased to $4.6 million in 1999 from $3.7 million
in 1998. Direct software costs as a percentage of software revenues were 9.8% in
1999 and 7.9% in 1998. The increase in direct software costs as a percentage of
software revenues is primarily due to an increase in amortization of capitalized
software costs while software revenues remained relatively flat due to the
phase-out of Sunset Products.

    SELLING AND MARKETING.  Selling and marketing expenses increased 25% to
$39.6 million in 1999 from $31.6 million in 1998. As a percentage of revenues
these expenses were 25.4% in 1999 and 23.4% in 1998. The increase in selling and
marketing expenses as a percentage of revenues reflects an increase in sales
force personnel in 1999 and an incremental investment in marketing and brand
awareness for harbinger.net. In addition, the increase in 1999 is partially
attributable to the effect of reallocating personnel costs to integration
activity costs in 1998.

156

Exhibit H
0788

GENERAL AND ADMINISTRATIVE.  General and administrative expenses decreased 4% to $31.0 million in 1999 from $32.2 million in 1998. As a percentage of revenues these expenses were 19.9% in 1999 and 23.8% in 1998. Included in 1999 is a $3.3 million charge recorded in the fourth quarter for aged accounts receivable, offset by $1.8 million in credits recorded in the first nine months for recovery of outstanding royalty receivables from a specific customer that had been reserved for in 1998. Included in 1998 is a $5.8 million net charge recorded for outstanding royalty and accounts receivable from a reseller and certain other customer accounts. Excluding the aforementioned net charges, general and administrative expenses would have been $29.5 million or 18.9% of revenues in 1999 and $26.4 million or 19.5% of revenues in 1998. The increase in adjusted general and administrative expenses is primarily attributable to the effect of reallocating personnel costs to integration activity costs in 1998, and increases in office space and investments in information technology in 1999.

DEPRECIATION AND AMORTIZATION.  Depreciation and amortization increased 18% to $9.5 million in 1999 from $8.1 million in 1998. As a percentage of revenues these expenses were 6.1% in 1999 and 6.0% in 1998. The increase in depreciation and amortization is due to the purchase of computer hardware and software associated with Harbinger's investment in its information technology infrastructure during 1999 and the latter half of 1998.

PRODUCT DEVELOPMENT.  Total expenditures for product development, including capitalized software development costs, increased 24% to $17.6 million in 1999 from $14.1 million in 1998. Total expenses for product development increased 11% to $11.8 million in 1999 from $10.6 million in 1998. As a percentage of revenues total product development expenses decreased to 7.6% in 1999 from 7.9% in 1998. The increase in product development expenses is primarily attributable to increased development of Internet-based products, the 1999 addition of Harbinger Labs, Harbinger's development group devoted to next generation product development, and the effect of reallocating personnel costs to integration activity costs in 1998. Harbinger capitalized software development costs of $5.8 million and $3.6 million in 1999 and 1998, respectively. In the third quarter of 1999 Harbinger capitalized $1.6 million of development costs for software that was originally being developed for internal use by Harbinger's information technology group. Marketing and licensing efforts on this product were initiated in the third quarter of 1999 and the first license of this product was sold in the fourth quarter of 1999. Excluding this item, capitalized software development costs were $4.2 million or 26.6% of total expenditures for product development in 1999 and $3.6 million or 25.0% of product development in 1998. The increase in amounts capitalized reflects an increase in development activities associated with products that have reached technological feasibility. Amortization of capitalized software development costs included in direct costs of software totaled $2.0 million and $1.6 million in 1999 and 1998, respectively.

CHARGE FOR PURCHASED IN-PROCESS PRODUCT DEVELOPMENT, WRITE-OFF OF SOFTWARE DEVELOPMENT COSTS, RESTRUCTURING, ACQUISITION-RELATED AND OTHER CHARGES.  Harbinger incurred charges of $27.0 million in 1998 related to the costs of integrating its acquisitions in 1998 and 1997 and its restructuring in 1998. Approximately $4.1 million in 1998 charges were personnel costs reallocated to integration activity costs. The integration activities were completed by the end of 1998 and the internal resources and their associated costs are recorded in their original operating cost categories in 1999.

INCOME TAXES.  Harbinger recorded income tax expense of $813,000 and $705,000 in 1999 and 1998, respectively. Taxable income of $7.4 million will be required in future years to realize Harbinger's net deferred income tax assets at December 31, 1999 of $2.8 million, net of a valuation allowance. Future decreases of $3.3 million in the total valuation allowance of $18.9 million at December 31, 1999 relate to foreign net operating loss carryforwards and will reduce the intangibles associated with those acquisitions as the net operating loss carryforwards are realized.

DISCONTINUED OPERATIONS.  Harbinger discontinued its TrustedLink Procurement business on September 30, 1998 and its TrustedLink Banker division on December 31, 1997, both of which had

157

Exhibit H
0789

been generating lower than desired profitability and growth and which management deemed to be no longer strategic to Harbinger. The disposal of TrustedLink Banker was substantially completed by December 31, 1998. During 1999 Harbinger recovered the remaining loss reserve estimates associated with the disposal of TrustedLink Banker as contingencies related with the disposal were resolved. The recovery of the reserve in 1999 for TrustedLink Banker is reported in the accompanying consolidated statements of operations under "Income (loss) on disposal of discontinued operations." At December 31, 1999 Harbinger had a remaining reserve of $3.3 million for TrustedLink Procurement related to certain remaining contingencies.

NET INCOME (LOSS) AND EARNINGS (LOSS) PER SHARE.  Harbinger realized net income of $16.6 million or $0.41 per diluted share in 1999 and a net loss of $14.7 million or $0.35 per diluted share in 1998. In order to facilitate comparison of operating results year over year, Harbinger also presents its earnings by adjusting for certain charges and tax-affecting the results at a 39% effective rate, or core earnings. A comparison of 1999 and 1998 is as follows:

|  | 1999 | 1998 |
| --- | --- | --- |
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) | |
| Supplemental Information: | | |
| Operating income (loss) | $12,630 | $(12,652) |
| Charges | -- | 27,027 |
| Certain general and administrative charges net of recoveries | 1,546 | 5,763 |
| Adjusted operating income | 14,176 | 20,138 |
| Taxable interest income, net | 3,467 | 4,404 |
| Core earnings before income taxes | 17,643 | 24,542 |
| Core earnings net of income taxes at 39% | 10,762 | 14,970 |
| Non-taxable interest income | -- | 426 |
| Core earnings | $10,762 | $ 15,396 |
| Core earnings per share | $  0.26 | $   0.36 |
| Weighted average number of diluted shares outstanding | 40,739 | 43,306 |

Core earnings declined in 1999 compared to 1998 primarily as a result of Harbinger's investment in technology and marketing of its e-commerce portal, harbinger.net, in the first three quarters of 1999, as well as the fourth quarter launch of its marketing and brand awareness campaign for Harbinger as a whole. Harbinger expects to continue this program in 2000 as well as increasing its sales force and enhancing its technologies in order to position itself as a primary service provider to the anticipated growing number of businesses seeking e-commerce solutions over the next few years. As a result of these investments Harbinger expects a further decline in core earnings in 2000.

1998 COMPARED TO 1997

REVENUES.  Total revenues increased 14% to $135.2 million in 1998 from $118.2 million in 1997. Revenues for services increased 38.9% to $88.1 million from $63.4 million in 1997. This increase is partly attributable to acquisitions made in 1998, and also reflects growth in transaction fees, professional services and maintenance. Transaction fees increased as a result of an increase in subscribers to Harbinger's value-added network and IVAS networks, plus an increase in the average transaction volume per customer each year. Software revenues decreased 14.1% to $47.1 million in 1998 from $54.8 million in 1997, primarily due to decreased royalty revenues from resellers.

158

Exhibit H
0790

DIRECT COSTS.  Direct costs for services increased to $34.5 million in 1998 from $22.7 million in 1997. As a percentage of service revenues these costs were 39.2% in 1998 and 35.8% in 1997. The increase in direct costs as a percentage of service revenues is primarily attributable to a larger percentage of lower-margin professional enablement services in 1998. Harbinger increased its emphasis on enablement services in response to market demand for e-commerce solutions integration. The increase in direct costs in 1998 compared to 1997 was partially offset by the reallocation of personnel costs to integration activity costs in 1998. Direct software costs decreased to $3.7 million in 1998 from $7.8 million in 1997. Direct software costs as a percentage of software revenues were 7.9% in 1998 and 14.2% in 1997. The decrease in direct software costs is due to decreased software amortization resulting from a write-off of capitalized and purchased software development in connection with certain business combinations in 1997 and a decrease in royalty and other fees paid by Harbinger to third-party resellers in 1998.

SELLING AND MARKETING.  Selling and marketing expenses increased 18% to $31.6 million in 1998 from $26.7 million in 1997. As a percentage of revenues these expenses were 23.4% in 1998 and 22.6% in 1997. The increase in selling and marketing expenses as a percentage of revenues reflects an increase in sales and marketing personnel and related selling costs offset by a decrease in reallocated personnel costs to integration activity costs.

GENERAL AND ADMINISTRATIVE.  General and administrative expenses increased 55% to $32.2 million in 1998 from $20.8 million in 1997. As a percentage of revenues these expenses were 23.8% in 1998 and 17.6% in 1997. The increase in general and administrative expenses is primarily due to a $5.8 million net charge recorded for outstanding royalty and accounts receivable from a reseller and certain other customer accounts. Excluding the impact of this net charge, general and administrative expenses would have increased to $26.4 million or 19.5% of revenues for 1998. The increase in adjusted general and administrative expenses as a percentage of revenues is attributable to an increase in personnel and associated costs in both Harbinger's domestic and European operations, an increase in rent for expanded office space, adjustments to compensation related accruals and a decrease in personnel costs reallocated to integration activity costs in 1998 compared to 1997.

DEPRECIATION AND AMORTIZATION.  Depreciation and amortization increased 14% to $8.1 million in 1998 from $7.1 million in 1997. As a percentage of revenues these expenses remained the same. The increase in depreciation and amortization is a result of additions to fixed assets and increased intangible assets acquired through business combinations in 1998.

PRODUCT DEVELOPMENT.  Total expenditures for product development, including capitalized software development costs, decreased 30% to $14.1 million in 1998 from $20.3 million in 1997. Total expenses for product development decreased to $10.6 million in 1998 from $15.3 million in 1997. As a percentage of revenues total product development expenses decreased to 7.9% in 1998 from 12.9% in 1997. The decrease in product development expenses is primarily attributable to efficiencies gained in consolidating development resources of acquired companies, and the impact of personnel costs reallocated to integration activity costs. Harbinger capitalized software development costs of $3.6 million and $5.0 million in 1998 and 1997, respectively, which represented 25.0% and 24.7% of total expenditures for product development in these respective periods. The decrease in amounts capitalized reflects a decrease in development activities associated with products that have reached technological feasibility. Amortization of capitalized software development costs included in direct costs of software totaled $1.6 million and $3.7 million in 1998 and 1997, respectively.

CHARGE FOR PURCHASED IN-PROCESS PRODUCT DEVELOPMENT, WRITE-OFF OF SOFTWARE DEVELOPMENT COSTS, RESTRUCTURING, ACQUISITION-RELATED AND OTHER CHARGES.  Harbinger incurred charges of $27.0 million in 1998 and $40.6 million in 1997 as a result of 15 acquisitions and two restructurings from 1996 to 1998. Approximately $4.1 million in 1998 and $7.8 million in 1997 in charges were personnel costs reallocated to integration activity costs.

159

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0791

INCOME TAXES. Harbinger recorded income tax expense of $705,000 and $3.1 million in 1998 and 1997, respectively. 1998 tax expense decreased approximately 77% as compared with 1997. This is primarily due to profits in foreign taxing jurisdictions in 1997 that could not be offset by domestic net operating losses. Foreign tax expense was $1.2 million in 1997 as compared with a benefit of $100,000 in 1998. 1997 tax expense also included deferred taxes of $1.1 million. In 1998 there was no deferred tax expense because all deferred tax assets had been fully reserved for with an allowance.

DISCONTINUED OPERATIONS. Harbinger discontinued TrustedLink Procurement on September 30, 1998 and TrustedLink Banker on December 31, 1997, both of which had been generating lower than desired profitability and growth and which management deemed to be no longer strategic to Harbinger. The results of TrustedLink Procurement and TrustedLink Banker for 1998 and 1997 are reported in the accompanying reclassified audited consolidated statement of operations under "Loss from operations of TrustedLink Procurement business and TrustedLink Banker division." For TrustedLink Banker, Harbinger in 1997 provided for an anticipated loss of $4.0 million related to the discontinuance of the division, including an estimated $2.3 million for operating losses during the phase-out period. As of December 31, 1998, the disposal of TrustedLink Banker was substantially completed and $2.0 million in anticipated losses not incurred was recorded as a reduction to "Income (loss) on disposal of TrustedLink Banker" on the statement of operations in 1998.

For TrustedLink Procurement, Harbinger provided for an anticipated loss on the disposal of the business of $6.4 million, including $2.9 million for operating losses during the phase-out period.

LOSS ON EXTINGUISHMENT OF DEBT. Harbinger recorded a loss of $2.4 million on debt extinguishment in the first quarter of 1997 related to the acquisition of Harbinger Net Services.

NET LOSS AND LOSS PER SHARE. Harbinger realized net losses of $14.7 million or $0.35 per share in 1998 and $39.0 million or $1.02 per share in 1997. In order to facilitate comparison of operating results year over year, Harbinger also presents its earnings by adjusting for certain charges, and tax-affecting the results at a 39% effective rate (core earnings). A comparison of 1998 and 1997 is provided as follows:

| SUPPLEMENTAL INFORMATION | 1998 | 1997 |
|---|---|---|
| | (IN THOUSANDS, EXCEPT PER SHARE DATA) | |
| Operating loss | $(12,652) | $(22,705) |
| Charges | 27,027 | 40,555 |
| Certain general and administrative charges net of recoveries | 5,763 | -- |
| Adjusted operating income | 20,138 | 17,850 |
| Taxable interest income, net | 4,404 | 3,488 |
| Core earnings before income taxes | 24,542 | 21,338 |
| Core earnings net of income taxes at 39% | 14,970 | 13,017 |
| Non-taxable interest income | 426 | 418 |
| Core earnings | $ 15,396 | $ 13,435 |
| Core earnings per share | $ 0.36 | $ 0.33 |
| Weighted average number of diluted shares outstanding | 43,306 | 40,692 |

Core earnings increased in 1998 compared to 1997 primarily as a result of a decrease in product development expenses in 1998 which was realized by consolidating the development resources of acquired companies.

160

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0792

LIQUIDITY AND CAPITAL RESOURCES

Cash and short-term investments decreased $19.3 million to $73.0 million at December 31, 1999 compared to $92.3 million at December 31, 1998, primarily due to 1999 stock repurchases totaling $17.6 million and a $17.2 million investment in information technology and capitalized software, offset by $15.6 million of positive cash flows from operations and exercises of options and warrants.

Management expects Harbinger will continue to fund its operations, investment needs and capital expenditures through cash flows generated from operations, cash on hand, and additional equity and debt capital if necessary. Several factors could have an impact on Harbinger's cash flow in the future, including the effects of Harbinger's strategic investment in marketing and sales and technology development, currently projected to be $25 million in additional spending that will substantially be recorded to selling and marketing expenses on the consolidated statement of operations in 2000. Additionally, Harbinger recently announced the creation of a $25 million venture division focused on investing in new vertical market portal opportunities in 2000. Harbinger also anticipates continued liquidation of liabilities incurred due to charges and discontinued operations. Further, management is authorized to repurchase additional Harbinger stock if favorable pricing scenarios develop in the future. Liquidity could also be negatively impacted as a result of a shareholder class action lawsuit filed against Harbinger in 1999. Although the outcome of this action cannot be determined at this time, management does not believe the outcome will have a material adverse effect on Harbinger's financial position.

Harbinger does not believe that inflation has had a material impact on its business, however, there can be no assurance that Harbinger's business will not be affected by inflation in the future.

EURO CONVERSION

Effective January 1, 1999, 11 of the 15 member countries of the European Union adopted a single European currency, the euro, as their common legal currency. Like many companies that operate in Europe, various aspects of Harbinger's business were affected by the conversion to the euro. Harbinger has not experienced any significant impact in its internal IT systems or its customer products as a result of the euro conversion.

QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS

Harbinger has not entered into any transactions using derivative financial instruments or derivative commodity instruments and believes its exposure to interest rate risk, foreign currency exchange rate risk and other relevant market risks is not material.

161

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0793

HARBINGER MANAGEMENT

EXECUTIVE OFFICERS AND DIRECTORS

The current directors and executive officers of Harbinger and their ages as of March 31, 2000, are as follows:

| NAME | AGE | POSITION |
|------|-----|----------|
| James M. Travers | 48 | President and Chief Executive Officer |
| Daniel L. Manack | 42 | Executive Vice President, Global Operations |
| Dave Bursiek | 62 | Executive Vice President, Market Development |
| James K. McCormick | 43 | Chief Financial Officer |
| Douglas L. Roberts | 43 | Senior Vice President, Worldwide Sales |
| Gerald Diamond | 53 | Senior Vice President, Worldwide Product Development |
| Ray L. Dicasali | 51 | Chief Information Officer |
| Stuart L. Bell(2) | 46 | Director |
| William B. King(2) | 55 | Director |
| Klaus Neugebauer(1) | 61 | Director |
| David Hildes(1) | 49 | Director |
| Benn R. Konsynski(1) | 49 | Director |
| David T. Leach(1) | 49 | Director |
| John D. Lowenberg(1) | 57 | Director |
| Ad Nederlof(1) | 53 | Director |
| William D. Savoy(2) | 35 | Director |

------------------------

(1) Member of the audit committee.

(2) Member of the compensation committee.

JAMES M. TRAVERS has been a director of Harbinger since March 1999 and has served as President and Chief Executive Officer of Harbinger since January 2000. He served as President and Chief Operating Officer from October 1998 until January 2000, as President and General Manager of Harbinger's Software Division from June 1997 until October 1998, and from January 1994 until June 1997, he served as President of Harbinger Enterprise Solutions Division. From 1978 through 1994, Mr. Travers served in various managerial positions with Texas Instrument's Information Technology Group, including Vice President for North American Field Operations, and from June 1992 through December 1994 as Director of Business Development for Texas Instrument's Worldwide Applications Software Business.

DANIEL MANACK has served as Executive Vice President, Global Operations, of Harbinger since March 2000. From 1999 to March 2000, he served as Senior Vice President and General Manager of the EC Solutions Division of Harbinger. From February 1998 to February 1999, he served as Vice President and General Manager--Professional Services & Outsourcing Practice, and from January 1997 to February 1998 he served as Vice President of Professional Services and Outsourcing. From September 1994 until December 1996, he was a principal with the Information Services unit of Unisys Corporation. From June 1980 through August 1994, Mr. Manack served in various managerial positions with Texas Instruments.

162

Exhibit H
0794

DAVE BURSIEK has served as Executive Vice President, Market Development, of Harbinger since March 2000. From February 1999 to March 2000, he served as Executive Vice President and General Manager of Customer Solutions and Enhancements Division. From January 1997 through February 1999, he served as Senior Vice President of Sales, with responsibility for mass deployment sales. From December 1996 until January 1997, he served as the Executive Vice President of Sales of Supply Tech, Inc., which was acquired by Harbinger in January 1997. From 1995 until December 1996, he was a management consultant with Optimum Associates, a consulting firm. In 1994, he served as Chief Executive Officer of Sapiens International, a software and consulting firm.

JAMES K. MCCORMICK has served as Chief Financial Officer of Harbinger since April 1, 1999. From September 1997 until February 1999, he served as Chief Financial Officer, Treasurer and Secretary of Knology Holdings, Inc., a telecommunications service provider. From 1992 until August 1997, he worked as Corporate Controller and Treasurer for United Dairy Farmers, Inc., which is a holding company for dairy retail and manufacturing companies.

DOUGLAS L. ROBERTS has served as Senior Vice President--Worldwide Sales of Harbinger since April 1999. From October 1995 until April 1999, he served as Senior Vice President--Sales, of BellSouth Wireless Data, a telecommunications wireless data provider. From October 1993 until October 1995, he served as Vice President--General Manager--International of Software AG, a software firm.

STUART L. BELL has been a director of Harbinger since April 1995. Mr. Bell has served as the Chairman of Webloyalty.com, a web marketing firm since 1999, and as the Vice-Chairman of Interval International, a time share exchange company since 1997. He served as Chairman of Innovative Medical Research, a provider of clinical trials, from January 1995 until February 1998.

GERALD DIAMOND has served as Senior Vice President, Worldwide Product Development of Harbinger since December 1997. From May of 1996 to December of 1997, Mr. Diamond served as Senior Vice President of Premenos Technology Corp., a business-to-business e-commerce company which was acquired by Harbinger in December of 1997. From January 1994 to April of 1996, Mr. Diamond served as President of Don Valley Technology Corporation, a business-to-business e-commerce company which was acquired by Premenos in April of 1996.

RAY L. DICASALI has served as Chief Information Officer of Harbinger since July 1998. From May 1995 to July 1998, Mr. Dicasali served as Chief Technology Officer for Anacomp, a leading electronic document company.

WILLIAM B. KING has been a director of Harbinger since January 1993. Mr. King has served as Chairman of Private Business, Inc., a banking software provider, since 1991. From 1986 until February 1995, Mr. King served as Chairman of FISI-Madison Financial Corporation, Chairman of CUC Europe, and served on the Board of Directors of CUC International.

KLAUS NEUGEBAUER has been a director of Harbinger since March 1997. Dr. Neugebauer was a co-founder of Softlab GmbH, an international software development company that was sold to BMW AG in 1991. Dr. Neugebauer is a member of a number of German industrial boards and acts as a strategic information technology advisor to the State of Bavaria and the German Federal Government, and since 1991, has been a partner in NSE, Inc., an investment firm specializing in the software industry.

DAVID HILDES has been a director of Harbinger since December 1997. Mr. Hildes is a private investor. Prior to the acquisition of Premenos Technology Corp. in December 1997, Mr. Hildes was Vice Chairman, Secretary and a Director of Premenos from its organization in July 1995 until its acquisition by Harbinger in December 1997. Mr. Hildes was a Director and the Treasurer of Premenos from October 1989 until December 1997, and Vice Chairman, Director and Secretary from July 1995 until December 1997.

163

Exhibit H
0795

BENN R. KONSYNSKI has been a director of Harbinger since December 1996. Since 1993, Dr. Konsynski has been the George S. Craft Professor of Business Administration at the Goizueta Business School at Emory University. From 1987 to 1993, he served on the faculty at Harvard Business School. Dr. Konsynski is also a director of Tessco Technologies, Inc.

DAVID T. LEACH has been a director of Harbinger since February 1994 and is a private investor. He has served as acting Chairman of the Board since January 2000 and served as Vice Chairman from September 1998 until January 2000. From March 1997 until September 1998, he served as Chief Executive Officer of Harbinger, from February 1994 until March 1997, he served as President and Chief Operating Officer of Harbinger, and from June 1992 until February 1994, he was Executive Vice President, Group Sales and Operations.

JOHN D. LOWENBERG has been a director of Harbinger since December 1997. Mr. Lowenberg has been a manager of the general partner of Anvil Investment Associates, L.P., an investment fund since 1998. From 1970 to October 1997, he was employed by The Robinson-Humphrey Company, an investment banking firm, in increasingly senior capacities, serving as a Managing Director and a Director at the time of his departure. Mr. Lowenberg previously served as a director of Harbinger and its predecessors from 1983 to May 1995. Mr. Lowenberg has served as a Trustee since 1988 and the Chairman since 1990 of the Investment Committee of Denison University.

AD NEDERLOF has been a director of Harbinger since April 1997. Mr. Nederlof has served as President and Chief Executive Officer of Genesys Telecommunications Laboratories, a provider of call center software, since March 2000, and served as Senior Vice President--Europe, Middle East and Africa from March 1999 until March 2000. Genesys was acquired by Alcatel S.A. in January 2000. He served as President and Chief Operating Officer of Richter Systems, Inc., a provider of software applications for the retail industry, from March 1998 until February 1999. Mr. Nederlof was an independent software consultant from 1996 until March 1997. He served as Vice President of Oracle Northern Europe from 1994 to 1996, with responsibility for all Northern European subsidiaries. From 1991 to 1994, he served as Managing Director of Oracle Nederland BV, Oracle's Dutch subsidiary.

WILLIAM D. SAVOY has been a director of Harbinger since May 1993. Mr. Savoy has served as President of Vulcan Northwest, Inc. since 1988. Vulcan Ventures, Inc., a shareholder of Harbinger, and Vulcan Northwest, Inc. are beneficially owned by Paul G. Allen. Mr. Savoy is also a director of Telescan, Inc., Ticketmaster Online--City Search, Inc., USA Networks, Inc., Metricom, Inc., Charter Communications, Inc., drugstore.com, Go2Net, Inc., Value America and High Speed Access Corporation.

ELECTION AND COMPENSATION OF DIRECTORS

Harbinger's board of directors is divided into three classes that serve staggered three-year terms and are as nearly equal in number as possible. The board currently consists of four Class I directors, Stuart L. Bell, William B. King, Klaus Neugebauer, and James M. Travers; three Class II directors, David Hildes, David T. Leach, and Ad Nederlof; and three Class III directors, Benn R. Konsynski, John D. Lowenberg, and William D. Savoy. At each annual meeting of shareholders, a class of directors are elected to serve for a three-year term to succeed the directors of the same class whose terms are then expiring. The terms of the Class I directors will expire at the 2003 annual meeting of shareholders, the terms of the Class II directors will expire at the 2001 annual meeting of shareholders, and the terms of the Class III directors will expire at the 2002 annual meeting of shareholders.

As compensation for serving on the board of directors, directors who are not also employees of Harbinger receive $1,250 for each meeting of the full board and $250 for teleconference board meetings of 90 minutes or less in which they participate. In Harbinger's discretion, nonemployee directors may also be reimbursed for reasonable expenses incurred by them in connection with their attendance at board meetings. Nonemployee directors are also eligible to receive options under

164

Exhibit H
0796

Harbinger's Amended and Restated 1993 Stock Option Plan for Nonemployee Directors. Under this plan, nonemployee directors receive an option to purchase 15,000 shares of common stock upon becoming a director and an additional 15,000 shares of common stock each year immediately following the annual shareholders meeting. These options are fully vested upon issuance.

BOARD COMMITTEES

Harbinger's board of directors has established an audit committee and compensation committee. John Lowenberg, Klaus Neugebauer, Ad Nederlof, David Leach and Benn Konsynski presently serve on the audit committee. The audit committee met one time in 1999. The primary functions of the audit committee are to (i) review the scope and timing of the audit and non-audit services to be rendered by Harbinger's independent accountants, to review audit plans of the independent accountants and to review the reports upon completion of their audits, (ii) to review the appropriateness of Harbinger's accounting policies, the adequacy of its financial controls and the reliability of the financial information reported to the public, and (iii) to report to the board of directors on its activities.

Stuart Bell, William Savoy and William King presently serve on the compensation committee. The compensation committee met three times in 1999. The primary functions of the compensation committee are to review and approve, subject to ratification of the board of directors, the Chief Executive Officer's compensation, to consult with the Chief Executive Officer and approve compensation for executive officers and other key employees, to administer Harbinger's stock option plans and employee stock purchase plan including approval of all awards thereunder, to approve management incentive plans for senior management, and to report to the board of directors on these activities.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

None of the directors of Harbinger serves as a member of the board of directors or compensation committee of any other company that has one or more executive officers serving as a member of the Harbinger board of directors or compensation committee.

165

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0797

EXECUTIVE COMPENSATION

The following table presents summary information concerning compensation earned for services rendered to Harbinger by its Chief Executive Officer and each of the other four most highly compensated executive officers of Harbinger during 1999 for the fiscal years ended December 31, 1999, 1998 and 1997.

SUMMARY COMPENSATION TABLE

| NAME AND PRINCIPAL POSITION | YEAR | ANNUAL COMPENSATION | | LONG TERM COMPENSATION AWARDS | ALL OTHER COMPENSATION(1) |
| | | SALARY | BONUS | SECURITIES UNDERLYING OPTIONS | |
| --- | --- | --- | --- | --- | --- |
| James M. Travers(2) ......................... President and Chief Executive Officer | 1999 1998 1997 | $256,833 184,833 140,985 | $ 86,940 8,800 59,000 | 100,000 120,000 108,750 | -- -- $25,000(3) |
| C. Tycho Howle(2) .......................... Former Chairman of the Board and Chief Executive Officer | 1999 1998 1997 | $314,583 257,216 213,977 | $111,000 -- 81,000 | -- -- 225,000 | -- -- -- |
| David Bursiek .............................. Executive Vice President, Market Development | 1999 1998 1997 | $161,537 150,766 162,500 | $ 64,864 36,872 55,100 | 35,000 39,932 11,250 | -- -- -- |
| Daniel L. Manack(4) ........................ Executive Vice President, Global Operations | 1999 1998 1997 | $178,197 141,167 122,375 | $ 76,512 25,039 -- | 35,000 63,896 7,500 | -- -- -- |
| Douglas L. Roberts(5) ...................... Senior Vice President, Worldwide Sales | 1999 1998 1997 | $214,803 -- -- | $106,667 -- -- | 200,000 -- -- | $45,799 -- -- |

--------------------------

(1) In accordance with rules of the SEC, other compensation in the form of perquisites and other personal benefits has been omitted if such perquisites and other personal benefits constituted less than the lesser of $50,000 or 10% of the total annual salary and bonus for such year.

(2) In January 2000, Mr. Howle resigned as Chairman and Chief Executive Officer of the Harbinger and Mr. Travers became President and Chief Executive Officer. During 1999, Mr. Travers served as President and Chief Operating Officer.

(3) Mr. Travers was reimbursed $25,000 for certain expenses incurred in connection with his relocation to Atlanta.

(4) Mr. Manack joined the Harbinger in January 1997.

(5) Mr. Roberts joined the Harbinger in April 1999. Other compensation is primarily comprised of relocation costs.

166

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0798

OPTION GRANTS IN LAST FISCAL YEAR

The following table contains information concerning options granted during the year ended December 31, 1999 to the executive officers named in the table above:

| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED(1) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE ($/SH) | EXPIRATION DATE | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(2) | |
|---|---|---|---|---|---|---|
| | | | | | 5% | 10% |
| James M. Travers...... | 100,000 | 4.93% | $10.50 | 04/30/06 | $427,455 | $1,618,698 |
| C. Tycho Howle....... | -- | -- | -- | -- | -- | -- |
| David Bursiek......... | 35,000 | 1.73 | 6.75 | 04/01/06 | 96,177 | 364,207 |
| Daniel L. Manack...... | 35,000 | 1.73 | 6.75 | 04/01/06 | 96,177 | 364,207 |
| Douglas Roberts....... | 200,000 | 9.86 | 8.87 | 04/09/06 | 722,196 | 2,734,828 |

------------------------

(1) The options granted were awarded under the Harbinger's 1996 Stock Option Plan. The options granted under the 1996 Plan are exercisable for a period not to exceed seven years from the date of grant. Options generally vest over four years of continuous employment with Harbinger. The exercise price of each option granted was not less than 100% of the fair market value of a share of common stock on the date of grant.

(2) Amounts represent the hypothetical gains that could be achieved for the respective options at the end of the seven-year option term. The assumed 5% and 10% rates of stock appreciation are mandated by the rules of the SEC and may not accurately reflect the appreciation of the price of the common stock from the grant date until the expiration of the option term. These assumptions are not intended to represent a forecast of future stock appreciation of the common stock. No assurance can be given that the common stock will appreciate at all.

AGREEMENTS WITH EMPLOYEES

Employees of Harbinger, including executive officers, are required to sign an agreement with Harbinger defining the employee's responsibilities, restricting the ability of the employee to compete with Harbinger during his or her employment and for a designated period thereafter, restricting solicitation of customers and employees following employment with Harbinger, and providing for ownership and assignment of intellectual property rights to Harbinger. The agreements have an indefinite term, but the employee may terminate employment with Harbinger at any time.

Effective January 19, 2000, Harbinger entered into an employment agreement with James M. Travers to provide for Mr. Travers' continued services as President and Chief Executive Officer. The employment agreement provides for a three-year term at an initial base salary of $250,000, with a bonus opportunity of 75% of base salary at target if certain performance criteria are met. In addition to the terms of Harbinger's standard employment agreement described above, Mr. Travers' employment agreement provides for: (1) an option grant under the 1996 Plan to purchase 200,000 shares of common stock at a price equal to the fair market value of the common stock on the date of the grant, (2) termination for cause by Harbinger without payment of severance, (3) voluntary departure by Mr. Travers without severance, and (4) termination without cause by Harbinger with payment of severance.

Harbinger may terminate Mr. Travers for cause if Mr. Travers: (1) knowingly and willfully engages in misconduct with respect to the business and affairs of Harbinger, (2) violates any policy of Harbinger in a material way relating to ethical business conduct, practices or fiduciary duties of a senior executive, (3) knowingly and willfully breaches any material provision of his employment agreement that is not remedied within 30 days after receipt of notice, (4) commits a felony or an illegal act involving moral

167

Exhibit H
0799

turpitude or fraud or dishonesty that may reasonably be expected to have a material adverse effect on Harbinger, or (5) fails to comply with reasonable directives of the board, if not remedied within 30 days after receipt of notice. If Harbinger terminates Mr. Travers without cause, then it will be obligated to pay Mr. Travers the net present value of the compensation that would be payable to Mr. Travers during the remaining term of his employment agreement.

Mr. Travers' stock options vest ratably over four years. In the event Harbinger terminates Mr. Travers without cause, the stock options will continue to vest as if he were still employed by Harbinger. Further, in the event of a change in control of Harbinger, Mr. Travers' stock options shall immediately vest in their entirety. A change in control shall be deemed to have occurred if (and only if) any of the following shall have taken place: (1) a change in control is reported by Harbinger in response to either Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended or the (Exchange Act), or Item 1 of Form 8-K promulgated under the Exchange Act; (2) any person (as such term is used in Section 13(d) and 14(d)(2) of the Exchange Act) is or becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act) directly or indirectly, of securities of Harbinger representing 40% or more of the combined voting power of Harbinger's then outstanding securities; or (3) following the election or removal of directors, a majority of the board consists of individuals who were not members of the board two years before such election or removal, unless the election of each director who was not a director at the beginning of such two-year period has been approved in advance by directors representing at least a majority of the directors then in office who were directors at the beginning of the two-year period.

On March 4, 1997, Harbinger entered into an employment agreement with C. Tycho Howle in relation to his services as Chairman and Chief Executive Officer of Harbinger, on substantially the same terms as Mr. Travers' agreement. The employment agreement provided for a four-year term at a base salary of $275,000 per year for the period between January 1, 1999 and March 31, 1999 and $300,000 per year for the period between April 1, 1999 and December 31, 1999, with a bonus opportunity of 50% of base salary at target if certain performance criteria were met. Mr. Howle voluntarily resigned as Chairman and Chief Executive Officer in January 2000 and will not receive any payments from Harbinger under his contract.

In addition to the standard employment agreements referred to above, Messrs. Manack and Roberts have entered into amendments to their respective employment agreements which provide that in the event of change of control of Harbinger and their termination of employment from Harbinger in connection with the change of control, all outstanding unvested stock options will become fully vested and exercisable. Mr. Bursiek has entered into an employment agreement which provides that he will receive certain cash payments in the event of his involuntary termination.

401(K) PROFIT SHARING PLAN

Effective April 1, 1998, Harbinger merged its previous three 401(k) plans into one plan, now called the Harbinger Corporation 401(k) Retirement Plan. The 401(k) plan is intended to be a profit sharing plan as defined for purposes of Sections 401(a), 402, 412 and 417 of the Code of 1986, as amended, contain a cash or deferred arrangement under Sections 401(f) of the Code, and comply with the requirements of the Employee Retirement Income Security Act of 1974, as amended.

The 401(k) plan allows eligible employees to participate beginning on the first day of the first month following the employee's hire date. The employee may contribute from 2% to 15% of salary to the 401(k) plan up to a maximum of $10,000 per year. Harbinger makes a discretionary matching contribution of 50% of the employee's contribution, up to a maximum of 4% of annual compensation, subject to a $2,200 limit per employee. Harbinger match is made each pay period and vests 25% per year while the employee remains employed. Unvested portions of Harbinger match are forfeited at termination of employment.

168

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0800

STOCK OPTION PLANS AND STOCK PURCHASE PLAN

STOCK OPTION PLANS. Harbinger's 1996 Stock Option Plan was approved by Harbinger's shareholders and became effective on May 8, 1996. The 1996 plan replaced Harbinger's Amended and Restated 1989 Stock Option Plan. Following approval of the 1996 plan at the annual shareholders meeting in 1996, no further stock options were granted under the 1989 plan. The 1989 plan continues in effect only with respect to outstanding stock options which were granted under that plan and will terminate and cease to exist as of the date on which all outstanding stock options which were granted under the 1989 plan are exercised in full, expired or canceled. The purpose of the 1996 plan is to provide incentives for officers, directors, consultants and key employees to promote the success of Harbinger, and to enhance Harbinger's ability to attract and retain the services of such persons. The aggregate number of shares of common stock reserved for issuance under the 1996 Plan is 9,737,500 shares, plus an amount equal to the number of all shares that are either not subject to options granted under the 1989 plan or were subject to options granted under the 1989 plan that expire without exercise. Options granted under the 1996 plan may be either (1) options intended to qualify as "incentive stock options" under Section 422 of the Code, or (2) non-qualified stock options, each of which are approved plans under Section 423 of the Code. The 1996 Plan permits the grant of stock appreciation rights in connection with the grant of stock options. Stock options may be granted under the 1996 plan for all employees and consultants of Harbinger, or of any present or future subsidiary or parent of Harbinger, who are considered "key employees" or "key consultants." The 1996 plan is administered by the compensation committee of the board of directors. The compensation committee has the authority to determine exercise prices applicable to the options, the eligible officers, directors, consultants or employees to whom options may be granted, the number of shares of Harbinger's common stock subject to each option, and the extent to which options may be exercisable. The compensation committee is empowered to interpret the 1996 plan and to prescribe, amend and rescind the rules and regulations pertaining to the 1996 plan. Options granted under the 1996 Plan generally vest ratably over four years. No option is transferable by the optionee other than by will or the laws of descent and distribution, and each option is exercisable during the lifetime of the optionee only by such optionee, unless otherwise approved by the compensation committee.

Any incentive stock option that is granted under the 1996 plan may not be granted at a price less than the fair market value of the common stock on the date of grant (or less than 110% of fair market value in the case of holders of 10% or more of the total combined voting power of all classes of stock of Harbinger or a subsidiary or parent of Harbinger). Non-qualified stock options may be granted at the exercise price established by the compensation committee, which may be less than the fair market value of the common stock on the date of grant.

Each option granted under the 1996 plan is exercisable for a period determined by the compensation committee, which period may not exceed ten years from the date of grant (or five years in the case of a holder of more than 10% of the total combined power of all classes of stock of Harbinger or of a subsidiary or parent of Harbinger). Options terminate upon expiration of such period, or earlier upon termination of the recipient's employment with Harbinger, or as determined by the compensation committee.

The terms of the 1989 plan are substantially similar to the terms of the 1996 plan. The material difference between the plans is the manner of exercise permitted by the 1996 plan. Under the 1996 plan, payment of the purchase price for shares of common stock purchased upon exercise of an option may be made in any of the following terms: (1) in cash or subject to the sole discretion of Harbinger's board of directors, (2) by delivery to Harbinger of a number of shares of common stock which have been owned by the optionee for at least six months prior to the date of exercise of the option having an aggregate fair market value on the date of delivery of not less than the total purchase price for the shares being purchased upon exercise of the option; (3) by delivery of a promissory note executed by the optionee to Harbinger which shall include such terms and conditions as approved by the board of

169

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0801

directors, including without limitation, that: (a) the balance equal to the aggregate purchase price for the shares being purchased shall be payable in equal installments over such a period as approved by the board of directors; (b) interest shall accrue at a per annum rate equal to the prime rate as announced by the Wall Street Journal as the prevailing "prime rate" of interest per annum; and (c) the optionee shall be personally liable for the repayment of the unpaid principal balance of the loan and any and all accrued but unpaid interest on the loan; (4) by surrender of a number of shares of common stock otherwise issuable upon exercise of the option having an aggregate fair market value on the date of exercise of not less than the total purchase price for all shares being purchased upon exercise of the option, including the shares being surrendered; and (5) in any combination of the forms described above as approved by the board of directors.

As of March 8, 2000, options to purchase 361,918 shares of common stock were outstanding under the 1989 plan and 2,772,825 shares of common stock had been issued upon exercise of options granted under the plan. As of March 8, 2000, options to purchase 5,752,526 shares of common stock were outstanding under the 1996 plan and 2,075,597 shares of common stock had been issued upon exercise of options granted under such plan.

NONEMPLOYEE DIRECTORS PLAN.  The Amended and Restated 1993 Stock Option Plan for Nonemployee Directors became effective on April 30, 1993. A total of 875,000 shares of common stock have been reserved for issuance under the nonemployee directors plan.

The terms of the options granted under the nonemployee directors plan, including the exercise price, dates and number of shares subject to the options are specified in the nonemployee directors plan. The nonemployee directors plan provides for the automatic granting of non-qualified stock options to nonemployee directors. Each nonemployee director receives an option to purchase 15,000 shares of common stock on the date of, and at a time immediately following every, annual meeting of the shareholders. Each nonemployee director who is first appointed or elected to the board and attends a regular quarterly meeting of the board which occurs at any time other than at an annual meeting of the shareholders is granted an option to purchase a number of shares of common stock equal to the product of (1) 15,000 multiplied by (2) a fraction, the numerator of which is the number of regular quarterly directors meetings expected by the Chief Executive Officer of Harbinger to occur between the date that such nonemployee director is appointed or elected to the board and the first annual meeting of shareholders following such appointment or election, and the denominator of which is four. Annual grants and interim grants vest upon grant. No option is transferable by the optionee other than by will or laws of descent and distribution, and each option is exercisable during the lifetime of the optionee only by such optionee, unless otherwise approved by the compensation committee. The exercise price of all options must be at least equal to the fair market value of the shares on the date of grant, and the term of each option may not exceed seven years. The nonemployee directors plan will continue in effect for a period of ten years unless sooner terminated by the board of directors.

As of March 8, 2000, options to purchase an aggregate of 355,874 shares of common stock were outstanding under the nonemployee directors plan and approximately 94,312 shares had been issued pursuant to the exercise of options granted under the plan.

STOCK PURCHASE PLAN.  On May 8, 1995, the shareholders of Harbinger approved the Amended and Restated Harbinger Corporation Employee Stock Purchase Plan to be effective January 1, 1996. The purpose of the stock purchase plan is to encourage and enable employees of Harbinger and its subsidiaries to acquire a proprietary interest in Harbinger through ownership of shares of common stock. The stock purchase plan authorizes the issuance of up to 587,500 shares of common stock (subject to adjustment for capital changes) pursuant to the exercise of non-transferable options granted to participating employees.

An employee who elects to participate in the stock purchase plan must authorize a stated dollar amount of the employee's regular pay to be deducted by Harbinger from the employee's pay during

170

Exhibit H
0802

each of four quarterly payroll deduction periods. The minimum deduction for a participant is $10.00 per pay period. Purchase periods begin on January 1, April 1, July 1, and October 1 of each calendar year. On the last day of each purchase period, Harbinger is deemed to have granted a purchase right to each participant as of the first day of the purchase period to purchase as many shares of common stock as can be purchased with the participant's payroll deductions. On the last business day prior to reporting of financial results for the current fiscal period, the participant is deemed to have exercised this option, at the option price, to the extent of such participant's accumulated payroll deductions. The participant may not purchase common stock having a fair market value, measured on the first business day of the Purchase Period, in excess of $3,750 during a Purchase Period. The option price under the stock purchase plan is equal to 85% of the fair market value of the common stock on the third business day after the reporting of financial results for either the prior or current fiscal period, whichever is lower. Interest is not paid on amounts deducted from an employee's pay and used to purchase common stock under the stock purchase plan. An employee may not sell shares purchased under the stock purchase plan for at least one purchase period following the purchase period in which the option for such shares was granted.

An employee elects to participate by delivering to Harbinger a participation form authorizing the stated dollar amount to be deducted each pay period for the entire purchase period. If an employee does not file a participation form at least 15 days before the start of a purchase period, the employee's election or payroll deductions for the preceding purchase period remains in effect. Employee's rights under the stock purchase plan may not be assigned, transferred, pledged or otherwise disposed of, except by will or the laws of descent and distribution.

Employees of Harbinger and whose customary employment is more than 20 hours per week and five or more months per calendar year are eligible to participate in the stock purchase plan. An employee may not be granted an option under the stock purchase plan if after the granting of the option such employee would be deemed to own 5% or more of the combined voting power of value of all classes of stock of Harbinger. As of March 8, 2000, approximately 869 employees are eligible to participate in the stock purchase plan.

An employee's rights under the stock purchase plan terminate upon termination of his or her employment for any reason, including retirement. Upon termination, Harbinger will refund the employee's payroll deductions made during the purchase period. A participant may withdraw from the stock purchase plan at any time prior to the last business day of any purchase period by delivering to Harbinger a participation withdrawal form. The participant may elect on the withdrawal form to receive all of the accumulated payroll deductions as a refund or to exercise the participant's outstanding purchase rights to purchase common stock in the amount of payroll deductions withheld during the purchase period. A participant who withdraws from the stock purchase plan is not eligible to rejoin the stock purchase plan until the second purchase period following the purchase period of withdrawal. In the event a participant who is an officer who files reports under Section 16 of the Securities Exchange Act of 1934, as amended, ceases participation in the Plan, such officer may not re-enroll in the stock purchase plan under the purchase period beginning coincident with or immediately following the expiration of a six-month period beginning upon the effective date of such officer's withdrawal from the stock purchase plan.

The stock purchase plan is administered by the compensation committee. No member of the board of directors is eligible to participate in the stock purchase plan during the period he serves as a member of the compensation committee. The proceeds received by Harbinger from the sale of common stock pursuant to the stock purchase plan will be used for general corporate purposes.

The following discussion summarizes certain tax considerations for employees participating in the stock purchase plan and certain tax effects to Harbinger. However, the summary does not address every situation that may result in taxation. For example, it does not discuss the state taxes or the tax

171

Exhibit H
0803

implications arising from a participant's death. The stock purchase plan is not subject to the provisions of the Employee Retirement Income Security Act of 1974, and the provisions of Section 401(a) of the Code are not applicable to the stock purchase plan.

Amounts deducted from any employee's pay under the stock purchase plan are included in the employee's compensation subject to federal income and social security taxes, and Harbinger will withhold taxes on these amounts. An employee of Harbinger will not recognize any additional income at the time he or she elects to participate in the stock purchase plan, or purchase common stock under the stock purchase plan.

If an employee of Harbinger disposes of common stock purchased pursuant to the stock purchase plan within two years after the first business day of the purchase period in which such stock was purchased, the employee will recognize ordinary compensation income at the time of disposition in an amount equal to the excess of the fair market value of the stock on the day the stock was purchased over the purchase price the employee paid for the stock (i.e., the amounts withheld from the employee's compensation used to purchase the stock). This amount may be subject to withholding taxes, including social security taxes. In addition, the employee generally will recognize a capital gain or loss in an amount equal to the difference between the amount realized upon the sale of the stock and his or her basis in the stock, which is his or her purchase price plus the amount taxed as compensation income. Generally, if the shares have been held for more than eighteen months, such gain or loss will be long-term capital gain or loss.

If an employee of Harbinger disposes of common stock purchased pursuant to the stock purchase plan more than two years after the first business day of the purchase period in which such stock was purchased, the employee will recognize as ordinary compensation income at the time of such disposition an amount equal to the lesser of (a) the excess of the fair market value of the stock measured at the time of such disposition over the amount paid for the stock, or (b) 15% of the fair market value of the stock measured as of the first business day of the purchase period in which the stock was purchased. This amount, however, is not subject to social security taxes or other withholding. In addition, the employee generally will recognize a long-term capital gain or loss in an amount equal to the difference between the amount realized upon the disposition of the stock and his or her basis in the stock.

172

Exhibit H
0804

HARBINGER RELATED PARTY TRANSACTIONS

Harbinger has purchased insurance on the life of Mr. Travers and at December 1999 had similar insurance on the life of Mr. Howle. The policy for Mr. Howle was cancelled in January 2000.

Harbinger earned $73,000 in revenue in 1999 for software development, consulting and network services under an agreement with Lifeline Networks, B.V., an entity in which Ad Nederlof is a minority shareholder. Mr. Nederlorf has been a director of Harbinger since April 1997. Harbinger also paid $23,000 to Lifeline for expenses relating to support in terminating certain discontinued lines of business in Harbinger's Dutch subsidiary.

173

Exhibit H
0805

HARBINGER PRINCIPAL SHAREHOLDERS

   The following table sets forth the amount and percent of shares of Harbinger
common stock which, as of April 30, 2000, are deemed under the rules of the
Securities and Exchange Commission to be beneficially owned by each member of
the board of directors of Harbinger's, by each executive officer of Harbinger's,
by all directors, nominees and executive officers of Harbinger's as a group, and
by any person or group known to Harbinger's as of that date to be a beneficial
owner of more than 5% of the outstanding shares of common stock.

| DIRECTORS AND EXECUTIVE OFFICERS | COMMON STOCK BENEFICIALLY OWNED(1) | |
| | NUMBER OF SHARES OF COMMON STOCK | PERCENTAGE OF CLASS |
| --- | --- | --- |
| Stuart L. Bell(2) | 116,687 | * |
| David Hildes(3) | 1,446,417 | 3.6 |
| C. Tycho Howle(4) | 704,809 | 1.8 |
| William B. King(5) | 114,474 | * |
| Benn R. Konsynski(6) | 67,715 | * |
| David T. Leach(7) | 1,053,937 | 2.5 |
| John D. Lowenberg(8) | 144,942 | * |
| Ad Nederlof(9) | 91,125 | * |
| Klaus Neugebauer(10) | 78,000 | * |
| William D. Savoy(11) | 2,859,166 | 7.1 |
| James M. Travers(12) | 120,507 | * |
| David Bursiek(13) | 9,552 | * |
| Daniel Manack(14) | 8,752 | * |
| James McCormick(15) | 17,500 | * |
| Douglas Roberts(16) | 50,000 | * |
| Gerald Diamond(17) | 26,696 | * |
| Ray L. Dicasali(18) | 16,000 | * |
| All executive officers and directors as a group (17 persons)(19) | 6,926,279 | 16.3% |

| PERCENTAGE 5% SHAREHOLDERS OF CLASS | NUMBER OF SHARES OF COMMON STOCK | PERCENTAGE |
| --- | --- | --- |
| Vulcan Ventures, Inc./Paul G. Allen<br>110 110(th) Avenue, N.E.<br>Suite 550<br>Bellevue, WA 98004 | 2,740,854 | 6.8% |
| Massachusetts Financial Services Company<br>500 Boylston Street<br>Boston, MA 02116 | 4,196,566 | 10.5% |

------------------------

*   Less than 1% of the outstanding common stock.

(1) Information with respect to beneficial ownership shown in the table above
    is based on information supplied by the directors and executive officers of
    Harbinger and filings made with the Commission or furnished to Harbinger by
    other shareholders. Beneficial ownership is determined in accordance with
    the rules of the Securities and Exchange Commission and generally includes
    voting or investment power with respect to securities. Except as indicated
    by footnote, the persons named in the table above have sole voting and
    investment power with respect to all shares of common stock shown as
    beneficially owned by them. Percentage of beneficial ownership is based on
    40,057,369 shares of common stock outstanding as of March 31, 2000 and
    includes shares of common stock subject to options that may be exercised
    within 60 days of April 30, 2000. These shares are deemed to be outstanding
    for the purposes of

174

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0806

computing the percentage ownership of the individual holding such shares, but are not deemed outstanding for purposes of computing the percentage of any other person shown in the table.

(2)  Includes 65,437 shares subject to options exercisable within 60 days.

(3)  Includes 1,144,217 shares held of record by Mr. Hildes, 240,000 shares held by a charitable remainder trust of which Mr. Hildes and his wife are income beneficiaries, and 62,200 shares subject to options exercisable within 60 days.

(4)  Includes 526,074 shares held of record by Mr. Howle, 41,825 shares held of record by Mr. Howle's wife, an aggregate of 16,585 held by Mr. Howle's children, 32,325 shares held in a family limited partnership for the benefit of Mr. Howle, his wife and children, and 88,000 shares held by a family limited partnership. Mr. Howle disclaims beneficial ownership of all such shares, other than shares held of record by him for his own benefit. Mr. Howle resigned as Chairman and Chief Executive Officer of the Company in January 2000.

(5)  Includes 85,125 shares subject to options exercisable within 60 days.

(6)  Includes 62,765 shares subject to options exercisable within 60 days.

(7)  Includes 465,600 shares held by Mr. Leach, 5,212 shares held of record by Mr. Leach's wife and 583,125 shares subject to options exercisable within 60 days.

(8)  Includes 85,442 shares held jointly by Mr. Lowenberg and his wife, 11,500 shares held by the Lowenberg Charitable Trust, the trustees of which are Mr. Lowenberg and his wife, and as to which Mr. Lowenberg disclaims beneficial ownership, and 48,000 shares subject to options exercisable within 60 days.

(9)  Includes 76,125 shares subject to options exercisable within 60 days.

(10)  Includes 24,000 shares subject to options exercisable within 60 days.

(11)  Includes 87,375 shares subject to options exercisable within 60 days. Also includes 2,740,854 shares beneficially owned by Vulcan Ventures, Inc. and Paul G. Allen, as to which Mr. Savoy disclaims beneficial ownership. Mr. Savoy is the President of Vulcan Northwest, Inc., a company that is beneficially owned by Mr. Allen. Mr. Savoy's address is 110 110th Avenue N.E., Bellevue, WA 98004.

(12)  Includes 111,269 shares subject to options exercisable within 60 days.

(13)  Includes 800 shares held of record by Mr. Bursiek's wife and 8,752 shares subject to options exercisable within 60 days.

(14)  Includes 8,752 shares subject to options exercisable within 60 days.

(15)  Includes 17,500 shares subject to options exercisable within 60 days.

(16)  Includes 50,000 shares subject to options exercisable within 60 days.

(17)  Includes 3,801 shares held of record by Mr. Diamond's wife and 22,895 shares subject to options exercisable within 60 days.

(18)  Includes 15,000 shares subject to options exercisable within 60 days.

(19)  Includes 1,328,320 shares subject to options exercisable within 60 days and 3,174,389 shares as to which the respective director or officer disclaims beneficial ownership.

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0807

DESCRIPTION OF PEREGRINE CAPITAL STOCK

GENERAL

Peregrine is authorized to issue 200,000,000 shares of Peregrine common stock, $0.001 par value, and 5,000,000 shares of undesignated preferred stock, $0.001 par value. As of May 15, 2000, approximately 109,356,814 shares of Peregrine common stock were outstanding, 19,610,804 shares of Peregrine common stock were issuable upon exercise of outstanding options, and no shares of Peregrine preferred stock were issued and outstanding.

The following description of Peregrine's capital stock does not purport to be complete and is subject to and qualified in its entirety by Peregrine's amended and restated certificate of incorporation and bylaws and by the provisions of applicable Delaware law.

The amended and restated certificate of incorporation and bylaws contain certain provisions that are intended to enhance the likelihood of continuity and stability in the composition of Peregrine's board of directors and which may have the effect of delaying, deferring, or preventing a future takeover or change in control of Peregrine unless such takeover or change in control is approved by Peregrine's board of directors.

COMMON STOCK

Holders of Peregrine common stock are entitled to one vote per share on all matters to be voted upon by the stockholders. Holders of our common stock do not have cumulative voting rights, and, therefore, holders of a majority of the shares voting for election of directors can elect all of the directors. In such event, the holders of the remaining shares will not be able to elect any directors.

Holders of Peregrine common stock are entitled to receive such dividends as may be declared from time to time by the Peregrine board out of funds legally available therefor, subject to the terms of any existing or future agreements between Peregrine and its debtholders. Peregrine has never declared or paid cash dividends on its capital stock, expects to retain future earnings, if any, for use in the operation and expansion of its business, and does not anticipate paying any cash dividends in the foreseeable future. In the event of the liquidation, dissolution or winding up of Peregrine, the holders of Peregrine common stock are entitled to share ratably in all assets legally available for distribution after payment of all debts and other liabilities and subject to the prior rights of any holders of Peregrine preferred stock then outstanding.

PREFERRED STOCK

Peregrine is authorized to issue 5,000,000 shares of undesignated Peregrine preferred stock. The Peregrine board has the authority to issue the Peregrine preferred stock in one or more series and to fix the price, rights, preferences, privileges and restrictions thereof, including dividend rights, dividend rates, conversion rights, voting rights, terms of redemption, redemption prices, liquidation preferences and the number of shares constituting a series or the designation of such series, without any further vote or action by Peregrine's stockholders. The issuance of Peregrine preferred stock, while providing desirable flexibility in connection with possible acquisitions and other corporate purposes, could have the effect of delaying deferring or preventing a change in control of Peregrine without further action by the stockholders and may adversely affect the market price of, and the voting and the other rights of, the holders of Peregrine common stock. The issuance of Peregrine preferred stock with voting and conversion rights may adversely affect the voting power of the holders of Peregrine common stock, including the loss of voting control to others. Peregrine has no current plans to issue any shares of Peregrine preferred stock.

176

Exhibit H
0808

ANTITAKEOVER EFFECTS OF PROVISIONS OF CERTIFICATE OF INCORPORATION AND BYLAWS

Peregrine's amended and restated certificate of incorporation provides that all stockholder actions must be effected at a duly called annual or special meeting and may not be effected by written consent. Peregrine's bylaws provide that, except as otherwise required by law, special meetings of the stockholders can only be called by Peregrine's board of directors, the chairman of Peregrine's board of directors, the Chief Executive Officer of Peregrine or stockholders holding shares in the aggregate entitled to cast not less than 10% of the votes as such meeting. In addition, Peregrine's bylaws establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of stockholders, including proposed nominations of persons for election to Peregrine's board of directors. Stockholders at an annual meeting may only consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of Peregrine's board of directors or by a stockholder who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has delivered timely written notice in proper form to Peregrine's secretary of the stockholder's intention to bring such business before the meeting.

The foregoing provisions of Peregrine's amended and restated certificate of incorporation and bylaws are intended to enhance the likelihood of continuity and stability in the composition of the Peregrine's board of directors and in the policies formulated by Peregrine's board of directors and to discourage certain types of transactions which may involve an actual or threatened change of control of Peregrine. Such provisions are designed to reduce the vulnerability of Peregrine to an unsolicited acquisition proposal and, accordingly, could discourage potential acquisition proposals and could delay or prevent a change in control of Peregrine. Such provisions are also intended to discourage certain tactics that may be used in proxy fights but could, however, have the effect of discouraging others from making tender offers for Peregrine's shares and, consequently, may also inhibit fluctuations in the market price of Peregrine's shares that could result from actual or rumored takeover attempts. These provisions may also have the effect of preventing changes in the management of Peregrine.

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0809

COMPARISON OF RIGHTS OF HOLDERS OF
HARBINGER COMMON STOCK AND
PEREGRINE COMMON STOCK

THIS SECTION OF THE PROXY STATEMENT/PROSPECTUS DESCRIBES CERTAIN DIFFERENCES
BETWEEN HARBINGER COMMON STOCK AND PEREGRINE COMMON STOCK. WHILE WE BELIEVE THAT
THE DESCRIPTION COVERS THE MATERIAL DIFFERENCES BETWEEN THE TWO, THIS SUMMARY
MAY NOT CONTAIN ALL OF THE INFORMATION THAT IS IMPORTANT TO HARBINGER
SHAREHOLDERS, INCLUDING THE CERTIFICATE OF INCORPORATION AND BYLAWS OF PEREGRINE
AND THE ARTICLES OF INCORPORATION AND BYLAWS OF HARBINGER. HARBINGER
SHAREHOLDERS SHOULD READ THIS ENTIRE DOCUMENT AND THE OTHER DOCUMENTS REFERRED
TO CAREFULLY FOR A MORE COMPLETE UNDERSTANDING OF THE DIFFERENCES BETWEEN
HARBINGER COMMON STOCK AND PEREGRINE COMMON STOCK.

Harbinger's articles of incorporation and bylaws currently govern the rights
of shareholders of Harbinger. After the completion of the Harbinger merger,
Harbinger's common shareholders will become Shareholders of Peregrine. As a
result, former Harbinger shareholders' rights will be governed by Peregrine's
certification of incorporation and bylaws. Furthermore, because Peregrine is a
Delaware corporation, after the Harbinger merger former Harbinger shareholders'
rights will be governed by the Delaware General Corporation Law, rather than by
Georgia law. The following paragraphs summarize certain differences between the
rights of Peregrine stockholders and Harbinger shareholders under the
certificate of incorporation and bylaws of Peregrine and articles of
incorporation and bylaws of Harbinger, and under Delaware and Georgia law, as
applicable.

|  | PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
| --- | --- | --- |
| Common Stock................. | One class is issued and outstanding. Holders are entitled to one vote per share. | One class is issued and outstanding. Holders are entitled to one vote per share. |
|  | Holders of common stock have no preemptive rights or rights to convert their common stock into any other securities. | The holders of Harbinger common stock are entitled to one vote for each share held of record on all matters submitted to a vote of shareholders. |
|  | There are no redemption or sinking fund provisions applicable to the common stock. All outstanding shares of common stock are fully paid and non-assessable and have a par value of $0.001 per share. | There are no cumulative voting rights and each share has no par value. Subject to preferences that may be applicable to any outstanding shares of preferred stock, the holders of common stock are entitled to receive such dividends, if any, as may be declared by the board of directors out of funds legally available for the payment of dividends. In the event of a dissolution of Harbinger, the holders of common stock are entitled to share ratably in all assets |

178

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0810

|  | PEREGRINE<br>(DELAWARE) | HARBINGER<br>(GEORGIA) |
| --- | --- | --- |
|  |  | remaining after payment of liabilities and liquidation preferences of any outstanding shares of preferred stock.<br>Holders of common stock have no preemptive rights or rights to convert their common stock into any other securities.<br>There are no redemption or sinking fund provisions applicable to the common stock.<br>All outstanding shares of common stock are fully paid and non-assessable and have a par value of $0.001 per share. |
| Preferred Stock.............. | The Peregrine certificate of incorporation reserves for issuance 5,000,000 shares of undesignated preferred stock.<br><br>Peregrine's certificate of incorporation authorizes the board of directors to:<br><br>- issue shares of preferred stock in series;<br><br>- establish from time to time the number of shares to be included in such series; and<br><br>- fix the designation, powers preferences and rights of the shares to be included in each series and the qualifications, limitations and restrictions thereof.<br><br>- The preferred stock could thus be issued quickly with terms calculated to delay or prevent a change in control of Peregrine or make removal of management more difficult. | The Harbinger articles of incorporation provide that Harbinger shall have the authority to issue up to 20,000,000 shares of preferred stock of which Harbinger's board of directors has designated 385,000 shares as Series B preferred stock, 250,000 shares as Series C preferred stock, and 4,000,000 shares as redeemable zero coupon preferred stock.<br><br>Harbinger articles of incorporation authorize the board of directors to:<br><br>- issue shares of preferred stock in one or more series and<br><br>- to set the designations, preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications, and terms and conditions of redemption thereof.<br>- The preferred stock could |

179

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

|                                        | PEREGRINE<br>(DELAWARE) | HARBINGER<br>(GEORGIA) |
| -------------------------------------- | ----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- | ----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                                        | – Additionally, the issuance of preferred stock may have the effect of decreasing the market price of the common stock, and may adversely affect the voting and other rights of the holders of common stock. There are no shares of preferred stock outstanding and Peregrine has no plans to issue any of the preferred stock. | thus be issued quickly with terms calculated to delay or prevent a change of control of Harbinger or make removal of management more difficult.<br><br>– Additionally, the issuance of preferred stock may have the effect of decreasing the market price of the common stock and may adversely affect the voting and other rights of the holders of common stock. There are no shares of preferred stock outstanding, and Harbinger has no plans to issue any preferred stock. |
| Special meeting of shareholders.................. | Under Delaware law, a special meeting of stockholders may be called by the board of directors or any other person authorized to do so in the certificate of incorporation or the bylaws.<br><br>Peregrine's bylaws authorize the board of directors, the chairman of the board, the president, or a stockholder holding shares entitled to cost not less than 10% of the votes at the meeting to call a special meeting of stockholders. | Under Georgia law, a special meeting of shareholders may be called by the board of directors or any other person authorized to do so in the Articles of Incorporation or the bylaws. In addition, Georgia law provides that a special meeting of shareholders may also be called by the holders of at least 25%, or such greater or lesser percentages as the articles of incorporation or bylaws provide, of all votes entitled to be cast on any issue proposed to be considered at a special meeting.<br>Harbinger's bylaws allow the chief executive officer, a majority of the board of directors, or a majority of Harbinger's executive committee to call special meetings of shareholders, and provide that a special meeting of shareholders can be called by the request of the holders of at least 75% of the shares entitled to vote. |

180

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

|  | PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
| --- | --- | --- |
| Action by written consent lieu of a shareholders' meeting..................... | Under Delaware law, stockholders may take action by written consent in lieu of voting at a stockholders' meeting. However, Delaware law permits a corporation, pursuant to a provision in the corporation's certificate of incorporation, to eliminate the ability of stockholders to act by written consent.<br><br>Peregrine's certificate of incorporation eliminates the ability of stockholders to act by written consent. | Under Georgia law, shareholders may take action by written consent in lieu of voting at a shareholders meeting. Under Georgia law, all actions taken by written consent must be unanimous unless the articles of incorporation provide otherwise.<br><br>Harbinger's articles do not eliminate the need for unanimity for actions by written consent. Therefore, all actions by Harbinger's shareholders must be taken at a meeting of the shareholders or by unanimous written consent. |
| Voting by written ballot..... | Under Delaware law, the right to vote by written ballot may be restricted if so provided in the certificate of incorporation.<br><br>Peregrine's certificate of incorporation does not restrict the right to vote by ballot. | Georgia law does not contain a provision regarding voting by written ballot.<br><br>Harbinger's bylaws permit voting by voice vote or by show of hands unless any qualified voter demands vote by written ballot. |
| Record date for determining shareholders................. | Peregrine's bylaws provide that the board of directors may fix a record date that is not more than 60 days, nor less than 10 days, before the date of the meeting.<br><br>Furthermore, the bylaws provide that if the board of directors does not fix a record date in the manner described above, then the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the | Harbinger's bylaws provide that the board of directors may fix a record date for the purpose of determining the shareholders entitled to notice of or to vote at any meeting or any adjournment thereof, or to make a determination of shareholders for any other purpose, and such record date shall not be more than 70 days before the meeting or action requiring a determination of shareholders.<br><br>Furthermore, the bylaws provide that the determination of the board of directors regarding the record date shall apply to any adjournment or reconvened |

181

Exhibit H
0813

|  | PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
| --- | --- | --- |
|  | day on which the meeting is held. | meeting unless the board of directors sets a new record date for the reconvened meeting. If the adjournment is for a date more than 120 days after the date fixed for the original meeting, a new record date must be fixed. |
| Advance notice provisions for board nomination and other shareholders business--annual meetings...................... | Peregrine's bylaws require that nominations of persons for election to the board of directors and the proposal of business to be considered at any meeting of stockholders must be made by:<br><br>- the corporation's notice of meeting;<br><br>- the board of directors; or<br><br>- a shareholder who gives proper notice.<br><br>For nominations or other business to be properly brought before a stockholder meeting by a stockholder, the stockholder must have given timely notice thereof in writing to the secretary of Peregrine and such other business must otherwise be a proper matter for stockholder action.<br><br>To be timely, notice shall be delivered to the the secretary of the corporation not less than 90 days prior to the meeting; provided, however, that in the event that less than 100 days' notice or prior public disclosure of the meeting is given to the stockholders, notice by the stockholder to be timely must be delivered not later than the | Harbinger's bylaws require that nominations of persons for election to the board of directors at an annual or special meeting of shareholders must be made by:<br><br>- the board of directors or<br><br>- a stockholder who gives proper notice.<br><br>Pursuant to the bylaws, proposals by shareholders, including nomination of persons for election to the board of directors, must be made by advance written notice delivered or received not less than 30 days prior to the date of the meeting; provided however, if less than 30 days' notice or prior public disclosure of the date of the scheduled meeting is given or made, notice by the shareholder, to be timely, must be delivered or received not later than the close of business on the 10th day following the day on which the notice of the meeting is mailed or public disclosure of the date of such meeting is made.<br><br>Harbinger's bylaws also provide that any notice from a shareholder nominating a director for election must set |

182

|  | PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
|---|---|---|
|  | close of business on the tenth day following the day on which the notice of the meeting was mailed or public disclosure was made. | forth all information relating to that person that is required to be disclosed in solicitation of votes for election of directors or is otherwise required in each case under the Securities Exchange Act of 1934. With respect to any proposal, the shareholder must provide the name and address of the shareholder as they appear on Harbinger's books, the class and number of shares held by the shareholder. |
| Advance notice provisions for board nomination and other shareholders business--special meetings... | Peregrine's bylaws provide for the same requirements for raising business at special meetings of stockholders as for raising business at annual meetings. | Harbinger's bylaws provide for the same requirements for nominations of persons to the board of directors at special meetings as at annual meetings. |
| Number of directors.......... | Peregrine's bylaws provide that the board of directors shall consist of eight members. | Harbinger's bylaws provide that the number of the board of directors shall be not less than one nor more than 15, the precise number to be fixed by resolution of the board of directors. |
| Classified board of directors.................... | Delaware law provides that a corporation's board of directors may be divided into various classes with staggered terms of office. The board of directors of Peregrine is not classified. | Georgia law provides that a corporation's board of directors may be divided into various classes with staggered terms of office. The board of directors of Harbinger is divided into three classes, as nearly equal in size as possible, with one class being elected annually. Harbinger directors are elected to a term of three years and until their successors are elected and qualified. |
| Removal of directors......... | Under Delaware law, except as otherwise provided in the | Under Georgia law, except as otherwise provided in the |

183

Exhibit H
0815

|  | PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
| --- | --- | --- |
|  | corporation's certificate of incorporation, a director of a corporation without a classified board of directors may be removed with or without cause. The Peregrine bylaws provide that any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors. | corporation's articles of incorporation, a director of a corporation that has a classified board of directors may be removed only with cause. The Harbinger bylaws provide that any director, or the entire Harbinger board of directors, may be removed by the shareholders. Harbinger's bylaws do not allow directors to be removed without cause. |
| Board of director vacancies.................... | Under Delaware law, vacancies and newly created directorships may be filled by a majority of the directors then in office, even though less than a quorum, unless otherwise provided in the certificate of incorporation or bylaws. The Peregrine bylaws provide that vacancies on the board of directors may be filled by the vote of the majority of directors then in office, although such majority is less than a quorum, or by a plurality of the votes cast at a meeting of stockholders.<br><br>The Peregrine bylaws also provide that vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors that are in office, although less than a quorum, or by a sole remaining director. Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the provisions of Peregrine's | Under Georgia law, unless the articles of incorporation or a bylaw adopted by the shareholders provides otherwise, vacancies and newly created directorships may be filled by:<br><br>- the shareholders;<br>- the board of directors; or<br><br>- a majority of the directors remaining in office, even if such directors constitute less than a quorum.<br><br>Harbinger's bylaws provide that a vacancy may be filled by the affirmative vote of at least two-thirds of the remaining directors, even if less than a quorum.<br><br>The Harbinger bylaws also provide that a vacancy occurring by reason of an increase in the number of directors may be filled in like manner, but only until the next election of directors by the shareholders. |

184

Exhibit H
0816

|  | PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
|---|---|---|
|  | certificate of incorporation, vacancies and newly created directors of such class or series may be fined by a majority of the directors elected by such class or series, or by a sole remaining director. |  |
| Notice of special meetings of the board of directors....... | The Peregrine bylaws provide that special meetings of the board of directors may be called by:<br><br>- the chairman of the board;<br><br>- the president;<br>- any vice president;<br>- the secretary; or<br>- any two directors.<br>Notice of the time and place of a special meeting shall be delivered personally, by telephone or by first class mail or telegram. If by mail, the notice must be deposited in the United States mail at least four days before the time of the holding of the meeting. If the notice is delivered personally or by telephone, or by telegram, it must be delivered at least 48 hours before the time of the holding of the meeting. | The Harbinger bylaws provide that special meetings may be called by the chief executive officer or, in his absence, by the secretary of Harbinger or by any two directors upon 24 hour notice of the meeting. |
| Approval of loans to and guarantees of officers....... | The Peregrine bylaws provide that Peregrine may lend money to guaranty any obligation of or otherwise assist any officer or other employee whenever the directors judge such a loan, guaranty or assistance reasonably to be expected to benefit the corporation. | Harbinger's bylaws do not specifically address loans to officers or employees. |

185

Exhibit H
0817

| | PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
|---|---|---|
| Indemnification............. | The Peregrine certificate of incorporation provides that the directors and officers shall be indemnified to the fullest extent authorized by law against any action or proceeding brought against such a person by reason of the fact that he or she is or was a officer or employee of the corporation or serves or served at any other enterprise as at the request of the corporation.<br><br>The Peregrine bylaws provide that the corporation has the power to indemnify each of its directors and officers against expenses (including attorneys fees), judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceeding, arising by reason of the fact that such person is or was an agent of the corporation. | The Harbinger bylaws provide that Harbinger shall indemnify to the fullest extent permitted by law any person who is made a party to a proceeding because he is or was a director or officer against liability if the individual acted in a manner he believed in good faith to be in or not opposed to the best interests of Harbinger, and in any criminal proceeding, he had no reasonable cause to believe his conduct was unlawful; provided, however, that Harbinger shall not indemnify an individual (a) in connection with a proceeding by or in the right of Harbinger in which such individual was adjudged liable to Harbinger, or (b) in connection with any other proceeding in which such individual was adjudged liable on the basis that personal benefit was received by him, unless and only to the extent that a court of competent jurisdiction determines that such individual is fairly and reasonably entitled to indemnification. Indemnification in connection with a proceeding by or in the right of Harbinger is limited to reasonable expenses. The Harbinger bylaws provide that payment of reasonable expenses in advance shall be made if such individual provides a written affirmation of his good faith belief that he has met the applicable standard of conduct and an undertaking to repay any advances made if it is ultimately determined that he is not entitled to indemnification. Such individual may apply for indemnification or advances for |

186

| PEREGRINE<br>(DELAWARE) | HARBINGER<br>(GEORGIA) |
| --- | --- |
| | expenses to the court, which may order indemnification or advances for expenses if it determines the individual is entitled to mandatory indemnification under law or is fairly and reasonably entitled to indemnification, or in the case of advances for expenses, the individual is entitled pursuant to the Articles or any applicable resolution or agreement.<br>If authorized by the articles of incorporation or a contract or resolution approved or ratified by the shareholders by a majority of votes entitled to be cast, Harbinger may indemnify or obligate itself to indemnify a director or officer made party to a proceeding without regard to the limitations in the bylaws; provided, however, that no indemnification is made for (a) any appropriation by a director, in violation of the director's duties, of any business opportunity; (b) any acts or omissions of a director that involve intentional misconduct or knowing violation of law; (c) unlawful distributions; or (d) any transaction for which the director received an improper personal benefit. Harbinger may indemnify and advance expenses to an employee or agent of Harbinger to the same extent, consistent with public policy, that may be provided by the articles of incorporation, bylaws, general or specific action of the board of directors, or contract. |
| Limitations on liability..... | The Peregrine certificate of incorporation limits or eliminates, to the fullest extent | The Harbinger articles of incorporation eliminate a director's personal liability for |

187

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0819

| PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
| --- | --- |
| permitted by Delaware law, the personal liability of a director to Peregrine or its stockholders for monetary damages for breach of fiduciary duty as a director. Under Delaware law, such provision may not eliminate or limit director monetary liability for:<br><br>- breaches of the director's duty of loyalty to the corporation or its stockholders,<br>- acts or omissions not in good faith involving intentional misconduct or knowing violations of law,<br><br>- the payment of unlawful dividends or unlawful stock repurchases or redemptions, or<br><br>- any transaction in which the director received an improper personal benefit. | monetary damages to Harbinger or any of its shareholders for any breach of duties of such position, except that such liability is not eliminated for:<br>- any appropriation, in violation of such director's duties, of any business opportunity of Harbinger,<br>- acts or omission which involve intentional misconduct or a knowing violation of law,<br>- unlawful distributions, or<br><br>- any transaction from which the director received an improper personal benefit.<br><br>Harbinger's articles of incorporation provide that if, at any time, Georgia law is amended to further eliminate or limit the liability of a director, then the liability of each director of Harbinger shall be eliminated or limited to the fullest extent permitted thereby. |

| Shareholder approval of certain business combinations.................. | Under Delaware law, "business combinations" by corporations with "interested stockholders" are subject to a moratorium of three or five years, respectively, unless specified conditions are met. The prohibited transactions include:<br><br>- a merger with, disposition of assets to, or the issuance of stock to, the interested stockholder, or<br><br>- certain transactions that have the effect of increasing the proportionate share of the outstanding securities held by | Under Georgia law, a resident domestic corporation shall not engage in any "business combination" with any "interested shareholder" for a period of five years following the time that such shareholder became an "interested shareholder," unless specified conditions are met. The prohibited transactions include:<br><br>- a merger with, disposition of assets to, or the issuance of stock to, the interested shareholder, or<br><br>- certain transactions that have |

188

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

| PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
| --- | --- |
| the interested stockholder.<br><br>Under Delaware law, an interested stockholder may avoid the prohibition against effecting certain significant transactions with the corporation if: the board of directors, prior to the time such stockholder becomes an interested stockholder, approves such transaction or the transaction by which such stockholder becomes an interested stockholder or if at or subsequent to such time the board of directors and the stockholders approve such transaction. These provisions of Delaware law apply to a Delaware corporation unless the corporation "opts out" of the provisions in its certificate of incorporation or bylaws.<br><br>Peregrine has not opted out of these provisions in its certificate of incorporation or bylaws and consequently is subject to these provisions. | the effect of increasing the proportionate share of the outstanding securities held by the interested shareholder.<br><br>Under Georgia law, an interested shareholder may avoid the prohibition against effecting certain significant transactions with the corporation if the board of directors, prior to the time such shareholder becomes an interested shareholder, approves the transaction by which such shareholder becomes an interested shareholder. These provisions of Georgia law do not apply to a Georgia corporation unless it has affirmatively elected in its bylaws to be governed by them.<br><br>The Harbinger bylaws contain a provision electing to be governed by these provisions of Georgia law.<br><br>Georgia law also contains a provision concerning "fair price requirements." These provisions provide that, in addition to any other vote otherwise required by law or the articles of incorporation, a "business combination" shall be (a) unanimously approved by all of the directors who are not affiliates or associates of an "interested shareholder," provided that these continuing directors constitute at least three members of the board of directors at the time of such approval; or (b) recommended by at least two-thirds of the continuing directors and approved by a majority of the votes entitled to be cast by the |

189

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

|                                                  | PEREGRINE<br>(DELAWARE) | HARBINGER<br>(GEORGIA) |
|--------------------------------------------------|-------------------------|------------------------|
|                                                  |                         | holders of the voting shares, other than voting shares beneficially owned by the interested shareholder who is, or whose affiliate is, a party to the business combination.<br>The Harbinger bylaws contain a provision electing to be governed by these fair price requirements. |
| Par value, dividends and repurchases of shares........ | The concepts of par value, capital and surplus are retained under Delaware law.<br><br>Delaware law permits a corporation to declare and pay dividends out of surplus or, if there is no surplus, out of the net profits for the fiscal year in which the dividend is declared and/or for the preceding fiscal year as long as the amount of capital of the corporation following the declaration and payment of the dividend is not less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets.<br><br>In addition, Delaware law generally provides that a corporation may redeem or repurchase its shares only if such redemption or repurchase would not impair the capital of the corporation. Notwithstanding the foregoing, a Delaware corporation may redeem or repurchase shares having a preference upon the distribution of any of its assets if such shares will be retired upon acquisition, and provided that, after the reduction in capital | Georgia law dispenses with the concept of par value of shares for most purposes as well as statutory definitions of capital, surplus and the like.<br><br>Under Georgia law, a corporation may make distributions to its shareholders subject to any restrictions imposed in the corporation's articles of incorporation, except that no distribution may be made if, as a result, the corporation would not be able to pay its debts as they become due in the usual course of business or its total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.<br><br>A Georgia corporation may acquire its own shares and shares so acquired will constitute authorized but unissued shares, unless the articles of incorporation provide that such shares become |

190

| | PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
| --- | --- | --- |
| | made in connection with such retirement of shares, the corporation's remaining assets are sufficient to pay any debts not otherwise provided for. | treasury shares or prohibit the reissuance of reacquired shares. If such reissuance is prohibited, the number of authorized shares will be reduced by the number of shares reacquired. |
| Dissenters' or appraisal rights........................ | Such rights are not available with respect to a merger or consolidation by a corporation the shares of which are either listed on a national securities exchange or held of record by more than 2,000 stockholders if such stockholders are required to receive only: <br> - shares of the surviving corporation, <br> - shares of any other corporation which are either listed on a national securities exchange or held of record by more than 2,000 holders, <br> - cash in lieu of fractional shares, or <br> - a combination of the foregoing. | Same. |
| Description of Common Stock........................ | The holders of Peregrine common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. | Pursuant to Harbinger's amended and restated articles of incorporation, the board of directors has the authority, without further action by the shareholders, to issue up to 20,000,000 shares of preferred stock, $0.0001 par value per share for shares issued after July 20, 1995 and $10.00 par value per share for shares issued prior to July 20, 1995, in one or more series and to fix the designations, preferences, conversion rights, voting rights, powers, restrictions, limitations as to dividends, qualifications or redemption, any or all of which |

191

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0823

|  | PEREGRINE (DELAWARE) | HARBINGER (GEORGIA) |
|---|---|---|
|  |  | may be greater than the rights of the common stock. |
| Shareholder derivative suits........................ | Under Delaware law, a stockholder may only bring a derivative action on behalf of the corporation if the stockholder was a stockholder at the time of the transaction in question or his or her stock thereafter devolved upon the stockholder by operation of law. | Under Georgia law, a shareholder may not commence or maintain a derivative proceeding unless the shareholder was a shareholder of the corporation at the time of the act or omission complained of or became a shareholder through transfer by operation of law from one who was a shareholder at that time. In addition, Georgia law requires that the shareholder fairly and adequately represent the interests of the corporation in enforcing the rights of the corporation. |

192

Exhibit H
0824

EXPERTS

The consolidated financial statements and schedule of Peregrine Systems, Inc. as of March 31, 1999 and 2000 and for each of the three years in the period ended March 31, 2000, the consolidated financial statements of Telco Research Corporation Limited as of January 31, 2000 and December 31, 1998 and for the thirteen months ended January 31, 2000 and the year ended December 31, 1998 and the financial statements of Telco Research Corporation as of December 31, 1997 and 1996 and for the years then ended, included in this joint proxy/prospectus and elsewhere in the registration statement have been audited by Arthur Andersen LLP, independent public accountants, as indicated in their report with respect thereto, and are included herein in reliance upon the authority of said firm as experts in giving said report.

The consolidated financial statements of Harbinger Corporation as of December 31, 1999 and 1998 and for each of the years in the three-year period ended December 31, 1999 included in this joint proxy statement/prospectus have been so included in reliance upon the report of KPMG LLP, independent accountants, given on the authority of said firm as experts in auditing and accounting.

LEGAL MATTERS

The legality of the shares of Peregrine common stock offered will be passed upon for Peregrine by Wilson Sonsini Goodrich & Rosati, Professional Corporation, of Palo Alto, California, counsel for Peregrine. Harbinger is represented in connection with the merger by Brobeck, Phleger & Harrison LLP, Palo Alto, California, and Morris, Manning & Martin, L.L.P., Atlanta, Georgia. It is a condition to the completion of the merger that Harbinger receive an opinion of Morris, Manning & Martin, L.L.P. and that Peregrine receive an opinion from Wilson Sonsini Goodrich & Rosati, P.C., in each case to the effect that, among other things, the merger will be a reorganization for federal income tax purposes. See "The Merger--Material United States income tax considerations of the merger."

PEREGRINE STOCKHOLDER PROPOSALS

As a Peregrine stockholder, you may be entitled to present proposals for action at a forthcoming meeting if you comply with the requirements of the proxy rules established by the Securities and Exchange Commission. Proposals of Peregrine stockholders intended to be presented for consideration at Peregrine's 2001 annual meeting of stockholders must be received by Peregrine no later than April 7, 2001, in order that they may be included in the proxy statement and form of proxy related to that meeting.

The proxy card for our 2001 annual meeting will grant the proxy holders discretionary authority to vote on any matter raised at the annual meeting. If you intend to submit a proposal at the 2001 annual meeting, which is not eligible for inclusion in the proxy statement and form of proxy relating to that meeting, you must do so no later than June 21, 2001. If you fail to comply with the foregoing notice provision, the proxy holders will be allowed to use their discretionary voting authority when the proposal is raised at the 2001 Annual Meeting.

HARBINGER SHAREHOLDER PROPOSALS

If the merger is not completed, as a Harbinger shareholder, you may be entitled to present proposals for our 2001 annual meeting if you comply with the requirements of the proxy rules established by the Securities and Exchange Commission. Proposals of Harbinger shareholders intended to be presented for consideration at Harbinger's 2001 annual meeting of shareholders must be received by Harbinger no later than December 25, 2000, in order that they may be included in the proxy statement and form of proxy relating to that meeting.

193

Exhibit H
0825

WHERE YOU CAN FIND MORE INFORMATION

We will provide to you a copy of any and all of the information (excluding exhibits, other than those filed with this joint proxy statement/prospectus) that we file with the Securities and Exchange Commission, without charge, upon written or oral request. YOU SHOULD MAKE ANY REQUEST FOR DOCUMENTS BY JUNE 5, 2000 TO ENSURE TIMELY DELIVERY OF THE DOCUMENTS.


Requests for documents relating to          Requests for documents relating to
Peregrine Systems, Inc. should be directed to:          Harbinger should be directed to:

Peregrine Systems, Inc.                      Harbinger Corporation
12670 High Bluff Drive                       1277 Lenox Park Boulevard
San Diego, California 92130                  Atlanta, Georgia 30319
Telephone: (858) 481-5000                    Telephone: (404) 467-3000
Attention: Eric P. Deller                    Attention: Loren B. Wimpfheimer


Reports, proxy statements, and other information concerning Peregrine and Harbinger may also be inspected at The National Association of Securities Dealers, 1735 K Street N.W., Washington, D.C. 20006.

Peregrine and Harbinger have each filed reports, proxy statements, and other information with the Securities and Exchange Commission. Copies of their reports, proxy statements and other information may be inspected and copied at the public reference facilities maintained by the SEC:


Judiciary Plaza              Citicorp Center              Seven World Trade Center
Room 1024                    500 West Madison Street      13th Floor
450 Fifth Street, N.W.       Suite 1400                   New York, New York 10048
Washington, D.C. 20549       Chicago, Illinois 60661


Copies of these materials can also be obtained by mail at prescribed rates from the Public Reference Section of the SEC, 450 Fifth Street, N.W., Washington, D.C. 20549 or by calling the SEC at 1-800-SEC-0330. The SEC maintains a website that contains reports, proxy statements and other information regarding both Peregrine and Harbinger. The address of the SEC website is HTTP://WWW.SEC.GOV.

Peregrine has filed a registration statement under the Securities Act with the SEC with respect to Peregrine's common stock to be issued to Harbinger shareholders in the merger. This joint proxy statement/prospectus constitutes the prospectus of Peregrine filed as part of the registration statement. This joint proxy statement/prospectus does not contain all of the information set forth in the registration statement because certain parts of the registration statement are omitted as provided by the rules and regulations of the SEC. You may inspect and copy the registration statement at any of the addresses listed above.

194

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0826

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | PAGE |
|---|---|
| PEREGRINE'S CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED MARCH 31, 2000, 1999, AND 1998 | |
| Report of Independent Public Accountants | F-2 |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Operations | F-4 |
| Consolidated Statements of Stockholders' Equity (Deficit) | F-5 |
| Consolidated Statements of Cash Flows | F-6 |
| Notes to Consolidated Financial Statements | F-7 |
| | |
| TELCO RESEARCH CORPORATION LIMITED'S CONSOLIDATED FINANCIAL STATEMENTS FOR THE THIRTEEN MONTHS ENDED JANUARY 31, 2000 AND THE YEAR ENDED DECEMBER 31, 1998 | |
| Report of Independent Public Accountants | F-25 |
| Consolidated Balance Sheets as of January 31, 2000 and December 31, 1998 | F-26 |
| Consolidated Statements of Income (Loss) for the thirteen months ended January 31, 2000 and the year ended December 31, 1998 | F-27 |
| Consolidated Statements of Retained Earnings (Deficit) as of January 31, 2000 and December 31, 1998 | F-28 |
| Consolidated Statements of Cash Flows for the thirteen months ended January 31, 2000 and the year ended December 31, 1998 | F-29 |
| Notes to Consolidated Financial Statements | F-30 |
| TELCO RESEARCH CORPORATION'S FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 1997 AND 1996 | |
| Report of Independent Public Accountants | F-39 |
| Balance Sheets as of December 31, 1997 and 1996 | F-40 |
| Statements of Income for the years ended December 31, 1997 and 1996 | F-41 |
| Statements of Stockholders' Equity for the years ended December 31, 1997 and 1996 | F-42 |
| Statements of Cash Flows for the years ended December 31, 1997 and 1996 | F-42 |
| Notes to Financial Statements | F-43 |
| | |
| UNAUDITED PRO FORMA COMBINED CONDENSED FINANCIAL STATEMENTS (RELATING TO BUSINESS TO COMBINATION OF PEREGRINE AND TELCO RESEARCH) | |
| Unaudited Pro Forma Combined Condensed Financial Information | F-49 |
| Unaudited Pro Forma Condensed Consolidated Statement of Operations for the year ended March 31, 2000 | F-50 |
| Notes to the Unaudited Pro Forma Combined Condensed Statement of Operations | F-51 |
| | |
| HARBINGER'S CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 1999, 1998, AND 1997 | |
| Report of Independent Public Accountants | F-54 |
| Consolidated Balance Sheets | F-55 |
| Consolidated Statements of Operations | F-56 |
| Consolidated Statement of Comprehensive Income (Loss) | F-57 |
| Consolidated Statements of Shareholders' Equity | F-58 |
| Consolidated Statements of Cash Flows | F-59 |
| Notes to Consolidated Financial Statements | F-61 |
| HARBINGER'S UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS FOR THE THREE MONTHS ENDED MARCH 31, 2000 AND 1999 | |
| Consolidated Balance Sheets | F-83 |
| Consolidated Statements of Operations | F-84 |

Exhibit H
0827

Consolidated Statement of Comprehensive Income..............    F-85
Consolidated Statements of Cash Flows.......................    F-86
Notes to Consolidated Financial Statements..................    F-87

    </TABLE>

                              F-1

Exhibit H
0828

REPORT OF INDEPENDENT ACCOUNTANTS

To Peregrine Systems, Inc.:

    We have audited the accompanying consolidated balance sheets of Peregrine Systems, Inc. (a Delaware corporation) and subsidiaries as of March 31, 2000 and 1999, and the related consolidated statements of operations, stockholders' equity (deficit) and cash flows for each of the three years in the period ended March 31, 2000. These consolidated financial statements and the schedule referred to below are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and the schedule based on our audits.

    We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

    In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Peregrine Systems, Inc. and subsidiaries as of March 31, 2000 and 1999, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2000 in conformity with accounting principles generally accepted in the United States.

    Our audits were made for the purpose of forming an opinion on the basic financial statements taken as a whole. The schedule listed in the index to the consolidated financial statements is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic consolidated financial statements. The schedule has been subjected to the auditing procedures applied in the audits of the basic consolidated financial statements and, in our opinion, fairly states, in all material respects, the financial data required to be set forth therein in relation to the basic financial statements taken as a whole.

San Diego, California
April 25, 2000

F-2

Exhibit H
0829

PEREGRINE SYSTEMS, INC.

CONSOLIDATED BALANCE SHEETS

(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

|  | MARCH 31, 2000 | MARCH 31, 1999 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents.................................... | $ 33,511 | $ 21,545 |
| Short-term investments....................................... | -- | 2,000 |
| Accounts receivable, net of allowance for doubtful accounts of $2,179 and $1,248, respectively........................ | 69,940 | 38,947 |
| Deferred tax assets.......................................... | 4,024 | 5,798 |
| Other current assets......................................... | 18,802 | 10,370 |
| Total current assets..................................... | 126,277 | 78,660 |
| Property and equipment, net.................................. | 29,537 | 15,895 |
| Intangible assets, investments and other, net............... | 367,616 | 113,158 |
|  | $523,430 | $207,713 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current Liabilities:** | | |
| Accounts payable......................................... | $ 19,850 | $ 6,795 |
| Accrued expenses......................................... | 49,064 | 26,460 |
| Deferred revenue......................................... | 36,779 | 20,048 |
| Current portion of long-term debt........................ | 74 | 55 |
| Total current liabilities............................ | 105,767 | 53,358 |
| Long-term debt, net of current portion...................... | 1,257 | 594 |
| Deferred revenue, net of current portion.................... | 4,556 | 2,980 |
| Total liabilities........................................... | 111,580 | 56,932 |
| **Stockholders' Equity:** | | |
| Preferred stock, $0.001 par value, 5,000 shares authorized, no shares issued or outstanding........................... | -- | -- |
| Common stock, $0.001 par value, 200,000 shares authorized, 109,501 and 97,106 shares issued and outstanding, respectively............................................. | 110 | 97 |
| Additional paid-in capital................................... | 480,957 | 193,739 |
| Accumulated deficit.......................................... | (64,863) | (39,793) |
| Unearned portion of deferred compensation................... | (678) | (1,019) |
| Accumulated other comprehensive loss........................ | (666) | (518) |
| Treasury stock, at cost..................................... | (3,010) | (1,725) |
| Total stockholders' equity.................................. | 411,850 | 150,781 |
|  | $523,430 | $207,713 |

THE ACCOMPANYING NOTES ARE AN INTEGRAL PART OF THESE CONSOLIDATED FINANCIAL STATEMENTS.

F-3

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0830

PEREGRINE SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF OPERATIONS

(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

| | YEAR ENDED MARCH 31, | | |
| --- | --- | --- | --- |
| | 2000 | 1999 | 1998 |
| Revenues: | | | |
| Licenses.................................................... | $168,467 | $ 87,362 | $38,791 |
| Services.................................................... | 84,833 | 50,701 | 23,086 |
| Total revenues......................................... | 253,300 | 138,063 | 61,877 |
| Costs and Expenses: | | | |
| Cost of licenses............................................ | 1,426 | 1,020 | 326 |
| Cost of services........................................... | 51,441 | 31,561 | 10,326 |
| Sales and marketing........................................ | 101,443 | 50,803 | 22,728 |
| Research and development................................... | 28,517 | 13,919 | 8,394 |
| General and administrative................................. | 19,871 | 10,482 | 6,077 |
| Amortization of intangible assets.......................... | 34,753 | 18,012 | 3,168 |
| Acquired in-process research and development costs........ | 24,505 | 26,005 | 6,955 |
| Total costs and expenses............................... | 261,956 | 151,802 | 57,974 |
| Income (loss) from operations............................. | (8,656) | (13,739) | 3,903 |
| Interest income, net....................................... | 38 | 664 | 839 |
| Income (loss) from operations before income taxes.......... | (8,618) | (13,075) | 4,742 |
| Income taxes............................................... | 16,452 | 10,295 | 5,358 |
| Net loss................................................... | $(25,070) | $(23,370) | $ (616) |
| Net loss per share--basic and diluted: | | | |
| Net loss per share........................................ | $ (0.24) | $ (0.27) | $ (0.01) |
| Shares used in computation................................. | 102,332 | 87,166 | 69,520 |

THE ACCOMPANYING NOTES ARE AN INTEGRAL PART OF THESE CONSOLIDATED FINANCIAL
STATEMENTS.

F-4

Exhibit H
0831

PEREGRINE SYSTEMS, INC.
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)
(IN THOUSANDS)

| | NUMBER OF SHARES OUTSTANDING | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | ACCUMULATED DEFICIT | UNEARNED PORTION OF DEFERRED COMPENSATION | ACCUMULATED OTHER COMPREHENSIVE LOSS |
|---|---|---|---|---|---|---|
| Balance, March 31, 1997............. | 51,680 | $ 52 | $ 15,042 | $(15,807) | $(1,748) | $(388) |
| Net loss............................ | -- | -- | | (616) | | |
| Issuance of common stock in IPO, net of issuance costs of $1,181........ | 9,200 | 9 | 18,062 | -- | -- | -- |
| Stock options exercised and restricted stock granted (net)..... | 6,616 | 6 | 2,788 | -- | -- | -- |
| Stock issued for Apsylog Acquisition....................... | 7,664 | 8 | 30,498 | -- | -- | -- |
| Stock option tax benefit............ | -- | -- | 7,905 | -- | -- | -- |
| Compensation expense related to restricted stock and options....... | -- | -- | -- | -- | 414 | -- |
| Deferred compensation related to options granted................... | -- | -- | -- | -- | (159) | -- |
| Stock repurchased................... | -- | -- | -- | -- | -- | -- |
| Equity adjustment from foreign currency translation.............. | -- | -- | -- | -- | -- | (165) |
| Balance, March 31, 1998............. | 75,160 | 75 | 74,295 | (16,423) | (1,493) | (553) |
| Net loss............................ | -- | -- | | (23,370) | -- | -- |
| Stock options exercised............. | 7,018 | 7 | 7,914 | -- | -- | -- |
| Stock issued for acquisitions....... | 14,928 | 15 | 105,434 | -- | -- | -- |
| Stock option tax benefit............ | -- | -- | 6,096 | -- | -- | -- |
| Compensation expense related to restricted stock and options....... | -- | -- | -- | -- | 474 | -- |
| Stock repurchased................... | -- | -- | -- | -- | -- | -- |
| Equity adjustment from foreign currency translation.............. | -- | -- | -- | -- | -- | 35 |
| Balance, March 31, 1999............. | 97,106 | 97 | 193,739 | (39,793) | (1,019) | (518) |
| Net loss............................ | -- | -- | | (25,070) | -- | -- |
| Stock options exercised............. | 7,345 | 5 | 23,422 | -- | -- | -- |
| Stock issued for acquisitions........ | 5,050 | 5 | 169,643 | -- | -- | -- |
| Stock issued for strategic investments....................... | -- | 3 | 83,558 | -- | -- | -- |
| Stock option tax benefit............ | -- | -- | 10,595 | -- | -- | -- |
| Compensation expense related to restricted stock and options....... | -- | -- | -- | -- | 341 | -- |
| Stock repurchased................... | -- | -- | -- | -- | -- | -- |
| Equity adjustment from foreign currency translation.............. | -- | -- | -- | -- | -- | (148) |
| Balance, March 31, 2000............. | 109,501 | $110 | $480,957 | $(64,863) | $ (678) | $(666) |

| | TREASURY STOCK | TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | COMPREHENSIVE INCOME (LOSS) |
|---|---|---|---|
| Balance, March 31, 1997............. | $ | $ (2,849) | $ -- |
| Net loss............................ | -- | (616) | (616) |
| Issuance of common stock in IPO, net of issuance costs of $1,181........ | -- | 18,071 | |
| Stock options exercised and restricted stock granted (net)..... | -- | 2,794 | |
| Stock issued for Apsylog Acquisition....................... | -- | 30,506 | |
| Stock option tax benefit............ | -- | 7,905 | |
| Compensation expense related to restricted stock and options....... | -- | 414 | |
| Deferred compensation related to options granted................... | -- | (159) | |
| Stock repurchased................... | (262) | (262) | |
| Equity adjustment from foreign currency translation.............. | -- | (165) | (165) |
| Balance, March 31, 1998............. | (262) | 55,639 | (781) |
| Net loss............................ | -- | (23,370) | (23,370) |
| Stock options exercised............. | -- | 7,921 | |
| Stock issued for acquisitions....... | -- | 105,449 | |
| Stock option tax benefit............ | -- | 6,096 | |
| Compensation expense related to restricted stock and options....... | -- | 474 | |
| Stock repurchased................... | (1,463) | (1,463) | |
| Equity adjustment from foreign currency translation.............. | -- | 35 | 35 |
| Balance, March 31, 1999............. | (1,725) | 150,781 | (23,335) |
| Net loss............................ | -- | (25,070) | (25,070) |
| Stock options exercised............. | -- | 23,427 | |

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0832

| | | | |
|---|---|---|---|
| Stock issued for acquisitions........ | -- | 169,648 | |
| Stock issued for strategic investments........................ | -- | 83,561 | |
| Stock option tax benefit............. | -- | 10,595 | |
| Compensation expense related to restricted stock and options....... | -- | 341 | |
| Stock repurchased.................... | (1,285) | (1,285) | |
| Equity adjustment from foreign currency translation............... | -- | (148) | (148) |
| Balance, March 31, 2000............. | $(3,010) | $411,850 | $(25,218) |

THE ACCOMPANYING NOTES ARE AN INTEGRAL PART OF THESE CONSOLIDATED FINANCIAL
STATEMENTS.

F-5

Exhibit H
0833

PEREGRINE SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS

(IN THOUSANDS)

|  | YEAR ENDED MARCH 31, | | |
|  | 2000 | 1999 | 1998 |
|---|---|---|---|
| Cash flow from operating activities: | | | |
| Net loss........................................................... | $(25,070) | $(23,370) | $  (616) |
| Adjustments to reconcile loss to net cash provided by operating activities: | | | |
| Depreciation and amortization........................... | 43,788 | 21,776 | 4,901 |
| Acquired in-process research and development costs...... | 24,505 | 26,005 | 6,955 |
| Increase (decrease) in cash resulting from changes, net of business acquired, in: | | | |
| Accounts receivable.............................. | (24,364) | (18,984) | (5,982) |
| Deferred tax asset............................... | 1,774 | 1,499 | (856) |
| Other current assets............................. | (289) | (7,177) | (1,116) |
| Accounts payable................................. | 4,755 | 2,939 | 674 |
| Accrued expenses................................. | 6,733 | 6,390 | (1,767) |
| Deferred revenue................................. | 12,467 | 4,874 | 1,361 |
| Other assets..................................... | 2,717 | (245) | 534 |
|  | 47,016 | 13,707 | 4,088 |
| Net cash used by discontinued business..................... | -- | -- | (170) |
| Net cash provided by operating activities....... | 47,016 | 13,707 | 3,918 |
| Cash flows from investing activities: | | | |
| Technology acquisitions................................... | (22,351) | -- | -- |
| Purchases of short-term investments....................... | -- | (49,000) | (45,732) |
| Maturities of short-term investments...................... | 2,000 | 54,027 | 38,705 |
| Equity investments purchased............................. | (11,291) | -- | -- |
| Purchases of property and equipment....................... | (20,713) | (12,426) | (2,427) |
| Cash expenditures related to acquisitions................ | (7,752) | (11,231) | (2,410) |
| Other investing activities............................... | 145 | 103 | 582 |
| Net cash used in investing activities........... | (59,962) | (18,527) | (11,282) |
| Cash flows from financing activities: | | | |
| Repayments of bank line of credit, net.................... | -- | -- | (3,387) |
| Repayments of long-term debt............................. | (7,832) | (1,174) | (2,541) |
| Issuance of common stock................................. | 34,022 | 14,017 | 28,770 |
| Treasury stock purchased................................. | (1,285) | (1,463) | (262) |
| Principal payments under capital lease obligation......... | -- | -- | (406) |
| Net cash provided by financing activities....... | 24,905 | 11,380 | 22,174 |
| Effect of exchange rate changes on cash.................... | 7 | 35 | (165) |
| Net increase in cash and cash equivalents.................. | 11,966 | 6,595 | 14,645 |
| Cash and cash equivalents, beginning of period............. | 21,545 | 14,950 | 305 |
| Cash and cash equivalents, end of period................... | $ 33,511 | $ 21,545 | $ 14,950 |
| Cash paid during the period for: | | | |
| Interest....................................................... | $    451 | $    26 | $    38 |
| Income taxes................................................. | $  3,015 | $   155 | $   622 |
| Supplemental Disclosure of Noncash Investing and Financial Activities: | | | |
| Stock issued and other noncash consideration for acquisitions............................................ | $169,648 | $105,449 | $ 30,506 |
| Stock issued for strategic investments................... | $ 83,561 | $    -- | $    -- |

THE ACCOMPANYING NOTES ARE AN INTEGRAL PART OF THESE CONSOLIDATED FINANCIAL
STATEMENTS.

F-6

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0834

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. COMPANY OPERATIONS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

THE COMPANY

Peregrine Systems, Inc. (unless otherwise noted, "Peregrine Systems," "we," "PSI," "us," or "our" refers to Peregrine Systems, Inc.) is a leading provider of Infrastructure Management and e-Infrastructure software solutions. Using common shared data, our products help manage information technology assets as well as assets relating to corporate facilities and fleets. In addition, we have recently introduced products for rail management and internet-based asset procurement. We sell our software and services in North America and internationally through both a direct sales force and through business partnerships.

PRINCIPLES OF CONSOLIDATION

The consolidated financial statements include the accounts of PSI and its wholly owned subsidiaries. All significant intercompany accounts and transactions have been eliminated. Certain amounts previously reported have been reclassified in order to ensure comparability among the years reported.

USE OF ESTIMATES

The preparation of our financial statements in conformity with generally accepted accounting principles requires us to make estimates and assumptions that may affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities, and the reported amounts of revenues and expenses during the reporting periods. Actual results could differ from those estimates.

REVENUE RECOGNITION

We generate revenues from licensing the rights to use our software products primarily to end users. We also generate revenues from post-contract support (maintenance), consulting and training services performed for customers who license our products. We do not provide professional services unrelated to our products.

Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed, the product has been delivered, there are no material uncertainties regarding customer acceptance, collection of the resulting receivable is deemed probable, risk of concession is deemed remote, and we have no other significant obligations associated with the transaction. Revenues from post-contract support services are recognized ratably over the term of the maintenance period, generally one year. Maintenance revenues which are bundled with license agreements, are unbundled using vendor specific objective evidence. Professional services revenues are primarily related to implementation services most often performed on a time and material basis under separate service agreements for the installation of our products. Revenues from professional services and customer training are recognized as the respective services are performed.

Cost of license revenues consists primarily of amounts paid to third-party vendors, product media, manuals, packaging materials, personnel, and related shipping costs. Cost of maintenance and services revenues consists primarily of salaries, benefits, and allocated overhead costs incurred in providing telephone support, professional services, and training to customers.

F-7

Exhibit H
0835

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

1. COMPANY OPERATIONS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
Deferred revenues primarily relates to maintenance fees, which have been paid by our customers in advance of the performance of these services.

BUSINESS RISK AND CONCENTRATIONS OF CREDIT RISK

Financial instruments which may subject us to concentrations of credit risk consist principally of trade and other receivables. We perform ongoing credit evaluations of our customers' financial condition. We believe that the concentration of credit risk with respect to trade receivables is further mitigated as our customer base consists primarily of large, well established companies. We maintain reserves for credit losses and such losses historically have been within our expectations.

A substantial portion of our license revenue is derived from the sale of our Infrastructure Management applications and our e-Infrastructure solutions and is expected to account for a substantial portion of revenues for the foreseeable future. As a result, our future operating results are dependent upon continued market acceptance of the Infrastructure Resource Management strategy and applications, including future product enhancements and new product initiatives. Factors adversely affecting the pricing, demand for, or market acceptance of our Infrastructure Resource Management applications, such as competition or technological change, could have a material adverse effect on our business, operating results, and financial condition.

CASH AND CASH EQUIVALANTS

We consider all highly liquid investments with an original maturity of three months or less to be cash equivalents. Cash equivalents primarily consist of overnight repurchase agreements and money market accounts. The carrying amount reported for cash and cash equivalents approximates its fair value.

SHORT-TERM INVESTMENTS

We account for our short-term investments in accordance with Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities". Short-term investments consist of auction rate preferred stock with original maturities at date of purchase beyond three months. These securities are classified as available-for-sale and are carried at market. Gross unrealized gains or gross unrealized losses as of March 31, 1999 were not significant.

FAIR VALUE OF FINANCIAL INSTRUMENTS

The carrying value of certain of our financial instruments, including accounts receivable, accounts payable and accrued expenses approximates fair value due to their short maturities. Based on borrowing rates currently available to us for loans with similar terms, the carrying values of our notes payable approximates the fair values.

PROPERTY AND EQUIPMENT

Property and equipment are stated at cost less accumulated depreciation and amortization. Depreciation and amortization are provided using the straight-line method over estimated useful lives, generally three to five years for furniture and equipment. Amortization of leasehold improvements is

F-8

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0836

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

1. COMPANY OPERATIONS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
provided using the straight-line method over the lesser of the useful lives of
the assets or the terms of the related leases.

Maintenance and repairs are charged to operations as incurred. When assets
are sold, or otherwise disposed of, the cost and related accumulated
depreciation are removed from the accounts and any gain or loss is included in
operations for the applicable period.

LONG-LIVED ASSETS

We evaluate potential impairment of long-lived assets and long-lived assets
to be disposed of in accordance with Statement of Financial Accounting Standards
No. 121, "Accounting for the Impairment of Long-Lived Assets to be Disposed Of"
("SFAS No. 121"). SFAS No. 121 establishes procedures for review of
recoverability, and measurement of impairment, if necessary, of long-lived
assets and certain identifiable intangibles held and used by an entity. SFAS
No. 121 requires that those assets be reviewed for impairment whenever events or
changes in circumstances indicate that the carrying amount of an asset may not
be fully recoverable based on expected undiscounted cash flows attributable to
that asset. The amount of any impairment is measured as the difference between
the carrying value and the fair value of the impaired asset. As of March 31,
2000, we believe that there has not been any impairment of our long-lived assets
or other identifiable intangibles.

STRATEGIC INVESTMENTS

During fiscal 2000, we entered into a strategic relationship with Goldmine
Software Corporation ("Goldmine"), a developer of service desk and customer
relationship management software, to collaborate on sales and distribution
efforts and in the development of marketing and software content. As part of the
agreement, we invested approximately $74.5 million of our Common Stock in
exchange for approximately a 10% ownership of Goldmine, subsequent to our
investment. Our investment in Goldmine is being accounted for using the cost
method.

During fiscal 2000, we entered into a strategic relationship with
SupplyAccess, Inc. ("SupplyAccess"), a business-to-business electronic
marketplace provider for information technology equipment, to collaborate on the
sales and distribution efforts surrounding the information technology equipment
procurement market. As part of the agreement, we invested approximately
$9.1 million of our Common Stock in exchange for approximately an 18% ownership
of SupplyAccess, subsequent to our investment. Our investment in SupplyAccess is
being accounted for using the cost method.

In addition, we have made several other strategic investments for aggregate
consideration of approximately $11.3 million during fiscal 2000, all of which
are being accounted for using the cost method.

Many of our investments are in companies whose operations are not yet
sufficient to establish them as profitable concerns. Adverse changes in market
conditions or poor operating results of underlying investments could result in
losses or an inability to recover the carrying value of our investments.

F-9

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0837

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

1. COMPANY OPERATIONS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
INTANGIBLE ASSETS

Intangible assets are comprised of purchase price in excess of identifiable assets associated with our acquired businesses and purchased technology. Intangible assets are carried at cost less accumulated amortization, which is being amortized on a straight-line basis over generally five years.

CAPITALIZED COMPUTER SOFTWARE

In accordance with Statement of Financial Accounting Standards No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed", software development costs are capitalized from the time the product's technological feasibility has been established until the product is released for sale to the general public. During the three years in the period ended March 31, 2000, no software development costs were capitalized as the costs incurred between achieving technological feasibility and product release were minimal. Research and development costs, including the design of product enhancements, are expensed as incurred.

FOREIGN CURRENCY TRANSLATION AND RISK MANAGEMENT

Assets and liabilities of our foreign operations are translated into United States dollars at the exchange rate in effect at the balance sheet date, and revenue and expenses are translated at the average exchange rate for the period. Translation gains or losses of our foreign subsidiaries are not included in operations but are reported as other comprehensive income. The functional currency of those subsidiaries is the primary currency in which the subsidiary operates. Gains and losses on transactions in denominations other than the functional currency of our foreign operations, while not significant in amount, are included in the results of operations.

We enter into forward exchange contracts of approximately one month in length to minimize the short-term impact of foreign currency fluctuations on assets and liabilities denominated in currencies other than the functional currency of the reporting entity. All foreign exchange forward contracts are designated and effective as a hedge and are inversely correlated to the hedged item as required by generally accepted accounting principles.

Gains and losses on the contracts are included in other income and offset foreign exchange gains or losses from the revaluation of intercompany balances or other current assets and liabilities denominated in currencies other than the functional currency of the reporting entity.

INCOME TAXES

Deferred taxes are provided for utilizing the liability method as prescribed by Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes," whereby deferred tax assets are recognized for deductible temporary differences and operating loss carryforwards, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment. Deferred tax assets are reduced by a valuation allowance when, in our opinion, it is more likely than not that some portion or all of the deferred tax assets will not be realized.

F-10

Exhibit H
0838

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

1. COMPANY OPERATIONS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
COMPUTATION OF NET LOSS PER SHARE

Our computation of net loss per share is performed in accordance with the provisions of Statement of Financial Accounting Standards No. 128, "Earnings per Share" ("SFAS No. 128"). SFAS No. 128 requires companies to compute net income (loss) per share under two different methods, basic and diluted per share data for all periods for which an income statement is presented. Basic earnings per share is computed by dividing net income (loss) by the weighted average number of common shares outstanding during the period. Potential dilutive common shares are calculated using the treasury stock method and represent incremental shares issuable upon exercise of our outstanding stock options. For the years ended March 31, 2000, 1999, and 1998, the diluted loss per share calculation excludes the effect of outstanding stock options as inclusion would be anti-dilutive.

STOCK SPLIT

On January 20, 2000, our board of directors declared a two-for-one stock split of our Common Stock, effected in the form of a stock dividend. Stockholders of record as of the close of business on February 4, 2000 were issued a certificate representing one additional share of our Common Stock for each share of Common Stock held on the record date. All stock related data in the consolidated financial statements and related notes reflect this stock split for all periods presented.

RECENT ACCOUNTING PRONOUNCEMENTS

In June 1998, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("SFAS No. 133"). This statement changes the previous accounting definition of derivative--which focused on freestanding contracts such as options and forwards (including futures and swaps)--expanding it to include embedded derivatives and many commodity contracts. Under the statement, every derivative is recorded in the balance sheet as either an asset or liability measured at its fair value. The statement requires that changes in a derivative's fair value be recognized currently in operations unless specific hedge accounting criteria are met. SFAS No. 133, as amended by SFAS 137, is effective for all fiscal quarters of all fiscal years beginning after June 15, 2000. We do not anticipate that the adoption of this amendment will have a material impact on our financial position or results of operations.

In December 1999, the SEC issued Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" ("SAB No. 101"). SAB No. 101, as amended, is effective no later than the second calendar quarter of fiscal 2001. We are in the process of evaluating the potential impact of SAB No. 101, but we anticipate that the impact to our consolidated financial statements, if any, will be insignificant.

2. ACQUISITIONS

In September 1997, we completed the acquisition of all of the outstanding stock of Apsylog, a developer of decision software solutions designed for asset management. The consideration given for the stock of Apsylog included approximately 7,664,000 shares of our Common Stock valued at a total purchase price of $38.6 million, including merger costs and assumed liabilities.

On July 30, 1998, we completed the acquisition of Innovative Tech Systems, Inc. ("Innovative"), a developer of facilities infrastructure management software. This acquisition was structured as a tax-free

F-11

Exhibit H
0839

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

2. ACQUISITIONS (CONTINUED)

stock-for-stock exchange resulting in the issuance of approximately 11,837,000 shares of our Common Stock for all outstanding shares of Innovative Common Stock valued at a total purchase price of $85.9 million, including merger costs and assumed liabilities.

On September 23, 1998, we completed the acquisition of certain technology and other assets and liabilities from International Software Solutions and related persons and entities (collectively "ISS"), a developer of remote management software. We issued approximately 1,569,000 shares of our Common Stock in exchange for these assets valued at a total purchase price, including merger costs, of $15.6 million.

On March 2, 1999, we completed the acquisition of Prototype, Inc. ("Prototype"), a developer of fleet infrastructure management software. We issued approximately 1,522,000 shares of our Common Stock and $1.1 million in cash for all of the outstanding shares of Prototype. The purchase price, including merger costs and assumed liabilities, totaled $25.9 million.

On April 2, 1999, we completed the acquisition of F.Print UK Ltd. ("FPrint"), a developer of desktop inventory and asset discovery software. We issued approximately 1,508,000 shares of our Common Stock and $1.3 million in cash for all the outstanding shares of FPrint for a total purchase price, including merger costs, of $26.2 million.

On September 29, 1999, we completed the acquisition of Knowlix Corporation ("Knowlix"), a developer of knowledge management software. We issued approximately 706,000 shares of our Common Stock for all the outstanding shares of Knowlix for a total purchase price, including merger costs, of $17.8 million.

On March 23, 2000, we completed the acquisition of Telco Research Corporation Limited ("Telco Research"), a developer of telephony infrastructure management software and related ancillary products. We issued approximately 2,563,000 shares of our Common Stock for all of the outstanding shares of Telco Research for a total purchase price, including merger costs, of $123.9 million.

On March 24, 2000, we completed the acquisition of Barnhill Management Corporation ("Barnhill"), a provider of infrastructure management system solutions and related professional services. We issued approximately 273,000 shares of our Common Stock for all of the outstanding shares of Barnhill for a total purchase price, including merger costs and assumed liabilities, of $32.2 million.

ACCOUNTING TREATMENT OF ACQUISITIONS

All of the transactions above were accounted for under the purchase method of accounting and, accordingly, the assets, including in-process research and development, and liabilities, were recorded based on their fair values, as determined by independent appraisals, at the date of acquisition and the results of operations for each of the acquisitions have been included in the financial statements for the periods subsequent to acquisition.

F-12

Exhibit H
0840

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

2. ACQUISITIONS (CONTINUED)

We allocated each purchase price between acquired in-process research and development, the fair value of the net assets acquired, and the purchase price in excess of the acquired assets. The allocations of values are as follows (in thousands):

| | ACQUIRED IN-PROCESS RESEARCH AND DEVELOPMENT | FAIR VALUE OF NET ASSETS ACQUIRED | PURCHASE PRICE IN EXCESS OF THE ACQUIRED ASSETS | TOTAL |
|---|---|---|---|---|
| **FISCAL 2000** | | | | |
| Fprint........................... | $ 4,194 | $ -- | $ 22,018 | $ 26,212 |
| Knowlix.......................... | 2,852 | -- | 14,973 | 17,825 |
| Barnhill......................... | -- | -- | 32,192 | 32,192 |
| Telco Research................... | 17,459 | 7,520 | 98,934 | 123,913 |
| | $24,505 | $7,520 | $168,117 | $200,142 |
| **FISCAL 1999** | | | | |
| Innovative....................... | $18,907 | $ -- | $ 67,032 | $ 85,939 |
| ISS.............................. | 2,959 | -- | 12,614 | 15,573 |
| Prototype........................ | 4,139 | -- | 21,728 | 25,867 |
| | $26,005 | $ -- | $101,374 | $127,379 |
| **FISCAL 1998** | | | | |
| Apsylog.......................... | $ 6,955 | $ -- | $ 31,684 | $ 38,639 |
| | $ 6,955 | $ -- | $ 31,684 | $ 38,639 |

The value of each acquisition's acquired in-process technology was computed using a discounted cash flow analysis on the anticipated income stream of the related product sales. The value assigned to acquired in-process technology was determined by estimating the costs to develop the purchased in-process technology into commercially viable products, estimating the resulting net cash flows from the projects and discounting the net cash flows to their present value. With respect to the acquired in-process technology, the calculations of value were adjusted to reflect the value creation efforts of the companies acquired prior to the close of each acquisition.

The nature of the efforts required to develop acquired in-process technology into commercially viable products principally relates to the completion of all planning, designing and testing activities that are necessary to establish that the products can be produced to meet their design requirements, including functions, features and technical performance requirements. If the research and development project and technologies are not completed as planned, they will neither satisfy the technical requirements of a changing market nor be cost effective.

No assurance can be given, however, that the underlying assumptions used to estimate expected product sales, development costs or profitability, or the events associated with such projects, will transpire as estimated. We currently believe that actual results have been consistent with forecasts with respect to acquired in-process revenues. Because we do not account for expenses by product, it is not possible to determine the actual expenses associated with any of the acquired technologies. However,

F-13

Exhibit H
0841

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

2. ACQUISITIONS (CONTINUED)

we believe that expenses incurred to date associated with the development and integration of the acquired in-process research and development projects are substantially consistent with our previous estimates.

We have completed many of the original research and development projects in accordance with our plans. We continue to work toward the completion of other projects. The majority of the projects are on schedule, but delays may occur due to changes in technological and market requirements for our products. The risks associated with these efforts are still considered high and no assurance can be made that any upcoming products will meet with market acceptance. Delays in the introduction of certain products may adversely affect our revenues and earnings in future quarters.

During fiscal years 2000, 1999, and 1998 we expended $7.8 million, $11.2 million, and $2.4 million, respectively, for acquisition costs and liabilities assumed related to the acquisitions detailed above. These expenditures relate to advisory fees (investment bankers, attorneys, accountants and other consultant fees); employee severance and relocation costs; costs associated with the reduction of duplicate facilities, equipment and efforts; and other merger related costs (e.g. filing fees, travel costs, etc.).

Acquisition related liabilities of $3.4 million at March 31, 1999 related principally to severance, relocation and lease termination costs. These amounts were expended in fiscal 2000 in amounts approximating the recorded liability.

With respect to the acquisition related liabilities at March 31, 2000, we have both approved and preliminary plans of integration and consolidation. These plans include the steps we believe will be necessary within the year to integrate the operations of these acquisitions. The plans provide for the consolidation of duplicate facilities and infrastructure assets and the elimination of duplicative efforts and positions within the combined company. In connection with the integration plans we have accrued approximately $15.1 million in merger related costs comprised principally of the following components (in thousands):

|  | ESTIMATED LIABILITY |
| --- | --- |
| Estimated advisory fees | 3,650 |
| Employee severance and relocation | 5,854 |
| Duplicative facilities, equipment and efforts | 4,991 |
| Other merger related costs | 629 |
|  | $15,124 |

This accrual represents our best estimate, based on information available as of March 31, 2000, of the identifiable and quantifiable charges that we may incur as a result of the acquisition and integration plans, however these estimates may change. Any changes in the estimates during the next year will increase or decrease goodwill as appropriate. We believe substantially all of the above costs will be paid for within the next year.

In addition to the costs included in the accrual for our acquisition and integration plans we will incur other incremental costs as a direct result of our integration efforts. These costs will be accounted for as incurred in future periods. To the extent these costs become significant they could have a material adverse effect on our future operating results.

F-14

Exhibit H
0842

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

2. ACQUISITIONS (CONTINUED)
PRO FORMA FINANCIAL INFORMATION

The following table presents the unaudited pro forma results assuming we had acquired each of Telco Research and Innovative at the beginning of fiscal years 2000 and 1999, as applicable. Net loss and diluted loss per share amounts have been adjusted to exclude acquired in process research and development write-offs of $24.5 million and $26.0 million in fiscal years 2000 and 1999, respectively and to include goodwill amortization of $51.9 million and $35.2 million in fiscal years 2000 and 1999, respectively. This information may not necessarily be indicative of our future combined results.

The unaudited pro forma results of operations exclude the results of operations of certain acquisitions consummated during fiscal 2000 and 1999. The inclusion of the results associated with these acquisitions would not materially affect the pro forma financial information presented below.

In thousands, except per share data:

|  | PRO FORMA RESULTS FOR THE YEARS ENDED MARCH 31, | |
| --- | --- | --- |
|  | (UNAUDITED) | |
|  | 2000 | 1999 |
| Revenues | $283,911 | $174,409 |
| Net loss | $(40,874) | $(52,014) |
| Basic and diluted loss per share | $ (0.40) | $ (0.58) |

3. SENIOR CREDIT FACILITY

In July 1999, we entered into a $20 million senior credit facility for a term of three years with a syndicate of financial institutions. Any borrowings under the credit facility are secured by substantially all assets and shall bear interest at a rate equal to LIBOR plus the applicable margin rate. Proceeds of the senior credit facility may be used for general corporate purposes, including acquisitions.

4. BALANCE SHEET COMPONENTS

Other current assets consists of the following (in thousands):

|  | MARCH 31, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| Prepaid expenses | $ 8,505 | $ 4,928 |
| Other | 10,297 | 5,442 |
|  | $18,802 | $10,370 |

Property and equipment consists of the following (in thousands):

|  | MARCH 31, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| Furniture and equipment | $ 44,197 | $ 23,075 |
| Leasehold improvements | 8,830 | 5,035 |
|  | 53,027 | 28,110 |
| Less accumulated depreciation | (23,490) | (12,215) |
|  | $ 29,537 | $ 15,895 |

F-15

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0843

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

4. BALANCE SHEET COMPONENTS (CONTINUED)

Intangible assets, net and other consists of the following (in thousands):

|  | MARCH 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Strategic investments.................................... | $ 94,852 | -- |
| Intangible assets and purchased technology.............. | 323,957 | 133,550 |
| Other................................................... | 4,740 | 788 |
|  | 423,549 | 134,338 |
| Less accumulated amortization........................... | (55,933) | (21,180) |
|  | $367,616 | $113,158 |

Accrued expenses consists of the following (in thousands):

|  | MARCH 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Employee compensation................................... | $ 6,146 | $ 7,370 |
| Commissions............................................. | 11,673 | 6,066 |
| Taxes................................................... | 8,340 | 5,030 |
| Acquisition related liabilities......................... | 15,124 | 3,379 |
| Other................................................... | 7,781 | 4,615 |
|  | $49,064 | $26,460 |

5. LONG-TERM DEBT

Long-term debt consists of the following (in thousands):

|  | MARCH 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Note payable to lessor. Unsecured; interest at 8%. Monthly Payments of principal and interest of $4 through November 2003.................................................. | $ 158 | $194 |
| Note payable to lessor. Unsecured; interest at 8%. Monthly Payments of principal and interest of $4 through September 2003.................................................. | 129 | -- |
| Note payable to shareholders of an acquired company. Secured; interest at 7%. Specified Payments of principal and interest through December 2001...................... | 700 | -- |
| Note payable to third party. Unsecured; interest at 9%. Monthly payments of principal and interest of $3 through April 2004............................................... | 180 | -- |
| French Government Agency loans and other.................. | 164 | 455 |
|  | 1,331 | 649 |
| Less current portion...................................... | (74) | (55) |
|  | $1,257 | $594 |

F-16

Exhibit H
0844

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

## 5. LONG-TERM DEBT (CONTINUED)

Scheduled fiscal year principal payments on long-term debt due as of March 31, 2000 are as follows (in thousands):

|  | FUTURE SCHEDULED PRINCIPAL PAYMENTS |
| --- | --- |
| 2001 | $   74 |
| 2002 | 1,015 |
| 2003 | 134 |
| 2004 | 106 |
| 2005 | 2 |
|  | ------- |
|  | $1,331 |
|  | ====== |

## 6. INCOME TAXES

The geographic distribution of income (loss) before taxes is as follows (in thousands):

|  | MARCH 31, | | |
| --- | --- | --- | --- |
|  | 2000 | 1999 | 1998 |
| Domestic | $(23,275) | $(21,041) | $  (772) |
| Foreign | 14,657 | 7,966 | 5,514 |
|  | -------- | -------- | -------- |
| Total | $ (8,618) | $(13,075) | $4,742 |
|  | ======== | ======== | ====== |

The income tax provision (benefit) consisted of the following (in thousands):

|  | MARCH 31, | | |
| --- | --- | --- | --- |
|  | 2000 | 1999 | 1998 |
| Current |  |  |  |
| Federal | $ 9,670 | $ 5,304 | $5,197 |
| State | 925 | 792 | 1,017 |
| Foreign | 4,083 | 2,700 | -- |
|  | -------- | ------- | ------ |
| Total current | 14,678 | 8,796 | 6,214 |
|  | -------- | ------- | ------ |
| Deferred |  |  |  |
| Federal | 1,265 | 1,262 | (728) |
| State | 331 | 188 | (128) |
| Foreign | 178 | 49 | -- |
|  | -------- | ------- | ------ |
| Total deferred | 1,774 | 1,499 | (856) |
|  | -------- | ------- | ------ |
| Total provision | $16,452 | $10,295 | $5,358 |
|  | ======== | ======= | ====== |

We realize an income tax benefit from disqualifying dispositions of certain stock options. This benefit results in a decrease in current income taxes payable and an increase in additional paid-in capital at the time the benefit is realized. The amount of the benefit realized for the years ended March 31, 2000, 1999, and 1998 was $10,595,000, $6,096,000 and $7,905,000, respectively.

F-17

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0845

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

6. INCOME TAXES (CONTINUED)

A reconciliation of expected income taxes using the statutory federal income tax rate to the effective income tax provision is as follows (in thousands):

| | MARCH 31, | | |
| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Federal tax provision (benefit) at the statutory rate.......................................... | $(3,016) | $(4,446) | $1,612 |
| State tax provision (benefit), net of federal effect....................................... | (345) | (654) | 237 |
| Effect of foreign earnings taxed at different rates........................................ | (437) | (912) | -- |
| Foreign sales corporation......................... | (985) | -- | -- |
| Tax credits...................................... | (1,184) | (860) | -- |
| Non-deductible acquired R&D and amortization of intangibles.................................... | 21,792 | 14,023 | 3,943 |
| Other............................................ | 78 | 1 | 16 |
| Change in valuation allowance.................... | 549 | 3,143 | (449) |
| Total income tax provision....................... | $16,452 | $10,295 | $5,359 |

The amounts stated in the table above for the years ended March 31, 2000, 1999, and 1998 are based upon income before taxes which include expenses (a significant portion of which are not tax deductible) of $59,258,000, $44,017,000, and $10,123,000, respectively, related to the acquisition of in-process research and development and amortization of purchased intangibles. Excluding these acquisition-related expenses, the effective tax rate for the years ended March 31, 2000, 1999, and 1998 was 32.5, 33.3 and 37.0 percent, respectively.

U.S. income taxes and foreign withholding taxes were not provided for on a cumulative total of approximately $14.7 million of undistributed earnings for certain non-U.S. subsidiaries. We intend to reinvest these earnings indefinitely in operations outside of the U.S.

The tax effects of temporary differences that give rise to significant portions of the net deferred tax assets are as follows (in thousands):

| | MARCH 31, | |
| | 2000 | 1999 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating loss carryforwards........................ | $ 1,197 | $ 3,148 |
| Intangible Assets...................................... | 5,192 | 3,143 |
| Deferred maintenance revenue........................... | 1,576 | 2,752 |
| Other.................................................. | 726 | 1,030 |
| Total gross deferred tax assets........................ | 8,691 | 10,073 |
| Deferred tax liabilities: | | |
| Depreciation........................................... | (167) | (324) |
| Net deferred tax asset prior to valuation allowance....... | 8,524 | 9,749 |
| Valuation allowance.................................... | (4,500) | (3,951) |
| Net deferred tax assets................................ | $ 4,024 | $ 5,798 |

F-18

Exhibit H
0846

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

6. INCOME TAXES (CONTINUED)

As of March 31, 2000, we had total net operating loss carryforwards of approximately $66.8 million for domestic federal income tax reporting purposes, which expire beginning in 2012. Approximately $63.7 million of the net operating loss carryforwards (excluded from the table above) relate to disqualifying dispositions of stock options which will result in an increase in additional paid-in capital and a decrease in income taxes payable at such time that the tax benefit is realized. In certain circumstances, as specified in the Internal Revenue Code, an ownership change of fifty percent or more by certain combinations of our stockholders during any three year period could result in an annual limitation on our ability to utilize portions of our domestic net operating loss carryforwards.

A valuation allowance in the amount set forth in the table above has been recorded to properly reserve for a portion of the deferred tax assets due to uncertainties surrounding their realization. We evaluate on a quarterly basis the recoverability of the deferred tax assets and the amount of the valuation allowance. At such time as it is determined that it is more likely than not that the deferred tax assets are realizable, the valuation allowance will be reduced.

7. COMMITMENTS AND CONTINGENCIES

We lease certain buildings and equipment under noncancelable operating lease agreements. The leases generally require us to pay all execution costs such as taxes, insurance and maintenance related to the leased assets. Certain of the leases contain provisions for periodic rate escalations to reflect cost-of-living increases. Rent expense for such leases totaled approximately $9.1 million, $4.6 million, and $2.6 million in fiscal years 2000, 1999, and 1998, respectively.

Future minimum lease payments under noncancelable operating leases, at March 31, 2000 are as follows (in thousands):

|  | OPERATING LEASES |
|---|---|
| 2001 | $ 14,257 |
| 2002 | 18,362 |
| 2003 | 18,578 |
| 2004 | 17,291 |
| 2005 | 13,535 |
| Thereafter | 105,746 |
| Total minimum lease payments | $187,769 |

We sublease office space at our corporate headquarters to an affiliated company. The term of the sublease is from June 1996 to October 2003 and requires monthly rental payments of approximately $17,000.

On June 9, 1999, we entered into a series of leases covering up to approximately 540,000 square feet of office space in San Diego, including an option on approximately 118,000 square feet of office space. We have moved into a portion of the completed new facilities with the remaining uncompleted space currently scheduled for completion over the next four years. The future minimum lease commitments detailed above contain our future commitments associated with these leases. To the extent we do not require all of the space under these leases, we have the right to sublet excess space.

F-19

Exhibit H
0847

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

7. COMMITMENTS AND CONTINGENCIES (CONTINUED)

We pay commissions to employees who have authored certain of our products based on a percentage of the respective product's sales. Commissions paid under such agreements are included in research and development expense in the accompanying consolidated statements of operations and were approximately, $3.6 million, $3.2 million and $1.7 million for fiscal years 2000, 1999, and 1998, respectively.

On March 31, 2000, we had outstanding forward contracts to buy foreign currencies totaling $19.6 million U.S. Dollars. Additionally, we had outstanding forward contracts to sell foreign currencies totaling $11.8 million U.S. Dollars. These hedging exposures are consistent with transaction flows with respect to our international operations. These contracts typically expire within one month.

From time to time we are involved in various legal proceedings and claims arising in the ordinary course of business, none of which, in our opinion, is expected to have a material adverse effect on our consolidated financial position or results of operations.

8. STOCKHOLDERS' EQUITY

PREFERRED STOCK

We have authorized 5,000,000, $0.001 par value, undesignated preferred shares, none of which were issued or outstanding at March 31, 2000 and 1999. Our board of directors has the authority to issue the preferred stock in one or more series, and to fix the price, rights, preferences, privileges, and restrictions, including dividend rights and rates, conversion and voting rights, and redemption terms and pricing without any further vote or action by our shareholders.

STOCK OPTIONS

We have five stock option plans, the 1990 Nonqualified Stock Option Plan ("1990 Plan"), the 1991 Nonqualified Stock Option Plan ("1991 Plan"), the 1994 Stock Option Plan ("1994 Plan"), the 1997 Director Option Plan (the "Director Plan") and the 1999 Nonqualified Stock Option Plan ("the 1999 Plan").

We may no longer grant options under the 1990 and 1991 Plans. We may grant up to 32,553,000, 600,000, and 2,000,000 options under the 1994 Plan, Director Plan and the 1999 Plan, respectively. All options granted pursuant to the plans have an exercise price determined by our board of directors on a per-grant basis, which may not be less than fair market value on the date of grant. Option grants under all five stock option plans generally vest over four years. During December 1996, we recorded $631,000 in deferred compensation related to the grant of 740,000 options. This deferred compensation is being amortized on a straight-line basis to expense over the options' four year vesting period.

The following table summarizes our five stock option plans at March 31, 2000, 1999, and 1998 as well as changes during the periods then ended. The table excludes all option plans acquired as the

F-20

Exhibit H
0848

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

8. STOCKHOLDERS' EQUITY (CONTINUED)
result of acquisitions during the periods presented, which represent options to purchase 497,000 shares at March 31, 2000.

| | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE PER SHARE |
|---|---|---|
| | (IN THOUSANDS) | |
| Balances, March 31, 1997................... | 16,213.1 | $ 0.52 |
| Options granted........................... | 6,514.9 | 3.40 |
| Options exercised......................... | (7,290.6) | 0.39 |
| Options canceled.......................... | (1,142.5) | 3.05 |
| Balances, March 31, 1998................... | 14,294.9 | 1.70 |
| Options granted........................... | 14,067.4 | 6.57 |
| Options exercised......................... | (7,201.5) | 0.96 |
| Options canceled.......................... | (1,715.6) | 1.52 |
| Balances, March 31, 1999................... | 19,445.2 | 5.52 |
| Options granted........................... | 5,989.6 | 19.01 |
| Options exercised......................... | (4,791.0) | 4.22 |
| Options canceled.......................... | (776.1) | 8.35 |
| Balances, March 31, 2000................... | 19,867.7 | $ 9.79 |

As of March 31, 2000, 1999 and 1998 exercisable options outstanding were 4,064,000, 2,329,000 and 4,660,000, respectively, with weighted average exercise prices of $5.21, $2.00, and $0.68, respectively.

We have adopted the disclosure only provisions of Statement of Financial Accounting Standards No. 123 "Accounting for Stock-Based Compensation" ("SFAS No. 123"). Accordingly, we continue to account for stock options using the intrinsic value method prescribed in Accounting Principles Board Opinion No. 25.

Pursuant to SFAS No. 123, we are required to disclose the pro forma effects on net income (loss) and net income (loss) per share data as if we had elected to use the fair value approach to account for all of our employee stock-based compensation plans. Had compensation cost for our plans been determined consistent with the fair value approach enumerated in SFAS No. 123, our net income (loss)

F-21

Exhibit H
0849

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

8. STOCKHOLDERS' EQUITY (CONTINUED)
and net income (loss) per share for the years ended March 31, 2000, 1999, and 1998 would have been as indicated below:

In thousands, except per share data:

|  | FOR THE YEARS ENDED MARCH 31, | | |
|---|---|---|---|
|  | 2000 | 1999 | 1998 |
| Pro forma net loss: | | | |
| As reported.................................. | $(25,070) | $(23,370) | $   (616) |
| Pro forma expense effect of SFAS No. 123..... | (15,216) | (5,546) | (1,300) |
| Pro forma after giving effect to SFAS No. 123.................................... | $(40,286) | $(28,916) | $ (1,916) |
| Basic and diluted pro forma net loss per share | | | |
| As reported.................................. | $  (0.24) | $  (0.27) | $  (0.01) |
| Pro forma expense effect of SFAS No. 123..... | (0.15) | (0.06) | (0.02) |
| Pro forma after giving effect to SFAS No. 123.................................... | $  (0.39) | $  (0.33) | $  (0.03) |

The fair value of options was estimated on the date of grant using the Black-Scholes option-pricing model with the following weighted average assumptions used for option grants:

|  | FOR THE YEARS ENDED MARCH 31, | | |
|---|---|---|---|
|  | 2000 | 1999 | 1998 |
| Risk-free interest rate....................... | 6.38% | 5.65% | 6.11% |
| Expected life (in years)...................... | 4 | 4 | 4 |
| Expected volatility........................... | 89.03% | 78.92% | 63.06% |

RESTRICTED STOCK

During fiscal 1996, we granted 2,400,000 shares of nontransferable Common Stock under restricted stock agreements to certain employees. These shares were valued at a fair value of $0.59. The restrictions lapse on the shares ten years from the date of grant or, if we achieve certain objectives for earnings growth from fiscal 1997 through fiscal 2002, or, on a change in control of PSI. The unearned portion of restricted stock is included in stockholders' equity and is being amortized as compensation expense on a straight-line basis over the vesting period. During fiscal 1998, 808,000 of the above shares were canceled.

During fiscal year 1998, we granted an additional 200,000 shares of nontransferable Common Stock under restricted stock agreements valued at $3.16. These shares vest over a six-year term and deferred compensation of $631,000 is currently being amortized as compensation expense over this term.

1997 EMPLOYEE STOCK PURCHASE PLAN

In February 1997, our board of directors adopted, and the stockholders approved, the 1997 Employee Stock Purchase Plan ("Purchase Plan"). We have reserved 1,000,000 shares of common stock for issuance under the Purchase Plan. The Purchase Plan enables eligible employees to purchase common stock at 85% of the lower of the fair market value of the Company's common stock on the

F-22

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0850

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

### 8. STOCKHOLDERS' EQUITY (CONTINUED)

first or last day of each option purchase period, as defined. During fiscal years 2000, 1999, and 1998 we issued 100,000, 124,000, and 140,000 shares, respectively, pursuant to the Purchase Plan.

### DIRECTOR OPTION PLAN

In February 1997, our board of directors adopted, and the stockholders approved, the 1997 Director Option Plan ("Director Plan"). We have reserved 600,000 shares of our Common Stock for issuance under the Director Plan. The Director Plan provides each new eligible outside PSI director an initial option grant to purchase 50,000 shares of our Common Stock upon election to our board of directors. In addition, commencing with the 1998 Annual Stockholders meeting, such eligible outside directors are granted an option to purchase 10,000 shares of our Common Stock at each annual meeting. The exercise price per share of all options granted under the Director Plan will be equal to the fair market value of our Common Stock on the date of grant. Options may be granted for periods up to ten years and generally vest over four years. No grants were made under the Director Plan during fiscal 1998. We granted 50,000 and 100,000 shares of our Common Stock under the Director Plan in fiscal 2000 and 1999, respectively.

### 9. EMPLOYEE BENEFIT PLAN

We have a 401(k) Employee Savings Plan ("Plan") covering substantially all employees. The Plan provides for savings and pension benefits and is subject to the provisions of the Employee Retirement Income Security Act of 1974. Those employees who participate in the Plan are entitled to make contributions of up to 20 percent of their compensation, limited by IRS statutory contribution limits. In addition to employee contributions, we may also contribute to the Plan by matching 25% of employee contributions. Amounts we contributed to the Employee Savings Plan during fiscal 2000, 1999, and 1998, were $905,000, $467,000, and $200,000, respectively.

### 10. GEOGRAPHIC OPERATIONS

We operate exclusively in the Infrastructure Resource Management software industry. A summary of our operations by geographic area is presented below:

|  | NORTH AMERICA | EUROPE & OTHER | CONSOLIDATED |
|---|---|---|---|
| **Year ended March 31, 2000** | | | |
| Revenues.................................. | $149,582 | $103,718 | $253,300 |
| Identifiable assets........................ | $503,237 | $ 20,193 | $523,430 |
| **Year ended March 31, 1999** | | | |
| Revenues.................................. | $ 88,649 | $ 49,414 | $138,063 |
| Identifiable assets........................ | $179,376 | $ 28,337 | $207,713 |
| **Year ended March 31, 1998** | | | |
| Revenues.................................. | $ 39,512 | $ 22,365 | $ 61,877 |
| Identifiable assets........................ | $ 72,434 | $ 11,134 | $ 83,568 |

Amounts included in Europe and Other above relate principally to our European operations.

F-23

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0851

PEREGRINE SYSTEMS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

## 11. QUARTERLY INFORMATION (UNAUDITED)

The following unaudited quarterly financial information includes, in our opinion, all normal and recurring adjustments (in thousands) necessary to fairly state our consolidated results of operations and related information for the periods presented.

| | FIRST QUARTER | SECOND QUARTER | THIRD QUARTER | FOURTH QUARTER |
|---|---|---|---|---|
| **FISCAL 2000** | | | | |
| License revenues................................... | $ 32,092 | $ 37,102 | $ 46,524 | $ 52,749 |
| Services revenues.................................. | 19,513 | 20,705 | 21,020 | 23,595 |
| Total costs and expenses........................... | (53,093) | (56,006) | (63,233) | (89,624) |
| Income (loss) from operations...................... | (1,488) | 1,801 | 4,311 | (13,280) |
| Interest income (expense) and other................ | 86 | 7 | 5 | (60) |
| Income tax expense................................. | 3,439 | 4,042 | 4,183 | 4,788 |
| Net income (loss)................................. | $ (4,841) | $ (2,234) | $    133 | $(18,128) |
| Basic income (loss) per share...................... | $  (0.05) | $  (0.02) | $     -- | $  (0.17) |
| Diluted income (loss) per share.................... | $  (0.05) | $  (0.02) | $     -- | $  (0.17) |
| **FISCAL 1999** | | | | |
| License revenues................................... | $ 13,882 | $ 17,375 | $ 26,064 | $ 30,041 |
| Services revenues.................................. | 7,868 | 12,279 | 14,485 | 16,069 |
| Total costs and expenses........................... | (18,432) | (49,960) | (37,051) | (46,359) |
| Income (loss) from operations...................... | 3,318 | (20,306) | 3,498 | (249) |
| Interest income (expense) and other................ | 260 | 193 | 100 | 111 |
| Income tax expense................................. | 1,742 | 2,209 | 2,969 | 3,375 |
| Net income (loss)................................. | $  1,836 | $(22,322) | $    629 | $ (3,513) |
| Basic income (loss) per share...................... | $   0.03 | $  (0.26) | $   0.01 | $  (0.04) |
| Diluted income (loss) per share.................... | $   0.02 | $  (0.26) | $   0.01 | $  (0.04) |

## 12. SUBSEQUENT EVENT

On April 5, 2000 we entered into an Agreement and Plan of Merger and Reorganization with Harbinger Corporation ("Harbinger"), a Georgia corporation, in which each outstanding share of Harbinger common stock will be converted into the right to receive 0.75 of a share of our Common Stock (the "Merger"), or approximately 36 million shares, inclusive of approximately 5 million shares associated with Harbinger's outstanding stock options.

The Merger is intended to constitute a reorganization under Section 368(a) of the Internal Revenue Code of 1986, as amended, and is to be accounted for as a purchase transaction. Consummation of the Merger is subject to various conditions, including, among other things, receipt of the necessary approvals of our stockholders, the stockholders of Harbinger and certain regulatory agencies.

F-24

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Shareholders of

Telco Research Corporation Limited

We have audited the consolidated balance sheets of Telco Research
Corporation Limited as at January 31, 2000 and December 31, 1998 and the
consolidated statements of income, retained earnings (deficit) and cash flows
for the thirteen months ended January 31, 2000 and the year ended December 31,
1998. These financial statements are the responsibility of the Company's
management. Our responsibility is to express an opinion on these financial
statements based on our audits.

We conducted our audits in accordance with Canadian generally accepted
auditing standards. Those standards require that we plan and perform an audit to
obtain reasonable assurance whether the financial statements are free of
material misstatement. An audit includes examining, on a test basis, evidence
supporting the amounts and disclosures in the financial statements. An audit
also includes assessing the accounting principles used and significant estimates
made by management, as well as evaluating the overall financial statement
presentation.

In our opinion, these consolidated financial statements present fairly, in
all material respects, the financial position of the Company as at January 31,
2000 and December 31, 1998 and the results of its operations and its cash flows
for the thirteen months ended January 31, 2000 and the year ended December 31,
1998 in accordance with Canadian generally accepted accounting principles.

Arthur Andersen LLP
Chartered Accountants

March 17, 2000
Toronto, Canada

/s/ ARTHUR ANDERSEN LLP

-----------------------------------------
ARTHUR ANDERSEN LLP

F-25

Exhibit H
0853

TELCO RESEARCH CORPORATION LIMITED

CONSOLIDATED BALANCE SHEETS

(IN THOUSANDS)

|  | AS AT | |
|---|---|---|
|  | JANUARY 31, 2000 | DECEMBER 31, 1998 |
| **Assets** | | |
| **Current** | | |
| Cash and cash equivalents................................... | $ 18,911 | $ 2,922 |
| Accounts receivable........................................ | 10,002 | 7,042 |
| Inventory (Note 4)......................................... | 678 | 34 |
| Prepaid expenses and sundry assets......................... | 918 | 626 |
| Income taxes recoverable................................... | 379 | -- |
|  | 30,888 | 10,624 |
| Capital assets (Note 5).................................... | 2,512 | 1,560 |
| Software development costs (Note 6)........................ | 1,843 | 1,482 |
| Deferred income taxes...................................... | 958 | -- |
| Goodwill, net of amortization (Note 1)..................... | 12,862 | -- |
|  | $ 49,063 | $13,666 |
| **Liabilities** | | |
| **Current** | | |
| Accounts payable and accrued liabilities................... | $ 6,637 | $ 2,068 |
| Deferred revenue........................................... | 9,991 | 7,143 |
| Current portion of long-term debt (Note 7)................. | 6,239 | -- |
|  | 22,867 | 9,211 |
| Long-term debt (Note 7).................................... | 5,974 | -- |
| Deferred credit, net....................................... | 1,104 | 1,301 |
|  | 29,945 | 10,512 |
| Commitments (Note 7) | | |
| **Shareholders' Equity** | | |
| Share capital (Note 9)..................................... | 28,957 | 1 |
| Retained earnings (deficit)................................ | (10,060) | 2,991 |
| Cumulative translation adjustment.......................... | 221 | 162 |
|  | 19,118 | 3,154 |
|  | $ 49,063 | $13,666 |

THE ACCOMPANYING NOTES ARE AN INTEGRAL PART OF THESE CONSOLIDATED BALANCE SHEETS.

F-26

Exhibit H
0854

TELCO RESEARCH CORPORATION LIMITED

CONSOLIDATED STATEMENTS OF INCOME (LOSS)

(IN THOUSANDS, EXCEPT EARNINGS PER SHARE)

| | THIRTEEN MONTHS ENDED JANUARY 31, 2000 | YEAR ENDED DECEMBER 31, 1998 |
|---|---|---|
| Revenue (Note 10).......................................... | $35,669 | $25,265 |
| Cost of revenue........................................... | 15,067 | 6,346 |
| Gross profit.............................................. | 20,602 | 18,919 |
| Expenses | | |
| Operating................................................. | 4,778 | 2,568 |
| Selling and marketing..................................... | 7,987 | 4,143 |
| Research and development, net of investment tax credits of $226 (1998--nil)............................................. | 4,429 | 3,242 |
| | 17,194 | 9,953 |
| Earnings before the undernoted............................ | 3,408 | 8,966 |
| Unusual items (Note 11) | | |
| Management bonus........................................ | 2,210 | 8,063 |
| Income before income taxes................................ | 1,198 | 903 |
| Provision for income taxes (Note 12)...................... | 1,221 | 42 |
| Net income (loss)......................................... | $   (23) | $   861 |
| Earnings per share....................................... | $  0.00 | $  0.15 |

THE ACCOMPANYING NOTES ARE AN INTEGRAL PART OF THESE CONSOLIDATED STATEMENTS.

F-27

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0855

TELCO RESEARCH CORPORATION LIMITED

CONSOLIDATED STATEMENTS OF RETAINED EARNINGS (DEFICIT)

(IN THOUSANDS)

| | AS AT | |
| --- | --- | --- |
| | JANUARY 31, 2000 | DECEMBER 31, 1998 |
| Retained earnings, beginning of period...................... | $  2,991 | $2,130 |
| Net income (loss)......................................... | (23) | 861 |
| Dividends................................................. | (13,028) | -- |
| Retained earnings (deficit), end of period................. | $(10,060) | $2,991 |

THE ACCOMPANYING NOTES ARE AN INTEGRAL PART OF THESE CONSOLIDATED STATEMENTS.

F-28

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0856

TELCO RESEARCH CORPORATION LIMITED

CONSOLIDATED STATEMENTS OF CASH FLOWS

(IN THOUSANDS)

|  | THIRTEEN MONTHS ENDED JANUARY 31, 2000 | YEAR ENDED DECEMBER 31, 1998 |
|---|---|---|
| Cash provided by (used in): | | |
| Operating | | |
| Net income (loss).......................................... | $ (23) | $ 861 |
| Add items not involving cash | | |
| Depreciation................................................ | 1,277 | 703 |
| Amortization................................................ | 199 | (82) |
| | 1,453 | 1,482 |
| Net change in non-cash working capital balances related to operations................................................. | (3,610) | (655) |
| | (2,157) | 827 |
| Financing | | |
| Proceeds from long-term debt............................... | 10,152 | -- |
| Proceeds from issuance of common shares..................... | 55 | -- |
| Dividends.................................................... | (13,028) | -- |
| | (2,281) | -- |
| Investing | | |
| Capital asset additions, net................................ | (649) | (219) |
| Business acquisition (Note 1)............................... | 21,076 | -- |
| | 20,427 | (219) |
| Increase in cash and cash equivalents....................... | 15,989 | 608 |
| Cash and cash equivalents, beginning of year................ | 2,922 | 2,314 |
| Cash and cash equivalents, end of year...................... | $ 18,911 | $2,922 |

THE ACCOMPANYING NOTES ARE AN INTEGRAL PART OF THESE CONSOLIDATED STATEMENTS.

F-29

Exhibit H
0857

TELCO RESEARCH CORPORATION LIMITED

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(CANADIAN FUNDS; AUDITED; TABULAR AMOUNTS IN THOUSANDS, EXCEPT NUMBER OF SHARES AND PERCENTAGES)

1  REVERSE TAKEOVER OF TSB INTERNATIONAL INC.

Effective August 1, 1999 TSB International Inc. ("TSB") acquired all the outstanding shares of Telco Research Corporation ("TRC") by way of a share exchange under which the shareholders of TRC exchanged 100% of the outstanding shares of TRC for 6,149,069 common shares of TSB and warrants to acquire an additional 1,298,701 common shares. Subsequent to the reverse takeover, TSB changed its name to Telco Research Corporation Limited.

For accounting purposes, the transaction has been treated as a reverse takeover of TSB by TRC. The consolidated financial statements are issued under the name of Telco Research Corporation Limited (formerly TSB) but are considered to be a continuation of the financial statements of TRC, the legal subsidiary. Accordingly, the consolidated financial statements include the results of TSB only for the period from August 1, 1999 forward. Results for all previous periods are those of TRC only.

Goodwill arising on the transaction was calculated as follows:

| | |
|---|---:|
| Value of the shares and warrants issued in consideration of the acquisition................................................. | $28,901 |
| Less (add back): | |
| Cash acquired........................................................ | 21,076 |
| Fair value of net liabilities acquired, net of transaction costs................................................................ | (5,367) |
| Allocated to goodwill............................................. | $13,192 |

2  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(a) ACCOUNTING PRINCIPLES
The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in Canada.

(b) BASIS OF CONSOLIDATION
The consolidated financial statements include the assets, liabilities, revenues and expenses of Telco Research Corporation Limited ("the Company") and those of its subsidiaries. All significant inter-company transactions have been eliminated.

(c) REVENUE RECOGNITION
SOFTWARE LICENSE FEES--Revenue on software license fees is generally recognized upon shipment of the software to the customer, provided there are no significant vendor obligations remaining and collection is probable.
PROFESSIONAL SERVICES--Revenue on professional services is recognized as the services are performed.
MAINTENANCE AND ENHANCEMENTS--Revenue on service contracts is recognized ratably over the contract period. The Company provides product support services to new customers for one year following the date of sale of a product. After the first year, the customer may purchase support on an annual basis for a cost equal to a percentage of the current software cost. The revenue associated with product support services is recorded in deferred revenue in the accompanying combined balance sheets and amortized over the period in which the services are provided.

F-30

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0858

TELCO RESEARCH CORPORATION LIMITED

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(CANADIAN FUNDS; AUDITED; TABULAR AMOUNTS IN THOUSANDS, EXCEPT NUMBER OF SHARES
AND PERCENTAGES)

2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

SERVICE BUREAU--The Company provides telemanagement services to customers
for a monthly fee including rental fees on the equipment used by the
customers. The revenue on these contracts is recognized monthly as the
services are performed.

HARDWARE--Revenue on hardware sales is recognized upon shipment to the
customer.

(d)  INVENTORY

Inventory is recorded at the lower of cost and net realizable value using
the weighted average cost method.

(e)  CAPITAL ASSETS

Capital assets are recorded at cost. Depreciation and amortization are
provided annually at rates calculated to amortize the cost over the
estimated useful lives as follows:

| | |
|---|---|
| Furniture and fixtures......... | 20% declining balance |
| E.D.P. equipment............... | 33% straight-line |
| Motor vehicles................. | 25% straight-line |
| Leasehold improvements......... | Straight-line over the term of the lease |
| Software licenses.............. | 20% straight-line |

Land held for resale is recorded at cost. In the opinion of management,
the fair market value of the property exceeds its recorded value.

(f)  DEFERRED REVENUE

Deferred revenue represents amounts billed with respect to maintenance
and support services to be provided in future periods.

(g)  GOODWILL

Goodwill represents the excess of purchase consideration over fair market
value of net identifiable assets acquired, and is amortized on a
straight-line basis over the 20 year estimated useful life of those
assets. Goodwill is written down where there has been a permanent
impairment in the value of unamortized goodwill. A permanent impairment
in goodwill is determined by comparison of the carrying value of
unamortized goodwill with the estimated undiscounted future earnings of
the related businesses.

(h)  RESEARCH AND DEVELOPMENT

Research and development costs incurred up to the date on which
management determines that the product to which the research and
development costs relate is technologically and commercially viable are
expensed as incurred, net of investment tax credits recognized. After
technological and commercial viability are established, costs are
capitalized and amortized on a straight-line basis over three years.

(i)  DEFERRED CREDIT

The deferred credit represents the excess of fair value of net assets
acquired over their purchase price, and is amortized on a straight-line
basis over the estimated useful life of those assets.

F-31

Exhibit H
0859

TELCO RESEARCH CORPORATION LIMITED

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(CANADIAN FUNDS; AUDITED; TABULAR AMOUNTS IN THOUSANDS, EXCEPT NUMBER OF SHARES
AND PERCENTAGES)

2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
    (j) FOREIGN CURRENCY TRANSLATION

        (i) TRANSACTIONS DENOMINATED IN FOREIGN CURRENCIES
            Monetary assets and liabilities are translated at the rates in effect
at the balance sheet dates; other assets and liabilities are translated at
            exchange rates prevailing at the respective transaction dates.
            Revenues and expenses arising are translated at average exchange
            rates prevailing during the periods. Exchange gains and losses are
            reflected in net income for the periods.

        (ii) FOREIGN SUBSIDIARIES
            Subsidiaries are treated as self-sustaining operations. Assets and
liabilities of the subsidiaries are translated at the exchange rates in effect
            at the balance sheet dates. Revenues and expenses (including
            depreciation and amortization) are translated at the average exchange
            rates in effect during the periods. Exchange gains or losses arising
            from the translation of the Company's net equity investments in these
            subsidiaries are deferred and included as a separate component of
            shareholders' equity.

    (k) USE OF ESTIMATES
        The preparation of financial statements in conformity with generally
        accepted accounting principles requires management to make certain
        estimates and assumptions that affect the reported amounts of assets and
        liabilities at the date of the financial statements and the reported
        amounts of revenues and expenses during the reporting period. Subsequent
        experience could differ from those estimates.

3   TELCO BUSINESS SYSTEMS, LLP FORMATION AND RE-ACQUISITION

    On December 30, 1996 the shareholders of TRC formed Telco Business Systems,
LLP ("TBS") as a separate partnership which purchased the service bureau line of
business from TRC. The service bureau line of business consists of various
contracts with customers to provide telemanagement services. Under the terms of
the agreement between TBS and TRC, TBS paid TRC a lease fee for the use of its
service bureau assets and a monthly management fee based on a percentage of TBS
revenues.

    On July 16, 1999, TRC acquired the assets of TBS for nominal consideration
satisfied by the issuance of 458,318 shares of TRC. The Company recorded the
acquisition at $nil representing the carrying value of the assets acquired.

    The acquisition has been accounted for using the purchase method, and
results of operations have been included in the consolidated financial
statements from the date of acquisition.

F-32

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0860

TELCO RESEARCH CORPORATION LIMITED

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(CANADIAN FUNDS; AUDITED; TABULAR AMOUNTS IN THOUSANDS, EXCEPT NUMBER OF SHARES
AND PERCENTAGES)

## 4   INVENTORY

|  | JANUARY 31, 2000 | DECEMBER 31, 1998 |
| --- | --- | --- |
| Raw materials | $179 | $-- |
| Work in process | 101 | -- |
| Finished goods | 398 | 34 |
|  | $678 | $34 |

## 5   CAPITAL ASSETS

|  | COST | 2000 ACCUMULATED DEPRECIATION AND AMORTIZATION | NET | COST | 1998 ACCUMULATED DEPRECIATION AND AMORTIZATION | NET |
| --- | --- | --- | --- | --- | --- | --- |
| Land held for resale | $  412 | $    -- | $  412 | $  436 | $    -- | $  436 |
| Furniture and fixtures | 3,188 | 2,681 | 507 | 1,071 | 623 | 448 |
| E.D.P. equipment | 13,118 | 11,991 | 1,127 | 2,842 | 2,362 | 480 |
| Motor vehicles | 537 | 360 | 177 | 145 | 96 | 49 |
| Leasehold improvements | 803 | 537 | 266 | 240 | 93 | 147 |
| Software licences | 595 | 572 | 23 | -- | -- | -- |
|  | $18,653 | $16,141 | $2,512 | $4,734 | $3,174 | $1,560 |

## 6   SOFTWARE DEVELOPMENT COSTS

|  | 2000 | 1998 |
| --- | --- | --- |
| Balance as at beginning of period | $1,482 | $  540 |
| Expenses capitalized during period | 1,150 | 1,172 |
| Costs amortized during period | (789) | (231) |
| Balance as at end of period | $1,843 | $1,482 |

## 7   LONG-TERM DEBT

|  | 2000 | 1998 |
| --- | --- | --- |
| U.K. bank term loan bearing interest at LIBOR plus 1.75% per annum | $ 3,506 | $    -- |
| U.S. bank term loan bearing interest at LIBOR plus 2.00% per annum | 8,707 | -- |
| Less: current portion | (6,239) | -- |
|  | $ 5,974 | $    -- |

    The U.K. bank term loan is denominated in sterling and is secured by a
mortgage debenture providing a charge over the assets of the Company's U.K.
subsidiary, Telco Research Limited, and by the guarantee of the Company. The
loan is repayable over a period of six years ending October 31, 2004 at the rate
of $434,000 per year plus interest.

F-33

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0861

TELCO RESEARCH CORPORATION LIMITED

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(CANADIAN FUNDS; AUDITED; TABULAR AMOUNTS IN THOUSANDS, EXCEPT NUMBER OF SHARES
AND PERCENTAGES)

7  LONG-TERM DEBT (CONTINUED)

The U.S. bank term loan is denominated in U.S. dollars and is secured by a
security agreement providing a charge over the assets of TRC, and by the
guarantees of certain shareholders. The loan is repayable over a period of two
years ending July 28, 2001 at the rate of $5,887,000 per year plus interest.

8  COMMITMENTS

The Company has entered into operating leases for the use of office
premises, equipment and automobiles expiring between 2001 and 2005. Future
minimum lease payments, exclusive of certain incremental occupancy and operating
costs and sales taxes, are approximately as follows:

| | |
|---|---:|
| 2001 | $ 836 |
| 2002 | 733 |
| 2003 | 638 |
| 2004 | 611 |
| 2005 | 560 |
| | $3,378 |

9  SHARE CAPITAL

(a) Prior to the August 1, 1999 reverse takeover (see Note 1)
Capital stock of TRC:

| | | |
|---|---|---:|
| Authorized: | 10,000,000 common shares, no par value | |
| Issued: | 5,092,418 common shares | $ 1 |

F-34

Exhibit H
0862

TELCO RESEARCH CORPORATION LIMITED

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(CANADIAN FUNDS; AUDITED; TABULAR AMOUNTS IN THOUSANDS, EXCEPT NUMBER OF SHARES
AND PERCENTAGES)

9   SHARE CAPITAL (CONTINUED)
    (b) As at August 1, 1999, giving effect to the reverse takeover (see Note 1)


Share capital:

| | | |
|---|---:|---:|
| Existing share capital of TRC................................ | $ | 1 |
| Value of TSB shares issued in exchange for TRC shares....... | | 28,901 |
| | | ---------- |
| | $ | 28,902 |
| | | ========== |

Outstanding common shares:

| | |
|---|---:|
| Balance of outstanding common shares of TSB as at January 31, 1999.................................................. | 4,717,781 |
| Issued for cash under private placement..................... | 1,298,701 |
| Issued for no additional consideration under private placement adjustment....................................... | 143,000 |
| Issued for cash on exercise of options..................... | 10,000 |
| Issued for cash through Employee Share Ownership Plan..... | 4,801 |
| | ----------- |
| Balance of common shares of TSB as at July 31, 1999........ | 6,174,283 |
| Common shares of TSB issued to effect reverse takeover...... | 6,149,069 |
| | ----------- |
| Balance of common shares of the Company as at August 1, 1999.................................................. | 12,323,352 |
| | =========== |

F-35

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0863

TELCO RESEARCH CORPORATION LIMITED

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(CANADIAN FUNDS; AUDITED; TABULAR AMOUNTS IN THOUSANDS, EXCEPT NUMBER OF SHARES
AND PERCENTAGES)

9  SHARE CAPITAL (CONTINUED)

   (c) Subsequent to August 1, 1999

|  | NO. OF SHARES | AMOUNT (000'S) |
|---|---|---|
| Balance as at August 1, 1999........................... | 12,323,352 | $28,902 |
| Issued for cash on exercise of options................ | 10,000 | 40 |
| Issued for cash through Employee Share Ownership Plan............................................... | 2,981 | 15 |
| Balance as at January 31, 2000....................... | 12,336,333 | $28,957 |

On February 19, 1999 TSB completed the private placement of 1,298,701 units
for gross proceeds of $5,000,000. Each unit consisted of one common share and a
warrant to purchase an additional common share at prices escalating from $4.75
to $5.50. The warrants expire on February 18, 2004. As at October 31, 1999 the
Company had warrants outstanding for 2,597,402 common shares (1998--nil)
exercisable at prices between $4.75 and $5.50 per share and expiring in the
Company's 2005 fiscal year.

As at October 31, 1999 the Company had stock options outstanding for 459,746
common shares (1998--209,492 common shares) exercisable at prices between $3.95
and $6.38 per share and expiring between the Company's 2003 and 2005 fiscal
years.

The Company operates an Employee Share Ownership Plan under which up to
32,000 common shares may be issued up to December 31, 1999. The Company has
agreed to contribute $1 for each $5 the employees contribute. The contributions
of the Company are recorded as an operating expense.

10  GEOGRAPHIC SEGMENTS

|  | CANADA | UNITED KINGDOM AND EUROPE | UNITED STATES | ELIMINATIONS | TOTAL |
|---|---|---|---|---|---|
| **2000** |  |  |  |  |  |
| Sales to customers........................ | $ 1,033 | $8,946 | $25,690 | $   -- | $35,669 |
| Transfers between segments................ | 1,744 | -- | -- | (1,744) | -- |
| Total revenue............................. | $ 2,777 | $8,946 | $25,690 | $ (1,744) | $35,669 |
| Income (loss) before income taxes......... | $  862 | $  873 | $  (207) | $   (330) | $ 1,198 |
| Provision for (recovery of ) income taxes.................................. | 345 | 436 | 440 |  | 1,221 |
| Net income (loss)......................... | $  517 | $  437 | $  (647) | $   (330) | $   (23) |
| Identifiable assets....................... | $48,574 | $7,345 | $10,567 | $(17,114) | $49,372 |

F-36

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0864

TELCO RESEARCH CORPORATION LIMITED

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(CANADIAN FUNDS; AUDITED; TABULAR AMOUNTS IN THOUSANDS, EXCEPT NUMBER OF SHARES
AND PERCENTAGES)

10  GEOGRAPHIC SEGMENTS (CONTINUED)

|  | CANADA | UNITED KINGDOM AND EUROPE | UNITED STATES | ELIMINATIONS | TOTAL |
|---|---|---|---|---|---|
| **1998** | | | | | |
| Sales to customers | $    -- | $    -- | $25,265 | $    -- | $25,265 |
| Transfers between segments | -- | -- | -- | -- | -- |
| Total revenue | $    -- | $    -- | $25,265 | -- | $25,265 |
| Income before provision for income taxes | $    -- | $    -- | $   903 | $    -- | $   903 |
| Provision for income taxes | -- | -- | 42 | -- | 42 |
| Net income | $    -- | $    -- | $   861 | $    -- | $   861 |
| Identifiable assets | $    -- | $    -- | $13,666 | $    -- | $13,666 |

Transfers between geographic segments are accounted for at prices comparable
to open market prices for similar products and services.

11  BONUS PAYMENTS TO SHAREHOLDERS

Prior to August 1, 1999, TRC was an S Corporation, and, under Subchapter S
of the U.S. Internal Revenue Code, its income was taxed in the hands of its
shareholders. During this period, the equivalent to TRC's pre-tax earnings were
paid out to its shareholders by way of bonus. Effective August 1, 1999 TRC
reverted to a taxable C Corporation and ceased to bonus out pre-tax income.

12  INCOME TAXES

The provision for income taxes differs from the amount that would have been
expected by applying the statutory Canadian income tax rates to income before
taxes. The principal reasons for this difference are as set out in the following
table.

|  | 2000 | 1999 |
|---|---|---|
| Income before taxes | $1,198 | $  40 |
| Corporate tax rates | 44.6% | 44.6% |
| Expected income tax expense | $  534 | $  18 |
| Increase (decrease) in income taxes resulting from: | | |
| Non-taxable S corporation status | (174) | (18) |
| Conversion to taxable C corporation status | 736 | -- |
| Tax rate differential on income earned in foreign jurisdictions | (194) | -- |
| Non-deductible acquisition costs | 201 | -- |
| Non-deductible amortization charges | 84 | -- |
| Other | 34 | -- |
|  | $1,221 | $  -- |

F-37

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0865

TELCO RESEARCH CORPORATION LIMITED

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(CANADIAN FUNDS; AUDITED; TABULAR AMOUNTS IN THOUSANDS, EXCEPT NUMBER OF SHARES
AND PERCENTAGES)

13   SUBSEQUENT EVENT

On February 8, 2000 the Company entered into a definitive merger agreement
under which Peregrine Systems, Inc. ("Peregrine") will acquire all of the
Company's outstanding shares. The merger agreement was approved by the Boards of
Directors of both companies and is subject to approval by the Company's
shareholders, regulatory approvals, court approvals and customary closing
conditions. The transaction is structured as stock-for-stock exchange through a
plan of arrangement, at a fixed ratio of .082511 shares of Peregrine Common
Stock for each share of the Company. As consideration for the merger, Peregrine
expects to issue approximately 1.28 million shares in exchange for all of the
outstanding equity securities of the Company. All share amounts herein are prior
to the announced Peregrine 2:1 stock split to be effected in the form of a stock
dividend, payable February 18, 2000.

14   UNCERTAINTY DUE TO THE YEAR 2000 ISSUE

Most entities depend on computerized systems and therefore are exposed to
the Year 2000 conversion risk which, if not properly addressed, could affect an
entity's ability to conduct normal business operations. Management is addressing
this issue; however, given the nature of this risk, it is not possible to be
certain that all aspects of the Year 2000 issue affecting the Company and those
with whom it deals, such as customers, suppliers or other third parties, will be
fully resolved without adverse impact on the Company's operations.

15   U.S. AND CANADIAN GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP")

These consolidated financial statements have been prepared in accordance
with Canadian GAAP. The Company's management believes that there would be no
material differences in the consolidated financial statements if they were
prepared in accordance with U.S. GAAP.

16   IMPACT OF 13 MONTH REPORTING PERIOD

As a result of the reverse takeover of TSB (Note 1) the Company's reporting
year end was changed to January 31, 2000, as TRC was required to adopt the
reporting period of TSB, the legal parent. Consequently, these consolidated
financial statements have been prepared on a thirteen-month reporting period
from December 31, 1998 to January 31, 2000. The Consolidated results of
operations of TRC for the one month ended January 31, 2000 were as follows:

| | |
|---|---:|
| Revenue | $1,621 |
| Cost of revenue and expenses | 2,590 |
| Recovery of income taxes | (368) |
| Net loss | $ (601) |

17   PRIOR YEAR FINANCIAL STATEMENTS

Certain reclassifications have been made to the 1998 consolidated financial
statements to conform with the current year presentation.

F-38

Exhibit H
0866

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Board of Directors of
Telco Research Corporation:

We have audited the accompanying balance sheets of TELCO RESEARCH CORPORATION (A TENNESSEE CORPORATION) as of December 31, 1997 and 1996, and the related statements of income, stockholders' equity and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Telco Research Corporation as of December 31, 1997 and 1996, and the results of its operations and cash flows for the years then ended in conformity with generally accepted accounting principles.

/s/ ARTHUR ANDERSEN LLP

----------------------------------------
ARTHUR ANDERSEN LLP

Nashville, Tennessee
February 27, 1998

F-39

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0867

TELCO RESEARCH CORPORATION

BALANCE SHEETS

DECEMBER 31, 1997 AND 1996

|  | 1997 | 1996 |
|---|---|---|

### ASSETS

CURRENT ASSETS:

| | 1997 | 1996 |
|---|---|---|
| Cash and cash equivalents.................................. | $1,597,447 | $1,745,954 |
| Trade accounts receivable, net of allowance for doubtful accounts of $43,349 and $43,349, respectively........... | 4,735,686 | 4,026,510 |
| Receivable from related party........................... | 200,000 | 50,000 |
| Other current assets.................................... | 56,936 | 30,187 |
| Deferred tax asset...................................... | -- | 182,769 |
| Total current assets................................. | 6,590,069 | 6,035,420 |
| PROPERTY AND EQUIPMENT, NET.............................. | 851,658 | 846,161 |
| SOFTWARE DEVELOPMENT COSTS, NET.......................... | 353,001 | 258,334 |
| SERVICE BUREAU ASSETS, NET............................... | 96,325 | 160,311 |
| LAND HELD FOR RESALE..................................... | 283,539 | 283,539 |
| RECEIVABLE FROM RELATED PARTY............................ | -- | 200,000 |
| Total assets........................................ | $8,174,592 | $7,783,765 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

CURRENT LIABILITIES:

| | 1997 | 1996 |
|---|---|---|
| Accounts payable and accrued expenses.................... | $1,387,538 | $1,278,392 |
| Deferred revenue........................................ | 4,364,150 | 3,473,573 |
| Short term note payable................................. | -- | 300,000 |
| Income taxes payable.................................... | -- | 139,048 |
| Total current liabilities............................ | 5,751,688 | 5,191,013 |
| DEFERRED CREDIT.......................................... | 931,552 | 1,013,332 |
| NON CURRENT DEFERRED TAX LIABILITY....................... | -- | 129,335 |
| Total liabilities................................... | 6,683,240 | 6,333,680 |

COMMITMENTS AND CONTINGENCIES

STOCKHOLDERS' EQUITY:

| | 1997 | 1996 |
|---|---|---|
| Common stock, no par value; 10,000,000 shares authorized, 1,000,000 issued and outstanding at December 31, 1997 and 1996.............................................. | 1,000 | 1,000 |
| Additional paid-in capital.............................. | 99,236 | 99,236 |
| Retained earnings: | | |
| Undistributed C corporation earnings.................... | 1,349,849 | 1,349,849 |
| Undistributed S corporation earnings.................... | 41,267 | -- |
| | 1,391,116 | 1,349,849 |
| Total stockholders' equity........................... | 1,491,352 | 1,450,085 |
| Total liabilities, stockholders' equity.............. | $8,174,592 | $7,783,765 |

The accompanying notes to financial statements are an integral part of these balance sheets.

F-40

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0868

TELCO RESEARCH CORPORATION

STATEMENTS OF INCOME

FOR THE YEARS ENDED DECEMBER 31, 1997 AND 1996

|  | 1997 | 1996 |
|---|---|---|
| REVENUE: |  |  |
| Software license fees.................................... | $ 3,402,800 | $ 2,362,219 |
| Professional services................................... | 2,035,946 | 1,849,968 |
| Maintenance and enhancements............................. | 4,118,688 | 4,078,631 |
| Service Bureau.......................................... | 508,990 | 837,692 |
| Hardware and other...................................... | 1,810,727 | 1,734,338 |
| Total revenue....................................... | 11,877,151 | 10,862,848 |
| OPERATING EXPENSES: |  |  |
| Research and development................................. | 2,912,475 | 2,828,073 |
| Selling and marketing................................... | 5,667,846 | 5,212,702 |
| General and administrative............................... | 3,404,271 | 2,521,916 |
| Total operating expenses............................ | 11,984,592 | 10,562,691 |
| Operating income (loss)................................. | (107,441) | 300,157 |
| AMORTIZATION OF DEFERRED CREDIT........................... | 81,780 | 81,780 |
| OTHER INCOME, net....................................... | 66,928 | 424,393 |
| Income before income taxes.............................. | 41,267 | 806,330 |
| PROVISION FOR INCOME TAXES: |  |  |
| Current................................................ | -- | 145,000 |
| Deferred............................................... | -- | 98,628 |
|  | -- | 243,628 |
| Net income............................................. | $ 41,267 | $ 562,702 |

The accompanying notes to financial statements are an integral part of these
statements.

F-41

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0869

TELCO RESEARCH CORPORATION

STATEMENT OF STOCKHOLDERS' EQUITY

FOR THE YEARS ENDED DECEMBER 31, 1997 AND 1996

| | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | RETAINED EARNINGS | TOTAL |
|---|---|---|---|---|
| BALANCE, December 31, 1995................ | $1,000 | $99,236 | $1,287,147 | $1,387,383 |
| Purchase and retirement of treasury stock.................................. | -- | -- | (500,000) | (500,000) |
| Net income................................ | -- | -- | 562,702 | 562,702 |
| BALANCE, December 31, 1996................ | 1,000 | 99,236 | 1,349,849 | 1,450,085 |
| Net income................................ | -- | -- | 41,267 | 41,267 |
| BALANCE, December 31, 1997................ | $1,000 | $99,236 | $1,391,116 | $1,491,352 |

The accompanying notes to financial statements are an integral part of these statements.

F-42

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0870

TELCO RESEARCH CORPORATION

STATEMENTS OF CASH FLOWS

FOR THE YEARS ENDED DECEMBER 31, 1997 AND 1996

|  | 1997 | 1996 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income............................................ | $   41,267 | $   562,702 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization........................ | 528,329 | 583,043 |
| Amortization of deferred credit...................... | (81,780) | (81,780) |
| Deferred income taxes................................ | 53,434 | 98,628 |
| Changes in current assets and current liabilities: | | |
| Trade accounts receivable.......................... | (709,176) | (280,055) |
| Inventory.......................................... | 416 | 19,467 |
| Prepaid expenses and other......................... | (27,165) | 91,584 |
| Accounts payable................................... | 3,425 | (102,312) |
| Accrued expenses................................... | (33,327) | 417,322 |
| Deferred revenue................................... | 890,577 | (452,650) |
| Net cash provided by operating activities........ | 666,000 | 855,949 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Additions to property and equipment.................. | (356,507) | (267,013) |
| Additions to service bureau assets................... | -- | (185,793) |
| Retirement of property and equipment................. | -- | 17,201 |
| Additions to software development costs.............. | (208,000) | (180,000) |
| Acquisition and retirement of treasury stock........ | -- | (500,000) |
| Issuance of note to related party................... | -- | (250,000) |
| Proceeds from note to related party................. | 50,000 | -- |
| Net cash used in investing activities............ | (514,507) | (1,365,605) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from short-term debt........................ | -- | 300,000 |
| Payments on short-term debt.......................... | (300,000) | -- |
| Net cash provided by (used in) financing activities...................................... | (300,000) | 300,000 |
| NET DECREASE IN CASH.................................... | (148,507) | (209,656) |
| CASH, at beginning of year.............................. | 1,745,954 | 1,955,610 |
| CASH, at end of year.................................... | $1,597,447 | $ 1,745,954 |
| **SUPPLEMENTAL CASH FLOW INFORMATION:** | | |
| Cash payments of interest............................ | $      -- | $   25,532 |
| Cash payments of income taxes........................ | $ 135,192 | $   21,634 |

The accompanying notes to financial statements are an integral part of these statements.

F-43

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0871

TELCO RESEARCH CORPORATION

NOTES TO FINANCIAL STATEMENTS

DECEMBER 31, 1997 AND 1996

1.  ORGANIZATION AND SIGNIFICANT ACCOUNTING POLICIES

ORGANIZATION

Telco Research Corporation (the "Company") was incorporated under the laws of the state of Tennessee on December 30, 1977 for the purpose of designing, manufacturing and marketing telecommunication management systems. Telco operates primarily in the United States and its customers consist of corporations of various sizes as well as government agencies.

CASH AND CASH EQUIVALENTS

The Company considers all highly liquid debt instruments with a maturity of three months or less to be cash equivalents.

PROPERTY AND EQUIPMENT

Depreciation is provided using principally the straight-line method over 3 to 7 years.

Expenditures for maintenance and repairs are generally charged to expense as incurred, whereas expenditures for renewals and betterments are capitalized.

SERVICE BUREAU ASSETS

Service Bureau assets consist of assets owned by the Company which it leases to customers. The assets are amortized on a straight-line basis over the life of the customer lease, which is primarily three years.

SOFTWARE DEVELOPMENT COSTS

Software development costs incurred in the research and development of new software products and enhancements to existing software products are expensed as incurred until technological feasibility has been established. After technological feasibility is established, costs are capitalized in accordance with Statement of Financial Accounting Standards ("SFAS") No. 86 ACCOUNTING FOR THE COSTS OF COMPUTER SOFTWARE TO BE SOLD, LEASED, OR OTHERWISE MARKETED." The Company amortizes these costs on a straight-line basis over three years.

DEFERRED CREDIT

The deferred credit represents the excess of the fair value of net assets acquired from NYNEX in 1990 over their purchase price and is being amortized on a straight-line basis over 20 years.

REVENUE RECOGNITION

Trade accounts receivable represent receivables from customers in the ordinary course of business. Management believes that all appropriate reserves have been provided.

The Company accounts for software revenues in accordance with the American Institute of Certified Public Accountants' Statement of Position 91-1, Software Revenue Recognition ("SOP 91-1").

F-44

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0872

TELCO RESEARCH CORPORATION

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1997 AND 1996

1.  ORGANIZATION AND SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

SOFTWARE LICENSE FEES--Revenues for software license fees are generally recognized upon shipment of the software to the customer, providing there are no significant vendor obligations remaining and collection is probable.

PROFESSIONAL SERVICES--Revenues on professional services is recognized as the services are performed.

MAINTENANCE AND ENHANCEMENTS--Revenue on service contracts is recognized ratably over the contract period. The Company provides product support services to new customers for one year following the date of sale of a product. After the first year, the customer may purchase support on an annual basis for a cost equal to a percentage of the current software cost. The revenue associated with product support services is recorded in deferred revenue in the accompanying balance sheets and amortized over the period in which the services are provided.

SERVICE BUREAU--In 1997 this revenue consists of a management fee and equipment rental income received from Telco Business Systems, LLP (see Note 6). Prior to 1997, the Company provided telemanagement services to customers for a monthly fee. The revenues on these contracts were recognized monthly as the services were performed.

HARDWARE--Revenues on hardware sales is recognized upon shipment to the customer.

The American Institute of Certified Public Accountants has issued Statement of Position 97-2, Software Revenue Recognition ("SOP 97-2"), which supercedes SOP 91-1 and clarifies certain issues under SOP 91-1. The Company will be required to adopt SOP 97-2 effective January 1, 1998. Management has reviewed the SOP 97-2 and does not anticipate the adoption thereof to result in any change to its revenue recognition policy.

INCOME TAXES

Effective January 1, 1997, the shareholders elected to convert from a C Corporation to an S Corporation and, under Subchapter S of the Internal Revenue Code, to have Company income taxed directly to the shareholders. Under this election, each shareholder will include their share of the Company's applicable taxable income or loss in their individual federal income tax returns.

Prior to 1997, the Company accounted for income taxes in accordance with the provisions of SFAS 109, ACCOUNTING FOR INCOME TAXES. The provision for current income taxes was based on earnings reported in Telco's tax return. A deferred income tax asset or liability was determined by applying currently enacted tax laws and rates to the expected reversal of the cumulative temporary differences between the carrying value of assets and liabilities for financial statement and income tax purposes. A deferred income tax provision or benefit was measured by the change in the deferred income tax asset or liability during the year.

USE OF ESTIMATES

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements

F-45

Exhibit H
0873

TELCO RESEARCH CORPORATION

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1997 AND 1996

1. ORGANIZATION AND SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
and the reported amounts of revenues and expenses during the reporting period.
Actual results could differ from these estimates.

LONG-LIVED ASSETS

In March 1995, the Financial Accounting Standards Board ("FASB") issued
SFAS 121, ACCOUNTING FOR THE IMPAIRMENT OF LONG-LIVED ASSETS AND LONG-LIVED
ASSETS TO BE DISPOSED OF. This statement imposes stricter criteria for long-term
assets by requiring that such assets be probable of future recovery at each
balance sheet date. The Company adopted SFAS 121 effective January 1, 1996, the
result of which did not have a material impact on the results of operations,
financial condition or cash flows of the Company.

RECLASSIFICATIONS

Certain reclassifications have been made in the 1996 financial statements to
conform to the 1997 presentation.

2. PROPERTY AND EQUIPMENT

Property and equipment, at December 31, 1997 and 1996, consists of the
following:

|  | 1997 | 1996 |
|---|---|---|
| Furniture and fixtures | $ 780,258 | $ 696,540 |
| Computer equipment | 1,556,550 | 1,292,066 |
| Leasehold improvements | 157,486 | 149,181 |
|  | 2,494,294 | 2,137,787 |
| Less accumulated depreciation | (1,642,636) | (1,291,626) |
|  | $ 851,658 | $ 846,161 |

3. LAND HELD FOR RESALE

During 1993, certain land related to a previously planned facility was
transferred to the Company from an affiliated party. The Company intends to
dispose of the property and has placed it on the open market for sale. In the
opinion of management, the fair market value of the property exceeds its
recorded value. This property has been included in land held for resale in the
accompanying balance sheets.

4. RETAINED EARNINGS

Effective January 1, 1997, the Company's shareholders elected to convert the
Company's legal form to an S Corporation. Cumulative undistributed earnings
subsequent to the date of the conversion total $41,267 as of December 31, 1997.
Prior to the date of the conversion, the Company operated as a C corporation and
had retained earnings of $1,349,849 at the date of conversion.

F-46

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0874

TELCO RESEARCH CORPORATION

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1997 AND 1996

5.  INCOME TAXES

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. With the Company's change in tax status from a C Corporation to an S Corporation, the Company eliminated its deferred tax assets and liabilities and other associated tax reserves. The change in tax status did not result in a significant effect to the Company's operations during 1997. Significant components of the Company's deferred tax assets as of December 31, 1996 were as follows:

|  | 1996 |
|---|---|
| Current deferred tax assets: | |
| Reserves on assets | $  16,473 |
| Liabilities not yet deductible | 166,296 |
| Total current deferred tax asset | 182,769 |
| Noncurrent deferred tax assets (liabilities): | |
| Accumulated depreciation and amortization | (43,194) |
| Deferred software costs | (98,167) |
| Other | 12,026 |
| Total non-current deferred tax liability | (129,335) |
| Net total deferred tax assets | $  53,434 |

A reconciliation of the U.S. Federal statutory rate to the effective rate for the year ended December 31, 1996 is as follows:

|  | 1996 |
|---|---|
| Federal expense at 34% | $146,652 |
| State benefit, net of Federal deduction | 17,253 |
| Expenses not deductible | (62,777) |
| Tax liability resulting from gain on sale of Service Bureau, eliminated in combination | 142,500 |
|  | $243,628 |

6.  TELCO BUSINESS SYSTEMS, LLP

On December 30, 1996 the shareholders of the Company formed Telco Business Systems (the "Partnership") as a separate partnership and purchased the service bureau line of business from the Company for $375,000 by paying the Company $125,000 cash and issuing a payable to the Company for $250,000. The payable is included in receivables from related parties in the accompanying financial statements and has a balance of $200,000 at December 31, 1997. The service bureau line of business consists of various contracts with customers to provide telemanagement services. Under the terms of the agreement between the Partnership and the Company, the Partnership will pay the Company a lease fee for the use of the Service Bureau assets and a monthly management fee based on a percentage of the Partnership's revenues. The Company received payments under this agreement totaling $508,990 in 1997.

F-47

Exhibit H
0875

TELCO RESEARCH CORPORATION

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1997 AND 1996

7.  SHORT TERM NOTE PAYABLE

The Company had a note payable to a bank which totaled $300,000 at December 31, 1996. The note was paid in full in January of 1997.

8.  COMMITMENTS AND CONTINGENCIES

LEASE COMMITMENTS

The Company leases its office facilities under an operating lease. Total rent expense in fiscal 1997 and 1996 amounted to $366,150 and $375,389, respectively. Future minimum rental payments required under this operating lease at December 31, 1997 are as follows:

| | |
|---|---:|
| 1998 | $ 420,345 |
| 1999 | 421,355 |
| 2000 | 421,355 |
| 2001 | 421,355 |
| 2002 | 421,355 |
| Thereafter | 1,264,065 |
| | $3,369,830 |

PENSION PLAN

The Company sponsors both a defined contribution pension plan and a 401(k) plan which cover substantially all of its employees. All employees are eligible to participate in both plans after six months of service and the attainment of age 20.5. The Company makes annual contributions to the pension and 401(k) plans totaling 3.00% and 2.70%, respectively, of eligible participant wages. Company contributions to the pension and 401(k) plans for 1997 and 1996 totaled $263,085 and $172,307, respectively.

9.  COMMON STOCK

The transferability of the Company's common stock is restricted by the terms of a stockholders' agreement. The agreement gives the Company a right of first refusal and each stockholder a right of second refusal in any proposed sale of stock by a stockholder.

10.  STOCK RETIREMENT

During 1996, the Company purchased and retired all the stock of a former shareholder. When the stock was acquired it was recorded at cost and was subsequently retired through retained earnings at its acquisition cost.

F-48

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0876

UNAUDITED PRO FORMA COMBINED CONDENSED FINANCIAL INFORMATION

The following unaudited pro forma combined condensed statement of operations assumes a business combination between Peregrine Systems, Inc. and Telco Research Corporation (Telco) accounted for using the purchase method. The pro forma combined condensed statement of operations assumes the acquisition was consummated as of April 1, 1999 and is based on the respective historical consolidated financial statements and the notes thereto, see related Telco historical financial statements included herein and Peregrine's form 10-K.

A pro forma combined condensed balance sheet is not presented herein as the balance sheet of Telco is included in the balance sheet of Peregrine as of March 31, 2000.

The pro forma information is presented for illustrative purposes only and is not necessarily indicative of the operating results that would have occurred had the merger occurred during the period presented nor is it necessarily indicative of future operating results.

F-49

Exhibit H
0877

TELCO RESEARCH LIMITED CORPORATION AND PEREGRINE SYSTEMS, INC.

UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS

FOR THE YEAR ENDED MARCH 31, 2000

(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

| | PRO FORMA TELCO RESEARCH (YEAR ENDED JANUARY 31, 2000) | PSI (YEAR ENDED MARCH 31, 2000) | PRO FORMA ADJUSTMENTS | | PRO FORMA COMBINED |
|---|---|---|---|---|---|
| | (NOTE 2) | | (NOTE 1) | | |
| **Revenues:** | | | | | |
| Revenue............................. | $32,027 | $    -- | (32,027) | A,H | $    0 |
| Licenses............................ | -- | 168,467 | 17,761 | A | 186,228 |
| Services............................ | -- | 84,833 | 14,266 | A | 99,099 |
| Total revenues...................... | 32,027 | 253,300 | | | 285,327 |
| **Costs and Expenses:** | | | | | |
| Cost of revenue..................... | 14,063 | -- | (14,063) | A,H | 0 |
| Cost of licenses.................... | -- | 1,426 | 2,069 | A | 3,495 |
| Cost of services.................... | -- | 51,441 | 11,995 | A | 63,436 |
| Sales and marketing................. | 6,351 | 101,443 | -- | | 107,794 |
| Research and development............ | 3,747 | 28,517 | -- | | 32,264 |
| Operating........................... | 3,477 | -- | (3,477) | A | -- |
| General & administrative............ | -- | 19,871 | 3,598 | A | 23,469 |
| Amortization of intangible assets... | -- | 34,753 | 17,183 | A,B,D,F | 51,936 |
| Acquired in-process research and development costs................ | -- | 24,505 | -- | C,E | 24,505 |
| Total costs and expenses............ | 27,638 | 261,956 | | | 306,899 |
| Income (loss) from operations....... | 4,389 | (8,656) | | | (21,572) |
| Interest income, net................ | -- | 38 | 122 | A | 160 |
| Income (loss) from operations before income taxes....................... | 4,389 | (8,618) | | | (21,412) |
| Income taxes........................ | 1,938 | 16,452 | -- | | 18,390 |
| Net income (loss)................... | $ 2,451 | $(25,070) | | | $(39,802) |
| **Net income (loss) per share--basic:** | | | | | |
| Net income (loss) per share......... | | $  (0.24) | | | $  (0.39) |
| Shares used in computation.......... | | 102,332 | -- | B,G | 102,332 |
| **Net income (loss) per share--diluted:** | | | | | |
| Net income (loss) per share......... | | $  (0.24) | | | $  (0.39) |
| Shares used in computation.......... | | 102,332 | -- | B,G | 102,332 |

F-50

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

NOTES TO UNAUDITED PRO FORMA COMBINED CONDENSED
STATEMENT OF OPERATIONS

1. BASIS OF PRESENTATION

The unaudited pro forma combined condensed statement of operations for
Peregrine has been prepared based on the historical financial statements of
Peregrine for the year ended March 31, 2000 and for Telco for the year ended
January 31, 2000 considering the effects of the combination under the purchase
method. The pro forma statement of operations for the year ended March 31, 2000
has been prepared as if the combination had been consummated on April 1, 1999.

In management's opinion, all material adjustments necessary to reflect the
effects of the combination have been made. The unaudited pro forma combined
condensed statement of operations is not necessarily indicative of the actual
results of operations of Peregrine would have been assuming the combination had
been completed as of April 1, 1999, nor is it indicative of the results of
operations for future periods. The pro forma combined condensed statement of
operations should be read in conjunction with the Telco historical financial
statements included herein and Peregrine's form 10-K incorporated by reference
herein.

2. PRO FORMA ADJUSTMENTS AND ASSUMPTIONS

(A) The historical results of Telco Research have been adjusted to
conform to the Combined Company's basis of presentation for its Condensed
Consolidated Financial Statements.

(B) The purchase price for the completion of the Telco Research
acquisition was determined by combining the value of Peregrine Common Stock
issued to Telco Research stockholders (approximately 2,564,000 common shares
valued at $43.875 per share), the fair value of net assets acquired of Telco
Reserch and the estimated transactions costs for the acquisition. The
estimated direct transaction costs to be incurred by the Combined Company
include transaction fees for investment bankers, attorneys, accountants,
financial printing, and other related charges. The purchase price for the
completion of the acquisition is summarized below (in thousands):

```
Common stock and value of options assumed...................  $112,496
Estimated transaction costs..................................     8,327
Net assets acquired, including (I) and excluding (G)........   (13,431)
                                                              --------
                                                              $107,392
                                                              ========
```

(C) The estimated allocation of the purchase price for the completion of
the Telco Research acquisition was determined as follows (in thousands):

```
Acquired in-process technology...............................  $ 21,479
Intangible assets............................................    85,913
                                                               --------
                                                               $107,392
                                                               ========
```

The components of the pro forma adjustment to intangible assets,
investments, and other, net are as follows (in thousands):

```
Intangible assets (see above) resulting from this
   transaction...............................................  $ 85,913
Less: Telco intangible assets................................   (10,085)
                                                               --------
      Net adjustment.........................................  $ 75,828
                                                               ========
```

F-51

Exhibit H
0879

NOTES TO UNAUDITED PRO FORMA COMBINED CONDENSED
STATEMENT OF OPERATIONS (CONTINUED)

2. PRO FORMA ADJUSTMENTS AND ASSUMPTIONS (CONTINUED)

   (D) Amortization of the intangible assets for Telco Research will be on
the straight-line method over five years and will be included in the
amortization of intangible assets in the Combined Company's Statement of
Operations.

   (E) The pro forma statement of operations excludes the charge of $21.5
million for acquired in-process research and development costs, which arose
from the acquisition. These charges will be included in the Combined
Company's consolidated financial statements for the three-month period
ending March 31, 2000.

   (F) Reflects the amortization of intangible assets beginning April 1,
1998. The purchase price for the Telco Research acquisition was allocated to
the tangible and intangible assets of Telco Research based on preliminary
estimates of the fair market value of those assets.

   (G) Reflects a two-for-one stock split effected by Peregrine in February
2000.

   (H) Revenues include approximately $7.3 million of hardware sales, and
cost of revenues include approximately $6.0 million of hardware costs. After
consummation of the merger, Peregrine expects to record these revenues and
costs on a net basis.

3. TELCO RESEARCH LIMITED PRO FORMA CONSOLIDATED STATEMENT OF INCOME

TELCO RESEARCH CORPORATION LIMITED
PRO FORMA CONSOLIDATED STATEMENT OF INCOME
YEAR ENDED JANUARY 31, 2000
(UNAUDITED, IN THOUSANDS)

| | | (CANADIAN FUNDS, (B)) | | | (US FUNDS) |
| | TSB(B) | TRCL(C) | ADJUSTMENTS | CONSOLIDATED | CONSOLIDATED |
|---|---|---|---|---|---|
| Revenue............................. | $12,969 | $34,048 | $   360 (d)(i) | $47,377 | $32,027 |
| Cost of revenue..................... | 6,761 | 14,042 | -- (i) | 20,803 | 14,063 |
| Gross profit........................ | 6,208 | 20,006 | 360 | 26,574 | 17,964 |
| Expenses | | | | | |
| Selling........................... | 2,041 | 7,354 | -- | 9,395 | 6,351 |
| Research & development............ | 1,480 | 4,063 | -- | 5,543 | 3,747 |
| Operating......................... | 936 | 4,212 | (5 )(d)(e) | 5,143 | 3,477 |
| Bonus payments to shareholders..... | -- | 2,210 | (2,210 )(f) | -- | -- |
| | 4,457 | 17,839 | (2,215) | 20,081 | 13,575 |
| Income before income taxes........... | 1,751 | 2,167 | 2,575 | 6,493 | 4,389 |
| Provision for income taxes........... | 683 | 1,589 | 595 (g) | 2,867 | 1,938 |
| Net income........................... | $ 1,068 | $   578 | $ 1,980 | $ 3,626 | $ 2,451 |

NOTES TO TELCO RESEARCH CORPORATION LIMITED PRO FORMA CONSOLIDATED FINANCIAL
STATEMENTS

   Effective August 1, 1999 TSB International Inc. ("TSB") acquired all the
outstanding shares of Telco Research Corporation ("TRC") by way of a share
exchange. Subsequent to the reverse takeover, TSB changed its name to Telco
Research Corporation Limited ("TRLC").

F-52

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0880

NOTES TO UNAUDITED PRO FORMA COMBINED CONDENSED
STATEMENT OF OPERATIONS (CONTINUED)

3. TELCO RESEARCH LIMITED PRO FORMA CONSOLIDATED STATEMENT OF INCOME (CONTINUED)

The unaudited pro forma consolidated statements of income have been prepared to illustrate the effect of the reverse takeover had it occurred as at February 1, 1999, immediately prior to the opening of the pro forma period, on the following basis:

(a) all amounts in U.S. dollars have been translated to Canadian dollars at the average rates prevailing during the pro forma periods;

(b) actual results of TSB prior to August 1, 1999 are included in a separate column;

(c) actual results of TRCL are included on a reverse takeover basis (i.e. including the results of the former TSB only for the period from August 1, 1999 forward);

(d) the results of TRCL include the results of Telco Business Systems, a partnership acquired by TRC in July 1999, throughout the pro forma period;

(e) the results of TRCL have been adjusted to include charges of amortization of goodwill arising from the reverse acquisition throughout the pro forma period;

(f) the results of TRCL have been adjusted to exclude bonus payments made to shareholders of TRC prior to the merger;

(g) the results of TRCL have been adjusted to include a provision for income taxes with respect to the earnings of TRC prior to the merger;

(h) as a result of the reverse takeover of TSB , TRC's reporting year end was changed to January 31, 2000, as TRC was required to adopt the reporting period of TSB, the legal parent. Consequently, the results of TRC reflect a thirteen-month reporting period from December 31, 1998 to January 31, 2000. The Consolidated results of operations of TRC for the one month ended January 31, 2000 were as follows:

(i) the revenues of TRCL include approximately $7.3 million of hardware sales, and the associated costs of revenues include approximately $6.0 million of hardware costs. After consummation of the merger, Peregrine expects to record these revenues on a net basis.

| | |
|---|---:|
| Revenue | $1,621 |
| Cost of revenue and expenses | 2,590 |
| Recovery of income taxes | (368) |
| Net loss | $ (601) |

These Results have been elminated from the thirteen month results of TRC.

The unaudited pro forma consolidated financial statements have been prepared in accordance with Canadian generally accepted accounting principles ("GAAP"). The management of Peregrine believes that there would be no material differences in the financial statements if they were prepared in accordance with U.S. GAAP.

F-53

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0881

INDEPENDENT AUDITORS' REPORT

The Board of Directors
Harbinger Corporation:

We have audited the accompanying consolidated balance sheets of Harbinger Corporation and subsidiaries as of December 31, 1999 and 1998, and the related consolidated statements of operations, comprehensive income (loss), shareholders' equity, and cash flows for each of the years in the three-year period ended December 31, 1999. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Harbinger Corporation and subsidiaries as of December 31, 1999 and 1998, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1999 in conformity with generally accepted accounting principles.

/s/ KPMG LLP

Atlanta, Georgia
February 10, 2000

F-54

Exhibit H
0882

HARBINGER CORPORATION AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(IN THOUSANDS, EXCEPT SHARE DATA)

|  | DECEMBER 31, | |
|---|---|---|
|  | 1999 | 1998 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents.................................... | $ 12,934 | $ 33,059 |
| Short-term investments....................................... | 60,086 | 59,248 |
| Accounts receivable, less allowances for returns and doubtful accounts of $8,455 and $5,464 in 1999 and 1998, respectively............................................... | 43,975 | 35,891 |
| Royalties receivable, less allowance for doubtful accounts of $3,614 in 1999........................................... | 1,200 | 1,730 |
| Deferred income taxes........................................ | 2,103 | 2,103 |
| Other current assets......................................... | 3,621 | 5,622 |
| Total current assets........................................ | 123,919 | 137,653 |
| Property and equipment, less accumulated depreciation and amortization.............................................. | 26,339 | 23,150 |
| Intangible assets, less accumulated amortization............ | 16,863 | 16,803 |
| Deferred income taxes........................................ | 698 | 698 |
| Other non-current assets..................................... | 1,640 | 65 |
|  | $169,459 | $178,369 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable......................................... | $ 7,478 | $ 5,566 |
| Accrued expenses......................................... | 15,995 | 31,571 |
| Deferred revenues........................................ | 21,212 | 21,213 |
| Total current liabilities............................... | 44,685 | 58,350 |
| Commitments and contingencies................................ | | |
| Zero coupon redeemable preferred stock, no par value; 0 and 2,000,000 shares authorized, issued and outstanding as of December 31, 1999 and 1998................................ | -- | -- |
| Shareholders' equity: | | |
| Preferred stock, no par value; 20,000,000 and 18,000,000 shares authorized as of December 31, 1999 and 1998 respectively; none issued and outstanding.............. | -- | -- |
| Common stock, $0.0001 par value; 100,000,000 shares authorized; 43,404,247 and 42,313,031 shares issued as of December 31, 1999 and 1998, respectively............. | 4 | 4 |
| Additional paid-in capital............................... | 208,226 | 201,615 |
| Accumulated deficit...................................... | (56,968) | (73,528) |
| Accumulated other comprehensive loss..................... | (1,444) | (622) |
| Treasury stock, 4,323,050 shares and 1,562,100 shares as of December 31, 1999 and 1998, respectively............. | (25,044) | (7,450) |
| Total shareholders' equity............................... | 124,774 | 120,019 |
|  | $169,459 | $178,369 |

See accompanying notes to consolidated financial statements.

F-55

Exhibit H
0883

HARBINGER CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

(IN THOUSANDS, EXCEPT PER SHARE DATA)

| | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| | 1999 | 1998 | 1997 |
| Revenues: | | | |
| Services............................................... | $108,673 | $ 88,067 | $ 63,417 |
| Software.............................................. | 46,841 | 47,084 | 54,804 |
| Total revenues................................... | 155,514 | 135,151 | 118,221 |
| Direct costs: | | | |
| Services............................................... | 46,442 | 34,487 | 22,710 |
| Software.............................................. | 4,555 | 3,730 | 7,800 |
| Total direct costs............................... | 50,997 | 38,217 | 30,510 |
| Gross margin....................................... | 104,517 | 96,934 | 87,711 |
| Operating costs: | | | |
| Selling and marketing...................................... | 39,559 | 31,618 | 26,723 |
| General and administrative................................. | 30,970 | 32,205 | 20,775 |
| Depreciation and amortization............................. | 9,522 | 8,100 | 7,096 |
| Product development....................................... | 11,836 | 10,636 | 15,267 |
| Charge for purchased in-process product development, write-off of software development costs, restructuring, acquisition-related and other charges................... | -- | 27,027 | 40,555 |
| Total operating costs................................. | 91,887 | 109,586 | 10,416 |
| Operating income (loss)............................... | 12,630 | (12,652) | (22,705) |
| Interest income, net...................................... | 3,467 | 4,830 | 3,914 |
| Equity in losses of joint ventures........................ | (80) | -- | (313) |
| Minority interest income.................................. | -- | -- | 2 |
| Income (loss) from continuing operations before income taxes................................................ | 16,017 | (7,822) | (19,102) |
| Income tax expense....................................... | (813) | (705) | (3,093) |
| Income (loss) from continuing operations.............. | 15,204 | (8,527) | (22,195) |
| Discontinued operations: | | | |
| Loss from operations of TrustedLink Procurement business and TrustedLink Banker division........................ | -- | (1,793) | (10,433) |
| Income (loss) on disposal of TrustedLink Procurement business, and TrustedLink Banker division, including provisions for operating losses during phase-out periods........................................... | 1,356 | (4,392) | (4,000) |
| Income (loss) before extraordinary item.............. | 16,560 | (14,712) | (36,628) |
| Extraordinary loss on debt extinguishment................. | -- | -- | (2,419) |
| Net income (loss)................................... | $ 16,560 | $(14,712) | $(39,047) |
| Basic earnings (loss) per share........................... | $ 0.43 | $ (0.35) | $ (1.02) |
| Weighted average number of shares outstanding.............. | 38,938 | 41,557 | 38,162 |
| Diluted earnings (loss) per share......................... | $ 0.41 | $ (0.35) | $ (1.02) |
| Weighted average number of common shares outstanding assuming dilution......................................... | 40,739 | 41,557 | 38,162 |

See accompanying notes to consolidated financial statements.

F-56

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0884

HARBINGER CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)

(IN THOUSANDS)

| | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| | 1999 | 1998 | 1997 |
| Net income (loss)............................................ | $16,560 | $(14,712) | $(39,047) |
| Other comprehensive income (loss), net of tax: | | | |
| Foreign currency translation adjustments................... | (822) | 260 | (744) |
| Comprehensive income (loss)............................... | $15,738 | $(14,452) | $(39,791) |

See accompanying notes to consolidated financial statements.

F-57

Exhibit H
0885

HARBINGER CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

(IN THOUSANDS, EXCEPT SHARE DATA)

FOR THE YEARS ENDED DECEMBER 31, 1999, 1998 AND 1997

| | COMMON STOCK | | ADDITIONAL PAID-IN CAPITAL | ACCUMULATED DEFICIT | ACCUMULATED OTHER COMPREHENSIVE LOSS | TREASURY STOCK | |
| | SHARES | AMOUNT | | | | SHARES | AMOUNT |
|---|---|---|---|---|---|---|---|
| BALANCE, DECEMBER 31, 1996.... | 35,806,596 | $     3 | $113,846 | $(19,593) | $   (138) | -- | $   -- |
| Exercise of stock options and warrants and issuance of stock under employee stock purchase plan............... | 1,039,749 | -- | 5,098 | -- | -- | -- | -- |
| Tax benefits from stock plans | -- | -- | 498 | -- | -- | -- | -- |
| Issuance of stock and stock options to purchase a debenture and acquire minority interest of subsidiary.................. | 363,432 | -- | 6,416 | -- | -- | -- | -- |
| Issuance of common stock and vesting of contingent option in connection with acquisitions................ | 513,079 | -- | 3,958 | (296) | -- | -- | -- |
| Issuance of stock in secondary offering, net.............. | 3,105,000 | 1 | 60,025 | -- | -- | -- | -- |
| Other transactions............ | -- | -- | -- | (9) | -- | -- | -- |
| Foreign currency translation adjustment.................. | -- | -- | -- | -- | (744) | -- | -- |
| Net loss...................... | -- | -- | -- | (39,047) | -- | -- | -- |
| BALANCE, DECEMBER 31, 1997.... | 40,827,856 | 4 | 189,841 | (58,945) | (882) | -- | -- |
| Exercise of stock options and warrants and issuance of stock under employee stock purchase plan............... | 1,289,178 | -- | 11,803 | -- | -- | -- | -- |
| Shares purchased.............. | -- | -- | -- | -- | -- | (1,562,100) | (7,450) |
| Immaterial pooling-of-interests........ | 194,497 | -- | -- | 129 | -- | -- | -- |
| Foreign currency translation adjustment.................. | -- | -- | -- | -- | 260 | -- | -- |
| Other transactions............ | 1,500 | -- | (29) | -- | -- | -- | -- |
| Net loss...................... | -- | -- | -- | (14,712) | -- | -- | -- |
| BALANCE, DECEMBER 31, 1998.... | 42,313,031 | 4 | 201,615 | (73,528) | (622) | (1,562,100) | (7,450) |
| Exercise of stock options and warrants and issuance of stock under employee stock purchase plan............... | 1,091,216 | -- | 6,611 | -- | -- | -- | -- |
| Shares purchased.............. | -- | -- | -- | -- | -- | (2,760,950) | (17,594) |
| Foreign currency translation adjustment.................. | -- | -- | -- | -- | (822) | -- | -- |
| Net income................... | -- | -- | -- | 16,560 | -- | -- | -- |
| BALANCE, DECEMBER 31, 1999.... | 43,404,247 | $     4 | $208,226 | $(56,968) | $(1,444) | (4,323,050) | $(25,044) |

| | TOTAL SHAREHOLDERS' EQUITY |
|---|---|
| BALANCE, DECEMBER 31, 1996.... | $ 94,118 |
| Exercise of stock options and warrants and issuance of stock under employee stock purchase plan............... | 5,098 |
| Tax benefits from stock plans | 498 |
| Issuance of stock and stock options to purchase a debenture and acquire minority interest of subsidiary.................. | 6,416 |
| Issuance of common stock and vesting of contingent option in connection with acquisitions................ | 3,662 |
| Issuance of stock in secondary offering, net.............. | 60,026 |
| Other transactions............ | (9) |
| Foreign currency translation adjustment.................. | (744) |

Exhibit H
0886

```
Net loss.......................        (39,047)
                                       --------
BALANCE, DECEMBER 31, 1997....         130,018
Exercise of stock options and
  warrants and issuance of
  stock under employee stock
  purchase plan...............          11,803
Shares purchased..............          (7,450)
Immaterial
  pooling-of-interests........             129
Foreign currency translation
  adjustment..................             260
Other transactions............             (29)
Net loss......................         (14,712)
                                       --------
BALANCE, DECEMBER 31, 1998....         120,019
Exercise of stock options and
  warrants and issuance of
  stock under employee stock
  purchase plan...............           6,611
Shares purchased..............         (17,594)
Foreign currency translation
  adjustment..................            (822)
Net income....................          16,560
                                       --------
BALANCE, DECEMBER 31, 1999....        $124,774
                                       ========
```

              See accompanying notes to consolidated financial statements.

                              F-58

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0887

HARBINGER CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

(IN THOUSANDS)

| | YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1999 | 1998 | 1997 |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ 16,560 | $(14,712) | $(39,047) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Allowance for returns and doubtful accounts | 12,072 | 10,016 | 4,709 |
| Charge for purchased in-process product development, write-off of software development costs, acquisition-related and other noncash charges | -- | 3,981 | 26,761 |
| Income (loss) on disposal of discontinued operations | (1,356) | 5,737 | 4,000 |
| Loss on debt extinguishment | -- | -- | 2,419 |
| Depreciation and amortization | 11,530 | 10,847 | 10,917 |
| Loss on sale of property and equipment | -- | -- | 389 |
| Discount amortization on investments | -- | (153) | 88 |
| Equity in losses of joint ventures | 197 | -- | 302 |
| Minority interest and other | -- | -- | (287) |
| Deferred income taxes | -- | -- | 1,110 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (20,815) | (7,451) | (17,680) |
| Royalties receivable | 530 | 20 | (4,027) |
| Other assets | 1,454 | (2,256) | 1,410 |
| Accounts payable and accrued expenses | (11,183) | (2,724) | 9,300 |
| Deferred revenues | (1) | 2,864 | 1,260 |
| Net cash provided by operating activities | 8,988 | 6,169 | 1,624 |
| **Cash flows from investing activities:** | | | |
| Net purchases of short-term investments | (838) | (26,762) | (2,577) |
| Purchases of property and equipment | (11,398) | (12,887) | (8,576) |
| Additions to software development costs | (5,806) | (3,572) | (5,014) |
| Investment in acquisitions and joint venture | (300) | (3,547) | (13,924) |
| Proceeds from disposal of property and equipment | -- | -- | 7 |
| Proceeds from sale of discontinued operations | 500 | -- | -- |
| Net additions to notes receivable | (125) | -- | -- |
| Net cash used in investing activities | (17,967) | (46,768) | (30,084) |

F-59

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0888

HARBINGER CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)

(IN THOUSANDS)

| | YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1999 | 1998 | 1997 |
| Cash flows from financing activities: | | | |
| Exercise of stock options and warrants and issuance of stock under employee stock purchase plan | 6,611 | 11,803 | 5,098 |
| Principal payments under notes payable and long-term debt | -- | (623) | (2,968) |
| Proceeds from issuance of common stock | -- | -- | 60,026 |
| Purchases of common stock | (17,594) | (7,450) | -- |
| Repayments under credit agreement | -- | -- | (1,550) |
| Purchase of subordinated debenture | -- | -- | (1,500) |
| Net cash (used in) provided by financing activities | (10,983) | 3,730 | 59,106 |
| Net increase (decrease) in cash and cash equivalents | (19,962) | (36,869) | 30,646 |
| Cash and cash equivalents at beginning of year | 33,059 | 69,811 | 35,697 |
| Effect of exchange rates on cash held in foreign currencies | (163) | 65 | (76) |
| Cash received from acquisitions | -- | 52 | 3,544 |
| Cash and cash equivalents at end of year | $ 12,934 | $ 33,059 | $ 9,811 |
| Supplemental disclosures: | | | |
| Cash paid for interest | $ -- | $ 50 | $ 90 |
| Cash paid for income taxes | $ 788 | $ 991 | $ -- |
| Supplemental disclosures of noncash investing and financing activities: | | | |
| Purchase of subordinated debenture in exchange for common stock | $ -- | -- | $ 4,200 |
| Acquisition of minority interest in exchange for issuance of common stock | $ -- | $ -- | $ 2,216 |
| Acquisition of minority interest in exchange for common stock | $ -- | $ -- | $ 392 |
| Acquisition of businesses in exchange for assumption of liabilities and issuance of common stock, options and warrants to acquire common stock | $ -- | $ -- | $ 454 |
| Issuance of notes receivable in exchange for sale of discontinued operations | $ 800 | $ -- | $ -- |

See accompanying notes to consolidated financial statements.

F-60

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0889

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1. PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

BUSINESS AND PRESENTATION

Harbinger Corporation and subsidiaries (the Company) develops, markets and supports software products, provides computer communications networks and provides professional consulting services to enable businesses to engage in e-commerce. The Company's products and services are used by customers in targeted industries, including the petroleum, chemicals, utilities, electronics, distribution, aerospace, automotive, communications, transportation, textile/apparel and healthcare industries both in the United States and certain international markets including Europe, South America and Asia.

The consolidated financial statements of the Company include the accounts of Harbinger Corporation and its subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation.

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

REVENUE RECOGNITION

SERVICES

Revenues for services principally include subscription fees for transactions on harbinger.net, the Company's e-commerce portal; software maintenance; and professional service fees for outsourcing, training and e-commerce enablement. Subscription fees are a combination of monthly access charges and transaction-based usage charges and are recognized as incurred each month. Software maintenance is billed in advance with revenue deferred and recognized ratably over the one-year service period. Revenues for professional services are based on actual services rendered and are recognized as services are performed.

SOFTWARE

The Company recognizes revenue in accordance with Statement of Position (SOP) 97-2, SOFTWARE REVENUE RECOGNITION, and SOP 98-4, DEFERRAL OF THE EFFECTIVE DATE OF A PROVISION OF SOP 97-2. Revenue is derived from the sale of software licenses, hardware and software services and is allocated to each element of the arrangement based on the relative fair values of the elements established by the price charged when the respective element is sold separately.

Revenues derived from software license fees are recognized upon shipment, net of estimated returns. Software revenues also include royalties due to the Company under distribution agreements with third parties that are recognized either on shipment of software to a distributor or upon sales to end users by a distributor, depending on the terms of the distribution agreement.

In December 1998 the Accounting Standards Committee of the American Institute of Certified Public Accountants issued SOP 98-9, SOFTWARE REVENUE RECOGNITION WITH RESPECT TO CERTAIN TRANSACTIONS. SOP 98-9 is effective for fiscal years beginning after March 15, 1999 and the Company does not expect a material change to its accounting for revenues as a result of adopting the provisions of SOP 98-9.

F-61

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0890

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

1. PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
   DEFERRED REVENUES

Deferred revenues represent payments received from customers or billings invoiced to customers for software and services billed in advance of revenue recognition.

DIRECT COSTS

Direct costs for services include network asset depreciation and amortization, telecommunications charges and the costs of personnel to manage network operations, customer support, professional service engagements and consulting. Direct costs for software include duplication, packaging and shipping of software, amortization of purchased technology and software development costs and royalties paid to third-party distributors.

CASH, CASH EQUIVALENTS AND SHORT-TERM INVESTMENTS

Cash, cash equivalents and short-term investments are stated at cost, which approximates fair value, and consist primarily of money market funds and U.S. Treasury bills. The Company considers all highly liquid investments with original maturities of three months or less to be cash equivalents. Investments maturing between three and 12 months from the date of purchase are classified as short-term investments.

Management determines the appropriate classification of debt securities at the time of purchase and re-evaluates such designations quarterly. As of December 31, 1999 debt securities were classified as held-to-maturity as the Company intended to hold, and had the ability to hold, these securities to maturity. Held-to-maturity securities are stated at amortized cost, which approximates fair market value.

Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of temporary cash investments and other short-term obligations of the U.S. Government.

PROPERTY AND EQUIPMENT

Property and equipment are stated at cost, less accumulated depreciation and amortization. Depreciation and amortization are provided using the straight-line method over the estimated useful lives of the assets, generally three to 10 years. Leasehold improvements are amortized straight-line over the shorter of the lease or estimated useful life of the asset.

NONMONETARY TRANSACTION

The Company accounts for nonmonetary transactions based on the fair value of the assets or services involved. During 1999 the Company acquired software to use in its internal purchasing system as part of its overall ERP project in exchange for certain Company software products that the acquiring company used internally. The fair value, based on a combination of market comparables, competitive bids and prior sales histories, was $330,000. This value was recorded as property and equipment on the consolidated balance sheets and as software revenue on the consolidated statements of operations.

F-62

Exhibit H
0891

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

1. PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
   INVESTMENTS IN JOINT VENTURES

During 1999 the Company became one-third owner of GLINK, LLC (GLINK), a joint venture established to develop an electronic marketplace for the grocery industry. The Company accounts for its ownership in GLINK using the equity method of accounting, which requires the Company to record its share of income and losses of GLINK to the consolidated statements of operations under "Equity in losses of joint ventures" in the period they occur. The Company also applied the equity method of accounting for its holdings in other immaterial joint ventures in 1997 that have since been dissolved.

INTANGIBLE ASSETS

PURCHASED TECHNOLOGY, GOODWILL AND OTHER INTANGIBLE ASSETS

Purchased technology, goodwill and other intangible assets are amortized on a straight-line basis over the expected periods to be benefited, generally five to 10 years. The Company evaluates the recoverability of these intangible assets at each period end using the undiscounted estimated future net operating cash flows expected to be derived from such assets. If such evaluation indicates a potential impairment, the Company uses the fair value to determine the amount of these intangible assets that should be written off.

SOFTWARE DEVELOPMENT COSTS

The Company capitalizes certain software development costs in accordance with Statement of Financial Accounting Standards (SFAS) No. 86, ACCOUNTING FOR THE COSTS OF COMPUTER SOFTWARE TO BE SOLD, LEASED OR OTHERWISE MARKETED. Costs incurred internally to create a computer software product or to develop an enhancement to an existing product are charged to expense when incurred as research and development until technological feasibility has been established for the product or enhancement. Thereafter, all software production costs are capitalized and reported at the lower of unamortized cost or net realizable value. Capitalization ceases when the product or enhancement is available for general release to customers. Software development costs are amortized on a product-by-product basis at the greater of the amounts computed using (a) the ratio of current gross revenues for a product or enhancement to the total current and anticipated future gross revenues for that product or enhancement, or (b) the straight-line method over the remaining estimated economic life of the product or enhancement, not to exceed five years. The Company evaluates the net realizable value of its software development costs at each period end using undiscounted estimated future net operating cash flows expected to be derived from the respective software product or enhancement. If such evaluation indicates that the unamortized software development costs exceed the net realizable value, such amount is written off.

INCOME TAXES

The Company accounts for income taxes using the asset and liability method of SFAS No. 109, ACCOUNTING FOR INCOME TAXES. Under SFAS No. 109 deferred income tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred income tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on

F-63

Exhibit H
0892

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

1. PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
deferred income tax assets and liabilities of a change in tax rates is
recognized in income in the period that includes the enactment date.

RECLASSIFICATIONS

Certain reclassifications have been made to the 1998 and 1997 consolidated
financial statements to conform with the 1999 presentation.

FAIR VALUE OF FINANCIAL INSTRUMENTS

The Company uses financial instruments in the normal course of its business.
The carrying values of cash equivalents, short-term investments, accounts and
royalties receivable, accounts payable, accrued expenses and deferred revenues
approximate fair value due to the short-term maturities of these assets and
liabilities.

FOREIGN CURRENCY TRANSLATION

Assets and liabilities of the Company's international operations are
translated into U.S. dollars at current exchange rates while the related
statements of operations are translated at average exchange rates during each
quarterly reporting period. Net exchange gains or losses resulting from the
translation of assets and liabilities are recorded as cumulative foreign
currency translation adjustments and reported in the consolidated statements of
comprehensive income (loss).

STOCK COMPENSATION PLANS

The Company applies the intrinsic-value-based method of accounting for its
nonvariable stock option plans in accordance with the provisions of Accounting
Principles Board Opinion No. 25, ACCOUNTING FOR STOCK ISSUED TO EMPLOYEES (APB
Opinion No. 25), and related interpretations. As such, compensation expense
would generally be recorded on the date of grant only if the current market
price of the underlying stock exceeded the exercise price.

2. ACQUISITIONS AND INVESTMENTS

1999 INVESTMENT

GLINK

The Company became one-third owner of GLINK, a joint venture established to
develop an electronic marketplace for the grocery industry. The Company made an
initial $300,000 cash investment, which was recorded in "Other assets" on the
consolidated balance sheets (see note 13) .

1998 ACQUISITIONS

EDI WORKS! LLC (EDI WORKS!)

Effective March 31, 1998 the Company acquired EDI Works!, a Texas limited
liability company, for 194,497 shares of the Company's common stock in a
transaction accounted for using the pooling-of-interests method of accounting.
The EDI Works! business combination is not material, and therefore has been
accounted for as an immaterial pooling, with the accumulated earnings of EDI
Works! of

F-64

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0893

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

2. ACQUISITIONS AND INVESTMENTS (CONTINUED)

$129,000 being added directly to the Company's accumulated deficit on the date of acquisition. The results of operations of EDI Works! are included in the Company's consolidated statements of operations for the year ended December 31, 1998. In connection with the EDI Works! acquisition the Company recorded a charge of $805,000 for acquisition-related expenses, asset write-downs and integration costs (see note 10).

MACTEC, INC. (MACTEC)

Effective July 9, 1998 the Company acquired substantially all of the assets of the Materials Management Division of MACTEC, located in Tulsa, Oklahoma, for approximately $3.5 million in cash. The Company recorded the acquisition using the purchase method of accounting, with approximately $3.5 million recorded to goodwill in 1998 and an additional $128,000 recorded to goodwill in 1999. The goodwill will be amortized ratably over 10 years.

1997 ACQUISITIONS

SUPPLYTECH, INC. (STI)

On January 3, 1997 the Company acquired STI for 3,600,000 unregistered shares of the Company's common stock in a transaction accounted for using the pooling-of-interests method of accounting. Effective January 3, 1997 the results of operations of the Company and STI were retroactively combined. In connection with the STI acquisition, the Company incurred a charge of $12.4 million for acquisition-related expenses, asset write-downs and integration costs incurred (including a $3.2 million charge for the vesting of a contingent option which became exercisable upon the closing of the merger) (see note 10). The Company recorded a net deferred income tax asset during the first quarter of 1997 of $1.8 million relating to the STI acquisition and provided a valuation allowance against such net deferred income tax asset to reduce it to zero.

PREMENOS TECHNOLOGY CORP. (PREMENOS)

On December 19, 1997 the Company acquired Premenos, a Delaware corporation based in Concord, California. In connection with the transaction, which was accounted for using the pooling-of-interests method of accounting, the Company issued 8,037,982 shares of its common stock in exchange for all of the shares of Premenos common stock. All Premenos options and warrants were converted into the Company's options and warrants in accordance with the conversion ratio. In connection with the Premenos acquisition, the Company incurred charges for acquisition-related expenses, asset write downs and integration costs of $13.7 million in 1998 and $15.3 million in 1997 (see note 10).

F-65

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0894

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

2. ACQUISITIONS AND INVESTMENTS (CONTINUED)

The financial position and results of operations of the Company have been restated for all periods presented to give retroactive effect to the Premenos acquisition. Total revenues and net income (loss) for the Company and Premenos as previously reported are as follows (in thousands):

|  | 1997 |
|---|---|
| Total revenues: | |
| Harbinger Corporation...................................... | $ 77,414 |
| Premenos................................................... | 40,807 |
| | $118,221 |
| Net income (loss): | |
| Harbinger Corporation...................................... | $(42,832) |
| Premenos................................................... | 3,785 |
| | $(39,047) |

On September 30, 1998 the Company discontinued its TrustedLink Procurement business (TLP) and on December 31, 1997 the Company discontinued its TrustedLink Banker division (Banker). The revenues of Harbinger Corporation reported above have been restated accordingly (see note 11).

HARBINGER NET SERVICES (HNS)

On January 1, 1997 the Company exercised its rights as majority shareholder of HNS to appoint a majority of the members of the HNS Board of Managers. As a result, effective January 1, 1997 the Company began accounting for its investment in HNS by consolidating the balance sheets and statements of operations of HNS with those of the Company. Prior to the January 1, 1997 acquisition date the Company accounted for its investment in HNS using the equity method of accounting.

Also on January 1, 1997 the Company entered into a debenture purchase agreement with the holder of the debenture whereby the Company acquired the debenture in exchange for $1.5 million in cash and 363,432 shares of the Company's common stock valued at $4.2 million. The Company recorded an extraordinary loss on debt extinguishment of $2.4 million in the first quarter of 1997 related to this transaction.

Immediately after this transaction the Company acquired the remaining minority interest in HNS, consisting of 585,335 shares of HNS common stock and stock options to acquire 564,727 shares of HNS common stock at exercise prices ranging from $0.70 per share to $1.65 per share, by exchanging cash of $1.6 million and stock options to acquire 532,975 shares of the Company's common stock at exercise prices ranging from $10.14 per share to $11.02 per share which were valued at $2.2 million. Including transaction and other costs of $350,000, the Company paid $4.1 million for the acquisition of the HNS minority interest which was accounted for using the purchase method of accounting, with $2.7 million of the purchase price allocated to in-process product development and charged to the consolidated statement of operations on January 1, 1997, and $1.4 million allocated to goodwill and purchased technology. The Company also incurred acquisition-related expenses and asset write-downs related to this acquisition of $2.0 million in 1997 (see note 10). The Company recorded a net deferred income tax asset of approximately $840,000 as a result of this acquisition and provided a valuation allowance against such net deferred income tax asset to reduce it to zero.

F-66

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0895

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

2. ACQUISITIONS AND INVESTMENTS (CONTINUED)

SMART SOLUTIONS FOR ELECTRONIC COMMERCE, INC. (SMART SOLUTIONS)

Effective May 1, 1997 the Company acquired all of the common stock of Smart Solutions, a Michigan corporation based in Traverse City, Michigan, for $677,000, consisting of 29,635 unregistered shares of the Company's common stock valued at $454,000 and the assumption of $223,000 in liabilities. The Company recorded the acquisition using the purchase method of accounting with $100,000 of the purchase price allocated to purchased technology, $71,000 allocated to tangible assets and $506,000 allocated to goodwill.

ACQUION, INC. (ACQUION)

Effective August 22, 1997 the Company acquired all of the common stock of Acquion, a California corporation based in Greenville, South Carolina, for approximately $13.6 million, consisting of $12.0 million in cash and the assumption of approximately $1.6 million in liabilities including transaction costs. The Company recorded the acquisition using the purchase method of accounting with $10.9 million of the purchase price allocated to in-process product development and charged to the consolidated statement of operations in 1997, $641,000 allocated to purchased technology and $2.0 million allocated to goodwill. The Company also incurred acquisition-related expenses and asset write downs of $2.5 million during 1997 related to this acquisition (see note 10). The Company recorded a net deferred income tax asset of approximately $4.1 million as a result of this acquisition and provided a valuation allowance against such net deferred income tax asset to reduce it to zero. TLP, a separate business within Acquion, was discontinued by the Company on September 30, 1998 (see note 11).

ATLAS PRODUCTS INTERNATIONAL, LIMITED (ATLAS)

Effective October 23, 1997 the Company acquired Atlas, a company organized under the laws of England, based in Manchester, United Kingdom, for 467,098 unregistered shares of the Company's common stock in a transaction accounted for using the pooling-of-interests method of accounting. In connection with the acquisition the Company recorded charges for acquisition-related expenses, asset write downs and integration costs incurred of $1.4 million in 1998 and $2.0 million in 1997, respectively (see note 10). The Atlas business combination was not material, and therefore was accounted for as an immaterial pooling, with Atlas' accumulated deficit of $296,000 being credited directly to the Company's accumulated deficit on the date of acquisition.

PRO FORMA FINANCIAL INFORMATION

The results of operations of the acquired companies have been included in the Company's consolidated statements of operations beginning on the following dates: EDI Works!: March 31, 1998; MACTEC: July 9, 1998; HNS: January 1, 1997; Smart Solutions: May 1, 1997; Acquion: August 22, 1997; and Atlas: October 1, 1997.

Unaudited pro forma results of operations of the Company for 1998 would not be materially different as a result of the 1998 acquisitions of EDI Works! and MACTEC and are therefore not presented for 1998.

F-67

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0896

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

3. PURCHASED TECHNOLOGY AND DISTRIBUTION AGREEMENTS

SYSTEM SOFTWARE ASSOCIATES, INC. (SSA)

On May 26, 1999 the Company executed an agreement (the Agreement) with SSA terminating its distributor arrangement that had existed since 1995. Under the Agreement, SSA paid the Company a total of approximately $2.0 million in settlement of certain royalty receivables, maintenance services provided to SSA's customers by the Company from 1995 through 1999 and an additional license of source code provided to SSA. The settlement proceeds were allocated pro-rata to the three components of the Agreement based on their relative fair values. The following credits were recorded to the Company's accompanying consolidated statement of operations in 1999: $1.0 million to general and administrative costs for collection of accounts that had been reserved for in 1998, $628,000 to direct costs of services for reimbursement of maintenance costs, and $420,000 to software revenue for license of source code.

At December 31, 1998 the Company had a net provision of $3.6 million in its allowance for doubtful accounts related to royalty receivables due from SSA.

On July 21, 1995 the Company entered into a distribution agreement and purchased certain software products from SSA in exchange for the issuance of 1,237,500 shares of the Company's common stock valued at $4.7 million at the date of issuance and the issuance of 4,000,000 shares of the Company's zero coupon redeemable preferred stock (see note 8). The Company allocated the consideration associated with these transactions of $4.8 million (including transaction costs of $122,000) as follows: $2.3 million to purchased technology and $2.5 million to the distribution agreement based upon the estimated fair values of the purchased technology and distribution agreement at the date of the exchange. During 1997 the purchased technology was written down due to the acquisition of other replacement technology that was licensed to SSA. In 1998 the intangible asset associated with the distribution agreement was written off based upon estimated future net cash flows from the arrangement (see note 10).

GENERAL ELECTRIC INFORMATION SERVICES, INC. (GEIS)

On September 30, 1999 the Company entered into an agreement with GEIS that terminated all prior existing arrangements between the Company and GEIS relating to GEIS' distribution and support of a certain product. As part of the 1999 agreement GEIS paid the Company $665,000 for the license of certain object and source codes.

On December 31, 1995 the Company entered into an alliance agreement with GEIS and an agreement to purchase certain software products from GEIS. The total purchase price was $2.5 million, consisting of $300,000 in cash and the assumption of a note payable to GEIS in the amount of $2.2 million. The Company recorded the purchase of the technology and the alliance agreement based upon fair value with $1.2 million of the purchase price allocated to in-process product development and charged to the consolidated statement of operations in 1995, $375,000 allocated to purchased technology, $950,000 allocated to the alliance agreement, and $15,000 allocated to tangible assets. During 1997 the purchased technology was written down due to the acquisition of other replacement technology that was licensed to GEIS and the distribution agreement was written down based upon future expectations of net cash flows from the arrangement (see note 10).

Certain terms of the alliance agreement include the referral of customers to the Company by GEIS, the performance of certain software maintenance services by GEIS and a $1.2 million

F-68

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0897

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

3. PURCHASED TECHNOLOGY AND DISTRIBUTION AGREEMENTS (CONTINUED)
guaranteed payment by GEIS to the Company for the two-year period ended
December 31, 1997, relating to software maintenance revenues to be paid by GEIS
to the Company. GEIS' subsequent sales to end-users exceeded the $1.2 million
guaranteed payment each year.

DISTRIBUTION AGREEMENT

On February 5, 2000 the Company entered into an agreement with an existing
distributor whereby the distributor agreed to pay $1.2 million to the Company
for royalties owed from prior agreements dating back to 1992. This amount was
recorded as software revenues in the fourth quarter of 1999 in the accompanying
consolidated statements of operations.

4. PROPERTY AND EQUIPMENT

Property and equipment consisted of the following at December 31, 1999 and
1998 (in thousands):

|  | 1999 | 1998 |
|---|---|---|
| Computer and communications equipment................... | $ 45,648 | $ 34,632 |
| Furniture, fixtures and leasehold Improvements.......... | 10,900 | 10, 210 |
| Other.................................................... | 83 | 438 |
|  | 56,631 | 45,280 |
| Less accumulated depreciation and amortization........................................ | (30,292) | (22,130) |
|  | $ 26,339 | $ 23,150 |

5. INTANGIBLE ASSETS

Intangible assets consisted of the following at December 31, 1999 and 1998
(in thousands):

|  | 1999 | 1998 |
|---|---|---|
| Purchased technology (note 10)............................ | $ 1,296 | $ 1,521 |
| Goodwill, GEIS alliance and SSA distribution Agreements (notes 3 and 10)........................................ | 8,222 | 12,130 |
| Software development costs (note 10)...................... | 17,250 | 9,041 |
|  | 26,768 | 22,692 |
| Less accumulated amortization............................ | (9,905) | (5,889) |
|  | $16,863 | $16,803 |

F-69

Exhibit H
0898

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

6. ACCRUED EXPENSES

Accrued expenses consisted of the following at December 31, 1999 and 1998 (in thousands):

|  | 1999 | 1998 |
|---|---|---|
| Accrued salaries, wages and benefits...................... | $ 5,816 | $ 9,522 |
| State income, property, sales and other taxes............. | 1,168 | 3,870 |
| Accrued severance, lease exit costs and other (note 10)... | 2,750 | 6,129 |
| Accrued discontinued operations costs (note 11).......... | 3,336 | 6,518 |
| Accrued integration costs incurred (note 10)............. | 169 | 1,358 |
| Other accrued expenses................................... | 2,756 | 4,174 |
|  | $15,995 | $31,571 |

7. INCOME TAXES

Income (loss) from continuing operations before income taxes for the years ended December 31, 1999, 1998 and 1997 consisted of the following (in thousands):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| U.S. operations................................. | $13,708 | $(5,835) | $(21,063) |
| Foreign operations............................. | 2,309 | (1,987) | 1,961 |
|  | $16,017 | $(7,822) | $(19,102) |

Income tax expense from continuing operations for the years ended December 31, 1999, 1998 and 1997 is summarized as follows (in thousands):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Current: |  |  |  |
| Federal............................................ | $ -- | $ 442 | $ 581 |
| Foreign............................................ | 495 | (124) | 1,187 |
| State.............................................. | 318 | 387 | 215 |
| Total current.................................. | 813 | 705 | 1,983 |
| Deferred: |  |  |  |
| Federal............................................ | -- | -- | 981 |
| State.............................................. | -- | -- | 129 |
| Total deferred................................. | -- | -- | 1,110 |
|  | $813 | $ 705 | $3,093 |

The Company's income taxes currently payable for federal and state purposes have been reduced by the tax benefit derived from stock option transactions. The benefit, which totaled $498,000 for the year ended December 31, 1997, has been credited directly to stockholders' equity.

There is no income tax expense or benefit for discontinued operations of TLP (from operations) in 1999 and 1998. There was no income tax expense for discontinued operations of Banker (from operations) in 1997. There was no income tax expense or benefit relating to loss on disposal of TLP or Banker or extraordinary loss on debt extinguishment.

F-70

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0899

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

7. INCOME TAXES (CONTINUED)

Income tax expense differs from the amounts computed by applying the federal statutory income tax rate of 34% to income (loss) from continuing operations before income taxes as a result of the following (in thousands):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Computed "expected" income tax expense (benefit)............ | $ 5,445 | $(2,660) | $(6,495) |
| Increase (decrease) in income tax expense (benefit) resulting from: |  |  |  |
| State income taxes, net of federal income tax benefit....... | 210 | 255 | 227 |
| Tax-exempt income.......................................... | (13) | (168) | (157) |
| Change in tax status of STI................................ | -- | -- | (1,798) |
| Nondeductible charge for purchased in-process product development and other costs........................... | -- | 488 | 1,431 |
| Increase (decrease) in the valuation allowance for deferred tax assets allocated to income tax expense..... | (5,092) | 2,759 | 10,003 |
| Other...................................................... | 263 | 31 | (118) |
|  | $ 813 | $ 705 | $ 3,093 |

The significant components of deferred income tax expense (benefit) from continuing operations for the years ended December 31, 1999, 1998 and 1997 are summarized as follows (in thousands):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Deferred income tax expense (benefit)...................... | $ 5,092 | $(2,759) | $(12,399) |
| Increase (decrease) in the valuation allowance for deferred income tax assets........................................ | (5,092) | 2,759 | 13,509 |
|  | $ -- | $ -- | $ 1,110 |

The income tax effects of the temporary differences that give rise to the Company's deferred income tax assets and liabilities as of December 31, 1999 and 1998 were as follows (in thousands):

|  | 1999 | 1998 |
|---|---|---|
| Deferred income tax assets: |  |  |
| Net operating loss carryforwards......................... | $12,655 | $ 4,269 |
| Intangible assets........................................ | 1,588 | 7,446 |
| Accrued expenses......................................... | 5,807 | 13,992 |
| Discontinued operations.................................. | 1,301 | 1,762 |
| Research tax credit...................................... | 1,561 | 2,082 |
| Other.................................................... | 132 | 790 |
| Gross deferred income tax assets........................ | 23,044 | 30,341 |
| Valuation allowance........................................ | (18,624) | (23,716) |
| Deferred income tax assets, net of the valuation allowance............................................... | 4,420 | 6,625 |
| Deferred income tax liabilities--principally due to software development costs........................................ | (1,619) | (3,824) |
| Net deferred income tax assets.......................... | 2,801 | 2,801 |
| Less current deferred income tax assets.................... | 2,103 | 2,103 |
| Noncurrent deferred income tax assets...................... | $ 698 | $ 698 |

F-71

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0900

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

7. INCOME TAXES (CONTINUED)

During 1999 the net decrease in the valuation allowance was $5.1 million.
During 1998 the net increase in the valuation allowance was $2.8 million. A
valuation allowance is established to reduce the deferred income tax assets to
the level at which it is 'more likely than not' that the tax benefits will be
realized. Realization of tax benefits of deductible temporary differences and
operating loss and tax credit carryforwards depends on having sufficient taxable
income within the carryback and carryforward periods. Sources of taxable income
that may allow for the realization of tax benefits include: (a) taxable income
in the current year or prior years that is available through carryback, (b)
future taxable income that will result from the reversal of existing taxable
temporary differences, and (c) future taxable income generated by future
operations. The Company continually reviews the adequacy of the valuation
allowance and recognizes these benefits as reassessment indicates that it is
more likely than not that the benefits will be realized.

The Company acquired net operating losses and research tax credit
carryforwards in the 1997 Premenos acquisition (see note 2) of approximately
$1.3 million and $1.7 million, respectively. The utilization of these net
operating loss and research tax credit carryforwards is restricted, based on the
ability of Premenos as a separate company to generate taxable income.

At December 31, 1999 the Company had domestic and foreign net operating loss
carryforwards and research tax credit carryforwards of approximately $48.0
million, $11.8 million and $1.5 million, respectively. The domestic net
operating loss carryforwards expire at various dates through 2021 unless
utilized. The foreign net operating loss carryforwards do not expire and the
research tax credit carryforwards expire beginning in 2007 through 2012. The
Company's domestic net operating loss carryforwards at December 31, 1999 include
$30.5 million in income tax deductions related to stock options excluded from
the table of deferred income tax assets above, which will be reflected as a
credit to additional paid-in capital when realized.

8. REDEEMABLE PREFERRED STOCK

In 1995 the Company issued 4,000,000 shares of zero coupon redeemable
preferred stock to SSA. The zero coupon redeemable preferred stock issued had no
voting or dividend rights, vested at a rate of 1,000,000 shares per year only if
SSA attained certain royalty targets for the years 1997 through 2000, and
contained mandatory redemption provisions of $0.67 per share payable in cash or
the Company's common stock, at the option of the holder, 30 days after the end
of each year. The royalty targets for 1998 and 1997 were not met and 2,000,000
of the shares of the zero coupon redeemable preferred stock were forfeited by
December 31, 1998. The remaining 2,000,000 shares were terminated in 1999 per
the terms of an agreement executed between the Company and SSA on May 26, 1999
that dissolved the distributor relationship (see note 3).

9. SHAREHOLDERS' EQUITY

PREFERRED STOCK

The Board of Directors is authorized, subject to certain limitations
prescribed by law, without further shareholder approval, to issue from time to
time up to an aggregate of 20,000,000 shares of preferred stock in one or more
series and to fix or alter the designations, preferences, rights and any
qualifications, limitations or restrictions on the shares of each such series
thereof, including the dividend rights, dividend rates, conversion rights,
voting rights, terms of redemption (including sinking

F-72

Exhibit H
0901

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

9. SHAREHOLDERS' EQUITY (CONTINUED)

fund provisions), redemption price or prices, liquidation preferences and the number of shares constituting any series or designations of such series. As of December 31, 1999 there were no shares of redeemable preferred stock issued and outstanding.

COMMON STOCK

On April 24, 1998 the Board of Directors declared a three-for-two stock split in the form of a stock dividend on the Company's common stock paid on May 15, 1998 to shareholders of record on May 1, 1998. All share, per share and shareholders' equity amounts included in the Company's consolidated financial statements have been restated to reflect the split for all periods presented.

WARRANTS

The Company issued warrants in December 1997 related to the acquisition of Premenos. The warrants enable the holders to acquire 26,199 shares of the Company's common stock at $5.63 per share, representing the exchange ratio agreed to in the merger agreement. As of December 31, 1999, 25,913 warrants were exercised and 286 warrants were cancelled, leaving no warrants outstanding.

The Company issued warrants in April 1996 related to the acquisition of NTEX and INOVIS. The warrants enable the holders to acquire 73,125 shares of the Company's common stock at a range of $7.55 to $7.61 per share, representing the fair value of the common stock at the date of issuance. There were 20,000 warrants outstanding as of December 31, 1999, all at an exercise price of $7.61.

STOCK COMPENSATION PLANS

As of December 31, 1999 the Company had five stock-based compensation plans, of which four were related to stock options and one was related to stock purchases, more fully described below.

STOCK OPTIONS

The Company's 1989 Stock Option Plan (the 1989 Plan) and 1996 Stock Option Plan (the 1996 Plan), together combined (the Plans), provide for the grant of options to officers, directors, consultants and key employees. The 1996 Plan was amended in 1998 to add 1,050,000 options available for grant. The maximum number of shares of stock that may be issued under the 1996 Plan may not exceed the sum of 8,737,500 plus an amount equal to the number of all shares that are either not subject to options granted under the 1989 Plan or were subject to options granted thereunder that expire without exercise to officers, directors, consultants and key employees. There were 1,044,628 options available for grant at December 31, 1999. Options granted under the terms of the 1996 Plan generally vest ratably over four years and are granted with an exercise price no less than the fair market value of the common stock on the grant date. Options granted prior to July 1994 vested ratably over three years and options granted since July 1994 vest ratably over four years. All options granted expire seven years from the date of grant. At December 31, 1999 there were options outstanding to purchase 6,373,845 shares of the Company's common stock, of which options to purchase 2,358,682 shares were exercisable. In 1998 the Board of Directors authorized a repricing of certain unexercised employee stock options held by employees other than certain senior executive officers. The number of shares repriced to $6.91 was approximately 2.6 million. The four-year vesting period for all repriced shares began in October 1998.

F-73

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0902

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

9. SHAREHOLDERS' EQUITY (CONTINUED)

In 1993 the Board of Directors authorized the creation of a stock option plan for nonemployee members of the Company's Board of Directors (the Nonemployee Directors Plan). The Nonemployee Directors Plan was amended in 1998 to add 187,500 options, for a total of 525,000 shares of common stock reserved for issuance under the Nonemployee Directors Plan at an option price no less than the fair market value of the common stock on the option grant date. Options expire seven years from the date of grant. The options granted under the Nonemployee Directors Plan vest ratably in the year of grant based on attendance at regularly scheduled board meetings. Options which have not vested in the year of grant expire and become available for grant under the Nonemployee Directors Plan. At December 31, 1999 there were options outstanding and exercisable to purchase 372,749 shares of the Company's common stock and 57,939 options available to grant.

In addition to outstanding options granted under the Plans and Nonemployee Directors Plan, the Company has granted options to acquire 157,500 shares of common stock to certain existing and former nonemployee directors for past services. As of December 31, 1999, all of these options had been exercised.

At December 31, 1999 the Company had five stock-based compensation plans which are described herein. The Company applies APB Opinion No. 25 and related interpretations in accounting for its plans. Accordingly, no compensation cost has been recognized for its nonvariable stock option plans and its stock purchase plan. Had compensation cost for the Company's five stock-based compensation plans been determined in accordance with SFAS No. 123, ACCOUNTING FOR STOCK-BASED COMPENSATION, the Company's net income (loss) and income (loss) per share would have been the pro forma amounts indicated below (in thousands, except per share data):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Net income (loss): |  |  |  |
| As reported | $16,560 | $(14,712) | $(39,047) |
| Pro forma | $ 287 | $(28,254) | $(48,221) |
| Diluted income (loss) per share: |  |  |  |
| As reported | $ 0.41 | $ (0.35) | $ (1.02) |
| Pro forma | $ 0.01 | $ (0.68) | $ (1.26) |

The fair value of each option grant is estimated on the date of grant using the Black-Scholes option-pricing model with the following assumptions: 1999: dividend yield of 0.5%, expected volatility of 92.9%, risk-free interest rate of 6.17% and expected lives of five years for all the Plan options; 1998: dividend yield of 0.5%, expected volatility of 82.6%, risk-free interest rate of 5.3% and expected lives of five years for all of the Plan options; 1997: dividend yield of 0.5%, expected volatility of 67.3%, risk-free interest rate of 5.7% and expected lives of five years for all of the Plan options.

F-74

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0903

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

9. SHAREHOLDERS' EQUITY (CONTINUED)

A summary of the Company's stock option plans as of and for the years ended December 31, 1999, 1998 and 1997 is as follows:

| NONVARIABLE OPTIONS | 1999 SHARES (000S) | 1999 WEIGHTED AVERAGE EXERCISE PRICE | 1998 SHARES (000S) | 1998 WEIGHTED AVERAGE EXERCISE PRICE | 1997 SHARES (000S) | 1997 WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|---|---|---|---|
| Outstanding at beginning of year | 7,290 | $8.90 | 7,267 | $10.73 | 4,567 | $ 7.51 |
| Granted | 2,029 | $9.98 | 5,185 | $12.55 | 4,497 | $13.99 |
| Exercised | (992) | $5.95 | (1,118) | $ 8.79 | (858) | $ 3.61 |
| Forfeited/canceled | (1,049) | $8.87 | (4,044) | $16.70 | (939) | $17.19 |
| Outstanding at end of year | 7,278 | $9.57 | 7,290 | $ 8.90 | 7,267 | $10.73 |
| Options exercisable at end of year | 2,731 | $9.30 | 2,070 | $ 7.88 | 1,875 | $ 6.01 |
| Weighted average fair value of options granted during the year | $10.15 | | $ 6.72 | | $ 6.03 | |

The following table summarizes information about nonvariable stock options outstanding at December 31, 1999:

| RANGE OF EXERCISE PRICES | OPTIONS OUTSTANDING NUMBER OUTSTANDING | OPTIONS OUTSTANDING WEIGHTED AVERAGE REMAINING CONTRACTUAL LIFE (YEARS) | OPTIONS OUTSTANDING WEIGHTED AVERAGE EXERCISE PRICE | OPTIONS EXERCISABLE NUMBER EXERCISE | OPTIONS EXERCISABLE WEIGHTED AVERAGE EXERCISABLE PRICE |
|---|---|---|---|---|---|
| $ 0.01 -- $ 2.83 | 522,144 | 1.71 | 2.65 | 510,894 | 2.64 |
| $ 2.84 -- $ 6.89 | 519,293 | 5.31 | 5.95 | 113,751 | 4.19 |
| $ 6.91 -- $ 6.91 | 1,909,981 | 5.81 | 6.91 | 349,717 | 6.91 |
| $ 7.61 -- $ 7.78 | 883,266 | 3.95 | 7.75 | 498,015 | 7.77 |
| $ 8.71 -- $10.50 | 1,410,194 | 6.39 | 10.21 | 171,953 | 10.18 |
| $10.67 -- $13.50 | 1,053,433 | 4.95 | 11.48 | 636,390 | 11.37 |
| $13.61 -- $35.00 | 979,889 | 5.55 | 19.03 | 450,712 | 18.41 |
| $ 0.01 -- $35.00 | 7,278,200 | 5.21 | 9.57 | 2,731,432 | 9.30 |

EMPLOYEE STOCK PURCHASE PLAN

The Company offers employees the right to purchase shares of the Company's common stock at 85% of the market price, as defined, pursuant to the Employee Stock Purchase Plan (the Purchase Plan). Under the Purchase Plan, full-time employees, except persons owning 5% or more of the Company's common stock, are eligible to participate after six months of employment. Employees may contribute up to 15% of their annual salary toward the Purchase Plan up to a maximum of $15,000 per year. A maximum of 487,500 shares of common stock are reserved for issuance under the Purchase Plan. During the years ended December 31, 1999, 1998 and 1997 shares issued under the Purchase Plan were 96,000, 89,247 and 160,813, respectively. A portion of the shares issued in 1997 disclosed above was authorized under existing purchase plans of acquired companies and is excluded from the calculation of shares available to issue under the Purchase Plan.

F-75

Exhibit H
0904

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

9. SHAREHOLDERS' EQUITY (CONTINUED)

Under SFAS No. 123, compensation cost is disclosed for the fair value of the employees' purchase rights, which was estimated using the Black-Scholes model with the following assumptions for 1999: dividend yield of 0.5%, expected volatility of 92.9% and risk-free interest rate of 6.17%; 1998: dividend yield of 0.5%, expected volatility of 82.6%, and risk-free interest rate of 5.3%; and for 1997: dividend yield of 0.5%, expected volatility of 67.3% and risk-free interest rate of 5.7%. The expected life of the employees' purchase rights was three months for all years. The weighted average fair value of those purchase rights granted in 1999, 1998 and 1997 was $10.32, $7.11 and $5.95, respectively. The impact of the Purchase Plan on the Company's pro forma net income (loss) and income (loss) per share presentation required per SFAS No. 123 has been included in STOCK OPTIONS above.

10. CHARGE FOR PURCHASED IN-PROCESS PRODUCT DEVELOPMENT, WRITE-OFF OF SOFTWARE DEVELOPMENT COSTS, RESTRUCTURING, ACQUISITION-RELATED AND OTHER CHARGES

In connection with acquisitions and restructurings in 1998 and 1997, the Company incurred charges for purchased in-process product development, write-off of software development costs, restructuring, acquisition-related and other charges (Charges). A summary of the components, as adjusted for discontinued TLP, are as follows (in thousands):

|  | 1998 | 1997 |
|---|---|---|
| In-process product development | $ -- | $ 2,853 |
| Integration costs | 13,154 | 14,319 |
| Transaction charges | 638 | 9,515 |
| Lease termination | 2,335 | -- |
| Intangible asset write-downs | 3,963 | 8,431 |
| Asset write-downs | 396 | 1,599 |
| Severance costs | 4,281 | 3,838 |
| Other costs to exit activities | 2,260 | -- |
|  | $27,027 | $40,555 |

Integration costs associated with business combinations include costs incurred for cross training, planning, product integration and marketing. For 1998 and 1997 approximately $4.1 million and $7.8 million of integration costs, respectively, resulted from the redirection of internal resources and their associated costs (Integration Activity Costs) to manage integration activities. At December 31, 1999 the accrued liabilities related to the Charges were approximately $3.0 million, compared to $7.5 million at December 31, 1998 (see note 6). The reduction to accrued liabilities in 1999 was all due to cash payments made. The liabilities at December 31, 1999 consist primarily of reserves for lease terminations, severance costs and legal fees. The remaining liabilities involve management estimates and the actual results could vary from these estimates.

Charges for in-process product development are recorded as a result of acquiring research and development efforts through business combinations that, at the date of acquisition, have not yet generated commercializable products and have no alternative future use. The valuations for such purchased in-process product developments are made with the assistance of third-party experts based on fair value. Intangible asset write downs consist primarily of capitalized software and goodwill that have become impaired as a result of product phase-outs.

F-76

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0905

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

11. DISCONTINUED OPERATIONS

The Company discontinued TLP on September 30, 1998 and established a $6.4 million reserve for the estimated loss on disposal of TLP, including $2.9 million for anticipated operating losses during the phase-out period. In the second quarter of 1999 the Company sold the intangible assets and certain property and equipment of TLP for $1.3 million, comprised of cash of $500,000 and a note receivable of $800,000. The resulting loss on disposal of TLP was $2.0 million. Repayment on the note will occur at the earlier of the buyer achieving certain sales targets or December 31, 2000.

At December 31, 1999, the remaining balance in the loss reserve was $3.3 million, available for certain remaining contingencies associated with the disposal of TLP. Such contingencies primarily relate to lease termination costs, customer transition issues and collection risks associated with notes and accounts receivable. Management presently does not have an estimate on when these final contingencies will settle.

The operating loss during the phase-out period from the measurement date of September 30, 1998 to December 31, 1999 was $1.2 million.

The results of operations for TLP for 1998 and 1997 are reported in the accompanying reclassified statements of operations under "Loss from operations of TrustedLink Procurement business and TrustedLink Banker division". Revenues from TLP for the years ended December 31, 1998 and 1997 were $2.9 million and $2.5 million, respectively. No income tax benefit was recognized in 1998 or 1997 due to the Company's net operating loss carryforwards.

The assets and liabilities of TLP are included in the Company's consolidated balance sheets as of December 31, 1999 and 1998 and are summarized as follows (in thousands):

|  | 1999 | 1998 |
| --- | --- | --- |
| Accounts receivable | $457 | $ 454 |
| Other current assets | 62 | 106 |
| Property and equipment, net | -- | 766 |
| Intangible assets, net | -- | 2,454 |
| Deferred revenues | -- | (45) |
| Other current liabilities | (67) | (281) |
|  | $452 | $3,454 |

In the fourth quarter of 1997 the Board of Directors approved the discontinuance of Banker. Revenues from Banker were $4.0 million for the year ended December 31, 1997. The results of operations for Banker for all years presented are reported in the accompanying reclassified statements of operations under "Loss from operations of TrustedLink Procurement business and TrustedLink Banker division". In the fourth quarter of 1997 the Company established a $4.0 million reserve for the estimated loss on disposal of Banker, including $2.3 million for anticipated operating losses during the phase-out period. No income tax expense or benefit was recognized in 1997 due to the Company's net operating loss carryforwards. As of December 31, 1998 the disposal of Banker was substantially completed and $2.0 million in estimated losses not incurred was recorded as a reduction to "Loss on disposal of TrustedLink Banker" on the statement of operations. During 1999 the remaining contingencies associated with Banker were settled and $1.4 million in estimated losses not incurred was recorded as a reduction to "Loss on disposal of TrustedLink Banker" in 1999. The operating loss of Banker during 1998 was $280,000. The assets and liabilities of Banker included in the Company's consolidated balance sheets were immaterial at December 31, 1999 and 1998.

F-77

Exhibit H
0906

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

11. DISCONTINUED OPERATIONS (CONTINUED)

A reconciliation of the amounts appearing on the consolidated statements of operations for the years ended December 31, 1999, 1998 and 1997 is as follows (in thousands):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Loss from operations of: |  |  |  |
| TLP.......................................... | $  -- | $(1,793) | $(10,311) |
| Banker........................................ | -- | -- | (122) |
|  | $  -- | $(1,793) | $(10,433) |
| Income (loss) on disposal, including provisions for operating losses during phase-out periods, for:........................................ |  |  |  |
| TLP.......................................... | $  -- | $(6,392) | $  -- |
| Banker........................................ | 1,356 | 2,000 | (4,000) |
|  | $1,356 | $(4,392) | $ (4,000) |

12. EARNINGS (LOSS) PER SHARE

The following sets forth the computations of basic and diluted earnings (loss) per share for the years ended December 31, 1999, 1998 and 1997 (in thousands except per share data):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Basic earnings per share: |  |  |  |
| Income (loss) from continuing operations................... | $  0.39 | $ (0.20) | $ (0.58) |
| Loss from discontinued operations......................... | -- | (0.04) | (0.27) |
| Income (loss) on disposal of discontinued operations...... | 0.04 | (0.11) | (0.11) |
| Extraordinary loss on debt extinguishment................ | -- | -- | (0.06) |
| Net earnings (loss) per share........................... | $  0.43 | $ (0.35) | $ (1.02) |
| Weighted average number of shares outstanding:............. | 38,938 | 41,557 | 38,162 |
| Earnings per share assuming dilution: |  |  |  |
| Income (loss) from continuing operations................... | $  0.38 | $ (0.20) | $ (0.58) |
| Loss from discontinued operations......................... | -- | (0.04) | (0.27) |
| Income (loss) on disposal of discontinued operations...... | 0.03 | (0.11) | (0.11) |
| Extraordinary loss on debt extinguishment................ | -- | -- | (0.06) |
| Net earnings (loss) per share........................... | $  0.41 | $ (0.35) | $ (1.02) |
| Weighted average number of shares outstanding:............. | 38,938 | 41,577 | 38,162 |
| Effect of potentially dilutive stock options................ | 1,801 | -- | -- |
| Weighted average number of shares outstanding assuming dilution.................................................. | 40,739 | 41,557 | 38,162 |

Options to purchase 1.6 million shares of common stock outstanding during 1999 were excluded from the computation of diluted earnings per share because the options' exercise price was greater than the average market price of the common shares, and therefore, the effect would be antidilutive.

F-78

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0907

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

12. EARNINGS (LOSS) PER SHARE (CONTINUED)

Options to purchase 4.4 million and 3.0 million shares of common stock outstanding during 1998 and 1997, respectively, were excluded from the computation of diluted earnings per share due to their antidilutive effect as a result of the Company's loss from continuing operations in those years.

13. OTHER RELATED PARTY TRANSACTIONS

During 1999 the Company became one-third owner of GLINK, which licensed certain Company software for $250,000 and contracted for $252,000 in professional services for which the Company received a 12-month note receivable that matures on September 30, 2000. One-third of the aforementioned revenues were eliminated in consolidation. Additionally, the Company provided $80,000 in consulting services to GLINK in 1999 that was recorded as work-in-process and deferred revenue on the accompanying consolidated balance sheets because payment terms by GLINK had not been finalized (see note 2).

The Company received notes receivable during the first quarter of 1999 totaling $605,000 from five employees who were former shareholders of EDI Works!. The terms of the full-recourse notes are 18 months with an annual interest rate of 8.75%. Interest accrues on a monthly basis with principal and interest due at the end of the term of the notes. At December 31, 1999 four of the notes, including interest, were paid in full to the Company resulting in a remaining balance of principal and interest of $135,000.

The Company received $40,000, $284,000 and $465,000 in 1999, 1998 and 1997, respectively, in revenue from an affiliated company that is partially owned by an employee of one of the Company's foreign subsidiaries. This same affiliated company also billed the Company $22,000, $189,000 and $63,000 in 1999, 1998 and 1997, respectively, for services.

The Company has a note receivable of $50,000 from a former executive officer with an annual interest rate of 9%, renewable at the end of each year. At December 31, 1999 this note was fully reserved, as it is anticipated this debt will be forgiven as part of a severance agreement (see note 6).

Prior to the acquisition of Premenos, one of Premenos' directors was a partner of a law firm that provided various legal services to Premenos. Two other directors of Premenos also provided training and consulting services to the Company from time to time. Amounts incurred for all such services in 1997 were $493,000.

14. SEGMENT INFORMATION, GEOGRAPHIC INFORMATION AND MAJOR CUSTOMERS

SEGMENT INFORMATION

The Company operates in a single industry segment: the establishment and management of e-commerce relationships between businesses. The Company manages its business along geographical lines, thus resulting in three reportable segments: North America, Europe, and Asia Pacific and Latin America. The accounting policies of each segment are the same as those described in the summary of significant accounting policies. Revenues are attributed to a reportable segment based on the location of the customer. Management evaluates the performance of each segment on the basis of operating income, excluding Charges and certain net general and administrative charges. Intersegment royalties are calculated based upon revenues, as defined, derived from the sales of certain software products and

F-79

Exhibit H
0908

HARBINGER CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

14. SEGMENT INFORMATION, GEOGRAPHIC INFORMATION AND MAJOR CUSTOMERS (CONTINUED)
services at agreed upon percentages between the segments. The measurement of
long-term assets is not a significant factor in management's evaluation of the
results of the reportable segments.

A summary of the Company's reportable segments as of and for the years ended
December 31, 1999, 1998 and 1997 is presented below (in thousands):

| | NORTH AMERICA | EUROPE | ASIA PACIFIC AND LATIN AMERICA | TOTAL |
|---|---|---|---|---|
| Revenues: | | | | |
| 1999 | $133,685 | $22,653 | $4,309 | $160,647 |
| 1998 | $115,800 | $20,285 | $2,950 | $139,035 |
| 1997 | $ 98,816 | $17,676 | $3,272 | $119,764 |
| Intersegment royalties: | | | | |
| 1999 | $ 5,133 | $ -- | $ -- | $ 5,133 |
| 1998 | $ 3,884 | $ -- | $ -- | $ 3,884 |
| 1997 | $ 1,543 | $ -- | $ -- | $ 1,543 |
| Operating income (AS DEFINED): | | | | |
| 1999 | $ 9,294 | $ 3,831 | $1,051 | $ 14,176 |
| 1998 | $ 18,747 | $ 754 | $ 637 | $ 20,138 |
| 1997 | $ 16,071 | $ 1,300 | $ 479 | $ 17,850 |

| | 1999 | 1998 | 1997 |
|---|---|---|---|
| Revenues: | | | |
| Total gross revenues for reportable segments | $160,647 | $139,035 | $119,764 |
| Elimination of intersegment royalties | (5,133) | (3,884) | (1,543) |
| Total consolidated revenues | $155,514 | $135,151 | $118,221 |
| Operating income (AS DEFINED): | | | |
| Total operating income for reportable segments | $ 14,176 | $ 20,138 | $ 17,850 |
| Charges for integration and restructuring | -- | (27,027) | (40,555) |
| Certain net general and administrative costs | (1,546) | (5,763) | -- |
| Total consolidated operating income (loss) | $ 12,630 | $(12,652) | $(22,705) |

F-80

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0909

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

14. SEGMENT INFORMATION, GEOGRAPHIC INFORMATION AND MAJOR CUSTOMERS (CONTINUED)

GEOGRAPHIC INFORMATION

Revenues attributed to the United States, the Company's country of domicile, are substantially the same as revenues reported for the reportable segment of North America (above) for all years presented. Revenues derived from customers in foreign countries did not exceed 10% in any one country of the Company's consolidated revenues in 1999, 1998 or 1997.

The Company's long-lived assets, excluding net intangible and deferred tax assets, as of December 31, 1999 and 1998 were as follows (in thousands):

|  | 1999 | 1998 |
|---|---|---|
| United States............................................ | $23,984 | $21,203 |
| Foreign countries........................................ | 2,355 | 1,947 |
|  | $26,339 | $23,150 |

MAJOR CUSTOMERS

No single customer comprised greater than 10% of the Company's consolidated revenues in 1999, 1998 or 1997.

15. COMMITMENTS AND CONTINGENCIES

401(K) PROFIT SHARING PLAN

During 1998 the Company consolidated its three separate 401(k) savings and retirement plans into one plan (Plan) for all its domestic employees. In general, all domestic employees are eligible to participate in the plan after one month of employment and may contribute up to 15% of their annual salary up to the maximum allowed by the Internal Revenue Code. Under the consolidated plan the Company matches employee contributions at 50% to a maximum of 4% of their annual salary, subject to a $2,200 limit per employee. Prior to consolidating the plans the Company's matching contributions in 1997 varied from a range of discretionary to 50% of employees' contributions. Total Company contributions for its 401(k) plans totaled $776,000, $736,000 and $454,000 for the years ended December 31, 1999, 1998 and 1997, respectively.

CREDIT FACILITY

During 1998 the Company converted its $10.0 million committed line of credit to an uncommitted credit facility. There are no restrictive covenants or commitment fees associated with the uncommitted facility. No amounts were outstanding at December 31, 1999 and 1998.

LEASES

The Company leases office facilities, automobiles, fixtures and equipment under operating leases which extend through 2005. Rent expense under all operating leases was approximately $5.9 million, $5.5 million and $4.3 million for the years ended December 31, 1999, 1998 and 1997, respectively. At

F-81

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0910

HARBINGER CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

15. COMMITMENTS AND CONTINGENCIES (CONTINUED)
December 31, 1999 the Company is obligated under these agreements to make the
following lease payments (in thousands):

| | |
|---|---:|
| 2000 | $ 6,127 |
| 2001 | 5,332 |
| 2002 | 4,056 |
| 2003 | 3,675 |
| 2004 | 3,626 |
| Thereafter | 9,727 |
| Total minimum lease payments | $32,543 |

    In conjunction with one building lease, the Company was required to provide
a standby letter of credit, which was $350,000 at December 31, 1999.

    CONTINGENCIES

    The Company is involved in claims and other legal actions arising out of the
ordinary course of business, including discontinued operations and the phase-out
of certain non-strategic software products. Additionally, a shareholder class
action lawsuit was filed against the Company in September 1999 (see part I, Item
3 of the Company's December 31, 1999 Form 10-K). While the ultimate results and
outcomes cannot be determined, management does not expect that they will have a
material adverse effect on the Company's results of operations or financial
position.

                                    F-82

Exhibit H
0911