# Exhibit H
# Continued

HARBINGER CORPORATION

CONSOLIDATED BALANCE SHEETS

(UNAUDITED)

(IN THOUSANDS, EXCEPT SHARE DATA)

| | MARCH 31, 2000 | DECEMBER 31, 1999 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents.................................... | $ 21,049 | $ 12,934 |
| Short-term investments...................................... | 58,149 | 60,086 |
| Accounts receivable, less allowances for returns and doubtful accounts of $8,102 at March 31, 2000 and $8,455 at December 31, 1999.................................... | 48,289 | 43,975 |
| Royalties receivable........................................ | -- | 1,200 |
| Deferred income taxes....................................... | 2,103 | 2,103 |
| Other current assets........................................ | 5,393 | 5,130 |
| Total current assets................................... | 134,983 | 125,428 |
| Property and equipment, less accumulated depreciation and amortization........................................... | 25,903 | 26,339 |
| Intangible assets, less accumulated amortization............ | 17,302 | 16,863 |
| Deferred income taxes....................................... | 698 | 698 |
| Other non-current assets.................................... | 4,327 | 131 |
| | $183,213 | $169,459 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable............................................ | $ 5,452 | $ 7,478 |
| Accrued expenses............................................ | 19,859 | 15,995 |
| Deferred revenues........................................... | 23,448 | 21,212 |
| Total current liabilities.............................. | 48,759 | 44,685 |
| Commitments and contingencies | | |
| Shareholders' equity: | | |
| Preferred stock, no par value; 20,000,000 shares authorized; none issued and outstanding................ | -- | -- |
| Common stock, $0.0001 par value; 100,000,000 shares authorized, 44,380,419 shares and 43,404,247 shares issued as of March 31, 2000 and December 31, 1999....... | 4 | 4 |
| Additional paid-in capital.................................. | 216,678 | 208,226 |
| Accumulated deficit......................................... | (55,596) | (56,968) |
| Accumulated other comprehensive loss........................ | (1,588) | (1,444) |
| Treasury stock, 4,323,050 shares as of March 31, 2000 and December 31, 1999......................................... | (25,044) | (25,044) |
| Total shareholders' equity............................. | 134,454 | 124,774 |
| | $183,213 | $169,459 |

See accompanying notes to unaudited consolidated financial statements.

F-83

HARBINGER CORPORATION

CONSOLIDATED STATEMENTS OF OPERATIONS

(UNAUDITED)

(IN THOUSANDS, EXCEPT PER SHARE DATA)

| | THREE MONTHS ENDED MARCH 31, | |
| --- | --- | --- |
| | 2000 | 1999 |
| Revenues: | | |
| Services......................................... | $27,236 | $25,372 |
| Software......................................... | 11,171 | 8,131 |
| Total revenues.............................. | 38,407 | 33,503 |
| Direct costs: | | |
| Services......................................... | 10,738 | 10,626 |
| Software......................................... | 1,058 | 1,131 |
| Total direct costs.......................... | 11,796 | 11,757 |
| Gross margin............................... | 26,611 | 21,746 |
| Operating costs: | | |
| Selling and marketing............................ | 12,504 | 8,386 |
| General and administrative....................... | 8,684 | 6,560 |
| Depreciation and amortization.................... | 2,866 | 2,233 |
| Product development.............................. | 2,193 | 3,011 |
| Total operating costs....................... | 26,247 | 20,190 |
| Operating income.......................... | 364 | 1,556 |
| Interest income, net............................. | 1,391 | 898 |
| Equity in losses of joint ventures............... | (241) | -- |
| Income before income taxes................. | 1,514 | 2,454 |
| Income tax expense............................... | 142 | 113 |
| Net income................................ | $ 1,372 | $ 2,341 |
| Basic earnings per share......................... | $ 0.03 | $ 0.06 |
| Weighted average number of common shares outstanding........ | 39,439 | 39,879 |
| Earnings per share assuming dilution............. | $ 0.03 | $ 0.06 |
| Weighted average number of common shares outstanding assuming dilution......................................... | 42,246 | 40,451 |

See accompanying notes to unaudited consolidated financial statements.

F-84

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

HARBINGER CORPORATION

CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
(UNAUDITED)
(IN THOUSANDS)

|                                                              | THREE MONTHS ENDED MARCH 31, | |
|                                                              | 2000    | 1999    |
| ------------------------------------------------------------ | ------- | ------- |
| Net income.................................................. | $1,372  | $2,341  |
| Other comprehensive loss, net of tax:                        |         |         |
|   Foreign currency translation adjustments.................. | (144)   | (635)   |
| Comprehensive income.................................... | $1,228  | $1,706  |

See accompanying notes to unaudited consolidated financial statements.

F-85

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0914

HARBINGER CORPORATION

CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)
(IN THOUSANDS)

| | THREE MONTHS ENDED MARCH 31,T | |
| --- | --- | --- |
| | 2000 | 1999 |
| Cash flows provided by operating activities................. | $ 3,670 | $   454 |
| Cash flows from investing activities: | | |
| Net redemptions (purchases) of short-term investments..... | 1,937 | (653) |
| Purchases of property and equipment....................... | (2,216) | (2,378) |
| Additions to software development costs................... | (1,503) | (887) |
| Investments in joint ventures, net........................ | (1,855) | - |
| Net cash used in investing activities................. | (3,637) | (3,918) |
| Cash flows from financing activities: | | |
| Exercises of stock options and warrants and issuance of stock under employee stock purchase plan................ | 8,452 | 486 |
| Purchases of common stock................................. | - | (15,778) |
| Net cash provided by (used in) financing activities... | 8,452 | (15,292) |
| Net increase (decrease) in cash and cash equivalents........ | 8,485 | (18,756) |
| Cash and cash equivalents at beginning of period............ | 12,934 | 33,059 |
| Effect of exchange rates on cash held in foreign currencies................................................ | (370) | (194) |
| Cash and cash equivalents at end of period................. | $21,049 | $ 14,109 |
| Supplemental disclosures: | | |
| Cash paid for income taxes................................... | $    - | $    45 |

See accompanying notes to unaudited consolidated financial statements.

F-86

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

HARBINGER CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

MARCH 31, 2000

(UNAUDITED)

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

BASIS OF PRESENTATION

The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. The financial information included herein is unaudited; however, the information reflects all adjustments (consisting solely of normal recurring adjustments) that are, in the opinion of management, necessary to a fair presentation of the financial position, results of operations, comprehensive income, and cash flows for the interim periods. Operating results for the three months ended March 31, 2000 are not necessarily indicative of the results that may be expected for the year ended December 31, 2000. For further information, refer to the financial statements and footnotes thereto included in Harbinger Corporation's ("Harbinger" or the "Company") Form 10-K for the year ended December 31, 1999 and the Company's current reports on Form 8-K dated January 24, 2000, April 6, 2000 and April 17, 2000.

RECLASSIFICATIONS

Certain reclassifications have been made to the quarter ended March 31, 1999 unaudited and the December 31, 1999 audited consolidated financial statements to conform to the presentation of the quarter ended March 31, 2000.

REVENUE RECOGNITION

On January 1, 2000 the Company adopted Statement of Position 98-9, Software Revenue Recognition with Respect to Certain Transactions, which did not have a material impact on accounting for revenues.

2. INVESTMENTS IN JOINT VENTURES

During the three months ended March 31, 2000 the Company acquired equity positions in two privately- held ventures and issued a letter of intent to invest in a third privately-held venture, fundamentally exchanging the Company's technologies and services for equity positions in the ventures. Each investment will be accounted for using the equity method of accounting, which requires the Company to record its share of income or loss to the consolidated statements of operations under "Equity in losses of joint ventures" in the period they occur. The Company has chosen to use the equity method for these investments due to its belief that it has the ability to exercise significant influence over the entities. More specifically, the Company invested $2.0 million in FactorWorks.com Inc. ("FactorWorks") for a 7.8% ownership position and recorded approximately $1.4 million in services revenues net of $117,000 of revenue eliminated in consolidation; invested $3.0 million for a 7.4% ownership of Edaflow Corporation and recorded $1.4 million in software revenue net of $117,000 of revenue eliminated in consolidation; and committed to an estimated $4 million investment for an estimated 20% ownership of a joint venture in the golf and hospitality industry and recognized $1.9 million of software revenue, net of $476,000 of revenue eliminated in consolidation. The Company's share of income or loss in these investments for the three months ended March 31, 2000 was not

F-87

Exhibit H
0916

HARBINGER CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

MARCH 31, 2000

(UNAUDITED)

2. INVESTMENTS IN JOINT VENTURES (CONTINUED)
material. These ventures are early-stage enterprises which therefore may be
financially volatile, with no assurances on the ultimate value of the Company's
investments. The Company's investments are recorded as "Other non-current
assets" on the consolidated balance sheets.

3. ACCRUED LIABILITIES

    At March 31, 2000 the Company had a remaining reserve of $2.4 million
related to charges for purchased in-process product development, write-off of
software developed costs, restructuring, acquisition related and other charges,
compared to $3.0 million at December 31, 1999. The reduction to the reserve in
2000 was due to cash payments made for $600,000. The liabilities at March 31,
2000 consist primarily of reserves for lease terminations, severance costs and
legal fees. The remaining liabilities are based on management estimates and the
actual results could vary from these estimates.

4. DISCONTINUED OPERATIONS

    The Company discontinued its TrustedLink Procurement business ("TLP") in
September 30, 1998 and established a $6.4 million reserve for an estimated loss
on disposal of TLP, including anticipated losses during the phase-out period.
The Company sold the business in 1999 and wrote off certain additional assets in
2000, resulting in a $2.3 million loss on disposal. The Company presently has an
$800,000 note receivable from the purchaser of TLP. Repayment of this note will
occur at the earlier of the buyer achieving certain sales targets or December
31, 2000.

    At March 31, 2000 the remaining balance in the loss reserve was $ 2.9
million, available for certain remaining contingencies associated with TLP. Such
contingencies relate to lease termination costs, customer transition issues and
collection risks associated with notes and accounts receivables. At present,
management is not able to estimate specific time frames during which these
contingencies will be resolved. The operating loss during the phase-out period
from the measurement date of September 30, 1998 to March 31, 2000 was $ 1.2
million. The net assets and liabilities of TLP included in the Company's
consolidated balance sheets were $5,228 at March 31, 2000 and $452,000,
primarily consisting of account receivables, at December 31, 1999.

5. SEGMENT INFORMATION

    The Company operates in a single industry segment: the development,
marketing and support of software products and the providing of network and
professional services to enable businesses to engage in business-to-business
e-commerce. The Company manages its business along geographical lines, thus
resulting in three reportable segments: North America, Europe, and Asia Pacific
and Latin America. The accounting policies of each segment are the same as those
described in the summary of significant accounting policies. Revenues are
attributed to a reportable segment based on the location of the customer.
Management evaluates the performance of each segment on the basis of operating
income, excluding certain general and administrative charges and credits.
Intersegment royalties are calculated based upon revenues, as defined, derived
from the sales of certain software products and services at agreed upon
percentages between the segments.

F-88

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0917

HARBINGER CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

MARCH 31, 2000

(UNAUDITED)

5. SEGMENT INFORMATION (CONTINUED)

A summary of the Company's reportable segments as of March 31, 2000 and March 31, 1999 is presented below (in thousands):

| | NORTH AMERICA | EUROPE | ASIA PACIFIC AND LATIN AMERICA | TOTAL |
|---|---|---|---|---|
| Revenues: | | | | |
| 2000........................... | $34,697 | $ 3,976 | $1,206 | $39,879 |
| 1999........................... | $28,413 | $ 5,729 | $ 511 | $34,653 |
| Intersegment Royalties: | | | | |
| 2000........................... | $ 1,472 | $ -- | $ -- | $ 1,472 |
| 1999........................... | $ 1,150 | $ -- | $ -- | $ 1,150 |
| Operating Income (as defined): | | | | |
| 2000........................... | $ 1,915 | $(1,654) | $ 103 | $ 364 |
| 1999........................... | $ 54 | $ 833 | $ (81) | $ 806 |

| | 2000 | 1999 |
|---|---|---|
| REVENUES: | | |
| Total gross revenues for reportable segments.............. | $39,879 | $34,653 |
| Elimination of intersegment royalties.................... | (1,472) | (1,150) |
| Total consolidated revenues............................. | $38,407 | $33,503 |

| | 2000 | 1999 |
|---|---|---|
| OPERATING INCOME: | | |
| Total operating income for reportable segments, as defined................................................ | $ 364 | $ 806 |
| Certain general and administrative credits................ | -- | 750 |
| Total consolidated operating income, as reported........ | $ 364 | $ 1,556 |

6. CONTINGENCIES

The Company is involved in claims and other legal actions arising out of the ordinary course of business, including discontinued operations and the phase-out of certain non-strategic software products. Additionally, a shareholder class action lawsuit was filed against the Company in September 1999 (see Part I, Item 3 of the Company's December 31, 1999 Form 10-K). While the ultimate results of such claims and legal actions cannot be determined, management does not expect that they will have a material adverse effect on the Company's results of operations or financial position.

7. SUBSEQUENT EVENT

PENDING MERGER

On April 5, 2000 the Company entered into an Agreement and Plan of Merger and Reorganization (the "Merger Agreement") with Peregrine Systems, Inc. ("Peregrine"), a Delaware

F-89

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0918

HARBINGER CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

MARCH 31, 2000

(UNAUDITED)

7. SUBSEQUENT EVENT (CONTINUED)

corporation, and Soda Acquisition Company, a Delaware Corporation and a wholly-owned subsidiary of Peregrine, in which each outstanding share of Harbinger common stock will be converted into the right to receive 0.75 of a share of Peregrine common stock (the "Merger").

The Merger is intended to constitute a reorganization under Section 368 (a) of the Internal Revenue Code of 1986, as amended, and is to be accounted for as a purchase transaction. Consummation of the Merger is subject to various conditions, including, among other things, receipt of the necessary approvals of the stockholders of Peregrine, shareholders of Harbinger and certain regulatory bodies. (See Annex A of this Form S-4, Agreement and Plan of Merger and Reorganization)

In connection with the proposed merger, Peregrine will file a proxy statement and Registration Statement on Form S-4 with the Securities and Exchange Commission ("SEC"), and Harbinger will file a proxy statement with the SEC. Harbinger and Peregrine will mail a Joint Proxy Statement/Prospectus to stockholders of Harbinger and Peregrine containing additional information about the proposed merger after approval from the SEC. Depending on whether the SEC reviews the proposed merger, the transaction is expected to close in summer or early fall of 2000.

F-90

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0919

ANNEX A

AGREEMENT AND PLAN OF MERGER AND REORGANIZATION

BY AND AMONG

PEREGRINE SYSTEMS, INC.

SODA ACQUISITION CORPORATION

AND

HARBINGER CORPORATION

DATED AS OF APRIL 5, 2000

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H

0920

TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| ARTICLE I | THE MERGER | A-1 |
| 1.1 | The Merger | A-1 |
| 1.2 | Effective Time; Closing | A-2 |
| 1.3 | Effect of the Merger | A-2 |
| 1.4 | Articles of Incorporation; Bylaws | A-2 |
| 1.5 | Directors and Officers | A-2 |
| 1.6 | Effect on Capital Stock | A-2 |
| 1.7 | Surrender of Certificates | A-3 |
| 1.8 | No Further Ownership Rights in Company Common Stock | A-5 |
| 1.9 | Lost, Stolen or Destroyed Certificates | A-5 |
| 1.10 | Tax and Accounting Consequences | A-5 |
| 1.11 | Taking of Necessary Action; Further Action | A-5 |
| ARTICLE II | REPRESENTATIONS AND WARRANTIES OF COMPANY | A-6 |
| 2.1 | Organization and Qualification; Subsidiaries | A-6 |
| 2.2 | Articles of Incorporation and Bylaws | A-6 |
| 2.3 | Capitalization | A-6 |
| 2.4 | Authority Relative to this Agreement | A-8 |
| 2.5 | No Conflict; Required Filings and Consents | A-8 |
| 2.6 | Compliance; Permits | A-9 |
| 2.7 | SEC Filings; Financial Statements | A-9 |
| 2.8 | No Undisclosed Liabilities | A-10 |
| 2.9 | Absence of Certain Changes or Events | A-10 |
| 2.10 | Absence of Litigation | A-10 |
| 2.11 | Employee Benefit Plans | A-11 |
| 2.12 | Labor Matters | A-13 |
| 2.13 | Registration Statement/Joint Proxy Statement/Prospectus | A-13 |
| 2.14 | Restrictions on Business Activities | A-13 |
| 2.15 | Title to Property | A-14 |
| 2.16 | Taxes | A-14 |
| 2.17 | Environmental Matters | A-15 |
| 2.18 | Brokers | A-15 |
| 2.19 | Intellectual Property | A-15 |
| 2.20 | Agreements, Contracts and Commitments | A-18 |
| 2.21 | Insurance | A-19 |
| 2.22 | Opinion of Financial Advisor | A-19 |

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

i

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

                                                                              PAGE
                                                                          --------

    2.23    Board Approval.................................................  A-20

    2.24    Vote Required..................................................  A-20

    2.25    State Takeover Statutes........................................  A-20

            REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB.....  A-20
ARTICLE III

    3.1     Organization and Qualification; Subsidiaries..............  A-20

    3.2     Certificate of Incorporation and Bylaws....................  A-21

    3.3     Capitalization.................................................  A-21

    3.4     Parent Common Stock............................................  A-21

    3.5     Authority Relative to this Agreement.......................  A-21

    3.6     SEC Filings; Financial Statements..........................  A-21

    3.7     No Undisclosed Liabilities.................................  A-22

    3.8     Compliance; Permits...........................................  A-22

    3.9     Absence of Certain Changes or Events.......................  A-22

    3.10    Absence of Litigation.......................................  A-23

    3.11    Registration Statement; Joint Proxy Statement/Prospectus....  A-23

    3.12    Brokers........................................................  A-23

    3.13    Opinion of Financial Advisor...............................  A-23

    3.14    Board Approval.................................................  A-23

    3.15    Vote Required..................................................  A-23

ARTICLE IV  CONDUCT PRIOR TO THE EFFECTIVE TIME.......................  A-24

    4.1     Conduct of Business by Company.............................  A-24

    4.2     Conduct of Business by Parent..............................  A-26

ARTICLE V   ADDITIONAL AGREEMENTS.......................................  A-27

    5.1     Joint Proxy Statement/Prospectus; Registration Statement....  A-27

    5.2     Shareholder and Stockholder Meetings.......................  A-27

    5.3     Confidentiality; Access to Information.....................  A-28

    5.4     No Solicitation................................................  A-28

    5.5     Public Disclosure............................................  A-30

    5.6     Reasonable Efforts; Notification...........................  A-30

    5.7     Third Party Consents.........................................  A-31

    5.8     Stock Options and Employee Benefits; Warrants..............  A-31

    5.9     Form S-8.......................................................  A-32

    5.10    Indemnification..............................................  A-32

    5.11    Nasdaq Listing...............................................  A-33

    5.12    Affiliates.....................................................  A-33

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

5.13    Regulatory Filings; Reasonable Efforts...................... A-33

ii

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0924

|  |  | PAGE |
|---|---|---|
| 5.14 | Parent Board of Directors | A-33 |
| 5.15 | Shareholder Litigation | A-33 |
| ARTICLE VI | CONDITIONS TO THE MERGER | A-33 |
| 6.1 | Conditions to Obligations of Each Party to Effect the Merger | A-33 |
| 6.2 | Additional Conditions to Obligations of Company | A-34 |
| 6.3 | Additional Conditions to the Obligations of Parent and Merger Sub | A-34 |
| ARTICLE VII | TERMINATION, AMENDMENT AND WAIVER | A-35 |
| 7.1 | Termination | A-35 |
| 7.2 | Notice of Termination; Effect of Termination | A-36 |
| 7.3 | Fees and Expenses | A-37 |
| 7.4 | Amendment | A-38 |
| 7.5 | Extension; Waiver | A-38 |
| ARTICLE VIII | GENERAL PROVISIONS | A-38 |
| 8.1 | Survival of Representations and Warranties | A-38 |
| 8.2 | Notices | A-38 |
| 8.3 | Interpretation; Definitions | A-39 |
| 8.4 | Counterparts | A-40 |
| 8.5 | Entire Agreement; Third Party Beneficiaries | A-40 |
| 8.6 | Severability | A-40 |
| 8.7 | Other Remedies; Specific Performance | A-41 |
| 8.8 | Governing Law | A-41 |
| 8.9 | Rules of Construction | A-41 |
| 8.10 | Assignment | A-41 |

### INDEX OF EXHIBITS

| Exhibit A-1 | Form of Company Voting Agreement |
|---|---|
| Exhibit A-2 | Form of Parent Voting Agreement |
| Exhibit B | Form of Stock Option Agreement |
| Exhibit C | Form of Affiliate Agreement |

iii

AGREEMENT AND PLAN OF MERGER AND REORGANIZATION

This AGREEMENT AND PLAN OF MERGER AND REORGANIZATION is made and entered into as of April 5, 2000, among Peregrine Systems, Inc., a Delaware corporation ("PARENT"), Soda Acquisition Corporation, a Delaware corporation and a wholly-owned subsidiary of Parent ("MERGER SUB"), and Harbinger Corporation, a Georgia corporation ("COMPANY").

RECITALS

A. Upon the terms and subject to the conditions of this Agreement (as defined in Section 1.2 below) and in accordance with the Georgia Business Corporation Code ("GEORGIA LAW") and the Delaware General Corporation Law ("DELAWARE LAW"), Parent and Company intend to enter into a business combination transaction.

B. The Board of Directors of Company (i) has determined that the Merger (as defined in Section 1.1) is consistent with and in furtherance of the long-term business strategy of Company and fair to, and in the best interests of, Company and its shareholders, (ii) has unanimously approved and declared advisable this Agreement, and has approved the Merger (as defined in Section 1.1) and the other transactions contemplated by this Agreement, and (iii) has determined to recommend that the shareholders of Company adopt and approve this Agreement and approve the Merger.

C. The Board of Directors of Parent (i) has determined that the Merger is consistent with and in furtherance of the long-term business strategy of Parent and is fair to, and in the best interests of, Parent and its stockholders, (ii) has approved this Agreement, the Merger and the other transactions contemplated by this Agreement, and (iii) has determined to recommend that the stockholders of Parent approve the issuance of shares of Parent Common Stock (as defined below) pursuant to the Merger (the "SHARE ISSUANCE").

D. Concurrently with the execution of this Agreement, (i) as a condition and inducement to Parent's willingness to enter into this Agreement, each affiliate of Company is entering into Voting Agreements in the form attached hereto as EXHIBIT A-1 (the "COMPANY VOTING AGREEMENTS") and (ii) as a condition and inducement to Company's willingness to enter into this Agreement, certain affiliates of Parent are entering into Voting Agreements in the form attached hereto as EXHIBIT A-2 (the "PARENT VOTING AGREEMENT").

E. Concurrently with the execution of this Agreement, and as a condition and inducement to Parent's willingness to enter into this Agreement, Company shall execute and deliver a Stock Option Agreement in favor of Parent in the form attached hereto as EXHIBIT B (the "STOCK OPTION AGREEMENT").

F. The parties intend, by executing this Agreement, to adopt a plan of reorganization within the meaning of Section 368 of the Internal Revenue Code of 1986, as amended (the "CODE").

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

ARTICLE I

THE MERGER

1.1 THE MERGER. At the Effective Time (as defined in Section 1.2) and subject to and upon the terms and conditions of this Agreement and the applicable provisions of Georgia Law and Delaware Law, Merger Sub shall be merged with and into Company (the "MERGER"), the separate corporate existence of Merger Sub shall cease, and Company shall continue as the surviving corporation and as a

A-1

Exhibit H
0926

wholly-owned subsidiary of Parent. Company as the surviving corporation after the Merger is hereinafter sometimes referred to as the "SURVIVING CORPORATION."

1.2  EFFECTIVE TIME; CLOSING.  Subject to the provisions of this Agreement, the parties hereto shall cause the Merger to be consummated by filing a certificate of merger with the Secretary of State of the State of Georgia in accordance with the relevant provisions of Georgia Law (the "CERTIFICATE OF MERGER") and a certificate of merger with the Secretary of State of the State of Delaware in accordance with the relevant provisions of Delaware Law (the "DELAWARE CERTIFICATE OF MERGER") (the time of the later of such filings (or such later time as may be agreed in writing by Company and Parent and specified in the Certificate of Merger) being the "EFFECTIVE TIME") as soon as practicable on or after the Closing Date (as herein defined). The closing of the Merger (the "CLOSING") shall take place at the offices of Wilson Sonsini Goodrich & Rosati, Professional Corporation, 650 Page Mill Road, Palo Alto, California 94304-1050 at a time and date to be specified by the parties, which shall be no later than the second business day after the satisfaction or waiver of all of the conditions set forth in Article VI, or at such other time, date and location as the parties hereto agree in writing (the "CLOSING DATE").

1.3  EFFECT OF THE MERGER.  At the Effective Time, the effect of the Merger shall be as provided in this Agreement and the applicable provisions of Georgia Law and Delaware Law. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all the property, rights, privileges, powers, and franchises of Company and Merger Sub shall vest in the Surviving Corporation, and all debts, liabilities and duties of Company and Merger Sub shall become the debts, liabilities, and duties of the Surviving Corporation.

1.4  ARTICLES OF INCORPORATION; BYLAWS.

(a) At the Effective Time, the Articles of Incorporation of Company, as in effect immediately prior to the Effective Time, shall be the Articles of Incorporation of the Surviving Corporation until thereafter amended as provided by law and such Articles of Incorporation of the Surviving Corporation.

(b) The Bylaws of Company, as in effect immediately prior to the Effective Time, shall be, at the Effective Time, the Bylaws of the Surviving Corporation until thereafter amended.

1.5  DIRECTORS AND OFFICERS.  The initial directors of the Surviving Corporation shall be the directors of Merger Sub immediately prior to the Effective Time, each to hold office in accordance with the Articles of Incorporation and Bylaws of the Surviving Corporation until their respective successors are duly elected or appointed and qualified. The initial officers of the Surviving Corporation shall be the officers of Merger Sub immediately prior to the Effective Time, each to hold office in accordance with the Articles of Incorporation and Bylaws of the Surviving Corporation until their respective successors are duly appointed.

1.6  EFFECT ON CAPITAL STOCK.  Subject to the terms and conditions of this Agreement, at the Effective Time, by virtue of the Merger and without any action on the part of Merger Sub, Company or the holders of any of the following securities, the following shall occur:

(a)  CONVERSION OF COMPANY COMMON STOCK.  Each share of Common Stock, par value $.0001 per share, of Company (the "COMPANY COMMON STOCK") issued and outstanding immediately prior to the Effective Time, other than any shares of Company Common Stock to be cancelled pursuant to Section 1.6(b), will be cancelled and extinguished and automatically converted (subject to Sections 1.6(e) and (f)) into the right to receive that number of shares of Common Stock, $0.001 par value per share, of Parent (the "PARENT COMMON STOCK") equal to 0.75 (the "EXCHANGE RATIO") upon surrender of the certificate representing such share of Company Common Stock in the manner provided in Section 1.7 (or in the case of a lost, stolen or destroyed certificate, upon delivery of an affidavit (and bond, if required) in the manner provided in Section 1.9). If any shares of Company Common Stock outstanding immediately prior to the Effective Time are

A-2

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0927

unvested or are subject to a repurchase option, risk of forfeiture or other condition under any applicable restricted stock purchase agreement or other agreement with the Company, then the shares of Parent Common Stock issued in exchange for such shares of Company Common Stock will also be unvested and subject to the same repurchase option, risk of forfeiture or other condition, and the certificates representing such shares of Parent Common Stock may possibly be marked with appropriate legends. The Company shall take all action that may be necessary to ensure that, from and after the Effective Time, Parent is entitled to exercise any such repurchase option or other right set forth in any such restricted stock purchase agreement or other agreement.

   (b)  CANCELLATION OF PARENT-OWNED STOCK.  Each share of Company Common Stock held by Company or owned by Merger Sub, Parent or any direct or indirect wholly-owned subsidiary of Company or of Parent immediately prior to the Effective Time shall be cancelled and extinguished without any conversion thereof.

   (c)  STOCK OPTIONS; WARRANTS; EMPLOYEE STOCK PURCHASE PLANS.  At the Effective Time, each outstanding Warrant (as defined in Section 2.3), all options to purchase Company Common Stock and stock appreciation rights then outstanding under Company's Amended and Restated 1989 Stock Option Plan (the "1989 PLAN"), Company's 1996 Stock Option Plan, as amended, (the "INCENTIVE PLAN"), Company's 1993 Stock Option Plan for Nonemployee Directors (the "DIRECTOR PLAN" and, together with the 1989 Plan and the Incentive Plan, the "COMPANY OPTION PLANS"), and each of the Company Option Plans shall be assumed by Parent in accordance with Section 5.8 hereof. Purchase rights outstanding under Company's Amended and Restated Employee Stock Purchase Plan (the "ESPP") shall be treated as set forth in Section 5.8.

   (d)  CAPITAL STOCK OF MERGER SUB.  Each share of Common Stock, $0.001 par value per share, of Merger Sub (the "MERGER SUB COMMON STOCK") issued and outstanding immediately prior to the Effective Time shall be converted into one validly issued, fully paid and nonassessable share of Common Stock, $0.001 par value per share, of the Surviving Corporation. Each certificate evidencing ownership of shares of Merger Sub Common Stock shall evidence ownership of such shares of capital stock of the Surviving Corporation.

   (e)  ADJUSTMENTS TO EXCHANGE RATIO.  The Exchange Ratio shall be adjusted to reflect proportionately and equitably the effect of any stock split, reverse stock split, stock dividend (including any dividend or distribution of securities convertible into Parent Common Stock or Company Common Stock), reorganization, recapitalization, reclassification or other like change with respect to Parent Common Stock or Company Common Stock occurring on or after the date hereof and prior to the Effective Time.

   (f)  FRACTIONAL SHARES.  No fraction of a share of Parent Common Stock will be issued by virtue of the Merger, but in lieu thereof, each holder of shares of Company Common Stock who would otherwise be entitled to a fraction of a share of Parent Common Stock (after aggregating all fractional shares of Parent Common Stock that otherwise would be received by such holder) shall, upon surrender of such holder's Certificates(s) (as defined in Section 1.7(c)), receive from Parent an amount of cash (rounded to the nearest whole cent), without interest, equal to the product of (i) such fraction and (ii) the average closing price of Parent Common Stock for the five trading days immediately preceding the last full trading day prior to the Effective Time, as reported on the Nasdaq National Market System ("NASDAQ").

1.7  SURRENDER OF CERTIFICATES.

   (a)  EXCHANGE AGENT.  Parent shall select a bank or trust company reasonably acceptable to Company to act as the exchange agent (the "EXCHANGE AGENT") in the Merger.

   (b)  PARENT TO PROVIDE COMMON STOCK.  Within five (5) business days after the Effective Time, Parent shall make available to the Exchange Agent, for exchange in accordance with this Article I,

A-3

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0928

(i) the shares of Parent Common Stock issuable pursuant to Section 1.6 in exchange for outstanding shares of Company Common Stock and (ii) cash in an amount sufficient for payment in lieu of fractional shares pursuant to Section 1.6(f) and any dividends or distributions to which holders of shares of Company Common Stock may be entitled pursuant to Section 1.7(d).

(c)  EXCHANGE PROCEDURES.  As soon as practicable after the Effective Time, Parent shall cause the Exchange Agent to mail to each holder of record (as of the Effective Time) of a certificate or certificates (the "CERTIFICATES"), which immediately prior to the Effective Time represented outstanding shares of Company Common Stock whose shares were converted into the right to receive shares of Parent Common Stock pursuant to Section 1.6, cash in lieu of any fractional shares pursuant to Section 1.6(f), and any dividends or other distributions pursuant to Section 1.7(d), (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Exchange Agent and shall contain such other provisions as Parent may reasonably specify) and (ii) instructions for use in effecting the surrender of the Certificates in exchange for certificates representing shares of Parent Common Stock, cash in lieu of any fractional shares pursuant to Section 1.6(f) and any dividends or other distributions pursuant to Section 1.7(d).  Upon surrender of Certificates for cancellation to the Exchange Agent or to such other agent or agents as may be appointed by Parent, together with such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, the holders of such Certificates shall be entitled to receive in exchange therefor certificates representing the number of whole shares of Parent Common Stock into which their shares of Company Common Stock were converted at the Effective Time, payment in lieu of fractional shares which such holders have the right to receive pursuant to Section 1.6(f) and any dividends or distributions payable pursuant to Section 1.7(d), and the Certificates so surrendered shall forthwith be cancelled. Until so surrendered, outstanding Certificates will be deemed from and after the Effective Time, for all corporate purposes, subject to Section 1.7(d) as to the payment of dividends, to evidence only the ownership of the number of full shares of Parent Common Stock into which such shares of Company Common Stock shall have been so converted and the right to receive an amount in cash in lieu of the issuance of any fractional shares in accordance with Section 1.6(f) and any dividends or distributions payable pursuant to Section 1.7(d).

(d)  DISTRIBUTIONS WITH RESPECT TO UNEXCHANGED SHARES.  No dividends or other distributions declared or made after the date of this Agreement with respect to Parent Common Stock with a record date after the Effective Time will be paid to the holders of any unsurrendered Certificate(s) with respect to the shares of Parent Common Stock represented thereby until the holders of record of such Certificate(s) shall surrender such Certificate(s). Subject to applicable law, following surrender of any such Certificate(s), the Exchange Agent shall deliver to the record holders thereof, without interest, a certificate(s) representing whole shares of Parent Common Stock issued in exchange therefor along with payment in lieu of fractional shares pursuant to Section 1.6(f) hereof and the amount of any such dividends or other distributions with a record date after the Effective Time payable with respect to such whole shares of Parent Common Stock.

(e)  TRANSFERS OF OWNERSHIP.  If any certificate representing shares of Parent Common Stock is to be issued in a name other than that in which the Certificate surrendered in exchange therefor is registered, it will be a condition of the issuance thereof that the Certificate so surrendered will be properly endorsed and otherwise in proper form for transfer and that the persons requesting such exchange will have paid any transfer or other taxes required by reason of the issuance of certificates representing shares of Parent Common Stock in any name other than that of the registered holder of the Certificates surrendered, or established to the satisfaction of Parent or any agent designated by it that such tax has been paid or is not payable.

A-4

(f)  REQUIRED WITHHOLDING.  Each of the Exchange Agent, Parent, and the Surviving Corporation shall be entitled to deduct and withhold from any consideration payable or otherwise deliverable pursuant to this Agreement to any holder or former holder of Company Common Stock such amounts as may be required to be deducted or withheld therefrom under the Code or under any provision of state, local or foreign tax law or under any other applicable legal requirement. To the extent such amounts are so deducted or withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the person to whom such amounts would otherwise have been paid.

(g)  NO LIABILITY.  Notwithstanding anything to the contrary in this Section 1.7, neither of the Exchange Agent, Parent, the Surviving Corporation, or any party hereto shall be liable to a holder of shares of Parent Common Stock or Company Common Stock for any amount properly paid to a public official pursuant to any applicable abandoned property, escheat, or similar law.

1.8  NO FURTHER OWNERSHIP RIGHTS IN COMPANY COMMON STOCK.  All shares of Parent Common Stock issued upon the surrender for exchange of Shares of Company Common Stock in accordance with the terms hereof (together with any cash paid in respect thereof pursuant to Section 1.6(f) and 1.7(d)) shall be deemed to have been issued in full satisfaction of all rights pertaining to such shares of Company Common Stock, and there shall be no further registration of transfers on the records of the Surviving Corporation of shares of Company Common Stock which were outstanding immediately prior to the Effective Time. If, after the Effective Time, Certificates are presented to the Surviving Corporation for any reason, they shall be cancelled and exchanged as provided in this Article I.

1.9  LOST, STOLEN OR DESTROYED CERTIFICATES.  In the event that any Certificate shall have been lost, stolen, or destroyed, the Exchange Agent shall issue in exchange for such lost, stolen, or destroyed Certificates, upon the making of an affidavit of that fact by the holder thereof, certificates representing the shares of Parent Common Stock into which the shares of Company Common Stock represented by such Certificates were converted pursuant to Section 1.6, cash for fractional shares, if any, as may be required pursuant to Section 1.6(f) and any dividends or distributions payable pursuant to Section 1.7(d); PROVIDED, HOWEVER, that Parent may, in its discretion and as a condition precedent to the issuance of such certificates representing shares of Parent Common Stock, cash, and other distributions, require the owner of such lost, stolen, or destroyed Certificate to deliver a bond in such sum as it may reasonably direct as indemnity against any claim that may be made against Parent, the Surviving Corporation, or the Exchange Agent with respect to the Certificates alleged to have been lost, stolen or destroyed.

1.10  TAX AND ACCOUNTING CONSEQUENCES.

(a)  It is intended by the parties hereto that the Merger shall constitute a reorganization within the meaning of Section 368 of the Code. The parties hereto adopt this Agreement as a "plan of reorganization" within the meaning of Sections 1.368-2(g) and 1.368-3(a) of the United States Income Tax Regulations.

(b)  It is intended by the parties hereto that the Merger shall be treated as a purchase for accounting purposes.

1.11  TAKING OF NECESSARY ACTION; FURTHER ACTION.  If, at any time after the Effective Time, any further action is necessary or desirable to carry out the purposes of this Agreement and to vest the Surviving Corporation with full right, title, and possession to all assets, property, rights, privileges, powers and franchises of Company and Merger Sub, the officers and directors of Company and Merger Sub are fully authorized in the manner of their respective corporations or otherwise to take, and will take, all such lawful and necessary action.

A-5

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

ARTICLE II

REPRESENTATIONS AND WARRANTIES OF COMPANY

As of the date hereof and as of the Closing Date, Company represents and warrants to Parent and Merger Sub, subject to such exceptions as are specifically disclosed in writing in the disclosure schedules, dated as of the date hereof delivered by Company to Parent (the "COMPANY SCHEDULE"), as follows. The Company Schedule shall be arranged in sections corresponding to the numbered sections contained in this Article and the disclosure in any paragraph shall qualify other sections in this Article only to the extent it is reasonably apparent from a reading of such disclosure that it also qualifies such other sections.

2.1  ORGANIZATION AND QUALIFICATION; SUBSIDIARIES.

(a)  Each of Company and its subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as it is now being conducted. Each of Company and its subsidiaries is in possession of all franchises, grants, authorizations, licenses, permits, easements, consents, certificates, approvals and orders ("APPROVALS") necessary to own, lease and operate the properties it purports to own, operate or lease and to carry on its business as it is now being conducted, except where the failure to have such Approvals would not, individually or in the aggregate, have a Material Adverse Effect on Company. Each of Company and its subsidiaries is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except for such failures to be so duly qualified or licensed and in good standing that would not, either individually or in the aggregate, have a Material Adverse Effect on Company.

(b)  Company has no subsidiaries except for the corporations identified in Section 2.1(b) of the Company Schedule. Neither Company nor any of its subsidiaries has agreed nor is obligated to make nor be bound by any written, oral or other agreement, contract, subcontract, lease, binding understanding, instrument, note, option, warranty, purchase order, license, sublicense, insurance policy, benefit plan, commitment or undertaking of any nature, as of the date hereof or as may hereafter be in effect (a "CONTRACT") under which it may become obligated to make, any future investment in or capital contribution to any other entity. Neither Company nor any of its subsidiaries directly or indirectly owns any equity or similar interest in or any interest convertible, exchangeable or exercisable for, any equity or similar interest in, any corporation, partnership, joint venture or other business, association or entity, other than passive investments in equity interests of public companies constituting less than 5% interests therein as part of Company's cash management program

2.2  ARTICLES OF INCORPORATION AND BYLAWS.  Company has previously furnished to Parent a complete and correct copy of its Articles of Incorporation and Bylaws as amended to date (together, the "COMPANY CHARTER DOCUMENTS"). Such Company Charter Documents and equivalent organizational documents of each of its subsidiaries are in full force and effect. Company is not in violation of any of the provisions of the Company Charter Documents, and no subsidiary of Company is in violation of its equivalent organizational documents.

2.3  CAPITALIZATION.

(a)  The authorized capital stock of Company consists of 100,000,000 shares of Company Common Stock, par value $0.0001 per share, and 20,000,000 shares of Preferred Stock, without par value ("COMPANY PREFERRED STOCK"). At the close of business on March 31, 2000, (i) 40,057,369 shares of Company Common Stock were issued and outstanding, all of which are validly issued,

A-6

Exhibit H
0931

fully paid and nonassessable; (ii) 4,323,050 shares of Company Common Stock were held in treasury by Company or by subsidiaries of Company; (iii) 233,633 shares of Company Common Stock were available for future issuance pursuant to Company's ESPP; (iv) 6,505,987 shares of Company Common Stock were reserved for issuance upon the exercise of outstanding options to purchase Company Common Stock under the Incentive Plan; (v) 346,874 shares of Company Common Stock were reserved for issuance upon the exercise of outstanding options to purchase Company Common Stock under the Director Plan; (vi) 266,168 shares of Company Common Stock were reserved for issuance upon the exercise of outstanding options to purchase Company Common Stock under the 1989 Plan; (vii) 8,007,468 shares of Company Common Stock were reserved for issuance upon the exercise of the Stock Option Agreement; (viii) 43,200 shares of Company Common Stock were reserved for issuance upon the exercise of outstanding warrants to purchase Company Common Stock (the "WARRANTS"); (ix) 106,473 shares of Company Common Stock were available for future grant under the Incentive Plan; (x) 83,814 shares of Company Common Stock were available for future grant under the Director Plan; and (xi) no shares of Company Common Stock were reserved for future grant under the 1989 Plan. As of the date hereof, no shares of Company Preferred Stock were issued or outstanding. There are no commitments or agreements of any character to which the Company is bound obligating the Company to accelerate the vesting of any Company Stock Option as a result of the Merger.

(b) Section 2.3(b) of the Company Schedule sets forth the following information with respect to each Company Stock Option (as defined in Section 5.8) outstanding as of the date of this Agreement: (i) the name and address of the optionee; (ii) the particular plan pursuant to which such Company Stock Option was granted; (iii) the number of shares of Company Common Stock subject to such Company Stock Option; (iv) the exercise price of such Company Stock Option; (v) the date on which such Company Stock Option was granted; (vi) the applicable vesting schedule; and (vii) the date on which such Company Stock Option expires. Company has made available to Parent accurate and complete copies of all stock option plans pursuant to which the Company has granted such Company Stock Options that are currently outstanding and the form of all stock option agreements evidencing such Company Stock Options. All shares of Company Common Stock subject to issuance as aforesaid, upon issuance on the terms and conditions specified in the instrument pursuant to which they are issuable, would be duly authorized, validly issued, fully paid and nonassessable.

(c) All outstanding shares of Company Common Stock, all outstanding Company Stock Options, and all outstanding shares of capital stock of each subsidiary of the Company have been issued and granted in compliance with (i) all applicable securities laws and other applicable Legal Requirements (as defined below) and (ii) all requirements set forth in applicable Contracts. For the purposes of this Agreement, "LEGAL REQUIREMENTS" means any federal, state, local, municipal, foreign or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issues, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity (as defined below) and (ii) all requirements set forth in applicable contracts, agreements, and instruments.

(d) Section 2.3(d) of the Company Schedule describes the interests of all persons in the subsidiaries of Company, other than interests held by the Company or any other of its subsidiaries and other than interests of subsidiaries held by certain nominee holders as required by the laws of a subsidiary's jurisdiction of incorporation (which interests do not materially affect the Company's control of such subsidiary).

(e) Except as set forth in Section 2.3(d) and except for the Stock Option Agreement, there are no subscriptions, options, warrants, equity securities, partnership interests or similar ownership interests, calls, rights (including preemptive rights), commitments or agreements of any character

A-7

to which Company or any of its subsidiaries is a party or by which it is bound obligating Company or any of its subsidiaries to issue, deliver or sell, or cause to be issued, delivered or sold, or repurchase, redeem or otherwise acquire, or cause the repurchase, redemption or acquisition of, any shares of capital stock, partnership interests or similar ownership interests of the Company or any of its subsidiaries or obligating the Company or any of its subsidiaries to grant, extend, accelerate the vesting of or enter into any such subscription, option, warrant, equity security, call, right, commitment or agreement. As of the date of this Agreement, except as contemplated by this Agreement, there are no registration rights and there is, except for the Company Voting Agreements, no voting trust, proxy, rights plan, antitakeover plan or other agreement or understanding to which the Company or any of its subsidiaries is a party or by which they are bound with respect to any equity security of any class of the Company or with respect to any equity security, partnership interest or similar ownership interest of any class of any of its subsidiaries. Shareholders of the Company will not be entitled to dissenters' rights under Georgia Law in connection with the Merger.

2.4  AUTHORITY RELATIVE TO THIS AGREEMENT.  Company has all necessary corporate power and authority to execute and deliver this Agreement and the Stock Option Agreement and to perform its obligations hereunder and thereunder and, subject to obtaining the approval of the shareholders of Company of the Merger, to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Stock Option Agreement by Company and the consummation by Company of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of Company, and no other corporate proceedings on the part of Company are necessary to authorize this Agreement and the Stock Option Agreement or to consummate the transactions so contemplated (other than, with respect to the Merger, the approval and adoption of this Agreement by holders of a majority of the outstanding shares of Company Common Stock in accordance with Georgia Law, the Company Charter Documents) and duly adopted resolutions of the Board of Directors of Company. This Agreement and the Stock Option Agreement have been duly and validly executed and delivered by Company and, assuming the due authorization, execution and delivery by Parent and Merger Sub, constitute legal and binding obligations of Company, enforceable against Company in accordance with their respective terms.

2.5  NO CONFLICT; REQUIRED FILINGS AND CONSENTS.

(a) The execution and delivery of this Agreement and the Stock Option Agreement by Company do not, and the performance of this Agreement and the Stock Option Agreement by Company will not, (i) conflict with or violate the Company Charter Documents or the equivalent organizational documents of any of Company's subsidiaries; (ii) subject to obtaining the approval of Company's shareholders of the Merger and compliance with the requirements set forth in Section 2.5(b) below, conflict with, or result in any violation of, any law, rule, regulation, order, judgment or decree applicable to Company or any of its subsidiaries or by which either Company or any of its subsidiaries or any of their respective properties is bound or affected; or (iii) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or impair Company's or any of its subsidiaries' rights or alter the rights or obligations of any third party under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of a lien or encumbrance on any of the properties or assets of Company or any of its subsidiaries pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which Company or any of its subsidiaries is a party or by which Company or any of its subsidiaries or its or any of their respective properties are bound or affected. Except where such conflict, violation, breach, default, impairment or other effect could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Company.

A-8

(b) The execution and delivery of this Agreement and the Stock Option Agreement by Company do not, and the performance of this Agreement by Company will not, require any consent, waiver, approval, authorization or permit of, or filing with or notification to, any court, administrative agency, commission, governmental or regulatory authority, domestic or foreign (a "GOVERNMENTAL ENTITY"), except (A) for applicable requirements, if any, of the Securities Act of 1933, as amended (the "SECURITIES ACT"), the Securities Exchange Act of 1934, as amended (the "EXCHANGE ACT"), state securities laws ("BLUE SKY LAWS"), the pre-merger notification requirements (the "HSR APPROVAL" of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR ACT"), the rules and regulations of Nasdaq, and the filing and recordation of the Certificate of Merger as required by Georgia Law and the Delaware Certificate of Merger as required by Delaware Law and (B) where the failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the parties hereto, prevent consummation of the Merger or otherwise prevent the parties hereto from performing their obligations under this Agreement.

2.6  COMPLIANCE; PERMITS.

(a) Neither Company nor any of its subsidiaries is in conflict with, or in default or violation of, (i) any law, rule, regulation, order, judgment or decree applicable to Company or any of its subsidiaries or by which its or any of their respective properties is bound or affected or (ii) any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which Company or any of its subsidiaries is a party or by which Company or any of its subsidiaries or its or any of their respective properties is bound or affected, except for any conflicts, defaults or violations that (individually or in the aggregate) would not cause the Company to lose any material benefit or incur any material liability. No investigation or review by any governmental or regulatory body or authority is pending or, to the knowledge of Company, threatened against Company or its subsidiaries, nor has any governmental or regulatory body or authority indicated an intention to conduct the same, other than, in each such case, those the outcome of which could not, individually or in the aggregate, reasonably be expected to have the effect of prohibiting or materially impairing any business practice of the Company or any of its subsidiaries, any acquisition of material property by the Company or any of its subsidiaries or the conduct of business by the Company or any of its subsidiaries.

(b) Company and its subsidiaries hold all permits, licenses, variances, exemptions, orders and approvals from governmental authorities, the absence of which could not reasonably be expected to have a Material Adverse Effect on Company (collectively, the "COMPANY PERMITS"). Company and its subsidiaries are in compliance in all material respects with the terms of the Company Permits.

2.7  SEC FILINGS; FINANCIAL STATEMENTS.

(a) Company has made available to Parent a correct and complete copy of each report, schedule, registration statement and definitive proxy statement filed by Company with the Securities and Exchange Commission ("SEC") since December 31, 1999 (the "COMPANY SEC REPORTS"), which are all the forms, reports and documents required to be filed by Company with the SEC since December 31, 1999. The Company SEC Reports (A) were prepared in accordance with the requirements of the Securities Act or the Exchange Act, as the case may be, and (B) did not at the time they were filed (and if amended or superseded by a filing prior to the date of this Agreement, then on the date of such filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of Company's subsidiaries is required to file any reports or other documents with the SEC.

A-9

Exhibit H
0934

(b) Each of the consolidated financial statements (including, in each case, any related notes thereto) contained in the Company SEC Reports was prepared in accordance with generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto or, in the case of unaudited financial statements, do not contain footnotes as permitted by the SEC on Form 10-Q, Form 8-K or any successor form under the Exchange Act) and each fairly presents the consolidated financial position of Company and its subsidiaries at the respective dates thereof and the consolidated results of its operations and cash flows for the periods indicated, except that the unaudited interim financial statements were or are subject to normal adjustments which were not or are not expected to be material in amount.

(c) Company has previously furnished to Parent a complete and correct copy of any amendments or modifications, which have not yet been filed with the SEC but which are required to be filed, to agreements, documents or other instruments which previously had been filed by Company with the SEC pursuant to the Securities Act or the Exchange Act.

2.8  NO UNDISCLOSED LIABILITIES.  Neither Company nor any of its subsidiaries has any liabilities (absolute, accrued, contingent or otherwise) which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect on Company and its subsidiaries taken as a whole, except (i) liabilities provided for in Company's balance sheet as of December 31, 1999 and (ii) liabilities incurred since December 31, 1999 in the ordinary and usual course of business, consistent with past practice. None of the liabilities described in the foregoing sections (i) or (ii) could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect on Company.

2.9  ABSENCE OF CERTAIN CHANGES OR EVENTS.  Since December 31, 1999, there has not been: (i) any Material Adverse Effect on Company; (ii) any declaration, setting aside or payment of any dividend on, or other distribution (whether in cash, stock, or property) in respect of, any of Company's or any of its subsidiaries' capital stock, or any purchase, redemption or other acquisition by Company of any of Company's capital stock or any other securities of Company or its subsidiaries or any options, warrants, calls or rights to acquire any such shares or other securities except for repurchases from employees following their termination pursuant to the terms of their pre-existing stock option or purchase agreements; (iii) any split, combination or reclassification of any of Company's or any of its subsidiaries' capital stock; (iv) any granting by Company or any of its subsidiaries of any increase in compensation or fringe benefits, except for normal increases of cash compensation to non-officer employees in the ordinary and usual course of business consistent with past practice, or any payment by Company or any of its subsidiaries of any bonus, except for bonuses made to non-officer employees in the ordinary course of business consistent with past practice, or any granting by Company or any of its subsidiaries of any increase in severance or termination pay or any entry by Company or any of its subsidiaries into any currently effective employment, severance, termination or indemnification agreement or any agreement the benefits of which are contingent or the terms of which are materially altered upon the occurrence of a transaction involving Company of the nature contemplated hereby; (v) entry by Company or any of its subsidiaries into any licensing or other agreement with regard to the acquisition or disposition of any Intellectual Property (as defined in Section 2.19) other than licenses in the ordinary and usual course of business, consistent with past practice, or any amendment or consent with respect to any licensing agreement filed or required to be filed by Company with the SEC; (vi) any material change by Company in its accounting methods, principles or practices, except as required by concurrent changes in GAAP; or (vii) any material revaluation by Company of any of its assets, including, without limitation, writing down the value of capitalized inventory or writing off notes or accounts receivable or any sale of assets of the Company other than in the ordinary and usual course of business, consistent with past practice.

2.10  ABSENCE OF LITIGATION.  There are no claims, actions, suits or proceedings pending or, to the knowledge of Company, threatened (or, to the knowledge of Company, any governmental or regulatory

A-10

Exhibit H
0935

investigation pending or threatened) against Company or any of its subsidiaries or any properties or rights of Company or any of its subsidiaries, before any court, arbitrator or administrative, governmental or regulatory authority or body, domestic or foreign which, if decided adversely to Company, could reasonably be expected to have a Material Adverse Effect on Company.

2.11  EMPLOYEE BENEFIT PLANS.

   (a) All employee compensation, incentive, material fringe or benefit plans, programs, policies, commitments or other arrangements or remuneration of any kind (whether or not set forth in a written document and including, without limitation, all "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) for the benefit of any active, former employee, director or consultant of Company ("EMPLOYEE"), any domestic subsidiary of Company or any trade or business (whether or not incorporated) which is a member of a controlled group or which is under common control with Company within the meaning of Section 414 of the Code (a "PLAN AFFILIATE"), or with respect to which Company has or may in the future have liability, are listed in Section 2.11(a) of the Company Schedule (the "PLANS"); PROVIDED, HOWEVER, consulting agreements not material to the Company's business or operations are not listed on Schedule 2.11(a). Company has made available to Parent correct and complete copies of all (i) documents embodying each Plan including (without limitation) all amendments thereto, all related trust documents, and all material written agreements and contracts relating to each such Plan; (ii) the three (3) most recent annual reports (Form Series 5500 and all schedules and financial statements attached thereto), if any, required under ERISA or the Code in connection with each Plan; (iii) the most recent summary plan description together with the summary(ies) of material modifications thereto, if any, required under ERISA with respect to each Plan; (iv) all Internal Revenue Service ("IRS") or United States Department of Labor ("DOL") determination, opinion, notification and advisory letters; (v) all material correspondence to or from any governmental agency relating to any Plan; (vi) all COBRA (as defined below) forms and related notices (or such forms and notices as required under comparable law); (vii) all discrimination tests for each Plan for the most recent three (3) plan years; (viii) the most recent annual actuarial valuations, if any, prepared for each Plan; (ix) if the Plan is funded, the most recent annual and periodic accounting of Plan assets; (x) all material written agreements and contracts relating to each Plan, including, but not limited to, administrative service agreements, group annuity contracts and group insurance contracts; (xi) all material communications to employees or former employees regarding in each case, relating to any amendments, terminations, establishments, increases or decreases in benefits, acceleration of payments or vesting schedules or other events which would result in any material liability under any Plan or proposed Plan; (xii) all policies pertaining to fiduciary liability insurance covering the fiduciaries for each Plan; and (xiii) all registration statements, annual reports (Form 11-K and all attachments thereto) and prospectuses prepared in connection with any Plan.

   (b) Each Plan has been established, maintained and administered in all material respects in compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules and regulations (foreign or domestic), including but not limited to ERISA and the Code, which are applicable to such Plans. No suit, action or other litigation (excluding claims for benefits incurred in the ordinary course of Plan activities) is pending, or to the knowledge of Company, threatened, against or with respect to any such Plan. There are no audits, inquiries or proceedings pending or, to the knowledge of Company, threatened by the IRS or DOL with respect to any Plan. All contributions, reserves or premium payments required to be made or accrued as of the date hereof to the Plans have been timely made or accrued. Any Plan intended to be qualified under Section 401(a) of the Code and each trust intended to qualify under Section 501(a) of the Code (i) has either obtained a favorable determination notification, advisory and/or opinion letter, as applicable, as to its qualified status from the IRS or still has a remaining period of time under

A-11

Exhibit H
0936

applicable Treasury Regulations or IRS pronouncements in which to apply for such letter and to make any amendments necessary to obtain a favorable determination and (ii) incorporates or has been amended to incorporate all provisions required to comply with the Tax Reform Act of 1986 and subsequent legislation enacted on or before December 6, 1994. Company does not have any plan or commitment to establish any new Plan, to modify any Plan (except to the extent required by law or to conform any such Plan to the requirements of any applicable law, in each case as previously disclosed to Parent in writing, or as required by this Agreement), or to enter into any new Plan. Each Plan (including any stock option plan in respect of future stock grants) can be amended, terminated or otherwise discontinued after the Effective Time in accordance with its terms, without liability to Parent, Company or any of its Plan Affiliates (other than ordinary administration expenses).

(c) Neither Company nor any Plan Affiliate has at any time ever maintained, established, sponsored, participated in, or contributed to any plan subject to Title IV of ERISA or Section 412 of the Code or to any multiple employer plan, or to any plan described in Section 413 of the Code, at no time has Company or any Plan Affiliate contributed to or been obligated to contribute to any "multiemployer plan," as such term is defined in ERISA. Neither Company, nor any of its Plan Affiliates, nor any officer or director of Company or any of its Plan Affiliates is subject to any liability, penalty or tax under Sections 4975 through 4980B of the Code or Title I of ERISA. No "prohibited transaction," within the meaning of Section 4975 of the Code or Sections 406 and 407 of ERISA, and not otherwise exempt under Section 408 of ERISA (or any administrative class exemption thereunder) or Section 4975 of the Code, has occurred with respect to any Plan.

(d) Neither Company nor any Plan Affiliate has, prior to the Effective Time and in any material respect, violated any of the health continuation requirements of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), the requirements of the Family Medical Leave Act of 1993, as amended, the requirements of the Women's Health and Cancer Rights Act, as amended, the requirements of the Newborns' and Mothers' Health Protection Act of 1996, as amended, or any similar provisions of state law applicable to Employees of the Company or any of its Plan Affiliates. None of the Plans promises or provides retiree health benefits to any person except as required by applicable law, and neither Company nor any of its Plan Affiliates has represented, promised or contracted (whether in oral or written form) to provide such retiree benefits to any employee, former employee, director, consultant or other person, except to the extent required by statute.

(e) Neither Company nor any of its subsidiaries is bound by or subject to (and none of its respective assets or properties is bound by or subject to) any arrangement with any labor union. No employee of Company or any of its subsidiaries is represented by any labor union or covered by any collective bargaining agreement and, to the knowledge of Company, no campaign to establish such representation is in progress. There is no pending or, to the knowledge of Company, threatened labor dispute involving Company or any of its subsidiaries and any group of its employees nor has Company or any of its subsidiaries experienced any labor interruptions over the past three (3) years, and Company and its subsidiaries consider their relationships with their employees to be good. The Company and its subsidiaries are in compliance in all material respects with all applicable material foreign, federal, state and local laws, rules and regulations respecting employment, employment practices, terms and conditions of employment and wages and hours.

(f) Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment (including severance, unemployment compensation, golden parachute, bonus or otherwise) becoming due to any shareholder, director or employee of Company or any of its subsidiaries under any Plan or otherwise, (ii) materially increase any benefits otherwise payable under any Plan, or (iii) result in the acceleration of the time of payment or vesting of any such benefits. Without limiting the

A-12

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

foregoing, no payment or benefit which will or maybe made by the Company
with respect to any person as a result of the transactions contemplated by
this Agreement will be characterized as an "excess parachute payment,"
within the meaning of Section 280G(b)(1) of the Code.

(g) Each employee compensation, incentive, fringe or benefit plans,
program, policy, commitment or other remuneration of any kind (whether or
not set forth in a written document) that has been adopted or maintained by
Company or any Plan Affiliate, whether informally or formally, or with
respect to which Company or any Plan Affiliate will or may have any
liability, for the benefit of Employees who perform services outside the
United States (each an "INTERNATIONAL EMPLOYEE PLAN") has been established,
maintained and administered in compliance with its terms and conditions and
with the requirements prescribed by any and all statutory or regulatory laws
that are applicable to such International Employee Plan. Furthermore, no
International Employee Plan has unfunded liabilities, that as of the
Effective Time, will not be offset by insurance or fully accrued. Except as
required by law, no condition exists that would prevent Company or Parent
from terminating or amending any International Employee Plan at any time for
any reason without liability to Company or its Plan Affiliates (other than
ordinary administration expenses or routine claims for benefits).

2.12  LABOR MATTERS.  (i) There are no controversies pending or, to the
knowledge of each of Company and its respective subsidiaries, threatened,
between Company or any of its subsidiaries and any of their respective employees
that would reasonably be expected, individually or in the aggregate, to have a
Material Adverse Effect on Company; (ii) as of the date of this Agreement,
neither Company nor any of its subsidiaries is a party to any collective
bargaining agreement or other labor union contract applicable to persons
employed by Company or its subsidiaries nor does Company or its subsidiaries
know of any activities or proceedings of any labor union to organize any such
employees; and (iii) as of the date of this Agreement, neither Company nor any
of its subsidiaries has any knowledge of any strikes, slowdowns, work
stoppages or lockouts, or threats thereof, by or with respect to any employees
of Company or any of its subsidiaries.

2.13  REGISTRATION STATEMENT/JOINT PROXY STATEMENT/PROSPECTUS.  None of the
information supplied or to be supplied by Company for inclusion or incorporation
by reference in (i) the registration statement on Form S-4 to be filed with the
SEC by Parent in connection with the issuance of the Parent Common Stock in or
as a result of the Merger (the "S-4") will, at the time the S-4 becomes
effective under the Securities Act, contain any untrue statement of a material
fact or omit to state any material fact required to be stated therein or
necessary in order to make the statements therein, in light of the circumstances
under which they are made, not misleading; and (ii) the joint proxy
statement/prospectus to be filed with the SEC by Company pursuant to
Section 5.1 hereof (the "JOINT PROXY STATEMENT/ PROSPECTUS") will, at the dates
mailed to the shareholders of Company, at the times of the shareholders meeting
of Company (the "COMPANY SHAREHOLDERS' MEETING") in connection with the
transactions contemplated hereby, at the dates mailed to the stockholders of
Parent, at the times of the stockholders' meeting of Parent (the "PARENT
STOCKHOLDERS' MEETING") in connection with the Share Issuance and as of the
Effective Time, contain any untrue statement of a material fact or omit to state
any material fact required to be stated therein or necessary in order to make
the statements therein, in light of the circumstances under which they are made,
not misleading. The Joint Proxy Statement/ Prospectus will comply as to form in
all material respects with the provisions of the Exchange Act and the rules and
regulations promulgated by the SEC thereunder. Notwithstanding the foregoing,
the Company makes no representation or warranty with respect to any information
supplied by Parent or Merger Sub which is contained in any of the foregoing
documents.

2.14  RESTRICTIONS ON BUSINESS ACTIVITIES.  There is no agreement,
commitment, judgment, injunction, order or decree binding upon Company or its
subsidiaries or to which the Company or any of its subsidiaries is a party which
has or could reasonably be expected to have the effect of prohibiting or
materially impairing any business practice of Company or any of its
subsidiaries, any acquisition of

A-13

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0938

property by Company or any of its subsidiaries or the conduct of business by Company or any of its subsidiaries as currently conducted.

2.15 TITLE TO PROPERTY. Neither Company nor any of its subsidiaries owns any material real property. Company and each of its subsidiaries have good and valid title to all of their material properties and assets, free and clear of all liens, charges and encumbrances except liens for taxes not yet due and payable and such liens or other imperfections of title, if any, as do not materially detract from the value of or interfere with the present use of the property affected thereby; and all leases pursuant to which Company or any of its subsidiaries lease from others material real or personal property are in good standing, valid and effective in accordance with their respective terms, and there is not, under any of such leases, any existing material default or event of default (or any event which with notice or lapse of time, or both, would constitute a material default and in respect of which Company or subsidiary has not taken adequate steps to prevent such default from occurring). All the plants, structures and equipment of Company and its subsidiaries, except such as may be under construction, are in good operating condition and repair, in all material respects.

2.16 TAXES.

(a) For the purposes of this Agreement, "TAX" or "TAXES" refers to any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and liabilities relating to taxes, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts and any obligations under any agreements or arrangements with any other person with respect to such amounts and including any liability for taxes of a predecessor entity.

(b) (i) The Company and each of its subsidiaries have timely filed all federal, state, local and foreign returns, estimates, information statements and reports ("RETURNS") relating to Taxes required to be filed by the Company and each of its subsidiaries with any Tax authority, except Returns which are not material to the Company. Such returns are true and correct in all material respects and have been completed in accordance with applicable law, and the Company and each of its subsidiaries have paid all Taxes shown to be due on such Returns.

(ii) The Company and each of its subsidiaries as of the Effective Time will have withheld with respect to its employees all federal and state income taxes, Taxes pursuant to the Federal Insurance Contribution Act, Taxes pursuant to the Federal Unemployment Tax Act and other Taxes required to be withheld, except Taxes which are not material to the Company.

(iii) Neither the Company nor any of its subsidiaries has been delinquent in the payment of any material Tax nor is there any material Tax deficiency outstanding, proposed or assessed against the Company or any of its subsidiaries, nor has the Company or any of its subsidiaries executed any unexpired waiver of any statute of limitations on or extending the period for the assessment or collection of any Tax.

(iv) No audit or other examination of any Return of the Company or any of its subsidiaries by any Tax authority is presently in progress, nor has the Company or any of its subsidiaries been notified of any request for such an audit or other examination.

(v) No adjustment relating to any Returns filed by the Company or any of its subsidiaries has been proposed in writing formally or informally by any Tax authority to the Company or any of its subsidiaries or any representative thereof.

(vi) Neither the Company nor any of its subsidiaries has any liability for any material unpaid Taxes which has not been accrued for or reserved on the Company balance sheet dated December 31, 1999 in accordance with GAAP, whether asserted or unasserted, contingent or

A-14

Exhibit H
0939

otherwise, which is material to the Company, other than any liability for unpaid Taxes that may have accrued since June 30, 1999 in connection with the operation of the business of the Company and its subsidiaries in the ordinary course.

(vii) There is no contract, agreement, plan or arrangement to which the Company or any of its subsidiaries is a party as of the date of this Agreement, including but not limited to the provisions of this Agreement, covering any employee or former employee of the Company or any of its subsidiaries that, individually or collectively, would reasonably be expected to give rise to the payment of any amount that would not be deductible pursuant to Sections 280G, 404 or 162(m) of the Code. There is no contract, agreement, plan or arrangement to which the Company or any of its subsidiaries is a party or by which it is bound to compensate any individual for excise taxes paid pursuant to Section 4999 of the Code.

(viii) Neither the Company nor any of its subsidiaries has filed any consent agreement under Section 341(f) of the Code or agreed to have Section 341(f)(2) of the Code apply to any disposition of a subsection (f) asset (as defined in Section 341(f)(4) of the Code) owned by the Company or any of its subsidiaries.

(ix) Neither the Company nor any of its subsidiaries is party to or has any obligation under any tax-sharing, tax indemnity or tax allocation agreement or arrangement.

(x) None of the Company's or its subsidiaries' assets are tax exempt use property within the meaning of Section 168(h) of the Code.

2.17  ENVIRONMENTAL MATTERS.  Company (i) has obtained all applicable permits, licenses and other authorizations that are required under Environmental Laws the absence of which would have a Material Adverse Effect on Company; and (ii) is in compliance with all material respects with all material terms and conditions of such required permits, licenses and authorizations, and also is in compliance in all material respects with all other material limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in such laws or contained in any regulation, code, plan, order, decree, judgment, notice or demand letter issued, entered, promulgated or approved thereunder. "ENVIRONMENTAL LAWS" means all Federal, state, local and foreign laws and regulations relating to pollution of the environment (including ambient air, surface water, ground water, land surface or subsurface strata) or the protection of human health and worker safety, including, without limitation, laws and regulations relating to emissions, discharges, releases or threatened releases of Hazardous Materials, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials. "HAZARDOUS MATERIALS" means chemicals, pollutants, contaminants, wastes, toxic substances, radioactive and biological materials, asbestos-containing materials, hazardous substances, petroleum and petroleum products or any fraction thereof, excluding, however, Hazardous Materials contained in products typically used for office and janitorial purposes properly and safely maintained in accordance with Environmental Laws.

2.18  BROKERS.  Except for fees payable to Goldman Sachs & Co. pursuant to an engagement letter dated March 21, 2000, a copy of which has been provided to Parent, Company has not incurred, nor will it incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any transaction contemplated hereby

2.19  INTELLECTUAL PROPERTY.  For the purposes of this Agreement, the following terms have the following definitions:

"INTELLECTUAL PROPERTY" shall mean any or all of the following and all rights in, or arising out of: (i) all United States and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof ("PATENTS"); (ii) all inventions (whether patentable or not), invention disclosures, improvements, trade secrets, proprietary information, know how, technology, technical data and customer lists, and all documentation relating to any of the foregoing; (iii) all copyrights, copyright registrations and

A-15

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

applications therefor and all other rights corresponding thereto throughout the world; (iv) all semiconductor and semiconductor circuit designs; (v) all rights to all mask works and reticles, mask work registrations and applications therefor; (vi) all industrial designs and any registrations and applications therefor throughout the world; (vii) all trade names, logos, common law trademarks and service marks; trademark and service mark registrations and applications therefor and all goodwill associated therewith throughout the world; (viii) all databases and data collections and all rights therein throughout the world; (ix) all computer software including all source code, object code, firmware, development tools, files, records and data, all media on which any of the foregoing is recorded, all Web addresses, sites and domain names; (x) any similar, corresponding or equivalent rights to any of the foregoing; and (xi) all documentation related to any of the foregoing

"COMPANY INTELLECTUAL PROPERTY" shall mean any Intellectual Property that is owned by or exclusively licensed to the Company or any of its subsidiaries. Without in any way limiting the generality of the foregoing, Company Intellectual Property includes all Intellectual Property owned or licensed by the Company related to the Company's products, including without limitation all rights in any design code, documentation, and tooling for packaging of semiconductors in connection with all current products and products in design and development.

"REGISTERED INTELLECTUAL PROPERTY" shall mean all United States, international and foreign: (i) patents, patent applications (including provisional applications); (ii) registered trademarks, applications to register trademarks, intent-to-use applications, or other registrations or applications related to trademarks; (iii) registered copyrights and applications for copyright registration; (iv) any mask work registrations and applications to register mask works; and (v) any other Company Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued by, filed with, or recorded by, any state, government or other public legal authority

"COMPANY REGISTERED INTELLECTUAL PROPERTY" means all of the Registered Intellectual Property owned by, or filed in the name of, the Company or any of its subsidiaries.

(a) Section 2.19(a) of the Company Schedule is a complete and accurate list of all Company Registered Intellectual Property and specifies, where applicable, the jurisdictions in which each such item of Company Registered Intellectual Property has been issued or registered and lists any proceedings or actions before any court, tribunal (including the United States Patent and Trademark Office (the "PTO") or equivalent authority anywhere in the world) related to any of the Company Registered Intellectual Property.

(b) Company has made available to Parent a complete and accurate price list of all products and services currently offered by Company or any of its subsidiaries ("COMPANY PRODUCTS").

(c) No Company Intellectual Property or Company Product is subject to any proceeding or outstanding decree, order, judgment, contract, license, agreement, or stipulation restricting in any manner the use, transfer, or licensing thereof by Company or any of its subsidiaries, or which may affect the validity, use or enforceability of such Company Intellectual Property or Company Product, except for provisions contained in the documents granting licenses as ownership to any portion of the Company Intellectual Property or Company Product and in amendments thereto and provisions of licenses granted to customers of Company.

(d) Each material item of Company Registered Intellectual Property is valid and subsisting, all necessary registration, maintenance and renewal fees currently due in connection with such Company Registered Intellectual Property have been made and all necessary documents, recordations and certificates in connection with such Company Registered Intellectual Property have been filed with the relevant patent, copyright, trademark or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of maintaining such Company Registered Intellectual Property.

A-16

Exhibit H
0941

(e) Company owns and has good and exclusive title to, each material item of Company Intellectual Property free and clear of any lien or encumbrance (excluding non-exclusive licenses and related restrictions granted in the ordinary course). Without limiting the foregoing: (i) Company is the exclusive owner of all trademarks and trade names used in connection with the operation or conduct of the business of Company and its subsidiaries, including the sale, distribution or provision of any Company Products by Company or its subsidiaries; (ii) Company owns exclusively, and has good title to, all copyrighted works that are Company Products or which Company or any of its subsidiaries otherwise purports to own; and (iii) to the extent that any Patents would be infringed by any Company Products, Company is the exclusive owner of such Patents.

(f) To the extent that any technology, software or material Intellectual Property has been developed or created independently or jointly by a third party for Company or any of its subsidiaries or is incorporated into any of the Company Products, Company has a written agreement with such third party with respect thereto and Company thereby either (i) has obtained ownership of, and is the exclusive owner of, or (ii) has obtained a perpetual, non-terminable license (sufficient for the conduct of its business as currently conducted and as proposed to be conducted) to all such third party's Intellectual Property in such work, material or invention by operation of law or by valid assignment, to the fullest extent it is legally possible to do so.

(g) Neither Company nor any of its subsidiaries has transferred ownership of, or granted any exclusive license with respect to, any Intellectual Property that is or was material Company Intellectual Property, to any third party, or permitted Company's rights in such material Company Intellectual Property to lapse or enter the public domain.

(h) Section 2.19(h) of the Company Schedule lists all material contracts, licenses and agreements to which Company or any of its subsidiaries is a party: (i) with respect to Company Intellectual Property licensed or transferred to any third party (other than end-user licenses in the ordinary course); or (ii) pursuant to which a third party has licensed or transferred any material Intellectual Property to Company.

(i) All material contracts, licenses and agreements relating to either (i) Company Intellectual Property or (ii) Intellectual Property of a third party licensed to Company or any of its subsidiaries, are in full force and effect. The consummation of the transactions contemplated by this Agreement will neither violate nor result in the breach, modification, cancellation, termination or suspension of such contracts, licenses and agreements. Each of Company and its subsidiaries is in material compliance with, and has not materially breached any term of any such contracts, licenses and agreements and, to the knowledge of Company, all other parties to such contracts, licenses and agreements are in compliance with, and have not materially breached any term of, such contracts, licenses and agreements. Following the Closing Date, the Surviving Corporation will be permitted to exercise all of Company's rights under such contracts, licenses and agreements to the same extent Company and its subsidiaries would have been able to had the transactions contemplated by this Agreement not occurred and without the payment of any additional amounts or consideration other than ongoing fees, royalties or payments which Company would otherwise be required to pay. Neither this Agreement nor the transactions contemplated by this Agreement, including the assignment to Parent or Merger Sub by operation of law or otherwise of any contracts or agreements to which the Company is a party, will result in (i) either Parent's or the Merger Sub's granting to any third party any right to or with respect to any material Intellectual Property right owned by, or licensed to, either of them, (ii) either the Parent's or the Merger Sub's being bound by, or subject to, any non-compete or other material restriction on the operation or scope of their respective businesses, or (iii) either the Parent's or the Merger Sub's being obligated to pay any royalties or other material amounts to any third party in excess of those payable by Parent or Merger Sub, respectively, prior to the Closing.

A-17

(j) The operation of the business of the Company and its subsidiaries as such business currently is conducted, including (i) Company's and its subsidiaries' design, development, manufacture, distribution, reproduction, marketing or sale of the products or services of Company and its subsidiaries (including Company Products) and (ii) the Company's use of any product, device or process, has not, does not and will not infringe or misappropriate the Intellectual Property of any third party or constitute unfair competition or trade practices under the laws of any jurisdiction.

(k) Neither Company nor any of its subsidiaries has received notice from any third party that the operation of the business of Company or any of its subsidiaries or any act, product or service of Company or any of its subsidiaries, infringes or misappropriates the Intellectual Property of any third party or constitutes unfair competition or trade practices under the laws of any jurisdiction.

(l) To the knowledge of Company, no person has or is infringing or misappropriating any Company Intellectual Property.

(m) Company and each of its subsidiaries has taken reasonable steps to protect Company's and its subsidiaries' rights in Company's confidential information and trade secrets that it wishes to protect or any trade secrets or confidential information of third parties provided to Company or any of its subsidiaries, and, without limiting the foregoing, each of Company and its subsidiaries has and enforces a policy requiring each employee and contractor to execute a proprietary information/confidentiality agreement substantially in the form provided to Parent and all current and former employees and contractors of Company and any of its subsidiaries have executed such an agreement, except where the failure to do so is not reasonably expected to be material to Company.

2.20  AGREEMENTS, CONTRACTS AND COMMITMENTS.  Neither Company nor any of its subsidiaries is a party to or is bound by:

(a) any employment or consulting agreement, contract or commitment with any officer or member of Company's Board of Directors, other than those that are terminable by Company or any of its subsidiaries on no more than thirty (30) days' notice without liability or financial obligation to the Company (other than termination provisions provided by law);

(b) any agreement or plan for the benefit of any director, employee or consultant, including, without limitation, any stock option plan, stock appreciation right plan or stock purchase plan, any of the benefits of which will be increased, or the vesting of benefits of which will be accelerated, by the occurrence of any of the transactions contemplated by this Agreement or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement;

(c) any agreement of indemnification or any guaranty other than any agreement of indemnification entered into in connection with the sale or license of software products in the ordinary course of business or guaranty of a subsidiary's obligation by Company;

(d) any agreement, contract or commitment containing any covenant limiting in any respect the right of Company or any of its subsidiaries to engage in any line of business or to compete with any person or granting any exclusive distribution rights;

(e) any agreement, contract or commitment currently in force relating to the disposition or acquisition by Company or any of its subsidiaries after the date of this Agreement of a material amount of assets not in the ordinary course of business or pursuant to which Company or any of its subsidiaries has any material ownership interest in any corporation, partnership, joint venture or other business enterprise other than Company's subsidiaries;

A-18

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0943

(f) any dealer, distributor, joint marketing or development agreement (other than reseller agreements not material to Company's business) currently in force under which Company or any of its subsidiaries have continuing material obligations to jointly market any product, technology or service and which may not be canceled without penalty upon notice of ninety (90) days or less;

(g) any agreement, contract or commitment currently in force to provide source code to any third party for any product or technology that is material to Company and its subsidiaries taken as a whole (other than (i) licenses granted in the ordinary course of business to the Company's customers to use (but not to copy, sublicense, market, or otherwise distribute) source code that do not in any way impair Company's ownership interests in such source code and (ii) agreements requiring the Company to place source code in escrow for the benefit of a customer in the event of the Company's default, bankruptcy, insolvency, or similar event);

(h) any agreement, contract or commitment currently in force to license any third party to manufacture or reproduce any Company product, service or technology, or any agreement, contract or commitment currently in force to sell or distribute any Company products, service or technology except agreements with distributors or sales representative in the normal course of business cancelable without penalty upon notice of ninety (90) days or less and substantially in the form previously provided to Parent;

(i) any mortgages, indentures, guarantees, loans or credit agreements, security agreements or other agreements or instruments relating to the borrowing of money or extension of credit in excess of $250,000 individually or $500,000 in the aggregate, other than between Company and its subsidiaries and except as disclosed in the Company's balance sheet as of December 31, 1999 or in the related footnotes;

(j) any settlement agreement entered into within three (3) years prior to the date of this Agreement that involves a continuing material obligation of Company; or

(k) any other agreement that has an aggregate value of (or represents future aggregate obligations in excess of) $2,000,000 or more individually.

Neither Company nor any of its subsidiaries, nor to Company's knowledge any other party to a Company Contract (as defined below), is in breach, violation or default under, and neither Company nor any of its subsidiaries has received written notice that it has breached, violated or defaulted under, any of the terms or conditions of any of the agreements, contracts or commitments to which Company or any of its subsidiaries is a party or by which it is bound that are required to be disclosed in the Company Schedule (any such agreement, contract or commitment, a "COMPANY CONTRACT") in such a manner as would permit any other party to cancel or terminate any such Company Contract, or would permit any other party to seek damages or other remedies (for any or all of such breaches, violations or defaults, in the aggregate), the effect of which would not, individually or in the aggregate have a Material Adverse Effect on Company.

2.21  INSURANCE.  Company maintains insurance policies and fidelity bonds covering the assets, business, equipment, properties, operations, employees, officers and directors of Company and its subsidiaries (collectively, the "INSURANCE POLICIES") which are of the type and in amounts customarily carried by persons conducting businesses similar to those of Company and its subsidiaries. There is no material claim by Company or any of its subsidiaries pending under any of the material Insurance Policies as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds.

2.22  OPINION OF FINANCIAL ADVISOR.  Company has been advised by its financial advisor, Goldman Sachs & Co., that in its opinion, as of the date of this Agreement, the Exchange Ratio is fair to the shareholders of Company from a financial point of view. Company shall provide Parent a copy of the

A-19

Exhibit H
0944

written confirmation of such opinion, dated as of the date of this Agreement, promptly after receipt thereof.

2.23  BOARD APPROVAL.  The Board of Directors of Company has, as of the date of this Agreement, unanimously (i) approved and declared advisable this Agreement and has approved the Merger and the other transactions contemplated hereby, (ii) determined that the Merger is consistent with and in furtherance of the long-term business strategy of Company and fair to, and in the best interests of, Company and its shareholders and (iii) determined to recommended that the shareholders of Company adopt and approve this Agreement and approve the Merger.

2.24  VOTE REQUIRED.  The affirmative vote of a majority of the votes that holders of the outstanding shares of Company Common Stock are entitled to vote with respect to the Merger is the only vote of the holders of any class or series of Company's capital stock necessary to approve this Agreement and the transactions contemplated hereby.

2.25  STATE TAKEOVER STATUTES.  The Board of Directors of the Company has approved the Merger, the Merger Agreement, the Stock Option Agreement, the Company Voting Agreements and the transactions contemplated hereby and thereby, and such approval is sufficient to render inapplicable to the Merger, the Merger Agreement, the Stock Option Agreement, the Company Voting Agreements and the transactions contemplated hereby and thereby the provisions of Code Section 14-2-1110 et seq. and 14-2-1131 et seq. of the Georgia Law to the extent, if any, such section is applicable to the Merger, the Merger Agreement, the Stock Option Agreement, the Company Voting Agreements and the transactions contemplated hereby and thereby. To Company's knowledge, no other state takeover statute or similar statute or regulation applies to or purports to apply to the Merger, the Merger Agreement, the Stock Option Agreement, the Company Voting Agreements or the transactions contemplated hereby and thereby.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Parent and Merger Sub jointly and severally represent and warrant to Company, subject to such exceptions as are specifically disclosed in writing in the disclosure schedules dated as of the date hereof delivered by Parent to Company (the "PARENT SCHEDULE"), as follows. The Parent Schedule shall be arranged in sections corresponding to the numbered sections contained in this Article and the disclosure in any paragraph shall qualify other sections in this Article only to the extent it is reasonably apparent from a reading of such disclosure that it also qualifies such other sections.

3.1  ORGANIZATION AND QUALIFICATION; SUBSIDIARIES.  Each of Parent and its subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as it is now being conducted, except where the failure to do so would not, individually or in the aggregate, have a Material Adverse Effect on Parent. Each of Parent and its subsidiaries is in possession of all Approvals necessary to own, lease and operate the properties it purports to own, operate or lease and to carry on its business as it is now being conducted, except where the failure to have such Approvals would not, individually or in the aggregate, have a Material Adverse Effect on Parent. Each of Parent and its subsidiaries is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except for such failures to be so duly qualified or licensed and in good standing that would not, either individually or in the aggregate, have a Material Adverse Effect on Parent.

A-20

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0945

3.2   CERTIFICATE OF INCORPORATION AND BYLAWS.  Parent has previously furnished to Company complete and correct copies of its Certificate of Incorporation and Bylaws as amended to date (together, the "PARENT CHARTER DOCUMENTS"). Such Parent Charter Documents and equivalent organizational documents of each of its subsidiaries are in full force and effect. Parent is not in violation of any of the provisions of the Parent Charter Documents, and no subsidiary of Parent is in violation of any of its equivalent organizational documents.

3.3   CAPITALIZATION.  The authorized capital stock of Parent consists of (i) 200,000,000 shares of Parent Common Stock, and (ii) 5,000,000 shares of Preferred Stock, $0.001 par value per share ("PARENT PREFERRED STOCK"). At the close of business on March 31, 2000, (i) 109,228,419 shares of Parent Common Stock were issued and outstanding, (ii) 157,472 shares of Parent Common Stock were held in treasury by Parent or by subsidiaries of Parent, (iii) 609,764 shares of Parent Common Stock were reserved for future issuance pursuant to Parent's employee stock purchase plan, and (iv) 19,853,100 shares of Parent Common Stock were were reserved for issuance upon the exercise of outstanding options to purchase Parent Common Stock. As of the date hereof, no shares of Parent Preferred Stock were issued or outstanding. The authorized capital stock of Merger Sub consists of 1,000 shares of common stock, par value $0.001 per share, all of which, as of the date hereof, are issued and outstanding.

3.4   PARENT COMMON STOCK.  The Parent Common Stock to be issued pursuant to the Merger has been duly authorized and will, when issued in accordance with this Agreement be validly issued, fully paid, and unassessable and will not be subject to any restrictions on resale under the Securities Act, other than restrictions imposed by Rule 145 under the Securities Act.

3.5   AUTHORITY RELATIVE TO THIS AGREEMENT.  Each of Parent and Merger Sub has all necessary corporate power and authority to execute and deliver this Agreement and the Stock Option Agreement and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Stock Option Agreement by Parent and Merger Sub and the consummation by Parent and Merger Sub of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of Parent and Merger Sub, and no other corporate proceedings on the part of Parent or Merger Sub are necessary to authorize this Agreement and the Stock Option Agreement, or to consummate the transactions so contemplated, subject only to the approval of the Share Issuance by Parent's stockholders and the filing of the Certificate of Merger pursuant to Georgia Law and the Delaware Certificate of Merger pursuant to Delaware Law. This Agreement and the Stock Option Agreement have been duly and validly executed and delivered by Parent and Merger Sub and, assuming the due authorization, execution and delivery by Company, constitute legal and binding obligations of Parent and Merger Sub, enforceable against Parent and Merger Sub in accordance with their respective terms.

3.6   SEC FILINGS; FINANCIAL STATEMENTS.

(a)  Parent has made available to Company a correct and complete copy of each report, schedule, registration statement and definitive proxy statement filed by Parent with the SEC on or after April 1, 1999 (the "PARENT SEC REPORTS"), which are all the forms, reports and documents required to be filed by Parent with the SEC since April 1, 1999. The Parent SEC Reports (A) were prepared in accordance with the requirements of the Securities Act or the Exchange Act, as the case may be, and (B) did not at the time they were filed (or if amended or superseded by a filing prior to the date of this Agreement, then on the date of such filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of Parent's subsidiaries is required to file any reports or other documents with the SEC.

A-21

Exhibit H
0946

(b) Each of the consolidated financial statements (including, in each case, any related notes thereto) contained in the Parent SEC Reports was prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto or, in the case of unaudited statements, do not contain footnotes as permitted by Form 10-Q of the Exchange Act) and each fairly presents the consolidated financial position of Parent and its subsidiaries at the respective dates thereof and the consolidated results of its operations and cash flows for the periods indicated, except that the unaudited interim financial statements were or are subject to normal adjustments which were not or are not expected to be material in amount.

(c) Parent has previously furnished to Company a complete and correct copy of any amendments or modifications, which have not yet been filed with the SEC but which are required to be filed, to agreements, documents or other instruments which previously had been filed by Parent with the SEC pursuant to the Securities Act or the Exchange Act.

3.7  NO UNDISCLOSED LIABILITIES.  Neither Parent nor any of its subsidiaries has any liabilities (absolute, accrued, contingent, or otherwise), which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect on Parent and its subsidiaries, taken as a whole, except (i) liabilities provided for in Company's balance sheet as of December 31, 1999; (ii) liabilities provided for in the balance sheet as of October 31, 1999 of Telco Research Corporation Limited ("TELCO"), a copy of which has been made available to Company; (iii) liabilities of Barnhill Management Group, a Nevada corporation acquired by Parent in March 2000 ("BARNHILL"), which liabilities are not material to Parent and its subsidiaries, taken as a whole; and (iv) liabilities incurred since December 31, 1999 by Parent and its subsidiaries (including Telco and Barnhill) and liabilities incurred by Telco between October 31, 1999 and December 31, 2000. None of the liabilities described in the foregoing sections (i), (ii), (iii), or (iv) could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect on Parent.

3.8  COMPLIANCE; PERMITS.

(a) Neither Parent nor any of its subsidiaries is in conflict with, or in default or violation of, (i) any law, rule, regulation, order, judgment or decree applicable to Parent or any of its subsidiaries or by which its or any of their respective properties is bound or affected or (ii) any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which Parent or any of its subsidiaries is a party or by which Parent or any of its subsidiaries or its or any of their respective properties is bound or affected, except for any conflicts, defaults or violations that (individually or in the aggregate) would not cause the Parent to lose any material benefit or incur any material liability. No investigation or review by any governmental or regulatory body or authority is pending or, to the knowledge of Parent, threatened against Parent or its subsidiaries, nor has any governmental or regulatory body or authority indicated an intention to conduct the same, other than, in each such case, those the outcome of which could not, individually or in the aggregate, reasonably be expected to have the effect of prohibiting or materially impairing any business practice of Parent or any of its subsidiaries, any acquisition of material property by Parent or any of its subsidiaries or the conduct of business by Parent or any of its subsidiaries.

(b) Parent and its subsidiaries hold all permits, licenses, variances, exemptions, orders and approvals from governmental authorities, the absence of which could not reasonably be expected to have a Material Adverse Effect on Parent (collectively, the "PARENT PERMITS"). Parent and its subsidiaries are in compliance in all material respects with the terms of the Parent Permits.

3.9  ABSENCE OF CERTAIN CHANGES OR EVENTS.  Since December 31, 1999, there has not been: (i) any Material Adverse Effect on Parent, (ii) any declaration, setting aside or payment of any dividend on, or other distribution (whether in cash, stock or property) in respect of, any of Parent's or any of its subsidiaries' capital stock (other than a two-for-one stock split in the form of a dividend effected in

A-22

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0947

February 2000), or any purchase, redemption or other acquisition by Parent of any of Parent's capital stock or any other securities of Parent or its subsidiaries or any options, warrants, calls or rights to acquire any such shares or other securities except for repurchases from employees following their termination pursuant to the terms of their pre-existing stock option or purchase agreements, (iii) any split, combination or reclassification of any of Parent's or any of its subsidiaries' capital stock, (iv) any material change by Parent in its accounting methods, principles or practices, except as required by concurrent changes in GAAP, or (v) any material revaluation by Parent of any of its assets, including, without limitation, writing down the value of capitalized inventory or writing off notes or accounts receivable or any sale of assets of the Parent other than in the ordinary course of business.

3.10  ABSENCE OF LITIGATION.  There are no claims, actions, suits or proceedings pending or, to the knowledge of Parent, threatened (or, to the knowledge of Parent, any governmental or regulatory investigation pending or threatened) against Parent or any of it subsidiaries or any properties or rights of Parent or any of its subsidiaries, before any court, arbitrator or administrative, governmental or regulatory authority or body, domestic or foreign, which, if decided adversely to Parent, could reasonably be expected to have a Material Adverse Effect on Parent.

3.11  REGISTRATION STATEMENT; JOINT PROXY STATEMENT/PROSPECTUS.  None of the information supplied or to be supplied by Parent for inclusion or incorporation by reference in (i) the S-4 will, at the time the S-4 becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading; and (ii) the Joint Proxy Statement/Prospectus will, at the dates mailed to the shareholders of Company and of Parent, at the time of the Company Shareholders' Meeting, the time of the Parent Shareholders' Meeting and as of the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. The S-4 will comply as to form in all material respects with the provisions of the Securities Act and the rules and regulations promulgated by the SEC thereunder. Notwithstanding the foregoing, Parent makes no representation or warranty with respect to any information supplied by the Company which is contained in any of the foregoing documents.

3.12  BROKERS.  Except for fees payable to Deutsche Bank Securities, Inc., Parent has not incurred, nor will it incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any transaction contemplated hereby.

3.13  OPINION OF FINANCIAL ADVISOR.  Parent's Board of Directors has received an opinion from Deutsche Bank Securities, Inc., dated as of the date hereof, to the effect that as of the date hereof, the Exchange Ratio is fair to Parent from a financial point of view.

3.14  BOARD APPROVAL.  The Board of Directors of Parent has, as of the date of this Agreement, unanimously (i) has determined that the Merger is consistent with and in furtherance of the long-term business strategy of Parent and is fair to, and in the best interests of, Parent and its stockholders; (ii) has approved this Agreement, the Merger and the other transactions contemplated by this Agreement; and (iii) has determined to recommend that the stockholders of Parent approve the Share Issuance.

3.15  VOTE REQUIRED.  The affirmative vote of a majority of the shares of Parent Common Stock that cast votes regarding the Share Issuance in person or by proxy at the Parent Stockholders' Meeting is the only vote of the holders of any class or series of Parent's capital stock necessary to approve this Agreement and the transactions contemplated hereby.

A-23

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0948

ARTICLE IV

CONDUCT PRIOR TO THE EFFECTIVE TIME

4.1  CONDUCT OF BUSINESS BY COMPANY.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement pursuant to its terms or the Effective Time, Company and each of its subsidiaries shall, except to the extent that Parent shall otherwise consent in writing, carry on its business, in the usual, regular and ordinary course and in compliance with all applicable laws and regulations, pay its debts and taxes when due and pay or perform other material obligations when due, subject to good faith disputes over such debts, taxes, and obligations, and use its commercially reasonable efforts, consistent with past practices (except as set forth in Schedule 4.1), and policies to (i) preserve intact its present business organization, (ii) keep available the services of its present officers and employees and (iii) preserve its relationships with customers, suppliers, distributors, licensors, licensees, and others with which it has business dealings, except in each case as set forth in Section 4.1 of the Company Schedule.

In addition, except as expressly permitted by the terms of this Agreement and, except in each case as set forth in Section 4.1 of the Company Schedule, without the prior written consent of Parent, during the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement pursuant to its terms or the Effective Time, Company shall not do any of the following and shall not permit its subsidiaries to do any of the following:

(a) Waive any stock repurchase rights, accelerate, amend or change the period of exercisability of options or restricted stock, or reprice options granted under any employee, consultant, director or other stock plans or authorize cash payments in exchange for any options granted under any of such plans except pursuant to plans and agreements existing as of the date hereof the relevant terms of which are described in the Company Schedule;

(b) Grant any severance or termination pay to any officer or employee except pursuant to written agreements outstanding, or policies existing, on the date hereof and as previously disclosed in writing or made available to Parent, or adopt any new severance plan;

(c) Transfer or license to any person or entity or otherwise extend, amend or modify any rights to the Company Intellectual Property, or enter into grants to transfer or license to any person future patent rights, other than in the ordinary course of business consistent with past practices, provided that in no event shall Company license to any person or entity on an exclusive basis or sell any Company Intellectual Property;

(d) Declare, set aside or pay any dividends on or make any other distributions (whether in cash, stock, equity securities or property) in respect of any capital stock or split, combine or reclassify any capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for any capital stock;

(e) Purchase, redeem or otherwise acquire, directly or indirectly, any shares of capital stock of Company or its subsidiaries, except repurchases of unvested shares at cost in connection with the termination of the employment relationship with any employee pursuant to stock option or purchase agreements in effect on the date hereof;

(f) Issue, deliver, sell, authorize, pledge or otherwise encumber or propose any of the foregoing with respect to, any shares of capital stock or any securities convertible into shares of capital stock, or subscriptions, rights, warrants or options to acquire any shares of capital stock or any securities convertible into shares of capital stock, or enter into other agreements or commitments of any character obligating it to issue any such shares or convertible securities, other than (x) the issuance delivery and/or sale of (i) shares of Company Common Stock pursuant to the exercise of stock options outstanding as of the date of this Agreement or granted pursuant to

A-24

Exhibit H
0949

clause (y) hereof, and (ii) shares of Company Common Stock issuable to participants in the ESPP consistent with the terms thereof and (y) the granting of non-discretionary stock options to non-employee directors under the Director Plan in an amount not to exceed options to purchase 135,000 shares in the aggregate;

(g) Cause, permit or propose any amendments to the Company Charter Documents (or similar governing instruments of any of its subsidiaries);

(h) Acquire or agree to acquire by merging or consolidating with, or by purchasing any equity interest in or a portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets or enter into any joint ventures, strategic partnerships or alliances;

(i) Sell, lease, license, encumber or otherwise dispose of any properties or assets except sales of inventory or non-exclusive licenses of Company intellectual property in the ordinary course of business consistent with past practice and, except for the sale, lease or disposition (other than through licensing) of property or assets which are not material, individually or in the aggregate, to the business of Company and its subsidiaries;

(j) Incur any indebtedness for borrowed money or guarantee any such indebtedness of another person, issue or sell any debt securities or options, warrants, calls or other rights to acquire any debt securities of Company, enter into any "keep well" or other agreement to maintain any financial statement condition or enter into any arrangement having the economic effect of any of the foregoing other than in connection with the financing of ordinary course trade payables consistent with past practice;

(k) Adopt or amend any employee benefit plan, policy or arrangement, any employee stock purchase or employee stock option plan, or enter into any employment contract or collective bargaining agreement (other than offer letters and letter agreements entered into in the ordinary course of business consistent with past practice with employees who are terminable "at will"), pay any special bonus or special remuneration to any director or employee, or increase the salaries or wage rates or fringe benefits (including rights to severance or indemnification) of its directors, officers, employees or consultants;

(l) (i) Pay, discharge, settle or satisfy any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), or litigation (whether or not commenced prior to the date of this Agreement) other than the payment, discharge, settlement or satisfaction, in the ordinary course of business consistent with past practice or in accordance with their terms, or liabilities recognized or disclosed in the most recent consolidated financial statements (or the notes thereto) of Company included in the Company SEC Reports or incurred since the date of such financial statements, or (ii) waive the benefits of, agree to modify in any manner, terminate, release any person from or fail to enforce any confidentiality or similar agreement to which Company or any of its subsidiaries is a party or of which Company or any of its subsidiaries is a beneficiary;

(m) Make any individual or series of related payments outside of the ordinary course of business (other than payments to financial, legal, accounting or other professional service advisors not in excess of the estimates thereof set forth in Section 4.1 of the Company Schedule);

(n) Except in the ordinary course of business consistent with past practice, modify, amend or terminate any material contract or agreement to which Company or any subsidiary thereof is a party or waive, delay, the exercise of, release or assign any material rights or claims thereunder;

A-25

Exhibit H
0950

(o) Enter into or materially modify any contracts, agreements, or obligations relating to the distribution, sale, license or marketing by third parties of Company's products or products licensed by Company on an exclusive basis;

(p) Revalue any of its assets or, except as required by GAAP, make any change in accounting methods, principles or practices;

(q) Incur or enter into any agreement, contract or commitment outside of the ordinary course of business calling for payments by Company in excess of $350,000 individually;

(r) Engage in any action that could cause the Merger to fail to qualify as a "reorganization" under Section 368(a) of the Code, whether or not otherwise permitted by the provisions of this Article IV;

(s) Engage in any action with the intent to directly or indirectly adversely impact any of the transactions contemplated by this Agreement;

(t) Make any tax election that, individually or in the aggregate, is reasonably likely to adversely affect in any material respect the tax liability or tax attributes of Company or any of its subsidiaries or settle or compromise any material income tax liability; or

(u) Agree in writing or otherwise to take any of the actions described in Section 4.1 (a) through (t) above.

4.2  CONDUCT OF BUSINESS BY PARENT.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement pursuant to its terms or the Effective Time, Parent shall not do any of the following and shall not permit its subsidiaries to do any of the following:

(a) Declare, set aside, or pay any dividends or make any other distributions (whether in cash, stock, equity securities or property) in respect to Parent's capital stock, except where (i) an adjustment is made to the Exchange Ratio in accordance with Section 1.6(e) or (ii) the holders of Company Common Stock will otherwise receive an equivalent, proportional dividend or distribution (based on the Exchange Ratio, as adjusted pursuant to Section 1.6(e)) in connection with the Merger as if they had been holders of Parent Common Stock on the record date for such dividend or distribution;

(b) Purchase, redeem, or otherwise acquire, directly or indirectly, any shares of capital stock of Parent or its subsidiaries in any amounts that would adversely affect Parent's financial condition or liquidity;

(c) Effect any amendment to the Company's Certificate of Incorporation that would have an adverse effect on the rights of holders of Parent's Common Stock (including the Parent Common Stock to be issued pursuant to this Agreement);

(d) Engage in any action that could cause the Merger to fail to qualify as a "reorganization" under Section 368(a) of the Code, whether or not otherwise permitted by the provisions of this Article IV;

(e) Engage in any action with the intent to directly or indirectly adversely impact any of the transactions contemplated by this Agreement;

(f) Following the filing of the S-4, acquire or agree to acquire any business or any corporation, partnership, association or other business organization or division if such acquisition or agreement would require the inclusion in the S-4 of proforma financial information regarding such acquisition; or

(g) Agree in writing or otherwise to take any of the actions described in Section 4.1(a) through (f) above.

A-26

Exhibit H
0951

ARTICLE V

ADDITIONAL AGREEMENTS

5.1  JOINT PROXY STATEMENT/PROSPECTUS; REGISTRATION STATEMENT.

(a) As promptly as practicable after the execution of this Agreement, Parent and Company shall jointly prepare and shall file with the SEC a document or documents that will constitute (i) the S-4 and (ii) the Joint Proxy Statement/Prospectus. Each of the parties hereto shall use commercially reasonable efforts to cause the S-4 to become effective as promptly as practicable after the date hereof, and, prior to the effective date of the S-4, the parties hereto shall take all action required under any applicable Laws in connection with the issuance of shares of Parent Common Stock pursuant to the Merger. Parent or Company, as the case may be, shall furnish all information concerning Parent or Company as the other party may reasonably request in connection with such actions and the preparation of the S-4 and the Joint Proxy Statement/ Prospectus. As promptly as practicable after the effective date of the S-4, the Joint Proxy Statement/Prospectus shall be mailed to the shareholders of Company and of Parent. Each of the parties hereto shall cause the Joint Proxy Statement/Prospectus to comply as to form and substances to such party in all material respects with the applicable requirements of (i) the Exchange Act, (ii) the Securities Act, (iii) the rules and regulations of the Nasdaq.

(b) The Joint Proxy Statement/Prospectus shall include the approval of this Agreement and the Merger and the recommendation of the Board of Directors of Company to Company's shareholders that they vote in favor of approval of this Agreement and the Merger, subject to the right of the Board of Directors of the Company to withdraw its recommendation and to recommend a Superior Proposal determined to be such in compliance with Section 5.4 of this Agreement; PROVIDED, HOWEVER, that the Board of Directors of Company shall submit this Agreement to Company's shareholders whether or not at any time subsequent to the date hereof such board determines that it can no longer make such recommendation. The Joint Proxy Statement/Prospectus shall also include the approval of the Share Issuance and the recommendation of the Board of Directors of Parent to Parent's stockholders that they vote in favor of approval of the Share Issuance.

(c) No amendment or supplement to the Joint Proxy Statement/Prospectus or the S-4 shall be made without the approval of Parent and Company, which approval shall not be unreasonably withheld or delayed. Each of the parties hereto shall advise the other parties hereto, promptly after it receives notice thereof, of the time when the S-4 has become effective or any supplement or amendment has been filed, of the issuance of any stop order, of the suspension of the qualification of the Parent Common Stock issuable in connection with the Merger for offering or sale in any jurisdiction, or of any request by the SEC for amendment of the Joint Proxy Statement/ Prospectus or the S-4 or comments thereon and responses thereto or requests by the SEC for additional information.

5.2  SHAREHOLDER AND STOCKHOLDER MEETINGS.  Company shall call and hold the Company Shareholders' Meeting and Parent shall call and hold the Parent Stockholders' Meeting as promptly as practicable after the date hereof for the purpose of voting upon the adoption and approval of this Agreement and the approval of the Merger (in the case of the Company Shareholders' Meeting) and the Share Issuance (in the case of the Parent Stockholders' Meeting) pursuant to the Joint Proxy Statement/Prospectus, and Company and Parent shall use all reasonable efforts to hold the Parent Stockholders' Meeting and the Company Shareholders' Meeting on the same day and as soon as practicable after the date on which the S-4 becomes effective. Nothing herein shall prevent Company or Parent from adjourning or postponing the Company Shareholders' Meeting or the Parent Stockholders' Meeting, as the case may be, if there are insufficient shares of Company Common Stock or Parent Common Stock, as the case may be, necessary to conduct business at their respective meetings of the

A-27

Exhibit H
0952

shareholders or stockholders. The Board of Directors of Company shall submit this Agreement and the Merger for shareholder approval pursuant to Section 14-2-1103(c) of Georgia Law subject only to the condition of shareholder approval as described in Section 2.24. Unless Company's Board of Directors has withdrawn its recommendation of this Agreement and the Merger in compliance with Section 5.4, Company shall use commercially reasonable efforts to solicit from its shareholders proxies in favor of the adoption and approval of this Agreement and the approval of the Merger pursuant to the Joint Proxy Statement/Prospectus and shall take all other commercially reasonable action necessary or advisable to secure the vote or consent of shareholders required by Georgia Law or applicable stock exchange requirements to obtain such approval. Parent shall use commercially reasonable efforts to solicit from its stockholders proxies in favor of the Share Issuance pursuant to the Joint Proxy Statement/Prospectus and shall take all other commercially reasonable action necessary or advisable to secure the vote or consent of stockholders required by the Delaware Law or applicable stock exchange requirements to obtain such approval. Company shall call and hold the Company Shareholders' Meeting for the purpose of voting upon the adoption and approval of this Agreement and the approval of the Merger whether or not Company's Board of Directors at any time subsequent to the date hereof determines that this Agreement is no longer advisable or recommends that Company's shareholders reject it.

5.3  CONFIDENTIALITY; ACCESS TO INFORMATION.

(a)  The parties acknowledge that Company and Parent have previously executed a Confidentiality Agreement, dated as of March 1, 2000 (the "CONFIDENTIALITY AGREEMENT"), which Confidentiality Agreement will continue in full force and effect in accordance with its terms.

(b)  Each of the Company and Parent will afford the other and the other's accountants, counsel and other representatives reasonable access to its properties, books, records and personnel during the period prior to the Effective Time to obtain all information concerning its business as such other party may reasonably request. No information or knowledge obtained in any investigation pursuant to this Section 5.3 will affect or be deemed to modify any representation or warranty contained herein or the conditions to the obligations of the parties to consummate the Merger.

5.4  NO SOLICITATION.

(a)  From and after the date of this Agreement until the Effective Time or termination of this Agreement pursuant to Article VII, Company and its subsidiaries will not, nor will they authorize or permit any of their respective officers, directors, affiliates or employees or any investment banker, attorney or other advisor or representative retained by any of them to, directly or indirectly, (i) solicit, initiate, encourage or induce the making, submission or announcement of any Acquisition Proposal (as defined below), (ii) participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or take any other action to facilitate any inquiries or the making of any proposal that constitutes or would reasonably be expected to lead to, any Acquisition Proposal, (iii) engage in discussions with any person with respect to any Acquisition Proposal, (iv) approve, endorse or recommend any Acquisition Proposal or (v) enter into any letter of intent or similar document or any contract, agreement or commitment contemplating or otherwise relating to any Acquisition Transaction (as defined below); PROVIDED, HOWEVER, that nothing contained in this Section 5.4 shall prohibit the Board of Directors of Company from (i) complying with Rule 14d-9 or 14e-2(a) promulgated under the Exchange Act with regard to a tender or exchange offer or (ii) in response to an unsolicited, bona fide written Acquisition Proposal that Company's Board of Directors reasonably concludes constitutes a Superior Offer (as defined below), engaging in discussions or participating in negotiations with and furnishing information to the party making such Acquisition Proposal to the extent (A) the Board of Directors of the Company determines in good faith after consultation with its outside legal

A-28

Exhibit H
0953

counsel that failure to take such action would be inconsistent with its fiduciary obligations under applicable law, (B) (x) at least two business days prior to furnishing any such nonpublic information to, or entering into discussions or negotiations with, such party, Company gives Parent written notice of Company's intention to furnish nonpublic information to, or enter into discussions or negotiations with, such party and (y) Company receives from such party an executed confidentiality agreement containing customary limitations on the use and disclosure of all nonpublic written and oral information furnished to such party by or on behalf of Company, and (C) contemporaneously with furnishing any such nonpublic information to such party, Company furnishes such nonpublic information to Parent (to the extent such nonpublic information has not been previously furnished by the Company to Parent). Company and its subsidiaries will immediately cease any and all existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal. Without limiting the foregoing, it is understood that any violation of the restrictions set forth in this Section 5.4 by any officer, director or employee of Company or any of its subsidiaries or any investment banker, attorney or other advisor or representative of Company or any of its subsidiaries shall be deemed to be a breach of this Section 5.4 by Company.

For purposes of this Agreement, "ACQUISITION PROPOSAL" shall mean any offer or proposal (other than an offer or proposal by Parent) relating to any ACQUISITION Transaction. For the purposes of this Agreement, "ACQUISITION TRANSACTION" shall mean any transaction or series of related transactions other than the transactions contemplated by this Agreement involving: (A) any acquisition or purchase from the Company by any person or "group" (as defined under Section 13(d) of the Exchange Act and the rules and regulations thereunder) of more than a 15% interest in the total outstanding voting securities of the Company or any of its subsidiaries or any tender offer or exchange offer that if consummated would result in any person or "group" (as defined under Section 13(d) of the Exchange Act and the rules and regulations thereunder) beneficially owning 15% or more of the total outstanding voting securities of the Company or any of its subsidiaries or any merger, consolidation, business combination or similar transaction involving the Company pursuant to which the shareholders of the Company immediately preceding such transaction hold less than [85]% of the equity interests in the surviving or resulting entity of such transaction; (B) any sale, lease (other than in the ordinary course of business), exchange, transfer, license (other than in the ordinary course of business), acquisition or disposition of more than 15% of the assets of the Company; or (C) any liquidation, dissolution, recapitalization or other significant corporate reorganization of the Company; and (C) "SUPERIOR PROPOSAL" shall mean an Acquisition Proposal with respect to which (x) if any cash consideration is involved, shall not be subject to any financing contingency (or, after consultation with Company's financial advisors, the Board of Directors shall have determined in good faith that such financing is reasonably likely to be obtained by any acquiring party on a timely basis), and with respect to which Company's Board of Directors shall have determined in good faith (after consultation with Company's financial advisors) that the acquiring party is capable of consummating the proposed Acquisition Transaction on the terms proposed, and (y) Company's Board of Directors shall have determined in good faith that the proposed Acquisition Transaction provides greater value to the shareholders of Company than the Merger (taking into account the advice of Company's independent financial advisors).

(b) In addition to the obligations of Company set forth in paragraph (a) of this Section 5.4, Company as promptly as practicable, and in any event within 24 hours, shall advise Parent orally and in writing of any request for information which Company reasonably believes would lead to an Acquisition Proposal or of any Acquisition Proposal, or any inquiry with respect to or which Company reasonably believes would lead to any Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the person or group making any such request, Acquisition Proposal or inquiry. Company will keep Parent informed in all material respects of the status and terms (including material amendments or proposed amendments) of any such request, Acquisition Proposal or inquiry. In addition to the foregoing,

A-29

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0954

Company shall (i) provide Parent with at least 48 hours prior notice (or such lesser prior notice as provided to the members of Company's Board of Directors but in no event less than eight hours) of any meeting of Company's Board of Directors at which Company's Board of Directors is reasonably expected to consider an Acquisition Proposal and (ii) provide Parent with at least 48 hours prior written notice (or such lesser prior notice as provided to the members of the Company's Board of Directors but in no event less than eight hours) of a meeting of Company's Board of Directors at which Company's Board of Directors is reasonably expected to recommend a Superior Offer to its shareholders and together with such notice a copy of the definitive documentation relating to such Superior Offer.

5.5  PUBLIC DISCLOSURE.  Parent and Company will consult with each other and agree before issuing any press release or otherwise making any public statement with respect to the Merger, this Agreement or an Acquisition Proposal and will not issue any such press release or make any such public statement prior to such agreement, except as may be required by law or any listing agreement with a national securities exchange, in which case reasonable efforts to consult with the other party will be made prior to any such release or public statement. The parties have agreed to the text of the joint press release announcing the signing of this Agreement.

5.6  REASONABLE EFFORTS; NOTIFICATION.

(a) Upon the terms and subject to the conditions set forth in this Agreement (including the provisions of Section 5.4), each of the parties agrees to use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Merger and the other transactions contemplated by this Agreement, including using commercially reasonable efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent set forth in Article VI to be satisfied, (ii) the obtaining of all necessary actions or nonactions, waivers, consents, approvals, orders and authorizations from Governmental Entities and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Entities, if any) and the taking of all reasonable steps as may be necessary to avoid any suit, claim, action, investigation or proceeding by any Governmental Entity, (iii) the obtaining of all necessary consents, approvals or waivers from third parties, (iv) the defending of any suits, claims, actions, investigations or proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed and (v) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement. In connection with and without limiting the foregoing, Company and its Board of Directors shall, if any state takeover statute or similar statute or regulation is or becomes applicable to the Merger, this Agreement or any of the transactions contemplated by this Agreement, use commercially reasonable efforts to ensure that the Merger and the other transactions contemplated by this Agreement may be consummated as promptly as practicable on the terms contemplated by this Agreement and otherwise to minimize the effect of such statute or regulation on the Merger, this Agreement and the transactions contemplated hereby. Notwithstanding anything herein to the contrary, nothing in this Agreement shall be deemed to require Parent or Company or any subsidiary or affiliate thereof to agree to any divestiture by itself or any of its affiliates of shares of capital stock or of any business, assets or property, or the imposition of any material limitation on the ability of any of them to conduc their business or to own or exercise control of such assets, properties and stock.

(b) Company shall give prompt notice to Parent of any representation or warranty made by it contained in this Agreement becoming untrue or inaccurate, or any failure of Company to comply

A-30

Exhibit H
0955

with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement, in each case, such that the conditions set forth in Section 6.3(a) or 6.3(b) would not be satisfied; PROVIDED, HOWEVER, that no such notification shall affect the representations, warranties, covenants or agreements of the parties or the conditions to the obligations of the parties under this Agreement.

(c) Parent shall give prompt notice to Company of any representation or warranty made by it or Merger Sub contained in this Agreement becoming untrue or inaccurate, or any failure of Parent or Merger Sub to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement, in each case, such that the conditions set forth in Section 6.2(a) or 6.2(b) would not be satisfied; PROVIDED, HOWEVER, that no such notification shall affect the representations, warranties, covenants or agreements of the parties or the conditions to the obligations of the parties under this Agreement.

5.7  THIRD PARTY CONSENTS.  As soon as practicable following the date hereof, Parent and Company will each use its commercially reasonable efforts to obtain any consents, waivers and approvals under any of its or its subsidiaries' respective agreements, contracts, licenses or leases required to be obtained in connection with the consummation of the transactions contemplated hereby.

5.8  STOCK OPTIONS AND EMPLOYEE BENEFITS; WARRANTS.

(a) At the Effective Time, each outstanding option to purchase shares of Company Common Stock (each, a "COMPANY STOCK OPTION") under the Company Option Plans, whether or not vested, shall by virtue of the Merger be assumed by Parent. Each Company Stock Option and Warrant so assumed by Parent under this Agreement will continue to have, and be subject to, the same terms and conditions of such options or Warrant immediately prior to the Effective Time (including, without limitation, any repurchase rights or vesting provisions of outstanding options), except that (i) each Company Stock Option and Warrant will be exercisable (or will become exercisable in accordance with its terms) for that number of whole shares of Parent Common Stock equal to the product of the number of shares of Company Common Stock that were issuable upon exercise of such Company Stock Option and Warrant immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole number of shares of Parent Common Stock and (ii) the per share exercise price for the shares of Parent Common Stock issuable upon exercise of such assumed Company Stock Option and Warrant will be equal to the quotient determined by dividing the exercise price per share of Company Common Stock at which such Company Stock Option and each outstanding Warrant was exercisable immediately prior to the Effective Time by the Exchange Ratio, rounded up to the nearest whole cent.

(b) ESPP.  Prior to the Effective Time, outstanding purchase rights under Company's ESPP shall be exercised in accordance with Sections 14 and 16 of the ESPP and each share of Company Common Stock purchased pursuant to such exercise shall by virtue of the Merger, and without any action on the part of the holder thereof, be converted into the right to receive a number of shares of Parent Common Stock equal to the Exchange Ratio without issuance of certificates representing issued and outstanding shares of Company Common Stock to ESPP participants. Company agrees that it shall terminate the ESPP immediately following the aforesaid purchase of shares of Company Common Stock thereunder.

(c) 401(k) PLANS.  Company and its Plan Affiliates, as applicable, shall each terminate (i) any and all group severance, separation or salary continuation plans, programs, or arrangements and (ii) any and all 401(k) plans, effective as of the day immediately preceding the Closing Date. Parent shall receive from Company evidence that Company's and each Plan Affiliate's, as applicable, program(s) have been terminated pursuant to resolutions of each such entity's Board of Directors (the form and substance of such resolutions shall be subject to review and approval of Parent), effective as of the day immediately preceding the Effective Time.

A-31

Exhibit H
0956

(d)  SERVICE CREDIT.  To the extent permitted by Parent's employee benefit plan and applicable law, Parent will use reasonable efforts, or will cause Company to use reasonable efforts, give individuals who are employed by Company and its subsidiaries as of the Effective Time ("AFFECTED EMPLOYEES") full credit for purposes of eligibility, vesting, benefit accrual (excluding, however, benefit accrual under any defined benefit pension plans) and determination of the level of benefits under any employee benefit plans or arrangements maintained by Parent or any subsidiary of Parent for such Affected Employees' service with Company or any subsidiary of the Company to the same extent recognized by Company immediately prior to the Effective Time. To the extent permitted by Parent's employee benefit plans and applicable law, Parent will, or will cause Company to (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Affected Employees under any welfare benefit plans that such employees may be eligible to participate in after the Effective Time, other than limitations or waiting periods that are already in effect with respect to such employees and that have not been satisfied as of the Effective Time under any welfare plan maintained for the Affected Employees immediately prior to the Effective Time, and (ii) provide each Affected Employee with credit for any co-payments and deductibles paid prior to the Effective Time in satisfying any applicable deductible or out-of-pocket requirements under any welfare plans that such employees are eligible to participate in after the Effective Time.

5.9  FORM S-8.  Parent agrees to file a registration statement on Form S-8 for the shares of Parent Common Stock issuable with respect to assumed Company Stock Options as soon as is reasonably practicable (and in any event within twenty business days) after the Effective Time.

5.10  INDEMNIFICATION.

(a)  From and after the Effective Time, Parent will, and will cause the Surviving Corporation to, fulfill and honor in all respects the obligations of Company pursuant to any indemnification agreements between Company and its directors and officers in effect immediately prior to the Effective Time and any indemnification provisions under the Company Charter Documents as in effect on the date hereof. The Certificate of Incorporation and Bylaws of the Surviving Corporation will contain provisions with respect to exculpation and indemnification that are at least as favorable to the indemnified parties thereunder (the "INDEMNIFIED PARTIES") as those contained in the Company Charter Documents as in effect on the date hereof, which provisions will not be amended, repealed or otherwise modified for a period of six years from the Effective Time in any manner that would adversely affect the rights thereunder of the Indemnified Parties, unless such modification is required by law.

(b)  For a period of six years after the Effective Time, Parent will, and will cause the Surviving Corporation to, use its commercially reasonable efforts to maintain in effect directors' and officers' liability insurance covering those persons or classes of persons who are currently covered by Company's directors' and officers' liability insurance policy with coverage in an amount and scope at least as favorable as that applicable to the current directors and officers of Company; PROVIDED, HOWEVER, that in no event will Parent or the Surviving Corporation be required to expend an annual premium for such coverage in excess of 150% of the annual premium most recently paid by Company (the "PREMIUM CAP"); PROVIDED, FURTHER, that if the annual premium for such coverage would at any time exceed the Premium Cap, then the Surviving Corporation shall maintain insurance policies that provide the maximum coverage available at an annual premium equal to the Premium Cap.

(c)  The provisions of this Section 5.10 are intended to be in addition to the rights otherwise available to the Indemnified Parties by law, charter, statute, bylaw or agreement, and shall operate for the benefit of, and shall be enforceable by, each of the Indemnified Parties.

A-32

Exhibit H
0957

5.11  NASDAQ LISTING.  Parent agrees to authorize for listing on Nasdaq the shares of Parent Common Stock issuable, and those required to be reserved for issuance, in connection with the Merger, upon official notice of issuance.

5.12  AFFILIATES.  Set forth in Section 5.12 of the Company Schedule is a list of those persons who may be deemed to be, in Company's reasonable judgment, affiliates of Company within the meaning of Rule 145 promulgated under the Securities Act (each, a "COMPANY AFFILIATE"). Company will provide Parent with such information and documents as Parent reasonably requests for purposes of reviewing such list. Company will use its commercially reasonable efforts to deliver or cause to be delivered to Parent, as promptly as practicable on or following the date hereof, from each Company Affiliate an executed affiliate agreement in substantially the form attached hereto as EXHIBIT C (the "COMPANY AFFILIATE AGREEMENT"), each of which will be in full force and effect as of the Effective Time. Parent will be entitled to place appropriate legends on the certificates evidencing any Parent Common Stock to be received by a Company Affiliate pursuant to the terms of this Agreement, and to issue appropriate stop transfer instructions to the transfer agent for the Parent Common Stock, consistent with the terms of the Company Affiliate Agreement.

5.13  REGULATORY FILINGS; REASONABLE EFFORTS.  As soon as may be reasonably practicable, Company and Parent each shall file with the United States Federal Trade Commission (the "FTC") and the Antitrust Division of the United States Department of Justice ("DOJ") Notification and Report Forms relating to the transactions contemplated herein as required by the HSR Act, as well as comparable pre-merger notification forms required by the merger notification or control laws and regulations of any applicable jurisdiction, as agreed to by the parties. Company and Parent each shall promptly (a) supply the other with any information which may be required in order to effectuate such filings and (b) supply any additional information which reasonably may be required by the FTC, the DOJ or the competition or merger control authorities of any other jurisdiction and which the parties may reasonably deem appropriate; PROVIDED, HOWEVER, that Parent shall not be required to agree to any divestiture by Parent or the Company or any of Parent's subsidiaries or affiliates of shares of capital stock or of any business, assets or property of Parent or its subsidiaries or affiliates or of the Company, its affiliates, or the imposition of any material limitation on the ability of any of them to conduct their businesses or to own or exercise control of such assets, properties and stock.

5.14  PARENT BOARD OF DIRECTORS.  The Board of Directors of Parent will take all actions necessary such that two members of Company's Board of Directors reasonably acceptable to Parent, at least one of whom is an independent director of the Company's Board of Directors, shall be appointed to Parent's Board of Directors as of the Effective Time with a term expiring at the next annual meeting of Parent's stockholders.

5.15  SHAREHOLDER LITIGATION.  Until the earlier of termination of this Agreement in accordance with its terms or the Effective Time, Company shall give Parent the opportunity to participate in the defense or settlement of any shareholder litigation against Company or members of its Board of Directors relating to this Agreement and the transactions contemplated hereby or otherwise, and shall not settle any such litigation without Parent' prior written consent.

ARTICLE VI

CONDITIONS TO THE MERGER

6.1  CONDITIONS TO OBLIGATIONS OF EACH PARTY TO EFFECT THE MERGER.  The respective obligations of each party to this Agreement to effect the Merger shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a)  SHAREHOLDER AND STOCKHOLDER APPROVALS.  This Agreement shall have been approved and adopted, and the Merger shall have been duly approved, by the requisite vote under applicable

A-33

law, by the shareholders of Company. The Share Issuance shall have been approved by the requisite vote under applicable Nasdaq rules by the stockholders of Parent.

(b)   REGISTRATION STATEMENT EFFECTIVE; JOINT PROXY STATEMENT.  The SEC shall have declared the S-4 effective. No stop order suspending the effectiveness of the S-4 or any part thereof shall have been issued and no proceeding for that purpose, and no similar proceeding in respect of the Joint Proxy Statement/Prospectus, shall be pending or shall then be threatened in writing by the SEC.

(c)   NO ORDER; HSR ACT.  No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, executive order, decree, injunction or other order (whether temporary, preliminary or permanent) which is in effect and which has the effect of making the Merger illegal or otherwise prohibiting consummation of the Merger. All waiting periods, if any, under the HSR Act relating to the transactions contemplated hereby will have expired or terminated early and all material foreign antitrust approvals required to be obtained prior to the Merger in connection with the transactions contemplated hereby shall have been obtained.

(d)   TAX OPINIONS.  Parent and Company shall each have received written opinions from their respective tax counsel, in form and substance reasonably satisfactory to them, to the effect that the Merger will constitute a reorganization within the meaning of Section 368(a) of the Code and such opinions shall not have been withdrawn; PROVIDED, HOWEVER, that if the counsel to either Parent or Company does not render such opinion, this condition shall nonetheless be deemed to be satisfied with respect to such party if counsel to the other party renders such opinion to such party. The parties to this Agreement agree to make such reasonable representations as requested by such counsel for the purpose of rendering such opinions.

6.2   ADDITIONAL CONDITIONS TO OBLIGATIONS OF COMPANY.  The obligation of Company to consummate and effect the Merger shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Company:

(a)   REPRESENTATIONS AND WARRANTIES.  Each representation and warranty of Parent and Merger Sub contained in this Agreement (i) shall have been true and correct in all material respects as of the date of this Agreement and (ii) shall be true and correct on and as of the Closing Date with the same force and effect as if made on the Closing Date except, in the case of each of clauses (i) and (ii), (A) for such failures to be true and correct that do not in the aggregate constitute a Material Adverse Effect on Parent and Merger Sub, and (B) for those representations and warranties which address matters only as of a particular date (which representations shall have been true and correct (subject to the qualifications set forth in the preceding clause (A)) as of such particular date) (it being understood that, for purposes of determining the accuracy of such representations and warranties, (i) all "Material Adverse Effect" qualifications and other qualifications based on the word "material" contained in such representations and warranties shall be disregarded and (ii) any update of or modification to the Parent Schedule made or purported to have been made after the date of this Agreement shall be disregarded). Company shall have received a certificate with respect to the foregoing signed on behalf of Parent by an authorized officer of Parent.

(b)   AGREEMENTS AND COVENANTS.  Parent and Merger Sub shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date, and Company shall have received a certificate to such effect signed on behalf of Parent by an authorized officer of Parent.

6.3   ADDITIONAL CONDITIONS TO THE OBLIGATIONS OF PARENT AND MERGER SUB.  The obligations of Parent and Merger Sub to consummate and effect the Merger shall be subject to the satisfaction at or prior to

A-34

the Closing Date of each of the following conditions, any of which may be
waived, in writing, exclusively by Parent:

(a)  REPRESENTATIONS AND WARRANTIES.  Each representation and warranty
of Company contained in this Agreement (i) shall have been true and correct
in all material respects as of the date of this Agreement and (ii) shall be
true and correct on and as of the Closing Date with the same force and
effect as if made on and as of the Closing Date except, in the case of each
of clauses (i) and (ii), (A) for such failures to be true and correct that
do not in the aggregate constitute a Material Adverse Effect on the Company
PROVIDED, HOWEVER, such Material Adverse Effect qualifier shall be
inapplicable with respect to representations and warranties contained in
Section 2.3(a), 2.3(e), 2.23, and 2.24, which shall be true and correct in
all material respects, and (B) for those representations and warranties
which address matters only as of a particular date (which representations
shall have been true and correct (subject to the qualifications set forth in
the preceding clause (A)) as of such particular date) (it being understood
that, for purposes of determining the accuracy of such representations and
warranties, (i) all "Material Adverse Effect" qualifications and other
qualifications based on the word "material" contained in such
representations and warranties shall be disregarded and (ii) any update of
or modification to the Company Schedule made or purported to have been made
after the date of this Agreement shall be disregarded).  Parent shall have
received a certificate with respect to the foregoing signed on behalf of
Company by an authorized officer of Company.

(b)  AGREEMENTS AND COVENANTS.  Company shall have performed or complied
in all material respects with all agreements and covenants required by this
Agreement to be performed or complied with by it at or prior to the Closing
Date, and Parent shall have received a certificate to such effect signed on
behalf of Company by the Chief Executive Officer and the Chief Financial
Officer of Company.

(c)  CONSENTS.  Company shall have obtained all consents, waivers and
approvals required in connection with the consummation of the transactions
contemplated hereby in connection with the agreements, contracts, licenses
or leases set forth on Schedule 6.3(c).

ARTICLE VII

TERMINATION, AMENDMENT AND WAIVER

7.1  TERMINATION.  This Agreement may be terminated at any time prior to the
Effective Time, whether before or after the requisite approval of the
shareholders of Company:

(a)  by mutual written consent duly authorized by the Boards of Directors
of Parent and Company;

(b)  by either Company or Parent, by written notice to the other, if the
Merger shall not have been consummated by October 31, 2000 for any reason;
PROVIDED, HOWEVER, that the right to terminate this Agreement under this
Section 7.1(b) shall not be available to any party whose action or failure
to act has been a principal cause of the failure of the Merger to occur on
or before such date and such action or failure to act constitutes a breach
of this Agreement;

(c)  by either Company or Parent, by written notice to the other, if a
Governmental Entity shall have issued an order, decree or ruling or taken
any other action that has the effect of permanently restraining, enjoining
or otherwise prohibiting the Merger and is final and nonappealable;

(d)  by either Company or Parent, by written notice to the other, if
(i) the required approval of the shareholders of Company contemplated by the
first sentence of Section 6.1(a) of this Agreement shall not have been
obtained by reason of the failure to obtain the required vote at a

A-35

Exhibit H
0960

meeting of Company shareholders duly convened therefor or at any adjournment or postponement thereof or (ii) the required approval by the stockholders of Parent of the Share Issuance required under applicable Nasdaq rules shall not have been obtained by reason of the failure to obtain the required vote at a meeting of Parent stockholders duly convened therefor or at any adjournment or postponement thereof;

(e) by Company, by written notice to Parent, upon a breach of any representation, warranty, covenant or agreement on the part of Parent set forth in this Agreement, or if any representation or warranty of Parent shall have become untrue, in either case such that the conditions set forth in Section 6.2(a) or Section 6.2(b) would not be satisfied as of the time of such breach or as of the time such representation or warranty shall have become untrue, PROVIDED, that if such inaccuracy in Parent's representations and warranties or breach by Parent is curable by Parent, then Company may not terminate this Agreement under this Section 7.1(e) for thirty (30) days after delivery of written notice from Company to Parent of such breach, provided Parent continues to exercise commercially reasonable efforts to cure such breach (it being understood that Company may not terminate this Agreement pursuant to this paragraph (e) if such breach by Parent is cured during such thirty (30)-day period);

(f) by Parent, by written notice to Company, upon a breach of any representation, warranty, covenant or agreement on the part of Company set forth in this Agreement, or if any representation or warranty of Company shall have become untrue, in either case such that the conditions set forth in Section 6.3(a) or Section 6.3(b) would not be satisfied as of the time of such breach or as of the time such representation or warranty shall have become untrue, PROVIDED, that if such inaccuracy in Company's representations and warranties or breach by Company is curable by Company, then Parent may not terminate this Agreement under this Section 7.1(f) for thirty (30) days after delivery of written notice from Parent to Company of such breach, provided Company continues to exercise commercially reasonable efforts to cure such breach (it being understood that Parent may not terminate this Agreement pursuant to this paragraph (f) if such breach by Company is cured during such thirty (30)-day period); or

(g) by Parent, by written notice to Company, if (i) the Board of Directors of Company withdraws, modifies or changes its recommendation of this Agreement or the Merger in a manner adverse to Parent or its stockholders, (ii) the Board of Directors of Company shall have recommended to the shareholders of Company an Acquisition Proposal, (iii) the Company fails to comply with Section 5.4, (iv) a bona fide Acquisition Proposal shall have been publicly announced or otherwise become publicly known and the Board of Directors of Company shall have (A) failed to recommend against acceptance of such by its shareholders (including by taking no position, or indicating its inability to take a position, with respect to the acceptance by its shareholders of an Acquisition Proposal involving a tender offer or exchange offer) or (B) failed to reconfirm its approval and recommendation of this Agreement and the transactions contemplated hereby within ten business days thereafter, or (v) the Board of Directors of Company resolves to take any of the actions described above.

7.2 NOTICE OF TERMINATION; EFFECT OF TERMINATION. Any termination of this Agreement under Section 7.1 above will be effective immediately upon the delivery of written notice of the terminating party to the other parties hereto (or such later time as may be required by Section 7.1). In the event of the termination of this Agreement as provided in Section 7.1, this Agreement shall be of no further force or effect, except (i) as set forth in this Section 7.2, Section 5.3(a), Section 7.3 and Article 8, each of which shall survive the termination of this Agreement, and (ii) nothing herein shall relieve any party from liability for fraud in connection with, or any willful breach of, this Agreement.

A-36

Exhibit H
0961

7.3  FEES AND EXPENSES.

(a)  GENERAL.  Except as set forth in this Section 7.3, all fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such expenses whether or not the Merger is consummated; PROVIDED, HOWEVER, that Parent and Company shall share equally all fees and expenses, other than attorneys' and accountants fees and expenses, incurred in relation to the printing and filing of the Joint Proxy Statement/Prospectus (including any preliminary materials related thereto) and the S-4 (including financial statements and exhibits) and any amendments or supplements thereto.

(b)  TERMINATION FEE.

(i)  In the event that (A) Parent shall terminate this Agreement pursuant to Section 7.1(g), or (B) this Agreement shall be terminated (x) pursuant to Section 7.1(b) or (y) pursuant to Section 7.1(d)(i) and, in the case of clause (B)(x) or clause (B)(y), (1) prior to such termination, a bona fide Acquisition Proposal shall have been announced or shall otherwise have become publicly known and (2) within 12 months after such termination, Company shall enter into a definitive agreement providing for any Company Acquisition or any Company Acquisition shall be consummated, then, in the case of clause (A) or (B), respectively, Company shall pay to Parent cash and issue to Parent shares of Company Common Stock, in such combination as Company may elect (provided that the cash component must be at least $20 million) with an aggregate value (such shares of Company Common Stock to be valued at $24.125 per share for all purposes of this Section 7.3(b)(i)) of $50 million (the "TERMINATION FEE"). In the event this Agreement shall be terminated as set forth in clause (A), the Termination Fee shall be payable in two installments of equal value, the first of which shall be paid contemporaneously with the termination of this Agreement pursuant to Section 7.1(g), and the second of which shall be due and payable on the 30th day after such termination. In the event this Agreement shall be terminated as set forth in clause (B), the Termination Fee shall be payable in two installments of equal value, the first of which shall be paid contemporaneously with the execution of a definitive agreement providing for the Company Acquisition, and the second of which shall be due and payable on the earlier to occur of (i) the consummation of such Company Acquisition and (ii) the 90th days after the date of execution of the definitive agreement relating to such Company Acquisition. If Company satisfies its obligation to pay the Termination Fee in part by delivering to Parent shares of Company Common Stock (the "TERMINATION FEE SHARES"), then Parent shall be entitled to registration rights with respect to such shares as described in the Option Agreement (treating the Termination Fee Shares for all purposes of Section 7 of the Option Agreement as if they were Option Shares (as defined in the Option Agreement)).

(ii)  The Company acknowledges that the agreements contained in this Section 7.3(b) are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, Parent would not enter into this Agreement; accordingly, if the Company fails to pay in a timely manner the amounts due pursuant to this Section 7.3(b) and, in order to obtain such payment, Parent makes a claim that results in a judgment against the Company for the amounts set forth in this Section 7.3(b), the Company shall pay to Parent its actual out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) in connection with such suit, together with interest on the amounts set forth in this Section 7.3(b) at the prime rate of Citibank, N.A. in effect on the date such payment was required to be made. Payment of the fees described in this Section 7.3(b) shall not be in lieu of damages incurred in the event of fraud in connection with or willful breach of this Agreement.

A-37

Exhibit H
0962

(iii) In the event that Parent shall terminate this Agreement pursuant to Section 7.1(f), then Company shall promptly reimburse Parent for Parent's costs and expenses in connection with this Agreement and the transactions contemplated hereby.

(iv) For the purposes of this Agreement, "COMPANY ACQUISITION" shall mean any of the following transactions (other than the transactions contemplated by this Agreement): (i) a merger, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Company pursuant to which the shareholders of the Company immediately preceding such transaction hold less than 60% of the aggregate equity interests in the surviving or resulting entity of such transaction, (ii) a sale or other disposition by the Company of assets representing in excess of 40% of the aggregate fair market value of the Company's business immediately prior to such sale or (iii) the acquisition by any person or "group" (as defined under Section 13(d) of the Exchange Act) (including by way of a tender offer or an exchange offer or issuance by the Company), directly or indirectly, of beneficial ownership or a right to acquire beneficial ownership of shares representing in excess of 40% of the voting power of the then outstanding shares of capital stock of the Company.

(v) For purposes only of this Section 7.3(b), each reference to "15%" in the definition of Acquisition Transaction set forth in Section 5.4(a) shall be deemed to be "40%," and the reference to "85%" in such definition shall be deemed to be "60%."

(vi) In the event that Company shall terminate this Agreement pursuant to Section 7.1(e), then Parent shall promptly reimburse Company for Company's costs and expenses in connection with this Agreement and the transactions contemplated hereby.

7.4 AMENDMENT.  Subject to applicable law, this Agreement may be amended by the parties hereto at any time by execution of an instrument in writing signed on behalf of each of Parent, Merger Sub and Company.

7.5 EXTENSION; WAIVER.  At any time prior to the Effective Time, any party hereto may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (ii) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto and (iii) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party. Delay in exercising any right under this Agreement shall not constitute a waiver of such right.

ARTICLE VIII

GENERAL PROVISIONS

8.1 SURVIVAL OF REPRESENTATIONS AND WARRANTIES.  The representations and warranties of Company, Parent and Merger Sub contained in this Agreement shall terminate at the Effective Time, and only the covenants that by their terms survive the Effective Time shall survive the Effective Time.

8.2 NOTICES.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or sent via telecopy (receipt confirmed) to the parties at the following addresses or telecopy numbers (or at such other address or telecopy numbers for a party as shall be specified by like notice):

(a) if to Parent or Merger Sub, to:

Peregrine Systems, Inc.
12670 High Bluff Drive
San Diego, California 92130
Attention:  Richard Nelson
           Eric Deller
Telecopy No.:  (858) 794-5057

A-38

Exhibit H
0963

with copies to:

Wilson Sonsini Goodrich & Rosati
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304-1050
Attention:  Douglas H. Collom
Telecopy No.:  (650) 493-6811

and

Wilson Sonsini Goodrich & Rosati
Professional Corporation
Spear Street Tower
One Market
San Francisco, California 94105
Attention:  Steve L. Camahort
Telecopy No.:  (415) 947-2099

(b) if to Company, to:

Harbinger Corporation
1277 Lenox Park Boulevard
Atlanta, Georgia 30319
Attention:  James Travers
           Loren B. Wimpfheimer
Telecopy No.:  (404) 848-2864
and  (404) 467-3476

with a copy to:

Brobeck, Phleger & Harrison LLP
Two Embarcadero Place
2200 Geng Road
Palo Alto, California 94303
Attention:  Rod J. Howard
Telecopy No.:  (650) 496-2885 and (650) 496-2777

and

Morris Manning & Martin LLP
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326
Attention:  John C. Yates
Telecopy No.:  (404) 365-9532

8.3  INTERPRETATION; DEFINITIONS.

(a) When a reference is made in this Agreement to Exhibits, such reference shall be to an Exhibit to this Agreement unless otherwise indicated. When a reference is made in this Agreement to Sections, such reference shall be to a Section of this Agreement. Unless otherwise indicated the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The table of contents and headings contained in this

A-39

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0964

Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. When reference is made herein to "the business of" an entity, such reference shall be deemed to include the business of all direct and indirect subsidiaries of such entity. Reference to the subsidiaries of an entity shall be deemed to include all direct and indirect subsidiaries of such entity.

(b) For purposes of this Agreement:

(i) the term "KNOWLEDGE" means with respect to a party hereto, with respect to any matter in question, knowledge of the executive officers of such party after reasonable inquiry;

(ii) the term "MATERIAL ADVERSE EFFECT" when used in connection with an entity means any change, event, violation, inaccuracy, circumstance or effect, individually or when aggregated with other such changes, events, violations, inaccuracies, circumstances or effects, that is materially adverse to the business, assets, liabilities, financial condition or results of operations of such entity and its subsidiaries taken as a whole; PROVIDED, HOWEVER, in no event shall either of the following, alone or in combination, be deemed to constitute, nor shall either of the following be taken into account in determining whether there has been or will be a Material Adverse Effect on any entity: (A) any change in such entity's stock price or trading volume or the failure to meet or exceed Wall Street research analysts' or such entity's internal earnings or other estimates or projections in and of itself constitute a Material Adverse Effect or (B) any change, event, violation, inaccuracy, circumstance or effect that such entity successfully bears the burden of proving results from (x) changes affecting the industry in which such entity operates generally (which changes do not disproportionately affect such entity), (y) changes affecting the United States economy generally or (z) the public announcement or pendency of the transactions contemplated hereby;

(iii) the term "PERSON" shall mean any individual, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization, entity or Governmental Entity; and

(iv) the term "SUBSIDIARY" shall mean any corporation, association, joint venture, partnership, or similar business arrangement or entity in which Company or Parent, as the case may require, owns 50% or more of the outstanding voting interests.

8.4  COUNTERPARTS.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.

8.5  ENTIRE AGREEMENT; THIRD PARTY BENEFICIARIES.  This Agreement and the documents and instruments and other agreements among the parties hereto as contemplated by or referred to herein, including the Company Disclosure Schedule and the Parent Disclosure Schedule (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof, it being understood that the Confidentiality Agreement shall continue in full force and effect until the Closing and shall survive any termination of this Agreement; and (b) are not intended to confer upon any other person any rights or remedies hereunder, except as specifically provided in Section 5.10.

8.6  SEVERABILITY.  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision

A-40

Exhibit H
0965

to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

8.7  OTHER REMEDIES; SPECIFIC PERFORMANCE.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy. The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

8.8  GOVERNING LAW.  Except to the extent mandatorily governed by Georgia Law, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of law thereof.

8.9  RULES OF CONSTRUCTION.  The parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

8.10  ASSIGNMENT.  No party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other parties. Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

****

A-41

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0966

IN WITNESS WHEREOF, the parties hereto have caused this Agreement and Plan of Reorganization to be executed by their duly authorized respective officers as of the date first written above.

PEREGRINE SYSTEMS, INC.
a Delaware corporation

By:            /s/ STEPHEN P. GARDNER
      ------------------------------------

Name:          Stephen P. Gardner
      ------------------------------------

Title:            President
      ------------------------------------

SODA ACQUISITION CORPORATION
a Georgia corporation

By:            /s/ ERIC P. DELLER
      ------------------------------------

Name:          Eric P. Deller
      ------------------------------------

Title:            Secretary
      ------------------------------------

HARBINGER CORPORATION
a Georgia corporation

By:            /s/ JAMES M. TRAVERS
      ------------------------------------

Name:          James M. Travers
      ------------------------------------

Title:            President
      ------------------------------------

A-42

ANNEX B

STOCK OPTION AGREEMENT

THIS STOCK OPTION AGREEMENT (this "AGREEMENT") is made and entered into as of April 5, 2000, between Peregrine Systems, Inc., a Delaware corporation ("PARENT"), and Harbinger Corporation, a Georgia corporation (the "COMPANY"). Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Reorganization Agreement (as defined below).

RECITALS

A. The Company, Merger Sub (as defined below) and Parent have entered into an Agreement and Plan of Reorganization (the "REORGANIZATION AGREEMENT") which provides for the merger (the "MERGER") of a wholly-owned subsidiary of Parent ("MERGER SUB") with and into the Company. Pursuant to the Merger, all outstanding capital stock of the Company will be converted into the right to receive Common Stock of Parent.

B. As a condition to Parent's willingness to enter into the Reorganization Agreement, Parent has requested that Company agree, and Company has so agreed, to grant to Parent an option to acquire shares of Company's Common Stock, $0.01 par value per share (the "COMPANY SHARES"), upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements set forth herein and in the Reorganization Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1. GRANT OF OPTION. The Company hereby grants to Parent an irrevocable option (the "OPTION") to acquire up to 8,007,468 Company Shares (as adjusted as set forth herein) (the "OPTION SHARES"), in the manner set forth below by paying cash at a price of $43.50 per share (the "EXERCISE PRICE").

2. EXERCISE OF OPTION.

(a) The Option may be exercised by Parent, in whole or in part, at any time or from time to time after (i) termination of the Reorganization Agreement pursuant to Section 7.1(g) thereof or (ii) the time immediately prior to the occurrence of an event within the scope of Section 7.3(b)(i)(B)(2) of the Reorganization Agreement that causes the Termination Fee to become payable pursuant to Section 7.3(b)(i)(B) of the Reorganization Agreement (any of the events being referred to herein as an "EXERCISE EVENT"). In the event Parent wishes to exercise the Option, Parent will deliver to the Company a written notice (each an "EXERCISE NOTICE") specifying the total number of Option Shares it wishes to acquire. Each closing of a purchase of Option Shares (a "CLOSING") will occur on a date and at a time prior to the termination of the Option designated by Parent in an Exercise Notice delivered at least two business days prior to the date of such Closing, which Closing will be held at the principal offices of the Company.

(b) The Option will terminate upon the earliest of (i) the Effective Time, (ii) twelve (12) months following the date on which the Reorganization Agreement is terminated pursuant to Section 7.1(b) or 7.1(d) thereof, if no event causing the Termination Fee to become payable pursuant to Section 7.3(b)(i)(B) of the Reorganization Agreement has occurred during such 12-month period, (iii) twelve (12) months following payment of the Termination Fee in connection with termination of the Reorganization Agreement pursuant to Section 7.1(g) thereof, (iv) in the event the Reorganization Agreement has been terminated pursuant to Section 7.1(b) or 7.1(d)(i) thereof and the Termination Fee became payable pursuant to Section 7.3(b)(i)(B) thereof, 12 months after payment of the Termination Fee; and (v) the date on which the Reorganization

B-1

Exhibit H
0968

Agreement is otherwise terminated; PROVIDED, HOWEVER, that if the Option cannot be exercised by reason of any applicable government order or because the waiting period related to the issuance of the Option Shares under the HSR Act will not have expired or been terminated, then the Option will not terminate until the tenth business day after such impediment to exercise will have been removed or will have become final and not subject to appeal.

3. CONDITIONS TO CLOSING. The obligation of Company to issue Option Shares to Parent hereunder is subject to the conditions that (A) any waiting period under the HSR Act applicable to the issuance of the Option Shares hereunder will have expired or been terminated; (B) all material consents, approvals, orders or authorizations of, or registrations, declarations or filings with, any Federal, state or local administrative agency or commission or other Federal state or local governmental authority or instrumentality, if any, required in connection with the issuance of the Option Shares hereunder will have been obtained or made, as the case may be; and (C) no preliminary or permanent injunction or other order by any court of competent jurisdiction prohibiting or otherwise restraining such issuance will be in effect. It is understood and agreed that at any time during which the Option is exercisable, the parties will use their respective best efforts to satisfy all conditions to Closing, so that a Closing may take place as promptly as practicable.

4. CLOSING. At any Closing, (A) the Company will deliver to Parent a single certificate in definitive form representing the number of Company Shares designated by Parent in its Exercise Notice, such certificate to be registered in the name of Parent and to bear the legend set forth in Section 9 hereof, against delivery of (B) payment by Parent to the Company of the aggregate purchase price for the Company Shares so designated and being purchased by delivery of a certified check or bank check.

5. REPRESENTATIONS AND WARRANTIES OF THE COMPANY. Company represents and warrants to Parent that (A) Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Georgia and has the corporate power and authority to enter into this Agreement and to carry out its obligations hereunder; (B) the execution and delivery of this Agreement by the Company and consummation by the Company of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Company and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or any of the transactions contemplated hereby; (C) this Agreement has been duly executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company and, assuming this Agreement constitutes a legal, valid and binding obligation of Parent, is enforceable against the Company in accordance with its terms; (D) except for any filings required under the HSR Act, the Company has taken all necessary corporate and other actions to authorize and reserve for issuance and to permit it to issue upon exercise of the Option, and at all times from the date hereof until the termination of the Option will have reserved for issuance, a sufficient number of unissued Company Shares for Parent to exercise the Option in full and will take all necessary corporate or other action to authorize and reserve for issuance all additional Company Shares or other securities which may be issuable pursuant to Section 9(a) upon exercise of the Option, all of which, upon their issuance and delivery in accordance with the terms of this Agreement, will be validly issued, fully paid and nonassessable; (E) upon delivery of the Company Shares and any other securities to Parent upon exercise of the Option, Parent will acquire such Company Shares or other securities free and clear of all material claims, liens, charges, encumbrances and security interests of any kind or nature whatsoever, excluding those imposed by Parent; (F) the execution and delivery of this Agreement by the Company do not, and the performance of this Agreement by the Company will not, (i) conflict with or violate the Certificate of Incorporation or Bylaws or equivalent organizational documents of the Company or any of its subsidiaries, (ii) conflict with or violate any law, rule, regulation, order, judgment or decree applicable to the Company or any of its subsidiaries or by which its or any of their respective properties is bound or affected or (iii) result in any breach of or constitute a default (or an event that with notice

B-2

Exhibit H
0969

or lapse of time or both would become a default) under, or impair the Company's or any of its subsidiaries' rights or alter the rights or obligations of any third party under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of a lien or encumbrance on any of the properties or assets of the Company or any of its subsidiaries pursuant to, any material note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries or its or any of their respective properties are bound or affected; and (G) the execution and delivery of this Agreement by the Company does not, and the performance of this Agreement by the Company will not, require any consent, approval, authorization or permit of, or filing with, or notification to, any Governmental Entity except pursuant to the HSR Act.

6.    CERTAIN RIGHTS.

(a)    PARENT PUT.  At the request of and upon notice by Parent (the "PUT NOTICE"), at any time during the period during which the Option is exercisable pursuant to Section 2 (the "PURCHASE PERIOD"), the Company (or any successor entity thereof) will purchase from Parent the Option, to the extent not previously exercised, at the price set forth in subparagraph (i) below (as limited by subparagraph (iii) below), and the Option Shares, if any, acquired by Parent pursuant thereto, at the price set forth in subparagraph (ii) below (as limited by subparagraph (iii) below):

(i) The difference between the "MARKET/TENDER OFFER PRICE" for the Company Shares as of the date Parent gives notice of its intent to exercise its rights under this Section 6(a) (defined as the higher of (A) the highest price per share offered as of such date pursuant to any Acquisition Proposal which was made prior to such date and (B) the highest closing sale price of Company Shares then on the NASDAQ National Market during the 20 trading days ending on the trading day immediately preceding such date) and the Exercise Price, multiplied by the number of Company Shares purchasable pursuant to the Option that remain, but only if the Market/Tender Offer Price is greater than the Exercise Price. For purposes of determining the highest price offered pursuant to any Acquisition Proposal which involves consideration other than cash, the value of such consideration will be equal to the higher of (x) if securities of the same class of the proponent as such consideration are traded on any national securities exchange or by any registered securities association, a value based on the closing sale price or asked price for such securities on their principal trading market on such date and (y) the value ascribed to such consideration by the proponent of such Acquisition Proposal, or if no such value is ascribed, a value determined in good faith by the Board of Directors of the Company.

(ii) The Exercise Price paid by Parent for Company Shares acquired pursuant to the Option PLUS the difference between the Market/Tender Offer Price and such Exercise Price (but only if the Market/Tender Offer Price is greater than the Exercise Price) multiplied by the number of Company Shares so purchased.

(iii) Notwithstanding subparagraphs (i) and (ii) above, pursuant to this Section 6 Company will not be required to pay Parent in excess of an aggregate of (x) $50,000,000 minus (z) any cash amounts paid (or due to be paid in the future) to Parent by the Company pursuant to Section 7.3(b) of the Reorganization Agreement.

(b)    PAYMENT AND REDELIVERY OF OPTION OR SHARES.  In the event Parent exercises its rights under Section 6(a), the Company will, within five business days after Parent delivers notice pursuant to Section 6(a), pay the required amount to Parent in immediately available funds and Parent will surrender to the Company the Option and the certificates evidencing the Company Shares purchased by Parent pursuant thereto.

B-3

Exhibit H
0970

7.  REGISTRATION RIGHTS.

(a) Following the termination of the Reorganization Agreement, Parent (sometimes referred to herein as the "HOLDER") may by written notice (a "REGISTRATION NOTICE") to the Company (the "REGISTRANT") request the Registrant to register under the Securities Act all or any part of the shares acquired by the Holder pursuant to this Agreement (such shares requested to be registered, the "REGISTRABLE SECURITIES") in order to permit the sale or other disposition of any or all shares of the Registrable Securities that have been acquired by or are issuable to Holder upon exercise of the Option in accordance with the intended method of sale or other disposition stated by Holder, including a "shelf" registration statement under Rule 415 under the Securities Act or any successor provision. Holder agrees to cause, and to cause any underwriters of any sale or other disposition to cause, any sale or other disposition pursuant to such registration statement to be effected on a widely distributed basis so that upon consummation thereof no purchaser or transferee will own beneficially more than 5.0% of the then-outstanding voting power of Registrant.

(b) The Registrant will use all reasonable efforts to effect, as promptly as practicable, the registration under the Securities Act of the Registrable Securities requested to be registered in the Registration Notice and to keep such registration statement effective for such period not in excess of 120 calendar days from the day such registration statement first becomes effective as may be reasonably necessary to effect such sale or other disposition; PROVIDED, HOWEVER, that the Holder will not be entitled to more than an aggregate of two effective registration statements hereunder. The obligations of Registrant hereunder to file a registration statement and to maintain its effectiveness may be suspended for up to 120 calendar days in the aggregate if the Board of Directors of Registrant shall have determined that the filing of such registration statement or the maintenance of its effectiveness would require premature disclosure of material nonpublic information that would materially and adversely affect Registrant or otherwise interfere with or adversely affect any pending or proposed offering of securities of Registrant or any other material transaction involving Registrant. If consummation of the sale of any Registrable Securities pursuant to a registration hereunder does not occur within 120 days after the filing with the SEC of the initial registration statement therefor, the provisions of this Section 7 will again be applicable to any proposed registration. The Registrant will use commercially reasonable efforts to cause any Registrable Securities registered pursuant to this Section 7 to be qualified for sale under the securities or blue sky laws of such jurisdictions as the Holder may reasonably request and will continue such registration or qualification in effect in such jurisdictions; PROVIDED, HOWEVER, that the Registrant will not be required to qualify to do business in, or consent to general service of process in, any jurisdiction by reason of this provision. If Registrant effects a registration under the Securities Act of Company Common Stock for its own account or for any other stockholders of Registrant (other than on Form S-4 or Form S-8, or any successor form), it will allow Holder the right to participate in such registration by selling its Registrable Securities, and such participation will not affect the obligation of Registrant to effect demand registration statements for Holder under this Section 7; PROVIDED that, if the managing underwriters of such offering advise Registrant in writing that in their opinion the number of shares of Company Common Stock requested to be included in such registration exceeds the number which can be sold in such offering, Registrant will include the shares requested to be included therein by Holder pro rata with the shares intended to be included therein by Registrant and such other stockholders.

(c) The registration rights set forth in this Section 7 are subject to the condition that the Holder will provide the Registrant with such information with respect to the Holder's Registrable Securities, the plan for distribution thereof, and such other information with respect to the Holder as, in the reasonable judgment of counsel for the Registrant, is necessary to enable the Registrant to include in a registration statement all facts required to be disclosed with respect to a registration thereunder.

B-4

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

(d) A registration effected under this Section 7 will be effected at the Registrant's expense, except for underwriting discounts and commissions and the fees and expenses of counsel to the Holder, and the Registrant will provide to the underwriters such documentation (including certificates, opinions of counsel and "comfort" letters from auditors) as are customary in connection with underwritten public offerings and as such underwriters may reasonably require. In connection with any registration, the Holder and the Registrant agree to enter into an underwriting agreement reasonably acceptable to each such party, in form and substance customary for transactions of this type with the underwriters participating in such offering.

(e)  INDEMNIFICATION.

(i) The Registrant will indemnify the Holder, each of its directors and officers and each person who controls the Holder within the meaning of Section 15 of the Securities Act, and each underwriter of the Registrant's securities, with respect to any registration, qualification or compliance which has been effected pursuant to this Agreement, against all expenses, claims, losses, damages or liabilities (or actions in respect thereof), including any of the foregoing incurred in settlement of any litigation, commenced or threatened, arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, prospectus, offering circular or other document, or any amendment or supplement thereto, incident to any such registration, qualification or compliance, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, or any violation by the Registrant of any rule or regulation promulgated under the Securities Act applicable to the Registrant in connection with any such registration, qualification or compliance, and the Registrant will reimburse the Holder, each of its directors and officers and each person who controls the Holder within the meaning of Section 15 of the Securities Act, and each underwriter for any legal and any other expenses reasonably incurred in connection with investigating, preparing or defending any such claim, loss, damage, liability or action; PROVIDED, that the Registrant will not be liable in any such case to the extent that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement or omission or alleged untrue statement or omission, made in reliance upon and in conformity with written information furnished to the Registrant by such Holder or director or officer or controlling person or underwriter seeking indemnification.

(ii) The Holder will indemnify the Registrant, each of its directors and officers and each underwriter of the Registrant's securities covered by such registration statement and each person who controls the Registrant within the meaning of Section 15 of the Securities Act, against all expenses, claims, losses, damages and liabilities (or actions in respect thereof), including any of the foregoing incurred in settlement of any litigation, commenced or threatened, arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, offering circular or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by the Holder of any rule or regulation promulgated under the Securities Act applicable to the Holder in connection with any such registration, qualification or compliance, and will reimburse the Registrant, such directors, officers or control persons or underwriters for any legal or any other expenses reasonably incurred in connection with investigating, preparing or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular or other document in reliance upon and in conformity with written information furnished to the Registrant by the Holder for use therein; PROVIDED, that in no event will any

B-5

Exhibit H
0972

indemnity under this Section 7(e) exceed the net proceeds of the offering received by the Holder.

(iii) Each party entitled to indemnification under this Section 7(e) (the "INDEMNIFIED PARTY") will give notice to the party required to provide indemnification (the "INDEMNIFYING PARTY") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and will permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom, PROVIDED, that counsel for the Indemnifying Party, who will conduct the defense of such claim or litigation, will be approved by the Indemnified Party (whose approval will not unreasonably be withheld), and the Indemnified Party may participate in such defense at such party's expense; PROVIDED, HOWEVER, that the Indemnifying Party will pay such expense if representation of the Indemnified Party by counsel retained by the Indemnifying Party would be inappropriate due to actual or potential differing interests between the Indemnified Party and any other party represented by such counsel in such proceeding, and PROVIDED FURTHER, HOWEVER, that the failure of any Indemnified Party to give notice as provided herein will not relieve the Indemnifying Party of its obligations under this Section 7(e) unless the failure to give such notice is materially prejudicial to an Indemnifying Party's ability to defend such action. No Indemnifying Party, in the defense of any such claim or litigation will, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. No Indemnifying Party will be required to indemnify any Indemnified Party with respect to any settlement entered into without such Indemnifying Party's prior consent (which will not be unreasonably withheld).

8.  PROFIT LIMITATION.

(a) Notwithstanding any other provision in this Agreement or the Reorganization Agreement, in no event shall Parent's Total Profit (as defined below) exceed $60,000,000 (the "MAXIMUM PROFIT") and, if Parent's Total Profit otherwise would exceed the Maximum Profit, Parent, at its sole discretion, shall either (i) reduce the number of Option Shares subject to the Option, (ii) deliver to the Company for cancellation Option Shares (or other securities into which such Option Shares are converted or exchanged) previously purchased by, or Company Shares issued by the Company pursuant to Section 7.3 of the Reorganization Agreement ("TERMINATION FEE SHARES") (or other securities into which such Termination Fee Shares are converted or exchanged) to, Parent, (iii) pay cash to the Company, (iv) reduce the number of Termination Fee Shares to be paid by the Company or (v) any combination of the foregoing, so that Parent's actually realized Total Profit shall not exceed the Maximum Profit after taking into account the foregoing actions; PROVIDED, HOWEVER, that to the extent the payment by the Company of cash to Parent in satisfaction of the Termination Fee pursuant to Section 7.3 of the Reorganization Agreement would cause Parent's Total Profit to exceed the Maximum Profit (after Parent has had an opportunity to reduce Parent's Total Profit pursuant to clause (iv) of this sentence), then the Company need not pay such cash portion of the Termination Fee.

(b) For purposes of this Agreement, "TOTAL PROFIT" shall mean: (i) the aggregate amount (before taxes) of (A) any excess of (x) the net cash amounts or fair market value of any property received by Parent pursuant to a sale of Option Shares or Termination Fee Shares (or securities into which such shares are converted or exchanged) over (y) the Parent's aggregate purchase price for such Option Shares (or other securities), plus (B) any amounts received by Parent pursuant on the repurchase of the Option by the Company pursuant to Section 6, plus (C) any termination fee paid in cash by the Company and received by Parent pursuant to the Reorganization Agreement, minus (ii) the amounts of any cash previously paid by Parent to the Company pursuant to this

B-6

Exhibit H
0973

Section 8 plus the value of the Option Shares or Termination Fee Shares (or other securities) previously delivered by Parent to the Company for cancellation pursuant to this Section 8.

(c) For purposes of Section 8(a) and clause (ii) of Section 8(b), the value of any Option Shares delivered by Parent to the Company shall be the Market/Tender Offer Price of such Option Shares, and the value of any Termination Fee Shares delivered by Parent to the Company shall be the Market/Tender Offer Price of such Termination Fee Shares (deeming the date of notice of intent described in Section 6(a)(i) to be the date on which such Termination Fee Shares have been issued to Parent).

9.  ADJUSTMENT UPON CHANGES IN CAPITALIZATION OR ISSUANCE OF TERMINATION FEE SHARES.

(a) In the event of any change in the Company Shares by reason of stock dividends, stock splits, reverse stock splits, mergers (other than the Merger), recapitalizations, combinations, exchanges of shares and the like, the type and number of shares or securities subject to the Option, the Exercise Price will be adjusted appropriately, and proper provision will be made in the agreements governing such transaction so that Parent will receive, upon exercise of the Option, the number and class of shares or other securities or property that Parent would have received in respect of the Company Shares if the Option had been exercised immediately prior to such event or the record date therefor, as applicable.

(b) Without limiting the parties' relative rights and obligations under the Reorganization Agreement, if the number of outstanding Company Shares increases or decreases after the date of this Agreement (other than pursuant to an event described in Section 9(a)) or if the Company satisfies a portion of its obligation to pay Parent the Termination Fee pursuant to Section 7.3 by issuing to Parent shares of Company Common Stock (the "TERMINATION FEE SHARES"), then the number of Company Shares subject to the Option (including those Option Shares which may have already been exercised) will be adjusted so that the sum of the number of Company Shares subject to the Option and the number of Termination Fee Shares equals 19.99% of the number of Company Shares then issued and outstanding, without giving effect to any Option Shares or Termination Fee Shares; provided, however, that if any such reduction in the number of Company Shares subject to the Option shall decrease Parent's Total Profit and if such decreased Total Profit would be below the Maximum Profit, then the Exercise Price of the Company Shares then subject to the Option shall be reduced to the extent necessary to cause Parent's Total Profit to equal the lesser of (i) the Maximum Profit or (ii) Parent's Total Profit in the absence of such reduction in the number of Company Shares subject to the Option.

10.  RESTRICTIVE LEGENDS.  Each certificate representing Option Shares issued to Parent hereunder will include a legend in substantially the following form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY BE REOFFERED OR SOLD ONLY IF SO REGISTERED OR IF AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. SUCH SECURITIES ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER AS SET FORTH IN THE STOCK OPTION AGREEMENT DATED AS OF APRIL 5, 2000, A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER.

B-7

Exhibit H
0974

It is understood and agreed that (i) the reference to restrictions arising under the Securities Act in the above legend will be removed by delivery of substitute certificate(s) without such reference if such Option Shares have been registered pursuant to the Securities Act, such Option Shares have been sold in reliance on and in accordance with Rule 144 under the Securities Act or Holder has delivered to Registrant a copy of a letter from the staff of the SEC, or an opinion of counsel in form and substance reasonably satisfactory to Registrant and its counsel, to the effect that such legend is not required for purposes of the Securities Act and (ii) the reference to restrictions pursuant to this Agreement in the above legend will be removed by delivery of substitute certificate(s) without such reference if the Option Shares evidenced by certificate(s) containing such reference have been sold or transferred in compliance with the provisions of this Agreement under circumstances that do not require the retention of such reference.

11.   LISTING AND HSR FILING.  The Company, upon the request of Parent, will promptly file an application to list the Company Shares to be acquired upon exercise of the Option for quotation on the Nasdaq National Market and will use commercially reasonable efforts to obtain approval of such listing as soon as practicable. Promptly after the date hereof, each of the parties hereto will promptly file with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice all required premerger notification and report forms and other documents and exhibits required to be filed under the HSR Act to permit the acquisition of the Company Shares subject to the Option at the earliest possible date.

12.   BINDING EFFECT.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Nothing contained in this Agreement, express or implied, is intended to confer upon any person other than the parties hereto and their respective successors and permitted assigns any rights or remedies of any nature whatsoever by reason of this Agreement. Any shares sold by a party in compliance with the provisions of Section 7 will, upon consummation of such sale, be free of the restrictions imposed with respect to such shares by this Agreement and any transferee of such shares will not be entitled to the rights of such party. Certificates representing shares sold in a registered public offering pursuant to Section 7 will not be required to bear the legend set forth in Section 10.

13.   SPECIFIC PERFORMANCE.  The parties hereto recognize and agree that if for any reason any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy. Accordingly, each party hereto agrees that in addition to other remedies the other party hereto will be entitled to an injunction restraining any violation or threatened violation of the provisions of this Agreement or the right to enforce any of the covenants or agreements set forth herein by specific performance. In the event that any action will be brought in equity to enforce the provisions of the Agreement, neither party hereto will allege, and each party hereto hereby waives the defense, that there is an adequate remedy at law.

14.   ENTIRE AGREEMENT.  This Agreement and the Reorganization Agreement (including the appendices thereto) constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersede all other prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof.

15.   FURTHER ASSURANCES.  Each party hereto will execute and deliver all such further documents and instruments and take all such further action as may be necessary in order to consummate the transactions contemplated hereby.

16.   VALIDITY.  The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of the other provisions of this Agreement, which will remain in full force and effect. In the event any Governmental Entity of competent jurisdiction holds any provision of this Agreement to be null, void or unenforceable, the parties hereto will negotiate in good faith and will

B-8

Exhibit H
0975

execute and deliver an amendment to this Agreement in order, as nearly as possible, to effectuate, to the extent permitted by law, the intent of the parties hereto with respect to such provision.

17. NOTICES. All notices and other communications hereunder will be in writing and will be deemed given if delivered personally or by commercial delivery service, or sent via telecopy (receipt confirmed) to the parties at the following addresses or telecopy numbers (or at such other address or telecopy numbers for a party as will be specified by like notice):

(a) if to Parent, to:

Peregrine Systems, Inc.
12670 High Bluff Drive
San Diego, California 92130
Attention: General Counsel
Telecopy No.: (858) 794-5057

with copies to:

Wilson Sonsini Goodrich & Rosati
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304-1050
Attention: Douglas H. Collom
Telecopy No.: (650) 493-6811

and

Wilson Sonsini Goodrich & Rosati
Professional Corporation
Spear Street Tower
One Market
San Francisco, California 94105
Attention: Steve L. Camahort
Telecopy No.: (415) 947-2099

(b) if to the Company, to:

Harbinger Corporation
1277 Lenox Park Boulevard
Atlanta, Georgia 30319
Attention: James Travers
           Loren B. Wimpfheimer

Telecopy No.: (404) 848-2864
And (404) 467-3476

with a copy to:

Brobeck, Phleger & Harrison LLP
Two Embarcadero Place
2200 Geng Road
Palo Alto, California 94303
Attention: Rod J. Howard
Telecopy No.: (650) 496-2885 and (650) 496-2777

18. GOVERNING LAW. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware without giving effect to the conflicts of law principles thereof.

B-9

Exhibit H
0976

19.  EXPENSES.  Except as otherwise expressly provided herein or in the Reorganization Agreement, all costs and expenses incurred in connection with the transactions contemplated by this Agreement will be paid by the party incurring such expenses.

20.  AMENDMENTS; WAIVER.  This Agreement may be amended by the parties hereto and the terms and conditions hereof may be waived only by an instrument in writing signed on behalf of each of the parties hereto, or, in the case of a waiver, by an instrument signed on behalf of the party waiving compliance.

21.  ASSIGNMENT.  Neither of the parties hereto may sell, transfer, assign or otherwise dispose of any of its rights or obligations under this Agreement or the Option created hereunder to any other person, without the express written consent of the other party, except that the rights and obligations hereunder will inure to the benefit of and be binding upon any successor of a party hereto.

22.  COUNTERPARTS.  This Agreement may be executed in counterparts, each of which will be deemed to be an original, but both of which, taken together, will constitute one and the same instrument.

23.  EFFECT OF HEADINGS.  The section headings are for convenience only and shall not affect the construction or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

PEREGRINE SYSTEMS, INC.

Signature:
-----------------------------------------------------------------
Print Name:
-----------------------------------------------------------------
Print Title:
-----------------------------------------------------------------

HARBINGER CORPORATION

Signature:
-----------------------------------------------------------------
Print Name:
-----------------------------------------------------------------
Print Title:
-----------------------------------------------------------------

B-10

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0977

ANNEX C

FORM OF COMPANY VOTING AGREEMENT

THIS VOTING AGREEMENT (this "AGREEMENT") is made and entered into as of April 5, 2000, among Peregrine Systems, Inc., a Delaware corporation ("PARENT"), and the undersigned shareholder and/or option holder (the "SHAREHOLDER") of Harbinger Corporation, a Georgia corporation (the "COMPANY").

RECITALS

The Company, Merger Sub (as defined below) and Parent have entered into an Agreement and Plan of Reorganization (the "REORGANIZATION AGREEMENT"), which provides for the merger (the "MERGER") of a wholly-owned subsidiary of Parent ("MERGER SUB") with and into the Company. Pursuant to the Merger, all outstanding capital stock of the Company shall be converted into the right to receive common stock of Parent, as set forth in the Reorganization Agreement; and

Shareholder is the beneficial owner (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "EXCHANGE ACT")) of such number of shares of the outstanding capital stock of the Company and shares subject to outstanding options and warrants as is indicated on the signature page of this Agreement.

NOW, THEREFORE, intending to be legally bound, the parties hereto agree as follows:

1.  CERTAIN DEFINITIONS.  Capitalized terms not defined herein shall have the meanings ascribed to them in the Reorganization Agreement. For purposes of this Agreement:

(a)  "EXPIRATION DATE"  shall mean the earlier to occur of (i) such date and time as the Reorganization Agreement shall have been terminated pursuant to Article VII thereof, or (ii) such date and time as the Merger shall become effective in accordance with the terms and provisions of the Reorganization Agreement.

(b)  "PERSON"  shall mean any (i) individual, (ii) corporation, limited liability company, partnership or other entity, or (iii) governmental authority.

(c)  "SHARES"  shall mean: (i) all securities of the Company (including all shares of Company Common Stock and all options, warrants and other rights to acquire shares of Company Common Stock) beneficially owned by Shareholder as of the date of this Agreement; and (ii) all additional securities of the Company (including all additional shares of Company Common Stock and all additional options, warrants and other rights to acquire shares of Company Common Stock) of which Shareholder beneficial acquires ownership during the period from the date of this Agreement through the Expiration Date.

(d)  TRANSFER.  A Person shall be deemed to have effected a "TRANSFER" of a security if such person directly or indirectly: (i) sells, pledges, encumbers, grants an option with respect to, transfers or disposes of such security or any interest in such security; or (ii) enters into an agreement or commitment providing for the sale of, pledge of, encumbrance of, grant of an option with respect to, transfer of or disposition of such security or any interest therein.

2.  TRANSFER OF SHARES.

(a)  TRANSFEREE OF SHARES TO BE BOUND BY THIS AGREEMENT.  Shareholder agrees that, during the period from the date of this Agreement through the Expiration Date, except as may be required by court order or operation of law, Shareholder shall not cause or permit any Transfer of any of the Shares to be effected unless each Person to which such Shares or any interest in any of such Shares is or may be transferred shall have (i) executed a counterpart of this Voting Agreement and a proxy in the form attached hereto as EXHIBIT A and (ii) agreed to hold such Shares or interest in such Shares subject to all of the terms and provisions of this Agreement.

C-1

Exhibit H
0978

(b)   TRANSFER OF VOTING RIGHTS.   Shareholder agrees that, during the period from the date of this Agreement through the Expiration Date, Shareholder shall not deposit (or permit the deposit of) any Shares in a voting trust or grant any proxy or enter into any voting agreement or similar agreement in contravention of the obligations of Shareholder under this Agreement with respect to any of the Shares.

3.   AGREEMENT TO VOTE SHARES.   At every meeting of the shareholders of the Company called, and at every adjournment thereof, and on every action or approval by written consent of the shareholders of the Company, Shareholder (in his or her capacity as such) shall cause the Shares to be voted (to the extent such Shares have voting rights and are entitled to vote thereon) (i) in favor of adoption and approval of the Reorganization Agreement and approval of the Merger, (ii) in favor of any matter that could reasonably be expected to facilitate the Merger, (iii) against any Acquisition Proposal and (iv) against any matter that could reasonably be expected to facilitate any Acquisition Proposal. Notwithstanding the foregoing, and notwithstanding any other provision of this Agreement, nothing in this Agreement shall limit or restrict Shareholder from acting in Shareholder's capacity as a director or officer of Company (it being understood that this Agreement shall apply to Shareholder solely in Shareholder's capacity as a shareholder of Company) or voting in Shareholder's sole discretion on any matter other than those matters referred to in the foregoing clauses (i), (ii), (iii) and (iv) of this Section 3.

4.   IRREVOCABLE PROXY.   Concurrently with the execution of this Agreement, Shareholder agrees to deliver to Parent a proxy in the form attached hereto as EXHIBIT A (the "PROXY"), which shall be irrevocable to the fullest extent permissible by law, with respect to the Shares.

5.   REPRESENTATIONS AND WARRANTIES OF THE SHAREHOLDER.   Shareholder (i) is the beneficial owner of the shares of Company Common Stock and the options and warrants to purchase shares of Common Stock of the Company indicated on the final page of this Agreement, free and clear of any liens, claims, options, rights of first refusal, co-sale rights, charges or other encumbrances that, in each case, would deprive Parent of the benefits of this Agreement; (ii) does not beneficially own any securities of the Company other than the shares of Company Common Stock and options and warrants to purchase shares of Common Stock of the Company indicated on the final page of this Agreement; and (iii) has full power and authority to make, enter into and carry out the terms of this Agreement and the Proxy.

6.   LEGENDING OF SHARES.   If so requested by Parent, Shareholder agrees that the Shares shall bear a legend stating that they are subject to this Agreement and to an irrevocable proxy. Subject to the terms of Section 2 hereof, Shareholder agrees that Shareholder shall not Transfer the Shares without first having the aforementioned legend affixed to the certificates representing the Shares.

7.   TERMINATION.   This Agreement shall terminate and shall have no further force or effect as of the Expiration Date.

8.   MISCELLANEOUS.

(a)   SEVERABILITY.   If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

(b)   BINDING EFFECT AND ASSIGNMENT.   This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but, except as otherwise specifically provided herein, neither this Agreement nor any of the rights, interests or obligations of the parties hereto may be assigned by either of the parties without prior written consent of the other.

C-2

Exhibit H
0979

(c)  AMENDMENTS AND MODIFICATION.  This Agreement may not be modified, amended, altered or supplemented except upon the execution and delivery of a written agreement executed by the parties hereto.

(d)  SPECIFIC PERFORMANCE; INJUNCTIVE RELIEF.  The parties hereto acknowledge that Parent shall be irreparably harmed and that there shall be no adequate remedy at law for a violation of any of the covenants or agreements of Shareholder set forth herein. Therefore, it is agreed that, in addition to any other remedies that may be available to Parent upon any such violation, Parent shall have the right to enforce such covenants and agreements by specific performance, injunctive relief or by any other means available to Parent at law or in equity.

(e)  NOTICES.  All notices and other communications pursuant to this Agreement shall be in writing and deemed to be sufficient if contained in a written instrument and shall be deemed given if delivered personally, telecopied, sent by nationally-recognized overnight courier or mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the following address (or at such other address for a party as shall be specified by like notice):

If to Parent:          Peregrine Systems, Inc.
                       12670 High Bluff Drive
                       San Diego, California 92130
                       Attention: Richard T. Nelson, Vice President
                       Corporate Development
                       Eric Deller, Vice President, General
                       Counsel
                       Telecopy No.: (858) 794-5057

With copies to:        Wilson Sonsini Goodrich & Rosati
                       Professional Corporation
                       650 Page Mill Road
                       Palo Alto, California 94304
                       Attention: Douglas H. Collom
                       Facsimile No.: (650) 845-5000

                       and

                       Wilson Sonsini Goodrich & Rosati
                       Professional Corporation
                       Spear Street Tower
                       One Market
                       San Francisco, California 94105
                       Attention: Steve L. Camahort
                       Facsimile No.: (415) 947-2099

If to Shareholder:     To the address for notice set forth on the signature
                       page hereof.

With a copy to:        Brobeck, Phleger & Harrison LLP
                       Two Embarcadero Place
                       2200 Geng Road
                       Palo Alto, California 94303
                       Attention: Rod J. Howard
                       Telecopy No.: (650) 496-2885 and (650) 496-2771

                       and

                                C-3

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0980

Morris Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Attention: John C. Yates
Facsimile No.: (404) 365-9532

(f)   GOVERNING LAW.  Except to the extent mandatorily governed by the laws of the State of Georgia, this Agreement shall be governed by the laws of the State of Delaware, without giving effect to the conflicts of law principles thereof.

(g)   ENTIRE AGREEMENT.  This Agreement and the Proxy contain the entire understanding of the parties in respect of the subject matter hereof, and supersede all prior negotiations and understandings between the parties with respect to such subject matter.

(h)   EFFECT OF HEADINGS.  The section headings are for convenience only and shall not affect the construction or interpretation of this Agreement.

(i)   COUNTERPARTS.  This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement.

(j)   PERMITTED ACTIVITIES.  Nothing in this Agreement shall be construed to require Shareholder to exercise any option, warrant or other right to acquire Company Common Stock, and nothing in this Agreement shall be construed to prohibit Shareholder from (i) engaging in customary sales of Shares consistent with Shareholder's past sales (but in no event aggregating more than 15% of Shareholder's total Shares), or (ii) engaging in a net exercise of any option, warrant or other right to acquire Company Common Stock (if the contractual terms of such option, warrant, or other right currently permit such a net exercise).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

C-4

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0981

IN WITNESS WHEREOF, the parties have caused this Voting Agreement to be duly executed on the day and year first above written.

PEREGRINE SYSTEMS, INC.

---

SHAREHOLDER

---

Signature

---

Signature

---

Print Name

---

Print Name

---

Print Title

---

Print Title

---

---

Print Address

---

Print Telephone

---

Print Facsimile No.

Shares beneficially owned:

------------ shares of Company Common Stock

------------ shares of Company Common Stock issuable upon exercise of outstanding options or warrants

C-5

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0982

IRREVOCABLE PROXY

The undersigned shareholder of Harbinger Corporation, a Georgia corporation (the "COMPANY"), hereby irrevocably (to the fullest extent permitted by law) appoints the members on the Board of Directors of Peregrine Systems, Inc., a Delaware corporation ("PARENT"), and each of them, as the sole and exclusive attorneys and proxies of the undersigned, with full power of substitution and resubstitution, to vote and exercise all voting and related rights (to the full extent that the undersigned is entitled to do so) with respect to all of the shares of capital stock of the Company that now are or hereafter may be beneficially owned by the undersigned, and any and all other shares or securities of the Company issued or issuable in respect thereof on or after the date hereof (collectively, the "SHARES") in accordance with the terms of this Proxy. The Shares beneficially owned by the undersigned shareholder of the Company as of the date of this Proxy are listed on the final page of this Proxy. Upon the undersigned's execution of this Proxy, any and all prior proxies given by the undersigned with respect to any Shares are hereby revoked and the undersigned agrees not to grant any subsequent proxies with respect to the Shares on any matters covered hereby until after the Expiration Date (as defined below).

This Proxy is irrevocable (to the fullest extent permitted by law), is coupled with an interest and is granted pursuant to that certain Voting Agreement of even date herewith by and among Parent and the undersigned shareholder (the "VOTING AGREEMENT"), and is granted in consideration of Parent entering into that certain Agreement and Plan of Reorganization (the "REORGANIZATION AGREEMENT"), among Parent, Soda Acquisition Corporation, a Delaware corporation and a wholly-owned subsidiary of Parent ("MERGER SUB"), and the Company. The Reorganization Agreement provides for the merger of Merger Sub with and into the Company in accordance with its terms (the "MERGER"). As used herein, the term "EXPIRATION DATE" shall mean the earlier to occur of (i) such date and time as the Reorganization Agreement shall have been validly terminated pursuant to Article VII thereof or (ii) such date and time as the Merger shall become effective in accordance with the terms and provisions of the Reorganization Agreement.

The attorneys and proxies named above, and each of them, are hereby authorized and empowered by the undersigned, at any time prior to the Expiration Date, to act as the undersigned's attorney and proxy to vote the Shares, and to exercise all voting, consent and similar rights of the undersigned with respect to the Shares (including, without limitation, the power to execute and deliver written consents) at every annual, special or adjourned meeting of shareholders of the Company and in every written consent in lieu of such meeting (i) in favor of approval of the Reorganization Agreement and the Merger, (ii) in favor of any matter that could reasonably be expected to facilitate the Merger, (iii) against any Acquisition Proposal (as defined in the Reorganization Agreement) and (iv) against any matter that could reasonably be expected to facilitate any Acquisition Proposal.

The attorneys and proxies named above may not exercise this Proxy on any other matter except as provided above. The undersigned shareholder may vote, and grant proxies with respect to, the Shares on all other matters.

Any obligation of the undersigned hereunder shall be binding upon the successors and assigns of the undersigned.

C-6

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0983

This Proxy is irrevocable (to the fullest extent permitted by law). This Proxy shall terminate, and be of no further force and effect, automatically upon the Expiration Date.

Dated: April 5, 2000

Signature of Shareholder:

_____

Print Name of Shareholder:

_____

Shares beneficially owned:

_____

shares of Company Common Stock

shares of the Company Common Stock issuable upon exercise of outstanding options or warrants

C-7

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0984

ANNEX D

FORM OF PARENT VOTING AGREEMENT

THIS VOTING AGREEMENT (this "AGREEMENT") is made and entered into as of April 5, 2000, among Harbinger Corporation, a Georgia corporation ("COMPANY"), and the undersigned stockholder and/or option holder (the "STOCKHOLDER") of Peregrine Systems, Inc., a Delaware corporation ("PARENT").

RECITALS

A. Company, Merger Sub (as defined below) and Parent have entered into an Agreement and Plan of Reorganization (the "REORGANIZATION AGREEMENT"), which provides for the merger (the "MERGER") of a wholly-owned subsidiary of Parent ("MERGER SUB") with and into the Company. Pursuant to the Merger, all outstanding capital stock of the Company shall be converted into the right to receive common stock of Parent, as set forth in the Reorganization Agreement; and

B. Stockholder is the beneficial owner (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "EXCHANGE ACT")) of such number of shares of the outstanding capital stock of Parent and shares subject to outstanding options and warrants as is indicated on the signature page of this Agreement.

NOW, THEREFORE, intending to be legally bound, the parties hereto agree as follows:

1. CERTAIN DEFINITIONS. Capitalized terms not defined herein shall have the meanings ascribed to them in the Reorganization Agreement. For purposes of this Agreement:

(a) "EXPIRATION DATE" shall mean the earlier to occur of (i) such date and time as the Reorganization Agreement shall have been terminated pursuant to Article VII thereof, or (ii) such date and time as the Merger shall become effective in accordance with the terms and provisions of the Reorganization Agreement.

(b) "PERSON" shall mean any (i) individual, (ii) corporation, limited liability company, partnership or other entity, or (iii) governmental authority.

(c) "SHARES" shall mean: (i) all securities of the Parent (including all shares of Parent Common Stock and all options, warrants and other rights to acquire shares of Parent Common Stock) beneficially owned by Stockholder as of the date of this Agreement; and (ii) all additional securities of Parent (including all additional shares of Parent Common Stock and all additional options, warrants and other rights to acquire shares of Parent Common Stock) of which Stockholder acquires beneficial ownership during the period from the date of this Agreement through the Expiration Date.

(d) TRANSFER. A Person shall be deemed to have effected a "TRANSFER" of a security if such person directly or indirectly: (i) sells, pledges, encumbers, grants an option with respect to, transfers or disposes of such security or any interest in such security; or (ii) enters into an agreement or commitment providing for the sale of, pledge of, encumbrance of, grant of an option with respect to, transfer of or disposition of such security or any interest therein.

2. TRANSFER OF SHARES.

(a) TRANSFEREE OF SHARES TO BE BOUND BY THIS AGREEMENT. Stockholder agrees that, during the period from the date of this Agreement through the Expiration Date, except as may be required by court order or operation of law, Stockholder shall not cause or permit any Transfer of any of the Shares to be effected unless each Person to which any of such Shares or any interest in any of such Shares is or may be transferred shall have (i) executed a counterpart of this Voting

D-1

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0985

Agreement and a proxy in the form attached hereto as EXHIBIT A and (ii) agreed to hold such Shares or interest in such Shares subject to all of the terms and provisions of this Agreement.

(b)  TRANSFER OF VOTING RIGHTS.  Stockholder agrees that, during the period from the date of this Agreement through the Expiration Date, Stockholder shall not deposit (or permit the deposit of) any Shares in a voting trust or grant any proxy or enter into any voting agreement or similar agreement in contravention of the obligations of Stockholder under this Agreement with respect to any of the Shares.

3.  AGREEMENT TO VOTE SHARES.  At every meeting of the stockholders of Parent called, and at every adjournment thereof, and on every action or approval by written consent of the stockholders of Parent, Stockholder (in his or her capacity as such) shall cause the Shares to be voted (to the extent such Shares have voting rights and are entitled to vote thereon) (i) in favor of the Share Issuance, (ii) in favor of any matter that could reasonably be expected to facilitate the Share Issuance, and (iii) against any matter that could reasonably be expected to prevent the Merger. Notwithstanding the foregoing, and notwithstanding any other provision of this Agreement, nothing in this Agreement shall limit or restrict Stockholder from acting in Stockholder's capacity as a director or officer of Parent (it being understood that this Agreement shall apply to Stockholder solely in Stockholder's capacity as a stockholder of Parent) or voting in Stockholder's sole discretion on any matter other than those matters referred to in the foregoing clauses (i), (ii), and (iii) of this Section 3.

4.  IRREVOCABLE PROXY.  Concurrently with the execution of this Agreement, Stockholder agrees to deliver to Company a proxy in the form attached hereto as EXHIBIT A (the "PROXY"), which shall be irrevocable to the fullest extent permissible by law, with respect to the Shares.

5.  REPRESENTATIONS AND WARRANTIES OF THE STOCKHOLDER.  Stockholder (i) is the beneficial owner of the shares of Parent Common Stock and the options and warrants to purchase shares of Common Stock of Parent indicated on the final page of this Agreement, free and clear of any liens, claims, options, rights of first refusal, co-sale rights, charges or other encumbrances that, in each case, would deprive Company of the benefits of this Agreement; (ii) does not beneficially own any securities of Parent other than the shares of Parent Common Stock and options and warrants to purchase shares of Common Stock of Parent indicated on the final page of this Agreement; and (iii) has full power and authority to make, enter into and carry out the terms of this Agreement and the Proxy.

6.  LEGENDING OF SHARES.  If so requested by Company, Stockholder agrees that the Shares shall bear a legend stating that they are subject to this Agreement and to an irrevocable proxy. Subject to the terms of Section 2 hereof, Stockholder agrees that Stockholder shall not Transfer the Shares without first having the aforementioned legend affixed to the certificates representing the Shares.

7.  TERMINATION.  This Agreement shall terminate and shall have no further force or effect as of the Expiration Date.

8.  MISCELLANEOUS.

(a)  SEVERABILITY.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

(b)  BINDING EFFECT AND ASSIGNMENT.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but, except as otherwise specifically provided herein, neither this Agreement nor any of the rights, interests or obligations of the parties hereto may be assigned by either of the parties without prior written consent of the other.

D-2

Exhibit H
0986

(c) AMENDMENTS AND MODIFICATION. This Agreement may not be modified, amended, altered or supplemented except upon the execution and delivery of a written agreement executed by the parties hereto.

(d) SPECIFIC PERFORMANCE; INJUNCTIVE RELIEF. The parties hereto acknowledge that Parent shall be irreparably harmed and that there shall be no adequate remedy at law for a violation of any of the covenants or agreements of Stockholder set forth herein. Therefore, it is agreed that, in addition to any other remedies that may be available to Company upon any such violation, Company shall have the right to enforce such covenants and agreements by specific performance, injunctive relief or by any other means available to Company at law or in equity.

(e) NOTICES. All notices and other communications pursuant to this Agreement shall be in writing and deemed to be sufficient if contained in a written instrument and shall be deemed given if delivered personally, telecopied, sent by nationally-recognized overnight courier or mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the following address (or at such other address for a party as shall be specified by like notice):

```
If to Company:     Harbinger Corporation
                   1277 Lenox Park Boulevard
                   Atlanta, Georgia 30319
                   Attention: James Travers
                   Loren B. Wimpfheimer
Telecopy No.:      (404) 467-3476

With a copy to:    Brobeck, Phleger & Harrison LLP
                   Two Embarcadero Place
                   2200 Geng Road
                   Palo Alto, California 94303
                   Attention: Rod J. Howard
                   Facsimile No.: (650) 496-2885 and (650) 496-2777

                   and

                   Morris Manning & Martin, LLP
                   1600 Atlanta Financial Center
                   3343 Peachtree Road, NE
                   Atlanta, Georgia 30326
                   Attention: John C. Yates
                   Facsimile No.: (404) 365-9532
```

If to Stockholder: To the address for notice set forth on the signature page hereof.

(f) GOVERNING LAW. This Agreement shall be governed by the laws of the State of Delaware, without giving effect to the conflicts of law principles thereof.

(g) ENTIRE AGREEMENT. This Agreement and the Proxy contain the entire understanding of the parties in respect of the subject matter hereof, and supersede all prior negotiations and understandings between the parties with respect to such subject matter.

(h) EFFECT OF HEADINGS. The section headings are for convenience only and shall not affect the construction or interpretation of this Agreement.

(i) COUNTERPARTS. This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement.

D-3

Exhibit H
0987

(j) Nothing in this Agreement shall be construed to require Stockholder to exercise any option, warrant or other right to acquire Parent Common Stock, and nothing in this Agreement shall be construed to prohibit Stockholder from (i) engaging in customary sales of Shares consistent with Stockholder's past sales (but in no event aggregating more than 15% of Stockholder's total Shares), or (ii) engaging in a net exercise of any option, warrant or other right to acquire Parent Common Stock (if the contractual terms of such option, warrant, or other right currently permit such a net exercise).

[Remainder Of This Page Left Blank Intentionally]

D-4

Exhibit H
0988

IN WITNESS WHEREOF, the parties have caused this Voting Agreement to be duly executed on the day and year first above written.

COMPANY                                          STOCKHOLDER

------------------------------------------       ------------------------------------------
Signature                                        Signature

------------------------------------------       ------------------------------------------
Print Name                                       Print Name

------------------------------------------       ------------------------------------------
Print Title                                      Print Title

                                                 ------------------------------------------

                                                 ------------------------------------------
                                                 Print Address

                                                 ------------------------------------------
                                                 Print Telephone

                                                 ------------------------------------------
                                                 Print Facsimile No.

                                                 Shares beneficially owned:

                                                 ------------ shares of Parent Common Stock

                                                 ------------ shares of Parent Common Stock
                                                              issuable upon exercise of
                                                              outstanding options or warrants

[SIGNATURE PAGE TO PARENT VOTING AGREEMENT]

D-5

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0989

IRREVOCABLE PROXY

The undersigned stockholder of Peregrine Systems, Inc., a Delaware corporation (the "PARENT"), hereby irrevocably (to the fullest extent permitted by law) appoints the directors on the Board of Directors of Harbinger Corporation, a Georgia corporation ("COMPANY"), and each of them, as the sole and exclusive attorneys and proxies of the undersigned, with full power of substitution and resubstitution, to vote and exercise all voting and related rights (to the full extent that the undersigned is entitled to do so) with respect to all of the shares of capital stock of Parent that now are or hereafter may be beneficially owned by the undersigned, and any and all other shares or securities of Parent issued or issuable in respect thereof on or after the date hereof (collectively, the "SHARES") in accordance with the terms of this Proxy. The Shares beneficially owned by the undersigned stockholder of Parent as of the date of this Proxy are listed on the final page of this Proxy. Upon the undersigned's execution of this Proxy, any and all prior proxies given by the undersigned with respect to any Shares are hereby revoked and the undersigned agrees not to grant any subsequent proxies with respect to the Shares on any matters covered hereby until after the Expiration Date (as defined below).

This Proxy is irrevocable (to the fullest extent permitted by law), is coupled with an interest and is granted pursuant to that certain Voting Agreement of even date herewith by and among Company and the undersigned stockholder (the "VOTING AGREEMENT"), and is granted in consideration of Company entering into that certain Agreement and Plan of Reorganization (the "REORGANIZATION AGREEMENT"), among Parent, Soda Acquisition Corporation, a Delaware corporation and a wholly-owned subsidiary of Parent ("MERGER SUB"), and the Company. The Reorganization Agreement provides for the merger of Merger Sub with and into the Company in accordance with its terms (the "MERGER"). As used herein, the term "EXPIRATION DATE" shall mean the earlier to occur of (i) such date and time as the Reorganization Agreement shall have been validly terminated pursuant to Article VII thereof or (ii) such date and time as the Merger shall become effective in accordance with the terms and provisions of the Reorganization Agreement.

The attorneys and proxies named above, and each of them, are hereby authorized and empowered by the undersigned, at any time prior to the Expiration Date, to act as the undersigned's attorney and proxy to vote the Shares, and to exercise all voting, consent and similar rights of the undersigned with respect to the Shares (including, without limitation, the power to execute and deliver written consents) at every annual, special or adjourned meeting of stockholders of Parent and in every written consent in lieu of such meeting (i) in favor of the Share Issuance (as defined in the Reorganization Agreement), (ii) in favor of any matter that reasonably be expected to facilitate the Stock Issuance or the Merger, and (iii) against any matter that could reasonably be expected to prevent the Merger.

The attorneys and proxies named above may not exercise this Proxy on any other matter except as provided above. The undersigned stockholder may vote, and grant proxies with respect to, the Shares on all other matters.

Any obligation of the undersigned hereunder shall be binding upon the successors and assigns of the undersigned.

D-6

Exhibit H
0990

This Proxy is irrevocable (to the fullest extent permitted by law). This Proxy shall terminate, and be of no further force and effect, automatically upon the Expiration Date.

Dated: April 5, 2000

Signature of Stockholder:    ------------------------------------------------

Print Name of Stockholder:   ------------------------------------------------

Shares beneficially owned:

                     shares of Parent Common Stock
------------

                     shares of the Parent Common Stock issuable upon
------------  exercise of outstanding options or warrants

[SIGNATURE PAGE TO IRREVOCABLE PROXY]

D-7

VOTING AGREEMENT
(FORM OF VOTING AGREEMENT ENTERED BY JOHN J. MOORES)

THIS VOTING AGREEMENT (this "AGREEMENT") is made and entered into as of April 5, 2000, among Harbinger Corporation, a Georgia corporation ("COMPANY"), and the undersigned stockholder and/or option holder (the "STOCKHOLDER") of Peregrine Systems, Inc., a Delaware corporation ("PARENT").

RECITALS

A. Company, Merger Sub (as defined below) and Parent have entered into an Agreement and Plan of Reorganization (the "REORGANIZATION AGREEMENT"), which provides for the merger (the "MERGER") of a wholly-owned subsidiary of Parent ("MERGER SUB") with and into the Company. Pursuant to the Merger, all outstanding capital stock of the Company shall be converted into the right to receive common stock of Parent, as set forth in the Reorganization Agreement; and

B. Stockholder is the beneficial owner (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "EXCHANGE ACT")) of such number of shares of the outstanding capital stock of Parent and shares subject to outstanding options and warrants as is indicated on the signature page of this Agreement.

NOW, THEREFORE, intending to be legally bound, the parties hereto agree as follows:

1. CERTAIN DEFINITIONS. Capitalized terms not defined herein shall have the meanings ascribed to them in the Reorganization Agreement. For purposes of this Agreement:

(a) "EXPIRATION DATE" shall mean the earlier to occur of (i) such date and time as the Reorganization Agreement shall have been terminated pursuant to Article VII thereof, or (ii) such date and time as the Merger shall become effective in accordance with the terms and provisions of the Reorganization Agreement.

(b) "PERSON" shall mean any (i) individual, (ii) corporation, limited liability company, partnership or other entity, or (iii) governmental authority.

(c) "SHARES" shall mean all securities of the Parent (including all shares of Parent Common Stock and all options, warrants and other rights to acquire shares of Parent Common Stock) beneficially owned by Stockholder as of the record date for the determination of stockholders of Parent entitled to vote on any matter subject to this Agreement.

2. AGREEMENT TO VOTE SHARES. At every meeting of the stockholders of Parent called, and at every adjournment thereof, and on every action or approval by written consent of the stockholders of Parent, Stockholder (in his or her capacity as such) shall cause the Shares to be voted (to the extent such Shares have voting rights and are entitled to vote thereon) (i) in favor of the Share Issuance, (ii) in favor of any matter that could reasonably be expected to facilitate the Share Issuance, and (iii) against any matter that could reasonably be expected to prevent the Merger. Notwithstanding the foregoing, and notwithstanding any other provision of this Agreement, nothing in this Agreement shall limit or restrict Stockholder from acting in Stockholder's capacity as a director or officer of Parent (it being understood that this Agreement shall apply to Stockholder solely in Stockholder's capacity as a stockholder of Parent) or voting in Stockholder's sole discretion on any matter other than those matters referred to in the foregoing clauses (i), (ii), and (iii) of this Section 2.

3. IRREVOCABLE PROXY. Concurrently with the execution of this Agreement, Stockholder agrees to deliver to Company a proxy in the form attached hereto as EXHIBIT A (the "PROXY"), which shall be irrevocable to the fullest extent permissible by law, with respect to the Shares.

4. REPRESENTATIONS AND WARRANTIES OF THE STOCKHOLDER. Stockholder (i) is the beneficial owner of the shares of Parent Common Stock and the options and warrants to purchase shares of Common

D-8

Exhibit H
0992

Stock of Parent indicated on the final page of this Agreement, free and clear of any liens, claims, options, rights of first refusal, co-sale rights, charges or other encumbrances that, in each case, would deprive Company of the benefits of this Agreement; (ii) does not beneficially own any securities of Parent other than the shares of Parent Common Stock and options and warrants to purchase shares of Common Stock of Parent indicated on the final page of this Agreement; and (iii) has full power and authority to make, enter into and carry out the terms of this Agreement and the Proxy.

5. TERMINATION. This Agreement shall terminate and shall have no further force or effect as of the Expiration Date.

6. MISCELLANEOUS.

(a) SEVERABILITY. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

(b) BINDING EFFECT AND ASSIGNMENT. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but, except as otherwise specifically provided herein, neither this Agreement nor any of the rights, interests or obligations of the parties hereto may be assigned by either of the parties without prior written consent of the other.

(c) AMENDMENTS AND MODIFICATION. This Agreement may not be modified, amended, altered or supplemented except upon the execution and delivery of a written agreement executed by the parties hereto.

(d) SPECIFIC PERFORMANCE; INJUNCTIVE RELIEF. The parties hereto acknowledge that Parent shall be irreparably harmed and that there shall be no adequate remedy at law for a violation of any of the covenants or agreements of Stockholder set forth herein. Therefore, it is agreed that, in addition to any other remedies that may be available to Company upon any such violation, Company shall have the right to enforce such covenants and agreements by specific performance, injunctive relief or by any other means available to Company at law or in equity.

(e) NOTICES. All notices and other communications pursuant to this Agreement shall be in writing and deemed to be sufficient if contained in a written instrument and shall be deemed given if delivered personally, telecopied, sent by nationally-recognized overnight courier or mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the following address (or at such other address for a party as shall be specified by like notice):

If to Company:    Harbinger Corporation
                  1055 Lenox Park Boulevard
                  Atlanta, Georgia 30319
                  Attention: James Travers, Chief Executive Officer
                  Loren B. Wimpfheimer, Vice President, Business
                      Development/General Counsel
                  Facsimile No.: (404) 848-2864 and (404) 467-3476

D-9

Exhibit H
0993

With a copy to:  Brobeck, Phleger & Harrison LLP
                 Two Embarcadero Place
                 2200 Geng Road
                 Palo Alto, California 94303
                 Attention:  Rod J. Howard
                 Facsimile No.:  (650) 496-2885 and (650) 496-2777

                 and

                 Morris Manning & Martin, LLP
                 1600 Atlanta Financial Center
                 3343 Peachtree Road, NE
                 Atlanta, Georgia 30326
                 Attention:  John C. Yates
                 Facsimile No.:  (404) 365-9532

If to Stockholder: To the address for notice set forth on the signature page hereof.

(f)   GOVERNING LAW.  This Agreement shall be governed by the laws of the State of Delaware, without giving effect to the conflicts of law principles thereof.

(g)   ENTIRE AGREEMENT.  This Agreement and the Proxy contain the entire understanding of the parties in respect of the subject matter hereof, and supersede all prior negotiations and understandings between the parties with respect to such subject matter.

(h)   EFFECT OF HEADINGS.  The section headings are for convenience only and shall not affect the construction or interpretation of this Agreement.

(i)   COUNTERPARTS.  This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement.

(j) Nothing in this Agreement shall be construed to require Stockholder to exercise any option, warrant or other right to acquire Parent Common Stock.

D-10

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0994

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on the day and year first above written.

HARBINGER CORPORATION                    STOCKHOLDER

------------------------------------    ------------------------------------
Signature                               Signature

------------------------------------    ------------------------------------
Print Name                              Print Name

------------------------------------    ------------------------------------
Print Title                             Print Title

                                        ------------------------------------

                                        ------------------------------------
                                        Print Address

                                        ------------------------------------
                                        Print Telephone

                                        ------------------------------------
                                        Print Facsimile No.

[SIGNATURE PAGE TO PARENT VOTING AGREEMENT]

D-11

Exhibit H
0995

IRREVOCABLE PROXY

The undersigned stockholder of Peregrine Systems, Inc., a Delaware corporation (the "PARENT"), hereby irrevocably (to the fullest extent permitted by law) appoints the directors on the Board of Directors of Harbinger corporation, a Georgia corporation ("COMPANY"), and each of them, as the sole and exclusive attorneys and proxies of the undersigned, with full power of substitution and resubstitution, to vote and exercise all voting and related rights (to the full extent that the undersigned is entitled to do so) with respect to all of the shares of capital stock of Parent that are beneficially owned by the undersigned as of the record date for the determination of stockholders of Parent entitled to vote on any matter subject to this Agreement (collectively, the "SHARES") in accordance with the terms of this Proxy. Upon the undersigned's execution of this Proxy, any and all prior proxies given by the undersigned with respect to any Shares are hereby revoked and the undersigned agrees not to grant any subsequent proxies with respect to the Shares on any matters covered hereby until after the Expiration Date (as defined below).

This Proxy is irrevocable (to the fullest extent permitted by law), is coupled with an interest and is granted pursuant to that certain Voting Agreement of even date herewith by and among Company and the undersigned stockholder (the "VOTING AGREEMENT"), and is granted in consideration of Company entering into that certain Agreement and Plan of Reorganization (the "REORGANIZATION AGREEMENT"), among Parent, Soda Acquisition Corporation, a Delaware corporation and a wholly-owned subsidiary of Parent ("MERGER SUB"), and the Company. The Reorganization Agreement provides for the merger of Merger Sub with and into the Company in accordance with its terms (the "MERGER"). As used herein, the term "EXPIRATION DATE" shall mean the earlier to occur of (i) such date and time as the Reorganization Agreement shall have been validly terminated pursuant to Article VII thereof or (ii) such date and time as the Merger shall become effective in accordance with the terms and provisions of the Reorganization Agreement.

The attorneys and proxies named above, and each of them, are hereby authorized and empowered by the undersigned, at any time prior to the Expiration Date, to act as the undersigned's attorney and proxy to vote the Shares, and to exercise all voting, consent and similar rights of the undersigned with respect to the Shares (including, without limitation, the power to execute and deliver written consents) at every annual, special or adjourned meeting of stockholders of Parent and in every written consent in lieu of such meeting (i) in favor of the Share Issuance (as defined in the Reorganization Agreement), (ii) in favor of any matter that reasonably be expected to facilitate the Stock Issuance or the Merger, and (iii) against any matter that could reasonably be expected to prevent the Merger.

The attorneys and proxies named above may not exercise this Proxy on any other matter except as provided above. The undersigned stockholder may vote, and grant proxies with respect to, the Shares on all other matters.

Any obligation of the undersigned hereunder shall be binding upon the successors and assigns of the undersigned.

D-12

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0996

This Proxy is irrevocable (to the fullest extent permitted by law). This Proxy shall terminate, and be of no further force and effect, automatically upon the Expiration Date.

Dated: April 5, 2000


Signature of Stockholder:    _____

Print Name of Stockholder:   _____

[SIGNATURE PAGE TO IRREVOCABLE PROXY]

D-13

Exhibit H
0997

[GOLDMAN, SACHS & CO. LETTERHEAD]

PERSONAL AND CONFIDENTIAL

April 5, 2000

Board of Directors
Harbinger Corporation
1277 Lenox Park Blvd
Atlanta, GA 30319-5396

Gentlemen:

You have requested our opinion as to the fairness from a financial point of view to the holders of the outstanding shares of Common Stock, par value $.0001 per share (the "Shares"), of Harbinger Corporation (the "Company") of the Exchange Ratio (as defined below) pursuant to the Agreement and Plan of Reorganization, dated as of April 5, 2000, among Peregrine Systems, Inc. ("Peregrine"), Soda Acquisition Corporation, a wholly-owned subsidiary of Peregrine ("Merger Sub"), and the Company (the "Agreement"). Pursuant to the Agreement, Merger Sub will be merged with and into the Company (the "Merger") and each Share will be converted into the right to receive 0.75 of a share (the "Exchange Ratio") of Common Stock, par value $0.001 per share, of Peregrine (the "Peregrine Common Stock").

Goldman, Sachs & Co., as part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for estate, corporate and other purposes. We are familiar with the Company having acted as its financial advisor in connection with, and having participated in certain of the negotiations leading to, the Agreement. In addition, Goldman, Sachs & Co. is a full service securities firm and in the ordinary course of its trading activities it may from time to time effect transactions, for its own account or the account of customers, and hold positions in securities or options on securities of the Company and Peregrine.

In connection with this opinion, we have reviewed, among other things, the Agreement; Annual Reports to Stockholders and Annual Reports on Form 10-K of the Company for the five years ended December 31, 1999 and of Peregrine for the three fiscal years ended March 31, 1999, certain interim reports to stockholders and Quarterly Reports on Form 10-Q of the Company and Peregrine; certain

[LETTERHEAD]

E-1

Exhibit H
0998

Board of Directors
Harbinger Corporation
April 5, 2000
Page Two

other communications from the Company and Peregrine to their respective
stockholders; certain internal financial analyses and forecasts for the Company
prepared by its management; and certain cost savings and operating synergies
projected by the management of the Company to result from the transaction
contemplated by the Agreement (the "Synergies"). We also have held discussions
with members of the senior management of the Company and Peregrine regarding
their assessment of the strategic rationale for, and the potential benefits of,
the transaction contemplated by the Agreement and the past and current business
operations, financial condition and future prospects of their respective
companies. In addition, we have reviewed the reported price and trading activity
for the Shares and the Peregrine Common Stock, which like many Internet related
stocks have been and are likely to continue to be subject to significant short
term price and trading volatility, compared certain financial and stock market
information for the Company and Peregrine with similar information for certain
other companies the securities of which are publicly traded, reviewed the
financial terms of certain recent business combinations in the enterprise
software, B2B e-commerce and enterprise e-commerce industries specifically and
in other industries generally and performed such other studies and analyses as
we considered appropriate.

    We have relied upon the accuracy and completeness of all of the financial
and other information discussed with or reviewed by us and have assumed such
accuracy and completeness for purposes of rendering this opinion. In that
regard, we have assumed, with your consent, that the Synergies have been
reasonably prepared on a basis reflecting the best currently available judgments
and estimates of the management of the Company. As you are aware, Peregrine did
not make available to us its projections of expected future performance.
Accordingly, our review of such matters was limited to discussions with the
senior management of Peregrine of certain publicly available estimates of
research analysts for Peregrine (as commented on by senior management of
Peregrine, the "Analyst Projections"). We have also assumed, with your consent,
that the Analyst Projections have been prepared on a basis that does not
materially differ from the view of the management of Peregrine as to the future
performance of Peregrine. In addition, we have not made an independent
evaluation or appraisal of the assets and liabilities of the Company or
Peregrine or any of their subsidiaries and we have not been furnished with any
such evaluation or appraisal. Our advisory services and the opinion expressed
herein are provided for the information and assistance of the Board of Directors
of the Company in connection with its consideration of the transaction
contemplated by the Agreement and such opinion does not constitute a
recommendation as to how any holder of Shares should vote with respect to such
transaction.

    Based upon and subject to the foregoing and based upon such other matters as
we consider relevant, it is our opinion that, as of the date hereof, the
Exchange Ratio pursuant to the Agreement is fair from a financial point of view
to the holders of Shares.

Very truly yours,


/s/ Goldman, Sachs & Co.


GOLDMAN, SACHS & CO.


                                    E-2

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
0999

[LOGO]                                                                                                    [LOGO]

April 5, 2000

Board of Directors
Peregrine Systems, Inc.
12670 High Bluff Drive
San Diego, CA 92130

Gentlemen:

   Deutsche Bank Securities Inc. ("Deutsche Bank") has acted as financial
advisor to Peregrine Systems, Inc. ("Peregrine") in connection with the proposed
merger of Peregrine and Harbinger Corporation (the "Company") pursuant to the
Agreement and Plan of Merger and Reorganization (the "Merger Agreement") among
the Company, Peregrine and Soda Acquisition Corporation, a wholly owned
subsidiary of Peregrine ("Merger Sub"), which provides, among other things, for
the merger of Merger Sub with and into the Company (the "Transaction"), as a
result of which the Company will become a wholly owned subsidiary of Peregrine.
As set forth more fully in the Merger Agreement, as a result of the Transaction,
each share of the Common Stock, par value $.0001 per share, of the Company
("Company Common Stock") not owned directly or indirectly by the Company or
Peregrine will be converted into the right to receive 0.75 shares (the "Exchange
Ratio") of Common Stock, par value $0.001 per share, of Peregrine ("Peregrine
Common Stock"). The terms and conditions of the Transaction are more fully set
forth in the Merger Agreement.

   You have requested Deutsche Bank's opinion, as investment bankers, as to the
fairness, from a financial point of view, to Peregrine of the Exchange Ratio.

   In connection with Deutsche Bank's role as financial advisor to Peregrine,
and in arriving at its opinion, Deutsche Bank has reviewed certain publicly
available financial and other information concerning the Company and Peregrine
and certain internal analyses and other information furnished to it by the
Company and Peregrine. Deutsche Bank has also held discussions with members of
the senior managements of the Company and Peregrine regarding the businesses and
prospects of their respective companies and the joint prospects of a combined
company. In addition, Deutsche Bank has (i) reviewed the reported prices and
trading activity for Company Common Stock and Peregrine Common Stock,
(ii) compared certain financial and stock market information for the Company and
Peregrine with similar information for certain other companies whose securities
are publicly traded, (iii) reviewed the financial terms of certain recent
business combinations which it deemed comparable in whole or in part,
(iv) reviewed the terms of drafts of the Merger Agreement and certain related
documents, and (v) performed such other studies and analyses and considered such
other factors as it deemed appropriate.

   Deutsche Bank has not assumed responsibility for independent verification
of, and has not independently verified, any information, whether publicly
available or furnished to it, concerning the Company or Peregrine, including,
without limitation, any financial information, forecasts or projections
considered in connection with the rendering of its opinion. Accordingly, for
purposes of its opinion, Deutsche Bank has assumed and relied upon the accuracy
and completeness of all such information and Deutsche Bank has not conducted a
physical inspection of any of the properties or assets, and has not prepared or
obtained any independent evaluation or appraisal of any of the assets or
liabilities, of the Company or Peregrine. With respect to the financial
forecasts and projections made available to Deutsche Bank and used in its
analyses, Deutsche Bank has assumed that they have been reasonably prepared on
bases reflecting the best currently available estimates and judgments of the
management of

F-1A

Exhibit H
1000

Peregrine Systems, Inc.
April 3, 2000
Page 2

the Company or Peregrine, as the case may be, as to the matters covered thereby. In rendering its opinion, Deutsche Bank expresses no view as to the reasonableness of such forecasts and projections or the assumptions on which they are based. Deutsche Bank's opinion is necessarily based upon economic, market and other conditions as in effect on, and the information made available to it as of, the date hereof. Although subsequent developments may affect this opinion, Deutsche Bank assumes no obligation to update, revise or reaffirm this opinion.

For purposes of rendering its opinion, Deutsche Bank has assumed that, in all respects material to its analysis, the representations and warranties of Peregrine, Merger Sub and the Company contained in the Merger Agreement are true and correct, Peregrine, Merger Sub and the Company each will perform all of the covenants and agreements to be performed by it under the Merger Agreement, and all conditions to the obligations of each of Peregrine, Merger Sub and the Company to consummate the Transaction will be satisfied without any waiver thereof. Deutsche Bank has also assumed that all material governmental, regulatory or other approvals and consents required in connection with the consummation of the Transaction will be obtained and that in connection with obtaining any necessary governmental, regulatory or other approvals and consents, or any amendments, modifications or waivers to any agreements, instruments or orders to which either Peregrine or the Company is a party or is subject or by which it is bound, no limitations, restrictions or conditions will be imposed or amendments, modifications or waivers made that would have a material adverse effect on Peregrine or the Company or materially reduce the contemplated benefits of the Transaction to Peregrine. In addition, you have informed Deutsche Bank, and accordingly for purposes of rendering its opinion Deutsche Bank has assumed, that the Transaction will be tax-free to each of Peregrine and the Company and their respective stockholders and that the Transaction will be accounted for as a purchase transaction. Finally, Deutsche Bank, with your permission, has given no consideration to the lawsuit described in Section 2.10(A) of the Company Schedule (as defined in the Merger Agreement) and has assumed that such lawsuit will not have a material adverse effect on the Company or Peregrine.

This opinion is addressed to, and for the use and benefit of, the Board of Directors of Peregrine and is not a recommendation to the stockholders of Peregrine to approve the Transaction and the issuance of shares of Peregrine Common Stock in the Transaction. This opinion is limited to the fairness, from a financial point of view, to Peregrine of the Exchange Ratio, and Deutsche Bank expresses no opinion as to the merits of the underlying decision by Peregrine to engage in the Transaction.

Deutsche Bank will be paid a fee for its services as financial advisor to Peregrine in connection with the Transaction, a substantial portion of which is contingent upon consummation of the Transaction. We are an affiliate of Deutsche Bank AG (together with its affiliates, the "DB Group"). One or more members of the DB Group have, from time to time, provided investment banking services to Peregrine and the Company for which it has received compensation, including the acquisition of Innovative Technology, Inc. by Peregrine. In addition, one or more members of the DB Group have provided investment banking services to the Company, including in connection with the initial public offering of the Company, a follow-on equity offering of the Company, and the Company's acquisition of Premenos Technology Corporation. In the ordinary course of business, members of the DB Group may actively trade in the securities and other instruments and obligations of Peregrine and the Company for their own accounts and for the accounts of their customers. Accordingly, the DB Group may at any time hold a long or short position in such securities, instruments and obligations.

F-2A

Exhibit H
1001

Peregrine Systems, Inc.
April 3, 2000
Page 3

    This opinion may not be published or otherwise used or referred to, nor
shall any public reference to Deutsche Bank be made, without the prior written
consent of Deutsche Bank. Deutsche Bank hereby consents, however, to the
inclusion of this opinion in its entirety as an exhibit to any proxy or
registration statement distributed to the shareholders of Peregrine in
connection with the approval of the proposed Transaction and to any description
of, or reference to, this opinion therein in form and substance acceptable to
Deutsche Bank and its legal counsel.

    Based upon and subject to the foregoing, it is Deutsche Bank's opinion as
investment bankers that the Exchange Ratio is fair, from a financial point of
view, to Peregrine.

                              Very truly yours,

                              /s/ Deutsche Bank Securities, Inc.

                              DEUTSCHE BANK SECURITIES INC.

          F-3A

Exhibit H
1002

PART II
INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 20. INDEMNIFICATION OF DIRECTORS AND OFFICERS.

Section 145 of the Delaware General Corporation Law permits a corporation to include in its charter documents and in agreements between the corporation and its directors and officers, provisions expanding the scope of indemnification beyond that specifically provided by the current law.

Article IX of the Peregrine amended and restated certificate of incorporation provides for the indemnification of directors to the fullest extent permitted under Delaware law.

Article VI of the Peregrine bylaws provides for the indemnification of officers, directors and third parties acting on behalf of the corporation to the fullest extent permitted under the General Corporation Law of Delaware.

The Registrant has entered into indemnification agreements with its directors and executive officers, in addition to indemnification provided for in Peregrine's amended and restated certificate of incorporation and bylaws, and intends to enter into indemnification agreements with any new directors and executive officers in the future.

In addition, pursuant to the terms of the merger agreement, Peregrine has agreed to fulfill and honor in all respects the obligations of Harbinger pursuant to any indemnification agreements between Harbinger and its directors and officers in effect immediately prior to the merger (the "Indemnified Parties") and any indemnification provisions under Harbinger's certificate of incorporation or bylaws as in effect immediately prior to the merger. The certificate of incorporation and bylaws of the surviving corporation will contain provisions with respect to exculpation and indemnification that are at least as favorable to the Indemnified Parties as those contained in the certificate of incorporation and bylaws of Harbinger as in effect on April 5, 2000, which provisions will not be amended, repealed or otherwise modified for a period of six years from the effective time of the merger in any manner that would adversely affect the rights thereunder of individuals who, immediately prior to the effective time of the merger, were directors, officers, employees or agents of Harbinger, unless such modification is required by law.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the registrant pursuant to the foregoing provisions, the registrant has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

ITEM 21. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.
  (A)  EXHIBITS

| EXHIBIT NO. | | EXHIBIT TITLE |
|---|---|---|
| 2.1 | *(a) | Agreement and Plan of Merger and Reorganization by and among Peregrine Systems, Inc., Soda Acquisition Corporation and Harbinger Corporation, dated as of April 5, 2000. |
| 3.1A | (c) | Amended and Restated Certificate of Incorporation as filed with the Secretary of the State of Delaware on February 11, 1997. |
| 3.1B | (a) | Certificate of Amendment of the Amended and Restated Certificate of Incorporation as filed with the Secretary of State of the State of Delaware on September 10, 1998. |
| 3.2 | (c) | Bylaws, as amended. |
| 4.1 | (c) | Specimen Common Stock Certificate. |

II-1

Exhibit H
1003

| EXHIBIT NO. | | EXHIBIT TITLE |
|---|---|---|
| 5.1 | +(a) | Opinion of Wilson Sonsini Goodrich & Rosati, Professional Corporation. |
| 8.1 | (a) | Opinion of Wilson Sonsini Goodrich & Rosati, Professional Corporation, as to Tax Matters. |
| 8.2 | (a) | Opinion of Morris Manning & Martin, L.L.P., as to Tax Matters. |
| 9.1 | *(a) | Form of Voting Agreement between Peregrine Systems, Inc. and certain shareholders of Harbinger Corporation dated as of April 5, 2000. |
| 9.2 | *(a) | Form of Voting Agreement between Harbinger Corporation and certain stockholders of Peregrine Systems, Inc. dated as of April 5, 2000. |
| 9.3 | *(a) | Stock Option Agreement between Peregrine Systems, Inc. and Harbinger Corporation dated as of April 5, 2000. |
| 9.4 | *(a) | Affiliate Agreement between Peregrine Systems, Inc. and certain shareholders of Harbinger Corporation dated April 5, 2000. |
| 10.1 | (c) | Nonqualified Stock Option Plan, as amended, and forms of Stock Option Agreement and Stock Buy-Sell Agreement. |
| 10.2 | (c) | Nonqualified Stock Option Plan, as amended, and forms of Stock Option Agreement and Stock Buy-Sell Agreement. |
| 10.3A | (f) | 1994 Stock Option Plan, as amended through July 1998. |
| 10.3B | (f) | 1995 Stock Option Plan for French Employees (a supplement to the 1994 Stock Option Plan). |
| 10.4 | (d) | Form of Stock Option Agreement under the 1994 Stock Option Plan, as amended through February 6, 1997. |
| 10.5 | (d) | 1997 Employee Stock Purchase Plan and forms of participation agreement thereunder. |
| 10.6 | (d) | 1997 Director Option Plan. |
| 10.7 | (c) | Form of Indemnification Agreement for directors and officers. |
| 10.8 | (h) | Credit Agreement dated as of July 30, 1999 by and between the Registrant and Bank of America, N.A., Banc of America Securities LLC and BankBoston, N.A. |
| 10.9 | (c) | Sublease between the Registrant and JMI Services, Inc. |
| 10.10 | (c) | Lease between the Registrant and the Mutual Life Insurance Company of New York dated October 26, 1994, as amended in August 1995, and Notifications of Assignment dated June 14, 1996 and December 9, 1996 for the Registrant's headquarters at 12670 High Bluff Drive, San Diego, CA. |
| 10.11 | (c) | Lease between the Registrant and the Mutual Life Insurance Company of New York dated October 26, 1994, as amended in August 1995, and Notification of Assignment dated December 9, 1996 for the Registrant's headquarters at 12680 High Bluff Drive, San Diego, CA. |
| 10.14 | (c) | XVT Stock Option Agreement dated January 18, 1995 between the Registrant and Christopher Cole, as amended on October 3, 1996. |
| 10.16 | (d) | Restricted Stock Agreement dated November 1, 1995 between the Registrant and David Farley. |
| 10.17 | (c) | Stock Option Agreement dated as of December 7, 1990 between the Registrant and Christopher Cole, as amended on October 26, 1995. |

Exhibit H
1004

II-2

Exhibit H
1005

| EXHIBIT NO. | | EXHIBIT TITLE |
|---|---|---|
| 10.18 | (c) | Form of Stock Option Agreement under 1995 Stock Option Plan for French Employees. |
| 10.19 | (c) | Form of Stock Option Agreement under 1997 Director Option Plan. |
| 10.22 | (b) | Executive Officer Incentive Program and Form of Restricted Stock Agreement. |
| 10.24 | (g) | Lease between the Registrant and KR-Carmel Partners LLC dated June 9, 1999 for Building No. 1 of the Registrant's future campus in San Diego, CA. |
| 10.25 | (g) | Lease between the Registrant and KR-Carmel Partners LLC dated June 9, 1999 for Building No. 2 of the Registrant's future campus in San Diego, CA. |
| 10.26 | (g) | Lease between the Registrant and KR-Carmel Partners LLC dated June 9, 1999 for Building No. 3 of the Registrant's future campus in San Diego, CA. |
| 10.27 | (g) | Lease between the Registrant and KR-Carmel Partners LLC dated June 9, 1999 for Building No. 5 of the Registrant's future campus in San Diego, CA. |
| 10.28 | (g) | Lease between the Registrant and KR-Carmel Partners LLC dated June 9, 1999 for Building No. 4 of the Registrant's future campus in San Diego, CA. |
| 10.29 | (h) | 1999 Nonstatutory Stock Option Plan. |
| 21.1 | (h) | Peregrine Systems, Inc. Subsidiaries. |
| 23.1A | (a) | Consent of Arthur Andersen LLP, Independent Public Accountants (relating to financial statements for Peregrine Systems). |
| 23.2A | (a) | Consent of KPMG LLP, Independent Accountants (relating to financial statements for Harbinger Corporation). |
| 23.3 | +(a) | Consent of Wilson Sonsini Goodrich & Rosati, Professional Corporation (included in Exhibit 5.1). |
| 23.4 | (a) | Consent of Wilson Sonsini Goodrich & Rosati, Professional Corporation (included in Exhibit 8.1) |
| 23.5 | (a) | Consent of Morris Manning & Martin, L.L.P. (included in Exhibit 8.2). |
| 23.6 | (a) | Consent of Goldman, Sachs & Co. |
| 23.7 | *(a) | Consent of Deutsche Bank Securities Inc. (included in Exhibit 99.2). |
| 24.1 | +(a) | Power of Attorney (see page II-6). |
| 27.1 | +(a) | Financial Data Schedule for Peregrine Systems, Inc. |
| 27.2 | +(a) | Financial Data Schedule for Harbinger Corporation. |
| 99.1 | *(a) | Opinion of Goldman, Sachs & Co. |
| 99.2 | *(a) | Opinion of Deutsche Banc Securities Inc. |
| 99.3 | +(a) | Form of Proxy Card of Peregrine Systems, Inc. |
| 99.4 | +(a) | Form of Proxy Card of Harbinger Corporation. |

------------------------

\* Filed as an annex to the Proxy Statement/Prospectus constituting part of this Registration Statement and incorporated herein by reference.

\+ Previously filed.

(a) Filed herewith.

(b) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Registration Statement on Form S-1 (Registration Statement 333-39891), which the Securities and Exchange Commission declared effective on November 19, 1997.

II-3

Exhibit H
1007

(c) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Registration Statement on Form S-1 (Registration Statement 333-21483), which the Securities and Exchange Commission declared effective on April 8, 1997.

(d) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Annual Report on Form 10-K for the year ended March 31, 1997.

(e) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1997.

(f) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Registration Statement on Form S-8 (Registration Statement 333-65541) which became effective upon its filing on October 9, 1998.

(g) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Annual Report on Form 10-K for the year ended March 31, 1999.

(h) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Annual Report on Form 10-K for the year ended March 31, 2000.

(B) FINANCIAL STATEMENTS SCHEDULES

PEREGRINE SYSTEMS, INC.
SCHEDULE II--VALUATION AND QUALIFYING ACCOUNTS
FOR THE YEARS ENDED MARCH 31, 2000, 1999, AND 1998
(IN THOUSANDS)

| | BALANCE AT BEGINNING OF PERIOD | ADDITIONS CHARGED TO EXPENSE | ADDITIONS ACQUIRED | DEDUCTIONS | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| **Year ended March 31, 2000** | | | | | |
| Allowance for doubtful accounts......... | $1,248 | $635 | $ 430 | $ (134) | $ 2,179 |
| Accrued acquisition costs............... | $3,379 | $ -- | $19,555 | $ (7,810) | $15,124 |
| **Year ended March 31, 1999** | | | | | |
| Allowance for doubtful accounts......... | $ 485 | $516 | $ 325 | $ (78) | $ 1,248 |
| Accrued acquisition costs............... | $1,112 | $ -- | $13,510 | $ (11,243) | $ 3,379 |
| **Year ended March 31, 1998** | | | | | |
| Allowance for doubtful accounts......... | $ 220 | $168 | $ 97 | $ -- | $ 485 |
| Accrued acquisition costs............... | $ -- | $ -- | $ 3,500 | $ (2,388) | $ 1,112 |

ITEM 22. UNDERTAKINGS.

(a) The undersigned registrant hereby undertakes to respond to requests for information that is incorporated by reference into the prospectus pursuant to Items 4, 10(b), 11, or 13 of Form S-4, within one business day of receipt of such request, and to send the incorporated documents by first class mail or other equally prompt means. This includes information contained in documents filed subsequent to the effective date of the registration statement through the date of responding to the request.

(b) The undersigned registrant hereby undertakes to supply by means of a post-effective amendment all information concerning the transaction, and the company being acquired therein, that was not subject of and included in the registration statement when it became effective.

II-4

Exhibit H
1008

(c) The undersigned registrant hereby undertakes as follows:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement: (i) To include any prospectus required by section 10(a)(3) of the Securities Act of 1933; (ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement; (iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material changes to such information in the registration statement;

(2) That, for the purpose of determining any liability under the Securities Act of 1933, as amended, such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof; and

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(d) Insofar as indemnification for liabilities arising under the Securities Act of 1993 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

(e) The undersigned registrant hereby undertakes that, for the purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to section 13(a) or section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(f) The undersigned registrant hereby undertakes as follows:

(1) Prior to any public offering of the securities registered hereunder through the use of a prospectus which is a part of this registration statement, by any person or party who is deemed to be an underwriter within the meaning of Rule 145(c), the issuer undertakes that such reoffering prospectus will contain the information called for by the applicable registration form with respect to reofferings by persons who may be deemed underwriters, in addition to the information called for by the other Items of the applicable forms; and

(2) That every prospectus (i) that is filed pursuant to paragraph (f)(1) immediately preceding, or (ii) that purports to meet the requirements of section 10(a)(3) of the Act and is used in connection with an offering of securities subject to Rule 415, will be filed as part of an amendment to the registration statement and will not be used until such amendment is effective, and that, for purposes of determining liability under the Securities Act of 1933, each post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

II-5

Exhibit H
1009

SIGNATURES

Pursuant to the requirements of the Securities Act, Peregrine Systems, Inc. has duly caused this Amendment No.1 to this Registration Statement on Form S-4 to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of San Diego, State of California, on May 22, 2000.

PEREGRINE SYSTEMS, INC.

By:        /s/ DAVID A. FARLEY
-------------------------------------------
        David A. Farley
   SENIOR VICE PRESIDENT, FINANCE AND
ADMINISTRATION AND CHIEF FINANCIAL OFFICER

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURES | TITLE | DATE |
| --- | --- | --- |
| /s/ STEPHEN P. GARDNER*<br>-------------------------------------<br>Stephen P. Gardner | President and Chief Executice Officer (Principal Executive Officer) and Director | May 22, 2000 |
| /s/ DAVID A. FARLEY<br>-------------------------------------<br>David A. Farley | Senior Vice President, Finance and Administration, Chief Financial Officer (Principal Financial Officer) and Director | May 22, 2000 |
| /s/ MATTHEW C. GLESS*<br>-------------------------------------<br>Matthew C. Gless | Vice President, Finance, and Chief Accounting Officer (Principal Accounting Officer) | May 22, 2000 |
| /s/ JOHN J. MOORES*<br>-------------------------------------<br>John J. Moores | Chairman of the Board of Directors | May 22, 2000 |
| /s/ CHRISTOPHER A. COLE*<br>-------------------------------------<br>Christopher A. Cole | Director | May 22, 2000 |
| /s/ RICHARD A. HOSLEY II*<br>-------------------------------------<br>Richard A. Hosley | Director | May 22, 2000 |

II-6

Exhibit H
1010

| SIGNATURES | TITLE | DATE |
|------------|-------|------|

/s/ CHARLES E. NOELL III*

-------------------------------------------------   Director    May 22, 2000

Charles E. Noell III

/s/ NORRIS VAN DEN BERG*

-------------------------------------------------   Director    May 22, 2000

Norris Van Den Berg

/s/ THOMAS G. WATROUS, SR.*

-------------------------------------------------   Director    May 22, 2000

Thomas G. Watrous, Sr.

*By:        /s/ DAVID A. FARLEY

         -------------------------------------

              David A. Farley
              ATTORNEY-IN-FACT

II-7

Exhibit H
1011

EXHIBIT INDEX

| EXHIBIT NO. | | EXHIBIT TITLE |
|---|---|---|
| 2.1 | *(a) | Agreement and Plan of Merger and Reorganization by and among Peregrine Systems, Inc., Soda Acquisition Corporation and Harbinger Corporation, dated as of April 5, 2000. |
| 3.1A | (c) | Amended and Restated Certificate of Incorporation as filed with the Secretary of the State of Delaware on February 11, 1997. |
| 3.1B | (a) | Certificate of Amendment of the Amended and Restated Certificate of Incorporation as filed with the Secretary of State of the State of Delaware on September 10, 1998. |
| 3.2 | (c) | Bylaws, as amended. |
| 4.1 | (c) | Specimen Common Stock Certificate. |
| 5.1 | +(a) | Opinion of Wilson Sonsini Goodrich & Rosati, Professional Corporation. |
| 8.1 | (a) | Opinion of Wilson Sonsini Goodrich & Rosati, Professional Corporation, as to Tax Matters. |
| 8.2 | (a) | Opinion of Morris Manning & Martin, L.L.P., as to Tax Matters. |
| 9.1 | *(a) | Form of Voting Agreement between Peregrine Systems, Inc. and certain shareholders of Harbinger Corporation dated as of April 5, 2000. |
| 9.2 | *(a) | Form of Voting Agreement between Harbinger Corporation and certain stockholders of Peregrine Systems, Inc. dated as of April 5, 2000. |
| 9.3 | *(a) | Stock Option Agreement between Peregrine Systems, Inc. and Harbinger Corporation dated as of April 5, 2000. |
| 9.4 | *(a) | Affiliate Agreement between Peregrine Systems, Inc. and certain shareholders of Harbinger Corporation dated April 5, 2000. |
| 10.1 | (c) | Nonqualified Stock Option Plan, as amended, and forms of Stock Option Agreement and Stock Buy-Sell Agreement. |
| 10.2 | (c) | Nonqualified Stock Option Plan, as amended, and forms of Stock Option Agreement and Stock Buy-Sell Agreement. |
| 10.3A | (f) | 1994 Stock Option Plan, as amended through July 1998. |
| 10.3B | (f) | 1995 Stock Option Plan for French Employees (a supplement to the 1994 Stock Option Plan). |
| 10.4 | (d) | Form of Stock Option Agreement under the 1994 Stock Option Plan, as amended through February 6, 1997. |
| 10.5 | (d) | 1997 Employee Stock Purchase Plan and forms of participation agreement thereunder. |
| 10.6 | (d) | 1997 Director Option Plan. |
| 10.7 | (c) | Form of Indemnification Agreement for directors and officers. |
| 10.8 | (h) | Credit Agreement dated as of July 30, 1999 by and between the Registrant and Bank of America, N.A., Banc of America Securities LLC and BankBoston, N.A. |
| 10.9 | (c) | Sublease between the Registrant and JMI Services, Inc. |
| 10.10 | (c) | Lease between the Registrant and the Mutual Life Insurance Company of New York dated October 26, 1994, as amended in August 1995, and Notifications of Assignment dated June 14, 1996 and December 9, 1996 for the Registrant's headquarters at 12670 High Bluff Drive, San Diego, CA. |

| EXHIBIT NO. | | EXHIBIT TITLE |
|---|---|---|
| 10.11 | (c) | Lease between the Registrant and the Mutual Life Insurance Company of New York dated October 26, 1994, as amended in August 1995, and Notification of Assignment dated December 9, 1996 for the Registrant's headquarters at 12680 High Bluff Drive, San Diego, CA. |
| 10.14 | (c) | XVT Stock Option Agreement dated January 18, 1995 between the Registrant and Christopher Cole, as amended on October 3, 1996. |
| 10.16 | (d) | Restricted Stock Agreement dated November 1, 1995 between the Registrant and David Farley. |
| 10.17 | (c) | Stock Option Agreement dated as of December 7, 1990 between the Registrant and Christopher Cole, as amended on October 26, 1995. |
| 10.18 | (c) | Form of Stock Option Agreement under 1995 Stock Option Plan for French Employees. |
| 10.19 | (c) | Form of Stock Option Agreement under 1997 Director Option Plan. |
| 10.22 | (b) | Executive Officer Incentive Program and Form of Restricted Stock Agreement. |
| 10.24 | (g) | Lease between the Registrant and KR-Carmel Partners LLC dated June 9, 1999 for Building No. 1 of the Registrant's future campus in San Diego, CA. |
| 10.25 | (g) | Lease between the Registrant and KR-Carmel Partners LLC dated June 9, 1999 for Building No. 2 of the Registrant's future campus in San Diego, CA. |
| 10.26 | (g) | Lease between the Registrant and KR-Carmel Partners LLC dated June 9, 1999 for Building No. 3 of the Registrant's future campus in San Diego, CA. |
| 10.27 | (g) | Lease between the Registrant and KR-Carmel Partners LLC dated June 9, 1999 for Building No. 5 of the Registrant's future campus in San Diego, CA. |
| 10.28 | (g) | Lease between the Registrant and KR-Carmel Partners LLC dated June 9, 1999 for Building No. 4 of the Registrant's future campus in San Diego, CA. |
| 10.29 | (h) | 1999 Nonstatutory Stock Option Plan. |
| 21.1 | (h) | Peregrine Systems, Inc. Subsidiaries. |
| 23.1A | (a) | Consent of Arthur Andersen LLP, Independent Public Accountants (relating to financial statements for Peregrine Systems). |
| 23.2A | (a) | Consent of KPMG LLP, Independent Accountants (relating to financial statements for Harbinger Corporation). |
| 23.3 | +(a) | Consent of Wilson Sonsini Goodrich & Rosati, Professional Corporation (included in Exhibit 5.1). |
| 23.4 | (a) | Consent of Wilson Sonsini Goodrich & Rosati, Professional Corporation (included in Exhibit 8.1). |
| 23.5 | (a) | Consent of Morris Manning & Martin, L.L.P. (included in Exhibit 8.2). |
| 23.6 | (a) | Consent of Goldman, Sachs & Co. |
| 23.7 | *(a) | Consent of Deutsche Bank Securities Inc. (included in Exhibit 99.2). |
| 24.1 | +(a) | Power of Attorney (see page II-6). |
| 27.1 | +(a) | Financial Data Schedule for Peregrine Systems, Inc. |
| 27.2 | +(a) | Financial Data Schedule for Harbinger Corporation. |

Exhibit H
1013

| 99.1 | *(a) | Opinion of Goldman, Sachs & Co. |
| 99.2 | *(a) | Opinion of Deutsche Banc Securities Inc. |
| 99.3 | +(a) | Form of Proxy Card of Peregrine Systems, Inc. |

Exhibit H
1014

| EXHIBIT NO. | | EXHIBIT TITLE |
|---|---|---|
| 99.4 | +(a) | Form of Proxy Card of Harbinger Corporation. |

------------------------

*   Filed as an annex to the Proxy Statement/Prospectus constituting part of this Registration Statement and incorporated herein by reference.

+   Previously filed.

(a) Filed herewith.

(b) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Registration Statement on Form S-1 (Registration Statement 333-39891), which the Securities and Exchange Commission declared effective on November 19, 1997.

(c) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Registration Statement on Form S-1 (Registration Statement 333-21483), which the Securities and Exchange Commission declared effective on April 8, 1997.

(d) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Annual Report on Form 10-K for the year ended March 31, 1997.

(e) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1997.

(f) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Registration Statement on Form S-8 (Registration Statement 333-65541) which became effective upon its filing on October 9, 1998.

(g) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Annual Report on Form 10-K for the year ended March 31, 1999.

(h) Incorporated by reference to the exhibit bearing the same number filed with the Registrant's Annual Report on Form 10-K for the year ended March 31, 2000.

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
1015

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

CERTIFICATE OF AMENDMENT OF THE

AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION OF

PEREGRINE SYSTEMS, INC.

Peregrine Systems, Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation"), DOES HEREBY CERTIFY:

FIRST: That at a meeting of the Board of Directors of the Corporation, a resolution was duly adopted approving the following proposed amendment to Article Fourth(a) of the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate") and calling for the submission of such amendment to the stockholders of the Corporation for consideration and approval:

"FOURTH: (a) The Corporation is authorized to issue two classes of shares to be designated, respectively, Common Stock and Preferred Stock. The total number of shares of Common Stock which this Corporation shall have the authority to issue shall be 200,000,000, $.001 par value, and the total number of shares of Preferred Stock this Corporation shall have authority to issue shall be 5,000,000, $.001 par value."

SECOND: That at the Corporation's Annual Meeting of Stockholders held on September 9, 1998, the stockholders of the Corporation representing greater than the minimum number of shares required by the Delaware General Corporation Law and the Certificate to approve the foregoing amendment voted in favor of the amendment.

THIRD: That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by Stephen P. Gardner, its President and Chief Executive Officer, and attested by Richard T. Nelson, its Secretary, this 10th day of September, 1998.

PEREGRINE SYSTEMS, INC.

/s/ Stephen P. Gardner
----------------------------------------
Stephen P. Gardner,
President and Chief Executive Officer

ATTESTED:


/s/ Richard T. Nelson
----------------------------------
Richard T. Nelson, Secretary

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit 8.1

[FORM OF OPINION OF WILSON SONSINI GOODRICH & ROSATI, P.C.]

May __, 2000

Peregrine Systems, Inc.
12670 High Bluff Drive
San Diego, CA 92130

Ladies and Gentlemen:

    We have acted as counsel to Peregrine Systems, Inc., a Delaware corporation ("Parent"), in connection with the preparation and execution of the Agreement and Plan of Merger and Reorganization (the "Agreement") dated as of April 5, 2000, by and among Parent, Soda Acquisition Corp., a Delaware corporation and a direct, wholly-owned subsidiary of Parent ("Merger Sub"), and Harbinger Corporation, a Georgia corporation (the "Company"). Pursuant to the Agreement, Merger Sub will merge with and into the Company (the "Merger"), the separate corporate existence of Merger Sub will cease and the Company will become a wholly-owned subsidiary of Parent. The Merger and certain proposed transactions incident thereto are described in the Registration Statement on Form S-4 (the "Registration Statement") of Parent which includes the Joint Proxy Statement/Prospectus relating to the Merger (the "Proxy Statement/Prospectus"). This opinion is being rendered pursuant to the requirements of Item 21(a) of Form S-4 under the Securities Act of 1933, as amended. Unless otherwise indicated, any capitalized terms used herein and not otherwise defined have the meaning ascribed to them in the Proxy Statement/Prospectus.

    In connection with this opinion, we have examined and are familiar with the Merger Agreement, the Registration Statement, and such other presently existing documents, records and matters of law as we have deemed necessary or appropriate for purposes of our opinion. In addition, we have assumed (i) that the Merger will be consummated in the manner contemplated by the Proxy Statement/Prospectus and in accordance with the provisions of the Merger Agreement, (ii) the truth and accuracy of the representations and warranties made by Parent, Merger Sub and the Company in the Merger Agreement, and (iii) the truth and accuracy of the certificates of representations to be provided to us by Parent, Merger Sub and the Company.

    Based upon and subject to the foregoing, in our opinion, the discussion contained in the Registration Statement under the caption "Material United States federal income tax considerations of the merger," subject to the limitations and qualifications described therein, sets forth the material United States federal income tax considerations generally applicable to the Merger. Because this opinion is being delivered prior to the Effective Time of the Merger, it must be considered prospective and dependent on future events. There can be no assurance that changes in the law will not take place which could affect the United States federal income tax consequences of the Merger or that contrary positions may not be taken by the Internal Revenue Service.

    This opinion is furnished to you solely for use in connection with the Registration Statement. We hereby consent to the filing of this opinion as Exhibit 8.1 to the Registration Statement. We also consent to the reference to our firm name wherever appearing in the

Peregrine Systems, Inc.
May __, 2000
Page 2

Registration Statement with respect to the discussion of the material federal
income tax consequences of the Merger, including the Proxy Statement/Prospectus
constituting a part thereof, and any amendment thereto. In giving this consent,
we do not thereby admit that we are in the category of persons whose consent is
required under Section 7 of the Securities Act of 1933, as amended, or the rules
and regulations of the Securities and Exchange Commission thereunder, nor do we
thereby admit that we are experts with respect to any part of such Registration
Statement within the meaning of the term "experts" as used in the Securities Act
of 1933, as amended, or the rules and regulations of the Securities and Exchange
Commission thereunder.

                    Very truly yours,

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit 8.2

[FORM OF OPINION OF MORRIS, MANNING & MARTIN, L.L.P.]

May __, 2000

Harbinger Corporation
1277 Lenox Park Boulevard
Atlanta, Georgia 30319

Ladies and Gentlemen:

We have acted as counsel to Harbinger Corporation, a Georgia corporation ("Company"), in connection with the proposed merger (the "Merger") among Peregrine Systems, Inc., a Delaware corporation ("Parent"), Soda Acquisition Corporation, a Delaware corporation and a direct, wholly-owned, transitory merger subsidiary of Parent ("Merger Sub"), and Company pursuant to an Agreement and Plan of Merger and Reorganization dated as of April 5, 2000 (the "Merger Agreement"). The Merger is described in the Registration Statement of Parent on Form S-4 (the "Registration Statement") filed on or about the date hereof with the Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "Securities Act"), which includes the joint proxy statement and prospectus of Company and Parent (the "Proxy Statement/Prospectus"). This preliminary opinion letter is rendered pursuant to the requirements of Item 21(a) of Form S-4 under the Securities Act. Unless otherwise indicated, any capitalized terms used herein and not otherwise defined have the meaning ascribed to them in the Proxy Statement/Prospectus.

In connection with rendering this preliminary opinion letter, we have reviewed the Merger Agreement, the Proxy Statement/Prospectus, and such other materials as we have deemed necessary or appropriate for purposes of our opinion. In addition, we have assumed: (i) that the Merger will be consummated in accordance with the provisions of the Merger Agreement and as contemplated by the Proxy Statement/Prospectus; and (ii) the truth and accuracy, on the date of the Merger Agreement and on the date hereof, of the representations and warranties made by Company, Parent, and Merger Sub in the Merger Agreement.

Furthermore, we have not obtained written certificates from representatives of Parent and Company to verify certain relevant facts that have been represented to us or that we have assumed in rendering this preliminary opinion letter. We contemplate, however, that we will obtain such written certificates as we deem appropriate from such representatives before rendering our final opinion letter on the matters discussed herein prior to the Effective Time. We expect that our final opinion letter with regard to these matters will be dated as of the Effective Time and will be in substantially the same form as this preliminary opinion letter.

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
1022

May __, 2000
Page 2

Based upon and subject to the foregoing, it is our opinion that the discussion contained in the Registration Statement under the caption "Material United States Federal Income Tax Considerations of the Merger," subject to the limitations and qualifications described therein, sets forth the material United States federal income tax considerations generally applicable to the Merger. Because this preliminary opinion letter is being delivered prior to the Effective Time of the Merger, it must be considered prospective and dependent upon future events. There can be no assurance that changes in the law will not take place which could affect the federal income tax consequences of the Merger or that contrary positions will not be asserted by the Internal Revenue Service.

This opinion letter is being furnished solely in connection with the Registration Statement. You may rely upon and refer to this opinion letter in the Proxy Statement/Prospectus. Any variation or difference in any fact from those set forth or assumed either herein or in the Proxy Statement/Prospectus may affect the conclusions stated herein.

We hereby consent to the use of our name under the caption "Material United States Federal Income Tax Considerations of the Merger" in the Proxy Statement/Prospectus and to the filing of this preliminary opinion letter as an Exhibit to the Registration Statement. In giving this consent, we do not admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act or the rules and regulations of the Commission thereunder.

Very truly yours,

MORRIS, MANNING & MARTIN, LLP

By: ---------------------------------------
     Cassady V. Brewer, A Partner

Exhibit H
1023

Exhibit H
1024

EXHIBIT 23.1A

CONSENT OF INDEPENDENT PUBLIC ACCOUNTANTS

As independent public accountants, we hereby consent to the inclusion in this registration statement of our reports dated April 25, 2000, on Peregrine Systems, Inc., March 17, 2000 on Telco Research Corporation Limited and February 27, 1998 on Telco Research Corporation and to all references to our Firm included in this registration statement.

ARTHUR ANDERSEN LLP

/s/ Arthur Andersen LLP

San Diego, California
May 19, 2000

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

Exhibit H
1025

Exhibit H
1026

EXHIBIT 23.2A

INDEPENDENT AUDITORS' CONSENT

The Board of Directors
Harbinger Corporation

We consent to the inclusion of our report dated February 10, 2000, with
respect to the consolidated balance sheets of Harbinger Corporation and
subsidiaries as of December 31, 1999 and 1998, and the related consolidated
statements of operations, comprehensive income (loss), shareholders' equity,
and cash flows for each of the years in the three-year period ended
December 31, 1999, which report appears in the form S-4 of Peregrine Systems,
Inc. dated May 22, 2000, and to the references to our firm under the captions,
"Selected Financial Data of Harbinger" and "Experts" in the Joint Proxy
Statement Prospectus.

/s/ KPMG LLP

Atlanta, Georgia
May 22, 2000

Exhibit H
1027

Source: PEREGRINE SYSTEMS IN, S-4/A, May 22, 2000

EXHIBIT 23.6

PERSONAL AND CONFIDENTIAL

May 22, 2000

Board of Directors
Harbinger Corporation
1277 Lenox Park Blvd
Atlanta, GA  30319-5396

Re:     Amendment No. 1 to Registration Statement on Form S-4 (File No. 333 -
        36744) of Peregrine Systems, Inc.

Gentlemen:

Reference is made to our opinion letter dated April 5, 2000 with respect to the
fairness from a financial point of view to the holders of the outstanding shares
of Common Stock, par value $.0001 per share of Harbinger Corporation (the
"Company") of the Exchange Ratio (as defined in the Agreement referred to below)
pursuant to the Agreement and Plan of Reorganization, dated as of April 5, 2000,
among Peregrine Systems, Inc. ("Peregrine"), Soda Acquisition Corporation, a
wholly-owned subsidiary of Peregrine, and the Company (the "Agreement").

The foregoing opinion letter is provided for the information and assistance of
the Board of Directors of the Company in connection with its consideration of
the transaction contemplated therein and is not to be used, circulated, quoted
or otherwise referred to for any other purpose, nor is it to be filed with,
included in or referred to in whole or in part in any registration statement,
proxy statement or any other document, except in accordance with our prior
written consent. We understand that the Company has determined to include our
opinion in the above-referenced Registration Statement.

In that regard, we hereby consent to the reference to the opinion of our Firm
under the captions "Summary of the Joint Proxy Statement/Prospectus - the
Merger", "The Merger - Background of the merger", "The Merger - Harbinger's
reasons for the merger" and "The Merger - Opinion of Goldman, Sachs & Co.,
financial advisor to Harbinger", and to the

Exhibit H
1029

Harbinger Corporation
May 22, 2000
Page Two

inclusion of the foregoing opinion in the Joint Proxy Statement/Prospectus
included in the above-mentioned Registration Statement. In giving such consent,
we do not thereby admit that we come within the category of persons whose
consent is required under Section 7 of the Securities Act of 1933 or the rules
and regulations of the Securities and Exchange Commission thereunder.

Very truly yours,

/s/ Goldman, Sachs & Co.

GOLDMAN, SACHS & CO.

---

Created by 10KWizard    www.10KWizard.com